UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA            :            14 Cr. 68 (KBF)

      - against -            :            (Electronically Filed)

ROSS ULBRICHT,            :

             Defendant.    :
-------------------------------------------------------X

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT ROSS ULBRICHT'S PRE-TRIAL MOTIONS
<u>CHALLENGING THE FACE OF THE INDICTMENT</u>**

JOSHUA L. DRATEL
JOSHUA L. DRATEL, P.C.
29 Broadway, Suite 1412
New York, New York 10006
(212) 732-0707

*Attorneys for Defendant Ross Ulbricht*

– Of Counsel –

Joshua L. Dratel
Lindsay A. Lewis
Whitney Schlimbach

TABLE OF CONTENTS

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

POINT I

COUNTS ONE, TWO, AND THREE SHOULD BE DISMISSED BECAUSE
THE CONDUCT CHARGED THEREIN AGAINST MR. ULBRICHT DOES
NOT STATE AN OFFENSE UNDER THE ENUMERATED STATUTES
AND BECAUSE EVEN IF THE CONDUCT DID STATE AN OFFENSE,
THOSE STATUTES WOULD BE UNCONSTITUTIONALLY VAGUE
AS APPLIED IN THIS CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.    *Count One:  21 U.S.C. §846.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B.    *Count Two:  21 U.S.C. §848(a).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

POINT II

COUNT THREE SHOULD BE DISMISSED BECAUSE THE
CRITICAL STATUTORY TERM "ACCESS WITHOUT
AUTHORIZATION" IN §1030(a)(2)(C) IS UNDEFINED,
AND THEREFORE UNCONSTITUTIONALLY
VAGUE AS APPLIED TO MR. ULBRICHT IN THIS CASE. . . . . . . . . . . . . . . . . . . . . . . . 12

POINT III

COUNT FOUR SHOULD BE DISMISSED BECAUSE IT
FAILS TO ALLEGE SUFFICIENTLY THE ESSENTIAL ELEMENT
OF A "FINANCIAL TRANSACTION[]," WHICH MUST INVOLVE
EITHER "FUNDS" OR A "MONETARY INSTRUMENT[]," NEITHER
OF WHICH INCLUDES BITCOIN WITHIN §1956'S DEFINITIONS. . . . . . . . . . . . . . . . . . 15

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

TABLE OF AUTHORITIES

CASES

*Burrage v. United States*, ___ U.S. ___, 134 S.Ct. 881 (2014). . . . . . . . . . . . . . . . . . . . . . . . . 18

*Cmty. Health Ctr. v. Wilson–Coker*, 311 F.3d 132 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . 16

*Chevron v. United States*, 467 U.S. 837 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Garcia v. United States*, 01 Civ. 6234 (SWK),
        2002 WL 562647 (S.D.N.Y. April 15, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Kruse v. Wells Fargo Home Mortgage, Inc.*, 383 F.3d 49 (2d Cir. 2004). . . . . . . . . . . . . . . . . . 16

*SEC v. Shavers*, 2013 WL 4028182 (E.D. Tx. August 6, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Apodaca*, 843 F.2d 421 (10th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Burgos*, 94 F.3d 849 (4th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Chestaro*, 197 F.3d 600 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Cole*, 423 F.App'x 452 (5th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*United States v. Cruz*, 785 F.2d 399 (2d Cir. 1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Day*, 700 F.3d 713 (4th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Esdaille*, 769 F.2d 104 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Franklin*, 09 Cr. 168 (RPP),
        2011 WL 1311818 (S.D.N.Y. April 1, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Gatien*, 18 Fed.App'x 37 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*United States v. Garcia-Torres*, 280 F.3d 1 (1st Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Jenkins*, 419 F.3d 614 (7th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Jerome*, 942 F.2d 1328 (9th Cir.1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Joyner*, 201 F.3d 61 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Lane*, 97 Cr. 50 (LEK),
   1997 WL 625497 (N.D.N.Y. September 25, 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Lindsey*, 123 F.3d 978 (7th Cir.1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*United States v. Mannino*, 635 F.2d 110 (2d Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Martines-Chaves*, 131 Fed. App'x 151 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . 6

*United States v. McCullough*, 457 F.3d 1150 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Mead Corp.*, 533 U.S. 218 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Palomares-Parra*, 116 Fed. App'x 71 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . 7

