Eahaaulbc                    Conference

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          14 CR 68 (KBF)

5    ROSS WILLIAM ULBRICHT,

6              Defendant.

7    ------------------------------x

                                        New York, N.Y.
8                                       October 17, 2014
9                                       11:00 a.m.

10
     Before:
11
                    HON. KATHERINE B. FORREST,
12
                                        District Judge
13

14                       APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     SERRIN TURNER
17   TIMOTHY HOWARD
          Assistant United States Attorney
18
     JOSHUA DRATEL
19        Attorney for Defendant Ulbricht

20

21

22

23

24

25

Eahaaulbc                    Conference

1        THE COURT:  Good morning, everyone.  Please, be

2   seated.

3        (Case called)

4        MR. TURNER:  Good morning, Serrin Turner, for the

5   government.  With me at counsel table is AUSA Tim Howard, agent

6   Gary Alford and paralegals Nicholas Evert and Molly Rosen, from

7   my office.

8        THE COURT:  All right.  Good morning, everyone.

9        MR. DRATEL:  Joshua Dratel, with Lindsay Lewis and

10   Joshua Horowitz, for Mr. Ulbricht.

11        THE COURT:  Good morning, all of you.

12        We're here for a conference.  And as you folks know, I

13   had issued the order, I guess last week and got responses about

14   the schedule in this matter.  I am hesitant, as you folks know

15   I was hesitant to move the trial but have done so to January 5

16   to ensure that with the defense case we don't run into or

17   potential defense case we don't run into holidays and have the

18   jurors feel like they want to rush things.  They really need to

19   be able to consider things as long as they need to consider

20   things.  And the number of counts is sufficiently large and the

21   conduct complicated that I want them to have really enough time

22   to fully deliberate.  So that was my thinking.  Originally I

23   think we had thought that it would fit within the timeframe but

24   now I think not only would we run into Christmas but we'd also

25   run into New Years.  So I didn't see any good way of doing it

Eahaaulbc                    Conference

1    otherwise.

2              I'd sent you folks a proposed schedule because I would

3    like to start on January 5 as opposed to the week after that.

4    So the schedule I have proposed but I want to talk to you folks

5    about it, would have the questionnaires being filled out in one

6    to two groups at the clerk's office discretion depending upon

7    how many folks they can call up during those time periods.

8    That would also then give you folks a little bit more time to

9    go through them and we would proceed at pace.  I've laid out

10   the other interim dates.

11             So my main agenda for today is to talk about the

12   schedule and then the upcoming additional sort of pieces that

13   are going to be arising and you folks can add in whatever else

14   you would like.

15             Mr. Turner, how does the government feel about this

16   schedule?

17             MR. TURNER:  The government has conferred with defense

18   counsel, your Honor, and we're both fine with the schedule.

19   The only other date I thought of is the date for production of

20   3500 material.  And as to that, the parties are agreed that the

21   government will endeavor to produce all 3500 material of any

22   non cooperating witnesses by December 29 and any 3500 material

23   for any cooperating witnesses by the Friday before trial,

24   January 2.

25             THE COURT:  All right.

Eahaaulbc                    Conference

1        MR. DRATEL:  Your Honor, just with respect to the

2   schedule and Mr. Turner's correct, I guess it would be our hope

3   that we could have as many jurors as possible fill out

4   questionnaires on the 22nd simply because of the number of

5   people that won't be available to do questionnaires in that

6   week between Christmas and New Years.  It may be a much smaller

7   number.

8        THE COURT:  My first hope is that we can do all of it

9   then.  Really, the second week is in case we for whatever

10  reason have a lot of cancellations and things do happen.  As we

11  all know, I think questionnaires end up having the effect of

12  having the jurors be starting their service at an earlier point

13  in time and they're effectively on call.  So you don't want to

14  make it too early because then you run into that ongoing issue

15  for the jurors.

16        Now let me raise with you folks and get your

17  thoughts --

18        Before that, Mr. Dratel, are you otherwise OK with the

19  schedule?

