UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                      :

   -v.–                                                    :            S1 14 Cr. 68 (KBF)

ROSS ULBRICHT,                                      :
  a/k/a "Dread Pirate Roberts,"
  a/k/a "DPR,"                                       :
  a/k/a "Silk Road,"
                                                              :

             Defendant.

                                                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

# GOVERNMENT'S MOTIONS IN LIMINE

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States of America

SERRIN TURNER
TIMOTHY T. HOWARD
     Assistant United States Attorneys
     *Of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                      :

   -v.-                                              :          S1 14 Cr. 68 (KBF)

ROSS ULBRICHT,                                     :
  a/k/a "Dread Pirate Roberts,"
  a/k/a "DPR,"                                       :
  a/k/a "Silk Road,"
                                                              :
                Defendant.
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S MOTIONS IN LIMINE

The Government respectfully submits this memorandum of law to seek the following

rulings *in limine*.  First, the Government respectfully requests rulings that certain evidence

should be admitted at trial: specifically, evidence of the defendant's procurement of fraudulent

identification documents, evidence of the defendant's solicitations of murders for hire, and

evidence regarding illicit or otherwise criminally oriented goods and services sold on Silk Road

not specifically referenced in the Indictment.  All of this evidence is admissible as direct

evidence of the charged offenses or, in the alternative, admissible pursuant to Rule 404(b) as

proof of intent, knowledge, identity, absence of mistake and lack of accident.  Finally, the

Government seeks to preclude argument or evidence regarding any potential consequences of

conviction, or political views or excuse by the defendant for his criminal conduct.

For the reasons set forth below, the Court should grant the Government's motions.

## FACTUAL BACKGROUND

As set forth in detail in the Complaint and prior submissions, the defendant is charged with owning and operating the Silk Road underground website under the online pseudonyms "Dread Pirate Roberts" or "DPR."  Silk Road promoted the large scale distribution of narcotics, computer hacking tools and services, counterfeit identity documents, and other illegal goods and services.  On or about August 21, 2014, the Government filed a superseding indictment in this matter (the "Indictment") which charges the defendant with: (1) distributing or aiding and abetting the distribution of narcotics, in violation of Title 21, United States Code, Section 841(a) (Count One); (2) distributing or aiding and abetting the distribution of narcotics by means of the Internet, in violation of Title 21, United States Code, Section 841(h) (Count Two); (3) conspiring to distribute or aid and abet in the distribution of narcotics, in violation of Title 21, United States Code, Section 846 (Count Three); (4) engaging in a continuing criminal enterprise, in violation of Title 21, United States Code, Section 848 (Count Four); (5) conspiring to commit and aid and abet computer hacking, in violation of Title 18, United States Code, Section 1030(b) (Count Five); (6) conspiring to traffic and aid and abet in the trafficking of fraudulent identification documents, in violation of Title 18, United States Code, Section 1028(f) (Count Six); and (7) conspiring to commit money laundering, in violation of Title 18, United States Code, Section 1956(h) (Count Seven).

As part of its case, the Government, among other things, intends to offer in evidence regarding: (1) the defendant's attempts to obtain fraudulent identification documents; (2) the defendant's solicitation of murders for hire; and (3) evidence of illicit goods and services, or goods and services otherwise of appeal to criminals, that were sold through Silk Road but that are not specifically referenced in the Indictment.  As set forth below, this evidence is all directly

a part of and intimately intertwined with the story of the defendant's ownership and operation of the Silk Road website.

**A.      The Fraudulent Identification Evidence**

The Government intends to offer evidence that, while the Silk Road website was operational during 2013, the defendant attempted to procure fraudulent identification documents from Silk Road, and that the defendant leased servers under fake identities.

On or about July 10, 2013, agents with U.S. Customs and Border Protection ("CBP") intercepted a package that was inbound from Canada as part of a routine border search, which contained nine fraudulent identification documents.  (Compl. ¶ 42(a)(i)).  These counterfeit identity documents consisted of fake driver's licenses bearing Ulbricht's photograph, but with different names, and appeared to be issued by New York, Florida, Texas, Colorado, California, South Carolina, Alberta, Canada, the United Kingdom and New South Wales, Australia.  The Government expects to offer these seized counterfeit identification documents into evidence, through the testimony of an agent with Homeland Security Investigations, who, on or about July 26, 2013, performed a controlled delivery of the fraudulent identification documents to Ulbricht. (Compl. ¶ 42(a)(ii)).  The Government expects Agent-1 to testify that Ulbricht produced a copy of his true government-issued Texas driver's license during this encounter, and stated, in sum and substance and among other things, that: (1) "hypothetically" anyone could go onto a website called "Silk Road" and purchase any drugs or fake identity documents he or she desired; and (2) he lived at the residence to which the package containing the fake IDs was addressed, where he was living under the alias "Josh."  (Compl. ¶¶ 42(b)(iii)-(iv)).

Further, the Government intends to introduce evidence that Ulbricht in fact ordered these counterfeit identification documents off of Silk Road, using the Silk Road user account

"shefoundme." Specifically, beginning on June 10, 2013—approximately one month before the nine fake IDs were seized by CBP—"shefoundme" sent a message on the Silk Road messaging system to a Silk Road vendor named "KingOfClubs," in which "shefoundme" indicated he wanted to order "a few of your highest quality IDs." In subsequent messages, "shefoundme" ordered nine fake IDs for $1,650 in United States currency, and specified that he wanted counterfeit identification documents from New York, Florida, Texas, Colorado, California, South Carolina, Alberta, Canada, the United Kingdom and New South Wales, Australia, corresponding to the jurisdictions on the nine counterfeit IDs which were ultimately seized by CBP. On July 5, 2013, "KingOfClubs" confirmed that he had sent the package containing the fraudulent identification documents to "shefoundme" and that they were scheduled to be delivered the following week. On July 18, 2013, "KingOfClubs," provided the United States Postal Service ("USPS") tracking number to "shefoundme," in response to complaints that the package had not arrived, and "shefoundme," indicated that he checked the USPS website, which indicated that the package was "inbound out of customs on the 10th," the date on which the counterfeit identification documents were seized by CBP.

