USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 01/07/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :
UNITED STATES OF AMERICA                                    :
                                                            :
                          -v-                               :        14-cr-68 (KBF)
                                                            :
ROSS WILLIAM ULBRICHT,                                      :        OPINION & ORDER
        a/k/a "Dred Pirate Roberts,"                        :
        a/k/a "DPR,"                                        :
        a/k/a "Silk Road,"                                  :
                                                            :
                                          Defendant.        :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

On February 4, 2014, a federal grand jury returned Indictment 14 Cr. 68 (the "Original Indictment") against Ross Ulbricht ("defendant" or "Ulbricht").  (ECF No. 12.)  On August 21, 2014, the Government filed Superseding Indictment S1 14 Cr. 68 (KBF) (the "Superseding Indictment"), charging Ulbricht with seven crimes: Narcotics Trafficking (Count One), Distribution of Narcotics by Means of the Internet (Count Two), Narcotics Trafficking Conspiracy (Count Three), Continuing Criminal Enterprise (Count Four), Conspiracy to Commit and Aid and Abet Computer Hacking (Count Five), Conspiracy to Traffic in Fraudulent Identification Documents (Count Six), and Money Laundering Conspiracy (Count Seven).  (ECF No. 52.)

The charges in the Superseding Indictment stem from the Government's allegation that Ulbricht designed, launched, and supervised the administration of Silk Road—a sprawling online marketplace for illicit goods and services—under the username "Dread Pirate Roberts" ("DPR").  According to the Government, Ulbricht

was Dread Pirate Roberts, and controlled every aspect of Silk Road, including the server infrastructure and programming code, the administrative staff responsible for assisting with the site's day-to-day operation, and the profits generated from sales.  The Government further alleges that Ulbricht was willing to resort to violence to protect Silk Road.  Trial is scheduled to begin on January 13, 2015.

On December 9 and 10, 2014, the parties filed motions in limine.  (ECF Nos. 108, 112.)  The Court orally ruled on the motions at the final pretrial conference ("FPTC") held on December 17, 2014.  The Court stated at the FPTC that it would issue a fuller, written opinion in a separate order.  This is that order.

I.      THE MOTIONS IN LIMINE[1]

This Opinion & Order addresses the followings motions in limine[2]:

A.      Defendant's motion to preclude certain evidence regarding Silk Road product listings and transactions, including evidence of narcotics seizures at Chicago O'Hare Airport and evidence of undercover narcotics buys in Chicago and New York;

B.      Defendant's motion to preclude, and the Government's motion to allow, evidence that Ulbricht solicited six murders-for-hire, and defendant's renewed motion to strike the murder-for-hire allegations from the Superseding Indictment as surplusage;

---

[1] The Government, as is typical in motions in limine, loosely uses the term "admit" throughout its brief in connection with certain motions.  (See, e.g., Government's Motions in Limine ("Gov't Mem.") at 20 ("EVIDENCE OF SOLICITATIONS FOR MURDERS FOR HIRE SHOULD BE ADMITTED."), ECF No. 108.)  In this pre-trial context, the Court construes "admit" to mean "not preclude."  That is, granting one of the Government's motions in limine allows the Government to proceed to offer the evidence at trial.  The Court is not, of course, "admitting" anything as trial has not yet commenced.  The Court's rulings here deal only with certain issues and not with whether a proper foundation has been or could be laid as to any piece of evidence.

[2] The Court has addressed one of defendant's motions in limine—discussed at POINT V of defendant's brief (ECF No. 114)—in a separate Sealed Memorandum & Decision dated December 22, 2014.

C.      Defendant's motion to preclude certain Government exhibits as insufficiently authenticated;

D.      Defendant's motion to preclude, and the Government's motion to allow, evidence that Ulbricht ordered fraudulent identification documents from Silk Road;

E.      Defendant's motion to preclude a variety of government exhibits not covered by his other motions in limine;

F.      The Government's motion to allow evidence regarding illicit or otherwise criminally oriented goods and services sold on Silk Road not specifically referenced in the Superseding Indictment; and

G.      The Government's motion to preclude argument or evidence regarding (a) any potential consequences of conviction, and (b) defendant's political views or other excuses.

II.     BACKGROUND[3]

A.      The Murder-for-Hire Evidence

The Government intends to offer evidence that Ulbricht solicited six murders-for-hire as part of his efforts to protect Silk Road and his interests therein. (Government's Motions in Limine ("Gov't Mem.") at 6, ECF No. 108.)  The Government is prepared to stipulate that (1) Ulbricht solicited the first murder-for-hire from an undercover Drug Enforcement Administration ("DEA") agent and, accordingly, no actual murder occurred, and (2) the Government is not currently aware of any evidence that the remaining murders-for-hire were carried out.  (Id. at 6 n.1.)

---

[3] The Court assumes familiarity with the facts underlying this action.  This section sets forth only those facts that are relevant to the motions in limine.

1.    <u>Murder-for-Hire Solicitation No. 1</u>

The Government intends to offer evidence that, in January 2013, as part of his efforts to protect Silk Road and his interests therein, Ulbricht solicited the murder-for-hire of a former Silk Road employee (the "Employee"), whom Ulbricht suspected of stealing approximately $350,000 worth of bitcoins from Silk Road.  (<u>Id.</u> at 6.)  This evidence allegedly consists of records of online conversations between Ulbricht[4] and two alleged coconspirators ("CC-1" and "CC-2"), as well as testimony from a cooperating witness.  (<u>Id.</u> at 7.)

The Government contends that chat records recovered from Ulbricht's laptop will show as follows:  In mid-January 2013, Ulbricht discussed with CC-1 that the Employee had gone missing and that approximately $350,000 in bitcoins had been stolen from Silk Road.  (<u>Id.</u> at 6.)  On January 26, 2013, CC-1 informed Ulbricht that he had determined that the Employee was responsible for the theft of bitcoins from various vendor accounts.  (<u>Id.</u>)  Later that day, Ulbricht told CC-1 that he knew the identity of the Employee, that the Employee had been arrested on narcotics charges, and that he (Ulbricht) had arranged for "muscle" to "get to [the Employee] quickly."  (<u>Id.</u>)  CC-1 assured Ulbricht that "you always have me at your disposal if you locate him and need someone to go handle it."  (<u>Id.</u>)  Ulbricht responded, "thanks.  I want to kick his ass myself, but let's leave it to the pros." (<u>Id.</u>)

_____

[4] The Government contends that Ulbricht participated in these online conversations; the Court therefore uses defendant's name when discussing this evidence.  However, the Court notes that this issue is subject to proof at trial.  Defendant has not conceded that he is DPR or that he participated in any of the subject conversations.

The next day, Ulbricht told another coconspirator, CC-2, about the theft.  (Id.)
Ulbricht expressed surprise that the Employee had stolen from him given that he
had a copy of the Employee's driver's license.  (Id. at 6-7.)  Later in the conversation,
Ulbricht and CC-2 discussed the possibility that the Employee was cooperating with
law enforcement, and CC-2 remarked:

> [A]s a side note, at what point in time do we decide that we've had
> enough of someone[']s shit, and terminate them?  Like, does
> impersonating a vendor to rip off a mid-level drug lord, using our rep
> and system; follows up by stealing from our vendors and clients and
> breeding fear and mis-trust, does that come close in your opinion.

(Id. at 7.)  Ulbricht responded, "terminate? execute?" and later stated, "I would have
no problem wasting this guy."  (Id.)  CC-2 responded that he could take care of it,
and stated that he would have been surprised if Ulbricht "balked at taking the step,
of bluntly, killing [the Employee] for fucking up just a wee bit too badly."  (Id.)
Later that day, Ulbricht told CC-2 that he had solicited someone to track down the
Employee.  (Id.)

On February 5, 2013, Ulbricht reported to CC-2 that the Employee was
captured and interrogated about the stolen bitcoins.  (Id.)  A few hours later,
Ulbricht told CC-2 that the Employee had been executed.  (See id.)  On February 23,
2013, Ulbricht reported to CC-1 that he had successfully arranged the Employee's
capture and execution.  (Id.)

