ECHKULBM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                          14 CR 68 (KBF)

ROSS WILLIAM ULBRICHT,

              Defendant.

------------------------------x

                                New York, N.Y.
                                December 17, 2014
                                2:00 p.m.


Before:

              HON. KATHERINE B. FORREST,

                                District Judge


                    APPEARANCES


PREET BHARARA,
     United States Attorney for the
     Southern District of New York
SERRIN A. TURNER
TIMOTHY HOWARD
     Assistant United States Attorney

JOSHUA LEWIS DRATEL
LINDSAY LEWIS
JOSHUA HOROWITZ
     Attorneys for Defendant

ECHKULBM

1              THE DEPUTY CLERK:  In the matter of United States of

2    America versus Ross William Ulbricht, 14 CR 68.

3              Counsel, please state your names for the record.

4              MR. TURNER:  Good afternoon, Your Honor.  Serrin

5    Turner, for the government.  With me at counsel's table is AUSA

6    Timothy Howard.  Paralegal Molly Rosen, and Paralegal Nicholas

7    Everett will be joining us shortly.

8              THE COURT:  All right.  Good afternoon.

9              MR. HOWARD:  Good afternoon.

10             MR. DRATEL:  Good morning, Your Honor.  Joshua Dratel,

11   for Mr. Ulbricht, who's standing besides me.  And also for

12   Mr. Ulbricht is Lindsay Lewis from my office and Joshua

13   Horowitz.

14             THE COURT:  All right.  Good afternoon, all of you.

15             We are here this afternoon for the final pretrial

16   conference for this matter.  We start trial on January 5th, and

17   we've got the processes all lined up for the jury questionnaire

18   to go out and to proceed, as we've all discussed now numerous

19   times.  And if there are any issues or questions about that,

20   we'll take them up maybe at the end.  I assume that I've issued

21   so many orders on this and so many versions of the

22   questionnaire and of the spreadsheet, that hopefully we're all

23   on the same page at this point.

24             Now, in terms of how we're going to proceed this

25   afternoon, I want to talk first about the motions in limine.

ECHKULBM

And in that regard, I do want to talk a little bit, though we
don't need to belabor this too much, about the nature of the
conspiracy questions that I had posed and that the government
answered, and I want to thank the government for responding so
quickly with a much longer piece than I had thought you'd be
able to put together, and I didn't mean to give you an
assignment that would really cause somebody to have lost some
sleep perhaps.  You've got enough of those assignments on your
own.  But I do want to talk about that and about the motions in
limine because they do relate together to one another, and then
go through the jury selection, how the peremptories are going
to work, some of those logistics, through things like just how
the exhibits are going to be presented at trial, jury books,
making sure we're all on the same page, and so we'll go through
then the normal final pretrial checklist.

In terms of the nature of the conspiracy, it's an
unusual thing, I do understand, for the Court to be focusing on
this so much at this stage, but this is an unusual case.  It's
a case that has got aspects to it which I think we can probably
all agree we've searched far and wide for and don't quite fit
any fact patterns of any case anywhere precisely on all fours.
Now, that's the common-law system, that happens all the time.
The common-law system is a system which is designed to account
for and be able to subsume within it any manner of fact
patterns, and indeed, the country was founded at a time when

ECHKULBM

1   cars didn't exist, and then certainly the Internet didn't

2   exist, but we've managed to accommodate.  So the mere fact that

3   this is novel doesn't mean that it can't be encompassed within

4   existing law.  The question is to what extent do we have to

5   figure some of those issues out now and what is the existing

6   law we're going to end up applying to it.

7           The reason that I need to do some of it now is because

8   I do believe that there are gatekeeping issues which the Court

9   needs to undertake which cannot await decision of the jury.

10  The Court is required to determine what relevant evidence is,

11  and that's a determination of law for the Court, and if things

12  are irrelevant, I need to exclude them, the jury should not be

13  burdened with irrelevant pieces of evidence.

14          Even relevant evidence has to go through a 403

15  analysis where one weighs whether the probative value is

16  substantially outweighed by any prejudicial effect, and that

17  prejudicial effect can include things like confusing the jury,

18  being duplicative, wasteful of time, as well as all of the

19  other pieces of 403.  So there's a 403 analysis that has to go

20  on as well.

21          I do need to understand your theory, the government's

22  theory in this case, because I can't, I think, rule in a just

23  manner unless I do.

24          Now, it may be that you folks are so comfortable --

25  and by you folks, it could be all of the counsel and the

ECHKULBM

1    defendant here, or it could be the government, or it can be

2    some subset of -- are so comfortable with what the theory is,

3    that it's easy for you to imagine, and you can't understand why

4    I'm struggling with this, but so be it, you'll bear with me,

5    and I appreciate the fact that you gave me your letter.  I can

6    promise you that, in my view, the biggest issues in this case,

7    in terms of difficulties, is precisely with what I'm focusing

8    on right now.  This is, I think, a lot of the difficulty of, in

9    my view, some of the legal issues in this case.  So I think to

10   the extent we can sort through some of this now and figure out

11   where we are now, the better.  So that's why we're doing it

12   now, not just because I'm the judge, and I say I want to do it

13   now, I actually think we need to do it now.

14           I want to reiterate, having carefully studied the

15   government's most recent submission of today, but also, I

16   have -- and I know that this is what I am supposed to do, and

17   so is this is not to say anything other than what you expect --

18   I have spent an extraordinary number of time reading every

19   conspiracy case that I can possibly conceive of that could be

20   anywhere near many different aspects of this case.  And that's

21   what I was doing when I wrote the decision on the motion to

22   dismiss, that's what I have been doing ever since, I've got

23   cases, and cases, and cases on this.  I do believe -- and I say

24   that because I am aware of the law that you wrote in the

25   decision on the motion to dismiss, and I am aware of the law

ECHKULBM

1    that you folks cited to me, though I had not read the 1976 Kue

2    Chin case, which I've now read.  I think that's the name of the

3    case.  You folks know it, but I've now read it.  But I wanted

4    to say to the government that I'm troubled by the breadth of

5    your theory on the conspiracy.  I want you just to hear that

6    from me and take that seriously.  I understand what you're

7    saying.  I am not of the view that -- and I do believe you

8    passed the motion to dismiss, right.  I think that as a matter

9    of law, the motion to dismiss the indictment is a very

10   different standard, but I just want to -- as we're on the

11   precipice of trial, and you've got some time to think about

12   this, I just want you to understand you're hearing it from me

13   now in as close to words of one syllable as I can give you, and

14   let me tell you why.  I have no theoretical issue with the fact

15   that for a narcotics conspiracy, that one could put together

16   proof -- whether you will or not is for you folks to do and for

17   the jury to decide -- you could put together proof where, for

18   instance, Mr. Ulbricht, as a for instance -- this is

19   arguendo -- is the center point of a narcotics conspiracy, he

20   designs something, the system, the Silk Road World, which he

21   then, as the -- I'm going to use the example of the hub of the

22   conspiracy -- puts out there, gets a lot of people to want to

23   sell, and buy, and look at drugs on that website.  The people

24   are the spokes, the buyers and the sellers are the spokes, and

25   the website -- conceivably the website itself is the flypaper,

1    the stickiness that's around it.  So you've got him in the

2    center, you've got the website in the center binding everybody

3    together, and you've got the spokes.  So that's your rim,

4    right, would be the website with the stickiness.  The defendant

5    and the website, then, are separable.  The website becomes the

6    stickiness.  I understand that.

7        The question for me is whether -- and this is, I

8    think, a very hard question, so if you think it's easy, then

9    one of us is really misled, and I will tell you that I think

10   it's so hard, that I've spoken to a bunch of other judges about

11   it, and I'm not the only one who thinks it's hard just to sort

12   of give you a sense of am I the only person out there in the

13   ether thinking this is difficult.

14       The issue is, can you have a conspiracy -- let's take

15   it very broadly -- of heroin at all times during the life of

16   the website, also and all those folks in the same conspiracy

17   with people selling Gucci belts that are counterfeit, all

18   right, the contraband, such that, for instance, you can get

19   around coconspirator statements and the hearsay issues you'd

20   otherwise have with the website screenshots, to put it in terms

21   of the legal issues for the Court.

22       So one of the arguments were are these people together

23   with Mr. Ulbricht all in a conspiracy for the illegal?  I find

24   that extraordinarily broad.

25       Now, it may well be that when you put together the

ECHKULBM

1    proof at trial, that it will appear as if there are things that

2    I had not expected, but then I have a different issue, which is

3    are the folks in the LSD conspiracy allegedly the same folks,

4    are they also in the conspiracy with the cocaine, with the

5    heroin, with the prescription drugs, with the oxycodone, with

6    the stimulants, with whatever, and it may be the answer is yes,

7    and I really have much less of an issue with the narcotics,

8    it's when you mix narcotics with different things, but also the

9    time frames and the theories.

10            So one of the theories is for mutual dependence, that

11    the success -- that there was mutual dependence on the overall

12    success of the website.  Success means different things to

13    different people at different times.  There is success at the

14    outset, there is a different expectation of success on day one

15    when it's launched, and you might have X number of eyeballs

16    versus success when you're on -- when you're talking about day

17    300, when you may have -- of unique users, you may have

18    millions.  And so there's different views of success.  You may

19    have evidence that's going to talking about all of that, it's

20    got to be percipient, I think, in some respects, otherwise

21    you're going to have a hard time with some of the inferences.

22    And I think that the time frames become anyway more of an

23    issue.  So I just want to lay it out there in terms of why I'm

24    troubled.  So it's the nature of the goods, the breadth, it's

25    the time frame.

1              Now, why does it matter?  And I am familiar with the

2       cases where in single-defendant cases, when you show a

3       multiplicity of conspiracies, there's a question after, if you

4       were able to get a conviction, is there a variance, have you

5       varied from the terms of the indictment in terms of what was

6       proven at trial, and is the case somehow defective for that

7       reason?

8              I acknowledge that the cases out there where there

9       have been variances found are multidefendant cases where the

10      Courts of Appeals, including the Second Circuit, look at

11      whether or not the defendant, a particular defendant, has been

12      prejudiced.  When it's a single defendant as to whom multiple

13      conspiracies have been shown, the Second Circuit typically says

14      here there has not been prejudice, we find no prejudice.  And

15      in multiple defendant conspiracies, it can go the other way,

16      depending upon the nature of the multiple conspiracies shown.

17             The principle is not, there can never be prejudice --

18      this is what I want to emphasize -- with a single person with

19      multiple conspiracies.  Imagine, for instance, you need to get

20      your heroin quantity up to a certain amount, and one conspiracy

21      is different from the other, is there prejudice if you've added

22      the quantity together, and you've charged a single conspiracy,

23      but you've got a multiplicity?  Maybe the answer is no, but

24      maybe the answer is yes.  What if -- let's take a harder

25      example than just quantity -- statutory maximum.  Statutory

ECHKULBM

1    maximum for, let's just say, heroin, let's say it was life, but

2    let's say the statutory maximum for something else was not

3    life, if you combine your conspiracies for a single defendant,

4    do you have prejudice?  I don't know.  These are the kinds of

5    things that I am struggling with.  I think these are hard

6    issues.  I'm not saying that there aren't answers to them, but

7    I'm struggling with them.

8            So I did read your paper, Mr. Turner.  I just want to

9    give you a sense of where I'm going, and then I'll go to the

10   motions in limine, but it sets the stage for some of that.

