UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                                                               :
UNITED STATES OF AMERICA                                       :
                                                               :
                           -v-                                 :
                                                               :
ROSS WILLIAM ULBRICHT,                                         :
                                                               :
                           Defendant.                          :
-------------------------------------------------------------- X

```
┌──────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____               │
│ DATE FILED: February 1, 2015         │
└──────────────────────────────────────┘
```

14-cr-68 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

Lawyers and clients make tactical decisions. The Court cannot always understand why certain decisions are made, nor need it. But when tactical decisions run contrary to established rules and case law, the Court's duty is clear. The Court is duty-bound to apply the law as it exists, not as any party wishes it to be.

There have been numerous instances during the course of this trial—and, indeed, at least one similar issue arose pretrial—in which the defense has made tactical decisions that have carried consequences. Before the trial even began, the defense made a lengthy motion to preclude evidence on the basis of a Fourth Amendment violation—but refused to provide an affidavit or declaration asserting some level of personal interest in the item(s) searched, even when the Court provided a twelfth-hour additional opportunity to do so, making clear the deficiency and inviting a fix. The law was crystal clear—and this Court would have committed error to ignore it—that such an affidavit or declaration attesting to a personal privacy interest was required in light of defendant's positions at that time. The

defense's decision not to submit one is particularly interesting in light of their opening statement in which they conceded that defendant Ulbricht was the creator of Silk Road.

During trial, the defense has made additional tactical decisions that have carried consequences—including choices underlying the two pending motions by the Government to preclude expert witnesses defendant now seeks to call.  As background to this motion, it is obvious but worth mentioning that the evidence on which the Government has based its case-in-chief was long ago disclosed to the defense.  Indeed, the appropriate disclosures occurred months and months ago. Trial was delayed at the defense's request, and all signs pointed to extensive preparations by the defense to counter the disclosed evidence.  That most of the evidence in this case is based on information gleaned from servers and hard drives of the Silk Road website and Ulbricht's own personal computer has been known since the outset; that Silk Road transactions occurred in Bitcoins was known at the outset; that the Silk Road servers contained records of Bitcoin wallets was disclosed in discovery; that defendant Ulbricht's laptop contained its own Bitcoin wallets was disclosed in discovery; that timestamps were included on information on Ulbricht's laptop was disclosed in discovery; that certain PGP keys were used was disclosed in discovery; that a BitTorrent program was downloading a media file at the time of defendant's arrest was disclosed in discovery; and so on.

When asked about the expected duration of any defense case last fall, counsel for Ulbricht indicated that he expected his evidence to consume a week or two of

trial time; it was reasonable to assume that he was preparing whatever case he deemed appropriate to insure that his theory of defense was presented. Of course, he does not bear the burden of proof in this criminal trial—the Government does. But if he has a particular defense theory that requires evidence to support it, he must insure that he has prepared a case to get such evidence in.

Fast forward to the trial itself. As of the start of trial, the defense had failed to disclose its intention to call any expert witness. Proper expert disclosures are not a mere technicality with which compliance may be made or not—they are required by Rule 16 of the Federal Rules of Criminal Procedure. Defense counsel, particularly the learned lead counsel that Ulbricht has retained in this case, Mr. Joshua L. Dratel, Esq., know the rules. These rules are accompanied by an extensive body of case law—from the Supreme Court on down—requiring district courts to comply with the rules, and setting forth clear requirements as to the proper disclosure of expert witnesses and the trial court's role in evaluating whether expert testimony should be allowed or precluded. These cases span decades and are consistent in their holdings. They do not only apply to one side and not the other. There has not been a change of law, and there is no confusion in the law as to the relevant requirements.

Trial started, and trial proceeded. Mr. Dratel included in his opening statement an acknowledgment that defendant created Silk Road; he conceded that defendant ran it for several months; he previewed that there was some sort of "handoff" to others after those few months; and he stated that defendant was then

somehow lured back into Silk Road by unnamed operators—that, in effect, he was framed.  He further stated that defendant was a Bitcoin investor and trader.  He made a vague reference to what was happening to Bitcoin and the "Bitcoin market" as having some relevance to how events unfolded.  All of this was tantalizing.  In defense counsel's initial cross-examination he introduced a screenshot from defendant's laptop showing that defendant had been using BitTorrent to download a media file at the time of the arrest.  It seemed that the defense would present evidence that supported this story.

