F1ddulb1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

           v.                         14 Cr. 68 (KBF)

ROSS WILLIAM ULBRICHT,

               Defendant.

------------------------------x

                              New York, N.Y.
                              January 13, 2015
                              9:20 a.m.

Before:

             HON. KATHERINE B. FORREST,

                             District Judge

                      APPEARANCES

PREET BHARARA,
     United States Attorney for the
     Southern District of New York
SERRIN A. TURNER
TIMOTHY HOWARD
     Assistant United States Attorneys

JOSHUA LEWIS DRATEL
LINDSAY LEWIS
JOSHUA HOROWITZ
     Attorneys for Defendant

        – also present –

Special Agent Vincent D'Agostino
Molly Rosen, Government Paralegal
Nicholas Evert, Government Paralegal
Linda Moreno, Defense jury consultant

F1ddulb1

1          THE CLERK:  In the matter now on trial, the United

2     States of America versus Ross William Ulbricht, 14 Cr. 68.

3          Counsel, please state your names for the record.

4          MR. TURNER:  Good morning, your Honor.  Serrin Turner

5     for the government.  With me at counsel's table is A.U.S.A.

6     Timothy Howard, FBI Agent Vincent D'Agostino and two paralegals

7     from our office, Nicholas Evert and Molly Rosen.

8          MR. HOWARD:  Good morning, your Honor.

9          THE COURT:  Good morning.  All right.  I am just

10     getting Mr. D'Agostino.  I see he is over here.  OK.  Terrific.

11          MR. DRATEL:  Good morning, your Honor.  Joshua Dratel

12     for Mr. Ulbricht, who is standing beside me.  With me at

13     counsel table is Lindsay Lewis, of my office, Joshua Horowitz,

14     and also Linda Moreno, who is an attorney who is assisting us

15     with jury selection.

16          THE COURT:  All right.  Good morning to all of you.

17          COUNSSEL:  Good morning, your Honor.

18          THE COURT:  We've got a couple of housekeeping matters

19     to raise right now and then we'll take whatever issues you

20     folks may have in addition.

21          We're going to get the jury, I think, the panel, about

22     10 o'clock.  That is my guess.  The reason for the delay is

23     while we've got our own set of folks, there is another very

24     significant case that is picking a jury today as well, and so

25     there is a lot of folks coming in downstairs.  And when we do

F1ddulb1

that, the plan is if all 91 or 92 show up, we'll take about 60,

who will fit in a this room, or so, and they will come in and

we'll then start from there.  So we'll have actually a group of

some number, if we get full attendance, who will stay in the

other room for a period of time.

        All right.  Now, one thing that I want to make sure

you folks all realize is that while a lot of letters come into

the Court's email, copied to both sides, unless they are under

seal, we've got to make sure, for purposes of the overall

record, that everything is on the docket.  We've done our best

to try to ensure that whatever we've received, if it is under

seal, that it has been placed in the sealed vault.  If it is ex

parte it is also placed in the sealed vault with a notation of

that, and if it belongs on the docket because it does not

require being under seal, which should be everything possible,

then that belongs on the docket.

        So I want to have you folks take individual

responsibility for ensuring that whatever you have sent to the

Court is appropriately captured in that universe.  In other

words, there should be nothing which you think I have in a file

in my office.  All right?  Because if one day somebody has to

reconstruct the file, I want them to be able to reconstruct it

in its entirety.  So we've done what we can.  Going forward, it

will be easier but let's just get all ourselves reconciled in

that process.

F1ddulb1

1          Now, there is one open item from Mr. Dratel's letter

2     of January 9th.  I did not receive a response from the

3     government, that I'm aware of, relating to the oral

4     presentation of the Internet evidence.  Mr. Turner.

5          MR. TURNER:  Your Honor, our position would be these

6     are records just like any other records.  They can be read to

7     the jury.  You have wire transcripts that are often read to the

8     jury.  This is not an unusual situation.  And I don't even know

9     how mechanically we would work it so that you would type these

10    chats out and have them shown to the jury that way.

11         THE COURT:  Let's back up a little bit.  It is

12    typically the case that wires are in their -- you've got your

13    line transcriptions and they will be highlighted, and the

14    government typically has the agent recite what is on the

15    screen, or whichever witness is -- sometimes it is a

16    cooperating witness who was a party to that, just to literally

17    read out the words on the page.  That is a different process

18    from what I understood you folks were proposing here, which was

19    to have two folks basically be the voices, if you will, of the

20    Internet communications.  So let's separate out the two

21    because, as I understand it, the thrust of the letter is

22    towards this back and forth between these voices, the two

23    voices, as opposed to the first, more typical way, which is on

24    the screen.

25         So as to the two voices, are you folks willing to

F1ddulb1

<table>
<tr><td>1</td><td>forgo that and let's see if we can narrow this, and then we</td></tr>
</table>

1    forgo that and let's see if we can narrow this, and then we

2    will get Mr. Dratel's position on doing it the traditional way?

3              MR. TURNER:  Well, your Honor, I certainly -- I mean,

4    I myself have had cases with wires, for example, where the

5    transcripts were read in exactly that way, with two parties,

6    one reading one voice, the other reading the other.  I think it

7    makes it easier for the jury to understand rather than have the

8    whole thing in one person's voice.  I think your Honor already

9    addressed this issue of, you know, inflection and that sort of

10   thing in terms of reading it in an unfair way.  I really don't

11   think that will happen, but that is something the Court can

12   address at that time, if it does happen.

13             We are simply -- I should just clarify, I think we're

14   only planning on doing that where we have lengthy chats that we

15   may not have -- we may not introduce in the course of a

16   particular witness' testimony but read them after a witness

17   testifies.  So I think there will be a number of chats where we

18   read the whole thing in, because it is, you know, only half a

19   page and we don't do the two-person reading of the document.

20   But for lengthy interchanges I think it will make it easier for

21   the jury to understand.  I really don't think it would be

22   prejudicial to the defendant in any way.  If that circumstance

23   does arise, the Court can at that time decide maybe to do it

24   differently.  I don't think it will be a problem.

25             THE COURT:  I hear that position.  The defendant has

F1ddulb1

1    presented, I think, an issue that's different from that, which

2    is that wires are a type of intended oral communication and

3    that the written chats, while they are called "chat," which has

4    an oral connotation, the written chats were not necessarily

5    intended to be orally communicated and so that there is a

6    difference between the two.  And there might be a way in which

7    the jury then is brought to believe a particular -- or have a

8    particular view of the chat when it is rendered into oral

9    comment.

10             MR. TURNER:  So it seems to me there are two issues.

11   If that is the issue, that it is a written communication, I

12   really don't think that is an issue because all the time you

13   have letters, you have contracts, you have all sorts of

14   documents that are constantly used as evidence at trial, and it

15   is absolutely routine to read from those documents, you know,

16   even in their entirety sometimes.  Just because it was

17   originally written doesn't mean you can't communicate it to the

18   jury orally in some way.

19             THE COURT:  That is exactly, Mr. Turner, why I was

20   separating out the two issues, which is what I was calling the

21   typical way, which is that written things are communicated

22   orally but not through, as I understood it, a paralegal or two

23   paralegals who were going to not act the part, because they

24   would simply be reciting the words, but for purposes of this

25   discussion act the part.

F1ddulb1

1          MR. TURNER:  Right.  It seems to me there are two

2     issues.  One, should a written communication be transmitted

3     orally?  To me, I think the answer is clearly yes.  It happens

4     all the time.  The other issue is is there some danger of

5     unfair prejudice if you have parties reading it in this way

6     that they will engage in certain inflections or that sort of

7     thing.  I believe the Court has already sufficiently addressed

8     that.

9          So our position would be we should proceed as we

10    originally planned, and if for some reason the evidence is

11    introduced in a prejudicial way, we address that at that time,

12    but I don't think there is any reason to expect or anticipate

13    that at this point.

14         THE COURT:  All right.  Mr. Dratel, let me have you

15    address also these two buckets that I've separated the issue

16    into.  One is having this proceed in what I would call the

17    typical fashion of it.  There is a written document.  It is on

18    the screen.  Either one or sometimes the prosecutor will with a

19    witness do a back and forth and that is very typical, and that

20    is different in the Court's view of potentially from what I am

21    for purposes of this discussion calling the paralegal version.

22         MR. DRATEL:  This is different in the sense that it is

23    not an isolated letter or paragraph or something like that,

24    which, by the way, if someone objected to, it might be

25    appropriate in the context of the case.  So I am not suggesting

F1ddulb1

that because things are done traditionally that somehow it

wouldn't necessarily also be subject to the same type of

problem if in fact the communications were designed for a

certain type of absorption by the recipient.

          In this instance it is very much the case that chats

are designed to be absorbed through reading, not through

hearing.  So there are a couple of problems.  One, the Court

has already identified the distinction between transcripts of

conversations that are oral to begin with and these chats.  One

is that there are a fair number of nonverbal parts of these

communications, symbols, emoticons, things like that, all of

that which is not necessarily communicable in an oral context.

          The second part is that these -- the way that a person

perceives and absorbs the information is very much tied to the

medium that it is in.  So to hear it may mean that the jury is

not reading it, and they really ought to read these.  These

were meant to be read.  They are a written medium, and it is a

new -- it is different.  It has evolved over time.  So that it

is not a letter that people often read aloud in the context of

a group.  You don't have that in a chat context.  It is not the

way they exist.  It is very personal.  It's very intimate on a

certain level, and it is designed for that medium in a way that

letters do not replicate in any way.  And I think that, again,

because of also just the elements in there that aren't verbal,

and we want the jury to absorb them in the way that they were

F1ddulb1

1    provided to be absorbed and not to hear it and not to read it

2    from the screen.

3              Also, these chats will be in evidence so it is not an

4    issue of the jury's access to them.  They can read them on the

5    screen.  Often we have transcripts on the screen that juries

6    follow along while they are hearing them because sometimes they

7    are not even audible so they read them more than hear them to

8    begin with.  So juries are not -- it's not an unusual issue for

9    a jury to read a document rather than to hear it.  It is not --

10   I mean, in the sense that oftentimes it is simultaneous.  Here

11   we are saying it shouldn't be simultaneous, it should be

12   exclusive for purposes of reading.

13             THE COURT:  All right.  So here is what my ruling is

14   at this point in time, and we can reassess this ruling if and

15   how this plays out there is a need to reassess it and it

16   becomes obvious that things should change.  But what I am going

17   to do is to have the government proceed in the manner that it

18   would typically proceed and not do anything different.  In

19   other words, we are not going do it with the paralegals.  The

20   prosecutor can proceed with either a witness on the stand or

21   the prosecutor with another prosecutor.  I will then give a

22   limiting instruction stating that these were originally

23   written.  They were in no sense -- there is no indication that

24   they were orally communicated.  The jury should understand

25   that.  The jury should read them.  They are meant to be read.

F1ddulb1

1     The jury should note the punctuation and emoticons.  But there

2     is an interest in the convenience of conveying the information

3     to the jury in a manner in which we can all be clear in court

4     of what's happening at the same time, and it would be novel to

5     have a document where there is a particular piece of evidence

6     pointed out where there is not some specific reference to the

7     text of that through oral communications.  Trials are about the

8     typically sensory communication of evidence.

9             So we'll proceed that way.  Let's eliminate the

10    paralegal version of this and just have the government proceed

11    as they would normally have proceeded in some other case, and

12    I'll give the instruction as to how this material should be

13    taken and reviewed.  All right?

14            Now, in terms of the next --

15            MR. TURNER:  Your Honor.

16            THE COURT:  Yes.

17            MR. TURNER:  May I just inquire with one question?

18            So if the government wishes to put in a -- read in a

19    chat after a witness has left the stand, should the prosecutor

20    just read it in in its entirety rather than having a two-way

21    reading of it, just the prosecution --

22            THE COURT:  What I am suggesting is don't introduce

23    other people into the process who appear to be actors in a way,

24    even if they are just paralegals.  If you and Mr. Howard want

25    to just read back and forth, you can read back and forth.  But

F1ddulb1

| | |
|---|---|
| 1 | I don't want other people coming in for purposes of assuming a |
| 2 | position on the stand or somewhere else where they are doing a |
| 3 | reading as if it's a dialogue in a scene from something.  All |
| 4 | right? |
| 5 | MR. TURNER:  Yes. |
| 6 | THE COURT:  So we'll do it the old-fashioned way, the |
| 7 | way it is typically and normally done at trial and nothing |
| 8 | specific. |
| 9 | Now, I was supposed to get an updated exhibit list |
| 10 | from the government.  Do you folks have one, or is there not |
| 11 | one?  If there is not one, then that is fine. |
| 12 | MR. TURNER:  There is one, your Honor, and we can |
| 13 | provide that as well as an updated disc of exhibits. |
| 14 | THE COURT:  All right.  Is there an updated witness |
| 15 | list, or is the witness list that is operative that which you |
| 16 | have already shared? |
| 17 | MR. TURNER:  There is an updated witness list and we |
| 18 | can provide that as well. |
| 19 | THE COURT:  And have you shared all of the names at |
| 20 | this point? |
| 21 | MR. TURNER:  Yes. |
| 22 | THE COURT:  In the past you have always shared |
| 23 | everything with the defendants.  They have all the names and |
| 24 | they have that information? |
| 25 | MR. TURNER:  Yes. |

F1ddulb1

1          THE COURT:  Terrific.  Thank you.  I have received an

2     updated witness list.

3          In terms of the jury selection, let me just tell you

4     folks, give you a short reminder as to how it is going to

5     proceed.  The folks will come into the room, and Joe will

6     randomly from his box spin the box.  My method is to put the 12

7     in the panel in the box, and of the first group there will be

8     four alternates.  Also put into the first group we'll be

9     working for the initial questions with all 16 but the

10     peremptories will be against the 12 first and then separately

11     against the four as the alternates.  All right?  So the

12     peremptories are the first peremptories, 10 to the defense, 6

13     to the government in six rounds simultaneous, and then a

14     separate two-round, one each, as to the alternates.  That will

15     be done separately and I will make it clear when that is

16     happening.

17          The jurors are going to be given a pen along with some

18     biographical questions because we'll eventually -- whoever is

19     seated in the box before the peremptories will have an

20     opportunity -- and, indeed, not opportunity, we're going to ask

21     them to stand up and give us 30 seconds about themselves.  What

22     kind of job they have, what their spouse or significant other

23     might do, if they've got children, what they read, what they

24     watch on TV, sort of 30 seconds.  On the back of that piece of

25     paper, which is blank, they will be instructed when they first

F1ddulb1

1   come in to write down any questions to which they have a "yes"

2   answer, and so if I put somebody from the audience into the box

3   we will be asking them did you have any "yes" answers and

4   picking up from there.

5          Again, it's use it or lose it.  You can't accumulate

6   your peremptory strikes.  If you waive for a round, which

7   happens frequently for various tactical reasons that you folks

8   may have, it's use it or lose it.

9          All right.  Now, what is the order of witnesses for

10  today, if we have?  Who is your first witness?

