F1fdulb1                          Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                        14 Cr. 68 (KBF)

ROSS WILLIAM ULBRICHT,

              Defendant.

------------------------------x

                                        New York, N.Y.
                                        January 15, 2015
                                        9:19 a.m.

Before:

                    HON. KATHERINE B. FORREST,

                                        District Judge

                          APPEARANCES

PREET BHARARA,
     United States Attorney for the
     Southern District of New York
BY:  SERRIN A. TURNER
     TIMOTHY HOWARD
          Assistant United States Attorneys

JOSHUA LEWIS DRATEL
LINDSAY LEWIS
JOSHUA HOROWITZ
     Attorneys for Defendant

          – also present –

Special Agent Vincent D'Agostino
Molly Rosen, Government Paralegal
Nicholas Evert, Government Paralegal
Sharon Kim, Government Intern

F1fdulb1                          Trial

1           (Trial resumed; jury not present)

2           THE COURT:  Please be seated, everyone.

3           THE CLERK:  Continuation of the matter now on trial,

4    the United States of America versus Ross William Ulbricht, 14

5    Cr. 68.

6           Counsel, please state your names for the record.

7           MR. TURNER:  Good morning, your Honor.  This is Serrin

8    Turner and Timothy Howard for the government.  With us at

9    counsel table presently are Agent Vincent D'Agostino from the

10   FBI, Molly Rosen, a paralegal from our office, and Sharon Kim,

11   a legal intern from our office.  Nicholas Evert will be here

12   shortly, a paralegal from our office.

13          THE COURT:  All right.  Good morning, all of you.

14          MR. DRATEL:  Good morning, your Honor.  Joshua Dratel

15   for Ross Ulbricht, who is standing beside me, Lindsay Lewis

16   from my office, and also counsel Joshua Horowitz.

17          THE COURT:  Good morning to all of you.

18          OK.  I've got two matters to raise.  One is I wanted

19   to refer specifically to some additional support for the

20   Court's ruling yesterday relating to the co-conspirator

21   exception for the hearsay objections and to refer in particular

22   to the *Bourjaily* case, which you are all very familiar with,

23   I'm sure.  It is a Supreme Court case.  B-o-u-r-j-a-i-l-y,

24   which requires the Court to make a finding that the various

25   elements for the co-conspirator exception are made by a

F1fdulb1                          Trial

1    preponderance, which is what I believe I said.

2              I also had mentioned that there were some instances

3    where the evidentiary rules were different.  Let me just be

4    clear that that is not the case with respect to the

5    co-conspirator rule.  It is a preponderance standard.  Where it

6    might be different, and this is a question that as yet actually

7    unresolved, is with things, for instance, having to do with

8    relevance and some probative evidence, and whether or not that

9    is a lower standard than preponderance is something which is an

10   open question but need not trouble us here.  I wanted to make

11   it clear that my findings as to the co-conspirator exception

12   are by a preponderance of the evidence.

13             And in terms of the screenshots in particular of the

14   narcotics, I wanted to indicate that -- as I had said

15   yesterday, and as the *Bourjaily* case makes clear, "The

16   inquiry" -- I am reading from the *Bourjaily* case, "The inquiry

17   made by a court concerned with these matters is not whether the

18   proponent of the evidence wins or loses his case on the merits

19   but whether the evidentiary rules have been satisfied.  Thus,

20   the evidentiary standard is unrelated to the burden of proof on

21   the substantive issues in a criminal case," At 2278.

22             With that said, I do find by a preponderance that as

23   to the screenshots the vendors were in a conspiracy with Dread

24   Pirate Roberts.  It remains subject to connection to the extent

25   that the government is asserting that Dread Pirate Roberts at

F1fdulb1                    Trial

1   that time was Mr. Ulbricht.  The Court does believe at this

2   point in time that, subject to that connection, there is

3   sufficient proof of a conspiracy with a common criminal

4   objective, which is the distribution of illegal narcotics.

5   There is demonstration of that conspiracy through, for

6   instance, the vendor contracts, which were put in yesterday.

7   There is also evidence of personal involvement by Dread Pirate

8   Roberts in the form of information put in yesterday of the

9   document -- one of the two documents relating to commissions

10  refers to commissions being taken in instances where he has and

11  the word "involved" is used specifically and "escrow," and that

12  creates a level of involvement as well as the finalize buttons

13  and the arbitration process, all of which there was evidence as

14  to yesterday from Mr. Der-Yeghiayan.

15          In terms of the in furtherance requirement, the Court

16  does find that putting the screenshot of the illegal narcotics

17  up on the Web is in furtherance of the distribution of illegal

18  narcotics, and the reliability of the content being what it

19  purports to be was in part supported by the testimony yesterday

20  that there had been buys from the undercover agent,

21  Mr. Der-Yeghiayan, that indicated that the narcotics received

22  in response to orders from the website tested in all but one

23  instance positive for the narcotics they purported to be.

24  Therefore, based upon a preponderance of the evidence, I just

25  wanted to indicate that the co-conspirator exception did apply

F1fdulb1                         Trial

1    in the manner that I suggested and with the evidentiary basis

2    that I suggested.

3           The second issue is that I understand that a juror was

4    approached yesterday on the subway platform by an individual

5    who represented himself to be a New York Post reporter.  It was

6    an individual with a red beard.  And the juror indicated that

7    she did not speak to him and that she walked away.

8           It is my intention -- and I should say that that was

9    reported to my deputy.  I have not had a conversation with the

10   juror.  My intention this morning is at the appropriate time to

11   make sure that I reiterate carefully and slowly the general

12   instructions, indicate that if anybody approaches them

13   purporting to be a reporter or anybody else, that they should

14   walk away and do just that.

15          Do you folks believe that anything further need be

16   done in this instance at this time?  I mean, there are pros and

17   cons to having people brought out here and individually

18   questioned, but I will take applications.

19          It was Juror No. 2, by the way.

20          MR. TURNER:  May we have a moment to confer?

21          THE COURT:  Sure.  Yes.

22          (Pause)

23          MR. TURNER:  Your Honor.

24          THE COURT:  Yes.

25          MR. TURNER:  The parties both agree, a limited voir

1   dire would be I think a good idea just to get clear on what was

2   said, if anything was said that might bias the juror in one

3   direction or another.

4           MR. DRATEL:  And to make sure that the juror is still

5   obviously in the same position she was before -- in other

6   words, mentally before the encounter.

7           THE COURT:  Yes.  All right.  That's fine.  I think

8   that we can do that in a low-key way.  What I would propose to

9   do is just to have her come on out and sit in her spot and ask

10  her a couple of questions and then have her head back in.

11  Sound all right to you folks?

12          MR. DRATEL:  That is all we had in mind.

13          MR. TURNER:  Yes, your Honor.

14          THE COURT:  Let's go ahead.  We know she is here.  I

15  know you folks may have some things, but let's get her out here

16  to do that.

17          MR. DRATEL:  May I alert the Court to a logistical

18  issue, which is Mr. Ulbricht can't see the witness.  We may

19  move the monitor around so we can try to configure it in a way

20  to do that.

21          THE COURT:  Oh, absolutely.

22          MR. DRATEL:  Also, if we move this back a little bit,

23  would that be better, too, just because I am blocked off.

24          THE COURT:  It doesn't bother me.  What I want to do

25  for the podium, my main concern is that the jurors can see what

F1fdulb1                    Trial

```
 1   is going on.  You are certainly welcome to move that back a
 2   little bit so long as it doesn't create so much distance that
 3   there is another issue, but I don't think you are talking about
 4   more than a few inches.
 5           In terms of the monitor, do whatever you need to do.
 6   I need to see Mr. Ulbricht's face as well, but I can because he
 7   is sufficiently tall that I can actually see him over the
 8   monitor.  Just move it a little over.
 9           MR. DRATEL:  This way is fine with me.
10           THE COURT:  Right.  Also, there is no magic to that
11   particular monitor.  If you've got a smaller monitor with a
12   similar connection, that would work.
13           MR. DRATEL:  I think this is all right.  I don't think
14   I will have a problem.  I can bring it up on my own screen.
15           THE COURT:  Fine.  I know we have at least one other
16   matter from somebody who wanted to raise it.  Does anybody want
17   to raise a matter other than this?
18           MR. TURNER:  I just had two brief matters, your Honor.
19           THE COURT:  OK.
20           MR. TURNER:  One, I just want to make sure --
21           THE COURT:  Can we just do the juror thing first?
22           MR. TURNER:  Absolutely.
23           THE COURT:  Terrific.  I just want to make sure I know
24   what the lay of the land is.  We have two from the government.
25   Anything from you, Mr. Dratel?
```

F1fdulb1                         Trial

1            MR. DRATEL:  No, your Honor.

2            THE COURT:  All right.  So let's just get Juror No. 2

3       out here.

4            (Juror No. 2 was present)

5            THE CLERK:  All rise.

6            THE COURT:  Let's all be seated.

7            Juror No. 2, thank you for coming out here.  I know it

8       is a little intimidating to come out all by yourself with this

9       whole big room full of people.  I appreciate it.

10           JUROR NO. 2:  That is fine.

11           THE COURT:  I just wanted to find out from you what

12      happened yesterday.  I understand somebody may have approached

13      you.  Why don't you just tell us what happened.

14           JUROR NO. 2:  OK.  I was at the Centre Street station

15      and I was walking down the stairs to the uptown Bronx side,

16      where the 5 and the 4 and the 6 train are.  I walked down the

17      stairs and was walking along the platform, and a reporter kind

18      of approached me with a pad and pencil, said, "I'm from the New

19      York Post.  Can I ask you some questions?"  And I just went

20      like this with my hand (indicating) and kept walking, and

21      that's all that happened.

22           THE COURT:  OK.  All right.  And what you did was

23      perfectly appropriate and absolutely right and consistent with

24      the Court's instructions.  So I thank you for that.

25           And let me just ask you, did the fact that you were

F1fdulb1                     Trial

1   approached in any way make you feel like you are going to be

2   unable to be fair and impartial in this case?

3              JUROR NO. 2:  No, not at all.

4              MR. DRATEL:  One other question, your Honor, which

5   is --

6              THE COURT:  I will ask it.

7              MR. DRATEL:  Yes.  As to whether there has been any

8   conversation with other jurors about that.

9              THE COURT:  I think that is very fair.

10             One thing we want to make sure of is that a

11  conversation even about an incident like that doesn't end up

12  leading to conversations with other jurors, and if it has just

13  let me know and then we'll figure out what to do.

14             JUROR NO. 2:  When I mentioned it to Joe, some of the

15  other jurors heard me tell Joe that the encounter happened

16  yesterday.

17             THE COURT:  OK.  So did you have any other

18  conversations with them about it?

19             JUROR NO. 2:  No.

20             THE COURT:  Did anybody say to you anything else or

21  ask you any questions about it?

22             JUROR NO. 2:  No.  I mean they heard me say it.  Joe

23  asked me, you know, what happened.  And what I just told you.

24             THE COURT:  Yes.

25             JUROR NO. 2:  You know, she made a comment, "Well,

F1fdulb1                          Trial

1    that was rude," and that was it.

2             THE COURT:  OK.  All right.  So I'll address that, you

3    know, by making sure that I have communicated all the

4    instructions properly.

5             Will you be sure not to --

6             JUROR NO. 2:  OK.

7             THE COURT:  -- lead to any other -- have that approach

8    lead to any other conversation.  Just tell the other jurors

9    that you can't talk about it.

10            JUROR NO. 2:  Mm-hmm.

11            THE COURT:  I am going to mention to the jurors again

12   that you folks shouldn't talk about anything to do with the

13   case.  It is really the broad instruction of nobody should talk

14   about anything having to do with this case, and that covers all

15   of the myriad ways in which the case could come up.

16            JUROR NO. 2:  OK.

17            THE COURT:  Does that make sense?

18            JUROR NO. 2:  It does.  Thank you.

19            THE COURT:  All right.  Terrific.

20            So go back into the room, and even if they ask you

21   what happened just now, just say --

22            JUROR NO. 2:  I can't talk about it.

23            THE COURT:  Right.  You can't talk about it.  All

24   right?

25            JUROR NO. 2:  Thank you.

1          THE COURT:  Terrific.  Thanks very much.

2          THE CLERK:  All rise.

3          (Juror not present)

4          THE COURT:  All right.  Let's all be seated.

5          OK.  Any comments on what just occurred?  My view is

6    that what I am simply going to do now is before the next break,

7    but not right away, but before the jury goes back into the

8    room, to give them their instructions again slowly and

9    carefully.  I can also, if people would like -- well, what

10   would you like?  Anything else other that that?

11         MR. DRATEL:  Just to confirm that it hasn't had an

12   impact on anybody, to ask them whether or not anybody --

13         THE COURT:  The question is do you want me to say to

14   the entire jury panel there was a juror who was approached.

15   The juror handled it perfectly appropriately by telling -- by

16   just walking away and not saying anything.  If anybody else is

17   approached, please let the Court know.  And was anybody else

18   approached?  Do you want me to do that?

19         MR. DRATEL:  It is a question of whether it has had an

20   impact on anybody's ability to the judge the case impartially,

21   that is all.

22         THE COURT:  Do you want me to ask the entire panel?

23         MR. DRATEL:  Yes, because think they all know about it

24   by now.

25         THE COURT:  Mr. Turner.

1              MR. TURNER:  It doesn't strike me as particularly

2     necessary, your Honor, but I don't object to it.  I think that

3     probably the most important thing is to stress to the other

4     jurors that if that happens, that they should do exactly what

5     this juror did, or, you know, just make clear that they should

6     not talk to them, perhaps, and try to avoid hearing any

7     comments about the case that might influence their decision

8     making.

9              THE COURT:  All right.  So the press who is here in

10    the room, you see what happens -- if this did occur, what

11    happens when this kind of thing occurs because of the

12    possibility of juror influence.

13             So here's what I am going to do.  When the group comes

14    out here, I am going to then state, in order to put all of

15    these pieces together that you folks suggested:  A juror was

16    approached.  She did exactly the right thing, which is she

17    walked away.  And I want to make sure that you all understand

18    that if the press, or anybody else even purporting to be the

19    from the press or anybody approaches you about this case, that

20    you do the same thing.  Just walk away.  Do not have a

21    conversation.  Don't talk to each other about any approaches

22    that may be made to you about this case.  Do let us know.  And

23    has anybody been approached or know about that approach other

24    than what I said and believe that at this point they cannot be

25    fair and impartial based on that?

F1fdulb1                    Trial

1          Is that all right, Mr. Dratel?

2          MR. DRATEL:  Yes.  Thank you, your Honor.

3          MR. TURNER:  Yes, your Honor.

4          THE COURT:  Both parties are in agreement that that

5   would be an appropriate way to proceed.

6          OK.  Now, Mr. Turner, you had other things.

7          MR. TURNER:  Just briefly.  I wanted to make sure that

8   our position on the hearsay issue has been adequately

9   articulated.  I'm not sure it was yesterday.

10          In terms of the forum posts and the communications of

11   DPR, our position would be that to the extent he says anything

12   like, you know, you've got to follow my rules or else, those

13   statements don't have truth value; it is simply indicative of

14   his role.  To the extent that he says things like I am leading

15   an international narcotics enterprise, that would be a party

16   admission.  That would not qualify as hearsay under 801.  That

17   would be our position.

18          And on the offers of drugs on the website, you know,

19   I'm not sure those are being offered for the truth.  If you

20   have simply pictures posted like that on a website with a price

21   tag, there is no statement there.  It is just making it clear

22   that somebody is making an offer of drugs.  This is a

23   marketplace where people are offering to sell things and buying

24   things.

25          THE COURT:  The issue comes in -- just to be very

1    clear on the first point, I think that is exactly what I was

2    differentiating between yesterday, the portions which are not

3    hearsay versus the portions which could be hearsay, and we, I

4    think, now dealt with them thoroughly.

5             In terms of the posts, the website vendor -- I don't

6    mean the chat posts, I mean the screenshots.

7             MR. TURNER:  The listings.

8             THE COURT:  When you put up one that says tell us some

9    of the things that were available on that website and the

10   witness says "heroin," all right, not "this is a photograph

11   which has the words on it indicating heroin," then it is being

12   offered for the truth, I think.  I think that is a fair

13   argument.  That is one that the defendant raised pretrial as

14   part of the hearsay objections.

15            Nevertheless, my ruling on the co-conspirator

16   exception, sort of the reason why I am belaboring it is for

17   that very reason, to ensure that the record is clear as to the

18   basis for my ruling.  But I do think that there is some amount

19   of truth which is being sought after and potentially sought to

20   come in for based upon the content.  It is not just a picture

21   of a brown block but the word "heroin" around "heroin" that

22   appears underneath it.

23            MR. TURNER:  Understood.  I just wanted to articulate

24   our position and make sure it is on the record, your Honor.

25            THE COURT:  Do you disagree with me?

F1fdulb1                          Trial

1           MR. TURNER:  I think there are arguments in the

2     alternative.  I think your Honor is certainly correct that if

3     it is being offered for the truth, it would certainly be

4     statements of a co-conspirator.  Under the government's theory,

5     we made clear that we think that all the vendors are conspiring

6     with the defendant.

7           THE COURT:  Now, I just want to pause for one second.

8           If you don't intend something to be offered for the

9     truth, you will need to approach the questions in a manner that

10    makes that clear.  In other words, I see that this indicates,

11    you know, whatever, but, you know, some set of questions other

12    than tell me the type of goods that were sold.

13          MR. TURNER:  Understood.  There was one other matter

14    that we would request to address at the sidebar, your Honor.

15          THE COURT:  All right.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

F1fdulb1                    Trial

1           (At the sidebar)

2           MR. TURNER:  I really don't think this will be a

3     problem but I just wanted to give the Court a heads up.  The

4     witness actually is recovering from a serious respiratory

5     illness and is on heavy antibiotics, and he reportedly was

6     feeling very ill after yesterday's testimony.  He is a tough

7     guy and I think he will be fine today, but there may be a point

8     when we will just request an additional break, or something

9     like that, if he has indicated that he is not feeling well.

10    Again, I don't think that will happen, but I didn't want it to

11    be a total surprise if it did.

12          THE COURT:  Is there any way in which the taking of

13    the antibiotics makes his mind unclear?

14          MR. TURNER:  No.  I think it is queasiness, nausea.

15    So I don't think it is lack of memory or lack of reasoning

16    ability.

17          MR. DRATEL:  I appreciate that because, obviously, I

18    would like him to be fully cognizant on cross as well.  I don't

19    want him to say he doesn't remember or things like that because

20    he is not feeling well.  I guess the purpose of my cross is to

21    make him queazy.  But you understand what I am saying.

22          THE COURT:  I do.

23          MR. DRATEL:  So if he does need time, I am OK with

24    that because I do want him to be fully attentive.

25          THE COURT:  Let's take this, as I like to say, one

F1fdulb1                          Trial

1    step at a time.  If there is a point when he is feeling unwell,

2    then we can take a break and take another witness in between.

3    It is very important that he be able to proceed with his

4    faculties about him, as he has proceeded up to this point.  In

5    other words, we're not asking him to perform differently than

6    he has performed up to this point, but we don't want Mr. Dratel

7    to end up with a guy who suddenly can't testify because he is

8    sick only for cross.

9              MR. TURNER:  No.  And that is why I am saying he has

10   been fine so far and I don't think it will be a problem.  I

11   think all I want is to let him know that we let the Court know

12   so that if he does feel like he is sick, he can let the Court

13   know and that won't be a problem.  Honestly, I don't think

14   there is going to be a problem.

15             THE COURT:  OK.  One step at a time.

16             MR. DRATEL:  OK.  Great.

17             THE COURT:  Thank you.

18             (Continued on next page)

19

20

21

22

23

24

25

F1fdulb1                          Trial

1              (In open court)

2              THE COURT:  Is there any reason we can't just go ahead

3    and bring the jury out and start right now?  Anybody need a

4    break before we start?

5              MR. TURNER:  No, your Honor.

6              MR. DRATEL:  No, your Honor.

7              THE COURT:  OK.  Let's go ahead and bring the witness

8    in and we'll get the jury out.

9              (Pause)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1fdulb1                     Trial

1          THE CLERK:  All rise as the jury enters.

2          (Jury present)

3          THE COURT:  All right.  Ladies and gentlemen, let's

4     all be seated.  Thank you.

5          I see that you folks -- it looks like the coffee

6     service has arrived this morning.  Are there tops for the

7     coffee service?  Terrific.  OK.

8          Now, remember, confess if you spill, and I will, too,

9     if I spill up here.

10          Ladies and gentlemen, one thing I want to mention

11     before we start this morning is that one of the jurors was

12     approached yesterday on the subway platform by somebody who

13     identified himself as a member of the press, and she did

14     exactly the right thing, which is just walked away, didn't

15     engage at all, and that's exactly the right thing.

16          So if that happens to you, I instruct you to do the

17     same thing.  Not to talk to anybody about this case no matter

18     who they are.  As I've said, even each other.  And so it's

19     very, very important.

20          Now, if it does happen to you and somebody approaches

21     you -- somebody approaches you about this case, be it from the

22     press or somebody else, don't talk to each other about it.

23     Mention it to Joe, and then we'll take it from there.  All

24     right?

25          So in light of the fact that it has happened once and

F1fdulb1                         Trial

```
 1   I have just mentioned this to you folks, is there anybody who
 2   believes that the fact that somebody has been approached and
 3   that a member of the press, or somebody identifying themselves
 4   as from the press, has approached somebody, does that make
 5   anybody feel that they can't be fair and impartial in this
 6   case?
 7              (The jury indicated negatively)
 8              THE COURT:  All right.  Thank you.
 9              We'll go ahead and we'll continue.  I want to remind
10   the witness, sir, Mr. Der-Yeghiayan, you are still under oath
11   from your first day and from yesterday.
12              All right, sir?
13              THE WITNESS:  Yes.  Thank you.
14    JARED DER-YEGHIAYAN,
15       Resumed, and testified further as follows:
16              THE COURT:  You may proceed, Mr. Turner.
17              MR. TURNER:  Thank you, your Honor.
18   DIRECT EXAMINATION
19   BY MR. TURNER:
20   Q.  Agent Der-Yeghiayan, yesterday we left off talking about
21   the defendant's arrest, and I want to get back to that in a
22   minute, but first I want to go back to a topic that we didn't
23   quite finish earlier yesterday.
24              MR. TURNER:  Mr. Evert, could you pull up Government
25   Exhibit 125B and go to page 2.
```

F1fdulb1                         Der-Yeghiayan - direct

1    Q.  So this was a forum post we looked at yesterday, Dread

2    Pirate Roberts, and it says, "Drumroll, please.  My new name is

3    Dread Pirate Roberts."

4              First of all, I wanted to ask you, are you familiar

5    with the name Dread Pirate Roberts in the context of pop

6    culture?

7    A.  Yes, I am.

8    Q.  How are you familiar with it?  Where does it come from?

9    A.  It came from a movie from I think it is like the '80s.

10   Q.  What is the movie called?

11   A.  The Princess Bride.

12   Q.  And what is the basic legend of the Dread Pirate Roberts in

13   the movie?

14   A.  So in the movie there is -- the main character was the

15   Dread Pirate Roberts, and he met up with one of his loves in

16   his life and he confessed to them that he was not the original

17   Dread Pirate Roberts, that he took over the identity of Dread

18   Pirate Roberts from another guy I think by the name of Ryan and

19   that guy got it from another guy whose name was like

20   Cumberbundt, or something like that, and then he got it from

21   the original Dread Pirate Roberts that was retired like 15

22   years earlier.  And the whole point of it was that the identity

23   was what was important, the name was important, that the name

24   lived on.  So multiple people could basically assume that name,

25   and it is just the -- or the story of Dread Pirate Roberts

1  would be the intimidating factor.

2  Q.  OK.  And we also looked yesterday at this "Begin PGP sign

3  message" and "PGP signature" underneath.  Let's try it again.

4         So what is the benefit of having a PGP sign message

5  and what does that mean?

6  A.  So a PGP sign message, again, is just a way to authenticate

7  or validate who you are online.  So when you first -- when you

8  are talking to someone on the Internet, it is hard to always

9  validate you are always talking to the same person every time

10 you see them day after day.  So one of the ways that we are

11 able to identify ourselves is using this program, this PGP,

12 because it allows you to create a key that is unique to you

13 that you share with other people, and that key, it is a public

14 key, you could use to verify messages from them at a later

15 date, messages they could sign, that they will authenticate so

16 that you will know time and time again that that person has the

17 same key that you are talking to.  It is an unique key as well.

18 Q.  All right.  So did Dread Pirate Roberts post his public key

19 anywhere on the site?

20 A.  Yes, he did.

21 Q.  We looked at this exhibit before, Government Exhibit 133.

22 Could you put that up on the screen.  Please zoom in.

23        And when was this screenshot taken by you again?

24 A.  What exhibit was that again?

25 Q.  That was 133.

1    A.  That was August 19, 2013.

2    Q.  And so you could take this public key and do what with it?

3    A.  This would be something that I could then use to

4    authenticate messages that would be later on signed by Dread

5    Pirate Roberts.

6    Q.  Like the one we just saw on the forum?

7    A.  Yes.

8    Q.  Did this public key change over time of Dread Pirate

9    Roberts, or did it stay the same as long as you investigated

10   the site?

11   A.  From the beginning of my investigation until the time of

12   the arrest, it stayed the same.

13   Q.  Could we take a look at Government Exhibit 133A, please,

14   which did not come in yesterday yet so please don't publish it.

15   A.  OK.

16   Q.  Do you recognize this document?

17   A.  Yes, I do.

18   Q.  How do you recognize it?

19   A.  It was a screenshot that I took of Dread Pirate Roberts'

20   profile on the Silk Road market page on September 19, 2012.

21   Q.  So how does that date -- well, your Honor, we would offer

22   this exhibit into evidence.

23           MR. DRATEL:  Just a hearsay objection, your Honor.

24           THE COURT:  All right.  For the same reasons that

25   we've previously discussed, that objection is overruled.

F1fdulb1                            Der-Yeghiayan - direct

1                   GX-133A is received.

2                   (Government's Exhibit 133A received in evidence)

3                   MR. TURNER:  Put that up, Mr. Evert, and zoom in down

4       here.

5       Q.  So this is from approximately what, a year earlier than the

6       last one?

7       A.  About, yes.

8       Q.  And it is the exact same public key?

9       A.  Yes.

10      Q.  Did you prepare any sort of demonstration for the jury

11      today to help you explain these concepts and help explain how

12      PGP keys work?

13      A.  Yes, I have.

14      Q.  Would it aid your testimony to give that demonstration to

15      the jury?

16      A.  Yes, it would.

17                  MR. TURNER:  May I approach, your Honor?

18                  THE COURT:  You may.

19      Q.  Do you recognize the CD I am handing you right now?

20      A.  Yes, I do.

21      Q.  How do you recognize it?

22      A.  It is a disc that I initialed that contains the video that

23      I prepared.

24      Q.  May I take it back?

25                  MR. TURNER:  I am showing the witness what has been

1    marked as Government Exhibit 133B.  With your Honor's

2    permission, may we play it for the jury?

3              THE COURT:  Yes.  I take it you have shown that to the

4    defendant?

5              MR. TURNER:  Yes.

6              THE COURT:  All right.

7              (Pause)

8    Q.  OK.  So if you could do the same thing with this video that

9    you did with yesterday's video, if you could tell Mr. Evert

10   when to start and stop and walk the jury through what it shows,

11   please.

12   A.  OK.  So what I'm going to demonstrate here in this video is

13   me creating a message and then digitally signing it using the

14   key that I own.  So I will show you how that process is done,

15   how I would sign the message, and then how I could verify that

16   that message is authentic from my key.

17             So the first thing I am going to show you once -- if

18   you would begin, please -- is a program that you would use to

19   store your key.  And in this instance I have already my key in

20   there.  This is one of the keys I used in my Cirrus account.

21   Q.  Agent Jared, could I just interrupt you?

22             Is this a public key that you are talking about right

23   now?

24   A.  This is both a public key and a private key.

25   Q.  And could you explain the difference between private key

1    and public key?

2    A.   Absolutely.  So I not only have my public key, which I

3    could share with other people that could verify me, and then I

4    also have the private key, which is what is unique to me.  I'm

5    the only one that has that, and that's what allows me to create

6    messages from my key.  It basically allows me to sign messages.

7    Q.   And if you don't use your private key to sign your message,

8    can the public key be used to authenticate it came from you?

9    A.   Without the private key, you cannot create a message.  You

10   can't sign it without the private key.

11   Q.   OK.  Go ahead.

12   A.   And so right now it's paused, and, actually, you could stop

13   it.  I'm sorry.

14        What this is is it is the profile of the key, and

15   there is there are a few things to point out.  That there is a

16   name that you enter in when you create the key as well as an

17   email address.  This can be anything you want.  It doesn't have

18   to be anything real.  In this instance the name that I used was

19   "me" with a lot of e's.  And then that is a fake email account,

20   which is just 101010@101010.org.  You don't have to enter

21   anything that is real.  It is just whatever you want to enter

22   in, you can; it is not required to enter in anything that is

23   real.

24        The other thing that I wanted to point out is the

25   create date.  That is automatically added to the key when you

F1fdulb1                          Der-Yeghiayan - direct

1      create it.  It is on there.  You can't modify that or adjust

2      it.  It is part of the key.  So it will document that.  In this

3      case this key was created on October 2, 2013.

