F1ldulb1                          Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          14 Cr. 68 (KBF)

5    ROSS WILLIAM ULBRICHT,

6                 Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           January 21, 2015
9                                          9:22 a.m.

10

     Before:
11
                    HON. KATHERINE B. FORREST,
12
                                           District Judge
13

14                         APPEARANCES

15

     PREET BHARARA,
16        United States Attorney for the
          Southern District of New York
17   BY:  SERRIN A. TURNER
          TIMOTHY HOWARD
18             Assistant United States Attorneys

19   JOSHUA LEWIS DRATEL
     LINDSAY LEWIS
20   JOSHUA HOROWITZ
          Attorneys for Defendant
21
               – also present –
22

     Special Agent Vincent D'Agostino
23   Molly Rosen, Government Paralegal
     Nicholas Evert, Government Paralegal
24   Sharon Kim, Government Intern

25

F1ldulb1                        Trial

1              (Trial resumed; jury not present)

2              (Case called)

3              THE COURT:  Good morning to all of you.

4              The first thing I would like to do is to have you,

5      Mr. Dratel, while I am addressing a couple of other matters

6      gather up what I have been referring to as the AA posts that

7      you wanted to compare to the mises piece, the mises.org piece,

8      so I can just take a quick look at them.  I have reviewed the

9      portion of the transcript yesterday, as I had told you I would,

10     early relating to that discussion.  So I just want to take a

11     quick look and see whether or not we're able to do anything

12     with that.

13             MR. DRATEL:  I'm not sure what the Court means in

14     terms of are you talking about the language analysis?

15             THE COURT:  Yes.  We dealt at sidebar with an

16     evidentiary issue, and you wanted to use some mises posts of

17     some sort with the Silk Road forum.

18             MR. DRATEL:  No, it is not the mises posts with the

19     Silk Road forum.  What it was was --

20             THE COURT:  Two different.  One was a mises.org.

21             MR. DRATEL:  It was not mises.org necessarily.  It was

22     this witness' analysis, comparison of the writing that he

23     attributed to Anand Athavale and Dread Pirate Roberts' writing

24     as well in comparison.

25             THE COURT:  Do you have --

F1ldulb1                    Trial

1              MR. DRATEL:  Yes.  I can find it from the 3500 --

2              THE COURT:  If you can.  Because what I am wondering

3      is whether or not there is a way of doing something that is a

4      factual-based series of questions.  In other words, in terms of

5      were you familiar with these mises whatever they are called,

6      whatever the right word is called.  Did you review them in the

7      course of your investigation?  Yes.  And did they have the

8      following name associated with it?  Or whatever they are.  Did

9      you separately look at Y?  And then you can draw -- he can't

10     talk about his conclusions, and I won't let him talk about his

11     assumptions, but you can, through argument, draw whatever

12     inferences you want to draw.  This is the first issue.  Yes.

13     But I need to see the stuff -- before I even know if that

14     works, I need to see the materials.

15             MR. DRATEL:  Sure.

16             MR. TURNER:  Your Honor.

17             THE COURT:  Yes.

18             MR. TURNER:  I don't think the defense has the actual

19     mises.org.  The defense is referring to the defendant's own

20     analysis.

21             THE COURT:  I understand he has referred to it like

22     that.  I'm trying to get underneath that and to see if there is

23     something factually that will work.  So let me see what he's

24     got and then we'll figure out if there is anything that we can

25     do with it.

F1ldulb1                    Trial

1          The conclusions of the analysis I'm not allowing in,

2     but whether or not there is the data that he used to do the

3     comparison, this witness used to do the comparison, whether or

4     not that could be presented to him.  Did you use this data?

5     Yes.  Did you compare it to this?  Yes.  That is something that

6     I want to assess.

7          MR. TURNER:  We would still be left with the

8     authentication issue, your Honor.  This witness does not have

9     the necessary foundation to --

10          THE COURT:  I believe that if he physically possessed

11     the documents, then Mr. Dratel can resolve that by saying did

12     you do anything to determine other than the fact that you

13     printed these off the Internet.  I mean, it is up to argument,

14     the weight that the jury gives it.  They are not coming in for

15     the truth.  They are not going to be -- let me just see what

16     he's got.  OK?  We've got other issues to deal with.  Let me

17     deal with some other issues first.  OK?

18          The other issue is Complaint Paragraph 22C.  I have

19     reviewed case law relating to the admissibility of complaints

20     signed by government agents.  I believe that Mr. Dratel is

21     correct that that one paragraph can be put in.  I didn't

22     receive any letters from you folks.  So it's Paragraph 22C.

23          Now, the way that that would be done would be stating:

24     In September 2013, the government made the following statement,

25     and the paragraph would be read in its entirety.  But based

F11dulb1                    Trial

1    upon the Ramirez case, in the Second Circuit 1990, as well as

2    some certain other cases, that appears to be something which

3    can be done.

4            Mr. Turner.

5            MR. TURNER:  Your Honor, we haven't had a chance to

6    look at that case.  We ask for the opportunity to do so.

7            THE COURT:  Did you find any other cases?  You folks

8    were tasked last night with coming up with any case law you

9    felt was supportive of your respective positions?

10           MR. TURNER:  That was considered hearsay.  The problem

11   is the defendant isn't even offering it for the truth.  They

12   are offering it to try to impeach him, essentially.

13           THE CLERK:  He offered them separately.  He made a

14   proffer.  I agree with you, and I had considered whether or not

15   this should be done in the context of the defense case.  That

16   is one possible issue.

17           However, Mr. Dratel did specifically recite the

18   hearsay rules to get it in as an admission.  In fact, he cited

19   three of them, one of which I think is more applicable than the

20   other two; that is the party admission.

21           MR. TURNER:  But, your Honor, that principle applies

22   when the party is trying to put that proposition in for the

23   truth.  What they're trying to do is say the government made an

24   inaccurate statement.  They are trying to sort of impeach this

25   statement.

1          THE COURT:  No.  I think his theory, from his opening,

2     which is why I've also considered the materiality of it and

3     wondered whether this is a collateral issue solely for

4     impeachment but then I recalled that in his opening Mr. Dratel,

5     as I understand part of your point, it's that this website was

6     alleged to have been making money hand over fist.  So where

7     is -- show me the money.  Basically, where's the beef.  And if

8     the defendant wasn't caught with the beef, then that's a point

9     Mr. Dratel wants to make, that that absence is an additional

10    circumstantial fact supportive of identity.

11         I think that is the argument.  So I think he wants it

12    in for the truth.  Am I wrong about that?

13         MR. DRATEL:  No, your Honor.  You are correct.  It is

14    an admission and it doesn't have to impeach, and the Court is

15    correct with respect to the GAF case.

16         THE COURT:  Yes, I have read the GAF case.

17         MR. DRATEL:  It is really dispositive.  It also says

18    that a party -- and, also, the Court mentioned Ramirez, also,

19    Warren, you know -- and I will just quote from it, where,

20    quote, the government has indicated in a sworn affidavit to a

21    judicial officer that it believes particular statements are

22    trustworthy, close quote, the Court -- and then the quote

23    continues -- may not sustain an objection to the subsequent

24    introduction of those statements on grounds that they are

25    hearsay.

F11dulb1                    Trial

1          THE COURT:  Right.

2          MR. DRATEL:  That is 22 --

3          THE COURT:  Yes, I read the Warren case.  I think that

4   is a D.C. Circuit case.  The GAF case had to do with a bill of

5   particulars, but I think it is sufficiently close that the

6   principle applies.

7          MR. DRATEL:  Right.  And I think, also, GAF also

8   stands for the proposition that even if the party changes its

9   strategy or its position in litigation, that prior position is

10   admissible.

11          THE COURT:  That was the situation in GAF where they

12   had two different bill of particulars.

13          MR. TURNER:  Your Honor, if I may?

14          THE COURT:  Yes.

15          MR. TURNER:  First of all, the government would like

16   an opportunity to look at this law, and this is law that we

17   haven't had an opportunity to see.  It is not an urgent --

18          THE COURT:  You were supposed to look at it last

19   night.  I did last night go over the things that were going on

20   for this morning.

21          MR. TURNER:  We did, your Honor, but we never received

22   anything from the defense.  We don't know what specific cases

23   your Honor looked at.  We would simply like an opportunity to

24   take a look at those cases ourselves and address them.

25          I want to make clear, though, your Honor, the

F1ldulb1                    Trial

1    government is not changing its position.  The amount of

2    bitcoins we're talking about is still the same.

3              THE COURT:  It is still 1,229,456?

4              MR. TURNER:  It is slightly higher, but the point is

5    the valuation --

6              THE COURT:  That is actually stated here.  That

7    bitcoins had fluctuated greatly.  That actually is why, in

8    terms of completeness, I had suggested that Mr. Dratel would

9    read the entirety of the paragraph.

10              MR. TURNER:  Precisely.  That is why this is going to

11   cause juror confusion.  The amount of bitcoins is not

12   significantly changing --

13              THE COURT:  If you folks can find cases contrary to --

14   I think Mr. Dratel has got his hands on the rights cases, which

15   are the same ones I have looked at, with the addition of the

16   Santos case, which is a case where the Second Circuit

17   actually -- it was an old case.  It was pre-rules.  But then

18   later on, in a later case, the Second Circuit ends up saying we

19   want to reaffirm the holding in Santos.  If you want to take a

20   quick look?

21              But at this point, Mr. Dratel, if you wanted to use

22   this for impeachment, you can use anything for impeachment.

23   But in terms of reading it, we'll hold off for a little while.

24   You can do that at any point in time.  You can do it when the

25   government rests, but I'm not at this point going to have a

1    ruling stand yet that he is precluded from reading it, because

2    I think the better reading is that as to this paragraph he can

3    read it.

4            MR. TURNER:  Your Honor, one more suggestion.  We're

5    going to have a witness toward the end of our case who is going

6    to testify about the statistics, about the bitcoins that were

7    seized from the defendant's computer, from the Silk Road

8    server.  If the defense wants to use it in the course of

9    cross-examination to try and impeach the witness' statement or

10   something like that, I think it would make a lot more sense

11   then.  All I'm saying is that there is no urgency now in case

12   you --

13           THE COURT:  The point is that I want to make sure that

14   while the current witness is still on the stand Mr. Dratel has

15   an opportunity to use this.  The witness may have in fact read

16   the Complaint in this action.  If the witness, who has

17   testified about the amount that he found in certain accounts

18   was X, if this is of any value to impeachment, I don't know

19   that it is, but I want to make sure that there is no ruling

20   precluding the use of 22C from the Complaint for impeachment

21   purposes.

22           Moreover, separately, and at another time, it is my

23   inclination to allow it to be read in as a party admission.  A

24   party admission need not be an inconsistent statement to come

25   in.  But we don't have to -- I agree with you on the latter

F1ldulb1                    Trial

1   point that we don't have to face that issue until a little bit

2   later.  But I want to make sure Mr. Dratel understands he can

3   use 22C.

4           MR. DRATEL:  Thank you, your Honor.

5           THE COURT:  All right.  Now, the other issue is -- I'm

6   waiting for the mises.org --

7           MR. DRATEL:  I'm trying to look for them and engage in

8   the discussion at the same time.

9           By the way, your Honor, yesterday I believe what he

10  said was you did not ask for a letter from us, you had the

11  cases, indicating the cases.

12          THE COURT:  The last thing, while you are looking for

13  the mises stuff -- let me just tell you while you are looking

14  for it, what I am thinking of, Mr. Dratel, is literally taking

15  the two factual pieces, the mises piece and the other piece,

16  asking him have you looked at each of them.  Not asking him

17  about his conclusions.  And if then you want to ask him did he

18  notice the word ABC and it happens to match ABC, he can stay

19  yes, but not ask him if he drew any conclusions about whether

20  this guy was DPR.  What you can then do is through argument

21  draw whatever inferences you believe are appropriate.  But it's

22  the factual back and forth that I think could be appropriate

23  while the speculative conclusions would not be.

24          MR. DRATEL:  OK.

25          THE COURT:  OK.  That is what I am thinking.  We'll

1    see if the evidence would work.

2              MR. TURNER:  Your Honor, again, the evidence is being

3    offered that Anand Athavale posted these things, and all that

4    would be relied upon would be a page that the agent --

5              THE COURT:  You can go back and say -- I mean, I would

6    expect Mr. Dratel would have no problem saying:  Do you know

7    for a fact who posted these?

8              MR. TURNER:  Right.

9              THE COURT:  And this guy can say:  No.  All I know is

10   they were associated with this name.  I didn't do any

11   independent verification.

12             MR. TURNER:  Then it should not come in.  It is a

13   threshold issue, your Honor --

14             THE COURT:  No.  Because I will tell you why it is

15   relevant.  It is relevant because during the course of the

16   investigation there was an exercise that was done, and I'm not

17   putting it in for the truth of whether these are from Anad,

18   whatever his name was, or not, that there were certain

19   materials -- they could have been from a trashcan -- compared

20   to other materials.  It was part of what he did.  I'm not

21   asking or confirming whether or not Anad was in fact the author

22   of the mises piece at all.  It is just that he did this

23   analysis.  He compared the two.  And then we can figure out

24   where to go.

25             But the fact of the comparison I don't believe is

1    hearsay.  I don't believe it's irrelevant because it's

2    probative of identity, which is a material issue in dispute.

3    And I believe that his exercise -- whether the exercise was

4    based upon competent evidence or not is a different issue.

5    It's not the pages which are being admitted for some sort of

6    truth-finding exercise, it is the exercise.

7         MR. TURNER:  It is not a hearsay issue, your Honor.  I

8    am not arguing it is a hearsay issue.  It is an authenticity

9    issue --

10        THE COURT:  No.  But the authenticity is that -- I

11   mean, all I need these pages for, to come in for, the only

12   purpose is that those are the pages he used.  They're authentic

13   pages which he used.  Whether they are in fact authentic from

14   mises or in fact authentically from a particular person is

15   different from whether he in fact held them in his hands or

16   looked at them on the screen and used them.  If you have doubt

17   that these are the pages he used, then we have an authenticity

18   issue.  If there is no doubt that these are the pages he used,

19   it is not about authenticity of the pages, it's about

20   authenticity of the underlying information.

21        MR. TURNER:  The government, your Honor, so if you

22   look at Vayner, the issue there was the document -- there has

23   to be evidence the document is what it purported to be.

24        THE COURT:  And that was a pause.  What it purported

25   to be were the pages this fellow used.

1          MR. TURNER:  Right.  In <u>Vayner</u> it was purported to be

2     the Russian Facebook page of the defendant.  OK?  And the Court

3     just didn't say, well, there are pages on the Internet and that

4     is fine.  The Court said that they're being offered as pages of

5     this particular defendant and there has to be authentication.

6          If I may?  Here, it's clear the defense is offering

7     this as pages posted by Anad Athavale.  So <u>Vayner</u> carries over.

8     You can't simply have the agent say, well, I had his name Anad

9     Athavale on it and, therefore, that is enough to authenticate

10    it.

11         THE COURT:  No.  I think that the purpose in Facebook

12    was to show that particular statements in Facebook were true

13    and that were statements of the posting party.  That's not part

14    of this exercise.

15         MR. TURNER:  It wasn't to show that they were true.

16    It wasn't a hearsay issue, your Honor.  It was an

17    authentication issue.

18         THE COURT:  Before they got to the hearsay issue.

19         MR. TURNER:  The point is this exercise your Honor is

20    referring to is only relevant insofar as they are trying to

21    show an alternative perpetrator theory.

22         THE COURT:  Yes.

23         MR. TURNER:  The alternative perpetrator theory is

24    there is this guy out there, Anad Athavale, and he posted all

25    of these things on mises.org, and his language choices match up

with Dread Pirate Roberts.  Things like he spelled "a lot"
a-l-o-t instead of with a space.  It is actually quite silly
when you look at it closely.  In any event, in order to prove
that theory, like your Honor explained yesterday, you have to
have the chain of inferences laid out.  You have to be able to
offer the chain of inferences.  Here it is a key inference or
it is a key point along that chain of inference that the pages
at mises that this Agent looked at were Anad Athavale's actual
posts.

          THE COURT:  What I'm suggesting is he cannot testify
and would not be allowed to testify that these were Anad
Athavale's posts.  All he can say is I found these -- as part
of my investigation, I found these things on the Internet.  I
did the following comparison to things on Silk Road.  Full
stop.

          MR. TURNER:  And as long as there is absolutely no
mention of Anad Athavale --

          THE COURT:  Not "no mention."  He can look at the page
and say this, but he can also say I have no idea whether it was
him or not.  I have no idea if John Doe posted these.  All I
know is that was the name.

          MR. TURNER:  But, your Honor, if that had been the way
things go in Vayner, then the Court would have said, well, no,
it is fine, just let it in and then the jury can be instructed
that the agent has no way of authenticating this issue but it

F1ldulb1                    Trial

1    should go to the jury anyway.  That is not how the <u>Vayner</u> Court

2    applied the rule.  It is a threshold issue.

3             THE CLERK:  I hear you.  I am using it for a different

4    purpose.

5             Let me see the information on both sides of this.  I

6    don't know if it works in the way that I'm suggesting.

7             MR. TURNER:  And, again, we just stress that the

8    proper way -- if the defense wants to establish this theory,

9    the proper way to do it is actually put the mises.org posts

10   before the jury, properly authenticate them.  Then they can

11   draw the inferences.  They don't need the agent to do so.  The

12   agent's opinion --

13            THE COURT:  He is not going to draw -- I am not going

14   to let him draw his conclusions.

15            MR. TURNER:  Then there is really no need for the

16   agent to testify about it.

17            THE COURT:  Here's the point.  Part of his

18   investigation was looking at a variety of information, and

19   there were a variety of facts which indicated circumstantially

20   and built a case.  These are among the facts that eventually

21   circumstantially fell off.  The jury might credit them more

22   than he credited them, but it is up to them to credit them.

23   And --

24            MR. TURNER:  This is exactly what the <u>Johnson</u> line of

25   cases talks about, that sort of the investigative background,

1    the story of how the investigation proceeded, is not relevant

2    and that --

3          THE COURT:  But that was for the investigative

4    background to show -- in the Johnson case, it was to show

5    really sort of important things coming in that were hearsay as

6    background.  And the Court said no, no, no, no, no, you can't

7    wedge in as background these clearly disputed issues of fact.

8    That's the Johnson case.

9          That's not this.  Let me see what Mr. Dratel has.

10   This may or may not go anywhere, but I do want to see what the

11   lay of the land is.

12         MR. TURNER:  OK.  But just to finish the thought, I

13   think the Court in Johnson emphasized the dangers of

14   introducing background evidence like this, because it can give

15   the impression the agent found this important, the agent, you

16   know, had suspicions about this evidence at the time.  That is

17   why the Court said it's generally not relevant, and --

18         THE COURT:  I hear your point.

19         Mr. Dratel, do you have anything to hand over?

20         MR. DRATEL:  Yes, I do, your Honor.  Thanks.  Some of

21   them are not consecutive so I've -- well, there are a couple --

22   I've categorized them --

23         THE COURT:  Can I have the prosecution come up here as

24   well?  Walk me through these.

25         MR. DRATEL:  Oh, sure.  This is all from the 3500,

1    obviously.  This is from emails, and then the top part is a

2    profile of Mr. Athavale.

3              MR. TURNER:  Can we be clear when you are talking

4    about emails?

5              MR. DRATEL:  Emails from the agent.  This is an email

6    from the agent or a report, really, from the agent.  And it

7    lists first the usernames -- I mean the IP addresses,

8    usernames.  And then on this page it starts with the writing

9    analysis that he has done.

10             There is an earlier -- there is also a report that he

11   has written, which is another part, which is essentially the

12   same but it just appears in a different part of the 3500, where

13   he talks about there is an extensive analysis of distinct

14   writing styles, sayings, spelling mistakes, clichés, and

15   specific nuances which have led to determining -- and then it

16   is redacted -- it is a highly likely target.  In fact, four

17   pages are redacted.  I think it is what is in this report and

18   in other parts of the 3500.  I don't really understand the

19   redactions.  There are a lot of redactions in the 3500 of the

20   agent.  For a period, I assume, that they had things that were

21   properly redacted.  I think this is not properly redacted, but

22   I imagine that we have it in this report so I'm not sure that

23   there is an issue.

24             But, anyway, then he goes on to list them in about six

25   pages worth.  And he also talks at another point about -- and

1    I'm not sure if it is in this one.  Let me just see if it is in

2    this part, where he talks about having sent it to a college

3    professor.

4              MR. TURNER:  Is it irrelevant?

5              MR. DRATEL:  The fact that he sent it is not a

6    conclusion.  If the government wants to bring out a conclusion,

7    that's fine.

8              (Pause)

9              THE COURT:  Do you have the -- what you have here --

10   and I'm focused on the "boths," do you have the two things that

11   were being looked at that resulted in that determination?

12             MR. DRATEL:  No, I don't have the mises posts because

13   it is just digested here.  This is the sort of longer version

14   of that in terms of it has the quotes pulled out, to a certain

15   extent, on what he based it on.  There is another section in

16   this part that goes into it in greater detail in terms of the

17   analysis.

18             MR. TURNER:  Your Honor, what's being done here is we

19   are talking about thousands of posts.  Instead of trying to get

20   a competent representation of those posts, he is just drawing

21   on this agent's memories, this agent's perceptions.  If it is

22   going to be done right, the right way to do it is to have the

23   actual documents themselves.  This is akin to us drawing

24   somebody off the streets and saying, hey, do you remember

25   looking at a bunch of posts on a website and were there

1  similarities between the posts and what you saw on the Web

2  page.  That is an improper way to prove our case.  It should be

3  an improper way for the defense to prove their case.

4          THE COURT:  The difference is this is an agent who is

5  not pulled off the street who was tasked with being careful and

6  accurate within the constraints.

7          Here's what we're going to do.  We're going to -- let

8  me just sort of see if I can do a series of questions.

9          (Pause)

10         THE COURT:  What are these things called, these posts?

11         MR. TURNER:  It is a report of email.  I can go back

12 and find the first page.

13         THE COURT:  What was he comparing it to, the mises

14 compared to?

15         MR. TURNER:  To DPR posts.

16         THE COURT:  On what?

17         MR. TURNER:  On the forum -- also, everything he gets

18 his hands on from DPR.

19         THE COURT:  OK.  This is what I am going to allow.

20 I'm going to allow questions along the following lines.

21         MR. TURNER:  Should I take notes?

22         THE COURT:  No, I'm going to hand you my page.

23         Did you look at the posts from the mises.org?  Whose

24 name appeared?  Do you know if in fact it was this person?  He

25 will say no.  Did you confirm that it was this person?  So it

1    is clear he did not confirm.  Did you compare what you found

2    from the mises' posts to anything else, in fact, to the DPR

3    forum?  Yes.  Did you look at words?  Yes.  Did you make

4    certain factual determinations as to the appearance of words in

5    certain places?  Yes.

6              What I do not want, and will not allow, is his

7    conclusion here where he talks in the first one:  "Both use the

8    same writing style."  OK?  He can't say that.

9              MR. DRATEL:  Right.

10             THE COURT:  But he can say both spell the word

11   "realtime" with a hyphen.  That is an English language

12   comparison.  The government can then go back on cross and

13   unsettle, undo the mises posts.

14             MR. TURNER:  Your Honor, I just want to make sure we

15   have a clear record.  When your Honor says the agent can be

16   asked did you do anything to confirm this came from this

17   person, that goes to the reliability of the document.  And

18   that's the whole point of the rules of evidence, that documents

19   that aren't proven to be reliable should not come in in the

20   first place.  That is the very reason -- the same thing with

21   the LinkedIn pages yesterday.  If they cannot be shown to come

22   under a hearsay exception, they can't just go to the jury with

23   the instruction that they can't be -- that the agent didn't do

24   anything --

25             THE COURT:  Well, what you can do on cross-examination

1   is bring out that he has no idea if this was from this person

2   or another person or the man on the moon.  But I am going to

3   allow this.  I understand the government's position is that

4   they oppose vigorously.

5            MR. DRATEL:  Your Honor, just two things.  One is with

6   respect to instead of asking him a sort of imperative question,

7   "Did you confirm," can I ask him "Did you do anything to

8   confirm?" because I don't know the answer?

9            THE COURT:  Fine.

10           MR. DRATEL:  Can I say, "Did you send all of this

11  material to a college professor for analysis?"  Just that

12  question.

13           MR. TURNER:  We argue that it is irrelevant to

14  anything.

15           THE COURT:  Well, it is not irrelevant.

16           Yes.

17           MR. DRATEL:  Thank you.

18           THE COURT:  All right.  The last thing we'll take up

19  at another time is how to deal with the strikes.  I don't want

20  to take it up now.

21           Do we have a full jury, Joe?

22           THE CLERK:  We do.

23           THE COURT:  We are going to proceed.  All right?

24           MR. DRATEL:  Your Honor, the government has provided

25  me a proposed instruction which I have some problems with, so

F11dulb1                        Trial

1    we'll try to work on that.

2             THE COURT:  All right.  Thank you.

3             Let's bring out the jury.  Get Mr. Der-Yeghiayan on

4    the stand.

5             MR. TURNER:  Are we going to redirect, your Honor, or

6    back to cross?

7             THE COURT:  We are going to go to redirect and then go

8    back to cross.  But I will allow Mr. Dratel, if necessary, to

9    go beyond the scope of the redirect to correct my rulings from

10   yesterday.

11            MR. DRATEL:  Thank you, your Honor.

12            (Pause)

13            MR. DRATEL:  Your Honor, while we are waiting, could

14   we just do a quick sidebar?

15            THE COURT:  They will be horrified if the jury walks

16   out and see us at the sidebar.  It will be like, you know,

17   Groundhog Day.

18            THE CLERK:  All rise as the jury enters.

19            (Continued on next page)

20

21

22

23

24

25

F11dulb1                          Trial

1           (Jury present)

2           THE COURT:  All right.  Ladies and gentlemen, as we

3   get to our seats, let's all be seated.

4           And we are still on the redirect of Mr. Der-Yeghiayan.

5           And you remain under oath, sir.  Do you understand

6   that?

7           THE WITNESS:  I do.  Thank you.

8

9    JARED DER-YEGHIAYAN,

10       Resumed, and testified further as follows:

11          THE COURT:  Thank you.

12          You may proceed, Mr. Turner.

13          MR. TURNER:  Thank you, your Honor.

14  REDIRECT EXAMINATION (Resumed)

15          MR. TURNER:  Could we put Government Exhibit 149 on

16  the screen, please?

17          Your Honor, I believe the defense is now going to

18  stipulate to the admission of this document.

19          MR. DRATEL:  Yes, but just as it appeared on

20  archive.org at that time.

21          THE COURT:  All right.  Thank you.  149 is received.

22          (Government's Exhibit 149 received in evidence)

23          MR. TURNER:  Mr. Evert, could you zoom into the top

24  Paragraph there.

25  BY MR. TURNER:

1   Q.  OK.  So it says, "This is not the Silk Road, but you are

2   close.  The Silk Road is an anonymous online market.  Current

3   offerings include marijuana, harsh, shrooms, LSD, ecstasy, DMT,

4   mescalin and more.  The site uses the Tor anonymity network,

5   which anonymizes all traffic to and from the site, so no one

6   can find out who you are or who runs Silk Road.  For money, we

7   use bitcoin, an anonymous currency."

8           Yesterday you testified that this website was hosted

9   at a Web hosting company controlled by Mr. Karpeles, right?

10  A.  Yes, it was.

11  Q.  And the name, again, of the company was what?

12  A.  It is KalyHost.

13  Q.  Did it go by another name as well?

14  A.  There is AutoVPS.

15  Q.  And you testified yesterday you searched emails associated

16  with Mr. Karpeles' Web hosting company, is that right?

17  A.  Yes, I did.

18  Q.  Did you find any emails from the email address

19  staff@silkroadmarket.org in there?

20  A.  Yes, I did.

21          MR. TURNER:  May I approach, your Honor?

22          THE COURT:  You may.

23  Q.  Do you recognize this exhibit?  I'm showing you what's been

24  marked as Government Exhibit 151.

25  A.  I do.

F11dulb1                    Der-Yeghiayan - redirect

1   Q.  How do you recognize it?

2   A.  It's one of the emails that I observed in Mark Karpeles'

3   email account.

4          MR. TURNER:  Your Honor, the government offers

5   Government Exhibit 151 into evidence.

6          MR. DRATEL:  Objection.

7          THE COURT:  Give me one more word.

8          MR. DRATEL:  Oh, hearsay.  Foundation.

9          MR. TURNER:  It is not being offered --

10          THE COURT:  Overruled.  Government Exhibit 151 is

11   received.

12          MR. DRATEL:  Your Honor, also authenticity.  There are

13   no headers.  There is nothing.  This could have been --

14          THE COURT:  Why don't you do a little more to lay a

15   foundation as to this, and then subject to that foundation it

16   is received.

17   BY MR. TURNER:

18   Q.  Where did you receive the documents from?

19   A.  The email came from Gmail from Google.

20   Q.  OK.

21          THE COURT:  Was that part of the subpoena response.

22          THE WITNESS:  It was the search warrant results that

23   were returned by Google.

24          THE COURT:  Thank you.  You may proceed.  It is

25   received.

F1ldulb1                      Der-Yeghiayan - redirect

 1              (Government's Exhibit 151 received in evidence)
 2              MR. TURNER:  Could you put it up on the screen,
 3   Mr. Evert.  Could you zoom in on the top.
 4   Q.  It is from "staff@silkroadmarket.org."  The date is
 5   March 18, 2011.  It's to "support@autovps.net."  The question
 6   is:  "How do I upgrade my memory for my VPS with AutoVPS?"
 7              Do you know what the terms "VPS" refers to?
 8   A.  It is virtual private server.
 9   Q.  Do you know what that term means?
10              MR. DRATEL:  Objection.
11              THE COURT:  Sustained.
12   Q.  Have you ever rented server space before?
13   A.  I have.
14   Q.  From that experience, are you familiar with the term
15   "virtual private server"?
16   A.  I am.
17   Q.  So based on that --
18              MR. DRATEL:  Objection.
19   Q.  -- can you explain what virtual private server space is?
20              THE COURT:  No.  This question is fine.
21              You may answer.
22   A.  Essentially, it's space that's allocated or taken from a
23   server that's assigned to you.  So it acts as if it is a server
24   of its own.  So it is just taking space and giving it to you
25   and allowing you to use it like a regular server would.

F1ldulb1                    Der-Yeghiayan - redirect

1   Q.  And this email address, to support@autovps.net, in

2   reviewing the emails that you saw in that search warrant

3   return, did you see other emails that were addressed to

4   support@autovps.net?

5   A.  I did.

6   Q.  What are those emails generally about?

7           MR. DRATEL:  Objection.

8           MR. TURNER:  Not for the truth, your Honor.

9           MR. DRATEL:  Objection.

10          THE COURT:  You could give some topics.  You may

11   answer.

12   A.  Basically -- I mean, for the most part,

13   customer-support-related inquiries related to the hosting

14   service.

15          MR. DRATEL:  Just objection, your Honor, with respect

16   to any inference that it is from silkroadmarket.org.  He is

17   talking about entirety, right?

18          THE COURT:  Let's talk about that at the break but I

19   have allowed the answer.

20   BY MR. TURNER:

21   Q.  Just to be clear, are you talking about customer support

22   inquiries from multiple other customers or just

23   staff@silkroadmarket.org?

24   A.  There were multiple customers.

25   Q.  OK.  So support@autovps.net was used to receive customer

F1ldulb1                          Der-Yeghiayan - redirect

1    support inquiries?

2              MR. DRATEL:  Objection.

3    Q.  Is that basically your testimony?

4              MR. DRATEL:  Objection.

5              THE COURT:  Overruled.

6    A.  Yes.

7    Q.  Now, did -- and just to be clear, when you were talking

8    about the search warrant for emails, it is a search warrant for

9    emails associated with Mark Karpeles' Web hosting company, is

10   that right?

11   A.  There were multiple, yeah, email accounts, I mean, we

12   looked into for Mark Karpeles.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

F1LGULB2                         Der-Yeghiayan - redirect

1    BY MR. TURNER:

2    Q.  Now, did Mark Karpeles' web hosting company KalyHost

3    AutoVPS help their customers register their websites?

4                MR. DRATEL:  Objection.

5                THE COURT:  Based upon your review, was there

6    information which indicated that to you?  You may answer.

7    A.  Based upon my review and then also had registered before, I

8    participated in registering -- also from my review, I've seen

9    it and from registering the site through KalyHost.

10   Q.  So you yourself tested it out by registering a site on

11   KalyHost?

12   A.  Yes, I participated in that.

13   Q.  Can you explain briefly what it means to register a

14   website?

15   A.  It means to provide information to basically claim

16   ownership over a website name and to provide your personal

17   details to take ownership of it.

18   Q.  So when you registered a website on KalyHost, did KalyHost

19   ask you for any information like that?

20   A.  They did.

21   Q.  What sort of information?

22   A.  There was information such as like a point of contact, so

23   it asked for your name, email address, address, telephone

24   number, as well as technical point-of-contacts and

25   administrative point-of-contacts.

F1LGULB2                          Der-Yeghiayan - redirect

1   Q.  Were you required to verify that information in any way?

2   A.  No.

3   Q.  Is there any way the public can view register information

4   associated with website addresses?

5   A.  Yes, there is.

6   Q.  And how can they do so?

7   A.  It's called a who.is database, so it's a public database

8   that records that information when you do register a website.

9   It keeps track of basically what information you provide when

10  you do register it so you can search that publicly.

11  Q.  Is that information available in the who.is web page that

12  we looked at earlier?

13  A.  That available there; yes.

14  Q.  Can you put GX 150 back on the screen, please.  Can you

15  zoom in here.

