F1MGULB1                          Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                        14 Cr. 68 (KBF)

ROSS WILLIAM ULBRICHT,

                Defendant.

------------------------------x

                                          New York, N.Y.
                                          January 22, 2015
                                          9:10 a.m.

Before:

                    HON. KATHERINE B. FORREST,

                                          District Judge

                          APPEARANCES

PREET BHARARA,
     United States Attorney for the
     Southern District of New York
BY:  SERRIN A. TURNER
     TIMOTHY HOWARD
          Assistant United States Attorneys

JOSHUA LEWIS DRATEL
LINDSAY LEWIS
JOSHUA HOROWITZ
     Attorneys for Defendant

          – also present –

Special Agent Vincent D'Agostino
Molly Rosen, Government Paralegal
Nicholas Evert, Government Paralegal
Sharon Kim, Legal Intern

1          (In open court; jury not present)

2          THE DEPUTY CLERK:  This is the continuation of the

3     matter now on trial, the United States of America v. Ross

4     William Ulbricht, 14 Cr. 68.

5          Counsel, state your names for the record.

6          MR. TURNER:  Good morning.  Timothy Howard and Serin

7     Turner for the government, joined by Nicholas Evert and Molly

8     Rosen and Sharon Kim who is a student intern.

9          THE COURT:  Good morning all of you.

10         MR. DRATEL:  Good morning.  Joshua Dratel with Ross

11    William Ulbricht and Lindsay Lewis and Joshua Horowitz.

12         THE COURT:  Good morning to all of you.

13         I have one matter to raise just relating to the letter

14    that I got from the government this morning and to give you

15    folks a sense as to how I think we should proceed on that.

16         We have a juror who had called 45 minutes ago saying

17    that he thought he would be ten to 15 minutes late due to a

18    plumbing issue that he had to address but he only thought it

19    would be ten to 15 minutes, so I think we're look at

20    9:40 anyway, unless he gets here earlier.

21         Do you folks have things that you would like to raise?

22         MR. HOWARD:  Just one issue we'd like to address at

23    side bar.

24         THE COURT:  Okay.  So there's one issue for the

25    government.

1      For you, Mr. Dratel, anything?

2          MR. DRATEL:  No, your Honor.

3          THE COURT:  Before we go to side bar, let me just deal

4  with the complaint of bitcoin amount, and this relates to the

5  defense application to read the paragraph 22C, if my memory

6  serves, from the complaint relating to the bitcoin amount.  I

7  think we are in agreement at least that the *GAF* case, among

8  others, does provide a basis to read documents of that type.

9  It seems that there's a dispute between the government and the

10  defense as to whether or not there's a material fact which

11  needs to be addressed by virtue of this.

12          My suggestion is sufficient unto the day.  Let's see

13  how the government's case comes in and whether or not the

14  defense believes that there's still a basis for asserting a

15  material dispute of fact.  I reviewed yesterday the way in

16  which I perceived, based upon the defense opening, that the

17  issue came into the case.  Whether or not the factual dispute

18  is resolved by virtue of whatever the proof is, that I think

19  remains to be determined.  So let's wait and see whether or

20  not, Mr. Dratel, your application remains and you want to do

21  that at the conclusion of the government's case.  It's

22  perfectly appropriate for you to do so if there still is a

23  remaining dispute of fact on that issue.

24          MR. DRATEL:  I just want to say, I think this case is

25  completely distinguishable from *GAF*, in fact, the Court says

F1MGULB1                          Trial

1    it's distinguishable from *GAF*.  So it's a theory of issue, not

2    a question of a representation made by the government in a

3    binding way, which was a sworn complaint under oath.  It's

4    extraordinarily different.

5            THE COURT:  Let me just make sure that I have put my

6    view clearly, which is, as a matter of law, the statement in

7    the complaint is the kind of statement, if there's a material

8    dispute of fact, which can be taken as an admission.

9            MR. DRATEL:  Right.  Thank you.

10           THE COURT:  Now, the question is whether or not

11   there's a material dispute of fact, and that is something which

12   the government is taking issue with.  My view is sufficient

13   unto the day.  If, at the end of the government's case, there's

14   no remaining material dispute of fact on that issue, so be it.

15   You may choose that you don't want to pursue this.  If you

16   believe that it remains, we'll talk about it, but I think the

17   legal principle we're now resolved on.

18           Yes, Mr. Turner.

19           MR. TURNER:  I just want to note on our part, we

20   actually don't agree that *GAF* applies to an agent affidavit.

21   It's not like a bill of particulars.  But in any event, we

22   don't think the Court needs to address that issue because even

23   if it does apply, we don't think there's a genuine conflict in

24   the representations being made.

25           THE COURT:  All right.  I think the rationale of bill

1   of particulars versus complaint may give -- is not as much of a

2   distinction as -- the difference between those two types of

3   documents is not so much of a distinction.  The rationale of

4   the *GAF* court really was a document put forward by a government

5   agent in furtherance of a governmental position sworn in under

6   oath, which this was.  Let's put it aside.  I think we

7   understand how we're going to be dealing with it, which is at

8   the end of the government case.

9           That was my issue.  Let's hear the issue that you

10  folks wanted to raise at side bar.

11          MR. DRATEL:  With respect to side bars, because we

12  have had some long ones, if Mr. Ulbricht can be present at side

13  bar.

14          THE COURT:  Well, come on up.

15          (At the side bar)

16          MR. TURNER:  This is brief.  I want to note the

17  government's continuing concern about the defendant turning to

18  communicate with his family in the presence of the jury during

19  side bars.  Members of my team noticed it yesterday.  The

20  marshals noticed it.  There was an entire news article that

21  talked about all the communications between the defendant and

22  his family in part in the presence of the jury.  So I just ask

23  that the defendant be reminded again to save those

24  communications until times when the jury has gone back to the

25  jury room.

1   THE COURT:  Mr. Dratel, will you remind your client of

2   that?

3   MR. DRATEL:  Okay.  Thank you.

4   THE COURT:  It's obviously difficult for -- I didn't

5   see the news article.  I don't read the press while the case is

6   ongoing, unless somebody feels like they need to bring

7   something to my attention.  I'll have my deputy pay attention

8   to the issue.  What I need to understand is what would be the

9   measures that the government would be suggesting should be

10  taken and if there was and issue.

11  One possibility is to move the parents and the family

12  to a different part of the courtroom.  There may be other

13  increasingly necessary measures, but let me have Mr. Dratel

14  talk to his client about that.

15  MR. DRATEL:  Not saying anything.  I'm not

16  acknowledging that there has been an issue.

17  THE COURT:  I haven't seen anything myself, but I

18  haven't been looking.  And it is an issue because there

19  shouldn't be communicative conduct that can convey things to

20  the jury, but if Mr. Ulbricht is going to come up during side

21  bars, this issue will be eliminated as we proceed because he'll

22  be here and not there.

23  MR. DRATEL:  Right.  Thank you.

24  THE COURT:  Remind him since he's standing here.  He

25  can hear.

F1MGULB1                         Trial

1          THE DEFENDANT:  I'm aware, and I'm listening.

2          THE COURT:  Thank you.

3          (In open court)

4          THE COURT:  We're checking on the jury.  We might have

5     lucked out, including the person who thought he might be late.

6          If the defendant wants to come up to side bar, which

7     is perfectly fine with the Court, the marshals will come up.

8     That's protocol.  I want you to be aware of that because the

9     jury may or may not draw an inference from that.  You know, you

10    folks can weigh the competing issues.  I don't have a problem

11    with that occurring.

12         We're waiting for Joe to see how the jury is doing.

13         MR. DRATEL:  Thank you.

14         THE COURT:  Anything else we should deal with right

15    now?

16         MR. HOWARD:  Not from the government's perspective.

17         THE COURT:  Okay.

18         Mr. Dratel, anything else from your perspective?

19         MR. DRATEL:  No.

20         THE COURT:  Joe is checking on them.  Let's take a

21    brief break.  Hopefully, we'll be able to start very shortly as

22    soon as we have a full array of jurors.

23         (Continued on next page)

24

25

F1MGULB1                        Trial

1              (In open court; jury present)

2              THE COURT:  Mr. Kiernan, I want to remind you, you are

3    still under oath from yesterday.

4              THE WITNESS:  Okay.

5              THE COURT:  Mr. Howard.

6              MR. HOWARD:  Thank you, your Honor.

7    THOMAS KIERNAN,

8    DIRECT EXAMINATION (Continued)

9    BY MR. HOWARD:

10   Q.  Good morning, Mr. Kiernan.

11   A.  Good morning.

12             MR. HOWARD:  Your Honor, may I approach the witness.

13             THE COURT:  You may.

14   Q.  Mr. Kiernan, I just handed you what's been marked for

15   identification purposes as Government Exhibit 502A.  Do you

16   recognize this exhibit?

17   A.  I do, yes.

18   Q.  What is this?

19   A.  These are two thumb drives that were recovered from the

20   defendant's residence.

21   Q.  And how do you recognize them?

22   A.  From the markings on them and from the paperwork provided

23   with them.

24             MR. HOWARD:  The government offers 502A.

25             MR. DRATEL:  I don't think -- one second, your Honor,

1    with respect to this specific -- no objection.

2              THE COURT:  All right.  Received.

3              (Government's Exhibit 502A received in evidence)

4    Q.  Mr. Kiernan, what is a thumb drive?

5    A.  It's a media device that you can hold files on.  It's a

6    little smaller than a hard drive, but it has the same purposes

7    as a hard drive.  You can store files from -- on the devices.

8    Q.  And how many thumb drives are contained in Government

9    Exhibit 502A?

10   A.  Two.

11   Q.  What is the storage capacity of each of those thumb drives?

12   A.  One was a four gig thumb drive, and the other one was a 16

13   gig thumb drive.

14   Q.  Did there come a time when you reviewed the contents of the

15   16 gigabyte thumb drive?

16   A.  Yes.

17   Q.  How did you get access to the contents of that thumb drive?

18   A.  Through a -- again, with the images that we had created, I

19   had made a staging copying of that -- of the drive, and we were

20   able to look at the drive using the FTK Imager.

21   Q.  Again, is a staging copy, what you testified yesterday, a

22   working copy for you not to affect the original?

23   A.  Correct, correct.  Yes.

24   Q.  Did you do anything to confirm whether the staging copy was

25   identical to the evidence on the original thumb drive?

F1MGULB1                        Kiernan – direct

1  A.  Yes.  We used the MD5 Hash, the digital fingerprint, to

2  make sure that what I was looking at was the actual true copy

3  of these two drives.

4  Q.  Could you please take a moment and flip to what has been

5  marked as Government Exhibit 502 in your binder, please.

6  A.  I'm sorry.  Which one?

7  Q.  502.

8  A.  200s, right?

9  Q.  502, in the very back.

10 A.  502.  Oh, yes, there it is.  Okay.

11 Q.  Do you recognize what this is?

12 A.  I do.

13 Q.  And what is it?

14 A.  This is a standard report from FTK Imager.

15 Q.  What does it depict?

16 A.  It depicts the checksum value of the -- of the drives here,

17 the digital fingerprinting.

18 Q.  Does it indicate anything about the MD5 Hash value?

19 A.  Yes, it does.  It has it here.

20        MR. HOWARD:  The government offers Government

21 Exhibit 502.

22        MR. DRATEL:  No objection.

23        THE COURT:  Received.

24        (Government's Exhibit 502 received in evidence)

25        MR. HOWARD:  Ms. Rosen, can you please publish

F1MGULB1                              Kiernan – direct

1    Government Exhibit 502.

2    Q.  Mr. Kiernan, see here at the bottom it says MD5 checksum

3    and then a long string of characters starting with "fc12"?

4    A.  Correct, yes.

5    Q.  What is that long string of characters that we just pointed

6    out?

7    A.  That's the number that's produced when you run that

8    program, that MD5 program on the devices.

9    Q.  That's what you refer to as essentially the fingerprint?

10   A.  That's the fingerprint.  That's the number that that

11   represents, yes.

12   Q.  Now, could you now flip in your binder to what's been

13   marked for identification purposes as Government Exhibit 205A.

14   A.  Okay.

15   Q.  Do you recognize what this is?

16   A.  Yes.

17   Q.  And what is it?

18   A.  This is the checksum that I took of the imaged files of the

19   thumb drives to make sure that I'm working on the same -- a

20   good copy of those drives.

21   Q.  And you took this screen shot?

22   A.  I took this screen shot, yes.

23            MR. HOWARD:  The government offers Government

24   Exhibit 502 -- sorry -- 205A.

25            MR. DRATEL:  No objection.

F1MGULB1                    Kiernan - direct

1    THE COURT:  Received.

2         (Government's Exhibit 205A received in evidence)

3         MR. HOWARD:  Ms. Rosen, can you please publish

4    Government Exhibits 502 and 205A side by side.  Actually, let's

5    focus on 205A.  Let's do that full screen.

6    Q.  Mr. Kiernan, you see here it says computer hash?

7    A.  Yes.

8    Q.  I'm sorry, up here on the MD5?

9    A.  MD5, yes.

10   Q.  And then here it says "fc12," a long string of characters.

11   Can you highlight that, Ms. Rosen.

12        What does this represent here?

13   A.  Again, that's the value created when looking at the thumb

14   drives that I had, that's the checksum, that's the fingerprint

15   that's created.

16   Q.  And did it match with the original copy?

17   A.  It did, yes.

18   Q.  Did you analyze the contents of this thumb drive?

19   A.  I did.

20   Q.  And what did you find on the copy of the thumb drive after

21   you started to analyze it?

22   A.  I found two files.

23   Q.  Could you please flip in your binder to what's been marked

24   for identification purposes as Government Exhibit 297.

25   A.  Okay.  Got it.

F1MGULB1                        Kiernan - direct

1   Q.  How many pages is this exhibit?

2   A.  This is two.

3   Q.  And what is it -- do you recognize this exhibit?

4   A.  I do.

5   Q.  And what is it?

6   A.  This is a screen shot of the files stored on the thumb

7   drive, the 16 gig thumb drive; yes.

8   Q.  What is the second page?

9   A.  The second page is a process used to look at one of those

10  files.

11  Q.  Did you take the screen shots of the images depicted in

12  Government Exhibit 297?

13  A.  Yes.

14          MR. HOWARD:  The government offers Government

15  Exhibit 297.

16          MR. DRATEL:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 297 received in evidence)

19          MR. HOWARD:  Could you please publish 297, please.

20  Q.  This is another screen shot taken from FTK Imager?

21  A.  That it is, yes.

22  Q.  What device?

23  A.  The 16 gig thumb drives.

24          MR. HOWARD:  So, Ms. Rosen, could you please zoom in

25  on the upper right-hand window.

F1MGULB1                    Kiernan - direct

1   Q.  And what is listed in this window, Mr. Kiernan?

2   A.  The files that were contained on that thumb drive.

3   Q.  A second ago, you mentioned two files in particular.  Which

4   ones are those?

5   A.  Correct.  Those two files are the backup.tar.gz.gpg above

6   that, not the fileslack one.

7   Q.  The one I'm pointing to right now?

8   A.  Yes, the one in green there.  And the other file is

9   www.tar.gz.gpg.  Those are the only active real files on that

10  drive.  The Xs represent files that were deleted that I did not

11  recover.  That's how it comes up.

12  Q.  Based on your review of the thumb drive, do you know what

13  date those files were saved?

14  A.  Yes.  9/23/2013.

15  Q.  And what, if you look at those two files that you just

16  discussed, they end in ".gpg"?

17  A.  Correct.

18  Q.  What is a gpg file?

19  A.  Again, that was encrypted software that had those two files

20  encrypted, encryption software.

21  Q.  Were you able to open these files despite the encryption?

22  A.  I was, yes.

23  Q.  And how were you able to do that?

24  A.  Again, by finding a password on the defendant's laptop

25  that -- was I able to open them.

F1MGULB1                    Kiernan - direct

1          MR. HOWARD:  Would you please publish the second page

2     of this exhibit, Ms. Rosen.

3     Q.  Mr. Kiernan, what does this screen shot depict?

4     A.  Just to verify that the file was actually decrypted after I

5     put the password in.  This is just the software tool that I

6     used to do it.  That's all.

7     Q.  I would like to first focus on the file www.tar.gz.gpg.

8     You were able to successfully decrypt that file, correct.

9     A.  Yes.

10    Q.  Did you analyze the contents of that file once you

11    decrypted it?

12    A.  Yes.

13    Q.  What did you discover?

14    A.  Those -- the files in that tar file, that file, were

15    similar to the ones I found on the laptop under that web

16    directory if remember from yesterday, that var www directory,

17    so it seemed to be a backup of that.

18          MR. DRATEL:  Objection.

19          THE COURT:  I'll allow it.  Overruled.

20    Q.  Mr. Kiernan, you said that these files were saved on

21    September 23, 2013 to the thumb drive, correct?

22    A.  Correct.

23    Q.  And is that the reason you believe it's a backup of the

24    files on the computer?

25    A.  Yes.

1              MR. DRATEL:  Objection.

2              THE COURT:  Overruled.

3   Q.  And that www/var directory that you testified about

4   yesterday, isn't it correct that you testified that that

5   contained web pages from the Silk Road website?

6   A.  Yes.  It was a var www, but, yes.

7   Q.  And yesterday we walked through a number of exhibits that

8   were from the directory that contained files from the Silk Road

9   website?

10  A.  Correct.

11  Q.  Did you find each of those exhibits those same files in

12  this backed-up version?

13  A.  Yes.  Exhibits --

14             MR. DRATEL:  Objection.

15             THE COURT:  Overruled.

16             Why don't you strike the word "backed-up" and just say

17  "version."  Rephrase.

18  Q.  Did you find the same files that were introduced as

19  exhibits yesterday in the folder on the laptop containing Silk

20  Road website files as were found in this file that was saved on

21  September 23 to the thumb drive?

22  A.  I did; yes.

23  Q.  Now, let's focus on the other file we discussed, the

24  backup.tar.gz.gpg file.

25  A.  Okay.

F1MGULB1                    Kiernan - direct

1   Q.  You were also able to successfully decrypt that, right?

2   A.  Yes.

3   Q.  Did you analyze the contents of that file?

4   A.  I did, yes.

5   Q.  And what did that appear to contain?

6   A.  That appeared to contain a different version of the files

7   that I found on the defendant's laptop under the

8   home/frosty/backup directory, that directory.

9   Q.  And you testified that those files were saved to a thumb

10  drive on September 23rd, 2013, correct?

11  A.  Yes.

12  Q.  Now, yesterday we discussed a number of exhibits that were

13  taken -- that you extracted from the back -- from the backup

14  directory on the computer, correct?

15  A.  Correct.

16  Q.  Did you also find copies of those same files in that file

17  from the thumb drive?

18  A.  Yes, in this version, yes.

19  Q.  Were there any differences?

20  A.  Yes.  They were -- seemed to be -- well, it didn't seem to

21  be.  They were older versions of what we had found on the

22  laptop.

23  Q.  Now, Mr. Kiernan, could you please flip to what's been

24  marked for identification purposes as Government Exhibit 298 in

25  your binder.

F1MGULB1                     Kiernan - direct

1   A.  Okay.

2   Q.  Do you recognize what this is?

3   A.  Yes.

4   Q.  And what is this?

5   A.  That was the log.txt file.

6   Q.  Where did you recover this log.txt file?

7   A.  This was 298 -- it's from the thumb drive of the

8   uncompressed -- the unencrypted file.  This file was part of

9   that.

10  Q.  Which of the two files that you -- which of the two files

11  is that from?

12  A.  From the USB drive.

13  Q.  Earlier you testified there were two files you decrypted

14  from the thumb drive, correct?

15  A.  Correct.

16  Q.  There was the one that contained the Silk Road website

17  files, correct?

18  A.  Yes.

19  Q.  And there was one that contained the backup files, correct?

20  A.  Yes.  Right.  So this was from the backup -- the backup

21  file, that backup file that we had found on the USB thumb

22  drive, so it's from that uncompressed file, the backup file.

23  Q.  Can you please take a look at the last page of this

24  exhibit.

25  A.  Yes.

1    Q.  What is the last page of this exhibit?

2    A.  This is a screen shot of the contents of the USB

3    drive -- of the -- I'm sorry -- of the uncompressed -- the

4    un -- the decrypted backup file that was found on the USB drive

5    that I decrypted.

6              MR. HOWARD:  The government offers Government

7    Exhibit 298.

8              MR. DRATEL:  No objection.

9              THE COURT:  Received.

10             (Government's Exhibit 298 received in evidence)

11             MR. HOWARD:  Ms. Rosen, can you please publish the

12   last page of Government Exhibit 298, page six, please.

13   Q.  Mr. Kiernan, this is another screen shot you took from FTK

14   Imager depicting the file from the thumb drive?

15   A.  Yes.

16   Q.  And what is depicted in the upper left-hand window of the

17   screen?

18   A.  So that's the directory structure starting with the USB of

19   the unencrypted file called backup.tar.gz right there.

20   Q.  And there included within a folder called frosty, correct?

21   A.  Yes.

22             MR. HOWARD:  Could you zoom out, please, Ms. Rosen.

23   Q.  Now, where was the log.txt file found specifically on the

24   thumb drive?

25             Ms. Rosen, can you zoom in on the bottom left-hand

F1MGULB1                        Kiernan - direct

1    corner here.

2    A.   On the thumb drive, after it was de-encrypted, the file

3    name is backup.tar.gz, which contained files in it, so it's

4    backup.tar.gz, it's home/frosty/backup is where it is on the

5    uncompressed version of that file.

6    Q.   What does the metadata reflect about the date that that

7    file was saved to the thumb drive?

8    A.   9/20/2013.

9              MR. HOWARD:   Ms. Rosen, can you please publish page

10   five of this exhibit, and could you please move this to the

11   left side.

12   Q.   Earlier you testified -- did you find a similar file on the

13   defendant's laptop?

14   A.   Yes.

15   Q.   Could you please publish Government Exhibit 241 on the

16   right side of the screen, which has already been admitted into

17   evidence, and please go to page five.

18             Now, Mr. Kiernan, the one on the left side is the one

19   from the thumb drive, right?

20   A.   That's correct.

21   Q.   And the one on the right is the one from the defendant's

22   laptop, right?

23   A.   Yes.

24             MR. HOWARD:   Ms. Rosen, can we zoom in on the last

25   couple of entries on each of these pages.  Why don't we try top

F1MGULB1                        Kiernan - direct

1   and bottom.  It might be more clear.

2   Q.  Now, to be clear, Mr. Kiernan, is the top one from the USB

3   drive?

4   A.  Yes.

5   Q.  And the bottom one is from the defendant's computer?

6   A.  Computer, correct.

7   Q.  And what is the last entry on the one taken from the USB

8   drive?

9   A.  9/19/2013.

10  Q.  "r&w pinged me and asked for meeting tomorrow," correct?

11  A.  That's correct.

12  Q.  And you testified that this file was saved on September 20,

13  2013 --

14  A.  Yes.

15  Q.  -- according to the metadata?

16  A.  Right.

17  Q.  Could we zoom in on the bottom here starting at 9/19/2013,

18  to the bottom.

19          "9/19/2013 red pinged me asked for meeting tomorrow."

20          That's similar to the last entry of the version you

21  found on the thumb drive, correct?

22  A.  That's correct.

23  Q.  And there are additional entries for 9/19 to 9/25/2013 as

24  well as 9/30/2013 on the version that was recovered from the

25  defendant's computer, correct?

F1MGULB1                         Kiernan - direct

1    A.  That's correct, yes.

2    Q.  So I'm going to read this now:  "9/19 to 9/25/2013 red got

3    in a jam and needed 500,000 to get out.  Ultimately he

4    convinced me to give it to him but I got his ID first and had

5    Cimon send Harry, his new soldier of fortune to Vancouver to

6    get $800,000 in cash to cover it.  Red has been mainly out of

7    communication, but I haven't lost hope.  Atlantis shut down.  I

8    was messaged by one of their team who said they shut down

9    because of an FBI doc leaked to them" dealing "vulnerabilities

10   in Tor."

11            THE COURT:  I think you misspoke in terms of the word

12   "dealings."  It's "detailing."

13   Q.  Pardon me.  "...detailing vulnerabilities in Tor.

14   9/13/2013 spoke with inigo for a while about the book club and

15   swapping roles with libertas.  Had revelation about the need to

16   eat well, get good sleep and meditate so I can stay positive

17   and productive."

18            MR. HOWARD:  Ms. Rosen, can you please publish

19   Government Exhibit 214 to the jury, which has already been

20   admitted into evidence.

21   Q.  Mr. Kiernan, what does Government Exhibit 214 depict?

22   A.  Screen shot of a -- from the defendant's computer of a

23   wallet.dat file.

24   Q.  Let's zoom in on the bottom left-hand corner here.  And

25   where was this wallet.dat file located?

F1MGULB1                          Kiernan - direct

1    A.  This was in the home/frosty.bitcoin directory.

2    Q.  Are you familiar with what a wallet.dat file is?

3    A.  Yes.  I am.

4    Q.  What is it?

5    A.  It's the file that contains your bitcoin wallets, your

6    addresses where you store your bitcoins.

7    Q.  And what, if anything, did you do with this file after you

8    discovered it on the defendant's laptop?

9    A.  Extracted it and gave it to Special Agent Ilhwan Yum.

10            MR. HOWARD:  Ms. Rosen, can you please publish

11   Government Exhibit 213 -- pardon me -- the last exhibit that we

12   looked at, the wallet.dat file.

13            THE COURT:  Ilhwan Yum?

14            THE WITNESS:  Yum, yes.

15            THE COURT:  Y-U-M?

16            THE WITNESS:  Yes.

17            THE COURT:  Thank you.

18            THE WITNESS:  You're welcome.

19   Q.  What device was the wallet.dat file on?

20   A.  Oh, this was back on the laptop.

21            MR. HOWARD:  Ms. Rosen, can you please publish

22   Government Exhibit 213, please.

23   Q.  Mr. Kiernan, what does Government Exhibit 213 depict?

24   A.  This is a directory structure of the MySQL database under

25   the -- called "market."

F1MGULB1                        Kiernan - direct

1    Q.  And on which device was this from?

2    A.  Again, this is back on the laptop.

3              MR. HOWARD:  Ms. Rosen, can we just zoom into this

4    area right here.

5    Q.  And where was the file located, Mr. Kiernan?

6    A.  Yes.  All these files are located under

7    var/lib/mysql/market.

8    Q.  And what kind of files were contained in that folder?

9    A.  Database files.

10   Q.  What is a database?

11   A.  A database is a collection of records or information that

12   you want to organize and keep in a nice forum.  So a digital

13   way to do it is a database.  You store it in the database like

14   a phone book, per se, or your contact list on your phones.

15   Those are all databases.  It just makes it easier so you can

16   search for people, search for things, phone numbers, where you

17   live -- where someone else lives, and you could do combos.  You

18   can query the database to get all the people that you know that

19   live in New York City but also work at a company here; and the

20   object of it is just to make it a lot easier to find data on

21   your hard drives.

22   Q.  Did you look at the contents of the database?

23   A.  I did.

24   Q.  And what did the database appear to contain?

25   A.  It contained some entries of drugs and items like that.

F1MGULB1                          Kiernan – direct

1            MR. HOWARD:  Ms. Rosen, can you please zoom into the

2    upper right-hand corner of this screen, give me part of the

3    page.

4    Q.  What is depicted in this window, Mr. Kiernan?

5    A.  The layout, the tables contained within the database.

6    Q.  I'm going to read a couple of the files here.  There's

7    balance log, withdrawals, transaction log, archive, categories,

8    messages, users archive, transaction log -- can we scroll down,

9    Ms. Rosen.  We have featured items, shipping, deposits, vendor

10   details.

11           You can take it off the screen, Ms. Rosen.

12           Now, Mr. Kiernan, you testified earlier that the

13   purpose of trying to arrest the defendant at his laptop was to

14   prevent his computer from becoming encrypted, correct?

15   A.  That's correct; yes.

16   Q.  And you also testified that not every laptop is encrypted,

17   correct?

18   A.  No, not every laptop.

19   Q.  And what does a user have to do to encrypt the data on his

20   laptop?

21   A.  Usually enable some type of software that enables

22   encryption.

23   Q.  And if a user has encryption available on the laptop, how

24   can the encryption be activated?

25   A.  Like we had talked about, same thing:  You can close your

1    laptop, you can log out of your laptop, power failure would

2    cause a laptop to go back into an encryption state, things to

3    that nature.

4    Q.  And what, if anything, did you do during the triage process

5    to prevent these things from happening?

6    A.  During the triage state, we continued to make sure the

7    computer was active, looked for any type of screen-savers or

8    programs running that would try to disable the laptop or turn

9    the laptop off and put it into a sleep state that would enable

10   encryption once again.  That was mostly what the triage was

11   for.

