UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 14 Cr. 68 (KBF)

ROSS WILLIAM ULBRICHT,

Defendant.

------------------------------x

New York, N.Y.
January 26, 2015
9:27 a.m.

Before:

HON. KATHERINE B. FORREST,

District Judge

APPEARANCES

PREET BHARARA,
United States Attorney for the
Southern District of New York
BY: SERRIN A. TURNER
TIMOTHY HOWARD
Assistant United States Attorneys

JOSHUA LEWIS DRATEL
LINDSAY LEWIS
JOSHUA HOROWITZ
Attorneys for Defendant

- also present -

Special Agent Vincent D'Agostino
Molly Rosen, Government Paralegal
Nicholas Evert, Government Paralegal

(In open court; jury not present)

THE DEPUTY CLERK: This is the continuation of the matter on trial, the United States of America v. Ross Ulbricht, 14 CR 68.

Counsel, state your names for the record.

MR. TURNER: Good morning. Serrin Turner for the government. With me at counsel table is AUSA Timothy Howard, Special Agent Vincent D'Agostino from the FBI, and Molly Rosen, a paralegal from our office. Nick Evert will be here shortly.

MR. DRATEL: Joshua Dratel for Ross Ulbricht standing beside me. Joshua Horowitz is here as well. Lindsay Lewis is trying to get into the building downstairs.

THE COURT: Mr. Horowitz gets an A because he's always the first one here of anyone. Thank you. Good morning, everyone.

We have a couple of things to go over. I want to talk first about the timing for the next few days in light of this significant snowstorm that actually we're in the process of getting right now. The snow has started outside. My intention is to adjourn today at noon. We have got some jurors who come from Rockland County and some who really need to get home because they are necessary for childcare and other things and I don't want them to be stuck here. It can create some very difficult issues.

Then my thought is that we would, in light of

the -- and I have been monitoring the reports and it doesn't seem like this is a fake storm that's going to go away, it seems like it's a real one -- that we'll tell them right now that we will not have trial tomorrow. I want to hear from you folks if anybody opposes this, and then for Wednesday, I think it depends on whether or not a lot of snow is, in fact, dumped on the area and how quickly people are able to get it cleaned up and what the conditions are where some of the jurors are.

I'm going to have Joe communicate with some of the jurors who are in the more far-flung locations on Tuesday to see whether or not they're able to get out, and then he will communicate with them all by text or phone to let them know. They're also going to be instructed for Wednesday to call into the court's auto line, which is if the courthouse is closed, generally there's an auto line that everybody can call and Joe will make sure they have all got that phone number, but if the court's closed, that's it. It doesn't matter if they can get in. But if the court is not closed but Manhattan is okay but folks can't get in from Westchester or Rockland, then we're going to have to hold off on Wednesday, as well. I will nevertheless tell them that Wednesday we will start not at 9:30, but at 10:00 for them. So the best-case scenario would be starting at 10:00, which would mean we would start at 9:30, just to give people a little bit of extra time to get through this.

How does that sound to you folks?

MR. TURNER: Sounds perfectly appropriate.

MR. DRATEL: That sounds exactly the same.

THE COURT: So we'll see. It may mean that we end up with half a day today and then Thursday and nothing in between but we'll play it by ear. I think we have all lived through some snowstorms now and we have had snowstorms with less snow that have resulted in significant disruption.

I wanted to fill you in on Juror No. 4. I have been in communication with Juror No. 4's employer regarding the requirement of this particular employer to use vacation time after two weeks of trial time. Now, we don't quite hit two weeks until I think half a day after we adjourn today at noon for her. We have been trying to get them to accommodate this unusual situation where it's a longer trial than most trials. Jury selection here was quite involved. I have not heard back whether or not they'll be able to make the accommodation.

If they can't, we'll have to discuss what to do next and confer with Juror No. 4 as to how she feels about it. We do know it was a concern of hers, which is why we have been trying to get an accommodation.

Juror No. 10 was the juror who has a potential issue around the 14th of February that she had previewed up at the side bar during voir dire. That may or may not be a problem. We'll play that out as we go, but those are the two that I'm

aware of. I just wanted to fill you in and make sure that everybody has the same information about those.

Witness lists: I've gotten this morning a revised witness list from the government. I take it has been shared with defense.

MR. TURNER: Yes, your Honor.

THE COURT: Tell me what's different. I can compare the two but why don't you give me a summary.

MR. TURNER: One moment, your Honor.

THE COURT: I see. You put in dates which will now be different yet again.

MR. TURNER: Right. Actually it looks like this is slightly outdated. Gary Alford will be our next witness. Then Alex Wilson -- I'm sorry -- Alex Miller from Stack Exchange, that will be a brief witness who is just a document custodian.

In terms of what else is different, I believe the only other difference is we are no longer planning to call Andrew Michael Jones as a witness. I'm sorry. We are planning on calling Vincent D'Agostino, the special agent here, to give brief testimony. Basically we have shortened it. Overall, we have shortened it. The witnesses we cut are shorter, their testimony.

THE COURT: Terrific. Thank you.

Anything further on this? We'll pick up with Mr. Beeson this morning and hopefully we can get him off the

stand and he can get on a plane before he gets snowed in.

MR. TURNER: Dubious, but there's hope I guess.

THE COURT: You think it's too late for that?

MR. TURNER: Probably. We would note that we have asked defense counsel witness list and are still waiting for a witness list from the defense.

THE COURT: I had told Mr. Dratel that I would start pressing him on Wednesday, so I'll press you whenever you're ready but no later than Wednesday. Do you want to preview anything.

MR. DRATEL: We did send the government an expert notice yesterday last night.

THE COURT: All right.

MR. DRATEL: Probably the extra time today, we can put together, probably overnight, for the government so we can get some others. There may be one daytime decision that -- in the next day or two.

THE COURT: We'll stay tuned for that. The jury charge: You folks should have received a copy of the jury charge, which we used yours as a reference and I went through each of the differences between that what we believe the correct statement of the law is and figured out what you had changed from my *Delva* (ph) charge and decided whether we cared.

In light of the fact that we'll have tomorrow off, if you folks could get us the Word version with comments, track

changes, by tomorrow late afternoon, 5:00, 6:00, that would be helpful. That way, we can start in on it Wednesday morning.

MR. DRATEL: What we were thinking of doing would be to communicate between the parties to see if we can narrow the issues that we presented to the Court.

THE COURT: Terrific.

MR. DRATEL: It would give us additional time.

THE COURT: Terrific. One of those I note, and I may need letters about this, you folks will need to figure out whether or not you'd like to state your position in a letter so that it can be something that we can all focus on. It has to do with a CCE. So the continuing series of violations, as you folks know, there's a fair amount of case law on this. There's the *Richardson* case and a number of other cases, but there seems to be a difference of view, certainly as between you folks. And it will be for you to let the Court know whether or not you've got support for your respective positions as to, number one, whether or not there has to be a specification of the series of violations in the verdict form, which I think the answer to that question is no; and the extent to which they need to be listed for the jury specifically in the charge or elsewhere, and I think the answer to that is open to debate.

In terms of the indictment, I think that it does not need to be listed in the indictment, though there are some courts which suggest that it's useful to do so.

But I'd like to get your views on the open issues with respect to the CCE because how that gets dealt with is very important, all right. Does that make sense?

MR. TURNER: We'll do that.

THE COURT: Terrific. Thanks.

We can fold in the *Alleyne* issue relating to CCE into that process, perhaps. There may not even be any debate between you folks as to whether or not that needs to occur.

I'm on Part 1 for the next two weeks. Because of the delays in the trial -- we pick Part 1 a year or more in advance. Originally, we were not scheduled for trial at this time. That's fine.

As you folks know, and the audience may not know, Part 1 is like judge-on-call. It's like being the doctor-on-call. It's 24/7 and it's for a two-week period. Typically, there's nothing after 7:00 p.m., so it's not really a difficult thing in the middle of the night.

It does mean we've got things shifted around so that I can take things before I come out here. I can take things at the break. I can take things at lunch hours. It does mean that there may be something if it was incredibly urgent that couldn't wait for a break or a lunch hour that I have to take. That would be unusual. It does happen. As you folks know, you've probably all been people on the side of coming into judges who are in Part 1 needing something urgent. We'll play

that by ear. I don't expect any big issues. I really don't.

That's what I have. What do you have? Anything?

MR. TURNER: No, your Honor.

THE COURT: Mr. Dratel.

MR. DRATEL: No.

THE COURT: We're waiting on seven. It is possible that one thing I had considered was whether or not -- it had not started snowing until about an hour ago -- that there may be some people who were sufficiently concerned about the snow that they just are not going to chance it. We haven't heard from the seven. Is that right? Two are on their way. The ones who are furthest out are actually already here. Hopefully, we'll get the others soon.

If there's nothing else, we'll take a break until these folks arrive. One thing, Mr. Dratel, as long as we have a minute and I don't know, is there another cooperator on this list?

MR. TURNER: Yes, Mr. Duch.

MR. DRATEL: Yes.

THE COURT: If you're going to go into your doing this, the line of cross, which is not atypical, you're doing this to get a break on the penalty, there was an objection during -- I was rereading the transcript -- there was an objection during Bates for life, a lifetime of imprisonment. Don't mention "life." You can do "substantial." You can do

"significant." You can do lots of other words, but lifetime imprisonment, unless you can show that they were going to be getting life -- in other words, mandatory life or something else, the range is not something that you should be going into.

As you know, there's lots of cases on this. It actually treads into the area of jury nullification, so life in the situation of the cooperators is off limits.

MR. DRATEL: I think I'm permitted to go into it.

THE COURT: To life?

MR. DRATEL: I understand the Court's ruling, but I'm making my record.

THE COURT: Why don't you give me a case that says you can go into life imprisonment for a range. It's not a statutory -- there's no requirement for these folks. There are so many crimes which carry up to life, and the use of the word life, when somebody reasonably expects that they're going to get far less, conveys to the jury a sense that this particular trial involves something different. Now, to the extent that that's the message to be conveyed, that's the message that we dealt with during the *in limine* motions.

