F1sdulb1                          Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                v.                        14 Cr. 68 (KBF)

5   ROSS WILLIAM ULBRICHT,

6                Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           January 28, 2015
9                                          9:35 a.m.

10
    Before:
11
                       HON. KATHERINE B. FORREST,
12
                                           District Judge
13

14                        APPEARANCES

15
    PREET BHARARA,
16       United States Attorney for the
         Southern District of New York
17  BY:  SERRIN A. TURNER
         TIMOTHY HOWARD
18           Assistant United States Attorneys

19  JOSHUA LEWIS DRATEL
    LINDSAY LEWIS
20  JOSHUA HOROWITZ
         Attorneys for Defendant
21
              - also present -
22
    Special Agent Vincent D'Agostino
23  Molly Rosen, Government Paralegal
    Nicholas Evert, Government Paralegal

24

25

F1sdulb1                          Trial

1           (Jury not present)

2           THE CLERK:  Continuation of the matter now on trial,

3    the United States of America v. Ross William Ulbricht, 14 Cr.

4    68.

5           Counsel, please state your names for the record.

6           MR. TURNER:  Good morning, your Honor, Serrin Turner

7    for the government.  With me is Timothy Howard from my office,

8    Special Agent Vincent D'Agostino from the FBI and Chris Evert

9    and Molly Rosen.

10          THE COURT:  All right.  Good morning to you all.

11          MR. DRATEL:  Good morning, your Honor.  Joshua Dratel.

12   Mr. Ulbricht is standing beside me.  Lindsay Lewis from my

13   office and Joshua Horowitz.

14          THE COURT:  All right.  Good morning to all of you.

15          All right.  We've got some jury instruction matters to

16   deal with.  But before we do that let me see whether or not you

17   folks have additional items that you would like to cover first

18   and that relate more directly to what's going to happen as soon

19   as the jury comes in because we'll deal with those first.

20          MR. TURNER:  Your Honor, we would like to take a brief

21   detour and have a witness testify out of order -- Alex Miller,

22   from Stack Overflow.  He is just a document custodian.  He has

23   a board meeting at noon.  So we were hoping to have him testify

24   the first thing -- he should on the stand for 10 minutes as far

25   as the government is concerned -- so that he could get back in

F1sdulb1                    Trial

1    time to get back for his afternoon meeting today.

2              THE COURT:  All right.  Have you spoken about that

3    with Mr. Dratel?

4              MR. TURNER:  I have advised him.

5              THE COURT:  Mr. Dratel, do you have a view on that?

6              MR. DRATEL:  No, your Honor.

7              THE COURT:  All right.  Well, then I don't see any

8    reason why a short document custodian witness should cause any

9    undue issues.  I will tell the jury, as I do when witnesses are

10   taken out of order, that we're going to take a witness out of

11   order and interrupt the examination of Mr. Alford in order to

12   accommodate some scheduling issues and then we'll continue with

13   Mr. Alford after that.

14             Any objection to me previewing it in that manner to

15   the jury?

16             MR. TURNER:  No, your Honor.  Thank you.

17             MR. DRATEL:  No, your Honor.

18             THE COURT:  All right.  Thank you.

19             Is there anything else that we should deal with before

20   we turn to some of the jury instruction matters?

21             MR. TURNER:  Not from the government.

22             MR. DRATEL:  No, your Honor.

23             THE COURT:  All right.  Let me just make sure that I

24   write down that Mr. Miller -- is it Mister?

25             MR. TURNER:  Yes.

F1sdulb1                    Trial

1              THE COURT:  Alex Miller is a fellow?

2              MR. TURNER:  Yes.

3              THE COURT:  All right.  Here.

4          The Court now has a letter from the government, dated

5     January 28, 2015.  I think it came in relatively -- I mean,

6     when I say "late" or "early," it depends on your definition,

7     but it's fine.  But I'm not sure Mr. Dratel has had an

8     opportunity to fully review it yet.  It came in about, I think,

9     8:15 or 8:20, something like that.  So let me -- we'll talk

10    about some of these matters, but we're going to leave open the

11    possibility that upon reviewing the cases the defense may have

12    additional thoughts that they would like to expression other

13    than what's raised this morning.

14         The Court has also received -- and I want to thank you

15    folks for this -- a set of jury instructions with draft changes

16    which very helpfully indicate, in terms of the Court's reading

17    of what you've done, where there are changes that no one

18    objects to, there are just changes, and where there is an

19    objection by one side or the other, there is a comment.  That's

20    very helpful to have you folks have combined it in that manner.

21    Am I reading things correctly that you both, if there is a

22    change and a deletion or an addition of language where there is

23    no comment, that I am to take that as an agreed change?

24         MR. TURNER:  I don't think so, your Honor.  I think we

25    tried our best.  I think defense counsel in particular didn't

F1sdulb1                    Trial

1    get a sufficient chance to note any objections to our language.

2    I think we should go through them one by one.

3              THE COURT:  All right.  Thank you.  We'll do that.

4    That's fine.  In any event, I think that it is probably useful

5    to go through them individually.

6              Let's turn to -- is there anything before page 4?  The

7    first change that you folks have is page 4.

8              MR. TURNER:  No.  And the government is fine with that

9    change.

10             THE COURT:  All right.  Mr. Dratel, that was your

11   change?

12             MR. DRATEL:  Yes, your Honor.

13             THE COURT:  All right.  So the Court will accept that

14   change.

15             The next change that I saw was on page 8.  Anybody

16   have any additional comments on that?  I'm fine with that

17   change if people are in agreement.

18             MR. TURNER:  No objection from the government.

19             MR. DRATEL:  Yes.  Right.  That is our change.

20             THE COURT:  All right.  So that is accepted.

21             The next change is on page 12.  I'm fine taking out

22   the desert island example.  I'm just curious as to why you

23   folks don't like it.  It is an example that does appear in

24   certain standard instructions.  Judge Sand had at one point

25   used it.  But is it redundant or cumulative, or did somebody

F1sdulb1                          Trial

1    have a substantive issue?

2            MR. TURNER:  That was the defendant's proposal, your

3    Honor.  We have no objection to that.

4            MR. DRATEL:  I think it is a little redundant because

5    you give an example beforehand.  Also, to me that one is

6    somewhat conclusive.  You know, if you are on a desert island

7    and you see footprints, there is really only one conclusion you

8    can draw.  I think circumstantial evidence as a matter of just

9    inference is something that there are multiple inferences one

10   could draw, and that one sort of suggests that the predominant

11   one is the one that should be accepted.  And I would think that

12   in the context of inferences that we are going to be asking the

13   jury to draw, there are different inferences.

14           THE COURT:  That is fine.  Just in my future use of

15   that charge, I know you would be thoughtful about it.

16           Let's turn to page 19, which is the next change.  It

17   is not a change.  It is just that with respect to defendant's

18   testimony, depending upon how that plays out, we'll modify that

19   charge, as necessary.  That's true for anything that occurs

20   during this trial.  If there is something which occurs which

21   requires a modification not currently anticipated, you folks

22   should raise that with me and not take our session now as the

23   only opportunity, by any means.  In fact, we won't get through

24   all of this today, but we'll, of course, revisit what's

25   necessary.

F1sdulb1                        Trial

1        Page 20, I'm fine with that change, the law

2    enforcement witnesses.  Anyone want to comment?

3        (Pause)

4        MR. DRATEL:  Well, I think that state of mind of a

5    witness is relevant.  It is also relevant in terms of the

6    investigation and prejudice and bias and other issues that are

7    appropriate and relevant.  So I would object to that.

8        THE COURT:  We struck it from the record pursuant to

9    the Court's instruction of whatever day that was last week.

10   The question is whether or not we need to reiterate it.  I

11   don't think it would be appropriate for the jurors to consider

12   that evidence at this point in light of the Court's previous

13   instruction.

14       So let me then think about it.  I take it that you are

15   objecting, then, to this additional language?

16       MR. DRATEL:  Yes.

17       THE COURT:  Let me then take that as an additional

18   objection.  We'll come back to that of.

19       Page 21.  This is for accomplice cooperating witness

20   testimony, and it is the insertion of a nonprosecution

21   agreement as among those agreements to be considered.

22       MR. DRATEL:  And that's fine with us, your Honor.

23   That is more accurate.

24       THE COURT:  Those changes are fine.

25       Then page 22.  This is I think reflecting that there

is only one cooperating witness and that it was only drug

dealing, as opposed to other criminal charges that may be at

issue in this particular case being tried.

          MR. TURNER:  That is correct, your Honor.  That is

more accurate.

          MR. DRATEL:  Are you talking about page 22?

          THE COURT:  Correct.

          MR. DRATEL:  I have no problem with the first part,

but the second part I would say that should remain as similar

rather than related.

          MR. TURNER:  I have no objection.  I made that change

for defendant's benefit.

          THE COURT:  So it will stay as similar, not related.

So there are three sets of changes on that page.  We'll take

the first two and not the third.  We'll leave similar as

similar and not accept the word related.  All right.

          The next change I have seen is on page 26 relating to

investigative techniques.  I'm fine taking that sentence out

about not speculating.  Would anyone like to comment?

          MR. TURNER:  I think we're fine with it, your Honor.

We'll think a little bit on whether we want any additional

language to substitute for that but I think I'm fine with it.

          THE COURT:  All right.  Thank you.

          Now, let me just do a couple of more of these and I

would like to do at least one of the more substantive comments

1    and then circle back.

2              Expert testimony.  At this point are we able to say

3    that there is a planned single expert or are there more than

4    one expert planned?

5              MR. DRATEL:  At least one.

6              THE COURT:  At least one, OK.

7              MR. DRATEL:  And perhaps one additional.

8              THE COURT:  All right.  So there may be two.  We'll

9    keep, then, the plural language here.  If it turns out that

10   only one testifies, my intention would be to modify the gender

11   appropriately and make it singular.  We'll come back to that,

12   as necessary.

13             Use of charts and tables.  This was some grammatical

14   changes and I was fine with those changes.  This is on page 30.

15             MR. DRATEL:  Yes, your Honor.

16             THE COURT:  Mr. Turner?

17             MR. TURNER:  Yes.  Thank you, your Honor.

18             THE COURT:  All right.  Then in terms of excerpts and

19   redactions, I was also fine with the inclusion of that

20   instruction.  It is a relatively standard instruction.

21             MR. DRATEL:  OK.  That's fine, your Honor.

22             THE COURT:  All right.  So page 31, we'll accept that.

23             In terms of uncalled witnesses equally available, I

24   understand the defense's reservation of rights, and let's

25   revisit this one as things go on.  This is one of those which

1   will depend on how the evidence comes in.

2           Now, let's start talking about some of the substantive

3   counts.  In terms of the distribution definition, which is on

4   page 36, it strikes me that the difference between these two is

5   the breadth of the types of acts which could be considered an

6   act of distribution and the defense assertion being a narrower

7   view.  That's the way I interpret this.

8           I went back to the cases cited by the government.

9   Their version is supported by the <u>Sepulveda</u> case, but that is a

10  First Circuit case which talks about brokering.  I don't know

11  that brokering has been picked up in the Second Circuit.  It

12  may have been.  It may not have been.  The defense charge is

13  based on the Sand's Model Jury Instructions.  Now, that's not

14  the only instruction that can be used.  Indeed, I modified

15  Sand's a lot.  In fact, this is Sand's old courtroom, so I

16  probably sit in the same place where he wrote a lot of these

17  and modified a few of them.  But it is important to stay within

18  the confines of the law when doing so.  Sometimes my

19  modifications are simply to make them more comprehensible to

20  the jury, and as idiom changes sometimes it is useful to change

21  them.

22          With that said, does the government have any

23  additional support for its position?  Let me just in particular

24  focus the government on the phrase "act in furtherance of."  So

25  part of the distribution phrasing that adds breadth to what the

1   government is suggesting is an act in furtherance of a sale.

2   That's different from saying a sale.  So while I agree, and I

3   think the law would agree certainly that a sale, delivery,

4   transfer of narcotics would be a distribution, brokering may be

5   analytically within that ballpark.  You'll tell me if the

6   Second Circuit has adopted that.  An act in furtherance of

7   expands the breadth of that.

8            MR. TURNER:  Your Honor, it's actually in Sand's as

9   well, activity in furtherance of the ultimate sale, such as

10  vouching for the quality of drugs, negotiating for it,

11  receiving a price, which is akin to brokering.  So I'm very

12  confident there is support in the law.  The language we

13  requested is tailored to the theory that we want to present.

14  If we have a theory that's supported in the case law, we are

15  entitled to an instruction along those lines.  So we would like

16  to keep the existing language.

17            If your Honor would like for me to provide more

18  examples of the case law that we are relying on, I am happy to

19  do so but I am very confident that there is support.

20            THE COURT:  All right.  If you could find something

21  other than Sand's for activities in furtherance of, some act in

22  furtherance of, just because of the potential breadth of that

23  and because that does seem to be the main issue and I

24  understand why.

25            Now, in terms of page 37 --

1           MR. TURNER:  Your Honor, there is an edit on 35.

2           THE COURT:  I'm sorry, 35?  Did I miss that?

3           (Pause)

4           Oh, OK.  Yes, you wanted to take out the particular

5    controlled substances.  They are not necessary for the 841

6    charge.

7           Mr. Dratel, do you have a comment?

8           MR. DRATEL:  I have no objection to that, your Honor,

9    but there is also one additional change that we had requested

10   on the same page, the next element, that it be knowingly and

11   intentionally.

12          THE COURT:  I was actually going to get to that on

13   page 37.  So that appears in several places.  Now, the statute,

14   841 actually is written in terms of "or."  841(a) states:

15   "Except as authorized by this subchapter, it shall be unlawful

16   for any person knowingly or intentionally."

17          There are, it's true, certain cases, particularly

18   district court cases, where the "and" finds its way in there,

19   and I think, frankly, that is a misstatement of the law and it

20   should be "or."

21          But what were you basing your position on, Mr. Dratel,

22   and does the government have a view?  Mr. Dratel.

23          MR. DRATEL:  Well, that it is a specific intent

24   offense and that going back and looking at charges in other

25   narcotics cases that I have tried, they are all "and."  It is

F1sdulb1                        Trial

1    all knowingly and intentionally.

2              THE COURT:  I think that certainly intent is a

3    specific intent element as well as knowing.  So the idea that

4    there is a particular kind of mens rea I think is captured by

5    either.  Whether there is a difference between knowingly and

6    intentionally I think a lot of people would debate.

7              But why don't you see whether or not you folks can

8    find a Second Circuit case which looks at the difference in

9    particular between the statutory language of 841 and the

10   elements as described, in other words, notwithstanding, etc.,

11   etc.?

12             MR. DRATEL:  I've seen it go the other way, where the

13   indictment charges as and -- not just this statute but other

14   statutes -- and then somehow it gets charged as an "or," but I

15   will go look for that, your Honor.

16             THE COURT:  Yes.  I would imagine if the indictment

17   charged it as an "and" and that was the charge in the

18   indictment, you could have a variance situation.  I don't know

19   that there could be a case as to whether or not there is such a

20   thing.

21             Does the government have a view?  Mr. Turner.

22             MR. DRATEL:  Candidly, your Honor, I wouldn't care one

23   way or the other.  We could prove knowingly and intentionally.

24   So I don't think it is a problem.

25             THE COURT:  Let me just see whether or not -- I just

F1sdulb1                         Trial

1    want to make sure that we get a correct statement of the law,

2    but it is helpful to know the positions.  That is also the

3    change on 37.  So we'll revisit that as well.

4          And then 37 has an additional change as well, which is

5    the additional language "and distributed the narcotics

6    intentionally."  I have not printed out whose changes these

7    except when there is comments in the area so I don't really

8    know whose -- I know that the metadata tells me but I haven't

9    looked to see in particular --

10         MR. TURNER:  That is the defendant's change, your

11   Honor.

12         THE COURT:  It is the defendant's?

13         MR. DRATEL:  Yes.  I'm sorry.  Yes.

14         THE COURT:  Does the government have a view?

15         MR. TURNER:  We're fine with the change.

16         THE COURT:  All right.  Fine.  So we'll revisit the

17   "or" at the top of that page, but otherwise we will accept the

18   additional language on page 37.

19         By the way, I've mentioned this to you before but just

20   so it's clear, I will be posting to docket all of the jury

21   instructions with your revisions as they came in to me at the

22   end of the case so there is a complete record as to precisely

23   who asked for what and it will be in electronic form as well on

24   ECF so that it can be -- the metadata can be accessed.

25         OK.  We are on page 38, aiding and abetting.  There

F1sdulb1                    Trial

1    was a typographical error I believe is the only changes on page

2    38.

3              MR. DRATEL:  Yes, your Honor.

4              THE COURT:  We are OK with this?

5              MR. TURNER:  Yes, your Honor.

6              THE COURT:  All right.  Moving right along.

7              Page 39, the defendant has asked to maintain the

8    language that is the "to determine" language, and the

9    government has said that they find that it is cumulative and

10   unnecessary.

11             If the government does not have a substantive

12   objection to it and the defendant would like to keep it, I will

13   keep it.

14             MR. TURNER:  No objection.  Thank you.

15             THE COURT:  All right.  So we'll keep that.

16             Court change on page 41, "methamphetamine."  Do the

17   parties agree that ecstasy and MMDA are shorthands for

18   methamphetamine?

19             MR. TURNER:  I don't think it is -- yes, I don't think

20   it is the same drug, your Honor.

21             THE COURT:  It is not, OK.

22             MR. TURNER:  Because it is like crystal meth.

23             THE COURT:  Crystal meth, OK.  An uncaffeinated judge.

24             Can I put in -- what I am trying to do is put in

25   something that is more colloquial.

F1sdulb1                        Trial

1          MR. TURNER:  We would have no objection to noting that

2     that would include substances commonly known as crystal meth

3     and maybe we can think of a few others.

4          THE COURT:  Mr. Dratel?

5          MR. DRATEL:  That's fine.

6          THE COURT:  All right.  OK.  Now, this is where we

7     have a deletion suggested by -- it is page 41 -- the defendant

8     about whether or not the defendant is required to have

9     awareness of the types and quantities of drugs distributed.

10    The government had cited the U.S. v. King case in its original

11    instructions, which is where we picked this up.  So that case,

12    which is a Second Circuit case 2003, states:  "We find no basis

13    for disturbing the settled principle that drug dealers

14    convicted under Section 841(a) need not know the type and

15    quantity of drugs in their possession in order to be subject to

16    sentencing enhancements contained in 841(b).  In so holding we

17    join all of the courts of appeal who have considered this

18    issue."

19          Mr. Dratel.

20          MR. DRATEL:  That is no longer good law because of

21    Booker.  And, also, that also doesn't affect the threshold

22    question of the elements of the offense.  Sentencing

23    enhancements is a very different question than the elements of

24    the offense, and I think it is clear, from Thomas and all the

25    cases since then that I think we cited in our initial comments

F1sdulb1                         Trial

1        on the jury charge, that type and quantity are, have been

2        recognized as elements of the offense.

3                THE COURT:  All right.  Certainly for purposes of

4        minimums, they are at issue.  The other place where it becomes

5        at issue is when, for instance, the statutory maximum can

6        change with respect to a particular charge.  And the statutory

7        maximum can change -- for instance, there is a Second Circuit

8        case where there were a variety of drugs at issue, one of which

9        was marijuana, which carried a different statutory maximum

10       penalty than other drugs, there was a question as to whether or

11       not the Court should have at least mentioned the type of drugs

12       and if there was marijuana included, broken out the verdict

13       form in some manner.

14               Mr. Turner, do you have anything to add other than

15       what you have said in your prior -- the first submission the

16       government made?

17               MR. TURNER:  No.  I don't think Booker has anything to

18       do with it.  To the extent --

19               THE COURT:  I agree with Booker not having anything to

20       do with it.

21               MR. TURNER:  To the extent that facts need to be

22       proven to the jury that affect the mandatory minimum here, the

23       only facts the statute require are that the violation involved

24       these weights.  It doesn't say that the defendant knew that the

25       violation involved these weights.  So I don't think Booker or

F1sdulb1                    Trial

 1   all of those related cases affects the holding in U.S. v. King.

 2            THE COURT:  All right.  And remind me, does the 841(b)

 3   charge carry a statutory max of is it 40?

 4            MR. TURNER:  Life.  (b)(1)(A) is life.

 5            THE COURT:  (b)(1)(A) is life.  That's with certain

 6   quantities proven?

 7            MR. TURNER:  Correct.

 8            THE COURT:  But in the absence of quantities proven --

 9            MR. TURNER:  It would be a (b)(1)(C).

10            THE COURT:  It is a (b)(1)(C).

11            MR. TURNER:  That section starts off --

12            THE COURT:  Right.

13            MR. TURNER:  -- "In the case of a violation of

14   Subsection (a) of this section involving" -- and then it lists

15   weights -- "the defendant should be sentenced to a term of

16   imprisonment not less than ten years," and it goes on to the

17   mandatory statutory maximum.  So the only fact that needs be

18   proven to trigger those changes is does the violation involve

19   those drugs.  Nothing about the defendant's knowledge.

20            MR. DRATEL:  Well, if it is an element of the offense,

21   which it is, it would have to be knowing or intentional or

22   knowing and intentional.  But whatever the instruction of that

23   particular scienter requirement is, it requires consciousness

24   by the defendant of an amount and a type.  It just can't be

25   that he -- you know, the defendant can't just have one drug

F1sdulb1                        Trial

1    deal and then all of a sudden have a situation in which they

2    are now accountable for an amount of which they had no

3    knowledge or intent.

4              MR. TURNER:  That's what the statute provides for,

5    your Honor.  And if that were the case, it would obviously be

6    case law reporting it in these kinds of drugs cases where the

7    statutory maximum and minimums apply, and U.S. v. King remains

8    good law.  It has not been reversed.

9              THE COURT:  Here's what I'll do.  Let me go back and

10   just reread the cases on this.  I do believe that you can show

11   a drug -- narcotics distribution offense just by showing that

12   any narcotic has been distributed.  The verdict form has to

13   have a special verdict form in terms of getting the (b)(1)(A)

14   quantities.  I think that it is useful -- well, and so -- but

15   that's for the verdict form and not for the violation.  But

16   we'll come back to this.

17             If anybody has anything else other than what you have

18   already given me or recited in today's session, let me know.

19   But I think it's pretty straightforward in terms of how the law

20   grapples with this issue.

21             I think we are waiting to find out from Joe if the

22   jury is here.  If they are here we will start.

23             Page 44 -- actually, I'm sorry, page 42.  This is the

24   inclusion of unanimity for the specific drug.

25             Joe, how are we doing?  We're waiting on one?  All

F1sdulb1                        Trial

1   right.  That is pretty good with the subway conditions.

2          Who was the proponent of this change?

3          MR. DRATEL:  Your Honor, I was.

4          THE COURT:  All right.

5          MR. DRATEL:  And it's basically that you can't

6   aggregate amounts from different jurors to get to any mandatory

7   minimum quantity.  So, in other words, if three jurors think it

8   is more than a kilogram of heroin and another couple of jurors

9   think the amount is cocaine, that won't be sufficient.  I think

10  that you can't have that kind of combination of votes on a jury

11  or get to a mandatory minimum.

12         THE COURT:  Yes.  And I think that the verdict form

13  would require unanimity on the answers to the interrogatories,

14  the special interrogatory, as to weight.

15         Mr. Turner, do you disagree?

16         MR. TURNER:  I don't disagree with the sort of spirit

17  behind the change.  I'm not sure that it comes across in the

18  language.  As your Honor points out, it is already reflected in

19  the verdict form, which requires "yes" or "no" answers to

20  specific drug weights and quantities.

21         THE COURT:  When you say you are not sure that the

22  spirit of it comes across, what do you mean?  Do you object to

23  this language?

24         MR. TURNER:  It already says:  "Your determination

25  regarding drug type and quantity must be unanimous."  And then

F1sdulb1                    Trial

1   it says "as to the specific drug."  It is not clear what that

2   means beyond what has already been said, that drug type and

3   quantity, you have to be unanimous.

4          THE COURT:  So you're basically saying it is redundant

5   and only includes half?

6          MR. TURNER:  Right.

7          THE COURT:  Because it would need to say you must be

8   unanimous as to the specific drug and quantity?

9          MR. TURNER:  And which would be repetitive.

10          THE COURT:  Which would be repetitive.

11          MR. TURNER:  I think that the verdict form will take

12   care of the concerns.

13          THE COURT:  I think we all agree on fundamental

14   principle, but there has to be unanimity as to the specific

15   type of drug and the specific -- whether the threshold on the

16   special verdict form has been met or exceeded, and then how

17   that gets conveyed I think will be some wordsmithing.

18          All right.  Page 44, dispensing.  The term "dispense"

19   is not relevant here.  I don't know whose change that is.  Do

20   you both agree?

21          MR. TURNER:  I think we both agree.

22          MR. DRATEL:  Yes, your Honor.

23          THE COURT:  All right.  Fine.

24          Knowingly or intentionally appears again on 46, and

25   we'll deal with that in a similar manner.

1       Now, page 48, this is now in the conspiracy to violate
2    the narcotics laws.  It has been my practice in the past to
3    preview that the conspiracy charge is separate and apart from a
4    substantive charge.  I don't mind taking it out here because it
5    is dealt with later and the charge is already so long that
6    deletions of things for redundancy are all to the good, but I'm
7    curious if there is a substantive reason behind this.
8       MR. TURNER:  Not really, your Honor.  I thought it
9    just sort of broke up the charge here, and you get to it in the
10   next instruction.  And, also, this isn't a case where there is
11   failure to complete the conspiracy at issue so I didn't think
12   that it was necessary to dwell on it.
13       THE COURT:  Mr. Dratel.
14       MR. DRATEL:  No problem.
15       THE COURT:  All right.  I will take that language out.
16       Page 49, the insertion of the word "general
17   instructions regarding conspiracy."  I'm fine with that
18   language change.  Anybody disagree?
19       MR. TURNER:  No, your Honor.
20       MR. DRATEL:  No.
21       THE COURT:  All right.  Now, the single conspiracy
22   versus multiple conspiracies and also whether or not -- well,
23   let's just start there.
24       I did read -- this is one of the topics dealt with in
25   the government's letter of today, and I pulled out and reread

F1sdulb1                          Trial

 1   <u>Sir Kue Chin</u> and some of the other cases, the one that it

 2   relies on, was it <u>Romney</u>?  What is it called?  <u>Corey</u>.

 3           I don't disagree that in most cases -- and, in fact, I

 4   don't know of a case where there has been a single defendant,

 5   the failure to include a single versus multiple conspiracy

 6   charge has been found to be error.

 7           Mr. Dratel, I don't know if you have had a chance to

 8   see that first part of the governments letter yet, or if you

 9   want to respond at a different time.

10           MR. DRATEL:  I think I will have to respond at a

11   different time.  I didn't see it until I got here.

12           THE COURT:  All right.  And what I would need is if

13   you are going to continue to object, if there is any legal

14   basis in a single defendant case or whether analytically you

15   believe this case is sufficiently different that it merits a

16   difference here.

17           All right.  That is, I think, really what was at issue

18   for 52 and 53.

19           I am still waiting to hear from Joe on this last

20   juror.

21           We get to the objects of the conspiracy, and there are

22   two changes on page 54.  One is the inclusion of the language

23   "beyond a reasonable doubt" on at least one specific object.  I

24   don't have any problem including that.  It is a correct

25   statement of law.  Anybody disagree?

F1sdulb1                          Trial

1              MR. TURNER:  I am fine with it, your Honor.

2              THE COURT:  All right.  And so it was a defense

3    change?

4              MR. TURNER:  Yes.

5              THE COURT:  All right, Mr. Dratel.  So we'll take

6    that.

7              All right.  The next one is the deletion -- and I take

8    it from the comment this is a deletion by the government -- I'm

9    sorry, by the defense -- of the language "or aid and abet such

10   activity."

11             Are we all set?

12             THE CLERK:  Yes.

13             THE COURT:  All right.  We have been sitting for half

14   an hour.  Do people need a break before we begin?  OK.  So

15   let's just take a short break.  We let's get the witness -- we

16   are going to start with Mr. Miller.

17             MR. TURNER:  Mr. Miller, yes.

18             THE COURT:  Let's go ahead and get the witness on the

19   stand so we don't have to have any delays due to that.  We will

20   start up in just three minutes, as soon as we can get ourselves

21   out and back.

22             THE CLERK:  All rise.

23             (Recess)

24             THE COURT:  All right.  Let's bring out the jury.

25             We will continue with the jury instructions tomorrow

F1sdulb1                          Trial

1   morning, if we have time.

2               (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1sdulb1                              Trial

 1                THE CLERK:  All rise as the jury enters.

 2                (Jury present)

 3                THE COURT:  All right, ladies and gentlemen.  Let's

 4     all be seated.

 5                And we've got here Mr. Miller on the witness stand.

 6     Due to some scheduling issues, we are going to take a brief

 7     segue -- a brief detour and hear some testimony from Mr. Miller

 8     and then we will go back to Mr. Alford.  So Mr. Alford's direct

 9     testimony will continue but we're going to take Mr. Miller in

10     between.

11                All right?  I hope you all made it through the storm

12     that kind of wasn't, kind of wasn't.  All right.  I had a lot

13     of pasta in my cabinet as a result of this.

14                All right.  Let's go ahead and swear in this witness.

15                THE CLERK:  Please raise your right hand.

16      ALEX MILLER,

17          called as a witness by the government,

18          having been duly sworn, testified as follows:

19                THE CLERK:  Please state your full name for the

20     record.

21                THE WITNESS:  Alex Miller.

22                THE CLERK:  Thank you.

23                THE COURT:  All right.  Mr. Miller, please be seated,

24     sir.  And it will be important for you to speak directly and

25     clearly into the mic.  So adjust yourself how it is best for

F1sdulb1                    Trial

1    you.

2              Mr. Turner, you may proceed.

3              MR. TURNER:  Thank you.

4    DIRECT EXAMINATION

5    BY MR. TURNER:

6    Q.  Good morning, Mr. Miller.

7    A.  Good morning.

8    Q.  Where do you work?

9    A.  Stack Exchange.

10   Q.  And what is Stack Exchange?

11   A.  We're a network of Q and A websites broken up into

12   different groups.

13   Q.  What are Q and A websites?

14   A.  It is question and answer.  So anyone on one of the topics

15   can go online and ask a question, get answers.

16   Q.  Is one of the Q and A websites your company operates called

17   Stack Overflow?

18   A.  Yes.

19              (Continued on next page)

20

21

22

23

24

25

1    BY MR. TURNER:

2    Q.  And what is Stack Overflow about?

3    A.  It's focused on computer programming.

4    Q.  So what can people do there?

5    A.  They can ask questions about anything directly related to

6    software development or computer programming and get answers

7    from the rest of the community or seek questions that have

8    already been asked.

9    Q.  And can any Internet user post on Stack Overflow?

10   A.  Yes.

11   Q.  And anybody can answer those posts?

12   A.  Yes.

13   Q.  Can a user register an account on Stack Overflow?

14   A.  Yes, they can.

15   Q.  And in registering, what information are they required to

16   provide?

17   A.  They provide an account name and email address and then a

18   password.

19   Q.  And when you say account name, what do you mean?

20   A.  A display name that is shown to identify them to the rest

21   of the community and whenever they ask or answer a question or

22   for their profile, to show what they have done on the site.

23   Q.  Is that their screen name?

24   A.  Yes.

25   Q.  Does Stack Overflow maintain records of a user's

F1SGULB2                      Miller - direct

1   registration information?

2   A.   Yes.

3   Q.   Are those records entered by hand or are they automatically

4   generated?

5   A.   It's all automatically handled by the computer.

6   Q.   At or near the time the registration information is

7   provided?

8   A.   Yes, as it happens.

9   Q.   And can a user change his registration information after

10  initially registering?

11  A.   Yes.   They can change any account information.

12  Q.   And Stack Overflow keeps records of those changes?

13  A.   Yes.

14  Q.   Does Stack Overflow keep records of all the posts by that

15  user?

16  A.   Yes.

17  Q.   And responses to those posts?

18  A.   Yes.

19  Q.   Do you have access to those records?

20  A.   Yes.

21  Q.   Are you familiar with the records maintained by your

22  company?

23  A.   Yes.

24  Q.   Do you have a binder in front of you?

25  A.   I do.

F1SGULB2                              Miller – direct

1    Q.  Can you take a look at what's been marked as GX or

2    Government Exhibit 1200.

3    A.  Yes.

4    Q.  Tell me if you recognize it.

5    A.  I do.

6    Q.  How do you recognize it?

7    A.  It's a question from Stack Overflow.

8    Q.  A question posted on Stack --

9    A.  Sorry.  A question that was posted on Stack Overflow.

10   Q.  And what was the date of the post?

11   A.  March 16, 2013.

12   Q.  And the username?

13   A.  Frosty.

14           MR. TURNER:  Your Honor, the government offers Exhibit

15   1200 into evidence.

16           MR. DRATEL:  Just hearsay, your Honor, and *Vayner*.

17           THE COURT:  All right.  That objection is overruled

18   and Government Exhibit 1200 is received.

19           (Government's Exhibit 1200 received in evidence)

20           MR. TURNER:  Mr. Evert, can you zoom in this area

21   first.