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Polk*, 715 F.3d 238 (8th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Possick*, 849 F.2d 332 (8th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Santos*, 541 F.3d 63 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Soto-Beniquez*, 356 F.3d 1 (1st Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Walker*, 912 F.Supp. 655 (N.D.N.Y. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Williams–Davis*, 90 F.3d 490 (D.C.Cir.1996). . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Witek*, 61 F.3d 819 (11th Cir.1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## STATUTES

U.S. Const. Amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9, 12

18 U.S.C. §1030(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. §1030(a)(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. §1030(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

18 U.S.C. §1956. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17, 18

18 U.S.C. §1956(b)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 U.S.C. §1956(c)(4)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

18 U.S.C. §1956(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

21 U.S.C. §841. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7

21 U.S.C. §841(b)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C. §841(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

21 U.S.C. §841(h)(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

21 U.S.C. §846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

21 U.S.C. §848. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9, 10

21 U.S.C. §848(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 9, 10, 11

21 U.S.C. §856. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

47 U.S.C. §230. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Introduction**

This Reply Memorandum of Law is submitted in support of defendant Ross Ulbricht's pretrial motions directed at the face of the Indictment, and in response to the government's papers in opposition to those motions.  Much of the government's response in opposition was anticipated and addressed in Mr. Ulbricht's initial Memo of Law, and/or does not require rejoinder.  As a result, this Reply will address only certain aspects of the government's response that illustrate its fundamental deficiencies.

For example, the government claims that "federal criminal laws are expansive and adaptable," and in particular to the internet.  *See* Government's Memo of Law, at 2.  Yet even that conceptual assertion cannot rewrite statutes, expand them beyond their linguistic or practical boundaries, or apply them in a manner that deprives a defendant of his Fifth Amendment Due Process right to fair notice of what is proscribed.

Accordingly, for all the reasons set forth below, as well as those in Mr. Ulbricht's initial Memo of Law, it is respectfully submitted that it is respectfully submitted that the Indictment should be dismissed.

**POINT I**

**COUNTS ONE, TWO, AND THREE SHOULD BE DISMISSED BECAUSE THE CONDUCT CHARGED THEREIN AGAINST MR. ULBRICHT DOES NOT STATE AN OFFENSE UNDER THE ENUMERATED STATUTES AND BECAUSE EVEN IF THE CONDUCT DID STATE AN OFFENSE, THOSE STATUTES WOULD BE <u>UNCONSTITUTIONALLY VAGUE AS APPLIED IN THIS CASE</u>**

In opposing Mr. Ulbricht's motion to dismiss Counts One (charging a conspiracy to violate 21 U.S.C. §841(b)(1)(A) [21 U.S.C. §846]), Two [charging a violation of 21 U.S.C.

1

§848(a)], and Three [charging a violation of 18 U.S.C. §1030(b)], the government describes Mr. Ulbricht's conduct in a variety of terms, but never alleges that he sold drugs or malicious software.

Rather, the government claims Mr. Ulbricht, by allegedly maintaining the Silk Road website, "facilitated" such sales, or created a "platform" for such sales. *See* Government's Memo of Law, at 3, 4. For instance, the government contends that Mr. Ulbricht

- "maintained the computer code and server infrastructure underlying the [Silk Road] site;"

- "decided what illegal goods and services could be bought and sold on the site;"

- "managed a small staff of employees who assisted in the day-to-day operation of the site;" and

- "controlled the massive profits generated as commissions from the illicit sales conducted through the site."

Government's Memo of Law, at 3.

Elaborating, the government maintains that Mr. Ulbricht "entered in to a joint venture with thousands of drug dealers around the world to distribute drugs online" because he "supplied dealers with an online sales portal specifically designed to facilitate illegal drug sales and to evade law enforcement." *Id.*, at 9.

Conversely, the government acknowledges that Mr. Ulbricht is not charged with "selling, buying, or possessing controlled substances." *Id.*, at 7. Rather, it "charges him with *conspiring with others* to violate certain narcotics laws[,]" *id.* (emphasis in original), and claims that Mr. Ulbricht's mere "alleged operation of the Silk Road website provides an ample factual predicate

2

for that charge." *Id*.

Yet the omission of any allegation that Mr. Ulbricht sold or possessed drugs or malicious software is important – notwithstanding the unremarkable proposition, established by the government in its Memo of Law, at 1, 7-9, that conspiracy provides a broad basis for criminal liability – because (1) in order to establish that Mr. Ulbricht is a conspirator in Counts One and Three, there must be an agreement by him to join that conspiracy to sell drugs or software; (2) with respect to Count Two, in order to establish that Mr. Ulbricht is a "kingpin," the government must allege more than that he provided others an opportunity to sell drugs; and (3) without these demanding standards, the government's description could apply to *any* internet service provider ("ISP") or website host whose site is used for illegal purposes by those who sell and/or purchase merchandise via the site.