20        MR. DRATEL:  Yes.  One thing about the 3500 which is

21  the cooperator's 3500, I understand from the government that

22  any cooperator will not be the first witnesses so that getting

23  into the Friday before trial gives us sufficient time.

24        MR. TURNER:  That's correct, your Honor.

25        THE COURT:  All right.  Thank you.

1          All right.  Now, in terms of the questionnaires one

2    additional just logistical point I think that would make sense

3    is to have us proceed in a manner that I've proceeded with

4    the -- another trial which is that we'll have a key of juror

5    names.  But the juror names will not be on the questionnaires.

6    There'll just be juror numbers.  And that will allow us more

7    easily to sort the Excel spreadsheet because what we'll have

8    are the juror numbers.  So on the far left hand column as you

9    can see from the model, the exemplar that you folks have put

10   together there will be a juror number, one through whatever the

11   number is, 200.  And they'll be then easily sorted by juror

12   number  You folks will have the key that will associate a juror

13   name with a juror number but it wouldn't otherwise be something

14   that we would have to have on the questionnaire or on the Excel

15   spreadsheet.

16         Does that make sense and is that acceptable to you

17   folks?

18              MR. TURNER:  Yes, your Honor.

19              MR. DRATEL:  Yes, your Honor.

20              THE COURT:  Another issue in terms of the use which I

21   am going to make of the questionnaires from my perspective.  I

22   just want to make sure that we're all aware of it.  I did lay

23   it out in a prior order on the questionnaires but I do want to

24   surface any concerns that folks may have, is that the way that

25   I use these questionnaires first is when they come in and you

1    folks have joint proposed strikes, those folks I will look over

2    but I've not yet kept somebody whom both parties think should

3    be jointly struck.  That individual would be struck probably

4    for whatever reason but let's just say hardship would be an

5    example, for whatever reason they could not sit for the length

6    of trial that we're anticipating.  So those folks would get

7    struck.  They would then be removed and called and told that

8    they need not even come in.  Although it may turn out that

9    given the way the timing works and the courthouse is scheduled,

10   they may have to show up on the fifth but be sent home right

11   away.

12           Then there are other groups.  There's a group of what

13   I would call Wave One and Wave Two.  This is what I've laid out

14   and potentially even additional strikes on my part.  And they

15   come in the following variations:

16           Let's assume that one or the other of you has proposed

17   a strike and the other hasn't agreed.  I will look at each

18   those.  And that's why I have you when you submit your letter,

19   list for me who you've proposed and the other side has not

20   agreed to.  I may agree that it is a good cause strike that

21   eliminates the need to have this individual appear.  I treat

22   those individuals as I do those which you folks have jointly

23   agreed to, meaning that there's been a proposal for a cause

24   strike.  You both have both agreed on that and I agree with

25   you.  Here, one of you is not agreeing with the Court and one

Eahaaulbc                      Conference

party but I treat it the same way.  So those folks are treated

as gone.

        Then there's the other group which is folks who may

have a variety of answers to a variety of questions which are

not a basis for a cause, strike and anybody's initial

impression at least in terms of reading the written

questionnaires or not that anybody believes but at least there

isn't sufficient agreement on that fact.  Those folks I will

separate into two piles.  The Wave One folks are the people who

will be called into the courtroom first.  They are the people

who have essentially nothing of any note that leaps to mind on

the questionnaires.

        So for instance, they haven't heard of Silk Road.

They haven't read anything about Mr. Ulbricht.  Now, the fact

that they have doesn't mean that there's a cause strike but it

may put, it may or may not depending on if they've put other

information in their questionnaire.  But a person who has

answered yes, I know about Silk Road; yes, I read about

Mr. Ulbricht, either one of those, frankly, would put them into

what I would think of as Wave Two.