Finally, the Government expects to offer evidence recovered from a Court-authorized search of the laptop that Ulbricht had in his possession at the time of his arrest, which indicates that Ulbricht leased servers under fake identities. Specifically, the laptop was found to contain a spreadsheet file which listed IP addresses and descriptions of various Silk Road-related servers along with information regarding approximately 21 different false identities, including names, address and e-mail addresses for each alias, under which each of the servers were leased and registered.

**C.**     **The Murder for Hire Evidence**

The Government also intends to offer evidence that Ulbricht solicited at least six murders for hire as part of his efforts to protect his interests as owner and operator of Silk Road.[1]

1.     Murder for Hire #1: Ulbricht Solicited Murder of Ex-Employee of Silk Road
       for Stealing Bitcoins

First, the Government intends to offer evidence that, in January 2013, Ulbricht solicited a murder for hire of a former member of his administrative staff, who he believed had stolen approximately $350,000 in Bitcoins from Silk Road.

Specifically, as reflected on chats logs recovered from Ulbricht's laptop, in mid-January 2013, Ulbricht was involved in discussions with a co-conspirator employee ("CC-1") regarding the fact that another employee (the "Employee") had gone missing, and that approximately $350,000 in Bitcoins had been stolen from Silk Road.  On January 26, 2013, CC-1 informed Ulbricht that he had determined that the Employee had stolen the Bitcoins from various vendor accounts.  Later that day, Ulbricht told CC-1 that he knew the real identity of the Employee and had learned that the Employee had been arrested the previous week on narcotics charges, and that he had arranged for "muscle" to "get to him quickly."  Further, CC-1 told Ulbricht that "you always have me at your disposal if you locate him and need someone to go handle it," and Ulbricht responded, "thanks.  I want to kick his ass myself, but let's leave it to the pros."

Ulbricht informed another co-conspirator ("CC-2") regarding the Bitcoin theft the following day.  Chat logs recovered from Ulbricht's laptop reflect that Ulbricht informed CC-2 that he was surprised that the Employee stole from him given that he had a copy of the

---

[1] As noted below, Ulbricht solicited the first murder for hire from an undercover DEA agent from a separate investigation, and accordingly, no murder actually occurred.  Further, the Government is not currently aware of any evidence that the remaining murders were carried out. The Government is prepared to stipulate to these facts at trial.

Employee's driver's license, and that the Employee had been arrested on narcotics charges. Later in the conversation, Ulbricht and CC-2 discussed the fact that the Employee might be cooperating with law enforcement, and CC-2 remarked, "[a]s a side note, at what point in time do we decide we've had enough of someone[']s shit, and terminate them?  Like, does impersonating a vendor to rip off a mid-level drug lord, using our rep and system; follows up by stealing from our vendors and clients and breeding fear and mis-trust, does that come close in your opinion."  Ulbricht responded, "terminate?  execute?" and later declared that "I would have no problem wasting this guy."  In response, CC-2 indicated that he could take care of it, and told Ulbricht that he would have been surprised if Ulbricht "balked at taking the step, of bluntly, killing [the Employee] for fucking up just a wee bit too badly."  Later that day, Ulbricht informed CC-2 that he had commissioned "Nob" to track down the Employee.[2]

On February 5, 2013, Ulbricht engaged in another chat with CC-2  in which he indicated that "Nob" had captured the Employee, and that they were interrogating the Employee to get the Bitcoins that he had stolen.  Several hours later, Ulbricht told CC-2 that "Nob" had confirmed that the Employee had been executed.  Several weeks later, on February 23, 2013, Ulbricht informed CC-1 that he had successfully arranged the capture and execution of the Employee.

To demonstrate the foregoing, the Government intends to offer into evidence at trial records of online conversations recovered from Ulbricht's laptop with CC-1 and CC-2 which discussed the murder for hire, as well as testimony from a cooperating witness.

---

[2] "Nob" was the username used by an undercover agent with the Drug Enforcement Administration ("DEA") as part of a separate investigation into Silk Road by the United States Attorney's Office for the District of Maryland.

2.      <u>Murder for Hire #2: Ulbricht Solicited Murder of Silk Road Vendor in Response to
Threats that Silk Road Vendor and User Identities Would Be Leaked</u>

Further, the Government intends to offer evidence that in March and April 2013 the

defendant commissioned a murder for hire of a Silk Road vendor known on Silk Road as

"FriendlyChemist," who was attempting to extort the defendant.

Specifically, as detailed in the Complaint, beginning on March 13, 2013,

"FriendlyChemist" began sending threats on the Silk Road messaging system to the defendant, in

which "FriendlyChemist" threatened to publish a list of real names and addresses of Silk Road

vendors and customers that he claimed he had obtained from hacking into the computer of

another Silk Road vendor.  (Compl. ¶ 31(a)).  "FriendlyChemist" indicated that he would publish

the information unless the defendant paid him $500,000 that he owed to his narcotics supplier,

and elaborated that the release of the information would expose those individuals to law

enforcement and threaten the future of Silk Road:

> what do u . . . think will happen if thousands of usernames, ordr amounts,
> addresses get leaked?  all those people will leave sr and be scared to use it
> again.  those vendors will all be busted and all there customers will be
> exposed too and never go back to sr.

(Compl. ¶¶ 31(a)-(b)).  Later, "FriendlyChemist" provided a sample of the Silk Road vendor and

user information he claimed to have stolen.  (Compl. ¶¶ 31(c)).

On March 25, 2013, "redandwhite" sent a message to the defendant which indicated that

he was the supplier that "FriendlyChemist" owed money to.  (Compl. ¶ 31(e)).  By March 27,

2013, the defendant sent a message over Silk Road to "redandwhite" that indicated that he

wished to arrange to have "FriendlyChemist" executed:

> In my eyes, FriendlyChemist is a liability and I wouldn't mind if he was
> executed . . . .  I'm not sure how much you already know about the guy,
> but I have the following info and am waiting on getting his address.