### 2.    Murder-for-Hire Solicitation No. 2

The Government also intends to offer evidence that, in March and April 2013,
Ulbricht, acting as DPR, solicited the murder-for-hire of a Silk Road vendor with

the username "FriendlyChemist," who was attempting to extort DPR.  (Id. at 8.)
This evidence consists of messages recovered from the Silk Road messaging system,
files recovered from Ulbricht's laptop, and proof that a Silk Road user was paid
1,670 bitcoins to murder FriendlyChemist.  (Id. at 11.)

The alleged extortion began on March 13, 2013.  (See id. at 8.)  In messages
sent over the Silk Road messaging system, FriendlyChemist threatened to publish a
list of real names and addresses of Silk Road vendors and customers unless DPR
paid him $500,000.  (Id.)  FriendlyChemist claimed that he had obtained the list
from hacking into the computer of another Silk Road vendor.  (Id.)  He indicated
that he needed the $500,000 to pay off his narcotics supplier.  (Id.)  In one message,
FriendlyChemist wrote to DPR:

> what do u . . . think will happen if thousands of usernames, ordr
> amounts, addresses get leaked?  all those people will leave sr and be
> scared to use it again.  those vendors will all be busted and all there
> customers will be exposed too and never go back to sr.

(Id.)  Later, FriendlyChemist provided to DPR a sample of the identifying
information that he claimed to possess.[5]  (Id.)

On March 25, 2013, user "redandwhite" sent a message to DPR revealing
that he was the supplier to whom FriendlyChemist owed money.  (Id.)  On March
27, 2013, DPR sent the following message to redandwhite:

> In my eyes, FriendlyChemist is a liability and I wouldn't mind if he
> was executed . . .  I'm not sure how much you already know about the
> guy, but I have the following info and am waiting on getting his
> address.

---

[5] The context of these communications could lead a rational juror to conclude that they are related to
narcotics vendors.

(Id.)  DPR listed FriendlyChemist's name and indicated that he lived in White Rock,

British Columbia, Canada, with "Wife + 3 kids." (Id. at 9.)

Meanwhile, FriendlyChemist's threats continued.  On March 29, 2013,

FriendlyChemist sent a message to DPR, stating:

> u leave me no choice I want 500k usd withn 72hrs or i am going to post
> all the info i have. . . . i hate to do this but i need the money or im going
> to release it all.  over 5000 user details and about 2 dozen vender
> identities.  wats it going to be?"

(Id.)  Several hours later, DPR sent a message to redandwhite confirming that he

wanted FriendlyChemist to be murdered and asking how much redandwhite

wanted to be paid for the job.  (Id.)  After redandwhite asked what problem

FriendlyChemist was causing, DPR responded, in a message dated March 30, 2013:

> [H]e is threatening to expose the identities of thousands of my clients
> that he was able to acquire . . . .  [T]his kind of behavior is unforgivable
> to me.  Especially here on Silk Road, anonymity is sacrosanct.

(Id.)  DPR also commented that the murder "doesn't have to be clean."  (Id.)  Later

that day, redandwhite responded with a quoted price of $150,000 to $300,000

"depending on how you want it done"—"clean" or "non-clean."  (Id.)  The next day,

DPR objected to the price: "Don't want to be a pain here, but the price seems high.

Not long ago, I had a clean hit done for $80k.  Are the prices you quoted the best

you can do?"  (Id.)

Through further messages exchanged on March 31, 2013, DPR and

redandwhite agreed upon a price of 1,670 bitcoins (approximately $150,000) for the

murder-for-hire.  (Id. at 9-10.)  DPR provided a transaction record confirming the

transfer of the bitcoins, and redandwhite confirmed receipt of payment.  (Id. at 10.)
Approximately 24 hours later, redandwhite sent an update to DPR, stating, "[Y]our
problem has been taken care of. . . .  Rest easy though, because he won't be
blackmailing anyone again.  Ever."  (Id.)  At DPR's request, redandwhite sent DPR
a picture of the victim after the job was done.  (Id.)  Next to the victim was a piece of
paper with random numbers that DPR had supplied.  (Id.)  On April 5, 2013, DPR
wrote to redandwhite, "I've received the picture and deleted it.  Thank you again for
your swift action."  (Id.)

According to the Government, evidence recovered from Ulbricht's personal
laptop corresponds to the information in the messages retrieved from the Silk Road
messaging system.  Specifically, agents recovered from the laptop a file labeled
"log," in which Ulbricht allegedly recorded his actions in operating Silk Road
between March 20, 2013 and September 30, 2013.  (Id.)  The Government contends
that the log includes numerous references to a murder-for-hire, including:

- March 28, 2013: "being blackmailed with user info.  talking with large
  distributor (hell's angels)";

- March 29, 2013: "commissioned hit on blackmailer with angels";

- April 1, 2013: "got word that blackmailer was executed"; and

- April 4, 2013: "received visual confirmation of blackmailers execution."

(Id.)  This timeline corresponds to that of DPR's solicitation of the murder-for-hire of
FriendlyChemist as described above.

3.    <u>Murder-for-Hire Solicitations Nos. 3–6</u>

Finally, the Government intends to offer evidence that, in April 2013,

Ulbricht, acting as DPR, solicited redandwhite to carry out the murders-for-hire of

four other individuals associated with FriendlyChemist.  (<u>Id.</u> at 11.)  The

Government's evidence allegedly consists of messages recovered from the Silk Road

messaging system, as well records recovered from Ulbricht's laptop.  (<u>Id.</u> at 13.)  The

Government also intends to demonstrate that DPR paid redandwhite 3,000 bitcoins

for the four additional murders-for-hire.  (<u>Id.</u>)

According to the Government, messages recovered from the Silk Road

messaging system will show as follows:  Around the same time that redandwhite

informed DPR that FriendlyChemist had been executed, he also told DPR that his

workers had questioned FriendlyChemist and that FriendlyChemist "spilled

everything he knew."  (<u>Id.</u> at 11.)  In particular, redandwhite indicated that

FriendlyChemist had identified "tony76" as a Silk Road user who participated in

the blackmail scheme and who had been involved in running scams on Silk Road

"for a couple of years."  (<u>Id.</u>)  During the conversation, redandwhite revealed

tony76's identity to DPR and stated that tony76 lived in Surrey, British Columbia,

Canada.  (<u>Id.</u>)

On April 5, 2013, DPR wrote to redandwhite, "I would like to go after

[tony26]. . . .  If he is our man, then he likely has substantial assets to be recovered.

Perhaps we can hold him and question him?"  (<u>Id.</u> at 12.)  redandwhite responded

that he would send people to "do some recon" and report back.  (<u>Id.</u>)  The next day,

on April 6, 2013, redandwhite informed DPR that tony26 was a drug dealer who "works/lives with 3 other people and they all sell product together."  (Id.)  The following conversation ensued:

> redandwhite: Do you want to deal with this . . . guy, or do you want me to put the team on standby?
>
> DPR: I am confident enough that it is him to move forward.  Can we round up all 4 of them, separate them, and get them to out each other and give up their stolen money?
>
> redandwhite: As for getting all 4, it would be possible but they would have to get them all at once so that one does not get away.
>
> DPR: Ok, let's just hit [tony26] and leave it at that.  Try to recover the funds, but if not, then not.

(Id.)

On April 8, 2013, redandwhite offered to "hit [tony26] only" for $150,000 "just like last time."  (Id.)  However, redandwhite cautioned DPR that if they murdered only tony26, then they would be unable to "do [the hit] at their place because there are always at least a few of them there. . . .  So we wouldn't be able to recover any of his things."  (Id.)  redandwhite further stated that he would "prefer to do all 4" in order to have a "chance of recovering any potential product/money he may have," adding, "Anything recovered would be split 50/50 with you."  (Id.)  redandwhite quoted a price of "500k USD" to do "all 4."  (Id. at 12-13).  Later that day, DPR responded, "hmm . . . ok, I'll defer to your better judgment and hope we can recover some assets from them."  (Id. at 13.)  DPR confirmed that he had sent a payment of 3,000 bitcoins (approximately $500,000) to redandwhite's designated Bitcoin address.  (Id.)