11           MR. TURNER:  Should I respond now, Your Honor?

12           THE COURT:  You certainly can, yes.

13           MR. TURNER:  So, Your Honor, I certainly acknowledge

14   that the technological context of this case is new, but I think

15   the legal principles are quite well-established.  So if you can

16   just imagine, if you and I were to agree to sell drugs, say

17   that I was a great marketer, I could find lots of people to

18   distribute drugs to, you were a great supplier, you could get

19   your hands on any kind of drug, and you and I agreed one day,

20   you know, you were going to find whatever drugs you could, and

21   I was going to find customers for them.

22           THE COURT:  Okay, stop right there.  You and I agree

23   on that.  You and I, as stepping out of our role play, agree

24   that coconspirators have to share the same objective.

25           MR. TURNER:  Correct, Your Honor.

ECHKULBM

1          THE COURT:  And you agree that you can't just guess

2     that you're sharing the same objective, you can do inferences,

3     but there has to be some proof that would lead you to a logical

4     inference.

5          MR. TURNER:  Sure.  Yes, Your Honor.

6          THE COURT:  Okay.  So then he can sell all kinds of

7     drugs, but is the other conspirator expecting him to sell more

8     than LSD or more than heroin?

9          MR. TURNER:  So, again, if the agreement is simply to

10     sell drugs, that is a violation of the drug conspiracy laws.

11     It does not have to be, we are going to sell LSD or this brand

12     of heroin, anything like that.

13          THE COURT:  Because what if some sellers want to sell

14     a whole variety and some sellers only care about their one

15     drug.

16          MR. TURNER:  As long as they agree on a common

17     objective, which is to sell illegal drugs, that is all the

18     conspiracy laws require.  There are commonly conspiracies that

19     involve different types of drugs, and it doesn't have to be

20     alleged in the indictment, and we didn't allege that in the

21     indictment.  The indictment alleges a conspiracy to distribute

22     unlawful drugs, period.

23          Now, there are specific drugs we allege for purposes

24     of the sentencing enhancement under 841(b)(1), but that's a

25     different issue.  In terms of the conspiracy, the underlying

1   conspiracy, it is simply a conspiracy to sell illegal drugs.

2            And, again, if you and I agreed to --

3            THE COURT:  I deal with this -- I deal with what

4   you've described all the time.

5            MR. TURNER:  So then let's say we have that agreement,

6   and we're doing great, I'm attracting all the customers, you're

7   supplying all the drugs.  Somebody else comes in, and they say,

8   we want to join your efforts, we have some more drugs that we

9   can -- you know, deliver to me, and I'll find customers for

10  them, and it grows over time.  And then the first person -- you

11  dropped out, and somebody else comes in, that is very common in

12  conspiracy cases.  The point is, as long as the intent, the

13  subject of the agreement, persists throughout those changes,

14  that all who are entering the conspiracy are agreeing to join

15  this venture to distribute illegal drugs, the conspiracy

16  remains intact.

17           THE COURT:  Is it the government's position that the

18  folks who are in the conspiracy to sell illegal drugs are the

19  same -- are in the same conspiracy as the folks who are selling

20  false identification documents?

21           MR. TURNER:  No, Your Honor, not necessarily.  If a

22  person is only selling false identification documents, they

23  would not have the intent to share -- to sell drugs.

24           THE COURT:  How about Gucci belts?

25           MR. TURNER:  No, Your Honor.

ECHKULBM

1        So we're talking about a conspiracy between the

2   defendant and the drug dealers dealing drugs on the site.

3   That's the drug conspiracy.  There's certainly the false

4   identification trafficking conspiracy, which would be between

5   the defendant and the sellers of false identification

6   documents.

7        THE COURT:  And then in terms of the sentencing

8   enhancements?

9        MR. TURNER:  Yes.  In that case, the question is, what

10  were the amounts of certain drugs involved in the defendant's

11  offense?  What did he intend to -- what did he conspire to

12  distribute through his offense?  And I really want to emphasize

13  that the narcotics conspiracy is the only one charged.

14       Obviously we read Your Honor's opinion, and we

15  responded in part by superseding with an indictment that

16  included not only conspiracy charges, but substantive narcotics

17  charges.  And I want to point the Court in particular to

18  841(h), which that act was passed by Congress specifically to

19  apply to illegal online pharmacies.  And the statute itself

20  provides an example of the sort of conduct it applies to, and

21  one of them is serving as an agent, intermediary, or other

22  entity that causes the Internet to be used to bring together

23  buyers and sellers of drugs.  If that doesn't describe what's

24  going on here, I don't know what does.

25       THE COURT:  I think that in terms of the substantive

ECHKULBM

1  charges, I understand three, actually, of those.  Then you've

2  got the fourth, I think it's Count Four is your conspiracy

3  charge, but some of the evidence, when I was going through your

4  exhibits, there's a huge amount of it that seems to fit in

5  mostly through the conspiracy charge, but not all, but there is

6  some stuff that does come in through the conspiracy charge that

7  otherwise might be a little further afield.

8         MR. TURNER:  Your Honor, as far as I'm concerned, as

9  far as the government's concerned, that evidence is relevant to

10 all of the narcotics charges.

11        THE COURT:  The Gucci belt?

12        MR. TURNER:  No.  So the Gucci belt --

13        THE COURT:  But that's just as important to me.  I'm

14 saying it lightheartedly, but the reality is, there's lots of

15 stuff on the counterfeiting, and now when I say lots, it's by

16 no means more than a tenth of the exhibits that you folks have,

17 but there are a number of these other contraband type exhibits.

18        MR. TURNER:  Here's the idea why we included those,

19 and it's really only a handful of exhibits we're talking about.

20 If we're showing the jury we're giving them a walk-through of

21 Silk Road, what the site was all about, and there's a list of

22 categories, so you had apparel and books, and unless the jury

23 has a complete picture, complete understanding of what sort of

24 apparel is being sold, what sort of books are being sold, it

25 might have an inaccurate view of what the site is really about.

ECHKULBM

1        So I know the defense wants to argue this is sort of a

2   neutral site, anybody could sell anything.  If you look at the

3   underlying apparel, it's counterfeit apparel.  If you look at

4   the underlying books, many of them are tutorials on how to

5   commit computer hacking and do illegal things.  The point is

6   this was a marketplace that catered to criminals, and we don't

7   want the jury to get an inaccurate view of that.

8        So we do think it's relevant to provide a full picture

9   of the nature of this website.  It's certainly not essential to

10  the government's case, but we think in order to get a complete

11  picture of the sort of marketplace this defendant ran, we think

12  it's a fair handful of exhibits to put in for that purpose.

13  It's the same as if you're putting in a document, and you want

14  to make sure the jury has a complete understanding of that

15  document by not omitting parts that, if omitted, might give an

16  incomplete picture.

17       And it also shows in some cases that the defendant

18  controlled what was sold on the site, so we have posts where

19  he's saying I'm going to allow this, but not that.  That

20  obviously is relevant to everything in the indictment because

21  it shows his control and constant operation of this illegal

22  enterprise.

23       THE COURT:  All right.  And so with respect to that

24  type of document, just make a note to yourself as we go through

25  the motions in limine, and if there's something that we need to

1    make sure we've included, that we keep track of that, because

2    that, obviously, I think would have some relevance to all the

3    charges.

4              MR. TURNER:  So just in terms of the relevance, again,

5    I think irrespective of the conspiracy issues, we're alleging

6    that this defendant was an online kingpin, that he was at the

7    top of this enterprise and distributing narcotics, he was

8    supplying narcotics through his website.  All these vendors

9    were his suppliers who were conspiring with him to do so.  He

10   was taking a cut of every one of their sales.  If you had a

11   real-life case against the kingpin, you don't have to -- the

12   government's not required to give them a narrow slice of proof.

13   The government should be entitled to present a full view to the

14   jury of what was entailed in this defendant's role, what was

15   entailed in his operation of this illegal enterprise, and

16   that's what we're trying to do.  I think we've actually been

17   fairly selective in the exhibits that we have chosen for trial,

18   but I think it would be unduly constrictive if we were trying

19   to just isolate the conspiracy to the defendant and one other,

20   two other dealers or something like that, because that's not

21   the nature of the enterprise we're talking about.  We're

22   talking about a sprawling drug marketplace that this

23   defendant --

24             THE COURT:  And one can characterize sprawl in

25   different ways, and I'm not suggesting it has to be, by any

ECHKULBM

1    means, a buyer/seller relationship only or even a conspiracy of

2    three, it could be a conspiracy of 150.  I don't really know

3    how it would break down if it broke into separate conspiracies.

4    I am just previewing to you folks the fact that I think there

5    is a possibility that it may fit better with multiple

6    conspiracies than with single.  That, I agree, ultimately on

7    the narcotics conspiracy will be an issue for the jury.

8           I'm just warning you in advance that I have concerns

9    about it.  If the way the evidence comes in for the narcotics

10   conspiracy comes in in a way that there's never an issue, so be

11   it; if it comes in in a way that it becomes clear there are

12   different things at different times, then that will be

13   something to grapple with at that point.  One of my concerns is

14   the conspiracies of all things illegal, okay.  That's the Gucci

15   belt with the heroin, and the defendant is not charged with

16   counterfeiting.  Currency, which is one of the exhibits --

17           MR. TURNER:  He is charged with money laundering, Your

18   Honor.

19           THE COURT:  He is charged with money laundering --

20           MR. TURNER:  That's what that exhibit goes to.  That's

21   exchanging Bitcoins for dollars.  That's drug dealers cashing

22   out their proceeds for dollars, that's money laundering.

23           THE COURT:  Okay.  You've got to then connect the drug

24   dealers to the currency sellers because it could also be

25   counterfeit currency, I have no idea.  But you'll figure out --

ECHKULBM

1    I can only see what's on the exhibit, and there wasn't any text

2    to the exhibit.  I just looked and saw it says currency, and

3    it's got different pictures of yen or euros --

4            MR. TURNER:  I can address that quickly, Your Honor.

5    The website offered the ability to exchange Bitcoins for money.

6            THE COURT:  The ability to exchange, if that's what

7    the currency pieces are geared towards, that's something

8    different.  I do understand that your Count Six is money

9    laundering.  Money laundering, in the indictment, is alleged in

10   terms of the narcotics, the computer hacking conspiracy, and

11   the false identification.  And it's all of the narcotics

12   charges plus those, it's all of the conduct that's really

13   called out in the indictment.  And I don't understand the money

14   laundering, for instance, to include counterfeiting -- the

15   sales of counterfeited belts, for instance, because we don't

16   know if they're, in fact, counterfeit.  We don't know about

17   whether there were sales that were obtained thereby, but

18   that's, I think, an easier -- a much easier issue.