As the trial proceeded, there were various interruptions—necessary sidebars, time spent before a trial day began, during a break, or after the Court had released the jury for the day—during which the defense's increasingly plain strategy of trying to put on a case through the Government's witnesses was discussed.  On numerous occasions, defense counsel would seek to question a Government witness in a manner clearly beyond the scope of that witness's direct testimony.  After displaying some patience, the Government began to object.  It had a right to do so. This Court sustained a number of objections as to scope.  The Court also reminded defense counsel that if he "complied with the appropriate disclosure requirements," he could call an expert and, of course, he could call his own percipient witnesses. (Tr. at 1064:9-11.)  But the tactical choice of the defense was clear: they wanted to use the Government's witnesses as their own.  Defense counsel argued that other courts had, in other trials, allowed him to extend the scope in the manner he was attempting here to do.  Perhaps.  Perhaps not.  What other courts may have done in

4

other trials is of no concern to this Court during this trial.  But let it be said that no ruling of this Court in this trial has applied the law in any way that is other than routine and according to longstanding legal principles.

And now to the issue presently before the Court.  On January 26, 2015—that is, well into the trial itself—the defense disclosed to the Government its intention to call an expert witness, Andreas M. Antonopoulos.  (See ECF No. 165 ex. A.)  The notice letter recited Rule 16.  The content of the letter listed eight subjects as to which Antonopoulos would testify.  Then, on the night of Friday, January 30, 2015, long after defense counsel knew that his cross-examination would be limited to that which the rules allowed, he disclosed another potential expert, Steven M. Bellovin. (ECF No. 170 ex. A.)  The letter disclosing Bellovin was similarly bare bones.  At the time that the defense made its Bellovin disclosure, the defense had already received the Government's January 29, 2015 motion to preclude Antonopolous on the basis of, inter alia, inadequate disclosure (including the failure to disclose a single opinion or basis therefore).  (ECF No. 165.)  Thus, the defense made a tactical choice to double-down on the nature of its disclosures.

Both disclosure letters attach curricula vitae.  Lacking are any expected opinions, lacking are the bases for such opinions.  Lacking is any description of analysis or methodology.  Lacking also is any indication that Antonopolous has any expertise in the areas in which he seeks to testify.  His resume lists that he has worked as a consultant in crypto-currencies and published unnamed "articles" in that area (not a single publication of the alleged group of "200" is listed, let alone

information sufficient to assess the seriousness or depth of such articles).  Of course, not all consultants are experts.  In contrast, Bellovin's curriculum vitae suggests that he has considerable expertise in cybersecurity.

The defense's decision to put in such belated and substantially inadequate notices of expert witnesses was a tactical choice.  It is clear that the possibility that defendant might want to call one or more expert witnesses was long known.  Indeed, as stated, defense counsel opened on a theory that somehow Ulbricht was framed in a manner involving undefined technical processes, and he opened on statements about Bitcoins and fluctuations in their value.  Defense counsel had an early focus in cross-examination on BitTorrent running on defendant's computer.  Providing deficient notices—failing, as they both do, to provide the basic information that Rule 16 on its face requires—was yet another tactical choice.

There is a deep and consistent body of case law that leaves no doubt such disclosures are inadequate.  That body of case law cites the repeated preclusion by trial judges of experts when disclosures have failed to meet the minimum requirements.  None of this is novel.

The Government has moved to preclude the testimony of both experts.  (ECF Nos. 165, 170.)  The defense has submitted two letters in opposition to the motions.  (ECF Nos. 171, 172.)  The defense's letter as to Antonopoulos—submitted at 9:07 p.m. on January 31, 2015—describes a further summary of Antonopoulos' testimony without in fact disclosing those opinions he intends to offer.  The letter indicates that "[i]ndependent defense investigation has uncovered that this number [of

Bitcoins transferred to a wallet on Ulbricht's laptop] is implausible . . . ." (ECF No. 171 at 3.)  But <u>what</u> about the transfer is implausible is unknown, and what analysis Antonopoulos performed and the methodology are unknown.  In other instances, the letter refers to why Antonopoulos should be allowed to testify (that he would rebut testimony) without indicating how he would testify.  The Government's motion made it clear that the defense needed to do more; the law requires that the defense do more; and it has not.  A defense preference for trial by ambush is legally unsupportable.