11          MR. TURNER:  Homeland Security Investigations Agent --

12  Special Agent Jerrod DerYeghiayan.

13          THE COURT:  Now, glossary.  Have you folks reached any

14  kind of agreement on any kind of glossary or technical

15  presentation of any kind?

16          MR. TURNER:  No, your Honor.

17          THE COURT:  All right.  What I am going to do is

18  assess evidence as it comes in and will then I think determine

19  how much of the evidence appears, potentially, to be highly

20  technical, and it may be that things are explained in such a

21  way that it doesn't get there and/or that even highly technical

22  concepts are explained in a way that are understandable.  But

23  if I believe that things are not understandable to the jury,

24  that things are going too quickly and words are being thrown

25  around that can't be understood by the average juror, we'll

F1ddulb1

1    talk about what might be a reasonable way to proceed at that

2    time.

3            Now, I have -- I think we have one other issue that we

4    wanted to raise at this time that I think it makes sense to

5    raise in the robing room, if the defendant will consent to

6    waive his presence.  If he won't, then we can do it at the

7    sidebar.  Your choice.

8            MR. DRATEL:  We can waive, your Honor, for the

9    purposes that we discussed.

10           THE DEFENDANT:  That would be fine.

11           THE COURT:  Thank you.  So let's go on into the robing

12   room with the court reporter to discuss this one issue.

13           (Pages 15-28 sealed by order of the Court)

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F1dgulb2                          Trial

1          (In open court)

2          THE COURT:  Let's all be seated.  So we now have a

3    group of people who have reported to a room, so we'll get sort

4    of an attendance sheet, if you will, as to who of the 90 or so

5    folks who are supposed to come, how many have come, and then

6    they'll hive off a bunch of them and bring them down.

7          Now, all of you folks who are in the seats, all of

8    those seats will be taken.  If you have any kind of disability

9    that requires you to be seated, then indicate that to the CSO

10   and he'll try to find a spot for you, but if you don't have a

11   disability and could stand, we'll need you to stand.

12         I'm not going to right now preclude people from the

13   courtroom.  It will be up to the CSO in terms of space

14   constraints.  The family of the defendant is entitled to stay

15   and will not be excluded from the courtroom, but others, it's

16   depending upon the amount of space that we've got.  When the

17   jury comes in, we'll need to make room for them so they can sit

18   down.  Thank you.

19         We'll take a break until we hear from Joe about the

20   jury coming in.

21         (Continued on next page)

22

23

24

25

1              (In open court)

2              (A jury of 12 and 4 alternates was impanelled and

3      sworn)

4              THE COURT:  Ladies and gentlemen, we're going to now

5      take a lunch break for an hour.  And when we come back, I'm

6      going to give you some very brief instructions and then we're

7      going to go right into the opening statements and then after

8      that, we'll start hearing from our first witnesses.

9              In the meantime, I want to give you one instruction

10     before you go back there and have some lunch.  Joe has gotten

11     lunch arranged and he'll give you some preliminary

12     instructions.  Because of the timing, we're going to ask you

13     folks to stay here and on this floor and in that jury room for

14     today at least.  That's why we arranged to have lunch for you

15     here today.

16             The instruction I have is not to talk to each other

17     now or at any point in time about this case or anybody else.

18     So if you have got any kind of device where you would

19     communicate with anybody, don't communicate with anybody about

20     this case, don't talk to each other about this case or anybody

21     else that you might run into in the restroom.  It's very

22     important that the only information that you have about this

23     case is in this room so you can listen to the evidence as it

24     comes in at this trial.

25             All right.  Right now you can take some lunch.

1              JUROR:  They took our cell phones downstairs.  Can we

2     go downstairs and let people know that you're on the case?

3              THE COURT:  That you won't be back?  That makes sense.

4     Just don't go outside the building.  Get the phone.

5              Joe, why don't you notify the CSOs that that might

6     occur.  A CSO might be able to go down with you to facilitate,

7     access the cell phones so the jurors don't have to leave the

8     building.  So they can speak downstairs and turn the cell phone

9     back in.  We'll see you folks at 2:30 when Joe will have you

10    come back out into the room and you'll take your seat.  All

11    right.  Thank you.

12             (Jury excused)

13             THE COURT:  Let's all be seated.  Joe will get things

14    organized back there, but we did have lunch arranged already so

15    they have got -- the jurors have an assortment of luncheon

16    items back there.

17             Is there anything you folks would like to raise with

18    me before we take our own break?

19             MR. SERRIN:  We just wanted to let your Honor know in

20    advance that we had one demonstrative in our opening.  We have

21    already cleared it with defense counsel.

22             THE COURT:  So as long as defense counsel has seen it

23    and hasn't raised any objections, then that's fine.  Thank you

24    for the advance notice.

25             Is there anything else?

F1dgulb3                    Trial

1          MR. SERRIN:  Not from the government.

2          THE COURT:  Mr. Dratel.

3          MR. DRATEL:  No.

4          THE COURT:  Thank you.  We will come back into this

5     room at 2:30.  At that point, I will give the normal

6     instructions on burden of proof, credibility, beyond the

7     reasonable doubt, open mind.  I'll tell the jury about how I

8     have LiveNote here at my computer and the few basics.  That

9     will take about ten minutes, maybe not quite.  And then we'll

10    go directly into opening statements without a further break.

11    Let's take our break.

12          Thank you.

13          (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

F1ddulb4

### A F T E R N O O N   S E S S I O N

2:31 p.m.

(Jury not present)

THE COURT:  Anything that anybody needs to raise with me?  We are ready to bring out the jury.

MR. TURNER:  We are ready, your Honor.

THE COURT:  All right.  Let's bring out the jury.

THE CLERK:  All rise as the jury enters.

(Jury present)

THE COURT:  All right.  Ladies and gentlemen, let's all be seated when you get to your spot.  I want to give you some preliminary instructions, and then we are going to go right into the opening statements.

As I previously told you earlier today, your function, ladies and gentlemen of the jury, is to decide the issues of fact in this case.  You are the deciders of fact.  You are to base your decision on the issues of fact solely on the evidence.  Nothing that I say is evidence.  Nothing that the lawyers say is evidence.  A question is never evidence.  It's the answer to the question that is evidence.

Objections aren't evidence.  Evidence will come in in the form of testimony from the witnesses who were sworn under oath and who are testifying at trial, or in the form of documents which are formally received into evidence.

Now, there are two kinds of evidence.  There is direct

F1ddulb4

1    evidence and also circumstantial evidence, and I'll just spend

2    a moment about this.

3              Direct evidence is something that you have or a

4    witness has seen, felt, heard, touched, with one of their

5    senses directly.  They were there.  They can tell you about X.

6    They heard X.  They saw X.  Whatever -- you know, whatever they

7    heard or saw directly, that's direct evidence.

8              But circumstantial evidence is proof of facts from

9    which you may infer or conclude that other facts exist.  So, in

10   other words, you've got several of the dots but you don't have

11   every dot in the picture, but you could infer from the

12   placement of several of these dots along the edges that certain

13   other facts occur.  So let me give you a typical example.

14             Let's assume that the windows are closed and you come

15   in this morning and it is sunny outside.  Over the course of

16   the day you see folks coming in and they're coming in and

17   they've got raincoats on and they are dripping and there is an

18   umbrella and it is dripping wet.  Now, you can't see outside.

19   You haven't seen the rain.  But you can infer, based upon the

20   fact that you've got people dripping wet with umbrellas, that

21   it's raining outside.  That is circumstantial evidence.  It is

22   not more complicated than that.  It is taking certain facts and

23   it's from those facts inferring other facts.

24             Now, both kinds of evidence are evidence that you can

25   use as you deem appropriate in considering whether or not

F1ddulb4

certain facts have been proven at trial.  Now, you're going to

hear from witnesses.  They're going to come to court.  They're

going to testify here in front of you.  And you, ladies and

gentlemen of the jury, are going to have to determine whether

or not you believe them, how credible do you find a particular

witness.  And how do you decide that?  You decide that based

upon how you decide that every single day in your own life.

Every single day in your own life you apply your common sense

to whether or not you believe somebody.  And you assess all

kinds of things.  What's is their demeanor?  How are they

presenting themselves?  Are they being evasive?  And we'll talk

more about that at the end of the case.  But it will be up to

you to decide how much of a witness' testimony to believe --

some of it, all of it, none of it.  That will be up to you in

your assessment of their credibility.

        Now, in terms of the burden of proof, as I said at the

very beginning, the burden of proof in a criminal case is on

the government.  It is the government's responsibility to prove

that the defendant is guilty beyond a reasonable doubt.  It is

the government's burden of proof.  The defendant does not carry

a burden of proof in a criminal trial.  And as I mentioned

before, the Indictment in this case is simply an accusation; it

is not proof of anything.  All right?  The fact that the

defendant has been indicted is not proof of anything.  He has

pled not guilty and that's why we're here at this trial.

F1ddulb4

1             Now, I will instruct you at the end of the evidence

2    about what it means to say that something is beyond a

3    reasonable doubt.  But let me just say that the defendant and

4    his lawyers need not present any evidence in this case if they

5    choose not to do so, because the burden, as I said before, the

6    burden is on the government.  And you can't draw any negative

7    inference against the defendant if he does not present

8    evidence.

9             Now, it's very important that you keep an open mind

10   until the close of the evidence.  Evidence is not like reading

11   a story in chronological order.  Evidence comes in in pieces.

12   You get a little bit of it from one witness and it might be out

13   of chronological order.  You need another witness or other

14   documents to fill in some of the other pieces.  So it's very

15   important that you keep an open mind.  Because you'll hear one

16   part of a story but you might not hear the other part of the

17   story until later.  So it is very important that you keep an

18   open mind until all of the evidence is in.

19            The way it proceeds is that, in terms of the evidence,

20   the government will present its evidence first.  It is going to

21   give its opening statement.  The defendant will give his

22   opening statement, through counsel.  Witnesses will be called.

23   The government will do direct examination.  Then there is an

24   opportunity for the defense to cross-examine a witness, if they

25   choose to do so.  And after that there may be some limited

redirect and recross.  It depends on how it goes.  But that is
the way in which it proceeds.

           Now, there may be instances where you've got friends
or family who you see in the courtroom or people that you know
in the courtroom.  It is very important that if you have
anybody in the courtroom who you know, that you let us know,
and that you not speak to that person about the case.  Because
as you know, you come in and out of the room at times when we
bring you in and out of the room, and there may be rulings on
evidence and other discussions which you are not present for.
And we don't want you inadvertently to be hearing things that
the jury shouldn't be hearing through a friend and/or relative
inadvertently.  So if Joe knows about it, then we will know to
be able to give a special instruction on that day.  It's just a
reminder of what I have said.

           Now, it is very important not to speak to anybody
about this case, each other, anybody at all -- a spouse,
anybody in your life.  You've got to keep this to yourself
until the close of all the evidence, and then when you are
instructed on the law you will go into the jury room and you
will deliberate and talk to each other.  And until you reach a
verdict, you still won't talk to anybody other than each other
about this case.  So you can't even talk to each other until
all the evidence is in and you have been instructed on the law.

           Now, it's very important that you also not be exposed

F1ddulb4

1    to what the media has to say about this case, what newspapers

2    have to say about this case or Internet blogs or people outside

3    who may approach you.  Do not let anybody approach you, talk

4    about this case at all.  OK?  If anybody approaches you about

5    this case, do not speak with them about this case at all.

6    Don't go home and do any Internet research.  Don't try to

7    become an expert in anything or follow up on your own personal

8    research about a particular person, place or event.  For

9    purposes of this case, you just receive the evidence in this

10   courtroom.  That is the only evidence that you should receive

11   in this case.

12           You don't want to -- and, actually, people have done

13   this and it just leads to all kinds of difficulties.  Don't

14   update your Facebook page saying I'm on, you know, X case.

15   This is what we heard today.  You know, don't update your

16   Facebook page.  Don't Twitter or tweet or send emails to people

17   about it or texts or anything else.  And I will be reminding

18   you about not talking to each other or anybody else about this

19   case repeatedly.  And you are going to be sick to death hearing

20   me talk about it, but it is important that I keep doing it.

21   Every once in a while I will change the way I do it so I can

22   try to make it a little bit different.

23           Now, I see some of you have the pads and pens for

24   taking notes.  Take notes if you want to take notes.  Different

25   people learn in different ways and you remember things in

F1ddulb4

1    different ways.  Sometimes it helps keep you attentive.  It is

2    up to you.

3           Your notes are for you and you alone.  They are not

4    for you to share with your neighbor.  It is not to play

5    Tic-Tak-Toe with your neighbor.  Believe it or not, that's

6    happened in the past.  So your notes are for you and you alone.

7    And you'll leave them here at the end of the day under your

8    chair or if you've got a particular spot in the room, and

9    others shouldn't be looking at your notes.  They are for you

10   and you alone.

11          Now, the lawyers here -- everybody here in this room,

12   and in fact everybody, if there is anybody else in the room who

13   you ever run into, but particularly the lawyers, they're not

14   going to say hello to you because I've told them they are not

15   allowed to say hello to you.  They are not being mean or rude

16   or nasty.  OK?  It is just complicated.  Because if somebody

17   says hello and they say hello in a particular way, you're like

18   are they trying to convey a message to me.  I don't want any of

19   that.  It is just easier if I say don't say hello to any of the

20   jurors.  So they'll probably cast their eyes down or look to

21   the side.  Don't think they're being rude.  I've just told them

22   don't talk to the jurors.  OK?

23          And you shouldn't talk to them either.  It's just

24   easier.  It makes things cleaner.  That way there is never a

25   question about whether anybody meant something from a

F1ddulb4

1    particular hello.

2              Now, LiveNote.  I use LiveNote.  LiveNote is a

3    particular program which allows me to get realtime feed of what

4    I am saying right now and anything else that is said in the

5    courtroom.  So what the court reporter is writing down I have

6    on my screen.  I do not do email, I do not surf the web, you

7    know, while I'm here on trial.  If you see me looking at my

8    screen, I'm not figuring out, you know, anything other than

9    just what's going on, has my screen gone to sleep.  If I'm

10   tapping it, it is because I am trying to put my name back in to

11   open it up again.  That is why I look at my screen sometimes.

12   I want you to know so that you don't think I am distracted.

13             All right.  Now, beverages in the courtroom.  My

14   practice in my particular courtroom is that you can have

15   beverages at your seat.  You can have water.  You can have hot

16   tea.  Cold tea.  I really couldn't care less what kind of

17   beverages, nonalcoholic beverages.  You can have coffee.  My

18   view is what is good for the goose is good for the gander.  I

19   am going to have coffee and I don't want to do that if you guys

20   can't have coffee.

21             Sometimes people find it difficult to be in their

22   seats all afternoon without having a little something to eat

23   because they feel like they just need a little something.  I

24   don't care.  Just don't bring in Doritos where you are

25   crunching.  OK?  If you just need to eat a little something,

F1ddulb4

1    that is fine.  Whatever makes you comfortable.  It's not like

2    you are going to sit there with popcorn.  This is not that kind

3    of a situation.  But my point is I want you to be comfortable.