4             So when I am going to share my key, everyone can see

5      this information.  So my public key and they have it.  This is

6      what they will see.  They will see the name of me.  They will

7      see the email address that I created, and they will see when I

8      created that account as well.

9             And so if you could go ahead and play, I am going to

10     show you how I would then create a message using my key and how

11     I would sign that message, then, using it.

12            So I'm closing out the program, and I would use simply

13     a text file, in this instance, to then type my message.  So I'm

14     writing -- this is an example of me signing the message using

15     my PGP key -- the message I wrote using my PGP key.  So in

16     order to do this, all I have to do is highlight the message and

17     in this instance right click, and I need to just click things

18     as signed.  And as I click sign -- can you pause it, please --

19     this is then what the result will be.  And it will essentially

20     take my message, which is in the body above here.  This is an

21     example of me signing a message saying I wrote using my PGP

22     key, and it adds this signature at the bottom.

23            And so now I'm going to go through and I am going to

24     find -- if I share this with someone else, they can now verify

25     this came from me and I'll show you how I would do that.

F1fdulb1                         Der-Yeghiayan - direct

1    Q.  They verify it using what?

2    A.  Using, again, a program such as this, a PGP program using

3    my public key that I would have shared with them.

4           In this instance I have my public key so I can verify

5    my own key.

6           If you could play it.

7           First, I just wanted to show you again I have

8    highlighted that that was the original message that I typed and

9    I signed.  Then in order to verify it, I just simply have to

10   right click and verify.  And it is going to tell me -- if you

11   could pause it, please -- that this is a good signature, and it

12   says -- it is a good signature from the person "me" with my

13   email address.  So I was able to automatically recognize the

14   key that I had stored in my program and verify it to that

15   message and tell me it is a good signature.

16          Click play, please.

17          And I'm going to show you what would happen if I was

18   to now alter this message after I signed it.  So this is me

19   typing extra information in there after signing the document.

20   So it is no longer the same document that I signed.

21          Now, I go to verify it again after I altered it -- can

22   you pause it, please -- it is going to tell me that I have a

23   bad signature by that user.  So there is no way after you sign

24   a document to alter it, to then manipulate it in any way.  Once

25   you sign that message, it has to stay exactly that message

1    intact.

2    Q.  Does that include the signature down at the bottom, if any

3    part of that signature changes.

4    A.  That is correct.  Anything on that from basically the top

5    line that begins "PGP sign message" all the way through the

6    very bottom has to remain exactly the same, the same amount of

7    spaces, the same amount of characters.  Everything has to be

8    exact in order for it to authenticate.

9           Can you click play, please.

10          I am just going to demonstrate that again by removing

11   the information that I added originally to it and verifying it

12   again in the original state that it was.  And it's going to

13   come back with a good signature again, that that was the

14   original message.

15          So now I'm going to take -- these are on the

16   right-hand side -- a text file of -- I will let him scroll

17   first.  Can you pause it, please.  On the right-hand side there

18   is a text file of all of DPR's posts from the forum from the

19   beginning of his account in around June 2011 'til about

20   May 2013.  That was all of the posts that I copied out of the

21   forum and into a text file such as this.

22          And on the left-hand side I also have a screenshot

23   that I took from my Cirrus account of posts that were made by

24   Dread Pirate Roberts, and what I am going to do first is show

25   you now if I was a user how I would acquire Dread Pirate

1    Roberts' public key and then how would I verify basically

2    things that he wrote.  So I am going through the steps of

3    essentially taking in his public key that he shares with

4    everybody and then verifying things that he wrote using his

5    signature.

6              So first this is -- if you want to play it, please.

7    This is one post that I copied, again, from Dread Pirate

8    Roberts' profile.  And it came from November 2012 --

9    November 12, 2012, which is up on the top.  And he signed a

10   message that said "The sig checks out for me," but I will do

11   another one just in case.  And then he says -- if you could

12   pause it right now, please.  He says, and right here -- "And

13   here is the public key that I've been using since the site

14   began, normally located on my user page on my main site.

15   Q.  Just to be clear, the user page on my main site, is that

16   the page we saw before with the --

17   A.  It is referring to the Silk Road market page.

18   Q.  That is the page we saw before with the public key?

19   A.  Yes.

20   Q.  OK.

21   A.  And so you could tell that this is his public key down

22   below because it says "begin PGP public key."  So this

23   information from here to here is his public key, again.  That

24   was a screenshot.  I can't copy that text exactly and import it

25   so I have to use that text document to do it.  So what I am

F1fdulb1                        Der-Yeghiayan - direct

 1    going to show you is that the text document on the right is the

 2    same information that is from the screenshot from the left.

 3              If you could play it, please.

 4              So again this is the text document.  I just wanted to

 5    point out that it is the same date.  Now, this was copied from

 6    a user that actually has time set differently on his computer

 7    when I originally copied this stuff.  So it is slightly

 8    different, but it is hours different because of the UTC

 9    variation.  But, again, it is the same message and the same PGP

10    key.

11              So can you pause it, please.  Pause, please.

12              So right now in order to import this key -- that is

13    actually fine.  That is a good place to stop.

14              I would highlight his public key, and what I am going

15    to do is import it.  There is a second option up here above

16    this.  And that's all I have to simply do in order to bring in

17    his public key into my program and for me to verify his

18    signatures at a later date.  So right now I am going to import

19    his key.

20              So click play, please.

21              There is nothing so important about importing it or

22    taking it as more than that this is how I would capture it.

23    And if you could pause it, please.  It tells me right now that

24    the import was successful and that I imported a key that was

25    titled Silk Road with the email address

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1   staff@silkroadmarket.org and the import was OK.  So it let me

2   know that the import was successful, that I was able to capture

3   that public key.

4   Q.  So now it is on your computer permanently?

5   A.  Yes.  Not permanently.  I can delete it, too.

6   Q.  Sure.

7   A.  So if you click play, please.

8           I'm going to show you off that same program where I

9   keep my key.

10          If you could pause it, please.

11          This is now that imported key that's from Silk Road.

12  So his public key is now available, and it lets me know that

13  all I have is his public key with that "pub."  And the one up

14  above says "sec/pub," and that means that I have the private

15  key and the public key for the key up above, which is mine,

16  but.  I only have the public key for Silk Road.  I do not have

17  the private key.

18  Q.  Just to be clear, the public key you are talking about,

19  that is used to verify a signature.  The private key is used to

20  sign the signature, right?

21  A.  Yes.  The private key is used to sign it and the public key

22  is used to verify.

23  Q.  The Silk Road name, did that come from you or was that

24  automatically generated when you downloaded it?

25  A.  That was what was created in the key when it was created by

F1fdulb1                          Der-Yeghiayan - direct

1   the user who created it.

2   Q.  So you didn't create that?

3   A.  I did not.

4   Q.  And the Silk Road -- the staff@silkroadmarket.org, same

5   thing?

6   A.  The same thing.  I am going to open his profile.

7           If you click play.

8   Q.  I just want to make clear.  You mentioned earlier that you

9   used a fictitious email address in creating your key?

10  A.  Yes, I did.

11  Q.  Do you know whether staff@silkroadmarket.org is a real

12  email address?

13  A.  That domain, which is silkroadmarket.org, that website does

14  exist or did exist at the time.  It was a website that was on

15  the open Internet that was used to advertise the Silk Road

16  market on Tor.  It was a redirect for people that would be

17  maybe doing a Google search on the regular Internet.  And

18  Google searching "Silk Road," they would find that website, and

19  that website would give you directions on how to get to the Tor

20  Silk Road website.

21  Q.  OK.  But the email address, staff@silkroadmarket.org, do

22  you know if that was real or not?

23  A.  I'm not sure if it was --

24  Q.  So it could have been fictitious, it could have been real,

25  it doesn't really matter for the program?

1   A.  Right.

2               MR. DRATEL:  Objection.  Leading.

3               THE COURT:  Why don't you rephrase.

4               MR. TURNER:  I will withdraw, your Honor.

5   A.  OK.  So if you click play, please.  I just want to show you

6   when I opened that -- again, if you pause it for a second --

7   the name that is on the account is Silk Road.  The email

8   account that was entered in by the user that created it was

9   staff@silkroadmarket.org, and it was created on April 1, 2011

10  at 4:47 a.m.  And that is information, again, that I can't

11  modify that comes with the key that comes when you share it.

12              Can you click play.

13              So now that we have his public key stored, we can now

14  verify messages that were signed by him.  And so I am going to

15  go through this list on my right.  I am going to scroll down.

16              Now, the bottom is the oldest messages and it starts

17  around June 2011, and it goes chronologically to the top which,

18  would be the newest messages, which would be May 2013.  And

19  what I'm going to do from the bottom is basically try to find

20  one of his first signed messages that I could see, and this is

21  the first signed one.

22              If you could pause it, please.

23              And this is from June 19, 2011.  And it is, again, a

24  signed message, and so I am going to try to verify this now

25  signed message with this key that I just imported.

1              Can you click play, please.

2              So, again, I copied the entire message.  I simply

3     right clicked and then clicked verify.

4              If you could pause it, please.

5              This then shows that I have a good signature from Silk

6     Road at staff@silkroadmarket.org.  So it is verifying that that

7     message that was signed -- and this is what a user would do if

8     they would see this message and maybe they didn't know if they

9     could trust who is posting this on the forum or posting it

10    elsewhere or posting it anywhere on the Internet, how do I know

11    that I can trust this message that came from Dread Pirate

12    Roberts?  Because anyone could just start up an account maybe

13    and try to fake it's him, well, this would be one way to do it

14    because this key is somewhere that somebody would have already,

15    something that they know they could trust him with, something

16    that would be something that is from the past.

17             And so click play, please.

18             I am going to also show that this key stayed the same

19    over time.  And so I'm going to actually scroll up somewhat

20    randomly here and go up to a post that I found from -- this is

21    from January 16, 2012.  And, again, I'm going to try to verify

22    this.  That's all I'm doing, just verifying that the message is

23    a good signature.  So when I could verify, again it comes back

24    as a good signature from Silk Road at staff@silkroadmarket.org.

25             I'm going to scroll up again.  This time I am going to

1    try to find something later in 2012, early 2013, to see if,

2    again, that signature is the same signature from that same key

3    and if it still verifies that it came from Dread Pirate

4    Roberts' public key.

5           (Pause)

6           Some of these I'm skipping over because they are a

7    little bit longer and I just wanted to get a message that was

8    shorter so you could see the entire message.  So this one was

9    from November 23, 2012.  Again, this is another signed message

10   with a signature.  And just by highlighting the entire message

11   and clicking "verify," it will tell me it is a good signature.

12          And, lastly, I'm going to go up to my most recent copy

13   that I had of a post that was made by Dread Pirate Roberts, and

14   I was going to see if that one, too, will verify.  That was

15   from -- it is going to be from May of 2013.

16          So this is the most recent post I had, and this is

17   from May 7, 2013.  When I say "most recent post I have," it is

18   just on this particular text file.

19          And when I click "verify," again it comes back as a

20   good signature, that it stayed the same signature and the same

21   key from 2011, 2012 -- late 2012 and May of 2013.

22          I'm going to show you again -- now, if I was to alter

23   this message that was signed by DPR -- so I typed in "altered."

24   Do you want to pause it, please.  So down at the bottom here I

25   actually typed in "altered" on this text page.  I am going to

F1fdulb1                          Der-Yeghiayan - direct

1    try to verify it now again that I have changed that message.

2              Click play, please.  And if you pause it.

3              It comes back as a bad signature now.  There is no way

4    that I could alter that message and still have it come up as a

5    good signature.  It has to stay in its original state that was

6    created by the person that owns that key.

7              And if you click play.  Again, I am going to remove

8    that -- actually, I could do a different version but that is

9    the end of the video.

10   Q.  All right.  So what does the fact that you were able to

11   verify those different messages from DPR at different times

12   imply about the user who posted those messages?

13             MR. DRATEL:  Objection.

14             THE COURT:  Why don't you rephrase it.

15             MR. TURNER:  OK.

16   Q.  So what did the person who posted those different messages

17   from DPR at different times have to have in order for you to be

18   able to successfully validate each of those messages?

19   A.  Since all those messages were verified with the same public

20   key, they had to have the same private key for that entire

21   duration.  So it is one person with one --

22             MR. DRATEL:  Objection.  Objection.

23             THE COURT:  I'll sustain the objection.

24             (Continued on next page)

25

1    BY MR. TURNER:

2    Q.  Let me see if I -- without talking about the number of

3    people involved, let me just ask you again, what would the

4    person or persons who posted these various messages have to

5    have in order for you to successfully validate those messages

6    using DPR's public key?

7    A.  It would have to be the same private key for the entire

8    duration.

9    Q.  If at any time those messages, one of those messages was

10   posted, the person posting them lacked DPR's private key, would

11   you have been able to validate that message with DPR's public

12   key?

13   A.  No.  It would come back as a bad signature.

14            MR. TURNER:  Let's go back to where we left off

15   yesterday afternoon and, Mr. Evert, can you pull up 128C,

16   please.

17   Q.  Just to recap.  Yesterday you testified that you saw the

18   defendant enter the library when you were in this area depicted

19   in the photo, right?

20   A.  Correct.

21   Q.  And when you saw the defendant enter the library where,

22   again, were you situated?

23   A.  I was seated across the street.

24   Q.  Would you use the laser pointer.

25   A.  I can't -- right here.

F1FGULB2                          Der-Yeghiayan - direct

1    Q.  Okay.  And who was with you when you saw him in the

2    library?

3    A.  It was computer scientist Tom Kiernan.

4    Q.  You testified yesterday that a few minutes after the

5    defendant entered the library, what happened to DPR's online

6    status?

7    A.  He went online.

8    Q.  And did you begin chatting with him after that?

9    A.  Yes, I did.

10   Q.  And where were you while you were chatting with him?

11   A.  I was seated outside, again, on the bench across the street

12   from the library.

13   Q.  Same place?

14   A.  Same place.

15   Q.  And who, if anyone, was with you by that point, at the

16   point when you were chatting with DPR?

17   A.  FBI Special Agent Chris Tarbell.

18   Q.  And where had Tom Kiernan gone?

19   A.  Tom Kiernan had entered into the library once he saw

20   Mr. Ulbricht enter.

21            MR. TURNER:  Could you put up 129C on the top half of

22   the page, Mr. Evert.  That's too much.  Just the bottom few

23   lines, please.  There we go.  Thank you.  Can you put 128C

24   below.

25   Q.  So you said at some point during your chat, you gave a

F1FGULB2                        Der-Yeghiayan - direct

1   signal to FBI Agent Chris Tarbell to do what?

2   A.  To effect arrest.

3   Q.  And at what point in the chat was that again?

4   A.  That was after the last message that I received from Dread

5   Pirate Roberts which said "okay, which post."

6   Q.  And then you typed in the last two lines of this chat?

7   A.  Yes, I did.

8   Q.  And where were you by that point?

9   A.  I was still seated across the street.

10  Q.  After typing in the last two lines of the chat, what did

11  you do next?

12  A.  After I got done with the last line that I typed in there,

13  "there was the one with atlantis," I got up and moved over to

14  the library, so I entered the library.

15  Q.  So can you take a look at Government Exhibit 128D, please.

16  Do you recognize this document?

17  A.  Yes, I do.

18  Q.  How do you recognize it?

19  A.  It's the outside of the Glen Park library.

20          MR. TURNER:  The government offers 128D into evidence.

21          MR. DRATEL:  No objection.

22          THE COURT:  Received.

23          (Government's Exhibit 128D received in evidence)

24  Q.  So you say you went inside the library?

25  A.  Yes.

1    Q.  And the patron area is located where?

2    A.  As you enter into the library, the stairs go immediately to

3    the right and go up into the library.

4    Q.  So could you look at 128F, please.  Do you recognize this

5    document?

6    A.  I do.

7    Q.  How do you recognize it?

8    A.  It's the stairway going up inside the Glen Park Library.

9            MR. TURNER:  The government offers Exhibit 128F into

10   evidence.

11           MR. DRATEL:  No objection.

12           THE COURT:  Received.

13           (Government's Exhibit 128F received in evidence)

14   Q.  Is this where you go after you enter the library?

15   A.  Yes.

16   Q.  And who is with you at this point?

17   A.  Special Agent Chris Tarbell.

18   Q.  Do you still have your computer open at this point?

19   A.  I do.

20   Q.  Are you still logged onto staff chat?

21   A.  I'm still connected to the Internet and still logged into

22   the staff chat.

23   Q.  Had you heard anything from Dread Pirate Roberts since you

24   sent those last two messages?

25   A.  There were no replies, no.

F1FGULB2                    Der-Yeghiayan - direct

1   Q.  And at any time at this point if DPR had tried to respond

2   to your last chat message, would you have received it on your

3   screen?

4   A.  Yes, I would have.

5   Q.  What happened next?

6   A.  As I was standing on the stairs with Agent Tarbell, the

7   other agents inside that effected the arrest brought

8   Mr. Ulbricht to us in handcuffs and turned him over to Agent

9   Tarbell.  And I then shut my laptop and put it in my book bag

10  and then escorted Mr. Ulbricht and with Agent Tarbell down the

11  stairs of the library.

12          MR. TURNER:  Could you pull up, Mr. Evert, 129C,

13  please, and could you zoom in at the end of the chat there.

14  Q.  Is the time when you shut your laptop that you just

15  described reflected anywhere in the chat?

16  A.  Yes, it is.

17  Q.  Where is it reflected?

18  A.  It says you have disconnected at 10:16:36.

19  Q.  Okay.  So what did you see -- excuse me.  What did you do

20  next?

21  A.  After I disconnected and we escorted Mr. Ulbricht

22  downstairs, Agent Tarbell performed a pat-down search of

23  Mr. Ulbricht.  And then I waited there for about a minute or

24  two before another agent came from downstairs and I asked him

25  to stay with Mr. Ulbricht and Agent Tarbell so I could go

1  upstairs into the library.  And I wanted to go up there so I

2  could see if there was a computer and if there was anything on

3  that computer.

4  Q.  So then what happened next?

5  A.  So I entered the library.  And I proceeded into the library

6  and I saw from a distance a computer scientist Tom Kiernan

7  sitting at a seat in the library.  So -- and he had a laptop in

8  his lap.

9          And so I proceeded to him and sat down next to him and

10  observed the computer.  And I saw on the computer screen the

11  same chat that I had with Dread Pirate Roberts minutes earlier.

12  Q.  What was Tom Kiernan doing exactly?

13  A.  Tom Kiernan had his Blackberry phone out at the time.  He

14  was taking photographs of the computer screen.

15  Q.  Could you take a look at what's been marked as Government

16  Exhibit 201H, please.  Do you recognize what's on this

17  photograph, this document?

18  A.  Yes, I do.

19  Q.  How do you recognize it?

20  A.  It's the computer screen that I saw in the library the day

21  after I had met up with the computer scientist Tom Kiernan.

22  Q.  Did you take this photograph?

23  A.  No, I did not.

24  Q.  Does it fairly and accurately depict what you remember

25  seeing on the screen?

F1FGULB2                          Der-Yeghiayan - direct

1    A.  Yes, it does.

2              MR. TURNER:  The government offers 201H into evidence.

3              THE COURT:  No objection?

4              MR. DRATEL:  No objection.

5              THE COURT:  Received.

6              (Government's Exhibit 201H received in evidence)

7              MR. TURNER:  Could you zoom into the box here.

8    Mr. Evert, could you compare that side by side with

9    Exhibit 129C and zoom in here, please.

10   Q.  So what are we looking at on the left side?

11   A.  On the left side was what I saw on the computer in the

12   library and on the right side is my chat.

13   Q.  And how do they compare?

14   A.  They're identical.

15   Q.  Identical except for what?

16   A.  Except for -- instead of "dread" it says "me," but then my

17   username cirrus is the same on the other screen and the colors

18   are different.

19   Q.  Just to be clear for the record, it says "me" on which copy

20   of the conversation?

21   A.  On the left-hand side.

22   Q.  The image of the computer that Mr. Kiernan was taking

23   photographs of?

24   A.  Yes.

25   Q.  Could you take a look at Exhibit 201I, please.

F1FGULB2                         Der-Yeghiayan - direct

```
 1    A.  Okay.

 2    Q.  Do you recognize this document?

 3    A.  I do.

 4    Q.  How do you recognize it?

 5    A.  Again, it's the computer that I saw in the library.

 6    Q.  And again, did you take this photograph?

 7    A.  No, I did not.

 8    Q.  Does it fairly and accurately reflect what you remember

 9    seeing on the screen?

10    A.  Yes, it does.

11              MR. TURNER:  The government offers 201I into evidence.

12              MR. DRATEL:  No objection.

13              THE COURT:  Received.

14              (Government's Exhibit 201I received in evidence)

15              MR. TURNER:  Could you zoom into here, Mr. Evert.  Can

16    you put it on the bottom half of the screen.  The top half.  It

17    doesn't matter.  Mr. Evert, before you do anything else, can

18    you zoom in here, the last line of the chat.

19    Q.  The last line that you sent to Dread Pirate Roberts was

20    "there was the one with the atlantis," right?

21    A.  Yes.

22    Q.  What did that refer to again?

23    A.  It referred to a flagged message that I was asking Dread

24    Pirate Roberts to look at.

25              MR. TURNER:  Mr. Evert, can you put 129D down at the
```

F1FGULB2                        Der-Yeghiayan - direct

1   bottom of the screen and zoom in here.

2   Q.  Do you remember this exhibit from yesterday?

3   A.  Yes, I do.

4   Q.  Where did this exhibit come from down at the bottom of the

5   screen?

6   A.  This is the flagged message page from the admin panel that

7   I took.

8   Q.  That you took from your computer?

9   A.  Yes.

10          MR. TURNER:  Can you back out of the top, Mr. Evert,

11  and zoom in here.

12  Q.  Did you see that same post on Mr. Ulbricht's computer that

13  you had directed DPR to look at?

14  A.  Yes, I did.

15  Q.  Could you take a look at what's been marked as Government

16  Exhibit 201J?

17  A.  Okay.

18  Q.  Do you recognize this exhibit?

19  A.  Yes, I do.

20  Q.  Is this a photograph that you took?

21  A.  No, it's not.

22  Q.  Does it fairly and accurately depict something that you saw

23  on Mr. Ulbricht's screen that day?

24  A.  Yes, it does.

25          MR. TURNER:  The government offers 201J into evidence.

F1FGULB2                         Der-Yeghiayan - direct

 1              MR. DRATEL:  No objection.

 2              THE COURT:  Received.

 3              (Government's Exhibit 201J received in evidence)

 4              MR. TURNER:  Can you zoom into here, Mr. Evert.

 5   Q.  What are we looking at here?

 6   A.  This is what I observed on the computer that showed the

 7   account was logged in as dread at the dot-onion address for the

 8   staff chat.

 9              MR. TURNER:  Can you compare that with 129B,

10   Mr. Evert.

11   Q.  And where is this image from?

12   A.  This is from my computer.

13   Q.  And this was the status window you used to check on DPR's

14   online activity?

15   A.  Yes, it was.

16   Q.  How does the dread username compare to the dread username

17   you saw on the screen here?

18   A.  It's the same.

19   Q.  And the avatar?

20   A.  It's the same.

21   Q.  And what program was this that was open on Mr. Ulbricht's

22   laptop?

23   A.  That would have been Pidgin.

24   Q.  How do you spell that?

25   A.  P-I-D-G-I-N.

F1FGULB2                           Der-Yeghiayan - direct

1   Q.  Do you remember yesterday we looked at the chat

2   instructions that DPR had given you on how to set up staff

3   chat?

4   A.  Yes.

5         MR. TURNER:  Mr. Evert, can you pull those up.  It's

6   Government Exhibit 127 right here.

7   Q.  "Hey, we're all on a more secure chat channel.  Here are

8   the instructions for joining in:  Download and install Pidgin."

9         Can you go down to the bottom of this message.

10        "add buddy dread@."

11        Is this the same dread username you saw again from

12  Mr. Ulbricht's computer?

13  A.  That is.

14  Q.  So about how long were you -- did you spend looking at the

15  computer while you were at the upstairs of the library?

16  A.  Only a few minutes I was up there.

17  Q.  And what did you do after you were done?

18  A.  After that, I went back downstairs out of the library and

19  met back up with Special Agent Tarbell who at that point, with

20  several other agents, they had Mr. Ulbricht inside a car

21  sitting in there, and then I observed him read Mr. Ulbricht his

22  Miranda rights.

23  Q.  What happened next?

24  A.  And then near that area, too, the rest of the team that was

25  there that was going to effect a search warrant then on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1FGULB2                        Der-Yeghiayan - direct

1    Mr. Ulbricht's residence was meeting up, and we basically

2    talked about how we're going to go over to the house and

3    approach it.

4    Q.  What house?

5    A.  Mr. Ulbricht's residence.

6    Q.  And why were you going there?

7    A.  To effect a search warrant.

8    Q.  So what happened next?

9    A.  I then -- I left that area and drove over to Mr. Ulbricht's

10   residence.  I parked outside down the street from the residence

11   and I waited for the rest of the team to arrive.  Shortly

12   thereafter, the computer scientist Tom Kiernan and another

13   agent arrived in a separate car, and I joined them in their

14   car.  And agent -- or computer scientist Tom Kiernan still had

15   the computer with him at the time.

16   Q.  And what was he doing with it at the time?

17   A.  He was still taking photographs of it.

18   Q.  And what happened next after you joined him in the car?

19   A.  I asked him whether or not he could click back on the

20   browser that was on the flagged message page to see if there

21   was anything before that, and I was asking that because I

22   know --

23   Q.  Let me interrupt you.  Click back on the browser, what do

24   you mean by browser?

25   A.  It was the Tor browser that was up, the web browser.  I

1  wanted to see if they'd hit the "back" button to see the

2  previous pages that might have been visited on that browser.

3  Q.  What was on the browser when you saw it in the library

4  again?

5  A.  It was on the flagged message page.

6  Q.  The one with the Atlantis reference in it?

7  A.  Yes.

8  Q.  And why did you want to hit the "back" button on the

9  browser?  What were you trying to learn?

10 A.  I know from my account from when I access that page I had

11 to be logged in under my administrator account.  So I wanted to

12 see what account he used to enter into that flagged message

13 page.

14 Q.  So what happened next?

15 A.  So when he clicked "back" on the browser, it then took to

16 the support page, which you would use to click to get to that

17 flagged message page, so the support admin panel came up on the

18 screen.

19 Q.  Would you take a look at Government Exhibit 201K, please.

20 A.  Okay.

21 Q.  Do you recognize this document?

22 A.  Yes, I do.

23 Q.  What is it?

24 A.  This is what appeared on the computer when the computer

25 scientist Tom Kiernan hit "back" on the browser.  This is the

1    support page.

2    Q.  Did you take the photo?

3    A.  No, I did not.

4    Q.  Does it accurately and fairly reflect what you remember

5    seeing on the screen?

6    A.  Yes, it does.

7              MR. TURNER:  Government offers 201K into evidence.

8              MR. DRATEL:  No objection.

9              THE COURT:  Received.

10             (Government's Exhibit 201K received in evidence)

11             MR. TURNER:  If we could zoom into this part here.

12   Q.  What are we looking at again?

13   A.  This is, again, the support panel that you use to access

14   the flagged message page that I was responsible for moderating.

15             MR. TURNER:  Could you put 127D below that, Mr. Evert.

16   Q.  What is 127D again?

17   A.  That was the screen shot that I took when I originally got

18   access to that support panel.

19             MR. TURNER:  Could you go back to 201K, Mr. Evert, and

20   can you zoom in up here.

21   Q.  What's the little icon here next to "support"?

22   A.  That would be the "back" button.

23   Q.  The little icon above the "back" button?

24   A.  Oh.  I'm sorry.  It's that's the man on the camel, the

25   green logo.

F1FGULB2                        Der-Yeghiayan – direct

1    Q.  From what?

2    A.  From Silk Road.

3    Q.  And the web address, do you recognize that?

4    A.  Yes, I do.

5    Q.  What is it?

6    A.  It's the Silk Road's market URL.

7    Q.  And it has the slash support?

8    A.  Yeah, the forward slash support is what you would type in

9    or what I'd type in to access that page.

10   Q.  And what is this over here?  It says SR?

11   A.  It's a folder that says SR.

12   Q.  So, did you go back any further in the browser?

13   A.  Yes, we did.

14   Q.  Could you take a look at Government Exhibit 201L.

15   A.  Okay.

16   Q.  Do you recognize this document?

17   A.  Yes, I do.

18   Q.  How do you recognize it?

19   A.  It's a what appeared on the screen on the computer after we

20   hit "back" again.

21   Q.  This is the second time you hit "back"?

22   A.  Yes.

23   Q.  Did you take this photograph?

24   A.  No, I did not.

25   Q.  Does it fairly and accurately reflect what you remember

F1FGULB2                         Der-Yeghiayan - direct

1    seeing on the screen at this point?

2    A.  Yes, it does.

3              MR. TURNER:  The government offers 201L into evidence.

4              MR. DRATEL:  No objection.

5              THE COURT:  Received.

6              (Government's Exhibit 201L received in evidence)

7              MR. TURNER:  Mr. Evert, could you try zooming in here,

8    including the address bar.

9    Q.  Had you ever seen this page before?

10   A.  No, I have not.

11   Q.  Just to be clear, you hadn't at the time, right?

12   A.  Well, previous to that, no, I had never seen it -- never

13   saw that screen before.