16          Going back to this web page, who does it reflect

17  registered the silkroadmarket.org website?

18  A.  The information provided shows that it was registered to

19  Richard Page at 11640 Gary Street, Garden Grove, California,

20  92840, and it's a telephone number, and then as well is an

21  email address which is richardpage@gawab.com.

22  Q.  Did you look into whether this address -- and, Mr. Evert,

23  can you zoom in here so it's very clear.

24          Did you look into whether this address, 11640 Gary

25  Street, Garden Grove, California, was a real address?

1   A.  I did.

2   Q.  And whether the phone number was a real phone number?

3   A.  I did.

4   Q.  How did you do that?

5   A.  The address I looked up in our -- the Clear database that

6   we have access to, as well as the telephone number I checked as

7   well.

8   Q.  What is the Clear database a compilation of?

9   A.  It's a compilation of credit data that's provided, as well

10  as, like, utility bills and public information generally about

11  people, so it stores that information.

12  Q.  And is Clear generally accepted and relied upon by law

13  enforcement to check address and phone number information?

14  A.  Yes, it is.

15          MR. DRATEL:  I'm going to object, your Honor.

16          MR. TURNER:  803.17 provides the basis.

17          MR. DRATEL:  This is a database full of hearsay.

18          THE COURT:  I'm going to allow it.

19  Q.  So, what did you find?

20  A.  The address wasn't registered to anybody, so it reflects to

21  me that it wasn't -- there wasn't anyone ever registered to

22  that address.  There wasn't utility bills, anything ever

23  associated to that address.

24  Q.  Did you find the real address with that number?

25  A.  No, I did not.

1   Q.   What about the phone number?

2   A.   The telephone number wasn't registered to anyone of that

3   name.

4   Q.   Have you seen this information for Richard Page anywhere

5   else?

6   A.   I have.

7   Q.   Where?

8   A.   When I searched Ross Ulbricht's computer after the arrest.

9   Q.   Where did you find it on Ross Ulbricht's computer?

10  A.   There was a file by the name of "aliases" on his computer

11  and there was a text document titled "info" that had the same

12  information on there, so the same name, as well as the -- what

13  appeared to be to me names, passwords and usernames for AutoVPS

14  and for KalyHost and for I believe gawab as well.

15  Q.   It included the exact same address?

16  A.   It did.

17  Q.   And the exact same phone number?

18  A.   It did.

19            MR. TURNER:  No further questions.

20            THE COURT:  Thank you.

21            Mr. Dratel.

22            MR. DRATEL:  Thank you, your Honor.  Can we come up

23  for a second one clarification.  It takes a minute.