12   Q.  When you were performing your triage, were you able to

13   determine whether there was any encryption running on the

14   computer?

15   A.  Yes.  Yes.  So using a -- I opened up a terminal window

16   to -- it's just a program to get a little bit behind the scenes

17   of what you -- the nice, gooey, pretty picture interface that

18   you're used to seeing on the screen, just to run some commands

19   to see if -- what was running on it.  So I did a listing of

20   what types of programs were running in the background to look

21   for an encryption-type software, and I was able to find a file

22   that showed that encryption was enabled on the machine.

23   Q.  What would have happened if the defendant had closed his

24   laptop before the FBI seized it?

25   A.  It would have went into an encrypted state.

F1MGULB1                    Kiernan - direct

1   Q.  And what would have happened if you had not been able to

2   keep the laptop alive while you were performing your triage?

3   A.  It would have turned into a brick basically.  It would have

4   been tough to -- it makes it a lot harder to get into -- into

5   the machine to actually get any data off of the device.

6            MR. HOWARD:  The government has no further questions.

7            THE COURT:  Thank you.

8            Mr. Dratel.

9            MR. DRATEL:  Thank you, your Honor.

10  CROSS-EXAMINATION

11  BY MR. DRATEL:

12  Q.  Good morning, Mr. Kiernan.

13  A.  Good morning.

14  Q.  I want to go back to actually where you ended with the day

15  of the arrest, the day that Mr. Ulbricht was arrested.  By the

16  way, the encryption, when you talked about closing the laptop

17  where it basically made it inaccessible, right?

18  A.  Yes.

19  Q.  So him being in a public place was an important factor,

20  right?

21  A.  Yes.

22  Q.  Because if you had to go through the door of his apartment,

23  he would have had an opportunity to close his laptop, right?

24  A.  That's right.

25  Q.  I want to go back to Government's Exhibit 128H, please.

F1MGULB1                          Kiernan - cross

1   And that's a paragraph of the Glen Park library, correct?

2   A.   That's correct, yes.

3   Q.   And that's where Mr. Ulbricht was arrested, right?

4   A.   Yes.

5   Q.   He was arrested -- if we can enlarge the right part, I

6   guess, yes.  That's fine.  He was arrested at the table where

7   the person is sitting against the window, is that right?

8   A.   Yes.

9   Q.   And in fact, Mr. Ulbricht was sitting not where that person

10  is, but he was actually sitting with his back to where we are

11  and he was looking out the window, right?

12  A.   He was -- what I remember, he was just like that.

13  Q.   You've been interviewed in preparation for your testimony,

14  correct?

15  A.   Yes.

16  Q.   You sat down with the government, right?

17  A.   Yes.

18  Q.   More than once, right?

19  A.   Several times.

20  Q.   Yes.  And didn't you tell the government that Mr. Ulbricht

21  had his wack to you looking out a window?  Didn't you say that

22  twice to the government?

23  A.   I don't -- do you have anything to show me?

24  Q.   Sure.  I'll show you what's marked as 3508-2 and 3508-7.

25  If you could look at 3508-2 and 3508-7 and the first

F1MGULB1                        Kiernan - cross

1   highlighted portion on that page and the highlighted portion on

2   that page.

3   A.   Sure.

4   Q.   Does that refresh your recollection, that you told the

5   government twice in preparation for this case that

6   Mr. Ulbricht's back was to you and he was looking out the

7   window?

8   A.   I don't know what these are, but that's what it says there,

9   yes.

10  Q.   And could we go to Government's Exhibit 225B, please.   If

11  we can scroll down a little bit.   This is a conversation that

12  you -- you didn't read it.   Mr. Howard read it yesterday,

13  right?   This is something you got off the laptop, right --

14  A.   Correct, yes.

15  Q.   -- you got off the drive that was given to you?   The

16  highlight version reads -- and this is -- just to put this back

17  in context, this is Dread Pirate Roberts and this is on a

18  TorChat, right?

19  A.   These are from the TorChats, yes.

20  Q.   And Dread Pirate Roberts is responding to someone working

21  for him that the person is concerned about being arrested,

22  right, about law enforcement?

23       And Dread Pirate Roberts responds "There is nothing on

24  your laptop for them to use, if you obscure your bitcoins

25  properly, there's there is no way for them to trace them back

F1MGULB1                    Kiernan – cross

1  to me.  Realistically, the only way for them to prove anything

2  would be for them to watch you log in and do your work," right?

3        That's Dread Pirate Roberts, right?

4  A.  That's what it says.

5  Q.  And that's January of 2013, right?

6  A.  Yes.

7  Q.  So if we could go further.  Again Dread Pirate Roberts:

8  "Sure, someone could stand behind you without you realizing

9  it," right?  Yes?

10  A.  Yes.

11  Q.  So Dread Pirate Roberts understood full well the dangers of

12  having his back to anyone who could sneak up behind him, right?

13        MR. HOWARD:  Objection; speculation.

14        THE COURT:  Sustained.

15  Q.  You testified yesterday, right, that the argument dispute

16  that was contrived to distract Mr. Ulbricht was, in fact,

17  behind him, right, and he turned around?

18  A.  Yes.

19  Q.  So if we go back to 228 -- I'm sorry -- 128H, Mr. Ulbricht

20  really couldn't be sitting in that spot where that person was

21  against the window because the other two people would have to

22  be behind him, right?

23  A.  That's where I remember him.

24  Q.  But you told the government twice in preparation for this

25  case that he had his back to you looking out the window?

F1MGULB1                          Kiernan – cross

1   A.   It's here.  It's in this document here.

2   Q.   You deny that you said that?

3   A.   Yeah, I mean.  I don't deny I said it, but it's here in the

4   document.  If that's what that is, then, yes, I said that.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1mdulb2                          Kiernan - cross

1   Q.   OK.   Now, just going back to 228 -- I'm sorry, 225B, which

2   we were just looking at.

3            So if we go back up a little further to the first

4   part, so it says:   "There is nothing on your laptop for them to

5   use.   If you obscure your bitcoins properly there is no way for

6   them to trace them back to me."

7            But all of the material that you put in yesterday, and

8   some of what you put in today, came from an image that

9   Mr. Beeson provided to you from Mr. Ulbricht's laptop?

10  A.   That is correct.

11  Q.   The journals, right?

12  A.   Yes.

13  Q.   The Tor chat logs; thousands of pages of Tor chat logs,

14  right?

15  A.   Yes.

16  Q.   PGP keys, right?

17  A.   Yes.

18  Q.   Now, you have a background in security, correct, in

19  Internet security, right?

20  A.   Yes.

21  Q.   You have taken courses; you have trained that way, right?

22  A.   Yes.

23  Q.   And aren't you -- isn't it part of the security for a PGP

24  key is not to make it available on your computer, your private

25  key?

1           MR. HOWARD:  Objection to form.

2           THE COURT:  Sustained.  You can rephrase.

3    BY MR. DRATEL:

4    Q.  Isn't it a fundamental part of security not to keep your

5    PG -- your private PGP key available on your computer in a

6    manner that can be viewed by anyone on that computer?

7    A.  No.  You have to -- the key has to be somewhere.  If you

8    set it up on your computer, that's where you would keep your

9    key.  The idea behind it is to store it in a safe location,

10   like an encrypted, again.

11   Q.  And you put it in a file that says "Key," is that a good

12   way to disguise it?

13          MR. HOWARD:  Objection.

14          THE COURT:  Sustained.

15   Q.  But you wouldn't put it in a file -- would you as a person

16   trying to be secure put it in a file with the name "Key" on it?

17          MR. HOWARD:  Objection.

18          THE COURT:  Sustained.

19   Q.  Do you instruct people on how to disguise PGP keys on their

20   computer?

21   A.  I don't --

22   Q.  Have you been instructed?  Is there training on that?

23   A.  Is there training on that?  No, there is no training on

24   where to keep your PGP key.  It is your secret key.  So if I

25   was doing it, I would have an encrypted laptop and keep my key

F1mdulb2                          Kiernan - cross

1    there, and when I turned off my laptop the key would be safe.

2    Q.  And you would put it in a file called "key"?

3            MR. HOWARD:  Objection.

4            THE COURT:  Sustained.

5    Q.  And when you say -- throughout your testimony, you said

6    "pulled off the defendant's laptop," "pulled off the

7    defendant's laptop."  In fact, what you're working with is not

8    the defendant's laptop, correct?

9    A.  Not the -- it's a copy of what was on the defendant's

10   laptop.

11   Q.  Right.  It was a copy that you didn't make?

12   A.  A copy I didn't make, no.

13   Q.  Right.

14   A.  That is correct.

15   Q.  It is what you received from Mr. Beeson?

16   A.  Yes.

17   Q.  So when you say "off the laptop," "off the laptop," it is

18   really off of a copy of a copy, right?  In other words,

19   Mr. Beeson gave you a hard drive that was not the hard drive

20   from the laptop but an image of the laptop?

21   A.  That is correct.

22   Q.  And then you made a copy of that and worked off of that?

23   A.  Yes.

24   Q.  So -- and you didn't participate in the imaging that

25   Mr. Beeson did, correct?

F1mdulb2                          Kiernan - cross

1   A.  That's correct.

2   Q.  Also, when you said -- sometimes you said it's up to the

3   designers of the site, right, in terms of certain issues with

4   respect to Web pages and things like that?

5          MR. HOWARD:  Objection to form.

6          THE COURT:  Overruled.

7   A.  I did, yes.

8   Q.  And when you -- and when you say "designers," that doesn't

9   mean that it can't be modified at some point, right, by other

10  people?

11  A.  The names of it?

12  Q.  The way the site appears, the names of fields and the way

13  of the Web pages.

14  A.  Sure, it could be changed, again, by the designer or --

15  Q.  When you say "designer," it doesn't have to be the same

16  designer as the initial designer, it could be other people

17  later on, right?

18  A.  Yes.

19         MR. DRATEL:  Now, if we could go to Government's

20  Exhibit 201A, please.

21         Go further up.  Go to the metadata.

22         (Pause)

23  Q.  So this is the one where your phone -- you are taking this

24  with your BlackBerry, correct?

25  A.  That is correct, yes.

F1mdulb2                          Kiernan - cross

1    Q.  And your BlackBerry registers East Coast time, right?

2    A.  It does, yes.

3    Q.  Even though you're standing in the Glen Park library in

4    California, your electronic device in your hand has East Coast

5    time, right?

6    A.  It does, yes.

7    Q.  So it doesn't reflect where you are?

8    A.  Time zone, no.

9    Q.  Right?

10   A.  Time zone, no.  Physically I'm still in San Francisco.

11   Q.  Right.  So the time zone reflected in your electronic

12   device in the metadata is not accurate as to where you actually

13   are?

14   A.  That's correct.

15   Q.  So metadata is just digital data, right?

16   A.  It is.

17   Q.  Now, we talked just for a second -- you have training in

18   network security, correct?

19   A.  I do.

20   Q.  And you were an informational technology -- information

21   technology specialist, is that one of the positions you have

22   held?

23   A.  Yes.

24   Q.  So could you explain what that involves in terms of

25   training?

F1mdulb2                          Kiernan - cross

1   A.   Information technology specialist?

2   Q.   Yes.

3   A.   Yes.  That is more on the side of maintenance and things to

4   that nature of computer systems.

5   Q.   Keeping networks secure?

6   A.   Keeping networks secure.

7   Q.   Teaching best practices to people who work on networks?

8   A.   Just, again, managing computer systems for users and things

9   like that.

10  Q.   Now, by the way, the photos that we've seen that you've put

11  in evidence were not the only photos that you took of the

12  laptop, correct?

13  A.   No.  No.

14  Q.   I want to show you what's marked as Defendant's G, for

15  identification.

16            I will give you the original.

17  A.   OK.

18  Q.   And I ask you if you recognize that?

19  A.   I do.

20  Q.   Is that a photo that you took?

21  A.   It is, yes.

22  Q.   Is it a photo of the defendant's laptop that you took

23  October 1, 2013, at the time -- at or near the time of his

24  arrest, or shortly after his arrest?

25  A.   Yes, it is.

F1mdulb2                    Kiernan - cross

1              MR. DRATEL:  I move it into evidence, your Honor.

2              THE COURT:  Mr. Howard.

3              MR. HOWARD:  No objection.

4              THE COURT:  Received, Defendant's Exhibit G.

5              (Defendant's Exhibit G received in evidence)

6              MR. DRATEL:  Thank you, your Honor.

7              So if we could publish it, please.

8    Q.  Now, this window shows one of the programs that was

9    operating at the time of Mr. Ulbricht's arrest, correct?

10   A.  It does, yes.

11   Q.  And it is a program called BitTorrent?

12   A.  It's called TransMissions but it is a BitTorrent client,

13   yes.

14   Q.  Right, it is a BitTorrent client.  Could you explain what

15   that means?

16   A.  It is a file sharing program that allows you to -- it

17   allows you to upload and download files that you want to look

18   at.  It's based on seeds that are up on the network that you

19   pull.  You pull down the seed and you can populate your data

20   with -- populate your folders with the data.

21   Q.  And it is very popular for music and movies and things like

22   that, correct?

23   A.  It is, yes.

24   Q.  It is called a peer-to-peer network, is that one of the

25   ways this is described?

F1mdulb2                          Kiernan - cross

1   A.   It runs on something like that, yes.

2   Q.   And it involves your computer connected to the Internet,

3   right?

4   A.   Yes.

5   Q.   I'm trying to break this down rather than have a compound

6   question.

7   A.   That's fine.

8   Q.   Your computer connected to the Internet with all other

9   people who are on that same network, that BitTorrent network,

10  who are connected to the Internet, right?

11  A.   Yes.

12  Q.   In other words -- and they can -- if they identify files on

13  your computer that they want to share, they can take them from

14  your computer, right?

15  A.   Not that easy but you have to give the Torrent to them to

16  actually get files from your computer that you designate.   It

17  is not willy-nilly where you can go anywhere on your computer,

18  but you designate spots that you can download from -- not put

19  on but download from.

20  Q.   But, in other words, you share the files, essentially?

21  A.   Essentially you are sharing some of your files.

22  Q.   And so this says, it says:   "Sending to 7 of 9 connected

23  peers," right?

24  A.   Yes.

25  Q.   So that means that there are seven computers out there in

F1mdulb2                              Kiernan - cross

1   the world that are actually connected to Mr. Ulbricht's

2   computer right there?

3   A.  To --

4   Q.  Through this network?

5   A.  To his specified location that he gave.

6   Q.  Right.  But to his computer?

7   A.  Yeah, to his computer.

8   Q.  Do you see what's downloading there is the Colbert Report,

9   right?

10  A.  Yes.

11  Q.  It is not complete at that point, right?

12  A.  It doesn't look to be.

13  Q.  It only looks like about 8-and-a-quarter megabytes of 197

14  megabytes, right?

15  A.  Yes.

16  Q.  So that takes some time, correct?

17  A.  Yeah.  Depending on connection speeds and things like that,

18  but yeah.

19  Q.  So you have to have an open port to the Internet on your

20  computer to operate BitTorrent, correct?

21  A.  You do.  The protocol is required that a port or a

22  connection spot is open.

23  Q.  And the fact that he's downloading at that time, that that

24  process is going on, means that the port was open at that time,

25  right?

F1mdulb2                        Kiernan - cross

1   A.   It was connected.

2   Q.   And that you know from your training makes one vulnerable,

3   correct, to have an open port like that -- it makes your

4   computer vulnerable?

5   A.   That's how the Internet works.  There is open ports on a

6   lot of different surfaces.  It is the nature of the Internet.

7   Something has to get transferred back and forth.  So, yes, a

8   port was open on the machine to allow BitTorrent, that client,

9   to work.

10  Q.   But that also means that those with sophisticated computer

11  skills could exploit an open port as well, correct?

12  A.   Is it possible for that to happen?  Yes.

13  Q.   In fact, you could be exploited by hackers, by viruses,

14  right; all sorts of things can get into your computer through

15  BitTorrent?  Even BitTorrent downloading, you can have viruses

16  and malware that come with those files, right?

17  A.   With the files you download?

18  Q.   Yes.

19  A.   Yes, they can contain programs that do things like that.

20  Q.   I'm sorry.  Programs?

21  A.   There are programs that can be used maliciously, yes.

22  Q.   Maliciously, including to operate a computer remotely,

23  right, that kind of malware can be --

24  A.   They make that stuff but it's again ...

25  Q.   And knowing a port is open on a computer, for someone

F1mdulb2                        Kiernan – cross

1    trying to exploit that computer makes it easier to get in,

2    right, if you know that there is a port there that's available?

3    A.  That's incorrect.  It is not easier.  It gives you

4    opportunities but it does not make it easier.  It is the

5    software guarding that port that is --

6    Q.  But, I mean, it is easier than no port at all open,

7    correct?

8    A.  Yes.  Again, that's how the Internet works.  You have these

9    ports that are open.

10   Q.  And does the FBI allow you to run BitTorrent on your

11   machine at work?

12            THE COURT:  Let's have a sidebar.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1        (At the sidebar)

2        THE COURT:  I'm concerned that you're trying to make

3   this witness into a general expert on BitTorrent.  I have no

4   problem -- obviously you are fully entitled to explore what

5   acts this witness took with respect to the testimony he has

6   given and explore his background in terms of whether he was

7   qualified to do that.  But you can't make him into a

8   generalized expert on BitTorrent.  This has gone far afield.

9        MR. DRATEL:  That is my last question on this subject.

10        THE COURT:  We are not going to this question.  It is

11   irrelevant with this witness.  It's beyond the scope of his

12   direct.  All right?  I mean --

13        MR. DRATEL:  I don't think it is beyond the scope of

14   his direct.

15        THE COURT:  Absolutely.  Are you aware that the FBI

16   allows BitTorrent?

17        MR. DRATEL:  It is for purposes of the security, in

18   other words, the lack of security of BitTorrent.

19        THE COURT:  That is not relevant.  Whether the FBI

20   allows BitTorrent on their computers is not relevant to whether

21   or not the particular computer here -- you've got to establish

22   that it was running BitTorrent.  If you want to explore whether

23   or not, if you've got a good faith basis to believe -- a good

24   faith basis to believe that the files were placed on this

25   computer, Mr. Ulbricht's computer, through the use of the

F1mdulb2                          Kiernan - cross

1    BitTorrent program, then go after that.  But I am not going to

2    let you go into the practices of the FBI.

3              MR. DRATEL:  It is the practice -- it is a fundamental

4    question of security.  This is a completely insecure system for

5    someone who --

6              THE COURT:  That is not this case.  Thank you.

7              Let's go back.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1mdulb2                          Kiernan - cross

```
 1                (In open court)
 2    BY MR. DRATEL:
 3    Q.  You have been trained and certified in the Linux operating
 4    system, correct?
 5    A.  Correct.
 6    Q.  A number of courses and certifications --
 7    A.  Yes.
 8    Q.  -- that you have taken with respect to Linux in particular?
 9    A.  Oh, yes.
10    Q.  And you talked about the Tor chats that you created as a
11    test, as an experiment, right?
12    A.  Yes.
13    Q.  And you saved them, right?
14    A.  Yes.
15    Q.  So could you describe the process by which you saved them?
16    A.  Sure.  Turn on the -- inside Tor chat in Tor chat client
17    there is an enabling button that allows you to log your chats
18    and save my chats.
19    Q.  So, in other words, you had to affirmatively hit the enable
20    button to save them?
21    A.  Yes.
22    Q.  So that was a decision -- conscious decision to save them
23    on your part?
24    A.  Yes.
25    Q.  And Tor chats can easily be deleted from a computer, right?
```

F1mdulb2                         Kiernan - cross

1  A.  Sure.

2  Q.  You wouldn't even have to save them at all.  Unless you hit

3  the button, they wouldn't be saved?

4  A.  Yes.

5  Q.  And there are programs that can wipe away even any trace of

6  what's happened on a computer previously, right?

7  A.  Yes.

8  Q.  And with respect to the chats that we saw, some of the

9  ones -- and, again, Mr. Howard read them, you didn't read them,

10  but some of them were snippets from chats, obviously, from a

11  long series of chats, right?

12  A.  That's right.

13  Q.  And the snippets sometimes were different days and they

14  were separated by a black line, right, some of them?

15  A.  Yes.

16  Q.  So those weren't all continuous; some of them were

17  separated by time?

18  A.  Yes.

19  Q.  Now, that line that's on the top of each chat as it appears

20  initially -- not in the way that it was done for purposes of

21  reading them into evidence, but initially the line that says

22  the log file is not signed and has no cogency of proof; do you

23  recall that?

24  A.  I do, yes.

25  Q.  And that's automatically generated at the beginning of each

F1mdulb2                         Kiernan – cross

1    chat, right?

2    A.  Yes.

3    Q.  And that means that there is no way to validate that these

4    particular log files were generated on that computer, correct?

5              MR. HOWARD:  Objection.

6              THE COURT:  I will allow it.

7    A.  I'm sorry.  Can you repeat that?

8    Q.  Sure.  What that means is that there is no way to validate

9    that those log files were in fact generated on that computer?

10   A.  Not generated but that's where they were saved.

11   Q.  Right.  OK.  So it doesn't -- OK, not generated.

12             And those log files don't take up a lot of space,

13   correct, about 15 kilobytes?

14   A.  No, they're small.  They are text files.  They are not big.

15   I don't know the size of them.

16   Q.  And a kilobyte is about a thousandth of a megabyte, right,

17   roughly?

18   A.  Somewhere about there.

19   Q.  1024 bites to a megabyte?

20             THE COURT:  Hold on.  I think that because your

21   question and his answer were interspersed, I'm not actually

22   sure if it is 1024, which you want it to be, or a thousand, or

23   if you care.

24             MR. DRATEL:  I don't necessarily care.  I was just

25   trying to be precise.

F1mdulb2                          Kiernan - cross

1    A.  1024 is what it is, but we will go with a thousand.

2    Q.  So those are files, because of the size of the files, the

3    physical text files, they could be quickly transferred,

4    correct?

5    A.  Yes.

6    Q.  Even over the Internet, correct?

7    A.  Yes.

8    Q.  And that is basically true for all the text files we saw,

9    right, that they are small?

10   A.  They are small --

11   Q.  Ones -- even some of those spreadsheets are relatively

12   compact, right, in terms of size?

13   A.  Yes.  It is not a huge file.

14   Q.  And you talked about the mastermind screen.

15   A.  Yes.

16   Q.  And the mastermind.php file?

17   A.  Yes.

18   Q.  And the mastermind screen is the one that you found by

19   hitting the back button, right, from the screen that was on the

20   laptop when you first received it?

21   A.  That's right.

22   Q.  And did you have an opportunity to examine any of the other

23   php files that were in that var/www directory?

24   A.  Where?  On the laptop?

25   Q.  What you had, the copy that you had.

F1mdulb2                          Kiernan – cross

1   A.  Yes.

2   Q.  And do you know whether a user logging into the Silk Road

3   site, using the password and username for the Dread Pirate

4   Roberts' account, would automatically be directed to that

5   mastermind page?  Would that be -- do you know whether that

6   would be the first thing that would come up?

7            MR. HOWARD:  Objection.  Beyond the scope.

8            THE COURT:  Hold on.  Let me just read his question.

9            (Pause)

10           THE COURT:  I will allow it.

11  A.  Can you repeat that?

12  Q.  Sure.  Do you know whether a user logging on to the Silk

13  Road site, using the Dread Pirate Roberts' username and

14  password to get on to the Silk Road site, would automatically

15  be directed to the mastermind page?

16  A.  I don't know.

17  Q.  I am going to show you what's marked as Defendant's J and

18  ask you to look at just first what it is.  Do you recognize

19  that?

20  A.  Yes.  The code looks familiar.

21  Q.  Is that from the php files?

22  A.  Yes.

23  Q.  From the image that you were given of the laptop, right?

24  A.  I don't know if from the laptop or the server.

25           MR. HOWARD:  Objection to foundation.

F1mdulb2                         Kiernan – cross

1    THE COURT:  Well, why don't you try to build a more

2    concrete foundation.

3    MR. DRATEL:  Sure.

4    Q.  You've reviewed this document in the course of your

5    investigation, correct?

6    A.  Yes.

7    Q.  That looks familiar to you?

8    A.  This looks familiar, yes.

9    Q.  And you don't know whether it is from the server or from

10   the laptop, or could it be from both?

11   A.  It could be from both.

12   Q.  And it would be either from the Silk Road server or from

13   the laptop image that you -- of Mr. Ulbricht's laptop that you

14   reviewed, right?

15   A.  Yes.

16   MR. HOWARD:  Objection.  Beyond the scope.

17   THE COURT:  Well, I don't know whether it is or not.

18   I have to see where this is going.  I will allow a few more

19   questions.

20   MR. DRATEL:  OK.  Thank you, your Honor.

21   I would move it in evidence, your Honor.

22   MR. HOWARD:  Objection.

23   THE COURT:  Well, I think that I'm going to receive it

24   subject to connection.  Obviously, whether it is in the server

25   or the laptop, if that becomes important, then you will need to

1    determine which it came from.  If that is an irrelevancy, then

2    since it came from one or the other, there would be a

3    sufficient foundation.  So I would receive it.

4          So it will be received subject to any later testimony

5    which may require a different ruling.

6          You may proceed.

7          MR. DRATEL:  Thank you, your Honor.

8          THE COURT:  Defense Exhibit J received.

9          (Defendant's Exhibit J received in evidence)

10   BY MR. DRATEL:

11   Q.  So if you look at the lines that are marked on page 2, do

12   you see that?

13   A.  Yes.

14   Q.  So from looking at those, is it possible now to answer the

15   question as to whether a person logging on to the Silk Road

16   site with the username and password of Dread Pirate Roberts

17   would automatically be directed to the mastermind page?

18   A.  I don't know.

19   Q.  And, by the way, php -- I'm sorry, go ahead.

20   A.  Like you said, I could read the php script and I could

21   tell.  I don't know.

22   Q.  I'm sorry.  You said you could read the php script?

23   A.  I don't know the context of the script, that is all.

24   Q.  Php is a script, essentially.  We talked yesterday about

25   operating systems, right, and so an operating system would be

F1mdulb2                        Kiernan - cross

1    Ubuntu as part of a Linux-based operating system, right, kind

2    of like Windows --

3    A.  Yes.

4    Q.  -- or Mac; Yosemite I think is the current version.  But

5    php is what's called a scripting program, right?

6    A.  It is, yes.

7    Q.  And by that we mean sort of how you build a site,

8    essentially, a website?

9    A.  Yes.

10   Q.  And is it somewhat similar to, in a Windows-based

11   environment, say html?

12   A.  Html, similar but not the same.

13   Q.  Not exactly, but it is the same -- in other words, it is

14   the way that website appears, its fields, that's the php part,

15   right?

16   A.  Yes.

17          THE COURT:  All right.  Let's take our mid-morning

18   break now, ladies and gentlemen.  And I want to remind you not

19   to talk to anybody else about -- anybody about this case,

20   including each other or anybody else.  And we'll come back in

21   just a few minutes.  Thank you.

22          THE CLERK:  All rise as the jury leaves.

23          THE COURT:  And, Mr. Kiernan, you can step down and

24   take a break.

25          THE WITNESS:  Thank you.

F1mdulb2                        Kiernan - cross

1              (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1mdulb2                    Kiernan – cross

1           (Jury and witness not present)

2           THE COURT:  All right.  Ladies and gentlemen, let's

3      all be seated.

4           I want to find out where you're going, Mr. Dratel,

5      because what you can't do with this witness is -- I've allowed,

6      in response to the government's objection about going beyond

7      the scope, I have allowed you some room, but what you can't do

8      is make him into a generalized computer expert for the defense.

9      You are welcome, of course, if you have complied with the

10     appropriate disclosure requirements, to call your own expert or

11     to call a percipient witness.  But the mastermind page came in

12     through the back button series.  It was a percipient witness

13     set of testimony, as opposed to generalized how you would enter

14     the username.  The username was there, but the coding behind it

15     was not the subject of this witness' testimony.

16          MR. DRATEL:  He testified about php.  He testified

17     about the website pages.

18          This is from the laptop.  We are going to establish

19     that with him.  And it is from the laptop, and he said he

20     looked at php files.  He should just --

21          THE COURT:  You have to stay within the scope of the

22     direct.  So the direct is not just because he mentioned php,

23     every php question you can think of that might be helpful to

24     the defense, it is to go after what this witness testified

25     about.  The scope of his direct, as you know, determines the

1    parameters of the cross.  And so you are welcome to go anywhere

2    with the cross.  But his direct was actually quite narrow.  It

3    was here's what I got.  Here are the files I extracted.

4              MR. DRATEL:  He put in the entire laptop.  That is

5    fair game now.

6              THE COURT:  It is not fair game now.

7              MR. DRATEL:  He can't just ignore it by not asking the

8    witness.  He examined the entire laptop.

9              THE COURT:  You can get him, through

10   cross-examination, on any one of the files he testified about.