MR. DRATEL: I'll look at the cases, but in my experience and what I think is appropriate based on the number of factors, one of which is when this guy pled guilty, he was told you can face up to life in prison, I don't know, I don't think it's your Honor, I think it's Judge Griesa is the judge

on that case, but the --

THE COURT: Not Duch, Bates.

MR. DRATEL: So whatever the maximum penalty is, they're told, and whatever he was charged with is a factor in a decision to cooperate.

THE COURT: Well, if you have particular facts relating to pressure placed upon a particular cooperator, that's what I want to elicit from you. If there's a particular reason why for this cooperator it's more relevant than it might otherwise be, but there are a series of cases on naming the penalties and going into things that are more than just the words of substantial, significant, more than a decade, and there are lots of ways of getting at it.

But you give me what you would like and if Mr. Duch, if there's something really specific for him, so be it.

MR. DRATEL: Also, I thought it was relevant for Bates, too, but obviously the Court has ruled, in terms of his own --

THE COURT: I didn't sustain the objection. I let it go because it was already out and I didn't want to pause on it. I thought I would preemptively discuss the issue.

Sometimes the government doesn't care about a particular point. This is my view.

Does the government have a position on this?

MR. TURNER: For Bates?

THE COURT: Not Bates, because Bates is done and locked and loaded. I'm not going to go back over Bates.

MR. TURNER: For Duch, to be candid, I think we would draw on direct the maximum penalty is he's facing 40 years.

THE COURT: The maximum for him is 40?

MR. TURNER: Yes.

THE COURT: He's looking at a (b)(1)(B)?

MR. TURNER: Yes.

MR. DRATEL: But it's (b)(1)(A) weight.

THE COURT: But if it's (b)(1)(A) weight and he's pled, then under *Alleyne*, he can't get a statutory maximum greater than 40.

MR. DRATEL: I understand that, but when he made the decision to cooperate --

THE COURT: You can always use (b)(1)(A) weight for purposes of the 3553(a) factors also, but he can't raise a statutory max now.

MR. DRATEL: No, I understand that in what he's facing, but what I'm saying is when he was sitting there with his lawyer deciding whether to cooperate, he was aware -- if he's not, he's not, but you know, that he was facing a significantly greater penalty.

THE COURT: You folks will present to me whether or not there are particular facts that were used to pressure that fellow that would be relevant to his bias. Obviously, bias for

a cooperator is a big point, which the defense can freely explore, but I want to make sure that we're within the limits of the law.

I think we're still waiting on folks. Let's take a break until they all show up.

(Continued on next page)

THE COURT: Let's bring out the jury.

(Jury present)

THE COURT: All right. Ladies and gentlemen, let's all be seated. Before we get going I want to fill you in on the schedule for the next few days. Today, because of the snow, we'll be ending at noon and I know that the snow itself isn't supposed to really become particularly bad until three o'clock or so or even later but I am concerned about some of the folks who are in further removed areas being able to be sure they can get home in a safe way. So he we will end at noon today. We will not have trial tomorrow.

While it's possible the storm will pass us by, I think it's sufficiently looking like it's going to land here that I don't want to have people wondering about what kinds of childcare arrangements and other arrangements they need to make. So we're going to go ahead and call it a snow day for tomorrow for you folks essentially no matter what happens.

For Wednesday my hope is that we'll be able to resume, that tomorrow, late tonight some time the snow will stop or tomorrow early they'll get the roads clear and we'll be able to for Wednesday get people here. To give you a little bit more time we'll start at ten a.m. on Wednesday. We'll still only go till five but we'll start at ten a.m. on Wednesday.

Now with that said, Joe is going to speak to some of you to get -- he's got all of your contact information. Make

sure he's got exactly where you are going to be or a cellphone to connect with you folks. But he's going to connect with some of you who are living outside of the city to see how the conditions are on Wednesday. Because even though Manhattan's clear and the courthouse is open, that doesn't mean you are going to be able to get in if you are snowed in in Rockland County. So Joe will be communicating with you folks. As you know, we can't go forward unless you are all here so we need to assess the conditions where you folks are.

If it looks like it's just awful there's an auto line and Joe will give you the phone number for it for the court, the entire building. And that will tell you if the courthouse is closed. If the court house is closed there is no way we are going to be having trial. It's possible that if the courthouse is open that we won't have trial Wednesday if some of you can't get here.

So bottom line to summarize, today at noon, then we're going to call off tomorrow, Wednesday at ten a.m. that's what we're hoping. Thank you.

I want to remind you, sir, you are still under oath from Thursday.

Mr. Dratel, do you want to continue, sir?

MR. DRATEL: Yes. Thank you, your Honor.

CROSS-EXAMINATION

BY MR. DRATEL:
Q. Good morning, Mr. Beeson.
A. Good morning.
Q. I just want to go back to something I showed you last week Thursday and show you a different version. This will be Defendant's H and ask if you recognize that.
A. I do recognize it as one of the pictures I took.
Q. Of the laptop while you were working with it?
A. Yes, this is a screen shot.
MR. DRATEL: OK. I move it into evidence, your Honor.
MR. TURNER: I have no objection.
THE COURT: Received; Defendant's Exhibit H.
MR. DRATEL: Thank you.
MR. TURNER: So looking at "H" we can get it published.
(Pause)
Q. And looking at "H" you see on the top of that line across and that's a bitcoin client program operating right where it says the Colbert report?
A. Unfortunately, I don't know for sure what it is. I can see that it says the Colbert report but I don't know what kind of application it is.
Q. But if you look at the metadata that's part of this exhibit now which -- did that enable you to recognize it, by the way?
A. Yes, it did. Thank you.

Q. So that's the 7:56 p.m. on October 1, 2013?
A. That's what it says, yes.
Q. 40 minutes off?
A. 40 minutes off.
Q. Which way though?
A. It's slow. So we'd have to add 40 minutes to this time making it 8:36.
Q. 8:36 p.m. San Francisco time?
A. Yes, sir.
Q. And it says 197 -- no, it says 197 megabites uploaded 26.10 MB, right? Do you see on top of the red line?
A. Yes, I do.
Q. Now, you took these photos after you had already imaged the laptop, correct?
A. My recollection is that the laptop was in the process of being imaged. In other words, I had started the process and was taking these photographs at that time.
Q. Did you testify Friday that you had already made your copies that you took the photos after you had imaged it?
A. I would have to refer to my notes to be sure on the times. A lot of times things are done as I go. You know, once I start something I can start something else. So exact times I can't recall.

MR. DRATEL: I just want to publish for a second Defendant's G which is already in evidence.

(Pause)

Q. And there it says "uploaded 8.35 megabites". Can you see that?

A. It's a little blurry on my screen but it looks like it could be 8.35.

Q. OK. An on the one that we just saw that you took it's 26.1 megabites, right?

A. Yes.

Q. So, are you not familiar with the program that's running on Defendant's H?

MR. TURNER: Objection; asked and answered, beyond the scope and relevance.

THE COURT: Sustained.

Q. And you didn't generate the MD5 hash value for the laptop until October 3 when you started the RAM capture?

A. Correct.

Q. And the RAM capture is essentially the running memory on the laptop?

A. Yes. RAM is random access memory, that's correct.

Q. Can you just define that for the jury, please?

A. Yeah. So, random access memory is the memory in your laptop or computer that's used by not hard drive storage. It is that instantaneous memory that the basic code for the programs get loaded into RAM and then your computer can use it in there.

Q. And that gives you a window -- it gives you a ability to see what processes are running on a computer, right, RAM?
A. Whether it gives you what processes are running -- everything get's loaded into RAM. So all the binary codes, all the codes that the computer needs to run is loaded into RAM. That could be the active process. That could be the operating system and so forth.
Q. So on October 3 which is two days after you received the laptop you began to do the RAM memory capture?
A. That's correct. One of my associates and I just to be clear.
Q. And you weren't quite sure how to do that RAM capture, correct?
A. The RAM capture was nontrivial.
Q. Right. But you weren't quite sure how to do it. You asked for assistance, in fact?
A. I did.
Q. You asked whether there was a RAM capture tool that you could use for it?
A. That's correct.
Q. And this is a relatively new field in computer forensics, RAM capture?
A. No. I wouldn't say it's a new field.
Q. Well, one of the things that is part of the RAM capture is encryption keys and passwords and other things that are stored

in the memory, right?
A. That's correct.
MR. TURNER: Objection.
THE COURT: Overruled.
Q. And the processes that the computer -- the process of the computer programs that are running on the computer is something else that RAM can tell you, RAM memory capture would be able to reserve for you?
A. That information can be in RAM.
Q. And the active network connections at the time that the capture occurred would be something else?
A. It can be. It doesn't necessarily mean that it is.
Q. And it could also determine whether there were malware or viruses or other programs running on the system, correct?
A. It could be, yes.
Q. Now, you've used a piece of software called FMEM, F-M-E-M, to try to acquire the RAM memory?
A. That's correct.
Q. And system memory is broken down into registers called ranges; s is that right?
A. That's correct.
Q. And for FMEM you have to specifically point the program at the registers that you want the system that you'd rather that you want to capture, right?
A. That's correct. The RAM is divided into chunks, into

groups, so to speak. Some are more protected than others.
Q. OK. And so -- and if you don't direct the capture process at the right registers of RAM they will go to something called uncachable, U-N-C-A-C-H-A-B-L-E?
A. I believe so.
Q. And you weren't sure at the time about this, is that fair to say?
A. Well, this is why I obtained the help from one of my associates.
Q. But in fact, the FMEM capture did not work entirely, correct?
A. Upon capturing what I believe was the third register or third section of the memory FMEM crashed the computer.
Q. And when it crashed the computer you were no longer able to get any of the RAM capture that you had not gotten initially, correct?
A. We were able to continue with the capture after the computer was restarted.
Q. Now, you in doing your RAM capture you consulted the manuals on the computer in an attempt to find out how to proceed, right?
A. I don't recall consulting any manuals on the computer.
Q. Did you keep a running roster of commands that you issued the computer during your work?
A. Yes, we did.