22   Q.  You said the date was?

23   A.  Yes, the date is March 16, 2013.

24   Q.  And this is the username?

25   A.  Yes.

1           MR. TURNER:  Can you back up, Mr. Evert.

2      Q.  And the title of the post, where is that shown?

3      A.  Directly right -- right there.

4           MR. TURNER:  Mr. Evert, maybe you can zoom in here.

5      So the title, before you do that, include the title.

6           The title is "How can I connect to a Tor hidden

7      service using curl in php."  It says "I'm trying to connect to

8      a Tor hidden service using the following php," and there's a

9      bunch of computer code under that.  Then it says "When I run it

10     I get the following error, couldn't resolve host name.  However

11     when I run the following command from my command line in the

12     ubuntu," and there's more computer language, "I get a response

13     as expected, the php curl documentations says this," and

14     there's some more computer language, and then it says "I

15     believe the reason it works from the command line is because

16     Tor (the proxy) is resolving the dot onion host name, which it

17     recognizes.  When running the php above, my guess is that curl

18     or php is trying to resolve the dot onion host name and doesn't

19     recognize it.  I've searched for a way to tell curl/php to let

20     the proxy resolve the host name, but can't find a way."

21     Q.  Based on Stack Exchange records, are you familiar with the

22     account information for the Stack Exchange user that made this

23     post?

24     A.  Yes.

25     Q.  You reviewed those account records?

1   A.  Yes.

2   Q.  And when was the account originally registered?

3   A.  I believe that was in March of 2012.

4   Q.  About a year before this post?

5   A.  Yes.

6   Q.  Up to this point, how many posts had the user made?

7   A.  One other post.

8   Q.  After this post was put up on Stack Overflow, were any

9   changes made to the account information for the user?

10  A.  Yes.  The publicly displayed username was changed.

11  Q.  And what was the account -- what was the account name or

12  display name originally associated to the account?

13  A.  Ross Ulbricht.

14  Q.  And what was it changed to after this post?

15  A.  Frosty.

16  Q.  And how soon after this post was made was that change made?

17  A.  Less than a minute.

18  Q.  Now, based on Stack Exchange records, do you know whether

19  any responses to this post were made by other users?

20  A.  Yes.

21  Q.  Were there?

22  A.  Yes.  He received -- the post received several answers.

23  Q.  Could you take a look at Government Exhibit 1205.

24  A.  Yes.

25  Q.  Do you recognize this exhibit?

1   A.  I do.

2   Q.  What is it?

3   A.  It's one of the answers that the post received.

4           MR. TURNER:  The government offers Exhibit 1205 into

5   evidence.

6           MR. DRATEL:  The same objection, your Honor.

7           THE COURT:  Government Exhibit 1205 is received.  The

8   objection is overruled.

9           (Government's Exhibit 1205 received in evidence)

10  Q.  So, somebody posted this.  This is the username of the user

11  who posted it?

12  A.  Yes.

13  Q.  It says "Wanted to help until I checked the URL and found

14  out it is the hidden wiki.  Sorry, I'm not helping that kind of

15  people."

16          And down below it says "Please don't jump to

17  conclusions.  I only used that as an example.  I've changed the

18  address to TorMail's hidden service."

19          Who posted that response there?

20  A.  The response came from the original poster of the question.

21  Q.  Frosty?

22  A.  Yes.

23  Q.  And after this -- it says here "I've changed the address to

24  TorMail's hidden service."

25          Was any change to the original post made around this

F1SGULB2                          Miller - direct

1    time?

2    A.  Yes.

3    Q.  Take a look at Government Exhibit 1204.

4    A.  Yes.

5    Q.  Do you recognize this exhibit?

6    A.  I do.

7    Q.  What is it?

8    A.  It's a revision history of the question showing the

9    original question and then a change that was made to it.

10             MR. TURNER:  The government offers 1204 into evidence,

11   your Honor.

12             MR. DRATEL:  Same objection.

13             THE COURT:  Government Exhibit 1204 is received.  The

14   objection is overruled.

15             (Government's Exhibit 1204 received in evidence)

16             MR. TURNER:  Can you zoom in on this part, Mr. Evert.

17   Q.  So the URL and the code provided by the user in the

18   original post was changed.

19   A.  Yes.

20             MR. TURNER:  Can you back out, Mr. Evert.

21   Q.  And can you see from the exhibit when that change was made,

22   directing your attention to the top?

23   A.  Yes.  That was made on April 4th, 2013.

24   Q.  And was any change to the account user information made

25   around this time?

F1SGULB2                          Miller - direct

1   A.  Yes.

2   Q.  What change was that?

3   A.  The email address on the account was changed.

4   Q.  From what to what?

5   A.  From, I believe, rossulbricht@gmail.com to

6   frosty@frosty.com.

7   Q.  And how soon after this amendment to the post was made was

8   that change made to the registration?

9   A.  Within a minute or two.

10              MR. TURNER:  No further questions.

11              THE COURT:  Mr. Dratel.

12              MR. DRATEL:  Thank you.

13  CROSS-EXAMINATION

14  BY MR. DRATEL:

15  Q.  Good morning, Mr. Miller.

16  A.  Good morning.

17  Q.  You just testified on direct about that March 16th post at

18  3:39, I think it's Exhibit 1200.

19  A.  Yes.

20  Q.  Right?

21  A.  Yes.

22  Q.  I want to go back about 20 minutes earlier in the timeline

23  and ask you a few questions about the process of logging on in

24  which you -- this user account logged onto the Stack Overflow.

25  A.  Okay.

F1SGULB2                         Miller - cross

```
1    Q.  So, Stack Overflow accepted a method of logging on called
2    OpenID, is that correct?
3    A.  That's correct.
4    Q.  And OpenID is a system that essentially allows people to
5    log in to multiple websites without having to enter the
6    username and the password for each website, right?
7    A.  Correct.
8    Q.  And it works by establishing -- and establishing the person
9    operating a web browser is who they claim to be, right?
10   A.  Yes.
11   Q.  And we're talking about any web browser, whether it be
12   Internet Explorer, Mozilla, Firefox, Google, right?
13   A.  Yes.
14   Q.  Now, as vice-president of operations, right --
15   A.  Correct.
16   Q.  -- at Stack Exchange --
17   A.  Yes.
18   Q.  -- you're aware that there are security flaws with the
19   OpenID system, correct?
20   A.  I'm not familiar with the technical details of them.
21   Q.  Are you familiar with literature with respect to security
22   researches from Microsoft and computer scientists from the
23   University of Indiana at Bloomington about OpenID?
24           MR. TURNER:  Objection; foundation, hearsay.
25           THE COURT:  If the answer is "no," then it's
```

F1SGULB2                          Miller - cross

1    straightforward.  We'll take it one question at a time.  I'll

2    allow this.

3    A.  I am not, at least not having actually read it.

4    Q.  Are you familiar with a term called covert redirect?

5    A.  Yes.

6    Q.  And that's when someone steals personal data from a user,

7    right?

8    A.  Yes.

9    Q.  And OpenID is something that can be vulnerable to covert

10   redirect, right?

11   A.  My understanding is that it could.

12   Q.  Also you said that all you really need to register is an

13   email address and a username, right?

14   A.  Correct.

15   Q.  So if I had your email, I could register as you and just

16   put a different username, right, with your email?

17   A.  Yes.

18   Q.  So all I have to do is know an email address for someone

19   else to sign onto Stack Overflow, use that email address with

20   whatever username I chose, right?

21   A.  Yes.

22   Q.  And there's no way from the records that we've seen or the

23   records that you have to determine who the actual person is who

24   is using that email account to register, correct?

25   A.  No.  We -- if I'm understanding your question correctly,

1  all we do is basically look at the email account.  We don't try

2  and look into who the actual person is.

3  Q.  Right.  So you wouldn't know from your records who is using

4  that email account to register on Stack Exchange or Stack

5  Overflow?

6  A.  Correct.

7  Q.  And there's nothing in your records that would help us

8  determine whether or not the use of the OpenID system to get

9  into that account was the subject of some covert redirect

10  attack, right?

11  A.  Correct.

12  Q.  Now, just looking at the sequence of events that you

13  testified to earlier, so the first thing that the person who

14  registered did was use the email rossulbricht@gmail.com, right?

15  A.  The account was originally created using Facebook Connect,

16  so the email address would have been passed automatically by

17  Facebook as part of that authentication.

18  Q.  But that's the email that was on the account?

19  A.  That's the email that Facebook tells us who is on the

20  account and, therefore, the email that we added to the account.

21          THE COURT:  What is Facebook Connect?

22          THE WITNESS:  It's a service that allows a website

23  such as ours to allow someone to use a Facebook account to

24  establish their account on our website.

25          THE COURT:  All right.

```
 1              THE WITNESS:  It's their version of the OpenID.
 2    Q.  So it's a version of OpenID essentially?
 3    A.  Yes.
 4    Q.  And subject to the same vulnerabilities that we just talked
 5    about with respect to OpenID?
 6    A.  I'm not familiar with the technical implementation details
 7    on it, but in theory, yeah, I would suppose.
 8    Q.  And then 30 seconds later, the username changes to frosty,
 9    correct?
10    A.  No.  The username frosty wasn't changed until the following
11    year.
12    Q.  Following year?
13    A.  Sorry.  Can you repeat the question?
14    Q.  Yes.  On March 16, 2013, at 3:39:25 a.m. the user posted a
15    question "How can I connect to a Tor hidden service using curl
16    and php," correct?
17    A.  Yes.
18    Q.  And put specific lines of code in the message, correct?
19    A.  Yes.
20    Q.  And available essentially for the world to see, correct?
21    A.  Correct.
22    Q.  And you keep all of those records, right?
23    A.  Yes.  We make them --
24    Q.  And even if someone changes their screen name or their
25    username, you would still have all the original records, right?
```

F1SGULB2                        Miller - cross

1   A.  Yes.

2   Q.  And they would be available by subpoena, right?

3   A.  Yes.

4   Q.  But we have that first entry, March 16, and that's Exhibit

5   1200, right, 3:39:25 a.m.?

6   A.  Yes.

7   Q.  And that's UTC time, by the way?

8   A.  That's correct.

9   Q.  So, at approximately 30 seconds later March 16, 2013, the

10  user changes the screen name to frosty, right?

11  A.  Yes.

12  Q.  So thereby establishing without any question for anyone

13  subpoenaing those records that frosty and Ross Ulbricht are

14  connected, right?

15          MR. TURNER:  Objection, form.

16          THE COURT:  Sustained.

17  Q.  So it doesn't change the fact that you still have all the

18  original records available by subpoena, right?

19  A.  Correct.

20  Q.  Kind of a blinking neon arrow, isn't it?

21          MR. TURNER:  Objection.

22          THE COURT:  Sustained.

23          MR. DRATEL:  Nothing further, your Honor.  Thank you.

24          THE COURT:  Redirect?

25          MR. TURNER:  Very briefly.

F1SGULB2                        Miller - cross

1              THE COURT:  All right.

2    REDIRECT EXAMINATION

3    BY MR. TURNER:

4    Q.  You said when the account was originally registered, it was

5    registered using a Facebook account?

6    A.  Yes.

7    Q.  Would the user of that Facebook account had to have been

8    logged into his Facebook account in order to register with

9    Stack Overflow in that manner?

10   A.  Yes.

11             MR. DRATEL:  Objection; foundation.

12             THE COURT:  Overruled.

13   Q.  And just to make sure the timeline is clear, the account

14   was registered in March 2012, right?

15   A.  Correct.

16   Q.  And from 2012 until March 2013, the display name for this

17   user was Ross Ulbricht, correct?

18   A.  Correct.

19   Q.  And the registered email address was

20   rossulbricht@gmail.com, right?

21   A.  Correct.

22   Q.  Not until the post we saw in 2013 did that information

23   change, right?

24   A.  Correct.

25             MR. TURNER:  No further questions.

1            MR. DRATEL:  Just a couple, your Honor.

2     RECROSS EXAMINATION

3     BY MR. DRATEL:

4     Q.  Now, you don't know how the person logged in, though, to

5     make that post, correct?

6     A.  In -- sorry.  In which case?

7     Q.  In 2013?  In other words, to log into Stack Overflow in

8     2013, they used the OpenID system?

9     A.  Correct.  They used the OpenID through Google.

10    Q.  Right.  So it didn't necessarily have to come through a

11    Facebook account?

12    A.  No.  In this case, if I'm understanding your question

13    correctly, we key -- we do what's called keying on the email

14    address.  So any OpenID-type system that you use if it returns

15    the same email address because that trusted third party

16    trusts -- says that that is the email address of this person,

17    we trust that it is the email address of the user at the time.

18    Q.  Right.  So in March of 2013 when that post was made, I

19    could have typed in "rossulbricht@gmail.com" and had the

20    right -- and that would be it, right?  I would be in there?

21    A.  Google would have to tell us that the person on the

22    computer -- if you were to do that, we would be trusting Google

23    to tell us that you had control over that Gmail address at that

24    time.

25    Q.  But that's what essentially the OpenID system does, right?

F1SGULB2                         Miller - recross

1    A.   Yes.

2    Q.   With respect to the register of an account that you say is

3    on Facebook, but obviously you don't know who is on the

4    Facebook account when they're registering, right?

5    A.   Correct, correct.

6              MR. DRATEL:  Can I have one moment, your Honor.

7              THE COURT:  Yes.

8              MR. DRATEL:  Nothing further.  Thank you.

9              THE COURT:  Thank you, Mr. Miller.  You may step down,

10   sir.

11             (Witness excused)

12             THE COURT:  Let's get Mr. Alford back on the stand.

13             Mr. Alford, you're reminded that you remain under oath

14   from our prior session.

15             THE WITNESS:  Thank you.

16    GARY ALFORD, resumed.

17   DIRECT EXAMINATION CONTINUED

18   BY MR. TURNER:

19   Q.   Agent Alford, when we last left off, we were going through

20   documents from the defendant's laptop and you were explaining

21   some of the links you found with evidence in the defendant's

22   Gmail account.  Do you remember that?

23   A.   Yes, I do, Facebook account.

24   Q.   Facebook account.  And we left off with an April 2012 entry

25   in the SR accounting spreadsheet for a laptop that you saw

F1SGULB2                        Alford - direct

1   corresponding receipt for in the defendant's Gmail account.  Do

2   you remember that?

3   A.  Yes.

4   Q.  Let me keep going chronologically through that evidence

5   with you and look at Government Exhibit 226E, which has already

6   been admitted into evidence.  Pull up the first part of the

7   chat.

8           Here we're at pages 507-08 of the chat log with vj and

9   it's dated March 9, 2012.  It starts out:

10          "Myself: I've been researching offshore stuff

11          Myself: well, I think I have my

12  citizenship/banking/living plan worked out, but I am feeling

13  around for advisors to make sure I'm not missing anythign

14          Vj: Make sure your plan includes at least two backup

15  locales

16          Myself: ok, don't have that but will work it in."

17          Can you go down to the next part.  March 26, 2012:

18          "Vj: One of the things I've learned in the last 10

19  days, how to run several offshore corps/trusts, and safely

20  transfer funds tween them.

21          Vj: It's as simple as going to the cayman islands,

22  taking out a cashiers cheque, or cash, and walking it down the

23  street, and depositing it in a trust account.

24          Myself: great. My top priority right now is getting a

25  new citizenship.

1        Myself: you aren't looking into that much are you?

2        Vj: interbank transfers always leave some trace.

3        Vj: Dominican Republic, 24 months, 10 grand gets you a

4   citizenship. Bahamas, 4 months, 280grand.

5        Myself: dominica 60k 2 months or so

6        Myself: didn't know about the bahamas, will look into

7   that.

8        Vj: Dominca kinda worries me, from what I've seen of

9   the process, I'm not sure it's all kosher."

10        Next page.

11        "vj: But remember, you can never have too many

12   passports.

13        Myself: yea, but I need to get rid of one first if you

14   know what I mean. THen the more the merrier"

15        Keep going.

16        "Myself: the citizenship I am applying for requires a

17   personal financial audit going back years

18        Vj: Look for other ones as well. You can never have

19   too many passports.

20        Myself: I will for sure. it's my new hobby."

21   Emoticon.

22        "Myself: but this is the fastest one I can get."

23        May 3, 2012 it starts out "myself: sorry, I got

24   distracted reading about what a terrible idea it is to renounce

25   my citizenship.

F1SGULB2                        Alford - direct

1          Vj: one word - taxes

2          Vj: Is there a terrible downside to renouncing your

3    citizenship?

4          Vj: can't be president

5          Vj: can't be vice-president

6          Vj: erm... anything else?

7          Myself: it is much harder to get back in the country

8    and you can't stay as long

9          Myself: I grew up here, I have an emotional attachment

10         Myself: my family is here

11         Vj: I used to feel that way. Now, I fly my family to a

12   nice place twice a year to meet.

13         Myself: wah wah boo hoo

14         Vj: they much prefer that to me visiting

15         Vj: naw, it's a valid point.

16         Vj: Having money eases the transition greatly

17         Myself: I'm sure it'll be fine. Have you looked at the

18   few tax havens in the world?

19         Myself: where you can live permanently w/o income tax

20         Myself: monte carlo, andorra

21         Vj: Yeah, my clever plan is to travel all the time, be

22   vague about permanent residence.

23         Myself: could get tiresome

24         Vj: and pick up some land in interesting places.

25         Myself: it brings up tough questions

F1SGULB2                        Alford - direct

 1              Myself: like if I want kids

 2              Vj: But being DPR and having a family are mutually

 3     exclusive, at least for a few years.

 4              Myself: I'm ok with that

 5              Vj: That said, rich playboy types can have a lot of

 6     fun.

 7              Myself: im ok with that too, but I do want a family

 8     someday.

 9              Vj: That's where careful creation and nurturing of a

10     public personae, business, etc., becomes so important.

11              Vj: So you can slip into it seamlessly when you want.

12              Myself: I'm not complaining about any of this, great

13     fucking problem to have.

14              Vj: heh, it is, isn't it!

15              Vj: also, we can buy citizenships/work/living visa's,

16     etc., no problem

17              Vj: cause it never hurts to have an extra country to

18     live in.

19              Vj: I plan on collecting passports like Pokemon's.

20     Gotta get 'em all!

21              Myself: well, that's what I'm getting into atm. I need

22     a different passport when I renounce

23              Myself: you could really screw yourself if you didn't

24     line something up. oops, renounced my citizenship, now I'm

25     stuck here."

F1SGULB2                     Alford - direct

1   Q.  In the defendant's Gmail account, did you find any evidence

2   about seeking foreign citizenship?

3   A.  Yes, I did.

4   Q.  What did you find?

5   A.  I found emails from the defendant to various friends asking

6   for, how do you say, when someone says -- like a reference for

7   citizenship.

8   Q.  And where specifically?  Citizenship where?

9   A.  Dominica.

10  Q.  Can you take a look at Government Exhibit 316.

11          MR. TURNER:  Mr. Evert, could you pop up that last

12  page of the chat?

13  Q.  Do you recognize Government Exhibit 316?

14  A.  Yes.

15          MR. TURNER:  Mr. Evert, can you zoom in on the last.

16  Q.  All right.  So what's Government Exhibit 316?

17  A.  It is three emails:  One from Ross Ulbricht to an

18  individual named Alden on May 1 2012; there's a second email

19  from the defendant to an individual named Mirza also on May 1,

20  2012; and there's a third email on that same date from the

21  defendant to an individual named Rene.

22          MR. TURNER:  Your Honor, the government offers 316

23  into evidence.

24          MR. DRATEL:  Just the same objection.

25          THE COURT:  All right.  Those objections are

1    overruled.  Government Exhibit 316 is received.

2              (Government's Exhibit 316 received in evidence)

3    Q.  The date of the email is May 1, 2012.  How does that

4    compare to the last chat we saw up on the screen?

5    A.  It's within two days.

6    Q.  And subject is "reference letter."  It says "Hey Alden,

7    Ever do a patent search on that dog collar idea?  Could be a

8    winner!  I'm applying for a second citizenship to an island

9    nation in the caribbean called Dominica and they need a few

10   non-family character references. There are few people that have

11   known me as long as you have.  Would you be willing to one of

12   them for me? All you would need to do is write a half page

13   testifying to my outstanding character, should be easy."

14   Emoticon.  "You may wonder why I am doing this crazy thing.

15   Well, it's part of a plan of mine to diversify myself

16   internationally. There are opportunites available to people

17   with non-us citizenship, such as ETF trading, and there could

18   also be substantial tax advantages in the future.  It's also a

19   bit of a political hedge if things ever get dicey here in the

20   US."

21   Q.  Are the other two letters in this email, collection of

22   emails -- excuse me -- are the other two emails in this exhibit

23   of a similar nature?

24   A.  Yes.

25   Q.  And they're from the same date?

F1SGULB2                     Alford - direct

1   A.  Yes.

2   Q.  Okay.  Let me go on to Government Exhibit 251.  The jury

3   has already seen this exhibit.  It's a spreadsheet from the

4   defendant's computer entitled "networth calculator."

5           MR. TURNER:  And can you zoom in on the first column,

6   Mr. Evert.  So the entries in the spreadsheet, go down to

7   June 2012.

8   Q.  Do you see that?

9   A.  Yes.

10          MR. TURNER:  Back out.  Could you zoom in on this area

11  here.

12  Q.  So under hard assets, there's SR Inc. listed as

13  $104 million in value and then there's a Samsung 700Z laptop

14  listed for $800.  Earlier we saw a laptop purchased for $1,150

15  in April?

16  A.  Yes.

17  Q.  There may have been some depreciation value?

18          MR. DRATEL:  Objection.

19          THE COURT:  Sustained.

20  Q.  So looking at the right-hand column, under liquid assets

21  inventory, there's an entry for USAA $1,400.  In the course of

22  your investigation, did you obtain any records from USAA?

23  A.  Yes, I did.

24  Q.  And from whom -- for whom -- who are they for?

25  A.  The defendant.

F1SGULB2                    Alford - direct

1   Q.  Could you take a look at Government Exhibit I think it's

2   806.

3   A.  I had a spreadsheet in this book.

4   Q.  806, do you have 806 in your book?

5   A.  Yes, I do.

6   Q.  Okay.  Do you recognize that document?

7   A.  Yes, I do.

8   Q.  How do you recognize it?

9   A.  It's a bank statement from USAA Federal Savings Bank which

10  was subpoenaed through the investigation.

11          MR. TURNER:  The government offers 806 into evidence.

12  We have a stipulation we can read in, your Honor.

13          THE COURT:  All right.

14          MR. TURNER:  We can read in the stipulations at the

15  end of the testimony, if that's okay.

16          THE COURT:  All right.

17          MR. TURNER:  Apologies for that.  The government

18  offers 806 into evidence.

19          THE COURT:  Mr. Dratel.

20          MR. DRATEL:  Okay.

21          MR. TURNER:  Subject to stipulation.

22          THE COURT:  Okay.  Subject to the stipulation,

23  Government Exhibit 806 is received.

24          (Government's Exhibit 806 received in evidence)

25  Q.  Now, we saw the last entry for the spreadsheet was in

F1SGULB2                          Alford - direct

1    June 2012.  And what was the balance in the defendant's USAA

2    account as of June 2012?  Mr. Evert, can you blow that up?

3    A.  It is $1,347.24.

4    Q.  How does that compare to the entry in the spreadsheet?

5    A.  It's within $60 of that entry.

6    Q.  There's also a line in here for PayPal, $50.  Did you

7    obtain any PayPal records in the course of your investigation?

8    A.  I obtained PayPal records relative to the defendant.

9    Q.  Can you take a look at Exhibit 808.

10   A.  I have it.

11   Q.  Do you recognize this document?

12   A.  Yes.

13   Q.  What is it?

14   A.  It is the document from PayPal relative to the transactions

15   of the defendant.

16        MR. TURNER:  Your Honor, we have a stipulation on this

17   and we can read it in after the defendant's (sic) testimony.

18        THE COURT:  All right.

19        MR. TURNER:  So the government offers 808 into

20   evidence.  Excuse me, it's the witness' testimony.

21        THE COURT:  Any objection?

22        MR. DRATEL:  No.

23        THE COURT:  Government Exhibit 808 is received.

24        (Government's Exhibit 808 received in evidence)

25   Q.  So what do the records from PayPal show was the balance in

F1SGULB2                        Alford - direct

1    the account?  And look up here so we can see what these columns

2    are.  Over here, can you zoom in.  From the side, there's a

3    date in this column and then zoom out, please, and then over

4    here, and then there's a balance remaining after the

5    transaction in each column in each row?

6    A.  Yes.

7    Q.  So, could we go down to the bottom, please, the bottom two.

8    Zoom in here first.  That's good.

9         June 7, 2012, there's a transaction involving a

10   checkout payment system, and then if you go to the other side

11   in the balance column, second from the right, what was the

12   balance as of June 7, 2012 in the account?

13   A.  $46.89.

14   Q.  How does that compare to the entry in the spreadsheet?

15   A.  It's within $4 of the entry on the spreadsheet.

16        MR. TURNER:  Let me now move to September 2012.  Put

17   up Government Exhibit 227F on the screen.  Blow this up,

18   please.  This is page 63 of a 337-page chat with Cimon, and

19   it's from 9/26/2012.

20        "Cimon:  Hey, it's 0700 here, and here I am!!!

21        OK, it's 715

22        Yeah, it's 0730, and we must have got our wires

23   crossed. I'm going to go grab some breakfast, back in a bit

24        Gotta assume ya' forgot our meet, I'm gonna go for my

25   morning walk, will check back later back, will be here for

F1SGULB2                        Alford - direct

1    another 2 hours or so, then I have a local meeting for lunch.

2    It's noon, and I'm off for a lunch meeting, will check back

3    later in the day."

4            Then it says "Myself: hey, sorry about that. I changed

5    timezones today and I think I got confused last night with my

6    flight schedule

7            Myself: it's actually getting late here, so I'll go to

8    sleep soon. I should be around during your morning tomorrow,

9    but the next 2-3 days after I'll be fairly busy. If you don't

10   find me on here but have something to say, feel free to message

11   me on Silk Road, or the dev forum

12           Myself: had a good chat with smed, don't worry about

13   getting me up to speed on the current state of things. He says

14   he'll have a demo of the exchange deployed on tuesday, so let's

15   all touch base then. I'll be posting a couple of things on the

16   dev forums tomorrow that you should look at when you get a

17   chance as well."

18   Q.  All right.  So the chat -- in the chat "myself" says "I

19   changed timezones today."

20           Did you see any records in the defendant's Gmail

21   account from this date indicating that the defendant was

22   traveling?

23   A.  Yes, I did.

24   Q.  What did you see?

25   A.  I saw an email regarding flight records.

F1SGULB2                          Alford - direct

1   Q.  Can you take a look at Government Exhibit 320.

2   A.  I had a spreadsheet in this book that's not here today.

3   Q.  Okay.  We won't use it for now, but do you see 320 in front

4   of you?

5   A.  Yes.

6   Q.  And do you recognize it?  What is it?

7   A.  It's an email from priceline.com to the defendant about

8   flights.

9          MR. TURNER:  The government offers Exhibit 320 into

10  evidence, your Honor.

11         MR. DRATEL:  One moment, your Honor, please.  *Vayner*

12  and hearsay, your Honor.

13         THE COURT:  All right.  Those objections are

14  overruled.

15         Government Exhibit 320 is received.

16         (Government's Exhibit 320 received in evidence)

17  Q.  First, let's focus on the header information.  The date is

18  9/3/2012 from priceline.com to rossulbricht@gmail.com,

19  itinerary for Austin, Texas, September 26, 2012.

20         Can you take a scroll down to the flights.  What are

21  the flights here?

22  A.  Okay.  There's a departing flight and it's from San

23  Francisco to Austin, Texas.

24  Q.  On what date?

25  A.  It's leaving on Wednesday, September 26, 2012.

F1SGULB2                          Alford - direct

1   Q.  And are you aware whether San Francisco is in a different

2   timezone from Austin, Texas?

3   A.  Yes, it is.  It's in the Pacific Standard Time and Austin

4   is in I believe the Central Standard Time.

5   Q.  Okay.  Let me move on to November 2012.  Could you pull up

6   227G, please.

7            MR. TURNER:  Can you scroll up a little bit.

8   Q.  This is page 157 of a 337-page chat with Cimon.  It starts

9   out November 15, 2012, "Myself: just got this

10           Myself: I'm not sure if tormail is not receiving

11  emails atm, but funds are coming in.

12           I was able to exploit a vulnerability in one of the

13  pages on silk road in a way that will cause a DOS attack and

14  SQLi attack.

15           Send 5k to..." then there's a long string "if you are

16  satisfied with WHAT I am doing. Send 15k to the same address to

17  know HOW I am doing it.

18           -JE

19           Myself: had to swollow my pride there

20           Cimon: I know, but fuck it, let's keep our eye on the

21  ball, and the ball is keeping the site open

22           Cimon: heh, yer still way richer than he!"  Emoticon.

23           "Myself: can't wait to put this behind me."

24           Can we go back to GX 250, please.  Could we go to page

25  seven, middle of the page, the SR accounting spreadsheet the

F1SGULB2                        Alford - direct

1    jury has seen earlier, and there's an entry here, 11/18/2012,

2    "pay off hacker."

3              See that?

4    A.  Yes.

5              MR. TURNER:  Go back to 227G, please.  I'm sorry.

6    227G.  You can get rid of the top panel.  Okay.  "Myself: can't

7    wait to put this behind me

8              Cimon: Has this fucked up your travel plans

9              Cimon: And have you slept recently

10             Myself: just stressed me out

11             Myself: I am rested

12             Myself: and I am done travelling

13             Myself: for a little while anyway."

14   Q.  Can you take a look at Government Exhibit 321.  Do you

15   recognize this exhibit?

16   A.  Yes, I do.

17   Q.  What is it?

18   A.  It is an email from Delta Airlines to the defendant on

19   November 13, 2012 regarding a flight itinerary.

20   Q.  And whose flight itinerary?

21   A.  The defendant.

22             MR. TURNER:  The government offers Exhibit 321 into

23   evidence, your Honor.

24             MR. DRATEL:  *Vayner* and hearsay.

25             THE COURT:  All right.  The objections are overruled.

1   GX 321 is received.

2          (Government's Exhibit 321 received in evidence)

3          MR. TURNER:  Can you zoom in on the header again.

4   From Delta Airlines to Ross Ulbricht subject, "It's time to

5   check-in."  The date is 11/13/2012.

6          And then could you zoom in to the last half of the

7   message, just the first three trips there.

8   Q.  So what are the flights indicated in the message?

9   A.  There's a trip one and it is departing on Wednesday,

10  November 14, 2012, it's departing San Francisco, California and

11  it's arriving at Atlanta, Georgia.

12         There's a second leg, which leaves on that same day,

13  which departs 7:37 p.m. from Atlanta, Georgia to San Juan.

14         And then there's a third leg on the next day,

15  Thursday, November 15, which departs San Juan and arrives in

16  Dominica.

17         And then there's a second trip, which is dated for

18  Tuesday, December 4th, which departs Dominica and arrives in

19  San Juan.  The day after on Wednesday December 5, it

20  departs -- the flight departs from San Juan and arrives in

21  Atlanta, Georgia.  And on that same day, another leg from

22  Atlanta, Georgia, to San Francisco, California.

23  Q.  So let me go on to February 2013, can we take a look at

24  what's marked in your binder as 227I.

25  A.  Yes.

1    Q.  Do you recognize this exhibit?

2    A.  227I?  Yes.

3    Q.  How do you recognize it?

4    A.  227I is a Tor chat.

5    Q.  Is this one of the Tor chats you reviewed from the

6    defendant's computer?

7    A.  Yes.

8            MR. TURNER:  The government offers 227I into evidence.

9            MR. DRATEL:  *Vayner* and hearsay, your Honor.

10           THE COURT:  227I is received.

11           (Government's Exhibit 227I received in evidence)

12           MR. TURNER:  Can you publish that, Mr. Evert.  This is

13   page 308-10 of a 337-page chat log with Cimon dated February 5,

14   2013, and it starts off "Cimon:  I will tell you I've been

15   boning up on both Tor and bitcoind source code and I've had the

16   Tor thing figured for a while, just the bootstrapping step I'm

17   having problems with and I'll be back home on Friday to work

18   with smed, he's further along on quite a few things than it

19   appears, eh.

20           Myself:  Okay.  I'll be away sat/sun, so maybe we can

21   catch up next Monday.

22           Cimon:  Take care.

23           Myself:  You too."

24           February 10.

25           "Cimon:  Hey, how was your weekend.

1        Myself:  One of the best I've had in a while.  How was

2    yours."

3        You looked to see in the defendant's Facebook account

4    any records from around this time period?

5    A.  Yes, I did.

6    Q.  And what did you find?

7    A.  I found a Facebook status update which corresponds with

8    this time frame.

9    Q.  Did you find any Facebook messages as well?

10   A.  Yes.

11   Q.  Can you take a look at Government Exhibit 331.  What are

12   you looking at there?

13   A.  It is records from the defendant's Facebook account and it

14   is messages to and from the defendant.

15        MR. TURNER:  The government offers Exhibit 331 into

16   evidence.

17        MR. DRATEL:  The same objection.

18        THE COURT:  All right.  That objection is overruled.

19   Government Exhibit 331 is received.

20        (Government's Exhibit 331 received in evidence)

21        MR. TURNER:  Can you zoom into here.

22   Q.  And the date of this message is February 8, 2013?

23   A.  Correct.

24   Q.  And could you explain what the messages say?

25   A.  The ones you have highlighted, February 8, 2013 it says

F1SGULB2                      Alford - direct

1   "Going camping this weekend," and the author is the defendant

2   and his recipient is an individual named Allison.