The government must allege more than that Mr. Ulbricht made resources available to those willing to engage in illegal transactions. Regardless the number of transactions conducted on the Silk Road site, the volume of drugs sold, or the number of vendors and/or buyers who availed themselves of the site, what is missing – what the government has not sufficiently alleged – is the *agreement* between any of them and Mr. Ulbricht to violate either 21 U.S.C. §§841, 848, or 18 U.S.C. §1030(b).

In that context, the government completely ignores the very specific Second Circuit standard and language, detailed in Mr. Ulbricht's initial Memo of Law, at 7-8, and not repeated herein because it is simply unchallenged by the government, regarding determining whether or not an indictment sufficiently alleges the charged offense.

Merely cataloging the most general standard for analyzing an indictment – as the

3

government does in its Memo of Law, arguing that an indictment need not do more than "track the language of the statute" to be sufficient, Government's Memo of Law, at 6 – without confronting the very particular requirements enunciated in *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000), demonstrates that the government does not have an answer beyond the rudimentary.

**A.** ***Count One: 21 U.S.C. §846***

Also, the government's construction would transform all internet service providers and website hosts into conspirators if they provide the virtual means by which users of the site or services can commit crimes on the internet.  Nor can the government's characterizations alter that conclusion.

For example, creating site rules, or a user merely "abiding by the rules" (Government's Memo of Law, at 7) promulgated by a site does not constitute an agreement between the site host and user to commit a crime.  It means only that persons visiting a site are admonished to adhere to rules the same as any internet service provider or website would.  *Id*., at 9.

Also unavailing is the government's attempt to distinguish Mr. Ulbricht's activity from that of a commercial, albeit virtual, landlord.  Surely a landlord recruits tenants, prescribes rules for those tenants, maintains tenant confidentiality (which the government, equating anonymity with illegal intent and behavior, describes pejoratively as "protecting [site users'] activities from law enforcement[,]" *id*., at 9), and collects rent.  Here, that describes Mr. Ulbricht's alleged conduct.

Likewise, the government engages in a further stretch by conclusorily denominating the users of the site as Mr. Ulbricht's "partners."  Government's Memo of Law, at 10.  There is

simply no basis, in practical, legal, or business terms, for classifying the vendors who sell on an internet site as "partners" of the website host.  Otherwise, Amazon.com, Google, Ebay, and other sites would have a rather awkward time explaining their corporate structures to their shareholders and the Securities and Exchange Commission.

As such, the government's "expansive and adaptable" application of the statutes at issue in Counts One, Two, and Three defies any limits, and runs afoul of both the statutory language and precedent, as well as Due Process.

Nor do the cases cited by the government, in its Memo of Law, at 8, support its expansive theory.  In fact, those cases illustrate vividly the difference between this case and the traditional aspects of a drug conspiracy.  *See, e.g., United States v. Garcia-Torres*, 280 F.3d 1 (1st Cir. 2002) (despite the defendant's participation in a kidnaping and murder carried out by members of a drug conspiracy, there was insufficient evidence to establish that he was a member of the conspiracy, as a result of his lack of knowledge of the conspiracy itself, and that participation in the kidnaping and murder would further the aims of that conspiracy);  *United States v. Burgos*, 94 F.3d 849 (4th Cir. 1996)  (although only one of the defendants actually carried a package containing cocaine base, another defendant's fingerprint was found on the packaging, and all three defendants bought bus tickets, traveled together, and were aware both that the package contained cocaine base and of the plan to distribute the drugs upon their arrival);  *United States v. Polk*, 715 F.3d 238 (8th Cir. 2013) (defendant assisted in the establishment and maintenance of multiple marijuana grow houses by seeking out and renting premises suitable for marijuana growth at the direction of a member of the conspiracy, and recruited further conspiracy members, and maintained an office inside one of the grow houses);  *United States v. Cole*, 423 F.App'x 452