        Wave One and Wave Two sit downstairs on Monday

January 5.  Wave One comes upstairs first.  They have random

numbers and they're sitting here randomly and they're then

called into the box randomly.  So all other aspects are random

and we proceed at pace.  This allows us in my view to get the

1    folks who are most likely to not have particular issues but it

2    leaves, frankly, all of the rest as well who will take more

3    time, for whatever reason, to go through.

4         That is my method of proceeding.  I believe that it

5    allows to us get a fair and unbiased jury in a relatively

6    efficient way.  Does anyone have any concerns with that manner

7    of proceeding?

8         Mr. Dratel, you've actually proceeded that way before

9    me in the past.

10        MR. DRATEL:  Yes.  I am familiar with it, your Honor.

11   And is certainly has a lot of merit.  The only thing different

12   in this case than the previous case is that I would hope that

13   Wave One would be a little more lenient in terms of what's

14   included because this is not -- in least this is my

15   anticipation.  I could be wrong because we don't know what the

16   questionnaire is going to look like --

17        THE COURT:  The questionnaire, I don't intend that

18   much to change it.

19        MR. DRATEL:  -- in terms of the answers, we don't

20   know.  So just from experience in the other of types cases

21   we're talking about, what I anticipate is that the answers that

22   are potential disqualifiers would be less categorical than

23   other cases.  So I don't know if Wave One would be easier to

24   get into Wave One than it was in some of the other cases

25   because the other cases, we are looking at very sort of hard

Eahaaulbc                         Conference

1    core emotional issues that were very easy to spot for people

2    that would put them in Wave Two.

3          THE COURT:  Let me tell about some of the types of

4    questions I think would not result in somebody going into Wave

5    Two.  I use the Internet everyday.  I use the Internet every

6    hour of everyday, you know high frequency Internet use.

7          I can't recall if we've got computer programming.  Let

8    me look in questionnaire.

9          (Pause)

10         THE COURT:  Yeah.  I use the Internet for both

11   personal and business.  None of those I think tell me really

12   much of anything that would cause me concern.  And I think of

13   those as they may walk down the street on a regular basis as

14   well.  I mean, it's just life now involves these kinds of

15   things.  They use it for particular purposes, reading,

16   streaming, news, music, purchasing things.  This does not

17   bother me, none of that, shopping, that to me is not something

18   that would automatically cause somebody to raise any kind of

19   eyebrow.

20         Have you ever purchased anything on the Internet?

21   That's a separate question.  That to me because it is not

22   something which given in the amount of commerce in 2014 would

23   cause a particular Wave One/Wave Two bifurcation, it may elicit

24   additional questioning but that will be to be determined.

25   However, things such as do you know, are you aware of this

Eahaaulbc                      Conference

1   case?  I would put them in Wave Two.  Silk Road, do you know of

2   Silk Road?  I would put them into Wave Two.  It does not mean

3   they are not coming into this room to be selected.  It just

4   means that we can only fill the room up with 75 people.  We are

5   going to have more than 75 people.  I've got to draw the line

6   some place.  And the best place, the most efficient way to do

7   it is to pick those that are going to have the least amount of

8   time spent trying to figure out whether or not they've got

9   bias.  So that's sort of my thinking.  Everything that's sort

10  of generalized is unlikely but those which are specific to this

11  case is more likely.

12          MR. DRATEL:  Just to articulate my concern with

13  respect to that is that I wouldn't want to eliminate since this

14  case has received a concern amount of publicity of traditional

15  media and internet media, I guess I wouldn't want to just

16  eliminate everyone whose heard about it because that might also

17  eliminate people whose backgrounds include other things that

18  might make them good jurors.

19          THE COURT:  And I do appreciate that.  That's why they

20  are not going to be eliminated.  The question is whether or

21  not -- if Wave One and Wave Two are going to help us at all,

22  after we're done with cause, at least the cause that leaps off

23  the page at us, the efficiency I think is best garnered here.

24  But if we've got four people who say they know about the case

25  maybe this is not such a big deal.  If we've got a hundred

Eahaaulbc                    Conference

1    people it may become more pertinent to whether or not we should

2    just forget about drawing the line.