In the same conversation, the defendant proceeded to provide a name for "FriendlyChemist," and indicated that he lived in White Rock, British Columbia, Canada, with "Wife + 3 kids." (Compl. ¶ 31(h)).

On March 29, 2013, "FriendlyChemist" escalated the threats to the defendant by stating, "u leave me no choice I want 500k usd withn 72hrs or i am going to post all the info i have. . . . i hate to do this but i need the money or im going to release it all.  over 5000 user details and about 2 dozen vender identities.  wats it going to be?" (Compl. ¶ 31(i)).  Several hours later, the defendant sent a message to "redandwhite," in which he confirmed that he wanted to proceed with arrangements for "FriendlyChemist" to be murdered, and asked how much "redandwhite" wanted to be paid for the job.  (Compl. ¶ 31(j)).

On March 30, 2013, after "redandwhite" asked the defendant what sort of problem "FriendlyChemist" was causing, the defendant responded: "[H]e is threatening to expose the identities of thousands of my clients that he was able to acquire . . . .  [T]his kind of behavior is unforgivable to me.  Especially here on Silk Road, anonymity is sacrosanct." (Compl. ¶ 31(k)).  As to the murder-for-hire, the defendant commented that "[i]t doesn't have to be clean." (*Id.*).  Later that same day, "redandwhite" sent a message to the defendant which quoted a price of $150,000 to $300,000 "depending on how you want it done" – "clean" or "non-clean." (Compl. ¶ 31(l)).  The next day, the defendant responded that the price seemed high, given that he previously was able to order a murder for $80,000 ("Don't want to be a pain here, but the price seems high.  Not long ago, I had a clean hit done for $80k.  Are the prices you quoted the best you can do?"). (Compl. ¶ 31(m)).

In further messages exchanged on March 31, 2013, the defendant and "redandwhie" settled on a price of approximately 1,670 bitcoins (approximately $150,000 in United States

currency at the time), and the defendant provided a transaction record confirming that the Bitcoins had been sent as agreed.  (Compl. ¶ 31(n)).  "Redandwhite" later confirmed that the payment had been received, and, approximately 24 hours later, informed the defendant that the murder had been carried out: "[y]our problem has been taken care of. . . Rest easy though, because he won't be blackmailing anyone again.  Ever."  (Compl. ¶¶ 31(o), (p)).

Subsequent messages reflect that, at the defendant's request, "redandwhite" sent the defendant a picture of the victim after the job was done, with random numbers written on a piece of paper next to the victim, which the defendant had supplied.  On April 5, 2014, the defendant wrote "redandwhite: "I've received the picture and deleted it.  Thank you again for your swift action."  (Compl. ¶ 31(q)).

Evidence recovered from Ulbricht's laptop, seized from him at the time of his arrest, further confirms the steps that the defendant took to solicit the murder of "FriendlyChemist." Specifically in a file labeled "log," Ulbricht maintained a record of his actions in operating Silk Road from the period from March 20, 2013 through September 30, 2013, which includes references to this murder for hire.  Specifically, the log includes, among other entries, a March 28, 2013 reference to being blackmailed by "FriendlyChemist" and discussions with "redandwhite" regarding the problem ("being blackmailed with user info. talking with large distributor (hell's angels)."  The log also contained an entry for March 29, 2013, confirming that the defendant arranged for "redandwhite" to murder "FriendlyChemist" on that day ("commissioned hit on blackmailed with angels").  Further, an entry for April 1, 2013 confirmed that "FriendlyChemist" had been executed ("got word that blackmailer was executed") and an entry for April 4, 2014 noted that the defendant had received the photograph confirming the murder of "FriendlyChemist" ("received visual confirmation of blackmailers execution").

10

To demonstrate the foregoing, the Government intends to offer into evidence at trial records of conversations recovered from the Silk Road messaging system with "FriendlyChemist," and "redandwhite," recovered from the Silk Road messaging system, and files from Ulbricht's laptop, including the log recovered from Ulbricht's laptop which includes entries regarding this murder for hire.  Further, the Government intends to offer evidence from the public Bitcoin ledger known as the "Blockchain" indicating that the defendant made the payment of 1,670 Bitcoins to "redandwhite" for the murder of "FriendlyChemist."

3.     Murder for Hires #3 through #6: Ulbricht Solicited Murder of Four Additional
        Individuals Associated with FriendlyChemist

Finally, the Government intends to offer evidence that, in April 2013, the defendant commissioned the murder for hire of four other individuals associated with "FriendlyChemist." As with the murder for hire of "FriendlyChemist," these murders for hire were also commissioned from "redandwhite."

Specifically, around the same time that "redandwhite" informed Ulbricht that "FriendlyChemist" had been killed, he also told the defendant that his workers had "questioned ["FriendlyChemist"] and he spilled everything he knew."  Further,"redandwhite" indicated that "FriendlyChemist" had identified "tony76," as another Silk Road user who was working together with "FriendlyChemist" on the blackmail scheme, and as someone who had been involved in running scams on Silk Road "for a couple of years."  During the conversation, "redandwhite" revealed the identity of "tony76," and indicated that he lived in Surrey, British Columbia, Canada.

Chat logs recovered from Ulbricht's laptop indicate that on April 3, 2013, Ulbricht also informed CC-2 that Ulbricht had been blackmailed by "tony76."  Specifically, Ulbricht indicated

that he had previously been blackmailed by an individual who threatened to reveal addresses of Silk Road customers and vendors, an apparent reference to "FriendlyChemist." Ulbricht told CC-2 that he paid a member of the Hell's Angel's "to hunt down the blackmailer," an apparent reference to "redandwhite," and had learned that "tony76" was involved in the blackmail scheme.