The Government contends that information recovered from Ulbricht's laptop corresponds to the evidence recovered from the Silk Road messaging system. According to the Government, chat logs from the laptop indicate that, on April 3, 2013, Ulbricht informed CC-2 that (1) he (Ulbricht) previously had been blackmailed by an individual who threatened to reveal addresses of Silk Road vendors and customers, (2) he had paid a member of the Hell's Angels "to hunt down the blackmailer," and (3) he learned that tony76 was involved in the blackmail scheme.  (<u>Id.</u> at 11-12.)  Ulbricht's log file allegedly contains entries further confirming his involvement in soliciting the murders-for-hire of tony26 and his three associates:

- April 6, 2013: "gave angels go ahead to find tony76";
- April 8, 2013: "sent payment to angels for hit on tony76 and his 3 associates."

(<u>Id.</u> at 13.)

        B.    <u>The Fraudulent Identification Evidence</u>

The Government intends to offer evidence that Ulbricht attempted to procure fraudulent identification documents from Silk Road in 2013.  (Gov't Mem. at 4.)

The Government contends that it will prove the following facts at trial:  On June 10, 2013, a Silk Road user "shefoundme" sent a message on the Silk Road messaging system to a vendor named "KingOfClubs," indicating that shefoundme wanted to order "a few of your highest quality IDs."  (<u>Id.</u> at 5.)  In subsequent messages, shefoundme ordered nine counterfeit identification documents from New

York, Florida, Texas, Colorado, California, South Carolina, Canada, the United Kingdom, and Australia for $1,650 in U.S. currency.  (Id.)

On July 5, 2013, KingOfClubs confirmed that he had mailed the package with the fraudulent identification documents and that it would be delivered to shefoundme the following week.  (Id.)  On July 18, 2013, after shefoundme complained that the package had not arrived, KingOfClubs provided a U.S. Postal Service ("USPS") tracking number to shefoundme.  (Id.)  shefoundme responded that the USPS website indicated that the package was "inbound out of customs on the 10th."  (Id.)

On July 10, 2013—the same day that shefoundme's package was "inbound out of customs"—federal agents with U.S. Customs and Border Protection ("CPB") intercepted a package from Canada as part of a routine border search.  (See id. at 4.)  The package contained nine counterfeit identification documents, each of which featured a different name and address but all of which contained a photograph of the same person, allegedly Ulbricht—some with facial hair and others without. (See id.; GX 402.)  The licenses stated that they were issued by New York, Florida, Texas, Colorado, California, South Carolina, Canada, the United Kingdom, and Australia—the same jurisdictions that shefoundme had ordered from KingOfClubs. (See Gov't Mem. at 4.)

On or about July 26, 2013, an agent with Homeland Security Investigations ("Agent-1") performed a controlled delivery of the counterfeit driver's licenses to the address on the package.  (See id.)  Agent-1 encountered Ulbricht at that address.

(See id.)  The Government expects Agent-1 to testify that Ulbricht produced his true government-issued Texas driver's license during this encounter, and stated, in sum and substance, that (1) "hypothetically" anyone could go onto a website called "Silk Road" and purchase any drugs or fake identity documents that he or she desired, and (2) he lived at the residence to which the delivered package was addressed under the alias "Josh."  (Id.)[6]

## III.   APPLICABLE LEGAL PRINCIPLES

### A.   Standard on a Motion In Limine

"The purpose of an in limine motion is 'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'"  Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996) (quoting Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc., 652 F. Supp. 1400, 1401 (D. Md. 1987)); see also Highland Capital Mgmt., L.P., v. Schneider, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008).  "The trial court should exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds."  United States v. Ozsusamlar, 428 F. Supp. 2d 161, 164-65 (S.D.N.Y. 2006) (citations omitted).

---

[6] The Government also intends to offer evidence that Ulbricht leased servers under false identities. (Id. at 5.)  According to the Government, a Court-authorized search of Ulbricht's laptop revealed a spreadsheet listing IP addresses and descriptions of various Silk Road–related servers along with approximately 21 false identities under which each of the servers was leased and registered.  (Id.)  It is not clear that any of those 21 identities are the same as the identities in the nine fraudulent identification documents discussed herein.

In limine rulings occur pre-trial, and that fact has significance.  The evidence at trial may come in differently than anticipated, altering the solidity of the proffered basis for a pre-trial ruling.  The Court therefore invites parties who believe that the factual record as developed at trial supports a revised ruling to bring such an application in a timely manner.

B.    Relevant Evidence

Rule 401 defines relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence," so long as "the fact is of consequence in determining the action."  Fed. R. Evid. 401; see also Old Chief v. United States, 519 U.S. 172, 178 (1997).  "The fact to which the evidence is directed need not be in dispute."  Old Chief, 519 U.S. at 179 (quoting Fed. R. Evid. 401 advisory committee's note) (internal quotation mark omitted).

To be relevant, evidence need not constitute conclusive proof of a fact in issue, but only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  McKoy v. North Carolina, 494 U.S. 433, 440 (1990) (quoting New Jersey v. T.L.O., 469 U.S. 325, 345 (1985)) (internal quotation marks omitted); see also United States v. Abu-Jihaad, 630 F.3d 102, 132 (2d Cir. 2010).

C.    "Other Act" Evidence

"It is well established that evidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to

14

complete the story of the crime on trial." United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997) (quoting United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989)) (alterations and internal quotation marks omitted); United States v. Kassir, No. 04 Cr. 356(JFK), 2009 WL 976821, at *2 (S.D.N.Y. Apr. 9, 2009).  Such evidence is direct evidence of a crime.  See Kassir, 2009 WL 976821, at *2.  A Rule 404(b) analysis is, however, prudent where it is not manifestly clear that the evidence in question is proof of the charged crime.  Id.

Rule 404(b) provides:

(1) Prohibited Uses.  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses; Notice in a Criminal Case.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. . . .

Fed. R. Evid. 404(b).  "Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct."  Huddleston v. United States, 485 U.S. 681, 685 (1988).

The Second Circuit evaluates 404(b) evidence under an inclusionary approach that allows evidence for any purpose other than to show a defendant's criminal propensity.  United States v. McCallum, 584 F.3d 471, 475 (2d Cir. 2009); see also United States v. Paulino, 445 F.3d 211, 221 (2d Cir. 2006).  Courts therefore may allow evidence of other acts by the defendant if the evidence is relevant to an issue at trial other than the defendant's character and if the risk of unfair prejudice does

not substantially outweigh the probative value of the evidence. United States v.
Morrison, 153 F.3d 34, 57 (2d Cir. 1998); see also United States v. Garcia, 291 F.3d
127, 136 (2d Cir. 2002). This inclusionary approach does not, however, invite the
Government "to offer, carte blanche, any prior act of the defendant in the same
category of crime." McCallum, 584 F.3d at 475 (quoting Garcia, 291 F.3d at 137).

In considering the admissibility of evidence pursuant to Rule 404(b), a court
must consider the following:

- Is the evidence offered for a proper purpose—that is, does it go to
  something other than the defendant's character or criminal
  propensity?

- Is the evidence relevant?

- Is the probative value of the evidence substantially outweighed by the
  danger of unfair prejudice?

- Has the court administered an appropriate limiting instruction?

McCallum, 584 F.3d at 475 (citation omitted).

It is well established that proving identity qualifies as a "proper purpose."
See, e.g., United States v. Gubelman, 571 F.2d 1252, 1254 (2d Cir. 1978) ("[T]he
record shows that appellant sufficiently raised the issue of mistaken identity at
trial to justify the admission of bad acts evidence relevant to that issue." (citations
omitted)).

Also among the "proper purposes" for presenting evidence of extrinsic acts are
to prove knowledge and intent. See United States v. Teague, 93 F.3d 81, 84 (2d Cir.
1996); United States v. Caputo, 808 F.2d 963, 968 (2d Cir. 1987). "Where a
defendant claims that his conduct has an innocent explanation, prior act evidence is

generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged."  United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993) (citation omitted).