19           MR. TURNER:  That's much more discrete, Your Honor, if

20   we're just talking about the handful of exhibits that deal with

21   uncharged sales items, a very discrete set of exhibits.

22           THE COURT:  Right.  So let me just take you through

23   where some of these things come out, and we will sort our way

24   through it.  My point that I wanted to make is not only to set

25   the stage for some of the contraband discussion and the

ECHKULBM

1    manuals, the various texts that are being discussed and are at

2    issue, but also just to give you sort of my read more

3    generally.  I just wanted to have time when I just -- and I

4    know I said it in the last conference -- you know, you hear me.

5              MR. TURNER:  I understand, Your Honor.

6              THE COURT:  All right.

7              Mr. Dratel?

8              MR. DRATEL:  Also because obviously the government's

9    letter came in this morning, we're preparing for it and looking

10   at the cases, et cetera, so I will address some of that here.

11             I think the Court has correctly recognized the apples

12   and oranges aspect of this multiple-conspiracy question.  We're

13   really talking about multiple conspiracies, we're talking about

14   the conspiracy charged in the indictment versus what

15   conspiracies get proved, and if the government doesn't prove

16   the conspiracy charged in the indictment, but instead proves a

17   series of other conspiracies, that's a sufficiency question.

18             And the government wants to concentrate on the

19   sufficiency aspect of it, but as the Court has recognized,

20   there's a whole gatekeeping aspect, particularly when you look

21   at the volume of evidence that could come in for conspiracies

22   not charged in the indictment, and then at the end of the day,

23   we're having this giant tail wagging this tiny dog, and the

24   case really comes in in a way that can't be cured by any

25   limiting instruction.  That's why I think the gatekeeping

ECHKULBM

1    function is so important, to avoid a position where there's no

2    alternative, but a mistrial.  If we come to the end of the

3    day -- that's why I'm talking about subject to connection

4    previously, which is that this could be an entire case subject

5    to connection that's never made or at least with respect to an

6    extraordinary amount of material.

7          The question of -- the government's application of

8    many of these principles is completely abstract, it has nothing

9    to do with the specific contours of those cases, again as the

10   Court has recognized.  When it talks about a real-life case,

11   yeah, that's right, those are real-life cases, this isn't an

12   imagined case, in the sense that it's completely abstract.  The

13   notion of mutual dependence is not about success, or wanting to

14   have marketing, or depending on some sort of -- it's the mutual

15   dependence on a real concrete aspect of people doing different

16   things in the conspiracy known to others, exchanged with

17   others, preplanned with others, conscious of others.  It's not

18   mutual dependence in the abstract in some sort of theoretical

19   context.

20         THE COURT:  It's possible, though, just so that I'm

21   clear, because I had mentioned mutual dependence, that I think

22   there is a way of having mutual dependence with a website in

23   terms of audience attraction, et cetera, et cetera.  There

24   needs to be proof of that in order to lead to the appropriate

25   inferences to the extent there have to be inferences -- to the

ECHKULBM

1    extent that the government believes there need to be

2    inferences, but I don't think it's impossible through the

3    Internet by any means to have mutual dependence.  How far it

4    extends, I think, is a question of both fact and law.

5          MR. DRATEL:  But I don't think that mutual dependence

6    is the same type of mutual dependence that the Courts are

7    talking about when they defined conspiracy.  That's what I'm

8    saying.  That mutual dependence is a different kind of mutual

9    dependence.  It's not the same as sharing profits, and sharing

10   personnel, and sharing suppliers, and all of that, which is

11   completely absent from this context.  The brick and mortar

12   aspect of those cases is critical.

13          Also, the government's proposition has no limit, and

14   that's why it can't be a single conspiracy, which is this:  The

15   government's proposition applies the same way as follows, and I

16   will give two analogies:  One is if I subscribe to the AT&T

17   network, I'm a subscriber of AT&T, I know people are using it

18   for drug deals, they're texting, they're making calls, I know

19   that, it's foreseeable to me.  If I'm selling drugs to one

20   person using my AT&T phone, does that make every other drug

21   seller on AT&T a coconspirator of mine?  Does that make AT&T a

22   coconspirator?  No.  There has to be an agreement, there can't

23   just be common conduct over a common carrier.  There has to be

24   agreement.  Agreement is the conspiracy, not mutual dependence,

25   not any of these other aspects.  The agreement is the key to a

ECHKULBM

conspiracy.  And you can have all that other stuff and not have
an agreement.  And I understand about inferences, and that's
fair, but the fact is, the inferences can't be ones that aren't
appropriate, or ones that are prejudicial, or ones that
ultimately -- that infer that there's a completely separate
conspiracy, or a bunch of separate conspiracies that are being
shoehorned to try to prove the conspiracy charge in the
indictment.

    The second one is a landlord analogy, which we used in
our papers, and that's why there's a whole separate statute,
856, to cover that kind of conduct, which is, I have a
building, I'm renting it out, I know there are drug dealers in
the building, I collect rent from them, I know they deal drugs,
I know some -- I may have an idea that some deal heroin, and
some deal cocaine, and some deal marijuana, they're not all
conspirators, and they're not my conspirators.  There has to be
more.  The notion of facilitating some kind of common conduct
is not a conspiracy.

    And just to get into some of the cases: At AT&T,
everybody is mutually dependent, too.  In the sense we're all
mutually dependent, AT&T stays in business, that it has plans
that allow us to text, and phone, and do all those things, but
that doesn't really make a conspiracy.  So first I wanted to
talk about a couple of the cases the government has cited.  One
is Gibel -- I don't know if I'm pronouncing it right -- but

ECHKULBM

1   G-I-B-E-L, a securities fraud case, which even though the

2   government cites it for a general principle about conspiracy

3   law, the facts actually go the complete other way and very much

4   supports our position, which is this concept of remote tippees

5   in an insider trading case.  Just because everyone who insider

6   trades knows there might be remote tippees doesn't make them

7   all coconspirators.  There is a limit to all of that, just like

8   there's a limit in the AT&T concept.  There has to be a limit

9   on some of these.

10          Some of the other cases, the marketplace cases.  The

11  marketplace cases, again, the brick and mortar concept is

12  critical because the marketplace cases, if you look, there's a

13  tremendous overlap among the functions of the people involved.

14  They share expenses, they share profits, they share runners,

15  they share security, they share all of these things in a way

16  that is very much -- some of them are extended families in some

17  of these cases.  And so that aspect is, I think, important.

18          Also, they all come -- one of the cases, I think it's

19  the first one that the government cites, which is -- I think

20  it's Brown, which they had the same supplier, it's a single

21  supplier.  So there are all sorts of very, very significant

22  distinguishing features from those cases from the type of

23  conspiracy that the government is alleging here and claims it

24  can prove.

25          Also, the case that the Court cited today, the Sir Kue

ECHKULBM

1    Chin case, which the government quotes from, but we're talking

2    about a single supplier selling to different customers.  No one

3    alleges that can't be a single conspiracy in the context of

4    different -- of the suppliers' multiple sales to different

5    customers, but that's not what we have here.  These are all

6    very different situations.

7            Also, the case is a multiple-drug case, there are

8    different drugs, but they're all part of an underlying

9    agreement among the people that can be inferred from very solid

10   facts, not the mere fact that they're all using the same

11   website, just like there's not the fact that they're all using

12   AT&T, that they're somehow a conspiracy for everybody using

13   AT&T to be in the same conspiracy.  So that doesn't define a

14   single conspiracy or the same conspiracy.

15           Also, drug types are elements of the offense now, at

16   least for the greater offenses in this circuit, Thomas, Adams,

17   Santos.  We've cited those in another context in the requests

18   to charge, so I won't go into that.  But, again, that

19   gatekeeping function, as the Court has recognized, is crucial

20   here because at the end of the day, we could have a volume of

21   inadmissible evidence about other conspiracies that overwhelms

22   evidence that properly goes to the charged conspiracy.

23           Thank you.

24           THE COURT:  Mr. Turner?

25           MR. TURNER:  A few things, Your Honor.

ECHKULBM

1      So the defendant just pointed to the fact that these

2  objections concern sufficiency.  That is not an appropriate --

3      MR. DRATEL:  I have to interrupt, Your Honor.  I said

4  the opposite.  It's not a sufficiency argument.  The government

5  wants to make it.  I'm saying it's not sufficiency.

6      MR. TURNER:  I believe the argument was that if the

7  proof is about multiple conspiracies, then it wouldn't suffice

8  to prove the conspiracy charged.  There is no such thing as a

9  motion for summary judgment in the criminal context, and the

10 Court's role is not to --

11     THE COURT:  Except Rule 29 is analogized to Rule 56,

12 but that's at the close of the evidence.

13     MR. TURNER:  Precisely, Your Honor.  So in terms of

14 gatekeeping here, it's not a proper gatekeeping role to say,

15 well, that evidence wouldn't be sufficient, so it shouldn't be

16 presented to the jury.

17     THE COURT:  I understand it's not a sufficiency issue,

18 it's really about relevance and about 403.  I have to be

19 convinced that things should come in for those reasons.

20     MR. TURNER:  In terms of the AT&T arguments and the

21 landlord arguments, again, these are all issues that the Court

22 has addressed already in the motion to dismiss.  As the Court

23 held itself, it was not just a landlord, this was a dream

24 house, it was intentionally designed to provide a haven for

25 drug-dealing, and that's the difference with the AT&T case.

ECHKULBM

1   AT&T is not agreeing with anybody to sell drugs, the defendant

2   did.

3              Again, I want to stress, the government's whole theory

4   here, the government's case, is that it was through the

5   operation of this website, that he aided and abetted

6   distribution of drugs, that he aided and abetted the

7   distribution of drugs through the Internet in violation of

8   841(h), that he conspired with others to distribute drugs, that

9   he operated a continuing criminal enterprise.  In order to

10  establish those charges, the government has to be able to

11  present its case, that here's what the website did, and the

12  defendant was the one who ran it.  That's what the government's

13  case consists of.

14             So I'm not sure -- that's what all the evidence

15  relates to.  So if there's a problem with the government

16  presenting its evidence as to those two propositions, then we

17  have a problem, and I don't think we should, because, again,

18  we've passed the motion-to-dismiss stage, we have the right to

19  present our case to the jury, and the case really consists of

20  doing the things alleged in the indictment through the

21  operation of this website.

22             THE COURT:  All right, thank you.  I think that we

23  have now had a full discussion on the topic, and let me just go

24  on now to the motions in limine.

25             I want to start by saying that I intend, I hope, to

ECHKULBM

1    put out a written decision on the motions in limine before

2    trial just so that you can have what I'm about to say in a form

3    where you can refer back to it.  But I haven't written it yet,

4    and although I've got part of it done, I wanted to give you

5    what the decisions are now.