As to Bellovin, the defense letter of February 1, 2015 is remarkable for what it does not say.  While suggesting that this Court should provide yet further opportunity for the defense to provide opinions and bases therefore <u>in futuro</u>, the topics and descriptions of the potential testimony in the letter do not tread new ground.  The defense opened on the theory of BitTorrent having some role in incriminating evidence finding its way onto Ulbricht's laptop.  Bellovin would, apparently, testify as to "the security implications of this practice."  (ECF No. 172 at 2.)  But what he would say remains unknown.  What his analysis is based on apart from <u>ipse dixit</u> is unknown.  And of course, the defense could and should long ago have planned and properly disclosed this very testimony.  Similarly, the role of timestamps on UNIX-based operating systems was long ago known; the PHP code to which Bellovin would testify was introduced <u>by defendant</u>.  Clearly, Bellovin— long before now—could have disclosed opinions and methodology about that code.  All of the other topics described in the defense letter of February 1, 2015 were

similarly known—but in any event, even if truly offered for rebuttal, there are no disclosed opinions or disclosed methodology.

The Court has considered, however, whether even in light of the plain deficiencies there is some way of allowing certain testimony. But there are competing considerations:

1. There are still few or no "opinions" and certainly no bases—and the defense knows the Government rests <u>tomorrow</u>. These witnesses are therefore currently "on deck." It would be grossly unfair to disclose opinions now which should have been disclosed long ago, and require the Government to be immediately prepared to respond.

2. There are known issues with a continuance. As counsel are aware—and as has been discussed several times—two of the jurors in the panel of twelve have timing issues. A continuance would potentially result in the dismissal of one or even both jurors. The Court cannot eliminate the defense's tactical decision in this regard.

Why did the defense choose to proceed as it has? This Court cannot know. Perhaps a tactical choice not to show the defense's hand; perhaps to try and accumulate appeal points; perhaps something else. In any event, the outcome of these choices is that the Court hereby GRANTS the Government's motions to preclude the testimony of both experts. (ECF Nos. 165, 170.)

I.      FURTHER DISCUSSION OF LEGAL PRINCIPLES

The admissibility of expert testimony is governed by a number of longstanding evidentiary rules, including Federal Rules of Evidence 104 (the Court

must decide preliminary questions as to qualification of a witness and competency

of evidence), 403 (the Court may exclude otherwise admissible evidence if its

probative value is substantially outweighed by the danger of confusing the issues,

misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence), 702 (expert testimony may be allowed if specialized

knowledge will assist the jury in understanding the evidence or determining a fact

in issue, the testimony is based on sufficient facts or data, the testimony is based on

reliable principles and methods, and the expert has reliably applied those principles

and methods), and 703 (an expert may base an opinion on facts or data that he has

been made are of or personally observed; he may base an opinion on inadmissible

facts or data such as hearsay to the extent such facts or data are reasonably relied

on by experts in the field; but if the facts or data would be inadmissible, then a Rule

403 analysis must be made).  Fed. R. Evid. 104, 403, 702-03.

     In addition to these rules, the Federal Rules of Criminal Procedure contain

certain disclosure requirements for expert witnesses.  If a defendant is going to call

an expert witness, and the Government requests disclosures (which certainly

occurred here), then Rule 16 requires that the defendant <u>must</u> provide a "written

summary of any testimony that the defendant intends to use," which "must describe

the witness's opinions, the bases and reasons for those opinions, and the witness's

qualifications."  Fed. R. Crim. P. 16(b)(1)(C).

     The Advisory Committee notes to Rule 16 explain that the disclosure

requirement "is intended to minimize surprise that often results from unexpected

expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment.

Courts' application of these rules in specific cases has led to the development of a substantial and consistent body of law governing the admissibility of expert testimony.  In a criminal case, the first question is whether the appropriate Rule 16 disclosures have been made.  A failure to provide timely disclosure can result in preclusion.  See, e.g., United States v. Blair, 493 Fed. App'x 38, 53 (11th Cir. 2012) (disclosure on eighth day of trial was untimely and justified preclusion of expert's testimony); United States v. Holmes, 670 F.3d 586, 597-99 (4th Cir. 2012) (disclosure on Friday before Monday start date of trial was untimely and justified preclusion of expert's testimony); United States v. Hoffecker, 530 F.3d 137, 184-87 (3d Cir. 2008) (disclosure three business days before jury selection was untimely and justified preclusion of expert's testimony); United States v. Perry, 524 F.3d 1361, 1371-72 (D.C. Cir. 2008) (disclosure 48 hours before Daubert hearing was untimely and justified preclusion of expert's testimony); United States v. Petrie, 302 F.3d 1280, 1288 (11th Cir. 2002) (disclosure on Friday before Monday start date of trial was untimely and justified preclusion of expert's testimony); United States v. Mahaffy, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *3 (E.D.N.Y. Apr. 24, 2007) (disclosure the day before trial was untimely and justified precluding expert's testimony); United States v. Wilson, 493 F. Supp. 2d 484, 485-88 (E.D.N.Y. 2006)

(disclosure less than one week before trial was untimely and justified precluding expert's testimony).