4    All right?

5         And so if you spill, own up to it.  It is not a

6    problem.  That way we can make sure it doesn't get into the

7    carpet and stain it forever more because it is the government.

8    I don't get new carpet more than once every couple of decades.

9    All right?

10        Now, we are going to go into opening statements.

11   Opening statements are the opportunity for the lawyers to speak

12   to you.  They have very few opportunities to speak directly to

13   you.  They have an opportunity now to speak directly to you and

14   to give you an overview as to what they think, what their view

15   is as to what the evidence will show.  Again, what the lawyers

16   say is not evidence.  And it will be up to you to decide

17   whether or not the evidence at trial has in fact shown what

18   anyone predicts that it might show.

19        Then we're going to go from the opening statements of

20   each side into the witnesses.  And after all the evidence is

21   done a couple of weeks from now, we will then have closing

22   statements, or summations; it is the same thing.  And that will

23   be another opportunity for the defense counsel to then address

24   you again about what they think the evidence has shown.

25        All right.  I think that we're ready to proceed.

F1ddulb4

1          Mr. Howard.

2          MR. HOWARD:  Thank you, your Honor.

3          This is a case about a dark and secret part of the

4    Internet that was home to an enormous marketplace for the sale

5    of illegal drugs.  It was a website called Silk Road where

6    anybody anywhere in the world could buy and sell dangerous and

7    addictive drugs with the click of a mouse.

8          During this trial we will take you inside this dark

9    and secret world and show you the man who controlled it all.

10   That man, the defendant, Ross William Ulbricht, he was the

11   kingpin of this digital criminal empire.

12         The defendant taught himself computer programming and

13   in 2009 began what he described as, quote, a secret project.

14   Using his laptop computer, he created the Silk Road website.

15   His idea was to make illegal drug deals as quick and easy as

16   ordinary online shopping.  And that is exactly what he did.

17   Drugs like heroin, cocaine, LSD, crystal meth, all of these

18   were available on Silk Road.

19         All someone had to do was go to the Silk Road website,

20   pick their drug of choice, and have it delivered right to their

21   doorstep.  The defendant's plan worked.  Thousands of drug

22   dealers flocked to Silk Road, and more than 1 million drug

23   deals took place on the site before the government shut it

24   down.

25         As the creator and the operator of Silk Road, the

1    defendant was in the center of each and every one of these drug

2    deals.  Like a traditional drug boss, he made them all

3    possible.  He decided what drugs could be sold on Silk Road.

4    He set the rules the dealers have to follow.  And he also tried

5    to protect those dealers from getting caught.  And like any

6    other drug boss, Ulbricht profited from the drug deals that

7    took place on his territory.  He took a cut of every single

8    deal that took place on Silk Road, and with that he amassed a

9    fortune -- $18 million.

10          Also like a traditional drug boss, the defendant was

11   vigilant to protect his criminal empire.  When he thought that

12   certain people posed a threat to Silk Road, he was willing to

13   use threats and violence to protect his turf.  But unlike a

14   traditional drug boss, the defendant's territory wasn't a city

15   block or even a neighborhood, it was the entire world.

16          And the defendant controlled his digital drug empire

17   from behind his laptop computer.  The defendant controlled

18   everything about Silk Road, from top to bottom.  As the

19   defendant himself put it, quote, I am Silk Road, the market,

20   the person, the enterprise, everything.

21          Through Silk Road, the defendant built a global online

22   network of drug dealers, and every one of them paid for the

23   privilege of doing business on his site.  And what did the

24   defendant give the drug dealers in return?  First, he gave them

25   a way to protect them from getting caught by giving a way to

1    hide the real identities and sell drugs anonymously, and,

2    second, he gave drug dealers a whole new way to find and hook

3    new customers.  Instead of going to the local street block or

4    street corner, a drug dealer on Silk Road could sell to anybody

5    with a computer anywhere in the world.

6            And, ladies and gentlemen, that is why we are here

7    today.  We are here to pull the curtain back on this dark and

8    secret world of online drug trafficking that occurred on Silk

9    Road.  We are here to show you that behind that curtain was one

10   man, Ross Ulbricht, and his laptop.

11           So now let me just give you a preview of what I expect

12   the evidence to show at trial.  First, how did Silk Road work?

13   In some ways it worked like any ordinary online shopping

14   website.  The Silk Road Web page displayed pictures of the

15   products that were for sale, and you could click on those

16   pictures to see more details.  Once the users found what they

17   wanted, they would add it to their online shopping cart and

18   provide a shipping address and provide for payment.  The

19   shipper then shipped the purchased items in the mail.  And in

20   this way it was no different than Amazon.com or eBay and other

21   popular online shopping sites, but there were critical

22   differences.  Let me just take a moment to show you what the

23   Silk Road website looked like.

24           Now I will draw your attention to the upper left-hand

25   corner here.  You can see listings of all kinds of illegal

1    drugs that were on Silk Road, divided by category.  And in the

2    middle of the homepage, you see colorful advertisements for

3    particular drugs that were offered on Silk Road.  For example,

4    here we have some French pure flake cocaine.  Down in the

5    left-hand corner we have MDMA, which is commonly known as

6    "ecstasy."  These were just a few of the products, a few of the

7    kinds of illegal drugs, just a few examples of the thousands of

8    listings that were available on Silk Road.

9           Ladies and gentlemen, around 95 percent of the items

10   that were sold on Silk Road were illegal drugs, but drugs were

11   not the only illegal items that were sold on Silk Road.  Silk

12   Road offered other products, like fake passports and fake

13   identification documents, for sale.  Silk Road offered tools to

14   hack into other people's computers or their email accounts.  It

15   even offered the services of other people to do the hacking for

16   you to hack into other people's computers.

17          But first and foremost, the site was designed to be an

18   online shopping paradise for the sale of illegal drugs.  The

19   defendant tried to attract drug dealers and other criminals to

20   the website by creating a safe haven for them, a place where

21   they could make money selling their drugs without getting

22   caught.  The defendant did this by making it virtually

23   impossible for anybody to trace the users on Silk Road.  And

24   there are two main ways he did this.  First, he made sure that

25   Silk Road could only be accessed in a special way.  The

defendant designed Silk Road to operate on a hidden part of the
Internet known as the TOR network.  Anyone can access the TOR
network simply by downloading some free software from the
Internet.

     But when someone uses TOR, no one can tell who that
person is or where the computer is located.  TOR hides the
locations and TOR hides their identity.  Thus, by making Silk
Road only available through the TOR network, the defendant
enabled buyers and sellers to conduct illegal transactions
without leaving a digital trail that could be led back to them.

     Now, the second way the defendant made Silk Road
untraceable was controlling the method of payment on Silk Road.
Ulbricht refused to allow Silk Road users to pay for their
drugs with a credit card or a check or a bank account.  Those
traditional forms of payment risk exposing the identities of
the people that use Silk Road.  Instead, the defendant required
that drug deals be paid for with bitcoins.  Now, bitcoins are a
digital currency.  You can't hold on to them like you can hold
on to a dollar bill.  You will learn more about bitcoins during
this trial.  But the reason that he chose them for the deals on
Silk Road was because they are anonymous.  When someone buys
something with bitcoins, they don't have to give their name.
They don't have to give any account information that can be
linked back to them like someone has to do when you buy
something online with a credit card or a check.  So unlike

1   these traditional forms of payment, bitcoins are designed to

2   leave no evidence of the identity of the people using them.

3          In addition to designing Silk Road to protect the drug

4   dealers that were operating on the site, the defendant designed

5   the website to ensure huge profits for himself.  You see, every

6   time a drug deal -- every time an illegal transaction occurred

7   on Silk Road -- Ulbricht charged a commission in bitcoins.  The

8   commission was a percentage of the overall sale, from 10 to

9   12 percent.  And he collected millions of dollars worth of

10  commissions from the sales that occurred on Silk Road.

11         He took his cut of every deal.  In about three years,

12  he amassed nearly $18 million worth of bitcoins.

13         So that is the general overview of Silk Road.

14         Now, what was the defendant's role on Silk Road?

15  First of all, he came up with the idea.  He designed the

16  website.  The evidence will show that he began planning Silk

17  Road as early as 2009. By 2011, he was ready to launch his

18  startup drug site but he didn't have any drugs to sell.  So

19  what did he do?  He got some drugs.  The defendant rented a

20  cabin outside of Austin, Texas, a short drive from where he

21  lived at the time, and set up a lab in a cabin and grew his own

22  hallucinogenic mushrooms, illegal drugs, so that he would have

23  something to sell on the site when it opened.

24         And once he had the drugs to sell, he needed to draw

25  users to the site.  So what did he do?  He went on various

1    drug-related discussion forums on the Internet and posted

2    advertisements for the site, explaining how you could buy any

3    kind of drugs you wanted on Silk Road.

4            Now, once Silk Road was up and running, the defendant

5    controlled every aspect of its operation.  Because he knew what

6    he was doing was illegal, he was careful to conceal his

7    identity while he was doing this.  He didn't run Silk Road

8    using his own name.  Instead, he used an online alias, a user

9    name, the Dread Pirate Roberts, or "DPR" for short.

10           Now, if you could put the screen back up, you can see

11   a reference to the Dread Pirate Roberts right here in the top

12   right-hand corner of the homepage, welcoming users to the site.

13   "A few words from the Dread Pirate Roberts."

14           The Dread Pirate Roberts was known across the Silk

15   Road community as the man in charge, the man who ran it all,

16   set all the rules, and controlled all the profits.  So what are

17   some of the things he did?

18           First, as I mentioned, he set all the rules for the

19   site.  And one of the most important rules for Ulbricht was

20   that users had to pay for their drugs or their other illegal

21   goods using the payment system on the website.  He didn't want

22   drug dealers to advertise drugs on the site, meet a willing

23   buyer, and then negotiate a way to pay for the drugs off of the

24   site.  And why did he do this, ladies and gentlemen?  Because

25   he wanted to protect his ability to get his cut, to get his

F1ddulb3                      Opening - Mr. Howard

1      piece of every single sale.

2              As an example of another rule, the defendant

3      prohibited any users from revealing any information that could

4      expose the true identities of the drug dealers and the other

5      users of the site.  The purpose of this rule was to prevent

6      Ulbricht and the drug dealers on the site from getting caught.

7              You will hear that this rule was so important to the

8      defendant that he was willing to use violence to enforce it.

9      When he believed that people were threatening to expose

10     information about Silk Road, he even tried to have them

11     murdered.  Now, although those murders were not successful, the

12     defendant paid hundreds of thousands of dollars to get them

13     done.  He was willing to stop at nothing to protect his

14     criminal empire.

15             Now, what were some of the other ways in which the

16     defendant controlled Silk Road?  He decided what illegal drugs

17     could be sold on Silk Road.  He was the one who decided that

18     all kinds of drugs, no matter how dangerous, no matter how

19     addictive, could be sold on the website.  He was the one who

20     decided that fake passports could be sold on the site no matter

21     who was buying them or what they were using them for.  He was

22     the one who decided that computer hacking tools and services

23     were available on the site without any regard to the innocent

24     people whose computers would be intruded on as a result.

25             And what else did he do as the operator of Silk Road?

1    He managed the day-to-day operations of the site.  For example,

2    he gave advice to members of the site to help them avoid

3    getting caught.  He advised drug dealers how to package their

4    shipments to make it look just like ordinary business mail.

5    And when disputes arose between drug dealers and users on the

6    site, he stepped in and helped resolve them.

7            Just as the defendant designed it to be, Silk Road

8    quickly became a place where thousands of drug dealers flocked

9    to sell drugs day in and day out.  In fact, the site attracted

10   so many drug dealers that it became too big for him to handle

11   by himself.  So he hired a staff of about ten people to help

12   with the day-to-day operation of the site.  Some handled

13   questions from drug buyers about how to use the site.  Others

14   did computer programming to help maintain the site.  The

15   defendant never met any of these employees in person.  He knew

16   them purely online, but he supervised them just like any other

17   boss, and paid them salaries amounting to hundreds of thousands

18   of dollars over time.

19           Finally, the defendant controlled the flow of money

20   through the site.  He designed the Silk Road payment system and

21   permitted payment through bitcoins only.  He charged a hefty

22   commission in bitcoins on each sale.  And as criminals racked

23   up sales on Silk Road, as drug dealers made over $200 million

24   in drug sales on Silk Road, the defendant made a fortune for

25   himself on his commissions.

1              The defendant took many steps to conceal his role

2      running this criminal enterprise.  As I mentioned, he was known

3      on Silk Road only by his alias, the Dread Pirate Roberts.  But

4      he was also careful not to let many people who were close to

5      him know what he was doing.  He kept most of his friends and

6      his family in the dark about his secret life.  But because of

7      how much time he was spending running this criminal empire,

8      sometimes he thought it was difficult to keep the secret.

9              His friends didn't understand why he didn't have any

10     free time.  The defendant confided to one of his Silk Road

11     employees that he wished he could just explain to his friends

12     why he didn't have free time, that he could scream at them that

13     he was busy because, quote, I'm running a multimillion dollar

14     criminal enterprise.

15             Now, while Ulbricht was making millions off his

16     criminal enterprise, he was careful not to lead a lavish

17     lifestyle that would draw suspicion.  He deliberately kept a

18     low profile to protect his secret.  He saved his money,

19     planning for a day in the future where he might move to another

20     country in the Caribbean where he could begin spending it.

21             Although the defendant tried to protect his identity

22     as the operator of Silk Road, he made some critical mistakes

23     along the way and ultimately his secret was exposed.  Law

24     enforcement agents figured out that Ulbricht was the person

25     using the alias Dread Pirate Roberts, that Ulbricht was the

founder, the owner, and the operator of Silk Road.  In

October 2013, the defendant's luck finally ran out and he was

arrested.

Now, the day of his arrest probably started as a

typical day for the defendant.  He was living in San Francisco

at the time.  He spent the morning in his apartment, and in the

afternoon he left his house to do his daily work, running Silk

Road.  Since he ran the website from behind a laptop computer,

all he needed was an Internet connection.  So on this day he

decided to go to a public library with his laptop.  It was

about a five-minute walk from his apartment.  And as he walked

to the library, he had no idea that he was being followed by

FBI agents.

The defendant arrives at the library, finds a table,

sits down and opens his laptop, and starts working on Silk

Road.  He struck up an online conversation with someone he knew

as one of the Silk Road employees, a member of his customer

support staff.  But what the defendant didn't know was this

person was not really a Silk Road employee but an undercover

federal agent.  And as the defendant typed away at his laptop,

he had no idea that federal agents in plainclothes were right

there in the library watching his every move.

So when the agents were in place and the undercover

federal agent confirmed that he was chatting online with the

Dread Pirate Roberts, the agents in the library made their

1    move.  They arrested the defendant.  They grabbed his laptop

2    before he had a chance to close it.  And what was the first

3    thing they saw on his computer screen, ladies and gentlemen?

4    Silk Road.  They saw the defendant was right in the middle of a

5    conversation, the conversation with the undercover agent.  The

6    Dread Pirate Roberts had been unmasked as Ulbricht, the

7    defendant.