14   Q.  And the address at the top, what did it say this time

15   instead of "support"?

16   A.  It says the silkroadmarket.onion/mastermind.

17   Q.  And there's some names under here:  Inigo, libertas,

18   cirrus.  Tell us who those are.

19   A.  Those are the other support staff members minus

20   samesamebutdifferent.

21   Q.  Do you know whether DPR ever kept track of your time on the

22   site?

23   A.  After that I knew.

24             MR. TURNER:  Can you back out, please.  Can you zoom

25   in here.

1  Q.  Could you read off what it says here?

2  A.  It says escrow db in parenthesis USD.  And then a number

3  $4,146,736.57.  And then in parenthesis, it's bitcoins

4  30,951.60.  And then there's escrow db, which is 22,234.91

5  bitcoins, and accounts db, which is 180,448.96 bitcoin.

6  Q.  And from your experience working on the support staff at

7  Silk Road, do you know whether at any given time on Silk Road

8  there were various pending transactions into the escrow system

9  of Silk Road?

10  A.  There were.

11          MR. TURNER:  Could you back out and zoom in down here.

12  Q.  The bottom:  Unshipped, in transit, resolution.  Can you

13  remind the jury what those categories relate to with respect to

14  Silk Road?

15  A.  The listing, when you place the order, it would say

16  "processing."  And then once a vendor will mark it as being

17  shipped, it will say "in transit."  So -- and then if -- there

18  is resolutions as well.  There would be -- there's a resolution

19  mode for any order that you placed you can put into resolution.

20  Q.  To put into resolution means what again?

21  A.  It means to try to resolve basically a package that didn't

22  arrive or a claim that it wasn't shipped.

23  Q.  Could you take a look at -- well, let me ask you, did you

24  go back any further or was this it in the browser?

25  A.  No.  I hit "back" again on it.

1   Q.  Could you take a look at Government Exhibit 201M.

2   A.  Okay.

3   Q.  Do you recognize this page?

4   A.  Yes, I do.

5   Q.  How do you recognize it?

6   A.  It's what appeared on the screen after I hit "back" again.

7   Q.  Did you take this photo?

8   A.  No, I did not.

9   Q.  Does it fairly and accurately reflect what you remember

10  seeing?

11  A.  Yes, it does.

12          MR. TURNER:  The government offers 201M into evidence.

13          MR. DRATEL:  No objection.

14          THE COURT:  Received.

15          (Government's Exhibit 201M received in evidence)

16          MR. TURNER:  Could you zoom into this corner,

17  Mr. Evert.

18  Q.  So what are we looking at here?  Do you know?

19  A.  This is that same URL, the silkroadmarket URL, forward

20  slash support, forward slash landing.  This is the same page

21  that appeared on my screen when I was given directions by Dread

22  Pirate Roberts to access the support panel.  He gave me that

23  URL and this was the screen that appeared that I put in my

24  username on the left and my password on the right before I

25  could go.

1              MR. TURNER:  Mr. Evert, could you put that on top and

2      on the bottom, could you bring up 127C, please.  Could you zoom

3      into the area of that hyperlink.

4      Q.  Do you remember 127C, an exhibit that we looked at

5      yesterday?

6      A.  Yes, I do.

7      Q.  Can you remind the jury what it is.

8      A.  It was a chat that occurred between myself and Dread Pirate

9      Roberts on the staff chat where he gave me instructions and

10     gave me more authority to access the support admin panel on the

11     marketplace.

12     Q.  And at one minute, 14 seconds -- excuse me -- at 01:14:24

13     it says "dread:  Now go to," and then it provides the

14     silkroad.onion address/support/landing, is that the page that

15     we see here up top?

16     A.  Yes, it is.

17     Q.  And then it says "and enter your user and pass and let me

18     know what happens."

19              So if you were on the page, what username would you

20     enter there?

21     A.  On the left-hand side, I would have entered in "cirrus."

22     Q.  And what username did you see when you hit the "back"

23     button on Mr. Ulbricht's computer?

24     A.  Dread Pirate Roberts.

25     Q.  And what did that indicate to you?

F1FGULB2                          Der-Yeghiayan - direct

1    A.   That the person had signed into that computer using Dread

2    Pirate Roberts.

3    Q.   So what happened next after you were in the car looking at

4    the computer?

5    A.   The rest of the team for the search warrant arrived and we

6    effected the search warrant on the home.

7    Q.   What type of residence was it?

8    A.   It was a multifamily home, like a multiflat.

9    Q.   Would you take a look at what is marked as 130A as in

10   apple.

11   A.   Okay.

12   Q.   Do you recognize this document?

13   A.   Yes, I do.

14   Q.   How do you recognize it?

15   A.   It's the outside of Mr. Ulbricht's home.

16   Q.   Did you take the photo yourself?

17   A.   No, I did not.

18   Q.   Does it fairly and accurately reflect the residence as you

19   remember it?

20   A.   Yes, it does.

21             MR. TURNER:   The government moves 130A into evidence.

22             MR. DRATEL:   No objection.

23             THE COURT:   Received.

24             (Government's Exhibit 130A received in evidence)

25   Q.   Which one is it on here?

1    A.   It's this one right here.   That's the front entrance.

2    Q.   The brown one?

3    A.   Yes.

4    Q.   So did you personally participate in the search?

5    A.   Yes, I did.

6    Q.   Were you able to locate the defendant's bedroom in the

7    residence?

8    A.   Yes, I was.

9    Q.   How were you able to identify his bedroom?

10   A.   There were personal effects in the room that belonged to

11   Mr. Ulbricht.

12   Q.   Such as what?

13   A.   There was a driver's license, a passport, as well as credit

14   cards and other bank statements.

15             MR. TURNER:   May I approach.

16             THE COURT:   Yes.

17   Q.   I'm showing you what's been marked as Government

18   Exhibit 134A.   Do you recognize the document?

19   A.   Yes, I do.

20   Q.   And what is it?

21   A.   It's Mr. Ulbricht's U.S. passport.

22   Q.   Could you take a look at what's been marked as Government

23   Exhibit 135 -- I'm sorry -- Government Exhibit 134.

24   A.   Okay.

25   Q.   Do you recognize those documents?

F1FGULB2                          Der-Yeghiayan - direct

1    A.  Yes, I do.

2    Q.  How do you recognize those?

3    A.  It's photographs of Mr. Ulbricht's U.S. passport and the

4    pages contained therein.

5    Q.  Did you yourself take those photographs?

6    A.  No, I did not.

7    Q.  Do the photographs accurately reflect the pages of the

8    passport?

9    A.  Yes, they do.

10           MR. TURNER:  The government offers Exhibits 134 and

11   134A into evidence.

12           MR. DRATEL:  No objection.

13           THE COURT:  Received.

14           (Government's Exhibit 134, 134A received in evidence)

15           MR. TURNER:  Could you publish Exhibit 134, Mr. Evert,

16   and can you go to the second page.

17   Q.  In looking at the passport, can you tell where the travel

18   markings are from here from the top half?

19   A.  Yes, I could.  It's from Dominica.  It's entry and exit

20   stamps.

21   Q.  What is Dominica?

22   A.  Caribbean country.

23   Q.  And what are the dates of the travel indicated, the enter

24   and exit?

25   A.  There's -- the blue stamp on the left -- on the right,

F1FGULB2                          Der-Yeghiayan - direct

1  sorry -- is an enter stamp and it's from November 15, 2012, and

2  the stamp on the left is an exit stamp from Dominica from

3  December 4, 2012.

4  Q.  Did you find anything related to Silk Road in the bedroom?

5  A.  Yes, I did.

6  Q.  What did you find?

7  A.  In the trash, there was, in the bedroom, I located the rest

8  of Mr. Ulbricht's belongings.  We found -- there was a paper

9  that was crumpled up in the trash, two yellow sheets of paper

10 that contained writing on it that I recognized as things that

11 were similar to Silk Road.

12 Q.  Did it say the Silk Road -- did the paper have the words

13 "Silk Road" written on it?

14 A.  No, they did not.

15 Q.  So what enabled you to make the link that it came from Silk

16 Road?

17 A.  There was language on it such as, like, talking about

18 transactions and buyer weights and ratings; and there was also,

19 like, a way to, like, rate the users on Silk Road that I

20 recognized as well, language that was similar to that.

21 Q.  How did you recognize it?  Was there something going on on

22 Silk Road with respect to the rating system?

23          MR. DRATEL:  Objection; leading.

24          THE COURT:  Sustained.

25          MR. TURNER:  I'll rephrase.

F1FGULB2                    Der-Yeghiayan - direct

```
 1    Q.  How did you recognize it as being related to anything going
 2    on at Silk Road at the time?
 3    A.  There was a -- they were fairly recent, within early
 4    September, talks from Dread Pirate Roberts about revamping and
 5    redoing the buyer rating system on Silk Road.  So there were
 6    discussions that were openly talked about by Dread Pirate
 7    Roberts about redoing that system.
 8    Q.  Can you take a look at Government Exhibit 130, please.
 9    A.  Okay.
10    Q.  Do you recognize these pages?
11    A.  Yes, I do.
12    Q.  How do you recognize them?
13    A.  These were the sheets of paper that we found in the trash.
14    Q.  Did you personally participate in that seizure?
15    A.  I was.  I witnessed it happening; yes.
16    Q.  So there are two pages at issue?
17    A.  Yes.
18             MR. TURNER:  The government offers Exhibit 130 into
19    evidence.
20             MR. DRATEL:  The previous objection, your Honor.
21             THE COURT:  All right.  Government Exhibit 130 is
22    received.  The objection is overruled.
23             (Government's Exhibit 130 received in evidence)
24             MR. TURNER:  Mr. Evert, can you publish Exhibit 130.
25    First of all, can you zoom in on the very top.
```

F1FGULB2                        Der-Yeghiayan - direct

1    Q.  There's, sort of, an algebraic formulas up top.  Do you see
2    that?
3    A.  That would be accurate.
4            MR. TURNER:  Zoom out and zoom into this area.
5    Q.  Okay.  Can you make out what it says there starting with
6    "ratings"?
7    A.  Yeah.  It says ratings, then buyer weight at time of
8    purchase X TX size X and age factor, followed by calculate on
9    page load and generate bars.
10           MR. TURNER:  Can you highlight "generate bars and
11   ratings," Mr. Evert, and then put that on top.
12   Q.  Now what I'd like you to do is take a look at Government
13   Exhibit 131.  Do you recognize what these pages are?  Where
14   they're from?
15   A.  Yes, I do.  They're screen shots that I took of posts made
16   by Dread Pirate Roberts on October 6, 2013.
17   Q.  And what do the posts concern?
18   A.  These had to do with the overhaul that Dread Pirate Roberts
19   was discussing in the feedback and the buyer ratings.
20           MR. TURNER:  Mr. Evert, could you put up page three of
21   Government Exhibit -- I'm sorry.
22           The government would move Exhibit 131 into evidence.
23           MR. DRATEL:  Objection on hearsay grounds and *Vayner*.
24           THE COURT:  The objections are overruled.  Government
25   Exhibit 131 is received.

1          (Government's Exhibit 131 received in evidence)

2          MR. TURNER:  Mr. Evert, can you zoom into just the

3     first paragraph in the heading.

4     Q.   So the date of this post is August 11, 2013, correct?

5     A.   Correct.

6     Q.   And the title is "feedback system overhaul," right?

7     A.   Yes.

8     Q.   And it says, Update 08/18/2013 2213 UTC.  Wow!  So much

9     feedback and ideas for ratings.  I think this will be a major

10    focus for a while until we can really flesh everything out so

11    both vendors and buyers can have all of the information and

12    tools they need to decide who they want to work with.  At this

13    point, there are so many things to do, we have to start

14    thinking about what order to do things and how to transition.

15    Everyone responds to change either positively or negatively,

16    and I'll keep doing my best to keep the negative to a minimum.

17          Can you scroll down a little bit, Mr. Evert.  Can you

18    zoom back in again.  Great.  Can you zoom in right here.  All

19    right.

20          You see at the top it talks about ratings and it says

21    calculate on page load and generate bars.

22          Update 2028 UTC:  Okay, I've rolled out the first set

23    of major changes.  We've done away with a percent based rating

24    score entirely and are now displaying the ratings as a bar

25    chart that shows the relative weight of each rating category

F1FGULB2                         Der-Yeghiayan - direct

 1    (one through five) and a total average.

 2              Could you go back up to the document here in the top

 3    and scroll down.  Maybe could you pull out a little bit and

 4    expand.  Can you highlight buyer weight, vendor weight, sales

 5    volume, age factor.  And now can you scroll down here and open

 6    that up more, please.  And go down here starting with the long

 7    line of text:

 8              So here's what we have so far.  I want to rework how

 9    both buyers and vendors are related.  We've identified six

10    critical dimensions that I think effect how SR users should be

11    judged, they are...

12              Mr. Evert, I want to point out buyer weight, account

13    age, vendor weight, total sales volume.

14              Now, was this the only post that DPR made on

15    August 2013 about revising, overhauling the rating system?

16    A.  No, it was not.

17              THE COURT:  Is this a good time that we can make our

18    mid-morning break, Mr. Turner?

19              MR. TURNER:  Five more minutes along these lines --

20              THE COURT:  Why don't we take a break right now if

21    it's going to be five minutes.  Ladies and gentlemen, we'll

22    take our mid-morning break.  I want to remind you not to talk

23    to each other or anybody else about this case.  Thank you.

24              (Jury excused)(Continued on next page)

25

1              (In open court; jury not present)

2              THE COURT:  You can take a break yourself.

3              THE WITNESS:  Thank you.

4              (Witness temporarily excused)

5              THE COURT:  The reason for the break right then was

6     one of the jurors made eye contact and indicated that he wanted

7     a break.

8              MR. TURNER:  Sorry for not picking that up.

9              THE COURT:  That's okay.  Because sometimes when I've

10    been just trying to find the right time, having you continue to

11    a logical end is neither here nor there for me.

12             I'll use this opportunity to address two of the

13    objections that I overruled, both as to GX 130 and GX 131.  In

14    the Court's view, neither of those were being offered for the

15    truth and therefore the hearsay objection would not be a

16    relevant objection.  In terms of I think the venue which you

17    mentioned as to 131, Mr. Dratel, that was addressed in my *in

18    limine* motion.  Did you mean *Vayner*?

19             MR. DRATEL:  I said *Vayner*.  I'm sorry.

20             THE COURT:  You said "venue."  All right, *Vayner*.  For

21    the *Vayner*, then my ruling would be similar to that from

22    yesterday, which is, these documents that we have gone through

23    all have been appropriately authenticated as the require; so

24    therefore, the *Vayner* objection would not be appropriate or

25    would not be sustained.

F1FGULB2                              Der-Yeghiayan – direct

1          MR. DRATEL:  When they come back out, would the Court

2     instruct the jury about 130, 131 about not for the truth, your

3     traditional instruction in that regard?

4          THE COURT:  Sure.  I'm happy to go through and to do

5     that.

6          MR. DRATEL:  Thank you.

7          THE COURT:  I think it's obvious because it's not

8     about whether or not -- it's just for the fact that the words

9     "buyer weight, vendor weight" was on the page, not whether or

10    not they were, in fact, ultimately taken into consideration.

11         MR. TURNER:  I don't think there's any unique

12    statement on the document that can carry any truth value.

13         THE COURT:  That's sort of my point; yes.  But

14    nevertheless, I'll just indicate that those are not for the

15    truth.  If Mr. Dratel would like that, I'm happy to do that.

16         MR. DRATEL:  Thank you.

17         THE COURT:  Is there anything else that folks would

18    like to raise before we take own break.

19         MR. DRATEL:  There's one issue.

20         THE COURT:  At the side bar, sure, come on up.

21         (Continued on next page)

22

23

24

25

1           (At the side bar)

2           MS. LEWIS:  I wanted to bring it to the Court's

3   attention that I may have inadvertently addressed -- I walked

4   into a crowded subway car at Union Square and I saw there was

5   woman behind me.  And seeing a juror in the courtroom makes me

6   think it may have been her.

7           THE COURT:  All right.

8           MS. LEWIS:  Such is life.

9           THE COURT:  Thank you.  Thank you for disclosing that.

10          MS. LEWIS:  That was all.

11          THE COURT:  It's life in the New York City subways at

12  rush hour.

13          Is there anything anybody thinks needs to be done?

14          MR. DRATEL:  As long as it wasn't a New York Post

15  reporter behind her.

16          THE COURT:  I think we're all set.  Does anybody want

17  the Court to do anything with that?

18          MR. TURNER:  No.

19          THE COURT:  Thank you.

20          Let's take our own break for a few minutes before we

21  resume.

22          (Recess)

23          (Continued on next page)

24

25

1            (In open court; jury present)

2            THE COURT:  Now, one thing I wanted to mention before

3      we continue is there were two documents that we were just

4      hearing testimony with respect to.  One was the photograph of

5      the crumpled notes, that's GX 130, and the other was the buyer

6      ratings.  What would you call it?  Posts?

7            MR. TURNER:  Yes.

8            THE COURT:  The posts at Government Exhibit 131 that

9      the government and the witness were going back and forth on,

10     these are not offered for the truth as to whether or not, for

11     instance, the calculation that was put forward, in fact, is the

12     right calculation or the truth of any of the information.  It's

13     just for the fact that these words appeared on the page.

14            Mr. Turner, you can go ahead and continue.

15            MR. TURNER:  Could we put Government Exhibit 131, the

16     page back on the screen, please.

17            You can publish the whole page.  Zoom in there.  We

18     were just looking at these references to buyer weight, account

19     age, vendor weight, sales volume, etc.  Mr. Evert, can you

20     scroll all the way down to the bottom of the message.

21     Q.  "There are a couple of other changes I have in mind, but

22     this post is already getting long and complex, so let's leave

23     it at that.  I look forward to hearing your feedback."

24            MR. TURNER:  Could you now put up page two of the

25     exhibit, please.

F1FGULB2                         Der-Yeghiayan – direct

1   Q.  So this is a forum post approximately 20 days later.  Is

2   that right?

3   A.  Yes.

4   Q.  It says more updates and ratings and reviews overhaul.  And

5   I'll read a few lines of it:

6           The latest, the buyers may remove a weighting and/or

7   review from the recent orders link on their account pages.  The

8   price of the transaction has been obscured in the same way that

9   buyer stats are when the review is displayed.  The style has

10  been slimmed down further.  Buyer weight now has the same

11  freshness factor included in the rating and vendor weights (old

12  transactions don't count as much toward a buyer's weight.)

13          Was this a continuing topic of discussion in the forum

14  posts around this time?

15  A.  Yes, it was.

16  Q.  So now let me go, please, to page one of the exhibit.  So

17  this the approximately 12 days later?

18  A.  Yes.

19  Q.  And it says:

20          Buyer ratings September 12, 2013.  Let's see

21  more -- excuse me.  Let's see, where were we?  Oh, yeah,

22  ratings and review overhaul.

23          There's an emoticon there.

24          Can you focus in on what's been marked with that has

25  the paragraph two number on it.

1          It says labeling four of five as "solid, would

2     recommend" is bringing down my average.  And that's in quotes.

3          Then it says don't worry, it's a level playing field

4     and all vendors are experiencing this.  The net effect is to

5     give more info to buyers, distinguishing "solid" vendors from

6     "outstanding" ones.

7          Can you just explain what this photograph is about?

8     A.  This is in reference to the marketplace when a buyer would

9     leave a rating for a vendor, they could label them one through

10    five basically as far as five being the highest.  And he's

11    talking about marketing or trying to make sure you could

12    differentiate between them being outstanding or just so-so, I

13    guess.

14          (Continued on next page)

F1fdulb3                        Der-Yeghiayan – cross

1   Q.  OK.  And the quote here, was this like a comment that

2   somebody had made previous to the post, the "labeling 4 of 5 as

3   'solid, would recommend' is bringing down my average"?

4   A.  I don't recall the previous messages on the post.

5   Q.  OK.  Did you find -- well, you said before there were two

6   pieces of paper you found in the trash?

7   A.  Yes, there were two sheets.

8           MR. TURNER:  Could you put up Government Exhibit 130,

9   page 2, on the bottom, Mr. Evert, and keep that same thing up

10  on the screen.  Could you zoom in here.

11  Q.  OK.  This is the second piece of scrap paper that you found

12  in Mr. Ulbricht's bedroom, in the trash?

13  A.  Yes, it was.

14  Q.  And the top line says:  "5– Wow!  Outstanding.

15          "5 – Wow!  Best of the best."

16          MR. TURNER:  Can you highlight "outstanding" there,

17  Mr. Evert and "outstanding" up here.

18  Q.  "4 – solid, would recommend."

19          Can you highlight that?

20          "3 – Meh, they're OK, I guess.

21          "2 – definitely needs improvement.

22          "1 – Never again!"

23          Do you recognize some of this specific terminology

24  from Silk Road?

25  A.  Yes, I do.

F1fdulb3                    Der-Yeghiayan - cross

1    Q.  How do you recognize it?

2    A.  It was similar exactly to what Dread Pirate Roberts said in

3    his posts.

4           MR. TURNER:  Could you cut out to the first page of

5    Government Exhibit 130, full screen, please, and zoom in here.

6    Q.  So what was down in the middle of this page?

7    A.  It was a name and a telephone number below it.

8    Q.  And the name is?

9    A.  Danielle.

10   Q.  And there is a phone number here.

11          MR. TURNER:  And, your Honor, just to make the record

12   clear, we've redacted it from the screen but not from the paper

13   copy that will be available to the jurors?

14          THE COURT:  All right.

15   Q.  So after you were done with the search, did you ever log

16   back into the chat channel you had been communicating with

17   Dread Pirate Roberts on prior to the defendant's arrest?

18   A.  Yes, I did.

19   Q.  First talk a look, actually, at Government Exhibit 129E, as

20   in Edward.

21          Do you recognize this document?

22   A.  Yes, I do.

23   Q.  How do you recognize it?

24   A.  It is a screenshot of my entire computer screen I took on

25   October 2, 2013.

1   Q.  That is the day after the arrest?

2   A.  Yes.

3           MR. TURNER:  The government offers Exhibit 129E into

4   evidence.

5           MR. DRATEL:  No objection, your Honor.

6           THE COURT:  Received.

7           (Government's Exhibit 129E received in evidence)

8           MR. TURNER:  Could you zoom in here, Mr. Evert.

9   Q.  So up 'til now we've seen a copy of that chat log in the

10  log forum.  Is this how it looked on your computer?

11  A.  This is how it looked on my computer.

12          MR. TURNER:  Now could we go back to the log screen at

13  129C, please.  And go down just to the bottom part here.

14  Starting a little bit farther up, starting with "Dread."

15  Q.  OK.  So the conversation, again, left off at 10:14 with you

16  saying, "There was the one with the Atlantis."  You

17  disconnected at 10:16.

18          Now, if the Dread Pirate Roberts had ever tried to

19  respond to your last message after you disconnected, would you

20  have had any way of receiving that message?

21  A.  The message would have came the next time I logged into the

22  server.

23  Q.  And when was the next time you logged into the chat server?

24  A.  At 3:32 a.m.

25  Q.  UTC?

F1fdulb3                         Der-Yeghiayan - cross

1    A.  UTC -- 3:33, sorry, a.m.

2    Q.  That would have been at 8 p.m. the night after the arrest?

3    A.  Yes.

4    Q.  Had you received any reply from the Dread Pirate Roberts by

5    that point?

6    A.  No, I had not.

7    Q.  All right.  Did you login subsequently after that?

8    A.  I did login after that.

9    Q.  When was the next time you logged in?

10   A.  Again, I believe hours later, so 7:19 a.m.

11   Q.  About midnight that night?

12   A.  Yes.

13   Q.  Still no reply?

14   A.  No reply.

15   Q.  Was the Silk Road website still operational by this point?

16   A.  Yes, it was.

17   Q.  When was it shut down?

18   A.  October 2nd, around -- I think like around 10 a.m., I want

19   to say, 11.

20   Q.  So the following day?

21   A.  I believe so.

22   Q.  And when was the defendant's arrest made public?

23   A.  At that time.

24   Q.  At what time?

25   A.  Around 10/11 a.m. Pacific.

1    Q.  October 2nd?

2    A.  Yes.

3    Q.  All right.  So up until that time, did the defendant --

4    excuse me, up until that time, from between the time when the

5    defendant was arrested to the time when the site was shut down

6    and the arrest was made public, did Dread Pirate Roberts ever

7    respond to your last chat message?

8    A.  No, he did not.

9            MR. TURNER:  That is all I have, your Honor.

10           THE COURT:  All right.  Thank you.

11           Mr. Dratel.

12           MR. DRATEL:  Thank you, your Honor.

13   CROSS-EXAMINATION

14   BY MR. DRATEL:

15   Q.  Good morning, Agent Der-Yeghiayan, is that right?

16   A.  It is right, yes, sir.

17   Q.  Why don't we talk about the PGP demonstration, the key that

18   you did this morning.

19   A.  OK.

20   Q.  And just initially, there were forum posts, weren't,

21   there's, that people couldn't validate with the public key,

22   correct?

23   A.  That's correct.

24   Q.  And a private key, which you talked about, is just a block

25   of text like the public key that you showed, correct?

1   A.  Correct.

2   Q.  And when you use the term own a private key, you just mean

3   have possession of that block of text, correct?

4   A.  That is correct.

5   Q.  So it could be cut and paste and sent to someone else,

6   correct?

7   A.  Yes, it can.

8   Q.  It could be shared by the person who generated the key,

9   correct?

10  A.  That is correct.

11  Q.  It could be stolen --

12  A.  Yes.

13  Q.  -- correct?

14          It doesn't have to be the same person who uses that

15  private key from message to message much less year to year,

16  right?

17  A.  It doesn't have to be, no.

18  Q.  And it doesn't have to be the same device that uses that

19  key from message to message, from month to month, year to year,

20  correct?

21  A.  That is correct.

22  Q.  It is really the block of text.  It is not whether it is a

23  laptop or a desk-top or a phone or anything like that, right,

24  it is the block of text that counts, right?

25  A.  It is universal, yes.

F1FDULB3                    Der-Yeghiayan - cross

```
1    Q.  So the only thing that you know when you verify is that

2    you're communicating with someone who is using that block of

3    text, correct?

4    A.  That is correct.

5    Q.  It doesn't have to be the same person from message to

6    message, just a person who is using that block of text?

7    A.  And let me clarify.  It is the same text and there is also

8    a password that is associated with utilizing that private key

9    as well, too.

10   Q.  Right.  But the same thing.  The password is just like any

11   other password?  It could be typed in?  It could be shared?  It

12   could be sent?  It could be cut and paste?  Right?

13   A.  That is correct.

14   Q.  It could be hacked, right?

15   A.  Yes.

16   Q.  So I just want to go back to that question.

17            So the only thing that you can verify is that you're

18   communicating with someone who has that block of text and can

19   enter the password?

20   A.  That is correct.

21   Q.  And these keys can be passed on, correct, from person to

22   person?

23   A.  It can be shared, yes.

24   Q.  In that way it is not really any different on a certain

25   level than a car key, right?  It can go from driver to driver
```

1    and you operate the car, correct?

2    A.  Well, it can but it needs a password, too.

3    Q.  Right.  So if you had to, let's say, enter something into a

4    car like on a punch key or something like that, it would be the

5    same difference, right?  All you had to do is a password?

6    A.  It would be key plus the password, yes.

7    Q.  Yes.  The same thing if the office manager retires and has

8    the key to the file cabinet and there is maybe also not only

9    the key but also a little keypad on it and the next office

10   manager comes along and says here's the file key and here's the

11   code for the key punch, right?

12   A.  That is correct.

13   Q.  Now, what you showed us on the exhibit was that the key was

14   created April 1, 2011, correct?

15   A.  That is correct.

16   Q.  And it wasn't created as Dread Pirate Roberts, right?

17   There is nothing about that key that says Dread Pirate Roberts,

18   right?

19   A.  That is correct.

20   Q.  It says Silk Road, right?

21   A.  Yes.

22   Q.  By the way, the person who creates that key would still

23   have the information -- even if it was passed on, they still

24   have that block of text, right?

25   A.  I'm sorry.  I am confused.

F1FDULB3                        Der-Yeghiayan - cross

1   Q.  Let me go through it again.

2           The person who created the key, generates the key,

3   created the key, they would retain that block of text forever,

4   essentially, right?

5   A.  They could save it, yes.

6   Q.  Right.  Even if someone else was using the key, even if

7   they passed on -- the office manager could have made a copy of

8   the file key, right -- of the file cabinet key, right?

9   A.  Right.  There could be multiple copies of a private key

10  that multiple people can have.

11  Q.  And multiple people could use it at the same time?

12  A.  They could, yes.

13  Q.  Message to messaging?

14  A.  They could.

15  Q.  You talked about Dread Pirate Roberts and the movie "The

16  Princess Bride," right?

17  A.  Yes.

18  Q.  In fairness to the author, you know it was also a book

19  originally?

20  A.  It was a book, yes.  I didn't read it, though.

21  Q.  Part of that legend is continuity, right?

22  A.  Yes.

23  Q.  And the continuity being that the essence of the

24  personality stays the same, correct?

25  A.  Yes.

F1FDULB3                        Der-Yeghiayan - cross

1    Q.  And if the key changed -- withdrawn.

2            If DPR had changed over time and the private key

3    changed over time, that would ruin that continuity, wouldn't

4    it?