24            THE COURT:  Okay.  (Continued on next page)

25

```
 1                  (At the side bar)

 2                  MR. DRATEL:  I'm just trying to be careful, because

 3      mises.org has not come up, I want to ask him what that is and

 4      why he was looking at it.  That's all.  It's part of the

 5      investigation, what was the relevance to the investigation?  So

 6      just two very quick questions on mises.org.

 7                  THE COURT:  Okay.

 8                  MR. DRATEL:  Thank you.

 9                  (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            (In open court; jury present)

2    RECROSS EXAMINATION

3    BY MR. DRATEL:

4    Q.  Good morning, Special Agent Der-Yeghiayan.

5    A.  Good morning.

6    Q.  Was there a time -- I want to draw your attention back to

7    Anand Athavale we spoke about him yesterday, A-T-H-A-V-A-L-E,

8    correct?

9    A.  Correct.

10   Q.  He was a Canadian citizen who at one time you were looking

11   at, right?

12   A.  He was one I investigated, yes.

13   Q.  And during the course of your investigation, did you come

14   across a site called mises.org, m-i-s-e-s.org?

15   A.  Yes, I did.

16   Q.  And what is that?

17   A.  It's a website that's set up for libertarian beliefs, as

18   well as there's an online forum associated with it, too.

19   Q.  And as part of your investigation, did you -- what was the

20   relevance to your investigation of mises.org?

21   A.  There was -- I observed on the bottom of Dread Pirate

22   Roberts' profile that he would link articles from that website

23   for things for people to read.  So there would be, on his

24   signature line on his forum profile, he would link mises pages.

25   Q.  And did you look at posts from the mises.org forum?

F1LGULB2                           Der-Yeghiayan - recross

1    A.  I did.

2    Q.  And did you look at posts under the name Anand Athavale?

3    A.  It wasn't under his name.

4    Q.  What was it under?

5    A.  It was under Liberty Student.

6    Q.  And how did you connect that to -- did you do anything to

7    connect that to Mr. Athavale?

8    A.  I did.

9    Q.  And what was that that you did?

10   A.  I looked through his posts that were publicly available.  I

11   was looking for anything that would be personal indicators to

12   help me identify who --

13            MR. TURNER:  Objection.

14            THE COURT:  I'll allow this.

15            MR. TURNER:  It calls for the agent's conclusion.

16   A.  -- who the person was that was potentially behind that

17   identity on that forum.

18   Q.  And at some point, did you compare those posts for

19   libertystudent.org and -- I guess, what facts led you to

20   associate libertystudent.org with Mr. Athavale?

21            MR. TURNER:  Objection.

22            THE COURT:  Sustained.  We'll go on to the next piece.

23   Q.  So did you compare those posts from libertystudent.org to

24   anything?

25   A.  I compared the posts by Liberty Student on mises to forum

F1LGULB2                    Der-Yeghiayan - recross

1    posts from Silk Road from Dread Pirate Roberts.

2    Q.  Anything else from Dread Pirate Roberts?

3    A.  As well as undercover chats, as well that I had access

4    to -- and I believe -- there might have been other -- whatever

5    else I had access to, if it was from the marketplace or from

6    anywhere else that was cited from Dread Pirate Roberts at the

7    time.

8    Q.  And did you compare the two posts, the words in the two

9    posts, I mean in the two sets of posts, libertystudent.org

10   versus Dread Pirate Roberts?

11   A.  I did.

12   Q.  And did you find similarities?

13            MR. TURNER:  Objection.

14            THE COURT:  Did you find sometimes the same word in

15   one as well as the other?

16            THE WITNESS:  There were commonalities; yes.

17            THE COURT:  Why don't you go through some of the

18   factual commonalities, if there are any.

19            MR. DRATEL:  Thank you.

20   Q.  And do they both spell "labor," L-A-B-O-R as "labour,"

21   L-A-B-O-U-R occasionally, right?

22   A.  That was one of them, yes.

23   Q.  Both use and spell the word "real-time" with a hyphen

24   between real and time, right?

25   A.  That's correct.

1  Q.  Both use the word "lemme," L-E-M-M-E as opposed to "let

2  me," right?

3  A.  There were occasions, yes.

4  Q.  Both end sentences with comma, right, question mark?

5  A.  Yes.

6  Q.  Both spell "route" R-O-U-T-E as "rout," R-O-U-T?

7  A.  Yes.

8  Q.  Both use the term "intellectual laziness"?

9  A.  Yes.

10 Q.  Both use the term and actively discussed the concept of

11 "agorism" and the "agorist"?

12 A.  Yes.

13 Q.  And do you know what that is?

14 A.  No, no, I don't.

15 Q.  Both use and spell the word "counter-economics" with a

16 hyphen between counter and economics, right?

17 A.  That's correct.

18 Q.  Both used the term "the ladder" in quotes before the "and"

19 after "ladder," right?

20 A.  They did.

21 Q.  Both quite often capitalize smaller words when they want to

22 emphasize, right?

23 A.  Yeah, like a -- capitalize an entire word, yes.

24 Q.  Neither uses hyphens to space out sentences or thoughts,

25 right?

1   A.  Yes.

2   Q.  Both start sentences with "and" and "but" quite often,

3   right?

4   A.  Yes.

5   Q.  Both will commonly not capitalize the first word in a

6   sentence when replying short and quick?

7   A.  Yes.

8   Q.  Both used the term "the heart of the matter"?

9   A.  That sounds correct, yes.

10  Q.  Both quite often will use a backslash, the symbol for

11  backslash on the computer to split words with similar meaning

12  and the second word never having the space after the slash,

13  right?

14  A.  That's correct.

15  Q.  Both used the term "altruistic," right?

16  A.  Yes.

17  Q.  Both used the term "pal," right?

18  A.  Yes.

19  Q.  Both used the term "war mongering"?

20  A.  Yes.

21  Q.  Both used the term "phoney," P-H-O-N-E-Y, right?

22  A.  Correct.

23  Q.  Both discuss and mention authors Murray Rothbard, right?

24  A.  Correct.

25  Q.  And Samuel Konkin?

F1LGULB2                        Der-Yeghiayan - recross

1    A.  Konkin?

2    Q.  K-O-N-K-I-N?

3    A.  Yes.

4    Q.  Do you know who they are?

5    A.  They were inspirations for Dread Pirate Roberts according

6    to his posts.

7    Q.  Are they libertarians?

8    A.  As far as I'm aware.  I'm not too familiar with them, but

9    yes.

10   Q.  Both commonly end sentences with a smiley face or the wink

11   smiley face emoticons?

12   A.  On their forum posts; yes.

13   Q.  Both sometimes end sentences with the word "amigo"?

14   A.  Yes.

15   Q.  Both use the term "a narco-capitalist" with a hyphen in the

16   middle?

17   A.  Yes.

18   Q.  Both misspell the word "alot," meaning that they spell

19   it -- that they're both spelled, in the comparisons that you

20   did, as one word as opposed to two words, "alot" A-L-O-T as one

21   word?

22   A.  That's correct.

23   Q.  Both have discussed the paleo human, P-A-L-E-O?

24   A.  Yes.

25   Q.  And they're both use the same expletive, right?  There's an

1   expletive?

2   A.  I believe so, yes.

3   Q.  And you wrote a report about that, correct?

4           MR. TURNER:  Objection.

5           THE COURT:  I will allow this question.

6   A.  Yes, I did.

7   Q.  And you also sent these sets of posts to an English

8   professor at a university to examine and analyze, right?

9   A.  Yes, I did.

10  Q.  Now, during your redirect yesterday afternoon, you

11  mentioned that DPR was security conscious, right?

12  A.  He was, yes.

13  Q.  Did he ever mention he was keeping a journal?

14  A.  Not in my posts or private messages or chats, no.

15  Q.  Did he ever tell you that he was saving chats on his

16  computer?

17  A.  Not that I recall, no.

18  Q.  Did he ever tell you that he was using public Wi-Fi?

19  A.  No.

20  Q.  Now, by the way, when he was out in public the day of the

21  arrest, when Mr. Ulbricht was out in public on the day of his

22  arrest, that was not at your prodding.  He went out on his own

23  voluntarily into a public place, right?

24  A.  He did.

25  Q.  But it was you who asked him to log onto Silk Road,

1    correct?

2    A.  I asked Dread Pirate Roberts to log onto Silk Road, yes.

3    Q.  So let's look at 129C, please, Government's 129C.  Now,

4    when you talked about the chat yesterday, that's not part of

5    Silk Road, correct, the chat itself?

6    A.  It's not on the marketplace or the forum.

7    Q.  Right.  It's a separate information called Pidgin, right?

8    A.  It's -- I believe it's a Java server that was on Tor.

9    Q.  Also called OTR, Off The Record, right?

10   A.  It can be done in OTR, yeah.

11   Q.  But it's a separate Tor chat program not part of any of the

12   Silk Road website or forums or anything like that, right?

13   A.  It was separate from it; yes.

14   Q.  So that's what he was logged on to when you realized he was

15   online, correct?

16   A.  When I was -- when he came online, this is what indicated

17   to me that he was online, was the chat.

18   Q.  Pidgin, not Silk Road, right?

19   A.  Correct.

20   Q.  He wasn't on Silk Road until you asked him to get on Silk

21   Road, right?

22   A.  That's correct.

23   Q.  And you say "check out one of the flagged messages for me,"

24   and then it says "sure," right, "let me log in"?

25   A.  Yes, it does.

1   Q.  So he's already online on Pidgin, which is the chat

2   program, but he's not on Silk Road at that point, right?

3   A.  From -- yeah, from this, yes.

4   Q.  And you were asked by Mr. Turner yesterday about who was on

5   the other side of the screen that day, right?

6   A.  Yes.

7   Q.  And you satisfied yourself based on going into the library

8   looking at the screen that Mr. Ulbricht was on the other side

9   of the screen that day, right?

10  A.  Yes.

11  Q.  But you can't testify, can you, about who you know was on

12  the other side of the screen (in)any other communication you

13  had with Dread Pirate Roberts, can you?

14  A.  No, I cannot.

15  Q.  After all, everybody on Silk Road thought you were somebody

16  else for a couple of years, right?

17  A.  For the --

18            MR. TURNER:  Objection.

19            THE COURT:  Why don't you reframe it.

20            MR. DRATEL:  Okay.

21  Q.  You were on Silk Road from some time in early 2012 through

22  the end of September of 2013 under various account names,

23  correct?

24  A.  I utilized multiple account names, yes.

25  Q.  And no one knew your real identity, right?

1   A.  I only actively chatted, though, with -- primarily with the

2   cirrus account, though, but the rest of the ones were primarily

3   used for either buys or for screen shots.

4   Q.  They didn't know your identity, your real identity, right?

5   A.  Not on any one of them, no.

6   Q.  They had no idea who was on the other end of that screen,

7   did they?

8   A.  No.  I never told them, no.

9   Q.  Also with respect to "flagged messages," you identified the

10  post you were looking for, right?

11  A.  At the end of the chat, I told him "the one with atlantis."

12  Q.  Right.  In terms of who is on the other end of the screen,

13  we went through that exchange before with respect to there was

14  a period of time in which you weren't sure whether DPR was

15  operating someone's account, whether it's SSBD, right, that's a

16  username, correct?

17             MR. TURNER:  Objection.

18             THE COURT:  Hold on one second.  Sustained.

19  Q.  Now, you were asked about Government Exhibit 130 on

20  redirect, right, the handwritten notes, right?

21  A.  Yes.

22  Q.  And you asked whether they said anything about Silk Road or

23  illegal drugs, right?

24  A.  I was asked that, yes.

25  Q.  But you're aware that in July of 2013, just a couple of

1   months before Mr. Ulbricht's arrest, that he was interviewed by

2   Homeland Security, right?

3          MR. TURNER:  Objection; foundation.

4   Q.  You're aware that he was interviewed, aren't you?

5   A.  Yes, I was.

6   Q.  And you're aware that it had to do with a shipment from

7   Silk Road, right?

8          MR. TURNER:  Objection; foundation, hearsay.

9          THE COURT:  You need to go back over that and lay a

10  foundation for it.

11  Q.  During your investigation, you became aware, right, that

12  Mr. Ulbricht -- withdrawn.

13          That Homeland Security interviewed Mr. Ulbricht

14  about -- and you've read -- withdrawn.

15          During the course of your investigation, you were kept

16  apprised of what was going on, correct?

17          MR. TURNER:  Objection; hearsay, vagueness.

18  Q.  For purposes -- you read reports --

19          THE COURT:  Hold on.  Ask the question.

20  Q.  You read reports about an interview of Mr. Ulbricht by

21  Homeland Security, correct?

22          THE COURT:  You can answer that yes or no.

23  A.  Yes, I did.

24  Q.  And the subject matter was about a package shipped by Silk

25  Road, a Silk Road vendor, correct?

1          MR. TURNER:  Objection to the hearsay.

2          THE COURT:  Right.  That's sustained.

3   Q.  Now, you were asked also on redirect about travel records,

4   right?

5   A.  That's correct.

6   Q.  And you said there were some aliases.  You ran those

7   aliases for travel records, too, didn't you?

8   A.  The aliases for travel records?

9   Q.  In other words, any aliases for Mr. Ulbricht that you might

10  have found, you ran them for travel records, too, didn't you?

11  A.  I can't recall if I did.

12  Q.  Now, we talked about that he takes about a trip a year out

13  of the country.  And you were asked about international travel,

14  whether you could determine whether he went from one country to

15  another country, right; you couldn't tell that from the travel

16  records that you looked at in terms of a sheet that you got

17  from border authorities, right --in other words, either leaving

18  the country or coming into the country is what you said, right?

19  A.  The records that were reflected in the database that we

20  have access to just shows where they're coming from and where

21  they travel to.

22  Q.  But you also had the passport, right?

23  A.  I didn't have that until after the arrest.

24  Q.  Right, but you had it now and you've had it for quite some

25  time, right?

1   A.  Yes.

2   Q.  So the case passport is in evidence, right?

3   A.  Yes.

4   Q.  It's Exhibit 134, right?

5   A.  I believe so, yes.

6   Q.  If we can go to the next page, please.  Those are the only

7   stamps in there, right, there's one for Australia, one for the

8   Island of Dominica and one for Costa Rica, right?

9   A.  Correct.

10  Q.  So if he went from Costa Rica to Brazil, there would be a

11  stamp, wouldn't there, on his passport?

12  A.  Not necessarily.  There's -- I've worked as border

13  inspector for a lot of years, so I do know that sometimes there

14  aren't always the stamps for the countries they enter into.  It

15  just depends.

16  Q.  So you know whether he would have been stamped or not?

17  A.  I couldn't tell you if another country would for sure stamp

18  it or not.  Sometimes they do, sometimes they don't.

19  Q.  Those three stamped it, right?

20  A.  They did stamp it.

21  Q.  And it matched exactly what you had on the travel records,

22  right?

23  A.  I'd have to go back and review it, but --

24  Q.  The MediaWiki, right, we talked about that?

25  A.  We did.

F1LGULB2                          Der-Yeghiayan - recross

1   Q.  And the fact is, though, that the commonality between the

2   Karpeles website and silkroadmarket.org was about the version

3   of MediaWiki, right?

4   A.  The version was the same, yes.

5   Q.  But it was an outdated version, right?  It wasn't the

6   current version at the time, right?

7   A.  At the current time, it was an outdated version; yes.

8   Q.  So of all the people who use MediaWiki, do you know how

9   many use an outdated version?

10  A.  I don't know how many use an outdated version.

11  Q.  It's free, right?  You can upgrade it for free, right?

12  A.  You can, yes.

13  Q.  Now, with respect to -- I'm showing you what's marked --

14  and I'll go back to travel for a second and show you what's

15  marked as 3505-3051 and just ask you to review it.  Let me know

16  when you're finished.

17  A.  Thank you.  Okay.

18  Q.  Does that refresh your recollection that the travel records

19  that you reviewed from your database matched exactly the stamps

20  on the passport?

21  A.  The stamps match, yes.

22  Q.  Now, with respect to the AutoVPS, the Karpeles company,

23  right, is another one of Mark Karpeles' company, right?

24  A.  Yes.

25  Q.  By the way, silkroadmarket.org moved from one Karpeles

1    company to another Karpeles company, right, at one point, from

2    KalyHost to XTA?

3    A.   It was, yeah, I believe registered through the one and then

4    I think the domain name server changed over to XTA, yes.

5    Q.   And those subpoenas -- I mean, the warrants that you got to

6    look at those emails was part of your investigation of

7    Mr. Karpeles, correct?

8    A.   Yes, it was.

9    Q.   But, in fact, you did not get those emails, they were not

10   produced until months after Mr. Ulbricht was arrested, right?

11   A.   It took a while for the return to come back, yes.

12   Q.   If we can look at Government's 149, please, if we could go

13   to the bottom, the very bottom, please, to the URL.

14           In fact, that's from archive.org in March of 2011,

15   right?

16   A.   I believe March 4.

17   Q.   That's what that 20110304 is right after web slash, right?

18   A.   Yes, it's the date.

19   Q.   So that's the date that appeared -- going back,

20   archive.org, again just to refresh, just captures pages of the

21   Internet, right?

22   A.   It does.

23   Q.   And then it puts them in an archive, right?

24   A.   It maintains it, yes.

25   Q.   And what they do at the bottom in that webarchive.org URL,

F1LGULB2                         Der-Yeghiayan - recross

1    the Internet address, is that it tells you what date it

2    captured it, right?

3    A.   Correct.

4    Q.   So it captured this particular screen March 4, 2011, right?

5    A.   March 4, 2011, yes.

6    Q.   By the way, if we go back up to the message, it's from Silk

7    Road staff, correct?

8    A.   It was signed, yes, Silk Road staff.

9    Q.   Not Dread Pirate Roberts or anything like that, right?

10   There's no Dread Pirate Roberts there?

11   A.   That didn't come until I believe January 2012.

12   Q.   Correct.  At one point you showed us I think it's

13   Government Exhibit 123, the Dread Pirate Roberts profile on

14   Silk Road, the profile page and the registration?

15   A.   Yeah.

16   Q.   Do you recall?

17   A.   I recall, yes.

18   Q.   You don't know when that may have been changed to the name

19   Dread Pirate Roberts from another username, right?

20   A.   That one was the Silk Road account that changed to Dread

21   Pirate Roberts after he announced his new name on that post.

22   Q.   Now, let's look at Government Exhibit 150 which we just saw

23   this morning.  Can we look on the left side.  There's a date of

24   registration -- no, further down, right there.

25   A.   Correct.

F1LGULB2                        Der-Yeghiayan - recross

1    Q.   It's registered on February 28, 2011, right?

2    A.   Yes.

3    Q.   And then it expires -- it expired February 28, 2012.  It

4    says "expires on," right?

5    A.   Yes, it did.

6    Q.   Now, if we look to the right side, that's the one by

7    Richard Page, right?

8    A.   The one on the left is by Richard Page, yeah.

9    Q.   The one on the right, the registration date is May 18,

10   2012, right?

11   A.   Correct.

12   Q.   That's roughly two and-a-half months after the expiration

13   of the one on the left, correct?

14   A.   Correct.

15   Q.   So let's see who it's registered to as of May 18, 2012.  Go

16   down further.  There it is.  So it's registered to Qin Shu

17   Tong, correct?

18   A.   Correct.

19   Q.   In China, right?

20   A.   In China.

21   Q.   And you checked that out, right?

22   A.   I looked into that, yes.

23   Q.   No apparent connection to anything, right?

24   A.   No.

25   Q.   So this particular registration with respect to anything

F1LGULB2                        Der-Yeghiayan - recross

1   connected to Richard Page was over by April of 2012, right?

2   A.  It wasn't renewed and then it was bought by someone else.

3   Q.  Right.  Now, you talked about the emails you got from Mark

4   Karpeles' companies, right?

5   A.  Correct.

6   Q.  Those are the only accounts at Google, right?

7   A.  There was -- for him, I believe there was a few.  He had a

8   personal one and then he had one that was to Evoni (ph) which

9   is a company.

10  Q.  But from Google?

11  A.  It all is through Google, yes.

12  Q.  You don't know about email accounts that he may have had on

13  proprietary servers of his own, right?

14  A.  I do not know of any.

15  Q.  So you didn't get to look at those if they exist, right?

16  A.  I didn't.

17  Q.  Did you ever get to look at any of his Tor chats?

18  A.  I did not find any Tor chats from him.

19  Q.  Any Java or Off The Record or Pidgin chats of his?

20  A.  I did not.

21  Q.  Did you get anything from any other servers with respect to

22  Mark Karpeles other than Google?

23  A.  Nothing about -- I mean, we did a broader search on another

24  individual from his company, but no.

25  Q.  Do you know whether he keeps a journal?

1  A.  No.

2  Q.  Going back to Dread Pirate Roberts for a second, that is

3  announced in the early part of 2012, right, February 2012?

4  A.  Yes.  I believe so.

5  Q.  Now, Mr. Karpeles owns web hosting companies, right?

6  A.  He does.

7  Q.  A number of them?

8  A.  He is -- yeah, well, KalyHost and then he has the AutoVPS,

9  which is a virtual server hosting.

10  Q.  And XTA, right?

11  A.  XTA, I believe that was the name server.  I don't know if

12  that was -- you might be able to register sites on that, too.

13  Q.  But a web host can monitor the traffic of their customers,

14  right?

15  A.  I believe so, yes.

16  Q.  In fact, they can also set rules for their customers,

17  right?

18  A.  They can.

19  Q.  They also know identifying information about the people who

20  rent space on their server, right?

21  A.  They should have, yeah, like registration information or

22  things that are provided to them, yes.

23  Q.  I'm sorry.  I didn't mean to cut you off.

24  A.  That's okay.  It's just basic information, whatever is

25  provided, as well as, like, account billing information they

1    should have.

2    Q.  And also IP addresses and things like that.  In the way

3    that the server connects to the outside world, the web host

4    knows all of that because it comes through their equipment,

5    right, correct?

6    A.  They should be able to tell that, yes.

7    Q.  Kind of like a landlord, right?

8    A.  That's a way to describe it, yes.

9    Q.  The same thing is true of anyone who runs a bitcoin

10   exchange, right, in terms of knowing about their account

11   holders?

12   A.  It changed over time.  I think originally a lot of them

13   didn't require very much information to register an account,

14   but a lot of them changed where they started requiring sort of

15   know your customer information.  Some actually requires Social

16   Security numbers.

17   Q.  But also they can monitor account activity and account

18   movement, they're in a perfect position to do that because it

19   all has to come in and out of their exchange, right?

20           MR. TURNER:  Object; foundation.

21           THE COURT:  Sustained.

22   Q.  As part of your investigation, you looked at MtGox records,

23   right?

24   A.  I did.

25   Q.  And you looked at how exchanges operate, correct?

1    A.  I did.

2    Q.  And exchanges have all of the information with respect to

3    transactions that their account holders do in the context of

4    bitcoins?  Everything that goes through that exchange is

5    information that's -- that the bitcoin exchange has?

6    A.  It should be visible to them; yes.

7    Q.  So any of the tracing that you could do on the block chain,

8    the bitcoin exchange can certainly do with respect to each

9    account holder?

10   A.  They should.

11   Q.  Now, we had a car rental analogy yesterday about bitcoin

12   and about servers and rentals.  Using bitcoin and even in the

13   context of web hosting, so you may have a fleet of cars that

14   you own but people are driving them but you can put a GPS in

15   there, right, and know exactly what everyone is doing in every

16   one of your cars, right?

17   A.  You could.

18   Q.  Now, the bitcoin issue:  Total commissions collected by

19   Silk Road totaled -- as computed by the government, 614,305

20   bitcoins was the total commissions collected by Silk Road

21   during the course of its operations, correct?

22            MR. TURNER:  Objection; foundation for this witness.

23            THE COURT:  Lay a foundation for this witness.

24   Q.  You looked at Silk Road, right, as a business, correct, you

25   examined it in terms of revenue and things like that, right?

1          MR. TURNER:  Objection; form, vagueness.

2          THE COURT:  I'll let you answer it if you understand

3    the question.

4    A.  I mean, I reviewed the site.  I reviewed the transactions

5    on it, the vendors, what was publicly available to me.

6    Q.  All right.  And you are also familiar with the complaint in

7    this action, right?

8    A.  The complaint for Mr. Ulbricht?

9    Q.  Against Mr. Ulbricht?

10   A.  Yes.

11   Q.  The complaint -- so you know that the amount of bitcoins

12   the government computed for the commissions for Silk Road were

13   614,305 bitcoins?

14   A.  I'd have to see the complaint, but yes, it sounds right.

15   Q.  I'll show you what we'll mark as Defendant's I for

16   identification and just ask you to read that paragraph, please.

17          THE COURT:  So he said this is consistent with what he

18   thinks.  This is just to refresh his recollection?

19          MR. DRATEL:  Correct.

20   A.  Okay.

21   Q.  Does that refresh your recollection that the government

22   computed the amount of bitcoins of commission -- I'm sorry --

23   that the amount of commissions Silk Road earned during the

24   course of its existence up until the point of Mr. Ulbricht's

25   arrest was 614,305 bitcoins?

1          MR. TURNER:  Your Honor, object.  Again, a foundation

2     and also beyond the scope of redirect.

3          THE COURT:  I'll allow this one because we're into it

4     just to finish it off.

5          You may answer.

6     A.  It does reflect that, yes.

7     Q.  And that would be -- and at the time of Mr. Ulbricht's

8     arrest, the government put the total revenue of Silk Road at

9     $1.2 billion, right, in current -- in the value of bitcoin at

10    the time of his arrest, right?

11         MR. TURNER:  Objection; foundation, relevance and

12    beyond the scope of redirect.

13         THE COURT:  All three of those are true.

14         Why don't you try it a different way --

15    Q.  The government --

16         THE COURT:  -- with this witness.

17         MR. DRATEL:  Sure.

18    Q.  The government was looking to estimate or get a handle on

19    the revenue that Silk Road had earned during the period of time

20    from the beginning of its existence through Mr. Ulbricht's

21    arrest, correct?

22         THE COURT:  Let me ask it this way:  I want to see

23    whether or not this is the right witness for this.

24         Were you involved in the efforts by the government to

25    calculate the total number of transactions on Silk Road?

1          THE WITNESS:  No, I was not.

2          THE COURT:  Were you involved in any efforts by the

3    government to calculate not only the number of transactions,

4    but any corresponding value in terms of bitcoins or U.S.

5    Dollars at any particular point in time?

6          THE WITNESS:  No, I was not.

7          THE COURT:  I think you'll need another witness for

8    these questions.

9          MR. DRATEL:  I have nothing further.

10          THE COURT:  All right.  Thank you.

11          Mr. Turner, are we okay or do we need a break?  Let me

12    take a look at the jury.  We're all right.  Let's continue.

13    Thank you.  This will be the end of this witness.  I think

14    we're almost done.  We'll see how this goes.  There's always a

15    bit of back and forth, but I think we're close.

16          MR. TURNER:  Mr. Evert, if you can put GX 134 back on

17    the screen.  The passport, can you zoom in on the bottom dates

18    there.

19    REDIRECT EXAMINATION

20    BY MR. TURNER:

21    Q.  The date of issue on the passport is what, Agent

22    Der-Yeghiayan?

23    A.  The date that the government issued that document.

24    Q.  Right.  But what does it appear here?

25    A.  April 26, 2012.

F1LGULB2                    Der-Yeghiayan - redirect

1    Q.  Any trips that the defendant took before this date, there

2    are not going to be stamps on the passport, right?

3    A.  Not on this passport, no.

4    Q.  KalyHost.  In terms of monitoring or collecting information

5    about its customers, when you registered a website on KalyHost,

6    you didn't have to verify your information, correct?

7    A.  No, I did not.

8    Q.  And in terms of their ability to see what IP addresses

9    you're logging in from, if you're coming in through Tor, can

10   they see your true IP address?

11   A.  They would see the Tor exit node.

12   Q.  Can they see your true IP address?

13   A.  No.

14   Q.  Mises.org, you said is a libertarian website, right?

15   A.  Yes, it is.

16   Q.  And it's a particular brand of libertarianism, is that

17   right?

18   A.  I believe so, yes.

19           MR. DRATEL:  Objection.

20           THE COURT:  There's very little you can do on this.

21   I'll allow one more question on it.

22   Q.  You looked at posts on mises.org, right?

23   A.  I did.

24   Q.  Were there terms that were commonly discussed on the

25   website?

F1LGULB2                         Der-Yeghiayan - redirect

1  A.  There were commonalities, I mean, the way the people spoke

2  on there.

3  Q.  Did they speak about agorism?

4  A.  They did.

5  Q.  And you mentioned some names.  Samuel Konkin and Murray

6  Rothbard, did those names come up?

7  A.  Yes, they did.

8  Q.  Not just on the liberty whatever it is you were looking at,

9  but across the site, is that right?

10  A.  It was not just on Liberty Student's account.  It was

11  across the site.

12  Q.  Users of that site generally were interested in those

13  concepts and authors?

14  A.  There was discussions about those authors, yes.

15  Q.  Did you find any profile in liberty reserve -- excuse

16  me -- any profile on mises.org in the defendant's name?

17  A.  I did.

18  Q.  With the defendant's picture on it?

19  A.  I did.

20  Q.  Did you find a profile of the defendant on YouTube?

21  A.  I did.

22  Q.  With the defendant's name on it?

23  A.  I did.

24  Q.  And the defendant's picture on it?

25  A.  Yes.

F1LGULB2                          Der-Yeghiayan - redirect

1    Q.  Did you see the subscriptions on the YouTube page?

2    A.  I did.

3    Q.  Did they include any subscriptions to mises.org?

4    A.  Yes, there were.

5              MR. TURNER:  No further questions.

6              THE COURT:  Thank you.

7              MR. DRATEL:  A couple, your Honor just based on that,

8    based on that.

9              THE COURT:  My goodness.  Okay.  Just two or three.

10             MR. DRATEL:  Yes.

11   RECROSS EXAMINATION

12   BY MR. DRATEL:

13   Q.  With respect to travel, your records go back before

14   April 2012 with that passport, right, your database goes back

15   much further than that, right?

16   A.  Not on that particular passport --

17   Q.  Not the passport.  For Mr. Ulbricht, when you looked at the

18   database for travel in and out of the United States, it's not

19   limited to the time of that passport?

20   A.  No, it's not.

21   Q.  It goes well before that, correct?

22   A.  The travel history is not based on the passport.

23   Q.  And with respect to --

24             THE COURT:  That was two.

25             MR. DRATEL:  I'm sorry?

1            THE COURT:  I was counting.  That was two.  You get

2      two more.

3      Q.  Mr. Ulbricht had his accounts on mises.org and YouTube in

4      his own name, right?

5      A.  He did.

6      Q.  Mr. Athavale, you associated him with an alias, correct?

7            MR. TURNER:  Objection.

8            THE COURT:  Sustained.

9      Q.  And you said the commonalities that you found with respect

10     to the mises.org posts of Liberty Student and DPR you sent to a

11     college professor for analysis, right?

12           MR. TURNER:  Objection; asked and answered and

13     relevance.

14           THE COURT:  It's been asked and answered.

15           You can answer it again.

16     A.  It was analyzed; yes.

17           THE COURT:  We're all set.

18           You're all done, Mr. Dratel?

19           MR. DRATEL:  Yes.  Thank you.

20           THE COURT:  Thank you.  You may step down, sir.

21           THE WITNESS:  Thank you.

22           (Witness excused)

23           THE COURT:  We're going to go on to your next witness,

24     ladies and gentlemen.  And maybe this is a good time, just

25     because we're at the next witness, to take a quick break.

F1LGULB2                         Der-Yeghiayan - recross

1    Let's not take a long break.   Come back in.   Just to stretch

2    our legs.   We'll get the next witness already on the stand just

3    to save some time and we'll start right up.   So it's just a

4    five-minute, seven-minute break as quickly as we can get out

5    and get back in.

6                  (Jury excused)

7                  (Continued on next page)

1           (In open court)

2           THE COURT:  This was to take a quick break before we

3   get the next witness out.  If we can get him or her on the

4   stand.  Is it still Mr. Kiernan?

5           MR. TURNER:  Yes.

6           THE COURT:  All right.  Is there anything you folks

7   want to raise?  I want to take a quick break.

8           MR. TURNER:  An issue to flag:  We want a jury

9   instruction about this Anand Athavale thing, that the testimony

10  about the mises.org cannot come in in order to prove that Anand

11  Athavale was an alternative perpetrator.  No link was made in

12  any authentic way.

13          THE COURT:  Why don't you do this:  If you are asking

14  for an instruction, draft up something, share it with

15  Mr. Dratel.  If you can't come to any agreement, you'll present

16  that to me without agreement.  And if you can, then I would

17  consider what you folks prepare, but the request is noted.

18          MR. TURNER:  Thank you.

19          MR. DRATEL:  Just one other thing, 151 we never

20  received until this morning.  We keep getting exhibits on the

21  fly, and I just wish that we could have a stationary target to

22  prepare from.  That's all I'm asking.

23          THE COURT:  It was, I think, in the nature of

24  rebuttal.

25          MR. DRATEL:  We got it when he testified.

F1LGULB2                         Der-Yeghiayan - recross

1                THE COURT:  Sometimes they're hard to get in advance.

2                MR. DRATEL:  I literally got it handed to me during

3      the examination.

4                MR. TURNER:  As I received it.

5                THE COURT:  Do the best you can.  I expect you'll do

6      the best you can.  Let's take a quick break.

7                (Recess)

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court; jury present)

2            THE COURT:  Mr. Kiernan, I'm going to ask you to

3    remain standing and I'll have my deputy swear you in.

4            (Witness sworn)

5            THE COURT:  Thank you, Mr. Kiernan.  Please be seated,

6    sir.

7            THE WITNESS:  Thank you.

8            THE COURT:  There's water there and I see you have a

9    bottle of water also on the side.

10           It will be important for you to pull yourself up to

11   the mic. and speak clearly and directly into the mic.

12           Mr. Howard.

13    THOMAS KIERNAN,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16   DIRECT EXAMINATION

17   BY MR. HOWARD:

18   Q.  Good morning.

19   A.  Good morning.

20   Q.  Who do you work for?

21   A.  The FBI, the Federal Bureau of Investigations.

22   Q.  And how long have you worked with the FBI?

23   A.  Twenty-three years.

24   Q.  And what is your position at the FBI?

25   A.  I'm currently a computer scientist with the FBI.

F1LGULB2                          Kiernan - direct

1    Q.  What are your duties and responsibilities as a computer

2    scientist?

3    A.  Sure.  I collect, review and analyze digital evidence.

4    Q.  Are you familiar with what a forensic image is?

5    A.  I am.

6    Q.  And what is a forensic image?

7    A.  It's a image of a hard drive or a digital media that makes

8    an exact duplicate of the original drive that you are looking

9    at, so you're making a copy of someone else's drive basically.

10   Q.  In your role as a computer scientist at the FBI, do you

11   have experience in reviewing the forensic images of computers?

12   A.  Yes.

13   Q.  In the course of your career, how many forensic images of

14   computers would you say you have examined in total

15   approximately?

16   A.  Hundreds of computers that we have gone through.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1    Q.  Do you have any specialized training with computers?

2    A.  Yes.  I'm a FBI -- I am a CART technician, which is a

3    Computer Analyst Response Team, which I have training in also.

4    Q.  And what is your educational background?

5    A.  I have a computer science degree from St. John's

6    University.

7    Q.  I am going to draw your attention to October 1, 2013.

8    A.  Sure.

9    Q.  Were you involved in an arrest that day?

10   A.  I was.

11   Q.  And whose arrest was that?

12   A.  The defendant, Ross Ulbricht.

13   Q.  Do you see that person in the courtroom today?

14   A.  I do.  He is at the second table wearing the pink-collared

15   shirt.

16          MR. HOWARD:  May the record please reflect that the

17   witness has identified the defendant?

18          THE COURT:  So reflected.

19   Q.  Now, in what city did this arrest take place?

20   A.  This was in San Francisco.

21   Q.  And what part of day did this take place?

22   A.  Afternoon, approximately 3:15.

23   Q.  When did you first arrive in San Francisco for the arrest?

24   A.  For the arrest, I was there two days prior to the arrest.

25   Q.  And what were you involved in in the days leading up to the

F1ldulb3                    Kiernan - direct

1    arrest?

2    A.   I had helped out with some of the surveillance that was

3    going on during that time period.

4    Q.   And what was the initial plan for the defendant's arrest?

5    A.   The initial arrest was going to be on October 2nd, which is

6    at his residence, but it was on this -- it was geared to the

7    2nd of October.

8    Q.   And did that plan, did it go as planned?

9    A.   No, it did not.

10   Q.   And why not?

11   A.   We had the opportunity to arrest the defendant with his

12   laptop and his laptop on at the time.

13   Q.   And what was the importance of arresting the defendant with

14   his laptop on?

15   A.   So with the laptop on we can beat or get past any type of

16   encryption problems that would arise on a laptop.  Usually --

17   encryption is when you have your laptop, or a hard drive, and

18   the data on top of it is in a format that is not humanly

19   readable that we can't get to.  So to get there with the laptop

20   on and at a point where it is on, we were able to get the

21   machine and pull up live data from the machine.

22   Q.   Now, were there other people involved in the arrest team?

23   A.   Yes.

24   Q.   Where was the arrest team deployed on October the 1st?

25   A.   On the 1st we were situated all around the area at the

F11dulb3                        Kiernan - direct

1    time, all in a -- in plainclothes, just trying to blend in with

2    the surroundings.

3    Q.  And what location were you in?  Where were you?

4    A.  I was -- myself, I was across the street from the library,

5    from a little cafe and back from the library spot, but right

6    across the street from the library.

7    Q.  And why were you in that specific location?

8    A.  We had witnessed the defendant in that area before, a

9    couple of days before that, when we were there doing

10   surveillance.  So we knew he was in that area, or we were

11   hoping that he would come back to that area.

12   Q.  Do you know where Mr. Ulbricht was living at the time?

13   A.  Yes, I do.

14   Q.  And how do you know that?

15   A.  We had done surveillance in front of his residence.

16   Q.  And approximately how close was his residence from the

17   place where you were stationed near the public library?

18   A.  Maybe a five-minute walk from his spot down to the cafe and

19   the library.

20   Q.  At some point did you learn that Mr. Ulbricht was

21   approaching the area?

22   A.  We did.

23         MR. HOWARD:  Now, Ms. Rosen, could you please publish

24   Government Exhibit 128C, which has already been admitted into

25   evidence.

F11dulb3                          Kiernan - direct

1   Q.  Do you recognize what this photograph depicts?

2   A.  I do.

3   Q.  And what does it depict?

4   A.  That is the area where we were actually sitting before we

5   entered the library.

6          I could use my pointer, right?

7   Q.  Go ahead, Mr. Kiernan.

8   A.  Here we go.  So this area here, this cafe area, we were

9   directly across the street, on this side of the street, from

10  there, just sitting on a bench, me and the UC at the time,

11  Jared -- I can never pronounce his last name but it was Jared.

12  The library was right over here, where we were waiting to enter

13  into.

14  Q.  Now, sorry, you were sitting with Special Agent Jared

15  Der-Yeghiayan, correct?

16  A.  Yes.

17  Q.  Were there other agents involved, too?

18  A.  Not where we were sitting but in the area, yes, there were

19  other agents in that area.

20  Q.  And they were also in plainclothes?

21  A.  Yes.

22  Q.  So at some point did you observe the defendant when you

23  were at this location?

24  A.  I did.  I did.  I just saw him take a -- when he was

25  walking on this side of the street, he took a quick peek in

F11dulb3                    Kiernan - direct

1   that little doorway there, which seemed like a coffee cafe, and

2   then he just continued on past this area right into the library

3   right there.

4   Q.  Now, after you witnessed the defendant enter the library,

5   did you see the undercover officer do anything?

6   A.  He just opened up his laptop to start a session, I guess.

7   Q.  And what was the plan for the undercover opening his

8   laptop?

9   A.  To try to get into a conversation with DPR.

10  Q.  What did you do next?

11  A.  That's when I left my area and entered into the library,

12  just across the street.

13  Q.  And once you entered the library, where did you go?

14  A.  The library was two -- it was a couple, it was two

15  floors -- well, the library itself, the entranceway and then I

16  went up to the second floor, where the actual entrance to the

17  main library section was.

18  Q.  Now, I'm going to ask you to flip in the binder that is

19  sitting in front of you to what's been marked for

20  identification purposes as Government Exhibit 128G.

21  A.  Got you.

22  Q.  Do you recognize this?

23  A.  I do.

24  Q.  What is this exhibit?

25  A.  This is a photograph of that second floor entrance into the

1    library.

2    Q.  Did you take this photograph?

3    A.  I did not take this.

4           THE COURT:  May I pause for one second?  I think that

5    my binders have taken a walk, and they will walk back.

6           (Pause)

7           OK.  So what number are you on, Mr. Howard?

8           MR. HOWARD:  128G.

9           THE COURT:  Thank you, sir.  You may continue.

10   BY MR. HOWARD:

11   Q.  Is it correct, you just testified that you did not

12   personally take this photograph, correct?

13   A.  No, I did not take this photo.

14   Q.  But does this photograph fairly and accurately depict the

15   area of the library that you just described?

16   A.  Yes, it does.

17          MR. HOWARD:  The government offers Government Exhibit

18   128G.

19          MR. DRATEL:  I have no objection, your Honor.

20          THE COURT:  Received.

21          (Government's Exhibit 128G received in evidence)

22          MR. HOWARD:  Could you please publish it on the

23   screen.

24   Q.  So you described it as the area of the library that you

25   first went to after you entered, correct?

1   A.  Yes.

2   Q.  Was there anyone else with you while you were at this

3   location?

4   A.  Not with me going in but inside there were some agents

5   already stationed.

6   Q.  Could you depict where in the photograph this was?

7   A.  Sure.  Right back in here, just behind this pole, basically

8   in front of this little terminal there.

9   Q.  Once you arrived at that location, did you meet with the

10  other agents?

11  A.  We did, yes.

12  Q.  And what happened during that meeting?

13  A.  During that -- it was a pretty quick meeting, but we were

14  trying to come up with a way to have the defendant turn away

15  from his laptop.  So he was sitting inside.  So we were trying

16  get him -- a diversion.  We were trying to create a diversion

17  so we could grab the laptop, take it, and start processing it,

18  start looking at it.

19  Q.  This is to obtain the laptop in an unencrypted state,

20  correct?

21  A.  Correct.  Yes.  Again, the goal was to get to the laptop in

22  its unencrypted state.  We wanted to look at that laptop.

23  Q.  Did you have a search warrant for the defendant's laptop at

24  the time?

25  A.  We did.

F11dulb3                         Kiernan - direct

1    Q.  Can you please flip to what's been marked for

2    identification purposes as 128H in your binder.

3    A.  Yes.  OK.

4    Q.  Do you recognize this exhibit?

5    A.  I do.

6    Q.  And what is it?

7    A.  A picture internal of the library approximately where the

8    defendant was sitting.

9    Q.  Did you take this photograph?

10   A.  I did not.

11   Q.  Does the photograph fairly and accurately depict the area

12   that you just testified about in the library?

13   A.  It does.

14          MR. HOWARD:  The government offers Government Exhibit

15   128H.

16          MR. DRATEL:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 128H received in evidence)

19   BY MR. HOWARD:

20   Q.  Mr. Kiernan, you described this as the area that you first

21   observed the defendant in the library, correct?

22   A.  It is, yes.

23   Q.  Can you describe where in this photograph you observed the

24   defendant?

25   A.  Sure.  I was situated to the left over here.  You see this

F1ldulb3                    Kiernan - direct

1    pole standing there?  I was in that area behind the case of

2    books or magazines in that area.  About 20 feet away, something

3    like that.

4    Q.  And where was the defendant specifically located?

5    A.  He was approximately in this area here, almost in this same

6    spot as that gentleman in there, in that picture.

7    Q.  What were you able to observe about the defendant before he

8    was arrested?

9    A.  Just that he was using his -- his laptop was on and he was

10   using his machine, just sitting there.

11   Q.  What did you see next?

12   A.  I saw two agents come from this area here, walking this

13   way.  I mean, towards the windows, right, would be better,

14   toward that "Science Fiction" sign there.  And I witnessed

15   them.  They tried to do our plan that they were talking about.

16          So they get into a verbal dispute.  They start, the

17   male and the female agent, like a domestic dispute, and they

18   started yelling at each other right behind the defendant's

19   area.

20   Q.  And so what happened after they started yelling behind the

21   defendant?

22   A.  Sure.  The defendant, like anyone would do, would look like

23   what's going on.  And that's when the male agent reached,

24   grabbed the laptop, pulled it over to the side.  The defendant

25   started to rise, as anyone would do.  Then the female agent

F11dulb3                        Kiernan - direct

1    grabbed it from the male agent, and that's when I came from my

2    position and took the laptop from the female agent.

3              MR. HOWARD:  Your Honor, may I approach the witness?

4              THE COURT:  You may.

5    Q.  I just handed you what's premarked for identification

6    purposes as Government Exhibit 200.  Do you recognize this

7    exhibit?

8    A.  Can I open it?

9    Q.  Go ahead.

10             (Pause)

11   A.  Maybe I can't.  It is not going back in the bag, that's for

12   sure.

13             All right.  Let's see.  Got it.  OK.  Yes.

14   Q.  Do you recognize this exhibit?

15   A.  I do.

16   Q.  And what is this exhibit?

17   A.  This was the laptop taken from the defendant.

18   Q.  And how do you recognize it?

19   A.  From the serial number and bar code and the paper with it.

20             MR. HOWARD:  The government offers Government Exhibit

21   200.

22             MR. DRATEL:  No objection, your Honor.

23             THE COURT:  Received.

24             (Government's Exhibit 200 received in evidence)

25   BY MR. HOWARD:

F1ldulb3                          Kiernan - direct

1    Q.  What brand of laptop is this?

2    A.  This is a Samsung 700Z.

3    Q.  And when you say "700Z," what are you referring to?

4    A.  That is the model number of the laptop.

5    Q.  Now, what did you do with Mr. Ulbricht's laptop after you

6    seized it?

7    A.  After I grabbed it I went to the other side of the table,

8    where the arrest was made, and started a triage on the laptop.

9    Q.  So what is a triage?

10   A.  A triage is, again, looking for if encryption is running on

11   the machine.  So I start looking for signs of that, and then I

12   start taking pictures of what I'm doing at the time.  It is

13   just I'm going through the computer in as safe a way as

14   possible to start collecting evidence from the machine.

15   Q.  And why was it necessary to do this triage?

16   A.  Again, the encryption is tough, it is tough to defeat.  So

17   the triage is, again, to make sure that I can start getting

18   valuable evidence from the machine in its live state, while the

19   machine is on.

20   Q.  How can a laptop become locked or encrypted?

21   A.  Sure.  By the closing of the lid will usually enable

22   encryption.  Screen savers, little programs that lock it out.

23   Things like that will enable encryption on the machine if it is

24   running.

25   Q.  Does every laptop have encryption running on it?

1   A.  No, not every laptop.

2   Q.  Did you extract any documents as part of the triage?

3   A.  Yes, I did.

4   Q.  And how did you do this?

5   A.  I had a USB drive with me, a brand new USB drive that I

6   plugged into the defendant's laptop and started what I could

7   take documents from his current home directory folder, which is

8   the directly that most of your documents remain in.  That is

9   the stuff you use most.  That is where you put your documents.

10            MR. DRATEL:  Objection.

11            THE COURT:  All right.  Well, the portion of the

12   answer "stuff you use most" is struck but the remainder of the

13   answer stays.

14            You may continue, Mr. Howard.

15   BY MR. HOWARD:

16   Q.  Mr. Kiernan, what kind of operating system was the computer

17   running?

18   A.  Linux in a flavor called Ubuntu.

19   Q.  What is an operating system?

20   A.  It's the software that lets you interface with your

21   computer.  It lets a human actually interface with your machine

22   so you can get to your files and your Web browsers and things

23   like that.

24   Q.  What are other popular kinds of operating systems?

25   A.  Sure.  You probably know Windows or Macintosh OS's.  Those

1   are other types of operating systems that are out there,

2   popular ones.

3   Q.  Do you have training in reviewing computers running the

4   Linux Ubuntu system?

5   A.  I do.

6   Q.  Is the home directory you testified about part of the Linux

7   Ubuntu system?

8   A.  It is.

9   Q.  And how many computers have you reviewed that have had the

10  Linux Ubuntu system on it?

11  A.  Hundreds of computers.

12          THE COURT:  How do you spell the Ubuntu?

13          MR. HOWARD:  I believe that is you U-b --

14          THE WITNESS:  U-b-u-n-t-u.

15          THE COURT:  All right.  Thank you.

16  BY MR. HOWARD:

17  Q.  And what is the significance of the home directory, that

18  you testified about, on a Linux Ubuntu system?

19  A.  It's the directory where you keep most of your files.

20  That's the directory that holds your data.  And it holds the

21  user accounts is in the home directory of the Linux system.

22  Q.  What is a user account?

23  A.  A user account is an account that is created by usually the

24  person setting up the laptop to give yourself access to the

25  machine, to the parts of the machine that you would use.  So it

1    is that part of the machine.

2    Q.  And how are user accounts labeled?

3    A.  The name that you give it, the name that you send to that

4    account.

5    Q.  In other words, the user can choose any name they want,

6    correct?

7    A.  Correct, yes.

8    Q.  Now, what, if anything, did you do to document what you

9    were doing while you were performing what you were calling the

10   triage of the laptop?

11   A.  Sure.  I was taking pictures of what I was doing with a

12   BlackBerry, my BlackBerry FBI-issued phone.

13   Q.  And why were you using a BlackBerry?

14   A.  Ah, that's what I had with me at the time.  That's what I

15   received.

16   Q.  Now, if you could please flip in your binder to what has

17   been marked for identification purposes as Government Exhibit

18   201A.

19   A.  Sure.

20          (Pause)

21   Q.  Do you recognize this exhibit?

22   A.  One second.  Sorry.

23          (Pause)

24          Yes, I do.

25   Q.  And what is this exhibit?

F1ldulb3                          Kiernan – direct

1   A.   This is a photograph of the defendant's computer at the

2   time of the arrest, or the time that I had it.

3   Q.   Did you take this photograph?

4   A.   Yes, I did.

5   Q.   And how soon after obtaining the laptop did you take this

6   picture?

7   A.   Right after.

8            MR. HOWARD:   The government offers Government Exhibit

9   201A.

10           MR. DRATEL:   No objection.

11           THE COURT:   Received.

12           (Government's Exhibit 201A received in evidence)

13   BY MR. HOWARD:

14   Q.   So, Mr. Kiernan, is it your testimony that this is the

15   first photograph you took of the defendant's laptop?

16   A.   Yes.

17   Q.   Did you do anything to the laptop, click on any windows, do

18   anything at all before you took this picture?

19   A.   Ah, no.  No.

20           MR. HOWARD:   If we could please just zoom into this

21   window right here, Ms. Rosen.

22   Q.   Can you describe what this window contains?

23   A.   Sure, except for that big flash I had there when I first

24   started taking the pictures.  That's the Pidgin chat client,

25   the Pidgin chat program that allows communications between

1    individuals, and this is a chat with the username Cirrus.

2    Q.  Do you recognize the username Cirrus?

3    A.  I do.

4    Q.  And how do you recognize it?

5    A.  That's the account that our undercover was using.

6           MR. HOWARD:  Now, if you could, Ms. Rosen, if you

7    could just zoom in on the upper left-hand corner of the screen.

8    Q.  Here it says "Ubuntu desk-top."  What does that mean?

9    A.  That was the software -- the operating system that was

10   running on the defendant's computer.

11   Q.  Now, does Government Exhibit 201A indicate -- anywhere

12   indicate the time that the photograph was taken?

13   A.  Yes, it does, on the second page.

14          MR. HOWARD:  Ms. Rosen, could we please flip to the

15   second page and zoom in on the upper right-hand corner.

16   Q.  Here it says, "Properties."  What is the information that's

17   depicted here?

18   A.  Sure.  That's metadata that comes with files.  So the

19   picture is part of your file that you look at.  This metadata

20   is sometimes -- not "sometimes," it is embedded within these

21   files.  So this is just the date and times of the times that I

22   took the pictures.

23   Q.  So let's first look down here at the bottom where it says

24   "Camera Properties."

25   A.  Sure.

1   Q.   "Camera model:  BlackBerry 9930."

2              What is BlackBerry 9930?

3   A.   That is my phone.

4   Q.   And below that it says, "Date Taken, October 1, 2013,

5   6:15:56 p.m."

6   A.   Yes.

7   Q.   What does that refer to?

8   A.   That's the time I took the picture in Eastern Time.

9   Q.   And why is it reflected in Eastern Time?

10  A.   That is what my phone settings were at.

11  Q.   And what time zone is San Francisco in?

12  A.   Pacific.

13  Q.   And at that time how many hours back was it?

14  A.   Three.

15  Q.   If you look up here under "Picture Properties," there is a

16  line that says, "Modified:  October 1, 2013, 3:15:56 p.m."

17             What does that reflect?

18  A.   That the converted time from Eastern to PST, minus the

19  three hours.  We just took the three hours off.  That is what

20  it looks like.

21  Q.   Now, Mr. Kiernan, could you just take a moment and flip

22  through your binder of what's been marked for identification

23  purposes as Government Exhibits 201B through 201G, and let me

24  know when you are ready.

25  A.   OK.  B through G?

F1ldulb3                         Kiernan - direct

1    Q.   B through G.

2    A.   Got you.

3              (Pause)

4              OK.

5    Q.   Sir, do you recognize what all of these exhibits are?

6    A.   Yes.

7    Q.   What are they, generally?

8    A.   Photos that I took of the defendant's laptop at the time of

9    the arrest.

10   Q.   Did you take these photographs?

11   A.   I did, yes.

12   Q.   Now, as with Government Exhibit 201A, is the time of each

13   photo reflected in the metadata on the second page of each

14   exhibit?

15   A.   Yes, it is.

16   Q.   And for each one under "camera properties," is the time

17   reflected in Eastern Time rather than Pacific Time?

18   A.   It is, yes.

19             MR. HOWARD:   The government offers Government Exhibits

20   201B through 201G.

21             MR. DRATEL:   No objection.

22             THE COURT:   Received.

23             (Government's Exhibits 201B through G received in

24   evidence)

25             MR. HOWARD:   Ms. Rosen, could you please publish

F1ldulb3                        Kiernan - direct

1   Government Exhibit 201C, please.

2   Q.  Now, Mr. Kiernan, what time was this photograph taken local

3   time?

4   A.  3:17 p.m.

5   Q.  And earlier you testified that the defendant got arrested

6   at about 3:15, correct?

7   A.  About, yep.

8              MR. HOWARD:  Ms. Rosen, if we could just zoom in on

9   the top bar here, please.

10  Q.  Here it says, "Tuesday, October 1, 3:17 p.m."

11             What does this mean?

12  A.  The date and time that the computer had on it when it was

13  running.  So the time stamp of the computer.

14  Q.  And right to the right here, there is the word "frosty"

15  next to a little white picture.  Now it is yellow after the

16  highlighting.

17  A.  That was the username that was logged in at the time.

18  Q.  And is this the username that you were talking about before

19  on the Ubuntu system?

20  A.  Yes, the created username, correct.

21  Q.  And who's username?

22  A.  Frosty, the defendant.  That's his username that he created

23  for that.

24             MR. DRATEL:  Objection.

25  Q.  What user account was the defendant logged into at the time