11   Go after that.  But you've got to tie it specifically to the

12   file in the extraction process.  The two things he did was

13   extraction, and then this file came out of this directory,

14   which had this folder in it.  That's it.

15             MR. DRATEL:  No, but there is more.  He puts in a

16   whole document, essentially.  If someone puts in a 30-page

17   document and he only testifies about page 2, that doesn't put

18   the other 29 off limits, I mean, on cross if they are part of

19   the same document.

20             THE COURT:  Sometimes it does.  It depends.  And so

21   just because he's got a laptop that he's authenticated doesn't

22   mean he can be your laptop expert.

23             Now, to be clear -- to be clear, if you want to call

24   somebody to talk about php, the laptop more generally,

25   BitTorrent more generally, that's the defense case, but this

1    witness is not your generalized computer witness.

2              MR. DRATEL:  He is not an expert.  I'm not making him

3    an expert.  He testified, number one, about the mastermind page

4    yesterday.  And he testified about the mastermind file on the

5    laptop in the php directories.  That makes him fair game for --

6              THE COURT:  That does not make him --

7              MR. DRATEL:  I can't be limited to just -- then I have

8    no cross if all I can do is just talk about what they've talked

9    about.  Cross is much further than that.

10             THE COURT:  No.  What you can do is talk about whether

11   or not in fact the file that he looked at on the computer was

12   not a php file, it was really something else, whether or not

13   his definition of php was inaccurate.  You go dig into anything

14   that he testified about.  Whether when he pushed the back

15   button it somehow corrupted the file, changed the file, whether

16   or not he's reading the directory and the file paths correctly.

17             Let me hear from the government, but I am concerned

18   that this is going to go on far longer than it needs to go

19   because you are trying to make him into a different witness.

20             MR. DRATEL:  He answered the question, no, he can.  I

21   just want to now establish that it's in the laptop --

22             THE COURT:  I know, but we are going to be coming back

23   to the same problem again and again.

24             MR. DRATEL:  I don't think so.

25             THE COURT:  Let me hear from the government about your

1  view.

2          MR. HOWARD:  Your Honor, I think the Court has it

3  absolutely right.  That is why we are objecting as to the scope

4  of the cross-examination.

5          Mr. Kiernan simply testified to the extraction of

6  files from certain locations on the laptop.  He did not testify

7  about how the scripts worked, how they operated, or anything of

8  that sort.  And it is apparent that Mr. Dratel is trying to go

9  further than the scope of Mr. Kiernan's direct, which was just

10  simply about locating and extracting files from the digital

11  evidence.

12          MR. DRATEL:  He didn't.  He went further.  He talked

13  yesterday about the purpose of php and --

14          THE COURT:  You can go after -- if his definition of

15  php was wrong and you want to undermine his credibility in

16  terms of his expertise by asking him whether the definition is

17  correct, that is fair game.  Absolutely.  No doubt about it.

18  That is absolutely impeachment material.

19          If, however, by merely mentioning the word "php" you

20  are now going to find other kinds of php material which would

21  be helpful to the defense, he's not your witness.  You need a

22  different witness, either that the government may later call

23  where you can use it or where you yourself call.  But we are

24  going to stay within the scope of the direct or this is going

25  to become a detour and frolic.  You need to call a witness to

F1mdulb2                          Kiernan - cross

 1    make the points you want to make if it is beyond the scope.  I

 2    am not going to allow it to be very far afield.

 3              You know what's within the scope of the direct.

 4              MR. DRATEL:  I disagree, your Honor.  OK.  So --

 5              THE COURT:  Well, stay within the scope of the direct.

 6    And if you are able to stay within the scope of the direct,

 7    then it will be clear to us both that you understand what I'm

 8    saying.  If you continue to go outside the scope of the direct,

 9    I will sustain the government's objections.

10              The government should continue to object if it

11    believes it is outside the scope of the direct.  I wanted to

12    see where this was going.  It's going outside the scope.  I

13    want to say, for the fifth time I think now, I am by no means

14    suggesting that the defense can't put on evidence it believes

15    is appropriate as to these very topics, as to these very

16    documents, as to these very files, but it's for the defense to

17    do if it's not for the purposes of directly going into the

18    scope of the direct of this witness.

19              Let's take our own break and then we'll come back.

20              THE CLERK:  All rise.

21              (Recess)

22              THE COURT:  All right.  Let's bring out the jury.

23              (Continued on next page)

24

25

1           THE CLERK:  All rise as the jury enters.

2           (Jury present)

3           THE COURT:  All right, ladies and gentlemen.  When you

4      get to your seats, please be seated.

5           Mr. Dratel, you may continue.

6           MR. DRATEL:  Thank you, your Honor.

7      BY MR. DRATEL:

8      Q.  So let's go back to your creating those Tor chats, where

9      you create the Tor chat that showed that myself was you, right,

10     on the Tor chat?  Do you know what I'm talking about?  You

11     testified about that on direct.

12     A.  Yes.

13     Q.  So you set up your computer with Ubuntu, right?

14     A.  Yes.

15     Q.  And Linux, right, which Ubuntu runs on?

16     A.  They run the same, yes.

17     Q.  Do you know how Mr. Ulbricht's laptop was set up, in other

18     words, the methodology of how the Tor chat program was

19     installed?

20     A.  No.

21     Q.  And, in fact, Linux is highly customizable, right,

22     meaning -- withdrawn.

23          A user who installs Linux has a lot of options,

24     correct?

25     A.  Yes.

F1mdulb2                          Kiernan - cross

1   Q.  And can make a custom version for themselves based on a lot

2   of variables?

3               MR. HOWARD:  Objection to form.

4               THE COURT:  Sustained.

5   Q.  A user of Linux has a lot of options of features to put on

6   their system and how they get on the system, correct?

7               MR. HOWARD:  The same objection, your Honor.

8               THE COURT:  I will allow this one question.

9   A.  Yes.  You can customize your install.

10  Q.  And there is something called a kernel, correct,

11  k-e-r-n-e-l?

12  A.  That's correct.

13  Q.  That is an essential part of the Linux operating system?

14  A.  Yes.

15  Q.  And the composition of the kernel is also a critical factor

16  in terms of its customizing, correct?

17              MR. HOWARD:  Objection.  Beyond the scope.

18              THE COURT:  Sustained.

19              MR. DRATEL:  Your Honor, he did an experiment --

20              THE COURT:  Sustained.

21              MR. DRATEL:  He --

22              THE COURT:  Sustained.

23  Q.  In your experiment, do you know -- you used a bundle of

24  Linux -- or Tor chat, right?  Withdrawn.

25              Linux is an open-source program, correct?

F1mdulb2                         Kiernan - cross

1   A.  Yes.

2   Q.  It is available for free on the Internet, right?

3   A.  Yes.

4   Q.  And both Linux and Ubuntu are perhaps not as popular as

5   Windows but they're popular, right?

6              MR. HOWARD:  Objection.

7              THE COURT:  Sustained.

8   Q.  The Linux kernel is essentially the glue that holds the

9   software and the hardware together, right, for Linux?

10             MR. HOWARD:  The same objection.

11             THE COURT:  Sustained.  Stay within the scope of the

12  direct.

13             MR. DRATEL:  Your Honor, this is within the scope.

14             THE COURT:  Sustained.

15             MR. DRATEL:  Can I have another sidebar, please?

16             THE COURT:  No.  Move on to your next line of

17  questioning.

18  BY MR. DRATEL:

19  Q.  So you don't know if the kernel that Mr. Ulbricht had --

20             THE COURT:  Leave "the kernel."

21  Q.  You used a Tor chat -- withdrawn.

22             You downloaded Tor chat through something called the

23  Debian package, correct, D-e-b-i-a-n?

24  A.  And AppGet, yes.

25  Q.  I missed that last one.

F1mdulb2                          Kiernan - cross

1   A.  The install command is AppGet.

2   Q.  Oh, OK.  But that's a preconfigured package that has all of

3   the Tor chat elements in it and you just put it right in on the

4   machine, right?

5   A.  Yes.

6   Q.  OK.  But it can also be done in sort of a DIY, do it

7   yourself, where a user can take code and put it in separately.

8   They don't even have to buy the package as a bundle.  They can

9   do it on their own with the various components, correct?

10          MR. HOWARD:  Objection.  Beyond the scope and

11  foundation.

12          THE COURT:  Sustained.

13          MR. DRATEL:  Your Honor, it's not beyond the scope.

14          THE COURT:  Sustained.

15          MR. DRATEL:  May I be heard?

16          THE COURT:  No.  You can be heard on this at the next

17  break.  Go on to your next line of questioning.

18  BY MR. DRATEL:

19  Q.  So in the experiment that you described yesterday, you

20  don't know that the way that you installed Tor chat on your

21  computer and the version of Tor chat was the same as that on

22  Mr. Ulbricht's computer, right?

23  A.  That's right.

24          (Continued on next page)

25

F1mgulb3                          Kiernan - cross

1    BY MR. DRATEL:

2    Q.  So, the experiment that you ran -- withdrawn.

3        The purpose of a scientific experiment is to try to

4    replicate as much as possible - and frankly completely - all of

5    the elements of one set of events so that you can match them to

6    a second set, right?

7                MR. HOWARD:  Objection.

8                THE COURT:  Sustained.

9    Q.  If an experiment doesn't have the same elements in it to

10   get to a result, it's not a valid experiment, is it?

11               THE COURT:  Why don't you ask it in terms of the

12   experiment he did.

13               MR. DRATEL:  Yes.  That's what I'm trying to do.

14               THE COURT:  No.  You're saying "if an experiment."

15   Not any generalized experiment.  Talk to him about the

16   experiment he did.

17               MR. DRATEL:  That's what I was doing before.  That's

18   exactly what I was doing before.

19               THE COURT:  Try again.

20   Q.  In your experiment, TorChat is an essential element of your

21   experiment, correct?

22   A.  Not essential, but it's -- the download was important to

23   get, yes.

24   Q.  Could you have done it without TorChat?

25   A.  I needed TorChat to run -- it wasn't an experiment.  I

F1mgulb3                        Kiernan - cross

1   wanted to make sure that the log files, what directory they

2   would start in and if logging was enabled by default.  Nothing

3   more complicated than that.

4   Q.  You were trying to create a Tor chat so you could see if

5   "myself" was you on the TorChat, correct?

6   A.  That was part of it; yes.

7   Q.  So you needed TorChat for that, right?

8   A.  Yes.

9   Q.  There are different versions of TorChat, correct?

10  A.  I don't know how many versions there are of TorChat.

11  Q.  And you have no idea what version Mr. Ulbricht downloaded?

12  A.  I don't know, no.

13  Q.  And you don't know whether he downloaded it through a

14  Debian package or whether he did it himself by taking

15  components off the Internet and making the TorChat program

16  accessible on his computer, right?

17  A.  That's right.

18  Q.  So, when you do an experiment like that, the experiment

19  that you did, if you don't know what went into it, how can you

20  verify what came out of it?

21  A.  "Myself" is the user of the computer.

22  Q.  On the one that you did, correct?

23  A.  On the one that I did.

24  Q.  And you didn't do it on the one that Mr. Ulbricht's laptop

25  had, right?

F1mgulb3                         Kiernan - cross

1  A.  I didn't do it with the version that he had, or I don't

2  know what version he had on his.

3  Q.  Right.

4  A.  Right; that correct.

5  Q.  Now, Linux -- you talked about creation dates, modification

6  dates, right?

7  A.  Yes.

8  Q.  Linux has timestamps for three times of files, right, three

9  types of timestamps, correct?

10  A.  Yes.

11  Q.  One is an "M" time, right?

12  A.  Correct.

13  Q.  C time, right?

14  A.  Yes.

15  Q.  And "A" time, right.  "M" time is for the modification time

16  of a file, right?

17  A.  Yes.

18  Q.  When the content of the file was last modified, right?

19  A.  That's right.

20  Q.  "A" time is for access, right?

21  A.  Yes.

22  Q.  When the last time it was opened or reviewed, right?

23  A.  Accessed.

24  Q.  And "C" time is not creation time, correct, Linux doesn't

25  recognize creation time the same way Windows operating systems

F1mgulb3                          Kiernan - cross

1    do?

2    A.  It does in the ExT4 version of the file system.

3    Q.  And when did that come out?

4    A.  2010 I believe.

5    Q.  So do you know what was running on Mr. Ulbricht's?

6    A.  ExT4; yes.

7    Q.  So you're saying that recognized "C" time?

8    A.  Oh, yes.

9    Q.  That was the creation time?

10   A.  Yes.

11   Q.  It's not the last time that metadata associated with the

12   file was changed, that's not what "C" time is in a Linux

13   system?

14   A.  No.

15   Q.  Now, you're familiar with Linux, right, you again have

16   certifications in programs, right?

17   A.  Yes.

18   Q.  And there's an option on Linux called Touch by which you

19   can change -- you can manipulate these metadata times, right?

20   A.  There is.  Touch files.

21   Q.  So it doesn't have to -- so when something says "May 8,

22   2012," that could have been changed somehow by the Touch

23   system, right?

24   A.  You can always change file systems, I mean, times, I mean.

25   Q.  So metadata just tells you a number, right?  A date, a

F1mgulb3                    Kiernan - cross

1    time.  It doesn't verify that that's the date something

2    actually happened, correct?  Right?

3    A.  It verifies the time that the files were there and created

4    and modified, but those are -- again, they're editable.  Sure.

5    Q.  Metadata is editable just like content, right?

6    A.  Correct.

7    Q.  And the Tor chat files are ordinary text files that can be

8    edited even after they're created, right?

9    A.  Yes.

10   Q.  So you talked about MD5 Hash values, right?

11   A.  Yes.

12   Q.  And the files that you took off the computer, you said you

13   had copied a couple of files initially, correct?

14   A.  Yes.

15   Q.  Before you gave it to Mr. Beeson, right?

16   A.  Yes.

17   Q.  And you didn't do any hash values for those, right?

18   A.  No.  I don't have any fields.

19   Q.  So just to make clear about the hash values, the hash

20   values you're comparing is not to the laptop itself, correct,

21   it's from the image that Mr. Beeson created, right?

22   A.  It's the hash value from his image.

23   Q.  Right.  So it's not from the laptop.  It's from the image?

24   A.  The image is from the laptop, right, it's from the image

25   that he created.

F1mgulb3                        Kiernan - cross

1    Q.   The hash value is from his image, right?

2    A.   Correct.

3    Q.   In other words, you're comparing what you copied on your

4    computer to the image you got from him and they matched, right?

5    A.   Yes, yes.

6    Q.   Not from the laptop itself?

7    A.   That's where the image was created from.

8    Q.   But it's not a hash value from the laptop itself?

9    A.   No, not from the laptop itself.  That's in a

10   different -- that was on the hard drive that came back that was

11   a brick that we couldn't actually look at.

12   Q.   Now, by the way, as far as encryption goes, on Ubuntu,

13   this -- the encryption that was running is an option on Ubuntu,

14   right?

15   A.   Yes.

16   Q.   So anyone who downloads Ubuntu can use that encryption

17   option?

18   A.   I'm sorry.  Say that again.

19   Q.   Anyone who downloads the Ubuntu operating system could

20   avail themselves of that encryption option that was on this

21   machine?

22   A.   Sure.

23   Q.   And you don't know whether closing the laptop would have

24   turned it on, right, made the files unavailable, right?  You

25   don't know because you didn't close it, right?

F1mgulb3                          Kiernan - cross

1  A.  We closed it later on, and we weren't able to get to any of

2  the file systems.

3  Q.  And was that -- Mr. Beeson was involved in that?

4  A.  Yes.

5  Q.  So that was really his work, not yours?

6  A.  Well, correct.

7  Q.  Right, so that's what you heard?

8        MR. DRATEL:  I move to strike that, your Honor, as

9  hearsay.

10        THE COURT:  That answer is struck.

11  Q.  Now, with respect to hash values, there can be problems

12  with MD5 Hash values, correct?

13  A.  Yes.  There is a one -- there is an older problem with MD5s

14  that it was able to recreate -- it's one of those long

15  shot-type deals that happened -- that was you're able to create

16  a file and make another MD5 with the same number, but with two

17  different files.  It's a known problem.

18  Q.  And in fact, there's a better system called SHA1, right?

19  A.  Yes.

20  Q.  And, in fact, if we look at Government Exhibit 205A -- or

21  201, whichever.  Look at 205A or 201.  I saw 205A this morning,

22  so that would be easiest.

23        In fact, there's a section for SHA, right?

24  A.  Yes.

25  Q.  But you didn't do that one.  You just did the MD5?

F1mgulb3                        Kiernan – cross

1   A.  Yes.  We used the MD5.  Standard.

2   Q.  Even though SHA1 is more reliable?

3   A.  They're both very reliable.

4   Q.  SHA1 is more reliable, correct?

5   A.  Yes.

6   Q.  Now, let me talk about some of the exhibits that were

7   admitted through you yesterday.  If we can go to 240A, please,

8   if we can scroll up a little bit.

9            This is a journal entry that you put in, right?

10  A.  Yes.

11  Q.  And it's labeled "2010," correct?

12  A.  Yes.

13  Q.  So if we can go up to the part that the government did not

14  read yesterday.  And I'll read it:  "Up to this point, I had

15  been working on selling my rental house in Pennsylvania. It had

16  helped me stay afloat with around $600/mo in cashflow, but

17  finally the sale came to a close. I made about $30k off the

18  whole thing, and could finally start trading again. I had been

19  practice trading for a while and saw an opportunity to take my

20  $30k And make it as a day trader. $30k isn't alot to start

21  with, and I didn't get off to a very good start with my

22  trading.  Around that time, another opportunity came into my

23  life. Donny had gotten a job offer from his brother in Dallas

24  to be the VP of sales at Their milling company. He didn't know

25  what to do about Good Wagon which he had grown somewhat to the

1    point that he was making around $6k per month in sales. He made

2    me an offer. 50% of the company and a $3k per month salary to

3    take over and run the business going forward. I took the deal

4    and we went to work on it. By the end of the year, we had our

5    best month on record with about $10k in sales in December."

6              This is 2010, correct -- go back to the top just for a

7    second -- right?

8    A.  Yes.

9    Q.  So let's go further down, the next highlighted portion,

10   again not read by the government:  "I went through a lot over

11   the year in my personal relationships as Well. I had mostly

12   shut myself off from people because I felt ashamed of where my

13   life was. I had left my promising career as a scientist to be

14   an investment adviser and entrepreneur and came up empty

15   handed.  More and more my emotions and thoughts were ruling my

16   life and my word was losing power.  At some point I finally

17   broke down and realized my love for people again, and started

18   reaching out. Throughout the year I slowly re-cultivated my

19   relationship with my word and started honoring it again."

20             Let's go to 240B.  This is "2011" it says, right?

21   A.  It does.

22   Q.  So let's go to the highlighted portion, again not read by

23   the government yesterday:  "At some point, a hacker found some

24   major flaws in my code. I sent it to him for review and he came

25   back with basically "this is amateur shit". I knew it too. I

F1mgulb3                    Kiernan - cross

tried to work with him but I think he lost interest and since I

wasn't charging commission, I only had my shroom money to pay

him with. Thankfully that quadrupled from bitcoin increasing in

price, little did I know I could've cashed out at 8x higher for

a total of 32x! That would have gotten me off to a hell of a

start.  As it was, I cashed out all the way up and all the way

down. I called the peak, my timing was just off."

           If we go down further -- no, I think that's it for

that.  No.  Okay.  I'm sorry.  I just want to ask you a couple

of questions while we're talking.

           The bitcoin came up.  You talked yesterday about cold

storage bitcoin, cold storage?

A.  I did.

Q.  And the bitcoins don't become physical at that point,

right?

A.  Never physical.

Q.  They're always digital, right?

A.  That's right.

Q.  They're always electronic, they're always in a file, right?

A.  Yes.

Q.  Or a wallet, let's say, right?

A.  Yes.

Q.  And transactions cashing out of them are going to be

registered on the public block chain, right?

A.  That's right.

F1mgulb3                    Kiernan - cross

1   Q.  Let's go up.  This is another paragraph or another section

2   not read by the government:  "It looked like I didn't have to

3   process the transactions manually anymore, but then the rot

4   started.  Some where the site accounting wasn't balancing and I

5   was losing hundreds of dollars every few hours.  I started to

6   panic.  I tried everything I could think of, but couldn't stop

7   the bleeding.  It was getting to the thousands of dollars and I

8   was losing sleep and getting slow.  I didn't give up though.  I

9   rewrote the entire transaction processor from scratch and some

10  how it worked.  To this day I don't know what the problem was."

11          Now, I want to look at 232A which is a Tor chat.  This

12  is March 14, 2012?

13  A.  Yes.

14  Q.  And it's between "da" and it says "myself," right?

15  A.  Yes.

16  Q.  And it says "We might want to construct a new identity for

17  you though," right.

18  A.  That's what it says; yes.

19  Q.  And if you go down further and the person asks "IRL or

20  online."

21          IRL means in real life?

22  A.  Oh.  You're asking?

23  Q.  IRL?

24  A.  Yes.  I'm sorry.

25  Q.  "Or online," right?  DA is asking "myself," I guess that's

1    Dread Pirate Roberts, right?

2              MR. HOWARD:  Objection; foundation.

3              THE COURT:  Overruled.  Why don't you just reask the

4    question attached to this.

5              MR. DRATEL:  Sure.

6    Q.  IRL to your knowledge is in real life?

7    A.  In real life; yes.

8    Q.  And in this chat, DA asks Dread Pirate Roberts "IRL or

9    online," right?

10   A.  Yes.

11   Q.  Distinguishing the two things, right?

12   A.  Yes.

13   Q.  Real life from online?

14             THE COURT:  Hold on.  He can't testify as to what was

15   meant by these people, but he can say what the word "IRL" means

16   to him.

17   Q.  And Dread Pirate Roberts answers no, just online.  My

18   concern is that LE, and that's law enforcement, right?

19             THE COURT:  Hold on.  He's not going to interpret what

20   the writers meant.  He didn't do it yesterday.  He's not going

21   to do it today.  You can put somebody else on the stand to do

22   that.

23   Q.  "My concern is that LE will see that DA is a player at Silk

24   Road by your forum presence and then track down who you bought

25   from, and sold to under that name and then find you irl."

F1mgulb3                          Kiernan - cross

1           Now, that application for the Island of Dominica that

2   you looked at yesterday, right --

3   A.  Yes.

4   Q.  -- all of the personal identifying information with respect

5   to Mr. Ulbricht that was in there - name, address, social

6   security - all the things in there was all accurate, wasn't it?

7           MR. HOWARD:  Objection.

8           THE COURT:  Sustained.

9   Q.  Do you know of any of it that was inaccurate?

10          MR. HOWARD:  Objection.

11          THE COURT:  Sustained.

12  Q.  Did you check as to the accuracy of any of that

13  information?

14          THE COURT:  I'll allow that.

15  A.  Personally, no.

16  Q.  And in that document, he provides references, right,

17  persons, correct?

18  A.  Correct.

19          MR. DRATEL:  Nothing further.

20          THE COURT:  Thank you.

21          Any redirect?

22          MR. HOWARD:  Thirty seconds if you don't mind.  It

23  will be very brief, your Honor.

24          THE COURT:  All right.  Redirect examination.

25  REDIRECT EXAMINATION

F1mgulb3                        Kiernan - redirect

1    BY MR. HOWARD:

2    Q.  On cross-examination, you testified about BitTorrent,

3    correct, BitTorrent?

4    A.  I did.

5    Q.  And BitTorrent was on the defendant's computer, correct?

6    A.  It was, yes.

7    Q.  And it's basically a file-sharing program?

8    A.  Yes.

9    Q.  You can --

10             MR. DRATEL:  Objection.

11             THE COURT:  Sustained.

12             Let's put it this way:  You had better state very

13   carefully with only the limited amount that was opened by the

14   defendant.  Don't go beyond that.

15   Q.  Did you look at the settings of the BitTorrent program on

16   the defendant's computer?

17   A.  Yes.

18   Q.  Did you see where -- what the settings indicated about

19   where files downloaded to the defendant's computer would go?

20   A.  Yes.

21   Q.  And what folder did that indicate the files would go?

22   A.  The home/frosty/downloads folder.

23   Q.  Did you look at the contents of that folder?

24   A.  Yes.

25   Q.  And what was contained within that folder?

F1mgulb3                          Kiernan - redirect

1    A.  Movies, books, things to that nature.

2    Q.  Were any of the files that were admitted as exhibits during

3    your direct examination found in that folder?

4    A.  No.

5    Q.  You testified about the Tor chats on cross-examination,

6    correct?

7    A.  I did.

8    Q.  And you've logged your own Tor chats, is that right?

9    A.  I have.

10   Q.  And have the logs of those Tor chats been true and accurate

11   transcriptions of the Tor chats that you have had?

12   A.  Yes.

13   Q.  And you found the Tor chats we put in on direct

14   examination, you found them on the defendant's computer,

15   correct?

16   A.  I did.

17            MR. DRATEL:  Objection.

18            THE COURT:  Overruled.

19            You may proceed.

20   A.  Yes.

21   Q.  You testified on direct that you found encryption -- an

22   encryption process was active on the computer, correct?

23   A.  Correct, yes.

24   Q.  If the defendant had been able to close his computer before

25   he was arrested, would you have been able to access the Tor

1    chat files?

2           MR. DRATEL:  Objection; objection.

3           THE COURT:  I will allow it.

4    A.  No.

5           MR. HOWARD:  Let me check with cocounsel and see if

6    there's anything else, but I think we're done.

7           No further questions.

8           THE COURT:  Mr. Dratel.

9    RECROSS EXAMINATION

10   BY MR. DRATEL:

11   Q.  To be clear about the last point, you didn't close the

12   laptop, correct?

13   A.  Correct.

14   Q.  So you don't have any personal knowledge as to what would

15   have happened had that laptop been closed, right?

16   A.  I know when I got it back --

17   Q.  No.

18   A.  Personal, no.

19          MR. HOWARD:  No further questions.

20          THE COURT:  He may still be going.

21          MR. HOWARD:  Pardon me.

22   Q.  Now, you testified about BitTorrent on redirect about

23   files, about download destination, right?

24   A.  Yes.

25   Q.  But you can't sit here now and testify that you know all of

F1mgulb3                      Kiernan - recross

1  the activity that went on through that open port on that

2  computer, either that day or some other day when he was

3  downloading something else?

4  A.  Not from the whole time period.

5  Q.  Right.

6  A.  But that's a BitTorrent --

7  Q.  But that's a BitTorrent, but the port is open and it gives

8  access to the computer, correct?

9  A.  It gives access to the BitTorrent client.

10 Q.  Right.  But people who -- and that means those seven users

11 out there who have it, right, who are connected?

12 A.  That's right.

13 Q.  And as we said before, it could contain all sorts -- that

14 anything you download, can contain all sorts of malware, right,

15 malicious --

16 A.  Possible.

17 Q.  -- malicious software that can be used against the person

18 who is operating the computer, right?

19         MR. HOWARD:  Objection.

20         THE COURT:  Sustained.

21         MR. DRATEL:  I have nothing further.

22         THE COURT:  Thank you.

23         Anything further, Mr. Howard, like one question?

24         MR. HOWARD:  Yes.  It is one question -- two

25 questions, but start with one.

F1mgulb3                         Kiernan - recross

1    REDIRECT EXAMINATION

2    BY MR. HOWARD:

3    Q.  Mr. Kiernan, did you review the contents of the defendant's

4    computer for malware?

5    A.  Yes.

6    Q.  Did you find any --

7                THE COURT:  I stopped Mr. Dratel on the malware.

8                MR. HOWARD:  I'm sorry.  Withdrawn.  No further

9    questions.

10               THE COURT:  Thank you.

11               You may step down.

12               THE WITNESS:  Thank you.

13               (Witness excused)

14               THE COURT:  Would the government like to call its next

15   witness, please.

16               MR. HOWARD:  The government is calling Special Agent

17   Greg Fine.  We're getting him right now.

18               (Witness sworn)

19               THE COURT:  Mr. Fine, please be seated.  And it will

20   be important for you to pull up your chair and adjust the

21   microphone so that you can speak clearly and directly into the

22   mic.

23               THE WITNESS:  Thank you.

24               THE COURT:  Mr. Turner, you may proceed.

25               MR. TURNER:  Thank you.

F1mgulb3                          Kiernan - redirect

1    GREGORY FINE,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. TURNER:

6    Q.   Thank you.  Good afternoon, Special Agent fine.

7    A.   Good afternoon.

8    Q.   Where do you work?

9    A.   For the Federal Bureau of Investigation.

10   Q.   What is your position there?

11   A.   I'm a special agent.

12   Q.   And what office of the FBI are you in?

13   A.   The San Francisco division.

14   Q.   Were you one of the agents involved in the search of Ross

15   Ulbricht's residence following his arrest on October 1, 2013?

16   A.   I was.

17   Q.   And was that search pursuant to a search warrant?

18   A.   Yes.

19   Q.   What was the address of the residence?

20   A.   235 Monterey Boulevard in San Francisco, California.

21   Q.   And were you able to locate the defendant's bedroom in the

22   residence?