Q. I am going to show you what's marked Defendant's I for identification -- "K", I am sorry. Call it Defendant's K for identification. And ask you to look at page two of this document. I ask you if that refreshes your recollection that you consulted the manuals on the computer?
A. These are not the manuals for the computer. These are manuals for the applications MEMDUM and FMEM that may or may not have been on the computer.
Q. Right, but you were looking for them?
A. Yes.
Q. And did you find one for MEMDUM?
A. I don't recall whether one came up or not.
Q. Well, there's no such file for that on a Lenox system, is there?
A. There could be. Depends on the Lenox system. Most likely there was not but I don't remember for certain. Chances are since I then checked for a manual for tool FMEM that there was no tool for MEMDUM on the system.
Q. And so you never got a full RAM memory capture, correct?
A. Can you define a full RAM memory capture, please?
Q. Well, why don't you.
A. Well, the difficulty in RAM capture is that it's live, so it's ever changing and it's ever active. When we captured what I believed was the third register or third group of memory from the RAM, the system crashed which is not that uncommon in RAM

captures. And so after we were able to restart we restarted with our own version and move onto the next and we continued to capture the other registers that were still there.
Q. But when you had the capture open before it crashed it has all the operations going, correct?
A. Yes.
Q. And so once it crashes and then you reboot it, you've lost all of that information that's included that went live before it crashed, right?
A. You do not lose all of the information.
Q. But you lose information?
A. Do you lose information.
Q. And you don't know what information you lost?
A. You do not know.
Q. And that information is lost to us forever, essentially?
A. It is.

MR. DRATEL: Nothing further, your Honor.

THE COURT: All right. Thank you.

Mr. Turner, anything further from the government?

MR. TURNER: One moment, your Honor.

(Pause)

MR. TURNER: Briefly, your Honor.

REDIRECT EXAMINATION

BY MR. TURNER:
Q. Agent Beeson, I talked to you about how when you are doing

a live capture, things are changing. Could you explain a little bit more what that means if you type something on a keyboard just a single press of a keyboard does that change --
A. Yeah. So in performing a live capture of basically capturing data from a running computer whether it be from the hard drive or from the RAM, everything that we do is to some degree altering information. And so our goal is to minimize that alteration to the maximum we can but we do have to use the computer in order to capture this information.
Q. So the sort of alterations you are talking about thought, does that involve --
A. Absolutely, not. It's very minimal footprint. We were trying our very best to not alter anything to the extent we can.
Q. You talked about some errors you ran into or crashes. Any of those prevent you from making a full and complete copy of the Lenox half of the computer that we talked about on direct?
A. No, it isn't.
Q. And those errors, could any of those errors have resulted in the generation of thousands of pages of TOR check logs on the computer that weren't there before?
A. Absolutely, not.
MR. TURNER: No further questions.
MR. DRATEL: Briefly, your Honor.
THE COURT: All right.

RECROSS EXAMINATION

BY MR. DRATEL:

Q. But the RAM capture, we lost the ability to see what the computer was doing at that time, correct, in the full range of it, correct?

A. Yes.

Q. Including connections to the internet, correct, in connection with what was going on with the internet?

A. I supposed. That's define as anything it's part of the group of things that could be in there.

Q. And the questions of malware and viruses and whatever else might have been on there we'll also never know, right?

A. Potentially.

MR. DRATEL: Nothing further. Thank you.

THE COURT: All right. Thank you.

MR. TURNER: Excuse me. One more question, your Honor.

THE COURT: One.

REDIRECT EXAMINATION

BY MR. TURNER:

Q. The RAM capture didn't prevent from you seeing what historically had been on the computer from years before?

A. No.

MR. DRATEL: Objection as to form.

THE COURT: Overruled.

RECROSS EXAMINATION

BY MR. DRATEL:

Q. You have no idea when anything was put on that computer, right?

A. I did not conduct the forensic exam on that computer, so.

THE COURT: All right. Thank you. You may step down, sir.

Would the government like to call its next witness, please.

MR. TURNER: Yes, your Honor. The government calls Internal Revenue Services Special Agent Gary Alford.

THE COURT: All right. Mr. Alford to the stand, please.

GARY LUIS ALFORD,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. TURNER:

Q. Good morning, Agent Alford.

A. Good morning.

Q. Who do you work for?

A. Internal Revenue Service Criminal Investigation.

Q. And what's your position at Internal Revenue Service Criminal Investigation?

A. I am a special agent.

Q. How long have you been a special agent with the IRS?
A. Approximately, six and a half years.
Q. Where are you currently assigned to work?
A. The New York Organized Crime Drug Enforcement Strike Force.
Q. What's the Strike Force do?
A. It's a task force of state, local and federal agencies and we are charged with investigating, disrupting and dismantling major drug trafficking organizations.
Q. What are yours duties at the strike force?
A. All the law enforcement duties whether it be surveillance, interviews, conducting warrants, arrests.
Q. So did there come a time when you were assigned to an investigation of the Silk Road website?
A. Yes, that was my first assignment.
Q. First assignment at the Strike Force?
A. Yes.
Q. When were you detailed to the Strike Force?
A. At the end of March 2013.
Q. And as part of your investigation into the Silk Road website did you make any efforts to identify the operator of the website?
A. I did.
Q. And did you ever do any searches on the Internet as part of that investigation?
A. I did.

Q. What were you looking for it?
A. I was looking for the first mention of the Silk Road website on the Internet.
Q. And how did you search for the first mention of "Silk Road" on the ordinary Internet?
A. I started using Google searches.
Q. OK. Did you restrict your search to certain date ranges?
A. Yes. When you search Google there's a task bar at the top where you can restrict the date or customize the date. So, I was aware of when the Silk Road allegedly had begun, so I had restricted the date, so I would search before that.
Q. Why were you searching for the first mention of the Silk Road website?
A. Because the Silk Road website was on a hidden part of Internet TOR and TOR hidden services. So it does no good or let's say a person who is not familiar with it for it just to be there. You would have to have, someone would have to tell you about it. So I figured that it would have to be on a regular Internet and someone would have to tell you where to go on the hidden Internet.
Q. OK. So could you take a look at the binder in front of you, Government Exhibit 301.
A. I see it.
Q. Do you recognize that document?
A. Yes, I do.

Q. What is it?
A. It's a representation of a Google search.
Q. That you did?
A. Yes.
Q. As part of your search for the first mention of the Silk Road website on the ordinary Internet?
A. Yes, a representation of what I did.
MR. TURNER: The government offers Exhibit 301 into evidence.
MR. DRATEL: No objection.
THE COURT: Received.
(Government's Exhibit 301 received in evidence)
MR. TURNER: Publish that.
(Pause)
Q. OK. So first of all, what were you searching for in the Google search box?
A. Well, I was searching for -- I know that since it was a Silk Road website you had to have Silk Road. But that's a pretty generic term that we have a lot of responses. So I know all the addresses on the TOR hidden services we use a dot on it. So I would put a term that would be restricted to what would be on the Silk Road website.
Q. Then there's this circle part of the screen. What does that reflect?
A. That's how you would test the date range of what you are

searching. So you can just put in an end date. So I'll put in January 31 because all information was that Silk Road had begun in February of 2011.
Q. OK. So you kept searching back, pushing the date range further and further back?
A. Correct.
Q. And here you were searching for the results before January 31, 2011?
A. Yes, sir.
Q. What did you get?
A. I got back what you see there, a response about a bitcoin talk forum.
Q. So bitcointalk.org, what is a bitcointalk.org? You visited the site?
A. Yes.
Q. What sort of site is hosted there?
A. It's a discussion forum surrounding bitcoins.
Q. So did you click on this link?
A. Yes, I did.
Q. What did it take you to?
A. It took me to a forum, a discussion thread.
Q. Can you just remind the jury what a discussion thread is?
A. On these forms you -- people would post a topic. So in this particular one the topic was a heroin store and people would comment and discuss that particular topic.

Q. Could you take a look at what's been marked as Government Exhibit 302 in your binder.
A. Yes.
Q. And do you recognize this document?
A. Yes, I do.
Q. How do you recognize it?
A. It's a screen shot that I took during ny investigation.
Q. What is it a screen shot of?
A. The heroin discussion thread.
Q. When did you take that screen shot?
A. June 3, 2013.
Q. Is that, approximately, when you first visited that thread?
A. Yes.
MR. TURNER: Government offers 302 into evidence.
MR. DRATEL: No objection.
THE COURT: Received.
(Government's Exhibit 302 received in evidence)
MR. TURNER: In on the top third of the page.
Q. All right. so this is bitcoin forum and here is the thread; is that right?
A. Yes, sir.
Q. And it's titled "The Heroin Store". And where do you find a mention of Silk Road in this thread?
A. Further down, approximately --
MR. TURNER: Crop page 6.

A. Yes, page six.

MR. TURNER: All right. Could you zoom in in this area.

(Pause)

Q. So tell us what we're looking at here.

A. It appears that Altoid had made a posting on the bitcoin form on January 29, 2011 and this member "shadow of" is cut off had quoted it. And it mentions what appears to be a URL for Silk Road.

MR. TURNER: All right. I think if you scroll down AL little bit more you can see the full name, "Shadow of Harbinger"?

A. Yes, that is the--

MR. TURNER: Can you scroll back up. All right. So first all there's in this part of the post right here? Put the name there.

(Pause)

Q. Just to be clear, the person who posted this overall post or the user is what?

A. Shadow Harbinger.

Q. The post includes a post from Altoid?

A. Correct.

Q. And what does that mean, a quote from another user like that?

A. Well, when you first on post on the bitcoin forum another

person say if they're responding to something you specifically said they will often quote your statement in their response that people can follow along with the conversation.
Q. So this is a quote from a previous post that appeared on the forum?
A. Yes.
Q. And what was the time of that previous post on the forum?
A. January 29, 2011 at approximately 7:44.
Q. And the user who posted that post was named "Altoid"?
A. Correct.
Q. All right. And it says:

What an awesome thread. You guys have a ton of great ideas. Has anyone seen Silk Road yet? It's kind of like an anonymous Amazon.com. I don't think they have heroin on there but they are selling other stuff. They basically use bitcoin and TOR to broker anonymous transactions. It's at -- and then there's that long onion address. Those not familiar with TOR can go to SilkRoad420.wordpress.com for instructions on how to access the dot onion site.