3   Q.  Okay.  And then the messages under that are an exchange

4   following that message?

5   A.  Yes, it is.  Yes, they are.  Excuse me.

6   Q.  Now, let me show you Government Exhibit 241, jumping to

7   May 2013.

8   A.  I have it.

9          MR. TURNER:  Could you go to page three of the

10  document.  It's a file that was recovered from the defendant's

11  laptop that's already been shown to the jury named log.txt.

12  And zoom in on actually 4/21.  That's fine.  Down at the

13  bottom.  Okay.  The first entry up at the top of the screen,

14  4/21 to 4/30/2013, it says "Market and forums under sever DoS

15  attack. Gave 10k btc ransom but attack continued. Gave smed

16  server access."

17         Then on 5/3/2013, "Helping smed fight off attacker,

18  site is mostly down.  I'm sick."

19         5/6/2013, "Working with smed to put up more defenses

20  against attack."

21         Did you find any emails in the defendant's Gmail

22  account referencing a smed?

23  A.  Yes, I did.

24  Q.  What did you find?

25  A.  I found an email in May of 2013 from the defendant to an

F1SGULB2                          Alford - direct

1  individual with a screen capture contained in it.

2  Q.  Let's take a look at that, can you take a look at

3  Government Exhibit 312, please.

4  A.  Which exhibit?

5  Q.  312.

6  A.  Yes, but this is not the exhibit.

7  Q.  317.  Sorry.

8  A.  Yes, I have it.

9  Q.  Okay.  Is this the email you're referring to?

10  A.  Yes.

11        MR. TURNER:  The government offers Exhibit 317 into

12  evidence.

13        MR. DRATEL:  Same objection; *Vayner* and hearsay, your

14  Honor.

15        THE COURT:  All right.  Government Exhibit 317 is

16  received.  Those objections are overruled.

17        (Government's Exhibit 317 received in evidence)

18        MR. TURNER:  Let's take a look at the message itself

19  first.  Blow that up.

20  Q.  The subject is IMG from Ross Ulbricht, dated May 2, 2013,

21  and then it's to someone named Curtis.  Was there any body in

22  the message?

23  A.  No.

24  Q.  And then it says attachment screenshot from 2013,

25  May first, and a timestamp there.

F1SGULB2                    Alford - direct

1    A.  That's correct.

2    Q.  Is page two the attachment?

3    A.  Yes, it is.

4    Q.  Let's take a look at that.  All right.  Are you familiar

5    with the print screen feature in a computer?

6    A.  Yes, I am.

7    Q.  Did you ever personally use that feature before?

8    A.  Yes, I have.

9    Q.  Have you ever used it in a computer attached to two

10   computer monitors?

11   A.  Yes.  That's my setup at work.

12   Q.  And what's happened when you used the print screen feature

13   on your computer with two monitors hooked up to it?

14   A.  I get a result similar to this where you have both screens

15   on the image that is produced.

16            MR. TURNER:  So let's zoom in on the top corner of the

17   right-hand image.  So the username frosty is there, the date,

18   May 1, 10:31 p.m.  Can you back out, please.  Do the same thing

19   for this image.

20   Q.  The same thing, right?

21   A.  Yes, it is.

22            MR. TURNER:  Could you zoom into the bottom-left

23   corner of the left-hand image, right here.

24   Q.  The PDF link here named hidden server.PDF.  Do you see

25   that?

F1SGULB2                        Alford - direct

1    A.  Yes.

2    Q.  Now, let's zoom into the window in the middle of the

3    screen.  What do you see?

4    A.  That is a Pidgin instant messenger box with the box open

5    and a discussion with an individual named smed and mg in the

6    background.

7    Q.  Okay.  So the open window has the tab labeled "smed"?

8    A.  Yes.

9    Q.  It says "private conversation with smed...started," and

10   then there's a long string of text starting:

11              "Smed:  Morning.

12              Me:  Hey, good morning."

13              And then there's a tab here labeled "mg," is that

14   right?

15   A.  Yes, it is.

16   Q.  Go back to Government Exhibit 241.  Go to the top of page

17   two.  Do you see a reference to mg in here?

18   A.  Yes, in the April 3, 2013 entry.

19   Q.  "got pidgin chat working with inigo and mg"?

20   A.  Correct.

21   Q.  And just to be clear, the date of that email, 317, what was

22   it again?

23   A.  The email with the screenshot was dated May 2, 2013.

24              MR. TURNER:  Mr. Evert, can you back out of that.

25   Q.  And the date of the entries we saw before with smed are

1   what?

2   A.  It is within a couple days prior.  And it was within one

3   entry, the day after; and the other entry, approximately five

4   days after.

5   Q.  Let's take a look at Government Exhibit 264.  This is a

6   spreadsheet the jury has already seen from the defendant's

7   computer labeled servers.ods.

8          MR. TURNER:  Can you zoom into the columns, please, up

9   at the top.  That's good.

10  Q.  Specifically to this one, is there one column in the

11  spreadsheet labeled IP address?

12  A.  Yes, there is a column.

13         MR. TURNER:  Back out, please, and then could you go

14  here.

15  Q.  And one column labeled "notes"?

16  A.  Yes.

17         MR. TURNER:  Can you back out.  Can you zoom in down

18  here.  Can you highlight this entry right here to here.

19  Q.  See this entry on the spreadsheet?

20  A.  Yes.

21  Q.  There's an IP address, 64.31.48.51, and then the notes are

22  "Connected to my real ID maxmind Ubuntu 12.10."

23         Did you receive any records from Google indicating the

24  IP addresses used by the defendant to log into his Gmail

25  account?

F1SGULB2                    Alford - direct

1   A.  I did.

2   Q.  Can you take a look at Government Exhibit 809.  I'm sorry.

3   Government Exhibit 333A.  Sorry about that.

4   A.  333A?

5   Q.  Yes.

6           MR. TURNER:  Your Honor, I have a stipulation to read,

7   a paragraph from the stipulation that's been marked as

8   Government Exhibit 803.

9           THE COURT:  All right.

10          MR. TURNER:  "Government Exhibit 333A is a true and

11  accurate copy of subscriber information associated with the

12  email account rossulbricht@gmail.com.  These records were

13  produced by Google to Agent Alford pursuant to subpoena on or

14  about July 17, 2013.  Among other things, Government

15  Exhibit 333A contains a chart reflecting user logins to the

16  email account rossulbricht@gmail.com between January 13, 2013

17  and June 20, 2013.  The chart indicates the date and time of

18  each login, as well as the Internet protocol IP address of the

19  user logging into the account.  These records were

20  automatically generated from Google's computer systems at or

21  near the time the logins occurred."

22          Your Honor, the government offers 333A into evidence.

23          MR. DRATEL:  No objection, your Honor.

24          THE COURT:  Received.

25          (Government's Exhibit 333A received in evidence)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1SGULB2                        Alford - direct

1              MR. TURNER:  Mr. Evert, can you log into this part

2    here.

3    Q.  So, do you see the IP address 64.31.48.51 anywhere in the

4    logins of the defendant's Gmail account?

5    A.  I do.

6    Q.  Where are they?

7    A.  They are in -- under the column "IP addresses" and

8    64.31.48.51 appears starting June 17th, 2013 and it

9    continues -- it continues to be listed as the documents until

10   June 20, 2013 in this sheet.

11             MR. TURNER:  Let me fast-forward to September 2013.

12   Can you pull up Government Exhibit 241, please, Mr. Evert.

13   This is the log.txt file we have seen before.  Can you go down

14   to the page five and highlight this one right here.

15   Q.  So this entry is dated 9/11 to 9/18/2013, "Could not

16   confirm ST bust.  Got covered in poison oak trying to get a

17   piece of trash out of a tree in a park nearby and have been

18   moping.  Went on a first date with amelia from okc."

19             Do you see any messages in the defendant's Gmail

20   account about poison oak?

21   A.  Yes, I did.

22                   (Continued on next page)

23

24

25

F1sdulb3                        Alford - direct

1    Q.  Take a look at Government Exhibit 325.

2    A.  I have it.

3    Q.  What is that?

4    A.  It is an email from the defendant to an individual named

5    Julio in which he references that he has poison oak rash from

6    head to toe.

7             MR. TURNER:  Your Honor, the government offers 325

8    into evidence.

9             MR. DRATEL:  Objection.  Vayner and hearsay, your

10   Honor.

11            THE COURT:  The objection is overruled.  GX325 is

12   received.

13            (Government's Exhibit 325 received in evidence)

14            THE COURT:  At 11:30 we will take a break.  Is that

15   all right with everybody?

16            MR. TURNER:  OK, your Honor.

17            THE COURT:  Thanks.

18            MR. TURNER:  Could you zoom in, please, great.

19   Q.  The date of the email is 9/19/2013?

20   A.  Yes.

21   Q.  "I have poison oak rash from head to toe.  I wish you were

22   here to comfort me."

23   A.  Correct.

24   Q.  How about "first date with Amelia from OKC," did you find

25   anything in the defendant's Gmail account about that?

F1sdulb3                         Alford - direct

1   A.  Yes.  I found an e-mail related to an okcupid! related to

2   Amelia.

3   Q.  Take a look at Government Exhibit 324.

4   A.  Yes.

5   Q.  Is that the email you are referring to?

6   A.  Yes.  It is an email from okcupid! to the defendant.

7           MR. TURNER:  The government offers Government Exhibit

8   325 into evidence.

9           MR. DRATEL:  Objection as to Vayner and hearsay, your

10  Honor.

11          THE COURT:  You mean 324?

12          MR. TURNER:  I'm sorry.  324.

13          THE COURT:  Mr. Dratel, was that the exhibit you were

14  referring to?

15          MR. DRATEL:  Yes.

16          THE COURT:  The objections are overruled.  Government

17  Exhibit 324 is received.

18          (Government's Exhibit 324 received in evidence)

19  BY MR. TURNER:

20  Q.  How many emails are included in this exhibit?

21  A.  Two.

22          MR. TURNER:  Can you zoom in on the header, please,

23  Mr. Evert.

24          The date is 9/18/2013.

25          "From:  Okcupid!

F1sdulb3                          Alford - direct

1        "To:  Ross Ulbricht at Gmail.com.

2        "Subject:  Ross-0, You have a new message from

3   amaliam."

4        Could you go down, please.

5        Amaliam says:  "Be there in a few.  I'm wearing a

6   khaki jacket and white shirt."

7   A.  Correct.

8   Q.  What does the next message say?

9   A.  The next message says "Nice meeting you," and a phone

10  number is reflected.

11  Q.  Take a look at Government Exhibit 130.  It has already been

12  admitted into evidence as the notes recovered from the

13  defendant's trashcan in his bedroom.

14       Could you zoom in here, Mr. Evert.

15       The phone number written on the piece of paper

16  "Danielle," the area code has been redacted, and it says

17  "5791503."  Did you receive any records from Google for a

18  Google Voice account associated with the defendant?

19  A.  Yes, I did.

20       MR. TURNER:  Your Honor, I have a stipulation to read.

21       "Government Exhibit 333B is a true and accurate copy

22  of records from the Google Voice account associated with the

23  email account rossulbricht@gmail.com (the Google Voice

24  account).  These records were produced by Google to Agent

25  Alford pursuant to subpoena on or about November 15, 2013.

F1sdulb3                           Alford - direct

Google Voice is a service offered by Google that enables a

user, among other things, to send and receive cell phone text

messages ("SMS" messages) over the Internet.

          "Government Exhibit 333B contains a chart reflecting

the SMS messages as well as other types of communications sent

to or from the Google Voice account from August 1, 2013 to

September 19, 2013.  For each of these SMS messages the chart

indicates the date and time of the message, whether the message

was incoming ("SMS in") or outgoing ("SMS out") and the phone

number of the other party to the message.

          "These records were automatically generated from

Google's computer system at or near the time of each

communication."

Q.  Could you take a look at 333B, please.

          MR. TURNER:  Your Honor, the government offers 333B

into evidence.

          THE COURT:  All right.  Mr. Dratel.

          MR. DRATEL:  No objection.

          THE COURT:  All right.  Received.

          (Government's Exhibit 333B received in evidence)

          THE WITNESS:  I have it.

          MR. TURNER:  Would you publish it, Mr. Evert.

          Could you put 130 back on the screen with that number

up top.

Q.  Can you find the records on the spreadsheet, Mr. Alford,

F1sdulb3                          Alford - direct

1    Agent Alford, that have -- well, I'm asking you, did you find

2    this phone number anywhere in these records?

3    A.  Yes, I did.

4           MR. TURNER:  Mr. Evert, could you zoom in on one of

5    those entries.

6    A.  I believe they are on page 4.

7    Q.  OK.  Page 4.  And where are they?

8    A.  Towards the top of page 4.

9    Q.  OK.  Right there.

10   A.  Yes.

11          (Pause)

12          MR. TURNER:  Your Honor, we are at a good stopping

13   place.

14          THE COURT:  All right.  Ladies and gentlemen, let's

15   take our mid-morning break and we will come back and then we

16   will go until lunchtime.  And the same reminders as you have

17   been hearing not to talk to each other about this case or

18   anyone else.  Thank you.

19          THE CLERK:  All rise as the jury leaves.

20          (Continued on next page)

21

22

23

24

25

F1sdulb3                          Alford - direct

1                    (Jury not present)

2                    THE COURT:  You can step down for a few minutes and we

3     will resume in about ten minutes.

4                    THE WITNESS:  Thank you.

5                    (Witness not present)

6                    THE COURT:  All right.  Ladies and gentlemen, let's

7     all be seated.  I have one matter and it relates to 227I, the

8     chat log page.  And I want to understand, since you'd gotten

9     the other chat log pages in through a different witness,

10    whether or not 227I the government can represent is from the

11    same group as to which the other Simon, Cimon chats relate and

12    it just happens to be a different page.

13                   MR. TURNER:  Yes, your Honor.  And you can see that in

14    the name of the file that's at the top of the header of the

15    document.  It is from the same file as the other ones.

16                   THE COURT:  All right.

17                   MR. TURNER:  All the other ones with that same

18    individual.

19                   THE COURT:  So this was out of all of the others for

20    the Cimon, or Simon, log that were previously admitted, this is

21    jury another excerpt of the same group, is that right?

22                   MR. TURNER:  Correct.

23                   THE COURT:  OK.  All right.  Thank you.

24                   Was there anything else which you folks wanted to

25    raise before we take our own mid-morning break?

F1sdulb3                        Alford - direct

1              MR. TURNER:  No, your Honor.

2              THE COURT:  Mr. Dratel?

3              MR. DRATEL:  No, your Honor.

4              THE COURT:  All right.  Thank you.  Let's take a short

5       break and we'll come back.

6              THE CLERK:  All rise.

7              (Recess)

8              THE COURT:  Let bring out the jury.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                THE CLERK:  All rise as the jury enters.

2                (Jury present)

3                THE COURT:  All right.  When you get to your seats,

4     please be seated.  Thank you.

5                And, Joe, there is something that is buzzing.

6                Mr. Turner, you may proceed, sir.

7                MR. TURNER:  Thank you.

8     BY MR. TURNER:

9     Q.  Agent Alford, did any agents in your group ever make any

10    uncover purchases of drugs from Silk Road?

11    A.  Yes.

12               MR. TURNER:  Your Honor, I have a stipulation to read.

13    It has been marked as Government Exhibit 802A.

14               THE COURT:  All right.

15               MR. TURNER:  And while I am reading, may I publish

16    Government Exhibit 802 for the jury, which is what it

17    corresponds to?

18               THE COURT:  Yes.

19               Any objection to -- well, 802, is it already in or are

20    you offering it?

21               MR. TURNER:  I am offering it based on the

22    stipulation.

23               THE COURT:  On the stipulation.

24               Mr. Dratel?

25               MR. DRATEL:  No objection.

1          (Government's Exhibit 802 received in evidence)

2          THE COURT:  All right.  Proceed.

3          MR. TURNER:  Thank you.

4          "It is hereby stipulated and agreed by and between the

5  United States of America, by Preet Bharara, United States

6  Attorney for Southern District of New York, Serrin Turner and

7  Timothy Howard, Assistant United States Attorneys, of counsel,

8  and Ross Ulbricht, by and through his counsel Joshua Dratel,

9  Esq., as follows:

10          "1.  If called to testify, Shelby Richardson, a

11  Special Agent with the Drug Enforcement Administration ("DEA")

12  would testify that from September 2011 to May 2013, Special

13  Agent Richardson attempted a total of eight undercover

14  purchases from the Silk Road website using the Silk Road

15  username 'downersforyou.'  Government Exhibit 802 is a

16  spreadsheet reflecting the results of the undercover purchases.

17  The column labeled 'Purchase Date' indicates the date the order

18  was placed on the website.  The column labeled 'Vendor'

19  indicates the username of the vendor with whom the order was

20  placed.  The column labeled 'drug Ordered' indicates the type

21  of drug ordered.  The column labeled 'Delivery Date' indicates

22  the date that the order was retrieved from the mailing address

23  designated by Special Agent Richardson and placing the order.

24          "All of the orders reflected in the spreadsheet were

25  placed by Special Agent Richardson using a computer located in

1    the Southern District of New York and were shipped to an

2    undercover mailing address located in the Southern District of

3    New York.  All of the substances received were submitted to the

4    DEA Northeast Laboratory for testing.

5            "2.  If called to testify Russell J. Gallis, a

6    forensic chemist with the DEA, would testify that on the dates

7    indicated in the column of Government Exhibit 802 labeled 'Lab

8    Test Date' Mr. Gallis tested each of the substances Special

9    Agent Richardson transferred to the DEA Northeast Laboratory.

10   The column of the spreadsheet labeled 'Net Weight' reflects the

11   weight of each substance submitted for testing after removal of

12   any packaging.  The column of the spreadsheet labeled 'Drug

13   Detected' indicates any illegal drugs the substance was found

14   to contain through testing a sample of the substance using

15   reliable laboratory procedures.  As reflected in the

16   spreadsheet, all substances submitted by Special Agent

17   Richardson tested positive for illegal drugs."

18           Your Honor, the government offers Government Exhibit

19   802 and the stipulation 802A into evidence.

20           THE COURT:  802 has been received and 802A is received

21   as a stipulation.

22           (Government's Exhibit 802A received in evidence)

23           MR. TURNER:  Thank you.

24   BY MR. TURNER:

25   Q.  Agent Alford, did you yourself participate in any

F1sdulb3                          Alford - direct

1   undercover purchases from Silk Road?

2   A.  Yes.

3   Q.  What did you purchase?

4   A.  I purchased a hacking pack.

5   Q.  And by "hacking pack," what do you mean?

6   A.  It is -- it was a listing for tools for someone to acquire,

7   computer programs or tools to perform computer hacking.

8           MR. TURNER:  Could we actually publish Government

9   Exhibit 116B, which has already been admitted into evidence.

10  Q.  The jury saw this earlier.  Is this the listing for what

11  you purchased?

12  A.  Yes.

13  Q.  And the advertisement is for "HUGE hacking pack, 150+

14  hacking tools & programs, "is that right?

15  A.  Yes.

16  Q.  And would you take a look at Government Exhibit 340B in

17  your binder.

18          Do you recognize this document?

19  A.  Yes.

20  Q.  What is it?

21  A.  It is a screenshot of the order that we placed for the

22  previously mentioned listing.

23  Q.  And what is the date of that screenshot?

24  A.  September 20, 2013.

25  Q.  Is that around the same time that you -- that your group

F1sdulb3                        Alford - direct

1    made the purchase?

2    A.  Yes.

3              MR. TURNER:  The government offers Exhibit 340B into

4    evidence.

5              THE COURT:  My 340B is different from what you have

6    just described.  I think that corresponds with what I have

7    marked as 340A.  Am I wrong about this?

8              MR. TURNER:  There should be a verified order section

9    at the bottom.

10             THE COURT:  340A relates to the hacking tools.  Is

11   that what you are attempting to --

12             MR. TURNER:  Both should, your Honor, 340A and 340B.

13             THE COURT:  B relates to something else that I've got

14   in my binder unless you have changed the exhibit numbers.  I

15   just want to make sure that I understand what we are receiving

16   into evidence.

17             (Pause)

18             MR. TURNER:  Your Honor, maybe if you look at the

19   bottom portion of 340B.

20             THE COURT:  Yes.

21             MR. TURNER:  That is what I am going to be referring

22   to.

23             THE COURT:  Oh, I'm sorry.  OK.  I was looking at the

24   top portion of 340B.  All right.

25             MR. TURNER:  OK.

F1sdulb3                          Alford - direct

1        THE COURT:  340B, Mr. Dratel?

2        MR. DRATEL:  Objection with respect to hearsay and

3   Vayner.  Hearsay certainly.

4        THE COURT:  I'm sorry.  It is a hearsay objection?

5        MR. DRATEL:  Yes.

6        THE COURT:  Hearsay and Vayner?

7        MR. DRATEL:  Yes.

8        THE COURT:  All right.  Overruled.

9        Government Exhibit 340B is received.

10       (Government's Exhibit 340B received in evidence)

11       MR. TURNER:  Could you zoom in to the "Verified

12  Orders," Mr. Evert.

13  Q.  So this is -- could you explain what is shown here, Agent

14  Alford?

15  A.  It is the record that we received from the Silk Road

16  marketplace about our completed -- we as soon as we completed

17  the order, we added it to cart so that is what is represented

18  in the account.

19  Q.  All right.  You said you placed this order around

20  September 20, 2013?

21  A.  Yes.

22  Q.  And what was the result of the order?

23  A.  We received a response with links to click on.

24  Q.  And where did you receive that response?

25  A.  Into the same account on the Silk Road marketplace.

F1sdulb3                    Alford - direct

1    Q.   What feature of the Silk Road system?

2    A.   The messaging system.

3    Q.   Could you take a look at 340A, and do you recognize this

4    exhibit in your binder?

5    A.   Yes.  It is a screenshot of the response we got back on the

6    Silk Road marketplace for the order we placed.

7    Q.   And the response you got back from who?

8    A.   The Silk Road marketplace and the vendor.

9    Q.   From the vendor?

10   A.   Yes.

11   Q.   OK.

12              MR. TURNER:  Your Honor, we offer 340A into evidence.

13              MR. DRATEL:  The same objection, your Honor.

14              THE COURT:  All right.  340A is received.

15              (Government's Exhibit 340A received in evidence)

16              MR. TURNER:  Zoom into the -- actually, could you go

17   up top, Mr. Evert, to the title there, the "Huge."

18              From:  Sniffsniff5.0.

19              Subject Line:  HUGE hacking pack, 150-hacking tools &

20   programs.

21              And then could you go down, Mr. Evert, to the body of

22   the message.

23              All right.  It says "hello," and then there are a

24   bunch of links, or three links specifically.  And then it says

25   "Freebies."  There are a series of other links.  Then it says,

F1sdulb3                         Alford - direct

1    "Please keep in mind that not all program will work in each

2    folder, but that's why I'm sending you extra working programs.

3    Thank you for purchasing my listing.  If you have any

4    questions, feel free to send me a message."

5           Did you yourself click on any of the links you got

6    back in response to this message?

7    A.  No.

8    Q.  What did you do with this information?

9    A.  Provided it over to the FBI.

10          MR. TURNER:  No further questions, your Honor.

11          THE COURT:  All right.  Thank you.

12          Mr. Dratel.

13   CROSS-EXAMINATION

14   BY MR. DRATEL:

15   Q.  Well, just about good afternoon, Agent Alford.

16   A.  Good afternoon.

17   Q.  I want to go back to something you testified about this

18   morning, government Exhibit 317.

19   A.  Yes.

20   Q.  That is an image attached to an email, correct?

21   A.  Correct.

22   Q.  If we can go to the image.

23          Now, if we go to the box there in the image on the

24   left.  And that is a chat window, correct?

25   A.  Yes.  It appears so.

F1sdulb3                          Alford - cross

1   Q.  It is a Pidgin chat window?

2   A.  That is reflected in the screen?

3   Q.  Yes.

4   A.  Yes.

5   Q.  So if you look at the screen that's behind the first

6   screen -- do you see -- and that would be the one that

7   Mr. Ulbricht is operating on, right?

8   A.  I can't say.

9   Q.  Well, there is a different avatar at the bottom right

10  there, correct?  There is an avatar at the bottom right there,

11  correct?

12  A.  That -- what you are pointing at?

13  Q.  Yes.

14  A.  Yes, that's an avatar.

15  Q.  And I want to go back to Government Exhibit 201 and show it

16  to you on the screen:

17  A.  Just 201?

18  Q.  F.  201F.

19          (Pause)

20          I'm sorry.  201G.

21  A.  201G?

22  Q.  It is already in evidence.

23  A.  All right.  Got it.

24  Q.  If you look on the bottom right, this is from the day of

25  Mr. Ulbricht's arrest, correct?

F1sdulb3                    Alford - cross

1   A.  I was not at his arrest.

2   Q.  But you are familiar with the photographs taken of his

3   laptop?

4   A.  Yes.

5   Q.  This is one of them, correct?  It is already in evidence.

6   A.  OK.  Yes.

7   Q.  That avatar on the bottom right is someone with a sword

8   essentially, right?

9   A.  Yes.

10  Q.  And a mask?

11  A.  It is pretty blurred, but, yes, I've seen that avatar.

12  Q.  That is Dread Pirate Roberts' avatar?

13  A.  Yes.

14  Q.  I want to go back to yesterday -- Monday, I guess -- your

15  testimony with respect to those original Altoid posts that you

16  testified about, correct?  Do you understand what I am talking

17  about, with bitcoin talk forum and shroomery.org?

18  A.  Yes.

19  Q.  All of those, with one exception which I will talk about,

20  were in the first half of 2011, right?

21  A.  2011?

22  Q.  Yes.

23  A.  The time indicated on the screenshot was 2011.  I did not

24  take them in 2011.

25  Q.  No, I'm not saying you took them in 2011, but the dates of

F1sdulb3                          Alford - cross

1    those posts were 2011?

2    A.  Yes.

3    Q.  In your first half.

4          Then there was one from October of 2011.

5          MR. DRATEL:  If we can go to government 306, please.

6    Q.  So just look at the date first.  That is October 11 -- I'm

7    sorry, October 11, 2011, right?

8    A.  Yes.

9    Q.  And that is about -- that is from Altoid, right?

10   A.  Correct.

11   Q.  "Looking for an IT person for a bitcoin startup company,"

12   right?

13   A.  Yes.

14   Q.  And then as contact information, it leaves the address

15   rossulbricht@Gmail.org -- @gmail.com, right?

16   A.  Correct.

17   Q.  And this is eight months after those other posts -- at

18   least eight months from the other posts that you talked about

19   in Government Exhibit 301, 302, 303, 304 -- if you want to --

20   A.  Are you talking about the Altoid posts?

21   Q.  Yes.

22   A.  Yes.  Approximately eight months after.

23   Q.  Now, as you mentioned just before, you didn't do that at

24   the time that those were posted, when you took those

25   screenshots down, right?

1              MR. TURNER:  Objection to form.

2    Q.  When you took those screenshots down, it was not at the

3    time that the posts were made back in 2011?

4    A.  No, I wasn't on the case.

5    Q.  So what you did was historical research on the Internet,

6    right?

7    A.  Yes.

8    Q.  And so what you showed us with those Altoid posts and that

9    information was from clicking -- well, first, putting in search

10   terms, right?

11   A.  Yes.

12   Q.  Restricting the dates, right, that you told us Monday,

13   right?

14   A.  Yes.

15   Q.  And putting in those search terms.  And then when you had

16   results, you would click on links and that took you to those

17   posts, right?

18   A.  Yes.

19   Q.  And so anyone using Google, or whatever search engine you

20   might use, putting in search terms like that would find the

21   same results, right?

22   A.  Yes.

23   Q.  Now, you researched everything you could about Mr. Ulbricht

24   in 2013, right, at some point in 2013, correct?

25   A.  I don't know about "everything" but a lot.

F1sdulb3                          Alford - cross

1    Q.  Everything you could find, pretty much, on open records and

2    a lot of subpoenas, as well?

3              MR. TURNER:  Objection.  Beyond the scope.

4              THE COURT:  Well, I think -- rephrase.  Why don't you

5    rephrase it, Mr. Dratel.

6              MR. DRATEL:  Sure.

7    Q.  Did you do a lot of open-source research on the Internet

8    with respect to finding out about Mr. Ulbricht?

9    A.  I don't know about your definition about "a lot" but I did

10   do public-source research on Mr. Ulbricht.

11   Q.  What kind of public-source research did you do?

12             MR. TURNER:  The same objection.  Beyond the scope.

13             THE COURT:  I will allow it.  We'll see where it is

14   going.  I will allow a few.

15   A.  Well, there is Internet searches.  We have a public records

16   search that we use.  FinCEN.

17   Q.  Can you explain what FinCEN is?

18   A.  It's a Financial Crimes Enforcement Network.  There is a

19   database where you can go into the database to look for certain

20   financial transactions that would be filed in the database.

21   Q.  Were there any results from your FinCEN search?

22             MR. TURNER:  Objection.

23             THE COURT:  Sustained.

24   Q.  You didn't find anything about Mr. Ulbricht from your

25   FinCEN search, correct?

F1sdulb3                        Alford - cross

 1              MR. TURNER:  Objection.

 2              THE COURT:  Sustained.

 3   Q.  You looked at his LinkedIn, right?  You looked at his

 4   LinkedIn --

 5              MR. TURNER:  The same objection.

 6   Q.  -- account?

 7              THE COURT:  Sustained.

 8              MR. DRATEL:  Your Honor, may we have a sidebar?

 9              THE COURT:  Yes.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1sdulb3                          Alford - cross

1                    (At the sidebar)

2                    THE COURT:  I will tell you the basis of my rulings

3        first so you know that they are beyond the scope of the direct

4        examination.

5                    MR. DRATEL:  The direct examination included things

6        that he found during his research.

7                    THE COURT:  And you can inquire into any of them.

8                    MR. DRATEL:  But I should also be able to go into what

9        he didn't find.  The scope of his investigation is fair game on

10       the cross.

11                   THE COURT:  No, it is not, not in the way that you are

12       doing it.  What you are trying to do is -- if you want to ask

13       somebody about LinkedIn, you need to find a witness who has

14       talked about linked.

15                   MR. DRATEL:  I don't think so.  I think that if he has

16       done this investigation of him, they can't just narrow it.

17       What the scope is is not what he testified about; it is the

18       subject matter of his testimony.  The subject matter of his

19       testimony is he did Internet research on the guy.  And they are

20       allowed to put in the things they want to put in, I don't think

21       that is fair for the scope of cross.

22                   THE COURT:  You can't inadvertently build up his

23       character.

24                   MR. DRATEL:  I am not trying to.  That is not what the

25       question is about.

1           THE COURT:  Let me ask the government.

2           MR. TURNER:  Your Honor is exactly right.  We have

3      been over this territory before.  If they want to use evidence

4      in their affirmative case that their LinkedIn page, first of

5      all, is not hearsay and it is properly authenticated and it is

6      somehow relevant to the defendant's case, they can do that.

7      They don't get to do that through this witness.

8           THE COURT:  All right.  My ruling stands.  OK?  So

9      stay within the investigation, stay within the areas of search.

10     But if there are things where you are wondering if they are

11     within that you haven't yet covered, you can ask a question and

12     I will sustain an objection but --

13          MR. DRATEL:  Yes.  I need to make a record.

14          THE COURT:  You can make a record at the break.  That

15     we can do at the break.

16          MR. DRATEL:  I need to ask the questions.

17          THE COURT:  We can make a record as to various things

18     at the break.  But if you want to cover certain things which

19     you think are in a gray area right now, I am not going to

20     preclude you from doing that.  But if there are things that you

21     can do other than what you know is going to be objectionable,

22     then let's go ahead and do them now.

23          MR. DRATEL:  I don't know what is objectionable.  In

24     my experience, I have in never been so curtailed with

25     cross-examination of an agent who has done a wholesale

F1sdulb3                        Alford - cross

1    investigation of the defendant and then to be only limited to

2    the things that the government wants to put in is just, to me,

3    I will have to get through this and see where we are.

4            THE COURT:  I am comfortable with my rulings despite

5    your experience.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1sdulb3                        Alford - cross

1    (In open court)

2    (Pause)

3    BY MR. DRATEL:

4    Q.  Now, with respect to the hacking tools that you talked

5    about just before you completed your direct testimony, you did

6    not click on any of those links, correct?

7    A.  No, I did not click on any of the links.

8    Q.  So when you were assigned to the Silk Road case, you

9    obviously examined a significant amount about the site,

10   correct?

11   A.  Yes.  I researched the site.

12   Q.  Would you -- is it fair to say, it was the most

13   sophisticated and extensive criminal marketplace on the

14   Internet today?

15            MR. TURNER:  Objection.  Foundation.

16            THE COURT:  I think you need to lay more of a

17   foundation --

18   Q.  Well --

19            THE COURT:  -- for this witness for comparison.

20            MR. DRATEL:  Yes.

21   Q.  Had you ever seen an Internet site as sophisticated as Silk

22   Road in terms of a place where you could buy drugs on the

23   Internet?

24            MR. TURNER:  Objection to form.  Foundation.  403.

25            THE COURT:  I will allow it.  You may answer.

F1sdulb3                        Alford - cross

1   A.  I can't really say.  It was my first case, so it was the

2   one and only so.