5

(5th Cir. 2011) (defendant was an established member of the Latin Kings, was posted as a guard outside of a house used by the gang for drug deals for an extended period, and participated in other violent activity characterized as retaliation for encroaching on Latin King drug territory); *United States v. Santos*, 541 F.3d 63 (2d Cir. 2008) (defendant was hired by a member of a drug conspiracy to murder individuals he was told had robbed a "traquetero," which translates as a "well-connected, heavy-selling drug dealer," of his drug proceeds); *United States v. Soto-Beniquez*, 356 F.3d 1 (1st Cir. 2004) (all defendants were convicted of membership in a single large drug conspiracy operating "six drug points," using common defense and distribution systems, because each defendant either ordered or participated in violent activity with the purpose of defending the drug points from discovery, disloyalty, and competing drug operations, and every defendant was involved in either supplying, packaging, or distributing drugs); *United States v. Jenkins*, 419 F.3d 614 (7th Cir. 2005) (recorded phone calls demonstrated that all of the defendants discussed the details of a drug operation over an extended period of time, including sharing customers, sources, and even drugs, as well as attempting to intimidate a witness threatening to expose the operation); *United States v. Martines-Chaves*, 131 Fed. App'x 151 (11th Cir. 2005) (guilty plea in which the defendant explicitly stated she knew about the conspiracy and agreed with a member of the conspiracy to receive drugs from co-conspirator).

In addition, in *United States v. Gatien*, 18 Fed.App'x 37 (2d Cir. 2001), cited by the Government in its Memo of Law, at 10, the defendant himself hired and controlled key club promoters he knew were selling drugs. He once told a promoter that "good drugs and good music make for good parties" and "encouraged" him to bring drugs to the clubs by "chastising him when they were absent." *Id.*, at 39-40. That conduct, directly involved in the network

6

selling drugs, differentiates *Gatien* from this case.

Moreover, the cases the government cites, in its Memo of Law, at 11 n. 3, for the proposition that liability under §841 and 21 U.S.C. §856 is co-extensive,[1] are inapposite, as they include classic drug conspiracy conduct in addition to the narrower conduct that would constitute a violation of §856.  *See, e.g.*, *Garcia v. United States*, 01 Civ. 6234 (SWK), 2002 WL 562647 (S.D.N.Y. April 15, 2002) (defendant was the superintendent of a building in which two apartments were being used for manufacturing, storage, and distribution of drugs, etc., who testified falsely on behalf of a conspirator, and was paid by conspiracy members to provide access to a locked storage compartment in the basement of the building, in which drugs were stored); *United States v. Palomares-Parra*, 116 Fed. App'x 71 (9th Cir. 2004) (defendant was observed entering the garage attached to his house, which was completely empty aside from hundreds of pounds of marijuana, drug traffickers, and wrapping paraphernalia);  *United States v. McCullough*, 457 F.3d 1150 (10th Cir. 2006) (defendant's knowledge of and participation in a drug conspiracy was established by the fact that she lived with her boyfriend, without any source of income, while he used her residence for storage of drugs, firearms, and cash, as well as drug transactions, which often occurred in her presence).

The government also disputes that Mr. Ulbricht's alleged role consisted of that of a "steerer."  *See* Government's Memo of Law, at 12-13 & n. 4.  Yet the government's categorization of a steerer as a minor component is without merit, as a steerer, while not a conspirator, *see* Mr. Ulbricht's Memo of Law, at 13, may nevertheless provide the indispensable

---

[1]  Also known as the "crack house" statute, §856 is discussed in detail in Mr. Ulbricht's initial Memo of Law, at 11-12.

service (regardless, as well, of remuneration) of drawing customers to the seller.

Again, the cases by the government, in its Memo of Law, at 13, n. 4, involve facts distinct from those present here, and which provide a basis – not present here – for defining the defendant's conduct as conspiratorial rather than as a "steerer."  *See, e.g., United States v. Esdaille*, 769 F.2d 104 (2d Cir. 1985) (facts fall outside the steerer exclusion from conspiratorial liability because the evidence clearly established a previous and ongoing financial relationship with other conspirators.  Specifically, the defendant brought an undercover into an apartment where drugs were stored, told him he had an unlimited supply of cocaine, discussed the officer and transaction with other people in the apartment, and finally, the buy money used in the transaction was found later on another conspirator);  *United States v. Lane*, 97 Cr. 50 (LEK), 1997 WL 625497 (N.D.N.Y. September 25, 1997) (defendant was not a steerer because, unlike in *Tyler*, he was told by the informant how much cocaine base the informant wanted, he specifically sought out a particular dealer knowing he could provide that amount, although that dealer was not the individual from whom the drugs were eventually purchased, and although the Court wrote that the defendant and informant "came upon . . . [an acquaintance of the defendant,] named 'Wise,'" the evidence supported the "jury's finding that the defendant purposefully sought" this seller out after the initial purchase fell through.  Finally, the transaction can be "vividly distinguished" from *Tyler*, as the defendant was a "conduit," rather than a steerer, because he took the drugs from Wise and handed them to the informant, and took the money from the informant and handed it to Wise);  *United States v. Franklin*, 09 Cr. 168 (RPP), 2011 WL 1311818 (S.D.N.Y. April 1, 2011) (during an investigation into "H," a confidential informant spoke with "H" over the phone and arranged multiple drug transactions to be attended by