3          So why don't we see how the questionnaires come out?

4    You've heard my views.  Unless you folks make an application to

5    change my views after you've seen the questionnaires I am just

6    going to proceed as I've indicated.  Again, we may well whip

7    through the first 75 and be into Wave Two immediately and Wave

8    Two will just be wave Two.  They'll be random.

9          MR. DRATEL:  I agree its premature at this point.

10          THE COURT:  Does the government have any concerns with

11    the process?

12          MR. TURNER:  No concerns with that process, your

13    Honor.  The only thought that jumps to my mind is given that

14    the jurors are going to have two weeks before the trial, that's

15    a lot of time when they might then look up information about

16    the case.  So your Honor may have addressed this about the jury

17    questionnaire already.  I apologize.  I can't remember.  But I

18    think it might be a good idea to have some sort of admonishment

19    in there that during those two weeks they should not look up

20    any information about the trial or the Internet or the media.

21          THE COURT:  Yes.  And Mr. Dratel is agreeing, so I

22    will insure that our instructions in that regard are clear and

23    the voir dire process that occurs here covers that.  In other

24    cases it has turned out that people who have filled out what

25    they wouldn't know anything about the defendant got into a Wave

1   One type of situation and they do.  Once they're sitting there

2   and they're really focused, they do.  So it's not fail proof.

3   So we still go through some of the voir dire anyway to the

4   extent we have to.

5           MR. DRATEL:  One question, your Honor, about how many

6   alternates, does the Court have any idea --

7           THE COURT:  At this point my view is that we would

8   have either three or four alternates.  I think that three

9   alternates ought to be sufficient but if you folks have a view,

10  let me know.  I've never gotten through -- I've gotten through

11  two alternates but I've never gotten through three alternates,

12  so I think three should do it.

13          MR. DRATEL:  For a trial of this length I think that's

14  sufficient.

15          MR. TURNER:  I agree.

16          THE COURT:  All right.  So, we'll do three alternates

17  and then obviously helps give you a sense of the strikes in

18  terms of the peremptories that you'll have.  As you folks know,

19  so you can start planning because we'll meet again before the

20  final pretrial, so you want to be thinking about this.  But the

21  way that I'll do the jury selection is whoever is in our

22  audience in Wave One, we'll call the first 12 names.  They'll

23  be sitting in the jury box.  Then we'll call three as

24  alternates.  The voir dire will occur as to those 15.  The

25  others who will be sitting out there will have pencils to be

Eahaaulbc                    Conference

1    writing if they've got "yes" answers to questions on the back

2    of their sheet.  They will have a sheet paper.  If one person

3    come out of here, we pop in another person.  We get through the

4    whole voir dire for cause.  We have people stand up and read 30

5    seconds about themselves or answers some questions.  That's

6    really for you to have an opportunity to hear them speak.

7    Sometimes we're able to determine if there are issues we hadn't

8    otherwise understood existed until people stood up and spoke.

9    English can sometimes be an issue that becomes clearer when we

10   hear from a juror.  After that we'll go into the peremptories.

11   So the peremptories are different from some judges in terms of

12   you folks.

13             Mr. Howard, you've tried a case in front of me.

14             MR. HOWARD:  No, I have not.  We came close to trial,

15   so you did explain the process.

16             THE COURT:  All right.  So the way I do it is you've

17   got the 12 and you've got the three and the peremptories are

18   against that 12 first, right, the ten and six, ten for the

19   defendant, six for the government.  Use it or lose it rounds.

20   So for the defense it's two, two, two, two one, one for a total

21   of ten and for the government it's one each round for a total

22   of six.  And that's the just the rules allowing ten to the

23   defendants and six to the government.  But I do them

24   simultaneous and blind.  So it means that if you both strike

25   juror number two so be it, you don't get an extra strike.  We

Eahaaulbc                    Conference

 1    don't allocate that person to one and not the other.