On April 5, 2013, the defendant told "redandwhite," "I would like to go after ["tony26"] . . . . If he is our man, then he likely has substantial assets to be recovered. Perhaps we can hold him and question him?" "redandwhite" responded that he would send people to "do some recon" and report back later. The following day, on April 6, 2013, "redandwhite" told Ulbricht that he "Tony26" was a drug dealer who "works/lives with 3 other people and they all sell product together." He asked Ulbricht, "Do you want to deal with this . . . guy, or do you want me to put the team on standby?" Ulbricht responded, "I am confident enough that it is him to move forward. Can we round up all 4 of them, separate them, and get them to out each other and give up their stolen money?" "redandwhite" replied, "As for getting all 4, it would be possible but they would have to get them all at once so that one does not get away." Ulbricht replied, "Ok, let's just hit ["tony26"] and leave it at that. Try to recover the funds, but if not, then not."

Two days later, on April 8, 2013, "redandwhite" offered to "hit ["tony26"] only" for "150 [thousand] just like last time." However, "redandwhite" cautioned that, if they only took out "tony26" and not his three co-residents, they would not be able to "do [the hit] at their place because there are always at least a few of them there . . . . So we wouldn't be able to recover any of his things." "redandwhite" stated that he would "prefer to do all 4" in order to have a "chance of recovering any potential product/money he may have," adding: "Anything recovered would be split 50/50 with you." "redandwhite" quoted Ulbricht a price of "500k USD" to do "all

4."  Ulbricht responded later that day: "hmm . . . ok, I'll defer to your better judgment and hope we can recover some assets from them." Ulbricht added that he had gone ahead and sent a payment of 3,000 Bitcoins, the equivalent of approximately $500,000 in United States currency at the time, to a Bitcoin address designated by "readandwhite."

As with the murder for hire of "FriendlyChemist," logs recovered from Ulbricht's laptop confirm his involvement in soliciting the murder of "tony26" and his three associates. Specifically, an April 6, 2013 entry indicates that Ulbricht gave approval for "redandwhite" to locate "tony76" ("gave angels go ahead to find tony76").  Further, an April 8, 2013 entry confirms that the Ulbricht paid for the murder for hire for "tony26" and his three associates ("sent payment to angels for hit on tony76 and his 3 associates").

To demonstrate the foregoing, the Government intends to offer into evidence at trial records of conversations between the defendant and "redandwhite," recovered from the Silk Road messaging system, as well as the chat log of the discussion between Ulbricht and CC-2. The Government also intends to offer into evidence files from Ulbricht's laptop, including the log recovered from Ulbricht's laptop which includes entries regarding these murders for hire. Further, the Government intends to offer evidence from the public Blockchain demonstrating that the defendant made the payment of 3,000 Bitcoins to "redandwhite" for these murders for hire.

**D.      Evidence of Other Contraband and Goods and Services Distributed on Silk Road and the Armory**

In addition to the evidence regarding the sale of illegal narcotics, computer hacking tools, and counterfeit identity documents, the Government intends to offer evidence of contraband and other goods and services of interest to criminals offered on Silk Road not specifically referenced

in the Indictment, including but not limited to counterfeit commercial merchandise, pirated

copies of copyrighted works, weapons, and manuals regarding the manufacture of explosives,

weapons and computer hacking.  Specifically, the Government intends to introduce evidence of

these additional products through law enforcement testimony regarding observations made on

the Silk Road website and screenshots of listings of products offered for sale on Silk Road

website (as well as a companion website known as the Armory, which the defendant set up

specifically to facilitate the sale of guns).  The Government also intends to introduce evidence of

online chats recovered from Ulbricht's laptop, in which he had discussions with co-conspirators

regarding the Armory and other illegal goods and services sold over Silk Road.  Further, the

Government intends to offer transactional data regarding these goods and services recovered

from the computer server used to host the Silk Road marketplace.

## **APPLICABLE LAW**

Evidence of uncharged conduct may be admitted without reference to Federal Rule of

Evidence 404(b) if it constitutes direct proof of charged criminal conduct, if it is inextricably

linked with the charged conduct, or if it is necessary to complete the story of the crimes on trial.

*See United States* v. *Quinones,* 511 F.3d 289, 309 (2d Cir. 2007); *see also United States* v.

*Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States* v. *Gonzalez*, 110 F.3d 936, 942

(2d Cir. 1997)) (internal quotation marks omitted) ("evidence of uncharged criminal activity is

not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same

transaction or series of transactions as the charged offense, if it is inextricably intertwined with

the evidence regarding the charged offense, or if it is necessary to complete the story of the crime

on trial");  *see also United States* v. *Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) ("evidence of other

bad acts may be admitted to provide the jury with the complete story of the crimes charged by

demonstrating the context of certain events relevant to the charged offense"); *Weinstein's Federal Evidence*, § 404.20[2][b] (noting that evidence of other wrongs is admissible without regard to Rule 404(b) where those wrongs "were necessary preliminaries to the crime charged"). In such circumstances, the uncharged crime evidence is appropriately treated as "part of the very act charged," or, at least, proof of that act. *United States* v. *Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992).

Even where uncharged conduct is not direct evidence of the alleged crime, Rule 404(b) allows "[e]vidence of other crimes, wrongs, or acts" to be admitted for purposes other than "to prove the character of a person in order to show action in conformity therewith," such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). It is well-settled that "other acts" evidence is admissible under Rule 404(b) so long as the evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect. *See United States* v. *Guang*, 511 F.3d 110, 121 (2d Cir. 2007) (citations omitted). The Second Circuit takes an "'inclusionary' approach to the admission of prior act evidence, under which "evidence of prior crimes, wrongs, or acts 'is admissible for any purpose other than to show a defendant's criminal propensity'" so long as it is not substantially outweighed by the danger of unfair prejudice. *United States* v. *Paulino*, 445 F.3d 211, 221 (2d Cir. 2006) (quoting *United States* v. *Pitre*, 960 F.2d 1112, 1118-19 (2d Cir. 1992)); *see also United States* v. *Teague,* 93 F.3d 81, 84 (2d Cir. 1996) (providing that proof of state of mind, such as intent, is a "proper purpose" for admission of other crimes evidence under Rule 404(b)) (quoting *Huddleston* v. *United States,* 485 U.S. 681, 691 (1988)); *see also United*

*States* v. *Ortiz*, 857 F.2d 900, 903 (2d Cir. 1988) ("[O]ther acts or crimes are admissible under

Rule 404(b) to prove matters other than the defendant's criminal propensity.").