Another "legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case" and can assist the jury in understanding the relationship of trust between the coconspirators.  United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) (citations omitted); see also United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993).

Completing the story of the crimes is also a legitimate use of "other act" evidence.  See United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense.").

Once the Government has proffered a proper purpose for "other act" evidence, the Court must then determine whether the other act is in fact probative of the crimes charged.  In this regard, the Government must identify a similarity or connection between the other act and an element of a charged offense.  See United States v. Brand, 467 F.3d 179, 197 (2d Cir. 2006).  To be relevant, the other act must be sufficiently similar to the conduct at issue to permit the jury reasonably to draw an inference from the act that the state of mind of the actor is as the proponent of the evidence asserts.  United States v. Curley, 639 F.3d 50, 57 (2d Cir.

2011); see also United States v. Peterson, 808 F.2d 969, 974 (2d Cir. 1987).  The court abuses its discretion if the "chain of inferences" necessary to connect the other act with the charged crime is "unduly long."  Curley, 639 F.3d at 57.  While the duration of elapsed time between two events can detract from the probative value of the prior event, see Garcia, 291 F.3d at 138, "temporal remoteness of . . . acts does not preclude their relevancy," Curley, 639 F.3d at 59.

It is, however, improper to receive evidence ostensibly as probative of knowledge and intent when it is in reality "propensity evidence in sheep's clothing." McCallum, 584 F.3d at 477.  The Government may not use Rule 404(b) to "parade past the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo." Huddleston, 485 U.S. at 689.  Under Rule 404(b), other act evidence is only admissible if it is relevant, and it is only relevant "if the jury can reasonably conclude that the act occurred and that the defendant was the actor."  Id.

D.    Rule 403

Rule 403 authorizes the exclusion of relevant evidence when "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403; see also Old Chief, 519 U.S. at 180.  "[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives."  Old Chief, 519 U.S. at 184.  "If an alternative were found

to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfairly prejudicial risk." Id. at 182-83.  In making this assessment, a court should take into consideration the "offering party's need for evidentiary richness and narrative integrity in presenting a case."  Id. at 183.

Rule 403 is concerned with "some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence."  United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980)) (internal quotation marks omitted).

Several courts have found that "other act" evidence is not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged.  United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990); see also Curley, 639 F.3d at 59 (finding that the district court did not err in finding that the probative value of prior acts of domestic violence with similar characteristics to the charged conduct outweighed the potential prejudicial effect when the prior acts were no more sensational than the charged conduct); Abu-Jihaad, 630 F.3d at 132-33 (finding that conversations referencing uncharged support of jihad were "no more inflammatory than the charges alleged in the indictment," id. at 133); United States v. Mercado, 573 F.3d 138, 142 (2d Cir. 2009) (upholding a Rule 403 determination where the challenged evidence was "not especially worse or shocking than the transactions charged" and where the district

court instructed the jury as to what inferences could properly be drawn from such evidence).

IV.    DISCUSSION

     A.    <u>Defendant's Motion to Preclude Certain Evidence Regarding Silk Road Product Listings and Transactions</u>

Defendant has moved to preclude certain evidence of Silk Road transactions, including evidence of narcotics seizures at Chicago O'Hare Airport and undercover buys of narcotics from Silk Road in Chicago and New York.  (<u>See</u> Memorandum of Law in Support of Defendant Ross Ulbricht's Motions <u>In Limine</u> ("Def. Mem.") at 3-8, ECF No. 114.)  Defendant also has moved to preclude evidence of various Silk Road product listings.  (<u>See</u> <u>id.</u>)  The challenged exhibits include, <u>inter alia</u>, photographs of contraband allegedly seized in Chicago, screenshots of Silk Road webpages allegedly showing narcotics and other contraband for sale (e.g., "BROWN HEROIN No3 0.2 GRAM!!" for 0.45 bitcoins in GX 103A), and summary charts allegedly listing undercover purchases of narcotics in Chicago and New York.

Defendant's principal argument in support of this motion is that the buy-sell transactions among Silk Road's users at most gave rise to a multitude of discrete conspiracies, rather than the "enormous, anonymous, and essentially unlimited conspiracy" (Def. Mem. at 3) charged in the Superseding Indictment.  Defendant contends that, as a result, evidence of these numerous, separate transactions necessarily implicates only buy-sell relationships and not conspiratorial behavior. Thus, according to defendant, the evidence is irrelevant to the conspiracy charge. In addition, he argues that in any event it constitutes inadmissible hearsay.

Defendant also argues that admission of such evidence (much of which is not facially tied to New York) can only tend to prove crimes committed outside of this district, rendering venue improper.  Based on this chain of logic, defendant argues that if venue is improper, allowing this evidence would similarly be improper. Finally, defendant argues that the evidence should be precluded under Rule 403.

The Government responds that defendant's attempt to preclude evidence on the basis of his view as to the adequacy of the Government's conspiracy charge simply disregards his previously denied motion to dismiss the Original Indictment. (See Memorandum of Law in Opposition to the Defendant's Motions In Limine ("Gov't Opp.") at 3, ECF No. 127.)  Defendant's argument also fundamentally elides that most of the narcotics charges against defendant are for his direct participation in substantive crimes.

<u>Discussion</u>

The Court agrees with the Government and DENIES defendant's motion as to the narcotics-related evidence.[7]  Defendant is charged with four separate counts of narcotics-related offenses, three of which are substantive charges and only one of which is a conspiracy charge: Narcotics Trafficking (Count One), Distribution of Narcotics by Means of the Internet (Count Two), Narcotics Trafficking Conspiracy (Count Three), and Continuing Criminal Enterprise (Count Four).  Plainly, to the extent the Government can tie the evidence to one of the three substantive counts,

---

[7] To the extent that some of the evidence challenged through this motion falls within the scope of the Government's motion to allow evidence of uncharged contraband, the Court's ruling on that motion, set forth in subpart F below, applies here.

defendant's conspiracy arguments are inapposite.  However, at this stage, the Court additionally finds the evidence relevant to the Government's theory of the narcotics conspiracy.  In all events, Rule 403 does not require preclusion.

The evidence plainly is relevant to the substantive narcotics charges in Counts One, Two, and Four.  Counts One and Two charge defendant with distributing or aiding and abetting the distribution of narcotics (Count One) and doing so by means of the Internet (Count Two).  Count Four charges defendant with engaging in a continuing criminal enterprise, which requires the Government to prove, inter alia, that he committed a Title 21 drug felony violation as part of a "continuing series" of Title 21 drug violations.  See United States v. Aiello, 864 F.2d 257, 263-64 (2d Cir. 1988).  Each of these substantive charges is premised on the allegation that Silk Road was an online platform for the distribution of narcotics.  Evidence of seizures and undercover purchases of narcotics in New York and Chicago, as well as evidence of narcotics product listings on Silk Road, is therefore highly probative and relevant.

The challenged evidence is also relevant to Count Three, charging defendant with participating in a narcotics trafficking conspiracy.  The Government's theory is that defendant sat atop an overarching single conspiracy, which included all vendors who sold any type of narcotics on Silk Road at any time.[8]  Under this theory, any and all vendors who sold the narcotics seized or purchased in Chicago

---

[8] At the FPTC, the Government clarified that the charged narcotics conspiracy is not alleged to have included vendors who sold criminally oriented merchandise other than narcotics.

and New York, and all those (if different) who listed and advertised narcotics on Silk Road, were Ulbricht's coconspirators.[9]  Evidence of narcotics seizures and undercover purchases in New York and Chicago, as well as evidence of narcotics product listings on Silk Road, is relevant to the existence of the charged conspiracy.[10]

Do the product labels constitute inadmissible hearsay?  No.  It is certainly true that the narcotics-related product listings contain labels—such as "BROWN HEROIN" in GX 103A—suggesting that the drugs sold on Silk Road were, in fact, real narcotics.  Thus, images showing such written statements would be offered for the truth.  However, these images fall within the coconspirator exception under Rule 801(d)(2)(E) of the Federal Rules of Evidence.