6          As with all motions in limine, you folks understand as

7    trial lawyers, that motions in limine are necessarily pretrial.

8    There are things which can come up sometimes even pretrial

9    where the Court gains a better understanding of the evidence

10   and of the parties' positions with respect to the evidence that

11   should change a particular ruling.  And certainly during trial,

12   all kinds of things happen that change the Court's

13   understanding and even the parties' understanding of the nature

14   of the evidence, and as a result, it is certainly appropriate

15   for the parties to, at trial, if they believe that a basis has

16   changed of the Court's ruling, to make an application to have

17   the ruling reconsidered.  And I will not take offense at that

18   by any means because of the uncertainties of trial.  So I say

19   that as a preliminary, and I am going to now go through the

20   motions in limine, and let me get through them all, if I can.

21   I don't really want to have a lot of reargument on them right

22   now, because we've got a lot of things to do today, but let's

23   just sort of see how it plays out.

24          In terms of the false identification documents, both

25   the government and Mr. Ulbricht moved for and against

ECHKULBM

introduction of materials relating to the false identification

documents.  The defendant argues that those materials are not

relevant to the offenses charged.  The government argues the

opposite.  There's also a discussion on both sides about

whether or not that evidence would be evidence of potential

preparation for flight and whether that's necessary to get to

here.

In particular, we're talking about the IDs that the

defendant is alleged to have obtained for himself in a variety

of different jurisdictions with certain, I think, facial hair

on some and not on others, et cetera.  My view is that this is

a direct evidence of Count Six, that Count Six is a count which

alleges a charge relating to false identification documents

specifically.  These false identification documents, based upon

the Court's pretrial understanding, were allegedly purchased

through Silk Road, they show Silk Road's capability for that

kind of sale and, therefore, go directly to the substantive

charge.  It's in a way one could think of it as a sampling of

the goods.

And in addition to that, it's potentially relevant to

showing or having an inference of consciousness of guilt and is

potentially probative of that.  Apparently, during the -- the

government has proffered that during the controlled delivery,

there was a potential statement or a statement by the

defendant, the government contends, indicating that

ECHKULBM

1   hypothetically one could purchase such goods through Silk Road,

2   and that could be probative of knowledge.

3           In terms of conduct offered for flight, I don't think

4   we need to get there, but to the extent that there would be any

5   argument of potential flight associated with those documents, I

6   want to make it clear that the Second Circuit, while it has

7   said that you've got to be quite careful -- the Court needs to

8   be quite careful of allowing in information which is for the

9   purpose of supporting flight, when the facts that are proffered

10  around it are sufficient to that point, it's possible that you

11  can support an inference of flight.  You just need to be sure

12  there is not an equally weighty explanation that's consistent

13  with innocence.  So I do think that there could be argument

14  potentially with the right foundation laid for those documents

15  of flight.  I don't know what the evidence would be around

16  that.

17          Now, in terms of 403, of course, just because I found

18  this relevant, I still have to do a 403 analysis, the Court

19  does not find that the probative value, which is directly

20  probative of Count Six, is substantially outweighed by the

21  prejudicial effect.  The fact that the defendant is charged

22  with a crime relating to false identification is certainly no

23  more inflammatory or these documents are no more inflammatory

24  than the charged crime.  In fact, they're along the same lines.

25  So that would be allowed in at this point.

ECHKULBM

        In terms of murder for hire:  There was a substantial
amount of argument on both sides in terms of the murder for
hire allegations.  There are two parts to the defendant's
motion.  One is to preclude it altogether, and the second is to
strike a surplusage.  The defendant's motions are denied.  I
will allow the murder-for-hire allegations for the following
reasons:

        The defendant argues that the murder-for-hire
allegations are entirely irrelevant to the crimes that have
been charged, and that in any event, it's highly prejudicial,
and under Rule 403, even if relevant, would arouse the
irrational passions of the jury.  That is the argument, and
that it would also require a mini trial effectively, and I have
looked at each of those arguments.

        The government, for its part, intends to offer six
potential examples of communications, I should say, relating to
murders for hire because the government, as I understand it --
and this is important -- is going to stipulate to the fact that
there is no evidence of any murders, that the information --
there is no information as to five whether or not there ever
was -- whether it was ever carried out, and as to one, we know
it was a sting.  So that is an important fact.

        But this -- and the government does argue that this
would be evidence of the defendant's alleged attempt to protect
the otherwise illegal businesses, in particular those which are

ECHKULBM

1    charged in the indictment of Silk Road, and that is a

2    compelling argument.  It is certainly supported in the case law

3    that there can be circumstantial evidence of one crime by

4    looking at how a defendant acts.  And the evidence that's been

5    proffered relating to the murders for hire do have references

6    to narcotics transactions, to the particular role of some of

7    the targets and what they were doing or alleged to have been

8    doing.  There are indications -- so that's relevant to the

9    various narcotics charges potentially and circumstantial

10   evidence of that.

11          There also is a great deal of relevance to the CCE,

12   the continuing criminal enterprise, charge, where the defendant

13   is alleged to have been in a supervisory position, and as to at

14   least the first of the alleged murders for hire, that is

15   alleged to have been of someone who was formally associated in

16   a particular capacity with Silk Road and goes -- and there is a

17   description of -- throughout in the materials that were

18   provided to the Court of the capability of that individual,

19   that third party, the target, if you will, to do certain things

20   and of the defendant wishing he had earlier prevented the

21   target from doing certain things so that this problem might not

22   have arisen in the first place, but in fact, he had not, and

23   therefore, this problem arose.  There is also a description and

24   an association with narcotics there.

25          So it's relevant to the existence of the substantive

1    narcotics crimes charge of the conspiracy, of the role as

2    supervisor, which is an element of the CCE charge, and of his

3    supervisory -- potentially supervisory role.

4         It also goes to identity potential, to whether or not

5    the defendant, number one, is the same person, but is the

6    person who is alleged to be the Dread Pirate Roberts.

7         Now, the fact that it didn't occur, and there are no

8    bodies, that's one of the defendant's arguments, I have

9    considered that, but the fact that there aren't any bodies

10   doesn't erase the fact that there was a desire to take

11   extremely harsh action against individuals who were alleged to

12   have threatened, and threatened Silk Road, and also been acting

13   adverse to the interests of Silk Road.  If a drug dealer, for

14   instance, in the brick and mortar world said to someone, I

15   would kill you to protect my drug organization, that would be

16   something which would be likely, very likely, after a 403

17   analysis, depending upon the case, allowed in as evidence that

18   there was a drug organization.  And there is an analogy between

19   that and this in terms of the circumstantial evidence that it

20   provides.

21        I then go into whether or not, under Rule 403, if I do

22   find that this is relevant, whether or not it's probative

23   value, as I've described it, is outweighed by -- is

24   substantially outweighed by its prejudicial effects.  There is

25   no doubt that the murder-for-hire allegations are prejudicial,

ECHKULBM

1    but the law does provide that essentially all evidence against

2    the defendant is prejudicial.  These allegations are certainly

3    allegations which are extremely serious, and they do bring a

4    particular issue into the case.  However, the allegation in the

5    case is that the defendant was presiding over a sprawling

6    enterprise that extended worldwide and that obtained tens of

7    millions of dollars, which is really not just your

8    run-of-the-mill allegation about a narcotics enterprise, this

9    is the most sprawling enterprise in terms of the reach that can

10   exist because it's considered -- it's being alleged as a

11   worldwide enterprise with folks everywhere, and the quantities

12   that are alleged are huge.

13          So when you think about how the allegations in the

14   indictment compare to these allegations, one has to keep in

15   mind that the allegations in the indictment are of such a very

16   large and significant drug organization and of the size and the

17   scope of that organization, and what's involved in protecting

18   that enterprise all go into whether or not the murder-for-hire

19   allegations -- and, again, it's communications about murder for

20   hire, it's not actually a murder for hire -- whether or not

21   that is substantially outweighed, and I do not find that it is.

22   I find that the probative value is greater than that

23   prejudicial effect.

24          The jury presumably will be provided with the evidence

25   and context, and if I need to give a particular limiting

ECHKULBM

1    instruction as the evidence comes in, we will consider that,

2    but I do find that it's more probative than prejudicial.

3            Now, in terms of the third motion, which I have dealt

4    with, which I think of as the contraband motion, this is the --

5    in fact, some of what we were just talking about, it's things

6    such as -- and I'm not going to list all the exhibit numbers, I

7    will give you the examples, and you will know what they are,

8    and we will talk about some of them specifically -- they're

9    things such as the homemade silencers, the recipe for survival,

10   the counterfeit goods, the counterfeit music, those kinds of

11   things, it's the belts that I was talking about, the Gucci

12   belts and things of that nature.  And here -- as well as the

13   gun sales.  Very importantly, as well as the gun sales, okay,

14   so the armory and all of the bits and pieces around the armory.

15           Now, the argument is that these are goods of interest

16   to criminals, and that's what makes them relevant generally.

17   The government also argues that these are inextricably

18   intertwined with the story of Silk Road, and that it's

19   necessary to complete the story, and I do not find that that is

20   the case.  I will preclude all of that additional contraband.

21   I believe that if it has any probative value, and it may have

22   some probative value, it is substantially outweighed by its

23   prejudicial effect.  You have quite a story without all of

24   that.  It is possible to talk about a sprawling marketplace for

25   the illegal and be referring to the large variety of narcotics

ECHKULBM

1    that will be part of your story.  You can talk all the

2    computer-hacking materials that are available and the false

3    identification materials that are available.  All of that is

4    part of a sprawling marketplace of the illegal.

5           However, I don't know, and the government doesn't

6    know, I don't think, there's no evidence before me that we know

7    that those Gucci belts were, in fact, counterfeit.  I think,

8    Mr. Turner, we -- in discussing the conspiracy, there's not a

9    position that we necessarily know or we're not going to spend

10   time at trial proving whether or not these Gucci counterfeit

11   dealers are in the same conspiracy or not.  Therefore, I have a

12   hearsay issue with the word "counterfeit" because some of it

13   says counterfeit, but that would be offered for the truth.

14          So it leads -- the contraband leads to a variety of

15   complicated evidentiary issues that we don't need to get to.

16   And so I do think that there will be instances in which the

17   government may want to characterize the Silk Road marketplace

18   as an enterprise for the underworld.  There are certain aspects

19   of that which I think are consistent with what I have allowed

20   in, which is all the narcotics, all the charged pieces, but if

21   there's a particular way of wording it that you want to discuss

22   before the openings, let's do that so that we don't run into

23   particular problems, but I think there's a fair amount of

24   leeway, but it can't be one-stop shopping for criminals for all

25   of their desired wears.  That would not be consistent with this

1    ruling.