Similarly, a failure to provide the required level of detail as to the expert's opinions and the bases, reasons, and sources of those opinions can also lead to preclusion.  For instance, preclusion is justified when the expert disclosures merely list general topics about which the expert will testify.  E.g., United States v. Concessi, 38 Fed. App'x 866, 868 (4th Cir. 2002); United States v. Valle, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013); United States v. Ferguson, No. 3:06CR137 (CFD), 2007 WL 4539646, at *1 (D. Conn. Dec. 14, 2007); United States v. Mahaffy, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *3 (E.D.N.Y. Apr. 24, 2007).  Courts have also precluded expert testimony when the Rule 16 disclosures fail to specify the expert's bases, reasons, and sources for their opinions. E.g., Concessi, 38 Fed. App'x at 868; Wilson, 493 F. Supp. 2d at 487; see also United States v. Sturman, No. 96 CR 318, 1998 WL 126066 (S.D.N.Y. Mar. 20, 1998) (a "general description of possible bases" does not meet the requirements of Rule 16(b)(1)(C)).

This is both sensible and fair.  It is sensible because without the appropriate detail, a Court cannot possibly assess admissibility, an opposing party cannot prepare a response or for proper cross-examination, and a trial devolves into jungle warfare by ambush.  The various rules and the case law interpreting them are designed to avoid that outcome.

Here, the defense made a choice to delay its Rule 16 disclosures until the trial had commenced and then to delay the second by another week.  The prejudice of this delay was compounded by the total lack of adherence to the basic prescriptions of the level of content required Rule 16.  Rule 16 requires that an expert's opinions and the bases for those opinions be set forth in the disclosures.  Again, the rules do not allow trial by ambush.

The lack of any opinions in defense counsel's initial disclosures is a flagrant failure to comply with Rule 16.  Defense counsel's letters in opposition to the Government's motion to preclude do not cure this defect.  Even though the defense has now set forth at least one opinion (as opposed to a general subject) as to which Antonopoulos will testify, it has not set forth the bases, reasons, and sources with anything close to the requisite specificity—merely asserting that Antonopoulos will provide this opinion based on some unspecified method of analyzing market forces and liquidity, based on data from unspecified sources, does not suffice.  As for Bellovin, as the Court discussed above, while the defense's response contains additional high-level description of the testimony, and the Court might be able to guess as to various opinions, it contains no real opinions, no bases for opinions, no analysis, no methodology.

Defense counsel clearly understood what it intended to do with regard to Antonopolous at the outset of the case—certain theories related to his proffered testimony were included in defense counsel's <u>opening</u>.  This exposes the lack of timeliness and lack of adequate content of the disclosure as tactical, not

substantive.  This is true even with regard to the testimony regarding the evidence supporting an inference that Bitcoins on the Silk Road servers were transferred to Ulbricht's laptop.  The defense opened on a theory that the Bitcoins in Ulbricht's possession were from some sort of Bitcoin speculation (and, thus, not connected to Silk Road).  It was reasonable to expect that defendant had performed the very comparison the Government then scrambled to perform.  That the Government presented the facts of such a comparison is nothing more than meeting a defense argument.  It would have been surprising had the Government not done this.  Thus, the facts as to what Bitcoins—a highly traceable digital currency—were on the Silk Road servers, and whether there was a factual basis to infer transfer to Ulbricht's laptop, was a door the defense opened at the outset.

With respect to Bellovin, the tactical choice was, in fact, similar.  Defense counsel argues that somehow the Court's ruling that he confine his cross-examination to the scope of the direct surprised him.  How can that be so?  According to counsel, only then, when he was required to follow rules that all lawyers must follow, did he suddenly realize he would need an expert on computers.  Simply put, this defies credulity and is an argument without a scintilla of merit.  If defense counsel truly planned his trial strategy around his ability to bend the rules and examine witnesses outside of the scope of their direct, then he should have had a "Plan B" that included complying with the rules.  Defense counsel took a calculated risk.  It has been clear from the outset that this case involves various technologies.  If defense counsel had a theory of the case upon which he intended to

13

rely, and which required the testimony of a witness with technical expertise to explicate, it behooved him to comply with the rules and make the appropriate disclosures.  Having failed to do so—for what appear to be tactical reasons—he cannot position his deficiencies as the result of unexpected necessity and ask the Court to disregard rules that apply in every case to all counsel.  Had necessity been the true mother of this issue, defense counsel would have been forthcoming with the anticipated opinions and methodology.