8           Now, that's an overview of what I expect the evidence

9    at trial to show.  So how will we prove that to you?  How will

10   you know by the end of this trial that this defendant was the

11   Dread Pirate Roberts who ran Silk Road?

12          First of all, the defendant was caught redhanded.  The

13   defendant was arrested at that library in San Francisco while

14   using his laptop in the middle of the online chat with the

15   undercover agent.  You will hear testimony from that undercover

16   agent.  He will tell you about how he investigated Silk Road

17   for nearly two years and was able to successfully infiltrate

18   the site as a trusted member of the Dread Pirate Roberts'

19   customer support staff.

20          He will explain how he monitored the activity of the

21   Dread Pirate Roberts online on that day of the defendant's

22   arrest and watched the defendant as he went into the library.

23   He'll explain how he started chatting with the defendant online

24   after he saw the defendant enter the library.

25          Um also hear from a member of the FBI who was at the

1   library watching the defendant.  And you will see photographs

2   taken of the screen of the laptop moments after the defendant's

3   arrest.

4           Those photographs show exactly what the defendant was

5   doing at the time that he was arrested.  Them show the

6   defendant was chatting with the undercover agent as the Dread

7   Pirate Roberts.  The photographs of the laptop will also show

8   the defendant was logged into the Silk Road website under the

9   user name Dread Pirate Roberts when he was arrested.  And he

10  wasn't just in any part of the website.  He was logged into a

11  special restricted part of the site that he called his

12  mastermind page, a special control panel that he could use as

13  the site administrator to monitor and control the entire site.

14  The defendant was literally caught with his fingers at the

15  keyboard running the Silk Road website.

16          But that's just the beginning.  After he was arrested,

17  agents found a mountain of additional evidence on the laptop

18  that he had been using at the time that he was arrested.  The

19  laptop contains all sorts of files showing the defendant's

20  operation of Silk Road.  And what were some of those files?

21  The defendant kept a personal journal on his laptop, a digital

22  diary, ladies and gentlemen, and that journal contains

23  devastating confessions by the defendant.

24          In this journal the defendant described in his own

25  words how he launched and how he operated Silk Road, including

1    the story I told you about how he had to grow his own illegal

2    hallucinogenic mushrooms in a cabin, how he set up his own drug

3    lab in order to set up the site.

4            The journal also describes about how excited he got as

5    the site, as Silk Road, got bigger from year to year. There

6    are also chat logs on the laptop, transcripts of online

7    communications that he had with other Silk Road employees.

8    These chats will show the defendant was involved in running

9    every aspect of Silk Road on a daily basis. And there is a lot

10   more on the defendant's laptop, including a to do list with

11   tasks related to running Silk Road, spreadsheets that track

12   expenses related to Silk Road, and lists of the computers that

13   he had around the world to run the website. The laptop also

14   contained the defendant's enormous profits. It contained

15   bitcoins worth approximately $18 million at the time of his

16   arrest.

17           Beyond this extremely damning evidence, I'm hear still

18   more evidence the defendant controlled Silk Road. I'm hear how

19   the defendant confessed to a long time friend of his from

20   college. When the defendant was first developing the site, he

21   sometimes turned to a friend for programming advice. Well, you

22   will hear from that friend at this trial. The friend will tell

23   you that in 2010, in 2011, when he was working as a computer

24   programmer, the defendant started calling on him to ask him

25   help on computer programming questions. The friend will tell

F1ddulb3                         Opening - Mr. Howard

you that he repeatedly asked the defendant,s hey, what are you

working on?  What kind of website are you building?  And the

defendant would refuse to answer, telling him that it was top

secret.

          Eventually the friend told the defendant that he

wouldn't provide any help any more unless the defendant told

him what this secret website was.  So the defendant eventually

gave in.  He told his friend that he was running a website that

sold illegal drugs.  You will hear how the defendant showed his

friend the Silk Road website and bragged that he was the

mastermind behind the entire thing.

          You will also hear from a federal agent who first

identified the defendant as the Dread Pirate Roberts based on

telltale clues he left behind on the Internet.  In 2011, when

he started the website, he publicized, he advertised the site

on various drug-related forums on the Internet.  Then he will

show you those Web pages and explain to you how he was able to

trace them to the defendant, which is what led law enforcement

to him.

          You will hear from some other witnesses.  You will

hear from a drug dealer who sold heroin on Silk Road.  Now,

that witness has pled guilty to serious drug offenses, but he's

here to give you an insider's view of how Silk Road operated

from one of its many -- from one of its thousands of drug

dealers.  He'll tell you his story about how he himself owned a

1    legitimate business but he was overwhelmed with his own

2    expensive addiction to heroin.  He'll tell you about how he

3    discovered Silk Road and almost overnight was able to become a

4    bigtime drug dealer on Silk Road.

5            Within days he was able to easily set up an account in

6    Silk Road and start distributing heroin that he had purchased

7    in New York all over the United States.  The defendant made it

8    possible for this man, who had never sold drugs before in his

9    life, to distribute heroin to literally thousands of people

10   across the country.

11           You will also hear from a computer scientist who had

12   examined the computers which ran the Silk Road website.  He

13   will tell you about the data that was recovered from the

14   servers and the huge volume of drug transactions that are

15   reflected in the data.

16           You will also hear about drug buys that undercover

17   agents made on the Silk Road website, how they went on the Silk

18   Road website and ordered drugs, and how those drugs then

19   arrived in the mail.

20           These are just some highlights of the proof you will

21   see and you will hear.  We submit to you that by the end of

22   this trial you will find that the evidence provides a detailed

23   and interlocking account of how Ross Ulbricht was the Dread

24   Pirate Roberts, the owner and the operator of the vast criminal

25   enterprise that was Silk Road.

1            Now, before I conclude, I just want to take a brief

2       moment to talk about the legal charges in this case.  First,

3       the defendant is charged with drug trafficking crimes based on

4       the drug deals that he brokered and that he profited from in

5       operating Silk Road.

6            The defendant is also charged with committing crimes

7       relating to other types of criminal activity that he brokered

8       and profited from through Silk Road.  He is charged with

9       trafficking in fraudulent identification documents based on the

10      fake passports and the fake ID's that were sold on Silk Road.

11           He is also charged with a computer hacking crime based

12      on the computer hacking tools and the services that were sold

13      on Silk Road, every one of which the defendant profited from.

14           And, finally, the defendant is charged with money

15      laundering based on the bit coin-based payment system used on

16      Silk Road, which the defendant designed to conceal the money

17      moving through the site from law enforcement.

18           This is just an overview of the charges in this case.

19      Judge Forrest will give you detailed legal instructions on all

20      of these charges at the end of the case before you deliberate.

21           At the end of this trial, after all the evidence has

22      been presented to you, we will have a chance to speak to you

23      again about how the evidence proves the defendant's guilt

24      beyond a reasonable doubt.  Between now and then, I would just

25      ask you to do three things:  First, listen carefully to the

 1    evidence; second, follow Judge Forrest's instructions on the

 2    law; and, third, use your common sense, the same common sense

 3    that you use every day.  If you do these three things -- pay

 4    careful attention to the evidence, follow the Judge's

 5    instructions on the law, and use your common sense -- you will

 6    reach the only conclusion that is supported by the evidence in

 7    this case -- that Ross Ulbricht, the defendant, is guilty as

 8    charged.

 9              THE COURT:  Thank you, Mr. Howard.

10              Mr. Dratel.

11              MR. DRATEL:  Thank you, your Honor.

12              Good afternoon.  May it please the Court:

13              My name is Joshua Dratel, and along with the other

14    members of the defense team, who you've already met as well, we

15    represent Ross Ulbricht.

16              Ross is a 30-year-old with a lot at stake in this

17    trial, as you can imagine.  It is important, as jurors -- part

18    of your oath -- I know you understand it -- to keep an open

19    mind, not to draw conclusions.  There is direct examination and

20    then there is cross-examination.  Cross-examination of

21    government witnesses is where we get the opportunity to ask

22    questions.  And those questions and answers, I submit to you,

23    will tell you the story about this case.

24              Use your common sense.  Use your life experience.

25    Those are the most important things you have with you to

1    determine the outcome of this case.  The outcome, which I

2    submit to you, after you hear all of the evidence, will be not

3    guilty on all of the counts.  Ross has pleaded not guilty.  It

4    is the government's burden, as the Court has told you, to prove

5    each and every element of the charges beyond a reasonable

6    doubt.  Now, I won't try to define that for you now but at the

7    end of the case the Judge will, and it is an important,

8    fundamental principle that protects all of us.

9            This case, to a large extent, is about the Internet

10   and the digital world where not everything is what it seems.

11   You and I are having this experience right now and you are

12   perceiving it and you know I am here and you know the Judge is

13   here and you know the government is here and Mr. Ulbricht is

14   here and everyone else.  Behind the screen, however, on a

15   computer, it is not always so easy to tell.  You don't know

16   what or who is on the other side.  You don't know if they are

17   telling you the truth.  You don't know if they are who they

18   present to be.

19           You will hear evidence.  You will hear how Ross is a

20   young man with ideas, a lot of ideas, many of which he doesn't

21   follow through with.  And Silk Road was Ross' idea.  He created

22   it as a completely freewheeling, free market site that could

23   sell anything except a couple of items that were harmful.  It

24   was kind of an experiment, an economic experiment that after a

25   few months was too stressful for him and it got out of hand in

1    terms of becoming popular and what it involved -- to be

2    involved in a site like that.  So he handed it off -- you will

3    hear, he handed it off to others.

4            And at the end -- I will get to the middle as well,

5    but at the end he was lured back by those operators to be in a

6    position, that you heard about from the prosecutor in that

7    library that day, to take the fall for the people operating the

8    website.  Because they had been alerted that they were under

9    investigation.  They had been alerted that the walls were

10   closing in on them.  They had been alerted that time was scarce

11   for them to escape.  And Ross was the perfect fall guy because,

12   after all, Silk Road was his idea.  He was also involved in

13   Bitcoin.  He was an investor in Bitcoin.  He was a trader in

14   Bitcoin.  You will hear about that.  So the connection of

15   Bitcoin and Silk Road, again, made him the perfect fall guy.

16   So other than that day of arrest we'll see what connects Ross

17   to the operation of Silk Road, whether it's just a digital

18   contrivance that left him holding the bag when the real

19   operators of Silk Road knew that their time was up.

20           Timelines are going to be very important in this case,

21   what's happening on the Silk Road website, what's happening

22   with the investigation, what's happening with Dread Pirate

23   Roberts, who we will call "DPR."  And you will hear about the

24   DPR concept and where it comes from.  It comes from a movie,

25   earlier a book, from decades ago.  Nothing particular to Ross.

1          They won't connect him to anything particular about

2    Dread Pirate Roberts and that name.  But look at the timeline,

3    what's happening with Dread Pirate Roberts, what's happening

4    with Silk Road, what's happening with Ross' life, what's

5    happening with Bitcoin and the Bitcoin market.

6          Now, the government's claim, as you'll hear from the

7    evidence, that Ross was Dread Pirate Roberts is a contradiction

8    that's so fundamental and dramatic that it defies all of your

9    common sense and life experience.  You heard the government

10   talk about what a mastermind, the complicated computer

11   operations, the scrupulous security to run the most profitable,

12   diverse black market Internet marketplace in history.  Yet --

13   and this is someone who studiously avoided revealing his

14   identity to anyone associated with the site.  That is

15   employees -- the employees will come in, they don't know Ross

16   Ulbricht from me.  The vendors, the people who sold on the

17   site, they don't know Ross Ulbricht from me.  The purchasers of

18   drugs on the site, they don't know Ross Ulbricht from me.  The

19   confidential informants the government had operating as buyers

20   and sellers and administrators didn't know Ross Ulbricht from

21   me.  DPR was impenetrable on that website in his meticulous

22   consideration of his operation with communications security.

23          And yet they are going to tell you that the same

24   person, this mastermind, this incredibly careful person goes to

25   a public library, gets on a public Wi-Fi system -- open on his

1    computer is also something called BitTorrent, which is a

2    peer-to-peer file sharing program that allows anyone access to

3    your computer who is on that same network.  Some of this is

4    technical, and regardless of your technical background, you

5    really should use your common sense and your life experience.

6    The technical stuff is the easy part.  The common sense is the

7    important part.

8            So he is in a public place, on a public Wi-Fi, with a

9    program open that allows anyone on a huge network worldwide

10   access to his computer.  With journals going back years, with

11   all sorts of other evidence the government is going to come in

12   and claim is a thread from beginning to end, that Ross is the

13   Dread Pirate Roberts?  It is a contradiction that is so

14   fundamental that it defies common sense, and you will hear all

15   of that in the evidence.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1             MR. DRATEL:  In his apartment, they found in the

2     wastebasket handwritten notes, handwritten notes about the

3     site.  Can you imagine that that's the same person?  Can you

4     imagine that Dread Pirate Roberts would do that in a

5     wastebasket?  This is the criminal kingpin the government has

6     described who managed and operated the most successful and

7     profitable Internet black market website in history:

8     Handwritten notes in his wastebasket.

9             You'll also hear that even before that day in

10    September when Ross is confronted by Homeland Security

11    investigators about materials delivered to him, phoney IDs that

12    were delivered to him from Silk Road, he talks to them, he

13    talks to them about Silk Road, and then what happens in the two

14    months between then and his arrest?  Does he run?  No.  Does he

15    go underground?  No, still living in San Francisco.  Under his

16    own name.

17            Does he move any money?  Any Bitcoin?  No.  Does he

18    destroy all the stuff on his laptop that's supposedly so

19    incriminating, that's supposedly on his laptop?  No.  Did Dread

20    Pirate Roberts do all that?  You'll hear about the evidence,

21    you'll hear the evidence what happened.  There's no evidence

22    you'll hear that he traveled with the money, that he did

23    anything to suggest that he was a criminal mastermind keeping

24    one step ahead of the law even after the Homeland Security

25    visit to him in his apartment in San Francisco.

1              Contrast that with what you'll hear about the real

2      DPR.  You'll see from the chats that the real DPR was

3      extraordinarily sensitive to security, extraordinarily

4      sensitive to law enforcement intrusion on Silk Road, law

5      enforcement infiltration of Silk Road, law enforcement attempts

6      to identify.  You'll hear from the evidence that the real DPR

7      was paying for information about law enforcement

8      investigations.  And you'll hear that he kept a file full of

9      information provided to him and how by September 13, he was

10     warned that law enforcement was in possession of his real name,

11     and that name is not Ross Ulbricht.  That is what compelled,

12     you'll hear from the evidence, compelled the real DPR to put

13     his escape plan into action and transfer the blame to Ross.

14             You'll see how Ross, naïve, ultimately became the

15     victim of DPR and that's why he is sitting before you now as a

16     defendant in this case, and conveniently supplied with access

17     and all the information to his laptop, so when FBI arrived that

18     day, he would be left holding the bag.