5    A.  That would create some doubt.

6    Q.  In fact, you yourself thought that DPR changed over time,

7    didn't you?

8    A.  There are times that there was writings that would make me

9    think that, yeah, it potentially was a different person.

10   Q.  And even as late as August of 2013, you thought that DPR

11   had changed in April of 2013, didn't you?

12   A.  There was discussions that I had had with another moderator

13   who was convinced that it was a new DPR.

14   Q.  But you told people inside your organization, Homeland

15   Security Investigations, that DPR -- you believed that DPR had

16   changed in April of 2013?

17   A.  There -- if there is anything that you could refresh my

18   memory?

19           MR. DRATEL:  Sure.  Just for the witness, 3505-787.

20           (Pause)

21           Your Honor, I understand it can't be done

22   electronically from our position.  I guess only from the

23   main -- I will just show him.

24           THE COURT:  I think it is fine if you just show it in

25   hardcopy to the witness, and let the government know what you

1    are turning his attention to.

2              MR. DRATEL:  Yes.  It is 3505-787.

3              (Handing)

4              THE WITNESS:  Thank you.

5              MR. DRATEL:  Obviously, just read it to yourself, the

6    top part.

7    Q.  And so in August of 2013, you expressed your opinion that

8    DPR had changed in April of 2013?

9    A.  I'm not sure if the April I was referring to was 2012 or

10   2013.  The April might have been from 2012.

11   Q.  But it is April?

12   A.  April.

13   Q.  I'm sorry.  The email is August of 2013, correct?

14   A.  Correct.

15   Q.  And you talk about someone with a screen name who you

16   thought might have been the previous DPR, right?

17   A.  There is another profile that was administrator on Silk

18   Road as well.

19   Q.  And you thought that even though you knew that the private

20   key was the same as it always had been, right?

21   A.  That's correct.

22   Q.  You thought there was a different DPR notwithstanding the

23   continuity of the private key?

24   A.  There was conversation that would change, and it would be

25   similar in a lot of ways but there would be other things that

F1FDULB3                        Der-Yeghiayan - cross

1   would make us think that potentially there might have been a

2   different person behind it at different times.

3   Q.  What I'm saying is even notwithstanding this same private

4   key throughout, you expressed an opinion in August of 2013,

5   basically two months before Mr. Ulbricht's arrest, correct,

6   that DPR had changed in April, and now you don't know whether

7   it is 2012 or 2013 in April, right?

8   A.  Correct.  I think it was April of 2012, though.

9   Q.  But it doesn't say 2012, does it?

10  A.  No.

11  Q.  That is not what you put in your email, right?

12  A.  It says just April.

13  Q.  Right.  In August of 2013, right?

14  A.  I don't think it is April 2013.

15  Q.  No.  No. what I am saying is the email is August of 2013?

16  A.  August, yes.

17  Q.  And when you say it changed in April, you didn't say April

18  a year ago, you said April, right?

19  A.  Yes.

20  Q.  Have you taken any acting courses?

21  A.  No, I have not.

22  Q.  What kind of computer training have you had?

23  A.  Just the basic stuff that we had from the academy.

24  Q.  What did that include?

25  A.  There are various courses on -- just basic computer classes

F1FDULB3                          Der-Yeghiayan - cross

1    for maintaining evidence and also documenting things as well as

2    we also have for submitting subpoenas and things that are

3    related to computers and investigating computer crimes, just a

4    basic overview course.

5    Q.   OK.  So nothing about computer deception, right?

6    A.   No.

7    Q.   Nothing about how to assume an online identity different

8    from your actual identity, right?

9    A.   No.

10   Q.   But you were able to do that flawlessly, right?

11   A.   Yes, I was.

12   Q.   You operated a number of accounts, maybe two dozen over

13   time, maybe more, right, on Silk Road at some point or another?

14   A.   I'm not sure of the exact number but there was over a

15   dozen.

16   Q.   And you were an administrator communicating directly with

17   Dread Pirate Roberts every couple of days, right?

18   A.   That is correct.

19   Q.   Communicating with the other administrators -- inigo,

20   libertas -- right?

21   A.   Yes.

22   Q.   Anybody else, administrators who you communicated with?

23   A.   The same thing but different.

24   Q.   And they never -- withdrawn.

25            Yes.  They didn't know that you were a law enforcement

F1FDULB3                          Der-Yeghiayan - cross

1   agent?

2   A.  No, they did not.

3   Q.  Dread Pirate Roberts didn't know you were a law enforcement

4   agent?

5   A.  No, he did not.

6   Q.  None of the people you interacted with on the vendor

7   support or any kind of other -- with Silk Road users, none of

8   them knew, right, that Cirrus was a law enforcement agent,

9   right?

10  A.  That is correct.

11  Q.  Without any training, you were able to do that?

12  A.  Yes.

13  Q.  You had multiple persona at the same time, right?

14  A.  There were multiple identities that I would operate.

15  Q.  At the same time online, right?

16  A.  Yeah, during different periods.

17  Q.  And, again, without any glitch in terms of you never gave

18  it away; no one ever said, oh, I know you're a cop, get off the

19  site, right?

20  A.  No.

21  Q.  In fact, you weren't sure yourself often who you were

22  communicating with on the site despite their screen name,

23  correct?

24  A.  There was always a level of distrust as to potentially who

25  you might be talking to.  So there would be ways that we would

1    try to always authenticate one another through just different

2    language and common things that we would say to one another.

3    Q.  And, in fact, there were times when you taught that DPR

4    might be operating some of the other administrator accounts,

5    right?

6    A.  There was, yeah, there was times that we didn't know who

7    was operating what accounts.

8    Q.  And at one point it was pretty frustrating, right, for your

9    investigation purposes, correct?

10   A.  It was very difficult, yeah.

11   Q.  In fact, at one point you said "Who's on first," right?

12   A.  That would probably be something that I would say.

13   Q.  I mean, literally, right?

14   A.  If there was an email, yeah, I'm pretty sure, yeah.

15   Q.  OK.

16           MR. DRATEL:  May I approach, your Honor?

17           THE COURT:  You may.

18           MR. DRATEL:  It was a little more complicated than I

19   had hoped it would be.

20           (Pause)

21           THE WITNESS:  Thank you.

22           MR. DRATEL:  It is the bottom of the first page, and

23   then it is double-sided so just flip over to the top of the

24   next page.

25           (Pause)

F1FDULB3                        Der-Yeghiayan - cross

1    A.  I recall this, yes.

2    Q.  So you said, "Sheesh, who's on first," right?

3    A.  "Sheesh, who's on first again."

4    Q.  Because it was a complicated situation as to whether or not

5    someone was commandeering someone else's account and who you

6    are actually communicating with, right?

7    A.  Yeah.  Specifically in this period of time there was

8    multiple things going on with multiple accounts.

9    Q.  And that's June of 2013?

10   A.  That was June 2013, yes.

11   Q.  And Cirrus was an account that you took over, correct?

12   A.  Yes, it was.

13   Q.  And Cirrus was originally an account that was called Scout,

14   correct?

15   A.  Yes, it was Scout before.

16   Q.  And you ultimately cultivated Scout to give up the account,

17   correct?

18   A.  The person that originally had, yeah, the Scout account

19   became Cirrus originally and then gave it over to me, yes.

20   Q.  At some point because you revealed to them that you were

21   law enforcement, correct?

22   A.  The original operator didn't know that I was law

23   enforcement, yes.

24   Q.  No, but I'm saying at some point you did reveal it and then

25   they let you assume their account?

F1FDULB3                         Der-Yeghiayan - cross

1    A.  They knew that I was law enforcement when they let me

2    assume the account, yes.

3    Q.  In fact, you were surprised when you found out Scout was

4    female, right?

5    A.  Yes.

6    Q.  One of your challenges in getting Scout to relinquish her

7    account and give you access to Scout, and then ultimately to

8    Cirrus, was how to convince Scout that you were law enforcement

9    and that DPR was tricking her -- him you thought at the time

10   but her and that her better option, or Scout's better option

11   was to go with the law enforcement, you had to do that online

12   in a way that didn't impair the investigation, correct?

13              MR. TURNER:  Objection to form.

14              THE COURT:  If you understand the question, you can

15   answer it.

16   A.  I --

17   Q.  I will break it down.

18   A.  I guess the response is that I wasn't -- I didn't portray

19   myself as law enforcement to Scout.  That was another agent

20   that did that.  I had another account at that time that I was

21   utilizing to talk to Scout that they did not know -- I wasn't

22   portrayed as law enforcement.

23   Q.  But that was a challenge for the investigation, correct, as

24   a whole?

25   A.  A challenge, I'm sorry, to?

1  Q.  To convince Scout, whether it was you or a colleague of

2  yours, to convince Scout that DPR was tricking Scout and that

3  Scout's better option was to essentially align with law

4  enforcement?

5  A.  That was another agent's goal with another account that

6  they were utilizing.  My particular goal with the account that

7  I was utilizing was to try to get Scout to buy something from

8  me which would then result in exchanging their name and

9  address.

10 Q.  Right.  That is ultimately what happened, right?

11 A.  That is what happened.

12 Q.  I'm saying, the other agent's challenge was this other

13 aspect of trying to do something online that would convince

14 Scout to essentially relinquish her account to law enforcement?

15 A.  Correct.

16 Q.  I want to go back to the beginning of your testimony.

17         And the first time that any of this came on the radar

18 at Chicago O'Hare International mail was June of 2011?

19 A.  It was roughly the first time that I saw a few of the

20 packages that contained ecstasy.

21 Q.  Then you started the investigation in October of 2011?

22 A.  Yes.

23 Q.  And you told us that the seizures began to increase after

24 June 2011, right?

25 A.  Correct.

F1FDULB3                          Der-Yeghiayan - cross

1  Q.  Prior to that there were hardly any -- nothing to note, if

2  there was anything noteworthy?

3  A.  That is correct.

4  Q.  In fact, by October -- in October of 2011, there were only

5  four seizures that year.

6  A.  That month I believe that we maintained, that we held for

7  our investigation, there were four seizures.

8  Q.  And then that multiplied by 2012 and throughout the months

9  of 2012, right?

10  A.  Yes.  They steadily increased over that period.

11  Q.  And you said you had never seen that ecstasy before, right?

12  You testified --

13  A.  I hadn't seen it in the mail in the letter class like that

14  before.

15  Q.  That is right.  OK.  Also, these Netherlands' shippers,

16  right?

17  A.  I had never seen packaging like that before.

18  Q.  So anything that would have happened on Silk Road before

19  June of 2011 really would not have come to your attention at

20  all, right?

21  A.  It potentially could have.  If there was a seizure that was

22  made, we would have been called.

23  Q.  But you don't know is what I am saying?

24  A.  I don't know, no.

25  Q.  You have no idea really where the packages -- you don't

F1FDULB3                        Der-Yeghiayan - cross

1   know anything about any of the transactions before June 2011?

2   A.  I don't.

3   Q.  And you had been there for years, in some form or another,

4   at O'Hare as either border patrol or HSI?

5   A.  Customs and Border Protection and HSI.

6   Q.  CBP?

7   A.  Yes.

8   Q.  Customs and Border Patrol.

9           And one of the things that -- well, withdrawn.

10          In June 2011, there was an article on gawker.com about

11  Silk Road, right?

12  A.  Yes, there was.

13  Q.  And the traffic on Silk Road increased significantly after

14  that, correct?

15  A.  That was about the time, yes.

16  Q.  And also there was an NPR report in October 2011, right?

17  A.  As I have been told, yes.

18  Q.  That also publicized it, and, again, you started seeing an

19  increase in traffic?

20  A.  That was what came out of an interview, I believe.

21  Q.  Now, you talked about border authority initially.

22  Basically, without a warrant, you have the authority to pretty

23  much search anything that is coming in, right, to the United

24  States?

25  A.  Yes.

1   Q.  You say you do a lot of x-ray and other -- and canines,

2   right?

3   A.  X-ray, canine, and then searching by hand as well.

4   Q.  Now, all of the screenshots that you put in evidence of the

5   silkroad.onion, they are all from 2012 or later, right?

6   A.  The majority of them, yes.  Actually, all of them, yes,

7   pretty much.

8   Q.  And were you on the site at all before 2012?

9   A.  I was.

10  Q.  Late 2011?

11  A.  Late 2011.

12  Q.  After you started your investigation?

13  A.  Yes.

14  Q.  So do you know when Silk Road first began charging

15  commissions?

16  A.  It was apparent from the beginning they started, from what

17  I read, they were on commissions.

18  Q.  You think it is from the very start?

19  A.  I believe it was, yes.

20  Q.  Did you ever look at the initial transaction history?

21  A.  No, I didn't have that.

22  Q.  But you have it now, right?

23  A.  I have the transaction history --

24  Q.  Yes.  You have access to it, right?

25  A.  I haven't reviewed it but I have access to it.

F1FDULB3                        Der-Yeghiayan - cross

1   Q.  You haven't reviewed it, right.  So it is your assumption

2   that the commissions go back to the beginning?

3   A.  That is correct.

4   Q.  But you don't know for sure?

5   A.  I don't know for sure.

6   Q.  How about the escrow system, do you know when that was

7   instituted on Silk Road?

8   A.  I believe that is from the beginning, from when we released

9   our first buys.

10  Q.  Your first buys were when?

11  A.  I believe it was January 2012.

12  Q.  So it has already been in existence for eight/nine months

13  already, right?

14  A.  That is correct.

15  Q.  So you don't know anything about the transactions before

16  then with respect to an escrow system other than when you

17  started making purchases, right?

18  A.  That is correct.

19  Q.  Do you know when Silk Road first launched its Wiki page?

20  A.  I don't recall offhand.

21  Q.  Do you know whether it was when it launched the forum,

22  before or after?

23  A.  The forum was around June 2011.

24  Q.  Right.  So do you know whether it was launched before or

25  after the forum?

1   A.  I don't know if it was before or after it.

2   Q.  Do you know what the seller's guide looked like in June or

3   July or August or September of 2011, before you first got on

4   that site?

5   A.  No, I do not.

6   Q.  Do you know what the buyer's guide looked like during that

7   same time period before you got on the site?

8   A.  No.

9   Q.  Do you know if there was a seller's contract of the type

10  where it says "I agree" before you got on the site?

11  A.  No, I do not.

12  Q.  Do you know when the first heroin sale on Silk Road was

13  made?

14  A.  No, I do not.

15  Q.  Cocaine?

16  A.  I do not.

17  Q.  Do you know when Silk Road first offered forgeries?

18  A.  No, I do not -- well, actually, from the posting that was

19  made from Dread Pirate Roberts, I can assume that that might

20  have been when it was announced.

21  Q.  When was that?

22  A.  I would have to look back at the screenshot.

23  Q.  With respect to 116B, which is not forgeries but the

24  hacking tools, right, there was something called an RAT?  Is

25  that a remote access trojan, do you know what that is?

F1FDULB3                         Der-Yeghiayan - cross

1   A.  I am assuming a trojan that you can access remotely.

2   Q.  Trojan means something you implant into somebody's

3   computer, right?

4   A.  It is something that would conceal itself as something else

5   as someone's computer that might be downloaded inadvertently, a

6   program perhaps.

7   Q.  And then allow others to operate it, right?

8   A.  It could do things like that, yes.

9   Q.  This is already in evidence, Government 106, Tor.  I want

10  to talk about Tor a little bit.  OK?

11          MR. DRATEL:  Would you show government's 106, please.

12          (Pause)

13          That is it.  Thank you.

14  Q.  So that is the diagram where you explained somewhat how Tor

15  operates, right?

16  A.  That is correct.

17  Q.  And if the user, let's say, on the left initiates a

18  communication, right, that first computer is the entry node,

19  right?

20  A.  That is correct.

21  Q.  And the one on the right, where it says "Web server (hidden

22  service)," where it goes from that last computer to the hidden

23  service, is an exit node, right?

24  A.  No, that wouldn't be an exit node.

25  Q.  Where were the exit nodes?

1    A.   This isn't completely accurate.  I think it is for simple

2    use.  But, generally, exit nodes are on the outside but a

3    hidden service is generally within, and there is what is called

4    intrapoints that protect the hidden service, which they are all

5    relays, essentially, within Tor.

6    Q.   Right.  Obviously, there is a lot more computers than this,

7    correct?

8    A.   Yeah.  There is a lot more relays and nodes.

9    Q.   That's why it works is because there are enough computers

10   worldwide on the Tor network to permit the relays not to be

11   traced?

12   A.   Yes.  There is -- they are all documented as well.

13   Q.   And when you say "documented" --

14   A.   There is lists of IPs for the relays and for the nodes.

15   Q.   Right.  But, nevertheless, because of the way it is done,

16   it's very difficult, if not impossible, to trace, correct?

17   A.   It is very difficult to trace, yes.

18   Q.   And some people think that by monitoring exit nodes and

19   looking at traffic, you can find hidden services, correct?

20   A.   We thought that we could earlier on but we realized fairly

21   quickly that we couldn't.

22   Q.   And let's try to put it in a different analogy.  If you're

23   the user on the left and you get into a car on the street and

24   then someone sees you get into the car on the street and then

25   you go on the highway and you stop and you change cars and you

1   stop and you change cars and you stop and you change cars and

2   you stop and you change cars, when you get to the destination,

3   no one may be able to find you, right, because assuming that

4   that -- that you are not being surveilled the whole way

5   through, right?

6   A.  That is a fair analogy, yes.

7   Q.  By the way, 125H, Government's 125H, just if you want to

8   look at it, for the forgeries.

9            (Pause)

10           August of 2011.

11  A.  Correct.

12  Q.  Thank you.  Now, Tor is not, as you said, not illegal.  In

13  fact, it is widely used by millions of users to access typical

14  Internet activity, right?

15  A.  That is correct.

16  Q.  And, for example, people, let's say, Chinese nationals in

17  China use Tor to get around governmental restrictions on their

18  Internet activity, right?

19  A.  That is correct.

20  Q.  And you talked about torproject.org, right, which is a

21  website on the open Web, right?

22  A.  Yes, it is on the regular Internet.

23  Q.  Ordinary Web, we'll call it, on the ordinary Internet.

24           And that will allow you to download Tor, correct?

25  A.  Yes.

F1FDULB3                         Der-Yeghiayan - cross

1    Q.  And you have been on that page, right?

2    A.  Yes.

3    Q.  And so you know that Tor was originally developed by the

4    U.S. government -- U.S. Naval research, right?

5    A.  It originally was, yes.

6    Q.  And designed for sensitive military and government

7    communications; that's what it was designed to facilitate?

8    A.  I believe it was between Navy ships trying to create a new

9    network to communicate between them.

10   Q.  But now it's used by not only the military, journalists,

11   law enforcement, as I say, people in countries where Internet

12   is restricted, right?

13   A.  That is correct.

14   Q.  It also has real-world advantages for ordinary people,

15   right -- well, withdrawn.

16          Ordinary people can use it so that they aren't

17   monitored by commercial establishments, websites, and others so

18   that they will know their buying habits and can target them for

19   merchandising and things like that, right?

20   A.  You can use it to protect essentially your identity, yeah,

21   and who you are.

22   Q.  So, for example, if a website uses your search history and

23   your buying history to decide whether you should get a discount

24   or not, depending on your buying habits and how often you buy

25   retail and how often you use a discount, Tor could prevent them

F1FDULB3                           Der-Yeghiayan - cross

 1   from discriminating one way or the other -- the website against

 2   a customer who uses Tor to gain access to those sites, right?

 3   A.  Yeah.  They could be tracking by your IP address, and if

 4   you constantly visit certain sites it will remember you and it

 5   could learn your buying habits and things, too.  So, yes.

 6   Q.  So what Tor really does is prevent whoever can, or would,

 7   from monitoring a person's Internet tracking?

 8   A.  It can, yes.

 9   Q.  In fact, you can use Tor as a law enforcement officer to

10   either visit a website or some other part of the Internet

11   without the other side knowing that it is law enforcement

12   that's viewing a page, right?

13   A.  It could be used for law enforcement, yes.

14   Q.  It is like having a No Caller ID, right?

15   A.  Right.  It won't come back to an IP address that is a

16   government IP.

17   Q.  And a lot of people got No Caller ID for that kind of

18   reason, right?

19   A.  That is correct.

20   Q.  Now, "hidden service" just really means that it is on Tor

21   alone, correct?

22   A.  That it is built within Tor and that is the website that it

23   is accessible.

24   Q.  It is only accessible --

25   A.  Only accessible on Tor, yes.

F1FDULB3                    Der-Yeghiayan - cross

1    Q.  It could be anything.  It could be something that someone

2    in Iran doesn't want censored, right?

3    A.  Just by being a hidden service doesn't make it illegal.

4    Q.  There is nothing sinister about that connotation, that

5    description, right?

6    A.  That is correct.

7    Q.  Now, let's talk about seizures.  And you had an exhibit

8    with all of the boxes, right --

9    A.  All the seizures.

10   Q.  -- that you made at Chicago O'Hare International mail of

11   illegal -- of contraband coming into the United States, right?

12   All of that was drugs, right?

13   A.  Yes, it was all primarily drugs.

14   Q.  And it was primarily -- withdrawn.

15          There was nothing on the packaging that said "As

16   advertised on Silk Road," or something like that, right?  There

17   was nothing that said it was ordered off of Silk Road, correct?

18   A.  No.  I never recall seeing any envelope that said Silk Road

19   on it.

20   Q.  So you connected them to Silk Road because you would match

21   the product with something that was advertised for sale on Silk

22   Road, correct?

23   A.  Yes.

24   Q.  But you don't have any proof that that was actually ordered

25   off of Silk Road, what you seized?

1    A.  Only what we were able to make by comparing it to our

2    controlled purchases.

3    Q.  Right.  Only the purchases that you made, right?  You were

4    able to go on the Internet, put in the information, the fake

5    address that you used, and then it would come to that address

6    and then you would confirm that it was off of Silk Road.

7           But that room full of drugs, none of that is confirmed

8    that it came off of Silk Road, right?

9    A.  There is at least one vendor that we did arrest that told

10   us --

11          MR. DRATEL:  Objection.

12          THE COURT:  Overruled.  He can finish.

13          MR. DRATEL:  OK.

14   A.  That during a proffer later that stated -- that confirmed

15   that several of the packages that I showed him that were part

16   of that collection that were mailed directly from him through

17   Silk Road.

18   Q.  And he told you that, right?

19   A.  Yes, he did.

20   Q.  OK.  There were also other websites on Tor that sell drugs,

21   right, through the mail and through -- right?  Through the

22   mail?

23   A.  There is other hidden services that would sell drugs, too,

24   yes.

25   Q.  And some of them -- withdrawn.

F1FDULB3                        Der-Yeghiayan - cross

1           So the only thing that connects all but those few that

2    you just talked about of seizures, all that connects them to

3    Silk Road is that those items were advertised on Silk Road,

4    right?

5    A.  For the ones that we did, for our buys.  The other ones,

6    yeah, were comparative analysis.

7    Q.  So if I saw a book on Amazon and then I ordered it from

8    Barnes & Noble and it came in a package that didn't say where

9    it was -- that didn't have either -- anything on it, can you

10   assume where it came from -- can you confirm, rather, can you

11   conclude that it came from Barnes & Noble's or Amazon if they

12   both sell it just because it advertises on Amazon?

13   A.  I couldn't necessarily confirm it just from looking at it.

14   Q.  It wouldn't even have to be off of sites; people could be

15   on Tor chat or some other private messaging, PGP, Pidgin, be in

16   direct contact with drug dealers overseas or in the United

17   States, order drugs through the mail?

18   A.  It could have been, yeah, independent from a market.

19   Q.  What could also happen is that someone could have been on a

20   site, any of the Tor sites, any of the hidden services that

21   might sell drugs, purchase ones off the site and then initiate

22   a private conversation with the person who actually sold the

23   drugs and do all the rest of the sales privately, right?

24   A.  That is a possibility, yes.

25   Q.  And they could tell all their friends how to do it, too,

1    right?

2    A.   Yeah.  I suppose that is possible, yes.

3    Q.   Now, at some point you stopped making seizures, right?

4    A.   Yes.

5    Q.   You had plenty, right?

6    A.   Yes.

7    Q.   We saw the room full of seizures.

8            The highest volume was ecstasy, right?

9    A.   The highest volume for the drugs that we maintained were

10   ecstasy.

11   Q.   By a large margin?

12   A.   By a large margin.

13   Q.   And heroin was only 261 grams, right, of heroin?

14   A.   I believe that is about right, yes.

15   Q.   And about 457 grams of cocaine, right?

16   A.   That sounds about right.

17   Q.   That is May of 2013?

18   A.   Correct.

19           THE COURT:  Let me just make sure I understand.  So

20   counsel was questioning you about the room full of boxes, is

21   that right?

22           THE WITNESS:  That is correct.

23           THE COURT:  And your statements were in connection

24   with the room full of boxes?

25           THE WITNESS:  Yes.

F1FDULB3                         Der-Yeghiayan - cross

1          THE COURT:  So is it the case that you examined the

2     contents of each of the boxes and that based upon your

3     examination of those contents the quantities were as you

4     testified?

5          THE WITNESS:  Yes.

6          THE COURT:  All right.  Thank you.

7          You may proceed.

8          MR. DRATEL:  Thank you, your Honor.

9     BY MR. DRATEL:

10    Q.  You talked a fair amount of bitcoin in your direct

11    testimony, right?

12    A.  Yes, I did.

13    Q.  Bitcoin was an essential element of Silk Road, right?

14    A.  That is correct.

15    Q.  And the exchanges that you talked about that were used to

16    cash out, the ones you talked about, like Mt. Gox and others,

17    were all on the ordinary Internet, right?

18    A.  Correct.

19    Q.  They are not hidden services, they are not on Tor?

20    A.  They are regular websites, yes.

21    Q.  And even any exchanges that were made on the page or as a

22    result of the people who were advertising on the page that you

23    showed in Silk Road to exchange bitcoins, all of those things,

24    all of those transactions still wind up on the block chain,

25    correct?

1   A.  Not internally within Silk Road it wouldn't.  If it was a

2   transfer between one account to another, that wouldn't be

3   reflected in the block chain.

4   Q.  No, but if you were cashing out.

5   A.  If you were cashing it out and taking it off of Silk Road,

6   yes, that would be reflected on the block chain.

7   Q.  The block chain, again, is this public ledger, right?

8   A.  Correct.

9   Q.  That records every bitcoin transaction where -- in terms of

10  everything that goes from bitcoin to cash, cash to bitcoin?

11  A.  Every transaction, basically just a transfer of bitcoins

12  between one address and another is documented.

13  Q.  So even bitcoin to bitcoin?

14  A.  Everything essentially is bitcoin to bitcoin.  There might

15  be a cash transaction that occurs outside of that, but the

16  block chain just reflects that you just moved a bitcoin from

17  one address to another.

18  Q.  I can't take -- there is no physical bitcoin, right?

19  A.  There is things that have been made into physical form that

20  they sell as bitcoins that have the private key on it, but it

21  is all done electronically, essentially.

22  Q.  Right.  So it -- and as of, let's say, prior to October of

23  2013, and even now, you can't -- I couldn't go and take a horde

24  of bitcoins to someone and then cash it for them without it

25  showing up on the block chain, right?

1    A.  Right.

2    Q.  Because they are not physical, they are a digital

3    instrument, right?

4    A.  It is a digital instrument, yes.

5    Q.  It doesn't exist outside of a digital character?

6    A.  Just those coins but they are not widely used.

7    Q.  And it was started in 2008 or so, right, it was invented,

8    essentially?

9    A.  Yeah.  I think the white paper that originally, the concept

10   of it was around 2008.

11   Q.  And the person who essentially invented them hasn't yet

12   revealed themselves, correct?

13   A.  Not publicly, no.

14   Q.  And it is a bit of a cottage industry to try and identify

15   that person, correct?

16   A.  It is.

17   Q.  Now, each bitcoin has a unique digital identity, correct?

18   A.  Each one, yeah, as I understand it, has it's unique

19   signature to it, in a sense, or unique string to it.

20   Q.  And some of the elements of bitcoin are designed to prevent

21   fraud, correct?

22   A.  I mean, the whole network itself, I mean, it's very well

23   documented, I mean, throughout the whole network.

24   Q.  Well, you can't duplicate a bitcoin, right?

25   A.  I believe so, yes.

1    Q.  You can't, or you can?

2    A.  I don't know.  There has been speculation.  I am not sure.

3    I am not technical enough to say that it can't be.

4    Q.  But it can't be counterfeited?

5    A.  Not that I am aware of, no.

6    Q.  And it can't be -- well, withdrawn.

7            Now, when you talked about -- on your direct you

8    talked about acquiring bitcoins and you were talking about you

9    how you did it by putting cash into an account, getting

10   bitcoins back, right?

11   A.  Correct.

12   Q.  But there are other ways to acquire bitcoins, correct?

13   A.  There are other ways, yes.

14   Q.  Can you describe what you understand to be bitcoin mining,

15   m-i-n-i-n-g?

16   A.  So bitcoin mining is the process of creating a bitcoin, and

17   that is -- someone that mines would generally use a computer to

18   specifically run a series of it is called algorithms that will

19   try to mathematically create this like perfect string which was

20   of all the different transactions.  It confirms them.  Once it

21   is confirmed it becomes a part of a block.  Once you solve a

22   block, you get a bitcoin.  And right now there is rewards that

23   are given.  And it has been -- I think it is 25 bitcoins right

24   now you get for each block you solve as a miner, but it takes a

25   lot of computing power.  So the thing to take away from it is

1   it takes a lot of computing power to solve this block and to be

2   awarded these bitcoins.  But people do it and try to run

3   computers all the time to try and mine and get these rewards.