F11dulb3                          Kiernan - direct

1    that you took this computer?

2    A.   The Frosty account.

3            MR. HOWARD:   Could you please zoom out, Ms. Rosen, and

4    zoom in on this window right here.

5    Q.   What is this window?

6    A.   That is a picture of the active buddy list, again, from

7    that Pidgin client that -- from the other pictures which were

8    the actual conversations, there is a buddy list from that same

9    program that shows you contacts that -- your contacts that you

10   use on the chat.

11   Q.   Right here, what is the first contact on the buddy list?

12   A.   Cirrus.

13   Q.   And the second one right under here?

14   A.   Inigo.

15           MR. HOWARD:   Ms. Rosen, could you please publish

16   Government Exhibit 201D.

17           Now, if you could zoom in on this window that starts

18   up here.

19   Q.   What is this window on defendant's computer?

20   A.   This is a browser window pulled up to the foreground.  So

21   it is a browser window of a website.

22   Q.   And what kind of browser was this?

23   A.   This was the Tor browser.

24   Q.   If you could just look up here, it says, "Support Tor

25   Browser" on the top.

F1ldulb3                          Kiernan - direct

1          What is a Tor browser, Mr. Kiernan?

2     A.  It is a browser, the same as your regular browser,

3     basically, except you are connecting through the Tor network to

4     sites that aren't available to your regular browser.  It is a

5     program that allows you to view those things.

6     Q.  Was this Tor browser running when you arrested -- sorry,

7     when you seized the defendant's computer?

8     A.  Yes, it was.

9     Q.  Now, if you could just zoom in here on the little tab here.

10          Here it says "Support" and a little thing to the left

11    of it.  What is that?

12    A.  That is the -- it is the support page of the Silk Road

13    server, and to the left is the Silk Road icon, the logo

14    associated with Silk Road, a man on a camel.

15    Q.  And right here, this white box here, what is that white

16    box?

17    A.  That's the URL, the page that is actually visited on your

18    browser that was present -- that it was looking at at the time.

19    Q.  So turn to the first part of the address,

20    silkroadvb5piz3r.onion, are you familiar with that address?

21    A.  I am.

22    Q.  And what is that address?

23    A.  That is the address of the Silk Road server.

24    Q.  And right here it says dot-onion.  What does dot-onion

25    mean?

1   A.  Dot-onion is how you route to a -- or how you get to sites

2   on Tor, dot-onion Tor sites, as opposed to the sites that you

3   are usually used to going to, like a dot-com or dot-edu, not

4   that you can't get to them through the Tor browser but the

5   dot-onion is a special category on the Tor network that you can

6   get to through the Tor browser.

7           MR. HOWARD:  Ms. Rosen, could you please publish

8   Government Exhibit 201G, please.

9   Q.  And, Mr. Kiernan, what is this window here, the white

10  window?

11  A.  That is a picture, again, of the full buddy list that was

12  running on the computer at the time.

13  Q.  You had taken photographs by this point, correct?

14  A.  At this point, yes, I was.

15  Q.  What is the white window here?

16  A.  Yes.  Again, that is the buddy list from that Pidgin

17  software.

18  Q.  So, again, we have cirrus and inigo and also later on the

19  list we have mg and smed?

20          THE COURT:  Is that right?

21  A.  That is correct, yes.

22          MR. HOWARD:  Now, Ms. Rosen, could you please publish

23  Government Exhibit 201J.

24  Q.  And what is this window, Mr. Kiernan?

25  A.  This was the bottom of that buddy list that you just saw.

1   Q.  I direct your attention to the little icon here on the

2   bottom right-hand corner.  Do you recognize what that is?

3   A.  I do.  That's the logo associated with or the avatar

4   associated with the user account Dread Pirate Roberts on the

5   Silk Road site.

6   Q.  Up here there is a little what appears to be some sort of

7   stop sign or some sort of traffic sign?

8   A.  Yep.

9   Q.  Then next to it is "dread@pl5mmj2ron" and I can't tell,

10  that looks like h-u-t-y, a bunch of characters, dot-onion?

11  A.  Yes.

12  Q.  Do you recognize what this is?

13  A.  Yes.  That's the account of the -- that is the Pidgin

14  account to log into the Pidgin client.

15          MR. HOWARD:  Ms. Rosen, could you please publish

16  Government Exhibit 201D to the jury.

17  Q.  Earlier you testified this is the Tor browser, correct?

18  A.  Correct.

19  Q.  What, if anything, did you do to look at what other Web

20  pages had been visited previously by the user of this computer?

21  A.  Sure.  I used the Tor's -- the Tor's, the browser's back

22  button to go back.

23  Q.  Could you indicate where the back button is?

24  A.  Sure.  It's right under the word "Support" with the little

25  icon and the arrow facing to the left.

1   Q.  And what does clicking on the back button do?

2   A.  It brings you to one page before the one that you are

3   currently on.  It brings you back one page in your browser.

4           MR. HOWARD:  Ms. Rosen, could you please publish

5   Government Exhibit 201K.

6   Q.  And so what does this depict, Mr. Kiernan?

7   A.  This is the result of clicking that back button, bringing

8   you to the one page before.

9           MR. HOWARD:  Ms. Rosen, if you just again zoom in on

10  the URL bar at the top.

11  Q.  So here at the beginning it says "silkroadvb5piz3r.onion."

12  Is that the same Silk Road address you testified about earlier?

13  A.  Yes.

14  Q.  Here at the end it says "slash support."  What does that

15  mean at the end of an address?

16  A.  That is the page that you are actually on, the actual -- it

17  is the page that you are on.

18  Q.  And who picks the name of the page?

19  A.  The person designing the website.

20  Q.  Did you click on the back button again?

21  A.  I did.

22          MR. HOWARD:  Ms. Rosen, could you please publish

23  Government Exhibit 201L.

24  Q.  Mr. Kiernan, do you recognize what this depicts?

25  A.  I do.

1    Q.  And what is this?

2    A.  This, again, is the previous page to the one we saw before.

3    This is the mastermind page of the Silk Road site.

4    Q.  And why do you call it the mastermind page?

5    A.  I am just going by the name that it is called on the site

6    itself.

7            MR. HOWARD:  Ms. Rosen, could you zoom in on the top,

8    please.

9    Q.  So here at the end of the address it says slash mastermind;

10   is that what you are referring to?

11   A.  That is, yes.

12   Q.  Again, this would have been chosen by the designer of the

13   site, is that correct?

14   A.  Yes.

15           MR. HOWARD:  If you could zoom out for a second?  And

16   zoom in on this fifth row right here.

17   Q.  Here it says "cold BTC" and below it "144,336.40," correct?

18   A.  Correct.

19           MR. HOWARD:  Ms. Rosen, could you please publish

20   Government Exhibit 201M, please.

21   Q.  And what does Government Exhibit 201M depict?

22   A.  Again, this is the -- hitting the previous button, this is

23   one page before the mastermind page.

24           MR. HOWARD:  So let's zoom in on the top of the URL

25   bar on the top of the page, please, Ms. Rosen.

F1ldulb3                         Kiernan - direct

Q.  And here at the beginning is the same Silk Road address
that you testified about earlier?

A.  It is, yes.

Q.  And what is the name of this page?

A.  Landing.

Q.  And down here in this box, what does it say?

A.  Dread Pirate Roberts.

Q.  And what does this indicate?

A.  This was the login name associated with -- the login name
used to get to those other pages that you saw before, the
mastermind, the support page, all of those pages there.

Q.  Now, approximately how long did you spend with the laptop
in the library performing this triage?

A.  The whole time, for about three hours.

Q.  What did you do with the laptop after you completed the
triage?

A.  I gave it over to RCFL, which is a computer team out in San
Francisco.  The agent's name was Beeson, Chris.

Q.  So let's take a step back for a second.

        After you were done with the laptop in the library,
what did you do next with the laptop?

A.  We transported it back to the defendant's residence.

Q.  And at what point did you provide it to Special Agent
Beeson?

A.  After we were back at the residence, we gave it back to

F11dulb3                          Kiernan - direct

1   Special Agent Beeson.  I gave it to Beeson.

2   Q.  Did there later come a time that you had access to the

3   contents of the laptop again?

4   A.  Yes.

5   Q.  And how did that occur?

6   A.  That occurred -- after they imaged the drive or made a

7   duplicate of the drive, we got a copy -- we got that copy back

8   to us in New York.

9   Q.  And in what format did you get the copy of the hard drive?

10  A.  It came on a hard drive.  It was a digital -- a forensic

11  image of the defendant's computer that came on a hard drive

12  back to us.

13          MR. HOWARD:  Your Honor, may I approach the witness?

14          THE COURT:  You may.

15          (Handing)

16          THE WITNESS:  Thank you.

17  Q.  So I just handed you what's been marked for identification

18  purposes as Government Exhibit 500.

19          Do you recognize this?

20  A.  Yes.

21  Q.  And what is this?

22  A.  This is the result of the images taken by Chris Beeson that

23  we got back to us in New York.

24  Q.  And how do you recognize it?

25  A.  Again, by the serial number on it and the serial number bar

F1ldulb3                    Kiernan - direct

1   codes that match on this.

2              MR. HOWARD:  The government offers Government Exhibit

3   500.

4              MR. DRATEL:  Your Honor, I think that has to be

5   subject to connection.

6              THE COURT:  Let me ask, that is the hard drive that

7   you understand was provided to you from Beeson?

8              THE WITNESS:  Correct.

9              THE COURT:  All right.

10             All right.  It is received.

11             (Government's Exhibit 500 received in evidence)

12  BY MR. HOWARD:

13  Q.  Now, what did you do after obtaining this hard drive?

14  A.  After obtaining this hard drive, I made a staging copy of

15  it.  So what I do is I take the drive from Beeson that has the

16  image on it.  I plug this into a write locker, just a device, a

17  piece of hardware that connects to the hard drive.  And I take

18  the images that were there and I copied them to a drive, or a

19  NAS drive that I have with me.

20  Q.  So you create a staging -- what is a staging copy?

21  A.  A staging copy.  It is a copy that I can work on without

22  working on this one.

23  Q.  And you indicated that you plugged it into a write locker.

24  What is a write locker?

25  A.  A write locker just takes -- makes this so I cannot write

1    anything to it.  Even with the format it is in, the images -- I

2    don't want to write anything to the hard drive, basically.

3    Q.  Was the working copy the same as the original?

4    A.  Yes, it was.

5    Q.  And how do you know that?

6    A.  I performed an MD5 Hash on my copy that I made.  And an MD5

7    Hash is just a digital fingerprint of the files that I

8    received.  And I performed one on what I got from Beeson, and I

9    do my own, just make sure that those match, and I know I'm

10   working on a good copy of the data.  That's all.

11   Q.  So you are doing a comparison of the hash values to show

12   that they match and they show that they are the same copy?

13   A.  Correct.

14   Q.  Please flip to what has been marked as Government Exhibit

15   200A, please.

16   A.  Sure.  I am running out of room up here.

17   Q.  Mr. Kiernan, would it be helpful if I remove the laptop?

18   A.  Please.  I don't want it to wind up on the floor.

19          MR. HOWARD:  May I approach, your Honor?

20          THE COURT:  You may.

21          (Pause)

22   Q.  Do you recognize what Government Exhibit 200A is?

23   A.  I do.

24   Q.  And what is it?

25   A.  A screenshot I took of the MD5 Hashes.

F1ldulb3                          Kiernan - direct

1   Q.   You said you took this screenshot, correct?

2   A.   Yes.  I'm sorry.  A screenshot I took.

3              MR. HOWARD:  The government offers Government Exhibit

4   200A.

5              MR. DRATEL:  No objection.

6              THE COURT:  Received.

7              (Government's Exhibit 200A received in evidence)

8              MR. HOWARD:  Ms. Rosen, if you would publish 200A,

9   please.

10  Q.   So here it says, "MD5 Hash, Computed hash" and a long

11  string of characters that start with a 1e61.

12  A.   Yes.

13             MR. HOWARD:  If you could zoom in on that.

14  Q.   What is this?

15  A.   That is the result of the mathematical -- the equation of

16  the program run on the imaged drive that make that hash, make

17  that value.

18  Q.   This was the value that you compared with the value of the

19  file from Special Agent Beeson?

20  A.   Correct.  Right.

21             THE COURT:  Wait.

22  Q.   Down here it says January 5, 2015.

23             THE COURT:  Wait a second.  I want to make sure that I

24  understand what the two things are that are being compared.

25             So there is the hard drive that you received from

F11dulb3                        Kiernan - direct

1    Beeson?

2              THE WITNESS:  Right, which had the -- I'm sorry.

3              THE COURT:  Which had had the image?

4              THE WITNESS:  Right.  It had a hash on it, too, but it

5    is the actual hash from the defendant's laptop when they made

6    that image.

7              THE COURT:  OK.  So when there was an initial image

8    made on the defendant's laptop that Mr. Howard just took back

9    from you and on the hard drive on the laptop, did it have a

10   hash there?

11             THE WITNESS:  Yes.

12             THE COURT:  Was there a hash there?

13             THE WITNESS:  Yes.  That is what I am comparing it to.

14             THE COURT:  So you are measuring the hash on the

15   laptop to the hash on the Beeson drive?

16             THE WITNESS:  Right, that is coming back.

17             THE COURT:  All right.  I am with you now.

18   BY MR. DRATEL:

19   Q.  To be clear, this hash, is this hash of the Beeson drive or

20   it's a hash of the staging copy that you made?

21   A.  Both, yeah.  So when they perform the image, right, when

22   they said sda4_crypt.dd, that is the name of the file that was

23   made by Beeson from the laptop.  All right?  That gets put on

24   the drive here, this one.  And when I look at it, I compare

25   that hash value with the one that is here, which is the image

F1ldulb3                          Kiernan - direct

1   of the drive from the defendant.

2              THE COURT:  I see.

3              THE WITNESS:  That is all.

4   Q.  Just real quickly, at the bottom here, on the bottom right,

5   it says January 5, 2015.

6   A.  Mm-hmm.

7   Q.  That is the date that you took the screenshot?

8   A.  Yes.

9   Q.  This was after you performed the analysis of the hard

10  drive?

11  A.  Yes.

12  Q.  Now, what would have happened if one file had gotten

13  changed during your analysis of the laptop?

14  A.  Those MD5s change.  They would be different.

15  Q.  They would no longer be a match?

16  A.  Right.  The fingerprints wouldn't match.

17  Q.  So after you received the image and made a staging copy,

18  what, if anything, did you do to analyze the contents of the

19  laptop?

20  A.  I mounted the image, the DD file, using a tool called FTK

21  Imager.

22  Q.  What does it mean to mount the image?

23  A.  You see, it's one file right now.  When you mount an image,

24  when you -- you take that file and you put it back into the

25  contents over there, the file system comes back up.  So you can

F1ldulb3                    Kiernan - direct

1   actually read what was on that drive at the time.  You can read

2   the files on it.

3   Q.  And what kind of software did you use to read the files

4   that were in the image?

5   A.  That was the FTK Imager software.

6   Q.  Do you have any training using FTK Imager?

7   A.  Yes.

8   Q.  Approximately how many computers have you analyzed using

9   FTK Imager?

10  A.  Hundreds.

11  Q.  Mr. Kiernan, if you could take a moment and flip in your

12  binder to what has been marked for identification purposes as

13  Government Exhibits 211 through 216.

14  A.  OK.

15  Q.  Do you recognize what these are?

16  A.  Yes.

17  Q.  And what are they?

18  A.  These are screenshots of FTK Imager and some of the

19  results.

20  Q.  Who took those screenshots?

21  A.  I did.

22          MR. HOWARD:  The government offers Government Exhibits

23  211 through 216.

24          MR. DRATEL:  No objection.

25          THE COURT:  Received.

F11dulb3                        Kiernan - direct

1           (Government's Exhibits 211 through 216 received in

2     evidence)

3           MR. HOWARD:  Ms. Rosen, could you please publish

4     Government Exhibit 211, and if you could zoom in on the left.

5     Q.  What does this left -- upper left-hand corner window

6     represent?

7     A.  Sure.  So that's the file structure from the defendant's

8     laptop.

9           MR. HOWARD:  Could we just zoom in on that window.

10    Q.  Right here at the top it says "sda4_crypt.dd."  What is

11    that?

12    A.  That is the file created during that image.  That is the

13    file that gets created during the imaging of the drive.

14    Q.  And below here we have all of these little folders with

15    names by them.  What are these?

16    A.  So that's your file structure, your directory, kind of like

17    a filing cabinet that you have at your house where you put all

18    your different files into them.  So each drawer is a different

19    folder.  And then under that you could have more folders and so

20    on and so on to get to --

21    Q.  I'm sorry.  I didn't mean to cut you off.

22    A.  That's OK.

23    Q.  If you could zoom in down here where the folder is labeled

24    "home."

25    A.  Sure.

F1ldulb3                    Kiernan - direct

1   Q.  And "frosty."  This is the home directly on Ubuntu Linux

2   system that you testified about earlier?

3   A.  It is.

4   Q.  And what does the home directly contain on the Ubuntu Linux

5   system?

6   A.  That contains user accounts.

7   Q.  How many user accounts did you find on the defendant's

8   computer?

9   A.  Just this one.

10  Q.  What was the name of that account?

11  A.  Frosty.

12  Q.  Did you review the contents of files that you found on the

13  defendant's computer?

14  A.  I did.

15  Q.  During your review of the defendant's laptop, did you find

16  any photographs of the defendant?

17  A.  I did.

18  Q.  Can you please take a minute to look at what's been marked

19  for identification purposes as Government Exhibit 273 in your

20  binder.

21  A.  Sure.

22          (Pause)

23          OK.

24  Q.  Do you recognize what this is?

25  A.  I do.

1   Q.  And what is the exhibit?

2   A.  It is a file found on the defendant's laptop.

3   Q.  And how many pages is this exhibit?

4   A.  It is two.

5   Q.  What is the second page of the exhibit?

6   A.  The second page contains the file structure again and some

7   metadata associated with where I found the file.

8   Q.  By the way, are there other files that you extracted from

9   the laptop other than this?

10  A.  Yes, there are.

11  Q.  And for every file that you extracted, did you also include

12  a screenshot of where it was located and its metadata, as you

13  described?

14  A.  I did.

15          MR. HOWARD:  The government offers Government Exhibit

16  273.

17          MR. DRATEL:  No objection.

18          THE COURT:  Received.

19          (Government's Exhibit 273 received in evidence)

20          MR. HOWARD:  Ms. Rosen, could you please publish

21  Government Exhibit 273.  Zoom in on the top.

22  Q.  Mr. Kiernan, is this the contents of the file you just

23  testified about?

24  A.  Yes, it is.

25  Q.  It says, "Ulbricht, Ross William."  It is a passport.

1              Can we go to the second page, please.

2              Now, this is the screenshot from FTK Imager, is that

3     correct?

4     A.  Yes.

5     Q.  And so what is depicted along the very bottom?  If you

6     could zoom into this.  What does "home/frosty/documents/

7     archive/documents/reference/ids.jpg mean?

8     A.  That is the folder structure or where the file actually was

9     contained on the drive, like what you saw before.

10             MR. HOWARD:  Could you zoom out, Ms. Rosen.

11    Q.  And what is this window right here on the lower left-hand

12    corner?

13    A.  That is the metadata or the data which is describing what

14    that file actually is.

15    Q.  Now, are you familiar with metadata on the Ubuntu Linux

16    operating system?

17    A.  I am.

18    Q.  So, first, I want to draw your attention to the "Date

19    Modified" field, January 5, 2007.

20             What does the date modified field mean?

21    A.  The date that it was modified, or changed, or made a change

22    to it.

23    Q.  So how could, let's say, a document be modified?

24    A.  Going into a document, adding something to a document,

25    removing something from a document, that will change the date

1    modified.

2    Q.  So this represents the last date that the file was changed,

3    is that correct?

4    A.  Yes.

5    Q.  Right above that, we have a field called "Date Created."

6    What does date created refer to?

7    A.  That's the time or the date that the file was actually put

8    on that machine or that volume, that computer.

9    Q.  Does this field refer to the date that the file was

10   created -- first created anywhere?

11   A.  No, not a born date but when it is on that machine.

12   Q.  So here to the right we see a date of May 8, 2012.

13   A.  Correct.

14   Q.  That is the date created, correct?

15   A.  Correct.

16   Q.  Now, in this instance the date created is after the date

17   modified?

18   A.  Correct.

19   Q.  So what does that indicate to you, Mr. Kiernan?

20   A.  That the files were put there at a different time.  That is

21   all.  They were probably copied over or moved over --

22            MR. DRATEL:  Objection.

23   A.  -- or backed up.  They were copied over --

24            MR. DRATEL:  Objection.

25            THE COURT:  I will allow it.

1    A.  They were just moved at a different time.

2    Q.  Does this indicate to you whether or not this file was

3    first created on this computer?

4              MR. DRATEL:  Objection.

5              THE COURT:  Based upon your experience, what does that

6    information indicate to you?

7              THE WITNESS:  That it was just on a different machine

8    or a drive at a different time and put here later on.

9    Q.  Now, this date created of May 8, 2012, is this the only

10   file you found on defendant's computer with a date created of

11   May 8, 2012, or were there others?

12   A.  Oh, there were others.  Sure.

13   Q.  Approximately how many others?

14   A.  Hundreds of them.  I mean, there are others there.

15   Probably when that user account was created on the machine.

16             MR. DRATEL:  Objection.

17             THE COURT:  Overruled.

18   Q.  Based on your training and experience, in seeing that

19   many -- that quantity of files with that same date created,

20   what does that indicate to you?

21             MR. DRATEL:  Objection.

22             THE COURT:  I will allow it.

23   A.  I'm sorry.  Can you repeat that?

24   Q.  From your training and experience --

25   A.  Yes.

1    Q.   -- based on seeing the large quantity of files with the

2    same date created of May 8, 2012, what did that indicate to

3    you?

4    A.   Yeah.  The files were moved from either another computer or

5    another piece of media to the machine for later on.

6    Q.   What is the "date accessed" field?  It says October 2,

7    2013.

8    A.   Just when it was looked at or accessed, touched.

9    Q.   That was the day after the defendant's arrest, correct?

10   A.   Correct.

11   Q.   And why would this date be after the defendant got

12   arrested?

13   A.   Because we were doing a live image.  The machine is on.  So

14   all those files, you know, they unfortunately get -- not

15   "unfortunately."  They are just accessed during that time,

16   during that imaging of the machine.  The machine is on so we're

17   not turning it off to take it so that gets changed.

18   Q.   Does this metadata indicate whether or not the file was

19   changed when it was accessed for the purpose of your image?

20   A.   It does not.

21   Q.   Does it indicate whether or not the file was changed when

22   it was accessed for the purpose of the image?

23   A.   No.

24   Q.   Was it changed?

25   A.   No.  The files weren't changed.

1    Q.  So, Mr. Kiernan, if you could now flip to Government

2    Exhibit 274 in your binder.

3    A.  Sure.

4    Q.  Do you recognize what this is?

5    A.  I do.

6    Q.  And what is it?

7    A.  Again, a file taken from the defendant's laptop.

8    Q.  And who took it from the defendant's laptop?

9    A.  A file that I extracted from the defendant's laptop, yes.

10           MR. HOWARD:  The government offers Government Exhibit

11   274.

12           MR. DRATEL:  I have no objection.

13           THE COURT:  Received.

14           (Government's Exhibit 274 received in evidence)

15           MR. HOWARD:  Ms. Rosen, could you please publish it.

16   Q.  Did you find any chat logs on the defendant's computer?

17   A.  I did.

18   Q.  And what is a chat log?

19   A.  Depending -- it's a file that records or keeps the

20   conversations between two people.  Like if you use your phone,

21   if you go back and check your text messages, the same type of

22   deal.  It just puts it into a file, depending on the client

23   that you are using at the time on the machine.

24   Q.  And what kind of chat program did you find on the

25   defendant's computer?

1   A.  I found Tor chat on the defendant's computer.

2           MR. HOWARD:  If you could please publish Government

3   Exhibit 215, which is already in evidence.  And if we could

4   zoom in on the left, upper left window.

5   Q.  Mr. Kiernan, this is the directory structure of the

6   computer again, is that correct?

7   A.  Yes, it is.

8           MR. HOWARD:  And if we could zoom in on this little

9   area here.

10  Q.  Here is a folder that says ".torchat," correct?

11  A.  Correct.

12  Q.  What is that folder?

13  A.  That is the full folder for Tor chat when you load -- when

14  you install Tor chat on your computer.

15  Q.  Now, Mr. Kiernan, you testified earlier that when you first

16  got the defendant's computer, you saw a Pidgin chat program

17  window open, is that correct?

18  A.  That is correct.

19  Q.  Is that a different program than Tor chat?

20  A.  Yes, it is.

21  Q.  Did you find the Pidgin program also installed on the

22  defendant's computer?

23  A.  I did.

24          MR. HOWARD:  Now, Ms. Rosen, could you please publish

25  215 again.  Sorry.  I had one more question.

F11dulb3                          Kiernan – direct

1              Could we just zoom in on the upper right window.

2      Q.   What are these lists on the left side of the window?

3      A.   That's the log files associated with Tor chat as it keeps

4      the logs on your computer.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  And if we can just zoom in on a couple of those.  That's

2  good.  Here you can see there's a whole bunch of characters

3  followed dot log.  What does dot log mean?

4  A.  Just the formality or the extension of the file that's

5  there.  It's just called dot log in this case.

6  Q.  So Mr. Kiernan, what is Tor chat?

7  A.  A program, again, to allow you to communicate with other

8  people in a program.  It -- it's person to -- it's

9  communication between people on the Tor network as opposed to

10  open network.

11  Q.  Have you personally ever used Tor chat?

12  A.  I have.

13  Q.  Have you tested Tor chat?

14  A.  I have.

15  Q.  Have you saved the logs of Tor chats on your own computer?

16  A.  I have.

17  Q.  If you save a Tor chat log to your own computer, how is

18  your part of the conversation labeled?

19  A.  The username "myself."

20  Q.  And if you save a log of a chat you have on your computer,

21  how is the other side of the conversation labeled?

22  A.  With the name given to that other user, your other buddy.

23  Q.  And who gives that name to the other user?

24  A.  The user of the computer.  The user of the Tor chat

25  program.

1          THE COURT:  Why don't you ask the same question,

2    Mr. Howard, in terms of "myself."  I'm unclear whether it's a

3    name you designate for yourself or whether it's an automatic

4    name given.

5    Q.  Mr. Kiernan, is "myself" something that you choose for

6    yourself as a user of Tor chat, or is it automatically selected

7    to you by the program?

8    A.  The program gives you that user account, the username and

9    the log as "myself."

10   Q.  And the name of the other party in the conversation, is

11   that automatically selected for you?

12   A.  No.  You can assign that a name.

13   Q.  Could it be assigned anything the user wants?

14   A.  Yes.

15   Q.  So, for example, if you're chatting with your mother, you

16   can label it "mom" if you want, right?

17   A.  Correct, because the usernames in Tor chat are long,

18   tough-to-read names.  You can see, as a matter of fact, from

19   that log file it's the actual name of the user on there.  So to

20   make it human-readable, you give it an easier-to-use name like

21   "mom."

22   Q.  So if we could please look at Government Exhibit 222 in

23   your binder, please.  Do you recognize what this exhibit is?

24   A.  I do.

25   Q.  What is this exhibit?

1    A.  This is a log file from that Tor chat directory.

2    Q.  This is from the defendant's computer?

3    A.  From the defendant's computer; yes.

4    Q.  And did you extract this file?

5    A.  I did.

6            MR. HOWARD:  The government offers Government

7    Exhibit 222.

8            MR. DRATEL:  No objection.

9            THE COURT:  Received.

10           (Government's Exhibit 222 received in evidence)

11           MR. HOWARD:  Ms. Rosen, can you please publish

12   Government Exhibit 222, please.  Zoom in on the first few lines

13   there.

14   Q.  Is this what a Tor chat log looks like, Mr. Kiernan?

15   A.  It is.

16   Q.  So let me just describe the very top line it says "This log

17   file is not signed and has no cogency of proof."

18           Are you familiar with what that is?

19   A.  I am.

20   Q.  What is that?

21   A.  That's, again, a default setting when the log file starts

22   getting created, it puts that in there.

23   Q.  So in other words, all Tor chat log files automatically

24   include that at the top, correct?

25   A.  They'll put it in there, yes.

1    Q.  And you testified that you tested and used Tor chat

2    yourself, right?

3    A.  I have.

4    Q.  And you've saved your own logs, correct?

5    A.  I have.

6    Q.  Have the logs been true and accurate copies of the

7    conversations that you logged?

8    A.  They have been, yes.

9    Q.  Now, if we can just -- I'm going to direct you to the

10   second line here where it says 2012-04-24, 17:06.  What does

11   that mean?

12   A.  It's the date and time of the chat.

13   Q.  So it's April 24, 2012, correct?

14   A.  Correct.

15   Q.  And what format is the time depicted in?

16   A.  It's based on the 24-hour clock.

17   Q.  So what time is that in time that we more commonly use?

18   A.  5:06.

19   Q.  To the right of there, you see this sSh, it's a lower-case

20   S, big S, little H.  What is that?

21   A.  That's the name given -- that's the name that was assigned

22   to one of the chat participants.

23   Q.  It's the other participant in the chat that was logged,

24   correct?

25   A.  Yes.

1    Q.  And it says "greetings" to the right.  What is that?

2    A.  That's what was typed in, "Greetings."

3    Q.  And the next line next to date and time it says "myself: hi

4    there."

5    A.  Yes.

6    Q.  What is "myself"?

7    A.  "Myself" is the user of the client software on the

8    computer.

9    Q.  The user who is logging the files on the computer, correct?

10   A.  Yes.

11   Q.  Now, Mr. Kiernan, can you please flip to what's been marked

12   for identification purposes as Government Exhibit 22B in your

13   binder.  Do you recognize what this is?

14   A.  I do.

15   Q.  What is this?

16   A.  An excerpt from the full chat log.

17   Q.  Is that an excerpt of the Tor chat log we just looked at?

18   A.  Yes, it is.

19   Q.  Did you participate in the creation of this exhibit?

20   A.  I did.

21   Q.  Is this a true and accurate excerpt from the full Tor chat

22   log?

23   A.  Yes. they are.  Yes.

24              MR. HOWARD:  The government offers Exhibit 222B.

25              MR. DRATEL:  No objection.

1              THE COURT:  Received.

2              (Government's Exhibit 222B received in evidence)

3              MR. HOWARD:  Ms. Rosen, can we publish this and zoom

4     into the top.

5     Q.  Right at the top it has 4XSB, a long list of characters,

6     dot log.  What does this refer to?

7     A.  That's the log file this was found in.  It's the user's Tor

8     name.

9     Q.  Is this the name of the file as it was stored on the

10    defendant's computer?

11    A.  Yes.

12    Q.  And here it says "page 1/5."   What does page one of five

13    refer to?

14    A.  That's the -- "1" being the page that this was on and "5"

15    is how many pages were in the whole chat.

16    Q.  So this indicates, in other words, that this is the first

17    page of the larger Tor chat file, correct?

18    A.  Yes.

19    Q.  And that the larger file had a total of five pages,

20    correct?

21    A.  Correct.

22    Q.  So I'm going to read it right now.

23              "It's sSh:  May I ask to whom I am speaking?  A

24    formality of course, myself DPR and you are.

25              SSh:  This squid."

1              Whose computer was this chat recovered from?

2     A.  The defendant's.

3     Q.  Mr. Kiernan, I want you to take your time and look through

4     what's been marked in your exhibit binder as 222A all the way

5     through 232E, and let me know when you're done.  Look at them

6     generally and let me know.

7     A.  I'm sorry.  222A to?

8     Q.  To 232E.

9     A.  Okay.

10    Q.  So do you recognize these exhibits?

11    A.  I do.

12    Q.  What are they?

13    A.  All excerpts from the Tor chat logs that were found in the

14    defendant's computer.

15    Q.  And again, these are not full chat logs.  They're excerpts,

16    correct?

17    A.  Correct.

18    Q.  Did you participate in the creation of these exhibits?

19    A.  Yes.

20    Q.  Are they true and accurate excerpts of the entire log

21    files?

22    A.  They are, yes.

23    Q.  Does each also contain the file name of the full log file

24    at the top like Government Exhibit 222B?

25    A.  Yes.

1   Q.  And does each excerpt also indicate where in the larger Tor

2   file -- the Tor chat log file it was located?

3   A.  Yes.

4              MR. HOWARD:  The government offers Government Exhibits

5   222A, 2223, 2224, and 2225 and 225B, 2226A through 226I, 227A.

6              Apparently, I said four "2's" at one point when I

7   should have only said three "2's."

8              Where was I?

9              THE COURT:  227A.

10              MR. HOWARD:  Through 227H, 2228, 222 -- sorry.  Just

11   two "2's", 9A through 229E; 231A through 231C; and 232A through

12   232E.  And that's it.

13              THE COURT:  So no 228?

14              MR. HOWARD:  All of them start with "22."  Why don't

15   we do it this way:  So we have 2A, 3, 4, 5A and 5B, 6A through

16   6I, 7A through 7H, 8, 9A through 9E.  Now, it's 231A through

17   231C and 232A through 232E and that should cover it.

18              THE COURT:  All right.

19              MR. HOWARD:  Just note that 229B was cut at the last

20   second, so that's not one that should be included.

21              THE COURT:  All right.  Thank you.

22              Mr. Dratel.

23              MR. DRATEL:  We had some prior objections which we

24   repeat.

25              THE COURT:  Yes.

1          MR. DRATEL:  To the extent they weren't covered, the

2     others, we make the same objections *Vayner*, 403.  And because

3     there has been some alteration of numbers, there have been some

4     changes.

5          THE COURT:  Understood.  Those objections are noted.

6     They're overruled.  And those documents are received.

7          (Government's Exhibits 222A, 223, 224, 225A-225B

8     received in evidence)

9          (Government's Exhibits 226A-226I, 227A-227H, 228

10    received in evidence)

11         (Government's Exhibits 229A-229E, 231A-231C, 232A-232E

12    received in evidence)

13         MR. HOWARD:  Thank you, your Honor.

14    Q.  In your review of the defendant's laptop, did you discover

15    files that appeared to be journal entries?

16    A.  I did.

17    Q.  Mr. Kiernan, can you please look in your binder what has

18    been premarked for ID purposes as Government Exhibit 240A

19    through 240D and 241.

20    A.  Yes.

21    Q.  Do you recognize these exhibits?

22    A.  I do.

23    Q.  And what are they?

24    A.  Files I extracted from the defendant's laptop.

25         MR. HOWARD:  The government offers Government Exhibits

1    240A through 240D and 241.

2              MR. DRATEL:  The same prior objections.

3              THE COURT:  All right.  Those objections are noted,

4    overruled and those documents are received.

5              (Government's Exhibits 240A-240D, 241 received in

6    evidence)

7              MR. HOWARD:  Ms. Rosen, can you please publish

8    Government Exhibit 240A.

9    Q.  What is the title of this file, Mr. Kiernan?

10   A.  2010.docx.

11   Q.  And what is the date that this file was last changed as

12   reflected in the meta data?

13   A.  2/27/2011.

14             MR. HOWARD:  Ms. Rosen, can you please add the

15   highlights to this document just for the ease of reading them

16   in.  I'm going to read the highlighted portions now.  If we can

17   zoom in at the top.

18             "2010.  I started the year in the middle of my stint

19   with Good Wagon Books.  Donny and I had worked on it the last

20   quarter of 2009 and we were trying to ramp up by hiring people

21   to go door-to-door.  It was a real struggle and by the end of

22   our trial partnership, it was clear that we hadn't grown the

23   business to the point that it made sense for me to stay on.

24             "I had to find a job quickly, so I turned to Craig's

25   List and found American Journal Experts.  For the next six

months, I edited scientific papers written by foreigners.  It

sucked.  The hours were flexible, but it drained me.  I hated

working for someone else and trading my time for money with no

investment in myself."

          Can we go to the next page, please.

          "While all of this was happening, I began working on a

project that had been in my mind for over a year.  I was

calling it Underground Brokers, but eventually settled on Silk

Road.  The idea was to create a website where people could buy

anything anonymously, with no trail whatsoever that could that

could lead back to them.  I had been studying the technology

for a while, but needed a business model and strategy.  I

finally decided that I would produce mushrooms so that I could

list them on the site for cheap to get people interested.  I

worked my ass off setting up a lab in a cabin near Bastrop off

the grid.  In hindsight, this was a terrible idea and I would

never repeat it, but I did it and produced several kilos of

high quality shrooms.  On the website side, I was struggling to

figure out on my own how to set it up.  Driving out to Bastrop,

working on Good Wagon, and trying to keep up my relationship

with Julia was taking all of my time.  By the end of the year,

I still didn't have a site up, let alone a server."

          Ms. Rosen, can you zoom out to the next page, please.

          "In 2011, I am creating a year of prosperity and power

beyond what I have ever experienced before.  Silk Road is going

1   to become a phenomenon and at least one person will tell me

2   about it, unknowing that I was its creator.  Good Wagon Books

3   will find its place and get to the point that it basically runs

4   itself.  Julia and I will be happy and living together.  I have

5   many friends I can count on who are powerful and connected."

6            Ms. Rosen, can you please publish Government Exhibit

7   240B.

8   Q.  Mr. Kiernan, what is the name of this file?

9   A.  2010.ODT.

10  Q.  And where was it located on the computer?

11  A.  I'm sorry.  2011.ODT.

12  Q.  And where in the defendant's computer was it located?

13  A.  This was in his home/frosty/Documents/journal/2011

14  directory.

15  Q.  And what was the date when this file was last changed?

16  A.  2/5/2012.

17           MR. HOWARD:  Ms. Rosen, can you please add the

18  highlights to this document as I'll read them, if you can just

19  zoom in the top.

20           "2011.  Still working on Good Wagon Books and Silk

21  Road at the same time.  Programming now.  Patchwork php mysql.

22  Don't know how to host my own site.  Didn't know how to run

23  bitcoind.  Got the basics of my site written.  Launched it on

24  freedomhosting.  Announced it on the bitcointalk forums.  Only

25  a few days after launch, I got my first sign-ups and then my

1    first message.  I was so excited I didn't know what to do with

2    myself.  Little by little, people signed up, and vendors signed

3    up, and then it happened.  My first order.  I'll never forget

4    it.  The next couple of months, I sold about ten pounds of

5    shrooms through my site.  Some orders were as small as a gram

6    and others were in the qp range.  Before long, I completely

7    sold out.  Looking back on it, I maybe should have raised my

8    prices more and stretched it out, but at least now I was all

9    digital, no physical risk anymore.  Before long, traffic

10   started to build.  People were taking notice, smart, interested

11   people.  Hackers.  For the first several months, I handled all

12   of the transactions by hand.  When they came into my local

13   bitcoin client, I matched them up with the amount of time" --

14   I'm sorry -- "with the amount and time of the purchase and did

15   all of the necessary account adjustments.  Between answering

16   messages, processing transactions, and updating the codebase to

17   fix the constant security holes, I had very little time left in

18   the day, and I had a girlfriend at this time!"

19           I'm skipping ahead.

20           "So, while still manually processing transactions and

21   responding to a bigger and bigger message load, I learned to

22   use codeigniter and began rewriting the site.  At some point

23   around this time, I also learned how to host my own site and

24   was on my own servers."

25           "Rewriting the site was the most stressful couple of

1    months I've ever experienced.  I worked all day everyday, still

2    processing transactions by hand, dealing with scammers,

3    answering messages, meeting new strange people through my site

4    and getting to know them.  When I finally got the site ready,

5    there were several new features including a tumbler and

6    automatic mated payment processing."

7        "AND in addition to these stressors, Silk Road got its

8    first press, the infamous Gawker article.  When you look at the

9    historic #s, you can see right when it happened.  A huge spike

10   in signups, and the beginning of an upward trend in commerce

11   that would continue until the time of this writing, and

12   hopefully for much longer.  There was really a smattering of

13   press at this time including the local news in FL!  Most

14   interestingly, two U.S. senators came out against the site and

15   against bitcoin.  They made a big deal out of it and called for

16   a shutdown of the site."

17       "Some major advances were price pegging, vendor

18   ranking, a more sophisticated feedback system, buyer stats,

19   transaction logging and building up the admin toolset.  Most

20   importantly, the market began its path to maturity.  Vendors

21   and buyers forged great relationships, more vendors came in to

22   fill holes in the market, other completed and variety, customer

23   service, and professionalism emerged.  After making about $100k

24   an up to a good 20-$25k monthly, I decided it was time to bring

25   in some hired guns to help me take the site to the next level.

1    This would prove to be the biggest challenge I ever faced.  I

2    actually got to see a fairly wide range of employee types.

3    SYG, the schmoozer who winds up being a waste, DA, the model

4    employee.  Super enthusiastic, hard working and trainable.

5    Then there was Utah, professional who does it for the money.

6    Gets the job done, but his heart isn't always in it.  First I

7    put up an ad for a system administrator.  I needed someone to

8    help me take the back end to the next level in security.  I had

9    many candidates duke it out in the forum on many topics from os

10   to isolation to software to security.  In the end, I made what

11   I thought was a wise decision."

12          "I was still working with SYG, so Utah was set to work

13   on rewriting the site.  Around this time, Variety Jones showed

14   up.  This was the biggest and strongest willed character I had

15   met through the site thus far.  He quickly proved to me that he

16   had value by pointing out a major security hole in the site I

17   was unaware of."

18          "He convinced me of a server configuration paradigm

19   that gave me the confidence to be the sole server administrator

20   and not work with someone else at all.  He has advised me on

21   many technical aspect of what we are doing, helped me speed up

22   the site and squeeze more out of my current servers.  He also

23   has helped me better interact with the community around Silk

24   Road, delivering proclamations, handling troublesome

25   characters, running a sale, changing my name, devising rules,

1    and on and on.  He also helped me get my head straight

2    regarding legal protection, cover stories, devising a will,

3    finding a successor and so on.  He's been a real mentor.

4    Shortly after I met VJ, I started looking for a right hand man,

5    an administrative assistant of sorts.  Someone to answer

6    messages, manage the forum and Wiki, and eventually even

7    dispute resolution.  I found that man in Digital Alchemy, who

8    was one of the original members of the site and had been

9    modding the forums for pretty much the whole time.  There were

10   lots of applicants, but for some reason DA stuck out as

11   promising, and he has turned out to be invaluable.  He quickly

12   learned how to respond to messages and keep things running

13   smoothly.  Before long he was managing the forums, the wiki,

14   the messages, the resolution center, scam prevention, and odd

15   jobs for me like mini-research projects and tedious tasks."

16   Q.  Now, Mr. Kiernan, at the end of this excerpt, there was a

17   reference to an employee named DA.  Did you find any references

18   to DA in the Tor chat log files?

19   A.  I did, yes.

20            MR. HOWARD:  Ms. Rosen, can you please publish

21   Government Exhibit 232B, which has already been admitted into

22   evidence.  Zoom in on the top half, a half at a time.

23            "myself:  Are you ready to become judge jury and

24   executioner.

25            Da:  Yep."

1            And then there's an emoticon.

2            "myself:  OK, click resolutions, form your support

3    panel.

4            Myself:  This will pull up the most past-due

5    resolution.

6            Da:  It's loaded.

7            Myself:  Top line is how many past due resolutions

8    there are.  It says "under review" to the users.  The next six

9    lines are the transaction details.  Kill resolution link

10   finalize the resolution without crediting buyer or seller.  You

11   rarely need to use this, but sometimes both parties are

12   completely unresponsive and you need to clear it out of your

13   queue."

14           By the way, I note this is a conversation from

15   January 8, 2012.  The conversation continues:

16           "myself:  Left stats table is the buyer.  Purchases

17   are the number of purchases that were eventually finalized and

18   not canceled and doesn't count open orders.  Refund rate is the

19   total money returned to the buyer from the resolution center

20   divided by the total money spent.  And the time-frames are the

21   stats from the past 30 days, 90 days, and the life of the

22   buyer's account.  Keep notes of what these numbers mean so you

23   can review them if you forget."

24           Ms. Rosen, can you please publish Government

25   Exhibit 232A, which has already been admitted into evidence.

1    Q.  Mr. Kiernan, at the top it says here pages "148-149 out of

2    257"?

3    A.  Yes.

4    Q.  Does 257 refer to the total number of pages in the full Tor

5    chat log?

6    A.  Yes, it does.

7    Q.  So now I'm going to read dated March 14, 2012.

8             "myself:  Do you make purchases with a DigitalALCH

9    account.

10            Da:  [...] No, not for a while.  I had at one point

11   but only to way out there drop location.  States away :)"

12            Emoticon.

13            Da:  I use the KindestDaze generally.

14            Myself:  That's good.  Your name is getting higher

15   profile on the forums and we wouldn't want anyone with your

16   address from past orders to compromise you.

17            We might want to construct a new identity for you

18   though.

19            Da:  Say that I'm quitting.  Yea?

20            Myself:  Maybe, or just disappear.  Let's think on it

21   for a few days.

22            Da:  IRL or online?

23            Myself:  No, just online.  My concern is that LE will

24   see that DA is a player at Silk Road by your forum presence and

25   then track down who you bought from and sold to under that name

1    and then find you irl.

2              Da:  Damn.  I really like the DigitalALCH moniker.  It

3    really fit me.  Oh, well freedom is better than prison."

4              Emoticon.

5              "myself:  Yep.  I got to protect my assets too.

6              Da:  Do you mean me?  Or outside assets.

7              Myself:  You."

8              MR. HOWARD:  Ms. Rosen, can you please publish

9    Government Exhibit 222A, which has already been admitted into

10   evidence.

11   Q.  Mr. Kiernan, this is page one of a Tor chat log chat that's

12   a total of 16 pages, correct?

13   A.  Correct.

14   Q.  It's dated April 20 -- the first excerpt is dated April 20,

15   2012, correct?

16   A.  Yes.

17   Q.  "sSh:  I have the forum to manage and the profile updates

18   review.  Is there anything else you'd like me to get doing, or

19   shall I refer to DA for such business.

20             Myself:  Normally DA, but since he is out of

21   commission, he can't manage it.

22             Myself:  That's fine for now.  Once we get you trained

23   on support, you'll have plenty to do before he's recovered."

24             It picks up again on April 21, 2012, correct,

25   Mr. Kiernan?

F1LGULB4                          Kiernan - direct

1    A.  Yes, it does.

2    Q.  "Myself:  OK, go to .onion/support and tell me what you

3    see.

4                SSh:  I see an entire screen of new options!  Many

5    radio boxes with various labels.

6                Myself:  Perfect.  I'll give you a little tour.  New

7    vendors, you are familiar with.  Click messages.  The number

8    next to it is the number of unread messages for SR support and

9    vendor support.

10               Vendor messages go to the front of the queue.  It's

11   just like the bulk reply view in the main messages area, but it

12   pulls up something like 75 messages at a time and the options

13   to the right of the message are a little different.

14               SSh:  All right.  I've got it loaded.  It seems that

15   quite a few people need assistance today.

16               Myself:  Actually the only difference is the forward

17   to DPR box.  If this is checked it forwards all unread messages

18   from the user to me."

19               And once again, the next section starts on April 21,

20   2012, right?

21   A.  Correct.

22               MR. HOWARD:  "myself:  We already gave him his seller

23   status back, so just tell him to change it.

24               We should have told him to change it before we made

25   him a seller again.

1     But I don't want to go back and forth taking and
2   giving.
3          SSh:  Okay then.  Should I put in a direct message, or
4   add it to the support message on the list page.
5          Myself:  Just add it to the message since we haven't
6   sent them off yet.
7          SSh:  How's this sound:  Your Vendor Status has been
8   restored.  Please change your profile to comply with the
9   seller's guide.  Best of fortune regarding your business here
10  on the Silk Road.
11         Myself:  That's good, but give him a warning too.
12  Something like.
13         Please read the seller's guide very carefully.  If we
14  find you out of compliance again, your selling privileges will
15  be permanently removed."
16         Ms. Rosen, can you please publish Government
17  Exhibit 240C, which is already in evidence.
18  Q.  Mr. Kiernan, what is the name of this file?
19  A.  Daily.ODT.
20  Q.  And where was it located on the defendant's computer?
21  A.  This was under the
22  home/frosty/documents/journal/2011Q4/December/week 4 directory.
23  Q.  And does the meta data indicate the date on which the file
24  was last saved?
25  A.  Yes.  12/29/2011.

Q.   "12/29/2011 chatted with VJ again today.  Him coming onto

the scene has reinspired me and given me direction on the SR

project.  He has helped me see a larger vision.  A brand that

people can come to trust and rally behind.  Silk Road chat,

Silk Road exchange, Silk Road credit union, Silk Road market,

Silk Road everything!  And it's been amazing just talking to a

guy who is so intelligent and in the same boat as me, to a

certain degree at least.  So, today we talked mostly about the

exchange, what to charge, boundary conditions, etc.  Then I

went for a surf with Billy Becket.  Caught a couple of good

waves, chatted with him took some wipe outs and went in.  Soon

after, I ran around the city with Ashley and Kelly.  We drank

some beer, walked around the city and botanical gardens.  I

then went out with Jessica.  Our conversation was somewhat

deep.  I felt compelled to reveal myself to her.  It was

terrible.  I told her I have secrets.  She already knows I work

with bitcoin which is also terrible.  I'm so stupid.  Everyone

knows I am working on a bitcoin exchange.  I always thought

honesty was the best policy and now I didn't know what to do.

I should have just told everyone I am a freelance programmer or

something, but I had to tell half truths.  It felt wrong to lie

completely so I tried to tell the truth without revealing the

bad part, but now I am in a jam.  Everyone knows too much.

Dammit."

          Mr. Kiernan, during this excerpt, there was a

1    reference to an employee named VJ?

2    A.  Yes.

3    Q.  Did you find any references to VJ in any Tor chats?

4    A.  I did, yes.

5         MR. HOWARD:  Ms. Rosen, can you please publish

6    Government Exhibit 226G, which has already been admitted into

7    evidence.

8         THE COURT:  Just for your planning purposes, we'll end

9    in about three minutes for lunch.

10        MR. HOWARD:  Maybe it makes sense to do this exhibit

11   and then take the break.

12        THE COURT:  That's fine.

13   Q.  Mr. Kiernan, was this another Tor -- this is an excerpt of

14   another Tor chat log recovered from the defendant's computer?

15   A.  Yes, it is.

16   Q.  And up here it says "page 312 of 1,096."  Does that reflect

17   that there were 1,096 pages in the full chat log?

18   A.  Yes, it does.

19   Q.  And this takes place on January 15, 2012, correct?

20   A.  Correct.

21   Q.  "VJ."  Emoticon or some sort of symbols.  "Kicks self for

22   assuming.  Should have asked for the code long ago.  Just

23   didn't see the need.  Mark it down as a learning experience for

24   me as well.

25        Myself:  This whole thing has been on a wing and a

1    prayer.  Besides basic php and html I've learned everything on

2    the fly.

3            Vj:  Well, I'm glad I didn't go for that nap, this was

4    much more rewarding.

5            Vj:  And you've done a damn fine job but you're

6    becoming more of a target for hackers and better ones as time

7    goes by.

8            Myself:  I hadn't opened a Linux terminal until I left

9    freedom hosting a month after the site launched.

10           Vj:  Just thank FSM that they didn't start on you

11   earlier.

12           Myself:  FSM?

13           Vj:  #Diety.

14           Myself:  Ahh.

15           Vj: Flying Spag.

16           Myself:  I've been incredibly blessed.

17           Vj:  I have a lot of admiration for the big brain on

18   you.

19           I don't know two other people that could have done it.

20           Myself:  I was a hairs breath from going to jail

21   before the site even launched for growing shrooms."

22   Q.  Mr. Kiernan, all of these chat logs that we have reviewed,

23   whose computer were they recovered from?

24   A.  The defendant's.

25           THE COURT:  Ladies and gentlemen, let's take our lunch

F1LGULB4                          Kiernan – direct

1    break now.  We'll resume at 2:00.  I want to remind you not to

2    talk to anybody, including each other about anything having to

3    do with this case.  Thank you.

4                (Jury excused)

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             (In open court; jury not present)

2             THE COURT:  Mr. Kiernan, you can take a break.  We're

3       going to pick up again at 2:00.

4             THE WITNESS:  Yes.

5             (Witness temporarily excused)

6             THE COURT:  Let's all be seated.  I just had two

7       things:  One, Mr. Dratel.  You had asked for the hard drive to

8       be received subject to connection.  I thought that I heard

9       enough for it to be received, but if you perceive by who is

10      going to testify, if anything occurs that undoes that, then

11      obviously we'll take that into consideration, but it did appear

12      to me there was enough to get it authenticated.

13            MR. DRATEL:  That's the reason why it's sort of the

14      cart before the horse to a certain extent.

15            THE COURT:  I understand.

16            MR. TURNER:  We'll complete the chain with the next

17      witness.

18            THE COURT:  Thank you.

19            Then there were the series of exhibits with the 22s

20      that we had, all of which were subject to various objections,

21      including some that weren't noted on the pretrial order because

22      they came in afterwards.  I just wanted to make it clear the

23      nature of the Court's rulings.  The objections were, among

24      others, the *Vayner* objection.  The Court does believe that

25      given the testimony of this witness, that there is sufficient

1    grounds for authenticity.

2              In terms of it not being part of the charged conduct,

3    that's really a relevance objection, and the Court finds that

4    these are directly relevant to a number of issues in the case.

5              In terms of 403, the Court does not find that these

6    are substantially outweighed by the danger of unfair prejudice

7    or misleading the jury or wasting time; indeed, they are

8    evidence which is necessarily to the government's case in terms

9    of the theories that they have posited and not unduly