23   A.   Yes.

24   Q.   And how were you able to do so?

25   A.   During the search, we found some of his personal effects.

F1mgulb3                    Fine - direct

1   Q.  Like?

2   A.  We found his Texas driver's license and his passport.

3   Q.  And did you find any computer devices in the bedroom?

4   A.  Yes.

5   Q.  What did you find?

6   A.  Found two thumb drives.

7   Q.  What are thumb drives?

8   A.  They're USB devices so essentially storage for -- storage

9   for digital files.

10  Q.  And you plug them into a computer?

11  A.  Yes.

12          MR. TURNER:  May I approach.

13          THE COURT:  You may.

14  Q.  I'M showing you what's been marked as Government

15  Exhibit 502.  It's already been admitted into evidence.

16          Do you recognize what I've shown you?

17  A.  I do.

18  Q.  How do you recognize it?

19  A.  These are the two USB drives that we found in

20  Mr. Ulbricht's room.

21  Q.  Where did you find them?

22  A.  On the nightstand.

23  Q.  And what did you do with them after you found them?

24  A.  We seized them pursuant to the search warrant, we packaged

25  them up and I transported them to the evidence room in San

1    Francisco.

2              MR. TURNER:  No further questions, your Honor.

3              THE COURT:  Thank you.

4              Mr. Dratel.

5              MR. DRATEL:  No questions, your Honor.

6              THE COURT:  Thank you.  You may step down, sir.

7              THE WITNESS:  Thank you.

8              (Witness excused)

9              THE COURT:  Would the government like to call its next

10   witness, please.

11             MR. HOWARD:  The government would call Richard Bates.

12             THE COURT:  All right.

13             (Pause)

14             THE COURT:  Mr. Bates.

15             (Witness sworn)

16             THE COURT:  Mr. Bates, please be seated, sir.

17             It will be important for you to pull yourself up so

18   you can speak directly into the mic.

19             Mr. Howard.

20             MR. HOWARD:  Thank you, your Honor.

21    RICHARD CHAPMAN BATES,

22        called as a witness by the Government,

23        having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25

F1mgulb3                          Bates - direct

1   BY MR. HOWARD:

2   Q.  Good afternoon, Mr. Bates.

3   A.  Good afternoon.

4   Q.  How old are you?

5   A.  I am 31 years old.

6   Q.  And where do you currently live?

7   A.  I currently live in Austin, Texas.

8   Q.  And where do you work?

9   A.  I work for eBay.

10  Q.  And what do you do for a living?

11  A.  I am a software engineer.

12  Q.  Are you familiar with Ross Ulbricht?

13  A.  Yes, I am.

14  Q.  And how are you familiar with him?

15  A.  I went to college with him at the University of Texas at

16  Dallas, and then I have reunited or rekindled our friendship

17  when I moved to Austin in 2010.

18  Q.  When did you first meet the defendant?

19  A.  That would be sometime in the summer of 2002 when I was

20  just now starting college, freshman year.

21  Q.  What did you study in college?

22  A.  I studied computer science.

23  Q.  And what did the defendant study in college?

24  A.  He studied physics.

25  Q.  Do you see Mr. Ulbricht sitting in the courtroom today?

F1mgulb3                          Bates - direct

1   A.  Yes, I do.

2   Q.  Could you please identify him by something he's wearing?

3   A.  It looks like he's got a gray sweater on and, what is that,

4   a red and black-striped tie, I believe.

5           MR. HOWARD:  Will the record please reflect that the

6   witness has identified the defendant.

7           THE COURT:  So reflected.

8   Q.  Now, Mr. Bates, I want to direct your attention to 2011.

9   A.  Okay.

10  Q.  Did the defendant share a secret with you?

11  A.  Yes, he did.

12  Q.  And what was the secret?

13  A.  He shared with me that he created and ran the Silk Road

14  website.

15  Q.  And what was the Silk Road website?

16  A.  It was a Tor-based website where people could buy and sell

17  drugs.

18  Q.  And why did the defendant share this secret with you?

19          MR. DRATEL:  Objection.

20          THE COURT:  Sustained.

21  Q.  Did you provide -- did the defendant tell you why he told

22  you the secret?

23  A.  I issued him basically an ultimatum because he wanted

24  programming assistance.  That's why he told me about it.

25  Q.  Did you provide help?

F1mgulb3                          Bates - direct

1   A.  Yes, I did.

2   Q.  And for how long did you provide help?

3   A.  I provided help unknowingly in 2010; and then during 2011,

4   I knew for a while and that went on into the summer of 2011.

5   Q.  So we'll circle back to discuss that more in detail later.

6            Turning your attention to October 2013, did you learn

7   at some point the defendant got arrested?

8   A.  Yes, I did.

9   Q.  After that, did you talk to any law enforcement agents?

10  A.  Yes.

11  Q.  To be clear, did law enforcement agents come to you or did

12  you reach out to law enforcement agents?

13  A.  They came to me.

14  Q.  And where did this occur?

15  A.  This occurred just outside my apartment.

16  Q.  And can you describe what happened during that encounter?

17  A.  To put it succinctly, I lied to them.

18  Q.  What happened?

19  A.  They, you know, asked me what I knew about Ross.  And I

20  said, you know, I didn't know that he was working on the Silk

21  Road when I knew that he was.

22  Q.  And why did you do that at the time?

23  A.  Because I was scared.

24  Q.  Now, are you testifying here today in part based on an

25  agreement with the government?

F1mgulb3                          Bates - direct

1   A.  Yes, I am.

2   Q.  And what kind of agreement is that?

3   A.  It's a nonprosecution agreement.

4   Q.  And what is your understanding of what your obligations are

5   under the agreement?

6   A.  My understanding is that my obligations are, you know, to

7   meet with prosecutors, to tell them the truth, and to tell the

8   truth to this Court here today.

9   Q.  Now, what is your understanding of what the government will

10  do if you fulfill your part of the agreement?

11  A.  That they will not prosecute me for three specific things:

12  The technical assistance that I gave Ross that he used to, you

13  know, run the Silk Road; they will not prosecute me for the

14  work I did with Ross where we tried to create a bitcoin

15  exchange; and they will not prosecute me for drugs that I

16  purchased for personal use.

17  Q.  Now, let's talk a little bit about your personal use of

18  drugs.  What kind of drugs have you used?

19  A.  I have used marijuana, MDMA, psychedelic mushrooms, Vicodin

20  and one time I purchased antibiotics.

21  Q.  When did you first start using illegal drugs?

22  A.  It was soon after graduating in 2007.

23  Q.  And what were your sources for these illegal drugs?

24  A.  At what time?

25  Q.  After 2011.

F1mgulb3                    Bates - direct

1    A.  After 2011, I was buying drugs on the Silk Road primarily.

2    Q.  How did you learn about the Silk Road?

3    A.  I learned about the Silk Road when Ross told me about it.

4    Q.  And what was your username on Silk Road?

5    A.  My username was mêlée spelled M-E-L-E-E.

6    Q.  What kinds of narcotics did you purchase from Silk Road?

7    A.  I -- basically the list I had gone over before, that would

8    be, you know, marijuana, MDMA, mushrooms, Vicodin and

9    antibiotics.

10   Q.  Focusing for a second on mushrooms, when was the first time

11   you used them?

12   A.  The first time I used them was in 2011.  I tried a very

13   small amount that Ross had given me.

14   Q.  Do you remember that incident when you -- when he gave you

15   those mushrooms?

16   A.  Yes, I do.  He had a large, black trash bag that was, you

17   know, running kind of empty.  It looked like it had been full

18   at some point --

19            MR. DRATEL:  Objection.

20            THE COURT:  Sustained.

21            You can continue.

22            THE WITNESS:  Do I just continue?

23            THE COURT:  Just pick up.

24            THE WITNESS:  Okay.  Give me one second.

25   A.  So, yeah, I got them from him.  He told me they were kind

F1mgulb3                         Bates – direct

1   of old, but I could have some if I wanted any, and he gave me a

2   small Ziploc bag with them in it.

3   Q.  Did the defendant have any discussions with you about where

4   he got those mushrooms from?

5   A.  He told me that he had grown them.

6   Q.  During 2011, how frequently were you using illegal drugs?

7   A.  During 2011, not that frequently.  I'd say, you know, you

8   know once every couple months.

9   Q.  Approximately when was the last time you used illegal

10  drugs?

11  A.  That would be in the summer of 2013.

12  Q.  Now earlier you described that you first met the defendant

13  in college, correct?

14  A.  That is correct.

15  Q.  When did you graduate from college?

16  A.  I graduated in 2007.

17  Q.  And where did you live immediately after graduating?

18  A.  I lived in the Dallas/Ft. Worth area.

19  Q.  Do you know where the defendant went after college?

20  A.  He went to Pennsylvania for graduate work.

21  Q.  Do you know where he went to graduate school?

22  A.  I believe it was Penn State.

23  Q.  Did you stay in touch with the defendant after he moved to

24  Penn State?

25  A.  We were, you know, Facebook friends.  We kind of stayed in

F1mgulb3                          Bates - direct

1    touch that way.

2    Q.  And earlier, you testified that you reconnected with him

3    when you moved to Austin?

4    A.  Yes, that's correct.

5    Q.  Can you describe what happened.

6    A.  I -- when I moved to Austin, I looked at my Facebook page

7    and I said well, who do I know that lives in Austin and I saw

8    that Ross lived there, and, you know, I remembered we had hung

9    out a couple of times, we went on a spring break trip.  And I

10   said hey, man, I'm moving down to Austin and we should hang

11   out.  And then after I moved down, we, you know, that's what we

12   did.  We hung out.  We went cliff-jumping a few weeks later.

13   Q.  And in late 2010, how frequently did you see the defendant?

14   A.  In late 2010, I'd say weekly.

15   Q.  Were you aware of what the defendant did for a living back

16   then?

17   A.  At that time, I -- my understanding was that he had a book

18   business called Good Wagon Books, and I also saw him editing

19   some academic papers, and my understanding was he was being

20   compensated for that, as well.

21   Q.  Was the defendant familiar with the fact that you were a

22   computer programmer?

23   A.  Yes, he was.

24   Q.  During late 2010, did you have any discussions with the

25   defendant regarding computer programming?

F1mgulb3                        Bates - direct

1   A.  I'm sorry.  What was the year again?

2   Q.  Late 2010?

3   A.  Late 2010?  Yes.

4   Q.  And generally what kinds of discussions were you having?

5   A.  In late 2010, he was asking me some PHP programming

6   questions, a few questions about server administration.

7   Q.  Could you please flip in your binder to what's been marked

8   for identification purposes to Government Exhibit 1000.

9   A.  Yes.

10  Q.  Do you recognize this exhibit?

11  A.  Yes, I do.

12  Q.  And what is it?

13  A.  This is a Google chat conversation between Ross and me.

14  Q.  And what is a Google chat conversation?

15  A.  It's, you know, a text-based communication, you can go

16  through the website or your phone and talk to another person

17  via text.

18          MR. HOWARD:  The government offers Government

19  Exhibit 1000.

20          THE COURT:  Mr. Dratel.

21          MR. DRATEL:  I just need to look.  The numbers have

22  changed.  So I just need to go back and find them.

23          Vayner and hearsay, your Honor.

24          THE COURT:  Those objections are overruled.

25  Government Exhibit 1000 is received.

1               (Government's Exhibit 1000 received in evidence)

2               MR. HOWARD:  Ms. Rosen, can you please publish

3      Government Exhibit 1000.  Can you zoom in on the top of the

4      message, please.

5      Q.  Mr. Bates, here it says at the top "Subject:  Chat with

6      baronsyntax@gmail.com."

7               What is baronsyntax@gmail.com?

8      A.  That is my personal email address.

9      Q.  Down on the "to" line it says "To rossulbricht@gmail.com."

10              What is rossulbricht@gmail.com?

11     A.  That's Ross' email address.

12     Q.  And what was the date of this chat communication?

13     A.  This was October 25, 2010.

14              MR. HOWARD:  Now, Mr. Evert, can you please scroll

15     down to the body of the message, please and zoom in down to

16     here, please.

17     Q.  There are references in this messaging to baronsyntax.

18     What does that refer to?

19     A.  Those are the parts of the conversation that I wrote.

20     Q.  And how about the parts that are labeled as "me"?

21     A.  Those are the parts that Ross wrote.

22     Q.       "Me: howdy

23               Baronsyntax: hey

24               Me: what's the latest?

25               Me: make it to work?

F1mgulb3                    Bates – direct

1              Baronsyntax: yeah, it seems to be running just fine
2      now."  Emoticon.
3              "Me: sweet
4              Me: mind a programming queastion?
5              Baronsyntax: No queastions please. but you can ask me
6      a ques..on if you'd likfe."  Emoticon.
7              "Baronsyntax: I am the grammar facists
8              Me: i can tell."  Emoticon.
9              "Me: ok
10             Me: log() is included in Math::Trig in perl, but my
11     admin won't include the module..."  And then there's some more
12     discussion.
13             Can you describe what is happening in this
14     conversation?
15     A.  Yes.  He's having an issue with Perl, and there's a library
16     function that he wants to use but can't and is asking me if
17     there's another way to use it.  I'm providing assistance to
18     him.
19     Q.  Is this the only time the defendant asked you for help with
20     computer programming?
21     A.  No.
22     Q.  How frequently would he ask you for help in late 2010?
23     A.  In late 2010, it was very frequent.
24     Q.  How about early 2011, was he still asking you questions
25     regarding programming?

1    A.   Yes.

2    Q.   During this time period, did you know what the defendant

3    was working on?

4    A.   If we're talking about early 2011?

5    Q.   That's correct.

6    A.   Not -- I believe the time that I knew about it was late

7    February/early March of 2011.

8    Q.   But before that --

9    A.   No, I didn't.

10   Q.   -- did you have any discussion about what he was working

11   on?

12   A.   Yes, I did.  And I asked him, you know, basically what are

13   you working on and he told me it was top secret.

14   Q.   Can you please flip now in your binder to what's been

15   marked for identification purposes as Government Exhibit 1001.

16   Do you recognize this exhibit?

17   A.   Yes, I do.

18   Q.   And what is it?

19   A.   It's another Google chat conversation between Ross and me.

20            MR. HOWARD:  The government offers Government

21   Exhibit 1001.

22            MR. DRATEL:  The same as the previous objections.

23            THE COURT:  Those objection are overruled.

24            GX 1001 is received.

25            (Government's Exhibit 1001 received in evidence)

1    MR. HOWARD:  Mr. Evert, can you please publish

2    Government Exhibit 1001.

3    Q.  What is the date of this chat communication, Mr. Bates?

4    A.  This is February 28, 2011.

5    Q.  To be clear, are the names and the parts of the

6    conversation labeled just like the last one we looked at?

7    A.  Yes.

8    Q.  Baronsyntax is you and "me" is the defendant, correct?

9    A.  That's correct.

10                   MR. HOWARD:  "Baronsyntax:  I'm officially forbidding

11   you from mentioning your secret project to me again unless you

12   are going to reveal it.

13                   Me:  Can I ask you programming questions for "no

14   particular reason".

15                   Baronsyntax:  Yea."

16   Q.  So Mr. Bates, what was going on in this conversation?

17   A.  This was kind of the build-up to where I issued him an

18   ultimatum not long after this where I told him that he needs to

19   either tell me what he's doing or leave me out of it.  I kind

20   of became a little suspicious.  I thought he might be trying to

21   hack into some website or something, but the fact that he just

22   said top secret worried me a little bit.

23   Q.  And after you gave the ultimatum, what happened?

24   A.  He was in my apartment and I told him tell me about it or

25   leave me out of it, and he told me about it.  And he said

F1mgulb3                          Bates - direct

something along the lines of, you know, it's a -- I'm working

on a website where people can buy drugs.  Then he had his

laptop at the time and he showed me the Silk Road homepage for

the first time.

Q.  Did he use your Internet when he did this?

A.  No, he didn't.  We were worried that it might somehow be

traced back to me, so I told him one of my neighbors had an

open Wi-Fi network.

Q.  And what do you mean by an open Wi-Fi network?

A.  I mean a Wi-Fi network that doesn't have password

protection and it was, you know, one of my neighbor's Internet

access.

Q.  And what did the defendant show you about the website?

A.  I remember seeing the homepage, I remember seeing the green

camel for the first time and pictures of drugs.

Q.  What was your reaction when you first learned about this?

        MR. DRATEL:  Objection.

        THE COURT:  Overruled.

A.  So -- sorry, what was the question again?

Q.  What was your reaction when you first learned?

A.  I was shocked but I was also very intrigued because, I

mean, I didn't know how this, you know, could be even possible.

I think my immediate reaction was they're going to shut this

thing down really, really soon, and that's when he first

explained Tor to me and he told me it accepted payment in

1    bitcoin.

2              Ross had told me about bitcoin before, but I didn't

3    really listen to it and now I was very much paying attention.

4    Q.  At the time you had this conversation, had you heard of Tor

5    before?

6    A.  No.

7    Q.  And what did the defendant tell you about Tor?

8    A.  Basically that it's, you know, a network that anonymizes or

9    tries to anonymize web traffic.

10             MR. HOWARD:  Your Honor, may I approach.

11             THE COURT:  You may.

12   Q.  Mr. Bates, I'm handing you what's been marked for

13   identification purposes as Government Exhibit 1005.

14   A.  Yes.

15   Q.  Do you recognize what this is?

16   A.  Yes, I do.

17   Q.  And what is it?

18   A.  This is a recording of a voicemail that Ross left me on

19   2011.

20   Q.  Do you remember the date that this voicemail was left?

21   A.  I believe it was March 15, 2011.

22   Q.  And do you remember what time of day this was

23   approximately?

24   A.  It was just after 6:00 p.m. central Time I believe.

25   Q.  Are you familiar with the defendant's voice?

F1mgulb3                         Bates – direct

1    A.  Yes, I am.

2    Q.  How do you know that this CD, this exhibit, this thing in

3    front of you contains that recording?

4    A.  Yesterday we went over it and they had me listen to it to

5    confirm that it was a voicemail, and I initialed and dated it

6    right there.

7              MR. HOWARD:  The government offers Government

8    Exhibit 1005.

9              MR. DRATEL:  No objection.

10             THE COURT:  Received.

11             (Government's Exhibit 1005 received in evidence)

12             MR. HOWARD:  May I approach, your Honor.

13             THE COURT:  You may.

14             MR. HOWARD:  Mr. Evert, can you please play the

15   recording.

16             (Audio recording played)

17             (Continued on next page)

18

19

20

21

22

23

24

25

F1mdulb4                          Bates - direct

 1                MR. HOWARD:  I'm sorry.  Would you please play the

 2     recorder.

 3                (Audio played)

 4                THE WITNESS:  Something went wrong.

 5                (Audio replayed)

 6     BY MR. HOWARD:

 7     Q.  What happened after this voicemail was left for you?

 8     A.  Not long after that we communicated on Google Chat about a

 9     problem he was having with the Silk Road being down.

10     Q.  Would you please flip in your binder to what's been marked

11     for identification purposes as Government Exhibit 1006.

12                (Pause)

13                Do you recognize what this is?

14     A.  Yes, I do.

15     Q.  And what is it?

16     A.  This is another Google Chat conversation between Ross and

17     me that happened shortly after that voicemail was recorded.

18                MR. HOWARD:  The government offers Government Exhibit

19     1006.

20                MR. DRATEL:  The same objections.

21                THE COURT:  Those objections are overruled.  GX1006 is

22     received.

23                (Government's Exhibit 1006 received in evidence)

24     BY MR. HOWARD:

25     Q.  Now, Mr. Bates, what was the date and time of this

1    conversation?

2    A.   This is March 15, 2011, and if my time conversion is

3    correct, this is 6:36 p.m. Central Time.

4    Q.   When you say "conversion," what are you referring to?

5    A.   It's listed on the paper as being Pacific Daylight Time,

6    and I'm converting it to Central Time, which is where Ross and

7    I were both located, in that time zone at the time.

8    Q.   And this is shortly after that voicemail we just played,

9    correct?

10   A.   That is correct.

11   Q.   And are the parts of the conversation labeled just like the

12   others we reviewed earlier?

13   A.   Yes, they are.

14   Q.   You are "baronsyntax" and the defendant is labeled as "me."

15   A.   That is correct.

16   Q.   "Baronsyntax: What's the problem?

17          "Baronsyntax: You happened to call when I was in the

18   bathroom

19          "Me: My site is down and I don't know why. Too much

20   traffic I think. I get an error about too many open connectons.

21   Might be my amature coding left open connections everywhere,

22   don't know

23          "Baronsyntax: What kind of connections?

24          "Me: Doesn't say. Maybe mysql

25          "Baronsyntax: ok, so you've got some requests that

1   leaves a mysql transaction open – is that what you're thinking?

2             "Baronsyntax: Are you looking at apache logs or what

3             "Baronsyntax: I don't have any frame of reference here

4             "Baronsyntax: Would it be better if I called?

5             "Me: Yea, if you can I don't want to be a nusance"

6             So what happened during this part of the –– during

7   this conversation, Mr. Bates?

8   A.   During this conversation he tells me that the Silk Road is

9   down and he's speculating as to why that might be.  And then

10  I'm trying to help him figure it out.  I'm basically trying to

11  troubleshoot.

12  Q.   And what was your understanding of what the defendant was

13  referring to when he said "my site is down"?

14  A.   That was the Silk Road.  Frequently, when we were talking

15  in Google Chat, we would refer to it as "the" site or "my" site

16  by the defendant.

17  Q.   Is there a reason you did it that way?

18  A.   Because we knew that, you know, this is something that

19  if –– I guess if someone was reading the conversation, since

20  this is over –– this is not encrypted protocol, that we didn't

21  want them to know that we were talking about Silk Road.

22  Q.   What do you mean by an encrypted protocol?

23  A.   An encrypted protocol would be, you know, software that has

24  some precautions in it that are designed to prevent anyone

25  except the intended recipient from reading the message.

F1mdulb4                         Bates - direct

1   Q.  Now, if you could please flip to what's been marked in

2   there for identification -- sorry, marked in your binder for

3   identification purposes as Government Exhibit 1007.

4           Do you recognize what this is?

5   A.  Yes, I do.

6   Q.  And what is this?

7   A.  This is another Google Chat conversation between Ross and

8   me that happened I think a few hours after the last one that we

9   looked at.

10          MR. HOWARD:  The government offers Government Exhibit

11  1007.

12          MR. DRATEL:  The same objections, your Honor.

13          THE COURT:  Those objections are overruled.  GX1007 is

14  received.

15          MR. HOWARD:  Mr. Evert, could you please publish

16  Government Exhibit 1007 and zoom in on the message.

17  Q.  Mr. Bates, you testified this happened the same night

18  following the previous conversation, correct?

19  A.  That's correct.

20  Q.  So I'm not going to even try to read the first four lines

21  labeled "baronsyntax."  Could you just describe what's going on

22  overall here?

23  A.  You know, I have to -- this was a while ago, but I believe

24  what's happening here is I'm giving him commands to run on his

25  server terminal.  I know tail dash F is a way of looking at the

1  output of a file realtime, and that's used for log files so

2  that you can see them as they're being updated.  Lsof is a, you

3  know, either a UNIX or Linux program that lists the open files

4  on a system.  And here I'm telling him, you know, tell me what

5  files are open and search for php -- that's what that "grep

6  php" is.  In essence, I'm trying to help him figure out why the

7  site is down.

8  Q.  By "the site," you mean Silk Road?

9  A.  Yes.

10  Q.  The last two lines of this chat go:

11          "Baronsyntax:  My neighbor has an open Wi-Fi network

12          "Me:  Sounds good."  Emoticon.

13          What were you discussing here?

14  A.  I believe that we were talking about either him coming over

15  to my place or me going over to his place.  It sounds like if I

16  say my neighbor has an open Wi-Fi network, we were at least

17  entertaining him coming over to my place.

18  Q.  Why were you telling the defendant that you had an open

19  Wi-Fi network?

20  A.  Well, my neighbor has the open Wi-Fi network.  This is,

21  again, related to, you know, it not being traceable back to,

22  you know, any of us.  It would be -- if they did trace back the

23  connection, it would go back to my neighbor and not either of

24  us.

25  Q.  You had your own Internet connection at this time, correct?

1    A.  That is correct.

2    Q.  Now, Mr. Bates, would you please flip in your binder to

3    what's been marked for identification purposes as Government

4    Exhibit 1008.

5         Do you recognize this exhibit?

6    A.  Yes, I do.

7    Q.  And what is it?

8    A.  This is another Google Chat conversation that happened

9    later in the evening after the one that we just looked at.

10        MR. HOWARD:  The government offers Government Exhibit

11   1008.

12        MR. DRATEL:  The same objections, your Honor.

13        THE COURT:  All right.  Those objections are

14   overruled.  Government Exhibit 1008 is received.

15        (Government's Exhibit 1008 received in evidence)

16        THE COURT:  And in just a few minutes, Mr. Howard, we

17   will break for lunch but we've got a few minutes.

18        MR. HOWARD:  Thank you.

19   BY MR. HOWARD:

20   Q.  Now, Mr. Bates, are your parts of the conversation and the

21   defendant's parts marked in the same way as all the other chats

22   we have looked at today?

23   A.  Yes, they are.

24   Q.  "Baronsyntax: I'm just now reading about the tor network

25        "Me: yea, site's down again

1          "Me: what are you reading?

2          "Baronsyntax: just the wikipedia page.  Apparently tor

3    does a lot of encryption/decryption.  Could be an expensive

4    operation

5          "Me: im so stressed! I gotta get this site up tonight.

6    It's so weird because the site is accessable through tor2web,

7    but not by directly accessing the .onion url

8          "Baronsyntax: I'm not sure how that stuff works

9          "Me: i wish i did."

10         So, Mr. Bates, what's going on in this part of the

11   conversation?

12   A.  I'm, you know, talking about the first time I read

13   documentation about Tor, and Ross is reiterating that, you

14   know, he's stressed because the Silk Road is still down in some

15   fashion and that he can't access the onion URL.

16   Q.  And what is the onion URL?

17   A.  Ah, in a dot-onion URL, you know, if you go to like

18   Google.com, that's -- in a normal Web browser, that's the

19   website address for Google.  In Tor you would have to go to

20   something dot-onion in the Tor browser to get to the site.

21   Q.  Now, could you please flip in your binder to what's been

22   marked for identification purposes as Government Exhibit 1002.

23   Do you recognize what this is?

24   A.  Yes, I do.

25   Q.  And what is it?

1   A.  This is another Google Chat conversation between Ross and

2   me that happened a few days after the last one we looked at.

3              MR. HOWARD:  The government offers Government Exhibit

4   1002.

5              MR. DRATEL:  The same objections, your Honor.

6              THE COURT:  Those objections are overruled.

7   Government Exhibit 1002 is received.

8              (Government's Exhibit 1002 received in evidence)

9   BY MR. HOWARD:

10  Q.  Now, what is the date of this online chat, Mr. Bates?

11  A.  This is March 17, 2011.

12  Q.  A couple days after the voicemail and the previous chats we

13  have reviewed?

14  A.  That's correct.

15  Q.  And are the parts of the conversation labeled just like all

16  the other ones we reviewed?

17  A.  That's also correct.

18  Q.  "baronsyntax: You still hiring for your book business?

19             "Me: yea, the team is getting full, but there are

20  still some spots, have someone in mind?

21             "Baronsyntax: possibly, what kind of work is it?

22             "Me: weekend job, door-to-door, pays $12/hr on average

23             "Baronsyntax: weekends only?

24             "Me: yep.  Sat and sun

25             "Baronsyntax: yeah, he's probably going to want more

1   hours than that.  Thanks for humoring me though :-)

2               "Me: sure."

3               Let's take a pause.

4               What was going on in this part of the conversation,

5   Mr. Bates?

6   A.  This was a while ago but I think we're -- yeah, we're

7   talking about a friend of mine who was looking for work and

8   possibly Ross hiring him at the book business that he ran.

9   Q.  And at the time -- at this time, did you understand him to

10  be involved in the book business?

11  A.  Yes.

12  Q.  And what was the name of that business?

13  A.  I believe it was Good Wagon Books.

14  Q.  This was in addition to Silk Road?

15  A.  At this time, yes, it was in addition to.

16  Q.  Let's continue down the chat:

17              "me: my site had a 40 minute spot on a national radio

18  program

19              "me: friggin crazy, you gotta keep my secret buddy

20              "baronsyntax: I haven't told anyone and I don't intend

21  to

22              "me: i know i can trust you

23              "baronsyntax: I don't even know the onion url.  I

24  might tell people about the site though - if that's ok?