Let me know what you guys think.

And then there's Shadow Harbinger's comments?
A. Yes.
Q. So here we go first bitcoin drug store response.

All right. So in the post Altoid mentions this SilkRoad420.wordpress.com site. Did that web page still exist

by the time you were doing your Google searches in June 2013?
A. No. It had been taken down.
Q. Were you able to obtain an archived version of the site?
A. Yes.
Q. Where did you get that from?
A. Archive.org.
Q. Could you take a look at what's been marked as 303 in your binder.
A. I have it.
Q. Do you recognize this document?
A. Yes.
Q. How do you recognize it?
A. That's a screen shot of the archive.org capture of the SilkRoad420.wordpress.com site.

MR. TURNER: The government offers 303 into evidence.

MR. DRATEL: No objection.

THE COURT: Received.

(Government's Exhibit 303 received in evidence)

MR. TURNER: Can you put it up on the screen.

(Pause)

MR. TURNER: Before you read it let me just read in a stipulation, your Honor.

It is hereby stipulated and agreed by and between the United States of America by Preet Bharara, United States Attorney for the Southern District of New York, Serrin Turner

and Timothy C. Howard, Assistant United States Attorneys, of counsel, and Ross Ulbricht, by and through his counsel Joshua Dratel, Esquire, Government's Exhibit 303 is a screen shot of an archived web page that was once success at http://SilkRoad420.wordpress.com.

Government Exhibit 303 fairly and accurately depicts the contents of the http://SilkRoad420.wordpress.com web page as it appeared on February 4, 2011 when the web page was archived on the website http:web?.

OK. So could we zoom into this part of the screen?

(Pause)

Q. So what did you find on SilkRoad420.wordpress.com?
A. It was a website that it gave you the instruction of how to access the Silk Road hidden site.
Q. And it says: This is not the Silk Road but you are close. Silk Road is a TOR hidden service that allows you to buy and sell anonymously online using bitcoins. To access the Silk Road site you must use a TOR enabled browser. If you use Firefox you can simply install the TOR button plug-in.

And then jumping to the next paragraph, the third paragraph. It says:

At Silk Road every precaution is made to ensure your anonymity and security while connecting to the site from making your transactions to receiving your items, current offerings include marijuana, shrooms and MDMA. You may also sell items

anonymously on Silk Road as an independent seller. So what are you waiting for. Install TOR and go to Silk Road now. Silk Road staff.

So after finding this web page did you do any further searches on Google?

A. I did.

Q. What did you search for next?

A. The SilkRoad420workpress.com.

Q. Could you look at Government Exhibit 304. And do you recognize that exhibit?

A. Yes.

Q. How do you recognize it?

A. It's a representation of the Google search that I performed.

MR. TURNER: Your Honor, the government offers Exhibit 304 into evidence.

MR. DRATEL: No objection.

THE COURT: Received.

(Government's Exhibit 304 received in evidence)

Q. So when you searched for SilkRoad420wordpress.com what new thing did you find?

A. I found that there was another posting.

Q. And where was this posting that you found?

A. It was at shroomery.org.

Q. What was the date of posting?

A. January 27, 2011.
Q. The one we looked at from Altoid@bitcointalktor when was that?
A. Two days later January 29, 2011.
Q. Could you take a look at Government Exhibit 305.
A. I have it.
Q. Do you recognize this exhibit?
A. Yes.
Q. How do you recognize this?
A. This is a screen shot I took during my investigation of the shroomery.org website.
MR. TURNER: The government offers 305 into evidence.
MR. DRATEL: No objection.
THE COURT: Received.
(Government's Exhibit 305 received in evidence)
MR. TURNER: Could you zoom in here.
(Pause)
Q. OK. So what was the shroomery website?
A. It's also a discussion forum for a discussion of illegal mushrooms.
Q. And what did you find? What post did you find when you clicked on the Google link that you found as a result of your search?
A. I found this posting from Altoid and it also directed the reader to the Word Press site.

Q. All right. And the user who posted it is reflected to the left?
A. Yes.
Q. And when it says registered 1/27/11 what does that reflect?
A. That reelects when the user registered the account on shroomery.org.
Q. The Altoid user?
A. Yes.
Q. When was this message posted?
A. That same day.
Q. It also directed you to go to SilkRoad420.wordpress.com?
A. Yes, it did.
Q. So after finding these two posts about the Silk Road by the user Altoid what did you do to try to find out who the person was behind the Altoid user name?
A. Well, I wanted to see all the posts that those users made on the relevant discussion forum.
Q. And so what did you do to look into that?
A. Well, the user -- you could click on the user and see posts for that specific user.
Q. Did you do that at shroomery.org?
A. Yes.
Q. Did you find any more posts?
A. No.
Q. What about bitcointalk.org?

A. There were other numerous posts.
Q. Could you take at look at Government Exhibit 306.
A. I have it.
Q. Do you recognize this exhibit?
A. Yes.
Q. And how do you recognize it?
A. It's a screen shot I took during my investigation of the post of Altoid on the bitcoin forum.
MR. TURNER: The government offers 306 into evidence.
MR. DRATEL: No objection.
THE COURT: Received.
(Government's Exhibit 306 received in evidence)
MR. TURNER: Top left.
(Pause)
Q. OK. So this page is all the posts of Altoid that you were able to pull up on bitcointalk.org?
A. Yes.
MR. TURNER: Exit out.
(Pause)
Q. Did you find the Altoid post on bitcointalk.org that you looked at earlier, the one that is quoted?
A. No, I did not.
Q. Can a bitcointalk user delete a post of theirs if they want, do you know?
A. Yes,they can.

Q. Can the site itself choose to delete a post --
MR. DRATEL: Objection.
THE COURT: Sustained.
Q. Have you visited bitcointalk forum?
A. Yes I have.
Q. Have you seen any rules of the site, any moderator actions on the site?
A. Yes.
Q. And from that review of the site do you know whether moderators on the site can delete content on the site?
MR. DRATEL: Objection.
THE COURT: Rephrase it.
Q. Sure. From familiarizing yourself with the site, the rules of the site, do you know whether moderators on the forum can delete forum posts if they think inappropriate?
MR. DRATEL: Objection.
THE COURT: I will allow it. It's not a perfectly formed question but it's fine. You may answer it.
A. Yes, they can delete and a user can delete.
Q. Do you know if the user post is deleted can any quotes from those users posts still show up in other user messages?
MR. DRATEL: Objection.
THE COURT: Sustained. You need to build --
MR. TURNER: I was asking if he knows, your Honor.
Q. Have you yourself tested the features of bitcointalk.org

forum?
A. I have.
Q. Have you tried -- can you explain from that testing that you've done of the site, do you know that if a user's post is deleted can a quote of that post still show up on the site?
A. Yes, I can. I went to the site and I tested it. I went to the site and registered an account and I put a test post up. Subsequent to that post I then quoted that same post so I can see that it quoted my original post. I then went and deleted the original post and see if the second post remained, which it did. So I know that if someone can't post on a site someone can delete it. But if one quotes a post it'll remain on the discussion forum.
Q. What were you able to find in the posts of Altoid that you were able to pull up on the bitcoin.org forum?
A. I found a post and I found the user had left an e-mail address.
MR. TURNER: Can you zoom-in on the full post here.
(Pause)
Q. Is this a post you are referring to?
A. Yes, sir.
Q. And what's the date of the post?
A. October 11, 2011.
Q. And it's titled bitcoin project development IT pro needed for venture back bitcoin start-up?

A. Yes.
Q. Hello. Sorry if there is another thread for this kind of post but I couldn't find one. I am looking for the best and brightest IT pro in the bitcoin community to be the lead developer in a venture backed bitcoin start-up company. The ideal candidate would have at least several years of web application development experience having built applications from the ground up. A solid understanding of OOP and software architecture is a must. Experience start-up environment is a plus or just being super hardworking, self-motivating and creative.
Compensation can be in the form of equity or a salary or somewhere in between.
If interested, please, send your answer to the following questions to RossUlbricht@G mail.com.
What are your qualifications for this position?
What interests you about bitcoin?
From there we can talk about things like compensation and references and I can answer your questions as well. Thanks for in advance to any interested parties. If anyone knows another good place to recruit, I am all ears.
So at some point in the investigation did you obtain a search warrant on the Ross Ulbricht@Gmail.com e-mail account?
A. I did.
Q. And when did you obtain that search warrant?

A. Approximately, October 78, 2013.
Q. So this was after the defendant's arrest in this case?
A. Approximately, a week after.
Q. And how does that work? When you obtain a search warrant on an e-mail account how do you get records?
A. Well, in this case you get a search warrant to swear out in front of a judge. Once it's sworn out then Google usually requires --
MR. DRATEL: Objection, your Honor.
THE COURT: I'll allow it. You may continue.
A. Google allows you to scan it and then send via e-mail a search warrant to them and then they produce the records and they usually produce the records in the form of a thumb drive.
Q. Objection. So did you get the records from Google?
A. Yes.
Q. When, approximately, did you get the records?
A. I will have to refresh my memory. It wasn't too long after.
MR. TURNER: I have a stipulation. Let's now read the stipulation, your Honor, if I may.
THE COURT: All right. Ladies and gentlemen, you recall from an earlier stipulation, not the one earlier today but last week or perhaps even at the end of the first week, that stipulations are agreements between the parties as to certain facts and you can take those facts as established.

You may proceed.

MR. TURNER: It is hereby stipulated and agreed by and between the United States of America, by Preet Bharara, United States Attorney for the Southern District of New York, Serrin Turner and Timothy Howard Assistant United States Attorneys, of counsel, and Ross Ulbricht by and through his counsel, Joshua Dratel, Government Exhibits 307, 308-A, 308-B, 309, 311, 312, 312-C, 314, 315-A, 315-B, 316, 317, 320, 321, 322, 324, 325, 329, 330, 1000, 1001, 1002, 1003, 1004, 1006, 1007, 1008 are true an accurate copies of e-mails contained in e-mail account RossUlbricht@Gmail.com as of December 3, 2013.

All of the e-mail were maintained on computer servers controlled by Google Inc. and were produced to Internal Revenue Service Special Agent Gary Alford pursuant to a court order served on Google on or about October 22, 2013.