3   Q.  Well, didn't you write that it was the most sophisticated

4   and extensive criminal marketplace on the Internet today?

5   A.  At the time of the investigation?  At which time are you

6   talking about?

7   Q.  September 30, 2013, in the civil forfeiture complaint that

8   you signed.

9   A.  Yes.

10  Q.  And Silk Road in its current form at the time as of

11  September 30, 2013 was created on or about June 18, 2011,

12  right?

13          MR. TURNER:  Objection to form.  Foundation.

14          THE COURT:  Do you mean to say -- why don't you

15  rephrase the question.  So I think that you want to compare the

16  June 2011 to September 2013.

17  BY MR. DRATEL:

18  Q.  Well, the Silk Road that existed in September of 2013 was

19  in that form created on or about June 18, 2011, right?

20          MR. TURNER:  Objection.  Foundation.

21          THE COURT:  If you know.

22  A.  I don't know if it was created at that time.  I came by the

23  case in 2013.

24  Q.  Did you write "Silk Road in its current form was created on

25  or about June 18, 2011," did you write that September 30, 2013

F1sdulb3                          Alford - cross

1    in the civil forfeiture complaint that you signed under oath?

2              MR. TURNER:  Objection to the foundation of the claim.

3              THE COURT:  I will allow the question.

4    A.  I would have to refresh my memory.  I would have to see the

5    document.

6              MR. DRATEL:  I show you what's marked 3501-207 through

7    -263.

8              (Pause)

9              MR. TURNER:  Your Honor, the government objects.  The

10   complaint says, "Upon information and belief."

11             THE COURT:  Hold on.  Hold on.  Let me just --

12             MR. DRATEL:  He said --

13             THE COURT:  I understand.  Can I just take a look at

14   it?  I don't have that series handy.  Sorry.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F1sgulb4                          Alford - cross

1              THE COURT:  Mr. Dratel, can you point me to a page?

2              MR. DRATEL:  Sure.  245, your Honor.

3              THE COURT:  245.  With the signature?

4              MR. DRATEL:  Is that the signature page?  I thought

5    that was --

6              THE COURT:  245 is not a signature page.

7              MR. DRATEL:  Oh, the signature page.  There's --

8              THE COURT:  You said he signed something.

9              MR. DRATEL:  238.

10             THE COURT:  238?

11             MR. DRATEL:  Wait.

12             THE COURT:  The only signature I have is on the last

13   page, but there may be another one.

14             MR. DRATEL:  No.  There's another page, your Honor.

15             THE COURT:  All right.  Hold on.  Hold on.  It's pages

16   208 through I think it's 238 or 228.  I can't tell.  It's cut

17   off.  Let me just take a look.  I'll allow it.

18             Mr. Dratel.

19             MR. DRATEL:  Thank you.

20             THE COURT:  The government can bring out what it wants

21   to bring out in cross or redirect.

22             MR. DRATEL:  Thank you, your Honor.

23             THE COURT:  I'm sorry.  There are some pages.

24             MR. DRATEL:  Thanks.

25   A.  May I see it.

F1sgulb4                              Alford - cross

1   Q.  Yes.  Certainly.  I'm just going to caddycorner it for you

2   here.

3   A.  Thank you.

4   Q.  I ask you to look at 245, if you want to look at the

5   document, but I'm directing you to 245.

6            THE COURT:  There are two different documents in the

7   pile that I had.

8            MR. DRATEL:  Right.

9            THE COURT:  The first pile on the right was the one

10  with the signature that I was referencing.

11           MR. DRATEL:  Right.

12           THE COURT:  That's Exhibit A to the same document,

13  Mr. Dratel?

14           MR. DRATEL:  Yes.

15  A.  My signature page --

16  Q.  Your signature page is here.

17           THE COURT:  To be clear, that's not his statement in

18  Exhibit A.  You'll rephrase that.

19           MR. DRATEL:  I'll get to that.

20           THE COURT:  Thank you.

21  A.  Can you point to my signature page?

22  Q.  Sure.  It's on the back of that first document.

23  A.  This one?

24  Q.  Let me go up there and make sure we're looking at the right

25  one.  This document.

F1sgulb4                      Alford - cross

1   A.  Okay.  All right.  Thank you.

2   Q.  And let me show you one other thing and draw your attention

3   to this and make sure I have the right page.  Okay.  So, look

4   at page 215 which is your -- which is the civil forfeiture

5   complaint.

6   A.  Okay.  This one.  Yes.

7   Q.  That incorporates by reference the other document, correct?

8   A.  Yes.

9   Q.  So when you do that, you're incorporating by reference

10  meaning you're adopting everything in there, right?

11          MR. TURNER:  Your Honor, the government objects on

12  hearsay grounds.  The witness should not be permitted to

13  testify --

14          THE COURT:  If it's an adopted statement, let me just

15  ask, apart from a legal definition of incorporation by

16  reference, Mr. Dratel, why don't you ask him what he meant he

17  intended to do.

18  Q.  What did you intend to do by incorporating by reference

19  that other document?

20  A.  This document?

21  Q.  Yes.

22  A.  I was incorporating it into the civil forfeiture so we can

23  seize the --

24  Q.  Right --

25  A.  -- the servers.

F1sgulb4                    Alford - cross

1   Q.  But the purpose of putting that in there was to include all

2   the facts that were in there in the -- withdrawn.

3           The purpose of incorporating the complaint, the

4   criminal complaint by reference, was to incorporate all of

5   those facts into the civil forfeiture complaint, correct?

6   A.  Correct.

7   Q.  So if you look at page 245, --

8   A.  Yes.

9   Q.  -- does that refresh your recollection?

10  A.  Yes, it does.

11  Q.  That the current form Silk Road was created on or about

12  June 18, 2011?

13          MR. TURNER:  The government objects on hearsay grounds

14  and beyond the scope.

15          THE COURT:  It's not beyond the scope.  It's for a

16  different purpose.

17          Mr. Dratel, why don't you, just so we have a clear Q

18  and A, though the prior question may have gotten so far lost

19  with the back and forth.

20          MR. DRATEL:  Thank you, your Honor.

21  Q.  So, does that refresh your recollection that you had stated

22  that in its current form, Silk Road was created on or about

23  June 18, 2011?

24  A.  Can you repeat the question.

25  Q.  Sure.  That you had stated that Silk Road in its current

F1sgulb4                        Alford - cross

1   form was created on or about June 18, 2011?

2   A.  It was my belief at that time.

3   Q.  But you stated it under oath in that document, right?

4   A.  Yes.  It was my belief.

5   Q.  And that was based on your looking at all of the evidence

6   available to you from the Internet and from other pieces of

7   your investigation as well, right?

8            THE COURT:  I think we need to be clear.  The

9   statement was admitted for the limited purpose of impeachment

10  and refreshing recollection, not for the truth of the

11  statement, just so that it's clear.  I think you should proceed

12  accordingly.

13  Q.  On October 19, 2011, there was an outage on the Silk Road

14  that was reported, right, on the site?

15  A.  I don't know.  October 19?

16  Q.  2011, did you see posts indicating an outage on the Silk

17  Road October 19, 2011?

18           MR. TURNER:  Objection; beyond the scope.  He's

19  already testified.

20           THE COURT:  I don't know yet.

21           MR. TURNER:  He testified his investigation did not

22  begin until 2013.

23           THE COURT:  Hold on.

24           Does this tie in directly to one of the posts the

25  government has showed him?

F1sgulb4                          Alford - cross

1            MR. DRATEL:  Well, it's the same time as that

2     October 11 post that they showed, the Altoid post.

3            THE COURT:  All right.  Why don't you go ahead and

4     proceed.

5     Q.  October 19, 2011, you're aware of posts on Silk Road that

6     there was an outage on the site at that time, correct?

7     A.  I'd have to see those posts.

8     Q.  Okay.  Look at 247.  See if that --

9     A.  I see it.

10    Q.  Okay.  The October 19, 2011 posts reported an outage on the

11    site at Silk Road?

12           MR. TURNER:  Your Honor, hearsay and beyond the scope.

13    We'd like a side bar.

14           THE COURT:  Hold on.  Let me take a look.  247?

15           MR. DRATEL:  Yes.

16           THE COURT:  I don't have that in my binder.  Can I

17    look at yours?

18           THE WITNESS:  Yes, ma'am.

19           THE COURT:  You're in the same document.

20           MR. DRATEL:  Yes.

21           THE COURT:  I'm sorry.  I was looking at Exhibit 247.

22    It's page 247.

23           MR. DRATEL:  No.  I'm sorry.

24           THE COURT:  Let's have a side bar.  Thanks.  You know,

25    I'll tell you what?  How do you folks feel about returning at

F1sgulb4                          Alford - cross

1    1:30 as opposed to 2:00?   Or do you have problems?  No, we

2    can't do that.  We can't do that.

3            We'll take an extra few minutes and try to start five

4    or ten minutes early.  I don't want you sitting through this.

5    We'll probably have a couple of things to work out and I want

6    to make sure that it's smooth for you folks.

7            So does it work if we started at ten to 2:00 for

8    people or do you have problems with that?  I know some people

9    do things during the break.  All right.  Let's start at ten

10   minutes to 2:00.  That way, it's only a five-minute difference,

11   all right.  Thanks very much.  And I want to remind you not to

12   talk to each other or anybody else about the case.

13           Thank you.

14           (Jury excused)

15           THE COURT:  Agent Alford, you may step down and have

16   your lunch as well.

17           (Witness temporarily excused)

18           (Continued on next page)

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  Ladies and gentlemen, let's all be seated.

3    We have a couple of things that I think are worth doing now.

4    Let's start from the beginning of the things that we were going

5    to do at the lunch break and then we'll pick up, Mr. Turner,

6    with where you are, and I think that these logically fit

7    together.

8          First, Mr. Dratel, I had indicated to you at the side

9    bar that we had that at the break, you'd be able to make a more

10   of a record to the extent that you hadn't made the record that

11   you wanted to fully at side bar, so if there's anything else

12   you want to say, otherwise, we'll go straight to the issue that

13   is currently tee'd up.

14         MR. DRATEL:  Your Honor, to preclude me from going

15   through this witness' investigation when he did so much

16   research and looked at so many things and to -- I think is just

17   an improper curtailment of my cross-examination, and just to

18   put out some of the things that I was going to do is about him

19   researching Mr. Ulbricht, one is the LinkedIn, another is about

20   phone records, another is about posts with respect to certain

21   dates, TECS search that he did, and that puts us in the current

22   posture.

23         THE COURT:  All right.  As for the phone records and

24   the posts of certain dates, of course, if they relate to any of

25   the matters that were opened on the direct examination of this

F1sgulb4                    Alford - cross

witness, you're certainly welcome to go into them.  The

investigation that this witness conducted to the extent that he

testified about it or is logically related to the scope as

scope is defined under the case law, you can go into it.  But

what you've been doing for the questions on LinkedIn and FinCEN

search or whatever it's called --

            MR. TURNER:  FinCEN.

            THE COURT:  -- FinCEN was beyond the scope, and I

suspect that TECS search is the same, although I don't know

what TECS search is, it wasn't opened up on direct.

            It's certainly the case that there are a variety of

instances when people are allowed, and I know you referred to

in your experience, being allowed to do more things along the

lines of what you were suggesting where judges will allow some

amount of leeway, particularly in the absence of an objection.

But in the face of an objection, it is perfectly appropriate

under the case law to -- indeed, some would argue that it's not

only appropriate, but it's important under the case law so that

the jury does not have its time wasted or misled or brought

down alleys and byways it shouldn't otherwise be brought down

to limit the scope of cross-examination to the scope of the

direct.

            You have made your record in terms of the fact that

you believe this is within the scope of the direct and somebody

probably other than myself certainly will ultimately decide

F1sgulb4                    Alford - cross

1   that if you choose, if there is any appeal in this matter, if

2   there's even a conviction.  I don't know where this matter will

3   go, but that's my ruling on that issue.

4          Mr. Turner, was there anything else the government

5   wanted to say on that particular issue?  Let's go on to the one

6   that is currently -- that we have tee'd up.

7          MR. TURNER:  I think this is endemic of a larger

8   pattern.  The LinkedIn, for example, if the defense wants to

9   use a LinkedIn page, they have to have a valid basis.  First of

10   all, they have to get authenticated LinkedIn records, either by

11   stipulation or authentication by a document custodian, but then

12   it would have to clear the hearsay bar.  And if they're

13   introducing it -- for example, if the LinkedIn page says I,

14   Ross Ulbricht, was running Good Wagon Books and now I'm doing

15   an economic experiment, that is hearsay.  They cannot get that

16   in.  They can't get it in through this witness.  They can't get

17   it in through another witness.  And the fact that this witness

18   may have looked at the LinkedIn page does not change that in

19   any way.  It's hearsay, and it should not come in.  And it's

20   the same for the documents we're talking about now.

21          What we're talking about is a forfeiture complaint

22   that this witness signed that is based on hearsay in part.

23   Agents can sign complaints based on all sorts of things:

24   Information they get from other agents.

25          THE COURT:  The issue that you segued into now, which

F1sgulb4                    Alford - cross

1    is the verified complaint, which this witness did sign the

2    first whatever number of pages it is under oath is a sworn

3    statement.

4              MR. TURNER:  Right.

5              THE COURT:  And it does incorporate the second

6    document sworn under oath by a different agent.

7              MR. TURNER:  Right.

8              THE COURT:  That, though, I think raises a *Ramirez*

9    issue if I have the name of the case correct.  I have actually

10   forgotten.  It's the case.  In any event, we were looking at,

11   that set of case law not too long ago in connection with a

12   different issue, which is, confronting the witness with a

13   statement or an admission if it's something that's material to

14   the case.

15             Now, there's a difference, and the reason that I

16   allowed it in for this witness was not for that purpose but was

17   because it was potentially impeachment purposes to show that he

18   said he didn't recall making the statement and then he then

19   recalled making the statement, so they can use a lot of

20   different statements for that.  But to the extent that

21   Mr. Dratel was going into the truth, I think we get into a

22   debate about admissions of a party opponent.

23             MR. TURNER:  I think that's exactly where we're

24   headed, your Honor, because that's why the defense keeps on

25   wanting to pull these documents out.  They want to pull from a

1    criminal complaint that somebody else signed.  All the

2    forfeiture complaint says is, you know, on this date, a

3    complaint was signed and it's attached hereto as Exhibit A,

4    incorporated by reference.

5         So this is an example where all the agent knows is

6    that some other agent said this about a post on Silk Road.

7         THE COURT:  Why couldn't Mr. Dratel, under that line

8    of cases that we discussed and I recited, just stand up and

9    recite facts which he believes are material and remain in

10   dispute?

11        MR. TURNER:  Because, first of all, we don't accept

12   that a criminal complaint sworn out by an agent is an admission

13   on the part of the government that can be just admitted through

14   an Agent Alford's testimony.

15        THE COURT:  I'm remembering the cases.  It's the *GAF*

16   case and the line of cases around the *GAF* case that I had in my

17   robing room, so I'll read it again.

18        MR. TURNER:  *GAF* was a bill of particulars signed by

19   an attorney and *Ramirez* specifically reserved decision on

20   whether an agent affidavit should be treated the same way.

21   There is no case law that specifically holds that an agent

22   affidavit should be treated the same way.

23        But if the defense wants to show there was some post

24   at some time, they have a copy of the servers.  They can do

25   this in the defense case.  They can say we looked at the

F1sgulb4                    Alford - cross

1    servers, there was a forum post on this date and make whatever

2    point they want to make, which I don't think honestly is

3    relevant in any event; but this is the wrong way to do things

4    through this agent which it's beyond the scope, he didn't

5    testify about posts that he saw on Silk Road, no testimony at

6    all about anything this agent saw on Silk Road, except the

7    hacking offer that he bought from, it is beyond the scope.  And

8    for them to try to insert their defense case in this circuitous

9    way is confusing to the witness, it violates the hearsay rules

10   and it's not proper.

11          MR. DRATEL:  It can't be confusing to the witness.  He

12   swore to all of that.  He wrote out that complaint.  Not only

13   that, he wrote the other complaint, but Agent Tarbell signed

14   it, and that's the way this case went down.

15          The other thing is, it is astonishing, contrary to

16   case law, contrary to due process, contrary to every rule there

17   could possibly be that they could have an agent swear to facts

18   to take to a judge to get a result and then come in here and

19   disavow it, and that's exactly what the Second Circuit says.

20          MR. TURNER:  To be clear --

21          MR. DRATEL:  They cannot do that.

22          MR. TURNER:  I'm not disavowing any facts.  What I'm

23   saying is, this is the wrong way to go about getting the

24   defense case in.  It's beyond the scope.  It relies on hearsay.

25   If they want to introduce those posts, they can do it by having

F1sgulb4                        Alford - cross

their computer person explain that these posts were pulled off

the server, the screenshots were taken at a particular time,

make whatever points they want.  We're not saying at all

anything in the complaint is inaccurate.  The point is, this is

the wrong way to go about proving the defense case.  We already

went through this to some extent.

MR. DRATEL:  Then I would move to strike all of Agent

Alford's testimony with the exception of what he actually did

on the Internet, because everything else is hearsay, everything

else is beyond his knowledge, everything else is fed to him so

he can testify to that and then not be cross-examined.  That's

what's happening here.

MR. TURNER:  The records he testified about were

properly authenticated with stipulations.

THE COURT:  Anyway --

MR. DRATEL:  That's not the issue, he's not the proper

witness.

THE COURT:  Special Agent Alford or Agent Alford -- is

he a special agent or an agent?

MR. TURNER:  Special Agent.

THE COURT:  Special Agent Alford, the testimony that

he gave on direct, the Court had rulings.  To the extent there

were objections, the Court dealt with them at the time.

In terms of the particular issue, which we're dealing

with right now, which is the verified complaint, there are two

1    analytically distinct issues that I want to separate:  One is

2    the extent to which it can be used with this witness right now

3    on cross, and separately the extent to which the defendant may

4    use it in connection with a defense case.

5            The second and latter use is a use that will come when

6    we -- and a ruling on that will come logically once the defense

7    case commences if the defendant chooses to put one on.  The

8    former issue is first and foremost dealt with in terms of the

9    scope of the direct examination and not going beyond the scope.

10           Here, however, what I'm going to do is, I want to

11   reread, which I can do with my LiveNote, some of Special Agent

12   Alford's direct.  I've got a little bit of time before I have a

13   matter coming up where I can do that so that I can refresh

14   myself as to the scope of the direct.  I encourage you folks to

15   do that as well so we don't end up with either examination that

16   goes where it shouldn't go or objections that go where they

17   should not go because he did start on Monday.  Being refreshed

18   on it I think is useful.

19           Then in terms of impeachment, if there's something on

20   direct and there is a statement that this witness made that was

21   contrary to that anywhere, then that obviously can be used for

22   impeachment purposes and the origin of that statement is not

23   particularly relevant.

24           Mr. Turner.

25           MR. TURNER:  Understood, your Honor.  I don't think

F1sgulb4                        Alford - cross

1    the witness was impeached with respect to any statement he made

2    on direct.  I think what the pattern is, you made this -- isn't

3    this true that there was this post, okay, that the agent had

4    actually never seen before himself, has no personal foundation

5    at all; then the agent says I don't know, and then he says,

6    well, didn't you say this, he shows him the affidavit of

7    another agent to impeach him on that statement.  And then it's

8    using that to try to get in the fact that there was this post

9    actually made that this agent actually has no foundation

10   himself to testify about.  Again, this is not the proper way to

11   get it in there and it's for the truth.

12            THE COURT:  I understand the arguments.

13            Mr. Dratel, do you have something you wanted to add?

14            MR. DRATEL:  No.

15            THE COURT:  I understand the arguments.  Let's take

16   our lunch break now.  Unless there's something else that you

17   folks would like to raise, why don't we come back at quarter

18   of.  We'll talk about the resolution of this issue.  I would

19   like you back at a quarter of.  The jury actually will back

20   hopefully at ten of.  They're scheduled to be back then and

21   then we can resume.

22            Let me ask the government who is next.

23            MR. TURNER:  After this, it will be HSI Special Agent

24   Dylan Critten.

25            THE COURT:  Let's take our own lunch break.  Thank

F1sgulb4                         Alford - cross

1    you.  I have a matter at 1:30, but I don't think I need to have

2    you folks.  I can do it in the robing room.

3                 (Luncheon recess)

4                 (Continued on next page)

F1sgulb4                    Alford - cross

                        AFTERNOON SESSION

                          1:45 p.m.

           (In open court; jury not present)

           THE COURT:  Let's all be seated for a moment before we
start again with the jury.

           I had an opportunity to go back over the transcripts
and have a fairly good and refreshed sense now of what was in
the scope of the direct.  And I also have a list of points that
were raised, but also just generally I can recall now much
better.

           I also went back to Second Circuit case law on
limitations of cross-examination and am satisfied that the
scope of direct of course, under both the Federal Rules of
Evidence as well as Second Circuit case law defines the scope
of cross-examination.

           Cross-examination, as we all know, is limited to
things like showing that the witness who testified is wrong
about a fact, is biased, is prejudiced, has self-interest, you
know, general motivations to testify in a manner that's either
for the government or suggests untruthfulness.

           Things which go into entirely new areas would be
beyond the scope of the direct.  Now, that of course, begs the
question as to what the phrase "entirely new areas" means, but
I am convinced and comfortable that things like LinkedIn, etc.,
TECS search and FinCEN are beyond the scope of the direct.

F1sgulb4                    Alford - cross

1           Now, in terms of the affidavit, that, I haven't read

2    every paragraph to know whether or not there's something in the

3    affidavit that goes to the points of whether the witness'

4    testimony is wrong, the testimony given on direct was wrong or

5    otherwise demonstrates bias, prejudice, motivation to testify

6    untruthfully, something like that.  If it does, then obviously

7    it would be appropriate, first, to set up that point and then,

8    second, to go into it.

9           Let me just give you some cases.  There are oodles of

10   Second Circuit case law on the points I have just stated:  *U.S.*

11   *v. Figueroa*, 548 F.3d 222, Second Circuit; *U.S. v. Lanza*, 790

12   F.2d 1015; *U.S. v. Pedroza*, 750 F.2d 187; *U.S. v. James*, 712

13   F.3d 79, and there are many other cases supportive of the

14   propositions that I've just stated.

15          So, the scope of the cross-examination for the witness

16   currently on the stand, Mr. Alford, will be limited to the

17   scope of the direct.  The scope of the direct will not include

18   things like, as we said before and I had already ruled before,

19   the LinkedIn, FinCEN, TECS search, or other matters which were

20   not raised and reasonably related to what was within the scope

21   of the direct.

22          In terms of the use of the declaration or affidavit or

23   complaint, the sworn statement, it will depend on whether or

24   not there are particular statements in there which go to one of

25   the areas that I've just suggested, but it has not been

1    proffered for that use at this point.

2              Mr. Turner.

3              MR. TURNER:  Yes.  Several points, if I may.

4              THE COURT:  Yes.

5              MR. TURNER:  In terms of the affidavit, I just want to

6    be very clear on what's going on:  There are two possible uses

7    the defendant could use it for and I think both of them are

8    improper here:  First is impeaching a prior inconsistent

9    statement.  On that point, all the affidavit says, this agent's

10   affidavit -- it's not even this agent's affidavit -- all the

11   civil forfeiture complaint says that the agent signed is that

12   on or about September 27th, 2013, the Honorable Frank Maas

13   signed this criminal complaint and this criminal complaint

14   alleges, among other things, and then it specifies what it

15   alleges, and then it attaches a copy.

16             It does not say "I know all these things to be true."

17   It just says there's another complaint out there that was sworn

18   on this date that alleges these things.

19             The agent has to say something contradictory to those

20   statements in order for that criminal complaint to be used as

21   impeachment material.  For example, if the agent were to

22   testify on this complaint, the criminal complaint was sworn

23   July 2013 when in the civil forfeiture complaint it says on or

24   about September 2013 it was signed, that would be inconsistent.

25   And then you could say, well, didn't you say here that it was

F1sgulb4                          Alford - cross

1   signed September --

2                    THE COURT:  I'm not sure if we're going to get

3   to -- because I don't know whether or not there is a statement

4   in that complaint which is inconsistent with what this witness

5   said on direct.

6                    MR. TURNER:  Right.

7                    THE COURT:  If there isn't, then we don't need to go

8   up that tree right now.

9                    MR. TURNER:  I just want to get clear ahead of time

10  what the scope of the statements are in the agent's own civil

11  complaint.

12                   THE COURT:  I hear your point, but before we have to

13  cross that bridge, let's find out whether that bridge needs to

14  be crossed in terms of that.

15                   MR. TURNER:  Absolutely.

16                   THE COURT:  I'm not ruling one way or the other on

17  that point because we may differ slightly.

18                   MR. TURNER:  In the interest of avoiding side bars, I

19  wanted to front our concerns.

20                   THE COURT:  I understand.  It would be helpful if you

21  had a copy of that.

22                   MR. TURNER:  I do.

23                   THE COURT:  Terrific.  You said you had other points

24  to make?

25                   MR. TURNER:  Right.  The only thing that this

1    complaint can be used to impeach the witness on is if he makes

2    some statement that contradicts his own statement in this

3    complaint.  But what the defense is trying to do is use this

4    prior statement and the reference it makes to a prior statement

5    of another agent is to get that information in for its truth,

6    but what they really want to do is to rely on *GAF*, and that's

7    wrong here for several reasons.

8         THE COURT:  But I don't think we need to get to *GAF*

9    because at this point that would come in, if at all, in the

10   defendant's affirmative case --

11        MR. TURNER:  Absolutely.

12        THE COURT:  -- should he choose to put one on.  So

13   that's the analytical second part that I spoke about before

14   lunch.

15        MR. TURNER:  That is absolutely our position.

16        THE COURT:  You don't need to argue it right now.

17        MR. TURNER:  That's fine.

18        THE COURT:  Hold your fire on that.  There may come a

19   time, but we're not going to get to the affirmative utilization

20   of any admissions or potential admissions or whether they're

21   not admissions until we get to the defendant's case.

22        MR. TURNER:  Thank you.

23        THE COURT:  Mr. Dratel, is there anything further you

24   would like to add?

25        MR. DRATEL:  Yes.  I don't think that those are the

F1sgulb4                        Alford - cross

1    only -- even though they're examples, they're certainly not

2    exhaustive as to what you can ask on cross-examination.  And

3    "entirely new areas" is a term that is ambiguous and vague, and

4    my point is that you can't have a witness testify about a

5    jigsaw puzzle, have him put one piece of the puzzle in evidence

6    and then be constrained from cross-examining about the other

7    pieces of the puzzle, and that's what I'm attempting to do.

8              THE COURT:  I hear your point.  I disagree with it.

9              Is there anything else you'd like to say in terms of

10   making your record?

11             MR. DRATEL:  Yes.  In the context of the investigation

12   as a whole, all of these issues are relevant and they go to

13   questions of bias and other issues with respect to that and I'm

14   going to develop that further in the rest of my

15   cross-examination.

16             THE COURT:  Let's just talk about all of these issues.

17   What issues are relevant to bias that you want to go into that

18   you say are these issues because if there are, for instance,

19   the LinkedIn account goes to bias --

20             MR. DRATEL:  The LinkedIn account goes to the fact

21   that it was made, the fact that the statement was made.

22             THE COURT:  So what goes to bias that you think is

23   captured within my ruling, because if so, and it truly goes to

24   bias, it should not be captured within my ruling and it's not.

25   I said bias is fair game and regular, run-of-the-mill

1   impeachment is certainly fair game.

2          MR. DRATEL:  The entire scope of the investigation is

3   a question of bias in the sense that what was done when and how

4   it evolved so that once this digital trail led to Mr. Ulbricht,

5   that was it, and everything else was dispensed with.

6          THE COURT:  That, in the Court's view, that's not

7   about bias.  You can go into any portion of the investigation

8   that this particular witness has testified about on cross and

9   if you need other things and he's an appropriate witness for

10  you to call on direct, you can cross that bridge when you come

11  to it, but the full investigation is not about bias or

12  impeachment or anything else.  He's here to testify about, on

13  cross-examination, matters within the scope of what he

14  testified about on direct.

15         MR. DRATEL:  But that doesn't insulate him from things

16  that he leaves out from things that are implicated and

17  contextural.  Cross-examination is about context.  It's not

18  about being limited to the questions that the prosecutor asked

19  and he's asking him in a leading fashion.

20         THE COURT:  If the context that you're talking about

21  is that you want to add in LinkedIn in the context of showing

22  what he did with Gmail, the answer is that's not appropriate

23  context.  If the context for Gmail is something relating to the

24  Gmail testimony that he gave, you're certainly welcome to build

25  up that area, but we're not going into the linked in area or

F1sgulb4                         Alford - cross

1    FinCEN or TECS search.

2              MR. DRATEL:  He does a thousand searches and all he's

3    got is what he puts here, and what about all the things they

4    don't have?

5              THE COURT:  That's the scope of your cross.  If you

6    want to call him in your case, you can list him as a witness

7    and make your decision and then you can proffer him and we can

8    determine if he's a relevant witness for you, but the scope of

9    his cross is what I've said.

10             Is there anything else, a new point that you would

11   like to add?

12             MR. DRATEL:  No.  With respect to cross-examining with

13   respect to the civil forfeiture complaint and the criminal

14   complaint, I only used it when he failed to recollect.

15             THE COURT:  He did, although I allowed you to go

16   beyond the scope.  When I was rereading that piece, I allowed

17   you to go beyond the scope to get to that statement, so you

18   were already beyond the scope.

19             MR. DRATEL:  This is someone who investigated the

20   history of Silk Road from the start and has accessed all of

21   these -- you know, it can't be that he looks at all of the

22   emails and he looks at all of the chats and he looks at the

23   laptop and looks at the servers --

24             THE COURT:  You can call him in your case, but for the

25   government's case, and they bear the burden of proof, they can

F1sgulb4                         Alford - cross

1    constrain the scope of their direct as they deem appropriate.

2    You can then cross them on the scope.  And then if you want to

3    put on another case, if you chose to do so, you have no

4    obligation to do so, you may do so.  And if he's relevant for

5    that and you have things to bring out where he's a precipient

6    witness, so be it.

7               Let's bring the jury out.  I want to know, is there

8    any new point:  These are the points we have already gone over.

9               MR. DRATEL:  No.

10              THE COURT:  All right.  Thank you.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1sgulb4                         Alford - cross

1              (In open court; jury present)

2              THE COURT:  I want to apologize to having you folks

3    ready to go at ten of, and I know you were.  All I can say is

4    the best laid plans.

5              We are on the cross-examination of Mr. Alford.

6              Mr. Dratel, you may proceed, sir.

7              MR. DRATEL:  Thank you, your Honor.

8     GARY ALFORD,

9    CROSS-EXAMINATION CONTINUED

10   BY MR. DRATEL:

11   Q.  Now, good afternoon, Agent Alford.

12   A.  Good afternoon.

13   Q.  You were focused in your investigation on trying to

14   identify Dread Pirate Roberts, correct?

15   A.  At one point, yes.

16   Q.  And did you come across evidence suggesting that there was

17   more than one Dread Pirate Roberts during the course of the

18   Silk Road?

19   A.  I did not.

20   Q.  Didn't you refer to Mr. Ulbricht at one point as the

21   original DPR?

22   A.  I don't recall that.  May I see the document?

23   Q.  Sure.  I show you what's marked as 3501-0002 and ask you to

24   just read that on top.

25   A.  "I received Google" -- The entire thing?

F1sgulb4                        Alford - cross

1    Q.  Don't read it.  Read it to yourself.  I apologize.

2    A.  Okay.  Okay.

3    Q.  Does that refresh your recollection that you, in December

4    of 2013, December 30th, 2013, referred to Mr. Ulbricht as the

5    original DPR?

6               MR. TURNER:  Objection; agent belief.

7               THE COURT:  He's asking whether or not he made that

8    statement.  You may answer.

9    A.  Yes.  I was referring to --

10   Q.  Just "yes" is fine.  Thank you.

11   A.  Yes.

12   Q.  And when you did all the -- when you looked for comparisons

13   of things that were happening online versus returns on

14   subpoenas and other things that you could find online such as

15   Google and other -- withdrawn.

16              When looking at Mr. Ulbricht, you were trying to

17   compare time frames with various things that were going on,

18   either on Google or Facebook -- Gmail, rather, or Facebook and

19   versus other things like chats and things like that, right?

20   A.  Information that was found on the laptop versus information

21   we found from outside.

22   Q.  And you did that a little bit with respect to Richard Bates

23   as well, correct?

24              MR. TURNER:  Objection; beyond the scope.

25              THE COURT:  Sustained.

F1sgulb4                          Alford - cross

1    Q.  Did you at one point find evidence that someone who worked

2    at eBay or PayPal was Dread Pirate Roberts?

3              MR. TURNER:  Objection; agent belief.

4              THE COURT:  Sustained.

5    Q.  One of the other purposes of your investigation was about

6    looking at bitcoins, correct?

7    A.  At bitcoins?

8    Q.  Trying to find bitcoin wallets and Silk Road bitcoin?

9              MR. TURNER:  Objection; form and beyond the scope.

10             THE COURT:  Well, I don't understand how it's within

11   the scope.  Sustained.

12   Q.  You had access to the Silk Road servers at some point, too,

13   correct?

14             MR. TURNER:  Objection; beyond the scope.

15             THE COURT:  I don't know where this is going.  I don't

16   find it within the scope.  I can't conceive how it's within the

17   scope.  Sustained.