representatives of "H," two of which were handled by the defendant, who had knowledge related to the preparation, availability, and source of the drugs, reasonably indicating a prior knowledgeable relationship about "H"'s drug operation, and excluding him from mere steerer liability).

Accordingly, Counts One and Two should be dismissed because it does not state an offense, and/or because it is unconstitutionally vague as applied to Mr. Ulbricht in this case, thereby denying him Due Process as guaranteed him by the Fifth Amendment.

**B.**      ***Count Two: 21 U.S.C. §848(a)***

Regarding the "kingpin" allegations attendant to Count Two, which alleges a violation of 21 U.S.C. §848(a), the government, in its Memo of Law, at 15, claims that Mr. Ulbricht's "control [of others, necessary to the charge] included organizing and managing the vendors selling drugs on the site[]" because he "designed the online structure through which all of the vendors did business" and "set the rules the vendors had to follow" and "policed vendor accounts for violations of those rules" and "controlled the arbitration process to which vendors had to submit in the event of a dispute with a buyer" and "determined the commission that had to be paid every time a vendor consummated a sale" – in other words, *what every commercial internet site does in managing its traffic*:  make the site available for use, set rules for site participants, protect buyers and sellers from fraud, maintain their privacy, and receive compensation.[2]

Similarly, the government bases the "kingpin" charge on the contention that Mr. Ulbricht "arranged and consolidated [the vendors'] activities into a unified, orderly business enterprise"

---

[2]  The government uses the term "control" repeatedly, yet that word is not present in §848's elements or definitions.

9

and "set the terms of doing business on the site, with which they had to comply."  *Id.*, at 16.
Again, that describes the role of any person or entity managing a commercial website.

Also regarding the "kingpin" allegation in Count Two, the government argues for an
expansive "pragmatic" application of the operative terms:  "organize," "supervise," and
"manage."  Government's Memo of Law, at 16.  Yet any "pragmatic" or "every day" usage of the
terms would eliminate Mr. Ulbricht from consideration as an "organizer," "supervisor," and
"manager" under §848(a).

In that context, the government argues that whether employees alleged to constitute the
requisite number of persons "supervised" ever sold drugs on the site does not matter.
Government's Memo of Law, at 17.  Thus, merely by arbitrating a dispute between buyer and
seller, or transmitting a communication through the private message system, would suffice.  *Id.*,
at 18.  By doing so, the government argues, Silk Road's "employees engaged in a continuing
series of drug felony violations, in concert with [Ross] and under his supervision, which is all the
statute requires."  *Id.*

Yet that alleged conduct is so far removed and attenuated from any illegal activity
conducted by vendors or purchasers on the site that it cannot establish the type of liability
reserved for those who manage or supervise a *drug-selling* enterprise, and would therefore be
subject to the stringent penalties imposed by §848.  Not surprisingly, too, the government's
assertions in that respect are not accompanied by citation to any cases.

However, there are a series of cases that conclude that if a person sets up a system of
supply for drugs, that is not sufficient to constitute a violation of §848(a).  *See United States v.
Jerome*, 942 F.2d 1328, 1331 (9th Cir.1991);  *see also United States v. Lindsey*, 123 F.3d 978,

988 (7th Cir.1997) (evidence of fronting drugs is by itself insufficient to satisfy management

requirement of CCE statute); *United States v. Williams–Davis*, 90 F.3d 490, 508–09

(D.C.Cir.1996) (same); *United States v. Witek*, 61 F.3d 819, 823 (11th Cir.1995) (same).