 2              I have you, if not, if all of you waive, if both of

 3    you waive then we go on to the next round but that round is

 4    done.  So we do the group of 12 first and then we do a separate

 5    set of strikes against the three alternates, all right?  And

 6    those are, it'll be one or two rounds.  And again it's use it

 7    or lose it and then that's it.  So of course strategically as

 8    you get towards the end of the use it or lose it round whoever

 9    fills in can end up filling in at the end, somebody you would

10    dearly love to have struck as peremptory and that's life as you

11    folks well appreciate.

12              I also ask you folks to hand over a Post-It each round

13    whether or not you're striking someone so that the jury does

14    not know that somebody is waiving and that allows the jury to

15    have no idea as to how many strikes each side gets, who's

16    striking whom and you can strike against the entire 12 the

17    entire time.  You can just sit there and strike number one each

18    time.  You can strike against the whole 12 each time.

19              All right.  So those are the matters that he wanted to

20    make sure we had some clarity on.  As a result of that process

21    I would expect that we would be at opening statements certainly

22    on the first day likely after lunch.  That would be the most

23    likely time and I would hope directly after lunch but it

24    depends.  And so we'll talk at the final pretrial about how

25    long you think they're going to be but I don't have any view as

1    to how long they should not be.

2          You folks understand juries and you'll understand how

3    long tactically as well as substantively you think it would

4    make sense to have them be but I won't cut you off or set a

5    timeframe.  I will ask you about timing repeatedly on all sorts

6    of issues simply for planning purposes, not to unduly truncate

7    you unless I think that we are just going around in circles,

8    but my timing questions are really just to make sure we're

9    doing things efficiently but also that I understand and you

10   understand what's coming up next.

11          What do you folks have to raise with me?

12          MR. TURNER:  Should the government be prepare to call

13   its first witness as well on the first day, your Honor?

14          THE COURT:  Yes, you should.  Now, it may turn out at

15   the final pretrial that you folks both are going to do two hour

16   openings, in which case we are not going to get to the first

17   witness and then we'll stand down.  But if you are going to do

18   45 minutes to one hour openings and if we start at two you

19   could have the first witness at say about four.

20          And my breaks just so that you folks know because it

21   would be relevant that first day, my normal breaks are jury

22   starts at 9:30 in the morning and we start at nine,

23   housekeeping.  Jury comes in at 9:30.  We'll take a break at

24   about 11.  Now, if there is an easy way to break before then or

25   a more logical way or just after then, we'll see.  Certainly,

Eahaaulbc                    Conference

1    if the jury raises their hand and makes eye contact with Joe

2    and needs a breaks, we'll end up taking a more frequent set of

3    breaks.  Then we'll have lunch at 12:45.  We'll break from

4    12:45 till two.  The first thing we do at every break is I ask

5    you if you have anything that you want to raise.  That's your

6    opportunity to make a record or ask questions or to surface as

7    I call it surprises.  I don't like surprises and you don't

8    particularly like surprises either.  So this helps head off at

9    the pass having us be surprised in front of the jury.  If it

10   was a bench trial I don't really care about surprises but not

11   in front of the jury.

12          So the first thing I'll do at 12:5 is ask you folks if

13   you have anything you want to raise, I typically have things in

14   here from one to two.  I'll do a calendar between one and two

15   for myself and so you'll just need to have two spots open

16   usually on my right, your left so that we don't have to have

17   things on your left on your right disrupted.  And then in the

18   afternoon after lunch I typically take a break around 3:15 to

19   3:30.  The breaks I always say ten minutes or seven to eight

20   minute because there'll be 15 jurors it's going to take them a

21   little bit of time.  So if we have a cigarette smoker it always

22   takes them a little longer.  So it take a little bit of time

23   but normally we're able to get back within say 12 minutes.  So

24   if I say ten it's usually about 12.  Then we don't take any

25   other breaks apart from that.