The Court has broad latitude in determining whether to admit evidence pursuant to Rule

404(b), and its ruling will be reviewed only for abuse of discretion.  *See United States* v.

*Mitchell*, 328 F.3d 77, 82 (2d Cir. 2003).   If requested, such evidence must be admitted with

limiting instructions to the jury.  *See, e.g., United States* v. *Ramirez*, 894 F.2d 565, 570 (2d Cir.

1990) (citing *Huddleston* v. *United States*, 485 U.S. at 690).

## ARGUMENT

I.   **EVIDENCE   OF   ULBRICHT'S   ATTEMPTS   TO   OBTAIN   FALSE
     IDENTIFICATION DOCUMENTS SHOULD BE ADMITTED**

### A.   The False Identification Evidence is Admissible as Direct Evidence

Evidence that Ulbricht attempted to obtain false identification documents is direct

evidence of his guilt, inextricably linked with the charged conduct, and necessary to complete the

story of the crimes charged.  *Quinones*, 511 F.3d at 309 (internal quotation marks omitted).

In the instant case, the Government expects to show that in mid-2013—while Silk Road was

active—Ulbricht took steps to obtain fraudulent identification documents through Silk Road

itself.   Documents recovered from Ulbricht's laptop indicate that he leased Silk Road-related

servers in various aliases.  Accordingly, given the charges in this case—that Ulbricht was

involved in owning and operating a underground black market website that sought to remain

anonymous and outside of the reach of law enforcement through the use of the Tor network and

Bitcoins—and the timing of this activity, the fraudulent identification evidence is inexorably

intertwined with the story of Ulbricht's ownership and operation of Silk Road, and is probative

of his criminal intent in operating the site.  *See United States* v. *Brady*, 26 F.3d 282, 287 (2d Cir.

1994) (evidence that "tends to prove or actually does prove" a charged offense is direct evidence

16

and not "other bad act" evidence under Rule 404(b)); *see also Carboni*, 204 F.3d at 44 (quoting *Gonzalez*, 110 F.3d at 942 (evidence "is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.").

Accordingly, the Court should find the false identification evidence admissible as direct evidence of the charged crimes at trial.

**B.     The False Identification Evidence is Alternatively Admissible as 404(b) Evidence**

In the alternative, the evidence of Ulbricht's attempts to obtain false identification documents is admissible under Rule 404(b), as it is highly probative of his intent, plan, knowledge, and absence of mistake or accident in engaging in the charged crimes.  Among other things, evidence that Ulbricht tried to conceal his connection to leased computer servers constitutes evidence of his intent to use those servers to promote an illegal enterprise, and avoid law enforcement detection.  Further, evidence that Ulbricht obtained these counterfeit identification documents from Silk Road and statements that Ulbricht made in connection with the controlled delivery of those false identification documents—acknowledging that such contraband could be obtained from the Silk Road underground website by anyone with a Tor browser—reflects his knowledge of the of the nature of illegal goods and services being sold on Silk Road.   This evidence broadly shows his criminal intent and that he possessed the requisite consciousness of guilt, in that he went through great lengths to distance himself from the criminal online enterprise he owned and operated.

The defendant's knowledge and intent regarding the illegal goods and services sold through Silk Road is directly at issue in this case.  Knowledge and intent is at issue in a criminal

proceeding, unless the defendant has unequivocally conceded that element of the offense.  *See,*
*e.g., United States* v. *Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989); *see also Ramirez*, 894 F.2d at
568 (holding that when the defendant "disavows awareness that a crime was being perpetrated"
and the Government bears the burden of providing knowledge "as an element of the crime,
knowledge is properly put in issue").  Indeed, Ulbricht has already made arguments asserting that
he lacked the requisite intent in this case in the course of moving to dismiss the Indictment.  *See*
*United States* v. *Ross Ulbricht*, -- F. Supp. 2d --, 2014 WL 3362059, at \*10 (S.D.N.Y. July 9,
2014).  Specifically, Ulbricht advanced the argument that even if he is found to have been
responsible for operating Silk Road, he merely created an online platform and he should have no
criminal liability for criminal conducted by others on the site.  As the Court previously held, in
denying the defendant's motion to dismiss, the Indictment critically includes allegations
regarding the defendant's intent that distinguished his operation of Silk Road from other online
marketplaces, such as Amazon and eBay:

> The Indictment does not allege that Ulbricht is criminally liable simply because
> he is alleged to have launched a website that was—unknown to and unplanned by
> him—used for illegal transactions.  If that were ultimately the case, he would lack
> the *mens rea* for criminal liability.  Rather Ulbricht is alleged to have knowingly
> and intentionally constructed and operated an expansive black market for selling
> and purchasing narcotics and malicious software and for laundering money.  This
> separates Ulbricht's alleged conduct from the mass of others whose websites
> may—without their planning or expectation—be used for unlawful purposes.

*Id.* at \*11.  Because intent is plainly at issue, and the false identification evidence is strongly
probative of his intent and knowledge regarding the nature of the goods and services sold on Silk
Road, the Court should admit the evidence under Rule 404(b).