The Court has considered defendant's arguments that if evidence is admitted under the coconspirator exception, and the conspiracy charge is later dismissed as overly broad, the entire trial would be irreparably infected.  This argument misconstrues the law relating to the elements necessary to make an appropriate

---

[9] The Court has previously expressed its concerns with the breadth of the Government's conspiracy theory.  However, the Government may nonetheless seek to prove such a conspiracy, and the jury will decide whether or not the Government's evidence is sufficient.  See United States v. Maldonado-Rivera, 922 F.2d 934, 962 (2d Cir. 1990) ("[W]here the proof is susceptible to the inference that there was more than one conspiracy, the question of whether one or more than one conspiracy has been established is a question of fact for a properly instructed jury." (citations omitted)); United States v. Gambino, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992) ("It is axiomatic that, in a criminal case, a defendant may not challenge a facially valid indictment prior to trial for insufficient evidence. Instead, a defendant must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary insufficiency." (citations omitted)).

[10] Defendant's venue objection is meritless at this stage.  In a conspiracy prosecution, "venue may lie in any district in which the conspiracy was formed or in any district in which a conspirator committed an overt act in furtherance of the criminal scheme."  United States v. Rommy, 506 F.3d 108, 119 (2d Cir. 2007) (citations omitted).  It will be up to the Government to prove venue by a preponderance of the evidence.  See id.

showing under Rule 801(d)(2)(E).  In sum, evidence may be admitted pursuant to the coconspirator exception whether or not the conspiracy which such evidence is alleged to be in furtherance of is the charged conspiracy; and such rulings may survive even if the defendant is acquitted of the charged conspiracy.

The governing legal principles are as follows: in order to admit a statement under Rule 801(d)(2)(E), this Court must find by a preponderance of the evidence "(1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy."  United States v. Tracy, 12 F.3d 1186, 1196 (2d Cir. 1993) (citations omitted); see also Bourjaily v. United States, 483 U.S. 171, 176 (1987) (holding that a "preponderance of the evidence" standard applies).  "[S]tatements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of those four prerequisites."  Tracy, 12 F.3d at 1199 (citations omitted).  In this case, that ruling awaits a specific proffer at trial.

The standard for a judicial determination that the elements to allow admission pursuant to the coconspirator exception are met is lower than that for a criminal conviction.  Courts repeatedly have found that even an acquittal on a conspiracy count "does not destroy the admissibility of the declarations of co-conspirators on the substantive charge."  United States v. Clark, 613 F.2d 391, 403 (2d Cir. 1979) (citation omitted).

The law also has long provided that "[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment." United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999); see also United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002). In fact, the Second Circuit has held that it is not even necessary that the Government charge a conspiracy to take advantage of Rule 801(d)(2)(E). United States v. DeVillio, 983 F.2d 1185, 1193 (2d Cir. 1993). Thus, in proving the existence of a conspiracy for purposes of Rule 801(d)(2)(E) in this case, the Government is not limited to the overarching conspiracy charged in Count Three; for example, proof of multiple small conspiracies may suffice for purposes of Rule 801(d)(2)(E).

Having found that the challenged evidence is relevant, the Court turns to Rule 403. Preclusion is not warranted under Rule 403. The probative value of the evidence substantially outweighs any danger of unfair prejudice. As discussed, the evidence is highly probative of the charged narcotics offenses. Defendant points to "the sheer volume of evidence of illegal transactions by Silk Road users" (Def. Mem. at 7), but a criminal defendant is not entitled to preclude evidence simply because it is incriminating and there is a lot of it. "All evidence which tends to prove guilt could be characterized as prejudicial," but "[o]nly unduly prejudicial evidence should be excluded under Fed. R. Evid. 403." United States v. Del Rosario, No. S1 12 Cr. 81(KBF), 2012 WL 2354245, at *3 (S.D.N.Y. June 14, 2012) (citation omitted); see also Gelzer, 50 F.3d at 1139 ("The prejudice that Rule 403 is concerned with

involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" (quoting <u>Figueroa</u>, 618 F.2d at 943)).

Accordingly, defendant's motion to preclude certain evidence regarding Silk Road product listings and transactions is DENIED.

B.    <u>The Murder-for-Hire Motions</u>

The Government has affirmatively moved to allow the murder-for-hire evidence.  Defendant has moved to preclude all evidence of Ulbricht's murder-for-hire solicitations.  Defendant also has moved to strike as surplusage references to these solicitations in the Superseding Indictment.

The Government argues that evidence of Ulbricht's solicitations of six murders-for-hire is admissible as direct evidence of the crimes charged in the Superseding Indictment.  In particular, the Government argues that Ulbricht solicited the murders-for-hire in furtherance of the charged offenses—in order to protect his criminal enterprise from theft, extortion, and threats of exposure to law enforcement.  According to the Government, Ulbricht's resort to violence is akin to that of a "traditional drug dealer on the street who uses violence to protect his corner or turf from rival dealers, or to prevent informants from cooperating with law enforcement."  (Gov't Mem. at 21.)  Alternatively, the Government argues that the murder-for-hire evidence is admissible under Rule 404(b) to prove Ulbricht's criminal knowledge and intent, as well as his identity as DPR.

In contrast, defendant argues that the murder-for-hire solicitations must be precluded as irrelevant to the charged offenses, and not admissible even as

background information because they are wholly unrelated to any of the charged offenses, which are limited to nonviolent crimes.  According to defendant, "[t]he government's acknowledgment that there is not any evidence that any murders, or even violence of any kind, occurred . . . reinforces the lack of relevance of the murder for hire allegations."  (Def. Mem. at 12.)  Defendant further argues that even if the murder-for-hire evidence is relevant, the Court should preclude it under Rule 403.

Discussion

For the reasons set forth below, the Court finds that the murder-for-hire evidence is relevant to the charged offenses, and would in any event be separately admissible under Rule 404(b) to prove Ulbricht's identity as DPR.  Finally, Rule 403 does not require preclusion.

The murder-for-hire evidence is directly relevant to proving the elements of the narcotics offenses.  First, the context of each of the alleged solicitations involves narcotics dealers, rendering the evidence probative of defendant's participation in the charged offenses.  Ulbricht's alleged solicitations of the murders-for-hire revolved around narcotics and protecting Silk Road.  The Government seeks to offer evidence that FriendlyChemist, a Silk Road user, was extorting DPR to pay off his narcotics supplier, and that Ulbricht solicited the supplier—another Silk Road user—to execute FriendlyChemist in order to protect the security and anonymity of Silk Road.  The Government also seeks to show that DPR solicited the same supplier to execute tony26 and his three associates at least in part to recover

"potential product/money." The supplier told Ulbricht that tony26 was a drug dealer who lived and "s[old] product" with the three associates. These statements are all probative of the existence of the unlawful conspiracy alleged by the Government.[11]

Further, the evidence has additional relevance to the CCE charge in Count Four. One of the elements of the CCE offense is that defendant occupied "a position of organizer, a supervisory position, or any other position of management." Aiello, 864 F.2d at 264. Evidence that Ulbricht solicited murders-for-hire of individuals who threatened Silk Road is relevant to show Ulbricht's supervisory role in the criminal enterprise—that he protected the criminal enterprise of which he was the leader. The first alleged murder-for-hire solicitation is particularly probative in this regard because the target was a Silk Road employee. Ulbricht suspected an employee of stealing approximately $350,000 worth of bitcoins from vendor accounts, and his alleged response—to solicit another Silk Road user to murder the Employee—shows that he occupied a central managerial role in the criminal enterprise. Evidence that Ulbricht expressed surprise that the Employee stole from

---

[11] It is well established that where "the indictment contains a conspiracy charge, 'uncharged acts may be admissible as direct evidence of the conspiracy itself.'" United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999) (quoting United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997)) (internal quotation marks omitted); see also United States v. Lopez, 572 F. App'x 1, 3 (2d Cir. 2014) (affirming the district court's decision to allow evidence of an uncharged murder as direct evidence of the existence of a conspiracy); United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994) (finding no error in the admission of evidence of a robbery that was not alleged in the indictment because the robbery, and the defendant's participation in that robbery, "were plainly acts in furtherance of the RICO conspiracy"). In particular, acts of violence may be admissible as overt acts in furtherance of a drug distribution conspiracy. See United States v. Estrada, 320 F.3d 173, 183 (2d Cir. 2003) (noting that "the use of violence to secure the organization's drug turf" and "carrying and using firearms to enforce its control over the drug market" are overt acts of a narcotics conspiracy (internal quotation mark omitted)).

him because he had the Employee's driver's license (obtained in connection with the Employee's work on Silk Road) is further proof that Ulbricht was at the top of the Silk Road hierarchy.[12]

Finally, the murder-for-hire evidence is separately admissible under Rule 404(b) to show identity—that Ulbricht was DPR. The Government contends that chats and other records recovered from Ulbricht's personal laptop correspond to DPR's communications about the murders-for-hire on the Silk Road messaging system. This connection is probative of identity.