2            MR. TURNER:  Could I ask one question about that, Your

3    Honor?

4            THE COURT:  Yes.

5            MR. TURNER:  Because I have a concern on the other

6    side, which is, if the defense tries to make the argument that,

7    A, it's not just about drugs, it's about any type of good could

8    be sold, look at the apparel, look at the books, look at these

9    other categories, if they open that door, I think at that

10   point, the government would be entitled to actually look at the

11   sort of apparel being offered, look at the sort of books being

12   offered, to rebut that argument.

13           THE COURT:  I think this is one of those "sufficient

14   unto the day."  I hear your point, the defense may have been

15   planning one thing, but now hearing my ruling, they may plan

16   something else.  I hear -- there's always an issue about one

17   when one opens a door, and we have to figure out how widely the

18   door is opened, if it's opened very widely, it may be opened

19   very narrowly.  You may be able to stipulate that not a hundred

20   percent was illegal, but you may not.  So I won't get there

21   until I have to get there.  I hear your point.

22           Let me just spend a moment on the armory, because I

23   know that the armory and the guns -- there were more documents

24   when I was going through the exhibits on -- not more, there

25   weren't that many of them, but there were a few.  The armory

1    and the gun issue, that's one of the places where the

2    substantially outweighed prejudicial effect really does come

3    into play more than, for instance, the copyrighted music.  If

4    we were talking just about copyrighted music or Gucci belts,

5    that's one thing, but the contraband, that includes things like

6    the armory, it lends a whole gun aspect to this case that's not

7    otherwise in this case.

8              So the defendant is not charged with being in a

9    conspiracy to sell illegal firearms.  That could have been a

10   charge, I suppose, if the government believed there really were

11   firearms, and it may be that that's being taken up elsewhere, I

12   don't know, but it's not part of this.  I don't want to

13   interject firearms.  Apparently some of the pictures -- there

14   are all kinds of firearms.  So I don't want to go down that

15   road.

16             So I do find that if there is any relevance, that is

17   substantially outweighed by its prejudicial effect, and so the

18   contraband and the noncharged goods, if you will, will be

19   precluded.  If you have any questions about what those are, let

20   me know, but I assume you know what those are.

21             The government had made a motion relating to

22   punishment and keeping references of that out, and the

23   defendant has -- Mr. Dratel has suggested that he's not going

24   to go anywhere near there.  And we'll talk about surprises --

25   you know I hate surprises as part of my remarks for the final

ECHKULBM

```
 1   pretrial -- so if anybody is going to go anywhere near, you
 2   don't want this guy to spend a lifetime behind bars, like that
 3   would be off limits.
 4            Mr. Dratel, do you agree?
 5            MR. DRATEL:  Yeah, I've never said that in my life.  I
 6   know what the limits are.
 7            THE COURT:  All right.  Okay.
 8            Now, the defendant also made -- there's also, I think,
 9   a thing about the defendant's political issues, and there is no
10   reason for anybody's political views to be raised one way or
11   the other.  This case will be decided on the elements and
12   whether or not the elements of the crimes charged have been
13   met, not why someone may have undertaken a particular course of
14   conduct and not a different particular course of conduct.  It's
15   irrelevant on both sides.  Whether you like the politics or
16   don't like the politics is entirely irrelevant to whether the
17   government has met its burden of proof.
18            Now, in terms of the authenticity of electronic
19   communications, I have read the Second Circuit's case in this
20   regard.  This is definitely a sufficient unto the day question.
21   I've got to see how these come in.
22            I expect, Mr. Dratel, that you will be listening
23   closely to the foundations as they are laid, and we will take
24   it one by one.  The government is correct that there is no
25   across-the-board prohibition on electronic communications
```

ECHKULBM

1    coming in if a foundation is appropriately laid.  They come in

2    all the time in all sorts of cases.  There can also be

3    deficiencies.

4         The case having to do with the Russian Facebook, that

5    was, I think, what everybody would agree was not a foundation

6    that one would expect would hold a big house, right, it was a

7    weak foundation, and they put somebody on the stand who

8    basically had almost zero familiarity with the site and then

9    tried to authenticate that Facebook for a particular person.

10   There were a number of different pieces of that exercise that

11   one could dig at.  So we'll take those as they come.

12        MR. DRATEL:  I just didn't want you to be surprised.

13        THE COURT:  I won't be surprised by your arguments.

14   What we can do is, if it becomes repetitive, what we'll do, so

15   you don't have to look like you're being slammed by the judge

16   each time, is we can do a couple of them, then we'll take them

17   up at a break, and if you've got a similar objection to a line,

18   we will deal with it, you'll preserve your position, and then

19   that way, you won't appear in front of the jury as if you're

20   being told to go away again and again.

21        MR. DRATEL:  Thank you, Your Honor.

22        THE COURT:  Although I will give the jury the normal

23   instruction that just because that you've got to raise

24   objections, everybody's got to raise objections, I've got to

25   give rulings, and the jury should take nothing from it, but I

1    do understand sometimes people feel sensitive even when the

2    jury is properly instructed.

3            Now, there were issues relating to Silk Road product

4    listings and Silk Road transactions.  Let me take these a

5    little bit separately.

6            The narcotics transactions for New York and Chicago,

7    I've given my views on some of the potential issues there, the

8    government has given their views on their response, the

9    defendant has given his views.  The narcotics, I will allow in

10   at this point.

11           In terms of the New York/Chicago and whether or not

12   those could be coconspirators, there are alleged to be at least

13   three co -- in every transaction, there are three participants

14   from the alleged conspiracy, as I understand the government's

15   theory.  It would be Silk Road, it would be the buyer, and it

16   would be the seller.  The recipient was only the buyer.

17           MR. TURNER:  I'm not sure the buyer would be included

18   in that, Your Honor.  I think the conspiracy is to distribute

19   drugs, and that agreement lies between the seller and the

20   defendant.

21           THE COURT:  All right.  In many of your papers, you

22   throw in the buyer, I think, a bunch, but I understand.  It is

23   a distribution conspiracy, and it may just be that that's --

24   maybe I overread the position.

25           So they were undercover buys in New York and Chicago,

ECHKULBM

1   right?  So the buyer is not a coconspirator.  In any event, you

2   don't need -- for purposes of a coconspirator's statement, you

3   don't need every participant to be present every time, right?

4   So if you've got the seller, and the middle persons are

5   coconspirators, and you've got evidence as to whatever the --

6   if it's going to be a hearsay issue, whatever the hearsay might

7   be, if it's labeled LSD, or labeled heroin, or whatever it is

8   are sold to the New York person as heroin, as being what is

9   advertised as heroin, you've got coconspirators who are in the

10  mix, if you will, for the various aspects of the potential

11  statement to meet the evidentiary rules.

12          The Chicago has got some of the issues we've already

13  discussed, but it can be potentially, even I would read it to

14  be a sprawling enough conspiracy during the appropriate time

15  frame that Chicago would be included.  When I say even I agree,

16  what I mean is just this is an issue I'm continually thinking

17  about in terms of how far, where, et cetera.  So the Chicago, I

18  will allow in as well.

19          In terms of manuals, let me just make sure that

20  everybody understands:  The manuals, the how-to manuals, the

21  books and things, that's part of what I am calling the

22  contraband.  It's not, strictly speaking, contraband in the

23  sense that I don't know that a manual to do anything is

24  contraband in this country, but to whatever extent it's

25  probative of anything, and I don't think it is probative of the

ECHKULBM

1    charged conspiracies.  If it were, I would preclude it under

2    403 because it injects a whole element of explosive devices and

3    all kinds of things that just don't need to be part of this

4    case, so just to make that clear.

5            And the undercover buys are also probative of the

6    actual existence of a distribution conspiracy where the

7    distribution is through the coconspirators, and it's the

8    New York evidence is direct evidence of Counts One, Two, Three,

9    and Four, so this stuff, the buys, all the narcotics stuff, can

10   come in at this point, unless we have specific objections to

11   the specific documents at the time, but I don't see any

12   immediate hearsay objections based upon the way in which the

13   government has cast their theory of the case.

14           I believe that takes care of the motions in limine.

15   Anybody think I've left one out?  Well, there's one issue, but

16   that's a separate issue.  But for motions in limine, is there

17   any other motion in limine I have missed?

18           MR. DRATEL:  Just --

19           THE COURT:  Wait.  I've got --

20           MR. DRATEL:  It's a subissue in terms of something the

21   Court talked about today, and I don't know whether the Court

22   had incorporated it within any of the other rulings or was

23   still thinking about it, which is the currency issue.

24           THE COURT:  Well, I think I misunderstood.  I've got

25   to go back to the currency.  Let's put -- as they say, let's

ECHKULBM

1    put a pin in it, because I had thought the currency was really

2    selling counterfeit currency.  To the extent it's selling

3    counterfeit currency, it falls under contraband.  To the extent

4    that it's an exchange of in some manner that really can be

5    characterized as money laundering consistent with Count Six, it

6    would come in consistent with the government can provide

7    evidence of the money laundering.

8         MR. DRATEL:  Right.  But it would have to be the

9    connection of that type of exchange being part of that process

10   for it to be --

11        THE COURT:  Yes.  For instance, if you have a user ID

12   of User 123 who's buying currency, and you can show that User

13   ID 123 also sold drugs through the site at any point in time,

14   you could draw the inference.  You could also draw the

15   inference that you have no idea that his grandmother gave him

16   the money for his birthday, you know, but that would not be an

17   unfair inference.  There may be other ways of doing it.  That's

18   just one example.

19        Mr. Turner?

20        MR. TURNER:  One footnote, Your Honor:  As to the

21   contraband, in their motion in limine, the defense mentioned --

22   sort of threw in with that issue the manual recovered from the

23   defendant's own laptop, which was the construction and

24   operation of clandestine drug laboratories.  I think that would

25   present a different issue, and then we would want to introduce

ECHKULBM

1    that as evidence of identity and evidence of intent, et cetera.

2    So this is not contraband that was sold on Silk Road, but this

3    was a manual that --

4            THE COURT:  I did think about the manual for the labs,

5    and I don't want to rethink about everything, but let me just

6    tell you what my thinking was on that particular manual,

7    because I did recognize that it had a narcotics aspect to it,

8    if you will, but there are particular crimes that can be

9    charged for the manufacture of drugs, and there can be

10   particular crimes that are charged for manufacturing illegal

11   prescription drugs, for instance.  And there was a pill

12   machine, also, so let me throw this in.  One of the government

13   exhibits is of a pill machine -- I can give you the number --

14   the pill press, Government Exhibit 116F.  Both of those things,

15   I felt, are not relevant to a distribution conspiracy.  You're

16   suggesting that at least the manual should be 404(b) evidence

17   as lack of mistake?

18           MR. TURNER:  No, Your Honor.  Actually, it goes deeper

19   than that.  So the way the defendant got the site off the

20   ground was by clandestinely growing magic mushrooms so that he

21   would have something to sell on the first day that the site

22   opened.  So that was in furtherance of the conspiracy, that was

23   distribution of drugs, so it's clearly relevant to charges One

24   and Three.