But there is more than just a failure to comply with Rule 16 at issue here. The Supreme Court also requires that if expert testimony is proffered, a trial court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993).  This requires that a trial court make a "preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and . . . can be applied to the facts in issue."  Id. at 592-93.  When an expert witness fails to identify the objective bases for his opinion, the district court cannot perform a proper assessment; a proffered opinion deficient in this manner fails to meet the basic requirements of the Federal Rules of Evidence.  United States v. Rea, 958 F.2d 1206, 1216 (2d Cir. 1992).

Assuming that there is enough detail to assess the opinion in the first instance, the reliability of a proposed expert's testimony is determined based on whether a technique on which it is based is generally accepted in the relevant

14

community, whether it can be tested, and whether it has been peer reviewed. Daubert, 509 U.S. at 593–94.

This Court cannot make the necessary preliminary inquiry required by longstanding Supreme Court precedent based on the disclosures it has received. It is unable to determine what Antonopoulos' and Bellovin's opinions are and it has received no analytical or learned basis for any opinion. The Court cannot assess whether Antonopolous's views are relevant, within the ambit of what others in the field would accept as reasonable; nor could it do so for Bellovin.

The reliability of testimony is also assessed in light of a witness's qualifications. A trial court must therefore also ask—as a threshold matter— whether the witness is in fact an expert at all in the area in which he intends to testify. Fed. R. Evid 104(a). Whether a proposed expert is qualified is a fact-based inquiry and depends on the nature and depth of their "knowledge, education, experience, or skill with the subject matter of the proffered testimony." See United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004). Courts have construed the inquiry into an expert's qualifications with an eye toward the "liberal thrust" of the Federal Rules and their general relaxation of traditional barriers to opinion testimony. See Daubert, 509 U.S. at 588–89; In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has the equivalent relevant practical experience."). That does not mean, however,

that an inquiry into adequate qualifications is unnecessary or that an expert with inadequate credentials would be allowed to testify.

It should go without saying that in order to assess whether an expert is qualified, a court must have sufficient information both as to the opinions he intends to offer, and then as to his particular knowledge and experience in the relevant areas. Insufficient information as to either prevents this inquiry. The Court lacks sufficient information with respect to Antonopolous, and to a lesser extent, given his qualifications, for Bellovin.

Moreover, the requirement that expert testimony be relevant to a material fact in issue finds its origins in both Rules 401 and 702 of the Federal Rules of Evidence. Preclusion is appropriate when opinions seek to prove something other than a material fact in issue. See United States v. Stewart, 433 F.3d 273, 311-12 (2d Cir. 2006).

Expert testimony is limited to those occasions "where the subject matter of the testimony is beyond the ken of the average juror." United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991). Expert testimony that seeks to address lay matters, which a jury is capable of understanding without expert help, is not relevant and therefore not admissible. United States v. Jiau, 734 F.3d 147, 154 (2d Cir. 2013). Indeed, a district court errs when it allows an expert to testify as to matters which require no specialized knowledge. United States v. Mejia, 545 F.3d 179, 196 (2d Cir. 2008). Even relevant expert testimony must be precluded if it usurps the

province of the jury to make factual determinations.  See United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991).

Antonopoulos' opinion regarding whether Ulbricht could have transferred from Silk Road as many Bitcoins as the Government contends he did would be relevant—but as explained above, the Court will not permit Antonopoulos to testify in light of defense counsel's deficient Rule 16 disclosures as to him, and because the Court cannot properly assess his qualifications.  As to any other opinions that would be offered by Antonopoulos, the Court cannot make the required relevance analysis because it has no idea as to what those opinions are.  It is not for this Court to engage in speculation—and then, if necessary, to speculate again as to whether Antonopoulos is qualified to offer these opinions.  As to Bellovin, the relevance of the summary descriptions as to the topics of his testimony is not in doubt.  But undoubted relevance does not trump the need to provide opinions and, particularly here, analytical or methodological bases.  Indeed, the very relevance of the high-level descriptions itself supports the importance of requiring compliance with disclosure of methodology—otherwise, the Government would be at a plain and unfair disadvantage in countering such testimony.  The rules are designed to prevent this.

Finally, without knowing the opinions and bases therefore, the Court also cannot perform the analysis that it must under Rule 403 which provides for the exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing

17

the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

II.    CONCLUSION

For the reasons set forth above, the Government's motions to preclude are GRANTED.  The Clerk of Court is directed to close the motions at ECF Nos. 165 and 170.

SO ORDERED.

Dated:      New York, New York
            February 1, 2015

_____
            KATHERINE B. FORREST
            United States District Judge