19             Also, look at Ross' lifestyle.  They didn't say he

20     didn't live lavishly, but really, when you talk about the

21     profits of this, you'll see that money in Bitcoin is a

22     fraction, a small fraction of what his -- the profits were from

23     the Silk Road website.  Where is the rest of the money?  They

24     haven't connected any of it to Ross.  There is no connection to

25     Ross to the rest of that money.  DPR has it, the real DPR.

1              And the whole thing about lavish lifestyles and living

2    under the radar, people don't operate drug empires to live a

3    simple life enjoying the creature comforts.  They do it for the

4    money.  They do it for the lifestyle.  They do it for the

5    greed.  You have life experience and you have common sense.

6    Apply it to the evidence as you hear it.

7              The government's premise all along is that Silk Road

8    was the product of a master computer programmer.  Doesn't fit

9    Ross' profile.  They can talk all they want about self-taught

10   and asking questions of a friend.  We'll hear about that as we

11   get into the evidence.

12             And where is that money?  The real DPR is out there.

13   Silk Road II was online within six to eight weeks of Ross'

14   arrest.  The government also talked about violence and attempts

15   at violence, but that's not charged here.  Don't be distracted.

16   It's not charged here.  There's no evidence ever the people

17   involved ever existed, you'll hear that and the government will

18   read that in a stipulation, no evidence anyone was ever harmed

19   or as, like I said, or even existed who were supposedly the

20   targets.

21             The Internet is an unusual place.  People can create

22   and fabricate profiles of themselves and others in ways that we

23   may not have been able to imagine 20 years ago, maybe 25 years

24   ago now.  It's like a dating site, you get all sorts of

25   information and when you meet them in person, they may not

1   quite match what was on that profile.  None of it may match.

2           When witnesses take the stand, you'll be able to judge

3   them.  You'll be able to evaluate their testimony, whether

4   they're lying, whether they're telling the truth, whether it's

5   a combination of both.  On the Internet, how do you judge that,

6   who you're communicating with?

7           Some of the concepts the government talked about

8   you'll find out a little more, the Tor, the onion router, the

9   part of the Internet that Silk Road existed on, this deep, dark

10  place that was developed by the United States government for

11  legitimate means that is used legitimately in many aspects.

12  There's nothing deep and dark about it.

13          Bitcoin, another aspect, it's traded openly.  Its

14  value over time will be an important aspect in this case

15  because you will hear how that $18 million was made.  That

16  Bitcoin was worth almost nothing in 2010 when an investor in

17  Bitcoin could buy them for pennies and that it's worth hundreds

18  and hundreds of dollars, four to $600 by the end of 2013.

19  Think about what kind of profit you can make just trading

20  Bitcoin.

21          By the way, you know it's only anonymous in terms of

22  the transaction between people in terms of Bitcoin, it's

23  traceable.  The transactions themselves are all traceable in

24  what's called a block chain for Bitcoin.  Bitcoin is not

25  designed to be a fraud.  Bitcoin is not designed to be a means

1    of criminal activity.  Bitcoin was designed to be an antifraud

2    currency measure, digital, unduplicatable in that regard, so

3    antifraud, and you'll hear all about that.

4          In regard to the witnesses, and again, by the way,

5    just about the money, no one traced any of it back to Ross

6    except what's on that laptop.  Where is the rest of it?  Let's

7    hear the evidence or the lack of evidence.

8          What about the witnesses?  The only one who even knew

9    Ross and this was a friend back in the beginning and others,

10   the drug dealer they talked about is another witness as well

11   who have made deals with the government in exchange for their

12   testimony to avoid the serious consequences of their own

13   conduct.  They made a choice, and you'll hear about it, to

14   provide testimony to the government in exchange for

15   significant, significant benefits, so that they can be in that

16   seat instead of that seat.

17         So please, as the evidence comes in at the conclusion

18   of the case I'll speak to you again obviously to sum up, but

19   the case is simpler than it appears in the context of the

20   technology.  You have to apply your common sense.  That's your

21   best attribute and your life experience.  Ross is not a drug

22   dealer.  Ross is not a kingpin.  Ross was not involved in any

23   conspiracy to do anything like that.  He was not involved in

24   any conspiracy to sell hacking software or phoney IDs or

25   anything that's charged in the indictment.

1          And at the end of the case, after you hear all of the

2     evidence and the closing arguments and deliberate, I submit to

3     you there's only one verdict that the evidence will permit and

4     that your common sense will permit, that Ross is not guilty on

5     all of the counts against him.

6          Thank you.

7          THE COURT:  Thank you, Mr. Dratel.  Ladies and

8     gentlemen, we'll take a brief break and then we'll come back

9     and have our first witness.  This will be our only break until

10    we end.  We're going to end right on the dot of 5:00.  So we're

11    not going to keep you today or any day past 5:00.  Let's take a

12    short break and then we'll come back and we'll go until about

13    ten of 5:00, all right, and then we'll have our first witness.

14    Thank you.

15         I want to remind you not to talk to each other or

16    anybody else about this case, about any impressions you have

17    about this case, anything at all to do with this case, don't

18    talk about it.  Thanks.

19         (Jury excused)

20         (Continued on next page)

21

22

23

24

25

F1DGULB5                         Trial

1             (In open court)

2             THE COURT:  Is there anything we need to raise before

3    we take our own break?

4             MR. SERRIN:  Would you like the witness to take the

5    stand?

6             THE COURT:  I'm indifferent to that.

7             Does anybody have a preference to how that

8    choreography goes?

9             MR. DRATEL:  I don't.

10            THE COURT:  Put the witness on the stand and that will

11   save the minute or two it takes to otherwise get the witness.

12   Let's take a five-minute break, seven-minute break and then

13   we'll come on back and pick up with the witness.  Thank you.

14            THE DEPUTY CLERK:  All rise.

15            (Recess)

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

F1DGULB5                        Trial

1              (In open court)

2              (Jury present)

3              THE COURT:  Call your first witness please, sir.  You

4    have already put him on the stand.

5              MR. SERRIN:  The government calls HSI Homeland

6    Security Investigator, Jared Der-Yeghiayan.

7              (Witness sworn)

8              THE COURT:  Please be seated and it will important

9    that you speak clearly and slowly into the microphone and I see

10   you have water there already.

11             Thank you.  Mr. Turner, you may proceed.

12             MR. SERRIN:  Thank you.

13             THE COURT:  You may want to back up the podium a

14   little bit more so that you're not in front of the jury like

15   that.

16             MR. SERRIN:  Thank you, your Honor.

17             THE COURT:  There you go.  Terrific.  Sorry, we hadn't

18   arranged that beforehand.  Thank you very much.  Perfect.

19    JARED DER-YEGHIAYAN,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows:

22   DIRECT EXAMINATION

23   BY MR. SERRIN:

24   Q.  Agent Der-Yeghiayan, who is your employer?

25   A.  I work for Homeland Security Investigations, Immigration

1   Customs Enforcement.

2   Q.  What is Homeland Security Investigations?

3   A.  It's the investigative branch of Homeland Security.

4   Q.  How is Homeland Security Investigations commonly referred

5   to?

6   A.  It's referred to as HSI.

7   Q.  So what's your title at HSI?

8   A.  I'm a special agent.

9   Q.  How long have you been a special agent with HSI?

10  A.  Since 2010.

11  Q.  And where are you currently assigned?

12  A.  I'm assigned right now to Chicago O'Hare International

13  Airport.

14  Q.  Chicago O'Hare International Airport?

15  A.  Yes.

16  Q.  What are your duties there?

17  A.  My duties include current investigations that are related

18  to immigration customs crimes such as human smuggling,

19  narcotics smuggling, IPR, which is different rights violations

20  for trade mostly.

21  Q.  So how long have you been assigned to work at O'Hare

22  International Airport in Chicago?

23  A.  I've been assigned at O'Hare, well, since 2010, I started

24  with HSI.

25  Q.  And you said -- you've been an HSI special agent since

1    2010?

2    A.  Yes.

3    Q.  And how about before that, any prior law enforcement

4    experience?

5    A.  Yes, I was also a CBP officer, Customs and Border

6    Protection Officer at Chicago O'Hare.

7    Q.  When did you do that?

8    A.  I started around 2003.  I was hired on by Immigration

9    Naturalization Service IMS inspector, which turned into Customs

10   Border Protection.

11   Q.  How about after that?

12   A.  After O'Hare, I was also assigned as a counterterrorism

13   response worker in 2005.

14   Q.  And after that?

15   A.  And then also I was assigned as a narcotic rover at Chicago

16   O'Hare.

17   Q.  Explain what a narcotic rover means.

18   A.  There's officers that are designated at the airport to try

19   to find narcotics that are being smuggled through.

20   Q.  So how long have you been at O'Hare International Airport

21   as a law enforcement officer in some capacity?

22   A.  Since 2003.

23   Q.  Are you familiar with the website known as the Silk Road?

24   A.  Yes, I am.

25   Q.  And did there come a time when you opened up an

F1DGULB5                          Der-Yeghiayan - direct

1   investigation of the website?

2   A.  Yes, I did.

3   Q.  When was that?

4   A.  It was October 2011.

5   Q.  And how did your work at the airport at Chicago O'Hare lead

6   you to open an investigation of the Silk Road website?

7   A.  We also cover, as part of O'Hare, there's a mail unit

8   that's assigned to the grounds that's an international mail

9   unit, so we were getting in and receiving lots of drugs that

10  were coming in through the mail through letter class mail,

11  unusual drugs.

12  Q.  So O'Hare is an international airport, right?

13  A.  Yes.

14  Q.  So in addition to receiving passengers from foreign

15  countries, does any international mail come through O'Hare

16  International Airport?

17  A.  Yes, it does.

18  Q.  Where does that mail come from?

19  A.  It comes from various countries from international

20  carriers.

21  Q.  What do you mean international carriers?

22  A.  It's -- so it would be the -- an airline that's operated by

23  a foreign government bringing in the mail.

24  Q.  So, an airline from, let's say, the Netherlands what would

25  that be?

F1DGULB5                        Der-Yeghiayan - direct

1   A.  From the Netherlands, that would be KLM airlines.

2   Q.  And they bring in the Netherlands' mail?

3   A.  Yes, they do.

4   Q.  After a plane lands at O'Hare International Airport, after

5   an international flight lands, what happens to the mail?

6   A.  The mail that is on the plane is then taken off the

7   airfield and taken over to the inspection area, which is in the

8   mail unit.

9   Q.  And who inspects it?

10  A.  The Customs Border Protection officers.

11  Q.  What do they inspect it for?

12  A.  They search for various things, again, a lot of trade

13  violations, anything that violates pretty much U.S. law that's

14  being imported.

15  Q.  How do they inspect it generally?

16  A.  Usually with x-rays and with a canine detection dogs.

17  Q.  Any warrant required to do that?

18  A.  No, there's no warrant required.

19  Q.  Why not?

20  A.  There's a border search authority --

21          MR. DRATEL:  Objection, your Honor.

22          THE COURT:  Overruled.

23  A.  There's a border authority that officers have that they

24  don't need a warrant to search incoming mail coming in.

25  Q.  So what happens if contraband is found in incoming

F1DGULB5                          Der-Yeghiayan - direct

1   international mail?

2   A.  If contraband is discovered, the officers will seize it and

3   it will be documented.

4   Q.  And what involvement, if at all, do you yourself have in

5   searching incoming international mail at O'Hare?

6   A.  As assigned as a special agent to O'Hare, I will -- if

7   there's a narcotic seizure, generally we're notified by Customs

8   Border Protection to investigate the seizure.

9   Q.  So tell us about the mail seizures that eventually led you

10  to open an investigation of the Silk Road website.

11  A.  There was -- while I was assigned or I would take -- make

12  routine trips to the mail unit to pick up various things that

13  either the officers would seize and also to look at the various

14  things that were suspicious that might lead to investigation,

15  and while I was there one day, an officer brought to my

16  attention --

17  Q.  What time frame is this?

18  A.  This is approximately June 2011.  An officer brought to my

19  attention several --

20           MR. DRATEL:  Objection, your Honor.

21           THE COURT:  Hold on one second.  Overruled.

22  Q.  Without telling me anything the officer said, what did you

23  see when you went to the mailroom?

24  A.  I saw there was packages, there was mail envelopes from the

25  Netherlands containing ecstasy pills in them.

F1DGULB5                              Der-Yeghiayan - direct

1   Q.   How many ecstasy pills?

2   A.   Each envelope, there were multiple envelopes, and they

3   contained one or two pills per envelope.

4   Q.   And how were they packaged?

5   A.   They were packaged in -- it was almost like a

6   commercial-like envelope that also had -- they tried to conceal

7   the drugs inside by wrapping it up in vacuum seal and foil.

8   Q.   What was unusual, if anything, about this drug seizure?

9   A.   It was unusual for me because I hadn't -- we haven't seen

10  ecstasy being seized in the mail or in letter class like that

11  in a lot of years, ever since I started pretty much at O'Hare.

12  Q.   And what was unusual, if anything, about the packaging the

13  drugs were contained in?

14  A.   It seemed like they went to unusual steps to try to mask

15  it, to hide it from detection, and it looks like they

16  also -- it was commercialized in the sense that it had sticker

17  labels on it that were printed and there was also similarities

18  in it, too, so the multiple envelopes shared the same

19  characteristics, outer characteristics.

20  Q.   So before this, when you had seen drugs seized at the

21  international mail at O'Hare --

22            MR. DRATEL:   Objection; leading a little too much.

23            THE COURT:   Why don't you rephrase.

24  Q.   Before this, what sort of packaging had you seen drugs come

25  in at O'Hare International Airport?

F1DGULB5                          Der-Yeghiayan - direct

1    A.   Generally with letter-class mail, you'd see it in the way

2    that it would -- it would usually just be, like, a single

3    occurrence.  It would be in an envelope that would be almost

4    personalized in the sense most of the time.  The commercial

5    stuff does come in every once in a while larger shipments, but

6    the smaller stuff with just one or two pills in a commercial

7    type of appearance was unusual because normally you would have

8    handwriting outside the envelope versus printed sticker labels,

9    and it wouldn't be multiple envelopes all addressed to

10   different people across the entire United States.

11   Q.   Was this seizure of ecstasy in June 2011 an isolated

12   incident or were -- did more seizures follow?

13   A.   There were more seizures to follow.

14   Q.   How do you know that?

15   A.   Because I asked -- I kept on monitoring the seizures that

16   were at the airport and at the mail unit that were coming in.

17   Q.   And these seizures that you noticed coming in, was this

18   from one country in particular or were there different

19   countries whose mail you were monitoring?

20   A.   In the beginning of the investigation, it was just

21   primarily the Netherlands.  After that, it did turn into other

22   countries that we found the same stuff in other countries' mail

23   as well.

24   Q.   So what did you notice about the number of seizures being

25   made from the mails?  Did they stay the same over time or

F1DGULB5                              Der-Yeghiayan - direct

1    increase or decrease?

2    A.   The numbers were increasing consistently.  Pretty much

3    every month, they would go up in volume.

4    Q.   And what did you notice about the types of drugs being

5    seized from the mail?  Was it just ecstasy or did that change

6    as well?