4   Q.  So it is essentially not necessarily free but you don't

5   have to pay for them, you have to -- you earn them essentially

6   by --

7   A.  Electricity is what people weigh it against generally, the

8   cost to run their computers, but, yeah.

9   Q.  And those aren't -- I mean, those are still authorized

10  bitcoins, right?

11  A.  Yes, they are.

12  Q.  Because the bitcoin universe is limited, right?

13  A.  It is at 21 million.

14  Q.  One of the theories of the person who invented bitcoin was

15  that it have a cap, and bitcoins are created periodically until

16  that cap will be reached at some point, correct?

17  A.  Correct.

18  Q.  And that's supposed to protect the valuation of bitcoin as

19  opposed to -- I don't want to get too technical about it but

20  monetary policy; that is why it is nongovernmental?

21  A.  To set a limit, I think.

22  Q.  By the way, you talked about computing power just a second

23  ago.  You defined a server as a computer that would run a

24  website.

25          Silk Road had servers, right?

1    A.  Correct.

2    Q.  Not just an ordinary computer running it, it had -- it is a

3    complex operation to run, right?

4    A.  Right.  Basically, I just described it as a computer but,

5    yeah, it is a server.

6    Q.  Silk Road, you have servers with significant computing

7    power, right?

8    A.  As I understood, yeah, they were ones that could operate a

9    website that's more heavy in traffic.

10   Q.  Now, you also mentioned on direct that the value of a

11   bitcoin fluctuates constantly?

12   A.  It does.

13   Q.  And in April of 2013 the market eclipsed $1 billion for the

14   first time, right?

15   A.  I believe so, yes.

16   Q.  And when you first got involved in the investigation, it

17   was worth a couple of dollars, right, per bitcoin?

18   A.  That is correct.

19   Q.  And then you said that there was a point in 2013 where it

20   went up to about 250, $250 per bitcoin?

21   A.  That is correct.

22   Q.  And then by the time of Mr. Ulbricht's arrest it was down

23   to $100 per bitcoin?

24   A.  Around 100, 117, somewhere in there.

25   Q.  Then after his arrest it went up again, right?

1   A.  It spiked dramatically.

2   Q.  Dramatically?

3   A.  Yeah, after his arrest.

4   Q.  Up to a thousand dollars for a bitcoin?

5   A.  Over a thousand dollars.

6   Q.  So people who were holding bitcoins at the time of

7   Mr. Ulbricht's arrest and thereafter could really make a

8   killing, right?

9   A.  I believe there is a lot of people who made money, yeah,

10  off of that.

11  Q.  And the more bitcoins you have, obviously, the more money

12  you are going to make on that transaction, right?

13  A.  Correct.

14  Q.  Have you ever seen a graph of bitcoin valuation over time?

15  A.  I have.

16  Q.  I show you what is marked as Defendant's B, for boy, and

17  ask you if that is a representation of the fluctuation of the

18  bitcoin marketplace from its inception through today -- not

19  today, through this week?

20  A.  It looks accurate, yes.

21          MR. DRATEL:  I move Defendant's B in evidence, your

22  Honor.

23          MR. TURNER:  No objection.

24          THE COURT:  Received.

25          (Defendant's Exhibit B received in evidence)

F1FDULB3                          Der-Yeghiayan – cross

1           MR. DRATEL:  Could we publish it, please.

2           It actually looks like that mountain.

3           (Pause)

4   Q.  OK.  So going back to 2011, if we look at the start in

5   2011, we see it is very close to zero, right?

6   A.  It was, yeah, approximately 2 to $4 or so at that point.

7   Q.  Then in 2013 is when it really starts to move, right?

8   A.  That is correct.

9   Q.  And then it goes down -- there is a spike in the early part

10  of 2013, and then it goes back down to somewhere in the

11  hundreds, right?

12  A.  That spike was at $250.

13  Q.  I'm sorry.  Do you have the --

14  A.  Laser pointer?  Yes.

15          MR. DRATEL:  Can I borrow yours?

16          THE WITNESS:  Do you want it?

17          MR. DRATEL:  I will just point it out.

18  Q.  So there is a little spike in the middle of 2011, right?

19  A.  That is about a $20 spike I believe it went up to.

20  Q.  By the way, just -- and that is zero, right, that line

21  there?

22  A.  The line is zero, yes.

23  Q.  So there we have in the early part of 2013, it goes up to

24  about 250, as you stated, right?

25          Then it goes back down until the latter part of 2013,

F1FDULB3                          Der-Yeghiayan - cross

1   and this spike right here is after Mr. Ulbricht's arrest,

2   right?

3   A.   It was, I believe, like starting around mid/late October,

4   yes.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Fifgulb4a                    Der-Yeghiayan - cross

1   Q.  And that goes up to over a thousand dollars per bitcoin?

2   A.  I think the highest is around a thousand or 1200.

3   Q.  Do you know what it is now?

4   A.  I believe it's around $300 bitcoin.

5   Q.  So even though a lot of bitcoin use may have been

6   attributable to Silk Road, it survives Silk Road?

7   A.  It survives Silk Road; yes.

8   Q.  In fact, it's now used or accepted by certain large

9   vendors, right, ordinary vendors?  I'm not talking about Tor or

10  illegal.  Overstock.com accepts bitcoin?

11  A.  Yes.  It's starting to hit other websites and other -- the

12  mainstream.

13  Q.  Certain casinos accept it?

14  A.  I think there's a university that you can pay tuition with

15  it.

16  Q.  Now, you talked about the tumbler, right, on Silk Road?

17  A.  Yes, I did.

18  Q.  Just to refresh the jury, tumbler -- I'll just try to

19  explain it shorthand -- which is something that's designed to

20  create confusion about which specific bitcoins are involved in

21  a specific transaction.  Is that a fair statement?

22  A.  That's a fair statement.

23  Q.  And do you know whether Silk -- do you know when Silk Road

24  instituted tumbler?

25  A.  I don't know when they instituted it, no.

1    Q.  Do you know if Silk Road actually used a tumbler?

2    A.  They advertised it in and I also did my own research

3    through the block chain of transactions that I would move into

4    Silk Road and out of Silk Road, and I observed from patterns

5    that would resemble that of a tumbler.

6    Q.  And those started in 2012?

7    A.  Yeah, the bitcoin --

8    Q.  In other words, your transactions --

9    A.  Yes.

10   Q.  -- that would you monitor?

11   A.  2012, yes.

12   Q.  So you were able, because you -- and you could see both

13   sides of a bitcoin transaction, right --

14   A.  Correct.

15   Q.  -- you were able to do some tracing, right?

16   A.  I was; yes.

17   Q.  Even with a tumbler, you were able to do some tracing?  Or

18   even if they were tumbled, you were able to do some tracing?

19   A.  Yes.  There were accounts that we believed belonged to Silk

20   Road that were so high in volume at the time that -- and they

21   would stop after we would deposit money and that would lead us

22   to believe that that belongs to Silk Road, and we'd be able to

23   trace other transactions to that account.

24   Q.  And that started in 2012?

25   A.  Yes.

1   Q.  And you never heard of Mr. Ulbricht until September of

2   2013, right?

3   A.  That's correct.

4   Q.  Now, based on your training and experience, you concluded

5   that the system was likely designed by someone with a high

6   level of technical expertise concerning the operation of

7   bitcoins, right?

8   A.  It appears so, yes.

9   Q.  In fact, Silk Road had a lot of sophistication, right?

10  A.  It was sophisticated; yes.

11  Q.  And I mean that in a computer way as well as marketing and

12  business oriented, right?

13  A.  Yes.

14  Q.  In fact, it used leading-edge encryption-based

15  technologies, right?

16  A.  It did, yes.

17  Q.  And encryption-based technologies is really about security,

18  right?

19  A.  Yes.

20  Q.  And you reported, right, that the operators of the website

21  are believed to be highly experienced web administrators that

22  take precautionary steps to protect themselves and their users,

23  right?

24  A.  Yes.

25  Q.  Would they be the type of people who would leave

Fifgulb4a                    Der-Yeghiayan - cross

1   handwritten notes in a wastebasket?

2   A.  At this point, I don't know.  I couldn't say whether they

3   would or wouldn't.

4   Q.  You called it a complex criminal enterprise, right?

5   A.  Yes, I did.

6   Q.  And you used multiple confidential informants throughout

7   the course of your investigation, right?

8   A.  Yes, I did.

9   Q.  Now, you have Mr. Ulbricht's passport still up there?

10  A.  Yes, I do.

11  Q.  And his birthdate is March 27, 1984?

12  A.  Yes, it is.

13  Q.  So in late 2010, he would be -- he would have been 26?

14  A.  Yes.

15  Q.  Now, you said on direct Silk Road operated like a lot of

16  other websites, correct, that operate on the ordinary Internet?

17  A.  It was similar, yes.

18  Q.  And we saw on the left-hand side all the categories of

19  merchandise, right?

20  A.  Correct.

21  Q.  And by the time you were on the site in December of 2011,

22  it had about 2,000 or so products for sale, right?

23  A.  I think that first screen shot was about April for the

24  2,000 products.  For the drugs, the earlier ones I think were

25  less.

Fifgulb4a                    Der-Yeghiayan - cross

1   Q.   Yeah, but I'm saying 2,000 products for sale total --

2   A.   Total or so --

3   Q.   -- like in December of 2011?

4   A.   That would be about correct, yeah.

5   Q.   And there were certain items -- by the time you got on the

6   site, there were certain items that were forbidden, correct?

7   A.   That's correct.

8   Q.   Child pornography, counterfeit currency, weapons of mass

9   destruction, right?

10  A.   That's correct.

11  Q.   And in fact, on the site it said -- and this is November of

12  2011 -- on the site it said please do not list anything whose

13  purpose is to harm or defraud, such as stolen credit cards,

14  counterfeit currency, personal info, assassinations, weapons of

15  mass destruction, chemical/bio weaponry, nukes and anything

16  used to make them.  Please do not post anything related to

17  pedophilia.  To allow listings of items designed to defraud or

18  harm innocent people would be to stoop to the level of the very

19  people we are standing up to.

20          Right, that's what it said on the site?

21  A.   That remained, yeah, throughout the site.

22  Q.   Now, you interviewed -- as you said before, you interviewed

23  some people who had ordered drugs and you'd go and then

24  confront them sometimes, right?

25  A.   Yes, I would.

1    Q.  And they weren't of any help really in identifying Dread

2    Pirate Roberts?

3    A.  No.  They only helped with the vendors.

4    Q.  And those vendors didn't give you access in terms of to who

5    Dread Pirate Roberts was, right?

6    A.  No.

7    Q.  Now, you mentioned that it was -- one of the seizures that

8    was tested -- sorry.  Withdrawn.  One of the undercover buys

9    that you made of the 50 or so undercover buys that you made

10   from Silk Road, that one tested negative for drugs, right?

11   A.  That's correct.

12   Q.  But do you know how many other sales or scams or frauds

13   that didn't provide real drugs in exchange for bitcoin?

14   A.  I don't know how many, no.

15   Q.  And it's kind of difficult for the consumer to go to the

16   police or the fraud bureau for that, right?

17   A.  It would be, yeah.

18   Q.  In one way that it differed from ordinary websites in some

19   respects is that the vendors would come and go, right?

20   A.  Yes, they would.

21   Q.  They would vanish for a little bit, come back, vanish.  It

22   was not that kind of organization or continuity that you would

23   find for, let's say, Amazon where sellers were there?

24   A.  No.  Some would stay for longer periods.  Others would

25   disappear periodically and then just reappear.  And sometimes,

1    they'd leave for a larger period and come back.

2    Q.  Now, with respect to the commissions that Silk Road charged

3    on transactions, January 2012 was when the commission structure

4    changed, correct, and you put in those exhibits.  And you

5    verified that in September of 2012 when you opened up your

6    first vendor account?

7    A.  That was an account we took over.

8    Q.  Sorry.  When you assumed control of the vendor account.

9            Now, do you know the volume of transactions before you

10   had access to the site?  I don't mean access in terms of with a

11   vendor account or something when you first went on the site.

12           You don't know the volume of transactions just from

13   going on the site at that point, right?

14   A.  I do not know that, no.

15   Q.  And have you studied that since in terms of the volume over

16   time?

17   A.  I've looked at -- there was other reports that are done by

18   universities.  Carnegie Mellon did a report where they did an

19   analysis and I reviewed that which was based upon the feedback

20   that was in the marketplace.  So I reviewed their work they

21   did, as well as I've seen results that came later on off of

22   servers.

23   Q.  So 2013 was a huge year, right?

24   A.  I'm sorry?

25   Q.  2013 was a huge year for Silk Road, right?

Fifgulb4a                        Der-Yeghiayan - cross

1   A.   It was a larger year, yeah.

2   Q.   There was a big spike in volume?

3   A.   The listings went up; yes.

4   Q.   Now, the silkroadmarket.org, that is something on the

5   ordinary Internet, right, was?

6   A.   Correct.

7   Q.   And the only way we have it is because of something called

8   archive.org, right?

9   A.   Right.

10  Q.   And archive.org is an organization that is dedicated to

11  capturing everything on the Internet, right?

12  A.   They capture everything on the regular Internet.

13  Q.   Not Tor?

14  A.   Correct.

15  Q.   Not anything that's on Tor, but on the ordinary Internet,

16  archive.org's purpose is to try to capture everything?

17  A.   It takes screen shots regularly over time and it documents

18  that on its website, that you can view a website and the screen

19  shots that it took.

20  Q.   Right.  So if I put in Silk Road, that's all you come up

21  with, is that Silk Road market.org, right, if you did that

22  research?

23  A.   It would lead you specifically to that URL, yes, it would

24  pull up silkroadmarket.org.

25  Q.   And that's the way for people to see historic pages on the

1   Internet that don't exist anymore, that you just can't get.

2   You type in a URL and the page no longer exists, right, when

3   you get that kind of message, you can try archive.org to see

4   whether something is there?

5   A.   Yes.  And it will show if there's changes done also.  You

6   can change a web page over to reflect different things.

7   Q.   So that silkmarket.org was just one page, right?

8   A.   It was just one page.

9   Q.   Silkroadmarket.org?

10  A.   Yes.

11  Q.   And that was a page essentially both -- if people put in

12  Silk Road into their ordinary Internet computer, that they

13  might get that and then be directed to Silk Road on Tor because

14  it kind of told you how to get there, right?

15  A.   That's correct.

16  Q.   And that page stopped operating in April of 2012, right?

17  A.   I believe that's correct; yes.

18  Q.   And there were changes throughout to the site over time,

19  right?

20  A.   The silkroadmarket.org?

21  Q.   No, I'm sorry.  Let's go back to dot-onion.

22  A.   Okay.

23  Q.   So, right, the site is changed in some ways over time,

24  right?

25  A.   There was a whole new format in appearance to the site

1   after I think it was in late 2012.

2   Q.  Also, even before that, did you know from reviewing forum

3   messages and things like that, right, that in June of 2011,

4   June 11 of 2011 in particular that there was a message that the

5   site was closed for a while and that it would reopen in July,

6   right?

7   A.  From what I read on previous articles, yes.

8   Q.  And that it was going to split into two sites and you've

9   seen that post, right, the one where it's going to split into

10  two sites?

11  A.  I don't recall offhand.

12  Q.  Well, one -- but you testified --

13  A.  Oh, the forum you're talking about?  Yes.

14  Q.  It split into two sites, the marketplace and the forum?

15  A.  Yes.

16  Q.  And you've seen that post that announced that, right?

17  A.  Yes.

18  Q.  And that's June 2011?

19  A.  Correct.

20          THE COURT:  Mr. Dratel, just for a couple of more

21  minutes.

22          MR. DRATEL:  This is a good time.

23          THE COURT:  Oh, this is a good time?

24          MR. DRATEL:  Yes.

25          THE COURT:  Ladies and gentlemen, we'll take our lunch

Fifgulb4a                      Der-Yeghiayan - cross

1    break now and pick up again at 2:00.  So, again, just to remind

2    you folks, most of you, if are able, to get yourself ready to

3    come out here a couple minutes before 2:00 so we can come on

4    out.

5              I want to remind you not to talk to anybody about this

6    case, including each other.  And if anybody tries to talk to

7    you about this case, to avoid them and just walk away and then

8    to let Joe know, all right.

9              We'll see you after lunch.  Thank you.

10             (Jury excused)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; jury not present)

2           THE COURT:  All right, ladies and gentlemen, be

3     seated.

4           Let's see if there are things that we need to take up.

5     One thing that I wanted to mention is that I had not

6     appreciated for some reason before just a little while ago that

7     the conspiracy charge is not only an 841(a)(1) charge, but also

8     an 841(h) charge; that is, given my comments about scope a

9     significant difference, and I wanted to state that on the

10    record.  I have to think through what the implications of that

11    are, but that is different from what I had been thinking.

12          It certainly doesn't alter my ruling in terms of the

13    bottom-line orders on the rulings which I had issued, though

14    the scope, it is potentially the case that the scope would

15    cause me less concern for an 841(h) than otherwise.  I have to

16    think that through.

17          The other point that I wanted to raise was that

18    Mr. Dratel had objected to a portion of the witness' answer

19    where an individual who was being arrested, I believe, an

20    alleged seller --

21          MR. DRATEL:  Purchaser, your Honor.  Never mind.  I

22    thought he was --

23          THE COURT:  Was he a purchaser?

24          MR. DRATEL:  I think he was a purchaser because I

25    think the testimony was essentially that when they confronted

1    him with the package, he said, yeah, he ordered it off of Silk

2    Road.

3                MR. TURNER:  My recollection was it was a vendor.

4                THE COURT:  I thought it was a vendor, too.  In any

5    event, the reason I allowed that in was because, number one, it

6    was responsive to the question in terms of presenting his

7    knowledge; but also to the extent that there was a statement

8    against interest under 804, it would have come in and there

9    would have been the requisite unavailability given the timing

10   and the reasonableness of getting someone here that quickly.

11   So that's the basis of what I was stating because it was to

12   support the facts that the witness had been asked to testify

13   about.

14                Are there any things which you folks would like to

15   state now or issues that we should go through before we take

16   our own lunch break?  I do not have a matter in here during the

17   lunch break.  I have a meeting someplace else.  You are welcome

18   to all stay here as you see fit.

19                MR. DRATEL:  I just wanted to project that this went

20   faster than I anticipated in large part because of the witness'

21   cooperative manner, so obviously that's very helpful and

22   efficient.  I'm coming to a more dense part, so it's hard to

23   say.  I think at least another two hours is my guess.

24                THE COURT:  So the government can plan around that in

25   terms of getting your next witness, Mr. Turner, on deck.  That

Fifgulb4a                    Der-Yeghiayan - cross

1    I think you had previously stated was Kiernan.

2            MR. TURNER:  Thomas Kiernan.

3            THE COURT:  So it will be Kiernan either way, so if we

4    start, it's possible Mr. Kiernan may get on the stand sometime

5    between 3:00 and 5:00.

6            MR. DRATEL:  I don't think he would be on before 4:00.

7            THE COURT:  So 4:00, so between 4:00 and 5:00 maybe.

8            MR. DRATEL:  We'll see how it goes.

9            THE COURT:  If you think you're going to beat 4:00,

10   let us know; otherwise, the government will have Mr. Kiernan

11   here at 4:00.

12           MR. DRATEL:  I will reevaluate at lunch what I think

13   based on how it went this morning.

14           THE COURT:  Right.  Understood.  Anything further that

15   we should go over right now?

16           MR. TURNER:  No, your Honor.

17           MR. DRATEL:  No, your Honor.

18           THE COURT:  Let me say one thing to the press also.  I

19   would ask you folks not to approach any of the jurors or to the

20   extent that you're communicating with anybody else from your

21   office to have them approach the jurors.  Obviously, it creates

22   issues with juror misconduct or potential bias.  They're not

23   having any misconduct on their part.  It's misconduct with the

24   jury.

25           I had the occasion to speak to other judges in the

1   courthouse regarding what they have done in the past.  They

2   have actually excluded the newspapers or the press itself from

3   the courtroom, not all, the offender member of the press and/or

4   his or her paper or if it's not a newspaper, it's an Internet

5   source.

6         I'm not doing that right now.  I just wanted to let

7   you folks know what would be one of the potential courses of

8   action that would be recommended to be taken at that time if we

9   had another repeat.

10         Thank you.  We're adjourned for lunch.

11         (Luncheon recess)

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                              2:05 p.m.

3             THE DEPUTY CLERK:  All rise for the jury.

4             (In open court; jury present)

5             THE COURT:  Mr. Dratel, you may proceed now.

6             MR. DRATEL:  Thank you.

7      JARED DER-YEGHIAYAN,

8   CROSS-EXAMINATION CONTINUED

9   BY MR. DRATEL:

10  Q.  Good afternoon, Agent Der-Yeghiayan.

11  A.  Good afternoon.

12  Q.  Ross Ulbricht, you learned during the course of your

13  investigation he was an Eagle Scout?

14  A.  I did.

15  Q.  And that he was living in that house in San Francisco,

16  right?

17  A.  There's I think there were two residents I knew of.

18  Q.  I'm saying he was in there.  There were other, as well,

19  right?

20  A.  Correct.

21  Q.  He shared that with other people?

22  A.  Yes.

23  Q.  He was not the owner of the house, right?

24  A.  I don't believe so, no.

25  Q.  You said that in his bedroom, you found credit cards, bank

1    statements, things like that, the passport, right?

2    A.  Correct.

3    Q.  And you investigated all of that, correct?

4    A.  Yes.

5    Q.  Because it was important to try to find out about money,

6    right, bitcoin and location?

7    A.  Yes.

8    Q.  And there was discussion -- withdrawn.  And there was a

9    concern about, not concern, but there was an interest in how

10   and when and in what quantity Mr. Ulbricht may have cashed out

11   bitcoins, right?

12   A.  Yes.

13   Q.  Now, you, as a law enforcement officer in an undercover

14   capacity, occupied and controlled the account for cirrus on

15   Silk Road, right?

16   A.  From July from July on; yes.

17   Q.  From July -- late July, you said about the 26th, 27th of

18   2013?

19   A.  Around -- correct, around that date.

20   Q.  And cirrus is C-I-R-R-U-S, right?

21   A.  Correct.

22   Q.  And that previously had been the account for scout?

23   A.  Correct.  The original operator that started the cirrus

24   account was scout before that.

25   Q.  And scout changed it to cirrus before you took it over,

1    right?

2    A.   Scout -- the person that operated scout account created the

3    cirrus account.

4    Q.   About two or three weeks after you got control of the

5    cirrus account, DPR, Dread Pirate Roberts, granted you

6    administrative rights over the Wiki page?

7    A.   I had the chat from one of the dates, but yes, it was

8    granted to me when I was controlling it.

9    Q.   Did August 16 sound about right?

10   A.   Sounds about right; yes.

11   Q.   You were given only limited privileges, correct?

12   A.   I was given a level -- second level underneath admin

13   privileges.

14   Q.   You never spoke to DPR on the telephone, right?

15   A.   No.

16   Q.   You never communicated in a ordinary Internet electronic

17   communication?

18   A.   Nothing outside of Tor.

19   Q.   Right.  And the same was true of the other -- to your

20   knowledge from your investigation and your interaction with the

21   other administrators, the same was true with them as well,

22   correct?

23   A.   I didn't engage with them outside of Tor either.

24   Q.   Right.  But I'm saying they didn't engage with DPR outside

25   of Tor?

1  A.  Not from what they told me.

2  Q.  And you saw no evidence of that in the course of your

3  investigation?

4  A.  No.  There were a few that were closer connected to him

5  than me, but not -- they didn't ever say that.

6  Q.  DPR would you say was careful to conceal his identity?

7  A.  I think he was.

8  Q.  And he set up a series of security measures on the site

9  such as this tiered level of access even for administrators and

10  employees?

11  A.  He did.

12  Q.  Now, for Government Exhibit 127, it's already in evidence.

13  A.  127.  Okay.

14  Q.  It's up there.  These are the instructions that you were

15  given by DPR on how to get administrative access, correct?

16  A.  To clarify, this was given to the person --

17  Q.  I'm sorry?

18  A.  I'm sorry.

19  Q.  This was given to cirrus before you were cirrus?

20  A.  Yes.

21  Q.  In essence -- now, did you learn how to get on the site

22  from the person who was operating the cirrus account or did you

23  go to this page to get the information?

24  A.  The person that operated the cirrus account walked me

25  through the steps.

FIFGULB4                          Der-Yeghiayan - cross

1    Q.  So, in essence, it was not a difficult process for someone

2    to walk someone through the process of getting access, as long

3    as you had the right password or access code?

4    A.  It was a little more complicated to set up than I was -- my

5    previous knowledge before that with dealing with, like, an IRC

6    type of setting like this, but it was -- with the directions it

7    was simple.

8    Q.  And you follow the directions, and you had, instead of that

9    username and that password, if that was for DPR, that would get

10   you DPR's access, right?

11           In other words, you know where it says 8b username?

12   So if that were in DPR's username and if 8c and 8d were DPR, it

13   wouldn't be any different to get into the DPR-level of access,

14   right?

15           MR. TURNER:  Objection; form.

16           THE COURT:  Hold on one second.  Let me read it.

17           Why don't you rephrase.

18   Q.  This is information that cirrus was given to log on, right?

19   A.  Correct.

20   Q.  So it's a username, a domain, is that a, b, c and d.

21   There's a username, domain and password that allow a certain

22   amount of access, right?

23   A.  I guess so, yes.

24   Q.  If you had the information for DPR's username, domain and

25   password, that's how you would get to -- there's no other way

1    to get in the site to your knowledge other than through this,

2    just with a different password and a different domain and

3    different username?

4    A.  I don't -- I wouldn't know how he got in.  I know that

5    there's -- there are different ways to access servers or there

6    are different ways to access programs.  I don't know if he

7    would do this from, like, almost a front-face way that you do

8    this.  I'm not sure.  Hypothetically, yes, I'm guessing it is

9    possible to do it that way, too.

10   Q.  And in terms of logging into the Pidgin chat, and just to

11   refresh the jury's recollection, the Pidgin chat is the little

12   box in the upper right that you were chatting with with DPR on

13   October 1, and you had a couple of other instances of that as

14   well, right?

15   A.  Correct.

16   Q.  And that's not on the Silk Road site, correct?

17   A.  No.  That server was separate.

18   Q.  That's a separate encrypted chat system, right?

19   A.  Yeah.  It's separate dot-onion address.

20   Q.  But for that one, in terms of logging on, the steps that

21   you went through with us are the only steps for logging on,

22   right?  Nothing more complicated than that?

23   A.  That's the only ones I know of; yes.

24   Q.  But that got you on the Pidgin chat, correct?

25   A.  It was a little bit different from the Adium program that

1    cirrus was originally using, so that's why that user or the

2    person, the original owner walked me through it because it was

3    different than Pidgin.

4    Q.  And Adium is used more on Macs, right?

5    A.  I guess so.  It was just the program that user decided to

6    use, so I wanted to stay consistent.

7    Q.  You talked about timezones on that, right?  And you're

8    aware that Adium has a plugin, meaning an additional option

9    that you can use to adjust the timezone?

10   A.  I'm not sure about a plugin for it, but I never did it.

11   Q.  And the timezone that's reflected on that, that's really

12   just a timezone of the person's computer who is logging on,

13   right?

14   A.  I'm assuming that that's the computer, yes, the computer's

15   time.

16   Q.  So if you set your computer in a different timezone --

17   withdrawn.

18           You can set your computer to a different time than the

19   time, right?

20   A.  You can set your computer to any timezone you want.

21   Q.  So all that does is tell you where the computer timezone

22   is, not where the computer is, but what timezone is provided to

23   that --is programmed to that computer; is that accurate?

24   A.  Yes.

25   Q.  Programmed to that computer?

1    A.  That's accurate.  You can modify your timezone on the

2    computer and that doesn't reflect where you're at at the

3    timezone.  You can put anywhere in the world.

4    Q.  Also, those chats, don't they also contain a line, and we

5    can look at it if you need to, but it says encrypted OTR chat

6    initiated identity not verified the other side, right?  Don't

7    they say that?

8    A.  There's OTR different plugins, I guess, that allow you to

9    do it.  It stands for off-the-record chats.

10   Q.  What I'm saying is, the ones that you've testified about,

11   don't they say that?  There's sort of a line that says it's

12   encrypted, but the other side is not verified?

13   A.  I believe so, yeah.  When you first start it up, all the

14   chats I had with the staff would always initiate the OTR

15   setting, so it would turn on every time I start a chat.

16   Q.  And you said before you spent thousands of hours on the

17   Silk Road site, right, in a variety of different roles

18   essentially:  Buyer, seller, administrator.  Right?

19   A.  Yeah, and just browsing, too.

20   Q.  Right.  Some of that, like you said, every couple of days

21   in direct contact with DPR, right?

22   A.  Just about, yes.

23   Q.  Is it fair to say that during that entire period, DPR never

24   let -- and I would say he, but it could be a she, right?  We

25   wouldn't know just from the screen, right?  I mean, in essence,

1   you don't know who you're talking to, right?