10   prejudicial, so the Court did allow those, and all of those

11   really fall under the same rationale.

12             Was there anything that you folks wanted to raise

13   before we took our own break?

14             MR. TURNER:  No, your Honor.

15             MR. DRATEL:  No, your Honor.

16             THE COURT:  Thank you.  I do have one matter at 1:00.

17   Oh, I don't.  It's been taken off-calendar.  I don't have a

18   matter at 1:00, so you folks are welcome to keep all of your

19   things there as you see fit.

20             Thank you.  We'll return at 2:00.

21             (Continued on next page)

22

23

24

25

                         AFTERNOON SESSION

1                              2:10 p.m.

2            (In open court; jury present)

3            THE COURT:  Let us all be seated.

4            Mr. Howard, you may proceed, sir.

5            MR. HOWARD:  Thank you, your Honor.

6    THOMAS KIERNAN, resumed.

7    DIRECT EXAMINATION CONTINUED

8    BY MR. HOWARD:

9    Q.  Good afternoon, Mr. Kiernan.

10   A.  Good afternoon.

11   Q.  So in the morning, you testified that it took approximately

12   three hours to do the triage of the laptop, right?

13   A.  That's correct.

14   Q.  Again, what were you trying to do with the laptop triage?

15   A.  Preserve evidence and not let the laptop get into a state

16   of encryption.

17   Q.  And following the triage, you provided the laptop to

18   Special Agent Beeson?

19   A.  I did.

20   Q.  And approximately how long were you performing the triage

21   in the library itself?

22   A.  In the library?  About an hour or so.

23   Q.  And what happened after you were finished in the library?

24   A.  We took the laptop and I carried it and transported it to

F1LGULB4                          Kiernan - direct

1    the defendant's residence.

2    Q.  And how did you transport it there?

3    A.  We had a van or we had a car outside.

4    Q.  Did you drive?

5    A.  I did not drive, no.

6    Q.  And what, if anything, did you do while you were in the car

7    with the laptop?

8    A.  Just ensured that the laptop stood on.  I didn't want the

9    laptop to turn off during that time.

10   Q.  And what did you do after you arrived in the defendant's

11   residence?

12   A.  I continued triage, kept the laptop running and then waited

13   for Special Agent Beeson to show up to give it to him.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1            MR. HOWARD:  Now, Ms. Rosen, could we please publish

2     Government Exhibit 222G again for just a quick moment.

3            Sorry, I meant 226G.  Pardon me.

4     Q.  So, Mr. Kiernan, this was the excerpt that we read before

5     we took the break for lunch, correct?

6     A.  Correct.

7     Q.  Right here at the top it indicates it is page 312 out of

8     1096, correct?

9     A.  It does, yes.

10    Q.  Were there other chat excerpts that were taken from this

11    1096 page file involving VJ?

12    A.  Yes, there was.

13            MR. HOWARD:  So at this point, Ms. Rosen, if you could

14    please publish Government Exhibit 226F, please.

15    Q.  Mr. Kiernan, this is page 964 of the 1096-page chat log,

16    right?

17    A.  Correct.

18    Q.  This conversation took place on June 1, 2012.

19    A.  Yes.

20    Q.  "Vj: Also, Variety Jones is dead, poor fella. No more seed

21    biz for him.

22            "Myself: :(

23            "Myself: you goin by cimon now?

24            "Cimon: I was keeping that going as a way to get btc

25    legally in the UK, but I'm leaving the UK, and the legality

1   elsewhere means it's best I shut it down.

2                "Cimon: I have no idea what i'm going by now, dammit!

3                "Myself: well I just changed you from vj to cimon on

4   torchat.

5                "Myself: so yer cimon.

6                "Cimon: there ya go.

7                "Cimon: and that's how changes are made.

8                "Cimon: cimon it is."

9                Now, Mr. Kiernan -- actually, Ms. Rosen could you put

10  that back up for a second.

11               So, Mr. Kiernan, up here at the top, we have the name

12  "VJ," correct?

13  A.  Correct.

14  Q.  And who names the other side of a Tor chat that's logged on

15  a one zone computer?

16  A.  The user of that computer.

17  Q.  And so down here at 5:53 p.m., you see "Simone"?

18  A.  Correct.

19  Q.  Is that a different user than VJ?

20  A.  A different username.

21  Q.  Right, but is it the same person in this chat?

22  A.  Yes.

23  Q.  What appears to have happened?

24  A.  The associated name given by the user of the computer, the

25  defendant, changed it to Cimon.

F11dulb5                          Kiernan - direct

1          MR. HOWARD:  Ms. Rosen, could you please publish

2     Government Exhibit 227B, which has already been admitted into

3     evidence, and zoom in, please.

4     Q.  This is on August 31, 2012, correct?

5     A.  Correct.

6     Q.  "Cimon: Hey, could you scratch together a little org chart

7     for me, so I know who's supposed to be doing what, on the

8     forums and support?

9               "Myself: sure

10              "Myself: support

11              "Me

12              "Indica|Sativa

13              "SquidShepherd

14              "Forum

15              "Admins

16              "Me

17              "Indica|Sativa

18              "Mods

19              "SquidShepherd

20              "Limetless

21              "Nomad bloodbath

22              "Guru

23              "Myself: Squid talks to indi, indi talks to me. very

24     occasionally Squid and I will talk."

25              Ms. Rosen, could you please publish Government Exhibit

1    227A, which has already been admitted into evidence.

2              And this chat occurred on October 24, 2012, correct?

3    A.  Correct.

4    Q.  "Myself: DA and squid both went awol

5              "Myself: squid said his comp died and is waiting on a

6    replacement, but that was about 5 days ago now

7              "Myself: DA is gone for good

8              "Cimon:" expletive, "I haven't seen DA onlne since we

9    talked, what happened with him?

10             Myself: got a new guy on who seems good and am looking

11   for another

12             "Myself: he slowly flaked out. the last I heard he had

13   a family emergency to rush off to and didn't know when he'd be

14   back

15             "Myself: right now I'm spending about an hour a day on

16   resolutions and inigo (new guy) is chipping away at the

17   messages

18             "Myself: I tried recruiting from bitcointalk.org

19             "Myself: but I may just dip into the local community

20             "Cimon: dude, really?

21             "Myself: well?

22             "Myself: working for a criminal enterprise isn't

23   exactly attractive

24             "Myself: to everyone

25             "Cimon: What were you paying squid?

1                   "Myself: $900/week

2                   "Cimon: What are the major issues CSRs deal with now?

3                   "Myself: the toughest stuff is keeping up with the

4        vendors and knowing when to demote them

5                   "Cimon: not including resolutions

6                   "Myself: that ties into the resolutions

7                   "Myself: besides that, answering messages is pretty

8        trivial, just time-consuming

9                   "Cimon: how many vendors get demoted, and how many

10       permanently?

11                  "Myself: messages, resolution, vendor quality control

12                  "Myself: 1-3 per week

13                  "Cimon: what are the issues, just non-delivery?

14                  "Myself: it varies

15                  "Myself: just a sec

16                  "Myself: faking feedback, going around escrow, loan

17       scamming, exchange scamming, fake product..."

18              MR. HOWARD:  Ms. Rosen, could you please publish

19       Government Exhibit 240D, which is already in evidence.

20       Q.  Mr. Kiernan, what was the name of this file as it was saved

21       on the defendant's computer?

22       A.  240D?  Excuse me.  "Daily.odd."

23       Q.  Where was it located on the defendant's computer?

24       A.  This is the "home/frosty/documents/journal/2012/Q1/January/

25       week one" folder.

F11dulb5                           Kiernan - direct

1    Q.  And what was the date that this file was last changed,

2    according to the metadata?

3    A.  1/1/2012.

4    Q.  "January 1st, 2012

5          "Well, I'm choosing to write a journal for 2012. I

6    imagine that some day I may have a story written about my life,

7    and it would be good to have a detailed account of it. I did

8    some work in the morning, can't remember now exactly what it

9    was, but it wasn't long before I was responding to text

10   messages and making plans to hang out on the beach. It was a

11   holiday for everyone, so the beach was as packed as I've ever

12   seen it, a teeming mass of humanity, helicopters flying

13   overhead, waves crashing, a real spectacle. I was offered a

14   ticket to a warehouse party by Nicole, but just couldn't bring

15   myself to accept. I just was not in the partying mood. George

16   also invited me to join him camping for 2-3 nights. I wanted to

17   go, but the swell is low and it's just too much time away from

18   Silk Road, and there is so much to do before the rents get

19   here, and before I leave for Thailand. I need to get

20   DigitalAlch set up handling the resolutions, and it just seems

21   like Variety Jones gives my broad sweeping tasks on a daily

22   basis. Emma, Jessica, Cally, Kim, Tim and a couple others,

23   Mike, were all on the beach with me. Playing paddle ball and

24   soaking up the sun. I've been thinking a bunch about what is

25   next for me. I like my little life here in Bondi, but what if I

1    love Thailand, or want to go on even further? I don't want to

2    go backwards, and while I could see a lot more in Australia,

3    I'm not even taking the opportunities that are coming up as it

4    is. I need to find a place I can work from cheap and off the

5    beaten path."

6         MR. HOWARD:  Ms. Rosen, could you please publish

7    Government Exhibit 225A, which has already been admitted into

8    evidence.

9    Q.  Mr. Kiernan, this is page 2 of the 15-page chat log, is

10   that correct?

11   A.  Correct.

12   Q.  "Myself: go here

13        "Myself: http://silkroadvb5piz3r.onion/support

14        "Myself: let me know when you are there

15        "Scout: just waiting for tor … okay, i'm there and

16   it's saying 'no access'

17        "Myself: you are signed in with scout?

18        "Scout: yes

19        "Myself: do you know how to figure out your account

20   id?

21        "Scout: i did many months ago. lol. remind me?

22        "Scout: oh i found it

23        "Myself: what is it?

24        "Scout: 77594f7023

25        "Myself: try again

F1ldulb5                          Kiernan - direct

1            "Myself: refresh

2            "Scout: okay, it worked - i'm in.

3            "Myself: cool

4            "Myself: it's kind of a mess

5            "Myself: but once you learn the tools, it's not so

6     bad."

7            MR. HOWARD:  Ms. Rosen, could you please publish that

8     again, and can you zoom in on the first three lines of the chat

9     and put it at the top of the screen, please.

10           And you could please publish 201K on the bottom of the

11    screen, please, and zoom in on the URL bar.

12    Q.  So, Mr. Kiernan, here you see during the chat "myself" says

13    "http" and then an address.  Do you recognize that address?

14    A.  Yes.

15    Q.  And is that the same address that you saw in -- on the Tor

16    browser that was running on the defendant's computer?

17    A.  It is, yes.

18           MR. HOWARD:  Ms. Rosen, could you please publish

19    Government Exhibit 225B, which has already been admitted into

20    evidence.

21    Q.  Mr. Kiernan, this chat is on January 26, 2013, correct?

22    A.  Correct.

23    Q.  "Myself: so, im down a set of hands as of 12 hours ago

24           "Myself: now would be a great time for you to come on

25    board if you are still interested

F1ldulb5                          Kiernan - direct

1              "Myself: or do you still have reservations?

2              "Scout: the only reservation i have is about the

3    safety of being part of the staff. safety from legal issues,

4    that is. having a hell of a time getting past that worry.

5              "Myself: the way i got over it is by looking at the

6    risk/reward

7              "Myself: if you look closely at the risk part of it

8              "Myself: you can break it down into 2 parts

9              "Myself: chances of getting caught, and what will

10   happen if you get caught

11             "Scout: right – and i have no idea what the answer is

12   to either of those hypotheticals

13             Myself: I'm not 100% about the what will happen part.

14   It's not like there have been cases in the past like ours. But

15   when you look at the chance of getting caught part, it's

16   incredibly small

17             "Myself: put yourself in the shoes of a prosecutor

18   trying to build a case against you

19             "Myself: what evidence could they pin on you?

20             "Myself: there is nothing on your laptop for them to

21   use, if you obscure your bitcoins propperly, there is no way

22   for them to trace them back to me. Realistically, the only way

23   for them to prove anything would be for them to watch you log

24   in and do your work.

25             "Scout: right. which, as i understand it, they could.

1          "Myself: this is just a realization I've come to after

2     doing this for almost 2 years

3          "Myself: sure, someone could stand behind you without

4     you realizing it

5          "Myself: we are definiely on the cutting edge, the

6     fringe. I'm not sure how else to put it, but the biggest con

7     about this work is not the risk of going to jail or having your

8     life disrupted

9          "Myself: it's getting used to and living with that

10    possibility no matter how remote

11         "Myself: and keeping your work a secret."

12         Ms. Rosen, could you please publish Government Exhibit

13    241.

14    Q.  Mr. Kiernan, what is the name of this file as stated on the

15    defendant's computer?

16    A.  "Log.text."

17         MR. HOWARD:  Ms. Rosen, could you just add the

18    highlights to the portions that we will read for now.

19    Q.  And, Mr. Kiernan, the first entry on the top of the first

20    page is labeled March 20, 2013, correct?

21    A.  Correct, yes.

22    Q.  "Someone posing as me managed to con 38 vendors out of 2

23    btc each with a fake message about a new silk road posted about

24    cartel formation and not mitigating vendor roundtable leaks.

25    Worked on database error handling in CI."

1              "4/9/2013:  Ssbd considering joining my staff.

2              "04/10/2013:  Some vendors using the hedge in a

3      falling market to profit off of me by buying from themselves.

4      turned of access log pruning so I can investigate later.

5      Market crashed today.  Being blackmailed again.  Someone says

6      they have my ID, but hasn't proven it."

7              "4/11/2013:  Set up tor relays.  Asked scout to go

8      through all images on site looking for quickbuy scam remnants.

9      Cimon told me of a possible ddos attack through tor and how to

10     mitigate against it.  Guy blackmailing saying he has my id is

11     bogus."

12             "4/13/2013:  Inigo is in the hospital, so I covered

13     his shift today. Zeroed everything and made changes to the site

14     in about 5 hours."

15             "4/14/2013:  Did support. inigo returned.  Started

16     rewritting orders->buyer_cancel, been getting error reports

17     about it."

18             "5/1/2013:  Symm starts working support today. Scout

19     takes over forum support."

20             "5/3/2013:  Helping smed fight off attacker. site is

21     mostly down. I'm sick.  Leaked IP of webserver to public and

22     had to redeploy/shred.  Promoted gramgreen to mod, now named

23     libertas."

24             MR. HOWARD:  And now, Ms. Rosen, could you actually

25     just stay on the next-to-last page of this exhibit and just

F1ldulb5                        Kiernan - direct

1  focus on the very, very bottom, the last entry.

2  Q.  What is the date of the last entry in this log file?

3  A.  9/30/2013.

4  Q.  What does the metadata reflect about the date that this

5  file was last changed?

6  A.  That's not on my copy I have here.

7       MR. HOWARD:  Do you want to go to the next page.  Can

8  we zoom in on the bottom left-hand window here.

9  Q.  And what does the metadata, Mr. Kiernan, indicate about the

10 date that this file was last changed?

11 A.  10/1/2013.

12 Q.  Now, Mr. Kiernan, could you flip in your binder to what's

13 been marked for identification purposes as Government Exhibit

14 242.

15 A.  Yes.

16 Q.  What is this exhibit?

17 A.  A file that I exported from the defendant's laptop.

18 Q.  What was the name of the file?

19 A.  "Weekly_report1-4-13.txt."

20 Q.  Where was the file located on the computer?

21 A.  This is from the home/frosty/backup/reference/reports

22 folder.

23 Q.  On what date was -- according to the metadata, on what date

24 was this file saved to the defendant's hard drive?

25 A.  1/5/2013.

F1ldulb5                         Kiernan - direct

1              MR. HOWARD:  The government offers Government Exhibit

2       242 into evidence.

3              MR. DRATEL:  The same objections, your Honor.

4              THE COURT:  All right.  Those objections are

5       overruled.  GX242 is received.

6              (Government's Exhibit 242 received in evidence)

7              MR. HOWARD:  Ms. Rosen, could you just please add the

8       highlights.  Just go to the very top, including the title.

9       Q.  "Weekly Report 1-4-2013.

10             "I. Important

11             "A.) Still getting dozens of users who have fallen for

12      the fake SR phishing sites."

13             Zoom out.  At the bottom:

14             "Demoted: NorCal420HookUp

15             "Reason: blatant ooe deals, he even had a listing for

16      ooe deals so he could get feedback."

17             Would you go to the last page of the metadata, and

18      could we focus in on the left bottom corner.

19             Mr. Kiernan, what is indicated about the date -- where

20      does it indicate when this file was saved from the defendant's

21      computer?

22      A.  1/5/2013.

23      Q.  Where on the file is it?  Can you just point with your

24      laser pointer?

25      A.  Somebody took my laser pointer.  The "Date Created" entry,

1    right there.

2    Q.   And does the file indicate when the file was last edited?

3    A.   Yes.

4    Q.   And what date was that?

5    A.   1/5/2013.

6    Q.   Now, Mr. Kiernan, was this the only report of this format

7    that you found on the defendant's computer, or did you find

8    other similar ones?

9    A.   I found similar ones.

10   Q.   And where were they located on the defendant's computer?

11   A.   In that same directory.

12          MR. HOWARD:   Ms. Rosen, can we zoom out on this file

13   and look at the top right-hand corner.

14   Q.   Is this the folder in which you found these similar

15   reports?

16   A.   Yes.

17   Q.   Do the other reports similarly have dates in the title?

18   A.   They do, yes.

19   Q.   Did the dates correspond to the dates within the documents?

20   A.   They did, yes.

21   Q.   And are the dates modified generally consistent with the

22   dates in the titles and in the documents?

23   A.   They are, yes.

24          MR. HOWARD:   If you could zoom a little further,

25   Ms. Rosen, just the ones that are labeled "weekly report," from

F11dulb5                    Kiernan - direct

1     here to here.

2     Q.  So we have weekly report 11-3-12, 11-12-12.  We have

3     1-25-13 at the bottom.

4              If you would scroll down.

5              (Pause)

6              We have some dated in February and March of 2013,

7     isn't that correct, Mr. Kiernan?

8     A.  That is correct, yes.

9     Q.  In your review of defendant's laptop, did you find any

10    copies of individuals belonging -- sorry, identification

11    documents belonging to other individuals?

12    A.  I did, yes.

13    Q.  Could you please flip in your binder to what's been marked

14    as government -- sorry, actually, Ms. Rosen, could you publish

15    Government Exhibit 216, which has already been admitted into

16    evidence.

17             Do you recognize what this depicts, Mr. Kiernan?

18    A.  I do.  It's the directories where I found those files.

19    Q.  And what is -- Ms. Rosen, could we just zoom in on the path

20    name down here.

21             What is the name of the folder that you found these

22    ID's in?

23    A.  Sure.  The home/frosty/backup/reference directory.

24             MR. HOWARD:  Could we zoom back out, Ms. Rosen, and

25    zoom in on the upper right-hand corner of the screen.

1   Q.  What does this depict, Mr. Kiernan?

2   A.  This is just a file listing of everything that was in that

3   directory, the directory I just spoke of.

4   Q.  Here we have files that are labeled inigo.jpg.gpg,

5   symm.tar.gz.gpg, libertas.jpg.gpg, cirrus.jpg.gpg and then

6   another file pics.tar.gz.gpg.  Are you familiar with files with

7   the extension ."gpg"?

8   A.  I am, yes.

9   Q.  What kind of files are those?

10  A.  Those are encrypted files.

11  Q.  Were you able to access the contents of those encrypted

12  files?

13  A.  I was, yes.

14  Q.  How were you able to do that?

15  A.  I used PGP to unencrypt them.  I found a password on the

16  defendant's laptop that I tried to put in and was able to

17  recover those files.

18  Q.  So, Mr. Kiernan, would you please flip to what has been

19  marked as Government Exhibit 256 in your binder, please.

20  A.  Sure.  OK.

21  Q.   Do you recognize this exhibit?

22  A.  I do.

23  Q.  What is it?

24  A.  It's the unencrypted file that I found in that directory

25  structure.

1    Q.  This is after you used the password you found on the

2    defendant's computer to successfully decrypt the files?

3    A.  Yes, this was after.

4    Q.  What is the file name?

5    A.  This was "inigo.jpg.gpg."

6    Q.  And this file was located in the directory that we were

7    just looking at?

8    A.  In the IDs directry, yes.

9           MR. HOWARD:  The government offers Government Exhibit

10   256.

11          MR. DRATEL:  No objection.

12          THE COURT:  Received.

13          (Government's Exhibit 256 received in evidence)

14   BY MR. HOWARD:

15   Q.  Here you can see it is a Virginia driver's license with the

16   name Andrew Michael Jones, with an address and other personal

17   identifiers, correct?

18   A.  That is correct, yes.

19          MR. HOWARD:  Ms. Rosen, could you please -- I'm sorry,

20   what was the file name again?  What was the name of the file?

21   A.  Inigo.jpg.gpg.

22   Q.  Now, Mr. Kiernan, in reviewing the Tor chats on the

23   defendant's computer, did you find any chat logs involving

24   communications with anyone identified as Inigo?

25   A.  I did, yes.

1          MR. HOWARD:  Ms. Rosen, could you please publish

2     Government Exhibit 229A, which has already been admitted into

3     evidence.

4     Q.  And this is dated October 17, 2012, correct?

5     A.  That is correct, yes.

6     Q.  "PatHenry: I got that DL scanned for you

7               "Myself: hi

8               "Myself: send it over

9               "PatHenry: let me know if you got it

10              "Myself: handsome devil

11              "Myself: is your address the same?

12              "PatHenry: :)

13              "PatHenry: why thank you

14              "PatHenry: yes for now

15              "PatHenry: I will be moving in the next few months to

16    northern virginia

17              "PatHenry: where im originally from

18              "Myself: ok

19              "Myself: I'm just getting your permissions set up so

20    you can access the support panel

21              "PatHenry: cool. I log into the main site for that

22    correct?

23              "Myself: how was doing your assignment?

24              "Myself: yes, login as inigo and I'll give you the url

25    in a sec

1              "PatHenry: squid gave me the support link, just let me

2       know when I have access

3              "Myself: is the page loading for you?

4              "Myself: a bunch of boxes with forms in them

5              "PatHenry: it just said no access but I havent tried

6       again since giving you my user id

7              "Myself: try again

8              "PatHenry: trying now

9              "PatHenry: okay im in

10             "PatHenry: thanks

11             "Myself: cool, I'll let squid take over. don't touch

12      anything you haven't been fully trained on, and take lots of

13      notes, don't trust your memory!

14             "PatHenry: yes sir

15             "PatHenry: notebook handy.

16             "PatHenry: thanks again sir :)

17             "Myself: you bet :)"

18             Mr. Kiernan, the next part of this file starts on

19      October 17, 2012, correct?

20      A.  Yes.

21      Q.  And in this excerpt we have the user "myself" and the user

22      "inigo," correct?

23      A.  Correct.

24      Q.  Were the prior excerpts taken from the same file?

25      A.  Yes.

1   Q.  And the prior excerpts involve PatHenry and myself,

2   correct?

3   A.  That's correct.

4   Q.  So what does this indicate that this name is now Inigo?

5   A.  Just that that buddy list that we talked about before, the

6   contact list had been changed by the defendant.

7   Q.  And this chat box, the next excerpt is from October 17,

8   2012, correct?

9   A.  Correct, yes.

10  Q.  "Myself:  How's your first day going?

11          "Inigo:  Tor has been giving me such a headache."

12          The next excerpt is on October 21, 2012, correct?

13  A.  Yes.

14  Q.  "Myself: CSR = customer support rep

15          "Inigo: how many of us are there?

16          "Myself: right now just you and squid.

17          MR. HOWARD:  Ms. Rosen, could you please publish

18  Government Exhibit 229C, which has already been admitted into

19  evidence.

20  Q.  Mr. Kiernan, is this another chat with Inigo from the same

21  log file?

22  A.  It is, yes.

23  Q.  And is this dated November 5, 2012?

24  A.  Yes.

25  Q.  "Inigo:  So uhh we have a vendor selling cyanide.

F11dulb5                          Kiernan - direct

1                "myself:  Link please

2                "inigo:  Getting it now."

3                Then Inigo sends a link:

4      "http://silkroadvb5piz3r.onion," and then a lot more text.

5                "myself: was it reported, or did you stumble on it?

6                "inigo: it was reported

7                "inigo: not sure where we stand on this, hes not

8      listing it as a poison, but its only the most well known

9      assasination and suicide poison out there

10               "inigo: lol

11               "inigo: at the same time, fentanyl has been used to

12     assasinate people too, but we allow that to be sold for

13     recreational use

14               "inigo: but this isnt a drug

15               "inigo: its tricky

16               "myself: cyanide has a bad reputation

17               "myself: as you say

18               "myself: the vendor lists a bunch of legit uses

19               "myself: and there are plenty of poisions you can get

20     off the shelf

21               "inigo: very true

22               "myself: some of the drugs we allow are poisons in

23     certain dosages

24               "inigo: so we're going to allow this?

25               "myself: it's bad for image/pr

F1ldulb5                    Kiernan - direct

1           "myself: just brainstorming with ya

2           "inigo: ah ok

3           "inigo: yeah it deff is

4           "inigo: i almost want to order some haha :X

5           "inigo: just to keep on hand

6           "myself: I think we'll allow it

7           "inigo: ok

8           "inigo: i kind of like the idea of allowing all kinds

9     of industrial chemicals, whatever they may be used for

10          "myself: it's a substance

11          "myself: and we want to err on the side of not

12    restricting things

13          "inigo: absolutely

14          "inigo: this is the black market after all :)

15          "myself: it is, and we are bringing order and civility

16    to it."

17          Ms. Rosen, could you please publish Government Exhibit

18    223, which has already been admitted into evidence.

19          Mr. Kiernan, this is from a different log file,

20    correct, than the last one we read?

21    A.  Yes, it is.  Yes.

22    Q.  And this chat occurred on October 25, 2012?

23    A.  Yes.

24    Q.  "Cp: do you need to see my id?

25          "Myself: yes

1              "Cp: or can i just tell you my name? like i did a few

2    months ago

3              "Cp: yea, I can do that, ill have to get brave enough

4    to do so, lol

5              "Myself: I'll need your id with current address. It

6    will be stored encrypted

7              "Myself: and I will probably never need to decrypt

8              "Cp: so, I guess ill just have to trust you on that

9              "Cp: thats a big trust

10             "Myself:  Yea, that's true."

11             Mr. Kiernan, the next section starts on October 25,

12   2012, correct?

13   A.  It does, yes.

14   Q.  Up here, the entire chat log that this was taken from was

15   259 pages, correct?

16   A.  Correct.

17   Q.  "Myself: you'll need to keep notes all week and then write

18   a report

19             "Myself: at the end of each week

20             "Myself: so that's the only thing you'll keep local

21             "Myself: that's a bit incriminating

22             "Cp: okay, I have a true cryptd hd"

23             Now, Mr. Kiernan, in your role as a computer

24   scientist, have you encountered something called TrueCrypt?

25   A.  I have, yes.

F11dulb5                          Kiernan - direct

1   Q.   What is TrueCrypt?

2   A.   TrueCrypt is a piece  of software that enables people to

3   encrypt or basically take your files, put them into a safe type

4   of deal, and so other people can't access them, basically.

5   Q.   Now, Mr. Kiernan, the next portion of the chat is on

6   October 26, 2012, correct?

7   A.   Yes.

8   Q.   "Cp: what will be my main responsibilities?

9            "Myself: at first, answering support messages.

10           "Myself:  We get 100 - 200 per day

11           "cp: are those just from vendors? or are they from

12   buyers as well?

13           "Myself: both

14           "cp: will I answer directly to you? or is there

15   someone in between?

16           "myself: you will talk to me and inigo

17           "myself: did you come up with a new name for yourself?

18           "cp: havent really thought about that yet

19           "myself: I'll be introducing you to inigo shortly

20           "cp: okay, any names that you like?

21           "myself: it's up to you

22           "cp: ill think of one shortly

23           "myself: how about pokerface

24           "cp: lol

25           "cp: thats a great one

F11dulb5                          Kiernan - direct

1           "myself: or holdem

2           "cp: i like holdem too

3           "cp: or fullhouse

4           "cp: fluh

5           "cp: flush

6           "myself: flush?

7           "cp: its a poker hand

8           "myself: yea, is that what you'd like to be called?

9           "cp: full house, flush, straight

10          "cp: I like flush

11          "cp: how is my identity protected

12          "cp: thinking of worst case scenario --

13          "cp: of course

14          "myself: well, the only record I'll have of it is your

15   scanned photo id, which I will encrypt and store on my laptop

16   where I use whole disk encryption on a hidden OS volume

17          "cp: okay, I think i already have my driverslicense

18   here on my computer

19          "cp: i had to scan it a year ago

20          "cp: so, that should be easy

21          "myself: is the address the same? I'm going to send

22   you a letter to confirm

23          "cp: yes it is

24          "cp: Also, are you the only person that knows all the

25   employees?

F1ldulb5                         Kiernan - direct

1              "myself:  Yes, no one knows anyone else

2              "cp:  Good."

3          Mr. Kiernan, the next part of the chat or the next

4    excerpt starts on November 4, 2012, correct?

5    A.  Correct, it does.

6    Q.  "Flush: was my salary of 1200 that you paid me last friday

7    was that for this week?

8              "Myself: your pay is $900/wk

9              "Flush: 900 i mean

10             "Myself: friday's pay is for the preceeding week."

11         Mr. Kiernan, the next part starts at November 7, 2012

12   at 11:44 a.m., correct?

13   A.  Correct.

14   Q.  "flush: i had a few people letting me know that someone is

15   selling cyanide

16             "Myself: yea, we're allowing it

17             "Flush: do we allow that?

18             "Flush: okay

19             "Myself: what do you think

20             "Myself: ?

21             "Flush: cyanide can be used for other purposes

22             "Flush: than nafarious ones

23             "Flush: its actually a blood pressure medication

24             "Flush: but its very dangeous

25             "Flush: and there are other purposes for it as well...

1   its very popular for poisoning."

2           Mr. Kiernan, the next excerpt is from November 8,

3   2012, correct?

4   A.  Correct.

5   Q.  That is from the same chat log?

6   A.  The same log, yes.

7   Q.  "Myself: if you find yourself idle while I'm gone, I would

8   like you to do some recon on the competition. see what's out

9   there in terms of alternatives to Silk Road. what are they

10  doing better than us. how big are they. read up on BMRs forum

11  and site and see what they are up to for me

12          "Flush: thats funny, I had planned on looking into

13  BMR."

14          Mr. Kiernan, the next chat is from page 81 of 259 of

15  the same chat log?

16  A.  The same log, yes.

17  Q.  November 22, 2012?

18  A.  Yes.

19  Q.  "Flush: got a ? for you.. How much are we growing each

20  month?  Just out of curiosity..

21          "Myself: hmm

22          "Myself: lemme pull up the latest

23          "Myself: looks like around 15%

24          "Flush: wow, thats huge

25          "Myself: that # is confidential fyi

1              "Flush: and its the darknet

2              "Flush: understood

3              "Myself: dude, we're selling drugs

4              "Myself: there is nothing to compare this to

5              "Myself: or course this last month the data is quite

6     skewed.  There is a massive tank in sales on the chart. should

7     snap back though."

8              Mr. Kiernan, the next excerpt is on December 11, 2012,

9     correct?

10    A.   Correct.

11    Q.   "Myself: where I think we are lacking is in quality

12    control.  We don't have the tools built and I am sure there we

13    can improve there.  I'm talking about making sure vendors are

14    complying with the rules"

15             Mr. Kiernan, the next section is from December 22,

16    2012, correct?

17    A.   That is correct.

18    Q.   "flush: selling stolen credit cards is vioalation right?

19             "Myself: yes

20             "Flush: k."

21             "flush: also accepting moneypak instead of bitcoins

22             "flush: right?

23             "myself: yes, that would be going around escrow.

24             The next section is five days later, on December 27,

25    2012, correct?

1   A.  Yes.

2   Q.  "myself: you're in charge of vendor support for now, and

3   inigo is in charge of customer support.  Also, I want you to go

4   back through all of the vendors you demoted and give them a

5   second chance. Send them a message like this:

6           "We'd like to give you a second chance to get your

7   account back in good standing. This will be your last warning.

8   If you disregard the Seller's Guide again, your vending

9   priviledges will be lost permanently. To bring your account

10  back into good standing, you must pay for the commissions you

11  should have paid on all of your out of escrow transactions to

12  date. It is your responsibility to determine how much this

13  comes to. If you low-ball it, we will investigate and

14  permanently demote your account. If anything you should include

15  a little extra as an apology and show of good will. Send this

16  money to 'SR Quality Control' via your account page. Message me

17  when this is done."

18          Mr. Kiernan, this next excerpt is from December 31,

19  2012, correct?

20  A.  Yes, it is.

21  Q.  That's page 190 of the 259-page Tor chat log, correct?

22  A.  Correct.

23  Q.  "Myself: one more thing.  We have investigated your account

24  have found that you have done many out of escrow deals, meaning

25  you take the coind directly to by pass SR fees. This is in

1   violation of the Seller's Guide and your vendor agreement. Your

2   account has been suspended.

3               "We'd like to give you a second chance to get your

4   account back in good standing. This will be your last warning.

5   If you disregard the Seller's Guide again, your vending

6   priviledges will be lost permanently.

7               "Flush: yea, thats a good one, ill replace the one

8   that i have with this one."

9               Mr. Kiernan, can you please flip to what has been

10  premarked as Government Exhibit 255 in your binder.

11              (Pause)

12              Do you recognize this exhibit?

13  A.  Yes, I do.

14  Q.  And what is it?

15  A.  A file pulled off of the defendant's laptop.

16  Q.  What is the file name?

17  A.  To do underscore weekly.

18  Q.  And what does the metadata reflect about the date that this

19  file was saved to the defendant's computer?

20  A.  10/1/2013.

21              MR. HOWARD:  Would you please publish -- I'm sorry.

22  The government offers Government Exhibit 255.

23              MR. DRATEL:  The same objection as previously.

24              THE COURT:  All right.  The objection is overruled.

25  GX255 is received.

F11dulb5                          Kiernan - direct

1         (Government's Exhibit 255 received in evidence)

2         MR. HOWARD:  Ms. Rosen, could you please zoom in on

3    the very top section here.

4         You see here:  "Pay employees.

5         "inigo – $1500

6         "libertas – $1500

7         "batman73 – $1000 // ssbd

8         "cirrus – $1000

9         "smedley – $2500

10        "spock8642 – $500 // drx."

11        Would you zoom out, Ms. Rosen.

12        Ms. Rosen, could you please publish Government Exhibit

13   229E, which has already been admitted into evidence.

14   Q.  Mr. Kiernan, is this a chat log excerpt dated October 19,

15   2012?

16   A.  It is, yes.

17   Q.  "Inigo: another question. do you recommend that i wash my

18   btc from you through bitcoin fog? or are they already mixed

19   sufficiently that I can send them to Mt. Gox to exchange? Also,

20   should I even use Mt. Gox? Or should I be converting them more

21   anonymously? I was thinking maybe one of those prepaid VISA

22   cards that you can load with bitcoin

23        "Myself: I would avoid mtgox if possible. I wouldn't

24   worry about bitcoin fog unless you are trying to move a large

25   amount.

1              "Inigo: ok

2              "Myself: read up on the bitcoin wiki for alternatives

3              "Inigo: k

4              "Myself: you could also hit up the exchangers on sr."

5         Now, Mr. Kiernan, in your review of the defendant's

6    laptop, did you discover any files that appeared to be an

7    expense report?

8    A.  I did, yes.

9    Q.  Mr. Kiernan, could you please flip in your binder to what

10   has been marked for identification purposes as Government

11   Exhibits 250.

12             THE COURT:  Two-five-zero?

13             MR. HOWARD:  Yes.

14   A.  OK.

15   Q.  Do you recognize this exhibit?

16   A.  I do.

17   Q.  What is it?

18   A.  A file extracted from the defendant's laptop.

19   Q.  What was the name of the file?

20   A.  SR underscore accounting.ods.

21   Q.  And what type of file is it?

22   A.  It seems to be -- or it is a spreadsheet.

23             MR. HOWARD:  The government offers Government Exhibit

24   250.

25             MR. DRATEL:  The same objection, your Honor.

1              THE COURT:  All right.  There wasn't an objection on

2       the pretrial order but we'll talk about that at the break.

3              GX250 is received.

4              (Government's Exhibit 250 received in evidence)

5       BY MR. HOWARD:

6       Q.  So, Mr. Kiernan, focusing on the top "sr_accounting.ods" --

7       Ms. Rosen, could you just zoom in on that.  I am having trouble

8       seeing it myself -- what does that refer to?

9       A.  That is the file name.

10      Q.  And who picks the name of the file?

11      A.  Whoever created it.

12      Q.  And what are the columns in this chart?

13      A.  "Date, expense, total expense, revenue, total_revenue,

14      total" and "notes" are the columns.

15      Q.  Mr. Kiernan, now, are the rows in this chart in

16      chronological order?

17      A.  Yes, they are.

18      Q.  And what is the first -- the first row here, what is the

19      first date?

20      A.  7/17/2010.

21      Q.  July 17th, 2010?

22      A.  July 17th, 2010.

23      Q.  How many pages does the spreadsheet go?

24      A.  Eight pages.

25      Q.  And what is the date of the last entry in the spreadsheet?

1   A.  7/3/2013.

2   Q.  And what does the metadata in the file indicate about the

3   last date that this file was changed?

4   A.  7/3/2013.

5          MR. HOWARD:  Ms. Rosen, if you could please go back to

6   the first page of the exhibit and add the highlights.  Would

7   you zoom in on them so we could read off a couple.

8          The first page, July 18, 2010, under the "expense"

9   column, it is $25.  "Notes" column says "lab clothes, carry

10  over from fall 2009."

11         Underneath that there is July 18, 2010.  And in the

12  "Expense" column it is $31.  In the "Notes" column, "Petri

13  dishes, carry over from fall 2009."

14         Further down the page, we have July 26, 2010 and

15  "Expense" of $80, and the "Notes" say "Pressure cooker."

16         Down here, October 15, 2010, $33 expense.  The notes

17  say "humidifier."

18         Ms. Rosen, actually, can you go to the May 2012.

19  Q.  Do you see here -- this one isn't highlighted, but

20  April 28, 2012, $1,150 and the notes say "laptop," correct,

21  Mr. Kiernan?

22  A.  Yes.  It does, yes.

23         MR. HOWARD:  Ms. Rosen, can you move up to the top of

24  the page.

25  Q.  Here we have February 21, 2012, an expense listed of

1    $132 for "server rent," correct, Mr. Kiernan?

2    A.  That's correct.

3    Q.  Mr. Kiernan, was this the only reference to server rent in

4    this chart or are there others?

5    A.  There are others.

6    Q.  Below that there is a date, March 2, 2012.  And in the

7    "Income" column, $65,933, and under "Notes," "commissions,"

8    correct?

9    A.  That's correct.

10   Q.  Is this the only reference to commissions in this chart or

11   are there others?

12   A.  There are others.

13   Q.  Down here we have March 10, 2012.  "Expense" of $3,200, and

14   the "notes" say "payroll," correct?

15   A.  That's correct.

16   Q.  Is this the only reference to payroll in this chart or are

17   there others?

18   A.  There are others.

19         MR. HOWARD:  Ms. Rosen, could we now publish

20   Government Exhibit 226C, please.

21         Actually, there is just one more thing on the last

22   one, pardon me, 250.  On that page with the highlights, please.

23   Can you zoom in on the last highlighted row.

24   Q.  Mr. Kiernan, here it says May 11, 2012, a $4,000 listing in

25   the "Expense" column, and the notes say "420 grand prize,"

 1    correct?

 2    A.   That's correct.

 3    Q.   Now, in your review of the Tor chat logs, did you find any

 4    references around this date to a 420 sale?

 5    A.   I did, yes.

 6           MR. HOWARD:   Ms. Rosen, could you please now publish

 7    Government Exhibit 226C, which has already been admitted into

 8    evidence.

 9    Q.   Now, Mr. Kiernan, this is, again, pages 575 to 576 of a

10    1096 page chat log, correct?

11    A.   That is right, yes.

12    Q.   This conversation starts on March 23, 2012?

13    A.   Yes.

14    Q.   "Myself: here's a rough draft for ya.  Roll up a doobie and

15    put your party hat on because the biggest stoner holiday is

16    just around the corner, and we've got alot of ganja to deliver!

17    We're pulling out all the stops to celebrate 420 this year.

18    Starting at 4:20 pm on 4/20/2012, we'll be giving away 420

19    prizes every 420 seconds! WOO!!! Gift cards, badass consumer

20    electronics, real gangsta shit! And to top it all off, we're

21    sending one lucky buyer on a dream vacation with all the

22    trimmings!!! The buzz around this is going to be HUGE!"

23           Now, Mr. Kiernan, this picks up and this is from the

24    same Tor chat log, correct?

25    A.   The same log, yes.

F1ldulb5                        Kiernan - direct

1    Q.   Pages 576 to 577 of 1096 pages?

2    A.   That is correct.

3    Q.   And it is on March 23, 2012, correct?

4    A.   Yes.

5    Q.   "vj: hmm - I wuz thinkin' dat we'd mebbe not go commission

6    free for this one

7              "Myself: really?

8              "Vj: mebbe 1/2? on 'em?

9              "Vj: I'd like to think that we can bring more to the

10   party than just dropped commissions. We're filling the prize

11   barell already.

12             "Myself: nah, it's just 3 days!

13             "Vj: and a mil in sales

14             "Vj: But ok, this time. But seriously, read the

15   announcement, and you'll see it doesn't lose much if you drop

16   that one fragment on comission free ;)

17             "Myself: we'll be doing a mil in sales every week at

18   full commission before long

19             "Myself: I think it's leading by example for the

20   vendors. they will be more generous if we are

21             "Vj: true.  There is that, and no one will have a klew

22   what the sale totals are.

23             "Myself: and we're selling drugs here, first one's

24   free little jonny! damn that sounds aweful

25             "Vj: ha!!!  Let's give away a couple of playground

1    sets, with swings and slides, just to complete the picture.

2              "Myself: sponge bob canoe and life size my little pony

3    with every hash purchase of 50 btc or more!"

4              Mr. Kiernan, now, this continues -- this is from the

5    same Tor chat log, correct?

6    A.  The same log, yes.

7    Q.  This is pages 917 to 918 of a 1096-page chat log, correct?

8    A.  That is correct.

9    Q.  And it starts:  "vj: Dude, I'm worried about our winner.

10             "Myself: whasamatta

11             "Vj: He's trying to dry out

12             "Vj: Heroin

13             "Vj: it's not working.

14             "Vj: and I think his recent influx of cash didn't help

15             "Myself: oh geez

16             "Myself: fuck, what are we doing

17             "Vj: Yeah, he told me some time ago he was trying to

18   quit, but SR made it kinda tough

19             "Vj: So I've been doing sessions with him, giving him

20   someone to talk to

21             "Myself: do you think he can't make the trip?

22             "Vj: I dunno, I'm sure he's gonna run out of spending

23   money early, that's for sure.

24             "Vj: Now, his friend coming from Aus doesn't imbibe,

25   so I'm hoping he'll be a good influence.

F1ldulb5                         Kiernan - direct

1              "Vj: I'm just worried that it's not the kinda place

2        you wanna get caught trying to score H, or posessing it.

3              "Myself: what does he want to do?

4              "Vj: Oh, he's all gung ho to go, it's me that's

5        worried ;)

6              "Vj: We'll go ahead as planned, the situation was just

7        getting to me, so I'm spreading around the Dread

8              "Vj: so to speak ;)

9              "Myself: shoulda thought more carefully about dropping

10       $4k on an addict

11             "Myself: maybe our next prize will be 3 months in

12       rehab."

13             Mr. Kiernan, could you please flip to what's been

14       marked for identification purposes as Government Exhibit 251 in

15       your binder.

16       A.   Yes.

17             (Pause)

18             OK.

19       Q.   What was the name of this file?

20       A.   Networthcalculator.ods.

21       Q.   And what was the date of this file -- according to the

22       metadata, what was the date that this file was first saved on

23       the defendant's computer?

24       A.   Umm, let's see.  6/17/2012.

25       Q.   And what was the date that it was last edited?

1    A.  12/2/2012.

2    Q.  What kind of file is this?

3    A.  A spreadsheet.

4            MR. HOWARD:  The government offers Government Exhibit

5    251.

6            MR. DRATEL:  Objection, your Honor.  Vayner and

7    hearsay.

8            THE COURT:  All right.  There weren't any objections

9    noted in the Pretrial Order, but we'll talk about that at the

10   break.

11           GX251 is received.

12           (Government's Exhibit 251 received in evidence)

13           THE COURT:  The objections are overruled.

14           MR. HOWARD:  So, Ms. Rosen, could you please zoom in

15   on the columns from here to the first black line.

16   Q.  So the columns here, Mr. Kiernan, are "Date," "Liquid

17   Assets," "Hard Assets," "Total Debt," "Net Liquid," "Net

18   Worth," and "Notes," correct?

19   A.  Correct.

20   Q.  And here it says, "August 06."  Net worth is listed at 821,

21   and "Notes" say "started at PSU," correct?

22   A.  That's correct.

23   Q.  And here we have May 07.  The net worth is listed as

24   13809.78, with a note saying "Just before buying house,"

25   correct?

F11dulb5                        Kiernan - direct

1    A.  Correct.

2    Q.  January 11 -- we'll skip one -- it says -- under the "Net

3    Worth" column, it is 29,539, and the note says "start as CEO of

4    Good Wagon."

5    A.  That's correct, yes.

6    Q.  April 2011, net worth is listed here under that column as

7    29948, and the notes column says "launch sr," correct?

8    A.  That's correct.

9    Q.  Let's skip down all the way to September 11, this one.  Net

10   worth -- under the net worth column, it says "100992."  Notes

11   column says "hire syg and h7"?

12   A.  That's right, yes.

13   Q.  December 11, the first one, under the net worth column,

14   "238645," "fire syg"?

15   A.  Correct.

16   Q.  Jan 12, under the net worth column, it says 68647, and the

17   notes say "bitcoin theft," correct?

18   A.  That is correct, yes.

19   Q.  And in June 2012, or June-12, under the net worth column,

20   it says "14238400"?

21   A.  Yes.

22   Q.  And what was the date that this file was last saved?

23   A.  12/2/2012.

24            MR. HOWARD:  Could you zoom out, please.

25            And now zoom into this column right here in the light

1    blue.

2    Q.  The columns are titled "Hard assets inventory" and "value

3    (USD)," correct?

4    A.  Correct.

5    Q.  And the first row says "sr inc" under "Hard assets

6    inventory," correct?

7    A.  Yes.

8    Q.  What is the number under the value column listed next to

9    "sr inc"?

10   A.  104 million.

11   Q.  The next one down here says "Samsung 700z?

12   A.  Correct.

13   Q.  And the value is listed as $800, right?

14   A.  That's right, yes.

15   Q.  What was the model and brand of the defendant's laptop?

16   A.  Samsung 700z.

17   Q.  And down here there is a section entitled "Bitcoins,"

18   correct?

19   A.  Correct.

20   Q.  And there seems to be a number of entries under there with

21   various values, correct?

22   A.  Yes.

23   Q.  And, Mr. Kiernan, what was the title of this spreadsheet?

24   A.  "Networthcalculator.ods."

25              MR. HOWARD:  Ms. Rosen, could we just go back to the

1    left side real fast.

2    Q.  So here you see this one, September 11.  The reference says

3    "hire syg and H7," correct?

4    A.  Yes.

5    Q.  In your review of the Tor chat logs, did you find a Tor

6    chat with a user identified as H7 around September 2011?

7    A.  Yes, I did.

8              MR. HOWARD:  Ms. Rosen, could you please publish

9    Government Exhibit 224, which is already in evidence, and zoom

10   in, please.

11   Q.  Mr. Kiernan, this is an excerpt taken from an 88-page log

12   file, is that correct?

13   A.  Yes.

14   Q.  And the first excerpt starts on September 30, 2011,

15   correct?

16   A.  Yes.

17   Q.  It says: "[Logging started]

18             "H7: Hi, I wanted to let you know whats going on

19   before the weekend. Ive got a SRM instance running on my end. I

20   have created a revised SQL search query, now i need to change

21   it to the Active Record Class used on the site.

22             "Myself: great, glad you are up and running and

23   starting to make progress. When do you think you'll have the

24   new search function ready for me to test?

25             "H7: soon

F11dulb5                          Kiernan - direct

1          "H7: if i do any work over the weekend ill let you

2     know, but probably monday or tuesday

3          "Myself: ok, that doesn't tell me much :P I'm not

4     trying to put pressure on you or anything, it just helps me to

5     know.

6          "Myself: that sounds good

7          "Myself: have a great weekend. I've got another little

8     project for you after the search is done before you start the

9     security audit, so message me Monday or Tuesday when it's

10    complete.

11         "H7: thanks, ill talk to you then. have a nice weekend

12    :-)."

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. HOWARD:

2    Q.  The next part is October 3, 2011, is that correct?

3    A.  Yes.

4         MR. HOWARD:  "h7: Hi, i've written a new search

5    function. Im pretty happy about it, although it does contain

6    one "work around."

7         H7: the only changes are in controllers/silkroad.php

8    search_results function.

9         H7: what format do you want it in?

10        Myself: just send me your version of

11   controllers/silkroad.php

12        Myself: I'll let you know if I have any trouble with

13   it, or questions. Are you ready for your next challenge?

14        H7: yes, whats next?

15        Myself: We've been having issues with users getting

16   their accounts hacked. I think the main issue is from sites

17   pretending to be Silk Road and stealing the user's login info.

18        Myself: Can you look at the login functions and see if

19   you can come up with a way to mitigate this problem?"

20   Q.  Mr. Kiernan, the next excerpt starts October 21, 2011, is

21   that correct?

22   A.  That's correct.

23        MR. HOWARD:  "H7: Silk Road, i would like to take next

24   week off. I have to take care of some other projects and i

25   figure you are busy with this outage anyways. The git repo

1   should not take long after i get back.

2           Myself: ok, hopefully I won't be busy next week like

3   I've been busy this week. How much did you work this week?

4           H7: 35 hours

5           H7: Ive got the notes on cleaning the code for thrid

6   pary audit if you want it now.

7           Myself: sure, send it over. I'll see you on the 31st

8   then?"

9   Q.  And the next excerpt starts from the same chat log,

10  correct?

11  A.  The same log, yes.

12  Q.  October 30, 2011, is that right?

13  A.  That is correct.

14          MR. HOWARD:  "H7: How was your week?

15          Myself: not bad. I will be travelling soon, so I have

16  much to do before I go and I didn't get as much as I wanted,

17  but this week I will focus on getting out of town.

18          H7: Ok."

19          THE COURT:  I think you left out the word "done."

20          MR. HOWARD:  Pardon me.  "Myself:  Not bad.  I will be

21  traveling soon, so I have much to do before I go and I didn't

22  get as much done as I wanted, but this week I will focus on

23  getting out of town.

24          H7:  Okay."

25          Thank you, your Honor.

1          THE COURT:  When we are done with this one, let's take

2     our afternoon break.

3          MR. HOWARD:  Sure.

4          "H7: Is it just you over there?

5          Myself: I have people to take care of, but I'll be

6     travelling alone. is that what you mean?

7          H7: No, When you leave town will anyone be looking

8     after the servers?

9          Myself: oh, yes indeed

10          H7: Because i see "The Silk Road Staff" written in

11     messages, but i dont know if its just you or not.

12          Myself: it's basically just me, but more and more I am

13     trying to spread the responsibility around. You are a big part

14     of that.;)"  Emoticon.

15          Did you want me to stop in the middle or should I

16     finish the exhibit?

17          THE COURT:  You can finish the exhibit and then we'll

18     take our break.

19          MR. HOWARD:  Thank you, your Honor.

20     Q.  Mr. Kiernan, the next section starts on November 9, 2011,

21     correct?

22     A.  Yes, it does.

23     Q.  And this is page 27 of a total of 88 pages in this chat

24     log?

25     A.  In this log, yes.

1          MR. HOWARD:  "Myself:  Okay, I want to give you a 50

2     percent raise to $1,500 per week.  You're going to be managing

3     people and that always comes with extra headache so I want you

4     to be well compensated for it.

5          H7:  Thank you.

6          Myself:  Sure, thank you!  So, we've received several

7     applicants already.  They are sending their applications to the

8     username Silk Road HR on the main site.  There is a link in the

9     footer now called "careers" that is directing them there.

10         Myself:  I'll give you access to that account so you

11    can see who you want to bring in for a trial period.

12         H7:  Okay.

13         Myself:  We've talked about it before, but basically I

14    want you to create tasks that can be given a dollar value

15    corresponding to your estimate of the time they should take at

16    a rate of $25/hour.  If a new person is giving you bad results,

17    or isn't communicating well, or for whatever reason they aren't

18    working out, gently let them go and block them out of the repo.

19    You'll probably want to figure out a good way of communicating

20    with your team, either through torchat, or the git site, or

21    whatever.  You'll need to keep track of what your team members

22    have earned, and each week I'll send you the coins for you to

23    disburse.  Try to keep it below $2,000 per week unless I let

24    you know that we can support more.

25         H7:  Okay.  Sounds good."

1  Q.  Mr. Kiernan, the next excerpt starts on December 15, 2011,

2  correct?

3  A.  That's correct.

4        MR. HOWARD:  "Myself:  By the way, I'm going to be

5  unavailable from about 4:00 a.m. UTC Friday to about the same

6  time on Sunday, so I'll send you your pay tomorrow.

7        H7:  K, you forgot me last week.

8        And can you send 100USD to Silk Road HR for this weeks

9  bounties.

10        Myself:  You are right, so sorry about that.  Sending

11  $3,000 now for last week and this week.

12        H7:  Why $3,000 for two week?

13        Myself:  Aren't I paying you $1,500/WK?

14        H7:  It was 2,000 a week last time you paid me.

15        Myself:  Our sales were up a bit that week so I

16  thought I'd give you a bonus.  The last rate we had talked

17  about was $1,500 a week, though.

18        H7:  I recall you asked me to work full time on the

19  group development and the new server/hosting.  Since then you

20  have told me to focus on group development.  Was I supposed to

21  revert to part-time.

22        Myself:  No.

23        Yeah, I guess you are right, sorry my memory isn't

24  serving me right now."

25        THE COURT:  All right.  Is this a good time for a