25              "baronsyntax: I won't even mention I know someone who

F1mdulb4                              Bates - direct

1    runs it

2              "me: mmm....ok, gotta have a good story for how you

3    found it in case they ask."

4              THE COURT:  Now, Mr. Howard, it may make sense to --

5    do you want to have the witness answer a question on that piece

6    because we are going to have to break for lunch?

7              MR. HOWARD:  I think it would make sense for us to

8    just recap that to start the next.  It ties into the subsequent

9    portion.  So maybe you should just break here.

10             THE COURT:  All right.  We'll break.

11             Ladies and gentlemen, we are going to break for lunch.

12   I want to remind you not to talk to each other or anybody else

13   about this case or anything having to do with this case.

14             And we'll pick up again at 2 o'clock.  Thank you very

15   much.

16             THE CLERK:  All rise as the jury leaves.

17             THE COURT:  (To the witness) You can step out as well.

18   Thank you.

19             (Continued on next page)

20

21

22

23

24

25

1           (Jury and witness not present)

2           THE COURT:  All right, ladies and gentlemen.  Let's

3    all be seated.

4            I've got a couple of things.  Let me just talk about

5    the last series of exhibits, which were Government Exhibits

6    1000, 1001, 1006, 1002.  It is the series relating to the chats

7    between this witness, Mr. Bates, and Mr. Ulbricht.  I've

8    overruled defense objections and I just want to state why.  If

9    there were other government exhibits in that series, I mean to

10   include them in this.

11           In terms of the <u>Vayner</u> objection, this witness has

12   sufficiently authenticated these chats.  And in terms of

13   hearsay, they're either -- they are of two types of content.

14   Either it is not for the truth, or to the extent there are

15   pieces for the truth, they are admissions by Mr. Ulbricht.

16   But, for instance, whether or not, in 1006, Bates went to the

17   bathroom is not for the truth, but there are portions which may

18   be for the truth in terms of some of the pieces that

19   Mr. Ulbricht stated.

20           That's what I wanted to raise.  Mr. Dratel, you wanted

21   to make a record on some of the testimony that you wanted to

22   elicit from Mr. Kiernan?

23           MR. DRATEL:  Yes, your Honor.

24           He conducted an exercise -- really, an experiment --

25   that was designed to allow, which he did in the beginning of

1   his testimony, which was predicate to all the Tor chats, which

2   was that by setting up Tor chat and then creating some chats,

3   that the person operating the computer would be "myself" on the

4   chats.  The underlying program that's used for that -- and how

5   it's composed -- is essential to that experiment.

6           You can't have an experiment where you have different

7   elements on each side of the experiment and have it be valid.

8   And I was not allowed to get into that.  It is directly

9   relevant to his direct.  I can't immunize it just by not asking

10  it when it is an implicit and a central part of what he did.

11  You can't say, ah, I'm running an experiment, you know, on a

12  substance and then have a different substance.  You can't have

13  a gas mileage experiment with cars and you use two different

14  types of gasoline.  That's what I was getting at.  And I

15  couldn't do it.  And I am moving for a mistrial on that basis.

16          And I'm also moving for a mistrial because the Court

17  then said in front of the jury I can call a witness.  It's not

18  my burden.  I have no burden.  You put the burden on me.

19          THE COURT:  The motion for a mistrial is denied.  I am

20  entirely comfortable with all of my limitations in terms of

21  what was within the scope of direct and what was outside of the

22  scope of the direct.

23          I believe that in the context of what was occurring,

24  my comment was entirely appropriate.  However, I will instruct

25  the jury that the defendant does not have a burden.

1           My point for you, Mr. Dratel, is to the extent the

2   defendant would like to put on evidence, which is entirely his

3   choice, ultimately, that he would like to present, he can do at

4   that, or not.  It will be up to the government to put together

5   the facts which the jury will use to determine whether or not

6   the government has carried its burden of proof as to each of

7   the charged counts.

8           Mr. Howard, would you like to respond at all to -- or,

9   actually, it was Mr. Turner?  Which one of you was it?  It was

10  Mr. Howard.

11          MR. HOWARD:  It was me, your Honor.

12          And I do believe the defendant was -- I'm sorry, the

13  defense counsel did ask some questions regarding about whether

14  the witness knew for sure about whether the burdens were

15  correct.  So that testimony was elicited in some form.

16          THE COURT:  That's my point about how when it was

17  within the scope, I allowed it.  When it was outside of the

18  scope, I disallowed it.

19          All right.  Is there anything further that people

20  would like to say on any topic before we break for lunch?  I do

21  have a matter in here at 1.  It is a criminal matter.  So I'll

22  need a little bit of space at the first two spots.

23          Is there anything that anybody else would like?

24          MR. TURNER:  Not from the government, your Honor.

25          THE COURT:  Actually, I do have one more thing.

1          Mr. Dratel, anything else?

2          MR. DRATEL:  No, your Honor.

3          THE COURT:  All right.  One thing I wanted to raise.

4  I want to have a copy of the jury instructions hopefully either

5  later today or tomorrow morning.  In the proposed verdict

6  form -- and we're going to have to go through the instructions,

7  obviously, at another time but I want you folks to have it.

8  For the continuing criminal enterprise, I want you folks to

9  take a look at 848, the statutory provision, and at the <u>Alleyne</u>

10  case and determine whether or not there are additional issues

11  which should be in your view either contained or not contained

12  on the verdict form.

13          MR. TURNER:  I just didn't catch that, your Honor.

14          THE COURT:  On the continuing criminal enterprise.

15          MR. TURNER:  The name of the case.

16          THE COURT:  <u>Alleyne</u>, A-l-l-e-y-n-e.  It holds that if

17  there is going to be a statutory minimum imposed by virtue of a

18  statutory requirement, the jury must determine beyond a

19  reasonable doubt that that requirement has been met.

20          So to the extent that there are provisions of 848 that

21  require supervisory findings and/or other findings, I believe

22  those need to be called out, but they are not on the proposed

23  verdict form.  So I am soliciting people's views.

24          MR. HOWARD:  We will look into that, your Honor.

25          THE COURT:  All right.  Thank you.

F1mdulb4                          Bates – direct

1              That is all I've got.

2              All right.  I'll see you all at 2 o'clock.

3              THE CLERK:  All rise.

4              (Luncheon recess)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1mdulb4                    Bates - direct

1                **A F T E R N O O N   S E S S I O N**

2                            2:05 p.m.

3    RICHARD BATES,

4        Resumed, and testified further as follows:

5             (Jury not present)

6             THE COURT:  All right.  Let's bring out the jury.

7             THE CLERK:  All rise as the jury enters.

8             (Jury present)

9             THE COURT:  All right.  Ladies and gentlemen, let's

10   all be seated.

11            And before we get going, I wanted to go back over one

12   matter with you.  As you heard me say at the beginning of the

13   case -- and I want to repeat now -- the defendant in a criminal

14   case does not bear the burden of proof.  He is not required to

15   call any witnesses.  The government bears the burden of proof

16   in a criminal case from the beginning and all the way through.

17            So whether or not the defendant -- he is not required

18   to call any witnesses, and any comments of mine that may have

19   suggested that he should or ought to, you should certainly

20   disregard.  The defendant does not bear any burden of proof.

21            All right.  Thank you.

22            Mr. Howard, you may proceed, sir.

23            MR. HOWARD:  Thank you, your Honor.

24   BY MR. HOWARD:

25   Q.  Good afternoon, Mr. Bates.

1    A.   Good afternoon.

2              MR. HOWARD:  So, Mr. Evert, could we please publish

3    Government Exhibit 1002, which is where we left off before the

4    lunch break?

5              THE WITNESS:  Before I had a folder with these

6    exhibits in them.  I don't have that.

7              MR. HOWARD:  May I approach the witness, your Honor?

8              THE COURT:  You may.

9              MR. HOWARD:  So, Mr. Evert, could you please zoom in

10   to the middle of the conversation, starting at "My site had."

11             "me: my site had a 40 minute spot on a national radio

12   program.  Friggin crazy, you gotta keep my secret buddy

13             "baronsyntax: I haven't told anyone and I don't intend

14   to

15             "me: i know i can trust you

16             "baronsyntax: I don't even know the onion url.  I

17   might tell people about the site though — if that's ok?  I

18   won't even mention I know someone who runs it

19             "me: mmm....ok, go..a have a good story for how you

20   found it in case they ask

21             "baronsyntax: I'll just tell them I saw it on 4chan or

22   something."

23             "Me: coo."

24             So, Mr. Bates, what is going on in this part of the

25   conversation?

1    A.   In this part of the conversation Ross was excited that Silk

2    Road was getting some media coverage.  And eventually I asked

3    him if it's OK if I just tell people that I know that the Silk

4    Road exists without, you know, associating him or myself with

5    it.  And he approves of that as long as I have a good story.

6    Q.   And continuing down the chat:

7              "baronsyntax: What was the national radio program?

8    Conservative talk radio?

9              "me: ill tell ya in person, i don't want to talk to

10   much over unsecured channels

11             "baronsyntax: gotcha.  Need to switch to TorChat

12   soon."

13             So, Mr. Bates, what's occurring in this part of the

14   conversation?

15             MR. DRATEL:  Your Honor, the conversation speaks for

16   itself.

17             THE COURT:  I will allow it.  You may give your view

18   as to what's happening in the conversation with the cross.

19   A.   This conversation happened over Google Chat, which is, as I

20   said earlier, I believe not encrypted, and Tor chat was --

21   after I learned about Tor, I thought wouldn't it be neat if

22   there was a chat program that worked on that, and a simple

23   Google search led me to TorChat.  And I suggested to Ross that

24   we use that to communicate securely and privately.

25   Q.   Did you, in fact, later have communications with the

1    defendant over TorChat?

2    A.  Yes, I did.

3    Q.  Can you please flip in your binder to what has been marked

4    for identification purposes as Government Exhibit 1003.

5           Do you recognize what this is?

6    A.  1003?  Oh, yes.  This is a Google Chat between Ross and me.

7           MR. HOWARD:  The government offers Government Exhibit

8    1003.

9           MR. DRATEL:  The same objection, your Honor.

10          THE COURT:  The same as the ones just in the

11   immediately prior ones?

12          MR. DRATEL:  Yes.

13          THE COURT:  All right.  Those objections are

14   overruled.  GX1003 is received.

15          (Government's Exhibit 1003 received in evidence)

16   BY MR. HOWARD:

17   Q.  So, Mr. Bates, what is the date of this online chat?

18   A.  This is April 1, 2011.

19          MR. HOWARD:  Mr. Evert, could we please zoom in on the

20   conversation, please.  The top half.  Thank you.

21   Q.  "baronsyntax: All my friends think your site is really cool

22   :•])

23          "Me: :)

24          "Baronsyntax: I told them I know the guy who runs it

25          "Me: you should be quiter

1           "Me: quieter

2           "Me: sp?

3           "Me: i think you mentioned something to jon too, huh?

4           "Baronsyntax: I didn't tell anybody about it - this is

5    just the only idea I had for an April Fool's joke

6           "Me: aww geez

7           "Baronsyntax: All I told Jon was that it was cool

8           "Me: even so, shhhh."

9           So, Mr. Bates, what is occurring in this conversation?

10   A.   This is an April Fool's joke that I laid on Ross, which in

11   retrospect is not very funny.

12   Q.   And what was the joke?

13   A.   The joke was that I told everybody that -- about the Silk

14   Road and told everyone that I know the guy who runs the Silk

15   Road, when in fact I had not told anybody about Ross'

16   involvement.

17   Q.   So did you -- you continued to provide programming help to

18   Mr. Ulbricht after you learned he was running Silk Road,

19   correct?

20   A.   That is correct.

21   Q.   And why did you do that?

22   A.   Because he was my friend.

23   Q.   What sorts of things, generally, do you remember him asking

24   for help on?

25   A.   I remember him asking me some php questions.  I remember

F1mdulb4                      Bates - direct

1   him asking me about object-oriented programming, a little bit

2   of Web design.  I remember us talking about encryption a little

3   bit.  That's all that's coming to mind right now.

4   Q.  Are you familiar with what a computer server is, Mr. Bates?

5   A.  Yes, I am.

6   Q.  Did you ever have administrative access to Silk Road's

7   servers?

8   A.  No, I did not.

9   Q.  Was it ever offered to you?

10  A.  Yes.  There was one time, granted, Ross and I had both been

11  very heavily drinking, and I was at the bar and Ross came up to

12  me and said something akin to, Hey, do you want to be an admin.

13  I understood he was talking about Silk Road.  I turned back to

14  him and I said, I've already got a job.

15  Q.  Did the defendant talk to you about -- tell you why he was

16  asking you?

17  A.  Yes.  Earlier he had kind of complained -- he vented a

18  little bit to me about some of the administrative duties that

19  he had.  He had to resolve conflicts between buyer and seller

20  in case something went wrong with the transactions.  He also

21  had to monitor the site.  It had certain rules about things

22  that could or could not be posted and he had to enforce that,

23  and he told me the workload was becoming too much and he would

24  have to hire some admins.

25  Q.  And when did this conversation occur, approximately?

1    A.   I believe this was in March of 2011 at some point.

2    Q.   What, if anything, did the defendant provide you in

3    exchange for your help on Silk Road?

4    A.   Nothing but his friendship.

5    Q.   How long did you continue to provide assistance with

6    programming help on Silk Road?

7    A.   I continued to provide help going into the summer of 2011.

8    Q.   And what happened?

9    A.   I grew increasingly uncomfortable.  Primarily, I recall

10   there was a news article about Chuck Schumer, you know, telling

11   the FBI to investigate.  I recall that being sometime in June

12   of 2011.  I remember after that came out, I went over to Ross'

13   apartment and I told him, "You know, they're looking for you,

14   right?"  And he just said, "Yeah."

15            Going after that, I at some point, maybe a few weeks,

16   possibly a month later, I remember having a conversation with

17   him where I said, "You know, hey, have you ever thought about

18   doing something legitimate, something legal?"  And that's when

19   he first mentioned the idea of creating a bitcoin exchange to

20   me.  And then a little later we actually started working on

21   that project.

22   Q.   And was the bitcoin exchange a legitimate project?

23   A.   It started off that way.  We had discussions later about

24   possibly using it to launder money.

25   Q.   Now, while you were working on this bitcoin exchange, were

F1mdulb4                      Bates – direct

1    you aware of whether or not the defendant was still working on

2    Silk Road?

3    A.  Yes.  To my knowledge he was still working on Silk Road.

4    Q.  And how do you know that?

5    A.  We had conversations about it.  I assume that if he was to

6    stop --

7             MR. DRATEL:  Objection.

8    A.  -- he would have mentioned it.

9             THE COURT:  Sustained.  Don't assume.

10            THE WITNESS:  OK.

11   BY MR. HOWARD:

12   Q.  Can you flip in your binder at what has been marked for

13   identification purposes as Government Exhibit 228, please.

14            THE COURT:  Can you give a timeframe of when the

15   bitcoin exchange work was occurring, Mr. Howard.

16   Q.  So when, approximately, did you start working on the

17   bitcoin exchange project with Mr. Ulbricht?

18   A.  It really ramped up around the September and October

19   timeframe.

20   Q.  How long did you work on it with Mr. Ulbricht?

21   A.  A.  It wasn't long after that, around late October or

22   November, you know, we started having disagreements and I

23   became not as interested in the project.  To be specific, we

24   had discussions about who else could be hired.  I wanted to vet

25   other programmers.  And there were some discussion about me

1    also having a job at the same time, which, you know, would make

2    me not able to contribute as much to that project.

3    Q.  And so what happened after you had those discussions about

4    you having a job at the time?

5    A.  After that, you know, he was also going to Australia.  He

6    sent me a contract.  I never replied to that message and I

7    never signed it.

8    Q.  So approximately when did you start working on that bitcoin

9    exchange project?

10   A.  November of 2011.

11   Q.  And during the time that you were involved in that project,

12   was it ever operational?

13   A.  No.

14   Q.  Can you please flip in your binder to what has been marked

15   for identification purposes as Government Exhibit 228.

16         Do you recognize what this is?

17   A.  Yes, I do.

18   Q.  What is this?

19   A.  This is a TorChat conversation between Ross and me.

20         MR. HOWARD:  Mr. Evert, could you please publish

21   Government Exhibit 228, which is already in evidence.

22   Q.  Now, Mr. Bates, how are your parts of this conversation

23   labeled?

24   A.  They are labeled as "r."

25   Q.  And what are Mr. Ulbricht's parts of the conversation

F1mdulb4                          Bates - direct

1    labeled as?

2    A.   They are labeled as "myself."

3    Q.   Starting on October 6, 2011:

4            "r: Hey man, I've got an idea how we both can make a

5    little bit of money

6            "myself: i like money

7            "r: You don't have a job besides the site right now,

8    do you?

9            "myself: nope

10           "r: ok, hear me out. If it's not your bag, that's fine

11           "myself: right on

12           "r: I've got lots of stuff I've been meaning to ebay,

13   but I don't have the time.  How about I give it to you, you

14   sell it and take care of packaging and I give you 20% and you

15   can pay me my share in BTC

16           "myself: haha, I need someone to do that for me too!

17           "r: haha

18           "myself: I still haven't sold my two cars

19           "r: well, that's a little harder to do on ebay

20           "myself: yea, that's a craigslist project

21           "r: I've got like an old radar detector and an old

22   GPS, a police scanner I haven't programmed since I moved and I

23   don't use anymore, that kinda of stuff

24           "r: well, if you decide that's something you wanna do,

25   let me know.  Otherwise I'll probably just find one of those

1    local services

2              "myself: i have a friend who just lost a job that

3    might want to do it

4              "r: ok, as long as he's trustworthy

5              "myself: I'll have him contact you."

6              So, Mr. Bates, what was occurring during this

7    conversation?

8    A.  During this --

9              MR. DRATEL:  Objection.  The conversation speaks for

10   itself.

11             THE COURT:  Overruled.

12             THE WITNESS:  Sorry.  What was the question again.

13   Q.  What was occurring during this conversation?

14   A.  I was suggesting to him that I had some things that I was

15   selling, and if he wanted to, I could give them to him and he

16   could sell them on eBay and package them and deal with taking

17   pictures and all of that and I would give him a cut.

18             MR. HOWARD:  So, Mr. Evert, could you please zoom in

19   on the top two lines of the conversation we just read.  No, on

20   the first page, please.

21             (Pause)

22   Q.  So, here, on October 6, 2011, you say:  "You don't have a

23   job besides the site right now, do you?"

24             And "myself" responds:  "Nope."

25             What were you referring to when you asked him if he

1    had a job besides the site?

2    A.  I was referring to the Silk Road website.

3    Q.  Now, how did you understand the defendant to be making

4    money at the time?

5            MR. DRATEL:  Objection.

6            THE COURT:  Overruled.

7    A.  Umm, at the time I knew he had some money and I did know

8    that he was receiving some money from Silk Road and from the

9    bitcoin.

10   Q.  And how do you know that he was receiving money from Silk

11   Road?

12   A.  At some point we discussed it.  I don't remember exactly

13   when.

14   Q.  And did he ever explain to you how he got money from Silk

15   Road?

16   A.  As I recall, it was a percentage of the transactions.  So

17   when someone had a transaction, he would get a percentage.

18           MR. HOWARD:  Mr. Evert, let's go to the next part of

19   the excerpts.

20           October 11, 2011:

21           "myself: you want to get together tonight or tomorrow?

22           "r: either would work for me.  On an unrelated note,

23   Aspen's new BF is quite the drug dealer

24           "myself: ok, let me make sure I'm free tonight...

25           "r: apparently they have LOTS of MDMA

F1mdulb4                          Bates - direct

1              "myself: rly!!!

2              "r: yeah, but they are charging more than SR is

3              "myself: ha!  Ok, I'm free tonight... wanna see my new

4      place?

5              "r: You're not living at that girl's place anymore?

6              "myself: same place, have you been here?

7              "r: dude . . .

8              "myself: when were you here?!?!

9              "r: I helped you move in

10             "myself: forhead smack.  Right right, well, anyway. my

11     place or yours?

12             "r: either one.  I've got to swing by office depot or

13     something for a whiteboard

14             "myself: ok, I don't really feel like driving, so is

15     my place ok? I can cook us some dinner while I wait for you

16             "r: sure

17             "myself: cool, what's your eta?

18             "r: text me your address again and I'll glympse you

19     when I leave at least an hour

20             "myself: ok, glimps me when you are leaving the store

21     and I'll start cooking then --

22             "1200 Treadwell St, apt. 119, 78704.

23             "r: going offline now

24             "myself: cya."

25             Mr. Bates, what was happening during this

F1mdulb4                          Bates - direct

1    conversation?

2    A.  I guess let's look at the beginning part.

3            So starting --

4            MR. HOWARD:  Mr. Evert, would you turn to the second

5    page, please, and zoom in here.

6    A.  So starting here, a mutual acquaintance of Ross and I,

7    named Aspen, had a new boyfriend who was selling MDMA.  I

8    mentioned it to Ross because I knew that he was interested in

9    MDMA.  And I also thought he would find it interesting that

10   they were charging more than Silk Road was because he was

11   running --

12           MR. DRATEL:  Objection.

13           THE COURT:  Overruled.

14   A.  Because he was running the Silk Road at this time.

15           Moving on into the conversation, we start talking

16   about me coming over.  I was going to get a white board so that

17   we could diagram some things about the bitcoin exchange.  And I

18   think that's everything in the conversation.

19   Q.  And, Mr. Bates, at the end of the conversation there was an

20   address, 1200 Treadwell Street, Apartment 119.  Are you

21   familiar with that address?

22   A.  Yes.  It's where Ross was living at the time in south

23   Austin.

24   Q.  Now, Mr. Bates, I want to direct your attention to

25   November 11, 2011.

```
1              Did you see the defendant that day?
2    A.  Yes, I did.
3    Q.  And can you explain what happened?
4    A.  I was having a party, a 11/11/11 party to celebrate the
5    date as just an excuse to have a party, really.  Ross showed up
6    early to the party and he wanted to speak with me.  He started
7    by asking me, you know, have you told anybody about, you know,
8    my involvement in the Silk Road.  And I had tried to tell one
9    person but I don't think I communicated across.  We were at a
10   bar and I was very drunk.
11             And then he explained to me very panicked that someone
12   who knew about his involvement had posted to his Facebook wall
13   something along the lines of I'm sure the authorities would be
14   very interested in your drug-running site.  And he told me that
15   he, you know, deleted that post, unfriended the person.  And at
16   that point I told him you've got to shut the site down.  This
17   is all they need.  Once they see this, they can get a warrant
18   and it's over.  This is not worth going to prison over.
19             And he told me that he couldn't shut down the site
20   because he had already sold it to someone else.
21   Q.  How did the defendant appear to you as he told you this
22   story?
23   A.  He was nervous.
24   Q.  And did the defendant tell you about who else he had told
25   about the Silk Road website?
```

F1mdulb4                        Bates - direct

1   A.  To my knowledge, Ross had told two people -- his

2   ex-girlfriend Julia and me.

3   Q.  When the defendant told you that he sold the site, did you

4   believe him?

5   A.  Yes, I did.

6   Q.  Now, following that party at your house on November 11,

7   2011, did you have any further discussions about Silk Road with

8   the defendant?

9   A.  Yes, I did.

10  Q.  Where was the defendant -- let's take a step back.

11          At the time of the 11/11/11 party, where was the

12  defendant living at that time?

13  A.  He was still living in Austin, Texas.

14  Q.  And at some point did he move away from Austin?

15  A.  Yes.  I think it was somewhere around the Thanksgiving

16  timeframe he went to Australia.

17  Q.  And so later did you have any discussions about Silk Road

18  with the defendant?

19  A.  Yeah.  A few times over Google Chat, I would send him links

20  about Silk Road usually when there was some sort of problem

21  like some sort of security issue or someone getting arrested,

22  and I was really kind of trying to insinuate, hey, aren't you

23  glad, you know, that you don't have to deal with this anymore.

24  Q.  Can you please flip in your binder to what has been marked

25  for identification purposes as Government Exhibit 1004.

1           (Pause)

2           Do you recognize what this is?

3    A.  Yes, I do.  This is another Google Chat conversation

4    between Ross and me.

5           MR. HOWARD:  The government offers Government Exhibit

6    1004.

7           MR. DRATEL:  No objection.

8           THE COURT:  Received.

9           (Government's Exhibit 1004 received in evidence)

10          MR. HOWARD:  Mr. Evert, could you please publish

11   Government Exhibit 1004.

12   Q.  What is the date of this conversation?

13   A.  This is February 5, 2013.

14          MR. HOWARD:  Mr. Evert, could you zoom in to this

15   section here.

16   Q.  And in this chat how are your parts of the conversation

17   labeled?

18   A.  They were labeled as baronsyntax@gmail.com.

19   Q.  How about the defendant's parts?

20   A.  They are labeled as "me."

21   Q.  "baronsyntax@gmail.com: Did you see slashdot last week?

22          "Me: negative

23          "Baronsyntax@gmail.com: There was something posted on

24   Friday that you might have found interesting

25          "Me: I'll take a look, thanks.  Glad that's not my

1  problem anymore :)

2          "Baronsyntax@gmail.com: yes

3          "Me: I have regrets, don't get me wrong... But that

4  shit was stressful.  Still our secret though, eh?

5          "Baronsyntax@gmail.com: yup.  I'm spilling the beans

6  when I turn 65 though.

7          "Me: lol. OK."

8          So, Mr. Bates, what was he referring to in this part

9  of the conversation?

10 A.  At some point Ross had asked me not to send him links about

11 the Silk Road anymore, and so I got kind of creative and I

12 said, you know, did you see slashdot last week.  I don't

13 remember exactly what the article was about but I know it was

14 related to Silk Road.

15          Here he kind of acknowledges that, you know, he's not

16 working on it at that time.  And I tell him, you know, it's

17 still a secret but when I turn 65, long after the statute of

18 limitations is up, I may tell someone.

19          MR. HOWARD:  Your Honor, may I just talk with

20 co-counsel for one minute?  Maybe not.

21          THE COURT:  Yes.

22          MR. HOWARD:  No further questions, your Honor.

23          THE COURT:  All right.  Thank you.

24          Mr. Dratel.

25 CROSS-EXAMINATION

F1mdulb4                         Bates - cross

BY MR. DRATEL:

Q.  Good afternoon, Mr. Bates.

A.  Good afternoon.

Q.  And the first time you met with the government was
October 3, 2013, correct, about this case?

A.  I believe it was that date or around that time.

Q.  And that was very soon after Mr. Ulbricht had been
arrested, right?

A.  That is correct.

Q.  And as you said before, you lied to the government, right?

A.  That is correct.

Q.  And you lied because you wanted to stay out of trouble?

A.  That's correct.

Q.  And they asked you about Mr. Ulbricht and Silk Road, right?

A.  Yes, they did.

Q.  And they asked you whether you were an administrator on the
site?

A.  That's correct.

Q.  And you denied that, right?

A.  Yes, I did.

Q.  And you said you had no idea that Mr. Ulbricht was
operating Silk Road, right?

A.  That is correct.

Q.  And that you had no idea what Mr. Ulbricht was doing with
the website, correct?

F1mdulb4                         Bates - cross

1   A.  That's also what I said.

2   Q.  And you also said that you didn't know anything about

3   Mr. Ulbricht and a bitcoin exchange, a bitcoin site, right?

4   A.  I recall differently.  I recall that as they were leaving,

5   I told them that I worked with him on a bitcoin exchange and it

6   never came to fruition.

7   Q.  I show you what's been marked as 3513 -- sorry, 3513 --

8   three-five-one-three dash 55.  I ask you to look at the end of

9   the second paragraph.

10  A.  OK.

11  Q.  Read it to yourself, please.

12  A.  The second-to-last paragraph?

13  Q.  The second paragraph, the end of the second paragraph.

14  Just read it to yourself.

15          (Pause)

16  A.  OK.

17  Q.  And did you not tell the government, or did you not deny

18  that you knew anything about Mr. Ulbricht and a bitcoin

19  business?

20  A.  I'm sorry, I'm a little confused.  Does it say that I

21  denied it somewhere in here?  I'm not seeing it.

22          MR. HOWARD:  Objection.

23          THE COURT:  Sustained.

24          MR. DRATEL:  Let me just point to the part of the

25  document that I'll need --

F1mdulb4                          Bates - cross

1          MR. HOWARD:  Objection.  As a matter of fact, may we

2     request a sidebar?

3          To be clear, there has been no foundation that -- I

4     think it is probably better for us all to have a sidebar.

5          THE COURT:  All right.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At the sidebar)

2    MR. HOWARD:  Your Honor, I believe the witness

3    testified that he had a different recollection.  There was no

4    foundation that he couldn't remember.  He improperly is trying

5    to refresh his recollection when the witness himself denied

6    that he had a memory.