Government Exhibit 1000, 1001, 1002, 1003, 1004, 1006, 1007 and 1008 and particular are logs on the record chats conducted through Google Talk, an online chat service operated by Google Inc. Google also provided the option to conduct chats off the record, OTR, which are not stored at Google Chat Talk either parties communicating through the chat.

I'll read the remainder later.

OK. So you didn't receive these records until after the defendant was arrested; is that right?

A. Correct.

Q. First of all, in reviewing the contents of this RossUlbricht@Gmail.com account did you find any evidence that the user of the account was Ross Ulbricht, the defendant in this case?
A. Yes.
Q. And what kind of evidence did you find along those lines?
A. I found communication to and from the defendant. I found pictures representing the defendant. I found e-mails regarding financial accounts of the defendant.

THE COURT: Mr. Turner, did you mean to offer the documents that you'd read, the exhibit numbers of.

MR. TURNER: I can just do it now or when I go through them.

THE COURT: All right. So long as you haven't forgotten if that was your intent. You can do it whenever.

MR. TURNER: The stipulation is Government Exhibit 803.

Q. Take a look at Government Exhibit 307.
A. Got it.
Q. Do you recognize that document?
A. Yes.
Q. This is one of the e-mails you found in the account?
A. It is.
Q. What is it of?
A. It's a e-mail that, from the defendant to an individual

named Crystal with an attachment and it states: I cut hair today. What do you think?

MR. TURNER: The government offers 307 into evidence.

MR. DRATEL: No objection.

THE COURT: Received.

(Government's Exhibit 307 received in evidence)

MR. TURNER: Zoom in quickly.

Q. So the bottom of the message is: I cut my hair today. What do you think? Which is an attachment to the e-mail?

A. Yes.

Q. Page two, the attachment?

A. Yes.

Q. You find our other e-mails, photos of the defendant like this in the account?

A. Yes.

Q. So going back to the posts from Altoid. Did you find any e-mail messages in the defendant's e-mail account that were addressed to Altoid?

A. Yes.

Q. Take a look at Government Exhibit 306-A -- excuse me -- 308-A.

(Pause)

A. I have it.

Q. What is this document?

A. It's an e-mail from shroomery.org website to Altoid with

the address RossUlbricht@Gmail.com.

MR. TURNER: Government Exhibit 308-A into evidence.

MR. DRATEL: Previous objection, your Honor.

THE COURT: All right. Those objections are overruled 308 A is received.

Q. So this message is from the shroomery. Do not reply at shroomery.org?

A. Yes.

Q. To Altoid. And then the user's e-mail address is indicated as RossUlbricht@Gmail.com?

A. Yes.

Q. Subject is shroomery message board account has been created. Date is 1/27/2011, 6:22 p.m. When we look back at shroomery post of Altoid, when did that indicate the account had been registered?

A. January 27, 2011, same date.

Q. It says: Dear Altoid, you have successfully created an account on the shroomery message board. Thanks for signing up. Before you can use your account it must be activated. To complete the process, please, click on the following link or paste it into your browser.

Did you find any other e-mails in defendant's e-mail account addressed to Altoid?

A. Yes.

Q. Could you take a look at Government Exhibit 308-B?

A. I have it.
Q. Do you recognize this document?
A. Yes.
Q. What is it?
A. It is answer e-mail I found in the Defendant's G mail account.
Q. And what is it about?
A. It is an e-mail from Drugs Forum to the defendant addressed to Altoid.

MR. TURNER: Government offers 308-B into evidence.

MR. DRATEL: Same.

THE COURT: Those objections are overruled. 308 B is received.

(Government's Exhibit 308-B received in evidence)

Q. OK. This is from February 9, 2011?
A. Correct.
Q. About two weeks later, the e-mail we just looked at?
A. Yes.
Q. It said private message, the Drugs Forum, have you been to Drugs Forum, by the way?
A. I have.
Q. What kind of website is it?
A. Also a discussion forum about illegal substances.
Q. It's from Drugs Forum, date February 9, 2011 to RossUlbricht@Gmail.com.

(Pause)

Q. It says do not reply to this e-mail.

Dear Altoid, have you received a new private message at Drugs Forum from Fungus Head entitled "you have received an infraction at Drugs Forum". To read the original version, respond to or delete this message you must log-in here. This is the message that was sent.

Dear Altoid, you've received an infraction at Drugs Forum. Reason: Spamming. This infraction is worth 100 points and may result in restricted access until it expires.

Zoom out.

(Pause)

Q. Original post. URL attach user received. No action required.

Has anyone heard of Silk Road? They claim to be an anonymous market place that uses TOR and bitcoin to broker anonymous transactions. They seem legit but wanted to see if anyone here has any experience on the site. The hidden URL is -- and then there's a link -- or you can go through http://SilkRoad420.wordpress.com. Would be interested to hear any feedback. All the best, Drugs Forum.

So you say you have been to Drugs Forum?

A. Yes.

Q. And you've been to a number of other discussion forums as well as part of your research?

A. Yes.
Q. Based on that experience can you explain what an infraction is on that discussion forum?
MR. DRATEL: Objection.
THE COURT: Why don't you do a little bit more in terms of building a foundation.
Q. Do you know what an infraction is on a discussion forum?
A. Yes.
Q. How do you know?
A. It's usually a violation.
MR. DRATEL: Objection.
Q. How do you know?
THE COURT: I'll allow it.
A. When you go to discussion forum there's a term of service. An infraction is when you violate the terms of service on that discussion forum.
Q. What was the reason according to this e-mail that Altoid was being notified that he gotten an infraction?
MR. DRATEL: Objection.
THE COURT: Overruled.
A. Spamming.
Q. Where is the spam located?
A. In that box where the message was sent.
MR. TURNER: OK. Could you put up Government Exhibit 240-A which has already been admitted into evidence. This is

journal file labeled 2010. The jury's already heard. Could you put it in top panel.

MR. DRATEL: I am going to object, your Honor.

THE COURT: Overruled.

MR. TURNER: Could you go to page two.

(Pause)

MR. TURNER: Could you pull it up so we can get part of the top panel.

(Pause)

BY MR. TURNER:

Q. It says: While all of this was happening I began working on a project that had been in my mind for over a year. I was calling it Underground brokers but eventually settled on Silk Road. The idea was to create a website where people could buy anything anonymously with no trail whatsoever that could lead back to them. I had been studying the technology for a while but needed a business model and strategy. I finally decided that I would produce mushrooms and I could list them on the site for cheap. I worked my ass off setting up a lab in a cabin out near Bastrop off the grid.

Did you find the e-mail notice Defendant's E mail account about renting a place in Bastrop Texas?

A. Yes, I did.

MR. DRATEL: I am objecting to the reading before with no question.

THE COURT: Overruled. You may proceed.
Q. I should just make clear, have you reviewed the contents of the defendant's laptop as part of your investigation?
A. Yes.
Q. That evidence was given to you by the FBI?
A. Yes.
Q. All right. So could I take a look at Government's Exhibit 314, please. Do you recognize this document?
A. Yes.
Q. How do you recognize it?
A. It's an e-mail in the Defendant's G Mail account.
Q. What's it about?
A. It's a e-mail regarding Craig's List about renting a country home in Bastrop.
MR. TURNER: The government offers 314 into evidence.
MR. DRATEL: Previous objection, your Honor.
THE COURT: All right. Those objections are overruled.
GX314 is received.
(Government's Exhibit 314 received in evidence)
MR. TURNER: Put that in the bottom panel, please.
(Pause)
Q. Subject $825/two bedroom country home (Bastrop) from Ross Ulbricht date July 6, 2010, 6:37 p.m. Is your house still available, Ross? And then there's a Craig's List listing.

Jump down to page two.

(Pause)

Yes, it is. Give me a number to call you back.

Reply?

A. Yes.

Q. Did you also review something on the defendant's commuter labeled SR accounting?

A. Yes, I did.

Q. What was the nature of that document?

A. That was a spreadsheet of expenses.

MR. TURNER: Could you publish Government Exhibit 250?

(Pause)

Q. The dates of these entries are all from July 2010. The first one is "start", then it's "lab clothes", "carryover from fall 2009", "petri dishes", "Hepa filter", carryover from fall 2009. Did you find anything in the government's -- excuse me -- in the defendant's e-mail account about any items like this?

A. Yes, I did.

Q. What sort of things did you find?

A. I found e-mails related to the purchase of the Hepa filter.

Q. Can you take a look at Government Exhibit 315-A, please.

(Pause)

A. Got it.

Q. And what is this document?

A. It is an e-mail from Sac sells or Sac distributors to the defendant regarding the purchase of a pure clean room Hepa filter.

MR. TURNER: The government offers Exhibit 315-A into evidence.

MR. DRATEL: Same objections.

THE COURT: Those objections are overruled. Government Exhibit 315-A is received.

(Government's Exhibit 315-A received in evidence)

Q. Subject orders shipped from SAC sales, date October 1, 2009 to RossUlbricht@Gmail.com. Then it says: Thank you for your purchase to SAC sales. Your order has been shipped. The description a precision air pure flow clean room Hepa filter and the total cost is $88.94. What was the cost of the expense reflected in the spreadsheet?

A. $89.

MR. TURNER: Could you put go back to the top panel and scroll down some.

THE COURT: Mr. Turner, we are going to take a short one break before we end, so you don't have to do it right now but at some point when you reach a logical breaking point.

MR. TURNER: Sure.

Q. OK. There's some more entries here. Now we're in August of 2010. We have containers, jars, hose, glue guns, plastic sheet, one for gas, one for humidifier. Again, did you find

any e-mail receipts in the Defendant's e-mail account reflecting any of these items?
A. Yes, I did.
Q. Take a look at Government Exhibit 315-B.
A. I have it.
Q. What is this document?
A. It's an e-mail from Amazon.com to the defendant regarding a purchase he made.
MR. TURNER: The government afters 315-B into evidence.
MR. DRATEL: Same objection.
THE COURT: All right. Those objections are overruled. Government Exhibit 315-B is received.
(Government's Exhibit 315-B received in evidence)
Q. Header information, subject, your order with Amazon.com. The date 8/16-201, Ross Ulbricht. Thank you for your order, Ross Ulbricht.
Scroll down, please.
(Pause)
Q. OK. So the delivery estimate is given for a cool mist humidifier, $33.42?
A. Yes.
Q. How does that compare to the spreadsheet entry that you saw?
A. It's within 42 cents of the 33 dollar entry.