18   Q.  Well, you talked about Government Exhibit 241, correct, on

19   your direct?

20   A.  Can you refresh.

21   Q.  The log?

22   A.  The log.

23   Q.  Yes.  In fact, there were other documents -- withdrawn.

24   You had access to the private messages, right, you reviewed

25   private messages on the Silk Road server?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sgulb4                          Alford - cross

1              MR. TURNER:  Objection; beyond the scope.

2              THE COURT:  I'll allow it.  Let him develop a few

3     questions on this.

4     A.  Can you repeat the question?

5     Q.  Sure.  By the way, all the things that you looked at and

6     that you went through today, you developed after the fact;

7     meaning that they weren't at the time that those posts were

8     made or those emails were sent or anything like that?  You did

9     all of that in the course of preparation for this trial,

10    correct?

11    A.  Everything had to be done after the fact.  It was -- it

12    happened before.

13    Q.  So you had access to private message system, right, that

14    was on -- from Silk Road on the servers, right?

15             MR. TURNER:  Same objection, and objection to form.

16             THE COURT:  What's the objection?

17             MR. TURNER:  Beyond the scope and the form.

18             THE COURT:  Sustained as to the scope.

19             If you're going to tie it -- are you going to tie it

20    into 241?

21             MR. DRATEL:  Yes.

22             THE COURT:  Tie it directly to 241 and then we'll

23    understand it.

24             MR. DRATEL:  I'm building a foundation.

25             THE COURT:  The parameters.

F1sgulb4                          Alford - cross

1    Q.  Let me show you what's marked as Defendant's E.  Let's go

2    back to 241 for a second.  Let's do that first.

3              Government's 241, if we can look at the first page at

4    the bottom?

5    A.  241 at the bottom.

6    Q.  Yes.  It's in evidence.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1sdulb5                              Alford - cross

1    Q.  Do you see the entry for April 2nd, 2013?

2               MR. TURNER:  Your Honor, objection.

3               May we have a sidebar, please?

4               THE COURT:  All right.  Hold on.

5               This is Exhibit 241 in evidence, right?

6               MR. DRATEL:  Yes.

7               THE COURT:  All right.

8               All right.  Let's have a short sidebar but we won't

9    have a long one.

10              (Continued on next page)

11              (Pages 1440 through 1442 sealed by order of the Court)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (In open court)

2   THE COURT:  All right.  You may proceed.

3   BY MR. DRATEL:

4   Q.  Let's look at the entry 3/21/2013, the top of that page of

5   Government Exhibit 241, which is in evidence.

6   It says, "Main server was ddosed and taken offline by

7   host."  Do you see that?

8   A.  Yes.

9   Q.  You know that that refers to a denial of service attack on

10  the Silk Road website, correct?

11  MR. TURNER:  Objection.  Foundation.

12  THE COURT:  Hold on.

13  MR. TURNER:  Beyond the scope.

14  THE COURT:  Why don't you build up the foundation

15  through his knowledge in that regard, Mr. Dratel.

16  BY MR. DRATEL:

17  Q.  You are aware that that refers to an attempted denial of

18  service attack on the Silk Road site at or around that time,

19  right?

20  A.  That's what the statement says, yes.

21  Q.  And if we go down to 3/25/2013, which is just a few entries

22  later, it says that "Server was ddosed, meaning that someone

23  knew the real IP," right?

24  A.  That's what it says.

25  Q.  And "real IP" meaning the real Internet protocol address of

F1sdulb5                    Alford - cross

1    the server, right?

2    A.   That is what IP, Internet protocol, means.

3    Q.   Right.  So this is March of 2013, right?

4    A.   Yes.

5    Q.   The same time as the Stack Overflow posts that you -- that

6    we saw this morning, right?  You know about the Stack Overflow

7    posts, right?

8              MR. TURNER:  Objection, foundation.

9              THE COURT:  Sustained.

10   Q.   You know about the Stack Overflow posts, correct, by

11   Mr. Ulbricht or Frosty, correct, in March of 2013?

12   A.   I am aware of it.

13   Q.   You have seen them, right?

14   A.   Which exact posts are you talking about?  The posts, all of

15   them?

16   Q.   I am talking about the posts on March 26, 2013 about code

17   and php and curl?

18   A.   I recall it being in March.  I'm not exactly certain if

19   that is the date, but I remember there was posts around that

20   time.

21   Q.   It is also the same time -- withdrawn.

22              Now, you've seen other posts with respect to the

23   denial of service attack on the defendant's computer?

24              MR. TURNER:  Objection.  Form.  Beyond the scope.

25              THE COURT:  I will allow this question and we'll see

F1sdulb5                          Alford - cross

1    where it goes.

2    A.  Can you repeat question?

3    Q.  Sure.  You've seen other posts on the defendant's laptop

4    referencing this denial of service, other files, other --

5    right, referencing this denial of service?

6    A.  I recall seeing other files referencing ddosed.

7           (Pause)

8    Q.  I show you what's marked as Defendant's N, as in Nancy.  I

9    just ask you it look at it.  Tell me if you recognize it.

10   A.  I do recognize it.

11   Q.  It is from the defendant's laptop, correct?

12          (Pause)

13   A.  I don't know if I've seen this statement on the laptop.

14   I've seen it in another.

15   Q.  And it's about the denial of service, right, attack?

16   A.  Yes.

17          MR. DRATEL:  I move it in, your Honor, as Defendant's

18   N.

19          MR. TURNER:  We'll stipulate that it was from the

20   computer, your Honor.

21          THE COURT:  Any objection?

22          MR. TURNER:  We don't think there was a proper

23   foundation laid but we will stipulate to that.

24          THE COURT:  Any objection?

25          MR. TURNER:  Beyond the scope.  Yes.

1    THE COURT:  Can I see the document?

2    THE WITNESS:  (Handing to the Court)

3    THE COURT:  Thank you, sir.

4    (Pause)

5    I will allow it.  Defendant's Exhibit N is received.

6    (Defendant's Exhibit N received in evidence)

7    MR. DRATEL:  Thank you, your Honor.

8    BY MR. DRATEL:

9    Q.  Now, you testified this morning about Government Exhibit

10   130, the handwritten notes, correct?

11   A.  I provided testimony about it, yes.

12   Q.  I show you, this is --

13   (Handing to the government)

14   Q.  I show you what's marked as Defendant's M, for Mary, and

15   ask you if you recognize that?

16   (Pause)

17   A.  I don't -- I don't recall this.

18   Q.  You reviewed the files on the defendant's laptop, correct?

19   A.  Not all the files.

20   Q.  How many?

21   A.  What was provided to me.

22   Q.  Did you prepare exhibits for purposes of this trial?  Did

23   you assist in the preparation of exhibits for this trial with

24   the prosecutors?

25   A.  Yes.

F1sdulb5                            Alford - cross

1   Q.  But that one you don't recognize, right?

2   A.  No.

3   Q.  You don't recognize that document?

4   A.  I don't recognizes it, no.  I don't have any -- no.

5   Q.  I want to go back to 241.  And look at the last page,

6   please.

7           And you talked about the poison oak, right, entry?

8   A.  Yes.

9   Q.  OK.  And it also talked about Amelia from OKC, right?

10  A.  Yes.

11  Q.  OK.  I want you to look through 241 in its entirety and

12  point out to me one entry that has anything personal before

13  that entry.  Withdrawn.

14          That entry is in September of 2013, right?  That's

15  what it says, right?

16  A.  The one with Amelia and the poison oak?

17  Q.  Yes.

18  A.  Yes.

19  Q.  Right?  It says September 11th to September 18th, right?

20  A.  Yes.

21  Q.  So I want you to look at the rest of 241 before then.  Tell

22  me if you could find a single entry that had anything personal.

23  I am talking about as opposed to Silk Road business.

24  A.  May 3rd, 2013?

25  Q.  No.  I mean the whole thing, starting with March 20, 2013,

F1sdulb5                          Alford - cross

1   when this exhibit starts, to the end.

2           MR. TURNER:  Objection.  The witness is about to

3   answer.

4           THE COURT:  He was answering.

5           MR. DRATEL:  Oh, I'm sorry.

6   A.  Yes.  On May 3rd, 2013 it says, "I'm sick."

7   Q.  OK.  Any others?  You don't think that has to do with

8   business -- withdrawn.

9           Let's look at May 3, 2013.  It says, "Helping smed

10  fight off attacker.  Site is mostly down.  I'm sick."

11          Right?

12  A.  Yes.  Correct.

13  Q.  So is it something that you might tell a coworker, that you

14  are sick?

15          THE COURT:  Don't speculate as to the state of mind of

16  the author.  The objection is sustained.

17  Q.  Any others?

18  A.  Let me look through.

19          (Pause)

20          Are you saying strictly personal?

21  Q.  Yeah.

22  A.  What you said before, I guess that's it.

23  Q.  Right.  That's it, right?

24  A.  Yes.

25  Q.  Now, you began your investigation -- withdrawn.

1            The Task Force began its investigation as a result of

2      an open letter from two United States senators, Chuck Schumer,

3      and another senator asking that Silk Road be shut down,

4      correct?

5                 MR. TURNER:  Objection.

6                 THE COURT:  Sustained.

7                 MR. DRATEL:  Your Honor, this goes to --

8                 THE COURT:  It is beyond the scope of this witness'

9      testimony.

10                MR. DRATEL:  It goes to a fundamental part --

11                THE COURT:  It is beyond the scope of this witness'

12     testimony.

13     BY MR. DRATEL:

14     Q.  You pulled out all the stops on this investigation,

15     correct?

16                MR. TURNER:  Objection.  Form and relevance.

17                THE COURT:  Overruled.

18     Q.  This is a high-priority investigation, correct?

19     A.  It was a high-priority investigation, yes.

20     Q.  And one of the things you did was to time it so that when

21     the arrest of Mr. Ulbricht occurred you would be able to also,

22     within a very short frame of time, speak to people who you'd

23     identified as people who knew him, correct?

24                MR. TURNER:  Objection.  Beyond the scope.

25                THE COURT:  Sustained.

F1sdulb5                          Alford - cross

1   Q.  Now, almost every agency of federal law enforcement was

2   involved in this investigation, correct?

3   A.  That is correct.

4   Q.  And that caused some friction between agencies, right?

5          MR. TURNER:  Objection.  Relevancy.

6          THE COURT:  Sustained.

7   Q.  Everybody wanted -- every agency wanted to get credit for

8   this arrest, correct?

9          MR. TURNER:  Objection.

10          THE COURT:  Sustained.

11  Q.  I want to go back to -- so 333A is -- you can put it up for

12  everybody -- that's something that was provided by Google about

13  logins, correct?

14  A.  That is correct.

15  Q.  Now, that was part of a larger subpoena production by

16  Google, correct?

17  A.  This?

18  Q.  Yes.

19  A.  Yes.

20  Q.  And that showed all the login times during a longer period,

21  correct?

22  A.  Yes.

23  Q.  And so you reviewed that, correct?

24  A.  Yes, I did.

25  Q.  And, in fact, there are gaps between login times in certain

1   place, right, sometimes as long as four days, right?

2   A.  I would have to see it.

3          (Pause)

4          (Mr. Dratel conferred with Mr. Turner off the record)

5   Q.  I show you what we'll mark as Defendant's O for purposes of

6   identification and just ask you to look here and see if that

7   refreshes your recollection that there were gaps of as many as

8   four days in logins by Mr. Ulbricht to his account?

9          THE COURT:  And we'll get a paper copy of this at some

10  point?

11         MR. DRATEL:  (Indicating affirmatively).

12         THE COURT:  Thank you.

13  A.  I believe this is a separate subpoena production than the

14  one I'm looking at on this, my exhibit.

15  Q.  But does that have Mr. Ulbricht's logins for Google, you

16  know, for his Gmail?

17  A.  If that's the logins, yes.

18         MR. DRATEL:  Can Mr. Horowitz help him, come up to

19  identify the document, if that helps him?

20         THE COURT:  Yes.

21         MR. DRATEL:  It is just a MacBook and I don't have a

22  MacBook.

23         (Mr. Horowitz assisted the witness)

24  Q.  Does that refresh your recollection that it's login times

25  for Mr. Ulbricht's Gmail or Google account?

F1sdulb5                         Alford - cross

1   A.  Yes, that looks like the --

2   Q.  OK.  And there is a four-day -- and does that refresh your

3   recollection that there was a four-day gap, between

4   June 24th and June 28th, just as an example, of logins,

5   according to those records?

6   A.  I've never used a Mac.  I'm going to have to have someone

7   scroll it down to that particular timeframe.

8           MR. DRATEL:  Mr. Horowitz, could you scroll it back to

9   where it was.  I'm sorry.  The last time I touched the

10  touchscreen the entire document disappeared.

11          (Mr. Horowitz assisted the witness)

12  A.  OK.  Yes.  What is represented there are four-day gaps.

13  Q.  Did you check the Gmail account to see whether there were

14  any emails sent by Mr. Ulbricht during that four-day period --

15  A.  I can't recall --

16  Q.  -- in Gmail?

17  A.  I would have to look through it to see those specific

18  dates.

19  Q.  You don't recall just offhand, no?

20  A.  Those specific dates off the top of my head?

21  Q.  Yes.

22  A.  No.

23  Q.  Do you recall looking to see whether there were emails from

24  Mr. Ulbricht's account on periods where there is no login from

25  the Google records?

F1sdulb5                          Alford - cross

1              MR. TURNER:  Objection.  Beyond the scope and

2      foundation for this witness.

3              THE COURT:  Sustained.

4              MR. DRATEL:  I have nothing further, then.

5              THE COURT:  All right.  Thank you.

6              MR. TURNER:  Could I have 241 back on the screen.

7              May I approach, your Honor?

8              THE COURT:  You may.

9      REDIRECT EXAMINATION

10     BY MR. TURNER:

11     Q.  You were asked during cross whether there were any

12     references to personal matters in this log prior to

13     September 2013, right?

14     A.  Yes, I was.

15     Q.  And you said there was one in May 3rd, 2013.

16             MR. TURNER:  Mr. Evert, could you go there.

17     Q.  Could you point to where it is?  I forget.

18     A.  It's towards the bottom.

19     Q.  There it is.  Pop that up on the screen, Mr. Evert.

20             "May 13, 2013:  Helping smed fight off attacker.  Site

21     is mostly down.  I'm sick."

22             Did you find anything in the defendant's Gmail account

23     indicating the defendant was sick on that date?

24     A.  I did.

25     Q.  Could you take a look at Government Exhibit 323.

1            Do you recognize this exhibit?

2   A.   Yes.

3   Q.   How do you recognize it?

4   A.   It's an email that I found in the defendant's Gmail

5   account.

6            MR. TURNER:   The government offers Exhibit 323 into

7   evidence.

8            MR. DRATEL:   Vayner and hearsay, your Honor.

9            THE COURT:   Those two objections are overruled.

10           GX323 is received.

11           (Government's Exhibit 323 received in evidence)

12           MR. TURNER:   The email says:  "Chat with Casa Bambu"

13  is the subject.

14           "From:  Casa Bambu.

15           "Date:  May 3, 2013.

16           "To:  Ross Ulbricht.

17           "Casa: how are you feeling today?

18           "Me: alot better.  I took Nyquil last night and got a

19  good night's sleep

20           "Casa: oh good."

21           No further questions, your Honor.

22           THE COURT:   Thank you.

23           Mr. Dratel, anything further for this witness?

24           MR. DRATEL:   No, your Honor.

25           THE COURT:   All right.  Thank you.  You may step down,

1     sir.

2                THE WITNESS:  Thank you.

3                (Witness excused)

4                THE COURT:  Would the government like to call its next

5     witness, please.

6                MR. HOWARD:  Sure.  Before the next witness is called,

7     I would like to be read two more core chats that have not yet

8     been read into the record.

9                THE COURT:  All right.  These are previously received

10    documents?

11               MR. HOWARD:  Yes, during Mr. Kiernan's testimony.

12               THE COURT:  All right.

13               MR. TURNER:  Your Honor, actually, while we are

14    waiting, could I just make sure we've gotten some of the

15    stipulations that were read in into evidence.  I'm not sure we

16    ever formally offered them.

17               THE COURT:  Yes.  You also had two from this morning

18    that you were going to offer now.

19               MR. TURNER:  Right, and I have them now.

20               THE COURT:  All right.

21               MR. TURNER:  I believe I've read all of the Google

22    stipulation, which has been marked as Government Exhibit 803.

23    I want to make sure that is entered in evidence.

24               THE COURT:  I don't have 803.  Do you have 803, Joe?

25               (The Court conferred with the Deputy Clerk)

F1sdulb5

1              THE COURT:  You offered the exhibit contained in 803

2      but not 803 itself.

3              MR. TURNER:  We would like to offer that at this time.

4              THE COURT:  All right.  Mr. Dratel, received by

5      stipulation?

6              MR. DRATEL:  Yes.

7              THE COURT:  All right.

8              (Government's Exhibit 803 received in evidence)

9              MR. TURNER:  On the Facebook stipulation that's been

10     marked as Government's Exhibit 10, there is one paragraph that

11     we had not read into evidence.  I could read it now briefly.

12             THE COURT:  Government Exhibit 10?

13             MR. TURNER:  810, your Honor.

14             THE COURT:  I'm sorry.  810.  All right.

15             MR. TURNER:  Paragraphs 1 through 3 have already been

16     read.

17             Paragraph 4 is:  "Government Exhibit 331, in

18     particular, reflects certain messages between the users and

19     another Facebook user, Allison, on February 8, 2013.  Each

20     message reflects the username of the recipient of the message,

21     the username of the author of the message, the date and time

22     the message was sent, whether the message was ever deleted from

23     the Ross Ulbricht account in the body of the message."

24             That is 810, and the government offers that

25     stipulation, as well, into evidence.

F1sdulb5

1          THE COURT:  Is that a stipulation, Mr. Dratel, of

2     yours?

3          MR. DRATEL:  Yes.

4          THE COURT:  GX810 is received.

5          (Government's Exhibit 810 received in evidence)

6          MR. TURNER:  Government Exhibit 806A is another

7     stipulation concerning the USAA records.

8          And the parties stipulate there that:  If called as a

9     witness, a custodian of records of USAA Federal Savings Bank

10    would testify that I'm employed by USAA Federal Savings Bank as

11    a custodian of records.  I am familiar with records created and

12    maintained by USAA Federal Savings Bank.  The following records

13    were kept in the course of regularly conducted business

14    activity of USAA Federal Savings Bank, were made at or near the

15    time of occurrence of the matters set forth in the records by,

16    or from information transmitted by, a person with knowledge of

17    those matters, and were records that were made as a regular

18    practice of USAA Federal Savings Bank activity.

19         Government Exhibit 806 consists of a bank statement

20    dated -- excuse me, bank statement from an account maintained

21    at USAA Federal Savings Bank by Ross W. Ulbricht, date of birth

22    March 27, 1984, registered to the address

23    Rossulbricht@gmail.com.

24         And that was a stipulation that goes back to 806.  The

25    government stipulation is marked 806A.  So we would want to

F1sdulb5

1      make sure both of those are admitted into evidence.

2              THE COURT:  806 was previously received.

3              806A was a stipulation, Mr. Dratel?

4              MR. DRATEL:  Yes.

5              THE COURT:  All right.  That is received as well,

6      806A.

7              (Government's Exhibit 806A received in evidence)

8              MR. TURNER:  Lastly, the PayPal stipulation reads

9      that:  If called as a witness, a custodian of records of

10     PayPal, Incorporated would testify that I'm employed by PayPal,

11     Inc. as a custodian of records.  I am familiar with records

12     created and maintained by PayPal, Inc.  The following records

13     were kept in the course of regularly conducted business

14     activity of PayPal, Inc., were made at or near the time of

15     occurrence of the matters set forth in the records by, or from

16     information transmitted by, a person with knowledge of those

17     matters, and are records that were made as a regular practice

18     of PayPal in its activities.

19              Government Exhibit 808 consists of records from PayPal

20     account registered to Ross Ulbricht, date of birth March 27,

21     1984, registered to the email address rossulbricht@gmail.com.

22              Pages 1 and 2 of the exhibit contain subscriber

23     information from the PayPal account maintained by PayPal, Inc.,

24     and the remaining pages of the exhibit contain a transaction

25     log of the account indicating, among other things, the date,

F1sdulb5

1      time and amount of each transaction, and the balance of the

2      account following the transaction reflected in the

3      second-to-last column, labeled "Balance."

4              The government asks that Exhibit 808 be admitted into

5      evidence, your Honor.

6              THE COURT:  The stipulation number is what?

7              MR. TURNER:  808A.  Excuse me.

8              THE COURT:  808A is received.  808 was previously

9      received.

10             (Government's Exhibit 808A received in evidence)

11             MR. TURNER:  That is all I have.

12             THE COURT:  All right.  Thank you.

13             Mr. Howard.

14             MR. HOWARD:  Yes.

15             Ms. Rosen, could you please publish Government Exhibit

16     227E, please.

17             Start with pages 54 to 56 of a 337-page chat log,

18     starting on page number 2012-09-23:

19             "Myself: oh wait it's the middle of the night. I got a

20     request from vice magazing to do an interview, btw. I told them

21     I'd talk to my PR consultant first :) Here's what they've

22     written:

23             "Dear the Dread Pirate Roberts,

24             "I am acting as an intermediary for Hamilton Morris of

25     Vice Magazine. He would like to do an interview with the Dread

F1sdulb5

Pirate Roberts, or the owners of Silk Road. I'm sure he will be amenable to using a secure chat solution, such as OTR, PGP, torchat or CryptoCat.

"You can Google Hamilton Morris to see some of his work. He is very smart and respectable and I'm sure he would only have excellent questions."

Skipping to the last paragraph.

"If you are willing to set up such an interview please let me know. I told him I would do him the favor of trying to get him in contact," and signed "ageis."

"cimon: Dude, God is putting on a lightning storm the likes of which I've never seen. Can't even hear myself think over the constant thunder. I'm amazed I've still got power.

"myself: sounds awesome.  Don't let your computer fry

"cimon: I have two spares ;)

"Nobody has ever regretted not doing an interview; lots of folks have regretted doing one.

"A problem I have with any type of interview is it ties you down, or could, in areas you want to remain loose. Are there one or more of you. Are you the guy who started the site, or the third or forth operator. Problem is areas where we want misdirection are the hardest to do, as pride makes yhou want to say yeah, I started it, nyah, nyah... but security says you should claim otherwise. It get's tough, and guaranteed at least one or more major mistake will be made during the process."

F1sdulb5

1        Ms. Rosen, could you please publish Government Exhibit

2   227H, please.

3        From pages 106 to 109 of a 337-page chat log, dated

4   October 29, 2012:

5        "cimon: on btctalk, there are folks who when you just

6   started out save you shroom packs. Coulple that with educatoin

7   and empoloyment I know – yer one of 12 folks in the world. Easy

8   odds.

9        "Sorry, don't mean to worry ya – I'm making a point

10  that I have 10 times more on D A – if needed, I can lay my

11  finger on him in weeks, easy. He leaked more info like a seive

12  than you did. Also, keep in mind I've shipped shit to his prev

13  addy. Not hard to track from there.

14       "and my point is I want to find him, and have a chat –

15  if it's ok with you.

16       "myself: go ahead

17       "cimon: Just make sure he's on side, is all.

18       "myself: I wouldn't think the info you have would

19  narrow me down to 12

20       "cimon: nothing bad will happen – it's just talk

21       "(04:29:53) Dipper: I wouldn't think the info you have

22  would narrow me down to 12

23       "Bet? ;)

24       "myself: just don't spook him too bad. I wouldn't want

25  him freaking out and attacking you or something

F1sdulb5

1              "where are you getting the number 12? do you have a

2     list?

3              "cimon: naw - if anything I'm gonna see if I can help

4     him. I'm sure he's stressted, scared, and just a little bit

5     fucked up in general.

6              "12's an estimate - could be as high - but no higher -

7     than 10, and no less than 8

8              "myself: I call bs

9              "cimon: Well, unless you lied in the early days, yer

10    right

11             "myself: not sure what the bet would be or how to

12    settle it, but I'd take it

13             "cimon: but if you didn't - and I don't think DA did -

14    then my good memeory serves me well

15             "myself: from what I remember, you know my educational

16    background (sort of), you can infer my gender, age, race, etc.

17    and you know where I was a year and a half ago roughly when I

18    started the site

19             "myself: does that really narrow me down to 12 people?

20             "you could estimate my travels a bit based on timezone

21             "cimon: yeah - I'm not looking for you - but you've

22    left enough hints - where you went to school - when you started

23    to work and left - info from folks on btctalk who posted images

24    of postmarks from shrooms you sent - yeah - I could narrow it

25    down quick.

F1sdulb5

1        "myself: where i went to school?  I don't remember

2    revealing anything like that

3        "cimon: dude, I'm not trying to worry you – I'm making

4    the point that DA slipped way more shit that you.

5        "myself: you are worrying me! won't you ease my mind

6    and tell me what you think you know?

7        "cimon: I mean, yer fine, how many experimantal

8    physicists quit to sell shrooms outta ndl anyways, eh.

9        "myself: shit, you know about the national dodgeball

10   league!

11       "my cover is blown

12       "cimon: goddammit! I was making a point, not trying to

13   worry you. Do I think I could find you quickly – absolutley.

14   Would I – what the fuck would I want to do that for – then I

15   have info folks would kill me for. I'd rather not know – the

16   point is it's easy to let info out, and DA did, and I 'll spend

17   $ to follow it up.  Shit, if I really wanted to just see you,

18   I'd just ask.

19       "myself: it's ok man, just never thought you were

20   capable of that

21       "What's ndl?

22       "Cimon: You know – I post up, and give you shitloads

23   of info that could if you tried just a bit (fuck, Plural of

24   Mongoose alone should do it!) that you could determine exactly

25   who I am. I did that to make you feel comfortable.

F1sdulb5

1        "Myself: i know

2        "Cimon: If you can't find me in 10 days, you've not

3   read my shit.

4        "Myself: it's not like I don't trust you dude

5        "Cimon: That's my way of trying to make you comfy -

6   there ain't much more I can do.

7        "Dude, you so don't trust me - I know you want to, but

8   it's not there yet. I'm doing my best to make it easy for you.

9        "Myself: i guess there are different levels

10       "Cimon: Fuck, I scare you. Shit, I scare me. We gotta

11   work together

12       "Myself: but I beleive you when you say you wouldn't

13   look for me.  But there is a difference between willing and

14   able.  Thats all

15       "Cimon: The reason I don't look for you is that leaves

16   a trail - but I'm pretty confident if I did, I'd find you. And

17   that's just a fact.

18       "Myself: didn't think you were able before, but I

19   guess you are

20       "Cimon: But, I'd rather some day you came to see me.

21       "Myself: I will.  Or I'll invite you somewhere

22       "Shit, now I'm worried you think I'm being, I dunno...

23       "Myself: we'll get to embrace, and shoot the shit, and

24   brainstorm

25       "Cimon: Fuck, do I need to knock on yer door and NOT

F1sdulb5

1     shoot ya to make you trust me? Tell me.

2               "Myself: lol

3               "Cimon: heh

4               "Myself: yer fine... just me processing info. I guess

5     I revealed too much.  Selling was my first mistake

6               "Cimon: Now, back on track – do you have a prob with

7     me having one of my folks tap on DA's door, and having a talk

8               "Myself: nope, go for it

9               "Cimon: yeah – there are records on reddit, and

10    bitcointalk, where folks have scans of your shipments – that

11    was the key.  But great shrooms, apparently!

12              "myself: they were fucking awesome

13              "cimon: but postmarks narrow it down.  With everything

14    else, yeah, I could find ya\

15              "but that said, no one else knows, no one else ever

16    will, and I won't do that.

17              "myself: thank you

18              "cimon: and further to that, the DPR thing is great,

19    and we need to make at least one publid set of statements that

20    indicates that the old admin is long gone, and dpr is now in

21    charge. Keep in mind the movie, and how dpr can change from one

22    time to the next. I've got yer back.

23              "myself: yea, I was thinking the same thing

24              "have a back story for him

25              "cimon: I suggested DPR when I first realized I could

F1sdulb5

1   track you. I don't give a shit who you are, and it's to my and

2   everyone's advantage no one else can.

3            "DPR by it's very nature indicates a rotating command.

4   We'll play that."

5            THE COURT:  Mr. Howard, would the government like to

6   call its next witness.

7            MR. HOWARD:  Yes, your Honor.  We would now like to

8   call Special Agent Dylan Critten.

9            THE COURT:  All right.  Dylan Critten to the stand,

10  please.

11           THE CLERK:  Please raise your right hand.

12   DYLAN CRITTEN,

13       called as a witness by the government,

14       having been duly sworn, testified as follows:

15           THE CLERK:  Please state and spell your full name for

16  the record.

17           THE WITNESS:  My name is Dylan Critten.  D-y-l-a-n,

18  last name Critten, C-r-i-t-t-e-n.

19           THE CLERK:  Thank you.

20           THE COURT:  All right.  Mr. Critten, please be seated,

21  sir, and it will be important for you to pull yourself up and

22  adjust the mic however is most comfortable for you to get a

23  clear and direct sound.

24           Mr. Howard, you may proceed, sir.

25           MR. HOWARD:  Thank you, your Honor.

F1sdulb5

```
1    DIRECT EXAMINATION

2    BY MR. HOWARD:

3    Q.  Good afternoon, Special Agent Critten.

4    A.  Good afternoon.

5    Q.  Who do you work for?

6    A.  I work for Homeland Security Investigations.

7    Q.  And how long have you worked there?

8    A.  A little over five years.

9    Q.  And what is your position there?

10   A.  I'm a special agent assigned with Criminal Investigations.

11   Q.  And where are you based?

12   A.  I'm based in San Francisco, California.

13   Q.  Are you assigned to a particular squad?

14   A.  I'm assigned to a Document and Benefit Fraud Task Force.

15   Q.  And what are your responsibilities and duties on that Task

16   Force?

17   A.  We investigate criminal activity related to counterfeit

18   documents, identity theft and other general fraud.

19           MR. HOWARD:  Your Honor, may I approach the witness?

20           THE COURT:  You may.

21   BY MR. HOWARD:

22   Q.  I have just handed you what's been marked for

23   identification purposes as Government Exhibit 400.  Do you

24   recognize what this is?

25   A.  I do.
```

1    Q.  And what is this?

2    A.  These are nine counterfeit driver license identity

3    documents from six different states and three different

4    countries.

5    Q.  And how are you familiar with them?

6    A.  I'm familiar with these because they were contained in a

7    package that was shipped from Vancouver, Canada, into the

8    United States, and it was intercepted at a mail facility in San

9    Francisco and forwarded to Investigations.

10   Q.  Who is depicted on the phase of the IDs?

11   A.  There are two different -- what I believe to be two

12   different photos on these, one bearded and one non-bearded, but

13   I believe that individual to be Mr. Ulbricht.

14           MR. HOWARD:  The government offers Government Exhibit

15   400.

16           MR. DRATEL:  No objection, your Honor.

17           THE COURT:  Received.

18           (Government's Exhibit 400 received in evidence)

19           MR. HOWARD:  Your Honor, may I approach the witness?

20           THE COURT:  You may.

21           MR. HOWARD:  May I publish this exhibit to the jury?

22           THE COURT:  You may.

23   BY MR. HOWARD:

24   Q.  So when, approximately, were these IDs seized by CBP?

25   A.  Approximately in the neighborhood of July 10th of 2013.

F1sdulb5                    Critten - direct

1   Q.  And what, if anything, did you do to investigate these

2   identification documents once you received them?

3   A.  I ran basic records checks and a few other checks, and

4   myself and another agent went to the residence where they were

5   postmarked to.

6   Q.  What did you discover after running the record checks you

7   just described?

8   A.  Each of the at least as far as the six state identification

9   documents were negative.  They did not come back to a valid ID

10  that was issued by any of those six states.  I ran record

11  checks on each of the individuals, which all came back negative

12  for any kind of identity.

13  Q.  Could you please flip in your binder to what has been

14  marked for identification purposes as Government Exhibit 402,

15  please.

16          Do you recognize what this is?

17  A.  Yes.  This is a photo of those same nine documents.

18  Q.  Did you take this photograph?

19  A.  I did not.  Customs and Border Protection took this photo

20  and forwarded it to us from the mail facility.

21  Q.  Does this photograph fairly and accurately depict the front

22  of these identification documents?

23  A.  It does.

24          MR. HOWARD:  The government offers Government Exhibit

25  402.

1        MR. DRATEL:  No objection.

2        THE COURT:  Received.

3        (Government's Exhibit 402 received in evidence)

4        MR. HOWARD:  Now, Ms. Rosen, could you please publish

5   Government Exhibit 402.

6   Q.  Special Agent Critten, could you please indicate where

7   these driver licenses appear to be issued from?

8   A.  They're purported to be issued from six different states,

9   including New York State, Colorado, Florida, California, Texas,

10  and South Carolina.

11  Q.  And how are the names on these IDs, are they the same name

12  or different names?

13  A.  Each of the nine identification documents has nine

14  individual names.  So there are nine separate names.

15  Q.  Is Ross Ulbricht's name on any of those identification

16  documents?

17  A.  Not his name, no.

18  Q.  How about the date of birth, how does that compare on these

19  nine documents?

20  A.  The date of birth is the exact -- I believe to be the exact

21  same as Mr. Ulbricht.