      In contrast, in the cases cited by the government, in its Memo of Law, at 16, for the

proposition that Silk Road's employees could serve as the requisite staff for §848(a)'s

supervisory or managerial element, and/or that Mr. Ulbricht's alleged conduct satisfied that

requirement, those included for supervisory purposes had a direct role in the drug-selling facet of

the operation at issue, and the defendant's control was direct and manifest. *See, e.g.*, *United

States v. Walker*, 912 F.Supp. 655 (N.D.N.Y. 1996) (defendant occupied a managerial or

supervisory position as to an individual whose home he used as a base of operations for his

distribution operation, and as to individuals who were asked to and compensated for

accompanying defendant on multiple trips to purchase drugs, and who sold drugs supplied by the

defendant, and under his direction, in exchange for a percentage of the profit); *United States v.

Possick*, 849 F.2d 332, 336 (8th Cir. 1988) (although merely "fronting of cocaine" does not

establish supervision or control, defendants were held to be in a management relationship

because they arranged acquisition of drugs, delivery, set price and terms of its distribution, and

used "force or threats to coerce payments"); *United States v. Cruz*, 785 F.2d 399, 407 (2d Cir.

1986) (although a supervisory role does not require personal contact, the evidence must establish

that the individuals "operated within an organization that [was] managed and organized" by the

defendant, which, in this case, was indicated by the defendant's controlling and supplying heroin

and cocaine to individuals tasked with cutting, packaging, labeling, and distributing the drugs at

street level); *United States v. Joyner*, 201 F.3d 61 (2d Cir. 2000) (defendant was a manager,

because he required sellers to work nearby so that he "could constantly monitor them," he did not permit sellers to negotiate discounts or non-cash exchanges without his permission, he controlled the stash house, directed the activities of drug mules and baggers, and distributed firearms to security at a local bar, clearly doing much more than "merely sell drugs to independent retailers"); *United States v. Mannino*, 635 F.2d 110 (2d Cir. 1980) (defendant qualified as a manger because he "set the terms" of drug sales, including quantity and delivery location, and did not allow any variation from his instructions, as well as arranging courier trips, and employing an individual to collect debts on his behalf); *United States v. Apodaca*, 843 F.2d 421 (10th Cir. 1988) ("mere buyer-seller relationship[s], without more" cannot establish a management role, but the defendant here supplied drugs and "carefully controlled the supply" to each dealer, offered to pay for legal counsel if anyone was arrested, and further indicated his control over the enterprise by stating that, after his release from jail, he intended to "get everybody going again").

Accordingly, it is respectfully submitted that Count Two should be dismissed because it does not state an offense, and/or because it is unconstitutionally vague as applied to Mr. Ulbricht in this case, thereby denying him Due Process as guaranteed him by the Fifth Amendment.

**POINT II**

> **COUNT THREE SHOULD BE DISMISSED BECAUSE THE CRITICAL STATUTORY TERM "ACCESS WITHOUT AUTHORIZATION" IN §1030(a)(2)(C) IS UNDEFINED, AND THEREFORE UNCONSTITUTIONALLY <u>VAGUE AS APPLIED TO MR. ULBRICHT IN THIS CASE</u>**

In its opposition to Mr. Ulbricht's motion to dismiss Count Three, the government dodges completely the problem of "transferred intent" with respect to the computer malware charge, *see* Government's Memo of Law, at 22-23, and fails to articulate how a website manager would

be responsible for (and have attributed to him) the criminal intent of a buyer of software – who does not communicate his or her intent to use illegally a product the government acknowledges can be used for legitimate purposes. *Id.*, at 23. Also, even if the buyer harbored such criminal intent, unless it is shared by Mr. Ulbricht, merely making such software – susceptible of a variety of legitimate uses, *see* Mr. Ulbricht's initial Memo of Law, at 23 – available would not establish *his* criminal intent.

In addition, the government argues that "[r]egardless of whether the purchasers of the software *actually* used it for computer hacking, as long as the Government could show that Ulbricht intended to aid and abet such use in conspiring with Silk Road vendors to sell the software, the Government would have sufficient evidence to convict." *Id.* (emphasis in original) (citation omitted).