Eahaaulbc                    Conference

1          I do allow the jury to have coffee, tea or any

2     beverage they want and also you folks and all the entire

3     audience.  I don't really care in my courtroom if you have

4     drinks or in the courtroom, so long as you fess up if you spill

5     because we can't replace carpet frequently.  So I'd rather we

6     clean it up and we'll give you paper towels to do that or we'll

7     do it just to save the carpet.  But I do allow the jury to have

8     coffee and drinks and I tell them this the first day because

9     I'll be drinking coffee.  And I think I am the goose.  They're

10    not the gander.  In any event, sometimes it requires a few more

11    breaks as life would have it.  So I think that's the process in

12    terms of how breaks happen and how timing is taken up

13          MR. TURNER:  How long do we go each day?

14          THE COURT:  We go till five o'clock and I will have

15    you call witnesses until they'll we're done until the day is

16    complete.  So if you are at 4:45 I'll have you call somebody

17    else.  If you are at 4:50 I probably wouldn't unless we've

18    talked about beforehand and we know about it.

19          Now, I also don't have particular rules about people

20    being called out of order or interrupted for scheduling if

21    somebody's flying in and they can only, they want to have a

22    flight that afternoon, they testified at nine a.m. or that

23    would really help them, you folks try to work that out folks

24    first.  If you folks are in agreement on that I'm very unlikely

25    to disagree with that.

1              Does that all make sense?

2              MR. DRATEL:  Yes, your Honor.

3              THE COURT:  And demonstratives, I assume we are going

4    to cover this again at the final pretrial.  You folks would

5    expect to share and share with sufficient time so that we're

6    not sharing it when the jury is supposed to be walking out in

7    case there are objections so that we can raise those at the

8    nine o'clock housekeeping.  If somebody says you've got all

9    this inflammatory stuff up here, we should surface that.

10   Everyday I'll ask to you to surface whatever you think might be

11   coming up that could be what I'll call surprise.  And you folks

12   know what surprising is.  If you think it's going to be

13   surprising I can assure you I want to know about it.

14             What else do we need to cover?

15             MR. TURNER:  One matter in terms of, it'll be an

16   exhibit heavy trial and some of the exhibits will consist of

17   chats and messages and that sort of thing.  We planned just to

18   read those in to have, if it's an exchange involves two parties

19   to have the attorney read one side and the paralegal or someone

20   else read the other side we wanted to make sure that was OK

21   with the Court.

22             THE COURT:  I would handle this in the same way that I

23   handle if people are going to read a transcript or something

24   where there's no audio.  There is no voice inflection because

25   we don't know what the voice inflection was and so this is not

1   their moment for dramatic arts.  They should just read it.  It

2   helps break it up to have two people read it.  It makes it sort

3   of interesting but there shouldn't be traumatic inflection.

4   That make sense?

5              MR. TURNER:  Yes.  We won't hire any actors.

6              THE COURT:  But sometimes people just can't help

7   themselves.  What do you mean?  As opposed to, what do you

8   mean?

9              All right.  What else do we have that you folks would

10  like to raise today?

11             We have to got one pending motion, Mr. Dratel, that I

12  am aware of that's on but that decision will be coming out next

13  week and I don't believe I have any other pending motions

14  currently before me.

15             MR. DRATEL:  I don't believe so, your Honor, but I

16  want to make sure the government's taken care of.