Further, there is no basis to exclude the evidence regarding the defendant's attempts to
obtain false identification documents under Rule 403 of the Federal Rules of Evidence.  The
proffered evidence regarding Ulbricht's attempts to obtain false identification documents,

including the nine fake IDs which were seized, pales in comparison to the serious charges in this case, involving the defendant's ownership and administration of an underground online empire responsible for the sale of hundreds of kilograms of drugs, computer hacking tools and services and false identification documents over a two and a half year period.    It is well-established in the Rule 404(b) context that "[p]robative value is not outweighed by prejudicial effect when the prior similar bad acts do not involve conduct more inflammatory than the charged crime or . . . conduct any more sensational or disturbing than the crimes charged." *See United States* v. *Camara*, 485 Fed. Appx. 457, 460 (2d Cir. 2012) (internal citations and quotation marks omitted); *see also United States* v. *Roldan-Zapata*, 916 F.2d at 804; *see also United States* v. *Williams*, 205 F.3d 23, 34 (2d Cir. 2000).  Accordingly, because evidence regarding his attempts to obtain false ID documents has substantial probative value, and because the evidence is plainly not "any more sensational or disturbing" than the charges in the instant case, there is no legitimate risk that the evidence will "arouse irrational passions" among the jurors, and should not be excluded under Rule 403.  *United States v. Smith*, 727 F.2d 214, 220 (2d Cir. 1984) (essential inquiry under Rule 403 for admission of other crimes evidence is whether it involves "conduct likely to arouse irrational passions").

Accordingly, if the Court declines to find that the false identification evidence is admissible as direct evidence, it should be admissible under Rule 404(b) to prove intent, knowledge, and absence of mistake or accident.

## II.     EVIDENCE OF SOLICITIATIONS FOR MURDERS FOR HIRE SHOULD BE ADMITTED

### A.     The Murder For Hire Evidence is Admissible as Direct Evidence

Evidence regarding Ulbricht's attempts to solicit murders for hire is also admissible as direct evidence as "part of the very act charged" and "necessary to complete the story of the crime on trial" and directly relevant to the existence and operation of the conspiracies charged in the Indictment.  *Quinones*, 511 F.3d at 309 (internal quotation marks omitted).  Ulbricht's actions in soliciting these murders for hire were directly in furtherance of the crimes that he is charged with in the Indictment—in fact, the Indictment included this conduct as overt acts reflecting his intent "to protect his criminal enterprise and the illegal proceeds it generated." (Indictment ¶¶ 4, 16(b), 16(c)).  As set forth in detail above, Ulbricht solicited these murders for hire as part of his role as owner and operator of Silk Road, to retaliate against a former staff member who he believed had stolen Bitcoins from the site and who he feared would provide information about the site to law enforcement, and to eliminate the threats posed by others who were threatening to publicly leak the names and addresses of Silk Road users and vendors.

It is well-established that the use of violence and threatened violence to protect one's drug empire are relevant to show the existence and operation of a narcotics conspiracy, and may be properly alleged as overt acts in furtherance of such charges.  *See United States* v. *Estrada*, 320 F.3d 173, 183 (2d Cir. 2003) (noting that "the use of violence to secure the organization's drug turf [and] carrying and using firearms to enforce its control over the drug market" are overt acts of a narcotics conspiracy); *see also United States* v. *Barret*, No. 10 Cr. 809 (KAM), 2011 WL 6704862, at *9 (E.D.N.Y. Dec. 20, 2011) (finding that uncharged acts of violence were "overt acts performed in furtherance of the conspiracy because each arose out of a drug trafficking-related dispute or was otherwise motivated by a desire to protect or enhance the

conspiracy").   As with any traditional drug dealer on the street who uses violence to protect his

corner or turf from rival dealers, or to prevent informants from cooperating with law

enforcement, the defendant's actions to preserve his illegal empire on the Silk Road underground

website were directly in furtherance of the charged conspiracy offenses.

Indeed, this Court has previously noted this particular significance of the violence

allegations in denying the defendant's motion to dismiss, which are important in the context of

arguments that the defendant has already advanced in this case.   Specifically, the defendant has

previously argued that his conduct with respect to the Silk Road website was merely as a

facilitator—just like eBay, Amazon, or similar websites—and that he cannot be said to have

organized, supervised, or managed the illegal transactions which occurred on Silk Road.   See

*Ulbricht*, 2014 WL 3362059, at *10 & *16.   In response to that argument, the Court recognized

that the defendant was asserting a factual argument, and explicitly noted the relevance of the

allegations of the murder for hire evidence:

> There is no legal reason why one who designs, launches, and operates a website
> or any facility for the specific purpose of facilitating narcotics transactions that he
> knows will occur, and acts as the rule-maker of the site—determining the terms
> and conditions pursuant to which the sellers are allowed to sell and the buyers are
> allowed to buy, *taking disciplinary actions to protect that enterprise (allegedly
> including murder-for-hire on more than one occasion)*—could not be found to
> occupy the requisite position. *See Cruz*, 785 F.2d at 407 (no distinction between
> salaried employees and independent contractors).   In this regard, the allegations
> amount to Ulbricht acting as a sort of "godfather"—determining the territory, the
> actions which may be undertaken, and the commissions he will retain;
> *disciplining others to stay in line*; and generally casting himself as a leader—and
> not a service provider.

*Ulbricht*, 2014 WL 3362059, at *17 (emphasis added).

Further, the murder for hire evidence is also highly probative as direct evidence to prove

identity—that Ulbricht was the person behind the keyboard who used the Silk Road username

"Dread Pirate Roberts."   The defendant's use of that online pseudonym in the private messages

21

soliciting the murders for hire matches evidence recovered from Ulbricht's personal laptop, including chat logs and journal entries on the laptop discussing the same murders for hire. This evidence therefore connects Ulbricht in the real world with "Dread Pirate Roberts" in cyberspace, and is direct evidence of the crimes charged.

In sum, the defendant's involvement in soliciting murders for hire is an integral part of the story of his involvement in the charged offenses as the owner and operator of the Silk Road underground enterprise, as he committed those acts in direct furtherance of the enterprise. The Court should allow the admission of evidence regarding the murders for hire for the purpose of establishing his criminal knowledge and intent in operating Silk Road, and in proving his identity as the "Dread Pirate Roberts."