The evidence of the first solicitation allegedly consists of records of online messages between Ulbricht and two other individuals, CC1 and CC2. In these messages, Ulbricht allegedly discussed with CC-1 and CC-2 that the Employee was responsible for the theft of $350,000 worth of bitcoins from vendor accounts; that he was arrested on narcotics charges; that he may be cooperating with law enforcement; and that Ulbricht solicited someone to murder him. These messages were allegedly recovered from Ulbricht's personal laptop and are probative of whether Ulbricht was DPR—the leader of Silk Road who took measures to protect the criminal enterprise from threats.

In addition, DPR's conversations on the Silk Road messaging system about FriendlyChemist allegedly correspond to entries in a log file recovered from

---

[12] Defendant emphasizes that there is no evidence that any of the murders-for-hire were carried out, but this fact is inapposite because it does not undermine the evidence that Ulbricht, acting as DPR, was willing to resort to extremely harsh, violent measures to protect his criminal enterprise. The Government has agreed to stipulate that it has no evidence of any actual murders, effectively eliminating any danger that the jury would improperly assume that the murders were carried out.

Ulbricht's laptop.  For example, on March 27, 2013, after FriendlyChemist had threatened to publish a list of real names and addresses of Silk Road vendors and customers unless DPR paid him $500,000, DPR wrote to redandwite, "In my eyes, FriendlyChemist is a liability and I wouldn't mind if he was executed."  An entry dated March 28, 2013 in Ulbricht's log appears to refer to the extortion and DPR's communication with redandwhite: "being blackmailed with user info.  talking with large distributor (hell's angels)."  The next day, when DPR and redandwhite discussed redandwhite's fee for murdering FriendlyChemist, Ulbricht allegedly wrote in his log, "commissioned hit on blackmailer with angels."  Then, in early April, when redandwhite sent DPR a message confirming that FriendlyChemist "won't be blackmailing anyone again" and later sent DPR a picture of an allegedly dead victim, Ulbricht updated his log with the following entries: "got word that blackmailer was executed" and, later, "received visual confirmation of blackmailers execution."  The correlation between DPR's messages and entries in Ulbricht's personal log is probative of whether Ulbricht and DPR were one and the same.

Finally, evidence of the solicitations of the murders-for-hire of tony26 and his three associates is also highly probative of identity.  Around the time that redandwhite told DPR that tony76 participated in FriendlyChemist's blackmail scheme, Ulbricht allegedly told CC-2—in chats recovered from Ulbricht's laptop— that (1) he had been blackmailed by an individual who threatened to reveal addresses of Silk Road vendors and customers, (2) he had paid a member of the Hell's Angels "to hunt down the blackmailer," and (3) he learned that tony76 was

involved in the blackmail scheme.  Then, on April 6, 2013, the same day that DPR

wrote to redandwhite "Ok, let's just hit [tony26]," Ulbricht allegedly updated his log

with "gave angels go ahead to find tony76."  Two days later, on April 8, 2013, when

DPR confirmed that he had sent a payment of 3,000 bitcoins to murder tony76 and

his three associates, Ulbricht allegedly wrote in his log, "sent payment to angels for

hit on tony76 and his 3 associates."

Exclusion of the murder-for-hire evidence is not warranted under Rule 403.

Since "drug trafficking is often attended by violence," United States v. Sureff, 15

F.3d 225, 228-29 (2d Cir. 1994), courts in this Circuit repeatedly have declined to

preclude evidence of violence in narcotics cases.  See United States v. Viserto, 596

F.2d 531, 537 (2d Cir. 1979) ("We have recognized that handguns are tools of the

narcotic trade, and that possible prejudice does not outweigh the relevance.");

United States v. King, 165 F.3d 15 (2d Cir. 1998) (holding that the district court did

not abuse its discretion in admitting two handguns because "[e]xperience on the

trial and appellate benches has taught that substantial dealers in narcotics keep

firearms on their premises as tools of the trade" (citation and internal quotation

marks omitted)).

Here, the probative value of the murder-for-hire evidence is not substantially

outweighed by the dangers of unfair prejudice, confusing the issues, or wasting

time.  To be sure, the evidence is prejudicial to Ulbricht, and it does inject an

element of violence into the case.  However, the prejudicial effect is reduced by the

Government's stipulation that no actual murders were carried out.  Moreover,

prejudice alone cannot warrant exclusion because, as explained above, all incriminating evidence is prejudicial to a criminal defendant.  See Del Rosario, 2012 WL 2354245, at *3.  The inquiry, rather, is whether the murder-for-hire evidence is unfairly prejudicial and whether the danger of unfair prejudice substantially outweighs the probative value of the evidence.

As explained above, the murder-for-hire evidence is probative both as evidence of the charged offenses and to prove Ulbricht's identity as DPR—a key disputed issue in this case.  In addition, the charges in this case are extremely serious: Ulbricht is charged not with participating in a run-of-the-mill drug distribution conspiracy, but with designing and operating an online criminal enterprise of enormous scope, worldwide reach, and capacity to generate tens of millions of dollars in commissions.  Evidence that defendant sought to protect this sprawling enterprise by soliciting murders-for-hire is, in this overall context, not unduly prejudicial.  Any danger of unfair prejudice is outweighed by the substantial probative value of the evidence.  See United States v. Matera, 489 F.3d 115, 121 (2d Cir. 2007) ("When a defendant engages in a criminal enterprise which involves very serious crimes, there is a likelihood that evidence proving the existence of the enterprise through its acts will involve a considerable degree of prejudice. Nonetheless, the evidence may be of important probative value in proving the enterprise." (citation omitted)).

Accordingly, defendants' motions to preclude the murder-for-hire evidence and to strike references to the murder-for-hire solicitations from the Superseding

Indictment are DENIED.  The Government's corresponding motion regarding the murder-for-hire evidence is GRANTED.

C.   Defendant's Motion to Preclude Exhibits as Insufficiently Authenticated

Defendant has moved to preclude certain Government exhibits as insufficiently authenticated under Fed. R. Evid. 901 and the Second Circuit's decision in United States v. Vayner, 769 F.3d 125 (2d Cir. 2014).  (See Def. Mem. at 16-20.)  Defendant argues that these exhibits—including screenshots of various websites, Silk Road forum posts, private Internet messages and chats, files recovered from Ulbricht's laptop, etc.—are "electronic in nature" and "cannot be verified as being what they purport to be, or by whom."  (Id. at 20.)  The Government asserts that Vayner is inapplicable and that in all events the motion is premature.  This Court agrees.

In Vayner, the defendant was indicted for transferring a false identification document.  769 F.3d at 127.  One of the issues in the case was whether the e-mail address from which the document was sent—azmadeuz@gmail.com—belonged to the defendant.  See id. at 127-28.  To corroborate a cooperator's testimony that the e-mail address belonged to the defendant, the Government offered into evidence a printout of a webpage, which it claimed was the defendant's profile page from a Russian social networking site akin to Facebook.  (See id.)  The printout contained the defendant's name and picture, and listed "Azmadeuz" as the defendant's address on Skype.  (Id. at 128.)  The district court admitted the printout over the

defendant's objection that the page had not been properly authenticated under Rule 901.  (Id.)