25           So the fact that he has a manual on his laptop about

1    how to operate a clandestine drug laboratory, that corroborates

2    the other evidence about --

3              THE COURT:  All right.  In terms of that particular

4    manual, is it of a time frame that is consistent with your

5    theory?  In other words, is it a 2012 manual when your theory

6    is that he made mushrooms in 2008?

7              MR. TURNER:  We'll have to check, Your Honor.

8              THE COURT:  So that would be the kind of thing when

9    you're laying a foundation, if you want to put it in for that

10   reason, that it's corroborative of your theory, I would want to

11   make sure that it's, in fact, corroborative.  It doesn't have

12   to be the manual, your suggestion is that he was looking for a

13   way and found a way to try to get the site off the ground.  And

14   I've heard that theory, I think, before, that that was a method

15   in terms of the government's theory, but let's just tie that

16   manual to the right time frame.

17             MR. TURNER:  Okay.  So this would be an exhibit that

18   gets tabled for further consideration?

19             THE COURT:  Yes.  If you can tie it to the right time

20   frame, I hear the theory.  Now, Mr. Dratel is standing up,

21   so --

22             MR. DRATEL:  I'll just await the government's attempt

23   to connect it.

24             THE COURT:  So if you could tie it in, that gives me

25   more comfort in terms of what you're doing with it that would

ECHKULBM

1    not be -- it would fit in with the story the government's

2    telling as opposed to opening up a new story, which is my

3    concern.

4              The pill press?

5              MR. TURNER:  The pill press was an item sold on Silk

6    Road.

7              THE COURT:  All right.  So that would fall under my

8    contraband ruling.  It's not purely contraband, but it falls

9    under the -- in and of itself, a pill press, that's a

10   manufacturing operation, it's not about the distribution

11   conspiracy.  Of course, you've got to make in order to

12   distribute, but --

13             MR. TURNER:  It would be an item of interest to the

14   sellers on Silk Road who needed that to manufacture pills they

15   were selling, Ecstasy pills or whatever the item was.

16             THE COURT:  Although the evidence isn't necessarily

17   going to be that these -- some of the evidence is going to be

18   that the pill machine -- well, there was Oxycontin and things

19   that were sold that was prescription that was sold.

20             MR. TURNER:  Sure.  There was a category on Silk Road

21   that you had drugs, you also had lab supplies.  If you clicked

22   on that, drug dealers could buy things like pill presses, they

23   could buy things like glassines to package their drugs in.  So

24   these were items that were not drugs themselves, but they're

25   certainly in furtherance of the drug conspiracy.

ECHKULBM

1          THE COURT:  You really want the pill press?

2          MR. TURNER:  We can do without it, Your Honor.  I just

3     want to explain why it was in there.

4          THE COURT:  All right.  Well, right now, the pill

5     press is out, as are all the other little sort of bells and

6     whistles, like the glassine envelopes, but let me think about

7     them, and if there are specific exhibits, which when you go

8     back, and you reflect on this, and you say we really do want

9     the following products in, and we believe they are consistent

10    nevertheless with what the Court has described, then maybe my

11    net has been cast too broadly.  But right now, I'm just

12    thinking that the heroin pictures, right, those are in if you

13    can lay a foundation, but the pictures of the narcotics and all

14    of that, those are in, of the packages of the narcotics that

15    have the narcotics in them, those, if you can lay a foundation,

16    are not precluded.  So when I say in, what I'm saying is I'm

17    not precluding them pretrial.

18         MR. TURNER:  I understand.  Thank you.

19         THE COURT:  Okay.  Now, I think I've also dealt with

20    the particular items that were on pages 19 and 20 of the

21    government's memo in opposition, which is some of the little

22    bits and pieces.

23         We've been going for an hour and 15 minutes.  Are

24    folks okay?

25         All right, let's continue.

1          So those are the motions in limine.  I hope to put out

2    something in writing on them so that you can have that and have

3    the rationale with the case cites, but the case cites are --

4    there isn't really a difference as to the law on the 403 test,

5    for instance, relevance test, for instance, and things of that

6    nature.  In terms of contraband and the exclusion of

7    contraband, it's both 403, I also would just note the 2009

8    Second Circuit Williams case cited by the defendant,

9    distinguishable facts, but there are some interesting pieces of

10   that case that are relevant to that decision.

11         Move on to the next piece?

12         I had issued an order, which you folks may have

13   already been thinking of doing in any event, I don't know, but

14   I've done it in other kinds of both criminal and civil complex

15   cases, which is having something that the jury cannot just hear

16   when they have the witness on the stand in terms of technology,

17   but actually have with them that they can refer to now and

18   again, because they hear it so quickly, and these are people,

19   some of whom may have a lot of familiarity with the Internet,

20   and you may have, for all we know, a computer programmer, but

21   they can't be in the back room talking about it with the other

22   jurors until they're deliberating, and so each of the 16 have

23   to sit there listening with whatever knowledge they have or

24   don't have, and I do think they need to understand this stuff

25   in order to administer justice here.  So in order to come to a

ECHKULBM

1    result without losing track of things, it would be nice to have

2    something which they could have with them.

3            What are your respective thoughts?  Do you think

4    that's desirable from your point of view and possible?

5            MR. TURNER:  I think it's an excellent idea, Your

6    Honor.  Our witnesses are planning to explain those concepts as

7    necessary as they went along, but I think having something that

8    the jury can consult as needed is a very useful suggestion.  I

9    would suggest that we can work out stipulations on those

10   definitions and just read them into evidence, and then the

11   document can be distributed to the jury for them to consult as

12   needed.

13           THE COURT:  And, Mr. Dratel, do you think this is a

14   desirable thing, and do you think it's possibly doable?

15           MR. DRATEL:  I'll start with the second one.  It's

16   possibly doable.  Desirable is really a turn-by-turn situation,

17   because obviously I'm not inclined to help the government

18   explain its case to the jury.  However, if they're not

19   controversial, and they advantage both sides in terms of making

20   the points that we need to make, I don't have an

21   across-the-board objection.  So we're engaged in discussions

22   with the government.  We've begun that process of doing it.

23           THE COURT:  Okay.  I appreciate you folks talking

24   about it and trying to reach an agreement.  There's a heavier

25   handed way of doing it, which is if the government puts on one

ECHKULBM

1    of their first witnesses, I know both of whom are computer

2    folks, and goes through a list of terms and introduces such a

3    thing, I can just have the jury hold onto it for the rest of

4    the case, but I'd prefer that you guys try to find some common

5    ground, at least as to some core set of terms, like

6    administrative capabilities, that's going to come up a lot.

7    Now, there may well be -- and you can build that in --

8    administrative capabilities and administrative capabilities,

9    and it may be that you want to say that they consist of a whole

10   variety of things.

11            MR. DRATEL:  Some of it depends, obviously, on our

12   ability to agree on precise terminology.

13            THE COURT:  Absolutely.  That, I understand.  That's

14   why it's thrown out there for you folks.

15            MR. DRATEL:  I appreciate that.  Thank you, Your

16   Honor.

17            THE COURT:  Okay.

18            In terms of people, places, and things that belong in

19   the voir dire, I just need to make sure I've gotten your

20   complete list.  I've gotten a list before.  If anything has

21   come onto the list as you folks have gotten closer to trial,

22   just make sure we have that.

23            Current estimate of trial duration, are we still at

24   about four to six weeks?

25            MR. TURNER:  I think it's going to be shorter than

ECHKULBM

1      that, Your Honor, but I hate to predict that in advance, but

2      our number of witnesses is fairly limited, and we may cut a few

3      if we can reach some stipulations with the defense.

4                  THE COURT:  All right.

5                  MR. DRATEL:  I think that the defense case is the same

6      as we thought, somewhere about a week or two, but somewhere --

7      give or take somewhere in that, but I don't think it will be

8      longer than two, but I'm saying it could be less than a week,

9      but it could go into the second week pretty easily.

10                 THE COURT:  The only reason I try to poke and prod in

11     advance is because with a case over three weeks, the jury --

12     you lose certain people, frankly, who can't sit for four weeks

13     or for six weeks.  So it will make a difference to how I

14     introduce it to them, but it is what it is.

15                 The jury selection process, we've talked about this, I

16     think, now a number of times, but let me just go through it.  I

17     use a hybrid approach.

18                 Mr. Howard, you've tried a case in front of me.  So

19     has Mr. Dratel.  Mr. Turner, have you -- you have.

20                 Mr. Howard, you have?

21                 MR. HOWARD:  No, Your Honor.  We came close, but we

22     didn't actually go to trial.  We just talked about this in the

23     abstract.  I've never been there in practice.

24                 THE COURT:  So Mr. Dratel and Ms. Lewis have tried a

25     case in front of me, and it's the same process.  So once we've

ECHKULBM

1    got whoever the pool is going to be -- and I think I actually

2    made the same statement before -- once we have the pool of

3    whoever is going to be out there, we'll take randomly out of

4    literally of the big old bingo wheel, we'll draw 16 names, the

5    first 12 and then four alternates.  I think 16 is probably the

6    right number if we think the trial might be four to six weeks.

7    I'm tempted to go to three alternates, but somewhere, I don't

8    think we need more than four.  I know like choosing six

9    alternates is all the fashion, but I just don't think we need

10   it.  I think that folks -- we might not use any of them.

11        So we'll put them into the box.  My questions will be

12   directed to those folks who are in the box.  The people who

13   will be out in the audience will be given a piece of paper and

14   a pencil to write down any questions to which they had a yes

15   answer.  I'll then direct questions to the folks in the box.

16   When it becomes clear that they've got issues and things to

17   talk about, depending on whether it's the kind of private thing

18   that we take over at the sidebar, that will be one scenario,

19   otherwise if it turned out that they thought they understood

20   English and don't understand English, and they really don't

21   understand English, then I'll excuse them from here, so that

22   will go a little faster.  We will then fill them in with

23   somebody randomly from the bingo wheel, and we will continue --

24   catch them up, and then we will continue.  So we will end up

25   with the 12 and then the four who will have made it through the

Court's voir dire process with appropriate sidebars as we all

deem necessary.  If I don't excuse somebody who you think

should be excused, you'll have raised that with me by making

appropriate requests for discussion about that.

Then we'll get into the peremptories.  I typically

tell the prospective jurors that peremptories are the

opportunity for the lawyers to strike people, and they should

not think twice about why, and they will not know which side

strikes them because the way that I do it is simultaneous and

blind.  And so it's a use-it-or-lose-it system, so if you waive

a strike, you can't accumulate your strikes.  And so I have you

both, even if you waive, hand a Post-it, or a piece of paper if

you don't have a Post-it, to Joe as we go along, so we'll say

this is round one, people, please hand your Post-its to Joe is

the way I phrase it.

Both of you will hand them to Joe for each of the

rounds, irrespective of whether or not you're, in fact,

striking anybody.  That way, the jury has no idea who's

striking whom.