7    A.   In the same type of envelopes that we were seizing that

8    appeared commercialized, we started seeing more than just

9    ecstasy.  We saw the drug that's commonly used in ecstasy,

10   which is MDMA.  We found it in powder and crystal form.  We

11   also found LSD.  We found cocaine.  We found heroin, as well as

12   several other Schedule I and II narcotics.

13   Q.   Just could you clarify what do you mean by Schedule I and

14   Schedule II.

15   A.   It's a classification for drugs as far as medical use goes

16   that's designated by the government:  Schedule I being no

17   medical use and Schedule II having very limited medical use.

18   Q.   So, do you see the binder of exhibits that's in front of

19   you?

20   A.   I do.

21   Q.   Can you turn to what's been marked as government

22   Exhibit 100A in that exhibit book.

23   A.   Okay.

24   Q.   Do you recognize this -- is it one page or a set of pages?

25   A.   A set of pages.

F1DGULB5                              Der-Yeghiayan - direct

1   Q.  Do you recognize these pages?

2   A.  Yes, I do.

3   Q.  What are they?  How do you recognize them?

4   A.  These are photographs that I took.

5   Q.  What are they photographs of?

6   A.  It's photographs of a seizure that we made of drugs at the

7   mail unit.

8          MR. SERRIN:  The government offers Government

9   Exhibit 100A into evidence.

10         MR. DRATEL:  Just note our objection.

11         THE COURT:  Government Exhibit 100A is received.

12         (Government's Exhibit 100A received in evidence)

13         MR. SERRIN:  Would you publish government

14   Exhibit 100A.

15  Q.  Could you walk us through these pages and tell us what they

16  show, first, what are we seeing on the screen here?

17  A.  The first image is -- this is the -- it's the piece of

18  paper that was discovered inside the envelope that's behind it,

19  which was a seizure that was paid from the Netherlands.

20         MR. DRATEL:  Your Honor, this monitor is not working.

21  It says no signal.  There's something that might have been

22  disconnected.

23         THE COURT:  Maybe from the noise we were having

24  earlier.

25         (Pause)

1    Q.  I'll get back to that in a minute.   When was this photo

2    taken?

3    A.  This photo was taken December 4, 2011.

4    Q.  By the way, is that marked anywhere on the exhibit itself?

5    A.  Yes, it is.  It's marked on one of the pages in the image

6    properties.

7    Q.  So the jury can see that, go to page six please, zoom in.

8    Can you go back to page one.

9            So this envelope, first of all, tell me about the

10   return address.

11   A.  The return address label in the left-hand corner says

12   studyabroad.com.  It was presented like a business.

13   Q.  Did you look up that website?

14   A.  I did.

15   Q.  And what did you find there?

16   A.  It didn't have the logo.  It wasn't a website for what was

17   advertised with the same address from the knowns.

18   Q.  What did you find inside the package?

19   A.  Inside was -- it was ecstasy pills.

20   Q.  And what kind of paper was it wrapped in?

21   A.  So there was a piece of paper inside and inside that piece

22   of paper was a silver foil, the silver foil was all

23   vacuum-sealed and there was a number 3 written on the outside

24   of it.  And then once you cut into the silver foil, there were

25   multiple Ziploc baggies that were wrapped around a cotton-like

F1DGULB5                          Der-Yeghiayan - direct

1    material.

2    Q.  Could you go to the next page.

3    A.  Next page, please.  And then when cutting into the

4    cotton-like material you can -- there's three pills, white

5    pills inside of it.  Next page.  And then these are the pills

6    that were discovered inside the packaging that had a speaker

7    logo on it.

8    Q.  And did you do any test on the pills to determine what

9    substance they contained?

10   A.  I field-tested it; yes.

11   Q.  What do you mean by field-test?

12   A.  There's a field test, a chemical test that we can perform

13   on suspected drugs; and it would react in a way that it would

14   let you know generally the consistencies of a certain drug.

15   Q.  And the paper here, what did it say that you found inside?

16   A.  The paper itself was labeled the Candy Shop and it said

17   don't forget the feedback.

18   Q.  Could you take a look at what's been marked as Government

19   Exhibit 100C, please.  Do you recognize -- do you recognize

20   these documents?

21   A.  Yes, I do.

22   Q.  How do you recognize them?

23   A.  It's a photograph I took.

24   Q.  What is it a photograph of?

25   A.  I'm sorry?

F1DGULB5                        Der-Yeghiayan – direct

1    Q.  What is it a photograph of?

2    A.  It's a photograph, while at the mail unit, of packages that

3    we were –– that I recovered out of the Netherlands mail.

4              MR. SERRIN:  The government offers Government

5    Exhibit 100C.

6              MR. DRATEL:  The same objection, your Honor.

7              THE COURT:  Why don't you establish the time frame.

8    Q.  When was the photo taken?

9    A.  The photo was taken on December 8, 2011.

10             THE COURT:  Government Exhibit 100C is received.

11             (Government's Exhibit 100C received in evidence)

12   Q.  Can you publish the exhibit.

13             What are these envelopes?

14   A.  These are envelopes that I recovered from the Netherlands'

15   mail that we had either already found drugs in similar-style

16   envelopes in the past, recognized them and also other ones that

17   were suspicious.

18   Q.  Did you actually examine the contents of all of these

19   envelopes?

20   A.  I did.

21   Q.  What were they found to contain?

22   A.  They were found to contain various drugs such as ecstasy,

23   LSD and amphetamines.

24   Q.  And over how many days were these envelopes seized?

25   A.  This was just one day.

F1DGULB5                          Der-Yeghiayan - direct

1   Q.  So how typical was it by the time you took this picture

2   that you'd be seizing this many packages in a given day?

3   A.  This is pretty standard early on when we started the

4   investigation that we'd start out by seizing quantities such as

5   this.

6   Q.  So what did you do with all these letters that you were

7   seizing from the incoming mail at O'Hare?

8   A.  The letters themselves, the drugs would be seized and also

9   the envelopes would be seized and we were holding and

10  maintaining them as evidence.

11  Q.  Who maintained the envelopes?

12  A.  HSI did.

13  Q.  And were you involved in preserving them?

14  A.  Yes.

15  Q.  Where is that evidence now?

16  A.  That evidence is stored in a vault, an HSI vault in

17  Chicago.

18  Q.  Can you take a look at Government Exhibit 104.  Do you

19  recognize this document?

20  A.  Yes.

21  Q.  How do you recognize it?

22  A.  I took this photograph.

23  Q.  When was it taken?

24  A.  It was taken approximately two months ago.

25  Q.  And what is this a picture of?

1    A.  It's a photograph of all the envelopes that we seized

2    during the course of this investigation.

3            MR. SERRIN:  Your Honor, the government offers

4    Government Exhibit 104 into evidence.

5            MR. DRATEL:  Same objection, your Honor.

6            THE COURT:  When you say all of the envelopes that

7    were received, what I see is something more akin to boxes.  Is

8    it your testimony that these boxes were full of envelopes?

9            THE WITNESS:  Yes.

10           THE COURT:  Were they full -- were there two or three

11   envelopes in the boxes or was it just an envelope in the box

12   that was actually packed full?

13           THE WITNESS:  Each box, your Honor, was filled with

14   numerous envelopes.  And on the outer side of them, it's very

15   hard to see on the image, but there's the number of the

16   individual seizures on the outside.  So each box can contain

17   approximately about 100 envelopes or more.

18           THE COURT:  How do you know each of these boxes

19   contained envelopes in the manner you've suggested?

20           THE WITNESS:  I put them in the boxes.

21           THE COURT:  Government Exhibit 104 is received.

22           (Government's Exhibit 104 received in evidence)

23   Q.  Can you publish the exhibit, Mr. Evert.

24           So how many letters approximately are in all these

25   boxes?

F1DGULB5                          Der-Yeghiayan - direct

1    A.  Approximately 3600.

2    Q.  And during what time period were these seizures made?

3    A.  This was from October 2011 through April 2013.

4    Q.  And how did this volume of drug seizures compare to the

5    volume of drug seizures in the O'Hare mail in years past?

6    A.  Once these seizures started, our numbers were higher than

7    any previous year.

8    Q.  How much higher are you talking about?

9    A.  Thousands higher.

10        MR. DRATEL:  Objection with respect to personal

11   knowledge.

12        THE COURT:  In connection with your duties and

13   responsibilities, why don't you connect up what information he

14   had in the past and therefore what the comparison is based on?

15        MR. SERRIN:  Sure.

16   Q.  You mentioned before that you were a narcotics rover in

17   Chicago O'Hare Airport for some time?

18   A.  Yes, I was.

19   Q.  And after that, what did you do?

20   A.  I also was an intel officer for a few months and then my

21   time at CBP.

22   Q.  And that covered what time period?

23   A.  That was from 2008 through 2010.

24   Q.  And the narcotics rover duties covered what time period?

25   A.  That started 2008.

F1DGULB5                          Der-Yeghiayan - direct

1    Q.  Go ahead.

2    A.  And went through early 2009.

3    Q.  And throughout that time period, did you -- what

4    involvement did you have in monitoring the narcotics seizures

5    being made at O'Hare?

6    A.  Part of my duties were also to research, analyze and

7    examine seizures that were happening at O'Hare.  That included

8    anything that was being seized in the entire airport, if it's

9    ecstasy or if it's any other serious drug.

10   Q.  So from that experience, do you know how this volume of

11   seizures that you were making at the O'Hare International mail

12   during this time represented in the boxes compared to years

13   past?

14   A.  Yes, I do.

15   Q.  And so how did it compare?

16   A.  These were -- it was a complete higher increase of

17   seizures.  We didn't have hardly any seizures of ecstasy in

18   years past and this was something that was -- we never seen

19   before.

20   Q.  At some point while you were making these seizures, did you

21   learn about the Silk Road website?

22   A.  Yes, I did.

23   Q.  Without telling me what you heard about it, approximately

24   when did you hear about -- did you first hear about the Silk

25   Road website?

F1DGULB5                              Der-Yeghiayan - direct

1    A.  It was approximately late September, early October, 2011.

2    Q.  Did you see that website?

3    A.  Yes, I did.

4    Q.  Generally, what did you find there?

5    A.  I found it was a market that was similar to an online

6    market that was similar to, like, Amazon, for instance, that

7    had items for sale that were mostly illegal in nature that I

8    could see, drugs and various other things.

9    Q.  And was there any way to see visually what the drugs looked

10   like that were being sold on the Silk Road?

11   A.  Yes, there was.

12   Q.  How?

13   A.  There were images that were on the website posted near all

14   the listings.

15   Q.  I'm going to ask you a lot more questions about Silk Road

16   later, but for now, I'm going to ask what links were you able

17   to make, if any, between Silk Road and the drugs you were

18   seizing at O'Hare?

19   A.  We were, during the course of the investigation, we were

20   able to link many of the seizures that we were making there to

21   various vendors on Silk Road throughout a variety of means if

22   it was just comparative of the actual drug we saw, that we

23   seized and matching up the actual drug to what was being seen

24   online and from the same countries, for instance.  So, with the

25   Netherlands mail that we primarily started seizing with, it had

F1DGULB5                          Der-Yeghiayan - direct

1    particular ecstasy pills that -- with certain logos on it and

2    certain colors for the pill and those exact same pills were

3    being advertised from sellers on Silk Road that were from the

4    Netherlands.

5           And so using that, and then also conducting undercover

6    purchases to try to match up the envelopes that we were seizing

7    at -- through the mail unit, we were able to draw conclusions

8    that it came from Silk Road.

9    Q.  So can you take a look at Government Exhibit 102D, please.

10

11   A.  102D, Delta?

12   Q.  "D" as in Delta.

13   A.  Okay.

14   Q.  Do you recognize the pages in this exhibit?

15   A.  Yes, I do.

16   Q.  What do they consist of?

17   A.  It consists of a photograph that I took as well as images

18   that I captured, as well as screen shot I took.

19   Q.  When you say images that you captured, what do you mean by

20   that?

21   A.  I retrieved an image, saved an image from a website.

22   Q.  Which website?

23   A.  Silk Road.

24           MR. SERRIN:  The government offers Government

25   Exhibit 102D into evidence.

F1DGULB5                        Der-Yeghiayan - direct

1           MR. DRATEL:  Previously -- can we have a line

2    objection.  If I have something different --

3           THE COURT:  Yes, yes.  Thank you.

4           Government Exhibit 102D is received.

5           (Government's Exhibit 102D received in evidence)

6    Q.  Can you publish page one of the exhibit, Mr. Evert.

7           Is this the same thing you saw before?

8    A.  Yes, it is.

9    Q.  What's on -- these are the three ecstasy pills, right?

10   A.  Correct.

11   Q.  And they have the Candy Shop logo inside?

12   A.  Yes.

13   Q.  So can you go to page two of the exhibit.  And what does

14   this page reflect?

15   A.  This was an image that I retrieved from the Silk Road

16   website.

17   Q.  Where did you retrieve it from?

18   A.  From a vendor that went by the name of Candy Shop.

19   Q.  When you say vendor, what do you mean?

20   A.  On the website itself, it was -- anyone can become a user,

21   anyone can register as a user, and they also could choose to

22   register as a vendor, as well, or become a vendor and sell

23   anything that they wanted.

24   Q.  Okay.  So could we cut to page three, please.  What's

25   reflected in this page?

1   A.  This was a screen shot that I took of Silk Road.

2   Q.  And Mr. Evert, can you zoom into that part.

3          What is reflected here?

4   A.  This is the listing from Candy Shop of ten Redbulls,

5   ecstasy pills.

6   Q.  Okay.  So it says seller, Candy Shop there; is that right?

7   A.  Yes.

8   Q.  And then ships from Netherlands?  Is that how you matched

9   it up to a Netherlands seller?

10  A.  Yes.  I was able to sort the actual website from -- by

11  vendors that shipped from particular country, so I was able to

12  also search Netherlands vendors that way.

13  Q.  By the way, the 98, do you know what that means?

14  A.  I do.

15  Q.  What does it mean?

16  A.  It's a feedback rating score for the vendor.

17  Q.  And what do you mean by that?

18  A.  So the website also had feedback that was on there, so as

19  you would leave -- as you would purchase something from a

20  vendor, you could leave feedback on your order and rate it.

21  And the score 100 would be the highest down to basically one or

22  zero.

23  Q.  Let's go on to Government Exhibit 102B, "B" as in boy.

24  A.  102B?

25  Q.  Do you recognize this page?

1   A.  Yes, I do.

2   Q.  And how do you recognize it?

3   A.  This was a photograph that I took.

4   Q.  When did you take it?

5   A.  I took it on December 30th, 2011.

6   Q.  And what is it of?

7   A.  It's me holding up -- I was at the mail unit and I was

8   holding up an envelope that was seized from the Netherlands and

9   I'm holding it up and it also shows the drugs as well as being

10  logged into Silk Road beside it on my computer.

11          MR. SERRIN:  The government offers Exhibit 102B into

12  evidence.

13          THE COURT:  I'm sorry.  I'm not really sure what I'm

14  looking at.  What were you --

15          THE WITNESS:  I'm holding an envelope on the left-hand

16  side and then there's drugs also below it; and then on the

17  right-hand side is my computer and me logged into Silk Road.