2   A.  From a user account, yeah, it could be a he or she.

3   Q.  DPR never let his or her guard down to give you a piece of

4   personal information that enabled you to establish identity; is

5   that fair to say?

6   A.  I don't know.  For gender-wise, I didn't never really see

7   anything that would indicate that it was a he, but some of the

8   writing just appeared to be more masculine to me from reviewing

9   it.

10  Q.  I'm not talking about gender.  I'm just talking about in

11  general.

12  A.  Okay.  No, there wouldn't be a defined, exact way to say

13  that it was a he or she.

14  Q.  Never let his guard down.  By the way, you were surprised

15  that scout was a woman, right?

16  A.  I was.

17  Q.  I want to take you to the day of Mr. Ulbricht's arrest, all

18  right.  And just so it's clear, you had never seen Mr. Ulbricht

19  in person prior to you going to California the day before?

20  A.  That's correct.

21  Q.  Did you identify him from photographs or from people

22  pointing him out, you know, in other words, the other agents

23  saying "that's him," or did you identify him -- in other words,

24  did they say this is him and then when you saw the photo, you

25  saw him?

1    A.  When I started investigating him around September tenth,

2    11th, it was brought to my attention.  I did pull up documents

3    such as his passport application, the photograph.  I saw other

4    photographs as well that I found online of him.

5    Q.  So that's how you were able to recognize him?

6    A.  Yes.

7    Q.  He didn't have any kind of markedly -- or different

8    appearance that would prevent you from recognizing him?

9    A.  No.

10   Q.  You had never spoken to Mr. Ulbricht before that time, in

11   other words, voice contact or anything else to your knowledge

12   in terms of Ross Ulbricht?

13   A.  I had not.

14   Q.  Now, I think you testified on direct that you

15   wanted -- that the plan was to try to have Mr. Ulbricht out in

16   public for purposes of effecting the arrest, correct?

17   A.  Correct.

18   Q.  And that would be so he would be more vulnerable that way

19   in terms of -- obviously in terms of just the immediacy of the

20   arrest and your ability to track and all that, right?

21   A.  Yes.  We had an arrest warrant, so we were -- wanted to

22   initiate that in those settings.

23   Q.  And you didn't, as cirrus, or anyone else to your knowledge

24   didn't coax him out of his house, right?

25   A.  No, I did not.

1    Q.  So he left his residence voluntarily, right, to go to, the

2    day before you noted, to a public Wi-Fi spot, right?

3    A.  Correct.

4    Q.  And then the next day, went to the cafe and then did not

5    stay at the cafe but instead went to the public library?

6    A.  Was never coaxed out that I know of.

7    Q.  Right, right.  But it was the plan to get him online during

8    that period, right?

9    A.  Mr. Ulbricht himself, we would be observing him if he went

10   to an area that would provide public Wi-Fi and then, yes, try

11   to initiate a chat with Dread Pirate Roberts online.

12   Q.  By the way, you mentioned the passport and you seized the

13   passport from his residence, right?  That's an authentic U.S.

14   passport, correct?

15   A.  It's an authentic U.S. passport.

16   Q.  And so, if we could pull up 129C, please.

17   A.  Okay.

18   Q.  And that's the chat that you were having at the time of

19   Mr. Ulbricht's arrest, correct?

20   A.  Correct.

21   Q.  And so, you initiated, correct?

22   A.  I initiated the chat; yes.

23   Q.  And then you asked him can you check out one of the flagged

24   messages for me, right?

25   A.  That's correct.

1    Q.  And dread says sure.  And then the next thing he says is

2    let me log in, right?

3    A.  Correct.

4    Q.  So he needs to log into silkroad, correct?

5    A.  To log into the market, yes.

6    Q.  So he's already on the Internet.  He's already active, so

7    you're chatting with him, but until you ask him, he's not

8    logged into silkroad, correct?

9    A.  I -- it doesn't appear he's logged on to silkroad.

10   Q.  And then -- by the way, you know what happens when you log

11   in as -- withdrawn.

12          Do you know whether or not if one logs in as DPR, as

13   Dread Pirate Roberts onto the silkroad site, whether or not the

14   mastermind page comes up automatically?  Do you know?

15   A.  I do not know.

16   Q.  Did you ever test it?

17   A.  No.

18   Q.  During that period in the library, you're aware that there

19   are law enforcement officers in the library, you're not sure

20   who but you know there are people watching him, right?

21   A.  That's correct.

22   Q.  And to your knowledge no one -- withdrawn.

23          Mr. Ulbricht still had his laptop out on a library

24   desk, right?

25   A.  As I was told by other agents there.

FIFGULB4                          Der-Yeghiayan - cross

1    Q.  By the way, with respect to the mastermind, going back to

2    the mastermind screen, you said that Mr. Kiernan is a computer

3    scientist?

4    A.  He is.

5    Q.  That's how you described him.  So you had to tell him to

6    hit the "back" tab to find the previous screen?

7    A.  I asked him if he could go back.  I think he was trying to

8    keep it in a place or trying to keep the computer just active

9    and alive so it wouldn't -- the encryption wouldn't turn back

10   on or wouldn't lock.  So he wasn't actively, as far as I could

11   tell, doing anything on the screen besides keeping it alive at

12   that point.

13   Q.  So before that chat, 129C on October 1, 2013, what was the

14   time before that that you communicated with DPR?

15   A.  I believe I had a chat.  I have to look back at my logs.

16   Q.  In fact, it was a couple of days, right?

17   A.  It might have been a few days before.  Actually, earlier I

18   think in the day, I think I had a short chat with him or it

19   might have been -- I got to doublecheck.

20   Q.  That day?

21   A.  Not -- I'm saying earlier the day before I left maybe.

22   Q.  Weren't you concerned that -- withdrawn.

23        Wasn't it unusual for him not to be on what you call

24   the IRC for two days?

25   A.  On the staff chat?

FIFGULB4                         Der-Yeghiayan - cross

1   Q.  Yes.

2   A.  It would be a little bit unusual but there were periods

3   that he would take some time off.

4   Q.  But did that concern you at some point?  I mean, did you

5   talk to the other agents and ask them whether they got physical

6   surveillance because Dread Pirate Roberts had not been on the

7   staff chat for over two days and that was unusual?

8   A.  I think he was online.  I hadn't been engaging him in chat,

9   though.

10  Q.  Do you recall?

11  A.  I'm sorry?

12  Q.  Do you recall specifically?

13  A.  I'd have to look back at my records to --

14  Q.  I'm going to show you what's marked as 3505, 36 and 37.

15  Just ask you to -- if you don't mind, I'll just point out to

16  you where I prefer that you read rather than take time.  So

17  that and then through there.  It goes up obviously from the

18  oldest quote.  Start on page 37 I think is how it works.

19  A.  Okay.

20              (Continued on next page)

21

22

23

24

25

1    Q.  So you wanted to know from Agent Tarbell whether they had

2    physical surveillance because you said that not logging into

3    IRC for over two days is unusual for DPR, right?

4    A.  Yes.

5    Q.  There is also something else.  Do you recall that on the

6    29th, which is two days before, that you noticed someone with a

7    username peaceloveharmony was what you called sitting on DPR's

8    profile for a couple of hours; do you recall that?

9    A.  If I could see something that would help me recollect?

10        (Pause)

11   Q.  I show you what's marked 3505-00775, and just ask you,

12   again, read from the bottom to the top, essentially.

13   A.  Sure.

14        (Pause)

15        I recall this.

16   Q.  Thank you.  So there was a period on the 29th of September,

17   2013, where someone with a username or a screen name

18   peaceloveharmony was what you called sitting on DPR's account?

19   A.  Yeah.  There was from the forums, on the Silk Road forums,

20   there is a way to see what users were viewing actively in the

21   forums, and what I mean by "sitting" on an account, they were

22   viewing the profile of Dread Pirate Roberts for an extended

23   period of time.

24   Q.  And so you asked the people on the arrest team as to

25   whether it was any of them, essentially, right?

1   A.   If there was anyone else that was monitoring him.

2   Q.   Right.  And they said no, that it was not them?

3   A.   Right.  The responses I got from the other agents that I

4   was working with said no.

5   Q.   Right.  Your conclusion was that it might be law

6   enforcement, some other law enforcement that you were unaware

7   of?

8   A.   I suspected, yes.

9   Q.   But it didn't have to be law enforcement, it could have

10  been anyone?

11  A.   It could have been anyone, yea.

12  Q.   But it was unusual, right; it wasn't typical activity that

13  someone would be monitoring that profile for that extended

14  period of time?

15  A.   I didn't actually watch them for a long time.  I was

16  watching his account and watching the forums more vigilantly,

17  actively for the last few days.  So that's why I took notice of

18  that.

19  Q.   And you had spent a fair amount of time yourself as law

20  enforcement doing that very thing, right, sort of trolling

21  through that account for periods, right?

22  A.   And watching it, yes.

23  Q.   While you were doing that, were other people doing it at

24  the same time?  Do you recall anyone else doing it?

25  A.   Generally me.  I believe Special Agent Gary Alford also was

1    watching the account on the forums as well.

2    Q.  But he wasn't peaceloveharmony; we don't know who that is?

3    A.  I said it to him and he said no.

4    Q.  I just said, we don't know who peaceloveharmony is?

5    A.  I don't know who peaceloveharmony is.

6    Q.  Now, is it fair to say that the Silk Road site, that users,

7    both vendors and purchasers, were extremely security conscious?

8    A.  A lot of them were, yes.

9    Q.  And there was a lot of talk on the forum about keeping

10   track of law enforcement infiltration or attempts to infiltrate

11   the site?

12   A.  There was discussions about that, yes.

13   Q.  And they actively discussed prior arrests and what happened

14   to people and rumors and all of that kind of stuff?

15   A.  There would be discussions about that regularly on the

16   forums.

17   Q.  Would you say they were very motivated in finding out more

18   about what law enforcement is doing with the Silk Road?

19   A.  There was a lot of discussion.  If there was anyone that

20   would ever bring up something that would occur with law

21   enforcement, then they would like to discuss that a lot.

22   Q.  Now, in April of 2012, you believe you had identified some

23   Silk Road bitcoin accounts, correct?

24   A.  That would be correct.

25   Q.  And you were working to further identify the people behind

F1fdulb5                         Der-Yeghiayan - cross

1    them, right?

2    A.  That is correct.

3    Q.  And sometime in the summer, maybe July of 2012, you

4    believed that you had identified the person, right?

5    A.  I believe that I had a good target for it, potentially.

6    Q.  A good target, Mark Karpeles, right?

7    A.  Karpeles and an associate of his.

8    Q.  Right.  Ashley Barr, correct?

9    A.  Correct.

10   Q.  Karpeles is K-a-r-p-e-l-e-s.

11          Mark Karpeles is a French citizen, right?

12   A.  That is correct.

13   Q.  He lives in Japan, right?

14   A.  He does.

15   Q.  He is also the owner of Mt. Gox, correct, the bitcoin

16   exchange?

17   A.  That is correct.

18   Q.  And he bought Mt. Gox I think in 2009?

19   A.  I think it was 2010.

20   Q.  OK.  But you thought that -- what you had concluded there

21   was that Karpeles was essentially behind Silk Road but that his

22   associate Ashley Barr was DPR?

23   A.  There was -- Karpeles' English that I could see from his --

24   the things he would write online did not match the level of

25   English skills that Dread Pirate Roberts possessed.  So I

1  thought it was someone else close to him, and there was a

2  person that shared some of the same viewpoints that was working

3  for him by the name of Ashley Barr that I suspected.

4  Q.  He was a Canadian, right?

5  A.  He was a Canadian citizen.

6  Q.  And has a degree in computer science, right?

7  A.  He has computer science degrees, yes.

8  Q.  And he is also Karpeles' right-hand man, or was at the

9  time, right?

10 A.  He was.

11 Q.  And so as a result you built up quite a large list of

12 information to lead you to that, right?

13 A.  There is little bits and pieces of evidence that was

14 pointing the investigation towards them, yes.

15 Q.  And -- well, did you say we had built up quite a large list

16 of information to lead us to this?

17 A.  It was, yeah, a lot of little pieces, a list of exhibits.

18 It was a lot of little things that added up to it.

19 Q.  The question is did you not say inside Homeland Security

20 Investigations, HSI, we had built up quite a large list of

21 information to lead us to this?

22 A.  That sounds right.

23 Q.  And you also didn't want anybody reaching out to Karpeles,

24 right?

25 A.  There was other --

F1fdulb5                          Der-Yeghiayan - cross

1   Q.  Just let me ask because I will get to that.

2   A.  OK.

3   Q.  I want to get to --

4   A.  Other law enforcement I didn't want reaching out.

5   Q.  Right.  You were worried that if someone reached out or did

6   something that Karpeles might find out, it could impair the

7   investigation?

8   A.  Correct.

9   Q.  Right.  So -- and in fact, you let people know within law

10  enforcement that Karpeles, he closely monitors everything, all

11  of his websites?

12  A.  That is correct.

13  Q.  And that you thought that a lot of the websites he ran --

14  and he ran a lot of websites, right?  He had a lot of domain

15  names and things like that within his control?

16  A.  He hosted a lot of websites, yes.

17  Q.  So you advised avoiding visiting them since many of them

18  appeared to be fronts and that Karpeles is actively tracking

19  them?

20  A.  That is correct.

21  Q.  So that if someone went on and wasn't sufficiently

22  disguised, then he might recognize it as law enforcement and

23  then again impair the investigation?

24  A.  That is correct.

25  Q.  In fact, in August of 2012 you sent out an email and then

1    you realized, as we all do at some point in our lives, that you

2    left out the word "not," right?

3    A.  There might have been an occasion like that.

4    Q.  You had to send a quick email to say not to --

5    A.  Not to, I think, maybe contact --

6    Q.  Right.  That was an important facet of the investigation,

7    obviously, is to keep it as confidential and as close as

8    possible as you gathered more information?

9    A.  That is correct.

10   Q.  And at some point because -- withdrawn.

11            It came to your knowledge that there were other

12   investigations of Silk Road going on around the country, right?

13   Other agencies, other offices, I mean, were investigating Silk

14   Road, right?

15   A.  That is correct.

16   Q.  And you -- when I say "you," HSI, and yourself as a part of

17   HSI, were operating with or working in tandem with the U.S.

18   Attorney's Office in the Northern District of Illinois, right?

19   A.  We were docketed there originally, yes.

20   Q.  You did that in Chicago, right?

21   A.  Right.

22   Q.  So that is where you were running your investigation out

23   of.  Those were the assistant U.S. attorneys that you were

24   talking to and keeping them advised of your progress?

25   A.  That is correct.

F1fdulb5                        Der-Yeghiayan - cross

1   Q.  And there are obviously other U.S. attorneys offices around

2   the country and other agencies that were not necessarily either

3   aware or in contact with Chicago about what they were doing?

4   A.  There was, yeah, we were doing our best to try to

5   deconflict with other districts.

6   Q.  At some point you learned that Baltimore had an

7   investigation, right?

8   A.  That is correct.

9   Q.  And, actually, you learned that from Agent Alford?

10  A.  No.  Baltimore, the HSI agent that originally opened the

11  case and their supervisor came to Chicago originally to talk to

12  us about their investigation and about working together.

13  Q.  It wasn't in August of 2012 that someone from the Organized

14  Crime Task Force told you that Chicago had input the same

15  information about Karpeles as a target as you had?

16  A.  I was notified of that, about Karpeles, later on, but I

17  knew of their investigation long before that, though.

18  Q.  And in January of 2013 you got permission to open up an

19  undercover bank account to try to move money through Mt. Gox,

20  the bitcoin exchanger, just to remind everybody, right?  It is

21  the largest bitcoin exchanger, right?

22  A.  It was at the time.

23  Q.  It was at the time.

24          And other companies owned by Karpeles, right?

25  A.  That is correct.

1   Q.  And so you got permission to do that?

2   A.  I got permission to open up under our investigation an

3   undercover bank account, yes.

4   Q.  Right.  Now, Karpeles is also a computer developer systems

5   administrator, right?

6   A.  That is correct.

7   Q.  Self-proclaimed hacker?

8   A.  That is correct.

9   Q.  Who brags about his hacking in Twitter and other social

10  media.

11  A.  He does.

12  Q.  And he has control over hundreds of websites and companies,

13  or had at the time in 2012/2013?

14  A.  He did have hosting services, yes.

15  Q.  And you believed him to be the mastermind behind keeping

16  Silk Road secure and operating?

17  A.  He had ties to the original silkroadmarket.org website.

18  Q.  But my question is did you not say that you believed him to

19  be the mastermind behind keeping the website secure and

20  operating?

21  A.  He had the credentials to do so, yes.

22  Q.  But did you say that?

23  A.  I would have said that, yes.

24  Q.  And that Ashley Barr was acting as the voice of the website

25  under the name Dread Pirate Roberts?

1   A.   That's what I suspected, yes.

2   Q.   Now, in April of 2013, Chicago initiated -- when I say

3   "Chicago," HSI Chicago, your office, right -- initiated an

4   undercover purchase from Silk Road using Mt. Gox and another

5   Karpeles company as the bitcoin exchange?

6   A.   Yeah.  We did an exchange through two different ways.

7   Q.   Part of the purpose of that was to -- withdrawn.

8        You also suspected that Karpeles was running an

9   unlicensed money exchange operation, right?

10  A.   I did.

11  Q.   And so this could be a way of establishing jurisdiction to

12  charge him with that in Chicago?

13  A.   Yes, it was.

14  Q.   And in May of 2013, HSI Chicago issued a grand jury

15  subpoena to a company called Dwolla, right, D-w-o-l-l-a?

16  A.   That is correct.

17  Q.   And that is an online payment processing system?

18  A.   Yeah.  It's like an online wire transfer company.

19  Q.   It is based in the United States, right?

20  A.   I believe so, yes.  It has service in the United States.

21  Q.   It was a way that Mt. Gox used to transfer money

22  essentially in and out of the U.S.?

23  A.   It was one of the ways that they offered to either withdraw

24  or deposit funds.

25  Q.   And bitcoin, right?  It was part of the bitcoin exchange

1   process that Mt. Gox used?

2   A.   It was used for just the money part of it to withdraw.

3   Q.   And that was -- and the subpoena was with regard to a

4   Karpeles company called -- and I will spell it -- M-u-t-u-m,

5   new word, S-i-g-i-l-l-u-m?

6   A.   Mutum Sigillum.

7   Q.   Right.  That was what the subpoena was for, the records for

8   that company, right?

9   A.   Correct.

10  Q.   And the grand jury subpoena keeps the investigation secret

11  and confidential, right?

12  A.   Correct.

13  Q.   Within law enforcement only?

14  A.   Right.

15  Q.   Then you find out the next day, May 10, 2013, that

16  Baltimore had seized the -- how do you pronounce it, the Mutum

17  Sigillum?

18  A.   Mutum Sigillum.

19  Q.   -- Mutum Sigillum that HSI Baltimore had seized $2 million

20  in that company's account, right?

21  A.   They notified me by phone, yeah.

22  Q.   Then it was apparent to Karpeles that the U.S. government

23  had him on its radar, right?

24  A.   That is correct.

25  Q.   This is May of 2013, right?

1   A.  I believe so, yes.

2   Q.  May 10th.

3         In fact, there were newspaper articles about it,

4   right?

5   A.  It was a large seizure at the time, yes.

6   Q.  Sorry.  More than $3 million was seized.

7         And it was from Mutum Sigillum's Wells Fargo account,

8   right?

9   A.  Correct.

10  Q.  And you were notified in advance that Baltimore was going

11  to do that?

12  A.  I was told that it had already happened.

13  Q.  Right.  And no one even in your office had been notified in

14  advance?  When I say "your office," I mean Chicago HSI.

15  A.  No.

16  Q.  And was that money ultimately returned to Mr. Karpeles?

17  A.  I don't know its current state right now.

18  Q.  And you thought that HSI Baltimore should have deferred

19  that seizure because of your criminal investigation of

20  Mr. Karpeles?

21  A.  At the time, yes.

22  Q.  Now, despite that and the fact that Mr. Karpeles was

23  already on notice, to a certain extent, that he was on your --

24  not your radar but the U.S. radar -- and I am not being

25  critical, I'm just talking about despite that, in terms of the

1     chronology, you prepared a draft affidavit of May 29, 2013 for

2     a search warrant for email of Mr. Karpeles, correct?

3     A.  That is correct.

4     Q.  And these search warrants would not be on notice to him,

5     correct?  They would just be to the provider, and they would

6     provide the information so that he wouldn't necessarily know,

7     right?

8     A.  No.  The provider -- well, he wouldn't know, yes, that the

9     provider --

10    Q.  So you were doing it in a way that would keep it

11    confidential.  Baltimore did it in a way where it would be

12    public.  You did it in a way that it was confidential, right?

13    A.  Correct.

14    Q.  So in your draft, which was prepared for swearing under

15    oath, right?

16    A.  That is correct.

17    Q.  And you said that Silk Road had been launched in March of

18    2011, right?

19    A.  Correct.

20    Q.  And that both the marketplace and the online forum were

21    operated by the same administrator?

22            This was your conclusion?

23    A.  Yeah, that's what I assumed, yes.

24    Q.  And that you had done some -- you talked yesterday about

25    whois.com, w-h-o-i-s.com?

1   A.  Who.is, yes.

2   Q.  You talked about it yesterday for the purpose of

3   identifying IP addresses or the people behind IP addresses?

4   A.  Correct.

5   Q.  And in your draft affidavit you talked about the whois.com

6   for the Silk Road -- the searches that you had done for the

7   silkroadmarket.org, right?

8   A.  Correct.

9   Q.  And when you said before -- oh, withdrawn.

10          That the registration was March 1, 2011, and then that

11  only went through April 13, 2011.  And then there was a

12  separate registration through March 30th, right, through 2012,

13  I guess, right?

14  A.  There were changes in the hosting administration.

15  Q.  There were changes in the postings, right?

16          And that there was something called sta.net, a

17  company, right, that was involved in -- well, withdrawn -- that

18  you concluded from your investigation was involved or connected

19  to the silkroadmarket.org?

20  A.  That is correct.

21  Q.  And that was registered to Mutum Sigillum?

22  A.  I believe so, yes, yeah.

23  Q.  Which was Karpeles' company?

24  A.  It was.

25  Q.  And in fact, he was the contact for Mutum Sigillum; it was

1   listed to his email address, right?

2   A.  That is correct.

3   Q.  Ands that he was the administrative -- and that he was in

4   administrative control of Mutum Sigillum since he had acquired

5   it in 2010?

6   A.  That is correct.

7   Q.  And in February 11, Karpeles bought Mt. Gox, right?  I

8   think -- I apologize before for having the wrong date, but

9   February 11th he bought Mt. Gox?

10  A.  Around February 2011.

11  Q.  If you want to see the draft, I would be happy to have

12  you -- to have it in front of you.

13  A.  If I could, yeah.  That would helpful.  Thank you.

14          (Pause)

15          MR. DRATEL:  I apologize but when it printed out, the

16  numbers cut off halfway so sometimes it is hard to tell 8's

17  from 9's.  This is 3505-3085 through 3092.  Yes.

18          (Handing)

19          THE WITNESS:  Thank you.

20  Q.  OK.  So let's go back to paragraph 18, if you could look at

21  that.

22  A.  OK.

23  Q.  And you trace more of Mr. Karpeles' sort of electronic

24  footprint as either corporate or personal, right?

25  A.  Correct.

1    Q.  In terms of how you link him through whois.com, other

2    companies, to sta and other companies that are affiliated --

3    that are connected, through your research and investigation,

4    connected to the silkroadmarket.org?

5    A.  That is correct.

6    Q.  So, in fact, if you look at 19, in February 2011,

7    Mr. Karpeles buys Mt. Gox, right?

8    A.  Sorry, you said 19th?

9    Q.  Yes.

10   A.  It stopped at 18.

11   Q.  What is the last page of that?

12   A.  Page 5.

13   Q.  On the bottom, 35 --

14   A.  Oh, it is cut off.  03 --

15   Q.  It is double-sided.

16   A.  It is still cut off.  03091, 92.

17          (Pause)

18   Q.  I'm sorry, paragraph 17.  I apologize.

19   A.  OK.

20   Q.  Do you have 17 there?

21   A.  I have 17, yes.

22   Q.  So in February 2011 -- so paragraph 17, he buys Mt. Gox in

23   February 2011?

24   A.  That is when it is shown, yes.

25   Q.  That is a month before Silk Road launches, right?

1   A.   That is correct.

2   Q.   And you note there that Mt. Gox handled perhaps as much as

3   more than 80 percent of all of the bitcoin exchange in the

4   world, right?

5   A.   That is what they advertised, yes.

6   Q.   And that was as of April 2013, right?

7   A.   Yes.

8   Q.   And, excuse me, part of your theory in terms of your

9   investigation was that Silk Road was a device for leveraging

10  the value of bitcoin, right?

11  A.   It appeared so.

12  Q.   Yes.   In other words, that if you had cornered the market

13  on bitcoin and could create a site that only used bitcoin and

14  everybody used bitcoin, you would drive the price up?

15  A.   Yes.

16  Q.   And also get business as an exchange?

17  A.   Right.

18  Q.   Now, so based on that, in terms of an affidavit, you were

19  prepared to swear that there was probable cause that Mark

20  Karpeles was intimately involved as the head of Silk Road?

21  A.   From the connections that I listed in the affidavit draft,

22  yes.

23  Q.   But he had already been -- he had already had that seizure

24  of Mutum Sigillum by the time you had drafted this affidavit,

25  right?

1     A.   Correct.

2     Q.   And he was in Japan?

3     A.   He was in Japan.

4     Q.   Also, around the same time, in May of 2013, you submitted

5     to Dwolla, or subpoenaed from Dwolla, the online payment

6     processing company here in the U.S., information about --

7     subscriber information for certain accounts that you thought

8     were suspicious and related to Silk Road based on the movement

9     of bitcoin or money in and out of there, right?

10    A.   There was a subpoena issued for that, yes.

11    Q.   And that was because -- well, you thought that there could

12    be vendors or operators that you could find with that

13    information?

14    A.   Yes.

15    Q.   And by "operators," you mean administrators, people who

16    were running the site?

17    A.   Potentially, yes.

18    Q.   And there was large movement of money -- withdrawn.

19         There were large movements of money from Mt. Gox to

20    Dwolla accounts?

21    A.   It showed, yeah, movement of money moving out of Mt. Gox

22    through Dwolla.

23    Q.   And, by the way, on that list I think there were 16 names

24    on that list or 16 accounts, do you recall?

25    A.   I don't.  If I could see the --

F1fdulb5                          Der-Yeghiayan - cross

1   Q.  Sure.

2              (Pause)

3              But do you recall whether or not Mr. Ulbricht's name

4   was on that list of accounts?

5   A.  I don't believe that it was.

6   Q.  And ultimately you created a spreadsheet -- or received a

7   spreadsheet from Dwolla with all of the transactions relating

8   to Mr. Karpeles, is that right?

9   A.  It was all the Mutum Sigillum -- I'm sorry, in the Mutum

10  Sigillum account for Dwolla for all the transactions that they

11  had received and debited, credited and debited.

12  Q.  That is about a thousand pages long, that --

13  A.  It was, yeah, a pretty large return.

14  Q.  And do you recall whether Mr. Ulbricht's name comes up

15  there?

16  A.  It did.

17  Q.  Right.  And there are about 20 transactions, right?

18  A.  Roughly or so, yes.

19  Q.  And they are all in the amount of probably like a thousand

20  dollars or around there, some less?

21  A.  Around a thousand dollars.  I think one was for like a few

22  hundred dollars.

23  Q.  So nothing large, assuming you mean by "large" more than a

24  thousand dollars, when you are talking about large movements of

25  money, right?

1    A.  No.  There wasn't anything that compared to the other

2    accounts, no.

3    Q.  And those were spread out over a couple of years, right?

4    A.  I believe so, if memory serves me right.

5    Q.  In fact, even after Mr. Ulbricht's arrest you went back and

6    looked at that, right?

7    A.  I did.

8    Q.  Now, you also learned as part of your investigation at some

9    point in the summer of 2013 that Baltimore was trying to work

10   on an interview with Karpeles through his attorneys, right?

11   A.  That is correct.

12   Q.  And they wanted to ask him directly about Silk Road as well

13   as his money business, right?

14   A.  Yes, they wanted to talk to him.

15   Q.  And you advised against that?

16   A.  We requested that they did not.

17   Q.  Right.  But they went ahead and met with his lawyers

18   July 11, 2013, right?

19   A.  That sounds about right, yes.

20   Q.  Not with him but with his lawyers?

21   A.  With the lawyers.

22   Q.  And then you say Karpeles' -- withdrawn.

23        Karpeles' attorneys brought up Silk Road, right?

24   A.  That is what I was told.

25   Q.  And they say that he was willing to tell the government who

F1fdulb5                           Der-Yeghiayan - cross

1   he thought was running Silk Road, right?

2   A.   That is correct.

3   Q.   And for that he would get a walk on his charges, right?

4   A.   I don't know what their deal was.

5   Q.   That's what he wanted?

6   A.   I don't know.  I don't know what was discussed then.

7          (Pause)

8   Q.   OK.  And during this period after this all occurred --

9   withdrawn.

10          So I am going to show you what is marked as 3505-300.

11          (Pause)

12          I am just going to bracket a point here.  Just read

13   that to yourself and then when you are done let me know.

14          (Pause)

15          During this period -- I'm sorry.  Let me know when you

16   are finished.