```
 1    break?
 2              MR. HOWARD:  Yes, your Honor.
 3              THE COURT:  Ladies and gentlemen, let's take our
 4    afternoon break.  I want to remind you not to talk to each
 5    other or anybody else about this case.  Thank you.
 6              (Jury excused)
 7              (Witness temporarily excused)
 8              (Continued on next page)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1           (In open court; jury not present)

2           THE COURT:  Let's all be seated.  One request that we

3    had gotten from the jury was that they wanted some magazines to

4    read while they were just spending time in the jury room.

5           MR. DRATEL:  Not during the testimony.

6           THE COURT:  Not during the testimony.  I have had

7    four, five just random magazines picked up in which I do not

8    believe there are any articles or reporting on Silk Road.  They

9    are Vanity Fair, New York Magazine, Sports Illustrated, the NFL

10   Sports Illustrated and Vogue, and they're all from the current

11   newsstand.

12          If you folks would like to look at them and assure

13   yourself that there is nothing in here that you object to in

14   terms of them just being used as sort of doctor-room, dentist's

15   office reading.

16          MR. DRATEL:  Did the Court look through them already?

17          THE COURT:  We looked through them.  I personally have

18   not.  That's why I'm offering them to you folks to look at

19   them.

20          MR. DRATEL:  It's New York Magazine, right?

21          THE COURT:  I believe it's New York Magazine.  I

22   encourage you folks to take a quick look to ensure yourselves

23   there's no problem and then we'll put them in there.  There's

24   no rush.  If anybody finds any articles on this case, please

25   let me know.  I don't intend to be turning over anything that

1    requires the jury to themselves avert their eyes, but that's

2    the only issue that I had on that one.

3           We had a couple of documents that were objected to:

4    GX 242, GX 250, 251 and 255.  And as to those, for the Silk

5    Road expense report, there had been no objection lodged.  You

6    had said, I believe, Mr. Dratel, *Vayner* and some of the other

7    objections and hearsay.

8           MR. DRATEL:  I'm not quite sure why we missed that

9    one, but yes, in the same character in terms of some of the

10   other documents.