7    MR. DRATEL:  I'm not refreshing his recollection.  I'm

8    impeaching him.  This is a prior consistent statement, if he

9    adopts it.  If he doesn't, he doesn't.  This is what the 3500

10   material is.

11   THE COURT:  I will allow it.  Let me see.

12   MR. TURNER:  It is those --

13   THE COURT:  It is just 302?

14   MR. HOWARD:  Yes.

15   THE COURT:  Let me just think about this.

16   MR. DRATEL:  Every judge in this courthouse --

17   THE COURT:  I never worry about that.  Never.

18   (Pause)

19   I'm going to allow it on the basis that it's not a

20   prior inconsistent statement because we have no idea if he even

21   made the statement that is in that document.  Hold on.  But he

22   can show him that, for whatever it is worth, that somebody

23   wrote it down and does that refresh his recollection that in

24   fact he didn't tell him that.

25   MR. DRATEL:  Your Honor, it is not a refreshed

 1    recollection.  This is what it is.

 2                THE COURT:  This is not a prior inconsistent

 3    statement?

 4                MR. DRATEL:  It is, because 3500 is prior statements

 5    of the witness.  I don't get this unless it is deemed by

 6    government to be a prior statement of the witness.  It doesn't

 7    have to be signed.

 8                THE COURT:  You get it for a variety of reasons.

 9                MR. DRATEL:  Not 3500 material.

10                THE COURT:  You can't put this into evidence, right?

11                MR. DRATEL:  I'm not putting it into evidence.

12                THE COURT:  I'm saying if it is a prior inconsistent

13    statement, then you can put it into evidence.

14                MR. DRATEL:  I can ask him if he --

15                THE COURT:  You know it is not a prior --

16                MR. DRATEL:  I can --

17                THE COURT:  Hold on.  I get to finish my sentence and

18    so you do you.  OK?

19                MR. DRATEL:  OK.

20                THE COURT:  Then I will let you finish your sentence.

21                MR. DRATEL:  OK.  Thank you.

22                THE COURT:  A prior inconsistent statement has a

23    particular meaning under the hearsay rules.  And it's a prior

24    inconsistent statement of the witness.  Something that is

25    written down on a 302 doesn't have the kind of evidentiary

F1mdulb4                          Bates – cross

1    value of a prior inconsistent statement.  Typically, I think it

2    is has to be, under the rules, under oath and a prior

3    inconsistent statement under oath.

4             MR. DRATEL:  No, it doesn't.

5             THE COURT:  I will take a look.  Hold on.

6             (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1mdulb4                          Bates - cross

1          THE COURT:  Let's take mid-afternoon break.  All

2     right?  I hate to have you guys waiting because then I know it

3     is just like wasting your time.  We'll work this out and then

4     you come back out and then we'll go smoothly.  All right?

5          And I want to remind you not to talk to each other

6     about this case.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; jury not present)

2           THE COURT:  Let's all be seated.

3           Mr. Dratel, 801(d)(1) does require an inconsistent

4    statement to have been given under oath under the penalty of

5    perjury.

6           MR. DRATEL:  That's not the --

7           THE COURT:  Give me your rule.

8           MR. DRATEL:  613.

9           THE COURT:  Now the word "statement" here, Mr. Howard.

10          MR. HOWARD:  Yes, your Honor.  It's not the

11   defendant's statement.  This is hearsay.  It's someone else's

12   statement about what he said.

13          THE COURT:  Correct.

14          MR. HOWARD:  So it can't be admitted as extrinsic

15   evidence of an inconsistent statement.

16          THE COURT:  Correct.  You can use a 302 for

17   impeachment purposes for the purposes of refreshing his

18   recollection, as I was explaining to you, where you can say to

19   him I'm showing this to you now, does this refresh your

20   recollection that in fact you did tell someone.  And he can

21   either say no, it doesn't refresh my recollection or he can say

22   yes, but you can't get it in as his statement.

23          MR. DRATEL:  I'm not getting in it, but he can adopt

24   it just like --

25          THE COURT:  If his recollection is refreshed, it's

F1mgulb5                          Bates - cross

1      neither here nor there.

2              MR. DRATEL:  No.  But just like I did with Mr. Kiernan

3      where I showed him a memorandum of an interview, he did not

4      write the memorandum of this interview.  Every single case, you

5      get a 302 by an agent of a witness' statements or proffer of a

6      proffer interview.  You use it to impeach them by saying did

7      you not tell the government X on X date.  And if he says -- if

8      he looks at the thing and says, yeah, I did, because you

9      confront him with it -- and if he says no, then you're stuck

10     with it.

11             THE COURT:  Exactly.

12             MR. DRATEL:  He hasn't answered that question as to

13     whether he told the government.

14             THE COURT:  I think it's not, though, an inconsistent

15     statement.  You were saying before that you can get it in as an

16     inconsistent statement.

17             MR. DRATEL:  It is inconsistent.

18             THE COURT:  You are doing exactly what I had suggested

19     over here that you can do.  You can do it in the following way,

20     which is the witness says I told them X.  You say, didn't you

21     really tell them Y.  He says I told them X.  Then you say let

22     me show this to you; does this refresh your recollection that

23     you told them Y.  And he'll say it doesn't refresh my

24     recollection because I have no idea who wrote this.  Or he'll

25     say actually, maybe it has spurred on a memory, yes.  That's

1    the way you use 302s.

2              MR. DRATEL:  No, actually I think Mr. Howard is right.

3    There was no failure of recollection.  And it's not a

4    refresh -- I can use anything to refresh recollection.  I don't

5    need 302.  I can use anything.  That's not the issue.  The

6    issue is it's a prior statement by the witness provided in

7    3500.  The government certainly adopted it.  They're not giving

8    it out of some largess.  And while there are different

9    practices in different places, here, 302s are considered 3500

10   material.  And this is not technically a 302, but it's a report

11   by a government agent acting within the scope of his authority.

12             The point is, if there's an inconsistent statement

13   there, I can confront the witness with it saying did you not

14   tell the government on such and such a date the following.

15             And if he says yes, I did, just like Mr. Kiernan said

16   yes, I did -- or he can say no, and then I'm stuck with it.

17   And even if he says yes, I can't put in the statement; I just

18   have the impeachment.

19             THE COURT:  Mr. Howard.

20             MR. HOWARD:  Your Honor, if he proceeds that way,

21   that's fine, in that manner.

22             THE COURT:  But it's not coming in for the truth.

23             MR. DRATEL:  It's impeachment.  It's purely

24   impeachment.

25             THE COURT:  Purely impeachment.

F1mgulb5                          Bates - cross

1              MR. DRATEL:  Does your Honor still have the page?

2              THE COURT:  I didn't take the page.

3              I think the jury is taking a break.  Let's take, like,

4    as little time as we can take, get ourselves back here and see

5    if we can gather up the jury and then come on back up.

6              THE DEPUTY CLERK:  All rise.

7              (Recess)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Mr. Dratel, you may proceed, sir.

3              MR. DRATEL:  Thank you, your Honor.  May I approach,

4    your Honor.

5              THE COURT:  Yes.

6    BY MR. DRATEL:

7    Q.  Can you just read the underlying statement to yourself and

8    then I'll ask you a question after you've done that, the

9    underlying sentence.

10   A.  It says here "Bates -- "

11   Q.  No.  Don't read it out loud.

12   A.  Just read it to myself.  Okay.

13   Q.  Just read it to yourself.  And now if you have, I'll be

14   able to ask you a question, okay?

15   A.  Okay.

16   Q.  Did you not tell the government October 3, 2013, or a date

17   right around there, that first interview, did you not tell the

18   government that you had no idea that Ross Ulbricht was involved

19   in any bitcoin business?

20   A.  I believe it's possible I may have contradicted myself at

21   that time.  I remember very specifically as they were leaving I

22   told them, you know, we worked on a bitcoin exchange together

23   but it never came to fruition.

24   Q.  Okay.  Thank you.  So, November 21, 2014 is the date of

25   your agreement with the government, right -- withdrawn -- your

1   proffer with the government, correct?

2   A.   That is correct.

3   Q.   You had an interview.  And that's also the date of your

4   agreement, right?  If you need to, I can refresh your

5   recollection.

6   A.   Please do.

7   Q.   I'm sorry.  The date of the agreement is December 12.   Does

8   that sound right?

9   A.   That sounds correct; yes.

10  Q.   But your interview was November 21, right?

11  A.   That sounds right.

12  Q.   Of 2014?

13  A.   Yes.

14  Q.   When you met with the government on November 21, you didn't

15  have any kind of agreement with the government as to what was

16  going to happen to you, right?

17  A.   That is correct.

18  Q.   And you knew that if you were charged and convicted of

19  being involved, of participating in the Silk Road and the sale

20  of drugs that you could face a life sentence, right?

21  A.   I don't know if I imagined it being so harsh, but I knew

22  that I could go to prison.

23  Q.   For a long time, right?

24  A.   For a long time.

25            MR. HOWARD:  Objection.

1       THE COURT:  Overruled.

2  Q.  You said for a long time right, yes; you agreed?

3  A.  Yeah.

4  Q.  And part of that November 21 meeting with the government

5  was about telling the government about your involvement so you

6  would hope that you could avoid getting charged, getting

7  convicted, going to prison, right?

8  A.  That was not a specific goal, but my lawyers told me we

9  have to tell them the truth, come clean, and then maybe we can

10  come to some kind of agreement, not necessarily a

11  nonprosecution agreement.

12  Q.  Ultimately you got a nonprosecution agreement, correct,

13  right?

14  A.  That is correct.

15  Q.  You're not going to be prosecuted at all?

16  A.  No.

17  Q.  And what you have to do is testify here, correct?

18  A.  I have to tell the truth here today.

19  Q.  You have to testify here today, right?  You couldn't refuse

20  to testify?

21  A.  No, I could not.

22  Q.  And all of your assistance would be provided pursuant to

23  specific instructions and control of the United States

24  Attorney's Office, right?

25  A.  I'm sorry.  Could you repeat the question one more time.

1    Q.   Sure.  Any assistance that you would provide to federal

2    criminal investigators would be pursuant to the specific

3    instructions and control of the U.S. Attorney's office and

4    designated investigators?

5              MR. HOWARD:  Objection to form, your Honor.

6              THE COURT:  I think he's asking him whether that's his

7    understanding.

8              Overruled.

9    Q.   Is that your understanding?

10   A.   I'm sorry.  Is this in my agreement?

11   Q.   If you can't recall, I'd be happy to refresh your

12   recollection.

13   A.   Yeah.  I would like to see it.

14   Q.   Okay.  I'm showing you what's marked as 3513-65 and I'd ask

15   you to read to yourself the last sentence on the page.

16   A.   Okay.

17   Q.   Does your agreement provide that any assistance that you

18   provide to the government, to investigators would be provided

19   pursuant to specific instructions and control of the U.S.

20   Attorney's Office and designated investigators?

21             MR. HOWARD:  Objection to form.

22             THE COURT:  You can rephrase it:  Do you recall that?

23   Q.   Does that refresh your recollection that your agreement

24   provides that any assistance that you provide to the

25   investigation is pursuant to specific instructions and control

F1mgulb5                          Bates - cross

1    of the United States Attorney's Office and designated

2    investigators?

3              MR. HOWARD:  The government has the same objection.

4              THE COURT:  Overruled.

5    A.  So that -- my understanding of the instructions is, you

6    know, them telling me things like I need to be at, you know,

7    we're going to meet at this time, that kind of thing.

8    Q.  I'm asking about your agreement.  Does that refresh your

9    recollection --

10   A.  I'm talking about the agreement.

11             MR. HOWARD:  Objection.

12             THE COURT:  Hold on.  We have to get a question and an

13   answer and a clean question.

14             So what's the question, Mr. Dratel?

15   BY MR. DRATEL:

16   Q.  Does 3513-65 refresh your recollection that your written

17   agreement with the government requires that any assistance that

18   you provide be pursuant to specific instructions and control of

19   the United States Attorney's Office and designated

20   investigators?

21             THE COURT:  You can answer that.

22   A.  Yes; that is what it says verbatim.

23   Q.  Now, your agreement also provides that the government

24   determines whether or not you have given false, incomplete or

25   misleading testimony or information or otherwise violated your

1   agreement, right?

2   A.   Perhaps you could point that out and refresh my memory

3   again if it's highlighted.

4   Q.   Sure.

5   A.   Is it that one?

6   Q.   Yes.   It's the first sentence there.   Some of it is not

7   highlighted but you can read the whole sentence silently.

8   A.   Okay.   Can you please repeat the question.

9   Q.   Sure.   That it's the government that determines whether or

10   not you've given false, incomplete or misleading testimony or

11   information or otherwise violated the agreement, right?   That's

12   if the government determines?

13   A.   Yes.   It says "If the government has determined..."

14   Q.   Right.   So there's no arbitrator involved, right, it's the

15   government that gets to make that decision.   You understand

16   that, right?

17   A.   I suppose, yeah.

18   Q.   And so if the government determines that you have not

19   honored your agreement, that if you've given false or

20   misleading testimony or otherwise violated the agreement, they

21   can rip it up, right?

22   A.   Yes.   It would mean that I could be prosecuted.

23   Q.   Correct.   You'd be prosecuted for all the things that

24   you're essentially getting a pass for, right, the things that

25   you mentioned on direct, right, your assistance with respect --

F1mgulb5                           Bates - cross

1   A.  Yes.

2   Q.  -- your assistance with respect to Silk Road, right?

3   A.  Yes.

4   Q.  Your assistance with respect to the bitcoin operation to

5   the extent it was involved in money laundering, right?

6   A.  I said that we discussed the possibility of using it for

7   money laundering.

8   Q.  But that's part of your agreement, right?

9   A.  It is in the agreement; yes.

10  Q.  And also your personal use of drugs during the period

11  of -- of a couple of years, right?

12  A.  That is correct.

13  Q.  And the agreement provides that if the government

14  determines that you have violated the agreement, that

15  everything you said to the government, not only in the context

16  of here, but also all that you've said in your meetings with

17  the government, all that's admissible against you if the

18  government chooses to prosecute you, right?

19  A.  That sounds correct.

20  Q.  And that anything that may be outside the statute of

21  limitations by the time you're prosecuted, as long as it was

22  within the statute when you signed the agreement, you could be

23  prosecuted for, right?

24  A.  Yes.  That sounds correct also.

25  Q.  So your choice is testify here for the government, you

F1mgulb5                         Bates - cross

1    reached that agreement with the government, or face those

2    charges and a very serious prison sentence, right?

3    A.   That sounds correct.

4    Q.   You chose to be there on the witness stand instead of there

5    as a defendant, right?

6              MR. HOWARD:  Objection.

7              THE COURT:  Why don't you rephrase.

8    Q.   You chose to make your agreement with the government and

9    testify rather than be charged?

10   A.   That is correct.

11   Q.   And you know -- and you knew when you signed the agreement

12   and you know here today that it's whether the government is

13   satisfied with your testimony as to whether that agreement

14   holds; it's not whether Mr. Ulbricht is satisfied or the judge

15   or anyone else, right?  It's whether the government is

16   satisfied, right?

17   A.   So I recall during the proffer agreement I asked my

18   attorney, I said to him what if I tell the truth and they don't

19   believe it, and he told me -- may I continue.

20   Q.   I don't know.  It's a privileged conversation.

21             THE COURT:  It is a privileged conversation.

22             THE WITNESS:  I apologize.

23             THE COURT:  Let me explain to you that you have a

24   privilege between yourself and your attorney insofar as you've

25   had any communications that were private between yourself and

1   your attorney.

2            THE WITNESS:  Okay.

3            THE COURT:  You can choose to waive that privilege,

4   but there are lots of implications about that you would want to

5   likely confer with an attorney about, all right?

6            THE WITNESS:  Okay.

7            THE COURT:  So if it's a private conversation between

8   you and your attorney, that's where the privilege attaches.

9            Mr. Dratel, why don't you pose a question.

10           MR. DRATEL:  Rather than get into a privileged

11   conversation, I'll move on.

12           THE COURT:  All right.

13   Q.  You talked about commissions this morning, one question and

14   answer - or maybe this afternoon - during your direct, correct?

15   A.  Yes, I did.

16   Q.  And that subject with the prosecutors just came up very

17   recently, right?

18   A.  I don't know.  Can you please explain the question.

19   Q.  Sure.  The idea of commissions at Silk Road, that just came

20   up recently in your discussions with the prosecution, not back

21   in November of 2014 but much more recently, right?

22   A.  I don't recall.  I do remember us talking about it

23   recently.  I don't remember if we talked about it before then.

24   It's possible.

25   Q.  But you remember talking about it recently, right, very

1    recently?

2    A.   Yes, I do.

3    Q.   Within the last week, right?

4    A.   Yes.

5    Q.   In fact, you never discussed commissions with them before,

6    right?

7    A.   I'm not sure.

8    Q.   Now, in terms of bitcoin, you invested in bitcoin at one

9    time, correct?

10   A.   That is correct.

11   Q.   When it was ten dollars a bitcoin, right?

12   A.   That sounds about right.

13   Q.   And you put $100 in?

14   A.   Something like that.

15   Q.   And you cashed out when it was $160 per bitcoin?

16   A.   Again, that sounds about right.

17   Q.   If you want, I can refresh your recollection.

18   A.   Please do.

19   Q.   It's one you may have up there still.

20   A.   No, I just have the proffer -- yes, okay, this is the one.

21   Yes, this was the -- I've read it here.

22   Q.   Okay.  By the way, you read that.  Does that refresh --

23   never mind.  Withdrawn.

24        Okay.  So you invested at ten, cashed out at 160,

25   right?

F1mgulb5                         Bates - cross

1   A.  That sounds correct.

2   Q.  And that's sometime around 2013 you think?

3   A.  Yes.

4   Q.  In fact, it helped to finance your trip to San Francisco in

5   April 2013?

6   A.  That is also correct.

7   Q.  And you relied on Mr. Ulbricht with respect to information

8   about bitcoin to some extent at least in the beginning, right?

9   A.  I heard about bitcoin from him initially.

10  Q.  And the idea for a bitcoin exchange was really

11  Mr. Ulbricht's idea?

12  A.  Yes, it was.

13  Q.  And it was an exchange site that would allow buyers and

14  sellers to exchange -- rather, to monitor all bitcoin exchanges

15  simultaneously?

16  A.  I don't -- not monitor, but it would work on top of other

17  exchanges was part of the idea.  So that if you had an order,

18  it could be fulfilled by our exchange directly or by another

19  exchange indirectly.

20  Q.  And this obviously would be on the Internet?

21  A.  That was the idea.

22  Q.  The split was going to be 60 percent/40 percent in

23  Mr. Ulbricht's favor?

24  A.  That sounds about right.  Can I look at the contract?

25  Q.  Sure.  I don't have a contract, but I'll show you something

F1mgulb5                         Bates - cross

1    that's marked 3513-64.  Directing your attention to a specific

2    part and then ask you if it refreshes your recollection.  Look

3    at the bracketed -- the first bracketed one.

4    A.  Okay.  What is your question?

5    Q.  That the proposed split would be 60/40, Mr. Ulbricht and

6    you, for the bitcoin exchange?

7    A.  There is a contract that was written out that specifies

8    that specifically, but that number sounds correct to me.

9    Q.  You testified today that -- about why you withdrew from

10   that project, but principally, it was because you were

11   unwilling to put in the time because of your other job, right?

12   A.  That was definitely a major factor.

13   Q.  And it was something that required a lot of work?

14   A.  That is correct.

15   Q.  And a lot of programming work, right?

16   A.  That is also correct.

17   Q.  And that's your specialty?

18   A.  Yes.

19   Q.  And that was your responsibility for the particular

20   project, right?

21   A.  Yes, I believe that that is specified in the contract that

22   wasn't signed.

23   Q.  So, as you mentioned, you asked -- you asked Mr. Ulbricht

24   to explain bitcoin to you, right, back in March of 2011?

25   A.  That sounds correct.

1   Q.  And you obtained a bitcoin wallet, right?

2   A.  Yes, at some point.  I don't recall exactly when but yes, I

3   did.

4   Q.  Would April 2011 sound right?

5   A.  That's perfectly possible it was at that time.

6   Q.  Let me show you 3513-31.

7   A.  Okay.

8   Q.  Let me show you 3513-31 and ask you if it refreshes your

9   recollection that you had a bitcoin wallet in April of 2011.

10  A.  Yes.

11  Q.  And in fact, you had a Google Chat with Mr. Ulbricht about

12  it that day, right?

13  A.  That's correct.

14  Q.  And you were going to encrypt your bitcoin wallet, right?

15  A.  That was something I had planned on doing, yes.

16  Q.  And that's for security purposes, right?

17  A.  That's correct.

18  Q.  And you were going to keep it on a thumb drive, right?

19  A.  That's also correct.

20  Q.  Now, you also asked Mr. Ulbricht where you could monitor

21  bitcoin exchange rates, right, back at the same time in

22  April 2011?

23  A.  That sounds correct.  Would this help refresh my memory?

24  Q.  No.  There's another.  3513-37.  I'm going to ask you to

25  just review that and then when you have, let me know.

F1mgulb5                    Bates - cross

1  A.  I'm sorry.  Can you repeat the question one more time.

2  Q.  Sure.  That you asked Mr. Ulbricht where you could monitor

3  the bitcoin exchange rate, right?

4  A.  That's correct.

5  Q.  And that's April 28, 2011 is when you did that, right?

6  A.  That is correct.

7  Q.  And in fact, you had a Google Chat that day about bitcoin?

8  A.  Yes.

9  Q.  And with respect to the bitcoin exchange project that you

10  had with Mr. Ulbricht, as you testified, it lasted into early

11  November of 2011, right?

12  A.  Yes.

13  Q.  And it started in the summer?

14  A.  The idea started in the summer.  I remember the work really

15  ramped up around September and October.

16  Q.  Okay.  And a lot of it was programming issues that you were

17  trying to solve, right?

18  A.  That sounds correct.

19  Q.  So, let me show you what's marked as 3513-57.  Show you

20  what's marked as 3513-57.

21  A.  What number was that again, the last one.

22  Q.  Fifty-seven.  Look at the bottom right.  That's what I'm

23  talking about.

24  A.  Okay.  Okay.  What's your question?

25  Q.  And so do you recognize that?

F1mgulb5                          Bates - cross

1    A.  Yes, I do recognize this.

2    Q.  What is it?

3    A.  This is a Tor chat between Ross and me.

4    Q.  And is it at around the same time or even the same day as

5    Government Exhibit 228, October 2011.

6    A.  It's a little bit -- you said October 28?

7    Q.  No.  The sixth.

8    A.  October 6.  Okay.  Yes, part of this conversation happens

9    on October 6, 2011.

10             MR. DRATEL:  I move it in, your Honor, as Defendant's

11   3533-57 -- let's call it R-57.

12             THE COURT:  All right.  Any objection?

13             MR. HOWARD:  No objection, your Honor.

14             THE COURT:  Defense Exhibit R-57 is received.

15             (Defendant's Exhibit R-57 received in evidence)

16             THE COURT:  Just give me the Bates number one more

17   time.

18             MR. DRATEL:  3513-57, your Honor.

19             THE COURT:  Thank you.

20   Q.  While we're waiting, let me just ask you some other

21   questions about bitcoin in terms of you, at some point, before

22   this, before October back in the spring of 2011 when you were

23   becoming interested in bitcoin, you were invested in silver at

24   that time?

25   A.  That's -- I owned physical silver.

F1mgulb5                    Bates - cross

1   Q.  But you were also interested in the market price for that

2   at the same time as well?

3   A.  Yes, because I own some.

4   Q.  And bitcoin was -- looked more attractive as an investment

5   at that time?

6   A.  I'm not sure.

7   Q.  But you talked about it with Mr. Ulbricht?

8   A.  Yes.

9   Q.  About the relative attractiveness of bitcoin and silver and

10  how they were doing in the market?

11  A.  Yeah.  We talked about how they were doing in the market;

12  yes.

13  Q.  Mr. Bates, let me have what is highlighted because that

14  makes it easier for me and I'll give you this one and I'll be

15  able to direct you to where it is.  Thanks.  So if we go about

16  two-thirds down the page -- I'm sorry -- go about one-third

17  down the page at 19:14.

18  A.  Okay.  19:14.

19  Q.  It says -- if we can just make that a little larger if

20  possible and I can read it here, but I don't know if everybody

21  can read.  Okay.

22          "R" is you, correct, Mr. Bates?

23  A.  Yes, that's correct.

24  Q.  "I need to talk to you sometime about you interact with

25  bitcoin.

F1mgulb5                          Bates - cross

1              R:  I can use the bitcoinj lib, but I don't know what

2      I'm doing."

3              And L-I-B, do you mean library?

4      A.  Yes.

5      Q.  And "myself" is Ross?

6      A.  That's correct.

7      Q.  "Okay.  Let me look up the link, just a sec.  Have you read

8      this."

9              And this is Ross again.  And that's a link, correct?

10     A.  Yes, that is a link.

11     Q.  This is Ross again: "I of course used the JSON-RPC PHP

12     library, but they have examples for a bunch of different

13     languages.

14             Myself:  Including java and perl.

15             Myself:  I've gotta jump in the shower, ttyl."

16             And what does that mean?

17     A.  Talk to you later.

18     Q.  "R" is you.  "Suweet."

19             And is that just the spelling of the word sweet with

20     an extra syllable in there?

21     A.  Yes.  It's meant to be stressed, but yes, it says suweet.

22     Q.  "And this is JSON too.

23             R:  I should be able to use what I wrote today to

24     access this too.

25             R:  So you have everyone's bitcoin address in one

F1mgulb5                          Bates - cross

1    instance of bitcoind.

2              R:  Okay.  This is pretty neat.

3              Myself:  Tell me more about what you are working on."

4    And there's an emoticon.

5              "R:  Okay.  I think I'm going to start by making a

6    JSON-RPC wrapper to bitcoin documentation says it only accepts

7    local calls by default.  Reply when you get this."

8              So you're talking there about the technical aspects of

9    writing program for this bitcoin exchange, right?

10   A.  Yes.

11   Q.  And further on down the page at 1909, and I'll just

12   summarize it, you are also talking about making a java wrapper,

13   right?  Go to 1909.

14   A.  Yes, that's correct.

15   Q.  And so you're talking about making a java wrapper so you

16   can do the bitcoin stuff in java, right?

17   A.  That's correct.

18   Q.  And java being a program language, right?

19   A.  Yes.  Java is a programming language.

20   Q.  Thank you.  And you continued to talk to Mr. Ulbricht

21   throughout -- even into 2013 about bitcoin, correct?

22   A.  Yes.  I believe we probably had conversations about it.

23   Again, if you have something to refresh my memory.

24   Q.  Sure.  Let me show you what's been marked as Defendant's

25   AA.  So, after you've had a chance to look at that, does that

1  refresh your recollection that in April of 2013 you were

2  discussing bitcoin and bitcoin values and trading bitcoin with

3  Mr. Ulbricht by chat?

4  A.  I was not trading bitcoins with Mr. Ulbricht.

5  Q.  No, I don't mean -- the discussion with Mr. Ulbricht?

6  A.  Yes.  The discussion was with Mr. Ulbricht and it was about

7  bitcoin prices and that I had just sold some.

8  Q.  Very good.  Now, you know at certain points -- withdrawn.

9          At certain points in the spring of 2011, Mr. Ulbricht

10 and you discussed trading in bitcoin and money that could be

11 made in terms of the fluctuating price of bitcoin, right?

12 A.  That sound correct.

13 Q.  And in April of that year, Mr. Ulbricht told you -- and you

14 would be chatting with the Google chats, right?

15 A.  Yes.

16 Q.  And Mr. Ulbricht told you that he made $4,000 over one

17 weekend if he sold out, if he had sold; in other words, the

18 appreciation in value?

19 A.  Is that in -- I'm having trouble remembering that again.

20 Q.  Okay.  That's the 3513-37.

21 A.  Ah, there we go.  Yes.

22 Q.  Okay.  Right?

23 A.  Sorry.

24 Q.  I'll repeat the question.

25 A.  Repeat the question.

1    Q.  That if he had sold his bitcoins that weekend, he would

2    have made $4,000?

3    A.  Yes.

4    Q.  And that ultimately in May, he does sell some bitcoins.  In

5    a chat he mentions to you that he sold all of his bitcoins and

6    that he was going to get back in the market, hopefully at a

7    lower price.  That's a different one.  Let me show you -- let

8    me refresh your recollection of that.  This is 3513-38.  Let me

9    know when you're finished.

10   A.  Okay.

11   Q.  Does that refresh your recollection that in a chat on

12   May 31, 2011, Mr. Ulbricht told you that he had sold all of his

13   bitcoins and was trying to get back in at under a dollar?