Q. So were these the only items you found like this that matched -- excuse me. Were these the only e-mails you found on the defendant's e-mail account that matched items on the spreadsheet or were there others?

A. There were numerous others.

MR. TURNER: Government Exhibit -- actually I'll stop there, your Honor.

THE COURT: All right. So ladies and gentlemen, let just take a short break and then we'll come back and we'll sit until noon. I want to remind you not to talk to each other or anybody else about this case. Thanks.

(Jury not present)

THE COURT: All right.

(Continued on next page)

(In open court; jury not present)

(Witness temporarily excused)

THE COURT: All right. Let's all be seated. It's just going to be a short break. I just wanted to make sure that the jury had some break this morning.

I think in terms of the objections, the documentary objections are in the nature of *Vayner* and hearsay. And the *Vayner* objections we have gone over before for this particular witness, the documents that he is getting in to, which there's been an objection on *Vayner* grounds, have been appropriately authenticated. In terms of hearsay, they are not for the truth.

But I do want, Mr. Dratel, to give you an opportunity to make the objection relating to the reading of the document because that's one that we haven't yet encountered.

MR. DRATEL: Right.

THE COURT: You and I are familiar with another trial with a similar objection, but I wanted you to make your record and have the government respond.

MR. DRATEL: Thank you, your Honor. First on the issue of initial exhibits, I didn't object because they were authenticated. He was just saying what he did on the Internet, but they shouldn't come in for the truth either because it's really just about his process, so therefore they were -- in other words, he said I took the screenshot, so it was the

screenshot, but, in fact, it shouldn't come in for the truth either.

But with respect to the reading, the government shouldn't get a chance to sum up periodically throughout the case. There wasn't a question or an answer. I understand the linkage between one exhibit and another exhibit if a question is posed to the witness to do it, but not with the wholesale reading of a post that has already been read in at the time that it was put in evidence. I think through Mr. Kiernan, that Mr. Howard read the same part. So, in that context, it's got to be narrow in the sense of not exploiting the fact that it's in evidence for the government to just simply reiterate its evidence and get a midterm summation.

THE COURT: Mr. Howard.

MR. TURNER: This is evidence already admitted into evidence. This is evidence that this agent reviewed and it's important to give context -- it is part of the question. The question is you reviewed this, did you find any evidence that links to it in some way in the defendant's email account. Without that context, the question doesn't make much sense and there's no reason why the jury needs to be confused as to the relevance of the questioning going on.

THE COURT: I allowed the question. And so long as it's tied in a manner that you've suggested or otherwise not cumulative, in other words, the government is not just slapping

up a document time after time without needing it for purposes of context, I will continue to allow it but will be mindful of if there's a point when it becomes cumulative.

MR. TURNER: I note a couple of things. First of all, most of the exhibits that we're going to be fronting in this manner the jury has either not seen before or have not seen the portions from which I'll be reading.

But can I make a record on the hearsay point?

THE COURT: Yes.

MR. TURNER: These statements are not human statements and the law is very clear under the federal rules that the hearsay rules only apply to human statements. We have some automatically-generated statement by Amazon or by a forum, a discussion forum software, those are machine statements. I can give your Honor law from several circuits.

THE COURT: How are you going to get in that it was done by a machine as opposed to a human being sitting there cutting and pasting his rules and slapping it onto an infraction?

MR. TURNER: That's a different matter. I'm talking about, for example, just the fact of the post, I think the fact that the Altoid post shows up there and we can have the agent testify that he tested out the discussion forum software, and the post automatically flashes up on the screen, you don't need a human being to type it up there.

THE COURT: I thought you were referring to the infraction language from drug forum.

MR. TURNER: No. I'm just speaking generally when we are talking about these computer-generated the statements.

THE COURT: Let me be clear: Your point is that the word Altoid as a username when it is appearing on a forum post is, according to the testimony, automatically generated?

MR. TURNER: Right.

THE COURT: Therefore, because it's automatically generated, it's not a, quote, statement or a declarative statement for hearsay purposes and, therefore, the hearsay rules don't apply?

MR. TURNER: Right. The hearsay rules exist to protect against problems of witness credibility, witness memory, out-of-court declarant's memory, perception. Those sort of issues, those sort of concerns do not apply to statements automatically generated by computer. All I'm saying is I'm not focusing on one exhibit we talked about in particular, but when we're looking at these emails things like Amazon receipts, etc., those are documents that are automatically generated by computer.

THE COURT: How do we know that?

MR. TURNER: We can have the agent testify that he shopped at Amazon before and it automatically pops up. We can have a custodian from Amazon actually testify to that, but I

think it's common knowledge.

THE COURT: We'll see whether it's contested, but I just want to note that if you're going to assert that something falls within an exception or there's not even the need to go to that exception, that it falls outside of a rule, while I might intuitively think it or somebody else might intuitively think it, I want to make sure that we either have a legal or evidentiary basis.

If it's been established in prior cases that such kinds of messages are automatically generated, then so be it. It would strike me as the kind of thing where potentially it could become a question of fact. So I just want to make sure that you understand that I hear your legal proposition; whether you've got a sufficient factual basis for that proposition I think is a second question.

MR. TURNER: Okay. Just to be clear, we do fully agree with your Honor that these things are not coming in for the truth in any event, but we just wanted to note that even if it were, these are not human statements. And if we need to make more of a record on that, we can. But these are the sorts of things that are generated when you do things on the computer automatically by the system of the company you're using.

THE COURT: Mr. Dratel, first, and then I'll let you say whatever you would like, but I want to make sure that I understand your position on whether there's a factual dispute

as to whether certain of the Amazon messages, for instance, are made by a machine or made by a human, similarly with respect to Altoid.

MR. DRATEL: Right. There's no evidence that they're computer-generated. I don't even know what that means in this context; that unless we are in a world of artificial intelligence that I don't believe we have reached yet, there are no spontaneous computer-generated pieces of information. They're all programmed by human beings. If I cut and paste something and then hit a keystroke, is that automated?

THE COURT: I think that's a legal question.

MR. DRATEL: Yes, but even as a factual question, it's not in evidence, so it's not established, so I'm not conceding anything on that point.

THE COURT: Here's what I think the government should do for this point just so we're clear -- there's plenty of time for the government to do if it chooses to, it's up to you folks -- one, I'd like to see some of the cases. I don't doubt that if you say they exist, there are cases. I don't know whether there are cases on both sides. I have not investigated this issue, so I would appreciate whatever cases there are, that you folks would like to make me aware of on either side of this issue to understand the legal landscape; but, secondly, as a factual matter, I think that even if the legal landscape says automatic population of text on a page is not a declarative

statement for hearsay purposes, I think it must be, not having read these cases, that the analytical background to that is there's a certain amount of reliability in the coding of the statement into the program, and so that, therefore, you get the reliability of the declarative statement through the computer program. If that's the case, then you need to demonstrate factually that, in fact, you can rely upon that analytical framework. That's my guess. You guys will look at the cases and decide whether or not you're within striking distance of the parameters, but I would think that would be close to the analytical foundation.

Let's take a short break.

Mr. Dratel, was there anything else you wanted to say? We were only dealing with that one issue.

MR. DRATEL: I think that's it.

THE COURT: Thank you. Let's take a short break and come right back out.

(Recess)

(Continued on next page)

(In open court; jury present)

THE COURT: Will you all be seated, please.

Mr. Turner, you may proceed.

MR. TURNER: Thank you, your Honor.

BY MR. TURNER:

Q. Agent Alford, you testified that you reviewed the contents of the defendant's computer as part of your investigation?

A. Yes, I did.

Q. And you reviewed the contents of the defendant's email account?

A. Yes, I did.

Q. And did you do any comparison between the two?

A. Yes, I did.

Q. And what were you looking for?

A. I was looking for things that matched information on the defendant's computer versus information in the Google account or Facebook account.

Q. Okay. We'll get to Facebook in a minute.

Let's go to Government Exhibit 240B. This has already been admitted into evidence. This is another journal entry on the defendant's computer. This one is dated 2011. Can you zoom in on the first eight lines or so.

It says "Still working on good wagon books and Silk Road at the same time. Programming now. Patchwork php mysql.

Don't know how to host my own site. Didn't know how to run bitcoind. Got the basics of my site written. Launched it on freedomhosting."

Do you know what freedom-hosting is?

A. Yes.

Q. What is it?

A. It was a site where you can host websites.

Q. Websites where?

A. Usually on the dark web.

MR. DRATEL: Objection.

Q. You mean Tor?

A. Tor.

THE COURT: Sustained, but you can repeat that last Q and A so it's clear.

MR. TURNER: Sure.

Q. Just to be clear, where were websites on freedomhosting, where did they exist? On Tor or the ordinary Internet?

A. Tor.

Q. So can you see any reference in the defendant's email address, in the defendant's email account about freedomhosting?

A. Yes, I did.

Q. Can you take a look at Government Exhibit 309. Do you recognize this document?

A. Yes.

Q. What is it? What is it from?

A. It's an email from miller@roothosts to the defendant regarding freedomhosting.

MR. TURNER: Government offers Exhibit 309 into evidence, your Honor.

MR. DRATEL: Hearsay and *Vayner*, your Honor.

THE COURT: Those objections are overruled and Government Exhibit 309 is received.

(Government's Exhibit 309 received in evidence)

MR. TURNER: Can you zoom in at the top third there, please. That's good.

Q. So this is an email, the subject is "Re: Tor hidden service." And I think the chain actually starts down at the bottom, so if you can go down there.

On September 24, 2010 at 12:36 a.m. Ross Ulbricht wrote "Hi, is it possible to set up a tor hidden service on your servers?"

Go up. This person is writing back from someone at roothosts.com?