22  Q.  What is the date of birth?

23  A.  3/27 of 1984 on all nine documents.

24  Q.  Would you please flip in your binder to what has been

25  marked for identification purposes as Government Exhibit 401.

1        Do you recognize what this is?

2   A.  I do.  This is a picture of the postal envelope that was

3   postmarked and said to be delivered to a San Francisco,

4   California address.

5   Q.  And what was contained in that package?

6   A.  The nine counterfeit identity document driver licenses.

7   Q.  Did you take this photograph?

8   A.  I did not.  Customs and Border Protection did.

9   Q.  Does this photograph fairly and accurately depict the

10  packaging that contained those IDs?

11  A.  It does.

12        MR. HOWARD:  The government offers Government Exhibit

13  401.

14        MR. DRATEL:  No objection.

15        THE COURT:  Received.

16        (Government's Exhibit 401 received in evidence)

17        MR. HOWARD:  Ms. Rosen, could you please publish it.

18  Q.  Special Agent Critten, what is the name of the individual

19  who is listed as to receive the package?

20  A.  The package was addressed to Andrew Ford.

21  Q.  And where is the address -- what is the address that is

22  listed on the packaging?

23  A.  The address for delivery is 2260 15th Avenue in San

24  Francisco, California.

25  Q.  Are you familiar with that address in San Francisco?

F1sdulb5                        Critten - direct

1   A.  I am.  Myself and another agent visited that address soon

2   after.

3   Q.  And when was that, approximately?

4   A.  Approximately July 26th of 2013.

5   Q.  And how many -- you said you went with one other agent to

6   that location?

7   A.  Yes.

8   Q.  What happened after you arrived at the location?

9   A.  Myself and another agent arrived at the location.  We went

10  directly to the door.  As I approached the door to knock on it,

11  I saw an individual in the hallway who I immediately recognized

12  from the photographs on the fake IDs.  It was a big -- the

13  front door was a big glass door, and so as I knocked on the

14  door that individual was already approaching the door to answer

15  the door.

16  Q.  Do you see that individual in the courtroom today?

17  A.  Yes, I do.

18  Q.  And could you please point him out and indicate what he's

19  wearing?

20  A.  He's wearing a blue collared shirt.

21  Q.  And which table is he sitting at?

22  A.  At the second table.

23           MR. HOWARD:  Could the record please reflect that the

24  witness has identified the defendant, please?

25           THE COURT:  So reflected.

F1sdulb5                          Critten - direct

1    BY MR. HOWARD:

2    Q.  So what happened after you observed the defendant on the

3    other side of the glass door?

4    A.  He came to the door.  And I immediately, myself and the

5    agent that I was with, we showed Mr. Ulbricht our

6    government-issued credentials and introduced ourselves as

7    government agents who work for Homeland Security

8    Investigations.

9    Q.  And what happened after you identified yourselves?

10   A.  I asked Mr. Ulbricht if he would be willing to speak to us

11   regarding our investigations.  He responded in the affirmative,

12   and he stepped out onto the front porch to speak with us.

13   Q.  And what was the first thing that happened after he stepped

14   out onto the front porch?

15   A.  So as he stepped out, the first thing I showed him was an

16   8-by-10 photo of one of the documents.  It was a photo of the

17   California driver license document.  And --

18   Q.  And how did he react?  What could you observe about his

19   demeanor when he observed the documents?

20            MR. DRATEL:  Objection.

21            THE COURT:  Why don't you restate that so it is one

22   question.

23   Q.  What were you able to observe about the defendant after you

24   provided him -- you showed him the photograph of the ID

25   document?

1    A.  I observed that he became visibly nervous.

2              MR. DRATEL:  Objection.

3              THE COURT:  Overruled.

4              MR. DRATEL:  I move to strike.

5              THE COURT:  Denied.

6    Q.  And what happened next?

7    A.  So we directly asked him if he had made a purchase of fake

8    identity documents.  And we also let him know that we were not

9    there to investigate him but we wanted to solicit his support

10   in our investigation of a fake document vendor which could have

11   sent the documents from Canada.

12   Q.  Was that the purpose of your investigation on that day?

13   A.  It was.

14   Q.  At that time were you familiar with Silk Road?

15   A.  No.

16   Q.  So what happened after you informed the defendant that you

17   weren't there to investigate him for something?

18   A.  After that he was willing to speak to us and he made

19   general statements, but he was unwilling to admit whether or

20   not he had made any sort of purchase of fake identity

21   documents.  He didn't want to incriminate himself.

22   Q.  So what happened after that?  After he indicated that he

23   didn't want to make any statements about himself, what did you

24   do?

25   A.  We explained that our purpose was not only to investigate

1    the fraudulent document vendor but also to make sure that the

2    recipient -- in this case the recipient of nine fake IDs -- was

3    not a fugitive.  There was nothing else, nothing further.  So

4    we asked that we could identify him and make sure he was not a

5    fugitive before we -- before we departed the location.

6    Q.  We'll circle back to that later.

7    A.  OK.

8    Q.  But did you have any discussions about where the IDs could

9    have come from?

10   A.  Yes.  At a later point in time Mr. Ulbricht made a

11   statement that hypothetically an individual could purchase

12   anything they wanted -- fake IDs, drugs, or generally anything

13   illegal on the Tor browser, using the Tor browser to access the

14   Silk Road website.

15   Q.  At the time had you heard of Silk Road before?

16   A.  No, I had not.

17   Q.  At the time had you heard of the Tor browser before?

18   A.  I had not.

19   Q.  Now, how did you come to learn the defendant's name?

20   A.  Mr. Ulbricht went back into the house and retrieved his --

21   what I believe to be his legitimate Texas driver license and

22   then returned to the front porch and showed it to me.

23   Q.  And did you have any discussions with the defendant about

24   his living arrangements at the time?

25   A.  Yes.  So the name on the identity document that

1  Mr. Ulbricht gave us was his true name, Ross Ulbricht.  And we

2  explained to him that we were going to have to speak to his

3  roommates regarding the situation because we wanted to get a

4  bigger picture of what was going on.  Since he was unwilling to

5  answer any questions regarding why he might have purchased the

6  documents, we would need to do further inquiry and speak to the

7  roommates.  It was at that time that he informed us that that

8  might be an issue because if we asked his roommates about Ross,

9  they wouldn't know what we were talking about because his

10 roommates only knew him by his name Josh.

11 Q.  Did you have any discussions with the defendant about how

12 long he had been living there at that location?

13 A.  Maybe not the exact time he had been living there, but he

14 said -- I don't recall the specific amount of time, but he said

15 he had found the place on Craigslist and he had sublet it from

16 two individuals who were traveling musicians.

17 Q.  Did he discuss the manner in which he paid for the rental?

18 A.  He paid them a thousand dollars each month using cash.

19 Q.  And he lived under the fake name Josh?

20 A.  Yes.

21         MR. HOWARD:  No further questions.

22         THE COURT:  All right.  Let's take our mid-afternoon

23 break, and then we'll come back and Mr. Dratel can commence his

24 cross-examination of this witness.

25         I want to remind you folks again -- and I know I say

F1sdulb5                        Critten - direct

1   this all the time, but as the days go on I want to make sure

2   you don't lapse into it -- not to talk to each other or anybody

3   else about the case.  Thank you.

4                  THE CLERK:  All rise as the jury leaves.

5                  (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (Jury not present)

 2                THE COURT:  You can step down and take a break as

 3   well.

 4                THE WITNESS:  Thank you, your Honor.

 5                (Witness not present)

 6                THE COURT:  All right.  Ladies and gentlemen, let's

 7   take our own break.  I've got something that I need to do in

 8   the other room.

 9                Is there anything that we need to do before we resume?

10   Normally, I would ask you folks if there was anything you

11   wanted to raise.  If there is, then I will come back out before

12   the jury is ready.

13                MR. TURNER:  Not from the government, your Honor.

14                MR. DRATEL:  I may, your Honor, with respect to some

15   of the cross.

16                THE COURT:  All right.  So I will have my deputy check

17   with you, Mr. Dratel, and so we will start a couple of minutes

18   early.  We will take a brief break right now.  Thank you.

19                THE CLERK:  All rise.

20                (Recess)

21                (Continued on next page)

22

23

24

25
```

1          (In open court; jury not present)

2          THE COURT:  Let's all be seated.

3          Mr. Dratel.

4          MR. DRATEL:  Yes, your Honor.  With respect to

5     cross-examination of Agent Alford, I'll just start from the

6     end.  With respect to the document that I was cross-examining

7     him about, which was a government exhibit and that was put in

8     by the government to suggest that those were accurate

9     reflections of login times, and my cross was designed to show

10    that those are not necessarily accurate reflections of login

11    times and it was directly related to the subject of his direct

12    examination and the objection was sustained.

13         With respect to some other aspects, the question of

14    the letter from Senator Schumer and the whole inception of the

15    investigation and its length and its ultimate conclusion are

16    bias issues, whether it's for this witness or the investigation

17    as a whole, those are clear bias issues.  And again, objections

18    were sustained.  And there's a whole series of questions that

19    are relevant to that, in addition to the scope of the

20    investigation as well and what was going on with the

21    investigation.

22         The bitcoin aspect of it was part of his investigation

23    of Mr. Ulbricht and it goes hand-in-hand with all of the other

24    aspects of it that we talked about earlier.  And the whole

25    point about the Silk Road servers, which was sustained as well,

F1sgulb6                      Critten - cross

is also related to the question of bias and the way the

investigation unfolded and ultimately what happened with it.

THE COURT:  Thank you.

Mr. Turner.

MR. TURNER:  Your Honor, on the IP logs, so those were

admitted pursuant to a stipulation between the parties.  It

says it's a true and accurate copy of subscriber information

and the login times.  In terms of whether the methods that

Google uses to produce those records are reliable, that's

beyond this witness' ken.  They can call a witness from Google,

I suppose, to call that into question.

I think the defendant's mistaken to believe that every

time there's a login into an email account there's necessarily

going to be an email reflected in that account.  You can login

and check your email and not actually send an email, and Google

can log that information, so I don't think it really shows

anything in any event.

The bias, I mean, the question is how is this witness

biased against the defendant because of the fact that the

investigation of Silk Road started by the federal government

generally -- I'm not saying this is true, but this was the

allegation -- started because of a letter submitted by Chuck

Schumer.  The connection isn't there.

Silk Road servers, the witness testified about nothing

related to evidence from the Silk Road servers during his

 1    direct and the same with the bitcoins.

 2            MR. DRATEL:  Also, your Honor, I left out one thing

 3    also with respect to the competition among the agencies

 4    involved:  This is a witness who in his 3500 material said

 5    there has been a lot of interagency dust-ups and big case/big

 6    problems.  He complained about the FBI not sharing information.

 7    There was an issue about him not getting to sign the criminal

 8    complaint and it had to be explained to him that it was not a

 9    slap in the face but that the FBI was taking control; the

10    question of what would happen to the bitcoins; and the question

11    of people getting credit for other people's work.  And why is

12    that relevant?

13            It's relevant for the whole reason is this:  Senator

14    Schumer and another senator issued a public letter that they

15    want Silk Road investigated and taken down.  That puts pressure

16    on law enforcement to do it.  It makes it a high priority

17    investigation.  It makes it something that they want to do as

18    quickly as possible; yet two and-a-half years later almost,

19    no -- yes, almost two and-a-half years later Silk Road is still

20    operating.  It's operating at a time which for three months the

21    government can pull the plug on the server at any moment.

22    There is tremendous motivation and pressure to find a suspect

23    as quickly as possible and arrest them regardless of the

24    merits.

25            THE COURT:  I think you folks have made your record.

1    I think, Mr. Dratel, whether you have a theory of the case is a

2    different issue as to whether or not there is something that is

3    within the scope of the direct for a particular witness.

4         What I hear in a lot of what you are attempting to do

5    is a theory of the case, and there are certain witnesses where

6    there may be areas opened up and there may be certain witnesses

7    where it's not opened up, and we will proceed with each witness

8    and each question as it comes.

9         MR. DRATEL:  Just one.  The only way I can get my

10   theory in is through witnesses.  It's in this witness'

11   knowledge and it's biased.

12        THE COURT:  You and I disagree.  I think that you've

13   got a view of the rules of evidence that is, frankly, rather

14   extraordinary for a person who is I know as intellectual as

15   you.  I can't decide whether or not you actually believe that

16   you're right or whether or not you are just taking the position

17   as a zealous advocate.  In either event, it is my job to apply

18   the rules.

19        I did, in fact, make an error in one of my rulings in

20   the last session and that was to allow the witness, Mr. Alford,

21   to testify that at one point in time he had thought there had

22   been an original DPR.  That was actually an error.  I thought

23   it was going to connect up to something.  It did not.  We'll

24   have to decide what to do with that at the appropriate time.

25        I believe the jury is ready for us so let's go ahead.

F1sgulb6                         Critten - cross

1          MR. DRATEL:  There's one factual thing I need to

2     correct with respect to what Mr. Turner said about Google.  He

3     misses the point entirely, which is not the fact that there

4     is -- it's the fact that there are gaps but there are emails in

5     between those gaps which shows that these records don't

6     necessarily reflect accurately when someone's logged onto their

7     Google account.

8          THE COURT:  I think the point about Google being the

9     appropriate witness for that testimony is perhaps apposite to

10    that as well.

11         MR. DRATEL:  But it's apparent from the documents

12    themselves.

13         THE COURT:  Then you don't need the witness.

14         Go ahead and bring out the jury.  Let's get the

15    witness back on the stand.

16         Who does the government have next on-deck?

17         MR. TURNER:  Michael Duch.

18         THE COURT:  Thank you.

19         (Continued on next page)

20

21

22

23

24

25

F1sgulb6                    Critten - cross

1              (In open court; jury present)

2              THE COURT:  Mr. Dratel, you may proceed with

3    cross-examination.

4              MR. DRATEL:  Thank you, your Honor.

5    CROSS-EXAMINATION

6    BY MR. DRATEL:

7    Q.  Agent Critten, with respect to Government Exhibit 401,

8    which was the shot of the envelope, right, the photo of the

9    envelope?

10   A.  Yes.

11   Q.  And that showed that the return address on the package was

12   Vancouver in Canada, is that correct?

13   A.  The "from," yes.

14   Q.  And you said when you approached Mr. Ulbricht, he agreed to

15   speak to the agent -- to you, right?

16   A.  Yes.

17   Q.  He didn't have to speak to you, right?  You didn't have a

18   subpoena?

19   A.  No.  It was completely voluntary.

20   Q.  And the interview lasted about what?  Ten minutes would you

21   say?

22   A.  Approximately, yes.

23   Q.  Now, he gave you, Mr. Ulbricht produced for you his Texas

24   driver's license, correct?

25   A.  Yes.

F1sgulb6                        Critten - cross

1    Q.  And as far as you could tell, that was an authentic

2    driver's license?

3    A.  Yeah, I did a record check before I left the premises and

4    it was verified through both the systems and the photo.

5    Q.  And you said that Mr. Ulbricht told you that he had found

6    the apartment that he was in on craigslist, right?

7    A.  Yes.  It was a house.

8    Q.  A house, but his room, or wherever he resided?

9    A.  Correct.

10   Q.  There were two other tenants aside from him?

11   A.  That I learned of; yes.

12   Q.  And he told you that they all knew him by the name Josh,

13   right?

14   A.  Yes.

15   Q.  And he said I think that the rent was paid $1,000 a month

16   in cash?

17   A.  Yes.

18   Q.  Now, he also told you that he was moving within a couple of

19   weeks, right?

20   A.  He did.

21   Q.  And he told you he was a currency trader, correct?

22   A.  He did.

23   Q.  Now, when you explained to Mr. Ulbricht that you weren't

24   there to arrest him but were looking to investigate the sources

25   of and vendors for fake identification documents, you told him

1  that he could speak in a hypothetical, correct?

2  A.  I told him if you felt more comfortable, he could speak in

3  a hypothetical; yes.

4  Q.  So that's when he told you hypothetically someone can go on

5  to the Tor browser and to the Silk Road site, correct?

6  A.  Yes.

7  Q.  And you say you hadn't heard of Silk Road before then?

8  A.  Not before then, no.

9  Q.  So there was nothing from the packaging or anything else

10  that would suggest Silk Road?

11  A.  Not at all.

12  Q.  Now, Mr. Ulbricht also gave you an email address, correct?

13  A.  He did.

14  Q.  And it was fractalform@tormail.org, right?

15  A.  Correct.

16  Q.  And you replied "very anonymous," right?

17  A.  I don't recall replying.

18  Q.  And you also did a criminal history check, correct?

19  A.  I did.

20  Q.  And that came back with nothing for Mr. Ulbricht, right?

21          MR. HOWARD:  Objection.

22          THE COURT:  Sustained.

23  Q.  You entered the information in the TECS system from your

24  interview, correct?

25  A.  I entered my report into the TECS system, yes.

1    Q.  And that would make it accessible to law enforcement around

2    the country if they were looking for something about

3    Mr. Ulbricht?

4    A.  Yes.

5              MR. DRATEL:  I have nothing further.  Thank you.

6              THE COURT:  Mr. Howard, anything further from you?

7              MR. HOWARD:  Nothing from the government, your Honor.

8              THE COURT:  Thank you.  You may step down, sir.

9              (Witness excused)

10             THE COURT:  Would the government like to call its next

11   witness?

12             MR. TURNER:  The government calls Michael Duch to the

13   stand.

14             THE COURT:  Mr. Duch to the stand, please.

15             (Witness sworn)

16             THE COURT:  Mr. Duch, it will be important to pull up

17   your chair and adjust the microphone how ever it's comfortable

18   for you so that you can speak clearly into the mic.

19             THE WITNESS:  Thank you very much so much.

20             THE COURT:  Mr. Turner, you may proceed, sir.

21    MICHAEL DUCH,

22        called as a witness by the Government,

23        having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY MR. TURNER:

F1sgulb6                          Duch - direct

1   Q.  Good afternoon, Mr. Duch.

2   A.  Good afternoon, Mr. Turner.

3   Q.  How old are you?

4   A.  I'm 40 years old.

5   Q.  And where did you grow up?

6   A.  I grew up in Orange County, New York.

7   Q.  And what's your educational background?

8   A.  I graduated high school with a Regents diploma.  I also

9   attended three years of college.  I went to Orange County

10  Community College, Baruch College here in New York City, as

11  well as Brookdale College out in New Jersey.  I also attended

12  or and participated in a variety of technical education courses

13  for computers.

14  Q.  And what occupation have you held most of your life?

15  A.  I've been a computer consultant.  I've worked in networking

16  in security.

17  Q.  In 2012, how were you employed?

18  A.  I was self-employed.  I owned my own business.

19  Q.  What kind of business was it?

20  A.  It was a computer consulting company, again, focusing on

21  networking and security.

22  Q.  The name of the company?

23  A.  The name of the company is called COMM-LAN.

24  Q.  And what kinds of IT jobs did your company do?

25  A.  It was mainly servicing business-to-business type stuff, a

F1sgulb6                          Duch - direct

1    variety of different doctor's offices, surgical centers, law

2    firms, sometimes do residential work as well.  If some of the

3    clients liked the services that we provided, we also did work

4    for some of their home stuff as well.

5    Q.  How much money were you making per year in about 2012?

6    A.  Um, about $75,000 a year after all expenses were paid.

7    Q.  You're in prisoner's clothing today; is that right?

8    A.  That's correct.

9    Q.  Are you currently in jail?

10   A.  Yes, I am.

11   Q.  When were you arrested?

12   A.  I was arrested in October of 2013.

13   Q.  Where were you arrested?

14   A.  Outside of a post office in Monroe, New York.

15   Q.  What were you doing at the post office in Monroe, New York?

16   A.  I was attempting to deliver at the post office packages of

17   heroin.

18   Q.  How many packages were you trying to mail out?

19   A.  Somewhere between 20 and 25.

20   Q.  Why were you mailing out packages of heroin from the post

21   office?

22   A.  Well, I was involved with Silk Road.  I was a seller of

23   drugs on Silk Road and that was one of the -- that was the

24   method that I used to deliver those drugs.

25   Q.  I'm going to ask you some questions about your activity on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sgulb6                          Duch - direct

1   Silk Road in a minute, but let me first ask, after you were

2   arrested, did you cooperate with authorities?

3   A.  Yes, I did.

4   Q.  And the assistance you provided, was that initially about

5   Silk Road or something else?

6   A.  It was some about Silk Road, but it also -- but I also

7   helped with a control buy with one of my suppliers.

8   Q.  So what specific crime -- did you end up pleading guilty?

9   A.  Yes, I did.

10  Q.  What specific crime did you plead guilty to?

11  A.  Conspiracy to distribute drugs.

12  Q.  Have you been sentenced yet on that charge?

13  A.  No, I have not.

14  Q.  How many years in prison could you get on that charge?

15  A.  Up to 40 years in prison.

16  Q.  Do you face any mandatory minimum prison term?

17  A.  There's a mandatory minimum of five years on that charge.

18  Q.  And as a result of the assistance you gave to authorities,

19  did the government give you a cooperation agreement?

20  A.  Yes, they did.

21  Q.  And what does your cooperation agreement require you to do?

22  A.  The cooperation agreement requires that I be truthful,

23  honest and I don't commit anymore crimes.

24  Q.  And are you testifying today pursuant to that cooperation

25  agreement?

F1sgulb6                        Duch - direct

1   A.  Yes, I am.

2   Q.  Now, if you satisfy your obligations under your cooperation

3   agreement, what's your understanding of what the government

4   will do for you?

5   A.  From my understanding is that the government will submit a

6   5K letter, and that letter pretty much states that, you know,

7   I've been cooperative.

8   Q.  Who does that letter go to?

9   A.  That goes to my judge.

10  Q.  The judge who will sentence you?

11  A.  That's correct.

12  Q.  Okay.  What do you understand the government will put in

13  that letter?

14  A.  That I've been cooperative and I've been truthful, honest,

15  haven't broke any crimes, and my judge will take that into

16  consideration upon sentencing time.

17  Q.  And is it your hope that based on that letter to the judge

18  you'll get a lighter sentence than you might otherwise?

19  A.  Yes, it is.  That's my hope.

20  Q.  If the government writes that letter, will you still face

21  that mandatory minimum of five years?

22  A.  I can still face that mandatory minimum of five years;

23  that's correct.

24  Q.  If the government writes that letter, will you get out from

25  that mandatory minimum?

F1sgulb6                         Duch - direct

1   A.  I do have the ability to get sentenced below that mandatory

2   minimum of five years; that's correct.

3   Q.  So what sentence do you hope to receive as a result of your

4   cooperation?

5   A.  I hope to receive time served.

6   Q.  Even if the government writes that letter to your

7   sentencing judge, is there any guarantee that the government's

8   given you that you'll get a sentence of time served?

9   A.  Absolutely not.  It's absolute completely up to my judge.

10  Q.  For any particular sentence has the government guaranteed

11  you?

12  A.  None whatsoever.

13  Q.  Will the jury's verdict in this case have any effect on

14  whether the government writes the sentencing letter to your

15  judge?

16          MR. DRATEL:  Objection.

17  Q.  Has the government told you that?

18          THE COURT:  I'll allow it.

19  A.  Can you repeat the question, please.

20          THE COURT:  Why don't you rephrase.

21          MR. TURNER:  Sure.

22  Q.  Is it your understanding that the jury's verdict --

23          THE COURT:  Why don't you say "the outcome of the

24  case."

25  Q.  Is it your understanding that the outcome in this case will

1   have any effect on whether the government writes the sentencing

2   letter to your judge?

3   A.   It should have no impact on whether the letter is written

4   or not.

5   Q.   And what happens to your cooperation agreement if the

6   government learns that you haven't been truthful today?

7   A.   From what I understand, the letter won't be written and I

8   can face up to 40 years in jail.

9   Q.   Do you have any history of drug addiction?

10  A.   Yes, I do.

11  Q.   Are you clean today?

12  A.   Yes, I am.

13  Q.   How long have you been clean?

14  A.   About a year and-a-half almost.

15  Q.   Were you using drugs at the time of your arrest?

16  A.   Yes, I was.

17  Q.   Have you ever used drugs since then?

18  A.   No, I have not.

19  Q.   What drugs were you -- do you -- in terms of your drug

20  addiction history, what drugs have you been addicted to in the

21  past?

22  A.   Mainly heroin, as well as opiate painkillers.

23  Q.   How often did you use those drugs when you were addicted to

24  them?

25  A.   On a daily basis several times a day.

F1sgulb6                          Duch - direct

1    Q.  And when did you first develop a drug addiction problem?

2    A.  I believe it was in about 2007 or '08 when I initially had

3    some battles with addiction.

4    Q.  And did you get addicted to painkillers at that time?

5    A.  Yes, I did.

6    Q.  And where did you get those painkillers?

7    A.  From my doctor.  I suffered from a few different sporting

8    injuries and those sporting injuries required -- well, didn't

9    require, but you know, it helped that I took those opiate pain

10   relievers, and being that I took those opiate pain relievers

11   for an extended period of time, I developed an addiction.

12   Q.  And then what happened?

13   A.  Well, the opiate pain relievers didn't really provide the

14   same level of relief.  Over a period of time, I developed a

15   tolerance.  At that time, I had also got painkillers from other

16   people on the street besides my doctor, and I eventually found

17   out that heroin was a -- was just as effective as the

18   painkillers and it was also cheaper.  So, you know, developing

19   a tolerance, not being able to afford my habit to the

20   painkillers, I turned to heroin being a cheaper alternative and

21   it was also much more potent.

22   Q.  How much heroin did you start using?

23   A.  It was somewhere about 30 bags per day.

24   Q.  And by bags, what do you mean?

25   A.  Individual little glassine bags that they're sometimes

F1sgulb6                          Duch - direct

1    called stamps.

2    Q.  How long did your heroin addiction continue?

3    A.  To about 2007 up to about 2009.

4    Q.  And did your use of heroin increase or decrease over time?

5    A.  It increased.

6    Q.  Why is that?

7    A.  Again, I developed -- I continued to develop a tolerance

8    and was addicted to the heroin, so more of the drug was

9    required to achieve the same effect.

10   Q.  Did you run into any trouble with the law during this time?

11   A.  Yes, I did.

12   Q.  What happened?

13   A.  I was arrested on several occasions for failure to turn

14   over a controlled, dangerous substance to law enforcement.

15   Q.  And were you arrested for anything else?

16   A.  I was also arrested for I believe it was a burglary

17   shoplifting charge.

18   Q.  Was that shoplifting charge connected to your drug

19   addiction at all?

20   A.  Yes, it was.

21   Q.  How was it?

22   A.  Well, I wasn't able to afford my addiction, so to pay for

23   my addiction, so I actually wound up shoplifting some items

24   from a Target store.

25   Q.  And how much did you start spending on your heroin

F1sgulb6                          Duch - direct

1   addiction?

2   A.  It was probably about 200- to $300 a day.

3   Q.  So at some point, you got clean?

4   A.  Yes, I did.

5   Q.  When was that initially?

6   A.  Initially, it was in October of 2009.

7   Q.  And did you ever develop an addiction to drugs again?

8   A.  Yes, I did.

9   Q.  And when was that?

10  A.  That was in about October, maybe September of 2012.

11  Q.  And what drug did you become addicted to?

12  A.  Painkillers.

13  Q.  And did you start using painkillers regularly again?

14  A.  Yes, I did.

15  Q.  Did you develop a tolerance to them again?

16  A.  Yes, I did.

17  Q.  Did you start using any other drugs around this time?

18  A.  I also began to use heroin.

19  Q.  And how much heroin did you start taking?

20  A.  Again, about 30 bags a day.

21  Q.  How would you ingest it?

22  A.  Initially, I snorted the drugs, but over time, I began to

23  inject the drugs.

24  Q.  And what would happen if you didn't take it?

25  A.  Um, I would start to become ill and go through withdrawal

F1sgulb6                           Duch - direct

1   symptoms.  Those symptoms included sweating, vomiting,

2   diarrhea, extreme flu-like symptoms.

3   Q.  How long did it take for those withdrawal symptoms to

4   start?

5   A.  Within a few hours usually.

6   Q.  So how often did you have to keep up the use of heroin to

7   stop the withdrawal symptoms?

8   A.  Every few hours, several times per day.

9   Q.  Did you quit using painkillers after you started using

10  heroin?

11  A.  I continued to use the painkillers.  Over time, I probably

12  used more heroin than painkillers.

13  Q.  Why did you continue using the painkillers?

14  A.  So you know, at the time I lived with my girlfriend and I

15  also maintained a job so, you know, it was something that I

16  tried to conceal from my girlfriend, my family member -- my

17  family members, people who I worked with so, during other times

18  when I wasn't able to discreetly use heroin, I would use the

19  painkillers, you know, like on a weekend or if I needed to be

20  at a job or something.

21  Q.  So at some point in 2012, did you start buying drugs on the

22  Silk Road website?

23  A.  Yes, I did.

24  Q.  How had you heard about it?

25  A.  Probably through one of the news media outlets.

F1sgulb6                         Duch - direct

1    Q.  And roughly when did you first visit Silk Road?

2    A.  It was in October of 2012.

3    Q.  And what drugs were you looking to buy?

4    A.  Painkillers.

5    Q.  And why were you looking to buy painkillers at that time?

6    A.  Well, I -- again, I had become addicted to them and to

7    stave off any withdrawal and/or sickness, I looked to Silk Road

8    to get those painkillers.

9    Q.  And had your previous supply -- was it no longer available?

10   A.  That's correct.  It was no longer available.  I was under

11   the care of a doctor at the time who was prescribing those

12   painkillers and that prescription was no longer being filled.

13   Q.  So, what about heroin?  Were you looking to buy heroin on

14   Silk Road?

15   A.  No, I wasn't.

16   Q.  Why not?

17   A.  Well, I knew of a local supplier that I could go to and it

18   was cheaper for me to get it there.

19   Q.  So did you start buying painkillers on the site?

20   A.  Yes, I did.

21   Q.  And did the site work?

22   A.  Yes, it did.

23   Q.  You got what you ordered?

24   A.  Yes, I did.

25   Q.  Besides painkillers, did you ever buy any other drugs on

F1sgulb6                          Duch - direct

1    Silk Road?

2    A.   On a few occasions, I did, yes.

3    Q.   What other drugs?

4    A.   I purchased heroin on one occasion, cocaine on a couple of

5    occasions, ecstasy, as well as hash.

6    Q.   And why did you order cocaine and ecstasy?  Did it have

7    anything to do with your opiate addiction?

8    A.   No, it didn't.  I think maybe I was under the influence at

9    the time and, you know, it was available.  I don't necessarily

10   know anybody who has those things and being that the website

11   that I was on had them, I purchased them through the site at

12   that time.

13   Q.   So when did you start dealing drugs on Silk Road?

14   A.   I initially started dealing drugs I believe it was in April

15   of 2013.

16   Q.   And what led you to decide to do that?

17   A.   Well, my prescription painkiller addiction as well as

18   heroin addiction became very expensive, and I could no longer

19   afford it, so I resorted to dealing drugs on Silk Road.

20   Q.   How much heroin were you buying off the street for yourself

21   in a given week at that point, April 2013?

22   A.   My tolerance increased to the point where I would use

23   anywhere between 60 and 100 bags of heroin a day.

24   Q.   And painkillers, too?

25   A.   And painkillers as well.

F1sgulb6                         Duch - direct

1    Q.  So how much were you spending per week back then on drugs?

2    A.  At a very minimum of $2,000 all the way up to about $3,500

3    a week.

4    Q.  How much were you making a week from your IT job?

5    A.  Well, that decreased over time.  I wasn't able to

6    necessarily maintain the level of service that was required for

7    my job to perform adequately, and, you know, the income from my

8    main job, which was computers, decreased.

9    Q.  How much were you making compared to the 3500 you were

10   spending a week?

11   A.  I wasn't able to afford my habit.

12   Q.  So where were you getting the money at the time to buy your

13   drugs?

14   A.  Well, being that I was successful for a period of time, I

15   did have some money saved up.  So once I used up my savings, I

16   then turned to dealing drugs.

17   Q.  And what drugs did you start selling on Silk Road?

18   A.  Mainly heroin.

19   Q.  You had used drugs before this, right, but had you ever

20   dealt drugs before?

21   A.  No, I had not.

22   Q.  Had you ever considered selling drugs on the street?

23   A.  Never.

24   Q.  So why were you willing to deal drugs on Silk Road?

25   A.  Well, I think, you know, being successful in purchasing

F1sgulb6                         Duch - direct