That assertion, of course, begs the question:  what is "such use"?  If it is legitimate, it cannot sustain the conspiracy charge.  The government nevertheless seeks to skip an essential step in the chain of liability under §1030(a) (as well as for any conspiracy).  Criminal intent cannot be ascertained merely by the possible illegal use for a product marketed for sale.  If that is the standard, again, it would herald criminal liability across the board for many manufacturers, wholesalers, and retailers of almost every product available.[3]

In addition, in its Memo of Law, at 25, the government contends that purchasers manifested their intent to use malware in illegal fashion by reaching the site "in a surreptitious

---

[3]  In its Memo of Law, at 24, the government insists liability can be imposed for conspiring to aid and abet an offense by another person.  That combines two disparate theories of criminal liability in a manner that is not only logically and legally confusing, but also dangerously expansive, and, ultimately, impermissible.

fashion, by logging into the Tor network to hide their identities and locations . . ."  Again, that demonstrates the intolerable breadth of the government's theory of liability, as the government clearly equates the use of Tor with possessing criminal intent.

Thus, the government would render nefarious the desire for confidentiality and anonymity, thereby perverting the concept of privacy by making it the benchmark of suspicion. Consumers should not have to demonstrate why they prefer privacy and anonymity;  rather, the government should be required to articulate specific proof why such preference should be considered evidence of illegal intent.

The government also misconstrues Mr. Ulbricht's position with respect to 47 U.S.C. §230, discussed in Mr. Ulbricht's initial Memo of Law, at 28-32.  Mr. Ulbricht does not claim that §230 provides immunity in a criminal action, but rather than the policy imperatives underlying §230 mandate a narrow construction of criminal liability for web site hosts for alleged conduct performed and content posted by users of that site.

In that context, the government ignores entirely the Rule of Lenity, which applies to ambiguous statutes – even if their ambiguity is "constitutionally tolerable."  *See* Government's Mem of Law, at 31-32 n. 10 (*citing and quoting United States v. Chestaro*, 197 F.3d 600, 605 (2d Cir. 1999).[4]

Accordingly, it is respectfully submitted that Count Three should be dismissed because it is unconstitutionally vague as applied to Mr. Ulbricht in this case.

---

[4]  The government's reference, in its Memo of Law, at 31 n. 9, to 21 U.S.C. §841(h)(2)(C), is plainly inapposite, as §841(h) clearly addresses prescription drugs marketed via internet pharmacies.

**POINT III**

**COUNT FOUR SHOULD BE DISMISSED BECAUSE IT FAILS TO ALLEGE SUFFICIENTLY THE ESSENTIAL ELEMENT OF A "FINANCIAL TRANSACTION[]," WHICH MUST INVOLVE EITHER "FUNDS" OR A "MONETARY INSTRUMENT[]," NEITHER OF WHICH INCLUDES BITCOIN WITHIN §1956'S DEFINITIONS**

In opposing Mr. Ulbricht's motion to dismiss Count Four, which charges a violation of 18 U.S.C. §1956(h), *i.e.*, money laundering, the government, in arguing that Bitcoin falls within §1956's definitions – in particular, "funds" in §1956(c)(4)(i) – essentially contradicts the position of the Internal Revenue Service (hereinafter "IRS") and the guidance provided by the Department of the Treasury's Financial Crimes Enforcement Network (hereinafter "FinCEN") with respect to Bitcoin (both of which are detailed in Mr. Ulbricht's initial Memo of Law, at 46-49), and adopts a position that would dispense with the need for *any* limiting definitions in the money laundering statute. *See* Government's Memo of Law, at 33-38. The result of the government's strained interpretation would be untrammeled discretion for the government to fit all exchangeable property within the definition of "funds" within the money laundering statute.

As a threshold matter, the government's statutory analysis is unavailing. In §1956(b)(1)(A), "property" – which is the IRS's classification of Bitcoin – and "funds" are listed separately. Thus, since Bitcoin is property, it is *not* "funds," as that would render the separate subsections of §1956(b)(1)(A) wholly redundant and superfluous, and thereby contrary to the rules of statutory construction cited by the government. *See* Government's Memo of Law, at 38.

Also, dictionary definitions of "funds" fail to support the government's position. For example, the Oxford English Dictionary definition set forth in the government's Memo of Law,

15

at 35, is "money at a person's disposal; pecuniary resources." Similarly, dictionary.com defines "funds" as follows: "money immediately available; pecuniary resources: to be momentarily without funds."

Yet the IRS has definitively declared that Bitcion is *not money*. The government cannot escape that dispositive determination by a government agency that regulates the very item at issue. As the Supreme Court has repeatedly explained, agency determinations and interpretations must be accorded the high level of deference described in *Chevron v. United States*, 467 U.S. 837, 845 (1984) "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001); *see also Chevron*, 467 U.S. at 845 (deference afforded is not whether the finding represents the best interpretation, but whether it represents a reasonable one."). Even if an agency interpretation does not meet the requirements outlined in *Chevron*, "considerable deference" is still warranted. *Cmty. Health Ctr. v. Wilson–Coker*, 311 F.3d 132, 138 (2d Cir. 2002); *see also Kruse v. Wells Fargo Home Mortgage, Inc.*, 383 F.3d 49, 62 (2d Cir. 2004).