17             THE COURT:  Mr. Turner?

18             MR. TURNER:  Nothing further.

19             THE COURT:  Mr. Dratel.

20             MR. DRATEL:  One issue with respect to the discovery

21  review there's a rotating personnel issue at MDC.  There's a

22  new person in the visiting room.  We wanted to call legal

23  because of some issues with respect to -- on a regular basis

24  for a sufficient portion of the day, we were going to call the

25  legal department there and just make sure that the new person

Eahaaulbc                    Conference

```
1   is fully apprised of the prior orders and everything.  So I
2   would just ask that we could use the Court's name to say the
3   Court has issued --
4              THE COURT:  The Court order on Mr. Ulbricht's access
5   is public.
6              MR. DRATEL:  OK.
7              THE COURT:  It's been filed I believe on ECF.
8              Joe, am I right?
9              COURTROOM DEPUTY:  I will check.
10             THE COURT:  This is the -- there was a letter I
11  believe from the MDC referencing the kinds of accommodations
12  that there were making in the timeframe.  Then there was the
13  court order on top of that that indicated if there was going to
14  be a change to that schedule, they should notify the Court.
15  Those are both public.
16             COURTROOM DEPUTY:  Yes.
17             THE COURT:  June 27, 2014.  So just e-mail it to them.
18             MR. DRATEL:  Yes, we can preference that and that will
19  work.
20             THE COURT:  There was their own letter to me which was
21  on top of that.  There was also their letter to me that set out
22  the schedule and mine was to follow that.
23             MR. DRATEL:  Great.  Thank you.
24             THE COURT:  All right.  So what else should we grapple
25  with today?  And do you folks feel there's any need to get
```

Eahaaulbc                    Conference

1    together before the final pretrial?  Or just, I think we can

2    let you folks do your thing and let me know.

3              MR. TURNER:  I agree, your Honor.

4              MR. DRATEL:  Yes, your Honor.

5              THE COURT:  OK.  We've got the final pretrial.  I will

6    then sign this scheduling order.  It'll go up and we'll

7    actually add the 3500 non cooperating witnesses and the other

8    item, the other 3500 material.  I'll sign this and this will be

9    our procedure.  And our final pretrial then is Wednesday,

10   December 17 at two.  If I think based upon the in limine

11   motions -- let me talk about that also -- that I need more time

12   I will -- try to keep the morning of the 18th clear if you can

13   just so in case we have to sort of come back the next morning.

14             Now, on in limines, I think this makes sense -- if

15   you've got a strong objection to it, let me know -- but I asked

16   to have one memorandum that contains any in limine motions that

17   is you folks have numbered.  And then the response or the

18   opposition which comes in a week later, numbered similarly and

19   you each do that.  So if you are moving and you've gotten

20   things that you want the Court to address you've got motions in

21   limine number one, references to murder-for-hire; motion in

22   limine number two, the government's expert shouldn't be able,

23   whatever the topic is; motion in limine number three; then the

24   opposition comes in and it matches.

25             The reason for that is sometimes I find that counsel

Eahaaulbc                    Conference

1    will just number one, the worst of all possible worlds is when

2    they give me ten different in limine motions.  All of which

3    have a separate sort of statement of fact.  But then in

4    addition to that they skip all over the place and I am trying

5    to find the response to argument number four and it's easier if

6    it's numbered, frankly.  So if you folks could do that.

7              MR. DRATEL:  Yes.

8              THE COURT:  And you all know how to since we're not

9    going to meet again, how to do your objections in the Excel

10   format.

11             MR. DRATEL:  For the exhibits, your Honor?

12             THE COURT:  Yes.

13             MR. DRATEL:  Yes, the previous experience as

14   instructed in other words is not to just cite a rule.

15             THE COURT:  Right.  Don't just cite every rule for

16   hearsay.  Why I object, 401, 402, 403 all the 800s.  That does

17   happen and that's hard.  So try to pick a rule and try to pick

18   a few words.

19             MR. DRATEL:  Something that is sort of like a speaking

20   objection, so to speak.

21             THE COURT:  Correct.  So enough so that I can give you

22   a sense as to whether or not I am likely to think that there's

23   any legs to the objections.  But all objections, as you know,

24   need to be reiterated at trial to be preserved for the trial

25   record except for those that there's a determination that I've

Eahaaulbc                         Conference

1   made where I've said don't ever raise this again.  But

2   otherwise in limine motions is based upon the Court's view as

3   to the likely proof at trial.  Proof can change, expectations,

4   things happen.  So they can be revisited.

5           All right.  Anything else?

6           MR. TURNER:  No, your Honor.  Thank you.

7           MR. DRATEL:  No, your Honor.  Thank you.

8           THE COURT:  We're adjourned.  Thank you.

9                     (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25