**B.      The Murder For Hire Evidence is Alternatively Admissible as 404(b) Evidence**

In the alternative, evidence of Ulbricht's attempts to solicit murders for hire is admissible under Rule 404(b). For substantially the same reasons advanced above, the evidence demonstrates Ulbricht's knowledge and intent, and his identity as "Dread Pirate Roberts." Rule 404(b) allows "other act" evidence to be admitted for either purpose. *See United States* v. *Gubelman*, 571 F.2d 1252, 1255 (2d Cir. 1978) (other bad acts evidence properly admitted under Rule 404(b) where the "question of identity was a real one").

Further, the Government submits that the significant probative value of the murder for hire evidence is not substantially outweighed by unfair prejudice to the defendant such that it should be excluded under Rule 403. As set forth above, the murder for hire evidence has significant probative value to a number of important issues in this case, including the existence and nature of the charged conspiracies, the defendant's intent and knowledge, and to demonstrate that the defendant was "Dread Pirate Roberts" on Silk Road. Although the evidence is highly

incriminating, that itself does not render it unfairly prejudicial for the purposes of Rule 403.  As

this Court has noted, "all evidence which tends to prove guilt could be characterized as

prejudicial, but not necessarily so under the rules of evidence . . . [o]nly unduly prejudicial

evidence which should be excluded under Fed. R. Evid. 403." *United States* v. *Del Rosario*, No.

S1 12 Cr. 81 (KBF), 2012 WL 2354245, at *4 (S.D.N.Y. Jun. 14, 2014); *United States* v. *Gelzer*,

50 F.3d 1133, 1139 (2d Cir. 1995) ("Generally speaking, any proof highly probative of guilt is

prejudicial to the interests of that defendant.  The prejudice that Rule 403 is concerned with

involves some adverse effect beyond tending to prove the fact or issue that justified its admission

into evidence.") (internal quotation marks and citation omitted).

  Any potential undue prejudice in this case is ameliorated by the limited nature of the

evidence that Government intends to offer at trial with respect to this issue.  Specifically, the

evidence consists of statements made by the defendant to co-conspirators and financial records

showing that the defendant solicited and paid for the murders for hire in question.  The

Government does not intend to introduce any evidence of actual deaths; indeed, the Government

is prepared to stipulate that the first murder for hire did not occur and that the Government has

no evidence that the remaining murders for hire actually occurred.  Moreover, the Government

does not intend to produce any gruesome evidence of any murders, such as crimes scene or

autopsy photographs, further minimizing any risk of inflaming the jury.  *See, e.g., United States*

v. *Myers*, 280 F.3d 407, 413-14 (4th Cir. 2002) (affirming district court's admission of evidence

regarding murder; court did not abuse discretion under Rule 403 where murder had "substantial

probative value," to narcotics charge, among other charges, there was prejudicial impact was

minimized by the exclusion evidence of "inflammatory photographs depicting the body or

bloody scene"); *see also United States* v. *Mehanna*, 735 F.3d 32, 62-63 (1st Cir. 2013) (finding

that district court properly admitted evidence of "very probative" video depicting remains of American soldiers, where the court minimized prejudice by requiring that the more "gruesome elements" of the video be presented through witness testimony, rather than publishing the video to the jury); *see also United States* v. *Deitz*, 577 F.3d 672, 690-91 (6th Cir. 2009) (noting that district court minimized prejudice to defendant "by directing the government to omit the more gruesome details of the incident.").  The nature of the murder for hire evidence consists solely of communications by the defendant and payment information, and does not include inflammatory gruesome materials, which effectively minimizes potential prejudice to the defendant.

Finally, not only is the threat of potential prejudice mitigated by the nature of the evidence, any possible residual prejudice can be more than adequately addressed by a standard jury instruction, providing clear direction to the jury as to the issues for which they may properly consider the evidence for.  *See United States* v. *Abu-Jihaad*, 630 F.3d 102, 133 (2d Cir. 2010) (upholding a Rule 403 determination where the district court minimized the risk of unfair prejudice through jury instructions); *accord United States* v. *Mercado*, 573 F.3d 138, 141-42 (2d Cir. 2010); *United States* v. *Downing*, 297 F.3d 52, 59 (2d Cir. 2002) ("Absent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions."); *United States* v. *Serrano*, 13 Cr. 58 (KBF), 2014 WL 2696569, at *9 (admitting evidence of planned burglaries outside scope of charged conspiracies under Rule 404(b), noting that jury would be provided clear instruction as to the purpose for which it was being admitted under the rule).

In sum, because the evidence of the defendant's attempts to solicit murders for hire is highly probative of important issues in this case, since the potential prejudice is minimized by the nature of the murder for hire evidence and because any residual potential for undue prejudice

would be neutralized by an instruction to the jury, the murder for hire evidence should not be

excluded under Rule 403.  The evidence is strongly probative of issues that go to the heart of the

questions to be determined at trial – the defendant's knowledge and intent, and his identity as the

operator of Silk Road.  The highly incriminating nature and contents of the evidence—in

soliciting violent acts to protect his interests in illegal empire—is a direct result of the

defendant's own decisions and actions, which he is set to answer for at trial.  Accordingly, the

probative value of the evidence outweighs any potential for undue prejudice.  *See United States*

*v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997) (upholding admission of evidence in narcotics

conspiracy trial of uncharged murders of "persons who were considered to be threats" to

narcotics enterprise, finding that the evidence was "relevant to show the existence and nature of

the enterprise and the conspiracy," and that their probative value outweighed potential for unfair

prejudice).