The Second Circuit held that the district court abused its discretion in admitting the printout because "[t]he government did not provide a sufficient basis on which to conclude that the proffered printout was what the government claimed it to be—[the defendant's] profile page."  Id. at 131.  The Second Circuit explained that the printout was helpful to the Government's case only if the defendant authored it, and the mere existence of a webpage with the defendant's name and photograph did not "permit a reasonable conclusion that this page was created by the defendant or on his behalf."  Id. at 132.  The panel noted that while "the contents or 'distinctive characteristics' of a document can sometimes alone provide circumstantial evidence sufficient for authentication," the information on the printout was known to the cooperator and likely others, some of whom may have had a motive to fabricate the webpage.  Id. (citation omitted).

Vayner is not a blanket prohibition on the admissibility of electronic communications.  As the Second Circuit observed, "[e]vidence may be authenticated in many ways" and "the 'type and quantum' of evidence necessary to authenticate a web page will always depend on context."  Vayner, 769 F.3d at 133.  The Second Circuit also expressed skepticism that authentication of evidence derived from the Internet required "greater scrutiny" than authentication of any other record.  Id. at 131 n.5.  Whether the Government can meet Rule 901's authentication standard

34

with respect to the challenged exhibits is a question best answered at trial.  There simply is no basis to prejudge the Government's ability to meet that standard.

>    D.    The Fraudulent Identification Evidence Motions

Defendant has moved to preclude evidence that Ulbricht ordered fraudulent identification documents from Silk Road on the basis that the Government has not or cannot meet the standard to show "consciousness of guilt" necessary to argue that it is proof of flight.  However, defendant's briefing on this issue fails to address the existence of Count Six charging defendant with a conspiracy to traffic in fraudulent identification documents.  The Government has affirmatively moved to allow this evidence as direct evidence of Count Six and additionally as evidence of "consciousness of guilt."

The fraudulent identification evidence is admissible as direct evidence that Ulbricht knowingly and intentionally participated in a conspiracy to traffic in fraudulent identification documents, as charged in Count Six of the Superseding Indictment.  Specifically, evidence that Ulbricht purchased counterfeit driver's licenses from Silk Road is relevant to show that Silk Road had the capability to facilitate sales of fraudulent identification documents and that Ulbricht knowingly and intentionally exploited that capability—i.e., that the conspiracy charged in Count Six existed and included Ulbricht as a member.  The jury may infer from the evidence that Ulbricht's purchase was his "sampling the goods."  Ulbricht's statement during the controlled delivery that "hypothetically" anyone could go onto the Silk Road website and purchase any fake identity documents that he or she

desired is further evidence of the existence of a conspiracy to traffic in such documents.[13]

The Court also finds that exclusion under Rule 403 is not warranted because the probative value of the fraudulent identification evidence is not substantially outweighed by any danger of unfair prejudice.  Evidence that Ulbricht purchased counterfeit driver's licenses from Silk Road has substantial probative value as direct evidence of the charged conspiracy to traffic in fraudulent identification documents, and it is plainly not unduly prejudicial given the allegations in Count Six.

Accordingly, defendant's motion to preclude the fraudulent identification evidence is DENIED, and the Government's corresponding motion to allow such evidence is GRANTED.

E.      Defendant's Motion to Preclude Miscellaneous Government Exhibits

Defendant has objected to a number of the Government's proposed exhibits.

First, defendant objects to exhibits GX 107, 125A through O, 126A through D, 127B and C, 130, 240A through D, 241 through 243, 252, 254, 255, 258, 259, 270, 276A through F, 277A through D, 278, 281, 301 through 335, 501A through C, 700,

---

[13] The Court is not prepared to rule at this juncture whether the fraudulent identification evidence is also admissible as "flight" evidence demonstrating consciousness of guilt.  "[I]t is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself."  United States v. Steele, 390 F. App'x 6, 12 n.2 (2d Cir. 2010) (quoting United States v. Myers, 550 F.2d 1036, 1049 (5th Cir. 1977)) (internal quotation marks omitted); see also United States v. Wilson, 11 F.3d 346, 353 (2d Cir. 1993) ("[T]he use of false identification is relevant and admissible to show consciousness of guilt." (citing United States v. Morales, 577 F.2d 769, 772 (2d Cir. 1978))).  However, "[w]hile it is well-settled that flight can, in some circumstances, evidence consciousness of guilt, a satisfactory factual predicate must exist before such evidence may properly be admitted."  Steele, 390 F. App'x at 11.  Whether such a factual predicate exists in this case is a question best answered at trial.

36

and 803 as inadmissible hearsay.  The Government has provided its responses to these hearsay objections in an exhibit chart filed with the Court on December 10, 2014.  The Court will rule on these objections as necessary at trial.

Second, defendant objects to various photographs of narcotics seizures in Chicago and screenshots of the Silk Road website (GX 100A through 103) as lacking a foundation because the exhibits do not contain dates.  This motion is DENIED as premature.  Defendant may raise these objections at trial after the Government has laid a foundation and offered these exhibits in evidence, as appropriate.

Third, defendant objects to a number of exhibits—GX 100A through 104A, 126C, 225, 295E, 501C, 801, 801A, 802, and 802A—on the ground that they only provide evidence of a unilateral conspiracy because one of the participants is a law enforcement agent, or is operating under the direction of law enforcement, and therefore could not have formed criminal intent.  This motion is DENIED.  The Government's proposed use of these documents is not limited to the conspiracy charge.  The exhibits are separately relevant to the substantive narcotics charges in Counts One, Two, and Four because they are probative of what Silk Road was and how it operated.  In addition, as explained above, the Government intends to prove that Ulbricht was the leader of a single overarching narcotics conspiracy, which included all vendors who sold narcotics on Silk Road.  Evidence of undercover purchases and seizures from Silk Road is probative of the existence of such a conspiracy because it shows that Silk Road operated as a marketplace for narcotics.  Further, statements of defendant and his coconspirators to third parties, including

law enforcement agents, made in furtherance of the conspiracy are admissible against defendant even if the third parties are not members of the conspiracy.  In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93, 139 (2d Cir. 2008) ("Though [Rule 801(d)(2)(E)] requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member." (quoting United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir. 1989)) (internal quotation marks omitted)).

Fourth, defendant objects to product listings on Silk Road, and a companion website called The Armory, offering books, manuals, and "How To" guides regarding criminal activity (GX 116G, 116H, 116I, and 291C).  Defendant argues that selling these materials on Silk Road is protected First Amendment activity.  Defendant's motion is GRANTED as to these materials for the reasons set forth in subpart F below.  The books and manuals in these exhibits are irrelevant to any of the charged offenses and, even if they were, any marginal probative value is substantially outweighed by the danger of unfair prejudice to defendant.  The challenged exhibits—featuring books with titles such as "Silent but Deadly" and "Homemade C-4: A Recipe for Survival"—unnecessarily inject elements of violence and explosive devices that are not otherwise part of this case.

Defendant similarly objects to a manual recovered from his laptop (GX 271) on First Amendment grounds.  The Government argued at the FPTC that this manual—entitled The Construction & Operation of Clandestine Drug Laboratories,

38

Second Edition—is relevant to the charges in Counts One and Three because it supports the Government's theory that defendant clandestinely grew magic mushrooms in order to get Silk Road off the ground.  The First Amendment is not a proper basis for this objection: acts of speech may always be used as probative of participation in criminal activity.  For instance, if a defendant states, "I did it," that statement would not be precluded on First Amendment grounds.  Nevertheless, the admissibility of this manual will be determined at trial, after the Government lays a foundation.

Fifth, defendant objects to exhibits containing online chats in which defendant and coconspirators allegedly discuss potential criminal exposure for their activities on Silk Road (GX 226 and 230).  Defendant argues that these exhibits are unduly prejudicial because they can be interpreted as providing instructions on the law and could thus confuse and mislead the jury.  This motion is DENIED.  The conversations in GX 226 and 230 are highly probative of defendant's participation in the charged conspiracies and knowledge of the illegal nature of Silk Road.  Any potential prejudice from admitting these conversations can be cured by the Court's instructions.