And if you both strike the same person, you don't get

your strike back, then you both strike the same person.  The

way it will work will be, the defense gets the two, two, two,

two, one, one, so they get four rounds of two and two rounds of

one, for a total of ten strikes -- this is now the first 12 --

and you'll strike against the first 12 separately from striking

1    against the alternates.  And then the government will get one

2    strike each of those rounds, so that's just what the rules

3    provide, ten for the defendant, six for the government in those

4    kinds of rounds, but we'll do the rounds simultaneously.  Does

5    that all make sense?

6         We then fill them in each time, catch that person up,

7    are there any questions to which I asked to which you had a yes

8    answer, because they would have been told to write down their

9    yes answers.  Yes, I didn't realize before when I was filling

10   out the questionnaire, but I can't possibly sit for this length

11   of trial.  Why not?  I'm a first grade teacher, whatever it is,

12   and we'll decide what we think about that.  If they get struck,

13   we'll put somebody else in there until we get that person ready

14   to go, we'll have them stand up and do their 30 seconds of --

15   which all of them do before the peremptories, 30 seconds of who

16   they are, so you can hear from them, and we'll approach the

17   next round of peremptories.

18        So we'll do that, and then we'll have -- because it is

19   four alternates, unless we go to three, by Rule 24 of the

20   Federal Rules of Criminal Procedure, that entitles you both to

21   two additional strikes.  That would be in two rounds of one

22   each.

23        The way this works, it actually goes relatively

24   quickly, and I would think we would hopefully -- might hope to

25   have a jury certainly day one, and to do openings day one, and

1    maybe even get into a witness day one.

2              Does that all make sense to folks?

3              MR. TURNER:  Yes, Your Honor.  Thank you.

4              MR. DRATEL:  Yes, Your Honor.

5              THE COURT:  Now, in terms of the charging conference,

6    we're going to have that the second week after trial commences

7    earliest, right?  We'll see how things are going.  Your charge

8    is actually -- I appreciate the fact that you folks used one of

9    my prior criminal cases because it helps with the review of it.

10   You folks will all premark your documents, right?  The

11   government's, I think, are already marked on the exhibits that

12   I saw on the screen.

13             MR. TURNER:  With exhibit stickers, yes.

14             THE COURT:  So if you can, that's terrific.

15             In terms of jury books, how is the government planning

16   on putting its evidence up?

17             MR. TURNER:  I guess we were going to use paper

18   exhibits to show the witness and then ask to publish on the

19   screen to the jury in lieu of handing out exhibit binders.

20             THE COURT:  All right.  Whatever you want.  I just

21   want to understand how it's going to flow.

22             And then my practice -- it's not for the formality,

23   it's just to keep control of what's happening when -- is to

24   have you folks ask to approach.  So if it's easier to have a

25   witness book that's got five different witnesses, and they turn

ECHKULBM

1     to the first tab -- not the jury, I'm talking about what the

2     witness has -- that's fine.

3               MR. TURNER:  That sounds good.  That's what we will

4     do.

5               THE COURT:  Either way.

6               Mr. Dratel?

7               MR. DRATEL:  With cross-examination, obviously, with

8     impeachment, if it's 3500 material, things like that, we would

9     be putting it up on the screen, we'd be approaching with it,

10    and then if we wanted to admit a specific piece, we'd obviously

11    do it electronically as well.

12              THE COURT:  It's just the same way you did it during

13    the prior trial.

14              MR. DRATEL:  Yes.

15              THE COURT:  Yes.

16              You folks will coordinate on the use of technology and

17    make sure that if the defendants are going to piggyback on the

18    government's technology, that you folks know how to use it.

19              MR. DRATEL:  Yes.

20              THE COURT:  So we don't have issues with just trying

21    to piggyback on their paralegals as well.  Unless you guys have

22    agreed to that, but just so that you are all have worked out

23    your issues.

24              MR. DRATEL:  Right.

25              THE COURT:  Demonstratives, I don't care how you

ECHKULBM

1    exchange demonstratives or when, but you should in a manner

2    that you both agree is fair.  If you can't agree, I'm happy to

3    impose some rules, but if you can agree, I'm happy to have you

4    folks work that out.

5         MR. TURNER:  So the exhibits that are marked with a

6    parenthetical D on our exhibit list are demonstratives, and

7    we've already --

8         THE COURT:  If that's what they are, then the

9    defendant has already got them.

10        This goes into surprises, which is sometimes there are

11   demonstratives which come up at the last minute, and generally

12   there are always things which are surprising to you and would,

13   as a result, if I understood the importance of it, be

14   surprising to me.  I hate surprises at trial, because that's

15   where we really run into problems or could run into problems,

16   and I want to have this go as smoothly as possible with the

17   trial conducted in as clean a fashion as we can.  There's no

18   perfect trial, but we can try.

19        So if anybody thinks there's likely to be a surprise,

20   let me know, and let all of us know beforehand.  And by

21   beforehand, it can be that morning.  If we needed to grapple

22   with an issue, it can be two days before.  If you see an issue

23   coming down the highway at us, it certainly can be at a sidebar

24   if we really need to get there.  But when I say surprises, I'll

25   give you an example -- there are lots of different examples.

ECHKULBM

1      There's a type of cross-examination which you know is going to
2      be inflammatory, not just a really great gotcha, but I had a
3      case where there was an elderly fellow on the stand, and he was
4      a witness against defendants in an organized crime case, and
5      while he was being cross-examined about money laundering stuff,
6      he was suddenly asked about some very scurrilous allegations
7      that had been made against him in a lawsuit that had zero to do
8      with the case and a lot to do with trying to unsettle this
9      person.  That kind of thing shouldn't happen.  If you've got
10     something really, really juicy and really, really far afield,
11     we'll need to figure out how to handle it.  And I don't want to
12     have you give up your best cross.  You know where the lines
13     are.  You've all tried a lot of cases.

14          Schedule:  9:00 to 5:00.  We start at 9:00, the jury
15     comes in at 9:30.  This is all except for day one.  Day one, on
16     the 5th, we'll have gotten a preview of who's going to be
17     coming in.  We'll still start at 9:00 on day one, but I hope
18     everybody's ready -- we've got some people ready to come in at
19     9:30.  But there's going to be a lot other people coming in
20     that day for another major jury selection, we're going to be
21     ahead of them, and our group is going to be defined, but there
22     are going to be hundreds of people coming in that day.  Judge
23     your time accordingly for that day.  It's a very, very heavy
24     day of people coming in, not just for our case.

25          MR. DRATEL:  A civil case, right?

ECHKULBM

1          THE COURT:  No, it's a criminal case starting that

2     day.

3          I take two breaks and lunch.  If you folks need

4     another break, you'll let me know.  If the witness needs a

5     break, you'll let me know.  But my schedule is typically we

6     start at 9:00 on housekeeping, whatever we need to deal with,

7     the jury comes in at 9:30, sometimes we get three minutes in

8     between, 9:27 and 9:30, and we start.  Hopefully the jury will

9     be the kind of jury where they're on time.  You know, it will

10    be the personality of the jury.  Every jury has their own

11    personality.  I typically take a break at about 11:00 in the

12    morning.  Everybody -- again, including the defendant,

13    everybody can have, so long as it's okay with the marshals,

14    coffee and water, or green tea, or whatever people's preference

15    is.  I will be drinking coffee, and I will tell the jury that

16    they can do the same.  I don't mind if everybody has things.

17         It does sometimes result in more frequent breaks

18    requested by the jury.  That's life, but actually remarkably

19    not so much, and they appreciate that I am sitting here

20    drinking coffee.  I'm not just -- I wouldn't do that anyway,

21    this is really all to make us all feel comfortable generally.

22         So 11 o'clock, and then we'll go to 12:45.  At every

23    break, I will ask you, is there anything counsel would like to

24    raise.  Typically, one of the first things I do at the

25    beginning of the trial is for several breaks, I will tell you

ECHKULBM

1   often why I made certain rulings, so that we can try to get our

2   heads in the same place.  It doesn't mean that you should

3   change anything you are doing to protect what you believe is

4   the appropriate appellate record.  It just gives you a sense of

5   where I'm coming from.  It's also an opportunity for you, if

6   you think I'm really off base, and I am missing what you're

7   doing, that you tell me that.  And so I'll do that, but you at

8   every break, when I say is there anything you'd like to raise,

9   if you'd like to make a fuller record, that is an opportunity

10  to do that.

11          In the afternoon, I will take a lunch break, 12:45 to

12  2:00, but we often use the 12:45 to 1 o'clock for housekeeping,

13  1:00 to 2:00 is lunch.  I believe I have filled up the entire

14  time for between now and the end of the trial with luncheon

15  matters.  Often it's the only time I can do a sentencing for

16  any criminal matters or other things, and so I will ask to have

17  two seats available, you can just push things aside, it doesn't

18  matter to me which side it is.  Sometimes it's civil matters,

19  and if I can do them in the robing room, I will, if it's civil,

20  but just to give you a sense that -- you can stay in the

21  courtroom, everybody can stay in the courtroom, it's always an

22  open courtroom except in unusual situations, which you know the

23  rules for, but I'll need you to clear the benches.

24          Sidebar use, which brings me to sidebar use:  I hate

25  sidebars, they take up a lot of time.  There are some people

 1   who love sidebars.  I don't really understand what the desire

 2   for sidebars are, but some people just love sidebars.  And so I

 3   have a one free sidebar use rule, which is, I will trust you

 4   with your sidebar requests at least once.  The first time you

 5   ask, I will give you a sidebar, and then if it turns out that

 6   you really love sidebars, and I don't think that they're really

 7   necessary, it may lead to a time when I deny sidebars.  So use

 8   them judiciously if you really, really, really need sidebars.

 9   As Mr. Dratel knows, I will give you a sidebar mostly.

10          So even if I have denied a few, if you say to me, Your

11   Honor, I really need one this time or something like that, you

12   don't have to beg, but you know what I mean, make it clear that

13   this is an unusual situation, but I have my one free sidebar

14   use.

15          MR. DRATEL:  Do I have any store credits from the

16   previous trial?

17          THE COURT:  I can assure you that you used your

18   sidebars.  It's a good thing that it's refilled each trial.

19          Objections:  You know how to do this, right, just try

20   to make it so it's one word as much as possible.  After that,

21   objection, hearsay.  I also -- we can do it with the rules, you

22   know, objection 401, objection whatever your rule is, and

23   you're familiar enough with the rules, but you can also just do

24   one word, but don't do speaking objections or I'll cut you off,

25   and I hate to cut you off in front of the jury.  We will take

1   them up at the next break that we need to.

2          The questioning is from the podium.  If you're

3   walking, and you're presenting something to the witness, and

4   then on your way back, you're starting to ask a question,

5   that's fine, but this is to prevent people from trying to

6   intimidate people by shaking their finger in their face.  I

7   don't think that you folks or any counsel here is quite like

8   that, but that's just to let you all know.

9          What's your anticipated opening length?  Anybody have

10  any idea?  It's early.

11         MR. HOWARD:  Approximately 15 to 20 minutes.

12         THE COURT:  That's all?

13         MR. HOWARD:  Yes.

14         THE COURT:  I wouldn't cut you off anyway, just to get

15  a sense.