18          THE COURT:  And you took that photograph all at the

19  same time?

20          THE WITNESS:  Yes.

21          THE COURT:  Government Exhibit 102B is received.

22          (Government's Exhibit 102B received in evidence)

23          MR. SERRIN:  Thank you, your Honor.  Can we publish

24  this exhibit?

25  Q.  What's on the left-hand side?

F1DGULB5                          Der-Yeghiayan - direct

1   A.  Left-hand side is an envelope that's seized at the mail

2   unit out of the Netherlands mail.

3   Q.  And where are the drugs you say you seized from the

4   envelope?

5   A.  Below it's hard to see.  It's the five dots, small, black

6   holes in the bottom that are five in a row.

7   Q.  Did you test those drugs?

8   A.  Yes, I did.

9   Q.  What did they test positive for?

10  A.  For LSD.

11  Q.  And what's on the right-hand side of the screen?

12  A.  That was -- I logged into Silk Road and found the drugs,

13  the same drugs that we had -- that we had seized on Silk Road.

14  Q.  Where did they ship from?

15  A.  They shipped from the Netherlands.

16  Q.  Let's take a look at one more, Government Exhibit 102C, "C"

17  as in Charlie.

18          Do you recognize these pages?

19  A.  Yes, I do.

20  Q.  How do you recognize them?

21  A.  It was a photograph I took, as well as images I recovered

22  from Silk Road.

23  Q.  And how do they relate to one another?

24  A.  Could you repeat.  I'm sorry.

25  Q.  How do the pages relate to one another?

F1DGULB5                          Der-Yeghiayan - direct

1    A.   The seizures that we made at the mail unit were all from

2    the same Silk Road vendor that we also recovered images from

3    the Silk Road from that vendor.

4              MR. SERRIN:   The government offers Government

5    Exhibit 102C into evidence.

6              THE COURT:   Government Exhibit 102C is received.

7              (Government's Exhibit 102C received in evidence)

8              MR. SERRIN:   Publish the exhibit, please.

9    Q.   Could you explain to the jury what the envelopes in the

10   screen reflect?

11   A.   The envelopes, each one is an individual seizure we made.

12   And outside of the envelopes from the drugs that were

13   recovered, we placed the drugs on top of the envelopes.  The

14   one closest to the bottom is an amphetamine that we seized, as

15   well as ecstasy pills, MDMA, crystal.

16   Q.   Walk up from the bottom.

17   A.   Starting from the bottom, we had amphetamines as well as

18   above it five blue ecstasy pills and above that, it was crystal

19   MDMA powder, and as well as above that, cocaine.

20   Q.   And one of the envelopes says Dr. Amsterdam written there.

21   Who wrote that?

22   A.   I did.

23   Q.   Why did you write that there?

24   A.   I had previously linked these envelopes to that vendor on

25   the Silk Road username.

F1DGULB5                           Der-Yeghiayan - direct

1   Q.  How did you do that while we go to the next page?

2   A.  Those are the seizures that we were seizing matching up

3   these drugs to the images that were found by that one

4   particular vendor.

5   Q.  And just to be clear, these images, is this how you found

6   them on Silk Road, all bunched together like this?

7   A.  No.

8   Q.  How did you find the images on Silk Road?

9   A.  Each individual image was attached to the listing for that

10  particular product.

11  Q.  And you made a collage out of them here essentially?

12  A.  Yes.

13  Q.  So, can you put the two side by side, Mr. Evert, the first

14  page and the second page.

15          While he's doing that, can you just explain how you

16  matched them up?

17  A.  So for instance, the amphetamines had the same appearance

18  and they also tested positive for amphetamine, which was being

19  advertised by this vendor.  There was the same pills that were

20  being offered by that vendor that we were seizing, as well as

21  the MDMA and the cocaine.  It was an unusual combination of

22  various drugs and the particular pill, which not all the same

23  vendors on Silk Road sold the same pills.  They had all

24  different types of pills that they would sell as well.  So this

25  was -- this was a particular envelope style that was all the

1    same that contained the same drugs that was being offered by

2    this vendor that was on the Silk Road.

3    Q.   When you say unique combination, what do you mean?

4    A.   For instance, one vendor might just sell ecstasy or might

5    just sell LSD, just one drug or one type of drug.  This

6    particular vendor offered multiple different drugs and we were

7    able to seize those same drugs and the same pills from a

8    particular style of envelope, the same style envelope.

9    Q.   Let's discuss in more detail what you learned about how

10   Silk Road worked.  How did you familiarize yourself with the

11   various features of the site?

12   A.   I navigated it myself.

13   Q.   Did you establish any undercover accounts on the site?

14   A.   Yes, I did.

15   Q.   Approximately how many over time?

16   A.   Probably four or five.

17   Q.   And were you able to access any other user accounts that

18   you didn't yourself establish?

19   A.   Yes, I did.

20   Q.   And how did you do that during your investigation?

21   A.   Various accounts would -- through the course of the

22   investigation would either be turned over to us by people that

23   we interviewed or talked to, some people we arrested, as well

24   as not just regular accounts but also accounts that belonged to

25   vendors as well as acquired administrator account.

F1DGULB5                          Der-Yeghiayan - direct

1    Q.  What do you mean by administrator account?

2    A.  It was one of the staff member accounts for Silk Road.

3    Q.  So did Silk Road have a support staff?

4    A.  Yes.

5    Q.  And what was the name of your support staff account that

6    you eventually took over?

7    A.  The name was Cirrus.

8    Q.  When did you take that account over?

9    A.  It was July 2013.

10   Q.  How did you -- how long did you operate that account?

11   A.  Operated it from July 2013 until we shut down Silk Road.

12   Q.  When was Silk Road shut down?

13   A.  October 2, 2013.

14   Q.  Do you know when the defendant was arrested?

15   A.  He was arrested October 1, 2013.

16   Q.  So you were a staff member at the time of the defendant's

17   arrest?

18   A.  Yes, I was.

19   Q.  I'm going to come back to your Cirrus account later, but

20   let me ask, how often during your entire investigation did you

21   visit the Silk Road website through the various undercover

22   accounts that you controlled?

23   A.  Early on, it was once every few days, but then eventually

24   it became everyday.

25   Q.  Approximately how many hours would you say you spent on the

F1DGULB5                          Der-Yeghiayan - direct

1   site in total?

2   A.   Thousands I would say over the course of a few years.

3   Q.   Did you do any undercover buys on the site?

4   A.   Yes, I did.

5   Q.   Approximately how many?

6   A.   Approximately 50 or more.

7   Q.   So how would you even get to the Silk Road website?  Just

8   go to silkroad.com?

9   A.   No.  You have to use it -- use a special program referred

10  to as the Onion router, short for Tor, to access the actual

11  website.

12  Q.   What was the web address of Silk Road, do you remember?

13  A.   It was silkroad Victor Bravo -- I'm doing it -- sorry.

14  Q.   Just stick with the letters.

15  A.   Sorry.  Sounds all the same.  Silkroadvb5piz3r.onion.

16  Q.   What is a dot onion?

17  A.   Yes.

18  Q.   What kind of web address is that?

19  A.   The dot onion would be a website that resides within Tor.

20  Q.   So generally, what is the Tor network?  What's it do?

21  A.   Tor, the Tor network, it's a network on the Internet that

22  anonymizes your traffic, anonymizes who you are and allows you

23  also to visit these websites within Tor which are also known as

24  hidden services.

25              (Continued on next page)

1    Q.  Is there anything illegal in and of itself about the Tor

2    network?

3    A.  Using Tor itself is not illegal, no.

4    Q.  So is there any way to access Silk Road through the

5    ordinary Internet?

6    A.  No, there is not.

7    Q.  You had to access it through Tor?

8    A.  Yes.

9    Q.  Did you access the Tor network as part of your

10   investigation?

11   A.  Yes, I did.

12   Q.  Every time you visited Silk Road?

13   A.  Yes, I did.

14   Q.  Was it hard to get on the Tor network?

15   A.  No, it wasn't difficult.

16   Q.  What did you have to do?

17   A.  Visit the website, which is at torproject.org, and you can

18   download its program, which included -- it is a Tor program

19   bundled, which included a browser that -- Internet browser that

20   you could use then to access this network.

21   Q.  And when you used this Tor browser, how was it different

22   from browsing the Internet with an ordinary browser from your

23   perspective?

24   A.  It was -- it is similar in features as a normal Internet

25   browser, but it will allow you basically to remain anonymous

f1ddulb6                    Der-Yeghiayan - direct

1   while you are using the Internet and visiting other websites.

2   Q.  When you say that, what do you mean "remain anonymous?"

3   What information would it conceal?

4   A.  The browser itself protects your IP address, your Internet

5   protocol address that you have when you are using the Internet.

6   Q.  What is an Internet protocol address?

7   A.  It is a unique number that is generally assigned to you

8   when you are using a computer on the Internet.

9   Q.  Do you know how to find your IP address on your computer?

10  A.  Yes, I do.

11  Q.  What does it look like?

12  A.  It is a series of numbers.

13  Q.  So give me an example.

14  A.  Something like 50.19.236.250.

15  Q.  And what is an Internet protocol address used for?

16  A.  It's used to basically communicate when you are on the

17  Internet from if you want to visit a website, it needs to know

18  the connection.  So your IP address is basically what

19  identifies you on the Internet as well as any other computers

20  that you visit or any other website you visit has to be an IP

21  address as well.  So it helps to navigate the Internet.

22  Q.  In preparation for testifying today, did you prepare a

23  demonstration of a login of a Tor network?

24  A.  Yes, I did.

25  Q.  What kind of demonstration did you prepare?

1   A.  It's a video that I made using my computer, using software

2   to record what is going on within the computer.

3   Q.  When we're planing the video, can you explain the concepts

4   we are discussing?

5   A.  Yes, I would.

6   Q.  Would you turn to Government Exhibit 107.

7          Do you see anything there?

8   A.  Yes.

9   Q.  What do you see?

10  A.  It's a disc, the government exhibit -- I'm sorry, the

11  government evidence disc that is labeled for the video I

12  played.  I know that because I initialed it.

13         MR. TURNER:  Your Honor, the government would request

14  that we be able to play the video for the jury.

15         MR. DRATEL:  Just our prior objection, your Honor.

16         THE COURT:  All right.  Government Exhibit 107 is

17  received and you can publish it by playing it.

18         (Government's Exhibit 107 received in evidence)

19         MR. TURNER:  May I approach, your Honor?

20         THE COURT:  Yes, you may.

21         MR. TURNER:  Mr. Evert, just let me know when you are

22  ready.

23         MR. EVERT:  I am ready.

24  Q.  OK.  So Agent Der-Yeghiayan, once we put this up on the

25  screen, could you just direct Mr. Evert when to play and when

f1ddulb6                    Der-Yeghiayan - direct

1    to stop so you can talk through the video and explain what is

2    being shown?

3    A.   Sure.

4           So this is -- so I'm doing right now -- do you want to

5    pause it real fast, actually?  Sorry.  Go back.  On the

6    right-hand side I, just for easy, put two websites up on there.

7    The top one is a website that you can commonly find your IP

8    address on the Internet, and it will also show your location on

9    a map based off that IP address.  And you can simply do that by

10   plugging it into an Internet browser and it will run and tell

11   you what your IP address is.

12          And then the second address that's on there is one

13   that is a hidden service that I was describing on Silk Road.

14   Q.   I'm sorry, a hidden service?

15   A.   A hidden service that ends in ".onion."

16   Q.   So let's be clear.  The second Web address, that is the Web

17   address of Silk Road or another --

18   A.   No.  Sorry.  Silk Road was shut down by this point so it is

19   a different hidden service.

20   Q.   OK.  Go ahead.

21   A.   OK.  I'm sorry.  If you could play -- I am going to start

22   by basically visiting this first website with the normal

23   browser that you would use.  I am connecting to the Internet

24   right now.  And I just put in a net address.  If you want to

25   pause it.  By inputting that address into the URL bar, it pulls

f1ddulb6                    Der-Yeghiayan - direct

1   up the Web page and the Web page then will tell me what my IP

2   address is and put me on a map so I can see where I am

3   basically from.

4   Q.  A couple of things.  When you say "URL bar," what are you

5   referring to?

6   A.  It is the Internet bar up on top.

7   Q.  The address bar here?

8   A.  Yes.

9   Q.  Where is your IP address reflected here?

10  A.  It is reflected on the map itself and also down below right

11  now.

12  Q.  Right here?

13  A.  Yes.

14  Q.  OK.  Go ahead.

15  A.  OK.  And so if you want to play.

16          This shows me that I am in Chicago.  This is my IP

17  address where I am currently at in Chicago.

18          And so now I'm going to take that hidden service

19  dot-onion address and I am going to try to visit that -- do you

20  want to pause it, please.  I tried to visit that using the

21  regular browser.  So I put in the same dot-onion address and

22  tried to visit it and it comes back as being not available.

23  Q.  Go ahead, please.

24  A.  If you could play it, please.

25          So now I minimized that browser and I am going to open

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    up the Tor browser, which this is the Tor browser and I am

2    going to do the same steps I did before.  So I'm copying the

3    address that tells me where I'm located, and I'm running that

4    in the Tor browser and it's going to tell me where I'm located.

5            If you can pause it, please.

6            And so the Tor browser makes it appear as if I'm

7    coming from Germany.  And so it says my IP address is in

8    Germany.  So any website I visit using the Tor browser right

9    now will think I'm in Germany.

10   Q.  And where is your apparent IP address listed on the page?

11   A.  It's in the white box in the middle as well as down below.

12   It is the 188.138.9.489.

13   Q.  If you want to -- was that your actual IP address?

14   A.  No, that is not my actual IP address.

15   Q.  OK.  Go ahead.

16   A.  And now if you want to play it, I'm going to try to visit

17   that same hidden service, dot-onion address that I visited or

18   tried visiting with the regular browser, and I am going to try

19   it now using the Tor browser.

20           And if you pause it.

21           And so just by simply entering the same dot-onion

22   address now with the Tor browser, it makes the website appear.

23   So you can visit it only if you are using the Tor browser.

24   Q.  Please continue.

25   A.  And then just to show an example, with the two browsers

f1ddulb6                    Der-Yeghiayan - direct

1   side-by-side, I could be on the Internet.  It just depends

2   which browser I am using.  One will be my true IP address on

3   the left-hand side and the other one will be not my true

4   address, which is one that Tor protects basically the user

5   behind it.

6   Q.  All right.  So the video shows how Tor masks your IP

7   address.  From a law enforcement perspective what is the

8   significance of an IP address?

9   A.  An IP address we can use to identify someone that's

10  potentially doing something behind a computer that is doing

11  things on the Internet.

12  Q.  So how?  How is the IP address potentially useful for that

13  purpose?

14  A.  In other investigations that I have done as well as in this

15  investigation, if we had an IP address, we could use that to

16  then do a search on the open Internet, and it will tell us who

17  the Internet service provider is.  And from there we could

18  subpoena that company and do some other type of legal process

19  or request who is the person that is either renting or leasing

20  that IP address for that given moment in time.