17          (Pause)

18   A.   OK.

19   Q.   During this period you were upset about the work -- about

20   the investigation that Baltimore was pursuing and how they were

21   pursuing it, correct?

22   A.   I was upset about it, yes.

23   Q.   And you wrote a long memo with a chronology to lay out what

24   had occurred and what the problems you saw were?

25   A.   That is correct.

1   Q.  And as part of your investigation, as part of your

2   preparation and all of that, you learned that Karpeles' lawyers

3   had made this offer that they would tell the government who was

4   behind Silk Road if he would not be prosecuted for the money

5   exchange charges, which, by the way, had not been instituted,

6   right?

7   A.  I'm sorry.

8   Q.  He hadn't been charged yet with any money exchange --

9   A.  It was just the civil forfeiture, the civil seizure of the

10  money.

11  Q.  Right.  But in return for not pursuing any potential

12  charges against him, he was willing to give that name up?  That

13  was the offer that his lawyers made, that you learned during

14  your investigation?

15              MR. TURNER:  Objection.  Foundation.

16              THE COURT:  Certainly you will answer as to what you

17  know.  If you had knowledge of that fact or if your memory is

18  refreshed by something and now recollect something, then you

19  may testify to it.

20              MR. TURNER:  Objection.  Foundation.  Hearsay as well.

21              THE COURT:  Why don't you try and rephrase it,

22  Mr. Dratel, and come at it in a different angle.

23              MR. DRATEL:  Sure.

24  BY MR. DRATEL:

25  Q.  It was crucially important to you at the time to know what

1   was going on with respect to other pursuits of Karpeles and

2   what was going on with other agencies investigating or other

3   U.S. Attorney's offices investigating him, right?

4   A.  Yes.

5   Q.  And as part of that you had conversations and read

6   memoranda and were in touch with people who provided to you

7   information about it so that you could pursue your own

8   investigation correctly, right?

9   A.  Be more specific.  I am sorry.

10  Q.  Sure.  That you wanted to know what was going on with

11  Baltimore, you wanted to know what was going on with the

12  meeting with Karpeles' attorneys, you wanted to know what was

13  out there because you had your own parallel independent

14  investigation of him going on that could be completely wiped

15  out by what Baltimore was doing?

16  A.  Yes.  And we had verbal agreements with the attorneys in

17  that district also about that.

18  Q.  And so in the course of this and in pursuing your

19  investigation, you learned that Karpeles' lawyers had made that

20  offer to the government?

21           MR. TURNER:  Objection.

22  Q.  You learned through people either in Baltimore or at HSI in

23  Chicago?

24           MR. TURNER:  Objection.  Hearsay.

25           THE COURT:  Sustained.

1                MR. DRATEL:  I will just say Rule 807.

2                THE COURT:  You know, I think now is a good time to

3      take our mid-afternoon break so that we can take up this

4      evidentiary matter while you folks stretch your legs.

5                So let's take our mid-afternoon break.  We'll come

6      back in about -- probably about 12 minutes.  I want to remind

7      you not to talk to each other or anybody else about this case.

8      Thank you.

9                And you could take a break, too.

10                THE WITNESS:  Thank you, your Honor.

11                (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury and witness not present)

2           THE COURT:  All right.  Let's all be seated.

3           So, of course, you folks know a lot more about the

4    facts than I do, and so I'm learning about this as I hear it

5    and don't have the background that you folks have.

6           The residual exception of the hearsay rule is Rule

7    807.  That is the rule that Mr. Dratel has cited.  And since I

8    know he knows the rules well, I assume that that is the one he

9    intended to cite.

10          MR. DRATEL:  Correct, your Honor.

11          THE COURT:  All right.  And why don't you folks -- I

12   mean, as I understand the issue and as I have been hearing the

13   issue, the issue is that the witness allegedly learned

14   something only by virtue of being told it, that it is being

15   offered for the truth; namely, that this particular offer was

16   in fact made and that the offer had the terms that Mr. Dratel

17   has in his questioning suggested.

18          Am I right about what the problem is from the

19   government's perspective?

20          MR. TURNER:  Exactly right, your Honor.

21          THE COURT:  All right.  So so far so good.

22          And, Mr. Dratel, tell me where you are going with

23   this.  I mean, I understand generally the issue with

24   Mr. Karpeles.  I had followed that, I think.  I think it is

25   pretty clear where you are going with that.  But tell me why

1    you need this point through this witness in this way, as

2    opposed to after learning whatever he learned about the

3    Baltimore investigation with Karpeles, what did you do next.

4    That would be the typical way to avoid the hearsay issue.

5            MR. DRATEL:  The reason is because it's the offer by

6    Karpeles' attorneys that is the material fact.  In other words,

7    that is what it is.  Their client is saying we're going to give

8    you the name of Silk Road and don't charge us now.  Karpeles

9    was never charged.  But the point is that he was offering that

10   in return for that.

11           They had this guy in their sites and he had never been

12   charged.  The point is that he at some point claimed to know,

13   and our position is that he set up Mr. Ulbricht --

14           THE COURT:  I understand.

15           MR. DRATEL:  -- maybe not in this conversation.

16           THE COURT:  I followed your reasoning.

17           MR. DRATEL:  And I think it comes under the rule, you

18   knows, it has circumstantial guarantees of trustworthiness, I

19   think.  Otherwise, I will just -- you know, do I get to call

20   the assistants who were at the meeting, who heard this?

21           THE COURT:  You could call the lawyer.  I mean --

22           MR. DRATEL:  I don't know who the lawyer is.  I don't

23   know his name.  This is 3500 material.  I don't know.  This is

24   something we learned in December 31st, in a 5,000-page 3500

25   material dumped on this witness.

F1fdulb5                         Der-Yeghiayan - cross

1           THE COURT:  That is not unusual for this or any other

2      trial, as you know.

3           MR. DRATEL:  5,000 pages for a single witness, I

4      think --

5           THE COURT:  It is not really, not when you've got an

6      investigation that's been going on for years.  I'm sure you

7      have been involved in situations.

8           Let's not deal with the volume because I don't want

9      there to be some takeaway point that is not relevant to our

10     discussion about the procedures that we used.  I think we

11     followed the appropriate procedures for the 3500.

12          MR. DRATEL:  I agree with that.  I think it is <u>Brady</u>.

13          THE COURT:  That is a different issue, in any event.

14     It was disclosed pretrial.  Let's hear -- so your point is that

15     under the residual exception the offer by the attorney should

16     come in as an offer that was in fact made?

17          MR. DRATEL:  Yes.

18          THE COURT:  And then what are you planning on doing

19     next, just so that we've got the various issues on the table?

20          MR. DRATEL:  It is more about Karpeles and Baltimore

21     but not about that.

22          THE COURT:  All right.  So that would be the extent of

23     the conversation you want the witness to testify about?

24          MR. DRATEL:  There is one other part that I would --

25     that probably is part of the same piece, which is just that

F1fdulb5                      Der-Yeghiayan - cross

1  they were going to meet with Karpeles and this meeting was

2  supposed to be in Guam, and I don't know whether this meeting

3  ever occurred.

4            THE COURT:  All right.

5            MR. DRATEL:  This is the important part.  I don't care

6  about the Guam meeting or anything like that more than this.

7            THE COURT:  I just want to get the issues on the table

8  to deal with them as a group.

9            Mr. Turner, why don't you address your position on

10 this.

11           MR. TURNER:  I think we are dealing in hearsay and

12 double hearsay and potentially triple hearsay.  I think it is

13 basically --

14           THE COURT:  Why don't you walk through it slowly and

15 bit by bit so that we have got a clear record.

16           MR. TURNER:  Sure.  Basically, what is being asked is

17 for this witness to testify that he heard from an attorney in

18 Baltimore that an attorney for Mr. Karpeles had been told by

19 Mr. Karpeles that Mr. Karpeles had information about who DPR

20 was.  I cannot possibly see how that would be a reliable

21 statement and it would have indicia of trustworthiness.  In any

22 event, Rule 807 requires prior notice to the opposite party if

23 this is going to be introduced, and, obviously, we had none.

24           I would also add, your Honor, that this is all about

25 an investigation of someone that did not pan out and,

1   obviously, we haven't objected up to this point --

2            THE COURT:  Well, I assume you will go into that on

3   redirect.

4            MR. TURNER:  Yes.

5            THE COURT:  That will be for you to take up.

6            MR. TURNER:  Obviously, it is not unusual for any

7   number of leads to be --

8            THE COURT:  Well, you will take that up on redirect.

9            MR. TURNER:  I understand.

10           THE COURT:  Explain to me the different levels of

11  hearsay because I am not familiar with how this conversation

12  occurred.

13           Is it, Mr. Dratel, your view that this occurred from

14  the attorney himself who was making the offer to this witness,

15  or was it through one attorney to another attorney -- well,

16  originating with the client to the attorney to another attorney

17  to the witness?

18           MR. DRATEL:  The only part -- your Honor, the only

19  part to me that is hearsay is the relation by either Baltimore

20  or Chicago to Special Agent Der-Yeghiayan of what was said by

21  the lawyer.  The fact that the lawyer said it is not hearsay.

22  The fact that it was said, it would not come in for the truth

23  of it, that he could provide the name of the Silk Road operator

24  in return, but that he offered it; that is the important thing.

25  That is not hearsay.  That is just offered for the fact that it

 1    was said.  It is essentially a verbal act.  It is not hearsay.

 2    It is not offered for the truth.  It's offered for the fact

 3    that somebody made that offer to the government, someone whom

 4    the government was investigating.

 5              So the only part that is hearsay is what a U.S.

 6    attorney, or an agent of the United States government, told

 7    another agent of the United States government that the

 8    government is now saying is unreliable.

 9              THE COURT:  All right.  Let's take this piece by

10    piece.  Let's take it from -- because the way the hearsay rule,

11    as you all understand, is you evaluate it at each step.

12              Would you agree, Mr. Turner, that the initial

13    statement from the attorney for Mr. Karpeles, that his client

14    was offering to divulge information in exchange for some form

15    of leniency, that that is not in and of itself hearsay; that

16    would be offered for the fact that that statement was made?

17              MR. TURNER:  I think it could be offered that way.  I

18    think there is the danger of the jury understanding it as --

19              THE COURT:  I could give a limiting instruction, as I

20    have.

21              MR. TURNER:  Understood.  But, yes, an offer of

22    basically a proffer, an interview, would not have intrinsic

23    value in itself.

24              THE COURT:  Right.  And that that statement, would you

25    agree with Mr. Dratel's characterization, was made in terms of

 1    the way he's been positing it, Mr. Dratel, that is, to a U.S.
 2    attorney in Baltimore, an A.U.S.A. in Baltimore?
 3              MR. TURNER:  An assistant U.S. attorney in Baltimore
 4    is a human being, like everybody else, and the whole hearsay
 5    rule obviously exists in order to make sure that there is no
 6    misinterpretation, there is no miscommunication.
 7              THE COURT:  I understand.  But do you have any reason
 8    to believe that the offer was not made, that this was not a
 9    real offer?
10              MR. TURNER:  I do not know the details.  I certainly
11    wasn't present or involved in those conversations.
12              THE COURT:  But you have --
13              MR. TURNER:  Neither was this agent.
14              THE COURT:  I understand.  He can't, and you can go
15    back on cross how he has no idea if this was true, false.  All
16    he knows is that he was told this, and he has no idea if it was
17    in fact made.
18              But what I'm trying to figure out is have there been
19    other aspects of the Baltimore investigation which you have
20    found to be unreliable in some way, which leads you to believe
21    it is unreliable?  And in terms of these particular A.U.S.A.s
22    who were involved, let's put it that way -- and I don't need to
23    know their names because I don't want to --
24              MR. TURNER:  Your Honor, I am not going to comment on
25    the general proviso of another A.U.S.A., but what I would say

F1fdulb5                          Der-Yeghiayan - cross

1    is that obviously even where you have highly coordinated

2    investigations with other districts, all the time there is

3    miscommunication, misunderstandings because those people are

4    dealing with details in concrete situations that you are not

5    intimately familiar with like they are.  So you are going to

6    misconstrue things they say.  They are going to miscommunicate

7    things.  That is why they have the hearsay rules.  And there is

8    no reason here to believe that just because this is what Agent

9    Der-Yeghiayan believed he heard at that time, that it should be

10   offered for the truth and that the typical rule should not be

11   complied with.

12        MR. DRATEL:  Your Honor, just one thing I would add is

13   that Agent Der-Yeghiayan thinks it is reliable.  He put it in a

14   detailed chronology of the investigation because he was upset

15   about the way it was proceeding in Baltimore.  He felt

16   undermined by it.  So he would not have included it in that

17   chronology if he did not think it was reliable.

18        THE COURT:  One thing you can do, Mr. Dratel, is you

19   can ask Mr. Der-Yeghiayan whether or not when he put things in

20   the chronology, whether or not he believed the sources for that

21   information were reliable before you get to the next step.

22        MR. DRATEL:  Fine.

23        THE COURT:  If he says not always, that may lead us

24   down a different path.  If he says -- I don't know.  You do

25   what you want to do.

1         But here's my -- is there something else you wanted to

2    say, Mr. Turner?

3         MR. TURNER:  I understand.  He is reporting up his

4    chain what he has heard from others, but it still puts us right

5    in the hearsay box.

6         THE COURT:  I don't dispute that it's in the hearsay

7    box.  I think that we've appropriately analyzed whether or not

8    it -- how it travels up the chain.  There are two statements.

9    One statement is a statement from the lawyer to the A.U.S.A.

10   There is a subsequent statement from an A.U.S.A. to another

11   either A.U.S.A. or directly to Mr. Der-Yeghiayan.  It almost

12   doesn't matter whether or not it has got two hops after that or

13   one hop after that because I think my analysis would be the

14   same, which is that -- let me pause and make sure I have...

15         (Pause)

16         All right.  Let me ask, before I go any further -- one

17   portion of the rule does require that the adverse party have a

18   fair opportunity to meet it.  Is there anything that you think

19   you would do if you had found out about this this morning that

20   you can't do now?

21         MR. TURNER:  I mean, I haven't even looked at the

22   document, extensively.  I haven't had a chance to talk with the

23   witness about it.  I haven't had a chance --

24         THE COURT:  You can't talk to the witness about it,

25   anyway, during the pendency of an examination.

1          MR. TURNER:  This should have been provided to us

2     beforehand, though.

3          THE COURT:  I'm just trying to figure out what you

4     would have done.

5          MR. TURNER:  I could have talked to the A.U.S.A.  I

6     could have talked to the lawyer.  I could have done any number

7     of things.

8          THE COURT:  OK.  Here's what we're going to do.

9     Mr. Dratel, you are going to tell me how important this is,

10    because what we'll do is we'll hang the witness over the

11    weekend if that is important to you.  I will allow you to

12    continue, but I won't require the government to do his redirect

13    until we come back on Tuesday.

14         MR. DRATEL:  OK.

15         THE COURT:  So it will be both a tactical choice as

16    well -- because I am not going to make them end the witness,

17    and there is obviously issues involved in hanging him over the

18    weekend for this.

19         MR. DRATEL:  Right.

20         THE COURT:  I don't know if it is that kind of point.

21         MR. DRATEL:  I would like the point to be made.

22         So here's my proposal.  I have at least an hour, at

23    least, probably more.  I could probably --

24         THE COURT:  Don't take -- God knows, don't take up any

25    more time than you need to.

1              MR. DRATEL:  No.  No.  No.  What I am saying is we

2     won't be wasting time if we break at a time where I say, OK, we

3     can now resolve this issue and come back Tuesday morning.

4              THE COURT:  I would rather you complete your

5     examination so we at least know where you are ending.

6              Are you proposing to hold yours open?  I don't want to

7     hold yours open.

8              MR. DRATEL:  No.  No.  No.  What I am saying is I

9     don't know where I am going to end.  I am at least going to go

10    to 5 o'clock or finish very close to it.  That is what I meant.

11             THE COURT:  Well, if you're going to go to 5 o'clock,

12    what I'll do is we'll end before you get to this issue.  Don't

13    go back to it right now.  I will hold on whether or not we --

14    what we do with it because you both will then have had time to

15    consider it, so will I, over the weekend, and we can then come

16    back to it on Tuesday morning.  So let's do it that way.  It

17    sounds like it's sufficiently important to you.

18             Let me tell you my thinking on it without giving a

19    ruling on it, and this is an issue which, in light of the

20    defendant's interest in this, we'll hold it open until Tuesday

21    morning.  All right?  So the government will not with

22    Mr. Der-Yeghiayan be able to do the redirect until Tuesday

23    morning, for which I apologize, but that will be the way it is.

24    So that witness will have to just come back.

25             MR. DRATEL:  Right.

F1fdulb5                          Der-Yeghiayan - cross

1                THE COURT:  But do you want to hear what I am

2      thinking?

3                MR. DRATEL:  I'm sorry.  Yes.  OK.

4                THE COURT:  I'm thinking that there are indicia of

5      truth to this for 807 purposes, but I do want to consider it

6      further and will be able to do so in light of the additional

7      time that we will have.  Having a proffer from a lawyer is not

8      a particularly unusual type of act -- in fact, it is quite

9      common -- and, therefore, it is a reasonable thing that a

10     thought might occur which is that if there is any information

11     which a potential target of an investigation has, that they

12     might attempt to consider exchanging that for leniency.  So the

13     story that is going along with this has indicia of something

14     which could well have happened.

15                And the fact that it is between two A.U.S.A.s or one

16     or more A.U.S.A. in terms of the hearsay portion, because the

17     first portion with the lawyer is not a hearsay statement, but

18     the fact that an offer was made -- is being offered for the

19     truth, there are cases which suggest that sometimes indicia of

20     reliability can come from the position of a person.  That would

21     be the kind -- and there are cases and I believe, actually, it

22     is in the form of an attorney, not necessarily an A.U.S.A., if

23     I am recalling my Second Circuit cases.  I don't have a name

24     but you will be able to find them.

25                So I think that there is enough here that I am not

1    prepared right now if we are going to be falling over into

2    Tuesday anyway to make a definitive ruling on this.  We'll let

3    you folks noodle around with it some, and the government can

4    then have the notice that it otherwise would have had under the

5    rules.

6            And in the future we will try to head these off a

7    little earlier.

8            MR. DRATEL:  OK.  Yes.

9            THE COURT:  It is unusual for me to knowingly be in a

10   position where we're going to hold open a witness.  I don't

11   like to do that because it leaves open the possibility that the

12   jury's time won't be used most efficiently.  But I understand

13   the various interests, and in the interest of justice I am

14   going to do that.  So we will figure out what comes of it

15   step-by-step, as I say.

16           MR. DRATEL:  Your Honor, can I just ask, with respect

17   to where I'm going, because that's just one question of a

18   larger piece, obviously?

19           THE COURT:  Yes.

20           MR. DRATEL:  So -- and as I said before, that was not

21   any deeper than the question itself.  In other words, I wasn't

22   going to ask follow-up questions about that particular meeting.

23   But I will still pursue the Karpeles part without that piece.

24           THE COURT:  Yes.

25           MR. DRATEL:  OK.

1          THE COURT:  This is only about this one hearsay

2     statement.  Do what you otherwise were planning to do and do it

3     all.

4          MR. DRATEL:  OK.

5          THE COURT:  Then we will figure out where to go from

6     there.

7          Yes, Mr. Turner.

8          MR. TURNER:  I would just add that because it was

9     another office's investigation for Karpeles, that this is all

10    going to come in through what the agent heard about that

11    investigation from the agents involved there in Baltimore, the

12    lawyers involved, I think there is going to be a continuing,

13    running objection.

14         THE COURT:  All right.  So there may be more to this.

15    As we are thinking our way through it, Mr. Turner, you

16    understand what might be coming up with other testimony.  These

17    are things you can lay out and suggest that the time we've got

18    will be used by both sides to help put the picture together

19    completely, and people can decide whether this particular Q and

20    A is earthshattering enough to do this.

21         MR. DRATEL:  I will -- you know, your Honor, what I

22    will do is, as I go through it, if I think it is something that

23    is in the same ballpark, you know, obviously -- I know you

24    don't want to do sidebars so that would be --

25         THE COURT:  Well, in this case a sidebar is better

F1fdulb5                         Der-Yeghiayan - cross

 1    than waiting until Tuesday.

 2              MR. DRATEL:  Yes.  Right, I agree, because I would

 3    like to do it in sequence.

 4              I don't think that it is the same level of an issue of

 5    information imparted from others and what I am going to be

 6    doing down the road here.  It is more about his investigation.

 7              THE COURT:  We've got one open item and we don't have

 8    more.  Let's just continue and proceed as we normally would for

 9    this.  I don't expect there to be any other issues, right, that

10    you see coming up?

11              MR. DRATEL:  No.

12              THE COURT:  All right.

13              MR. DRATEL:  Not for today.

14              THE COURT:  Let's take a very short break ourselves,

15    come back, and we will go until two or three minutes before 5,

16    then we'll break for the today and, in fact, for the weekend.

17              THE CLERK:  All rise.

18              (Recess)

19              (Continued on next page)

20

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  I want to state one matter before we bring

3    in the jury.  As it turns out, the Post was active yesterday on

4    a story other than this case.  And it appears from information

5    that the courthouse has obtained that there was a red-bearded

6    Post reporter who looks like somebody actually here who

7    approached juror no. 2 and was in the process of writing an

8    article about man-spreading, apparently a new phenomenon of

9    which I was unfamiliar.

10             In any event, that was the topic about which he was

11   going to approach.  He was not assigned to this case.  So it

12   was just really a happenstance.  So I just wanted to make that

13   clear, that nobody on this case that we are aware of has then

14   been approached by anyone.

15             Let's bring out the jury.  I will look forward to

16   reading the article by the Post.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  We'll all be seated.  We have to get the

3    witness out here.  Witnesses also take a break during the

4    breaks for the jury.  Here we go.

5              Mr. Dratel, you may proceed.

6              MR. DRATEL:  Thank you, your Honor.

7    Q.  Special Agent Der-Yeghiayan, where we left off, after -- as

8    part of your investigation and in the course of your

9    investigation, you communicated to Baltimore in July of 2013

10   that you did not want Baltimore to pursue Mr. Karpeles or to

11   meet with him, correct?

12   A.  That's correct.

13   Q.  And you said that it would -- that you believed it would

14   damage HSI Chicago's investigation?

15   A.  Correct.

16   Q.  Now, in August, August 15 of 2013, you are operating as

17   cirrus on Silk Road, right?

18   A.  Yes.

19   Q.  You're operating a number of other buyer accounts, right?

20   A.  I had many available to me, yeah.

21   Q.  And you also had some seller accounts, as well?

22   A.  I did.

23   Q.  And you, at that point, drafted another search warrant for

24   emails for Mr. Karpeles, correct?

25   A.  Correct.

F1fgulb6                     Der-Yeghiayan – cross

1   Q.  And so one –– this is August 15, 2013, one was for the

2   Northern District of California, correct?

3   A.  Correct.

4   Q.  And one was for the Southern District of New York?

5   A.  Correct.

6   Q.  And they were for email accounts, Google email accounts?

7   A.  It was yeah, gmail.

8   Q.  Gmail accounts.

9        And this is, again, three months after the seizure of

10  Mr. Karpeles' money by HSI Baltimore that essentially put him

11  on notice of the government investigation?

12  A.  Yes.

13  Q.  And in your affidavit, which you were prepared to sign that

14  day and swear, right, August 15, 2013?

15  A.  I believe the date sounds right, yes.

16  Q.  If you need help, I'll be happy to ––

17  A.  That sounds correct.

18  Q.  You were ready to swear that there was probable cause to

19  believe that those gmail accounts contained evidence of

20  instrumentalities of narcotics trafficking and money

21  laundering, right?

22  A.  Correct.

23  Q.  Anal that was based upon your personal knowledge, your

24  review of documents and other evidence and your conversations

25  with other law enforcement officers and civilian witnesses?

F1fgulb6                          Der-Yeghiayan - cross

1    A.   Correct.

2    Q.   And you went through a lot of the details that we discussed

3    before about Mr. Karpeles, Silk Road market website, Mt.Gox,

4    all of that, right?

5    A.   Yes.

6    Q.   And you wrote -- ready to swear that -- and did you ever

7    swear to that evidence?

8    A.   Yes, I did.

9    Q.   So, you wrote I believe this evidence shows that Karpeles

10   controlled the silkroadmarket.org website along with the

11   tuxtele.com website and that he hosted them both at IP

12   addresses he controlled?

13   A.   That's correct.

14   Q.   And you also cited his LinkedIn entry, right?

15   A.   I believe so, yes.

16   Q.   Where he described himself as an experienced computer

17   programmer who, from 2003 to 2010, worked as a software

18   developer at various companies specializing in developing

19   ecommerce websites?

20   A.   That's correct.

21   Q.   And you wrote that based on my training and experience, I

22   know that that type of background would make Karpeles well

23   suited to operating an ecommerce site such as the Silk Road

24   underground website?

25   A.   That's correct.

F1fgulb6                         Der-Yeghiayan - cross

1   Q.   Now, you also had a confidential informant that you cited

2   in that affidavit, correct?

3   A.   Yes.

4   Q.   Who had worked with Karpeles for the past two years at that

5   time -- this is 2013 -- that had worked for him two years

6   previous to that, right?

7   A.   That's correct.

8   Q.   And that reported to -- that Karpeles operated something

9   called bitcointalk.org?

10           MR. TURNER:   Objection, your Honor.   803.

11           THE COURT:   Sustained.

12  Q.   Did you swear to this in an affidavit?

13  A.   I swore to it, yes.

14           THE COURT:   Do you want a side bar about this?   I

15  don't want to have the colloquy in front of the jury.

16           MR. DRATEL:   A short side bar.

17           THE COURT:   Come on up.

18           (Continued on next page)

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  Let me say that I don't want to do this in

3     front of jury.  There's no inconsistent statements so the fact

4     it that he's sworn to it doesn't get you for impeachment

5     purposes to ability to put that in.

6          MR. DRATEL:  Right.  What I want to do is get the

7     basis for his conclusions of his investigations.

8          THE COURT:  Why don't you ask him?

9          MR. DRATEL:  That's fine.  And the government's

10    objection is hearsay, I have no problem that it's not for the

11    truth.  It's just for what his investigation collected that led

12    him to have probable cause to believe --

13         MR. TURNER:  But --

14         THE COURT:  What the investigation -- so you would ask

15    him, and tell me, Mr. Turner, what your view is.

16         MR. TURNER:  That sounds like it is being offered for

17    the truth of the matter; he's trying to get out what the

18    probable cause was for the affidavit.  He's trying to establish

19    that these are the facts, that show that somebody else, in

20    fact, was running Silk Road, that somebody else is the real

21    operator of the site.

22         THE COURT:  It's obviously, number one, we can all

23    agree it's obviously highly relevant, right, if the lead

24    investigator believed at one point in time in August of 2013

25    that somebody else might be a candidate, then how he arrived at

F1fgulb6                         Der-Yeghiayan – cross

1    how that fellow was a candidate is obviously relevant; and also

2    how he changed his mind if he changed his mind would similarly

3    be relevant.  And you could go into that to your heart's

4    content on redirect and Mr. Dratel can bring it out.

5              MR. TURNER:  I think there are two concerns I have,

6    your Honor, one is, I understand if he believed these things,

7    but it's another thing to start citing the evidence that

8    consists of hearsay from a confidential informant.  That's core

9    hearsay.

10             THE COURT:  It goes to his state of mind, though.

11             MR. TURNER:  I think it's going to be impossible for

12   the jury to segregate that out.  We're bringing out --

13             THE COURT:  I'll give them a limited instruction, but

14   I'm going to allow him to ask what was the basis for his view

15   that somebody else was an appropriate target.  That strikes me

16   as in the heartland of the defense.

17             MR. TURNER:  Another problem I have is law enforcement

18   privilege.  If we're going to start getting into statements of

19   confidential informants, these are people who have brought

20   information to the government in secrecy.

21             THE COURT:  Here's what we're going to do.  We won't

22   have him go into the content of the communications.  He can

23   simply list, and why don't you take it carefully?

24             MR. DRATEL:  Okay.

25             THE COURT:  And let's cut him off if he's going to go

1     into the content of any of those communications.  He's just

2     going to give an itemized list of these are the types of things

3     I relied on.

4               MR. TURNER:  Not only the contents but the source, the

5     identity of somebody --

6               MR. DRATEL:  The information --

7               THE COURT:  What I was going to say is, the point that

8     I think it's fair for the defense to bring out is that there

9     was information listing the sources that led the investigator

10    to believe at one point in time that there was probable cause

11    for purposes of a warrant.  That I think can be done in a way

12    that does not invoke hearsay, all right.  So do it in that way

13    that does not get us into the hearsay problem.

14              MR. DRATEL:  Tell him what information -- can I lead

15    him?

16              THE COURT:  You're on cross.

17              MR. DRATEL:  Yes, right.

18              THE COURT:  You can just say -- why don't you ask him

19    what his conclusion is if he ever reached a conclusion and what

20    the source was to give you an itemized list of the types of

21    information --

22              MR. DRATEL:  But the silkforum.org is important

23    because it's the one that some of the initial --

24              THE COURT:  You can't go into the content of what the

25    bitcoin forum was.

1          MR. DRATEL:  No.  To say that he was running it.

2     That's the information they had.

3          THE COURT:  That's definitely -- you're trying to get

4     that in for the truth, right?  That is exactly the truth, so

5     you can't do that.