11          THE COURT:  I'm not holding you to a waiver.

12          Would the government like to respond in terms of 250?

13   Mr. Howard.

14          MR. HOWARD:  This document was recovered from the

15   defendant's computer.  We had the testimony from the computer

16   scientist.  I think it's properly authenticated under *Vayner*.

17          THE COURT:  The Court agrees.  And in terms of

18   hearsay, there's either the information is not there for the

19   truth or to the extent it is, it would be an admission subject

20   to connection by a preponderance of the evidence.

21          Exhibit 251 is the net worth calculator spreadsheet.

22   I believe that your objections were the same for 251.

23          MR. DRATEL:  That's correct.

24          THE COURT:  And the Court's rationale for that is the

25   same as well.

1          For 255, that was the weekly to-do list and the only

2     objection there was hearsay.  I don't believe that that was

3     offered for the truth.

4          Mr. Howard.

5          MR. HOWARD:  That's correct, your Honor.

6          THE COURT:  So it doesn't fall within the hearsay

7     rules.

8          And 242 was the weekly report.  That similarly had a

9     *Vayner* issue.  We have talked about that.  I do believe that

10    the *Vayner* issues had been eliminated by the foundation, and

11    then in terms of hearsay, it's not offered for the truth.  Am I

12    correct, Mr. Howard?

13         MR. HOWARD:  Yes, your Honor.

14         THE COURT:  That's the bases for those rulings.  Now,

15    we do need to talk about, as I said I would do, not this

16    morning but at another break, the striking of the testimony

17    that I had said I would strike.

18         I wanted to elicit from you folks, if you want to make

19    any suggestions, your views as to how that should be done.  I

20    have previewed what the Court was suggesting was its thoughts

21    on that, which was to give a generalized instruction.

22         You'll note that the testimony that has been struck

23    has now gone up on ECF as an order of the Court.  It should

24    have been posted.  So the court reporters should strike and

25    will make sure that they strike the portions which are referred

1    to in the shaded portions of today's ECF filing related

2    thereto, and we'll make sure that it's absolutely clear.

3              But in terms of instructing the jury, Mr. Turner.

4              MR. TURNER:  I drafted something for your Honor's

5    consideration.  It's fairly simple.

6              You heard testimony while Special Agent Der-Yeghiayan

7    was on the stand concerning his personal beliefs or suspicions

8    about particular individuals at various points during his

9    investigation.  I instruct you that what the agent believed or

10   suspected at any particular time, whether about the defendant

11   or others, is not evidence, and you are to disregard any such

12   testimony.

13             THE COURT:  Can you repeat that.  Pick up with

14   "personal beliefs and suspicions."

15             MR. TURNER:  Sure.  Personal beliefs or suspicions

16   about particular individuals at various points during the

17   investigation I instruct you that what the agent believed or

18   suspected at any particular time, whether about the defendant

19   or others, is not evidence, and you are to disregard any such

20   testimony.

21             THE COURT:  Mr. Dratel.

22             MR. DRATEL:  Yes.  One is, I don't think it was

23   mentioned, the defendant.  The witness said nothing about any

24   suspicions about the defendant.  That's highlighting something

25   that wasn't in the testimony.  So I don't think you should say

1    about the defendant because he didn't talk about that.

2              THE COURT:  I actually think it was more helpful to

3    have it about it the defendant.

4              MR. TURNER:  That's how it was intended.

5              MR. DRATEL:  But it makes it seem like he somehow

6    suspected the defendant and they're supposed to ignore that,

7    but he never testified about that.

8              THE COURT:  Fine.  If you want it out, that's fine.

9              MR. DRATEL:  Yes.  And after that first sentence it's

10   sufficient.  The personal beliefs and suspicions about other

11   people, that testimony should be ignored.  You don't need to

12   repeat it.  It should be streamlined.

13             THE COURT:  I also intend to say, so that the jury is

14   not confused, I'm going to actually give the entirety.  I don't

15   think that it's very long.  It's going to take seconds:  As to

16   other testimony from Mr. Der-Yeghiayan, you may consider it

17   during your deliberations and give it the weight that you

18   believe it deserves.

19             I don't want there to be any confusion and somehow

20   have the jury misunderstand that we're only striking a piece

21   and not all.

22             MR. DRATEL:  Could you just add to that the

23   usual -- consistent with my general instructions at the end of

24   the case about credibility?

25             THE COURT:  Yes.

F1LGULB6                           Kiernan - direct

1              MR. DRATEL:  So that it doesn't --

2              THE COURT:  I'll say consistent with all my

3    instructions at the end of the case.

4              MR. DRATEL:  Right.

5              THE COURT:  I'm not going to pull out one instruction.

6    I will give that instruction, all right --

7              MR. TURNER:  Thank you, your Honor.

8              THE COURT:  -- when they come back as a housekeeping

9    matter.

10             Is there anything else that we should go over before

11   we take our own brief break?

12             MR. HOWARD:  Not from the government.

13             MR. DRATEL:  No, your Honor.

14             THE COURT:  Thank you.  Let's take our own break.

15             (Recess)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  I had one housekeeping matter that I

3     wanted to go over with you folks.  You heard testimony while

4     Mr. Der-Yeghiayan was on the stand regarding personal beliefs

5     or suspicions he may have had about particular individuals at

6     various points during his investigation.  And I instruct you

7     that what the agent suspected about others isn't evidence and

8     should be disregarded.

9          Now, consistent with all of the instructions I'm going

10    to give you at the end of the case, there was other testimony

11    that Mr. Der-Yeghiayan provided which you may consider during

12    your deliberations and give it the weight that you deem that it

13    deserves.  So it's the suspicions, all right?  Thanks.

14          Mr. Howard, you may go ahead and proceed, sir.

15          MR. HOWARD:  Thank you, your Honor.

16          THE COURT:  I realize sometimes I have to think about

17    how what I'm saying reads in the transcript.  When I use the

18    word "suspicions," I meant it's the suspicions that should be

19    disregarded.  I hadn't finished that last sentence.  Thank you.

20          Mr. Howard, you may proceed.

21          MR. HOWARD:  Thank you.

22    Q.  Mr. Kiernan, in your review of the defendant's laptop, did

23    you have files with reference to computer servers?

24    A.  I did, yes.

25    Q.  What is a computer server?

 1   A.  It's a machine that will actually host or run a website or

 2   a database, something to that effect.  It's the place that you

 3   connect to when you actually go to the site, like Google has

 4   servers behind it.  When you go to Google's website, there's a

 5   machine behind it that's actually producing the answers for

 6   you.  That's what a server basically does.

 7   Q.  How are computer servers identified on the Internet?

 8   A.  Through an IP address.

 9   Q.  What is an IP address?

10   A.  An IP address is a numeric number used to actually get to a

11   computer, kind of like a phone number, how you call somebody on

12   your phone.  It's a unique number associated with the server or

13   any computer any time you're on a computer, and it allows you

14   to actually get to that destination point.

15   Q.  Mr. Kiernan, can you please flip to what has been marked

16   for identification purposes as Government Exhibit 264, please.

17   A.  Sure.  Okay.

18   Q.  Do you recognize what this is?

19   A.  I do.

20   Q.  And what is it?

21   A.  It's a file extracted from the defendant's computer.

22   Q.  And what was the name of the file?

23   A.  Servers.ODS.

24   Q.  And what is an ODS file?

25   A.  It's a -- this is a spreadsheet.

1  Q.  And according to the meta data, what was the date this file

2  was first saved on the defendant's computer?

3  A.  3/24/2013.

4           MR. HOWARD:  The government offers Government

5  Exhibit 264 into evidence.

6           THE COURT:  Mr. Dratel.

7           MR. DRATEL:  Just the hearsay and *Vayner*.

8           THE COURT:  Those objections are overruled and GX 264

9  is received.

10          (Government's Exhibit 264 received in evidence)

11          MR. HOWARD:  Ms. Rosen, can you please publish the

12  zoomed-in highlighted version of this chart, please.  Why don't

13  we look at the column titles, please.  Let's try part of it at

14  the top.

15 Q.  So here we have the columns are alias, type, host,

16 email/user, host, pass, username, pass, IP address, correct?

17 A.  That is correct, yes.

18 Q.  And the IP address what you just testified about being a

19 unique way that servers are identified on the Internet?

20 A.  How they communicate on the Internet, yes.

21          MR. HOWARD:  I've been advised the team is working on

22 getting a clearer version up.

23          THE COURT:  Thank you.  That or you may want to hand

24 around a piece of paper to the jury so they can actually see it

25 because I don't think that it's legible on the screen.

1   Q.  For the record, the highlighting, that's been added by the
2   government.
3          The file and the computer, Mr. Kiernan, did not
4   contain any highlights, correct?
5   A.  No highlights, no.
6          MR. HOWARD:  I'm going to get a copy to pass around to
7   the jury, if that's okay.
8          THE COURT:  Yes.  Do you want to maybe go on and come
9   back to this or does this fit right where you are now?
10         MR. TURNER:  I think it takes a second to autofocus.
11  We should have it.
12  Q.  Mr. Kiernan, are you able to read the titles of the columns
13  in the version that's in front of you?
14  A.  Yes, I can see them in this version right here.
15         THE COURT:  Could you pull down this for a second so I
16  can just see.  He was referring to some columns before in the
17  dark.  I see.  Okay.
18         THE WITNESS:  That's nice.
19  Q.  The columns are alias, type, host, email/user, host pass,
20  username, pass, IP address, correct, Mr. Kiernan?
21  A.  That's correct.
22  Q.  And the IP address, as what you testified, is the unique
23  way that servers are identified on the Internet, correct?
24  A.  That's correct, yes.
25  Q.  And the other is the remaining columns are location,

1    expires, use, notes and there are some additional columns

2    further down the page, correct?

3    A.  Correct.

4    Q.  Now, to draw your attention to a couple that the government

5    has highlighted.  There's one here that you can see, what is

6    the alias of this server I'm pointing to?

7    A.  Bora.

8    Q.  And what is the IP address that's listed for that server?

9    A.  It's 193.107.86.49-53.

10   Q.  And what -- does the chart describe the location of the

11   server?

12   A.  Iceland.

13   Q.  And what does it describe about the use of the server?

14   A.  Market back end.

15   Q.  I'd like to direct your attention to the other rows

16   highlighted here labeled "gala" under the alias.

17   A.  Yes.

18   Q.  What does it reflect about the IP address for this server?

19   A.  207.106.6.25.

20   Q.  And what does it say about the host for the server?

21   A.  Jtan.com.

22   Q.  And what does it list as the email/user of this server?

23   A.  Ggb.

24   Q.  What does it list about the location of the server?

25   A.  USA.

1    Q.  And what does it describe about the use of the server?

2    A.  Backup.

3    Q.  I just want to draw your attention to one more row that's

4    not highlighted, this one right here, there's Bora and then

5    there's one that says BTC, correct?

6    A.  Yes.

7    Q.  And there's an IP address?

8    A.  Sure.

9    Q.  What is the IP address?

10   A.  193.107.86.34.

11   Q.  Where is that located?

12   A.  Iceland.

13   Q.  What is the described use for that server?

14   A.  Live wallets, and then in parenthesis, archive wallets.

15   Q.  Now, Mr. Kiernan, what is listed on the very next line as

16   the use of the following server?  We haven't talked about this

17   server, but what is listed in the "use" column?

18   A.  I'm sorry.  For which?

19   Q.  It's this one -- you just said live wallets?

20   A.  Yes.

21   Q.  What is the use of the following server?

22   A.  Oh, the one after it?

23   Q.  Yes.

24   A.  The 178 -- that's smed has.

25   Q.  In your review of Tor chats recovered from the defendant's

1   computer, did you find any references to smed?

2   A.  I did; yes.

3          MR. HOWARD:  Ms. Rosen, can you please publish

4   Government Exhibit 231A, which has already been admitted into

5   evidence.

6   Q.  And this chat is dated May 4, 2012, correct?

7   A.  Yes.

8          MR. HOWARD:  "Myself: can I get your thoughts on

9   something?

10         Smed: always

11         Smed: i am your slave :)

12         Myself: vm isolation vs. seperate physical machines

13  vs. jails, permissions, etc.

14         Smed: yeah

15         Smed: interesting stuff

16         Smed: the more moving parts you have, the more doors

17  you have to protect

18         Myself: "attack surface" yea?

19         Smed: yeah

20         Smed: i have been staring at the ceiling a lot over

21  this project and how to go about it

22         Myself: lots of ins and outs, lots of what have yous,

23  lots of strands in the 'ol duder

24         Myself: shead

25         Smed: i think a medium footprint is best.. it's

1    impossible to be small.. you just cant do it. all paths lead

2    down to the same road.. you will have 1 or 2 servers under

3    constant attack by people you dont want getting in

4              Smed: so my job, as I see it, is to make sure that

5    when they do get in that you can get back up and running with

6    minimal damage

7              Smed: for example.. moving btc to cold storage offline

8    as soon as daily funding estimates are reached

9              Myself: prevent, detect, redeploy

10             Smed: yes!

11             Myself: patch

12             Myself: and on and on

13             Smed: yeah, exactly"

14             Just leave us on this page for a second.

15   Q.  Mr. Kiernan, in the first line it says by smed, "For

16   example, moving BTC to cold storage offline as soon as daily

17   funding estimates are reached."

18             Do you see that?

19   A.  I do.  Yes.

20   Q.  Do you have familiarity with bitcoin transactions?

21   A.  I do.

22   Q.  Do you have familiarity with what cold storage refers to in

23   the context of bitcoins?

24             MR. DRATEL:  Object; foundation.

25             THE COURT:  Why don't you build more foundation for

1    that before he answers, before he answers that last question,

2    all right?

3              MR. HOWARD:  Sure.

4              THE COURT:  In connection with his work how has he

5    encountered cold storage, etc.

6              MR. HOWARD:  Yes.

7    Q.  In connection with your work as a computer scientist at the

8    FBI, have you had experience with bitcoin wallet files?

9    A.  Yes, I have.

10   Q.  Have you had experience in dealing with bitcoin wallet

11   files on computers you've examined?

12   A.  Yes.

13   Q.  Are you familiar with how bitcoins are stored?

14   A.  I am.

15   Q.  Are you familiar with terminology used to refer to various

16   bitcoin wallets and where they are stored?

17   A.  Yes.

18             THE COURT:  Go ahead.

19   Q.  So do you -- are you familiar with what the phrase cold

20   storage means in reference to bitcoins?

21   A.  Yes.

22   Q.  And what does it refer to?

23   A.  Sure.  So when you're running a bitcoin wallet, you have

24   a -- it's a live, working device, not device but software.

25   It's -- what you do is, when you take your wallet from the live

F1LGULB6                        Kiernan - direct

1   working machine, basically you move it offline; you take it and

2   copy it someplace else so the computer doesn't have access to

3   it, others don't have access to it and the wallet is basically

4   in a cold storage state.  You can't make changes to it at that

5   point.

6            THE COURT:  You move the wallet off the computer?

7            THE WITNESS:  You can.  You just move it to a place

8   that it's not working in that program anymore.  So it's not

9   accessible to the actual coins, to the actual program running.

10            THE COURT:  I see.

11            You may continue.

12            MR. HOWARD:  Ms. Rosen, would you please publish

13   Government Exhibit 231B, which has already been admitted into

14   evidence.

15   Q.  And this chat is dated May 4, 2012.  Is that correct?

16   A.  Yes.  Sorry.

17            MR. HOWARD:  "Smed: i should be pushing you some code

18   tonight or tomrrow

19            Smed: i'm up against multiple deadlines due to travel

20   schedule

21            Myself: stress!

22            Smed: :)

23            Smed: i'm going to finish mods to your login function

24   hopefully tonight

25            Myself: hey smed, run into some trouble with the code

984

F1LGULB6                          Kiernan – direct

1    you mentioned yesterday?

2           Smed: what code did you have problems with?

3           Myself: none, just wondering if you had trouble since

4    you said you'd push me some by now, but it sounds like you are

5    just busy getting out of town

6           Smed: actually.. i should have something in a bit"

7           (Pause)

8           MR. HOWARD:  I'm sorry.  I didn't realize it was done.

9           Ms. Rosen, can you please publish Government

10   Exhibit 231C, which has already been admitted into evidence.

11   Q.  This chat begins on May 15, 2012, is that correct,

12   Mr. Kiernan?

13   A.  Yes.

14          MR. HOWARD:  "Myself: hey, got a minute?

15          Smed: always

16          Myself: thanks, just wanted to check in with you. can

17   you give me a quick rundown of where we've been, where we are,

18   where we are going in the development process?  I'm getting a

19   bit disoriented as new things have come up since we began and I

20   don't have anything tangible to orient around.

21          Smed: Sorry about that. My bad completely

22          Myself: no worries, we don't exactly have the most

23   freedom communication wise

24          Smed: exactly!! I'm glad you see it.. Normally, my

25   development process is quite open. The nature of the firewall

F1LGULB6                         Kiernan - direct

between you and the rest of the world has left a large gap in

my normal way of doing things and my habits have not been

sufficiently corrected to make that extra step

       Smed: Where we are..

       Smed: We have a fully functional "escrow management

system" in it's most raw form

       Smed: it moves BTC between users, in both roles as

shoppers and merchants

       Smed: admin/overlord role has the power to do anything

it wants as far as approving or rejecting transactions

       Smed: this 'system' in it's current form is going

through some fine tooth comb work right now to ensure that

nothing has been missed when it comes to decimal places,

confirmations etc

       Smed: existing test results have shown a high degree

of accuracy in reguards to all transactions

       Smed: i have not yet been able to cheat the system,

however those final tests (trying to cheat) have not been

marked as complete yet because we have not let cimon loose on

it ;)

       Smed: That side of the project is Team 1

       Smed: Team 2 is working on the more public side of the

shopping system

       Smed: the vendor management piece

       Smed: I have had several set backs and delays in the

1    vendor part and that side was behind for about 3 weeks due to

2    the moron factor

3            Smed: however, team 2 came through last week with part

4    2 of 3

5            Smed: really where i'm at is this..

6            Smed: I have replaced your entire foundation.. i

7    probably have a little bit more efficient approach only because

8    hindsight is 20/20

9            Myself: always good to get a fresh set of eyes on a

10   problem

11           Smed: exactly

12           Smed: from what I have seen.. if you did it right now

13   i dont think you would change much from what i'm doing

14           Smed: i've focused a lot on abstraction of the

15   concepts

16           Smed: making each one of them a bit more accessable

17   individually

18           Smed: but the concepts are yours either way

19           Myself: well, I'm not one to hold your feet to the

20   fire on estimates, I know you are working hard, but are we

21   behind our intial estimate at this point?

22           Smed: I'm going to be testing the latest submission

23   tonight and tomorrow.. the order management stuff.. will know

24   more about that side afterwards

25           Smed: I am a little behind on part, but some of the

1   additional code work (ykey etc) will allow me to catch up

2            Myself: how does additional work equal catching up?

3            Smed: because i'm bringing in more people to help me

4            Myself: ahh

5            Smed: Just so it's said.. I have lots of motivation to

6   get this done to where I stay in your good graces"

7   Q.  Would you flip to what has been marked as Government

8   Exhibit 254 in your binder for identification purposes.

9   A.  Okay.

10  Q.  Do you recognize this exhibit?

11  A.  I do.

12  Q.  What is it?

13  A.  It's a file pulled from the defendant's laptop.

14  Q.  What was the name of the file?

15  A.  Interview_questions.txt.

16  Q.  And what was the location of the file?

17  A.  This was found in the

18  home/frosty/backup/reference/directory.

19  Q.  And on what date was this file last saved on the

20  defendant's computer?

21  A.  6/5/2013.

22  Q.  And when was it first created on the defendant's computer?

23  A.  Also 6/5/2013.

24            MR. HOWARD:  The government offers Government

25  Exhibit 254 into evidence.

1          MR. DRATEL:  Prior objections, your Honor.

2          THE COURT:  Those objections are overruled.  GX 254 is

3     received.

4          (Government's Exhibit 254 received in evidence)

5          MR. HOWARD:  Zoom in on the top, Ms. Rosen.

6     Q.  And I'm sorry, the name of the file was

7     interview_questions.txt, right?

8     A.  Correct, yes.

9          MR. HOWARD:  "What kind of computer did you use

10    laptop/desktop?  What model and how old is it?  What OS do you

11    use?  Do you use whole disk encryption?  Do you use a Tor

12    bridge?  Do you use a VPN or proxy?  Who in your life knows of

13    your involvement with Silk Road?  Does anyone IRL know you are

14    a mod on the forums?  Does anyone (IRL or here) know I've

15    offered you a promotion?  How long will it take you to wrap up

16    your other responsibilities and begin training?  Are there any

17    major situations in your life that might pull you away from

18    your responsibilities here on short notice (health, family,

19    etc.)?  Do you have an income stream outside of SR?  How do you

20    intend to launder your earnings?"

21    Q.  Mr. Kiernan, could you please flip to what's been marked as

22    Government Exhibit 270 in your binder for identification

23    purposes.

24    A.  Yes.

25    Q.  And do you recognize this exhibit?

F1LGULB6                           Kiernan - direct

1    A.  I do.

2    Q.  And what is it?

3    A.  Again, a file extracted from the defendant's laptop.

4            MR. DRATEL:  Objection, your Honor.  Withdrawn.

5            THE COURT:  All right.  Proceed, Mr. Howard.

6    Q.  And what was the name of this file?

7    A.  1.text.

8    Q.  Where was it located in the defendant's computer?

9    A.  Sure.  This was under the

10   home/frosty/documents/archive/documents/op/prof/sec/security/

11   Arto directory.

12           MR. HOWARD:  The government offers Government

13   Exhibit 270.

14           MR. DRATEL:  Same objections as prior.

15           THE COURT:  All right.  Those objection are overruled.

16   GX 270 is received.

17           (Government's Exhibit 270 received in evidence)

18           MR. HOWARD:  Ms. Rosen, can you just zoom in on the

19   top section maybe down to about there.  It starts "On Sep. 15,

20   2009, at 17:01, Ross Ulbricht wrote," and now there's a section

21   with the little caret signs:

22           "Dear Arto.  Thank you for being open to my questions.

23   I don't want to bother you too much, but I find this topic

24   fascinating and very applicable.  The impression I get is that

25   the technology is getting close but not quite there yet."

1   Q.  What does the sections that is marked with the caret signs

2   in this document appear to be?

3   A.  An email.

4   Q.  And what does the section that is marked with these little

5   caret signs appear to be?

6              MR. DRATEL:  Objection as to drawing conclusions.

7              THE COURT:  Why don't you describe whether in your

8   experience in your job you've seen documents which have a

9   format similar to this.

10              THE WITNESS:  Okay.  Yes, I've seen emails or

11   documents with this type of format where it has the -- this

12   conversation split between basically a "from" and a "to," like

13   a thread of emails or a thread that keeps getting included on

14   your emails before.

15              This is based in a text file as opposed to a real

16   email would look like from your email clients, but it's the

17   appearance from that same type of format.  So to me, it looks

18   like an email conversation and it's divided by the greater-than

19   signs.

20   Q.  What does the greater sign portion refer to?

21   A.  That would be the person -- that would be, in this case, it

22   would be what Ross Ulbricht wrote in his email.

23              MR. HOWARD:  Now, Ms. Rosen, I just want to read only

24   the parts that have the carets by it.

25              "Dear Arto.  Thank you for being open to my questions.

1    I don't want to bother you too much but I find this topic

2    fascinating and very applicable.  The impression I get is that

3    the technology is getting close but not quite there yet.  What

4    do you think of Tor browsing and Tor hiding services?  Is it as

5    anonymous as they say it is?  The hidden services part sounds

6    interesting, but I have been unsuccessful in actually accessing

7    any of the existing ones yet including eCache."

8            Ms. Rosen, can you zoom in on the bottom part and

9    highlight the section with the carets, please.

10           "With Pecunix, I understand it is a goldbacked digital

11   currency.  Can I anonymously and securely deposit funds?  Can I

12   anonymously and securely withdraw funds in the form of fiat

13   currency or gold?  I can see how it would work as a closed

14   system, but is there a way to integrate it with the rest of the

15   economy securely?

16           "I would love to be able to set up an online

17   storefront that couldn't be traced back to me (Tor hidden

18   services?) where my customers could buy my products (revealing

19   their identity only to me) and transferring funds to me

20   anonymously and securely (Pecunix?).  I suppose this is the

21   ideal.  What are the key pieces that are currently missing that

22   would make this a reality.  Once again, I appreciate your

23   willingness to discuss these matters with me."

24   Q.  Mr. Kiernan, would you please turn to what's been marked

25   for identification purposes as Government Exhibit 280 in your

1    binder.

2    A.   Okay.

3    Q.   Do you recognize this exhibit?

4    A.   I do.

5    Q.   And what is that?

6    A.   A file extracted from the defendant's computer.

7    Q.   And where was it located on the defendant's computer?

8    A.   This was found in the

9    home/frosty/backup/reference/directory.

10   Q.   What was the name of the file?

11   A.   XMPP.txt.

12             MR. HOWARD:  The government offers Government

13   Exhibit 280.

14             THE COURT:  Mr. Dratel.

15             MR. DRATEL:  Hearsay and *Vayner*.

16             THE COURT:  All right.  Those objections are overruled

17   and GX 280 is received.

18             (Government's Exhibit 280 received in evidence)

19             MR. HOWARD:  "1. download and install pidgin."

20             And then there's a weblink to add Pidgin.

21             "2.10.7.exe"

22             2. close pidgin

23             3. download and install off-the-record (OTR)

24             4. start pidgin

25             5. enable OTR from the plugins menu

1          6. make sure Tor is running

2          7. create a new account

3          8. basic settings

4          8.a. protocol: XMPP

5          8.b. username: ***

6          8.c. domain: pi5mmj2ronhutyxv.onion

7          8.d. password: ***

8          9. advanced"

9          Some more instructions 9a through 10c.

10         "11. add the account. if it doesn't connect, double

11   check the socks port

12         Tor is listening on and change step 10.c. accordingly

13         13. add buddy "dread@pi5mmj2ronhutyxv.onion". if I'm

14   online we'll connect. There are a few more steps to finalize

15   OTR, but those can be done once we're chatting."

16         Ms. Rosen, can you please move this to the left-hand

17   side of the screen and publish Government Exhibit 127 on the

18   right side of the screen, which is already in evidence, which

19   is a forum post from the Dread Pirate Roberts -- sorry -- a

20   private message from the Dread Pirate Roberts.  Can you focus

21   on actually on the instructions part, the text.

22   Q.  Mr. Kiernan, how does the instructions that appear in the

23   private message from Dread Pirate Roberts on the right side

24   compare with the document you recovered from the defendant's

25   computer?

1   A.  They're identical except for the username and the password

2   fields on the right-hand side of the screen have been filled

3   in.

4   Q.  Mr. Kiernan, can you please flip to what's been marked as

5   Government Exhibit 271 in your binder.

6   A.  Okay.

7   Q.  Do you recognize this exhibit?

8   A.  I do.

9   Q.  And what is it?

10  A.  It's a file extracted from the defendant's computer.

11  Q.  And what was the date that the file was last modified?

12  A.  8/21/2009.

13  Q.  And what was the date that this file was saved to the

14  defendant's computer?

15  A.  5/8/2012.

16  Q.  Is this the date that you described previously that there

17  were a lot of files that were saved on the computer on that

18  date?

19  A.  Yes.

20          MR. HOWARD:  The government offers Government

21  Exhibit 271.

22          MR. DRATEL:  Same objections as previously.

23          THE COURT:  All right.  Those objections are

24  overruled.  GX 271 is received.

25          (Government's Exhibit 271 received in evidence)

1          THE COURT:  "The construction and operation of

2    clandestine drug laboratories, second edition.  Revised and

3    expanded, Jack B. Nimble."  It says Jelly PDR version.

4          The second page, can we zoom in on the table of

5    contents.  And I'm just going to read the section contents:

6    "Preface to second edition, the risks, security, scanners and

7    monitoring equipment, safety, location and facilities, when to

8    stop and how, glassware, heating, stirring and mixing, fume

9    hoods, miscellaneous equipment, scaling up, procurement of

10   suspicious items, tablets, capsules, and other packaging

11   materials, computers."

12         "Appendix one is more equipment; appendix two, watched

13   chemicals; appendix three, watched laboratory equipment;

14   appendix four, legitimate businesses that use laboratory

15   equipment; appendix five, common products and the valuable

16   chemicals they contain; and appendix six, recommended reading."

17         Ms. Rosen, can you flip through some of the pages.

18   Don't spend too much time with it.

19              (Continued on next page)

20

21

22

23

24

25

1          MR. HOWARD:  OK.  Ms. Rosen, you can take it off.

2     BY MR. HOWARD:

3     Q.  Mr. Kiernan, could you please flip to what has been marked

4     as Government Exhibit 272 in your binder.

5     A.  OK.

6     Q.  Do you recognize this exhibit?

7     A.  Yes, I do.

8     Q.  And what is it?

9     A.  A file extracted from the defendant's computer.

10    Q.  And what is the date this file was last changed?

11    A.  9/21/2013.

12    Q.  What does the metadata reflect about the date that the file

13    was first saved in the defendant's computer?

14    A.  9/24/2013.

15          MR. HOWARD:  The government offers Government Exhibit

16    272.

17          MR. DRATEL:  The same objections, your Honor.

18          THE COURT:  All right.  GX272 is received.  The

19    objections are overruled.

20          (Government's Exhibit 272 received in evidence)

21          MR. HOWARD:  Ms. Rosen, publish Government Exhibit

22    272.  Let's zoom in on the text on the back.

23          "Silk Road proof September 20 DPR," and then a heart

24    symbol.

25          Ms. Rosen, you can take that down.

F1ldulb7                         Kiernan - direct

1   Q.  Mr. Kiernan, could you please flip to what has been marked

2   as Government Exhibit 275 in your binder?

3   A.  OK.

4   Q.  Do you recognize what this exhibit is?

5   A.  I do.

6   Q.  What is it?

7   A.  A file extracted from the defendant's computer.

8   Q.  What is the title of the file?

9   A.  "Ops.txt."

10  Q.  Where was the file located in the defendant's computer?

11  A.  This was in the "home/frosty/backup/reference by me"

12  directory.

13          MR. HOWARD:  The government offers Government Exhibit

14  275.

15          MR. DRATEL:  The same as before, your Honor.

16          THE COURT:  All right.  Those objections are

17  overruled.  Government Exhibit 275 is received.

18          (Government's Exhibit 275 received in evidence)

19          MR. HOWARD:  We'll publish this at a later time, your

20  Honor.

21          THE COURT:  All right.

22  BY MR. HOWARD:

23  Q.  Mr. Kiernan, could you please flip to what has been

24  premarked as Government Exhibits 290 and 291 in your binder.

25  A.  290 and 291, OK.

F11dulb7                              Kiernan - direct

1   Q.  Do you recognize these exhibits?

2   A.  I do.

3   Q.  And what are they?

4   A.  Files extracted from the defendant's computer.

5   Q.  And what is the name of Government Exhibit 290, the name of

6   the file?

7   A.  290, yes.  "Dominica-economic-citizenship2011.pdf.

8   Q.  And where was it located on the defendant's computer?

9   A.  This was in the "home/frosty/backup/reference/

10  politics/Dominica" folder.

11  Q.  And what is the title of Government Exhibit 291, the title

12  of the file?

13  A.  Oh, "Disclosure form."

14  Q.  And where was that located on the defendant's computer?

15  A.  The location, file location was in "home/frosty/backup/

16  reference/politics/dominica" folder.

17  Q.  Is that the same folder that Government Exhibit 291 was

18  found in?

19  A.  Yes.

20  Q.  What are the dates -- what is the date that Government

21  Exhibit 291 was first saved to defendant's computer?

22  A.  5/1/2012.

23  Q.  And how about Government Exhibit 291?

24  A.  I'm sorry, that was 291.

25  Q.  So to be clear, let's go to 291 --

1   A.  I'm sorry, 291, yes.

2   Q.  What date was that?

3   A.  5/8/2012.

4   Q.  How about the other one, 290?

5   A.  Sorry about that.  290, 5/8/2012.

6           MR. HOWARD:  The government offers Government Exhibits

7   290 and 291.

8           MR. DRATEL:  Objection on 403, hearsay, Vayner, and

9   that is it.

10          THE COURT:  All right.  DXs -- sorry, Government

11  Exhibits 290 and 291 are received.  The objections are

12  overruled.

13          (Government's Exhibits 290 and 291 received in

14  evidence)

15          MR. HOWARD:  Thank, your Honor.

16          Ms. Rosen, could you please publish Government Exhibit

17  290.

18  Q.  Mr. Kiernan, this is the first page of the document that is

19  depicted on the screen, correct?

20  A.  Yes.

21  Q.  Here it says "Commonwealth of Dominica Economic Citizenship

22  Program, Guide of Reference 2011."

23          MR. HOWARD:  Ms. Rosen, could you add the highlights

24  to the document.  Let's zoom in on the bottom here.

25          "Benefits of passport of the Commonwealth of Dominica.

1   Dominica recognizes dual citizenship, and you are not required

2   to renounce your other citizenships.  Besides that, Dominica

3   does not notify authorities of your country of residence or

4   citizenship on your Dominican citizenship."

5          "Dominican citizenship is the most affordable option

6   and the one quicker to obtain.  It requires a $75,000 U.S.

7   donation for a single option and $100,000 U.S. for a family

8   option, and normally takes 2 to 5 months."

9          Could we now publish 291, please?  Zoom in on the top.

10         It's titled, "Disclosure Form – Individual."

11  Q.  And, Mr. Kiernan, this was found in the same folder you

12  said as the guide that we just saw, correct?