14   A.  Yes.  That's what he told me.

15   Q.  And a couple of weeks later, you mentioned to him that his

16   prediction of a bitcoin crash in the price had been correct and

17   that bitcoin had, in fact, gone down in value?

18   A.  I do recall there being a crash sometime around that time.

19   I don't remember Ross' prediction.  I'm sorry.  This was all

20   many years ago.

21   Q.  I'm sorry.  That's a different one.  I'll go back to that

22   in a minute, but since you have this one here now, also,

23   Mr. Ulbricht in June of 2011 told you that he would have made

24   $250,000 if he had cashed out -- rather, he tried to, but that

25   the market had closed, that he was unable to?

1          MR. HOWARD:  Objection; hearsay.

2          THE COURT:  Are you offering it for the truth?

3          MR. DRATEL:  No, your Honor.

4          THE COURT:  All right.

5          You can answer.

6    A.  Yes.  There was an incident where Mt.Gox was hacked.  There

7    was extreme volatility.  And he told me, you know, he would

8    have made a quarter of a million dollars if he had -- if

9    his -- I believe he said that his orders were undone as part of

10   Mt.Gox's correction.

11   Q.  You also had a discussion with Mr. Ulbricht about bitcoin

12   mining, right?

13   A.  About -- are you asking about how bitcoin mining -- we had

14   discussions about how bitcoin mining works?

15   Q.  Yes.

16   A.  I think that that's probable that we did.

17   Q.  Now, in terms of your relationship with Mr. Ulbricht, he

18   was a fun person to be around?

19   A.  Very much so.

20   Q.  And you also shared some political philosophy, right?

21   A.  At that time, yes.

22   Q.  And you mentioned, and it comes up in some of the chats

23   that are in evidence, Mr. Ulbricht's girlfriend he was living

24   with at the time in Austin, right?  Her name was Julia?

25   A.  Yes.

F1mgulb5                       Bates - cross

1  Q.  It was her friend who put up the Facebook post, correct?

2  A.  That is what Ross told me.

3  Q.  So there were three people who knew:  There was you, there

4  was his girlfriend Julia, as you said on your direct testimony,

5  and that other woman as far as you know, the other woman who is

6  Julia's friend who put something up on Mr. Ulbricht's Facebook

7  page?

8  A.  There are four people, if you include Ross himself.

9  Q.  Yes, but I'm saying, other than Ross.

10  A.  Other than Ross, what I was told was that -- obviously, I

11  knew about it, and I was told about two other people who knew

12  about it.

13  Q.  You were the person who wanted to switch over to Tor chat,

14  correct?

15  A.  I was the one who found the program, and I did suggest that

16  we use that.

17  Q.  And you had to prod Mr. Ulbricht over a period of time to

18  do it, right?

19  A.  There were problems connecting on the software.  I believe

20  somewhere there's a conversation where we talk about us trying

21  to connect, so we didn't keep that Tor chat connection open all

22  the time.  So there were instances where we would say let's go

23  to Tor chat basically.

24  Q.  But also wasn't there a series of times where you were on

25  Google Chat and you said we should be doing this on Tor chat?

F1mgulb5                          Bates - cross

1     A.   That sounds accurate.

2     Q.   Now, your relationship with Mr. Ulbricht, did

3     it -- withdrawn.

4             He went to Australia in the fall of 2011, correct?

5     A.   He went to Australia and then Costa Rica and a few other

6     places, but at that time, I think it was Australia that he went

7     to.

8     Q.   And you didn't know when he would be back at that point?

9     A.   I don't believe I did know, no.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1mdulb6                        Bates - cross

1    Q.  And the relationship dissipated somewhat after that, right?

2    A.  Yes, a little bit.

3    Q.  And so there were a lot fewer chats in 2012 and 2013 than

4    there were in 2011, correct?

5    A.  That's correct.

6    Q.  In fact, when he moved to San Francisco, initially you

7    weren't aware of that?

8    A.  I was not aware of that initially, but I messaged him and

9    found out he was in San Francisco.

10   Q.  Now, I want to talk about you have a background and degree

11   in computer science, right?

12   A.  That is correct.

13   Q.  And you have been in a programming capacity all your

14   professional life, right?

15   A.  That's also correct.

16   Q.  And you worked at PayPal, right?

17   A.  Yes.

18   Q.  And then you left PayPal for eBay, right?

19   A.  This actually gets a little complicated because eBay owns

20   PayPal, so technically my contract was with eBay and I have

21   moved within that organization.

22   Q.  And one of the things you have done as a programmer at

23   PayPal is designing portions of adaptive payment systems?

24   A.  That is correct.

25   Q.  Did that give you some insight into creating this bitcoin

1    exchange?

2    A.   Actually, I don't think so.

3    Q.   Was that basically from the ground up, the bitcoin part?

4    A.   Yeah, the bitcoin exchange would have been from the ground

5    up.  There were a lot of -- you know, this is really managing

6    buy-and-sell orders, which is a little different than what I

7    was doing at PayPal, which is, you know, just processing a

8    transaction.

9    Q.   Now, you've seen some of the government exhibits that

10   you've looked at this morning from the chats, right?  And I

11   want to talk about the technical discussion between you and

12   Mr. Ulbricht in 2010, in 2011, OK?

13            So in terms of the dates, those are all either in the

14   latter part of 2010 running through the spring of 2011,

15   correct?

16   A.   To my recollection, yes.

17   Q.   Well --

18   A.   Well --

19   Q.   We can look -- we can just go through them and --

20   A.   Pardon me.  The question is our technical conversations

21   went through --

22   Q.   Withdrawn.

23   A.   OK.

24   Q.   When you were asked by Mr. Ulbricht, in 2010, about

25   technical questions, the initial questions were about a

1   programming language called Perl, right, P-e-r-l?

2   A.  Yes, that's correct.

3   Q.  And that was about the Good Wagon Books Company that

4   Mr. Ulbricht was running, right?

5   A.  That is what he told me, yes.

6   Q.  And he was trying to work on a website, right?

7   A.  That's what he told me.

8   Q.  And you were able to help him with respect to certain of

9   those questions that he had, right?

10  A.  I certainly tried.  I think I did.

11  Q.  Well, let's look at Government Exhibit 1,000, please.

12          So if you look at that chat, is there any doubt in

13  your mind that it's about Good Wagon Books and not Silk Road?

14  A.  If you go to the bottom of this chat, he does tell me this

15  is about the artofbooks.com.

16  Q.  Right.  So -- but I'm saying in terms of the technical part

17  of it, the Perl part of it, is there anything that would lead

18  you to believe that it had anything to do with Silk Road, which

19  you were discussing later on?

20  A.  The only thing he did -- I know that he did lie to me now.

21  It's possible, but I think it's a reasonable assumption to

22  assume -- sorry, I'm not supposed to assume, am I?

23  Q.  That's right.

24  A.  Umm, I --

25  Q.  Is there anything technical about that in the Perl language

1    that had anything to do with what you know about Silk Road?

2    A.  No.

3    Q.  And all the Perl discussions are about that subject,

4    correct, about Good Wagon Books, to your knowledge?

5    A.  I believe so.

6    Q.  Now, when Mr. Ulbricht starts talking about php, that's

7    different, correct?

8    A.  My recollection is when he switched to php is when I began

9    asking him what he was working on, and that's when he started

10   telling me it was top secret.

11   Q.  Right.  And that's in the early part of 2012 –– I'm sorry,

12   2011.  Sorry, the early part of 2011?

13   A.  I think it may go back into late 2010.

14   Q.  And he had questions for you about Ubuntu, right?

15   A.  Yes, he did.

16   Q.  And about Debian, D-e-b-i-a-n?

17   A.  Yes.

18   Q.  Now, was he –– withdrawn.

19        He was having some difficulty with those things,

20   correct, with some of the programming issues?

21   A.  I don't know if that's accurate.  Debian and Ubuntu are

22   operating systems so there wouldn't be necessarily programming

23   involved.

24   Q.  How about php?

25   A.  Php is a programming language, yes, so ––

F1mdulb6                        Bates - cross

1    Q.  So he was getting frustrated, he told you, right, about

2    php -- about learning php?

3    A.  I don't recall him saying he was frustrated about learning

4    php but he did have issues with php.

5    Q.  I am going to show you what's marked as Defendant's P.

6           (Pause)

7           MR. DRATEL:  OK.  We'll come back to that.

8    Q.  OK.  So when you first saw Silk Road, you said you were

9    intrigued by it, correct?

10   A.  I was intrigued by the technology that it was built upon.

11   Q.  And even the concept, right?  You compared it to

12   Craigslist, did you not?

13   A.  I think at one point I probably did.

14   Q.  And so even after that point you had continued to assist

15   Mr. Ulbricht with respect to technical questions that he had?

16   A.  We're talking about 2011 again?

17   Q.  2011, yes, the first half of 2011.

18   A.  Yes, I did help him.

19   Q.  You may have provided him code on occasion, right?

20   A.  I believe that there were times I provided code snippets in

21   chat.  I don't remember writing any code.  At that time I had a

22   particular disdain for php so I really think I would have

23   remembered if I had written any significant php.

24   Q.  And he would send you code -- Mr. Ulbricht would send you

25   code occasionally?

F1mdulb6                         Bates - cross

1   A.  Again, he sent me code snippets.

2   Q.  Right.  And you would review it and delete it, right?

3   A.  Review it and delete it?

4   Q.  Yes.

5   A.  I don't -- oh, yeah.  Sorry.  There was one time over

6   TorChat that he did send me a zip file that had the php code

7   for the Silk Road website.  I looked at that.  He asked me to

8   review it.  I looked at it for a little bit and ultimately did

9   end up just deleting it.

10  Q.  So one of the reasons why you deleted it is you didn't want

11  it on your computer, right, anything connecting you to that?

12  A.  Yes.

13  Q.  OK.  You can look at P now, Defendant's P.

14  A.  Mm-hmm.

15  Q.  And I just ask you if you recognize that?

16  A.  I have no reason to believe that this is not an actual

17  conversation, but I don't remember it very well.  But we can

18  talk about it.

19  Q.  But April 2011, right?

20  A.  Yes.

21  Q.  Actually, I just ask you if it refreshes your

22  recollection --

23  A.  A little bit, yes.

24  Q.  -- that Mr. Ulbricht was frustrated trying to learn Cake,

25  C-a-k-e, php?

F1mdulb6                    Bates - cross

1    A.  Yes, which I'm not sure what that is right now.  I believe

2    it might be a module or library on top of php.

3    Q.  In terms of Mr. Ulbricht's state of mind during this

4    period, as time passed you observed that he was getting under

5    more and more stress, correct, during the period in 2011 now

6    that we are talking about -- that first half of 2011?

7    A.  There were times when he seemed stressed, as is evidenced

8    by the voicemail.

9    Q.  Yes.  And, also, though, you observed that it was occupying

10   too much of his time and he was dealing with crises on the

11   site, right?

12   A.  He did have a number of, you know, problems with running

13   the Silk Road, yes.

14   Q.  And you observed that that was wearing on him, correct?

15   A.  That's my opinion.

16   Q.  Yes.  And you told him that you thought it was a good idea

17   for him to get out because it was having an effect on him?

18   A.  I did tell him -- I don't recall if I did, actually.  I do

19   remember that on November 11th I did tell him to shut down the

20   site.

21   Q.  But he did express to you on some of the chats that we saw

22   and other times that you met him in person that he was stressed

23   out by all of this?

24   A.  Yes.

25   Q.  He also told you he was overwhelmed, right?

1  A.  That's possible.  Again, is there something to help me

2  remember?

3  Q.  I show you what's marked as 3513-25.  Just look at the

4  highlighted portion.

5          Does that refresh your recollection that March 29,

6  2011 in a chat Ross told you he was overwhelmed?

7  A.  Yes, he did tell me on this date that he was overwhelmed.

8  I'm not sure based on the context if this is about Silk Road or

9  not but it very well possibly could be.

10  Q.  Now, after Mr. Ulbricht returned from Australia and from

11  some other trips, you were in touch with him in May of 2012,

12  correct?

13  A.  That sounds correct.

14  Q.  And you chatted with him and you asked him how he was doing

15  and he said "chillin'," right?

16  A.  Again, you're going to have to refresh my memory but that

17  sounds right.

18          (Pause)

19          MR. DRATEL:  Just a second, your Honor.  I'm sorry.

20          (Pause)

21  Q.  So -- and occasionally you said that you would send

22  Mr. Ulbricht certain articles or links that you had seen about

23  Silk Road, correct?  This is during 2012.

24  A.  Yeah, this is going on 2012 into 2013.

25  Q.  Right.

F1mdulb6                          Bates - cross

1   A.   Yes.

2   Q.   And ultimately he asked you not to send him any more,

3   correct?

4   A.   Yes.

5   Q.   And you saw Government's -- if we could have Government's

6   1004?

7            So Government's 1004, you mention, "There was

8   something posted on Friday that you might have found

9   interesting."  Then Ross says, "I'll take a look, thanks."

10           By the way, this is Google Chat, right?

11  A.   That's correct.  This is on --

12  Q.   Not TorChat?

13  A.   This is on Google Chat.

14  Q.   So -- and then Ross says, "I'll take a look, thanks.  Glad

15  that's not my problem anymore."  Right?

16           And that's -- what you said to him was about Silk

17  Road, correct?

18  A.   That is correct.

19  Q.   And then there is an emoticon.  And what do you take that

20  emoticon to be?

21  A.   That is a smiley face.

22  Q.   As in happy, right?

23  A.   Yes.

24  Q.   And you say, "Yes."  Because you are in agreement, right?

25  That is a good thing?

1  A.  I'm in agreement that he communicated to me that he was

2  happy.

3  Q.  And then he says -- Ross says:  "I have regrets, don't get

4  me wrong ... but that shit was stressful."

5          Right?

6  A.  That is what it says.

7  Q.  Then he asks you to continue to keep the involvement

8  secret, right, that he was involved in?

9  A.  Yes.

10         (Pause)

11         THE COURT:  Well, I was thinking of taking a short

12 additional break, anyway.  And it looks like you are looking

13 for something?

14         MR. DRATEL:  Yes, and then I will wrap up, your Honor.

15 I appreciate it.

16         THE COURT:  Let's do that.  We'll take a short break.

17 We are going to go to 5 o'clock on the dot, or a minute or two

18 before.  As I mentioned to you, we are not going to sit

19 tomorrow, on Friday.  All right?  So when we break at 5, it

20 will be we will break until Monday morning.  But for right now

21 we'll just take a short break.  And remember not to talk to

22 each other or anybody else about this case.  Thank you.

23         THE CLERK:  All rise as the jury leaves.

24         THE COURT:  You can take a short break, too.

25         (Continued on next page)

```
 1              (Jury and witness not present)
 2              THE COURT:  Are you folks talking about timing?
 3              MR. TURNER:  Yes.
 4              THE COURT:  I am interested, too.
 5              MR. TURNER:  Your Honor, the issue is our next witness
 6    is from San Francisco.  I expect my direct to be pretty
 7    compact.
 8              THE COURT:  What does that mean?
 9              MR. TURNER:  15 minutes.  So I am hopeful we can
10    finish with him today so that he doesn't have to fly back here
11    Monday.
12              THE COURT:  The only issue is that we need to end by
13    5, because we do have some jurors, as you folks know, who has
14    got childcare and other issues on the back end.  So we can't
15    ask them to stay.
16              You know, how much longer do you have with this
17    witness?
18              MR. DRATEL:  Five minute, ten minutes, maybe, at most.
19              THE COURT:  OK.  So why don't we then just -- we'll
20    try to take as quick a break as we can.  Come right back on
21    out.  I only broke because we had taken the earlier break and I
22    didn't want to keep people and make them uncomfortable.  So we
23    will come back out and just proceed as expeditiously as
24    possible.  All right?
25              THE CLERK:  All rise.
```

F1mdulb6                          Bates - cross

1              (Recess)

2              THE COURT:  Let's get the jury back out.  It is always

3    hard to get 15 people out in five minutes, but they are

4    gathered again.  It took a little while to get them all rounded

5    up.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1mdulb6                    Bates - cross

1              THE CLERK:  All rise as the jury enters.

2              (Jury and witness present)

3              THE COURT:  All right.  Let's all be seated.

4         OK.  Mr. Dratel, you may proceed, sir.

5              MR. DRATEL:  Thank you, your Honor.

6    BY MR. DRATEL:

7    Q.  I just want to go back to something we talked about

8    earlier, about the bitcoin market in June of 2011 and you

9    couldn't recall about Mr. Ulbricht making a prediction.  So I'm

10   just going to show you what's marked as Defendant's CC.

11             I just ask you to look at that and then I'll ask you a

12   question.

13             (Pause)

14             Does CC refresh your recollection that at some point

15   in June 2011 you commented that the bitcoin market was

16   crashing, just like Mr. Ulbricht said it would?

17   A.  Yes.

18   Q.  Thank you.  And with respect to another one that we just

19   did right before the break, which is in May of 2012, when you

20   asked him what have you been up to and he said "chillin'," so

21   I'm going to show you what's marked as Defendant's P.

22   A.  The date on this is accurate?

23             MR. DRATEL:  Yes.  Your Honor, we have an agreement

24   that the date is accurate because it is a series of chats sort

25   of in a row.

1            MR. HOWARD:  That is correct, your Honor.

2            THE COURT:  All right.

3  Q.  So does that refresh your recollection that May 15, 2012,

4  you reached out to Mr. Ulbricht and said "How are you doing"

5  and he said "chillin'"?

6  A.  Yes.

7  Q.  Thank you.  Now, in terms of your meetings with the

8  government, did you ever bring them your laptop for review?

9  A.  No.

10 Q.  Ever bring them a desk-top for review?

11 A.  No.

12 Q.  Ever bring them anything you ever worked on, any computer

13 you worked on for review?

14 A.  No.

15 Q.  And there were two people who knew about your

16 involvement -- beside yourself, two people who knew about your

17 involvement in Silk Road, right?

18 A.  At which time?

19 Q.  At the time -- before you were confronted by the government

20 in October of 2013, there were two people who knew about your

21 involvement in Silk Road, correct -- Mr. Ulbricht, right?

22 A.  Mm-hmm.

23 Q.  And a woman you confided in sometime in 2012?

24 A.  In 2012?

25 Q.  Well, when was it?  You confided in a woman that you had

1   involved in Silk Road, correct?

2   A.  I tried to confide in a woman and a particular friend of

3   mine in 2011.  I don't think it was communicated across.  We

4   were both at a bar drunk.

5   Q.  Is that Shelli?

6   A.  Yes.

7   Q.  Didn't she say she didn't want to hear any more about it

8   when you told her about that?

9   A.  I don't remember.  Maybe.

10  Q.  Maybe.

11          MR. DRATEL:  I have nothing further, your Honor.

12  Thank you.

13          THE COURT:  Thank you.

14          Mr. Howard, anything further?

15          MR. HOWARD:  The government has no further examination

16  of this witness.

17          THE COURT:  All right.  You may step down, sir.

18          (Witness excused)

19          THE COURT:  All right.  Would the government call

20  their next witness, please.

21          MR. HOWARD:  Your Honor, before we do that, the

22  government would like to read just one Tor chat excerpt that is

23  already admitted into evidence as we get the witness.

24          THE COURT:  All right.  What government exhibit is

25  this?

F1mdulb6

1           MR. HOWARD:  Just give me one moment and I will pull

2      it up.  It is 226D, as in dog.

3           Mr. Evert, could you publish it.

4           Page 59 of 1,096.  December 9, 2011:

5           "vj: IRL — is there anyone with a clue at all?

6      Girlfriend, boyfriend, bunny you talk to, online buddy's who

7      you've know for years? Gramma, priest, rabbi, stripper?

8           "myself: unfortunately yes. There are two, but they

9      think I sold the site and got out and they are quite convinced

10     of it.

11          "vj: good for that — when do they think you've sold?

12          "myself: about a month ago

13          "vj: and do they now notice the demands on your time?

14     These the kinda people you'll know forever, or would a move

15     work someday?

16          "myself: no, I live no where near them anymore. One

17     I'll prob never speak to again, and the other I'll drift away

18     from."

19          Continuing from the same chat on page 314 of 1,096 on

20     January 15, 2012:

21          "vj: Have you even seen The Princess Bride?

22          "myself: growing up my parents had the last half of

23     spaceballs and the last 3/4 of the Princess Bride and all of

24     Romancing the Stone. that pretty much sums up my personality.

25          "vj: Well, that's about as well rounded as one can

F1mdulb6

1      get.  So you know the history of the Dread Pirate Roberts.

2                  "<-- it's a thought I'm working on, so humour me

3                  "myself: can't quite remember.

4                  "myself:  Wesley was him though yea.  Took up his name

5                  "vj: and over the years, a new one would take the

6      name, and the old one would retire.

7                  "myself: yep

8                  "vj: You need to change your name from Admin, to Dread

9      Pirate Roberts

10                  "<-- isn't kidding - start the legend now

11                  "myself: I like the idea

12                  "vj: <-- has just put 12 solid hours of thought into

13     it.  Clear your old trail - to be honest, as tight as you play

14     things, you are the weak link from those two prev contacts

15                  "myself: goes along with my captain analogy

16                  "vj: and the whole thing - I quite love it."

17                  MR. TURNER:  Your Honor, the government calls FBI

18     Special Agent Forensic Examiner Christopher Beeson to the

19     stand.

20                  THE COURT:  All right.  Mr. Beeson.

21                  THE CLERK:  Please raise your right hand.

22      CHRISTOPHER JON BEESON,

23          called as a witness by the government,

24          having been duly sworn, testified as follows:

25                  THE CLERK:  Please state your full name and spell your

 1   last name for the record.

 2           THE WITNESS:  It's Christopher Jon Beeson,

 3   C-h-r-i-s-t-o-p-h-e-r J-o-n B-e-e-s-o-n.

 4           THE COURT:  Mr. Beeson, please be seated.  And it will

 5   be important for you to pull your chair up so you can speak

 6   clearly and directly into the mic, sir.

 7           THE WITNESS:  Very good.  Thank you.

 8           THE COURT:  All right.  Mr. Turner.

 9   DIRECT EXAMINATION

10   BY MR. TURNER:

11   Q.  Agent Beeson, who do you work for?

12   A.  I work for the Federal Bureau of Investigation.

13   Q.  How long have you worked for FBI?

14   A.  I've worked for the FBI for 28 years, the last 20 as a

15   special agent.

16   Q.  What FBI office are you assigned to?

17   A.  I am assigned to the San Francisco office of the FBI.

18   Q.  And what are your duties at that office?

19   A.  I'm assigned to the Silicon Valley Regional Computer

20   Forensic Laboratory, where I am a Special Agent Forensic

21   Examiner.

22   Q.  And as part of your role as a Special Agent Forensic

23   Examiner -- I should say, by "forensic examiner," are you

24   talking about computer forensics or another type of forensics?

25   A.  Computer forensics.

1  Q.  As part of your role as a Special Agent Forensic Examiner,

2  are you ever called in to help with seizures of digital

3  evidence for investigations by FBI offices outside San

4  Francisco?

5  A.  Yes, I am.

6  Q.  What typically is your role in those situations?

7  A.  Typically when we are involved in collection of digital

8  evidence for other FBI offices, our role is simply that, to

9  collect and preserve digital evidence.  So identify particular

10  computer devices, what's going to be seized, etc., and then it

11  will be forwarded on to the other FBI office for analysis.

12  Q.  On October 1, 2013, were you called upon to help in

13  connection with an arrest of a target of the FBI New York field

14  office?

15  A.  I wasn't called upon to assist with the arrest but, rather,

16  the search of computer evidence.

17  Q.  OK.  The recovery of that evidence?

18  A.  Yes.

19  Q.  Whose arrest was it?

20  A.  It was the arrest of Ross Ulbricht.

21  Q.  Where were you called upon to go that day?

22  A.  We were told to respond to 235 Monterey Boulevard in San

23  Francisco.

24  Q.  Do you know whose residence that was?

25  A.  I was told it was the residence of Ross, Mr. Ulbricht.

F1mdulb6                          Beeson - direct

1   Q.  Was this before or after Mr. Ulbricht had been arrested?

2   A.  I'm sorry, counsel, one more time.

3   Q.  Was this before or after Mr. Ulbricht had been arrested?

4   A.  I was called just following his arrest.

5   Q.  So approximately what time of day did you arrive at the

6   residence?

7   A.  I arrived about 5:30 p.m.

8   Q.  Anyone come to assist you?

9   A.  Yes.  One of our Task Force officers, Sergeant Brian

10  Rodriguez, with the San Francisco police.

11  Q.  Were any law enforcement personnel already there by the

12  time you arrived?

13  A.  Yes.  There were several FBI agents already on the scene.

14  Q.  Did that include Thomas Kiernan from the New York field

15  office?

16  A.  Yes, Mr. Kiernan was there.

17  Q.  What was Mr. Kiernan doing when you arrived?

18  A.  He was accessing a laptop inside the residence in one of

19  the bedrooms.

20  Q.  I'm showing you what's already been marked as Government

21  Exhibit 200 and admitted into evidence.

22          When you have a chance to look at it, can you tell me,

23  do you recognize this exhibit?

24  A.  I do.

25  Q.  And how does this laptop compare to the one you saw

1    Mr. Kiernan working on?

2    A.  It's the same laptop.

3    Q.  How can you tell?

4    A.  Looking at the markings on the back of the laptop, I can

5    see from previously reviewing pictures that it has markings and

6    stickers on the back that indicate it is the same.

7    Q.  Those pictures you took?

8    A.  Yes, they are.

9    Q.  So what were you there to do exactly with the laptop?

10   A.  So my role in this instance was to assist in the collection

11   of the data that's on the laptop; basically, copy the data off

12   of it.

13   Q.  And who did you understand would be responsible later for

14   actually reviewing the contents of that data?

15   A.  I didn't know a particular individual was going to be

16   responsible, but I know that it was going to go to the New York

17   FBI office.

18   Q.  In the ideal situation, what procedure do you use to copy

19   the contents of a computer when you observe it?

20   A.  So typically when we respond to a site and we're going to

21   collect a computer or digital evidence, what we're going to do

22   is we're going to start from a computer that's powered off.

23   Right?  We aren't going to typically use one that's powered on.

24   We're going to power it down.  And we're going to frequently

25   remove the hard drive, and we're going to copy all the data

1    that is on the hard drive off to one of our own hard drives or

2    some other form of storage.

3    Q.  Why does it help to turn the computer off like that?

4    A.  Well, when file systems are live and up and running, the

5    data can change as things are going on.  And so what we do is

6    by powering it down, all that data is isolated on the hard

7    drive.  It can't be altered in any way.

8    Q.  Now, could you do that here?

9    A.  We couldn't do that here.

10   Q.  Why not?

11   A.  Well, once I responded to the scene and spoke with

12   Mr. Kiernan, he advised that the laptop was encrypted.  It was

13   using a form of encryption.  And so when encryption is deployed

14   on a computer, frequently if we don't have the password there

15   is nothing that we can do with that data if it is encrypted.

16   Right?  We would have to break that encryption.

17        So in this instance we had to capture the data while

18   the computer was still running.

19   Q.  So walk us through what you were able to do with this

20   laptop.

21   A.  So once we took possession of the laptop from Mr. Kiernan,

22   what I did is I started off by copying data that we believe

23   would be most useful.  And we did that in the form of what is

24   called a Tarball.  Similar to, for a Windows user, it would be

25   like a zip file.  A lot of people have seen zip files.  It is

1    just a way to containerize files.

2              And we started by creating those Tar images of groups

3    of data which we believe would be of most value.  You see, in

4    this instance, we didn't have enough time to know how long we

5    were going to have access to this laptop.

6    Q.  So when you got it, you said it was encrypted but do you

7    mean it was actually encrypted or there was just a danger of it

8    becoming encrypted?

9    A.  So the data is encrypted on the laptop, but the operating

10   system, like Windows -- this particular laptop was using Ubuntu

11   Linux -- the operating system was interfacing between that

12   encryption and allowing that data to be seen and viewed and

13   copied.

14   Q.  So just in layman's terms, was the computer on?

15   A.  Yes, the computer was on.

16   Q.  And was it logged in?

17   A.  Yes, it was logged in.

18   Q.  So you had access to the account that was logged in?

19   A.  Yes.  It would be just as if any of us logged into our

20   normal computer at work.  It was sitting there waiting for what

21   would you like us to do.

22   Q.  OK.  So while the computer was in this live state, were you

23   able to determine whether you had access to all of the data on

24   the hard drive or only some of it?

25   A.  Well, so what we determined was that the computer was set

F1mdulb6                    Beeson - direct

1   up in such a way that it could either run Windows or Ubuntu

2   Linux.

3   Q.  So it had a Linux half and a Windows half?

4   A.  Essentially, yes.

5   Q.  What part of it did you have access to?

6   A.  At that time it was running Ubuntu Linux.

7   Q.  It can't operate both at the same time?

8   A.  Not at the same time.

9   Q.  So what did you do while you were logged into the Linux

10  side of the computer?