A. Yes.

Q. And the reply is "Hello Ross. No, sorry. I suggest you look at Freedom Hosting or KOGEOX," and several dot-onion addresses are provided below that.

As part of your review of the defendant's computer, did you also look at some of the Tor chat logs on the defendant's computer?

A. I did.
Q. Did those include Tor chats with the username h7?
A. Yes.
MR. TURNER: Could you please publish GX 224, which has already been admitted into evidence.
Okay. And could you go to the bottom of page two, please, and zoom in on that. This is page 17 of an 88-page chat log. The date is October 30, 2011.
H7 says "How was your week?
Myself: Not bad. I will be traveling soon, so I have much to do before I go and I didn't get as much done as I wanted, but this week I will focus on getting out of town.
H7: Okay."
Go down to the next page.
"h7: Is it just you over there?
Myself: I have people to take care of, but I'll be traveling alone. Is that what you mean?
H7: No, when you leave town will anyone be looking after the servers?
Myself: Oh, yes indeed.
H7: Because I see "The Silk Road Staff" written in messages but I don't know if it's just you or not.
Myself: It's basically just me, but more and more I am trying to spread the responsibility around. You are a big part of that."

Can you go back to page two again, please, the bottom.

MR. DRATEL: Objection, your Honor.

THE COURT: Overruled.

BY MR. TURNER:

Q. It says "myself: I will be traveling soon." And the date of that is October 30th, 2011.

A. Yes.

Q. In the defendant's email account, did you see any evidence of travel plans around this time?

A. Yes, I did.

Q. Can you take a look at Government Exhibit 329, please. Do you recognize this document when you get to it.

A. Yes.

Q. What is it?

A. It's an email from CheapAir to rossulbricht@gmail.com regarding airline tickets.

MR. TURNER: The government offers Government Exhibit 329 into evidence.

MR. DRATEL: Hearsay and *Vayner*, your Honor.

THE COURT: Those objections are overruled. GX 329 is received.

(Government's Exhibit 329 received in evidence)

MR. TURNER: Could you scroll down. Let's see. Let's do the header information first, please.

Q. This is dated October 18, 2011; is that right?

A. Yes.
Q. It says "Confirmation for Ross Ulbricht."
Could you scroll down, please. Can you zoom in on the flights. It's hard to read here but can you describe what flights were shown?
A. There's an itinerary. One leg is dated Tuesday November 15, '11, for Austin, Texas to Denver, Colorado; then there's a second leg from Denver, Colorado to Los Angeles, California; then there's a third leg from Los Angeles, California to Sidney, Australia.
Q. Does the itinerary include a return trip on the second page?
A. Yes, it does.
Q. And what is that return trip?
A. The first leg is Tuesday, April 3rd, 2012.
Q. About six months later?
A. Yes, sir. And it's departing from Sidney, Australia to San Francisco, California; and then the final leg is April 3rd, 2012, from San Francisco, California to Austin, Texas.
Q. Could we take a look -- could we go back to Government Exhibit 224, please, up at the top.
MR. DRATEL: Objection. This is the fourth time it's going to be read.
THE COURT: Overruled. Overruled.
MR. TURNER: It wasn't read before.

THE COURT: You can proceed.

MR. TURNER: Could you go to page four, please and zoom in to the conversation at the bottom. Can you actually bring it into the center panel. Pages 52 through 53 of the 88-page chat log. December 15, 2011 is the date of the chat starts.

"myself: By the way, I'm going to be unavailable from about 4 am UTC Friday to about the same time on Sunday, so I'll send you your pay tomorrow.

h7: k, you forgot me last week

h7: and can u send 100USD to Silk Road HR for this weeks bounties?

myself: you are right, so sorry about that. sending $3k now for last week and this week."

Q. So, did you find any emails in the defendant's Gmail account about any travel plans the weekend of December 15, 2011?

A. Yes, I did.

Q. And what did you find? Take a look at Government Exhibit 330.

A. I found an email from Cally Ulbricht to the defendant regarding a houseboating trip.

Q. Is that a Government Exhibit 330?

A. Yes, it is.

MR. TURNER: Government offers 330 into evidence, your

Honor.

MR. DRATEL: Objection, your Honor; hearsay and *Vayner*.

THE COURT: Overruled. Government Exhibit 330 is received.

(Government's Exhibit 330 received in evidence)

MR. TURNER: Could you zoom in on the message headers? That's good.

Subject: Houseboating final checklist from Cally Ulbricht date December 15, 2011 to Ross Ulbricht. "Seafarers, if you remember nothing else for our trip tonight remember these important points: We'll be setting off at 7:00 p.m." and it goes on to offer various instructions.

And actually, if you could go down, Mr. Evert, to page three. Listing for Boat 2 and person number ten is listed as Ross Ulbricht for both days?

A. That's correct.

Q. Take a look at Government Exhibit 226I, please. Zoom in. So who is this chat with?

A. VJ.

Q. And what's the date of the chat?

A. January 26, 2012.

Q. So this is page 383 to 384 of a 1,096-page chat log and it says:

"myself: also, there is no sr user called smedley, I

guess he hasn't make him yet

myself: pretty great. speaking of spliffs, they are abundant here, so I may just have to partake." Emoticon.

"vj: Ah, I'll send him a note about that - when he said he was on at both sites, I guess he meant the private forums and the SRForums

vj: Yeah, had zero sleep last night due to leg/muscle cramps, and there was in the mail today a 1oz. time of Tangerine pheno AOrange from ~s, that's taken about a month to wend it's way to me. Kismet, I say.

vj: 1oz. tin., oops.

vj: Are you managing to relax?

myself: yea, for sure. friendly folks everywhere. very relaxing environment.

vj: Sounds very Thai

myself: haha, I didn't expect you to start guessing

vj: Heh - was a comment, not a guess. I love thailand for the weather, the people, and the weed ain't bad either."

Can you pull back up. Can you go down to the bottom of this chat. This is from a few days later, February 1, 2012, is that right?

A. Yes.

Q. It starts out:

"myself: ok, yea I keep all of my income/expenses from the site on a spreadsheet

vj: how many concurrent users does the site have?

myself: I'm actually not sure

myself: I think I have 24 hrs, lemme see

vj: k

vj: <-- making a coffee, back in 3

myself: unique users logged in:

Day: 6073

Week: 17589

Month: 38021

Quarter: 72830

vj: interesting numbers - the big question is how many concurrent."

You can skip down to the next page, Mr. Evert. The chat ends -- I'll start here:

"vj: So yeah, that's my things for today then. Don't need coin from you for a while, and we'll let utah/smed interact a bit more before we make any decisions there. Anything on your mind today?

myself: took the day off. ran around beaches and jungles with some girls, very little on my mind." Emoticon.

"vj: girls and jungles, life dont' get any better for o'l Dread Pirate Roberts, eh.

vj: But we'll hear no more of your fancy agorist beaches and babes talk!"

Now, you mentioned earlier that you also looked at

Facebook records?
A. Yes, I did.
Q. Whose Facebook account did you review?
A. The defendant's.

MR. TURNER: Just a moment, your Honor. I'd like to read in another stipulation. This is stipulation 810. It's Government Exhibit 810.

It is hereby stipulated and agreed by and between the United States of America by Preet Bharara, United States Attorney for the Southern District of New York, Serrin Turner and Timothy Howard, Assistant United States Attorneys, Counsel, and Ross Ulbricht, by and through his counsel Joshua Dratel, Esquire, as follows:

One, Government Exhibits 318, 319 and 331 are true and accurate copies of records obtained in the Facebook account Ross Ulbricht registered to the name Ross Ulbricht and to the email accounts rossulbricht@gmail.com and rwu103ftsu.com. All of the records were maintained on computer servers controlled by Facebook, Inc. and they were produced through the Internal Revenue Service Special Agent Gary Alford pursuant to Court order served on the days of on or about October 22, 2013.

Government Exhibit 318 in particular is a status update that was posted by the user to the Facebook account to the user's Facebook wall. The Facebook user's wall is a space on the user's Facebook profile where the user can post

messages, attachments and links that are visible to anyone who can view the user's profile.

Government Exhibit 319 in particular is a photograph stored in the Facebook account and user-created album entitled "Thailand, February 2012" and uploaded by the user to the account on or about March 29, 2012.

Q. So, can you take a look at Government Exhibit 319, please, actually, 318.

A. I have it.

Q. And what is this that you're looking at?

A. It's a Facebook post.

Q. Is this from the Facebook records you received for the defendant's Facebook account?

A. It is.

MR. TURNER: The government offers Exhibit 318 into evidence, your Honor.

MR. DRATEL: The same objection.

THE COURT: The objection is overruled. GX 318 is received.

(Government's Exhibit 318 received in evidence)

Q. So we saw the January 26 chat earlier. This is dated what?

A. January 27, 2012.

Q. It says "Surprise, I'm in Thailand now. Hanoi was way too cold and allure of a warm beach was too much."

Can you take a look at Government Exhibit 319.

A. I have it.

MR. TURNER: Mr. Evert, can you put the last page of the chat back up on the top panel.

Q. So we saw the reference before to beaches and jungles. What does Exhibit 319 reflect?

A. It's a picture of the defendant in front of what appears to be jungles and beaches.

Q. And is this from the Facebook account again?

A. Yes.

MR. TURNER: The government offers Exhibit 319 into evidence.

MR. DRATEL: Same objection.

THE COURT: The objection is overruled. GX 319 is received.

(Government's Exhibit 319 received in evidence)

MR. TURNER: There's the picture and down below, could you zoom in, Mr. Evert, here.

Q. What was the name of the album that was found in?

A. "Thailand, February 2012."

Q. Look at 226H. These have already been admitted into evidence.

MR. TURNER: Can you pull it up, Mr. Evert.