```
 1   drugs on Silk Road, I saw the relative ease that came with it.
 2   There was a certain amount of perceived level of safety as well
 3   as anonymity; and as long as you follow the rules of the site,
 4   it seemed like something that I could potentially -- to
 5   potentially get away with.
 6   Q.  When you say safety, safety from what?
 7   A.  Safety from being pursued by law enforcement.
 8   Q.  Now, you were addicted to drugs at the same time, right?
 9   A.  That's correct.
10   Q.  Didn't you have any misgivings about selling addictive
11   drugs to other people?
12            THE COURT:  Can you rephrase.
13   Q.  Did you have any misgivings about selling addictive drugs
14   to other people?
15            MR. DRATEL:  Objection.
16            THE COURT:  I'll allow it.
17            You may answer.
18   A.  Yes, I did.  It was something that bothered me on a daily
19   basis.
20   Q.  So how were you able to bring yourself to do it on Silk
21   Road?
22            MR. DRATEL:  Objection.
23   A.  Well, I think there were a couple --
24            MR. DRATEL:  Objection.
25            THE COURT:  Overruled.
```

F1sgulb6                          Duch - direct

 1    BY MR. TURNER:

 2    Q.  Go ahead.

 3    A.  I think there were a couple of factors that brought me to

 4    that point:  One is I had an addiction that I needed to feed.

 5    It was something that I didn't enjoy doing.  It was something I

 6    didn't like doing.  But to help ease the -- ease my moral

 7    conscience, I believe that my drugs -- my drug use continued to

 8    increase.

 9    Q.  So what did you have to do on Silk Road to become a vendor?

10    A.  Essentially, you needed to log onto the site, create a

11    username, log onto the site and agree to the terms and

12    conditions of the site.

13              MR. TURNER:  Could we put 121B on the screen.  Can you

14    pull it pup.

15    Q.  Do you recognize what you see on the screen?

16    A.  Yes, I do.

17    Q.  How do you recognize it?

18    A.  I believe this is the seller's agreement and it requires

19    you, prior to selling drugs on Silk Road, you needed to agree

20    to these terms and conditions of the seller contract.

21    Q.  And did you see this when you tried to create a vendor

22    account on Silk Road?

23    A.  Yes, I did.

24    Q.  It says "Get your products to your customers as quickly

25    easily and anonymously as a Silk Road independent seller.

F1sgulb6                         Duch - direct

1    Please read the following contract and the seller's guide

2    carefully by clicking 'I agree' at the bottom.  You agree to

3    abide by the guidelines and terms below when selling on Silk

4    Road."

5             Did you read the seller's guide?

6    A.  Yes, I did.

7    Q.  And what did you understand to be the guidelines and terms

8    you were agreeing to?

9    A.  There were a couple of different guidelines that were

10   recommended and that you needed to follow.  One was utilizing

11   some stealth shipping methods that were mentioned in the

12   forums.  You also needed to agree to the conditions of the site

13   to pay commissions to the Silk Road website for transacting

14   business.

15   Q.  So did you click "I agree" at the time?

16   A.  Yes, I did.

17   Q.  And who did you understand to be the other party to this

18   agreement?

19   A.  My understanding is that it was Dread Pirate Roberts.

20   Q.  And who did you understand Dread Pirate Roberts to be?

21             MR. DRATEL:  Objection.

22             THE COURT:  Overruled.

23   A.  I did not know the identity of Dread Pirate Roberts.  I was

24   just under the impression that this individual had run the Silk

25   Road website.

F1sgulb6                        Duch - direct

1   Q.  Once you entered into this agreement, did you ever have to

2   communicate with Dread Pirate Roberts or DPR directly as part

3   of being a vendor?

4   A.  I didn't have to.  No.

5   Q.  You said that one of the rules that you had to agree to was

6   to use the site's payment system?

7   A.  That's correct.

8   Q.  As a buyer on Silk Road, had you had any personal

9   experience with vendors who had gone outside the

10  personal -- had gone outside the Silk Road payment system?

11  A.  I had read some things about people going outside of the

12  payment system.  Part of the understanding of using Silk Road

13  is to never go outside of their payment system.  There was an

14  escrow system that was set up and in place for making payments,

15  and it was recommended to always use that escrow system and to

16  never release funds to any potential seller prior to receiving

17  product.

18  Q.  So did you set up a separate account to use as your vendor

19  account on the site as opposed to the buyer account used

20  earlier?

21  A.  Yes, I did.

22  Q.  What was the username you chose for your account?

23  A.  It was called deezletime.

24  Q.  How do you spell it?

25  A.  D-E-E-Z-L-E-T-I-M-E.

F1sgulb6                          Duch - direct

1    Q.   Did you have to pay anything to Silk Road to start up that

2    account?

3    A.   There was some initial money that was put in escrow.

4    Q.   How much money?

5    A.   I believe it was about $500.

6    Q.   And what was the purpose, as far as you understood, of that

7    payment?

8    A.   Once you established yourself and proved yourself as a

9    reliable seller on Silk Road, that money was later returned to

10   you.

11   Q.   How were you supposed to prove yourself reliable and

12   dependable?

13   A.   By delivering the products, by delivering drugs in my case,

14   to the sellers in a timely and efficient manner.

15   Q.   You mean to the buyers?

16   A.   To the buyers, that's correct.  I'm sorry.

17   Q.   And how was that supposed to be -- how was that feedback

18   supposed to be received by the website?

19   A.   So, as part of the website, there was also a feedback

20   system.  And any time that there was a transaction, a buyer was

21   afforded the opportunity to leave feedback regarding the drug

22   transaction.  So as long as the drug transaction went well, you

23   received positive feedback.  The more positive feedback that

24   you received, that was realized throughout your experience on

25   the website.

F1sgulb6                          Duch - direct

1    Q.  So, the $500 was a deposit?

2    A.  That's correct.

3    Q.  And if the feedback showed that you were actually dealing

4    drugs, you got your $500 back?

5    A.  That's correct.

6    Q.  Once you made that deposit and set up the account, how did

7    you advertise your heroin on Silk Road?

8    A.  Well, I created some listings.  There were generally three

9    different listings that I created:  One for an individual bag,

10   another one for ten bags, and another one for what's called a

11   brick of heroin, which is equivalent to 50 bags.

12          There was some sellers who --

13   Q.  Let me interrupt you.  Would you take a look at Government

14   Exhibit 700, please, in your binder in front of you.  Do you

15   recognize that document?

16   A.  Yes, I do.

17   Q.  How do you recognize it?

18   A.  I recognize it because it has my user account mentioned in

19   the top-right corner, and this is essentially a way to update

20   your profile on the Silk Road website.

21   Q.  Does this fairly and accurately reflect the contents of

22   your vendor page as of the time you were arrested?  Let me make

23   sure you're looking at 700.  A or B?

24   A.  I think that's what I'm looking at.  I think I might be

25   looking at the --

F1sgulb6                        Duch - direct

1    Q.  Take your time.

2    A.  There we go.  Thank you.  Yes, this was the -- my vendor

3    page, right before my arrest in 2013.

4    Q.  Okay.

5         MR. TURNER:  The government offers Exhibit 700 into

6    evidence, your Honor.

7         MR. DRATEL:  No objection.

8         THE COURT:  Received.

9         (Government's Exhibit 700 received in evidence)

10   Q.  So deezletime, that was your username?

11   A.  That's correct.

12        MR. TURNER:  Could we go over here.  Actually if we

13   can zoom in there.

14   Q.  Okay.  So it says Featured listings, East Coast Style

15   heroin stamps X10 (3 Free!!!) $98.  East Coast Style Heroin

16   Stamps X50 bags (1 Brick) $346.

17        Were these the -- what are we looking at here?

18   A.  Those are essentially listings that I created on the Silk

19   Road website.

20   Q.  And what do these terms mean?  What does East Coast Style

21   Heroin mean?

22   A.  The way heroin is packaged and distributed throughout the

23   New York metro area, excuse me, is it's packaged in individual

24   little glassine bags and they're sometimes referred to as

25   stamps because of the stamp that is put on the outside of the

F1sgulb6                        Duch - direct

1     bag with ink giving it some type of name.

2     Q.  So what stamp -- examples of stamps that would be on your

3     product?

4     A.  A few that I recall would be Black Magic, Murder, Hotshot.

5     Q.  And what was the approximate weight of each bag?

6     A.  They weighed somewhere around ten milligrams each.

7     Q.  And the brick you mentioned before, brick is -- what is

8     that again?

9     A.  That's equivalent to 50 bags of heroin.

10    Q.  The price is displayed in dollars, but how did you receive

11    your payments?

12    A.  All payments were received in bitcoins.

13    Q.  Did you have the option of displaying your price in

14    dollars?

15    A.  Yes, I did.

16    Q.  No images on the listings.  Was that your choice?

17    A.  Yes, it was my choice.

18    Q.  Why was that?

19    A.  There's something called geo-tagging and any time that you

20    take a digital photo, you can more or less identify where that

21    photo was taken, so I chose not to put any photos in there to

22    try to evade law enforcement.

23         MR. TURNER:  Back up, please.  Go here.

24    Q.  This gray area, by the way, did you control what text

25    appeared here?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sgulb6                    Duch - direct

1    A.  Yes.  And I did update that frequently.

2    Q.  So here it says:  "Update, 9/27/2013.  We will not be

3    shipping any product on Saturday 9/28/2013.  All orders

4    received after 3:00 p.m. EST on Friday 9/27/2013 will be

5    shipped on Monday 9/30/2013.  We repeat...no Saturday shipments

6    on 9/28!!!  All orders will be shipped on 9/30.  We apologize

7    for any inconvenience and thank you all for your continued

8    support."

9            Can you back out and go to and focus on this for the

10   time being.

11           This is from a little while before.  It says "New

12   Stamp...Fire!!!New Stamp.  Revised Saturday cutoff time.

13   Cut-off time for Saturday 9/21/2013 is 12:00 p.m. EST.  All

14   orders received prior to this time will be shipped same day.

15   All orders received after 12 noon will be shipped on Monday

16   9/23/2013.  We repeat cut-off time for 9/21 is 12 noon."

17           What are you talking about in these updates?

18   A.  Essentially I'm mentioning the cut-off times in which I

19   needed to receive orders.  So if anything I received before

20   3:00 p.m. that day would usually get shipped out the same day.

21   If there were any changes to that policy, I tried to make

22   updates to my vendor page letting potential buyers know that,

23   you know, you needed to either change your plans, get the

24   orders to me earlier, change the dates and/or times that, you

25   know, that things would be shipped out.

F1sgulb6                          Duch - direct

1    Q.  Was fast shipping something that you specifically

2    advertised?

3    A.  Yes, it was.

4    Q.  Same-day shipping?

5    A.  Same-day shipping, that's correct.

6    Q.  Why did you think your customers cared so much about fast

7    shipping?

8    A.  I think that users of heroin, they want to make -- they

9    want to know that their product is in the mail when they order.

10   I mean, it's something that they need to kind of listen to

11   because they're going to go through withdrawal symptoms.  Most

12   people who develop heroin addictions will go through withdrawal

13   symptoms.  These buyers wanted to make sure that they put their

14   money in escrow, that their package was in mail.

15   Q.  How did you communicate with your customers on the site?

16   A.  There was essentially a mail-messaging system that was

17   within the Silk Road website.

18   Q.  And would you get messages from your customers about

19   shipping times?

20   A.  All the time every day.

21   Q.  Take a look at Government Exhibit 704 in your binder.  Do

22   you recognize these -- what's in this document?

23   A.  Yes, I do.

24   Q.  How do you recognize it?

25   A.  They are messages from buyers asking about a variety of

F1sgulb6                          Duch - direct

1    different things.  Mainly, it appears that they're wondering if

2    their products have been shipped out that day.

3    Q.  And are these messages that you received in your vendor

4    account in your dealing with Silk Road?

5    A.  Yes, they are.

6            MR. TURNER:  The government offers Exhibit 704 into

7    evidence.

8            MR. DRATEL:  Objection as to hearsay and *Vayner*.

9            THE COURT:  All right.  Those objections are

10   overruled.  Government Exhibit 704 is received.

11           (Government's Exhibit 704 received in evidence)

12           MR. TURNER:  Could we take a look at the top one,

13   please.  August 9, 2013 from wigglyworm, subject: confirmation.

14   Message:  "Hey bud, just need some confirmation on if my

15   package will get to me tomorrow. I made the 3:00pm deadline by

16   at least a few hours so I'm hoping everything will go smoothly.

17   Otherwise I'm gonna be sick for the beautiful weekend we have

18   coming up here in NY... I know I can count on you to be as

19   reliable and professional as possible, so just get back to me

20   as soon as you can. Thanks!"

21           Can we go to the fifth from the top.

22           This is from August 15, 2013 from moderngoose:

23   "hello!! first time customer with you here, just wanted to make

24   sure but as soon as my btc hit my account im going to order ur

25   10 stamp listing via express and i wanted to make sure that as

F1sgulb6                    Duch - direct

long as i order them around 12:30pm EST will they ship out

today as well? i see ur cutoff time is 3 i just wanna double

check because i am EXTREMELY dope sick and NEED something by

tomorrow!! :( i am miserable at the moment having not slept all

night tossing and turning not to mention getting actually sick

:/ but anyways thank you very much for ur time, please respond

asap.  MG"

            Can we go to page two, the third from the top here.

            September 3, 2013.  "Hello.  Hey deezle, i placed the

order on the 31st... I understand there's been a few straggls

aside bt is there anyway you could ship it overnight. I am

throwing up, the worst of the worst withdrawl symptoms and plus

i have life destroying pain."

Q.  Was it relatively common for you to get messages from your

vendors indicating they needed the drugs right away because

they were dope sick?

A.  Yes.  I received those messages every day.

Q.  Could we go back to Government Exhibit 700, please.  Let's

go to page two.  This is also from your vendor page?

A.  Yes, it is.

            MR. TURNER:  And it says "Shipping/Packaging.  We

absolutely will go to the greatest lengths possible to provide

our clients with the most advanced packaging and shipping

methods available.  We ship USPS Priority and Express at this

time.  There is a slight up charge on whatever USPS charges as

F1sgulb6                          Duch - direct

the cost for our stealth and packaging is not cheap and is time

consuming."

          Jump to the second paragraph.

          "You will also find that our packaging processes use

stealth methods to prevent detection as well as the latest

technology in MBB and sealing."

Q.  What does MBB mean?

A.  MBB is a -- it stands for moisture barrier bag.

Q.  "The bottom line is that you know that your package will

arrive there" -- excuse me -- "will arrive as there will never

be anything that we do that will make your package look

suspicious if accidently opened and the vapor transfer

transmission rates of our materials are the lowest currently

available in the industry."  What are you talking about here?

A.  Moisture barrier bags are something that I use to package

the heroin inside of.  Inside of each moisture barrier bag,

it's engineered to have what's called a vapor transmission

rate.  That vapor transmission rate can potentially prevent law

enforcement or drug-sniffing dogs to potentially not smell the

drugs that are inside the package.

Q.  Take a look at what's been marked in your binder as

Government Exhibit 701.

          (Continued on next page)

F1sdulb7                        Duch - direct

1   Q.  Take a look at what's been marked in your binder as

2   Government Exhibit 701.

3         Would you flip through the pages in the binder, in

4   that exhibit.

5         (Pause)

6         Do you recognize what's in these photos?

7   A.  Yes, I do.

8   Q.  How do you recognize them?

9   A.  It's consistent with the name of the stamp that I shipped

10  as well as the shipping method that I used.

11  Q.  What is it?  What are the photos of in the exhibit?

12  A.  Essentially we've got an Express Mail envelope.  Inside of

13  the Express Mail envelope is a silver moisture barrier bag.

14  Q.  I just asked you is this a package that you yourself

15  shipped?

16  A.  Yes, it is.

17         MR. TURNER:  The government offers Exhibit 701 into

18  evidence.

19         MR. DRATEL:  No objection.

20         THE COURT:  Received.

21         (Government's Exhibit 701 received in evidence)

22         MR. TURNER:  Publish the exhibit.  OK.

23         Could you zoom in on the address.

24  Q.  The return address is "I sold it on eBay in Wayne, New

25  Jersey."  How did you choose that return address?

F1sdulb7                          Duch - direct

1   A.   EBay is obviously a common way for people to resell

2   products that I sold on eBay with an eBay reselling company

3   located out of Wayne, New Jersey.  I essentially just Googled

4   eBay resellers and used that legitimate address as a return

5   address to ship my order.

6   Q.   You didn't have any actual association with that company?

7   A.   None, whatsoever.

8        MR. TURNER:  Could we go to the next page.

9   Q.   What are we looking at here.

10  A.   This is an Express Mail envelope, and inside of the Express

11  Mail envelope is a silver moisture barrier bag.

12  Q.   Would you go to the next page.

13       And what are we looking at here?

14  A.   Inside of the moisture barrier bag there is a hair towel.

15  It was common for me to purchase cheap items like hair towels,

16  CD holders and try to hide the heroin inside of those products.

17  Q.   Could you go to the next page.

18       So what are we looking at here?

19  A.   Wrapped up inside of the hair towel there is another

20  moisture barrier bag and that is custom cut to fit the

21  specified order.

22  Q.   Would you go to the next page.  Could you zoom in.

23       So what are those?

24  A.   Those are individual bags of heroin and around them appear

25  to be some rubber bands.

F1sdulb7                          Duch - direct

1    Q.  Could you go to the next page.

2            Is that a closeup of the heroin?

3    A.  Yes, it is.

4    Q.  So each one of these is -- what is that?

5    A.  Each bag is an individual dose of heroin, or what's called

6    a stamp.

7    Q.  And where did you learn all of these packaging techniques?

8    A.  I learned most everything through the Silk Road website.

9    On the forums there are a variety of different methods that

10   were recommended in trying to come up with techniques to

11   prevent detection by law enforcement.

12   Q.  And how did you package the drugs without leaving

13   fingerprints behind?

14   A.  Each time that I would leave the package or anything, I

15   always wore gloves.

16   Q.  Where did you base your activity out of?  Where did you

17   package the drugs?

18   A.  Everything was done from my home.

19   Q.  Where was your home?

20   A.  In Orange County, New York.

21   Q.  And where did you buy the drugs?

22   A.  In Passaic County, New Jersey.

23   Q.  And where did you ship the drugs from?

24   A.  I shipped the drugs from my home but utilized the United

25   States Postal Service for shipping.

F1sdulb7                         Duch - direct

1   Q.  And what areas were those Post Offices in?

2   A.  Mostly in Orange County.

3   Q.  Anywhere else?

4   A.  I think I may have used a New Jersey Post Office once.

5   Q.  If you would go back to Government Exhibit 700.  Go to page

6   3.

7           Let's see.  If you could go here.

8           All right.  It says:  "In the event that SR goes down

9   you can reach us at BMR ("deezletime") and Atlantis

10  ("deezletime").  We will be using these accounts daily as well.

11          What are BMR and Atlantis?

12  A.  Atlantis and BMR are other sites that were also -- that I

13  also had accounts at that I also sold drugs at.  BMR stands for

14  Black Market Reloaded.

15  Q.  Were they similar to Silk Road?

16  A.  Yes.

17  Q.  Were they similar in size to Silk Road?

18          MR. DRATEL:  Objection.

19          THE COURT:  You need to lay a foundation.

20  Q.  How much of your -- well, from viewing the sites, could you

21  see the number of vendors on those sites compared to Silk Road?

22  A.  Yes, you can.

23  Q.  So how do the number of vendors on those sites compare to

24  Silk Road?

25  A.  Silk Road had a substantially more amount of --

1           MR. DRATEL:  Objection.  Hearsay.

2           THE COURT:  Hold on.

3           MR. TURNER:  Personal observation.

4           (Pause)

5           THE COURT:  I will allow it.

6   A.  Silk Road had a substantially larger amount of sellers that

7   were on there.

8   Q.  Let me ask you this.  How many of your orders came from BMR

9   and Atlantis as compared to Silk Road?

10  A.  Silk Road was probably over 99 percent of all orders I

11  received.

12  Q.  By the way, why did you need to deal on any of these

13  websites?  You are a tech guy, right?

14  A.  Right.

15  Q.  So why didn't you just launch a solo drug dealing business

16  yourself on the Tor network?

17  A.  Well, yeah, I potentially did have the technical

18  capability, but there was an infrastructure that was already in

19  place and that was known to be Silk Road and it was successful.

20  There was a lot of sellers that were there.  I know as a buyer

21  I was successful in obtaining product as well.

22          So there was the, you know, already established

23  infrastructure, the buyers, there were sellers.  And there was

24  a fair amount of publicity that the site had already received.

25  So there was constantly new clients or new buyers that were

1    already there.

2    Q.  When you say there were already sellers there, how is it

3    helpful for you to have -- to enter into a marketplace that was

4    already full of sellers?

5    A.  Well, I mean, without sellers there aren't going to be any

6    buyers.  So, I mean, you know, if there aren't any sellers,

7    then there aren't going to be any buyers that are coming to the

8    website.

9    Q.  So it is the buyers that ultimately --

10            MR. DRATEL:  Objection.

11            THE COURT:  Why don't you rephrase the question.

12            MR. TURNER:  Sure.

13   Q.  So in terms of what ultimately drew you to Silk Road, was

14   it customer base; is that fair?

15   A.  It was the customer base, that's correct.

16   Q.  And what was involved technically in setting up a vendor

17   page like we saw on Government Exhibit 700?  Is it easy to do?

18   A.  It was extremely easy to do.

19   Q.  Can we take a look at Government Exhibit 700A?

20            Do you see it in front of you?

21   A.  Yes.

22   Q.  What is that?

23   A.  That is the vendor profile page.  This page is used to

24   update your profile on the page that we were looking at

25   previously.

F1sdulb7                          Duch - direct

1                  MR. TURNER:  The government offers Exhibit 700A into

2       evidence.

3                  MR. DRATEL:  Objection as to hearsay.

4                  THE COURT:  Government Exhibit 700A is received.  The

5       objections are overruled.

6                  (Government's Exhibit 700A received in evidence)

7       BY MR. TURNER:

8       Q.  So explain what we are looking at here.

9                  And could we zoom in here.

10      A.  Sure.  So this is the profile description.  When you wanted

11      to make any updates to your vendor page, you would essentially

12      type it in right in that profile description.  When you click

13      the update profile button, whatever you typed in that box there

14      would update to your profile page.

15      Q.  Could we back out.  There are some options at the bottom

16      here.  One of them is post-commission pricing, pre-commission

17      pricing.  What did that mean to you?

18      A.  There were different ways that the money that was taken by

19      the Silk Road website was taken from you as a buyer.  You can

20      choose it either pre-commission or post-commission, but it is

21      actually included in the price to the seller or if it was

22      something that you paid after the transaction took place.

23      Q.  So, either way, was a commission taken on every sale that

24      you did on Silk Road?

25      A.  On every sale, that's correct.

F1sdulb7                          Duch - direct

1   Q.  Could you take a brief look at 700B.

2              (Pause)

3              Do you recognize this exhibit?

4   A.  Yes.  This is a page used to create a new listing within

5   your vendor profile.

6              MR. TURNER:  The government offers Exhibit 700B.

7              MR. DRATEL:  Hearsay, your Honor.

8              THE COURT:  Why don't you build more of a foundation

9   for that with this witness.

10  Q.  Did you yourself use a page like this to create your

11  listings on Silk Road?

12  A.  Yes, I did.

13  Q.  And does this exhibit fairly and accurately reflect your

14  recollection of what that page looked like?

15  A.  Yes, it does.

16             MR. TURNER:  The government offers 700B into evidence.

17             MR. DRATEL:  It still is hearsay, your Honor.

18             THE COURT:  All right.  The objection is overruled.

19  Government Exhibit 700B is received.

20             (Government's Exhibit 700B received in evidence)

21             THE COURT:  Let me ask you if we could go back to 700A

22  for one moment?

23             MR. TURNER:  Yes, your Honor.

24             THE COURT:  Mr. Duch, did you use each of the setting

25  boxes that are referenced on 700A?

1          THE WITNESS:  Yes, I did.

2          THE COURT:  And did they perform the functions

3   indicated?  In other words, "Change Password" had in fact

4   changed a particular password?

5          THE WITNESS:  Yes, it did.

6          THE COURT:  Is that true for each of the functions on

7   that page?

8          THE WITNESS:  Yes, that's true.

9          THE COURT:  Thank you.

10         You may proceed, Mr. Turner.

11         MR. TURNER:  Thank you, your Honor.

12  BY MR. TURNER:

13  Q.  OK.  700B.  So you just put in the title of your listing,

14  the asking price, quantity you had available, and then

15  description down below; is that how it worked?

16  A.  Pretty much.  You just type in, you know, a title, how much

17  you want to charge, the quantity, maybe how many you had on

18  sale, and a brief description of what it was that you were

19  selling.

20  Q.  So where did you get your heroin supply from?

21  A.  From a street-level dealer in Passaic County, New Jersey.

22  Q.  How often would you pick up heroin from your supplier?

23  A.  One to two times per week.

24  Q.  How would it be packaged when you picked it up?

25  A.  It was packaged in individual little glassine bags.  The

1   glassine bags were wrapped into bundles of ten.  Each --

2   Q.  The bags were stamped when you picked them up?

3   A.  That is correct.  The bags were already stamped with some

4   type of brand on them or name.

5            Each -- there were ten bags in each bundle.  They were

6   wrapped in individual -- wrapped around with rubber bands, and

7   the rubber bands were then wrapped around a larger set of

8   rubber bands which had 50 bags of heroin in them, and that was

9   equivalent to a brick of heroin.  Around the 50 bags of heroin

10  there was some magazine paper, and they were all taped together

11  to contain all of the heroin.

12  Q.  And how many bricks would you generally buy at a time?

13  A.  Up to 40 bricks of heroin.

14  Q.  And how much did your supplier charge you?  How much did

15  that cost you?

16  A.  Each bag was $3.  So it was about $6,000 for each time I

17  picked up heroin.

18  Q.  And how did that street price compare to what you were able

19  to sell the drugs for on Silk Road?  How much was your markup?

20  A.  I generally tried to keep it somewhere around double that.

21  So about 100 percent.

22  Q.  So you were just taking the same heroin you were buying off

23  the street and putting it up for sale on Silk Road at a hundred

24  percent markup?

25  A.  That's correct.

F1sdulb7                          Duch - direct

```
 1    Q.  How were you able to sell at such a high markup?
 2              MR. DRATEL:  Objection.
 3              THE COURT:  Why don't you rephrase.
 4    Q.  Why did you think you would be able to sell at such a high
 5    markup?
 6              MR. DRATEL:  Objection.
 7              THE COURT:  I will allow it.
 8              You may answer.
 9    A.  Well, there were -- being that Silk Road had access to a
10    large geographic region, there was -- some of these areas
11    didn't necessarily have --
12              MR. DRATEL:  Objection.
13              THE COURT:  Well, ladies and gentlemen, this answer is
14    for the witness' perception.  It is not offered for the truth
15    as to whether particular areas did or did not in fact have
16    access to heroin.
17              You may answer.
18    A.  OK.  There was a -- from what I understood, there was --
19    the heroin was not available in the geographic regions all over
20    the United States, and, you know, so somebody out in Utah was
21    now able to gain access to the heroin.  So, you know, it wasn't
22    something that was necessarily available to them, but the Silk
23    Road website made that available to them.
24    Q.  Did you know where your customers lived, where you were
25    sending the heroin -- not "lived," but did you know where they
```

F1sdulb7                         Duch - direct

1   were receiving the shipments you were sending them?

2   A.  Yes.  Well, I would get their addresses through the Silk

3   Road website.

4   Q.  And did you keep a record of the transactions you did with

5   your customers on Silk Road?

6   A.  Yes, I did.

7   Q.  What records did you keep?

8   A.  Essentially, I created a spreadsheet that tracked all the

9   business that I conducted, all the drugs that I sold on Silk

10  Road.

11  Q.  Did you keep your customers' addresses?

12  A.  Yes, I did.

13  Q.  You weren't supposed to do that under Silk Road's rules,

14  right?

15  A.  No, I wasn't.

16  Q.  But you did it anyway?

17  A.  Yes, I did.

18  Q.  Where did you keep that information?

19  A.  I kept it on my computer at home.

20  Q.  And was your computer seized by law enforcement as part of

21  your arrest?

22  A.  Yes, it was.

23  Q.  Do you see Government Exhibit 703 in your binder?

24  A.  Yes.

25  Q.  Do you recognize what's there?

F1sdulb7                          Duch - direct

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  It is a CD with my initials on it and a date that I created

4    it.

5    Q.  And when did you create it?

6    A.  On the 23rd of January.

7    Q.  Of this year?

8    A.  Of this year, that's correct.

9    Q.  And what's on this spreadsheet -- excuse me, what's on the

10   CD?

11   A.  This should be a spreadsheet containing a variety of

12   different information, information that I used to track my

13   orders on Silk Road.

14   Q.  Did this come from the data that you kept on your computer?

15   A.  Yes, it did.

16            MR. TURNER:  May I approach, your Honor?

17            THE COURT:  You may.

18            MR. TURNER:  Your Honor, the government moves Exhibit

19   703 into evidence and asks that it be published to the jury.

20            MR. DRATEL:  No objection.

21            THE COURT:  Received.  Government Exhibit 703 is

22   received.

23            (Government's Exhibit 703 received in evidence)

24            MR. TURNER:  OK.  Can we zoom in.

25   BY MR. TURNER:

F1sdulb7                          Duch - direct

1    Q.  Would you walk us through these columns and what each

2    reflects.

3    A.  Sure.  Column A was the order number.  This was generated

4    by the Silk Road website.

5            Column B was the quantity of heroin or the number of

6    bags of heroin that was ordered on the website.

7            Column C was an adjusted quantity that I created.

8    Traditionally with the -- some of my orders, I would give extra

9    bags of heroin.  So this adjusted quantity was something that I

10   created later to reflect the actual number of bags of heroin

11   that I distributed.

12   Q.  Just to be clear, is that something you created in

13   preparation for testifying today?

14   A.  Yes, I did.

15   Q.  OK.

16   A.  Column D is the postage method used.  I essentially used

17   two different ways to ship stuff -- united States Postal

18   Service Express and Priority.

19           Column E would be the address.

20           G is the buyer on Silk Road.  That is their -- that is

21   their username.

22           And Column H was the tracking number that I also kept

23   track of for that particular order.

24           MR. TURNER:  Ms. Rosen, just to show the jury how far

25   this goes down, could you scroll down slowly.

F1sdulb7                         Duch - direct

1              (Indicating)

2              MR. TURNER:  A little faster.  Keep going.

3              Go all the way down to the end, please.

4              (Indicating)

5              MR. TURNER:  OK.  Could we go back up.

6    Q.  What time span does this spreadsheet cover?

7    A.  Essentially from when I first started selling drugs on Silk

8    Road up to the day I was arrested.

9    Q.  Now, the address information from this document has been

10   redacted, but did you prepare any kind of summary of all the

11   places you mailed shipments to?

12   A.  Yes, I did.  Essentially, I extracted all of the cities and

13   states where heroin was shipped.

14   Q.  Can you take a look at Government Exhibit 703B in your

15   binder.

16             (Pause)

17             Do you recognize that document?

18   A.  Yes, I do.

19   Q.  What is it?

20   A.  It is the -- it is all the cities and states that were

21   extracted from the spreadsheet.

22             MR. TURNER:  The government offers Exhibit 703B into

23   evidence.

24             MR. DRATEL:  Objection.  Hearsay.

25             THE COURT:  That objection is overruled.  Government

F1sdulb7                          Duch - direct

1    Exhibit 703B is received.

2               (Government's Exhibit 703B received in evidence)

3    BY MR. TURNER:

4    Q.  Could you zoom in here.

5               It is in alphabetical order?

6    A.  Yes, it is.

7    Q.  Aberdeen, Mississippi; Agawam, Massachusetts; Aguadilla,

8    Puerto Rico; Akron, Ohio; Alanson, Michigan; Albany, New York;

9    Albemarle, North Carolina, etc.

10              How many pages does this go on for?

11              MR. TURNER:  Actually, scroll through the pages,

12   Ms. Rosen.

13              (Indicating)

14   A.  It is probably about 15 pages here or so.

15   Q.  And are the locations concentrated anywhere in particular,

16   or are they spread all over the country?

17   A.  They are pretty much spread all over the country.

18   Q.  By using this spreadsheet we looked at earlier, were you

19   able to calculate how many drug deals you did on Silk Road?

20   A.  Yes, I did.

21   Q.  And how many bags or stamps of heroin you sold?

22   A.  Yes, I did.

23   Q.  How did you calculate that information?

24   A.  I pretty much summed up the adjusted quantity that was

25   created in preparation for trial.

F1sdulb7                          Duch - direct

1    Q.  Would you take a look at Government Exhibit 703A.  Is this

2    the summary you created?

3    A.  Yes, it is.

4              MR. TURNER:  The government offers Government Exhibit

5    703A into evidence.

6              MR. DRATEL:  Hearsay, your Honor.

7              THE COURT:  Government Exhibit 703A is received, and

8    the objection is overruled.

9              (Government's Exhibit 703A received in evidence)

10   BY MR. TURNER:

11   Q.  OK.  So how many orders did you do in total?

12   A.  2,414.

13   Q.  And how many bags of heroin did you sell?

14   A.  31,827.

15   Q.  It is about 10 milligrams per bag?

16   A.  That is correct.

17   Q.  Was it ever more than that?

18   A.  Sometimes.  Sometimes more.  Sometimes a little less.  That

19   is about an average.

20   Q.  OK.  And total estimated weight, you just multiplied the

21   paper bag times the bags you sold and it is 3.18 kilograms of

22   heroin?

23   A.  That's correct.

24   Q.  And that's from April to September 2013?

25   A.  Yes, it is.

F1sdulb7                          Duch - direct

1   Q.  How long did it take you to start doing a steady volume of

2   business on Silk Road?  How fast did your business grow?

3   A.  Sure.  It took about -- in all, about six weeks to go from

4   having no status on Silk Road to becoming relatively well

5   known.

6   Q.  So after six weeks how many bags of heroin were you

7   shipping out on a given day?

8   A.  Anywhere between 400 to 600 bags of heroin per day.

9   Q.  How much revenue were you taking in per month?

10  A.  About 60 to $70,000 a month.

11  Q.  And how many hours were you working per day as a drug

12  dealer on Silk Road?

13  A.  At least six to eight hours a day Monday through Saturday

14  and some hours on Sunday as well.

15  Q.  How many hours per day were you spending on your IT

16  business at that point?

17  A.  Well, it decreased significantly over time.  I would

18  probably spend maybe two or three hours doing my computer tech

19  work per day.

20  Q.  And what did you do with all the money you were making from

21  the site?

22  A.  Most of it was used to either support my habit or to

23  reinvest in my drug selling.

24  Q.  So how many bags of heroin were you yourself consuming in a

25  given week by this point, by the time of your arrest?

F1sdulb7                          Duch - direct

1   A.  Up to 6 to 700 bags of heroin a week.

2   Q.  What was happening to your health at this point?

3   A.  It did decrease significantly.  My social life suffered.

4   My work life obviously suffered.

5   Q.  And so the same drug that was impacting your life in that

6   way you were dealing to thousands of people --

7             MR. DRATEL:  Objection.

8   Q.  -- on Silk Road?

9             THE COURT:  Hold on.

10  A.  Yes, I was.

11            THE COURT:  Hold on.

12            (Pause)

13            The objection is sustained.  The answer is struck.

14            MR. TURNER:  No further questions, your Honor.

15            THE COURT:  All right, Mr. Dratel.

16            MR. DRATEL:  Thank you, your Honor.

17  CROSS-EXAMINATION

18  BY MR. DRATEL:

19  Q.  Good afternoon, Mr. Duch.

20  A.  Good afternoon.

21  Q.  Now, you testified on direct about your deal with the

22  government, correct?

23  A.  Yes, I did.

24  Q.  And you said that under the charges that have been filed

25  against you by the government you face a penalty possibly of

F1sdulb7                    Duch - cross

1    anywhere from 5 to 40 years, right?

2    A.  That's correct.

3    Q.  And it is a mandatory minimum of five years unless you get

4    the letter from the government to the Judge about your

5    assistance, your substantial assistance, correct?

6    A.  That is correct.

7    Q.  Substantial assistance to the government, right?

8    A.  That is correct.

9    Q.  Now, you have a prior felony conviction, correct?

10   A.  Yes, I do.

11   Q.  Before the one that you pleaded guilty to regarding the

12   conduct you have talked about today, right?

13   A.  Yes, I do.

14   Q.  And you were aware that if the government chose to file

15   what's called a prior felony information against you, that

16   would double the mandatory minimum and make the maximum penalty

17   life in prison, right?

18   A.  I don't know whether it would be life in prison or not.  I

19   don't know about that.

20   Q.  Well, you were informed that it would double the mandatory

21   minimum, correct?

22   A.  Correct.

23   Q.  And that it would increase the maximum, correct?

24   A.  I'm not aware whether it would increase the maximum or not.

25   Q.  And part of your agreement with the government is that they

F1sdulb7                         Duch - cross