Indeed, here the government's construction would render "funds" meaningless: any item that could be exchanged for money would thereby become "funds."[5] But "property" is not "funds;" nor is barter or other means of exchange. The government cannot perform the requisite

---

[5] Moreover, even if Bitcoin is a "security," *see SEC v. Shavers*, 2013 WL 4028182 (E.D. Tx. August 6, 2013) – a designation that is inconsistent with IRS's and FinCEN's subsequent position – that is not "funds," either. *See also* Mr. Ulbricht's initial Memo of Law, at 49 n. 19(discussing *Shavers*).

alchemy that could transform Bitcoin into "funds," or apply any other categorization that would place Bitcoin within the ambit of §1956.  Nor can the government avoid the dispositive impact of the guidance from IRS and FinCEN.

The Fourth Circuit's opinion in *United States v. Day*, 700 F.3d 713 (4th Cir. 2012), cited by the government in its Memo of Law, at 35, does not require a different conclusion.  In *Day*, in which the defendant's direct proceeds from the offense conduct (a fraud) were transported to him in the form of gold (a set of circumstances demonstrably different from those alleged here against Mr. Ulbricht), the Court, noting that "funds" is not defined in §1956, grafted its own definition: "assets of monetary value that are susceptible to ready financial use."  *Id.*, at 725.

Here, the government has not established – or even attempted to – that Bitcoin satisfies that definition.  It is not traded on any recognized exchange, it cannot be presented at a bank or ordinary financial institution for exchange, it is *illegal* in certain countries (*see* Mr. Ulbricht's initial Memo of Law, at 48, n.18), it is not accepted as tender in the ordinary course of commerce, and it does not have any universally recognized, enforceable value at any given point in time.  The lack of such indicia place Bicoin outside the realm of "funds," and, unlike gold, with its rich history and easy liquidity, including Bitcoin – still in its nascent stages, and with no formal status other than as generic "property" – within "funds" would render §1956(h), and the definitional section at issue, §1956(c)(4)(i), unconstitutionally vague as applied in this case.

The government, in its Memo of Law, at 36, also points to Mr. Ulbricht's claim, in a companion civil forfeiture action, to Bitcoins on a laptop seized from him, as somehow constituting proof that Bitcoins are "funds."  Yet Mr. Ulbricht's claim is based on Bitcoin's status as *property*, not "funds," and is no different than if the government had seized a house, or

an automobile, or other *property* potentially subject to forfeiture.  Thus, Mr. Ulbricht's claim in

the forfeiture action does not provide the slightest support for the government's argument.

 Nor is the absence of any cases excluding Bitcoin from §1956, noted by the government

in its Memo of Law, at 36, determinative in any respect.  Not only is Bitcoin a relatively new

phenomenon, but this case likely represents the first challenge to the government's attempt

(perhaps for the first time as well) to stretch §1956 to encompass Bitcoin as the basis for a

prosecution.

 Moreover, if the application of §1956 to Bitcoin presents an ambiguous issue, the Rule of

Lenity would apply, and require dismissal of Count Four.  *See Burrage v. United States*, ___ U.S.

___,  134 S.Ct. 881 (2014).  *See also* Mr. Ulbricht's initial Memo of Law, at 24-26.

 Accordingly, it is respectfully submitted that Count Four should be dismissed.

**Conclusion**

Accordingly, for all the reasons set forth above, as well as those set forth in Mr. Ulbricht's initial Memo of Law, it is respectfully submitted that Mr. Ulbricht's pretrial motions addressing the face of the Indictment should be granted in their entirety, and the Indictment against him dismissed.

Dated:  27 May 2014
        New York, New York

                            /S/ Joshua L. Dratel
                            JOSHUA L. DRATEL
                            JOSHUA L. DRATEL, P.C.
                            29 Broadway, Suite 1412
                            New York, New York 10006
                            (212) 732-0707

                            *Attorneys for Defendant Ross Ulbricht*

– Of Counsel –

Joshua L. Dratel
Lindsay A. Lewis
Whitney G. Schlimbach

19