## III.    EVIDENCE OF UNCHARGED CONTRABAND AND OTHER GOODS AND SERVICES SOLD THROUGH SILK ROAD SHOULD BE ADMITTED

### A.    Evidence Regarding Uncharged Contraband and Other Goods and Services Sold Through Silk Road is Admissible as Direct Evidence

Evidence regarding goods and services sold through Silk Road that are not specifically

charged in the Indictment is inexorably intertwined with the charged conduct and necessary to

complete the story of the crimes charged-the defendant's ownership and empire of the illegal

online empire on Silk Road.  *Quinones*, 511 F.3d at 309 (internal quotation marks omitted).

First, with respect to types of contraband not referenced in the Indictment and other

goods and services of interest to criminals —including but not limited to weapons, counterfeit

commercial merchandise, pirated copies of copyrighted works, and manuals regarding the

manufacture of explosives, weapons, and computer hacking—this evidence completes the picture of the full range of products and services sold on Silk Road and the criminal nature of the website's clientele.  Accordingly, this evidence is direct evidence demonstrating the full scope of the online criminal enterprise that the defendant is charged with owning and operating, and probative of the defendant's knowledge and intent in operating a website geared to facilitate criminal activity.

Second, the Government also intends to produce evidence at trial regarding the defendant's policies with respect to allowing or disallowing various categories of items to be sold through Silk Road, including items not specifically referenced in the Indictment.  This evidence demonstrates generally that Ulbricht controlled what could be sold through Silk Road. As such, this evidence is probative to show that the defendant was not a passive administrator that merely created a platform that was used by others for illegal activity, but that he was intimately involved in controlling and promoting the sale of illegal wares and services on Silk Road.

Accordingly, the Court should find that the evidence of other contraband and other goods and services sold on Silk Road and the Armory is direct evidence of the charged crimes at trial.

**B.**     **Evidence Regarding Uncharged Contraband and Other Goods and Services Sold Through Silk Road is Alternatively Admissible as 404(b) Evidence**

In the alternative, the Government submits that evidence of sales of other contraband and other products on Silk Road, as well as evidence regarding the Armory, is admissible under Rule 404(b).  For substantially the same reasons advanced above, the evidence demonstrates Ulbricht's knowledge and intent, specifically demonstrating his knowledge of the illegal nature of the enterprise, as that he was responsible for setting policies on Silk Road, including establishing what illegal goods and services could and could not be sold on the website.

Similar to the evidence regarding Ulbricht's attempts to obtain false identification documents, in light of the significantly serious charges that Ulbricht faces in this case, evidence regarding the sale of weapons, counterfeit commercial goods, money laundering tools, and manuals regarding the manufacture of explosives, weapons and computer hacking "do not involve conduct more inflammatory than the charged crime or . . . conduct any more sensational or disturbing that the crimes charged."  *Camara*, 485 Fed. Appx. at 460 (internal citations and quotation marks omitted).  Accordingly, there is no legitimate risk that the evidence, which has substantial probative value, will "arouse irrational passions" among the jurors, and should not be excluded under Rule 403.  *See Smith*, 727 F.2d at 220 (essential inquiry under Rule 403 for admission of other crimes evidence is whether it involves "conduct likely to arouse irrational passions").

Accordingly, the Court should not exclude the evidence of other contraband and goods and services sold through Silk Road under Rule 403.

## IV.   THE COURT SHOULD PRECLUDE CERTAIN DEFENSE EVIDENCE QUESTIONING AND COMMENTS IN OPENING STATEMENTS AND ARGUMENT

In an abundance of caution, the Government moves to preclude the defendant from making particular arguments, or from attempting to introduce evidence on two topics: (1) the potential consequences to the defendant in the event he is convicted; and (2) the defendant's political views or other attempts to excuse his conduct notwithstanding its criminality.

First, the Court should preclude the defendant from presenting any evidence or argument concerning his sentencing exposure or otherwise exposing the jury to the potential consequence of convicting the defendant.  The Supreme Court and the Second Circuit have reiterated the "well established" rule that juries should not be permitted to consider the potential penalties

faced by criminal defendants.  *Shannon* v. *United States*, 512 U.S. 573, 579 (1994); *see also United States* v. *Blume*, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences.").  This case presents no reason for the Court to depart from this well settled rule.  Accordingly, the Court should preclude the parties from introducing any information – whether through jury addresses, witness examinations, or otherwise – about any of the potential consequences of conviction.

Second, the defendant should be prohibited from raising any arguments or presenting any evidence regarding the defendant's purported political views – including but not limited to views concerning the propriety of U.S. or international drug laws or the propriety of government regulation of individual conduct or commerce on the Internet – or anything else meant to convince the jury that the defendant's conduct should be excused, even if criminal, for any reason.  As the Second Circuit has explained, a defendant should not be allowed to mount a "political defense," because it is an "erroneous assumption that good motive is inconsistent with criminal intent."  *Rosado*, 728 F. 2d at 93.  The defendant's professed personal and political viewpoints on drug laws and government regulation are plainly not relevant to whether or not his conduct was in violation of the law, and cannot form the basis for a legal defense.  Rather, such arguments and evidence only serve to invite jury nullification and should therefore be excluded.  *See United States* v. *Thomas*, 116 F.3d 606, 616 (2d Cir. 1997) (holding that "trial courts have the duty to forestall or prevent [jury nullification]"); *see also United States* v. *Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) ("[T]he Court will not permit [defendant] to advance arguments aimed at jury nullification."); *United States* v. *Ahrendt*, 560 F.3d 69, 75-76 (1st Cir. 2009) (affirming preclusion of evidence regarding defendant's personal religious views on use of drugs because it promoted jury nullification); *United* States v. *Scarmazzo*, 554 F. Supp. 2d 1102,

1108 (E.D. Cal. 2008), *aff'd* 421 Fed. Appx. 670 (9th Cir. 2011) (excluding evidence and argument related to political debate as to drug legalization).

## <u>CONCLUSION</u>

For the reasons set forth above, the Government respectfully submits that the Court should grant the Government's motions.

Dated: New York, New York
December 9, 2014

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By: _____
TIMOTHY T. HOWARD
SERRIN TURNER
Assistant United States Attorneys
(212) 637-2308/1946