Finally, defendant objects to exhibits relating to uncharged contraband sold on Silk Road (GX 116G, 116H, 116I, 228A, 228B, 229A, 230, 276A through F, and 227A through D).  Defendant argues that these exhibits are irrelevant to the charged offenses.  This motion is GRANTED for the reasons set forth in subpart F below.

F.      Government's Motion to Allow Evidence of Criminally Oriented Goods and Services Not Specifically Referenced in the Superseding Indictment

The Government has moved to allow evidence that Silk Road was a marketplace not only for narcotics, computer hacking tools, and counterfeit identity documents—the contraband referenced in the Superseding Indictment—but also for other goods and services of interest to criminals, such as weapons, counterfeit commercial merchandise, and pirated copies of copyrighted books.  (See Gov't Mem. at 13-14.)  The Government also seeks to introduce evidence of The Armory—a companion website that Ulbricht allegedly set up to facilitate the sale of guns.  (Id. at 14.)

The Government argues that evidence of uncharged contraband is "inexorably intertwined with the charged conduct and necessary to complete the story of the crimes charged."  (Id. at 25.)  In the alternative, the Government argues that this evidence is admissible under Rule 404(b) as probative of Ulbricht's knowledge and criminal intent.  Defendant counters that evidence of contraband not referenced in the Superseding Indictment is irrelevant.  This Court agrees.

The Court disagrees with the Government that this evidence is "inexorably intertwined" with the charged offenses or "necessary to complete the story."  The charged offenses are limited to three types of contraband—narcotics, computer hacking materials, and fraudulent identification documents.  Evidence that other contraband—such as weapons and pirated copies of copyrighted books—was also sold on Silk Road is unrelated to, much less "inextricably intertwined" with the

40

charged offenses.  It is also not necessary to "complete the story": the charges in the Superseding Indictment suffice to present a story of a sprawling online marketplace where criminals all over the world could purchase a wide variety of contraband—all kinds of illegal narcotics, computer hacking tools, and fraudulent identification documents—anonymously.

The <u>Williams</u> case cited by defendant is persuasive in this regard.  In <u>Williams</u>, one of the defendants, Jackson, was charged with possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1).  <u>United States v. Williams</u>, 585 F.3d 703, 705 (2d Cir. 2009).  The Government's version of the facts was as follows: "the police responded to a report of a shooting in the building; they approached a group of people outside the building; Jackson fled; Officer Jordan saw a gun in Jackson's pocket; the police later apprehended Jackson; and an officer found the gun near where Jackson had run."  <u>Id.</u> at 707.  In addition to this evidence, the district court admitted evidence that Jackson had been present in the apartment where the shooting occurred and where police later found a cache of weapons and other contraband.  <u>See</u> <u>id.</u> at 706.  The Government argued, as the Government does here, that this evidence "completed the narrative and was 'inextricably intertwined with proof of the charged offense,'" <u>id.</u> at 708, but the Second Circuit held that admitting this evidence was an abuse of discretion:

> We disagree that the contraband evidence was relevant as background to the crime.  The physical evidence from the apartment was not particularly helpful to explain the crime.  The Government's version of the facts was simple and complete . . . .  The Government did not need the contraband to explain why the police were at the building, why Officer Jordan pursued Jackson, why Jackson was arrested, or why

> Jackson was charged with possessing a firearm.  Failing to detail the contents of the apartment would not have left any gaps in the Government's case, nor have left the jury wondering about missing pieces of the story.  We think the evidence more likely confused the jury than assisted its understanding of the case.

Id. at 707-08 (citation omitted).

In this case, too, evidence that contraband such as counterfeit belts was sold on Silk Road is not particularly helpful to explain the charges against defendant, all of which center around narcotics, computer hacking tools, and fraudulent identification documents.  Nor does precluding this evidence leave any gaps in the Government's case: as explained above, evidence of the charged offenses suffices to paint a compelling and self-contained story of Silk Road as a sprawling criminal enterprise.

Evidence of uncharged contraband is also not probative of Ulbricht's knowledge and intent.  The Government argues that evidence that Ulbricht was responsible for setting the policies governing which goods and services could be sold on Silk Road demonstrates that he knew about the illegal nature of the enterprise. (Gov't Mem. at 26.)  That may be true, but the Government can present this evidence without referencing any uncharged contraband.  That is, this ruling does not preclude the Government from presenting evidence that Ulbricht authored a policy that specifically allowed vendors to sell narcotics, computer hacking tools, and fraudulent identification documents on Silk Road.

Evidence of uncharged contraband also presents hearsay problems.  At the FPTC, the Government has conceded that the charged narcotics conspiracy does not

include vendors who sold merchandise other than narcotics.  As a result, any label or product listing suggesting that the merchandise is counterfeit or otherwise illegal—e.g., "Fake Ray ban RB2140 Sunglasses" in GX 116C—is inadmissible hearsay in the absence of an applicable exception.  Thus, to prove that the various products were indeed counterfeit or illegal likely would require a mini-trial within the trial.[14]

Even if evidence of uncharged contraband were relevant, the Court would preclude it under Rule 403 because any marginal probative value of this evidence is substantially outweighed by the dangers of unfair prejudice, confusing the issues, and wasting time.  In particular, evidence that firearms and other weapons were sold on Silk Road and The Armory is unduly prejudicial to defendant because it unnecessarily injects elements of violence and guns into this case.  In addition, introducing evidence of uncharged contraband may mislead the jury and lead it to convict defendant for uncharged conduct.  Finally, allowing such evidence may lead to a mini-trial on collateral issues, such as whether or not the Gucci belts sold on Silk Road were counterfeit.

Accordingly, the Government's motion to allow evidence of uncharged contraband is DENIED.[15]

---

[14] While the Government is not limited to the charged conspiracies in proving the elements of the coconspirator exception, it must allege facts supporting the existence of a conspiracy between defendant and any vendor who sold uncharged contraband.  The Government has not done so here, and the Court will not allow evidence on this collateral issue at trial.

[15] As discussed at the FPTC, the admissibility of any exhibits featuring currency will be determined at trial, after the Government lays a foundation for those exhibits.  The exhibits will be precluded if offered to show that counterfeit currency was sold on Silk Road but may be allowed if offered to prove money laundering.

G.   Government's Motion to Preclude Argument or Evidence Regarding
Potential Consequences of Conviction and Defendant's Political Views

The Government has moved to preclude argument and evidence on (1) the

potential consequences of defendant's conviction, and (2) defendant's political views

or other excuses for his conduct.  (See Gov't Mem. at 27-29.)

The defense has assured the Court that it is "well aware of the limits on

appropriate argument, and does not intend to argue the issue of Mr. Ulbricht's

potential punishment before the jury." (Memorandum of Law in Opposition to

Government's Motions In Limine at 17, ECF No. 126.)  The defense also has

represented that it will not make any arguments regarding jury nullification.  (Id.)

This motion is therefore DENIED as moot.

V.   CONCLUSION

A.   Defendant's motion to preclude certain evidence regarding Silk Road
product listings and transactions is DENIED, subject to the ruling in
subpart F.

B.   Defendant's motions to preclude evidence of defendant's murder-for-
hire solicitations and to strike references to such solicitations as
surplusage are DENIED.  The Government's corresponding motion to
allow the murder-for-hire evidence is GRANTED.

C.   Defendant's motion to preclude certain Government exhibits as
insufficiently authenticated is DENIED.  Defendant can renew this
motion as to any particular exhibit when it is offered at trial.

D.   Defendant's motion to preclude evidence that he ordered fraudulent
identification documents from Silk Road is DENIED.  The
Government's corresponding motion to allow this evidence is
GRANTED.

E.   Defendant's motion to preclude a variety of government exhibits not
covered by the other motions in limine is GRANTED in part and
DENIED in part.  The specific rulings are set forth above.

F.  The Government's motion to allow evidence of uncharged contraband is DENIED.

G.  The Government's motions to preclude argument and evidence regarding (1) any potential consequences of conviction, and (2) defendant's political views or other excuses is DENIED as moot.

The Clerk of Court is directed to terminate the motions at ECF Nos. 108 and

112.

Dated:   New York, New York
         January 7, 2015

_____
       KATHERINE B. FORREST
       United States District Judge