16         Mr. Dratel?

17         MR. DRATEL:  I think it will be that long, maybe a

18  little longer.

19         THE COURT:  All right.  Then we're very likely to get

20  to initial witnesses, I think, on the first day.  You folks, I

21  think, know my style, which is I like to have them stacked and

22  to go one witness after another until we rest.  We'll talk

23  about closings in due course, but we'll figure out whether or

24  not they're going to happen the same day as the last witness or

25  whether or not I'm going to charge the jury after the close of

ECHKULBM

1    all evidence on both sides, so to give you time effectively to

2    prepare for the closing, which is another way of doing it,

3    starting the charge, to take up the remainder of the time.  I

4    try to use the jury's days, if I can.

5              I have just one final matter that I wanted to raise,

6    which is, I wanted to have a direct discussion with the

7    defendant in open court about his knowledge that he gets to

8    make a decision as to whether or not he wants to testify, that

9    that's his decision ultimately, that he should realize that,

10   and also about whether any plea offers have been extended.

11   These are typical matters I always raise during final pretrial.

12             Is there anything else anybody would like to ask or to

13   raise right now?

14             MR. TURNER:  Two housekeeping matters, Your Honor.

15             THE COURT:  Yes.

16             MR. TURNER:  So the jury questionnaire, my

17   understanding is that it will be filled out by the potential

18   jurors and will be -- the questionnaires will be ready for the

19   paralegals to be input into a spreadsheet that same day?

20             THE COURT:  Correct.  By mid-day, I think.  Mid-day at

21   1 o'clock.

22             MR. TURNER:  So then the question is:  At what point

23   does the Court expect the government to provide that

24   spreadsheet to the Court and the defense?  Because it does

25   require a lot of work.

ECHKULBM

1          THE COURT:  I think that I put out a process order

2     that was labeled "Process Order" that went through the minutiae

3     of that.  Joe is looking for at it right now.  I may need to

4     look at that, Mr. Turner, and find out whether with the changes

5     of dates and things, it still got everything correct, but I

6     think that the way it was staged is, I need you folks -- I

7     don't need the spreadsheet till you folks have talked, but I

8     need it after you've talked.  So what I need to get from you is

9     on the 1st -- I think we said the 1st at --

10          MR. DRATEL:  5:00 p.m.

11          THE COURT:  -- 5:00 p.m., I need to get your list of

12     joint agreed strikes and proposed, but not agreed, if there are

13     any.  I will then look at that.  There's almost no chance that

14     a joint agreed strike wouldn't be struck, but it may be that

15     when I look at your proposed strikes that somebody hasn't

16     agreed to, that I actually am looking at the questionnaire,

17     it's possible that I would think that there should be a strike

18     there as well, and I would strike that person.  You would be

19     notified of that.

20          And if it was cause, if somebody answers, for

21     instance, I am biased on the questionnaire, the answer to the

22     very last question; I am biased -- it's order number 100 --

23     then it's hardly worth their -- it would be very hard to

24     overcome that unless they didn't understand the question, which

25     presents its own issues in terms of ability to read English,

1    the English language.  That's what I mean by those kinds of

2    things.

3            But you will have complete clarity on that because

4    you'll know what you sent me, and I will, on the 2nd, put out

5    an order that will list the juror numbers of everybody that the

6    Court is going to call and tell them to stay home.  And those

7    are the people who have all of your joint agreed strikes and

8    anybody else that I have come up with that I think is

9    appropriately struck.  Everybody else will be called and will

10   be sitting in an appropriate undisclosed location waiting to

11   come up in the manner in which the Court has previously

12   indicated.

13           MR. TURNER:  Thank you.

14           The second matter is exhibits.

15           THE COURT:  Yes.

16           MR. TURNER:  Obviously, we've tried to put as many of

17   our exhibits in the spreadsheet as possible.  We are, as we are

18   developing our Q&As, coming across some additional items we

19   want to add, and rather than providing those to the defense or

20   Court piecemeal, our thought was that we could provide an

21   updated exhibit list at the time that we disclose our initial

22   3500 material.

23           THE COURT:  And give me that date again.  When's the

24   initial 3500 coming?

25           MR. TURNER:  I think it's the 29th.

ECHKULBM

1           THE COURT:  What is the volume that you're thinking of

2    right now?

3           MR. TURNER:  I really don't think it will be that

4    much.

5           THE COURT:  "Not much" meaning a dozen --

6           MR. TURNER:  Yes.

7           THE COURT:  -- or 50?

8           MR. TURNER:  Much closer to a dozen.

9           THE COURT:  All right.  Well, because, then, the

10   defendant will have an opportunity, Mr. Dratel, of course, to

11   look at those, and I would not -- you can raise any issues of

12   any kind at that point.

13          MR. DRATEL:  Thank you, Your Honor.

14          THE COURT:  All right.  Those were the two

15   housekeeping matters you had.

16          Mr. Dratel, do you have some?

17          MR. DRATEL:  No.  I would just like a moment to speak

18   to Mr. Ulbricht.

19          THE COURT:  Yes.

20          (Pause)

21          MR. DRATEL:  Thank you, Your Honor.

22          THE COURT:  Before we get to the last matter, I just

23   want to say I hope it's clear, but if it's not, let me say

24   explicitly:  If you have an objection to a document that you

25   believe has been ruled upon in my in limine rulings, and it

1    gets offered at trial, you should preserve your objection by

2    objecting at trial, otherwise I will be convinced that you have

3    been so persuaded by my reasoning.  Now, if I have precluded

4    things altogether, and there's no opportunity to have a moment

5    at trial where you can say anything, then obviously there's no

6    second chance, but if you are provided with a chance, and

7    there's a document that's offered, and you don't object to it

8    coming in, then you'll have waived your objection.

9              MR. DRATEL:  I understand, Your Honor.

10             THE COURT:  Now, Mr. Ulbricht --

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  -- sir, you have -- there are two

13   decisions which are yours and yours alone to make.  One of them

14   is whether or not you choose to testify at trial.  Do you

15   understand you have a right to testify, if you choose to do so?

16             THE DEFENDANT:  Yes, I do, Your Honor.

17             THE COURT:  And do you understand that if you do

18   choose to testify, that that decision will be ultimately yours?

19   You will be advised by your lawyer, but ultimately, it will be

20   your decision if you want to testify, right?

21             THE DEFENDANT:  I understand completely.

22             THE COURT:  And if you choose not to testify, that's

23   also your decision ultimately.  Do you understand that?

24             THE DEFENDANT:  I understand, Your Honor.

25             THE COURT:  Now, if you choose not to testify, I want

ECHKULBM

```
 1    you to understand that the jury will be given an instruction
 2    that they cannot draw any inference or suggestion of guilt from
 3    the fact that you do not testify.  Do you understand that?
 4              THE DEFENDANT:  Yes.
 5              THE COURT:  Now, in terms of plea offers, has there
 6    ever been a time when the government has made a plea offer that
 7    has been conveyed to you?
 8              THE DEFENDANT:  Nothing in writing, Your Honor, but
 9    there was a verbal offer.
10              THE COURT:  All right.  Was that just one offer so far
11    as you understood?
12              THE DEFENDANT:  Yes.
13              THE COURT:  Mr. Dratel, is that your understanding,
14    that there was one oral offer that was made?
15              MR. DRATEL:  Correct, Your Honor.
16              THE COURT:  Is that consistent with what the
17    government believes has been extended to the defendant?
18              MR. TURNER:  Yes.  Preindictment, Your Honor.
19              THE COURT:  And that was a preindictment plea offer?
20              MR. TURNER:  Yes.
21              THE COURT:  All right.
22              Mr. Ulbricht, did you turn that offer down?
23              THE DEFENDANT:  I suppose by not responding, it was a
24    declining, yes.
25              THE COURT:  And I take it that there is no plea offer
```

ECHKULBM

```
 1   that is currently on the table; is that right, Mr. Turner?
 2            MR. TURNER:  Correct.
 3            MR. DRATEL:  That's my understanding as well, Your
 4   Honor.
 5            THE COURT:  All right.
 6            All right.  Thank you.
 7            THE DEFENDANT:  Your Honor?
 8            THE COURT:  Yes.
 9            THE DEFENDANT:  I wonder if I could have just a moment
10   with my lawyer?  There was an issue regarding the presentation
11   of evidence that I haven't had a chance to bring it up with
12   them, and it seemed like since we went over that earlier, it
13   would be a good time?
14            THE COURT:  Yes.
15            THE DEFENDANT:  Just a couple of minutes.
16            THE COURT:  I'll give you a couple of minutes and
17   wait.
18            MR. DRATEL:  Thank you, Your Honor.
19            (Pause)
20            THE COURT:  Mr. Dratel, is there anything further?
21            MR. DRATEL:  Just that -- I'll just tell the Court
22   what this is about.  It's about the chats, the issue about how
23   the government is going to present them with readers, and what
24   I think what I'd like to do is just get an opportunity to go
25   back, write a letter to the Court about that, just so that
```

ECHKULBM

1   we're clear on where we are and just whether I can find

2   anything on that one way or another.

3          THE COURT:  All right.  I think we had mentioned that

4   at a prior conference, that that was the way the government

5   would prefer to proceed, and I think that I -- am I recalling

6   the right matter?

7          MR. DRATEL:  Yes, Your Honor.

8          THE COURT:  That was with you folks, right?

9          MR. DRATEL:  Yes.

10         THE COURT:  Then I think I had said at the time that

11  at that point in time, I didn't have any opposition to it, so

12  long as it is done without any inflection at all, because we

13  don't know what's sarcastic, what's not sarcastic, what is

14  expecting an emphasis versus not.  If you folks -- it would be

15  useful for you folks to talk if you have any concerns about it

16  before you write to me, but I'm happy to read whatever you

17  write.

18         MR. DRATEL:  Right.  It's about the medium.  In other

19  words, it's a written medium, it's a medium that's read and not

20  spoken, and the question is whether two people speaking it is

21  really a proper replication of the medium.  So I'm just going

22  to do a little work on that hopefully in the next couple of

23  days, and if we can't agree something with the government,

24  we'll write a letter.

25         THE COURT:  All right.  And then after you've done

ECHKULBM

1    your research, talk to the government, maybe you can come to

2    some resolution.

3             MR. DRATEL:  Yes.

4             THE COURT:  Anything else we should go over today?

5             MR. TURNER:  No.  Thank you, Your Honor.

6             THE COURT:  All right.  I'm sure we will have some

7    back-and-forth with letters and things, otherwise the next time

8    I will see you will be 9:00 a.m. on the morning the trial

9    begins, which is January 5th.

10             MR. DRATEL:  Thank you, Your Honor.

11             MR. TURNER:  Thank you, Your Honor.

12             THE COURT:  We are adjourned.  Thank you.

13                           * * *

14

15

16

17

18

19

20

21

22

23

24

25