21  Q.  When you say "Internet service provider," what does that

22  mean?

23  A.  Internet service provider is a company that basically

24  assigns out and owns IP addresses that provides you your

25  Internet service that comes to your house, something like Time

f1ddulb6                          Der-Yeghiayan – direct

1    Warner or Comcast.

2    Q.  So let's say I'm a Time Warner customer and I use my

3    Internet connection to do something illegal on the Internet and

4    you as a law enforcement agent find out what I did and the IP

5    address associated with it.  So just where would you go from

6    there?

7    A.  So if you are a Time Warner customer and you –– and I guess

8    if we are able to get your IP address from another website or

9    from someone else that provided it to us or through

10   investigation, I would do a search for that IP address on the

11   open Internet.  There are several websites that you can use to

12   try to find out who the Internet search provider is.

13   Q.  It will come back to Time Warner?

14   A.  It would come back to Time Warner.  Once I found out it was

15   Time Warner, I would then issue a subpoena likely to Time

16   Warner, and I would ask them for the subscriber information for

17   the person that would own that particular IP address on that

18   given date and time.

19   Q.  All right.  And so if I instead use Tor to do the same

20   thing, would the same technique work?

21   A.  No, it would not.

22   Q.  And why is that?

23   A.  Because that IP address that Tor protects you with is not

24   your IP address; it belongs to one of the relays or the parts

25   of the network.  It is not you.

f1ddulb6                        Der-Yeghiayan - direct

1   Q.   How about a computer that hosts a website, are you familiar

2   with the term "server"?

3   A.   Yes, I am.

4   Q.   What does a server mean in the context of the Internet?

5   A.   Server is just basically another word for a computer that

6   usually hosts a website or can run a website.

7   Q.   And do you have any experience tracking down the location

8   of a server based on its IP address?

9   A.   Yes, I do.

10  Q.   So if a law enforcement officer -- as a law enforcement

11  officer, you are trying to track down the location of a server

12  that hosts a website on the ordinary Internet, how would you go

13  about that?

14  A.   Generally, not too different than how we would search for

15  someone that had an IP address in a similar way.  You could do

16  open searches on the Internet, again, through like websites

17  like who.is or the main tools that will tell you what an IP

18  address is for a particular website, and it would be the same

19  steps basically from there.  We would find out who the Internet

20  service provider it.  The Internet search provider will then

21  tell us who the subscriber is.  Sometimes it might come back to

22  a hosting company, which is generally used to host websites, or

23  sometimes it can be the subscriber themselves that are

24  operating that website.

25  Q.   You mentioned the who.is website.  Would you just explain

1    what kind of website that is?

2    A.  It is a website that you could search its domain names like

3    the www.nfl or Google.com, things like that.

4    Q.  Do you see Government Exhibit 106A, I believe it is, in

5    your binder?

6    A.  All right.

7    Q.  Do you recognize what these are, these pages are?

8    A.  Yes, I do.

9    Q.  What are they from?

10   A.  It's a screenshot of the website "who.is."

11   Q.  All right.  Would it be helpful in explaining these

12   concepts to show this as an example of the who.is website, what

13   it does?

14   A.  Yes, it would be.

15          MR. TURNER:  Your Honor, we would offer this as a

16   demonstrative just to show how this website works.

17          THE COURT:  This is Government Exhibit 106B?

18          MR. TURNER:  I believe it is 106A.

19   Q.  Is that it?

20   A.  A.

21          THE COURT:  All right.  Mr. Dratel.

22          MR. DRATEL:  I'm sorry, we were just -- the same

23   objections, your Honor, that we had before.

24          THE COURT:  All right.  I will assume it is the same

25   as the prior objection.

f1ddulb6                              Der-Yeghiayan - direct

```
 1              MR. DRATEL:  Yes.
 2              THE COURT:  My exhibit list I think doesn't have this
 3     from the prior.  We will deal with it at the break.
 4              Government 106A is received.
 5              (Government's Exhibit 106A received in evidence)
 6              MR. TURNER:  Could you publish it, Mr. Evert.  Could
 7     you zoom in up at the top.  Keep going.  There you go.  Thank
 8     you.
 9              Actually, you are going to have to zoom in some more
10     under the sticker, please.  There you go.  Yes, that is good.
11     BY MR. TURNER:
12     Q.  OK.  So, just briefly, what does this document show?
13     A.  This shows the -- it is the who.is website.
14     Q.  And what is it a search for in the who.is website?
15     A.  This is a page on the who.is website of a search result.
16     If you were able -- if you were to search in the box up above
17     that says "search domain name or IP address" and enter in a
18     domain, in this instance we looked up NFL.com, it will tell you
19     the who.is information for that particular website, including
20     IP address.
21     Q.  OK.  Where is the IP address located here?
22     A.  It's down at the bottom in the blue colored numbers.
23     Q.  All right.  And have you tried doing the same thing for a
24     dot-onion address?
25     A.  Yes.
```

```
 1   Q.  Could you turn to Government Exhibit 106B.  What is this
 2   document?
 3   A.  This is who.is as well as trying to search a dot-onion
 4   address.
 5            MR. TURNER:  Your Honor, again, we just offer this as
 6   a demonstrative to show the jury how this website works.
 7            THE COURT:  All right.  Government Exhibit 106B is
 8   received as such.
 9            (Government's Exhibit 106B received in evidence)
10            MR. TURNER:  Publish that, Mr. Evert.  Zoom in,
11   please.
12   Q.  OK.  So what does this show?
13   A.  This would be what would generally show up if you tried to
14   query or search for a dot-onion address.  In this instance,
15   that is the same address that I had in my video for the
16   dot-onion address that we visited on there.
17   Q.  OK.  So --
18            THE COURT:  Mr. Turner, just for your planning
19   purposes, there will be a couple of housekeeping matters that
20   we will have to take up.  So why don't you end in just a few
21   minutes.
22            MR. TURNER:  This is a good place to stop, actually,
23   your Honor.  I was going to shift to another topic.
24            THE COURT:  All right.  Ladies and gentlemen, we are
25   going to break for today.  I want to give you a couple of
```

f1ddulb6                    Der-Yeghiayan – direct

1    instructions.  Joe will give you instructions about how to

2    gather up your stuff and get out and where you should leave

3    your notebooks and things like that.

4           I want to remind you not to talk to anybody about this

5    case, including each other, anybody at all.  Please don't try

6    to become experts on the different parts of the Internet that

7    you may have heard about.  Don't do any research or get on and

8    Google things or try to downloads the Tor browser.  Again, it

9    is important that all you do is listen to the evidence in this

10   courtroom, and that's the evidence that will be used by you to

11   decide the factual issues in this case.

12          Again, don't email anybody about this case or update

13   your profile in Facebook.

14          We're going to start at 9:30 each day.  So it is

15   important that if you can get here by about 9:15, get yourself

16   in place and all of that, that would be very helpful.  Again,

17   you can bring coffee in or tea, or whatever, water, or whatever

18   you would like so that when we start at 9:30 we are ready to

19   walk out and get going.  We can't start until each and every

20   one of you, all 16 of you, are here.  So just be aware of that

21   and try to be on time.  It very important.  Otherwise, this

22   whole room is waiting for you.

23          All right.  Now, tomorrow when you come in, I don't

24   know -- we've got a bunch of different cases going on right now

25   in the courthouse.  If there is anybody outside who has got any

f1ddulb6                        Der-Yeghiayan - direct

1   of those pamphlets or posters or anything like that, I instruct

2   you that you are just to put your head down and keep walking.

3   Don't read.  Don't look.  Don't commune or confer with anybody

4   about anything outside of this building that might have to do

5   with the case or the jury process or anything else.  OK?

6           If you find that you have been approached by somebody

7   or inadvertently you have seen something, let Joe know and then

8   we will take it up.  But I ask you, please, to try to avoid any

9   media about this case in terms of newspapers or anything else

10  as well as whatever may be going on outside.  All right?

11          Thank you, ladies and gentlemen.  We'll see you

12  tomorrow morning.

13          THE CLERK:  All rise as the jury leaves.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F1DDULB6

1                    (Jury not present)

2                    THE COURT:  All right.  Sir, you can step down.  We

3     are going to continue tomorrow morning at 9:30.  So I will have

4     you back on the stand at 9:30.

5                    THE WITNESS:  Thank you, your Honor.

6                    THE COURT:  Go ahead and step out.

7                    THE WITNESS:  Thank you.

8                    (Witness not present)

9                    THE COURT:  Ladies and gentlemen, let's all be seated

10    and we'll take up a few matters now.

11                   First, and just in terms of the logistics, so I have

12    two exhibit lists, the one that was handed to me this morning,

13    that is I think the updated government exhibit list and then I

14    have the one that has all of the objections on it.  To the

15    extent that there are documents that are on the new list that

16    were not on the old list, I don't have any indication as to

17    objection.  That was the nature of why I said I assume it is

18    the prior objection for 106B.  And so I am assuming that

19    Mr. Dratel has had an opportunity to see the documents that are

20    not on my prior list.

21                   MR. TURNER:  That is correct, your Honor.

22                   THE COURT:  All right.  So, Mr. Dratel, we'll take it

23    step-by-step, but if they are just going to be the same

24    documents of a type, then your other objections will be, I

25    think, obvious.

F1DDULB6

1          MR. DRATEL:  OK.

2          THE COURT:  And my rulings will be similarly, and the

3   basis therefor will similarly be obvious.

4          MR. DRATEL:  Right.  Some of them we received over the

5   last couple of days so I'm not even sure if they are on the

6   government's list.  So sometimes it is hard to -- at least the

7   one that we have, but it is hard to make the comparison the

8   same way that the Court is doing.  I am trying to do it in a

9   way that covers that.

10         THE COURT:  All right.  So we'll just take it

11  step-by-step.

12         It's not my practice to have standing objections

13  throughout the entirety of a case, particularly when virtually

14  all the documents were objected to.  But we'll take it, again,

15  step-by-step.  So today we had a standing objection that stood

16  for all of the documents this afternoon.  It may be,

17  Mr. Dratel, that that makes sense for tomorrow.

18         Why don't you go through a couple and then do

19  something similar.  If you are finding it is the same, I don't

20  mind doing that.  If it is going to be repetitive for you, I

21  don't think it is necessary for you to seem to be objecting all

22  the time if you don't want to be, and I understand that.

23         MR. DRATEL:  Yes.  And I'm not sure whether the

24  Court -- I will check with counsel as to whether the Court

25  included objections in your instructions to the jury about not

F1DDULB6

1    to take any -- you know, I know the Court said nothing you say

2    is evidence and nothing you say expresses an opinion.  I'm not

3    sure you mentioned objections specifically.  But, obviously, I

4    am conscious of that issue --

5         THE COURT:  Yes.  I am happy if you would like me to

6    give an instruction to the jury that, ladies and gentlemen, you

7    should not draw any inference of any kind from the objections

8    that counsel may make on either side.  It is their

9    responsibility and it is expected.  And if you want me to do

10   something like that, I am happy to do it.  Why don't you let me

11   know in the morning.

12        MR. DRATEL:  I think so, yes.  We will discuss it.

13   Thank you, your Honor.

14        THE COURT:  Now, that is on the objections.

15        Was there anything you folks wanted to raise?  I've

16   got one more matter.

17        MR. TURNER:  No, your Honor.

18        THE COURT:  One I want to take up at the sidebar but

19   one I want to do here.

20        All right.  Outside there are still some folks.

21   That's what I was checking on before.  Now, it's, frankly,

22   going to -- what we'll have to do is -- and I think that the

23   defense has not wanted this and so I am not suggesting the

24   defense has any control over this.  But to the extent that

25   there are still people outside the courthouse who are

F1DDULB6

1   approaching jurors and approaching people who they perceive to

2   be jurors, it creates obviously issues for us and does lead us

3   to the need, potentially, very potentially, for an anonymous

4   jury.  I am happy to make that decision tomorrow, to let it go

5   into the morning and see whether or not we have any issues

6   tomorrow morning.  But if we do, then we will have to go with

7   an anonymous jury and have the jurors also have -- be brought

8   out to a different place and brought in specially.

9           I prefer for the defendant not to do that.  I know,

10   Mr. Dratel, you have objected and not wanted to have an

11   anonymous jury.  But if individuals are continuing, I don't

12   really know if we've got much alternative.

13           Do you have any views?

14           MR. DRATEL:  Yes.  I will put it on the record so that

15   maybe the press will report it, that the people think that they

16   are helping the defense by being out there doing this.  They

17   are not.

18           THE COURT:  Correct.

19           MR. DRATEL:  When it gets to that stage that the Court

20   has to act, it hurts us.  Hopefully, that will be reported and

21   that will reach the people.

22           THE COURT:  The Court has held off.  We will try to

23   take it step-by-step, but at this point the defendant would not

24   like to go this way but, really, it leaves me no alternative.

25           MR. DRATEL:  Obviously, let's see how it plays out

F1DDULB6

1    tomorrow, but I am sort of stating that on the record so that,

2    hopefully, the people are out of my control and out of

3    Mr. Ulbricht's control and will desist on their own.

4            THE COURT:  We will see how things go tomorrow morning

5    and then we'll make a decision, but we won't let it go any

6    longer than that because it's a classic reason to allow for

7    additional procedures.

8            Now, those are the matters that I had apart from one

9    additional item I wanted to take up over at the sidebar.

10           Are there things that you folks would like to raise

11   right now?

12           MR. TURNER:  No, your Honor.  Thank you.

13           MR. DRATEL:  No, your Honor.

14           THE COURT:  All right.  So we will start tomorrow

15   morning at 9 o'clock, take up any additional housekeeping

16   matters that may come in overnight.  If there is anything

17   tomorrow morning that you folks want to alert me to in terms of

18   what might be coming up that I should be aware of, surprises,

19   etc., you will let me know tomorrow morning at 9.  If we don't

20   need to take up all the time between 9 and 9:30, so be it, we

21   will take a break and get some coffee.

22           Can I have counsel at sidebar, please?

23           (Pages 118 through 119 sealed by order of the Court)

24

25

F1DDULB6

1          (Adjourned to January 14, 2015 at 9:00 a.m.)

2                              *  *  *

3                        INDEX OF EXAMINATION

4     Examination of:                        Page

5     JARED DER-YEGHIAYAN

6     Direct By Mr. Serrin . . . . . . . . . . . . . .71

7                       GOVERNMENT EXHIBITS

8     Exhibit No.                          Received

9      100A    . . . . . . . . . . . . . . . . . . .80

10     100C    . . . . . . . . . . . . . . . . . . .83

11     104   . . . . . . . . . . . . . . . . . . . .85

12     102D    . . . . . . . . . . . . . . . . . . .90

13     102B    . . . . . . . . . . . . . . . . . . .92

14     102C    . . . . . . . . . . . . . . . . . . .94

15     107   . . . . . . . . . . . . . . . . . . . 101

16     106A    . . . . . . . . . . . . . . . . . . 109

17     106B    . . . . . . . . . . . . . . . . . . 110

18

19

20

21

22

23

24

25