6          MR. TURNER:  We would ask for a strong limiting

7     instruction here, your Honor.

8          THE COURT:  He's saying it's not going to go into the

9     hearsay.  I think we can do this in a way that does not suggest

10    hearsay.

11         MR. TURNER:  My concern, is this the defense that the

12    defendant wants to put on, that there was another individual

13    behind it and this is the witness that they're seeking to draw

14    that evidence out of?

15         THE COURT:  Yes.

16         MR. TURNER:  So that is being offered for the truth in

17    terms of the evidence --

18         THE COURT:  No.  Let's go through it so we're

19    absolutely clear on what the question is going to be.

20         The question is going to be did there come a point in

21    your investigation when you formed a basis for believing that

22    there was probable cause for a warrant against Mr. Karpeles?

23    Yes or no?

24         You got these in mind?

25         MR. DRATEL:  Yes.

1          THE COURT:  Then it's going to be tell me, just by

2     source type, the type of sources that led you to that.  They

3     were written information that I had received, it was witnesses.

4     I can lead him through that if you want to, but you can do it.

5          MR. DRATEL:  No.  That's okay.  If I'm running astray,

6     you'll let me know.

7          THE COURT:  Then what do you want to do next because

8     those are not hearsay so far.  The fact that he did reach that

9     conclusion is clearly something that he can testify to.

10          MR. TURNER:  I understand that.  I guess my concern

11     there is if he just says something like witnesses, then it

12     makes it sound potentially more significant than it is.

13          THE COURT:  Then you can go back on cross, but that's

14     not hearsay.  That's part of a list of items.  I can't preclude

15     him from that.  I don't think there's a basis to preclude him

16     from that.

17          MR. TURNER:  As long as it's very clear that he's not

18     saying that a witness told me that.

19          THE COURT:  No, no.  We're not going to let him go

20     into content.  He can't go into the content of the

21     communications.

22          MR. TURNER:  Then I'm not sure what he can draw out of

23     the question.  I understand that he can show -- that asking

24     this witness whether he believes someone else was the person in

25     charge of Silk Road is relevant, but beyond that, unless -- I

1  don't know what the point of going further is unless the

2  defendant is seeking to draw that information out for the truth

3  to show there was credible evidence that somebody else --

4        THE COURT:  Well, he is saying this investigator

5  reached a point of having believing there was probable cause.

6        MR. TURNER:  I'm not even sure how that is relevant, I

7  mean, if it's not being offered for bias --

8        THE COURT:  It's clearly relevant; I have no problem

9  with making a relevance ruling on this.

10        MR. TURNER:  But why, your Honor, unless if it's being

11  offered for truth.

12        THE COURT:  It's being offered for the truth of

13  probable cause.  This is not hearsay.  None of this we talked

14  about so far is hearsay.  There's no statement.

15        MR. TURNER:  Right.  My concern, again, is that the

16  effect of the testimony is going to be that there were other

17  sources --

18        THE COURT:  He can always say there were 25 sources

19  and he can always list the type.  We don't get a hearsay

20  problem as a matter of law until he goes into the content.  I

21  think the government's concern is that by implication, there

22  was content.  Of course, there's content in any communication.

23  He when he says he spoke to people, there's necessarily

24  content.  He can't say what that content was, but his

25  subsequent action led him to do something one might infer, but

1    that's way people get around hearsay all the time.

2            I understand your concern.  Let's take it step by

3    step.  He clearly gets to ask about the investigator having

4    some belief.

5            MR. TURNER:  I would just, finally, I would note our

6    growing concern that there actually is no legitimate basis here

7    if the defense is not trying to show something like bias or

8    anything else that, but, instead, is trying to prove through

9    this witness the contents of other statements, statements of

10   others, of witnesses that aren't being called in to testify

11   themselves, basically the defense is trying to suggest there's

12   all this evidence out there of the person who is running Silk

13   Road.  If that's the case, then the defense can introduce that

14   evidence, but trying to get this witness to testify about that

15   evidence, particularly when it concerns statements of

16   others --

17           THE COURT:  Here's what we're going to do because I

18   think this is in the heartland of exactly what the defense

19   wants to do, and I have to say right now, my view is it seems

20   to be perfectly appropriate that this fellow says he put

21   together an investigation which identified the defendant, he

22   did it in the following way, showing that he may have put

23   together an equally strong investigation to identify somebody

24   else and that's issue:  Is this the right guy?

25           That strikes me as a defense that can be developed

1    through this witness because this witness is not limited only

2    to bias.  Factual impeachment by undermining some of his

3    testimony I think is perfectly appropriate, but I don't think

4    we're going to solve it right now.

5              MR. DRATEL:  No.

6              THE COURT:  Hold on.  But I also think, is there

7    anything else you can do because what I'd like to do is rather

8    than break right now, I want to make sure I hear and think

9    about these issues clearly because this is critical.  So if the

10   government feels as strongly and we're at 4:00 and we already

11   have issue that this witness is coming back for on Tuesday, I'm

12   inclined to hold both of these issues and talk about it so we

13   can raise our voices above a whisper, but is there anything

14   else you can go to?

15             MR. DRATEL:  No.

16             THE COURT:  That's fine.  We'll break for the day and

17   we'll talk about this then in open court.

18             MR. TURNER:  Thank you, your Honor.

19             THE COURT:  Thank you.

20             (Continued on next page)

21

22

23

24

25

1             (In open court; jury present)

2             THE COURT:  Ladies and gentlemen, we are going to

3    break for the afternoon because this conversation is going to

4    take a little bit longer and I don't want to take up your time

5    with it.  So since we're at 4:00 anyway, I'm sure you'll be

6    able to get a head start on the traffic and everything else and

7    the commute.

8             I want to give you a few reminders, though, because

9    you do have between now and -- we're not going to see you again

10   until Tuesday morning, right, so set your alarm clock.  Don't

11   forget about us.  We need you here on time by 9:15 on Tuesday

12   morning so we can pick up here in the room by 9:30.  We will

13   not meet tomorrow as I said before and Monday is a holiday, so

14   we will not meet on Monday.

15            I do want to remind you to take as seriously as you

16   can possibly take the instruction not to talk to anybody about

17   this case, anybody at all, including those in your life who you

18   may have in your home or visitors, friends, spouses,

19   significant others, whoever they may.  Be don't update your

20   Facebook page.  I know that sounds ridiculous.  People have

21   done it before.  And don't send emails about it, don't Tweet.

22            And really, it's very important that if you run across

23   any news articles on the Internet, on the television,

24   newspapers, avert your eyes.  Do not read them.  You can read

25   the remainder of the paper but do not read them.  It's very,

F1fgulb6                          Der-Yeghiayan – cross

 1   very important that the only information that you folks use as

 2   the triers of fact in this case is the evidence which you

 3   receive here in this room.  And don't watch Princess Bride over

 4   the weekend, okay?  Don't do any particular research on any

 5   aspect of this case from anything that you've heard about to

 6   further inform yourself.  You will have all the facts as they

 7   develop here in this record here at trial.

 8              See you Tuesday morning.  Thank you very much.

 9              (Jury excused)

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court; jury not present)

2        THE COURT:  Let's all be seated.  When the witness has

3   left the room, let's pick up where we left off on this issue

4   and we can speak about it then in a voice that is above a

5   whisper, which always feels both as if it's being done more

6   quickly than we otherwise might do.  There's an urgency to it

7   when we're at side bar and also people are constrained in terms

8   of what they can reasonably say.

9        (Witness temporarily excused)

10        THE COURT:  All right, so let's go back to the issue.

11   We have two issues on the table.  We have the one that we spoke

12   about before and that was the earlier issue, which we'll now

13   take up Tuesday morning as well.  You folks, by the way, on any

14   of these issues can write to me letters over the weekend and

15   collect your thoughts and any case law or other support that

16   you may believe is appropriate for me to have.  I will read

17   anything that you put before me.

18        On this last issue, Mr. Dratel, so we have it clearly

19   in mind now, can you maybe give me the kind of question or

20   questions that you believe you could ask that you believe are

21   not objectionable and otherwise comply with the rules of

22   evidence and then let's get them on the record.  And we'll find

23   out what kinds of issues we have so we can think about them.

24        Question number one?

25        MR. DRATEL:  Question number one is, you reached a

1    conclusion based on your investigation that there was probable

2    cause to believe that Mark Karpeles was behind the Silk Road as

3    an operator and was using it to sell narcotics, essentially,

4    what's in the affidavit.

5             Second would be, what kind of sources did you have for

6    that information.  And I would lead him saying you did your own

7    investigation, you did a lot of Internet research, you had

8    confidential informants, your own research, other collection by

9    your colleagues.  And then there is a whole range of

10   information that he collected on his own through his own

11   Internet research, which I would go into.

12            THE COURT:  "He" being the witness?

13            MR. DRATEL:  Special Agent Der-Yeghiayan, yes, that he

14   did, and it's really Internet research that he did, and then I

15   would just go through that with him a little bit.

16            THE COURT:  Hold on.  Let's take that, okay.  Let's

17   not skip through that too quickly.  I want to understand what

18   you want to do with it.

19            MR. DRATEL:  Sure.

20            THE COURT:  I understand the type of information, you

21   want to get a list of source types, right?  So that includes,

22   for instance Internet, confidential CI, confidential informant,

23   etc., that's a source type.

24            Then what's the next thing you want to do?

25            MR. DRATEL:  The next thing I wanted to do, and, your

1    Honor, just so we're clear, because I usually don't see the

2    need for this given how we practice in this district, but

3    obviously I'm going to ask for it specifically:  That there be

4    no communication with the witness from the prosecution team in

5    any respect because I am now previewing my cross, 615.

6              THE COURT:  So to the extent that anything would be

7    done differently -- there are things done with witnesses all

8    the time, but they shouldn't be talking to him about the

9    specific content of his testimony; I wouldn't expect anybody

10    would in terms of these things.

11              But to the extent they're going to have the kinds of

12    conversations and communications they would normally have, then

13    I'm not going to preclude that, but they shouldn't be preparing

14    him on your cross.

15              MR. DRATEL:  That's right, or on the redirect because

16    while someone is on cross, they shouldn't be talking --

17              THE COURT:  I have no reason to believe they won't

18    fulfill their obligations.  I'm not going to give a special

19    instruction.  So you're going into he develops his own

20    information.

21              MR. DRATEL:  Right.  This is it:  That the Silk Road

22    website, from visiting the Silk Road website, I'm quoting him

23    now, I know that this same software platform used by

24    bitcoin.talk is used to operate the discussion forums on Silk

25    Road.

1          THE COURT:  The same software platform?

2          MR. DRATEL:  Correct.  You can ask that in a way that

3     is simply getting out a factual question, right?

4          THE COURT:  Let's talk about the nonhearsay way of

5     getting at that which is, Are you familiar with bitcoin.talk,

6     are you familiar with that software platform, are you aware of

7     any similarities between that and the Silk Road platform,

8     right?

9          MR. DRATEL:  He says based on my training and

10    experience, this platform is not widely used by forum

11    administrators.  And then he reached the conclusion that the

12    forums were likely set up by the same administrator; that is,

13    Karpeles.  And there's more to it, which is, both platforms,

14    the Silk Road and bitcoin talk.org use something called

15    Mediawiki version 1.17, and this is not an updated version, but

16    the same exact version, even though the software has been

17    updated since the 1.17 version.

18         So he concludes I believe that Karpeles has been

19    involved in establishing and operating the Silk Road website.

20    And then he goes on to say in the affidavit that Karpeles is

21    using Silk Road to increase the value of bitcoin because Silk

22    Road generated a huge source demand for bitcoin.

23         Then he says Karpeles has the technical expertise and

24    experience necessary in order to establish and operate a large

25    commercial website such as Silk Road.  Further, the fact that

F1fgulb6                         Trial

1    the Silk Road relies on a highly complex system for processing

2    bitcoin strongly suggests that it was designed by someone with

3    extensive technical expertise related to bitcoin, which

4    Karpeles, being the owner and operator of a major bitcoin

5    exchange and bitcoin discussion forum, clearly has.

6            He also talks a little further about based on training

7    and experience, I believe it is likely that Karpeles has worked

8    with others in establishing and operating the Silk Road website

9    because the postings on the silkroadmarket.org are signed Silk

10   Road staff and written in the plural first person.

11           Then it points to some investigative stuff.  He did

12   some other subpoenas that went out.

13           THE COURT:  There's a bunch of that that you can get

14   at in a way that does not invoke any of the hearsay issues that

15   we're talking about.

16           MR. DRATEL:  That's right.  I'm just --

17           THE COURT:  I understand.

18           MR. DRATEL:  But there is one piece of hearsay that I

19   don't think it's hearsay based on my purpose, which is not with

20   respect to the affidavit because I'm trying to go through this

21   so we get all of this out of the way right now.

22           THE COURT:  Yeah.

23           MR. DRATEL:  But a little further on, in the context

24   of sort of DPR and the context of more than one DPR, there was

25   an interview done by a journalist named Andy Greenberg of DPR,

1    someone claiming to be DPR, in August 2013, right at the same

2    time.  And in the interview, DPR says no, I bought the site

3    from -- and I'm not going to go into that, that he bought the

4    site from someone else and all of that, I'm not going to go

5    into the hearsay -- but just the fact that in that interview,

6    the person who claims to be DPR to Andy Greenberg says I'm not

7    the first DPR, there were other DPRs before me.  And Special

8    Agent Der-Yeghiayan says in an email that sounds very much like

9    Karpeles.  That's what he says, that the person in that

10   interview --

11           THE COURT:  And so your point is that Der-Yeghiayan

12   reads -- that's the Bloomberg article?

13           MR. DRATEL:  Forbes.

14           THE COURT:  So Der-Yeghiayan reads the Forbes article

15   that has this statement in it, and I've actually run across

16   that, and you want to bring out that statement.

17           MR. DRATEL:  His conclusion, his conclusion that

18   sounds very much --

19           THE COURT:  You want to bring out the statement and

20   the conclusion he draws from that?

21           MR. DRATEL:  Right.

22           THE COURT:  Tell me now, give me your argument as to

23   why that's not rank hearsay.

24           MR. DRATEL:  Because it's his conclusion that it

25   sounds like Karpeles based on his investigation.  It's not

1  whether the statement is true that there were other -- it sort

2  of informs his conclusion and it buttresses it.

3          THE COURT:  There's a way of getting at the "sounds"

4  that doesn't bring out the statement, of course, so I need to

5  understand the statement.  Because the way to get out the fact

6  that he sounds like Karpeles could be, Did you read the

7  article?  Yes.  Did it -- let me finish it so the record is

8  clear about the way it could be brought out.

9          Were there words that were reported to be by DPR?

10  Yes.  Did you draw any conclusions?  Yes.  What was your

11  conclusion?  That it sounded like Karpeles.

12          That doesn't require getting into the statement.  So

13  if you're going to get into the statement, tell me why, in

14  terms of your argument, that's not rank hearsay.

15          MR. DRATEL:  You're right.  I agree.  Playing it out,

16  that's correct.

17          THE COURT:  All right, so you could do it that way.

18          MR. DRATEL:  That's my purpose, not to get into the

19  other stuff that we got into.

20          THE COURT:  So what you'd say is was there a Forbes

21  article?  In the Forbes article that you read, did you read

22  it -- did it purport to have an interview with DPR?  And did

23  you draw any conclusions from that?  Yes.  What was your

24  conclusion?  X.

25          MR. DRATEL:  Right.

1          THE COURT:  Okay.

2          MR. DRATEL:  In a leading way.

3          THE COURT:  What's that?

4          MR. DRATEL:  In a leading way.

5          THE COURT:  I'm playing out a nonhearsay way to do it.

6   And now I want to get the government's view.  And I am going to

7   allow these issues, of course, to evolve over the next few days

8   because we're all dealing with this right now for the first

9   time.

10         If you come up with additional questions, Mr. Dratel,

11  I'm not going to prevent you from asking them, nor will I

12  prevent the government from further refining its position.

13         Mr. Turner, what's your view about these pieces?  If

14  you can take them in a granular manner, that would be helpful.

15         MR. TURNER:  Sure.  Overall, I certainly understand

16  what your Honor was saying at side bar that in terms of this

17  being the core of the defense, that the defense wants to argue

18  that there was somebody else running the site, but it just has

19  to be done through competent evidence.  And the fact that a

20  witness at one time believed there was probable cause that

21  somebody else was running the site, that in and of itself is

22  not evidence; it's not competent evidence.  And there is no

23  inconsistent statement that's been drawn out that provides a

24  justification to use that sworn affidavit to try to impeach the

25  witness.

1           THE COURT:  Why isn't an investigator who says I

2   received the following four pieces of information, I took the

3   following action based upon that information -- it doesn't have

4   to be in terms of belief, not belief, when you file an

5   affidavit in support of a search warrant, you're taking action

6   based upon that information.

7           In the government's view, is that line of approach

8   acceptable or do you also oppose that line of approach?

9           MR. TURNER:  It's not evidence of anything.

10          THE COURT:  The investigator receives -- I received

11  four pieces of information.

12          MR. TURNER:  Right.

13          THE COURT:  I then took the following act based upon

14  those four pieces of information, that's evidence of four

15  pieces, correct?

16          MR. TURNER:  The government's view is what should be

17  the focus of the defense here is the four pieces of information

18  whether --

19          THE COURT:  And the act.

20          MR. TURNER:  I don't know what the act might be.

21          THE COURT:  If the act is to walk to a judge and get a

22  warrant, that's an act.

23          MR. TURNER:  If the act is simply an assertion that

24  this agent believed there was probable cause that someone was

25  operating a website other than Mr. Ulbricht at the time, that

1    assertion, that belief, that is not competent evidence of

2    anything.

3            THE COURT:  The act of "What did you do next?  I

4    sought a search warrant without the statement of law as to

5    probable cause."

6            MR. TURNER:  Right.  So that act would only be

7    evidence that the agent had that belief at the time, but again,

8    that belief isn't evidence of anything.

9            If the defendant is trying to prove that there was

10   somebody else operating Silk Road, they can do that by focusing

11   on the underlying evidence itself.  And then the question

12   becomes, What evidence is admissible?

13           THE COURT:  Are the four facts admissible?

14           MR. TURNER:  So, for example, the report of a

15   confidential informant obviously is clearly hearsay.

16           THE COURT:  Hold on.  We're not going into the content

17   of the report.  We're going to say what information did you

18   receive, just like he's testified for a day about the

19   information he developed about the website itself.

20           MR. TURNER:  But there, your Honor, it was all facts

21   that were being elicited.  Here, it's just a belief of the

22   agent.

23           THE COURT:  No, I'm moving aside from the belief.  I'm

24   taking the facts.  So he says there were four facts.  I read X

25   or I did Y or I heard this.  And he doesn't go into content.  I

1   had a communication; I had a visual sighting on some website.

2   I have my four facts, can he list those four facts?  In the

3   course of my investigation, because you don't want him to skip

4   over August, right, or April, I mean, that's part of what

5   you've been bringing out.

6             MR. TURNER:  It depends on what it's being offered

7   for, your Honor.  If, for example, what that information was

8   being offered for was to show some sort of inconsistency that

9   he says now that he never believed that anybody but Ross

10  Ulbricht --

11            THE COURT:  Isn't it an ultimate inconsistency?

12            MR. TURNER:  No, your Honor, because in order to prove

13  that, the defendant needs to rely on competent evidence.  In

14  order to prove the ultimate inconsistency that it was someone

15  else running the site, if that's what they're trying to prove,

16  they have to prove that through competent evidence.  Then it

17  becomes a question of the individual pieces of underlying

18  information that the agent relied on in his sworn affidavit,

19  for example, which of those are admissible.

20            THE COURT:  Let's take a different example because you

21  and I, our minds are not meeting here, I want to move away from

22  the word "belief."  I want to focus on analogous types of

23  evidence as to that which we have gone over here so far with

24  this witness.  And if analogous types of evidence were reviewed

25  by this witness and he lists those analogous types of evidence

1    as among those that he reviewed, he can do that, right?

2              MR. TURNER:  Right.

3              THE COURT:  I reviewed X, I reviewed Y, I reviewed Z.

4    He can do that, right?

5              MR. TURNER:  Right -- it depends, if I may.

6              So, for example, the forum software, that is a fact,

7    and if the defendant wants to bring that out through this

8    witness' testimony -- isn't it true that Silk Road, the forums

9    operated using a certain version of forum software?  Do you

10   know that to be a fact?  Did you personally observe that?

11             Those are facts that this witness can competently

12   testify to.

13             THE COURT:  Presumably, he might have information

14   about the bitcoin.org.  Did you become familiar with the

15   software platform that bitcoin.org relied upon?  Yes, I did.

16   And did you compare that to the Silk Road forum software

17   platform?  Yes, I did.  Did you draw any conclusions?  Yes, I

18   did.  What was your conclusion?  It was the same thing or

19   similar.

20             He can do that.

21             MR. TURNER:  Yes.  Those are personal observations of

22   this witness.  He's made no hearsay issue --

23             THE COURT:  Here's what we'll do:  First, I will

24   elicit from you whether there are any other bases upon which

25   you sought to object to the testimony so I get a full view of

1    your objections.

2             Then I want you to find a case for me, or cases,

3    because if what you're saying is supported and it's the way

4    that the law works, then there ought to be oodles of cases.  I

5    feel like what we're talking about is analogous types of

6    evidence that would be described in very similar ways, but

7    there may be something that I am missing --

8             MR. TURNER:  We'd be happy to brief it.

9             THE COURT:  -- at 4:30 on a Thursday.  It does happen.

10            Tell me:  Are there any other bases apart from this

11   one that you just described?

12            MR. TURNER:  Other than about confidential informants,

13   as I mentioned at side bar.

14            THE COURT:  So, the way I would articulate back to you

15   what I understand your concern is or your objection, is that

16   underlying the witness' statement or testimony, potential

17   testimony about why he took certain action which is seeking a

18   warrant, underlying that are or information which he believed

19   were facts and based upon which he took certain action, and you

20   dispute the reliability of those facts and you believe that

21   those facts are themselves based upon hearsay.

22            Do I have your point right?

23            MR. TURNER:  I'm not sure if that captures all of it,

24   honestly, your Honor.  There are a couple of points, and I

25   think it would probably best if, at the end of the day, for us

 1    to lay this out in our papers.

 2              I think one is certainly hearsay issues to the extent

 3    that basically what the defense is trying to draw out are

 4    hearsay assertions that were proffered as support for probable

 5    cause in a search warrant affidavit, that's not competent

 6    evidence.

 7              THE COURT:  He's not going to go into the content of

 8    the communications.  He would say I have these four types; I

 9    took this act.

10              MR. TURNER:  I understand.  Then our larger concern

11    is, the witness' act is irrelevant, what this witness did is

12    irrelevant.

13              THE COURT:  I don't think it's irrelevant because if

14    he pursued a target of this conduct and it wasn't the

15    defendant, I think that's directly relevant to the defendant's

16    theory of the case.

17              MR. TURNER:  My point is, your Honor, what the defense

18    is trying to prove here is not simply that this agent pursued

19    another target.  The defense is trying to argue that this other

20    target is the real DPR.

21              THE COURT:  They're trying to raise a reasonable doubt

22    as to whether or not the defendant is the real DPR.

23              MR. TURNER:  But that is the assertion they are trying

24    to prove, so that's why the hearsay concerns we have --

25              THE COURT:  How else do you do it?

1              MR. TURNER:  -- are so acute.

2              The way the defense does it, your Honor, is by relying

3       on competent evidence.  So, for example, if they want to point

4       to the fact that the Silk Road forums were based on a certain

5       software that Mark Karpeles also used, that has nothing to do

6       with what the agent did or didn't do or whether a search

7       warrant was sworn out or not.  It's a simple fact, and this

8       agent observed that fact and can testify to it.

9              It's a completely different matter for the defense to

10      say, well, didn't you hear from some confidential informant or

11      hear from some other witness certain information that led you

12      to believe that Mark Karpeles was the person behind it and then

13      go to a judge with a search warrant sworn out?  All of that is

14      being offered to try to prove that someone else was running the

15      site and that is clear hearsay being offered for the truth of

16      the matter.

17             THE COURT:  It's an inference.  There are certain

18      facts that are being posited to draw inferences.

19             Here's what I think we should do:  We should all get

20      this transcript and read this portion of it that relates to

21      what we have just all gone over.  I think that to the extent

22      that there's any question as to whether or not the defense has

23      been building all afternoon a picture that Mr. Karpeles was, in

24      fact, at least arguably a DPR, that I think has come out in

25      spades.  I think the jury understands that that's the argument.

1     I have no idea what they think about it, but that I think is

2     not -- that cat's out of the bag, right, and that this

3     particular witness Mr. Der-Yeghiayan, for some period of time,

4     was pursuing Mr. Karpeles, all of that's out.

5          So I don't know that what we're talking about,

6     frankly, is particularly additive, but you folks, again, know

7     more than I.  And I very much hesitate to preclude something

8     unless there's a very solid evidentiary basis when it goes to

9     the heartland of the defendant's theory.

10         That's why I want you to look at it, think about it,

11    measure it against what's already in the record, and then

12    present whatever you want to present in terms of a written

13    submission.  I'll absolutely read it.

14         MR. TURNER:  We'll do so.

15         THE COURT:  Thank you.

16         MR. DRATEL:  I wanted to add the identification of an

17    alternative suspect and the conduct of the government's

18    investigation with respect to that alternative suspect is core

19    *Brady* in so many cases, and we'll brief that for the Court.

20         THE COURT:  In terms of *Brady*, the very fact that we

21    have all this 3500 material is *Brady*.  If you think it's *Brady*,

22    then it's there.

23         MR. DRATEL:  Yes.  I'm just talking about relevance.

24    I agree with the Court, it couldn't be more relevant.  And the

25    question of competent evidence, the Court has navigated that,

1    but we'll address it in the papers.

2              THE COURT:  I'll tell you, it raises some issues that

3    I would benefit from people's writing things down so that I can

4    sit there and I can really go through it very carefully.

5              MR. DRATEL:  I'm saying, we will submit something as

6    well, your Honor.

7              THE COURT:  If you're going to change what you're

8    doing, let us know so we're not ships passing in the night.

9              MR. DRATEL:  Correct; I agree 100 percent.

10             THE COURT:  I am sorry that this occurred in terms of

11   cutting things short, but I think it was necessary in light of

12   this particular issue.

13             We'll come back on Tuesday morning.  Is there anything

14   else that we should know about that we should preview for next

15   week?  And we're going to need to come up with a solution for

16   that monitor because I can't see Mr. Ulbricht's face.  I like

17   to see actually everybody's face.  The Court looks around.  I

18   can see Mr. Howard's face because he's closer.  I don't need to

19   see Ms. Lewis' face.

20             MS. LEWIS:  I'm fine with that.  We can put it in

21   between.

22             MR. DRATEL:  We'll figure it out.

23             THE COURT:  I had a note to myself a couple of times.

24             MR. DRATEL:  Let me review what I have left.  And if

25   there's something else that I think needs to be previewed, I'll

1    include it in the submission and figure it out.

2              THE COURT:  Anything from the government's

3    perspective?

4              MR. TURNER:  No.

5              THE COURT:  What we're going to do, I'm also going to

6    provide next week, it's likely to be Wednesday, a set of the

7    draft jury instructions.  You folks will then be asked to go

8    back and to go through them using comments with Word so that I

9    can just look and see what you don't agree with.

10             We're actually working off of your draft because your

11   draft is off of one of my prior drafts, so actually I think

12   it's working okay that way.

13             Tomorrow I have a full day with a million lawyers in

14   this room, so you'll need, unfortunately, to at least clear the

15   tables and put things someplace safe.

16             MR. DRATEL:  It will be pristine.

17             THE COURT:  Terrific.  I don't mean the jury room.

18   Well, you can't go in the jury room.

19             We're adjourned.  Thank you.  See you Tuesday morning.

20             THE DEPUTY CLERK:  All rise.

21             (Adjourned to January 20, 2015 at 9:15 a.m.)

22                              *  *  *

23

24

25

559

```
INDEX OF EXAMINATION

Examination of:                              Page

JARED DER-YEGHIAYAN

Direct By Mr. Turner . . . . . . . . . . . . . 366

Cross By Mr. Dratel  . . . . . . . . . . . . . 421

                    GOVERNMENT EXHIBITS

Exhibit No.                              Received

 133A    . . . . . . . . . . . . . . . . . . . 370

 128D    . . . . . . . . . . . . . . . . . . . 386

 128F    . . . . . . . . . . . . . . . . . . . 387

 201H    . . . . . . . . . . . . . . . . . . . 390

 201I    . . . . . . . . . . . . . . . . . . . 391

 201J    . . . . . . . . . . . . . . . . . . . 393

 201K    . . . . . . . . . . . . . . . . . . . 397

 201L    . . . . . . . . . . . . . . . . . . . 399

 201M    . . . . . . . . . . . . . . . . . . . 401

 130A    . . . . . . . . . . . . . . . . . . . 403

 134, 134A  . . . . . . . . . . . . . . . . . 405

 130     . . . . . . . . . . . . . . . . . . . 407

 131     . . . . . . . . . . . . . . . . . . . 409
```

1     129E     . . . . . . . . . . . . . . . . . 419

2                              DEFENDANT EXHIBITS

3     Exhibit No.                                    Received

4     B   . . . . . . . . . . . . . . . . . . . 455

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25