13  A.  Yes, the same folder.

14         MR. HOWARD:  Ms. Rosen, could you zoom back out.  Can

15  you zoom in on the name, this box here.

16         Last name Ulbricht, first name Ross, middle names

17  William.  And then we have the beginning of a Social Security

18  number on the last line.

19         Could you go to the next page, please.

20         Zoom in on this additional personal information.  OK.

21  Q.  I'm not going to read all of this in, but we have fields

22  including date of birth, place of birth, names of family

23  members, and other identifiers; correct, Mr. Kiernan?

24  A.  Correct.

25         MR. HOWARD:  Ms. Rosen, could you slide down just a

F1ldulb7                          Kiernan - direct

1    little bit on that page.

2    Q.  And here you see a cell phone number that's been redacted,

3    an email address, "rossulbricht@gmail.com," correct?

4    A.  Correct.

5              MR. HOWARD:  Zoom out, Ms. Rosen.

6              Down -- can we just zoom in on this bottom section,

7    please.

8    Q.  "Residences: (List all residences) (other than your

9    current) you have had for the last 10 years."

10             One from 9/2009 to 5/16/2012.  There is an Austin,

11   Texas reference.  And then lower than that there is a July 2006

12   to September 2009 State College, Pennsylvania, reference.

13   Correct?

14   A.  Correct.

15             MR. HOWARD:  Can you go to the next page, Ms. Rosen.

16   Just keep on going.  Can you zoom in on the "Education" section

17   here?

18   Q.  "Education:  "List all academic and trade schools

19   attended."  I'm not going to read all of it, but

20   College/University, University of Texas at Dallas from August

21   2002 through May 2006, and then Pennsylvania State University

22   from July 2006 through September 2009.

23             At the bottom we have "List All Academic Degrees

24   Conferred."  "BS Physics, UT Dallas, May 2006; M.S. Materials

25   Science, Penn State University May 2009."

1    On the next page, the columns are "Name of Employer,

2  Address of Employer, Position Held, Dates, Month and Year, and

3  reason for leaving."

4    And the first row is "Self (IT consulting)," and the

5  reason for leaving, it says "Current" there, right?

6  A.  Yes, it does.

7  Q.  And what is the time period that he has been self-employed,

8  according to this column -- row, I'm sorry?

9  A.  Sure.  March 2011 to the present.

10  Q.  And what is his previous employment listed as?

11  A.  Good Wagon Books.

12  Q.  What are the dates that are listed for his employment at

13  Good Wagon Books?

14  A.  November of 2009 to May of 2011.

15  Q.  And what is listed as the reason for living -- for leaving?

16  A.  "Business was liquidated."

17    MR. HOWARD:  Ms. Rosen, could you please move to the

18  last page of this exhibit.  And then right here above the

19  signature line.  Above it, please.  Thank you.

20  Q.  The last paragraph:  "I authorize investigation of all

21  statements contained herein and the references and employers

22  listed above to give you any and all information concerning my

23  previous employment and any pertinent information they may

24  have, personal or otherwise, and release the company conducting

25  the investigation and the government of Dominica from all

F1ldulb7                          Kiernan - direct

1    liability for any damage that may result from utilization of

2    such information."

3              Mr. Kiernan, can you please flip in your binder to

4    what has been marked for identification purposes as Government

5    Exhibit 295.

6    A.  OK.

7    Q.  Do you recognize this exhibit?

8    A.  I do.

9    Q.  And what is it?

10   A.  A file extracted from the defendant's computer.

11   Q.  And what date was this file first saved on the defendant's

12   computer, according to the metadata?

13   A.  5/8/2012.

14             MR. HOWARD:  The government offers Government Exhibit

15   295.

16             THE COURT:  Any objection?

17             MR. DRATEL:  Yes, your Honor.  Hearsay and <u>Vayner</u>.

18             THE COURT:  All right.  Those objections are

19   overruled, and Government Exhibit 295 is received.

20             (Government's Exhibit 295 received in evidence)

21   BY MR. HOWARD:

22   Q.  So, Mr. Kiernan, how many pages is this exhibit?

23   A.  Two.

24   Q.  And so what is depicted right here on the -- is this

25   another screenshot from FTK Imager?

1    A.  Yes.

2    Q.  And where was this file located?

3    A.  This was in the "home/frosty/documents/archive/documents/op

4    prof sek/security/aliases/Richard Page" folder.

5            MR. HOWARD:  Can you zoom out please, Ms. Rosen, and

6    can you zoom in on the top left-hand corner here.

7    Q.  Is this an image showing -- another image showing the

8    directory structure of the defendant's computer?

9    A.  Yes.

10           MR. HOWARD:  And can you zoom in on this part,

11   Ms. Rosen.

12   Q.  And so is the directory that you just referenced as to

13   where the file was located reflected in this?

14   A.  Yes.

15   Q.  Can you just point it out?

16   A.  Sure.  The name of the folder is "Richard Page."

17   Q.  That was in a folder called "Aliases," correct?

18   A.  Correct.

19   Q.  Which is, in turn, in a folder called "security," correct?

20   A.  That's correct.

21   Q.  What does the metadata of the document reflect about the

22   date that this file was first saved to the defendant's

23   computer?

24   A.  5/8/2012.

25   Q.  Is that this reference right by the "Date Created" field?

F1ldulb7                        Kiernan - direct

1    A.  Yes.

2    Q.  And earlier you testified that there were a lot of files

3    with that date on them?

4    A.  Yes.

5            MR. HOWARD:  Can you zoom out, please.

6    Q.  What is contained on the bottom right-hand corner of this

7    exhibit?  What does this part of the screenshot represent?

8    A.  Oh, the contents of the file, what was in the file.  It is

9    a viewer for that.

10   Q.  So we have:  "Name:  Richard Page.  DOB:  5/13/1977.

11   Married.  Address, or "Addr:"  11640 Gary Street, Garden Grove,

12   California  92840, United States.  Phone is 714-620-7320.  PGP

13   pass phrase, and then a redacted area there.

14           Is there text in that section that is redacted?

15   A.  Yes.

16   Q.  And down here we see the word KalyHost, AutoVPS, Silk Road,

17   staff@SilkRoad.org, correct?

18   A.  Correct.

19           MR. HOWARD:  Ms. Rosen, can you please move this to

20   the left-hand part of the screen.

21           Could you publish Government Exhibit 150 on the

22   right-hand side, which has already been admitted into evidence,

23   which is the who.is information for silkroadmarket.org.  Can

24   you just zoom in here.

25           Actually, a little higher, please.  Right there.

1  Actually, you were in the right place.  That is my fault.

2          And a little higher.  Just a little bit.

3  Q.  So here it says, "Domain history info for

4  silkroadmarket.org," right?

5  A.  Correct.

6          MR. HOWARD:  Could you scroll down, Ms. Rosen.  Here

7  it says -- I'm sorry.  Pause it for a second.

8  Q.  "Old registrar information, March 12, 2011," correct?

9  A.  Yes.

10  Q.  Could you go down Ms. Rosen.

11          And this says -- can you focus on this little block

12  right here?  Right here.

13          Here it says:  "Registrant contact information.  Name:

14  Richard Page.  Address:  111640 Gary Street.  City:  Garden

15  Grove.  State: California.  Zip:  92840.  Country:  U.S.

16  Phone:  +1.7146207320.  And email:  Richardpage@gawab.com.

17          Mr. Kiernan, how does the information on the who.is

18  lookup compare to the information on the file that was

19  recovered from the defendant's computer?

20  A.  It's the same.

21          MR. HOWARD:  Ms. Rosen, could you please publish

22  Government Exhibit 212, which has already been admitted into

23  evidence.

24  Q.  Mr. Kiernan, what does Government Exhibit 212 depict?

25  A.  212 is the file structure of the defendant's laptop, of the

1    "var/www/market" directory.

2    Q.   Let me zoom in over here.  Is this upper left-hand window

3    again the file structure of the defendant's computer?

4    A.   Yes.

5    Q.   And so you are talking about the var/www directory,

6    correct?

7    A.   I am, yes.

8    Q.   Is this one of the folders you are referring to?

9    A.   Correct, that is one of the folders.

10   Q.   So what is -- you have experience with Linux-based

11   computers, correct?

12   A.   I do, yes.

13   Q.   Approximately how many have you analyzed in the course of

14   your career?

15   A.   Hundreds.

16   Q.   So what kind of files are stored in var/www directory on a

17   computer running Linux?

18   A.   Typically website files, Web server files.

19   Q.   And what can such website files found on a laptop in this

20   kind of directory be used for?

21   A.   For maybe backup there or to test out, to try --

22            MR. DRATEL:  Objection.  Objection.

23            THE COURT:  Well, apart from this document, your

24   general experience, why don't you discuss that.

25            THE WITNESS:  Sure.  Usually that directory structure

F11dulb7                    Kiernan - direct

1   on a Linux machine will house or hold Web files for the actual

2   Web server working.  So for this you can run it to practice, to

3   test, to backup a website, or things like that would generally

4   appear in this file structure.

5   Q.  Did you review the files in this directory?

6   A.  I did.

7   Q.  And did this directory contain files associated with any

8   website?

9   A.  Yes, they did.

10  Q.  And what website was that?

11  A.  The Silk Road website.

12  Q.  Mr. Kiernan, could you please flip in your binder to what's

13  been marked for identification purposes as Government Exhibits

14  268 and 269.

15          (Pause)

16  A.  OK.

17  Q.  And what are these exhibits?

18  A.  These are files extracted from the defendant's laptop.

19  Q.  And from what part of the laptop?

20  A.  This was from the "var/www/market/public" directory.

21  Q.  And you testified that this is a part of a Linux system in

22  which Web page files could be stored, correct?

23  A.  Sure.  Yeah.

24  Q.  Did you take these screenshots?

25  A.  I did, yes.

F1ldulb7                          Kiernan - direct

1          MR. HOWARD:  The government offers Government Exhibits

2     268 and 269.

3          THE COURT:  Mr. Dratel.

4          MR. DRATEL:  I am just going back to the page, your

5     Honor.

6          (Pause)

7          On Vayner, your Honor.

8          THE COURT:  All right.  That objection is overruled.

9     Government Exhibits 268, 269 are received.

10         (Government's Exhibits 268, 269 received in evidence)

11         THE COURT:  There wasn't an objection noted pretrial,

12    but we will go over that at the break.

13         MR. HOWARD:  Ms. Rosen, would you please publish

14    Government Exhibit 268.

15    Q.  So is this another screenshot from FTK Imager?

16    A.  It is.

17    Q.  And as with the other ones we've seen, is the contents of

18    the file contained in the bottom right-hand corner?

19    A.  Yes.

20    Q.  What is the title of this file?  What is it called?

21    A.  This is called "closed.PHP."

22    Q.  What does "php" mean?

23    A.  It's a scripting file or files that can sit on a server

24    running php software.  Basically, they are Web pages.  That is

25    how they look on the machine hosting that website.

F1ldulb7                          Kiernan - direct

1          MR. HOWARD:  And, Ms. Rosen, can you zoom in on the

2    bottom right-hand corner.

3    Q.  This is the one that contains the contents of the file,

4    correct?

5    A.  Yes.

6    Q.  And here it says, "Silk Road anonymous market."

7          Do you recognize what this is, what I am pointing to

8    on the screen?

9    A.  Yes.  That is the Silk Road logo.

10   Q.  It says here:  "Silk Road is down for maintenance.  More

11   information can be found on the forum here," then a link,

12   correct?

13   A.  Correct.

14   Q.  And the link includes a dot-onion address, isn't that

15   correct?

16   A.  That is correct.

17         MR. HOWARD:  Ms. Rosen, would you please publish

18   Government Exhibit 269, please.

19   Q.  Is this another file that was recovered from the part of

20   the computer used to store website files?

21   A.  Yep.  Ah, yes.

22   Q.  And what was the names of this file?

23   A.  This was "dpr_key.php."

24   Q.  And this is also a website code -- it is a php file?

25   A.  Right, it is a php file.

F11dulb7                        Kiernan - direct

1              MR. HOWARD:  Could you zoom in on the bottom

2      right-hand corner of the screenshot, please.

3      Q.  And this, again, this part of the FTK Imager shows the

4      contents of the file, correct?

5      A.  Yes, it does.

6      Q.  It says:  "The following PGP key can be used to verify

7      messages signed by the Silk Road administrator Dread Pirate

8      Roberts.  Begin PGP public key block," a bunch of text here and

9      then "End PGP public key block."

10             What is a PGP key, Mr. Kiernan?

11     A.  It's a key to enable -- to verify or to enable people to

12     share documents back and forth.  The keys basically lock the

13     message that's being shared.  To actually read it, you share

14     your public key with other people so they can open or verify

15     things that you get from them.

16             MR. HOWARD:  Ms. Rosen, can you just move this to the

17     left-hand side of the screen and just focus on the actual

18     contents.

19             And on the right side, can we please publish

20     Government Exhibit 133, which is a screenshot taken by Special

21     Agent Der-Yeghiayan of the Silk Road website.

22             And can we zoom in on the text here.  Above that,

23     please.

24             "The following PGP key can be used to verify messages

25     signed by the Silk Road administrator Dread Pirate Roberts.

1    Begin PGP public key block."  A bunch of text.  And "End PGP

2    public key block."

3    Q.  Mr. Kiernan, how did this file on the defendant's laptop

4    compare to this page from the Silk Road website?

5    A.  They were the same.

6    Q.  Now, what kind of -- is this a public key or private key,

7    Mr. Kiernan?

8    A.  These are public keys.

9    Q.  Did you find in your analysis of the defendant's computer,

10   did you find a corresponding PGP private key?

11   A.  I did, yes.

12   Q.  Mr. Kiernan, would you please flip in your binder to what

13   has been marked for identification purposes to Government

14   Exhibit 296.

15           (Pause)

16           Do you recognize what this is?

17   A.  Yes.

18   Q.  And what is it?

19   A.  This is the file extracted from the defendant's computer.

20   It's the Silk Road private key.

21   Q.  How many pages is this exhibit?

22   A.  Two.

23   Q.  What is the second page of this exhibit?

24   A.  The second page is when I imported that key into a

25   different program, a PGP -- a GPG program to get the statistics

F1ldulb7                         Kiernan - direct

1    of that file.

2    Q.  Mr. Kiernan, is that a screenshot that you took?

3    A.  Oh, I'm sorry.  Yes, it is.  Yes.

4             MR. HOWARD:  The government offers Government Exhibit

5    296.

6             MR. DRATEL:  Objection.  Vayner and hearsay.

7             THE COURT:  All right.  Those objections are

8    overruled.  GX296 is received.

9             (Government's Exhibit 296 received in evidence)

10   BY MR. HOWARD:

11   Q.  So, Mr. Kiernan, is this another screenshot taken from FTK

12   Imager?

13   A.  It is, yes.

14   Q.  What is the name of the directory that's depicted here on

15   the upper -- the files, what directory are they from?

16   A.  The "Home/frosty/backup/keys" directory.

17            MR. HOWARD:  And could you focus in on the top

18   right-hand window, Ms. Rosen.

19   Q.  These are the files that are located in that directory?

20   A.  Yes.

21   Q.  And where did you find the corresponding private key for

22   the Dread Pirate Roberts?

23   A.  In this directory.

24   Q.  And which file was it?

25   A.  SilkRoad.asc."

F1ldulb7                        Kiernan - direct

1  Q.  Can we please flip to page second -- page 2 of the exhibit.

2          Can you explain what is depicted in this screenshot?

3  A.  Yes.  So this was the gpg software where I imported the

4  keys from that other public -- from that file, from the

5  defendant's laptop.

6  Q.  What is gpg software?

7  A.  It's software to trade -- not trade, but it's software used

8  to create keys, pass out keys.  So when I sign my stuff, my

9  mails or my documents, I can give you the other key to actually

10 verify it is my stuff.

11         MR. HOWARD:  And so can we zoom in on this window

12 here, Ms. Rosen, the whole window.  If you could do the whole

13 window.

14 Q.  And so what does this depict, Mr. Kiernan?

15 A.  That depicts the opening of that ASC file that you saw

16 before, and it shows the name of the key, the Silk Road, the

17 email associated with the key, the staff@silkroadmarket.org.

18 And then if you go down, the date that the key was created.

19 And if you continue down, it says "key."  And right next to it

20 it has "secret and public key" contained within that file.

21 Q.  So what does "secret and public key" mean?

22 A.  So I could build -- well, it contains both keys.  I could

23 sign stuff and open stuff using this and verify stuff using

24 these keys.

25 Q.  If this wasn't a private key, if this was a public key,

1    what would it say there?

2    A.  Just have the public -- "secret" would be off there.

3    Public key would be the only thing you could see there.

4    Q.  What was the date this private key was created?

5    A.  April 1st, 2011.

6    Q.  And were you able to verify that this matched with the

7    public key?

8    A.  I was able to extract the public key from it, yes.

9    Q.  And did it correspond to the public key for the Dread

10   Pirate Roberts that you found on the Silk Road website and the

11   on the defendant's computer?

12   A.  Yes.

13            THE COURT:  Mr. Howard, you've got about eight minutes

14   left.  All right?  Just to give you a sense of timing.

15            MR. HOWARD:  For the day, your Honor?

16            THE COURT:  For the day.

17            MR. HOWARD:  I think there would be a few more

18   questions, and then it would be an appropriate time for a

19   natural breaking point, if that works.

20            THE COURT:  Absolutely, I want you to use the time or

21   for sure.  I just wanted to give you a sense of what you've got

22   left.

23            MR. HOWARD:  Thank you, your Honor.

24   BY MR. HOWARD:

25   Q.  Mr. Kiernan, can you please flip in your binder at what has

F11dulb7                    Kiernan - direct

1  been marked for identification purposes as Government Exhibit

2  212A.

3            (Pause)

4  A.  OK.

5  Q.  How many pages is Government Exhibit 212A?

6  A.  Three pages.

7  Q.  Do you recognize what this exhibit is?

8  A.  I do.  Files extracted from the defendant's computer.

9  Q.  And where on the computer were these files located?

10 A.  These were in the var/www/market/application/views

11 directory.

12 Q.  Is this part of the same var.www directory that you

13 described that was used to have Web page files?

14 A.  Yes.

15 Q.  Did you take these screenshots?

16 A.  I did, yes.

17           MR. HOWARD:  The government offers Government Exhibit

18 212A.

19           THE COURT:  Mr. Dratel.

20           MR. DRATEL:  Objection on Vayner and hearsay grounds,

21 your Honor.

22           THE COURT:  All right.  Those objections are

23 overruled.  Government Exhibit 212A is received.

24           (Government's Exhibit 212A received in evidence)

25           MR. HOWARD:  Ms. Rosen, could you please publish page

F11dulb7                        Kiernan - direct

1   1.

2   Q.  Are all the pages in this exhibit various screenshots of

3   files found within that directory used for website files?

4   A.  Yes.

5   Q.  What is the name of the file that's depicted on the first

6   page?

7   A.  About.php.

8   Q.  Could you focus on the bottom right-hand corner.

9   A.  I can, yes.

10          MR. HOWARD:  Ms. Rosen, why don't we just focus on

11  maybe the top of this.  We will see it a little bigger.

12  Q.  So, Mr. Kiernan, there is also -- there is this text here

13  that's inside little brackets.

14  A.  Yes.

15  Q.  What does that represent?  What is that?

16  A.  That's actually code within the file.  It doesn't get

17  rendered correctly in this viewer.

18  Q.  Are you familiar with that kind of code?

19  A.  Yes.

20  Q.  Can you describe -- can you read or point to on the screen

21  if this file was loaded in a browser, what is the text that

22  would appear?

23  A.  Sure.

24  Q.  Read it, please.

25  A.  "Greetings and welcome to Silk Road."  That would be one of

F11dulb7                        Kiernan - direct

1    them.  "I know you can't wait to get to the good stuff, but

2    please take a moment to read this message.  It's been written

3    to help keep you safe," and things like that.

4    Q.  That's enough.

5          Can we go to the second page of this exhibit.  What

6    was this file called?

7    A.  This was called "logo_hi-res.jpg."

8    Q.  What kind of file is a JPG file?

9    A.  An image file, a picture file.

10   Q.  Was this also found in that same section of the defendant's

11   computer?

12   A.  The same section, yes.

13   Q.  Do you recognize the photograph that that file contains?

14   A.  I do, yes.  It's the Silk Road logo.

15         MR. HOWARD:  Ms. Rosen, can we flip to the last page

16   of this exhibit.

17   Q.  What is the name of this Web page?

18   A.  "Sellers_guide.php."

19         MR. HOWARD:  Ms. Rosen, can you zoom into the bottom

20   right-hand window.

21   Q.  Again, this contains certain Web page code, correct?

22   A.  Correct, it does.

23   Q.  Could you please read the first two lines of what the text

24   would appear like and point to it on the screen if this was

25   loaded into a Web browser?

1   A.  Sure.  "Sellers Guide.  You and you alone will have your

2   client's shipping address" -- I'm sorry.  Above that, it is

3   "Client Anonymity."  Yes.  Right there.  "This information must

4   be destroyed as soon as it is used to label their package," and

5   so on.

6   Q.  Now, if you read the next couple of lines.

7   A.  Oh, sure.

8           "Never ask your clients for personal information.

9   Under no circumstance should you save a copy of your client's

10  address.  Publish a public encryption key in your user

11  description on your settings page."

12          Sorry.  All the way over here.

13          MR. HOWARD:  Ms. Rosen, can you zoom out, please.

14          Can you zoom in on the upper right-hand window.

15  Q.  And, Mr. Kiernan, what are all of these files that include

16  ".php" at the end?

17  A.  They are all Web page files.

18  Q.  Here we have "Buyers_guide.php," "Category."  We discussed

19  some already, like "DPR_key.php," correct?

20  A.  Correct.

21  Q.  Reviews.php?

22  A.  Yes.

23  Q.  Support.php, user.php?

24  A.  Yes.

25  Q.  Write_review.php?

F1ldulb7                          Kiernan - direct

1    A.  Yes.

2    Q.  These are all Web pages?

3    A.  Yes.

4    Q.  Mr. Kiernan, would you please flip in your binder to what's

5    been marked for identification purposes as Government Exhibit

6    212B.

7    A.  212B?

8    Q.  Do you recognize what this is?

9    A.  Yes.

10   Q.  And what is this?

11   A.  A file extracted from the defendant's computer.

12   Q.  And did you take this screenshot of this file?

13   A.  I did, yes.

14           MR. HOWARD:  The government offers Government Exhibit

15   212B.

16           THE COURT:  Mr. Dratel.

17           MR. DRATEL:  The same objections, hearsay and Vayner,

18   your Honor.

19           THE COURT:  Those objections are overruled.

20   Government Exhibits 212A and B are received.

21           (Government's Exhibits 212A and 212B received in

22   evidence)

23           MR. HOWARD:  Can you zoom in on the upper right-hand

24   corner.

25   Q.  What was the name of this file, Mr. Kiernan?

1   A.  This file was mastermind.php.

2   Q.  Are you familiar with the "mastermind" page from the Silk

3   Road website, Mr. Kiernan?

4   A.  I am.

5   Q.  And when have you seen it before?

6   A.  I've seen it when I was doing this laptop, looking at the

7   laptop, and when I was on the defendant's -- when I took the

8   pictures of the defendant's laptop.

9   Q.  And who chooses the titles for Web page files?

10  A.  The designers of the website.

11          MR. HOWARD:  Your Honor, this would be a natural

12  breaking point if you want to stop here.

13          THE COURT:  Yes.  Ladies and gentlemen of the jury, we

14  will end for the day.  We'll pick up tomorrow morning at 9:30.

15          I want to remind you not to talk to each other or

16  anybody else about this case.  I want to remind you, also, to

17  avoid any news articles or media that may discuss this case in

18  any way.  If you run across anything, avert your eyes.  I

19  instruct you that you must do so.

20          And, also, I want to remind you not to try to go on

21  the Web and do any research on your own.  It is very important

22  that the only evidence that is used to decide this case is the

23  evidence you receive in this room.  So don't try to go off onto

24  Google and become an expert in Linux or anything else.

25          All right.  Thank you.  We are adjourned for the

F11dulb7                      Kiernan – direct

1      evening.  We'll pick up tomorrow morning.

2                  THE CLERK:  All rise as the jury leaves.

3                  (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1ldulb7

1          (Jury not present)

2          THE COURT:  Mr. Kiernan, we'll pick up at 9:30

3    tomorrow morning.  So you can also step down.  Thank you.

4          THE WITNESS:  Thank you, your Honor.

5          (Witness not present)

6          THE COURT:  All right, ladies and gentlemen.  Let's

7    all be seated for just one moment.

8          I just wanted to very quickly go through the exhibits

9    that had had objections as to which the prior rulings, I wanted

10   to be sure that we understood that they apply.

11         GX264 was received and the Court overruled the <u>Vayner</u>

12   objection for all of the reasons that we've already discussed,

13   and, indeed, that is the same for each of the electronic

14   documents, that this witness has authenticated them

15   appropriately.

16         And in terms of hearsay, these are not for the truth,

17   nor is 254 for the truth or 270, 275, 295, 280, 268, but I want

18   the government to make sure with 268 that that is right, that

19   you are not offering it for the truth.  269 not for the truth.

20   296 not for the truth.  212A and B not for the truth.  There is

21   one of them, the Dominica Guide, 290 and 291, not for the

22   truth, 291 being the application.

23         272 was the photograph with the bags of what could be

24   whatever they are.  That was objected to in the Pretrial Order

25   under 403.  So the Court additionally had undertaken a 403

F1ldulb7

1    analysis, and finds that given the charges in this case, that

2    evidence is both relevant but it is not unduly prejudicial.

3    Its probative value is not substantially outweighed by any

4    prejudicial effect.  Certainly, at most, the inferences that

5    could be drawn are consistent with the charges in this case,

6    and it is no more serious than that.  It also was properly

7    authenticated.

8            Mr. Howard, were any of the documents which I had

9    mentioned things which the government had intended to offer for

10   the truth?

11           MR. HOWARD:  Your Honor, to the extent that some of

12   them included statements of the defendant, we would seek to

13   admit them as party admissions.

14           THE COURT:  All right.  To the extent that there are

15   portions where it is not only by the -- allegedly by the

16   defendant subject to connection, but that it's for the truth

17   associated with the defendant, as opposed to associated and not

18   for the truth, then they would be party admissions in the same

19   manner that we previously discussed subject to connection.

20           MR. HOWARD:  Yes, your Honor.

21           MR. DRATEL:  Your Honor, just because it is on his

22   laptop doesn't mean it is a party admission.  Everything on his

23   laptop is not by the defendant.

24           THE COURT:  Subject to connection.  As we all know,

25   the subject to connection will be a finding by a preponderance

F1ldulb7

1    of the evidence.  That is what the evidentiary objections

2    require.  And so when the government's case is in, we'll

3    determine whether or not ultimately all the "subject to

4    connection" statements have been met or not met, and we'll take

5    that up at that time.

6          All right.  Anything else that you folks wanted to

7    raise?

8          MR. DRATEL:  Just one thing.  I will wait for the

9    government first, just in case.

10          MR. HOWARD:  Yes, your Honor.  There is an additional

11    witness that we plan on calling tomorrow.  It is a very short

12    witness.  It is Special Agent Gregory Fine from the Federal

13    Bureau of Investigation.

14          THE COURT:  All right.  And tell me why Mr. Fine is

15    coming in now and was not on your original list.

16          MR. HOWARD:  Yes.  Special Agent Fine is only going to

17    be testifying about the seizure of thumb drive devices from the

18    defendant's residence.  The relevance of the files to the

19    government became more clear following what the defense

20    previewed in their opening statement.  So he will be

21    authenticating the seizure of thumb drives.

22          Mr. Kiernan tomorrow will testify about an analysis of

23    files that were recovered from that thumb drive.

24          THE COURT:  All right.  So he is simply to

25    authenticate the thumb drives?

F11dulb7

```
 1              MR. HOWARD:  Yes.
 2              THE COURT:  That is really his entire purpose is to
 3    say I was there, I got the thumb drives, do a chain of custody?
 4              MR. HOWARD:  Yes, your Honor.
 5              THE COURT:  All right.  Mr. Dratel.
 6              MR. DRATEL:  Do we have all of the exhibits that they
 7    are going to put in?  I want to make sure.
 8              THE COURT:  Do you have everything that you are going
 9    to use with this fellow?
10              MR. HOWARD:  Yes.  They are in the 200 series.
11              THE COURT:  And they have already been turned over to
12    the defense?
13              MR. HOWARD:  They have, your Honor.
14              THE COURT:  All right.
15              MR. DRATEL:  OK.
16              THE COURT:  Any 3500 material, I take it there
17    probability isn't any, but if there is, you have given it to
18    the defendant?
19              MR. HOWARD:  Yes.  We just need to verify that he
20    didn't send any emails that we can assert 3500.  Based on his
21    role in the search, we doubt there is anything.  We'll get that
22    immediately and promptly provide it to the defendant.
23              THE COURT:  Thank you.
24              Mr. Dratel.
25              MR. DRATEL:  Not 5,000 pages.
```

F1ldulb7

1          The only thing I wanted to add, your Honor, not about

2     that, but about some of the exhibits that came in -- I think

3     most of the exhibits that came in today through Mr. Kiernan

4     were different than the original ones that we had.  I don't

5     mean different altogether, but in terms of how they were sent

6     to us.  So, for example, many of them, in terms of the time

7     that we interposed objections, did not have metadata or a

8     different kind of presentation of metadata.

9          So I think that may be one of the reasons why there

10     may not be objections to some of them previously and there are

11     now.  I'm not saying that is all of them, but I just wanted --

12     there are differences.  We are getting the series of exhibits

13     as the government has posted them.

14          THE COURT:  I have not found that you have waived

15     objections.  I have been allowing you to put them on the

16     record, and we have been dealing with them.

17          If there are any other issues which you want to raise,

18     you can either raise them on cross-examination with this

19     witness if there are differences, or if there is anything that

20     you should bring to my attention, go ahead and bring it to my

21     attention either now or tomorrow morning about that.

22          MR. DRATEL:  It is just more about timing for that

23     particular issue.

24          THE COURT:  All right.  Anything further, folks, that

25     we should go over tonight?  Otherwise we will meet tomorrow

F11dulb7

1    morning at 9.

2              MR. HOWARD:  Nothing from the government, your Honor.

3              MR. DRATEL:  Nothing, your Honor.  Thank you.

4              THE COURT:  One thing I do want to encourage you

5    folks, because things have a way of coming up, as we know, if

6    we could be here close to 9, that would be helpful.  Otherwise

7    we end up starting with ourselves at 9:20.  We don't get the

8    jury out here until 9:40 or 9:45, today at 9:50.  So let's just

9    give it a go.

10             All right.  Thank you.  We are adjourned.

11             THE CLERK:  All rise.

12             (Adjourned to 9 a.m., Thursday, January 22, 2015)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            INDEX OF EXAMINATION

2    Examination of:                              Page

3    JARED DER-YEGHIAYAN

4    Redirect Mr. Turner  . . . . . . . . . . . . 802

5    Recross By Mr. Dratel  . . . . . . . . . . . 813

6    Redirect By Mr. Turner . . . . . . . . . . . 836

7    Recross By Mr. Dratel  . . . . . . . . . . . 839

8    THOMAS KIERNAN

9    Direct By Mr. Howard . . . . . . . . . . . . 844

10                        GOVERNMENT EXHIBITS

11   Exhibit No.                               Received

12    149   . . . . . . . . . . . . . . . . . . . 802

13    151   . . . . . . . . . . . . . . . . . . . 805

14    128G   . . . . . . . . . . . . . . . . . . . 851

15    128H   . . . . . . . . . . . . . . . . . . . 853

16    200   . . . . . . . . . . . . . . . . . . . 855

17    201A   . . . . . . . . . . . . . . . . . . . 860

18    201B through G  . . . . . . . . . . . . . . 863

19    500   . . . . . . . . . . . . . . . . . . . 873

20    200A   . . . . . . . . . . . . . . . . . . . 875

21    211 through 216  . . . . . . . . . . . . . 879

22    273   . . . . . . . . . . . . . . . . . . . 881

23    274   . . . . . . . . . . . . . . . . . . . 886

24    222   . . . . . . . . . . . . . . . . . . . 891

25    222B   . . . . . . . . . . . . . . . . . . . 894

1    222A, 223, 224, 225A-225B   . . . . . . . . 897

2    226A-226I, 227A-227H, 228   . . . . . . . . 897

3    229A-229E, 231A-231C, 232A-232E   . . . . . 897

4    240A-240D, 241  . . . . . . . . . . . . . . 898

5    242   . . . . . . . . . . . . . . . . . . . 930

6    256   . . . . . . . . . . . . . . . . . . . 934

7    255   . . . . . . . . . . . . . . . . . . . 948

8    250   . . . . . . . . . . . . . . . . . . . 950

9    251   . . . . . . . . . . . . . . . . . . . 957

10   264   . . . . . . . . . . . . . . . . . . . 976

11   254   . . . . . . . . . . . . . . . . . . . 988

12   270   . . . . . . . . . . . . . . . . . . . 989

13   280   . . . . . . . . . . . . . . . . . . . 992

14   271   . . . . . . . . . . . . . . . . . . . 994

15   272   . . . . . . . . . . . . . . . . . . . 996

16   275   . . . . . . . . . . . . . . . . . . . 997

17   290 and 291   . . . . . . . . . . . . . . . 999

18   295   . . . . . . . . . . . . . . . . . . .1003

19   268, 269   . . . . . . . . . . . . . . . . .1009

20   296   . . . . . . . . . . . . . . . . . . .1013

21   212A   . . . . . . . . . . . . . . . . . .1016

22   212A and 212B   . . . . . . . . . . . . . .1020

23

24

25