11  A.  Could you be more specific?

12  Q.  So you had access to the Linux side of the computer.

13  A.  Mm-hmm.

14  Q.  What did you do to recover data?

15  A.  Like I said, initially what I did was I started looking at

16  the home directory.  For example, on Linux that would be like

17  the "my documents" folder in your Windows computer.  Right?

18  And I started by containerizing all the files that were in that

19  folder on the laptop, and then I did a series of other folders.

20  OK?

21          And once I completed that and we still had access to

22  the laptop, we decided that we wanted to make an image, which

23  is a complete copy, of the unencrypted version of the whole

24  volume or partition that was running Linux.  The hard drive is

25  divided into multiple segments, and one of those segments was

1    fully accessible at that moment for us and so I wanted to

2    create an image of that.

3    Q.  And by "partition" you are referring to the Linux half of

4    the computer?

5    A.  Yes.  Exactly.

6    Q.  OK.  So were you able to make a complete copy of that Linux

7    partition?

8    A.  I was.

9    Q.  And where did you copy the data onto?

10   A.  I copied the data onto an FBI-owned hard drive.

11   Q.  I'm showing you what's been marked as Government Exhibit

12   500.

13        (Pause)

14        Do you recognize this exhibit?

15   A.  I do.

16   Q.  How do you recognize it?

17   A.  It is a hard drive which contains consolidated data from

18   our search.

19   Q.  And among the data on the hard drive, did you include the

20   data from the Linux half of the computer, the Linux half of the

21   laptop?

22   A.  Yes, I did.

23   Q.  Did you give that data a filename on that hard drive?

24   A.  Yes, I did.

25   Q.  What was that file name?

F1mdulb6                         Beeson - direct

1    A.   That file name was sda_crypt.dd.

2    Q.   Is it sda or sda4_crypt?

3    A.   I have to refer to my notes.  I thought it was sda4_crypt.

4    Is that right?  Did I say sda?

5    Q.   You said "sda" originally.  So which is right?

6    A.   Sda4.  Thank you.

7    Q.   Besides the laptop, were there any other digital devices

8    that you helped preserve as part of Mr. Ulbricht's arrest?

9    A.   Yes, we did.

10   Q.   Showing you what's been marked, already been admitted into

11   evidence, as Government Exhibit 502.

12   A.   OK.

13   Q.   Do you recognize this exhibit?

14   A.   Yes, I do.

15   Q.   How do you recognize it?

16   A.   This exhibit is marked with a yellow sticker.  It's also a

17   16 gig SanDisk USB thumb drive.

18   Q.   And there is another thumb drive in there as well?

19   A.   That is correct.  There is also a 4 gigabyte USB thumb

20   drive.  Looks identical, almost.

21   Q.   So what did you do with these thumb drives?

22   A.   So these thumb drives were brought to me later and I imaged

23   them in their entirety.

24   Q.   And what did you do with that copy of the data?

25   A.   That data was also consolidated onto this disc, Government

F1mdulb6                        Beeson - direct

Exhibit 500.

Q.  And what did you do with the -- I'm sorry.

        The thumb drives, what is the exhibit number you see
in front of you?

A.  I see 502A.

Q.  OK.  I think I misspoke and I said 502.  So let the record
reflect that 502A is in front of the witness.

        So once you loaded all this data onto the hard drive,
what did you do with the hard drive?

A.  So once we consolidated everything onto this drive here,
this hard drive was shipped to the FBI New York Field Office.

Q.  Before you sent the hard drive to the New York Field
Office, did you hash the various files that you put onto the
drive?

A.  Yes, I did.

Q.  Including the sda4_crypt file?

A.  Yes, sir, I did.

Q.  And the files from the thumb drives?

A.  Yes.

Q.  And can you explain what it means to hash a file and why
that is done?

A.  Sure.  So a hash is a way to generate a digital fingerprint
of data.  OK?  And it's unique to that group of data.  It's a
way that we can authenticate a file to make sure it hasn't
changed.

F1mdulb6                          Beeson - direct

1   Q.  OK.  So if you take the sda4_crypt file, how do you hash

2   it?

3   A.  How do I hash it?

4   Q.  Yes.

5   A.  So what I'm going to do is I'm going to use a tool,

6   computer tool application, and I'm going to run -- I'm going to

7   tell the application to read this file in, and the application

8   will take all the data, the data stream in that file, and will

9   generate a hash value.

10  Q.  Is that like a long string of numbers?

11  A.  It is.  It is a 32-character hexadecimal string, so it is

12  numbers and letters.

13  Q.  And if you have one file that is just a tiny bit different

14  than another, what is the difference between the hashes?

15  A.  It is substantially different.  So when you look at two

16  hashes, if the file is changed in only the smallest way -- a

17  period is deleted from a text file, for example -- the hash

18  will result in an entirely different appearing value.

19  Q.  So the hash values that you calculated, did you record them

20  anywhere?

21  A.  I did.

22  Q.  Would you take a look at what's been placed in front of

23  you, the binder of exhibits, there is an Exhibit there 500A.

24          Do you recognize this document?

25  A.  I do.

1   Q.  What is it?

2   A.  It is a -- this is a file -- a printed file that I created

3   that has the hash value and file name of every file that we

4   provided on this hard disc to the FBI in New York.

5              MR. TURNER:  The government offers Exhibit 500A into

6   evidence.

7              MR. DRATEL:  No objection.

8              THE COURT:  Received.

9              (Government's Exhibit 500A received in evidence)

10             MR. TURNER:  Publish 500A, please, and go to the

11  middle of page 2 and zoom in at sda4_crypt.

12  Q.  Mr. Beeson, can you help me find it?

13  A.  Yes.  It is in the center of the page.  I lost the laser

14  pointer that somebody gave me.  There we go.

15  Q.  So maybe we can zoom in right there.

16             Is that the hash value you calculated?

17  A.  Yes.  It is the hash value that starts with "1e610e."

18  There we go.

19  Q.  And could you take a look at Government Exhibit 502A --

20  sorry, is it 205A?

21             (Pause)

22  A.  I believe it's 502.

23  Q.  It's 205A.  We've already actually gotten it into evidence.

24             MR. TURNER:  Could we put it on the screen, Mr. Evert?

25             THE WITNESS:  My apologies.

1           MR. TURNER:  That is not it.

2     Q.  502.  Sorry about that.

3           Do you see 502 in your binder?

4     A.  I do, sir.

5     Q.  OK.  Did you create that document?

6     A.  I did.

7     Q.  What is it?

8     A.  This is a printed log from one of the tools that we use to

9     create forensic images of media, whether it be thumb drives,

10    hard drives.

11    Q.  And so what does it reflect?

12    A.  It is a summary of information from a log -- 16-gigabyte

13    hard drive, Government Exhibit 502A.

14    Q.  Does it include a hash value for the data from the

15    16-gigabyte thumb drive that you referenced earlier?

16    A.  It does.

17    Q.  Where is that hash value reflected?

18    A.  It is actually reflected in two places on that document.

19    One is where it said "computed hashes" about the middle of the

20    page, "md5 checksum."  Yes.  And then again at the bottom where

21    it was re-verified that it was the same.

22          So the first hash was when we copied the data, and

23    then we copied it to all of those files that are listed there,

24    USB Sandisk 801, 802.  And then the lower hash value indicates

25    that it again checked and the fingerprint was the same in both

F1mdulb6                         Beeson - direct

1    instances.

2    Q.  So you had fingerprinted the data.  You sent it to the New

3    York field office.  And then what can the New York field office

4    do with those fingerprints?

5    A.  So they can also hash this data and make sure that the data

6    didn't change or get damaged at any time during shipping or

7    during access.

8    Q.  Did you take any pictures while you were working on the

9    laptop?

10   A.  I did.

11   Q.  Can you take a look at 501A, B, C and D in your binder and

12   tell me if you recognize those.

13            (Pause)

14   A.  Yes, I recognize them.

15   Q.  And what are they?

16   A.  These are screenshots that I took of the laptop when --

17   well, a while after we had imaged it.  We had already made our

18   copies.  And I took these screenshots there of open Windows

19   applications that were running on the laptop when I first

20   encountered it.

21            (Continued on next page)

22

23

24

25

1   BY MR. TURNER:

2   Q.  What did you take those shots with?

3   A.  My FBI-issued camera.

4   Q.  And does the exhibit reflect the time that the camera shots

5   were taken?

6   A.  The metadata from each picture is here, yes.

7   Q.  Does the metadata accurately reflect the time that the

8   shots were taken?

9   A.  Yes.  So it turns out that my camera was about 40 minutes

10  slow at the time I took these pictures.  So all the times

11  reflected in the metadata for the picture is 40 minutes slow.

12  Q.  Okay.

13          MR. TURNER:  The government offers these Exhibits

14  501A, B, C and D into evidence, your Honor.

15          MR. DRATEL:  No objection.

16          THE COURT:  Received.

17          (Government's Exhibits 501A-501D received in evidence)

18  Q.  Can we look at 501A.  Please.  What does this depict?

19  A.  501A is a picture of an open Tor browser session.

20  Q.  And 501B?

21  A.  This is the lower half of the same browser window.

22  Q.  501C?

23  A.  This is a photograph of an open chat session.

24  Q.  And 501D?

25  A.  This is a picture I took of some commands that I was

F1mgulb7                          Beeson - direct

1   issuing in trying to copy the laptop early on, and I wanted to

2   record it for -- mostly for my note-keeping, my recordkeeping.

3   Q.  At the bottom, there's a line that says frosty@frosty.  Can

4   you explain what that reflects.

5   A.  Sure.  Frosty@frosty in Linux or in Unix, the host name for

6   the system and the user in this system show up here in these

7   terminal windows.  So what this indicates is that the user

8   Frosty is currently logged into the host or the computer named

9   Frosty.

10  Q.  Can you just break that down a little bit.

11          When you have a computer, let's say in Windows, what's

12  a default host name for a computer in Windows?

13  A.  Oftentimes in Windows, it's just "My Computer".

14  Q.  And can the user rename the computer?

15  A.  They could.  They could name it Chris' computer.

16  Q.  Can you do the same thing in Linux?

17  A.  Absolutely.  You can use any host name you'd like.

18  Q.  What does it indicate the computer name of this computer

19  was?

20  A.  The computer name was Frosty.

21  Q.  And on that computer, the user can create accounts on the

22  computer, right?

23  A.  That's correct.

24  Q.  So what accounts was logged into this computer at the time?

25  A.  According to this terminal window, Frosty.

1           MR. TURNER:  No further questions.

2           THE COURT:  Mr. Dratel.

3           MR. DRATEL:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MR. DRATEL:

6    Q.  You just mentioned that you took some photographs of the

7    laptop?

8    A.  Yes, sir, I did.

9    Q.  And the ones that you put in evidence were not the only

10   photographs, correct?  You took additional photographs?

11   A.  That's correct.

12   Q.  Let me show you what's marked as Defendant's H --

13   A.  Thank you.

14   Q.  -- and just ask you if you recognize that.

15   A.  I can't say that I do recognize this as one of the photos I

16   took.  I may have.  I took numerous photos of open screenshots.

17   I would have to see the file information or the metadata

18   relating to this photo to confirm it.

19   Q.  Okay.  I'll go --

20   A.  Because I did take several shots.

21   Q.  Yeah.  And several shots of the laptop, right?

22   A.  That's correct.

23   Q.  I'll move on.  We'll find them.  So, in terms of trying to

24   capture what was on the laptop, the use of the tar command,

25   correct, T-A-R?

1    A.  That's right.

2    Q.  That's to archive the files that you tell it to copy,

3    right?

4    A.  That's correct.

5    Q.  The command is really just essentially like any other

6    command on a computer, just telling the computer what to do

7    with a keystroke or series of keystrokes, right?

8    A.  Yes, sir.

9    Q.  Essentially, it reads those files and then places them in

10   an archive, the tar command, right?

11   A.  That's correct, much like a zip file, sir.

12   Q.  And but by doing this, you change all the access times for

13   all those files that you're tar'ing to the time when you tar,

14   right?

15   A.  The access times can be changed; yes.

16   Q.  Isn't that what happened here, that the access times were

17   all changed by that tar'ing command?

18   A.  Because I'm not the forensic analyst on this case, I don't

19   know exactly whether or not those were changed.

20   Q.  Well, there's a way to tar without changing access dates,

21   right?

22   A.  I am not familiar with the way for sure.

23   Q.  But if the access files are changed, then they only reflect

24   the time that you tar'ed it, right, and not the access files

25   that existed on the laptop itself?

F1mgulb7                          Beeson – cross

1   A.  If, in fact, the access times were changed as part of the

2   archiving process, then, yes, they would have been changed to

3   the current time when the archive was created.

4   Q.  Now, you're familiar with the Guidelines for Evidence

5   Collection and Archiving issued in 2002?

6   A.  Not specifically, sir.

7   Q.  Are you familiar with a section that says don't run

8   programs that modify the access times of all files on the

9   system, e.g., tar or X copy?

10  A.  If I'm not familiar with the section, I wouldn't be

11  familiar with that specific --

12  Q.  Now, while you were running the tar command on the Frosty

13  directory -- and by the way, Frosty is the main directory on

14  the computer?

15  A.  It's the home directory.

16  Q.  The home directory.

17          So you received an error message, correct?

18  A.  While I'm tar'ing?

19  Q.  Yes.

20  A.  I may have.

21  Q.  Do you recall?

22  A.  I don't recall for certain.

23  Q.  Let me show you what's part of 3512-1.  3512-1 -- and I'll

24  give you the entirety of it so that you can look at it.  Just

25  ask you to look at page three, this is double-sided, and that

F1mgulb7                          Beeson - cross

1    second paragraph.

2    A.   Sure.  May I ask you for clarification.  I just want to

3    make sure I'm at the right photograph.  It starts "Frosty user

4    folder"?

5    Q.   Yes.

6    A.   I'm ready.

7    Q.   Does that refresh your recollection that you received an

8    error message during the tar process?

9    A.   Yes, it does.  These are my notes.

10   Q.   Yes.  I'm saying that refreshes your recollection.  I have

11   to ask a question a certain way for evidentiary purposes.

12   A.   Yes, it does, sir.

13   Q.   Okay.  Thank you.

14        And the error message was "File changed as we read it

15   exiting with failure status due to previous errors."  Right?

16   A.   That's correct.

17   Q.   And at that point, you weren't sure whether you had

18   properly copied all of the files -- whether the tar process had

19   been completed at the point that you got that error message,

20   correct?

21   A.   That's correct.

22   Q.   And there are a number of possible reasons for that kind of

23   error message, right?

24   A.   Yes.

25   Q.   And one is that while the -- as you mentioned -- withdrawn.

F1mgulb7                          Beeson - cross

1              Just go back a bit.  You talked about live capture

2      versus the machine being off, correct?

3      A.  Yes.

4      Q.  So if the device is off, then you're not worried about

5      changing files, right, but while it's on, files can be changing

6      while you're tar'ing, right?

7      A.  That's correct.  It's a live file system, so things are

8      happening constantly.

9      Q.  Right.  And that's one of the possible reasons for an error

10     message, correct?

11     A.  It's a likely explanation for this error message.

12     Q.  You didn't know precisely, though, right, and you don't

13     know even today what the precise reason for that error message

14     was?

15     A.  I don't, nor do I know the file that caused the message.

16     Q.  And when you created the disk image of Mr. Ulbricht's

17     laptop, you didn't use any proprietary computer forensic

18     software, right?

19     A.  I did not.

20     Q.  And that's -- some of that software can automate the

21     process of capturing a hard drive image?

22     A.  In a live capture scenario, sir?

23     Q.  Well, is that different?

24     A.  It is.

25     Q.  All right.  So you used a piece of software called DD,

F1mgulb7                          Beeson - cross

1  right?

2  A.  Yes.

3  Q.  And that's built into many Linux-based operating systems?

4  A.  Yes.

5  Q.  And that's a delicate program, right?

6  A.  It's a powerful program.

7  Q.  In the computer world, doesn't DD have a widely-accepted

8  meaning in the forensics community for disk destroyer?

9  A.  I'm not familiar with that.  I've -- I've heard it or read

10  it, but it's not what it means.

11  Q.  But it can have disastrous consequences for imaging if a

12  mistake is made, correct?

13  A.  Yes.  As I said, it's a powerful tool.

14  Q.  And so at 7:42 p.m. that evening, the first of October, you

15  attempted to generate an MD5 Hash value of the device mapper of

16  on the drive on the computer, right?

17  A.  Of the folder depth mapper.

18  Q.  What did you attempt to get an MD5 Hash for?

19  A.  Well, I attempted several MD5s, so I just want to make sure

20  I'm answering.

21  Q.  At 7:42.

22  A.  One moment.  Okay.  Could you repeat that question for me,

23  sir.

24  Q.  Sure.  Yes.  At 7:42 p.m., 1942 hours essentially, you

25  attempted to get -- to generate an MD5 Hash value, right?

F1mgulb7                           Beeson - cross

1   A.   Actually, what I was attempting to do was to DD the disk,

2   to make a copy or an image of the disk; and at the same time,

3   take that data stream as I read it and pipe it into MD5 sum

4   which would generate my digital fingerprint of the disk at the

5   same time.

6   Q.   Right.  And that failed, right?

7   A.   It did.

8   Q.   Permission was denied?

9   A.   That's correct.

10  Q.   So, then you re-performed the command, though, but without

11  doing an MD5 Hash value at the same time, correct?

12  A.   That's correct.

13              THE COURT:  You have just a couple of minutes left on

14  today's session, Mr. Dratel.

15              MR. DRATEL:  I don't know that I'll finish, your

16  Honor.

17              THE COURT:  Just to let you know that we'll end at

18  5:00.

19              MR. DRATEL:  Okay.  Thank you.

20  Q.   Now, the live capture environment, because you're not sure

21  what -- you're not capturing an inactive image, that the image

22  is active, it's called slurring; is that right?

23  A.   I'm not familiar with the term slurring.

24  Q.   Well, you knew that the DD file that you created was not a

25  replica in exact terms of computer forensic terms of the hard

1   drive because of the active file system at the time, right?

2   A.  It was a replica at the instantaneous point in time when it

3   was made.

4   Q.  But it wouldn't match the DD file you created even a second

5   later?

6   A.  It would never match because every time I typed something

7   into the keyboard, parts of the file system would change again.

8   Q.  And you didn't generate the MD5 Hash until a couple days

9   later, correct, October 3?

10  A.  That's correct.

11  Q.  And that was when you had started the random access memory

12  – what we call RAM – capture of the laptop, correct?

13  A.  That's correct.

14  Q.  And are you familiar with the term "order of volatility" in

15  terms of computer forensics?

16  A.  I am.

17  Q.  So you attempt to capture the most volatile parts of the

18  system first, which is the memory, correct?

19  A.  I think in this instance it's arguable.

20  Q.  But that's the general principle, right?

21  A.  The general principle is, yes.

22  Q.  But you didn't try to capture the memory until you'd

23  already done two other processes, correct?

24  A.  That order was very carefully selected; yes.

25          MR. DRATEL:  I'm kind of going into a different area,

F1mgulb7                          Beeson - cross

1    Judge.

2            THE COURT:  How much more do you have?

3            MR. DRATEL:  I probably have about ten to 12 minutes

4    left.

5            THE COURT:  Ladies and gentlemen, we will break for

6    today and come back on Monday.  And I want to remind you not to

7    talk to each other or anybody else about this case.  I also

8    want you to make sure that if you run into any media or news

9    articles about this case, that you avert your eyes and that you

10   don't update your Facebook account or do any tweeting about

11   this case of any kind.

12           We'll pick up on Monday at 9:30, and I'll see you

13   then.  Thanks very much.  Have a good weekend.

14           (Jury excused)

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1                (In open court; jury not present)

 2                THE COURT:  You can step down, sir.  Thank you.

 3                (Witness temporarily excused)

 4                THE COURT:  Let's all be seated.

 5           Mr. Turner, I know your witness has been hung over the

 6     weekend, but it's important that people not feel too rushed if

 7     they have got additional examination.

 8                MR. TURNER:  We try.

 9                THE COURT:  So we gave it a go and it will be what it

10     will be, so we'll pick up with Mr. Beeson then on Monday

11     morning.

12           At this point in time, does the government have much

13     redirect?

14                MR. TURNER:  No.

15                THE COURT:  So who is going to be the next witness

16     then after him?

17                MR. TURNER:  The next agent would be Special Agent

18     Gary Alford from the IRS.

19                THE COURT:  And then after Mr. Alford?

20                MR. TURNER:  Then HSI Special Agent Dylan Critten.

21                THE COURT:  Those are the next two on my sheet.

22                MR. TURNER:  We are going to make some relatively

23     minor additions to our witness list.  We're going to be calling

24     one document custodian, I believe, and we're also going to have

25     one additional agent testify.  It shouldn't be more than 20

1   minutes or so of testimony.

2            THE COURT:  All right.  In terms of the document

3   custodian, is there any -- have you folks discussed whether

4   it's the kind of thing that there can be a stipulation as to so

5   we can eliminate the need for the custodian?

6            MR. TURNER:  We can discuss it.  But I think it's the

7   sort of thing that a document custodian from the company will

8   be able to explain.  We were originally going to have an agent

9   testify about it, but as we thought about it, we thought it

10  would be easier to explain it to the jury.

11           THE COURT:  Whatever you choose to do.  Sometimes

12  document custodians can be eliminated through stipulation.  If

13  they can't be, then they can't be.

14           MR. TURNER:  Of course.

15           THE COURT:  In terms of any other additions, I assume

16  you'll confer with Mr. Dratel first to see whether or not there

17  is any objection to that or if you can talk about the reason on

18  that so there's no need for any kind of court intervention with

19  that.

20           MR. TURNER:  Yes, your Honor.

21           THE COURT:  Have you previewed each other about that

22  already?

23           MR. TURNER:  About five minutes ago.

24           THE COURT:  Confer first and then write me a letter if

25  I need to look at anything in advance or we can deal with it

1   Monday morning, but if it's helpful for me to get up to speed

2   in advance -- if it's a response for certain testimony and you

3   want to preview that, you can do that.

4          Would the government also go through the witness list

5   and adjust whatever times now that you see how things are going

6   and what you may want to do or not do in terms of what your

7   projections are.

8          MR. TURNER:  We'll submit a revised witness list over

9   the weekend.

10          THE COURT:  Terrific.  Based on what you said, and I

11   have no idea what the cross-examination would be, it strikes me

12   that we would be likely to get to the -- for the government to

13   rest on around February 2, which would be about a week from

14   Monday.

15          Does that seem about right or do you think in your gut

16   it's going to go faster or slower or do you just not know?

17          MR. TURNER:  I think that sounds about right, your

18   Honor.

19          THE COURT:  Then, Mr. Dratel, is there any adjustment

20   to what we had talked about that first day that you know of

21   now?  We talked about how long you thought you would take.  I'm

22   trying to get a sense frankly.  We have juror number ten who

23   will have some timing issues at some point, which I'll try to

24   resolve, but I may not need to or they may not need to be

25   resolved if we're going to end before the middle of the month.

1          MR. DRATEL:  I don't know that it's any different in

2     the sense of certainly in terms of commitment, but we do have a

3     better crystallization of what we are going to want to do in

4     that context.  But I'll try by the end of tomorrow, certainly

5     by the end of Sunday, to have something prepared.

6          We'll be getting our notices to the government.  I

7     think we're in a position now to provide -- in other words, to

8     commit to certain things at least on a level of what we wanted

9     to.  We have gone far enough that I can make certain decisions

10    in that regard.

11         THE COURT:  I would say, if it turns out from the

12    government's review of its witness list and going through the

13    timing again, if it still looks like the government might rest

14    on a week from Monday, thereabouts, about Tuesday/Wednesday,

15    I'll start asking you, Mr. Dratel, for a better estimate and

16    whether or not you for sure know one way or the other whether

17    the defendant is likely to testify.  You don't have to make a

18    final decision, of course, until the moment you call him, but

19    just to get a sense of timing.

20         MR. DRATEL:  Sure.  Your Honor, I just wanted to say

21    that obviously I've just learned about the new witnesses, but I

22    also learned about a witness the government is not intending to

23    call anymore.

24         MR. TURNER:  I think it's subject to discussion.

25         MR. DRATEL:  Okay.

1      THE COURT:  All right.  Then I'll get the new witness

2  list.  Let me see.  Those are the new estimates.

3      Yesterday the government had mentioned that it wanted

4  to request a jury instruction or instruction to the jury.  I

5  did then give the instruction that we discussed.

6      Was there anything else that the government believed

7  was necessary?  Do you remember this?

8      MR. TURNER:  Yes.

9      THE COURT:  Do you think it's taken care of?

10      MR. TURNER:  Yes.

11      THE COURT:  I didn't know if there were two

12  instructions you were thinking of in terms of that that were

13  going to be separate, one for the AA, one for the other pieces.

14      MR. TURNER:  No, I think your Honor's instruction was

15  sufficient, combined obviously with the direct testimony.

16      THE COURT:  I have little notes of things that are

17  open.  You'll get the jury instructions, your first draft,

18  tomorrow.  My practice is to iterate.  Depending upon how much

19  time we have, my goal would be to get comments from you folks

20  Monday evening, hopefully in Word form, just in comments and

21  the text, and we start a charging conference on Tuesday at

22  9:00.

23      What I'll do is, we'll start with whatever page people

24  have comments on first and you'll both give me your comments.

25  If you've got language changes, you'll give me language changes

F1mgulb7                        Beeson - cross

1    as opposed to sort of, you know, 'I don't really like the way

2    this is.'

3              So if you have issues, be as specific as possible and

4    if you disagree with an instruction, come prepared with a case

5    cite or whatever it is you think supports your view.

6              And can I get a copy of GX 226, Government

7    Exhibit 226.  It's the chat that you read, Mr. Howard, just

8    before Mr. Beeson was called.

9              MR. TURNER:  I believe it's 226D.

10             THE COURT:  Maybe I just had written it down wrong and

11   that was why I didn't see it in my book.  I've got 226D.  Fine.

12             Is there anything that you folks would like to raise?

13             MR. TURNER:  No, your Honor.

14             THE COURT:  Mr. Dratel.

15             MR. DRATEL:  No.  Thank you, your Honor.

16             THE COURT:  Then we'll pick up Monday morning at 9:00

17   with us and I'll receive over the weekend from the government,

18   or whenever it is, the revised witness list.  You folks will

19   talk.  You'll let me know if there are things that you know of

20   in advance that you want to raise by letter, and you'll get a

21   copy of the draft jury instructions tomorrow.

22             Thanks.  We're adjourned.

23             THE DEPUTY CLERK:  All rise.

24             (Adjourned to January 26, 2015 at 9:00 a.m.)

25                                    * * *

INDEX OF EXAMINATION

Examination of:                                    Page

THOMAS KIERNAN

Direct By Mr. Howard . . . . . . . . . . . .1038

Cross By Mr. Dratel  . . . . . . . . . . . .1057

Redirect By Mr. Howard . . . . . . . . . . .1106

Recross By Mr. Dratel  . . . . . . . . . . .1108

Redirect By Mr. Howard . . . . . . . . . . .1110

GREGORY FINE

Direct By Mr. Turner . . . . . . . . . . . .1111

RICHARD CHAPMAN BATES

Direct By Mr. Howard . . . . . . . . . . . .1113

Cross By Mr. Dratel  . . . . . . . . . . . .1162

CHRISTOPHER JON BEESON

Direct By Mr. Turner . . . . . . . . . . . .1213

Cross By Mr. Dratel  . . . . . . . . . . . .1229

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 502A    . . . . . . . . . . . . . . . . . .1039

 502   . . . . . . . . . . . . . . . . . . .1040

 205A    . . . . . . . . . . . . . . . . . .1042

 297   . . . . . . . . . . . . . . . . . . .1043

 298   . . . . . . . . . . . . . . . . . . .1049

 1000    . . . . . . . . . . . . . . . . . .1122

 1001    . . . . . . . . . . . . . . . . . .1124

1245

1005   . . . . . . . . . . . . . . . . . . .1128

1006   . . . . . . . . . . . . . . . . . . .1129

1008   . . . . . . . . . . . . . . . . . . .1134

1002   . . . . . . . . . . . . . . . . . . .1136

1003   . . . . . . . . . . . . . . . . . . .1147

1004   . . . . . . . . . . . . . . . . . . .1160

500A   . . . . . . . . . . . . . . . . . . .1224

501A-501D   . . . . . . . . . . . . . . .1227

                        DEFENDANT EXHIBITS

Exhibit No.                              Received

G   . . . . . . . . . . . . . . . . . . .1068

J   . . . . . . . . . . . . . . . . . . .1081

R-57   . . . . . . . . . . . . . . . . . .1187