Q. This is another chat with VJ that you reviewed?

A. Yes.

Q. And the date of the chat is what?

A. February 7, 2012.
Q. It starts out "vj: tumbling is the key, and we need to set up a frickin' HUGE series of small servers running transactions all over the fucking place to the point that regression analysis is impossilbe because the error level progresively compounds until it could branch anywhere, and everywhere, at once. Think millions of transactions per portion of coin rec'd. We need a statistician, as I've said before, keep on the lookout for one.
myself: I know a good statistician
vj: World class?
vj: know - or know of?
myself: I'll check up on her latest publications
myself: I know her and her husband well
vj: dude, no
vj: but you can ask her who are the top 5 folks in the world in her field
myself: ok."
Q. Go to the next part of the chart. This is February 13.
A. Yes.
Q. It starts off: "myself: here is my convo with my stats friend:
Myself: who are the top 5 statisticians in the world?
Myself: Wow, good question.
In terms of lifetime achievement or current "hotness"?

myself: Someone you could take a life or death stats problem to and be confident in their answer.

myself: So this is a request for consultation, not an evaluation of the field?

For business I take it," and it continues on.

Q. Did you find anything in the Defendant's Gmail account about statisticians like this?

A. Yes, I did.

Q. Would you take a look at 322, please. What did you find?

A. I found an email from Ross Ulbricht; and in the email, the same language that is in the Tor chat is contained within the email.

MR. TURNER: The government offers Exhibit 322 into evidence.

Q. That's what you were looking at when you just described that email --

A. Yes, sir.

Q. -- just for the record?

MR. DRATEL: Objection; hearsay and *Vayner*.

THE COURT: All right. Those objections are overruled. GX 322 is received.

(Government's Exhibit 322 received in evidence)

MR. TURNER: So can you zoom into the header information, please. That's fine. You can start at the bottom. From Ross Ulbricht to someone named Joseph: "Subject,

statistician: Who are the top five statisticians in the world besides Heather?"

Can you scroll up.

Next chain, "Wow, good question. In terms of lifetime achievement or current "hotness"?"

Reply: "Someone you could take a life or death stats problem to and be confident in their answer."

Can we take a look at Government Exhibit 232C. It's another Tor chat.

A. Yes.

Q. And who are the -- who is the other person on the Tor chat this time?

A. DA.

Q. Could you zoom into the top half. The date of this chat is what?

A. March 3, 2012.

Q. It starts out "da: Hey I'm curious about something

myself: what's up man

da: When you first started SR it must have been hard to get the words aorund, it being a .onion

There was a mod KindBud who was part of GreenCo, who was here from week one. Which means they most liekly heard it form the place you first advertised. But then they dissapeared, and ever since I have wondered what happened (we were in the middle of a conversation and had been doing allot of

buissness).

myself: Ya know I almost forgot about KindBud and GreenCo. I honestly don't know what happened to them.

da: How did you get the word out there? It would almost seem you owuld have had to all ready know email vendors, etc. Or else you advertised at other forums, which means I might be able to find them else where.

myself: It's gotten back to me on more than one occasion that a vendor has been busted, but whenever I ask further, it's always from deals irl gone bad

da: (If you can;t tell that's cool)

myself: you know what I did

myself: I made one thread on the forums at bitcointalk.org

myself: and made a blog at wordpress.com with instructions

myself: both go taken down pretty quickly

myself: the rest was word of mouth

myself: and pr"

So, where did we see the first quote we looked at from Altoid?

A. It was from the bitcointalk forum.

Q. Let's go back to the SR account and spreadsheet please, Government Exhibit 250, page five. And zoom in a few lines down here. Scroll up, please. That's fine. Okay.

Q. So, we're looking at late April 2012 in the spreadsheet and there's an entry here for a laptop.
A. Yes.
Q. And what was the purchase price indicated on the spreadsheet for it?
A. $1,150.
Q. And did you see in the defendant's email account any record of a laptop purchased around this time?
A. Yes, I did.
Q. Can you take a look at Government Exhibit 312, please.
A. I have it.
Q. And what are you looking at?
A. I'm look at an email from Amazon.com to the defendant's Gmail account regarding a purchase of a Samsung series laptop.
MR. TURNER: The government offers Exhibit 312 into evidence.
MR. DRATEL: Same objection, your Honor, hearsay and *Vayner*.
THE COURT: The objections are overruled. Government Exhibit 312 is received.
(Government's Exhibit 312 received in evidence)
MR. TURNER: Can you scroll in ton header information and zoom in on the header information first.
Q. The date of this email is April 26, 2012?
A. Yes, it is.

Q. From Amazon.com to rossulbricht@gmail.com?
A. Yes, it is.
Q. And the subject is "Your order with Amazon.com"?
A. Correct.
MR. TURNER: And zoom out, and could you zoom into this area.
Q. The item at the bottom is Samsung series 7NP700Z5A, silver 15.6-inch laptop, and what's the price indicated for the item?
A. $1,153.98.
Q. How does that compare to the spreadsheet?
A. It's only within $4 of the amount listed on the spreadsheet.
Q. Could you tell from the defendant's email address how this laptop purchase was paid for?
A. Yes.
Q. How could you tell?
A. I saw purchases of Amazon gift cards through the use of bitcoins.
Q. Would you take a look at Government Exhibit 312C, please.
A. I have it.
Q. Are these the emails you were just referring to?
A. Yes, it is.
MR. TURNER: The government offers 312C into evidence.
MR. DRATEL: Same objection.
THE COURT: GX 312C is received. The objection is

overruled.

(Government's Exhibit 312C received in evidence)

Q. What do these documents reflect?

A. It reflects that they received payment of a certain amount of bitcoins for a $500 Amazon gift card.

Q. When you say "they," who are you referring to?

A. BTC Buy.

Q. You've been to that website?

A. That specific website? No, I have not.

Q. Have you been to other websites that offer gift cards for bitcoins?

A. Me personally? No, I have not.

Q. Withdrawn.

How many emails like this did you see in the account here?

A. From BTC Buy?

Q. Yes.

A. Approximately four.

Q. How many are reflected in 312C?

A. Three.

Q. How much are they each for?

A. They are for each $500.

Q. And what are the dates of those purchases?

A. They are all April 25, 2012.

Q. And how does that compare to the purchase of the laptop?

A. It's approximately for the same amount as the purchase price of the laptop.
Q. And the date? How does the date of those gift card purchases compare to the purchase of the laptop?
A. I believe it's the day before.
Q. Did you find any emails in the defendant's email account referencing the name Frosty?
A. Yes, I did.
Q. Would you take a look at Government Exhibit 311.
A. I have it.
Q. And what does it reflect?
A. It's an email from Peter to Ross Ulbricht where he addresses the defendant as Rossty Frosty.
MR. TURNER: If government offers Exhibit 311 into evidence.
MR. DRATEL: Same objections, hearsay and *Vayner*.
THE COURT: GX 311 is received. The objections are overruled.
(Government's Exhibit 311 received in evidence)
Q. This is from someone named Peter to Ross Ulbricht who referred to him as Rossty Frosty?
A. Yes.
Q. Is that the only email you found like that in the defendant's email account or were there others?
A. There were others.

MR. TURNER: I'm at a natural stopping point.

THE COURT: Thank you.

Ladies and gentlemen, we're now going to break until what I hope is Wednesday morning at 10:00. Make sure that you follow Joe's instructions in terms of getting the court auto line to call into to see whether the court is open, and then Joe will otherwise communicate with you. And I'm hoping that we all plan on being here ready to go Wednesday at 10:00.

I want to remind you not to talk to each other or anybody else about this case and, again, to stay away from any media reports about the case. And if you run across any articles of any kind, whether on the Internet or in hard copy or on the television, do make sure that you turn away from them and that you do not read them or listen to them at all, all right?

Thanks very much. Get home safe.

Mr. Alford, you may step down, as well. We'll resume Wednesday at 10 a.m. we hope.

(Jury excused)

(Witness temporarily excused)

(Continued on next page)

(In open court; jury not present)

THE COURT: Ladies and gentlemen, let's be seated and see if there is anything that we need to go over.

One thing that I wanted to note is that we had had a discussion about whether or not the hard drive had been properly authenticated in advance of Mr. Beeson's testimony and the Court's ruling at that time, and I made myself a note to this effect, was that it was received subject to further -- any further authentication. And the Court believes that there is now fully a sufficient foundation for the receipt of the hard drive, so that connection has been made.

Are there things which you folks would like to raise in advance of our break until Wednesday morning?

MR. TURNER: No, your Honor. Thank you.

MR. DRATEL: Nothing, your Honor. Thank you.

THE COURT: I look forward to receiving the jury instruction materials from you folks with track changes in Word tomorrow, late afternoon, if you can you can email it to my chambers email box. Thank you.

(Adjourned to January 28, 2015 at 10:00 a.m.)

INDEX OF EXAMINATION

Examination of: Page
Cross By Mr. Dratel . . . . . . . . . . . . . .1242
Redirect By Mr. Turner . . . . . . . . . . . .1250
Recross By Mr. Dratel . . . . . . . . . . . . .1252
Redirect By Mr. Turner . . . . . . . . . . . .1252
Recross By Mr. Dratel . . . . . . . . . . . . .1253
GARY LUIS ALFORD
Direct By Mr. Turner . . . . . . . . . . . . .1253

GOVERNMENT EXHIBITS

Exhibit No. Received
301 . . . . . . . . . . . . . . . . . . . .1256
302 . . . . . . . . . . . . . . . . . . . .1258
303 . . . . . . . . . . . . . . . . . . . .1261
304 . . . . . . . . . . . . . . . . . . . .1263
305 . . . . . . . . . . . . . . . . . . . .1264
306 . . . . . . . . . . . . . . . . . . . .1266
307 . . . . . . . . . . . . . . . . . . . .1273
308-B . . . . . . . . . . . . . . . . . . .1275
314 . . . . . . . . . . . . . . . . . . . .1279
315-A . . . . . . . . . . . . . . . . . . .1281
315-B . . . . . . . . . . . . . . . . . . .1282
309 . . . . . . . . . . . . . . . . . . . .1293
329 . . . . . . . . . . . . . . . . . . . .1295
330 . . . . . . . . . . . . . . . . . . . .1298

318 . . . . . . . . . . . . . . . . . . . .1302
319 . . . . . . . . . . . . . . . . . . . .1303
322 . . . . . . . . . . . . . . . . . . . .1305
312 . . . . . . . . . . . . . . . . . . . .1308
312C . . . . . . . . . . . . . . . . . . .1310
311 . . . . . . . . . . . . . . . . . . . .1311