```
 1   are not going to file that prior felony information against
 2   you, right?
 3   A.   There is no agreement on whether they'll file a prior
 4   felony information or not.
 5   Q.   You understand they're not going to do that, correct?
 6   A.   I --
 7   Q.   Whether it is in writing or not, you are not expecting them
 8   to go and file a prior felony information if they give you a 5K
 9   letter and then increase your mandatory minimum to possibly 10
10   years, right?  You don't expect them to do that?
11   A.   My expectation is that they wouldn't do that but there is
12   no agreement stating that.
13   Q.   It is something they are holding over your head, correct?
14   A.   It's never been mentioned.
15   Q.   It's never been mentioned.
16              Well, I want to show you what's been marked as 3514-2.
17              Let me start.  You've met with the government in
18   preparation, right, for your testimony, correct?
19   A.   Yes, I did.
20   Q.   That goes all the way back to even -- withdrawn.
21              When you first got arrested you agreed to cooperate,
22   correct?
23   A.   That's correct.
24   Q.   You signed a consent form for searches, right?
25   A.   Yes, I did.
```

F1sdulb7                          Duch - cross

1    Q.  You made tapes of your supplier, right, trying to

2    incriminate him, correct?

3    A.  I believe there was an audio recording made.

4    Q.  Well, you made it, right?

5    A.  I was a participant in making the recording, that's

6    correct.

7    Q.  By the way, when you're doing -- by October 2013, you are

8    doing 6 to 700 bags of heroin a week, right?  That's what you

9    said.

10   A.  Not in October of 2013, no.

11   Q.  So when were you doing that?

12   A.  It would probably be in -- around April of 2013.

13   Q.  Then you cut back?

14   A.  And I was arrested around October of 2013.

15   Q.  Right.  It is six months later, right?

16   A.  Right.

17   Q.  You say you cut back in your heroin use in those six

18   months?

19   A.  I didn't cut back, no.

20   Q.  So you were high all the time, right?

21   A.  I used heroin on a daily basis.

22   Q.  You were high all the time, right?

23   A.  I used heroin on a daily basis.

24   Q.  That's not the question.

25              How many times did you use heroin a day to get

F1sdulb7                         Duch - cross

1   those -- that is about a hundred bags a day?

2   A.   That's correct, up to a hundred bags a day.

3   Q.   So you can't do them all at once, right; you'll kill

4   yourself, right?

5   A.   I used heroin four to five times a day.

6   Q.   And how long did it last?

7   A.   Anywhere between six hours or so.

8   Q.   So if you did that four or five times a day, you're high 24

9   hours a day, right?

10   A.   I think there's a difference between being high on heroin

11   and having enough heroin so you don't actually become ill.

12   Q.   So you did it so you won't become ill, right?

13   A.   Part of the time, yes.  Other times I used --

14   Q.   You started to because you were in pain, right?  You didn't

15   go from pain killers to heroin because you wanted -- withdrawn.

16         You went from pain killers to heroin back at the

17   beginning of your problem because you wanted to get high,

18   right, not because of pain?

19   A.   I did it essentially for financial reasons.  I mean, to

20   continue to sustain a pain killer addiction is quite expensive.

21   Heroin is a cheaper alternative.

22   Q.   Are you saying that the getting high had no appeal to you?

23   A.   I -- I -- I'm not saying it didn't have any appeal to me.

24   Q.   Of course.  You wanted to get high, right?

25   A.   That wasn't the sole reason but it was a factor.

F1sdulb7                          Duch - cross

1    Q.  It was a huge factor, wasn't it?

2    A.  It was a factor.

3    Q.  So getting back to your agreement with the government.

4           So you started cooperating immediately, right?  And

5    then -- right?  Immediately upon your arrest, you began

6    cooperating?

7    A.  Yes, I did.

8    Q.  And then that involved meeting with the government,

9    correct, to discuss your life history, your variety of things,

10   including your conduct with respect to selling heroin, right?

11   A.  Yes, it did.

12   Q.  OK.  So one of those meetings was February 11, 2014, right?

13   I'm sorry.  February 6, 2014, right?

14   A.  I don't know if that was the date or not but it was

15   sometime in February, that's correct.

16   Q.  You met in White Plains, right?

17   A.  I did meet in White Plains in February.

18   Q.  You met with an assistant United States Attorney, right,

19   and a DEA agent, right?

20   A.  That's correct.

21   Q.  And a Homeland Security Investigations agent, right?

22   A.  That's correct.

23   Q.  And your attorney?

24   A.  Yes, I did.

25   Q.  Now, at the beginning of that meeting, did the prosecutor

F1sdulb7                          Duch - cross

1    say to you that your predicate felony information would be

2    considered, right?

3    A.  I don't know whether that was mentioned or not.

4    Q.  Could it have been mentioned?

5    A.  It might have been.

6    Q.  Do you recall?

7    A.  I don't recall it being mentioned.

8    Q.  Let me show you what's marked as 3514-2, and ask you

9    whether the highlighted portion -- read it to yourself.  Don't

10   read it out loud.

11   A.  Sure.

12   Q.  Just you could read the whole paragraph, if you want, for

13   context.  Tell me whether that refreshes your recollection as

14   to whether or not the government said -- the Assistant United

15   States Attorney at that meeting said to you that the prior

16   felony information that they could file against you would be

17   considered.

18           (Pause)

19   A.  No.  I'm not sure who created this or what was -- what the

20   point --

21   Q.  I am just asking you whether it refreshes your recollection

22   that at that meeting the Assistant United States Attorney

23   informed you that your prior felony and the prior felony

24   information that could be charged against you would be

25   considered.  This is back in February of 2014.

F1sdulb7                      Duch - cross

```
 1    A.  It essentially states that A.U.S.A. --

 2    Q.  I don't want to know what it states.  I want to know

 3    whether it refreshes your recollection that that was told to

 4    you at that meeting.

 5    A.  I don't recall it being told to me.

 6    Q.  In fact, you didn't sign a cooperation agreement until

 7    December 10, 2014, right?

 8    A.  That's correct.

 9              MR. DRATEL:  Let me just get this back.

10    Q.  Now, with respect to your agreement, you're charged in this

11    5-to-40 range that you're charged in in terms of a 5-year

12    mandatory minimum up to a maximum of 40, right?  That's based

13    on selling more than 100 grams of heroin, correct?

14    A.  That's correct.

15    Q.  Now, we just saw that chart that you estimate that you sold

16    3.1 kilograms of heroin, correct?

17    A.  That's correct.

18    Q.  Is that 30 times more, right?

19    A.  That's correct.

20    Q.  So -- and you knew, when you made your deal with the

21    government, that at one kilogram or more it's a mandatory

22    minimum of 10 years and a maximum of life, right?

23    A.  That's correct.

24    Q.  And you knew that with your prior felony conviction, if

25    they filed a prior felony information, that would be a minimum
```

F1sdulb7                      Duch - cross

1    of 20 years and a maximum of life, correct?

2    A.  That's correct.

3    Q.  Now, this agreement that you have with the government

4    doesn't just cover any drug dealing you might have done on Silk

5    Road, correct?

6    A.  I'm not sure what the question is.

7    Q.  The government's not going to prosecute you for other

8    crimes that you've committed, right?

9    A.  I'm not aware that that language is in the agreement.

10            MR. DRATEL:  If I may approach?

11            THE COURT:  Yes.

12            MR. DRATEL:  3514-17.

13            THE COURT:  Just for your planning purposes,

14   Mr. Dratel, you've only got a couple of minutes left today and

15   then we will pick up tomorrow.

16            MR. DRATEL:  OK.  I will just go through this one

17   thing.

18            THE COURT:  Yes.  Sure.

19            MR. DRATEL:  If I may stay up here, your Honor,

20   because this is my copy.

21            THE COURT:  As long as you keep your voice up so we

22   all can hear you.

23            MR. DRATEL:  I will stand over here so that the

24   reporter can hear me.

25   BY MR. DRATEL:

F1sdulb7                        Duch - cross

1   Q.  So doesn't the agreement -- I'm trying to refresh your

2   recollection here, that the agreement says that you will not be

3   prosecute, except for criminal tax violations, for, in addition

4   to the Silk Road sales, the theft, purchase and personal use of

5   ecstasy, GBH, cocaine, heroin, and various prescription drugs

6   from 1994 through 2013?

7   A.  OK.

8   Q.  That's part of your deal, right?

9           (Pause)

10          Do you want to look at the whole document?

11  A.  Sure.

12          (Pause)

13          Right, that I won't be prosecuted for any theft,

14  purchase or personal use of drugs.

15  Q.  Right.  And those were all illegal drugs that we are

16  talking about, correct, in that -- even though we haven't

17  talked about GBH, right?

18  A.  Right.

19  Q.  It also includes that you will not be prosecuted for theft

20  of property from your father in various Wal-Mart starts in

21  approximately 2008 and 2009, right?

22  A.  That is correct.

23  Q.  And that you will not be prosecuted for the throwing of a

24  telephone at your girlfriend in approximately 2008, right?

25  A.  I don't see that mentioned there.

F1sdulb7                          Duch - cross

1   Q.   (Handing)

2   A.   I see it now.

3   Q.   And the trading of heroin for prescription medications from

4   approximately 2008 through approximately 2009, right?

5   A.   That's correct.

6   Q.   Now -- by the way, you signed your cooperation agreement,

7   correct?

8   A.   Yes, I did.

9   Q.   And you read it before you signed it, correct?

10  A.   Yes, I did.

11  Q.   And, in fact, when you pleaded guilty, the judge asked

12  you -- and you were under oath -- have you read the agreement,

13  correct?

14  A.   Yes, I did.

15  Q.   But somehow you didn't know today what was in the

16  agreement, right?

17  A.   I knew what was in the agreement.  I just wasn't -- I don't

18  think that I was exactly clear on the language that was in

19  there.

20          MR. DRATEL:  This is a good spot, your Honor.

21          THE COURT:  All right.  Thank you.

22          Ladies and gentlemen, we'll break for today.  We will

23  pick up tomorrow, on Thursday, at 9:30, our usual time.  And

24  I'll try to have us start at 9:30.  I know you folks are good

25  about being here.

F1sdulb7                         Duch - cross

1              I want to remind you still, as usual, the same

2     reminder not to talk to anybody about this case.  Thank you.

3              THE CLERK:  All rise as the jury leaves.

4              (Continued on next page)

F1sdulb7

1           (Jury not present)

2           THE COURT:  Mr. Marshal, you may bring the witness

3    back.

4           (Witness not present)

5           THE COURT:  All right.  Ladies and gentlemen, let's

6    all be seated.

7           Is there anything in particular that you folks would

8    like to raise?  I just wanted to talk about sort of going

9    forward and the timing and things of that nature so I can get a

10   sense of how these witnesses are progressing.  We've only got a

11   few witnesses left in the government's case.  And I also wanted

12   to just mention that we'll be picking up with the jury

13   instructions tomorrow morning unless there are other

14   housekeeping matters tomorrow morning that arise and that we

15   should take up first.

16          Those are the only two things that I wanted to sort of

17   go over.  So, schedule first.  But are there things that you

18   folks would like to address?

19          MR. TURNER:  No, not besides the scheduling.

20          THE COURT:  Mr. Dratel.

21          MR. DRATEL:  Yes, your Honor, in terms of scheduling.

22          THE COURT:  In terms of schedule, but other than that?

23          MR. DRATEL:  Not other than scheduling.

24          THE COURT:  Why don't you give me a sense of,

25   Mr. Turner and Mr. Howard, how things look.  Actually, you've

F1sdulb7

1    got three witnesses left after this witness, and two of them

2    appear to be quite short and one of them a little bit -- one of

3    them longer.

4              MR. TURNER:  Right.  I think -- well, the next witness

5    will be short, Agent D'Agostino, and then for Ilhwan Yum I

6    think it may be two to three hours is our best guess.  And

7    Brian Shaw will be maybe three hours.  But there are a number

8    of exhibits to be read in during Mr. Shaw's testimony and it is

9    always hard to gauge that so it could go longer.  So we could

10   certainly be done by tomorrow or at the latest by Monday.

11             THE COURT:  All right.  So sometime Monday.  That

12   corresponds with what we had discussed previously even with the

13   snow.

14             All right.  If the government rests tomorrow, I will

15   not require the defense to start their case tomorrow.  We can

16   pick that up on Monday.  It doesn't sound like that is a likely

17   scenario, frankly, anyway.  It sounds like the most likely

18   scenario is you are going to have some amount of time going

19   into Monday.

20             Mr. Dratel, in terms of timing from your perspective?

21             MR. DRATEL:  It is difficult to determine because I

22   know that the government was trying to look on the outside as

23   to what these times would be, and some of them have been faster

24   for a variety of reasons.  But the question with Agent Yum is

25   Agent Yum is the witness after Agent D'Agostino.  So Agent

F1sdulb7

D'Agostino is going to be short and come right after Mr. Duch.

          With respect to Agent Yum, we received Monday night a
spreadsheet that he prepared on Bitcoin Wallet and bitcoin
transactions that has millions of pieces of information in it
without any corresponding 3500.  I'm not suggesting that they
haven't turned over 3500 that doesn't exist.  I am really not
in a position to cross-examine him on that tomorrow.  I thought
I would have until Monday based on the schedule as it was
projected.

          As it looks now, we will probably finish his direct
sometime early to mid-afternoon.  I would just ask that we
break at that point.  We could finish the charge conference at
that point.

          As far as our case, I'll let Ms. Lewis talk to the
Court about that because she has been coordinating that.  But,
with respect, I think it is really impossible -- we were trying
to get up on it but, you know, at the same time as doing
everything else in the case, it's really not in a position to
absorb -- and it is really just in many respects numbers.  It
is a spreadsheet.

          THE COURT:  Do I have this information in my binder
that you folks are planning on using with Agent Yum?

          MR. TURNER:  No, not yet, your Honor.

          The issue here is this is something the defendant
announced in their opening, that the bitcoins on the laptop did

F1sdulb7

```
 1    not come from Silk Road, it came from bitcoin trading or mining
 2    or whatever.  They opened that door, and we have been doing our
 3    best to complete an analysis by looking at the addresses on the
 4    wallets at issue in the block chain and looking to see the
 5    transfers from the Silk Road wallet to Mr. Ulbricht's laptop
 6    and to prepare that as soon as we could.  And we have provided
 7    Agent Yum's basically draft work as soon as we could.
 8            THE COURT:  When did you provide it?
 9            MR. TURNER:  We provided it to them Sunday night.
10            THE COURT:  And when was the material underlying -- so
11    on Sunday night.  Just so I'm clear, this past Sunday, which
12    would have been January 25?
13            MR. TURNER:  I think so, your Honor.
14            THE COURT:  All right.
15            MR. DRATEL:  Your Honor, I'm not suggesting that it
16    was delayed or --
17            THE COURT:  No.  I am just trying to get a sense of
18    timing.
19            You produced the spreadsheet?
20            MR. TURNER:  I produced the spreadsheet.  The actual
21    underlying information has been produced to the defense months
22    ago.  So you have the image of the defendant's laptop.  That
23    contains the Bitcoin Wallet files that were on the computer.
24    You have the images of the Silk Road servers.  That contains
25    the wallet files that were on the Silk Road servers.  It is a
```

F1sdulb7

1   very simple matter to look at the addresses in those wallets

2   and see how many addresses sent money from the Silk Road

3   servers to the addresses on Mr. Ulbricht's laptop.  So this is

4   certainly an analysis that could have been done by the defense

5   easily long ago.  And, you know, this is what we did in

6   response to their statement in their opening that the bitcoins

7   didn't come from Silk Road.

8           MR. DRATEL:  All I am asking is to put it over, the

9   cross, until Monday morning.

10          THE COURT:  Well, the issue is that right now it looks

11  like there is some chance that we will be into the very last

12  witness tomorrow afternoon -- I think a substantial chance.

13  Now, I don't know what you've got with Mr. Duch and you'll -- I

14  don't want to unduly delay that.  But let me get a full picture

15  of where we are with the defense case as well in terms of

16  timing to determine what we're looking at.

17          So, Ms. Lewis, why don't you give me a sense, first,

18  at this point in time how many witnesses do you have and what

19  is the approximate duration?

20          MS. LEWIS:  So at this time we put the government on

21  notice of eight witness, including one expert.

22          THE COURT:  OK.

23          MS. LEWIS:  The majority of those are lay witness.

24  All of the witnesses are out-of-town witnesses, some out of the

25  country -- at least one out of the country.  And given that, we

F1sdulb7

 1    have been trying to obviously keep them abreast of the duration

 2    of the government case and we have been adjusting that as we

 3    have been going, but even with those adjustments the case,

 4    obviously, has been moving faster than we had anticipated.

 5            So I told the witnesses to this point that they would

 6    not be -- could not expect to be called before Tuesday, just

 7    because there was no way that we would finish before then.

 8    Obviously, with the snowstorm, too, we would not know how that

 9    was going to go.

10            THE COURT:  Where does the expert in terms of your

11    planning fall generally within your current anticipated order?

12    Is he or she first, middle, last?  Just so I can get a sense.

13            MS. LEWIS:  I guess in the middle, your Honor.

14            THE COURT:  The middle.  All right.

15            Are the other seven witnesses, are they short?

16            MS. LEWIS:  They are character, fast witnesses.

17            THE COURT:  Are they half-hour witnesses on direct,

18    something in that nature, or more?

19            MS. LEWIS:  I think so.  Again, we are still kind of

20    ironing out exactly what they will testify to, but I believe

21    somewhere --

22            THE COURT:  I am not going to hold you to a timeframe,

23    a certain timeframe.  I am trying to get a sense of whether or

24    not they are going to be half a day --

25            MS. LEWIS:  These are short witnesses.

1    THE COURT:  All right.  So short witnesses.  So there

2   is seven of those and then one expert.  How long do you expect

3   the expert to be on direct?

4    MR. DRATEL:  I would think, at the outside, two hours

5   at the outside.

6    THE COURT:  All right.  And is the defendant going to

7   testify?  At this point in time, I am not having you commit to

8   that but that's obviously a longer witness than any of these.

9    MR. DRATEL:  Right.

10    THE COURT:  And I told you I would start asking you on

11   Wednesday.

12    MR. DRATEL:  True.  As of right now, the decision has

13   not been made because, obviously, it is not my decision so.

14    THE COURT:  Absolutely.  We talked about that at the

15   final pretrial.  It is ultimately Mr. Ulbricht's decision as to

16   whether or not he wants to testify.

17    MR. DRATEL:  Right.  And so -- but we'll try to have

18   an answer as soon as we have an answer.  I just, you know --

19    THE COURT:  Well, in terms of timing, I mean, can you

20   give me a sense as to whether or not you're leaning for it or

21   you're really just right in the middle right now?

22    MR. DRATEL:  I can't say where we are on that, your

23   Honor.

24    THE COURT:  OK.

25    MR. DRATEL:  I don't want to --

F1sdulb7

```
 1              THE COURT:  No.  That is fine.  I just needed to get a
 2     sense of it.  You are not in your case yet so you don't have to
 3     make a decision.
 4              I would think that Mr. Ulbricht is a -- I'm going to
 5     say a two-day witness, perhaps more, if he's called.  I don't
 6     know.  It depends on what occurs.
 7              MR. DRATEL:  I could tell you about the rest of our
 8     case.  I think the rest of our case would be -- my sense would
 9     be that it would not be longer than two days is my estimation.
10     It could be shorter.  It could be a day and a half.  Obviously,
11     I don't know what the extent of the cross-examination would be,
12     but I am just anticipating just from my --
13              THE COURT:  All right.  Let me ask the government.
14              MR. DRATEL:  -- perspective.
15              THE COURT:  Let me ask the government about Mr. Shaw.
16              Is there any possibility that the government could
17     call Mr. Shaw before Mr. Yum?  Is it a "Mr." Yum or "Ms." Yum?
18              MR. TURNER:  Yes.  Mr. Yum.
19              THE COURT:  So that we could swap that order.
20              MR. TURNER:  Well, I think the problem from the
21     government's perspective is that Mr. Yum sets the stage for
22     Mr. Shaw because he explains not only about the bitcoins but he
23     participated in the seizure of the servers and could explain
24     how these servers are known to be Silk Road servers.  So it
25     would be a little bit out of the left field otherwise for the
```

F1sdulb7

1    agent -- for the jury to hear testimony from Mr. Shaw, who

2    looked at the underlying servers, without understanding where

3    the data came from.  That is our concern.

4           THE COURT:  All right.  We are going to then proceed

5    in the ordinary course.  Mr. Duch will take however long he is

6    going to take.  Mr. D'Agostino will take however long he is

7    going to take.  We will then proceed into Mr. Yum.

8           It may or may not be the case that we get into

9    cross-examination of Mr. Yum.  It may also be the case that

10   Mr. Yum is held over after his direct for cross until after the

11   weekend.

12          So we'll proceed.  If there is an application renewed

13   tomorrow if his direct is finished and he's on cross and there

14   is a renewed application that you haven't been able to get to

15   it, let's see where we are in the afternoon.

16          MR. DRATEL:  Yes.

17          THE COURT:  And we'll take it as it comes, but I would

18   like to just proceed.

19          But I understand your point, Mr. Dratel.  So get

20   prepared for what you know you can do with Mr. Yum on the

21   assumption that if the government gets to Mr. Yum at noon, I

22   don't think it sounds likely but if they did then we would

23   probably finish Mr. Yum tomorrow, but there is a chance that we

24   can be held over the weekend.  But I'm not going to make it

25   occur in that manner.

F1sdulb7

| 1 | MR. DRATEL:  All right.  You know, I'll do what I can,

2 | but like I said, this is an avalanche of material.

3 | THE COURT:  I understand.  The issue arises because of

4 | what occurred in the opening, which opens the door to this

5 | and --

6 | MR. DRATEL:  I don't have any argument with that.

7 | THE COURT:  I know.  But it is possible that you had

8 | in your pocket the very same information going the other way.

9 | I don't really know which way any of this information goes.

10 | MR. DRATEL:  But --

11 | THE COURT:  So this is -- the topic, once it was

12 | introduced, put all of this in play, and you introduced it.

13 | MR. DRATEL:  We got a list of exhibits in early, you

14 | know, in early December that, you know, don't include anything

15 | in this, but then we go forward for six or seven weeks and then

16 | all of a sudden the defendant -- we're getting a dozen exhibits

17 | every day basically that are new.  You know, the entire exhibit

18 | list has been transformed either through additions,

19 | subtractions, modifications.  We have been doing this every

20 | night.  We get exhibits at 8:30 in the morning.  I'm not

21 | complaining about it, but I'm saying it has an impact on the

22 | amount of work I can do on things that come in that involve

23 | thousands and thousands of identified information and perhaps

24 | millions of transactions.  It is just humanly impossible.

25 | That's all.

F1sdulb7

1           THE COURT:  Well, then, it was a door that when opened

2      had some difficulties in terms of the amount of evidence that

3      would be responsive to it behind it.

4           In any event, trial is like this.  We'll proceed as

5      I've indicated and we'll pick up tomorrow.  We'll start with

6      the jury instruction tomorrow after we have dealt with

7      housekeeping.

8           Ms. Lewis.

9           MS. LEWIS:  I'm sorry.  I just wanted to raise again.

10     With regard to the defendant's case, though, we still have this

11     issue where all our witnesses are prepared to be here by

12     Tuesday but not necessarily by Monday.

13          THE COURT:  You need to get somebody here by Monday.

14          MS. LEWIS:  I will do my best to get at least one

15     person here by Monday --

16          THE COURT:  Well, get as many as you need -- as you

17     guys know from the final pretrial, get as many as you need to

18     fill up the remainder of the day.  I don't know what that is

19     going to be.

20          MS. LEWIS:  I only say that because these are lay

21     people coming from across the country.  It is difficult to get

22     them.

23          THE COURT:  I hear you, but this is not a particularly

24     new issue for anyone.  I mean, this is just the way it goes.

25     You will call your witness.  You will start your case the

F1sdulb7

1    moment the government rests, after any motion are made.  We'll

2    deal with those.  And we'll proceed apace.

3         So you can confer with the government on precise

4    timing.  I do understand the potential inconvenience to the

5    witnesses and the logistics and the difficulties with all of

6    it.  I'm not suggesting it doesn't exist in the real world

7    where these human beings actually live and have to get onto an

8    airplane and have to know when to get onto an airplane, and if

9    they are in far-flung places, that airplane ride might be quite

10   long and they need to know in advance.  I'm not suggesting that

11   I don't understand, but I am stating that we will proceed to

12   use the time.

13        We're going to run into some issues with a couple of

14   the jurors, as you folks know, in terms of their employment.

15   We're close enough that I want to make sure that they don't

16   feel in any way rushed during their deliberations, and I think

17   right now we've got plenty of time.

18        703B I wanted to just talk about for one moment.  That

19   is the list of addresses.  I wanted to indicate that I do

20   believe that Mr. Dratel was correct in the sense of it being in

21   for the truth.  I don't agree that there is a hearsay problem.

22   While the declaration underlying the actual information is a

23   declaration of a buyer -- in other words, the buyer says to the

24   seller this is the address to which you send the drugs -- the

25   seller, which is Mr. Duch in terms of his testimony, then

F1sdulb7

1    extracts that information.  He has testified he sold product to

2    those individuals.  And he then maintains those records as

3    business records of his rather substantial drug dealing

4    business.  So the basis of the Court's decision on that was

5    business record.

6            Anybody want to suggest that they had a different --

7    does the government want to suggest they had a different basis?

8            MR. TURNER:  I think, alternatively, your Honor, it is

9    just a record of the addresses where he shipped his shipments

10   to.  So it would just come in for that purpose.

11           THE COURT:  No.  It came in -- I think it depends on

12   what the use is going to be.  If the use is going to be related

13   to venue in some way, then it's coming in for the truth and it

14   is not just a record for the fact that it was said.  It would

15   be coming in for the fact that it went to these particular

16   locations.  I don't know if that is the government's plan or

17   not.

18           MR. TURNER:  But in terms of the hearsay, I think it

19   is just a record of his own actions, that he shipped product to

20   these various address.  He is just keeping a record.  I think

21   it comes in under the business records exception, anyway.  But

22   it is also just him recording I shipped 10 bags out to this

23   address, 20 bags out to this address, and that's his own.

24   There was no statement there.  It was just his own activities

25   that he recorded.

F1sdulb7

1              THE COURT:  I understand the government's position.

2    All right.  That is an additional basis.

3              Mr. Dratel.

4              MR. DRATEL:  That chart, those two charts are not

5    business records because --

6              THE COURT:  Not the -- the chart was extracted as in

7    the nature of a demonstrative, as I understand it, from the

8    information contained on the spreadsheet.

9              Did I get that wrong?

10             MR. TURNER:  A summary, your Honor.

11             THE COURT:  A summary.  So it is in as a summary of

12   information.  But you still, I think, had your hearsay

13   objection to that.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F1sgulb8                        Trial

1          MR. DRATEL:  A witness can't create something and then

2     call it a business record when he's created it for the

3     litigation.

4          MR. TURNER:  To be clear, the spreadsheet he kept in

5     the ordinary course of business.  Then he can summarize those

6     records for the purposes of trial.

7          THE COURT:  That was my understanding as to the way in

8     which things had occurred.

9          Thank you.  Let's all resume tomorrow morning at 9:00.

10    Thank you.

11          (Adjourned to January 29, 2014 at 9:00 a.m.)

12                              * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                         Page

 3   ALEX MILLER

 4   Direct By Mr. Turner . . . . . . . . . . . .1340

 5   Cross By Mr. Dratel  . . . . . . . . . . . .1348

 6   Redirect By Mr. Turner . . . . . . . . . . .1354

 7   Recross By Mr. Dratel  . . . . . . . . . . .1355

 8   GARY ALFORD

 9   Direct By Mr. Turner . . . . . . . . . . . .1356

10   Cross By Mr. Dratel  . . . . . . . . . . . .1434

11   Redirect By Mr. Turner . . . . . . . . . . .1453

12   DYLAN CRITTEN

13   Direct By Mr. Howard . . . . . . . . . . . .1467

14   Cross By Mr. Dratel  . . . . . . . . . . . .1484

15   MICHAEL DUCH

16   Direct By Mr. Turner . . . . . . . . . . . .1487

17   Cross By Mr. Dratel  . . . . . . . . . . . .1532

18                    GOVERNMENT EXHIBITS

19   Exhibit No.                          Received

20    1200    . . . . . . . . . . . . . . . . . .1343

21    1205    . . . . . . . . . . . . . . . . . .1346

22    1204    . . . . . . . . . . . . . . . . . .1347

23    316   . . . . . . . . . . . . . . . . . . .1362

24    806   . . . . . . . . . . . . . . . . . . .1364

25    808   . . . . . . . . . . . . . . . . . . .1365
```

1    320 . . . . . . . . . . . . . . . . . . .1368

2    321 . . . . . . . . . . . . . . . . . . .1371

3    227I . . . . . . . . . . . . . . . . . .1372

4    331 . . . . . . . . . . . . . . . . . . .1373

5    317 . . . . . . . . . . . . . . . . . . .1375

6    333A . . . . . . . . . . . . . . . . . .1379

7    325 . . . . . . . . . . . . . . . . . . .1381

8    324 . . . . . . . . . . . . . . . . . . .1382

9    333B . . . . . . . . . . . . . . . . . .1384

10   802 . . . . . . . . . . . . . . . . . . .1389

11   802A . . . . . . . . . . . . . . . . . .1390

12   340B . . . . . . . . . . . . . . . . . .1393

13   340A . . . . . . . . . . . . . . . . . .1394

14   323 . . . . . . . . . . . . . . . . . . .1454

15   803 . . . . . . . . . . . . . . . . . . .1456

16   810 . . . . . . . . . . . . . . . . . . .1457

17   806A . . . . . . . . . . . . . . . . . .1458

18   808A . . . . . . . . . . . . . . . . . .1459

19   400 . . . . . . . . . . . . . . . . . . .1468

20   402 . . . . . . . . . . . . . . . . . . .1470

21   401 . . . . . . . . . . . . . . . . . . .1471

22   700 . . . . . . . . . . . . . . . . . . .1507

23   704 . . . . . . . . . . . . . . . . . . .1511

24   701 . . . . . . . . . . . . . . . . . . .1514

25   700A . . . . . . . . . . . . . . . . . .1520

700B   . . . . . . . . . . . . . . . . . . . .1521

703   . . . . . . . . . . . . . . . . . . . .1526

703B   . . . . . . . . . . . . . . . . . . .1529

703A   . . . . . . . . . . . . . . . . . . .1530

                      DEFENDANT EXHIBITS

Exhibit No.                                    Received

  N   . . . . . . . . . . . . . . . . . . .1446