F22gulb1                        Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        14 Cr. 68 (KBF)

5   ROSS WILLIAM ULBRICHT,

6              Defendant.

7   ------------------------------x

                                         New York, N.Y.
8                                        February 2, 2015
                                         9:10 a.m.
9

10
    Before:
11
                    HON. KATHERINE B. FORREST,
12
                                         District Judge
13

14                        APPEARANCES

15

    PREET BHARARA,
16        United States Attorney for the
          Southern District of New York
17   BY:  SERRIN A. TURNER
          TIMOTHY HOWARD
18           Assistant United States Attorneys

19   JOSHUA LEWIS DRATEL
     LINDSAY LEWIS
20   JOSHUA HOROWITZ
          Attorneys for Defendant
21
             – also present –
22
     Special Agent Vincent D'Agostino
23   Molly Rosen, Government Paralegal
     Nicholas Evert, Government Paralegal
24

25

F22gulb1                    Trial

1                  (In open court; jury not present)

2                  THE DEPUTY CLERK:  Continuation of the trial of United

3         States of America v. Ross William Ulbricht.  Counsel, state

4         your names for the record.

5                  MR. TURNER:  Good morning.  Serrin Turner for the

6         government, along with Timothy Howard, Agent D'Agostino,

7         Nicholas Evert and Molly Rosen.

8                  THE COURT:  Good morning all of you.

9                  MR. DRATEL:  Good morning.  Joshua Dratel with

10        Mr. Ulbricht standing beside me, Lindsay Lewis from my office

11        and Joshua Horowitz.

12                 THE COURT:  Good morning.  We have seven jurors here

13        and have not heard from any that they will not be here.

14        Several asked whether or not we were going to hold court today

15        and we indicated yes, and they should just try to get in as

16        soon as possible.  We have not heard any specific time as to

17        delay.  So I am hopeful that they'll be in without too much

18        delay.

19                 There is one pending application before the Court

20        which was a letter that I received from the government relating

21        to Defense Exhibit E.  Before we go to that, let me find out

22        what the entire agenda is.  Are there additional matters which

23        need to be raised?

24                 MR. DRATEL:  Yes, your Honor.  With respect to the

25        Court's opinion yesterday precluding the two proposed defense

 1  experts, I would just object to the time frame in which we were

 2  compelled to answer.  I don't think it was reasonable or fair.

 3  I think Mr. Ulbricht's Sixth Amendment right to counsel and in

 4  turn his Fifth Amendment right to counsel -- I mean his Fifth

 5  Amendment right to due process were denied by that.  There was

 6  no deadline set before the weekend.  We had reached out to the

 7  government to ask for a schedule.  We did not hear back from

 8  them.  And in addition, there were -- we just did not get a

 9  confirmation.

10       Ms. Lewis talked with the government about Sunday and

11  they were going to get back to us with a confirmation.  They

12  agreed to Sunday.  I guess Ms. Lewis -- we didn't get to the

13  Court the schedule.  That was a miscommunication.  I did not

14  have any opportunity to contribute to the Antonopoulus letter

15  and there are significant aspects of that issue that were not

16  addressed in that letter because we did not have access to

17  Mr. Antonopoulus during the period of time.

18       And we were able to speak to him yesterday after the

19  Court had already issued its order and he would have been able

20  to provide significant evidence rebutting material and

21  testimony by Mr. Yum from last Thursday for which we had

22  virtually no notice.

23       I just want to go through some of the issues that he

24  would have been able to address.  One is that the impact of a

25  significant movement of bitcoin on the market, in other words,

F22gulb1                          Trial

1    what the volatility, what the volume was in trading at certain

2    periods of time and what the movement of the amount of bitcoins

3    that Mr. Yum talked about and what that would have involved and

4    what the movement of certain amounts of bitcoin would have

5    involved on the market.

6            In fact, the FBI auction of the bitcoins that they

7    seized from the laptop of Mr. Ulbricht was the largest single

8    trade I think in the history of bitcoin, was the largest single

9    transaction at that point.

10           Also with respect to the keys that Mr. Yum testified

11   to about bitcoin keys on the wallet and on the laptop and

12   addresses, Mr. Antonopoulus would have been able to testify

13   that it does not indicate ownership, that there are three

14   aspects of this process:  One is access, one is control and one

15   is ownership.  Access, which is all having the key suggests is

16   the weakest form of ownership or control.  It doesn't have

17   either.  And then control is weaker and then there's ownership.

18           The keys on the laptop do not mean that someone owns

19   or controls the bitcoins.  It also does not mean it's

20   exclusive.  More than one person can have access through

21   possession of the keys.  He analogized this concept to storage

22   lockers to having a pin number, where anyone with a pin number

23   with the storage locker could go to the storage locker, could

24   get access and also make deposits with a cash slot, that all

25   that would mean was access.

1    Also with respect to the laptop, he would be able to

2    opine that Mr. Yum's testimony and analysis would not be

3    conclusive as to how these bitcoins got into the wallet on the

4    laptop.  Who else could have had access?  And not even know

5    that the keys that the person whose laptop it was might not

6    even know that the keys were there or that the bitcoins were

7    there, that there is knowledge of public addresses and people

8    can deposit and get returns.  He has set up accounts where

9    people have put in money who he doesn't know.  We had evidence

10   here about the FBI -- even when the FBI took the bitcoins, the

11   account continued to grow because people were putting money in.

12   And there's a whole range of reasons why that occurs in the

13   bitcoin market.

14          He also said that storing keys on a laptop is terrible

15   security.  It is not recommended.  You should never have it on

16   a laptop.  It should never be on any computer connected to the

17   Internet.  And he assumes that everything connected to the

18   Internet is compromised.

19          He also confirmed my cross-examination of Mr. Yum

20   which is that a cold wallet is one that has never been online

21   and is on a computer that's disabled to preclude Internet

22   access; that once a wallet has been online, it is a hot wallet,

23   which is something that Mr. Yum disputed me on and he was

24   wrong.

25          He would only use a hot wallet for a single

F22gulb1                         Trial

 1    transaction, which would be to withdraw bitcoins from a wallet.

 2    He would never use it for any other purpose.  He also talked

 3    about the 700,000 number that the government had in Mr. Yum's

 4    testimony and report, that there is a chance for a significant

 5    double-counting because things can go from Silk Road to the

 6    wallet back to Silk Road back to the wallet and these round

 7    trips, which we establish have occurred in that -- in the time

 8    that now we've had to do this and talk to Mr.Ant no louse about

 9    it and others, that there's no indication that it's actually

10    700,000 bitcoins, that it could be many of the same bitcoins

11    going back and forth.

12            There are a number of explanations that he would have

13    had for that.  One is that many merchants and customers on Silk

14    Road in his experience as an expert used Silk Road as a hot

15    wallet and as a result they have a running balance moving back

16    and forth from Silk Road to their own wallet from Silk Road to

17    their own wallet back and forth, deposits and withdrawals,

18    deposits and withdrawals.  He said a lot of merchants do that.

19    And there's a lot of literature out there and posts and all of

20    that.  He said there are legal traders on Silk Road who do that

21    often, people who trade T-shirts, coffee, key chains.  He said,

22    in fact, when the government froze the wallets, a lot of

23    vendors with legitimate merchandise were out their money

24    because the bitcoins were seized.

25            He also pointed out that Silk Road is not a one-to-one

F22gulb1                        Trial

1  type of bitcoin wallet in the sense that if you were to put a

2  bitcoin in the Silk Road wallet, you would not get that

3  wallet -- you would not get that bitcoin back when you

4  withdrew.  It all goes to a single pot.  Very much like cash at

5  a bank or an ATM, if you put in five 20s in a deposit and then

6  you withdraw, you don't get the same five 20s back.  So that

7  could also account for these transactions, double-counting,

8  because you can't assume that it's not the same bitcoin going

9  back and forth and back and forth.

10        Also, Silk Road, according to his experience, was used

11  to trade currencies for bitcoin and as a primitive currency

12  exchange and that bitcoin speculators would use Silk Road in

13  and out as a means of speculation in bitcoin, and, of course,

14  that is what the defense theory is with respect to what

15  Mr. Ulbricht was doing at the time in terms of his business.

16        Also, he also said that in the early days because Silk

17  Road was a primary or the primary vehicle for using bitcoin in

18  commerce, that many ordinary bitcoin transactions or ordinary

19  bitcoin issues were treated on Silk Road where they weren't

20  available anywhere else, such as bitcoin mining and other

21  wallet issues and all of that as far as merchandise and people

22  using Silk Road in the context of bitcoin as a wallet and as a

23  means of exchange.

24        Also, he pointed out how bitcoins are traded in the

25  sense that -- not so much traded but how payment works for

1    bitcoins and that bitcoins are -- and this has to do also with

2    bitcoin mining and what's called block reward meaning if you

3    mine bitcoin successfully, you get block reward.  Let's say you

4    have 50.135 bitcoins would be a block award, so that goes to

5    the American who mined it.  And if that person wanted to

6    purchase something for one bitcoin, they don't take one bitcoin

7    and pay; they have to pay with the entire block of bitcoin that

8    they received, the 50.135 bitcoin.  So then you have to spend

9    all of it.  And what that means is essentially not dissimilar

10   to, let's say, if I wanted to buy a pack of gum for a dollar

11   and all I had was a $20 bill, I would have to use the 20 to pay

12   for the dollar.

13          The difference with the bitcoin situation is this:

14   When you get change from a bitcoin, in other words, if you pay

15   for a single bitcoin item with a 50-bitcoin piece, you're going

16   to get 49 bitcoins back in change.  The difference in the cash

17   situation, and I'll try to analogize it further, which is that

18   the bitcoind wallet, which was used on Silk Road, that was the

19   system used on Silk Road, it automatically puts the change in a

20   new wallet.  So that if I were to analogize it again to cash is

21   that if I were to pay for a pack of gum worth a dollar with a

22   $20 bill, if I take the 20 from my right pocket, when I get the

23   change of $19, I put it in my left pocket.  It's a different

24   wallet because of this bitcoind program.  That can also lead to

25   overcounting.

1     And he pointed out that these blocks are indivisible,

2    they are of arbitrary size and there are algorithms for sorting

3    these bitcoin amounts for efficient means of payment.  It's

4    something that Mr. Yum only touched on very, very generally

5    that is important in a more specific sense because it accounts

6    for the numbers of wallets, it accounts for the fractionalized

7    nature of the bitcoin that's in the wallets, and we believe

8    that that is relevant, that is important to our case.  We did

9    not have sufficient notice to provide that before.  Mr.

10   Antonopoulus was on a plane Saturday returning from overseas.

11   And the government knew he was away based on Ms. Lewis'

12   conversation with them.  We had told the government that we

13   would be providing his opinions to them Sunday when he arrived

14   back in the United States.  Let me just review my notes for one

15   moment.

16        So we're clear, I did not speak or otherwise

17   communicate with Ms. Lewis Saturday until later in the evening,

18   and based on the Court's ruling before we had a reasonable and

19   sufficient opportunity to respond, I move for mistrial or for

20   the remedy of giving us a chance to put Mr. Antonopoulus on the

21   stand.

22        THE COURT:  Well, the application is denied for the

23   reasons substantially stated in my opinion.  Still the Court

24   has no idea what Mr. Antonopoulus' qualifications are and

25   whether he is in fact qualified to present any of the opinions

F22gulb1                        Trial

1    that you've suggested.  The Court received simply a very bare

2    bones CV, a generic reference to 200 articles with none of the

3    articles listed or named.  Many of the topics are those which

4    would have naturally arisen based upon the opening statements

5    of counsel and therefore should have been anticipated rendering

6    much of the Antonopoulus proposed testimony as information

7    which should have been anticipated, therefore disclosed,

8    therefore the methodology disclosed.

9          The particular aspects which are responsive to Yum I

10   think ignore the fact that Yum was responsive to your opening.

11   In fact, it was the minimum kind of exercise one would have

12   expected the government to have undertaken in response to that

13   opening.  It would have been I think deficient for someone not

14   to have done that kind of exercise.

15         So for all of the reasons set forth in my opinion, the

16   preclusion order as to Mr. Antonopoulus remains.

17         Ms. Lewis.

18         MS. LEWIS:  I wanted to add, obviously since

19   Mr. Antonopoulus was traveling, we also anticipated we would be

20   able to get a more complete sense of specifically what his

21   credentials were.  I had an idea, but I wanted to confirm them

22   before putting them in a letter to the Court; and that was also

23   the purpose of speaking with him on Sunday.  I had told the

24   government that we were intending to speak with him at 3:15

25   that day when he returned and that I would let them know as

1  soon as we did have that conversation what his positions were

2  because, obviously, I would not want to misrepresent to them

3  something, have them agree to it, and then have it be something

4  else.

5          He was in Germany.  He had almost limited to no access

6  to Wi-Fi, so we were not able to get these things before,

7  though we did endeavor to do so.  We were in communication with

8  him.  It's in the 3500 material.  You can see we were

9  communicating with him to try to get this information and we

10  have this call set.

11          I did want to add, though, that he has been qualified

12  as an expert on bitcoin in Canadian court.  Obviously this is

13  not an issue that has been in American courts practically at

14  all, but it has been there.  He's also spoken, I believe, in

15  Europe as an expert on this topic.  And he has also written a

16  leading book in this area, "Mastering Bitcoin," as well as a

17  host of articles on this topic.  He's a security expert.  All

18  of this would have been in a subsequent submission had I had

19  the opportunity to speak with him as planned on Sunday.

20          THE COURT:  Well, I think bitcoin issues here have

21  been evident since this case was first charged, and the idea

22  that you would not have located or disclosed Mr. Antonopoulus

23  until when you did, let alone trying to get in touch with him

24  the day before he's supposed to go on the stand potentially is

25  a choice you folks made.

1  Does the government want to add anything to the

2  record?

3  MR. HOWARD:  To be clear on one thing:  We did speak

4  with Ms. Lewis on Friday evening.  It was requested whether or

5  not the government would agree to allow certain parts of

6  Mr. Antonopoulus' testimony in so they won't have to be

7  litigated.  At that time we expressed we filed our motion to

8  preclude and we were in no position to evaluate any kind of

9  compromise given we had no idea what his opinion would be

10 because the notes were so deficient.

11 We were told by Ms. Lewis that we would not receive

12 any more detail before Sunday and we did confirm the fact that

13 our position was that Mr. Antonopoulus' testimony should be

14 excluded and it was up to them to oppose it if that was their

15 choice.

16 MS. LEWIS:  That's correct.

17 MR. TURNER:  Could I add one brief point:  All of the

18 opinions that Mr. Dratel expressed, we would have objected to

19 as irrelevant and improper if we had had proper notice.  So I

20 don't want the record to be left unclear that, in the

21 government's view, we would have accepted the relevancy prior

22 to his opinions.

23 THE COURT:  That's the Antonopoulus issue.  Is there

24 anything else before we get to Defendant's Exhibit E?

25 MR. DRATEL:  Yes.

1        THE COURT:  All right.

2        MR. DRATEL:  As the Court is aware, the government's

3   initial exhibit list and throughout the first half of the trial

4   included Andrew Jones, who has pleaded guilty to his

5   involvement in Silk Road as an administrator under the name of

6   inigo.  At some point midway through the trial, the government

7   said they may not call him and then just last week conclusively

8   told us that they would not call him.

9        When it initially became -- when I was initially

10   informed that he would not be called by the government, I spoke

11   with Mr. Turner about a specific piece of *Brady* material that

12   the government provided.  The government doesn't call it *Brady*

13   because they don't call anything *Brady*.

14        Mr. Turner in a telephone conversation with me and

15   Ms. Lewis said there is no *Brady* material in this case because

16   he believes the defendant is guilty, so that's his view of

17   *Brady*.  So the notion that the government understands its *Brady*

18   obligations is not reliable in this case.

19        So I asked him if he would stipulate to the piece that

20   he knew we were interested in and he said yes, just a matter of

21   language.  Then I asked him again when he said that -- when

22   they concluded they would not call Mr. Jones and he agreed

23   again to stipulate.  And then over the weekend yesterday I gave

24   them the language of the stipulation which is only what is in

25   their letter with the exception of one sentence which was

1    removed; it's only what's in their letter.  And I got

2    back -- and then I spoke to Mr. Turner at 7:00 last night and

3    he at first resisted unless I met one of his conditions on

4    something completely unrelated that he would not stipulate

5    unless I made met a condition that was completely unrelated.  I

6    agreed because this stipulation is that important to his

7    condition.  And then at 11:00, he writes me an email saying

8    they're not stipulating.

9              THE COURT:  Why don't you describe to me what the

10   substance of the issue is.

11             MR. DRATEL:  Yes.

12             THE COURT:  Because it sounds like the alternative

13   would be to call Mr. --

14             MR. DRATEL:  Can't call him.  He's going to take the

15   Fifth Amendment.  I spoke to his lawyer.  He's unavailable.  So

16   I would move it, by the way, either as a statement against

17   penal interest, 807, defense witness immunity.  I'd ask for all

18   those things.  This is a case where if ever there was an

19   appropriate case for it, this is it.

20             So on December 29, 2014, we received a letter from the

21   government and on the second page of the letter it says that in

22   a recent witness interview, Andrew Jones a/k/a inigo said the

23   following, and this is the quote.  This is not necessarily a

24   quote from Mr. Jones but this is the government's

25   characterization of what he said.

1            THE COURT:  It's a 302?

2            MR. DRATEL:  No.  It's not a 302, but this is a letter

3       from Mr. Turner, signed by Mr. Turner:

4            At some point in or about August or September 2013,

5       Jones tried to authenticate that the Silk Road user "Dread

6       Pirate Roberts" whom he was talking to at the time (via Pidgin

7       chat) was the same person with whom he had been communicating

8       in the past with this username.  Previously in or about

9       October 2012, Jones and "Dread Pirate Roberts" had agreed upon

10      a "handshake" to use for authentication in which Jones would

11      provide a certain prompt and "Dread Pirate Roberts" would

12      provide a certain response.  When during the 2013 chat in

13      question Jones provided what he believed to be the designated

14      prompt, "Dread Pirate Roberts" was unable to provide the

15      response Jones thought they had agreed on; however, later in

16      the chat, Jones asked "Dread Pirate Roberts" to validate

17      himself by specifying the first job that "Dread Pirate Roberts"

18      assigned to him (running the 'DPR book club') which "Dread

19      Pirate Roberts" was able to do.

20           And then that's the block quote, and then the last

21      paragraph is:  The government is unaware of any extant record

22      of the 2013 chat described by Jones.  There is a record of an

23      October 2012 chat between the defendant and Jones discussing a

24      "handshake" in the file labeled MBSOBZVKHWX4HMJT on the

25      defendant's computer, which has already been provided to the

1    defense in discovery, and our stipulation would have included

2    that specific chat, which is very short -- I think it's one

3    page basically-- as part of the stipulation.

4              THE COURT:  Mr. Turner, why has the government taken

5    the position it has on the stipulation?

6              MR. TURNER:  First of all, your Honor, I just want to

7    be clear, I never said that we would stipulate.  What I said is

8    that we would consider stipulating.  And what happened was this

9    disclosure was made over a week and-a-half ago and the

10   defendant did not get proposed language to the government until

11   last night when the government was very, very busy with other

12   things.  The language that the defendant proposed for one thing

13   omitted the very last sentence the defense counsel just read,

14   which is, in the government's view, clearly important because

15   the point is that inigo, Mr. Jones, tried a prompt that didn't

16   work but then he tried another prompt that did.

17             THE COURT:  Then you could add that in.  That would be

18   the product of a negotiation over the language of the

19   stipulation.

20             MR. TURNER:  The problem that I had is that, like I

21   said, this came at the 11th hour.

22             THE COURT:  Can you look at it this morning as we're

23   proceeding?

24             MR. TURNER:  I can, although it's not my job to draft

25   appropriate language.

```
 1              THE COURT:  No.  Mr. Dratel, it sounds like, has done
 2     that job.  He's drafted language.  Why don't you take a look at
 3     it and see whether or not there are additions that you could
 4     make to it or changes you could suggest that would then make it
 5     acceptable to the government.
 6              Only at that point when I've got the two of you having
 7     truly joined issue do I want to have to then make a ruling.  If
 8     you folks are able to agree, then that's obviously the best
 9     course.
10              Will you do that?
11              MR. TURNER:  We will.  To make it clear --
12              THE COURT:  I understand you don't want to.
13              MR. TURNER:  No, I just think just quoting what we put
14     in a letter does not provide necessarily sufficient context by
15     itself.
16              THE COURT:  Go back and figure out what the context is
17     that's fair.  You folks then negotiate over this.  We still
18     have the government's witness on direct and I think Mr. Howard
19     said he's got an hour or two left with that.  Then there's
20     cross.  So you have some time while you're sitting there maybe
21     to take a look at this.
22              Mr. Dratel, do you have it in a form written or
23     otherwise that he could look at and fiddle with?
24              MR. DRATEL:  I sent him the stip.  I have it here.
25              THE COURT:  In paper copy.
```

1      MR. DRATEL:  I can give it to him.  I can give him my

2  copy.  I know what it says.  And so we're clear, Mr. Turner's

3  response to me last night was he couldn't consider alternative

4  language and it was too late to do so and he never made a plan

5  or proposal.  The reason I took that sentence out -- so we know

6  where we're going, the reason I took that sentence out is

7  because they could have called him to get that.  It's a

8  confrontation issue with respect to that.  There is a

9  confrontation issue.  If there's a completeness issue, that's a

10  different issue, but they never came back with a single

11  sentence that's not in there.  Everything else is from the

12  government's letter.  This has never been a mystery.  We're

13  talking about preparation time.  This has never been a mystery

14  as to what we want to do.

15      THE COURT:  I hear your position.  So I'm going to ask

16  the government to look at that and see if there are additions

17  or changes which would make it acceptable.

18      If the answer is after further considering the matter

19  there are not, then we will deal with it in that posture.  But

20  if there are further changes or modifications that would make

21  it acceptable, I'd like to know that.

22      Are there any other matters, Mr. Dratel?

23      MR. DRATEL:  I prepared some supplemental requests to

24  charge, they're very short, based on evidentiary issues.  If I

25  have a representation from the government that this is the

1    government's last witness, I'll be happy to share them now.

2              THE COURT:  Is this the last --

3              MR. DRATEL:  It's not going to result in something

4    coming into evidence that was not already --

5              THE COURT:  Is Mr. Shaw the last witness?

6              MR. TURNER:  Yes, your Honor.

7              THE COURT:  Mr. Dratel, you can proceed.

8              MR. DRATEL:  Thank you, your Honor.  I'll give the

9    government a copy here and I'll hand one up to the Court.

10   First, one, that law enforcement officers cannot qualify as

11   coconspirators.

12             The second is that even if you conclude beyond a

13   reasonable doubt that Mr. Ulbricht was involved in the sale of

14   mushrooms on the Silk Road site or otherwise in 2011, that

15   alone would not be sufficient to establish his guilt -- it says

16   "guilty," a typo -- on Counts One, Two or Four or his

17   participation in any of the conspiracies charged in Counts

18   Three and Seven, and the reason for that is venue.

19             This is number three, the undercover purchases by

20   Homeland Security Investigations in Chicago and any seizures

21   made by Homeland Security Investigations in Chicago are not by

22   themselves sufficient to find Mr. Ulbricht guilty on any count,

23   again because of venue.

24             Number four, even if you find that Mr. Ulbricht

25   ordered fake identification documents, that is not evidence you

1  can consider with respect to Count Six.  One is venue and the

2  second is it's not what's charged.  It's not charged

3  conspiracy, even if it is a conspiracy.

4          Supplemental defense instruction number five would be

5  in order to find Mr. Ulbricht guilty beyond a reasonable doubt,

6  there must be evidence beyond the uncorroborated admission of

7  the accused.  It is necessary for the government to introduce

8  substantial independent evidence which would tend to establish

9  the trustworthiness of any such statement sufficient.  It is

10 sufficient if the corroboration supports the essential facts

11 admitted sufficiently to justify an inference of their truth.

12 Any independent facts plus the other evidence besides the

13 admission must, of course, be sufficient to find guilt beyond a

14 reasonable doubt.  And the reason for that last instruction is

15 rather arcane and archaic but still the viable principle of

16 *corpus delicti*, which is that the uncorroborated admission or

17 confession of an accused is not sufficient evidence and there

18 must be some independent corroboration.

19          In the context of what I assume the government will be

20 arguing with respect to journals is that Mr. Ulbricht

21 acknowledged his participation in the defense even as early as

22 2011, even if we don't contest some of that.

23          THE COURT:  I see that you have some case cites here.

24 I'm going to have my clerks pull the cases.  I'll hand this to

25 them.  Let's take this up at the break or at the lunch and

F22gulb1                          Trial

 1    we'll see how we're progressing through the witness so that the

 2    government can determine what its response is to any of the

 3    particular requests.

 4           MR. DRATEL:  Okay.  The only other charge, if

 5    obviously this stipulation issue doesn't work out or that is

 6    not admitted the Jones statement is not admitted in some form,

 7    then I would ask for a missing witness charge because he is

 8    completely within the government's control.  He has pled guilty

 9    months ago.  The only reason he has a Fifth Amendment privilege

10    is because he has not been sentenced yet and it is completely

11    within the government's control pursuant to the provisions of

12    the cooperation agreement.

13           THE COURT:  We'll have the government respond to that

14    when they respond to the stipulation.  It may or may not be

15    necessary if the government and the defense are able to agree

16    on language in the stipulation.

17           Are there any other matters which we need to raise

18    before we go to Defense Exhibit E?

19           MR. TURNER:  Your Honor, the government would like

20    clarification on what the witness list of the defense is at

21    this point, the experts have now been precluded.  The defense

22    last week indicated they were having trouble arranging

23    arrangements for their character witnesses, so we'd like some

24    sense of where we're headed for the rest of the day and who we

25    need to prepare for.

F22gulb1                        Trial

1            THE COURT:  We'll have Ms. Lewis give us the list of

2       who you expect to call.

3            MS. LEWIS:  The first witness will be Karen Steib

4       Arnold, she's a character witness; followed by Thomas Haney,

5       the same, also character witness; and then Daniel Davis, who is

6       also a character witness.

7            MR. DRATEL:  We have one who could not make it today

8       because of travel.  His plane was canceled.

9            MS. LEWIS:  He's arriving this evening.  There's also

10      another witness that could only arrive today and wasn't able to

11      get here earlier.  Obviously, we thought we would have a number

12      of other witnesses here.  And then we also have another

13      witness, Bridget Prince, who is on-hand, but we do hope to be

14      able to get these other people.

15           THE COURT:  There's a possibility if some of the

16      others get here or if the testimony of Mr. Shaw goes long

17      enough that it would be tomorrow morning, it would be two or

18      three others?

19           MS. LEWIS:  Yes, your Honor.  That's correct.

20           THE COURT:  Of a similar nature?

21           MS. LEWIS:  There may actually be fact witnesses

22      instead -- one fact witness.

23           THE COURT:  Who would that be?

24           MS. LEWIS:  Alden Schiller and Chris Kincade.

25           THE COURT:  And what's their timing?

1          MS. LEWIS:  They're both arriving by this evening and

2    I believe both will be fairly short witnesses and we'll be able

3    to go on first thing tomorrow if we need them to be here.

4          THE COURT:  Let's see where we are today, but if

5    they're going to be available first thing in the morning and

6    they're fact witnesses, then tell them to continue to keep

7    their flight plans in place and to try to get here just as soon

8    as they can.

9          MS. LEWIS:  We have.  Obviously with the weather it's

10   possible things could be delayed further, but as far as I know,

11   they'll both be here tonight and are planning to come and

12   testify tomorrow.

13         MR. DRATEL:  Mr. Schiller was actually supposed to

14   arrive yesterday.  His flight was canceled.

15         THE COURT:  The record should reflect --

16         MR. DRATEL:  I'm sorry, that's not correct.

17         THE COURT:  There have been about six- to eight inches

18   of snow overnight which now has turned to rain, which makes us

19   able to be here but has caused some difficulties with travel

20   I'm sure.  It certainly has caused difficulties with folks

21   getting in just from Manhattan.  That's that.

22         Is there anything else we need to raise before we go

23   to Defense Exhibit E?

24         MR. TURNER:  No, your Honor.

25         MR. DRATEL:  No, your Honor.

F22gulb1                          Trial

```
 1              THE COURT:  Mr. Dratel, do you want to respond to the
 2    government's letter on Defense Exhibit E?
 3              MR. DRATEL:  The letter is filed under seal, your
 4    Honor.
 5              THE COURT:  The issue I think can be described as
 6    follows.  It's I think number one, whether or not the purpose
 7    of the document is for the truth and if it's not for the truth,
 8    then what other purpose does it serve?
 9              And then there's certainly an issue which we can talk
10    about in open court, in fact, I think we can talk about all of
11    it in open court, except for the one issue that has been under
12    seal throughout the entire case, but everything I think can be
13    referred to other than that.  The second point, if it's not
14    offered for the truth, goes to the issue of the Wade, what I'll
15    call the Wade issue about other perpetrator evidence.
16              MR. DRATEL:  It doesn't go for the truth in the sense
17    of the information in it; it goes for the truth the fact that
18    it was communicated to DPR, which is indisputable in that this
19    particular piece of evidence communicates to DPR the name and
20    profile of the person deathfromabove believes is DPR, and
21    that's what he says the information is.
22              Now, I don't know if I can go further or not go
23    further in open court, but the fact is, the government has
24    created a situation and now they want to profit from it by
25    precluding evidence and also saying that the other parts we
```

F22gulb1                          Trial

<sup></sup>

1   redacted, we redacted because they won't let us use it.  They

2   redacted.  They took that part out of the case, so I don't

3   understand how they can possibly have it both ways.

4            THE COURT:  Let's forget about the redactions for a

5   moment.  Let's just focus on if the information between these

6   two declarants is offered for the truth, in other words, if you

7   want to offer it for the truth that Anand is the perpetrator --

8            MR. DRATEL:  It's not offered for the truth.  It's

9   offered for the fact that DPR was getting information about

10  people who were supposed to be DPR and that these things were

11  coming in.  There's a whole law enforcement file that's part

12  and parcel of the whole thing.  And one of these people is one

13  of the people who the agent was investigating.

14            I think it's a fair inference.  I think it's a

15  completely fair inference for anyone to draw.

16            THE COURT:  The first part that I want to take is just

17  sort of the hearsay part whether it's for the truth or not for

18  the truth.  So if it's not for the truth, in other words, if

19  the defense doesn't intend to say Anand did it, the real DPR

20  was Anand -- if the defense is intending to say the real DPR

21  was Anand, then this is obviously for the truth.

22            MR. DRATEL:  No.

23            THE COURT:  Tell me whether or not you're planning on

24  making --

25            MR. DRATEL:  It's not that; it's that if you're DPR

F22gulb1                        Trial

1    and you get a name, a specific name, this Anand Athavale and a

2    profile and details, if it's Anand Athavale, if it is, and

3    you're put on notice that it's you, you're going to take steps,

4    so that's not saying that it's him.

5            THE COURT:  That's used for the truth.

6            MR. DRATEL:  No, it's not for the truth; it's the fact

7    that he was informed, it's the fact that DPR was informed.

8    That's indisputable.  It's not for the truth of whether it is

9    or not.  It's for an inference for the point is that if DPR is

10   informed that it's him, then he's going to take action.  And

11   that's not for the truth of the matter of whether it is or not;

12   it's for the purpose of drawing an inference that anyone

13   who -- and also the fact that if DPR is getting information

14   from law enforcement about specific people, he knows the walls

15   are closing in, he's going to take action to implement an

16   escape plan.  That is just a fair inference from all of that.

17           THE COURT:  So the theory would be that Anand Athavale

18   understands by virtue of his exchange that investigative sites

19   are trained on him and he takes evasive actions in response

20   thereto.

21           MR. DRATEL:  If it's him.  And I'm not going to say

22   it's him.  I'm going to say anyone in that situation and even

23   DPR even, if it's not Anand Athavale, DPR is very interested

24   and clued in as to what is going on in the law enforcement

25   community and he is actively security-conscious in a very

F22gulb1                        Trial

1    substantial way and that's an inference that we're -- it's not

2    even an inference.  It's a fact from this.

3              THE COURT:  So what evidentiary basis is there that

4    there was another DPR?  And what evidentiary basis is there

5    that the defendant ever handed off Silk Road and then took back

6    Silk Road as a setup that would then demonstrate the existence,

7    by inference at least, of an additional perpetrator?

8              MR. DRATEL:  Well, the evidence that he gave it up is

9    that Richard Bates testified to that.  The government's own

10   witness testified to that.

11             THE COURT:  That he told that he had given it up?

12             MR. DRATEL:  Yeah.

13             THE COURT:  What is the evidentiary basis that there

14   was a handoff to anyone else?

15             MR. DRATEL:  Well, that's a series of pieces of

16   evidence.

17             THE COURT:  Such as?

18             MR. DRATEL:  I don't want to sum up before they sum

19   up.

20             THE COURT:  Under the *Wade* case and other case law for

21   the Court, as you know, the Court must undertake an analysis as

22   to whether or not other perpetrator evidence is going to result

23   in inviting jury speculation and there must be a substantial

24   connection between some other potential perpetrator and the

25   facts before the Court.  You can't just throw up names and

1   other possibilities.  The courts have long said that that's an

2   inappropriate way to proceed.  There's just lots of case law on

3   this point.

4            We're waiting for two more jurors.

5            MR. DRATEL:  The government -- on Thursday, Agent Shaw

6   showed that there is a second administrative key, the SSH key,

7   that gives someone completely separate from even frosty,

8   assuming that that's Mr. Ulbricht, access to the server.  I

9   believe that the Government Exhibit 130 and the thumb drive

10  also are --

11           THE COURT:  The thumb drive found on his night table?

12           MR. DRATEL:  Right.

13           THE COURT:  Why would that possibly result in anything

14  other than incriminating him?

15           MR. DRATEL:  Because why would it be on the thumb

16  drive if it's on a laptop?  It's on a thumb drive because

17  that's what was given to him, and that's an inference that the

18  jury is entitled to draw.

19           THE COURT:  That sounds like the difference between an

20  inference and speculation.  Let me gather what you believe the

21  evidentiary basis is for another perpetrator.  It's Bates that

22  he was told that Ulbricht had given up Silk Road, and it was

23  the second administration key, which is not tied to somebody

24  who was calling themselves -- well --

25           MR. DRATEL:  There were changes in the site throughout

1    that would indicate that there was a change.  You have the

2    origin of DPR in general, the changes in October of 2011, the

3    changes in June of 2011, the changes in January 2012.

4            THE COURT:  You need to come up with something that is

5    a handoff to another person by inference; otherwise --

6            MR. DRATEL:  But Bates said he sold the site and that

7    it was no longer his problem as of 2013.  The standard is not

8    that I have to prove it's someone else.  The standard --

9            THE COURT:  The standard is you have to show a

10   substantial connection that there is another perpetrator.

11           MR. DRATEL:  No.  I think I have to show a substantial

12   connection to this case, not to another perpetrator

13   specifically.  That's a burden on the defense that doesn't

14   exist.

15           THE COURT:  It's a substantial connection that that

16   other person is, in fact, the true perpetrator of the crimes

17   charged here.

18           MR. DRATEL:  Well, that's what I was trying to get to

19   in my cross-examination of Agent Der-Yeghiayan.  I would have

20   gotten to it also with other witnesses, but I was precluded

21   from cross-examining them on this.

22           THE COURT:  For instance, is there evidence --

23           MR. DRATEL:  The Jones handshake in September 2013,

24   August or September of 2013, the handshake evidence is critical

25   in this.  It's not in yet, but it's critical.  You talk about

1   handoff at the end, that's an inference that we're entitled to

2   have.

3           THE COURT:  Let me hear from the government.

4           MR. HOWARD:  I believe the *Wade* case requires more of

5   a substantial connection between the actual alternative

6   perpetrator that they're trying to depict, not just someone

7   else generally.  Here the issue is that to the limited

8   extent -- to the extent this has any probative value, it is if

9   exactly as if Mr. Athavale is the alternative perpetrator.

10  There is no evidence which substantially connects him to a

11  theory that he's an alternative perpetrator in this case for

12  the reason we set forth in the letter.

13          THE COURT:  Defense Exhibit E is precluded on the

14  basis that it's hearsay.  It is offered for the truth that

15  Anand is the DPR or that Anand is one of potential other DPRs,

16  which makes it for the truth, and I can't find any reason that

17  it would be offered other than for the truth.

18          The *Harwood* case, 998 F.2d 91 deals with a situation

19  where information which comes in that's irrelevant, unless it's

20  for the truth, is applicable as well as other cases.  Let me

21  give you another one.  There are legions of cases that are

22  supportive of keeping things out which are coming in for the

23  truth.  And based upon everything I have heard, the use of this

24  would be for the truth.  Therefore, it makes the statements as

25  between two out-of-court declarants, and you can't just have

1  two out-of-court declarants, offered for the truth.

2          Also even if it wasn't offered for truth, you then get

3  into the secondary analysis of the *Wade* standard.  The *Wade*

4  standard relies upon the *McVeigh* standard, and it says "In the

5  course of weighing probative value and adverse dangers, courts

6  must be sensitive to the special problems presented by

7  alternative perpetrator evidence.  Although there is no doubt

8  that the defendant has a right to attempt to establish his

9  innocence by showing that someone else did the crime, a

10  defendant still must show that his proffer evidence on the

11  alleged alternative perpetrator is sufficient on its own or in

12  combination with other evidence in the record to show a nexus

13  between the crime charged and the asserted alternative

14  perpetrator.  It is not sufficient for a defendant merely to

15  offer up unsupported speculation that another person may have

16  done the crime.  Such speculative blaming intensifies the grave

17  risk of jury confusion and invites the jury to render its

18  findings based on emotion or prejudice."  That's cited in the

19  *Wade* case, Second Circuit, binding on this Court, 333 F.3d 51,

20  pin cite at 61.  So that issue is resolved.

21          How are we doing with the jurors?  Still waiting on

22  two.

23          (Continued on next page)

24

25

F225ulb2

1      MR. DRATEL:  And, your Honor, just since the entire
2  government's case is two declarants not in court, I would move
3  that the jury be instructed that nothing that came in in any
4  piece of evidence that the government put in except for perhaps
5  Bates' testimony, which is the only first-hand testimony in the
6  entire case, is not for the truth.
7      THE COURT:  Now, Mr. Dratel you understand, and the
8  Court spent a great deal of time on this both in pretrial --
9  and in the initial evidentiary rulings -- that there is an
10  exception to the hearsay rules for co-conspirator testimony.
11  Co-conspirator testimony can come in a variety of forms
12  including web shots and other things.  I went through that
13  extensively, did make the factual findings necessary to support
14  by a preponderance of the evidence the existence of the
15  necessary elements for a co-conspirator exception.  There were
16  also a couple of other exceptions which applied here and there,
17  we have dealt with them all to the extent that they were
18  unique.  So, those situations were independent and different.
19      All right.  Let's take a break until we get the jury
20  assembled.  We are close.  We are close and so I would hope
21  that they would be out shortly.
22      Let's get Mr. Shaw back so he is not delayed in
23  getting on the stand.
24      (Recess)
25      THE COURT:  We are waiting for one juror, juror no. 3.

F225ulb2

1    He has communicated with Joe, by text, indicating that he is

2    just getting on the no. 5 train, wherever that is occurring; he

3    said it will be about an hour.  That was about seven minutes

4    ago -- five, seven minutes ago, and so I don't know, maybe it

5    will take less than that but I can't imagine that we are going

6    to be starting before 11:00.  In light of the fact that he is

7    on his way and has shown up each day, I don't think we should

8    take any other action at this time.  So, I wanted to give you

9    folks an update.

10           Anyone disagree and think we should proceed without

11   this juror?

12           MR. TURNER:  No, your Honor.

13           MR. DRATEL:  No, your Honor.

14           THE COURT:  So, we will give you folks an update, but

15   plan an being back somewhere in the vicinity of 11:00, 11:05

16   and we will start then.

17           Thank you.

18           (Recess)

19           THE COURT:  Let's bring out the jury.

20           (Continued on next page)

21

22

23

24

25

F225ulb2

1          (Jury present)

2          THE COURT:  All right, ladies and gentlemen.  Let's

3  all be seated.

4          Mr. Howard, you may continue, sir.

5          And Mr. Shaw, you are under oath from last week.

6          THE WITNESS:  Okay.

7   BRIAN SHAW, resumed.

8  DIRECT EXAMINATION  (Continued)

9  BY MR. HOWARD:

10  Q.  Good morning, Mr. Shaw.

11  A.  Good morning.

12  Q.  Mr. Evert, can you please publish Government Exhibit 936,

13  please?  If we can go to where we left off on page 18, please?

14          Now, Mr. Shaw, you testified on last Thursday that

15  this was a compilation of private messages that were sent to

16  and from the Dread Pirate Roberts, correct?

17  A.  That's correct; with one exception.

18  Q.  And that exception being the one post from the Silk Road

19  forum, correct?

20  A.  Correct.

21  Q.  And that the other side of the party in each message is the

22  Dread Pirate Roberts other than the forum post, correct?

23  A.  That's correct.

24  Q.  Mr. Evert, can we zoom in on the post in blue there?

25          March 28, 2013, from redandwhite to Dread Pirate

Roberts:

         "I already have that information but thank you. 1M a
week sounds like it would be worth selling on here, once we
know exactly how everything works. Even if commission was 15%
it would not matter, as we lose more than 15% doing it on the
streets with street level guys getting robbed or arrest and
losing product etc. Also, we have kidnapped friendlychemists
partner Xin already and are on the hunt for friendlychemist. I
will keep you updated on the developments. So far though we are
liking what we see with this site and this could be a good
partnership for both of us. As far as I can see, this site
lacks any big time suppliers. It appears it is mostly it is
street level independents that are buying small amounts (1oz -
1 kilo at a time) and selling on here. We have the product and
the man power to do big things here. Forgive me, but it all
seems a little too good to be true right now so I will need
some time to really research this before I make any sort of
commitment."

         From Dread Pirate Roberts to redandwhite:

         "I understand, and that is great news about Xin. If I
understand the situation, he is the one responsible for your
loss. You should definitely take your time and start slowly. I
would hate for you to make a mistake and be left with a bad
experience. Just let me know if you need anything. Also, you
should look into PGP. Many customers like to encrypt their

F225ulb2                           Shaw - direct

receiving address so you should know how to decrypt it."

From redandwhite to Dread Pirate Roberts -- sorry, the end of the last message was:

"When you are ready, let me know what account you want to sell with and I'll cover the $500 security deposit for you."

The next is from redandwhite to Dread Pirate Roberts:

"We are all familiar with PGP as we have been using it for years via email linked to our smartphones. It's the only way we communicate with each other aside from in person, since phone calls are not secure. There is no loss anymore, also. We were able to recover all of our missing product when we grabbed Xin. After some "questioning" he admitted he was intending on moving to a different country and setting up a new seller account on this site. We don't take too kindly to thieves. He's gone. I appreciate your offer to waive the fee, but If we were to sell on here I would like to pay the same as everyone else. Very kind of you though. I will be in touch."

March 29, 2013, from friendlychemist to Dread Pirate Roberts:

"u leave me no choice i want 500k usd withn 72hrs or i am going to post all the info i have. i cant go back to my home and i had to move my kids and wife somewhere and i need the money so i can move my family and start a new life. i hate to do this but i need the money or im going to release it all. over 5000 user details and about 2 dozen vender identities wats

F225ulb2                            Shaw - direct

1    it going to be?"

2            From Dread Pirate Roberts to friendlychemist:

3            "Don't do anything foolish. The people that you owe

4    money to have caught up with Xin and reclaimed their loss. I

5    spoke to them and calmed them down. They are likely going to

6    become vendors here on SR. Now you can calm down too. Go back

7    to your normal life and don't get involved in this stuff any

8    more."

9            From friendlychemist to Dread Pirate Roberts:

10           "u dont think i kno what they did to xin? u think i

11   can just go on with my life? u dont know these ppl. i owed them

12   money and i ran away from them. its over for me. i need that

13   money to start over somewhere else with my family. i need it! i

14   dont want to do this but if u dont give it to me i have no

15   choice they are still telling me that i hav to meet them and i

16   kno what will happen. i cant let that happen! even if they say

17   it is ok i kno they will do the same thing to me. they say

18   everything is ok but i kno what they will do! 63 hours..

19   please.. dont force me to post everything. 500k is nothing to u

20   but its life and death for me they told me that i have a free

21   pass and that they dealt with it with xin but i kno that they

22   are doing that to make me think its ok and then get me! thats

23   how these ppl operate!"

24           From Dread Pirate Roberts to friendlychemist:

25           "Do me a favor and make it 96 hours. I will get back

1    to you on Monday. I want to work this out, but I have big plans

2    for this weekend and don't want to have to deal with this."

3              From Dread Pirate Roberts to redandwhite:

4              "Hi again R&W, I hate to come to you with a problem

5    when we are just starting to get to know one another, but Blake

6    (FriendlyChemist) is causing me problems. Are you still looking

7    for him or now that you've found Xin have you given up? I would

8    like to put a bounty on his head if it's not too much trouble

9    for you. What would be an adequate amount to motivate you to

10   find him? Necessities like this do happen from time to time for

11   a person in my position. I have others I can turn to, but it is

12   always good to have options and you are close to the case right

13   now. Hopefully this is something you are open to and can be

14   another aspect of our business relationship. Regards, DPR"

15             Now, Mr. Evert, could you put that message on the top

16   of the screen, please?  On the bottom of the screen can you

17   please publish Government Exhibit 241 -- this is already in

18   evidence, a file that was recovered from the defendant's

19   computer -- and zoom in on the entry from March 28, 2013 from

20   March 29, 2013?

21             3/28/2013:  Being blackmailed with user info.  Talking

22   with large distributor (hell's angels).

23             3/29/2013:  Commissioned hit on blackmailer with

24   angels.

25             Now go back to the message, Mr. Evert?

1          March 30th, 2013 from redandwhite to Dread Pirate

2   Roberts:

3          "What is the problem? We usually tend to stay away

4   from hits as they are bad for business and bring a lot of heat.

5   Is it a problem that can be resolved or does it need to be

6   dealt with sternly? As of right now, we don't care about him

7   because we retrieved more from Xin than what he took from us,

8   and he also paid for it with his life. Debt paid in our books.

9   As far as rates go, we don't have a flat rate for things like

10  that. It's on a case by case basis. Usually we pay our hitters

11  a percentage of what the person owes +/- how much they can

12  retrieve. If it's strictly a hit because they don't want the

13  person around anymore it's also different. Does he owe you

14  money or do you just not want him around anymore? I can send a

15  couple of my guys to do recon to find out exactly where he is

16  right now in the meantime until I hear back from you."

17         From Dread Pirate Roberts to redandwhite:

18         "If you can find his location, that may be enough for

19  me to scare him off. He is trying to blackmail me. Just let me

20  know what you need to make this worth your while."

21         From redandwhite to Dread Pirate Roberts:

22         "If I find his location, and you use it against him to

23  scare him, there is a chance he will switch locations again.

24  Speaking from experience, it will become a lot more difficult

25  to find him again after that once he knows there are people

1    capable of finding, him looking for him."

2            "Further, the people we use to do the recon are the

3    hitter themselves. I don't think they will be interested in

4    continuing looking for him if there will be a small sum to be

5    split between them just to find his address. If you have your

6    mind set on just finding his location, I can talk to them and

7    get them to get it for you for a fee (not sure what amount as

8    usually when we hunt someone, there is more involved after we

9    find them). If you want to deal with him the other way, we can

10   talk about that too, but price varies on the situation. If you

11   want it to look like an accident, it would cost a lot more. It

12   wouldn't be suspicious. He would just leave home one day and

13   not return. If you don't care what it looks like, it would be

14   cheaper than the accident. We use professionals and not street

15   level hoodlums who always end up fucking things up. How much

16   does he owe you and how much are you willing to pay? If there

17   are funds retrieved, how much would we keep from what he has

18   when we get him(if he has anything) ?"

19           From Dread Pirate Roberts to redandwhite:

20           "He doesn't owe me anything, but he is threatening to

21   expose the identities of thousands of my clients that he was

22   able to acquire working with Xin if I don't pay him off. As you

23   don't take kindly to thieves, this kind of behavior is

24   unforgivable to me. Especially here on Silk Road, anonymity is

25   sacrosanct. It doesn't have to be clean, and I don't think

1    there are any funds to be retrieved."

2           From redandwhite to Dread Pirate Roberts:

3           "Price for clean is 300k+ USD. Price for non-clean is

4    150-200k USD depending on how you want it done. These prices

5    pay for 2 professional hitters including their travel expenses

6    and work they put in. We can use out of town hitters if you

7    want as well, but I would not suggest them because they come

8    with an extra cost and you don't seem to care how he is taken

9    care of. When would you like this done?"

10          March 31st, 2013 from Dread Pirate Roberts to

11   redandwhite:

12          "Don't want to be a pain here, but the price seems

13   high. Not long ago, I had a clean hit done for $80k. Are the

14   prices you quoted the best you can do? I would like this done

15   asap as he is talking about releasing the info on Monday."

16          From redandwhite to Dread Pirate Roberts:

17          "I'm sorry, but we can't do anything for that price.

18   Best I can do is 150 and even that is pushing it. Since you

19   need a rush job done, usually we would charge even more. In the

20   interest of business relationship to be, I could do 150. No

21   lower. If 150 does not work for you, we are going to have to

22   pass. We use professionals, and we pay them a good price.

23   Always send them out in a team of 2+.. 75k each for expenses

24   and the job is a fair amount I think. We have one of his

25   associates, and we're paying him to set him up for us. We'll

1    pay for that ourselves on our end. I'm guessing you will not be

2    able to pay by cash, so how would payment work since you need

3    it done before monday?"

4           From redandwhite to Dread Pirate Roberts:

5           "If you want it done by Monday that only leaves today.

6    It's Sunday morning here. We always seem to miss each other

7    online, so I will leave a bitcoin address in case you want to

8    pay that way. Probably best so we can get used to dealing with

9    bitcoins anyways since we will be selling here more than likely

10   in the next week or two. I will check the computer in about 10

11   hours and If I see that you do want to go ahead with this, and

12   payment has been sent we'll do it today."

13          So then there is 1MWCS1ID and a lot of other

14   characters.

15          "If you want picture confirmation of the job

16   afterwards, give me random numbers and I will have them write

17   them beside him and take a picture for you."

18          From Dread Pirate Roberts to redandwhite:

19          "Thank you R&W. I've only ever commissioned the one

20   other hit, so I'm still learning this market. I have no problem

21   putting my faith in you and I am sure you will do a good job.

22   The exchange rate is above 90 right now, so at $90/btc, $150k

23   is about 1670 btc. If the market tanks in the next few days, I

24   will send more. Here are some random numbers for a picture:

25   83746102 Here is the transaction # for 1670 btc to" --

F225ulb2                            Shaw - direct

1           And then there is long strings of characters:

2           "Good luck and be safe, DPR"

3           Before we move on, Mr. Shaw, let me direct your

4    attention to this here.  Do you recognize what that is?

5    A.  Yes.

6    Q.  What is that?

7    A.  It appears to be a bitcoin address.

8    Q.  Mr. Evert, can we publish the top of the page, please?  Can

9    we put up Government Exhibit 630 on the bottom of the screen

10   that has already been admitted into evidence?  And just zoom in

11   on the top portion, here.

12          So, Mr. Shaw, do you recognize what this depicts?

13   A.  Yes.

14   Q.  And what does it depict?

15   A.  A bitcoin transaction, a log from the block chain.

16   Q.  Is there any information from this message reflected in

17   this message from the block chain?

18   A.  Yes, there are two pieces.

19          The bitcoin address, the 1MWV on the top matches the

20   1MWV on the bottom.  Additionally, the transaction number

21   listed here 4A0A is match on the bottom, 4A0A.

22   Q.  What does the block chain indicate about this transaction?

23   A.  This indicates that a bitcoin transaction occurred with

24   1670 bitcoins being spent from these four addresses and the

25   destination was to this address with the 1MWV.

F225ulb2                          Shaw - direct

1   Q.  And what is the date of the transaction?

2   A.  It is March 31st, 2013.

3   Q.  Is that consistent with the date in the private message?

4   A.  Yes, it is.

5   Q.  Mr. Evert, can we continue on to the next message, please?

6          March 31st, 2013 from redandwhite to Dread Pirate

7   Roberts:

8          "I received the payment. I appreciate the offer if

9   bitcoins lower in value. We know where he is. He'll be grabbed

10  tonight. I'll update you."

11         April 1, 2013 from redandwhite to Dread Pirate

12  Roberts:

13         "Your problem has been taken care of. They seized a

14  bunch of stuff he had with him at the time as well. They said

15  he had a couple laptops and a bunch of usb sticks. Is there

16  anything of that, that belongs to you? They questioned him and

17  he spilled everything he knew. He said that he and Xin were

18  actually working together on this scheme to blackmail you and

19  that they were brought in by a 3rd guy who has been selling on

20  here for a couple years who is a scam artist. Apparently he

21  makes selling accounts, sells for a while and then pulls a big

22  scam and he just keeps creating new accounts after he does his

23  scams. They got that guys name also , I will give that to you

24  free of charge when I meet them to get the picture and computer

25  hardware they got. Rest easy though, because he won't be

F225ulb2                          Shaw - direct

1    blackmailing anyone again. Ever."

2              Can you put that on the top of the page, please?

3              And Mr. Evert on the bottom can you please put

4    Government Exhibit 241 which has already been admitted into

5    evidence which is the same file from the defendant's computer

6    and go to April 1st, 2013?

7              4/1/2013:  Got word that the blackmailer was executed.

8              We will continue on with the next message.

9              April 2, 2013:  From Dread Pirate Roberts to

10   redandwhite:

11             "Excellent work. Please send any info you can get on

12   this third party along with the picture. The picture can be

13   uploaded here: http://silkroadvb5piz3r.onion/silkroad/upload I

14   have no need for any of his possessions, so you can do what you

15   want with that stuff. Thank you again for your assistance, DPR"

16             From redandwhite to Dread Pirate Roberts:

17             "Okay my guys are here now and here is the information

18   they extracted from FriendlyChemist before the deed. They were

19   working with a guy - real name of Andrew Lawsry of Surrey.

20   Apparently this is the guy that turned them on to frauding

21   people on here. He said that he started selling on silkroad a

22   couple of years ago and since then he has made a career of

23   making new seller profiles to sell and then rip people off. He

24   told them how to start on here and how to rip people off and

25   asked for a percentage in return. He said that he showed them

F225ulb2                          Shaw - direct

1    everything about how to sell and how to pull it off and all

2    that stuff. He didn't remember all of the account names he uses

3    or used but he said that tony76 and nipplesuckcanuck were two

4    of his names and that he has other seller accounts for people

5    he set up or is running himself. I also went and looked at all

6    of the possessions they seized from him. The laptops were empty

7    besides Tor and a couple other programs. The USB sticks he had

8    were packed full of text files with thousands of addresses from

9    all around the world. We destroyed everything we seized from

10   him, but I kept a text file that was named "blackmail.txt" that

11   had a ton of addresses in it like the other text files. Since

12   you mentioned that he was trying to blackmail you with that

13   information, I kept that text file in case you needed it. If

14   you don't need it, let me know and I will destroy it. I also

15   have the picture with me. A question before I send it to you. I

16   am not extremely good with all this anonymity computer

17   operations, but I know that pictures store GPS information and

18   the likes that police can use in evidence. Is it safe to send

19   it over here like that? We took care of him at one of our

20   safehouses so that worries me a little. I trust your judgement,

21   so I was wondering if there was a way to delete the GPS

22   information from a picture before I send it over the internet.

23   Another quick question regarding bitcoins. How do we withdraw

24   them? I paid the hitters with my own money until I figure out

25   how bitcoins work exactly. As I understand it, mtgox is the

F225ulb2                          Shaw - direct

1   main exchange. Is it safe to make an account there to withdraw?

2   Can they link it back to SilkRoad? They require verification

3   which bothers me a little so I figured you would know the best

4   way."

5           Mr. Evert, can you go back to the first part of that

6   message and zoom in on the first paragraph here with Andrew

7   Lawsry in Surrey?

8           Can we publish Government Exhibit 275 on the bottom

9   which is the .txt file recovered from the computer and zoom in

10  on bottom section starting here?  Why don't you zoom in there.

11          Rogue partner details:  Xin Cho Tuay

12          Address:  It was our shared apartment where we worked

13  out of... he moved out when he robbed me.

14          Age:  31.

15          Surrey, British Columbia.

16          Girlfriend's name:  Suzy Ngyuen.

17          redandwhite his suppliers.

18          tony76/nipplesuckcanuck personal info.

19          Andrew Lawsry of Surrey.

20          Mr. Evert, can we just continue with the conversation

21  on the next page, please?

22          (Continued on next page)

23

24

25

F22gulb3                              Shaw - direct

1            MR. HOWARD:  April 2, 2013 from Dread Pirate Roberts

2    to redandwhite: "Yes, you can destroy the info.  Thanks for

3    taking a look first.  Regarding image metadata you can strip

4    all that out and it is a good practice.  The upload page is

5    secure, but I would still have access to that metadata.  Of

6    course, you can trust me but what if I was compromised.  Do a

7    search of 'remove image metadata' a decent one for windows can

8    be found here.  Regarding bitcoin withdrawal I would avoid

9    Mt.Gox if at all possible, especially if you're withdrawing to

10   a USA account.  There are many other exchanges that don't have

11   so much attention on them.  You can find a list here."

12           And then provides a link.

13           "I am reluctant to give you a specific recommendation,

14   but look for ones offshore on that list that will do an

15   international wire transfer for a direct bitcoin payment.

16           "tony76 and nipplesuchcanuck were both blights on an

17   otherwise great track record.  What do you think about going

18   after Andrew Lawsry?  This guy has probably ripped off millions

19   of dollars at this point from me and the rest of the Silk Road

20   community."

21           April 4, 2013, from Dread Pirate Roberts to

22   redandwhite:  "Are you sure the name isn't Andrew Lawry?  Or

23   some other variant?  I can't find a surname anywhere of Lawsry.

24   And do you have any other info at all on this person."

25           April 5, 2013 from redandwhite to Dread Pirate

Roberts:  "I have sent the file.  I had to make sure I did the

information removal properly before I sent it so that it did

not send GPS information with the picture in case it was

intercepted somehow.  Please delete the picture as soon as you

take a look at it.  As for the name, it's Andrew Lawsry, aka

Tony76 aka nipplesuckcanuck aka some other names I do not know.

From what I got from FriendlyChemist, he has other names on

here as well or is working with other vendors on here like I

mentioned before.

        "As for your question about going after him, I would

need to do some asking around to see what kind of information

my guys can get on him.  Would you like me to look into it."

        From Dread Pirate Roberts to redandwhite:  "Yes,

please.  If you can find him, I would like to know."

        April 5, 2013 from redandwhite to Dread Pirate

Roberts: Did you get the picture?  Let me know so I can delete

the rest of the one I have.  Finding him would be possible.  I

can almost guarantee it, but I stop short of guaranteeing

anything unless I am 100 percent certain I can get the job

done.  I do that so I don't look like an idiot.  If I can't

accomplish something I have said I can.  We have a huge stake

in the trafficking on this side of the country, so if he is

grabbing product from anyone, we would be able to find out who

and get to him.  Would you want him dealt with if possible?  I

ask because I don't want to send people to hunt for him and

F22gulb3                          Shaw - direct

1   then nothing come of it once they find him.  Please don't

2   forget to delete that picture."

3        From Dread Pirate Roberts to redandwhite:  "I've

4   received the picture and deleted it.  Thank you again for your

5   swift action.  I would like to go after Andrew, though it is

6   important to me to make sure he is who Blake said he is.  I

7   would rather miss the chance to take him out, than hit an

8   innocent person.  If he is our man then he likely has

9   substantial assets to be recovered.  Perhaps we can hold him

10  and question him.

11       "I'd like to connect with you in real-time chat to

12  discuss this with you further.  I have a secure system set up

13  that we can connect through.  It requires downloading the chat

14  client pidgin and the plugin off the record OTR and some basic

15  configuration to connect.  If you're open to the idea, I'll

16  send you the instructions.  This is how I communicate with my

17  closest people.  If not, we can keep it here, but it is much

18  slower."

19       From redandwhite to Dread Pirate Roberts:  It was my

20  pleasure.  I hate thieves almost as much as I hate informants.

21  About holding and questioning someone.  It adds to the risk

22  somewhat the longer we have a target/transport a target.  The

23  safest way is to get in, do it, and get out as soon as

24  possible.  Are there any way to verify he is the intended

25  target?  Making him speak would not be a problem and of course,

F22gulb3                          Shaw - direct

1    we would not have him done in if he was not right person we

2    were looking for.

3             "Since you said you'd like to go after him, I will

4    send two of my guys to do some recon right now and find out

5    what I can about him and get back to you immediately.  We can

6    discuss price later once we know more.

7             "As for the real time chat, send the information over

8    and I will have my tech guy look at it.  He handles all my

9    security with phones and pgp blackberries so he would probably

10   know better than me how to set everything up."

11            April 6, 2013 from Dread Pirate Roberts to

12   redandwhite:  "My gut tells me he's our man, but I would hate

13   to be wrong.  Your men were able to get info from Blake, maybe

14   they can do the same with Andrew.  He is likely sitting on many

15   thousands of stolen bitcoin perhaps tens of thousands, so I

16   would think we'd want to "work him over" to get those funds

17   back.  They could be on an encrypted drive only he can unlock.

18   Taking him out would erase those coins forever.  In the process

19   of getting him to return the funds, I hope we could confirm

20   that he is indeed the one Blake says he is.  Here are the

21   instructions for accessing the chat server from a windows

22   computer.  Download and install pidgin," and a link.

23            There are a number of instructions.  The last

24   instruction says "No. 13 add buddy 'dread.'"

25            Go to the next message:  From redandwhite to Dread

F22gulb3                              Shaw - direct

Pirate Roberts:  "I got all the information correct, but when I try to connect it is stuck on 'connecting.'  I have the correct port that Tor is listing on."

From redandwhite to Dread Pirate Roberts:  "I have found out who Andrew is exactly and who he was picking up his supply from.  I talked to his supplier and he said he mainly grabbed heroin, coke, MDMA and LSD.  He said he always goes through phases where he grabs a ton of product and then stops for a couple of weeks and then starts again.  Sounds consistent with what FriendlyChemist said about how they run the stealing from the buyers on here.  He said last he heard from Andrew (a couple of days ago), he said he was planning on moving out of the province because things were too hot down here.  That might be because he has found out Xin and FriendlyChemist and is now scared.

"I also had a chance to actually sit down and talk to my hitters about exactly what happened and how everything went down in detail.  They said that FriendlyChemist was pleading with them and offering to give up Andrew, and that Andrew was a seller here by the name of tony and a bunch of other names (nipplesuckcanuck amongst others).  He said that when he first turned them on to the idea of doing this big scheme that he would often talk about how he stole so much money, and that he once stole 15,000 online currency coins from one person on the site and how easy stealing money was on here.  Does that ring a

1    bell?  Did he steal 15,000 bitcoins from a buyer here?  That

2    would be an easy way to find out if this Andrew person is the

3    same person you think it is.  Do you have his transaction

4    history to see if he did actually steal 15,000 bitcoins from

5    someone?  I trust my hitters to do a good job and they are

6    excellent at what they do.  Which is take people out or

7    interrogate/scare people, and they told me that they didn't

8    think he was lying.

9           "The info I have on him right now, is that he

10   works/lives with three other people and they all sell product

11   together.  They are planning on leaving the province soon (I

12   don't know when).  He is in contact with his supplier who

13   actually through a line of middlemen gets his product from us a

14   the end of the food chain.

15          "Do you want to deal with this Andrew guy, or do you

16   want me to put the team on standby."

17          From Dread Pirate Roberts to Redandwhite:  "I am

18   confident enough that it is him to move forward.  Can we round

19   up all four of them, separate them, and get them to out each

20   other and give up their stolen money?  Recovering the funds is

21   going to be tricky if you aren't in direct contact with your

22   team, or if your team doesn't know how bitcoins work.

23          "If you have the other users names FC mentioned, that

24   will help me piece together things on my end.  Regarding Chat,

25   there should be a certificate you have to accept when it

F22gulb3                          Shaw - direct

1   connects.  Does that show up."

2          From Redandwhite to Dread Pirate Roberts:  "It won't

3   even connect.  It just is stuck on connecting nl copy and

4   pasted all the information for the login and password, etc. So

5   it should be Good.  I also checked Tor to see what port to use.

6   Won't connect for some reason.  Do I have to fill in anymore of

7   the details, local Alias or anything like that.

8          "As for getting all four, it would be possible but

9   they would have to get them all at once so that one does not

10  get away.  I would send four hitters instead of two to make

11  sure there With were no fuck ups.  I'm not sure when they are

12  planning on leaving the province though.  The guy that has been

13  feeding me information on him says the guy is a degenerate

14  gambler so I don't know how much funds he will have on hand.

15  He says he owes a ton of people money too.  My guess is that he

16  is pulling these scams to fuel his gambling problem like a

17  degenerate.  It would make sense why he is also teaching other

18  people how to scam as well when it has been so profitable for

19  him to keep to himself.  Probably because he owes them money

20  and offers to show them how to do it, as a way of paying them

21  back.  I will have them take whatever they have on hand, but I

22  don't want my hitters to be hanging around with them for too

23  long since they are doing four people.

24          "Unfortunately, there are no bulk discounts for jobs

25  like this.  Usually the price goes up the more difficult it is.

1   Since you are easy to work with, I would be able to offer you

2   the same rate as last time x4.  If that works for you, let me

3   know.  If it doesn't, please also let me know as soon as you

4   can so I can call my guys off.  They have been doing info

5   gathering this whole time on Andrew and his crew."

6          From Dread Pirate Roberts to redandwhite:  "OK, let's

7   just hit Andrew and leave it at that.  Try to recover the

8   funds, but if not, then not.  How much do you need for this?

9   I'm not sure what the problem could be with chat.  Please

10  upload some screenshots of the settings you are using and the

11  main pidgin window."

12         April 8, 2013 from Redandwhite to Dread Pirate

13  Roberts:  "If you want to hit Andrew only, I can have it done

14  for 150 just like last time.  We wouldn't be able to do it at

15  their place though because there are always at least a few of

16  them there from what I'm told since it is their home/office.

17  So we wouldn't be able to recover any of his things.  It's up

18  to you what you want done, but we can't send hitters into their

19  house/office if they are only doing one of them.  Do you not

20  need the people he is working with dealt with also?  If they

21  are all working with him, it means they are doing the same

22  thing as him.  It would also be easier for the hitters to get

23  them in there so that they would have a chance of recovering

24  anything if he has anything there.  It would also be better

25  because it wouldn't be a public hit.  If we take just Andrew,

1    there's nothing to say that the other three won't start up

2    somewhere else with new selling IDs.  It is of course up to you

3    what you want done and how, since you are they client.

4              "I was pretty certain you would want them all taken

5    care, so I had an associate send me a couple of his out of town

6    hitters to accompany our local hitters.  It's not a problem as

7    I can just send them back and cover their travel expenses, but

8    I obviously would like for them to not go back empty handed.

9    My mistake for not confirming what you wanted before I had the

10   extra hitters sent down, but it's not really a problem if you

11   don't want the others dealt with.  I had a hard time connecting

12   to Silk Road for the last 24 hours or I would have asked before

13   having them sent down.  So if you would like to do the others

14   as well, I would be able to have it done for 500k USD.  If you

15   do not want all of them, and just Andrew it would be 150k.  I

16   would prefer to do all four as it would be better than having

17   to get Andrew somewhere else and have no chance of recovering

18   any potential product/money he may have.  Anything recovered

19   would be split 50/50 with you.  If you are certain that he has

20   that much product/money I think it would make sense to do it at

21   their home/officer.  It's up to you though, just let me know

22   what do do as soon as you can since I do not know when they are

23   leaving the province and if they do leave the province the

24   price would go up exponentially.

25             "If you would like Andrew done send 150k USD to the

F22gulb3                          Shaw - direct

1    same address you sent the other funds to.

2              "If you would like all four of them done and

3    product/money recovered from there send 500k USD to the same

4    address you sent the other funds to."

5              To the next page, please.  Let's go down to this

6    message.  April 8, 2013, from Dread Pirate Roberts to

7    Redandwhite:  "I see your problem, you need port 9150, not

8    9151.  9151 is the control port, 9150 is the socks port.  Hmmm,

9    ok, I'll defer to your better judgment and hope we can recover

10   some assets From them, 500k in btc 3000 at $166/btc has been

11   sent to," and then there's a long string of characters, numbers

12   and then transaction number and a long string of characters and

13   numbers.

14   Q.  Mr. Shaw, do you recognize what these numbers are?

15   A.  Yes.

16   Q.  And what are they?

17   A.  The number beginning with 1Mwv is a bitcoin address and the

18   long string beginning with e7db is a block chain transaction

19   number.

20             MR. HOWARD:  So Mr. Evert, could you please publish

21   this to the top of the screen, please.  And please publish

22   Government Exhibit 631, which has already been admitted into

23   evidence on the bottom.  And can you zoom in on the top part

24   here.

25   Q.  Mr. Shaw, do you recognize what this depicts?

F22gulb3                              Shaw - direct

1   A.  Yes, I do.

2   Q.  What does this depict?

3   A.  This is a record from the block chain, the bitcoin block

4   chain.

5   Q.  Can you tell me what's reported here on this part of the

6   block chain?

7   A.  Yes.  On the top left Beginning with the e7db52, that is

8   the transaction number associated with this bitcoin transfer.

9   And on the right side here, the string beginning with 1Mwv,

10  that is the bitcoin address that the funds were transferred to.

11  And in this transaction, there were 3,000 bitcoins transferred

12  from these three bitcoin addresses on the date of April 8,

13  2013.

14  Q.  Mr. Shaw, how does that information in the block chain

15  compare to the information in the private message we just read?

16  A.  It is a match.

17        MR. HOWARD:  Can we continue with the chats,

18  Mr. Evert -- Sorry.  One more thing.  Can we publish 241 from

19  the defendant's computer.  Can we go to page two, please.  And

20  zoom in on the entries from April 6, 2013 to April 8, 2013.

21        So April 6, 2013, the second line here says "Gave

22  angels go ahead to find tony76."

23        April 8, 2013, "Sent payment to angels for hit on

24  tony76 and his three associates."

25        Mr. Evert, can we please go back to the chat, please.

1        April 9, 2013 from Redandwhite to Dread Pirate

2   Roberts:  "I was finally able to connect but it seems you are

3   offline.  I will have them go take care of that thing asap.  I

4   will update you as soon as I hear more."

5        From Dread Pirate Roberts to Redandwhite:  "Glad to

6   hear you could connect.  I am connected quite a bit so keep

7   trying and I'm sure we'll cross paths."

8        April 11, 2013 from Redandwhite to Dread Pirate

9   Roberts:  "Hey there.  Still haven't been able to catch you on

10  pidgin.  I added you as a buddy but you don't show up in my

11  buddies list.  When adding a buddy, I leave everything blank

12  and just put the use name as dread, correct?  Our hitters have

13  been watching their house and we have a one week window to do

14  it but I wanted to ask you a couple questions before giving

15  them the green light.

16       "The price of bitcoin's trading at 61USD  right now.

17  How is this going to work, because you mentioned that you would

18  take care of the price fluctuations.  We haven't withdrawn any

19  of the bitcoins.

20       "Can you also give me some insight on this price

21  business?  I have been rallying our people to get involved will

22  selling on here, and they seem very interested but they are

23  saying we would lose money because of the price going up and

24  down so much and not being able to withdrawal fast enough to

25  not lose money."

F22gulb3                          Shaw - direct

1    April 12, 2013 from Dread Pirate Roberts to

2    Redandwhite:  "Check out this link."

3         And there's a dot-onion address provided ending in

4    "Seller'S Guide."

5         "Pay special attention to the Part about escrow

6    hedging.  I don't think this place would be possible without

7    it, at least not in the form it's in now.

8         "Regarding the 3k coins I sent, get the best price you

9    can for them and let me know if you are short and I will send

10   more to cover it.

11        "Regarding Chat I made a mistake, you should add me as

12   dread@pi5mmjtronhutyxv.onion.  I'm going to connect us manually

13   so that may not be necessary."

14        April 15, 2013 from Redandwhite to Dread Pirate

15   Roberts:  "The problem was dealt with.  I'll try to catch you

16   online to give you details.  Just wanted to let you know right

17   away so you have one less thing to worry about."

18        From Dread Pirate Roberts to Redandwhite:  "Thanks,

19   See you on chat."

20        From redandwhite to Dread Pirate Roberts:  "3:30 PST

21   tried to catch you online but no luck.  Want to link up at the

22   same time tomorrow."

23        And Then Dread Pirate Roberts Responds:  "Sure, I'll

24   make sure I am online at 3:30 p.m. PST."

25        April 18, 2013 from Dread Pirate Roberts to

1  redandwhite:  "It's nearly 4:00 P.M. PST.  I need to run some

2  errands.  I will probably be back on later though."

3          April 21, 2013 from Redandwhite to Dread Pirate

4  Roberts:  "Sorry I wasn't able to make it on.  I've had some

5  problems I've been dealing with, I came online today to see if

6  I could catch you but no luck.  I will wait online until

7  6:00 p.m. PST.  I've give you a brief rundown here just to let

8  you know what happened.  My crew did their job.  As far as

9  money/product/bitcoins/seller accounts.  Money:  They had

10 $15,000 Canadian dollars on site.  Product:  They had a quarter

11 kilo of cocaine and two ounces of heroin.  Bitcoins:  They have

12 been giving a third party bitcoins who cashes out for them.

13 The guy has roughly 350 bitcoins of theirs currently owing to

14 them.  The exchange guy is not in on the scam and is just some

15 exchanger who sends them funds via Western Union and they have

16 been using him from the start apparently.  I don't know what to

17 do about that.  Seller accounts:  They were in the process of

18 setting up another account to sell heroin and cocaine.  They

19 said a few of their friends know about this, so be on the

20 lookout if anyone from Canada starts to sell heroin and

21 cocaine.

22          "I also took a big loss.  After you sent me the extra

23 coins to cover the price going down when it was at 90, it

24 started to crash again.  It was at 65 and people were talking

25 about how it's going to go down even more, so I made a deal

 1    with an exchanger to take them all at 50 and sell them for me

 2    in case it went down even lower.  Of course, after I made that

 3    deal it has now started to rebound again but I'm out 250k.  I'm

 4    not telling you this because I think you should cover it.  In

 5    fact I don't want you to cover it.  You already did more than

 6    you needed to do when you covered the price crashing the first

 7    time.  I am just letting you know because this will cause a

 8    delay in us starting here because I was planning on covering

 9    the mens wages of 1,000 a day of street money to start selling

10    on here until it gets busy enough for them to be paid via a

11    percentage of what they sell here.  It was my mistake for not

12    arranging someone to take the entire bitcoin amount as soon as

13    I had received it, instead of letting it sit and have the price

14    crash.

15            "Hope to catch you online soon, as I have started on

16    that reading material and I love what I am reading so far.

17            "Talk soon."

18            Dread Pirate Roberts Responds:  "Okay.  I'll look for

19    you as well, but probably won't be online for the whole day

20    again until Tuesday."

21            June 1, 2013 from redandwhite to Dread Pirate Roberts

22    titled update:  "I have some news regarding our organization

23    selling on here.  A bunch of chapter leaders flew into town for

24    a meeting and the main topic of discussion was actually silk

25    road.  Would you be able to meet on pidgin at 3:00 p.m. PST on

F22gulb3                          Shaw - direct

1    Sunday to discuss?  There was quite a bit of stuff covered on

2    the topic."

3            Mr. Evert, can you please publish 227D as a dog, it's

4    a chat log that we have not yet read in.  This is from page 332

5    to 333 of a 337 page chat log.

6            April 3, 2013: "myself: I get blackmailed by a guy

7    saying he's in deep shit with hell's angels

8            Myself: he says he was fronted $700k in LSD from them

9            Myself: he gave it to lucydrop to sell on sr

10           Myself: he said lucy took off with the product

11           Myself: i said, have the hells angels contact me so i

12   can work something out

13           Cimon: ha!

14           Myself: very foolishly he did

15           Myself: they said they caught up with lucy, got the

16   product back and killed him

17           Myself: I didn't hear from the blackmailer agian so i

18   thought the case was closed

19           Cimon: wait-- I'm missing something here

20           Myself: go ahead

21           Cimon: how was he blackmailing?

22           Myself: oh yea

23           Myself: he had thousands of addresses from customers

24   and vendors

25           Myself: he said he installed a keylogger on lucys comp

F22gulb3                          Shaw - direct

1          Myself: he was threatening to release all of the user

2    addresses

3          Myself: make sense

4          Myself: ?

5          Cimon: yeppers.

6          Cimon: now it does

7          Myself: ok, so this last friday he says I have 72

8    hours to send him half a mil or he's releasing the info

9          Myself: by this time I've sold the hell's angels on

10   becoming vendors themselves

11         Myself: so I ask them if they are still after the guy

12         Myself: they say no, debt was paid when they caught up

13   to lucydrop, so I pay them to hunt down the blackmailer.

14         Myself: he's gone on the run by this time fyi

15         Myself: they catch up to him within a day and he sings

16         Cimon: well, I bet ya he won't use the HA as a

17   reference again any time soon

18         Myself: says he was in cahoots with lucy all along and

19   ripping the angels off and black mailing me was part of the

20   plan

21         Myself: he also said a 3rd party, our man tony76

22   orchestrated the whole thing

23         Myself: gave up his id

24         Cimon: ahhh, and that's how you got tony, fucking

25   excellent

F22gulb3                        Shaw - direct

1              Myself: he's a brit

2              Cimon: how very convenient, where's he located

3              Cimon: more or less, of course

4              Myself: lemme look it up. I have the town

5              Myself: gotta look up the message on SR

6              Myself: helluva story eh?

7              Cimon: Man, I still can't believe tony fell into yer

8    lap. Wonder if DA is hanging around the edge of that mix.

9              Myself: somehow I doubt it

10             Myself: have you tried connecting on pidgin?

11             Cimon: So how does tony 'train' other folks to rip you

12   off?

13             Cimon: installing it on my other laptop

14             Myself: not sure, prolly just shows them how to use SR

15   in general, how to get good feedback, and then how to maximize

16   the rip off at the end

17             Myself: the guy is from Surrey apparently

18             Cimon: I thoujght he was cali-based, or am I

19   completely confused

20             Myself: why did you think that?

21             Cimon: I thought that was the conclusion when he did

22   the rip off

23             Myself: I don't remember that

24             Cimon: yeah, I must be mis-remembering that

25             Myself: nipplesuckcanuck sounds canada based

F22gulb3                           Shaw - direct

1           Myself: vancouver

2           Cimon: How old is the info on tony, and does he know

3   or suspect you have his info?

4           Myself: it is less than 2 days old, and the only thing

5   he should know is that his two guys aren't getting back to him

6           Cimon: ok, installed pidgin here, adding the xmpp

7   server account...

8           Cimon: Gotta mess about here with proxy tor will

9   likely drop off for a few minutes while I configure it

10          Myself: ok."

11          MR. HOWARD:  Your Honor, at this time I'd Like to read

12  a stipulation into the record, Government Exhibit 805.

13          THE COURT:  All Right.

14          MR. HOWARD:  It Is hereby stipulated and agreed by and

15  between the United States of America by Preet Bharara, the

16  United States Attorney for the Southern District of New York,

17  Serrin Turner and Timothy Howard, Assistant United States

18  Attorneys of counsel and Ross Ulbricht, by and through his

19  counsel Joshua Dratel, Esq. as follows:

20          (1) Canadian Law Enforcement Authorities have no

21  record of any Canadian residents named Blake Krokoff or Andrew

22  Lawsry or any name associated with "FriendlyChemist."

23          (2) Canadian Law Enforcement Authorities do not have

24  any record of any homicide occurring in the area of white rock,

25  British Columbia on or about March 31, 2013 or any record of

F22gulb3                         Shaw - direct

1  any homicides occurring in the area of Surrey, British Columbia

2  on or about April 15, 2013 or any other evidence that anyone

3  was physically harmed as a result of the plans discussed by

4  "Dread Pirate Roberts" and "redandwhite."

5          We further stipulate and agree that the

6  above-referenced exhibits and this stipulation, Government

7  Exhibit 805, are admissible as Government exhibits at trial,

8  except that the Defendant reserves the right to object to these

9  exhibits under Federal Rules of Evidence.

10         MR. DRATEL:  So stipulated, your Honor.

11         THE COURT:  Received.  Government Exhibit 805 is

12  received.

13         (Government's Exhibit 805 received in evidence)

14  Q.  Now, Mr. Shaw, did you discover any transactional data in

15  the databases that you reviewed?

16  A.  Yes, I did.

17  Q.  Could you please flip in your binder to what's been marked

18  for identification purposes as Government Exhibit 920B as in

19  boy.

20  A.  Okay.

21  Q.  Do you recognize what this is?

22  A.  Yes, I do.

23  Q.  And what is that?

24  A.  It's a technical description of the transactions table from

25  the Silk Road Marketplace.

F22gulb3                          Shaw - direct

1   Q.  Did you take this screenshot?

2   A.  Yes, I did.

3           MR. HOWARD:  The Government offers Government

4   Exhibit 920B.

5           MR. DRATEL:  Objection as to hearsay and *Vayner*, your

6   Honor.

7           THE COURT:  The Objections are overruled.  Government

8   Exhibit 920B is received.

9           (Government's Exhibit 920B received in evidence)

10          MR. HOWARD:  Could we zoom in on the first column

11  here.

12  Q.  Mr. Shaw, what is depicted in this column.  Can you

13  describe it.

14  A.  Sure.  These are the fields that are present in the table

15  transactions, this means that each record stored inside of that

16  table will have information for each of these fields, though

17  they could be blank or null.  Some of the information that the

18  fields here includes information as to who the buyer account

19  was, that was part of the transaction, as well as the seller

20  account that was a party to this transaction, as well as

21  payment information and commission information all stored in

22  the database.

23  Q.  So each record is a separate transaction in the database?

24  A.  That is correct.

25  Q.  Does each record of each transaction include information

F22gulb3                          Shaw - direct

1   about the product that was sold?

2   A.  Yes, it does.  There is information about the item ID which

3   ties to the items table in the database.

4   Q.  Now, you pointed out the payment and commission fields.

5   A.  Yes.

6   Q.  And that information is stored for each transaction?

7   A.  That is correct.

8   Q.  Is that in bitcoins or dollars?

9   A.  The fields that are highlighted there, 8 and 9, were in

10  bitcoins.

11  Q.  And is there any information stored in each transaction

12  record about the equivalent U.S. dollars for each transaction?

13  A.  Yes.  There were multiple fields containing information

14  about U.S. dollars.

15  Q.  Is each record in the database uniquely identified?

16  A.  Yes, it is.

17  Q.  And how so?

18  A.  The first field is the index field, which is the

19  auto-incrementing field.

20  Q.  What do you mean by auto-incremented?

21  A.  That means it starts with one and then the next one would

22  be two and then three and then four.

23  Q.  So the first transaction put in the database gets a number

24  one?

25  A.  Correct.

F22gulb3                      Shaw - direct

1  Q.  And they sequentially add up as they go forward?

2  A.  Correct.

3         MR. HOWARD:  May I approach the witness.

4         THE COURT:  You may.

5  Q.  I just handed you what's been marked for identification

6  purposes as Government Exhibit 961.  Do you recognize what this

7  is?

8  A.  Yes, I do.

9  Q.  What is this?

10  A.  This is a video compiled showing some sample transaction

11  information.

12  Q.  Would this aid your testimony today?

13  A.  Yes, it would.

14         MR. HOWARD:  The government offers 961 for

15  demonstrative purposes.

16         MR. DRATEL:  No objection for demonstrative purposes.

17         THE COURT:  Received for demonstrative purposes.

18         (Government's Exhibit 961 received in evidence)

19         MR. HOWARD:  May I approach.

20         THE COURT:  You may.

21  Q.  How did you recognize this exhibit by the way?

22  A.  It has my initials on it.

23         Hold it right here -- it's not to be big screen,

24  sorry.

25         What we're looking at right here is information

1    extracted from the transactions table.  And I've already

2    resolved information such as the buyer ID and the seller ID

3    from the appropriate table as well as resolving the item

4    description -- title and description, and the category that

5    that item fell into was categorized as well as the stored value

6    of the U.S. dollars of the transaction.

7              Could you hit play, please.  Could you hit pause,

8    please.

9              For example, down here in row 15, we see a buyer with

10   the name.  That doesn't line up with my screen.  Sorry.  Okay.

11   There we go.  The buyer name sluggo318 sold product to

12   aceedee1080, the product was categorized in the "cocaine"

13   category and that was selected by the person who was who set up

14   the product for sale.  So the seller selected the category of

15   that item and chose to put that item under the "cocaine"

16   category.

17   Q.  Mr. Shaw, to be clear, is this all of the information for

18   each transaction or is there more information?

19   A.  There's more information.

20   Q.  This is only what's captured on the screen?

21   A.  This is just a summary of the information; correct.  The

22   description of that item was 1 gram of pure uncut cocaine, and

23   the transaction amount stored in the database in U.S. dollars

24   was $156.50.

25             Could you hit play, please and pause, please.

F22gulb3                              Shaw - direct

1          What we're looking at here is a screenshot of

2    information that was in the categories table of the Silk Road

3    Marketplace database.  One example of what we're looking at

4    here, if you look at row four, it's kind of hard to see, but it

5    has an ID of seven.  And each item, as you can tell, has a

6    unique number in this first column and associated with that is

7    a name of that category.

8          Now, there's also information about the parent ID, so

9    there was a concept of grouping, so you could say, you know, I

10   am selling in this case an item, LSD, and it is in group -- it

11   is group seven, but it is also -- has a parent ID of 41, which

12   when you look further down on the table at group 41 is the

13   category of psychedelics.  So the idea was, you could nest

14   different categories so you could have a parent category or you

15   could have a child category, so that's what's represented here.

16   Q.  So it's organizing different products into categories?

17   A.  Exactly.

18         Hit play, please and pause, please.

19         And you'll notice a category of 70 below the items

20   that we were looking at in the first page fell under the item

21   of category parent ID 78, which in this case is drugs.

22   Q.  What do you mean by "parent category"?

23   A.  That meant that the parent ID was drugs; however, the

24   subcategory could have been, you know, psychedelics.

25         If you can hit play, please.

1          Because all of this data is stored in a database,

2     you're able to quickly and easily ask it questions.  What I

3     have shown here -- hit pause, please -- was a selection of

4     transactions that all fell under the "heroin" category.  You

5     can read some of these.

6          For example on line nine there, there was a

7     transaction from the buyer Philbetter333 and the seller

8     Marlostanfield for, again, all of the items we're looking at

9     fell under the category of "heroin," and the U.S. dollar amount

10    stored in the database was $183.01 and the item title was

11    number four heroin for $150.

12         Could you hit play, please.

13    Q.  So Mr. Shaw, the items in the database, were they organized

14    by categories and subcategories?

15    A.  Yes, they were.

16    Q.  And you just showed an example of how you were able to

17    query or ask a question of the database to pull up a sample of

18    heroin transactions, correct?

19    A.  Correct.

20    Q.  Could you pull up a sample of any category you'd like?

21    A.  Yes.

22    Q.  Could you ask the database questions to extract only

23    certain users, what their transactions are?

24    A.  Yes.

25    Q.  So now earlier you testified that you located multiple

F22gulb3                                    Shaw – direct

1    copies of the databases, correct?

2    A.  That's correct.

3    Q.  Where were they located?

4    A.  They were located on both of the server images that I

5    received copies of.

6    Q.  Now, Mr. Shaw, you testified a second ago that one of the

7    fields -- one of the pieces of information that each

8    transaction record contains is commission, correct?

9    A.  That is correct.

10   Q.  Now based on your review of the transaction data,

11   approximately when did transaction data start to include

12   information about commissions?

13   A.  The first recorded commission that I saw in the database

14   was in the middle of 2011.  I believe it was May.

15   Q.  Could you please flip in your binder to what's been marked

16   for identification purposes as Government Exhibit 950.  Do you

17   recognize what this is?

18   A.  Yes, I do.

19   Q.  And what is that?

20   A.  These are some of the first transactions that had a

21   recorded commission.

22   Q.  Did you take this screenshot?

23   A.  Yes, I did.

24          MR. HOWARD:  The government offers Government

25   Exhibit 950.

F22gulb3                          Shaw - direct

1           MR. DRATEL:  Objection as to hearsay and *Vayner*, your

2     Honor.

3           THE COURT:  All right.  Those objections are

4     overruled.  Government Exhibit 950 is received.

5           (Government's Exhibit 950 received in evidence)

6     Q.  Mr. Shaw, could you please describe what is depicted here.

7     A.  Sure.  These are some of the transactions that occurred.

8     Again, these all had recorded commissions and these were some

9     of the earliest ones with recorded commissions.

10          For example, the one that is highlighted in orange

11    there was a transaction for -- recorded as 14 grams of MDMA;

12    the sales price was $337.06 in U.S. dollars recorded in the

13    database; and as recorded in the database, the commission in

14    U.S. dollars was $16.74.

15          MR. HOWARD:  Mr. Evert, would you please publish

16    Government Exhibit 226A, which is a chat log recovered from the

17    defendant's computer that we have not yet read in.

18          This is from pages 41 to 42 of a 1,096 page chat log.

19          December 7, 2011:  "Vj: OK - can't go without asking -

20    whats the weekly gross sales

21          Vj: save me scraping all the feedback pages and doin

22    the math

23          Myself: wanna take a guess?

24          Vj: nope - but 450 trans a day...

25          Vj: average say $55?

1      Vj: comes to 25 grand a week, and seems low to me

2      Vj: but that's the current guesses on the board

3      Myself: yea, 450 a day is high because saturday is

4 like 350 and sunday is like 250

5      Myself: but the avg is more like $75

6      Vj: Don't forget that xmas - end of jan is gonna slow

7 down, but growth might keep it from slowing too bad

8      Vj: but lots of folks are gonna be broke come xmas

9 morning

10      Myself: I track the monthly sales volume and it's

11 around $500k right now

12      Myself: so, $125k/wk or so

13      Vj: not bad for a guy that started selling shrooms, eh

14      Myself: haha

15      Myself: yep, pretty happy

16      Vj: so, why'd you stop vending, ha

17      Myself: too risky. I figured I'd be a target

18      Myself: and it was really time consuming.  I grew my

19 own."

20      Pages 522 to 523 of the 1,096 page chat log, March 11,

21 2012: "Vj: [. . .] Sometime, we have to have a discussion about

22 what to do in the event of arrest or incarceration, thought

23 about that a fair bit during the last two weeks.

24      Vj: For instance, if you were arrested

25      Vj: a decision would have to be made at what point in

F22gulb3                          Shaw - direct

1    time do I come get you out

2            Vj: and I would come and get you out

3            Vj: Myself, that time would be a lot longer - scary,

4    but jail doesn't scare me a whit anymore. I treat it like being

5    in a 3rd world country with poor communications infrastructure

6            Myself: I've been thinking a bit about that as well.

7    like I could put instructions for transferring control in an

8    encrypted file and give it to a family member. then I can give

9    them the password if I get put in jail.

10           Vj: and remember that one day when your in the

11   exercise yard, I'll be the dude in the helicopter coming in low

12   and fast, I promise.

13           Myself: ok

14           Vj: seriously, with the amount of $ we're generating,

15   I could hire a small country to come get you."

16           On page 549 of the 1,096 page chat log March 14, 2012:

17   "Vj: One of the things i'd like us to look at investing in is a

18   helicopter tour company.

19           Vj: Cause you never know when one of us is gonna need

20   a helicopter!

21           Vj: Be pretty handy to have it leased already.

22           Myself: I made a declaration about 8 years ago that

23   I'd be a billionaire by my birthday in 2014. If you cound the

24   discounted future revenues of the enterprise, it could happen.

25           Vj: When yer keeping your eye on the ball, that's the

1   big one.

2          Myself: yep, all that money won't be worth much if

3   we're behind bars."

4          March 22, 2012:  "Vj: how much was the total for the

5   last sale.

6          Vj: ?

7          Myself: $321,802.06 from 4197 orders

8          Vj: how many vendors do we have now?

9          Vj: and what are weekly sales?

10         Vj: hould do well over double weekly sales for the

11  sale, I'd think, quite easily moe.

12         Myself: weekly peaked out at ner $600k, but have

13  fallen this past week to $475k or so

14         Vj: So we'll easily break a mil for the sale - not bad

15  for a bit over a year old, eh.

16         Myself: # vendors is about 200 decent sized and active

17  vendors, and about 150 more small or new ones."

18         Mr. Evert, can you please publish 227C, another chat

19  log that was recovered from the defendant's computer that has

20  not yet been read.

21         From pages 44 to 47 of a 337-page chat log:  "Myself:

22  The site is still growing on its own.  Not quite exponential,

23  but more than linear.

24         Cimon:  What are weekly's now?

25         Myself:  Up to 1.3M.

F22gulb3                        Shaw - direct

1          Myself:  Try handling the entire escrow and account

2     balances of Silk Road sometime."  Emoticon.

3          Page 73, October 8, 2012:  "Myself:  We have over 700

4     unique sellers each week.  It's getting competitive on the

5     supply side.

6          Myself:  Volume go up to 1.4M about a week ago.

7          Cimon:  Mebbe it's time for sale, no trips this time,

8     eh"

9          January 29, 2013, "myself:  We crossed a cool

10    milestone today.

11         Cimon:  <pants>

12         Cimon.  What what what.

13         Myself:  10k unique customers in the last week."

14    Q.  Now, Mr. Shaw, were you able to run queries from the

15    database, ask questions to get total transaction amounts for

16    all the goods and services that were sold on the Silk Road

17    website?

18    A.  Yes, I was.

19    Q.  Could you please flip in your binder to what's been marked

20    for identification purposes as Government Exhibit 940.

21    A.  Okay.

22    Q.  Do you recognize what this is?

23    A.  Yes.  This is a summary of transactions by category.

24    Q.  And were you involved in the preparation of this exhibit?

25    A.  Yes, I was.

F22gulb3                          Shaw - direct

1    Q.  Does this chart accurately reflect the summary of the

2    transactions that were in the Silk Road Market databases?

3    A.  Yes, it does.

4             MR. HOWARD:  The government offers Government

5    Exhibit 940.

6             MR. DRATEL:  Hearsay.

7             THE COURT:  That objection is overruled.  Government

8    Exhibit 940 is received.

9             (Government's Exhibit 940 received in evidence)

10             THE COURT:  Mr. Howard, we're going to end at 1:00

11    for lunch.  Are you able to complete this by then, this

12    document?

13             MR. HOWARD:  Yes, by this document, for sure.

14             THE COURT:  Thank you.

15             MR. HOWARD:  Can we zoom in on the top, please.  And

16    give the header as well, Mr. Evert.

17    Q.  Can you please, Mr. Shaw, describe what is in this chart

18    and how it works.

19    A.  Yes.  So I'm taking the information from the transactions

20    table and tieing it to the items and then the categories of

21    those items.  We were able to add up the totals for each

22    category.  So each item was assigned to one category and one

23    category only.  So what we're looking at, for example, the

24    second row here of "drugs," those are items that -- were

25    assigned to the category of drugs, not to any of the

1   subcategories.  And this first -- all of these groupings up

2   here are kind of parent categories, top-level categories.  They

3   don't have any parent IDs.  So again, everything that we're

4   looking at for this row was assigned solely to the category of

5   drugs and none of it the subcategories.

6           What you can see on the chart here, the total

7   transactions that occurred for an item assigned the category of

8   drugs there were 25,976 transactions for payment in bitcoins

9   recorded in the database as 253,182.08 bitcoins.  In the

10  database, the payment amount in U.S. dollars that was recorded

11  was $9,755,333 U.S. dollars.  In the database the "total

12  commission for drugs" category recorded in bitcoins was

13  11,116.70.  The recorded commission in the database in U.S.

14  dollars was $392,000,108.

15  Q.  To be clear, this wasn't the transaction data for all drugs

16  on the site, correct?

17  A.  That is correct.

18  Q.  So what would you need to do in order to find the total

19  number amount of drugs sold, all kinds of drugs?

20  A.  You would add up this category along with any subcategories

21  that were associated with this group.

22  Q.  To be clear, this line item reflects products that were

23  marked as drugs but not marked with any subcategory?

24  A.  That is correct.

25          MR. HOWARD:  Could we zoom out, Mr. Evert, and please

1   go to page two of this exhibit.  Could we zoom in on these two

2   sections here.

3   Q.   So Mr. Shaw, could you explain what's depicted here.

4   A.   Sure.  So the second column here is the parent category.

5   What you see down here in this grouping down here for brown,

6   white and black tar.  They all have a parent category of 49

7   heroin.  And on this line we have "category 49 heroin."  So in

8   order to understand this chart, everything on this row is

9   something that was tagged as just generic heroin.  It didn't

10  have any subcategory.  It was just associated with the grouping

11  of the category of heroin; whereas, everything on this row was

12  categorized as brown, which was a subcategory of heroin.  And

13  then everything on this row is categorized as white, which is

14  also a subcategory of heroin.  And then this row was black tar

15  heroin.

16       So in order to get the total for all heroin

17  transactions, you would actually have to add up all four of

18  these rows, the heroin group, the brown group, the white group

19  and the black tar group.

20       MR. HOWARD:  Zoom out, Mr. Evert.

21  Q.   Mr. Shaw, what time period of transactions, what time

22  period does this data cover?

23  A.   According to the timestamps in the database, it covered

24  February 6, 2011 through October 2, 2013, so the entirety of

25  what was in the database.

F22gulb3                          Shaw - direct

1   Q.  That's the full date -- range of transactions that are in

2   there, correct?

3   A.  Correct.

4          MR. HOWARD:  Can we flip to the last page of this,

5   Mr. Evert.

6   Q.  Zoom in at the bottom -- to be clear, where we see category

7   names and parent names, those are defined in the database

8   itself, correct?

9   A.  That is correct.

10  Q.  There's this last line here that says "null" here.  The

11  category name is null and parent name is null?

12  A.  Right.

13  Q.  What does that mean?

14  A.  If the database joins between the tables didn't work, so we

15  weren't able to determine the category of the item in that

16  transaction, we assigned it to this group "null."

17  Q.  In other words, are those transactions that were reflected

18  in the database but no category -- you could not determine the

19  category that it was assigned to?

20  A.  That is correct.

21  Q.  And there are approximately, it looks like, $22 million

22  worth of those transactions?

23  A.  That is correct.

24  Q.  Could you please describe what is depicted on the last line

25  here?

1  A.   The last line is the total calculations for all

2  transactions in the database.  You see we have 1,530,252 total

3  transactions for a recorded value in bitcoins of 9,912,070.05

4  bitcoins, for a total U.S. dollar amount recorded in the

5  database of $213,888,103 U.S. dollars.  The commission value in

6  bitcoins here is 642,455.36 bitcoins, and the recorded value in

7  U.S. dollars for the commission was 13,174,896 U.S. dollars.

8  Q.   Now, Mr. Shaw, in terms of the U.S. dollar equivalencies,

9  is that reflecting the total U.S. value at any one given point

10  in time?

11  A.   That was what was recorded in the database at the time of

12  the transaction.

13  Q.   So as each transaction occurred, the equivalent U.S.

14  dollars was recorded in the database?

15  A.   That's correct.

16  Q.   And this number down here is the sum of all those

17  conversions?

18  A.   That's correct.

19          MR. HOWARD:  We can stop here if you'd like, your

20  Honor.

21          THE COURT:  Ladies and gentlemen, we'll take our lunch

22  break and were we able to bring in lunch.  We were able to

23  bring in lunch for you folks, so you don't have to deal with

24  the weather again.  We'll see you at 2:00 and remind you not to

25  talk to each other or anyone else about the case.  Thank you.

F22gulb3                        Shaw – direct

1    Sir, you can step down and be back at 2:00.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F22gulb3                          Shaw – direct

1                    (In open court; jury not present)

2                    THE COURT:  Is there anything we should raise before

3    we break for lunch?

4                    MR. TURNER:  No, your Honor.

5                    MR. DRATEL:  I don't think so.

6                    THE COURT:  Let's take a break and then we'll come

7    back at 2:00.  Now, I do have one criminal matter in this room

8    at 1:00, and so, I am going to need first the first two spots

9    at counsel table.  Thank you.

10                   (Luncheon recess)

11                   (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F22gulb5                          Shaw - direct

1                            AFTERNOON SESSION

2                                 2:05 p.m.

3              (In open court; jury present)

4              THE COURT:  Thank you, ladies and gentlemen.  Let's

5    all be seated.

6              Mr. Howard, you may proceed.

7              MR. HOWARD:  Thank you, your Honor.

8              Mr. Evert, can we publish Government Exhibit 940 and

9    go to page seven, please.  Zoom in on the bottom again.

10    BRIAN SHAW, resumed.

11   DIRECT EXAMINATION CONTINUED

12   BY MR. HOWARD:

13   Q.  Mr. Shaw, this is where we left off before the lunch break,

14   correct?

15   A.  Yes.

16   Q.  And this chart depicts over two -- sorry -- $213 million in

17   sales that were reflected in the transaction data on Silk Road,

18   right?

19   A.  That's correct.

20   Q.  Did you perform any analysis of what portion of those sales

21   came from the sale of illegal drugs?

22   A.  Yes, I did.

23   Q.  Would you please flip to what's been marked in your binder

24   as Government Exhibit 940A, please.

25   A.  Okay.

F22gulb5                              Shaw - direct

1     Q.  And what is this?

2     A.  It's a breakdown of total categorized Silk Road sales.

3     Q.  Did you participate in the creation of this exhibit?

4     A.  Yes, I did.

5     Q.  Does this exhibit fairly and accurately summarize

6     transaction data from the Silk Road databases?

7     A.  Yes, it does.

8              MR. HOWARD:  The government offers Government

9     Exhibit 940A.

10             MR. DRATEL:  Objection with respect to foundation and

11    in terms of hearsay, your Honor, and *Vayner*.

12             THE COURT:  Why don't you lay more of a foundation for

13    what's categorized under what you've described as drugs.

14    Q.  Mr. Shaw, what listings from the Silk Road database did you

15    group under the drug category?

16    A.  I grouped under the drug category using the categories from

17    the database anything that fell under the drugs parent

18    groupings, so anything from there and below, and in addition

19    pharmaceuticals.

20    Q.  So in other words, you looked at the transactional data for

21    everything for drugs and all the subcategories for drugs,

22    correct?

23    A.  Correct.

24    Q.  And this chart also shows nondrug sales.  What are those?

25    A.  That would be everything else that had an associated

1   category, so anything -- any category that wasn't under the

2   drugs category or pharmaceuticals.

3   Q.  When we were looking at this chart, there was a category

4   called "null," which I believe you testified included

5   transactions which you were not able to categorize based on the

6   information in the database, correct?

7   A.  Right.

8   Q.  Are those sales factored into this analysis?

9   A.  No, they are not.

10  Q.  So this is an analysis of only transactional data for which

11  the database reflected a certain category for the item?

12  A.  Correct.

13          MR. HOWARD:  The government offers Government

14  Exhibit 940A.

15          THE COURT:  Let me ask about the pharmaceuticals.

16          Do the pharmaceuticals include any equipment or other

17  nondrug items?

18          THE WITNESS:  I believe there are separate categories

19  for equipment but off the top of my head, I'm not sure.  I

20  could look at some of the categories.

21          THE COURT:  Do you have information there that would

22  tell?

23          THE WITNESS:  Going back to the previous chart.

24          THE COURT:  All right.  What I'm trying to determine

25  is when you used the word "drugs," are we talking about things

F22gulb5                        Shaw - direct

1   which are narcotics of some form, whether they be in the

2   pharmaceutical form or in a nonpharmaceutical form, or does it

3   also include things like surgical gloves or something of that

4   nature that might be considered a pharmaceutical?

5           THE WITNESS:  So there was a category described as

6   pharmaceuticals and its parent category was electronics and

7   other subcategories under electronics was medical supplies and

8   medical equipment, those were not included in this factor.  So

9   it was only items that were listed as pharmaceuticals in the

10  category pharmaceuticals.

11          THE COURT:  Thank you.

12          Government Exhibit 940A is received.

13          (Government's Exhibit 940A received in evidence)

14  Q.  Mr. Shaw, can you please describe what is depicted here in

15  this chart.

16  A.  Sure.  What we're seeing here is the sum of all of the

17  categories that were categorized under either drugs or that

18  category pharmaceuticals are depicted in blue.  Any other

19  transactions that were categorized are depicted in red, which

20  takes up four percent of the chart.

21  Q.  So the drugs -- the total drug sales based on this analysis

22  was approximately $182 million, correct?

23  A.  That is correct.

24  Q.  And how about the other sales, the nondrug sales?

25  A.  That amounted to about $8.5 million.

F22gulb5                          Shaw - direct

1    Q.  Can you please flip in your binder to what's been marked

2    for identification purposes as Government Exhibit 940B.

3    A.  Okay.

4    Q.  Do you recognize what this is?

5    A.  Yes, I do.

6    Q.  And, what this?

7    A.  It's a summary of sales transaction for fake IDs, forgeries

8    and passports.

9    Q.  And where did you get this information from for the sale of

10   these three kinds of products?

11   A.  From the database on the Marketplace.

12   Q.  And how did you identify which categories would fit in

13   here?

14   A.  This is based on information in the database on the

15   assigned category for those items.

16   Q.  Did you participate in the creation of this exhibit?

17   A.  Yes, I did.

18   Q.  Does this exhibit fairly and accurately summarize the data

19   from the Silk Road databases?

20   A.  Yes, it does.

21        MR. HOWARD:  The government offers Government

22   Exhibit 940B as in boy.

23        MR. DRATEL:  Same objection as to foundation, hearsay

24   and *Vayner*.

25        THE COURT:  Those objections are overruled and

F22gulb5                          Shaw - direct

1     Government Exhibit 940B is received.

2              (Government's Exhibit 940B received in evidence)

3     Q.  Mr. Shaw, can you please describe what is depicted in this

4     chart.

5     A.  Sure.  There were three categories that were all related.

6     There was the fake IDs category, it had a total number of sales

7     of 3,642, a recorded sales revenue in U.S. dollars was

8     $699,053.  The category of forgeries, there were 3,487 total

9     transactions for a sales revenue of 192,291 -- sorry $197,291.

10    In the passports category, there were 103 sales for a total of

11    105,292 U.S. dollars.  The total for all three of these

12    categories was 7,232 transactions for a total of over a million

13    dollars.

14    Q.  Now, Mr. Shaw, could you please flip in your binder to

15    what's been marked for identification purposes as Government

16    Exhibit 940C.

17    A.  Okay.

18    Q.  Do you recognize what this is?

19    A.  Yes, I do.

20    Q.  And what is this?

21    A.  It's a summary of information on transactions for

22    money-related categories.

23    Q.  And how did you select which categories would be included

24    in this chart?

25    A.  These all came from categories that were assigned in the

F22gulb5                              Shaw – direct

1    database.

2    Q.  And did you participate in the creation of this exhibit?

3    A.  Yes, I did.

4    Q.  Does this exhibit fairly and accurately reflect transaction

5    data from the Silk Road databases?

6    A.  Yes, it does.

7              MR. HOWARD:  The government offers Government

8    Exhibit 940C.

9              MR. DRATEL:  Same objection.

10             THE COURT:  The objections are overruled.

11             Government Exhibit 940C is received.

12             (Government's Exhibit 940C received in evidence)

13   Q.  So Mr. Shaw, can you please describe what is depicted in

14   this chart.

15   A.  Sure.  It's a breakdown of the different money-related

16   categories.  The first row for items categorized as money.

17   There were 14,345 total sales for a recorded revenue of

18   2,846,025 U.S. dollars.  And you can see similar numbers for

19   digital currencies, gold, bullion and silver.  The total for

20   all these categories was 32,820 transactions for a total sales

21   revenue recorded in the database of 3,273,833 U.S. dollars.

22   Q.  Now, Mr. Shaw, can you please flip in your binder to what's

23   been marked for identification purposes as Government

24   Exhibit 940E.

25   A.  Okay.

F22gulb5                              Shaw - direct

```
 1   Q.  Do you recognize what this is?

 2   A.  Yes, I do.

 3   Q.  What is this?

 4   A.  It's a summary of information for selected drug categories.

 5   Q.  And which drug categories are those?

 6   A.  Heroin, cocaine, methamphetamine and LSD.

 7   Q.  Where did you draw the data that is included in this chart

 8   from?

 9   A.  This is the database from the Silk Road Marketplace.

10   Q.  Did you participate in the creation of this exhibit?

11   A.  Yes, I did.

12   Q.  Does the exhibit fairly and accurately summarize data from

13   the Silk Road Marketplace databases?

14   A.  Yes, it does.

15           MR. HOWARD:  The government offers Government

16   Exhibit 940E.

17           THE COURT:  My 940E is empty.  I do have a 940H which

18   is, I take it, similar but not the same.

19           MR. HOWARD:  That is correct.  Let me see if we have

20   an extra copy.

21           THE COURT:  I can look for a moment on with the

22   witness.  Hold on.  All right.  940E is different from 940H.

23           Mr. Dratel.

24           MR. DRATEL:  The same objection, your Honor.

25           THE COURT:  940E is received over objection.
```

1          (Government's Exhibit 940E received in evidence)

2    Q.  Mr. Shaw, can you please describe what is depicted in this

3    chart?

4    A.  Sure.  This is a total number of sales that fell under the

5    heroin category and its subcategories -- well, for heroin,

6    cocaine, methamphetamine and LSD.  Recorded in the database

7    were over 53,000 transactions for heroin products for a total

8    sales revenue of over $8.9 million.

9          In the cocaine categories there were 82,582 total

10   transactions for a total sales revenue of $17,386,917.

11         In the category of meth, there were 34,689

12   transactions for a total sales revenue recorded at 8,110,453

13   U.S. dollars.

14         In the category of LSD, there were 54,567 transactions

15   for a recorded value in U.S. dollars of 7,073,838 U.S. dollars.

16   Q.  Now, Mr. Shaw, could you please flip to what's been marked

17   in your binder for identification purposes as Government

18   Exhibit 940H.

19   A.  Okay.

20   Q.  Do you recognize what that is?

21   A.  Yes, I do.

22   Q.  What is this?

23   A.  It's a calculation of total drugs sold at average

24   transaction prices.

25   Q.  And how did you determine the average transaction price?

F22gulb5                        Shaw - direct

1   A.  I selected 100 items at random and read through the

2   description of those items to determine the weight for those

3   items.  And from there, I was able to calculate the price per

4   weight for those items if there was a description of the

5   weight.  Taking the items that had a good weight description

6   and then averaging the price per weight together, I was able to

7   come up with an average price per weight.

8   Q.  And these 100 transactions were taken at random from the

9   Silk Road database?

10  A.  That's correct.

11  Q.  Are these for the same four drugs that we reviewed on the

12  prior chart?

13  A.  Yes.

14  Q.  Did you participate in the creation of this exhibit?

15  A.  Yes, I did.

16  Q.  Does this exhibit fairly and accurately reflect or

17  summarize data from the Silk Road Marketplace databases?

18  A.  Yes, it does.

19          MR. HOWARD:  The government offers Government

20  Exhibit 940H.

21          MR. DRATEL:  Objection as to 401, 403, hearsay and

22  Vayner.

23          THE COURT:  All right.  Let me ask a question,

24  Mr. Shaw.

25          I see that the total -- let me ask you:  Were you

1     extrapolating based upon your sample of 100 that the

2     transaction price was approximately the same for all other

3     transactions of the, for instance, the 53,649 transactions for

4     heroin?

5              THE WITNESS:  That is correct.

6              THE COURT:  Did you do anything to ensure that your

7     distribution over time was a distribution which appropriately

8     weighted the various time periods?

9              THE WITNESS:  I didn't do any weighting based on time

10    periods no, but it was a distribution over time.

11             THE COURT:  Did you do anything to ensure that, for

12    instance, you were receiving the same number of transactions

13    from each of the time periods that spanned the entire database?

14             THE WITNESS:  No.  The items were selected at random

15    based -- in the database, there is a column that is considered

16    random, and it was based on selecting items based on that

17    randomized number, so it was purely random.

18             THE COURT:  940E cannot be received -- I'm sorry --

19    940H cannot be received on this basis.

20             Let me ask you also, do you have any degree in

21    statistical analysis?

22             THE WITNESS:  I do not.

23             THE COURT:  It can't be received on this basis.

24             You may proceed.

25    Q.  Earlier you discussed the fact that the Silk Road databases

F22gulb5                        Shaw - direct

1   included information about Silk Road users, correct?

2   A.  That is correct.

3   Q.  What kind of -- what, if any, information did the Silk Road

4   database include about the location of users?

5   A.  Users were able to self-identify their country, where they

6   were.

7   Q.  Can you please flip in your binder to what's been marked

8   for identification purposes as Government Exhibit 940F.

9   A.  Okay.

10          THE COURT:  Maybe somebody could give me 940F also.

11  Thank you.

12  Q.  Do you recognize this exhibit, Mr. Shaw?

13  A.  Yes, I do.

14  Q.  What is this?

15  A.  This is a map representing countries that had ten or more

16  self-identified vendors.

17  Q.  Did you participate in the creation of this exhibit?

18  A.  Yes, I did.

19  Q.  Where did the data for this exhibit come from?

20  A.  From the Silk Road Marketplace.

21  Q.  Does it fairly and accurately summarize information from

22  that database?

23  A.  Yes, it does.

24          MR. HOWARD:  The government offers Government

25  Exhibit 940F.

1      MR. DRATEL:  Hearsay and *Vayner*.

2      THE COURT:  Hold on one second.  Government

3  Exhibit 940F is received.  The objections are overruled.

4      (Government's Exhibit 940F received in evidence)

5  Q.  Mr. Shaw, can you please describe what is depicted in this

6  chart.

7  A.  Sure.  Using the information from the database where users

8  identified what country they came from, I checked to see all of

9  the ones that participated in selling items on the Marketplace

10  and those that did, if that country had ten or more confirmed

11  vendors, then they're listed in green on this chart.

12  Q.  Can you please flip to what's been marked as Government

13  Exhibit 940G, please.

14  A.  Okay.

15  Q.  Do you recognize what this is?

16  A.  Yes, I do.

17  Q.  And what is this?

18  A.  This is a map representing countries that had 100 or more

19  buyers.

20  Q.  And where did this data come from?

21  A.  From the database from the Silk Road Marketplace.

22  Q.  Does this fairly and accurately summarize the data from the

23  Silk Road Marketplace databases?

24  A.  Yes, it does.

25      MR. HOWARD:  The government offers Government

1    Exhibit 940G.

2              MR. DRATEL:  Objection.  Hearsay, *Vayner*.

3              THE COURT:  All right.  Those objections are

4    overruled.

5              Government Exhibit 940G is received.

6              (Government's Exhibit 940G received in evidence)

7    Q.  Mr. Shaw, can you please describe what is depicted here.

8    A.  Yes.  This is a world map.  We took the information from

9    the database and for each user that self-identified a country,

10   if they participated in purchasing an item on the Marketplace

11   that is calculated by country and if the total number for that

12   country exceeded 100 buyers, they're listed in red on this

13   chart.

14   Q.  Mr. Shaw, can you please flip to what's been marked in your

15   binder for identification purposes as Government Exhibit 940D

16   as in dog.

17   A.  Okay.

18   Q.  Do you recognize this exhibit?

19   A.  Yes, I do.

20   Q.  And what is this?

21   A.  It's a summary of transactions from the Marketplace.

22   Q.  Where did the data from this exhibit come?

23   A.  It came from the database from the Silk Road Marketplace.

24   Q.  Does it fairly and accurately summarize the data from the

25   Silk Road Marketplace databases?

F22gulb5                            Shaw - direct

1   A.  Yes, it does.

2   Q.  Did you participate in the creation of this exhibit?

3   A.  Yes, I did.

4                MR. HOWARD:  The government offers Exhibit 940D.

5                MR. DRATEL:  Hearsay and *Vayner* objections.

6                THE COURT:  940D?

7                MR. HOWARD:  That's correct.

8                THE COURT:  The objections are overruled.  Government

9   Exhibit 940D is received.

10               (Government's Exhibit 940D received in evidence)

11   Q.  So Mr. Shaw, can you please describe what's in this chart.

12   A.  Yes.  So what we have here is the total numbers taken from

13   the database for transactions.  The total number of

14   transactions that were recorded in the database were 1,530,252.

15   The total number of buyer accounts that participated in

16   purchasing items on the Silk Road Marketplace was 115,391 user

17   accounts.  The number of seller accounts that participated in

18   the Marketplace, there were 3,748 user accounts that sold items

19   on the Marketplace.

20               The recorded value for the total sales revenue in

21   bitcoins was 9,912,070 bitcoins.  The U.S. dollar equivalent

22   recorded in the database of these transactions was

23   213,000 -- sorry -- 213,888,103 U.S. dollars.  The total

24   commissions recorded in bitcoins was 642,455 bitcoins.  The

25   recorded U.S. dollar equivalent for these commissions was

F22gulb5                          Shaw - direct

1   13,174,896 U.S. dollars.

2              MR. HOWARD:  May I have a moment with cocounsel,

3   please.

4              THE COURT:  Yes.

5              MR. HOWARD:  We're done with the witness but we would

6   like to have a side bar first about one issue before we let

7   Mr. Dratel cross him.

8              THE COURT:  All right.  Let's have a brief side bar.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F22gulb5                          Shaw - direct

1              (At the side bar)

2              MR. TURNER:  So in terms of the admissibility of the

3      drug weight evidence, I don't think the issue is admissibility

4      but weight.

5              THE COURT:  No.  It's admissibility.  I'll tell you

6      why, because what you've done is you've extrapolated from a

7      total number of sales.

8              MR. TURNER:  Right.

9              THE COURT:  And the transaction price, the average

10     weight, these two numbers, the transaction price and the weight

11     are derivative numbers based upon a sample of 100 that this

12     witness may not be competent to have drawn.

13             He did not do a statistical analysis to determine

14     whether or not that's an appropriate one.  Clearly, the

15     information in the record is sufficient to add up all of the

16     transaction prices and all of the total weights added to the

17     math so to do 100.

18             You're trying to get it in for -- as if it is a

19     one-to-one-to-one.  I don't think you've got a proper

20     foundation for this document.

21             MR. TURNER:  You can't add up all the weights because

22     the weights aren't consistently included in the offerings.

23     There are only some offerings that describe the weight.

24             THE COURT:  Then you can add up all the transaction

25     prices, but there are fluctuations.  There are market

F22gulb5                          Shaw - direct

 1    fluctuations.  And depending upon where the drugs are being

 2    sold to, for all I know, there could be differences in time as

 3    to where they're going.  So 100 random without understanding

 4    the market impact seems to me to be --

 5           MR. TURNER:  There is another exhibit we'd like to

 6    rely on instead which doesn't go into the average transaction

 7    price but the highest.

 8           THE COURT:  I don't know what that is, but if you want

 9    to try with this witness on something different, you can try

10    before you end.

11           MR. TURNER:  It's the absolute highest.

12           THE COURT:  I don't know.  Walk him through it.

13           Mr. Dratel.

14           MR. DRATEL:  So it's not about this document, it's a

15    separate set of questions.

16           THE COURT:  That's fine.

17           MR. DRATEL:  While we're up here in terms of cross, I

18    did intend to ask him to authenticate Defense E but the Court

19    has precluded it; rather than go through the -- I figured I'd

20    mention that now so -- just that I would have -- because he had

21    access to all the material and he has gone through it.

22           THE COURT:  It's not an authentication issue.

23           MR. DRATEL:  No.  I understand.

24           THE COURT:  It's a relevance issue.

25           MR. DRATEL:  I'm saying, I would have done that if the

F22gulb5                        Shaw – direct

1    Court had permitted the document.

2              THE COURT:  I understand.  That's your proffer?

3              MR. DRATEL:  Yes.

4              THE COURT:  But in light of the Court's ruling, you

5    won't do it because of the Court's rule.

6              MR. DRATEL:  Right.  I'm saying rather than interrupt

7    the cross.

8              THE COURT:  It's on the record.  I understand.

9              So you folks, the government can proceed how it wants

10   to proceed and we'll take it one step at a time.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F22gulb5                          Shaw - direct

 1              (In open court; jury present)

 2    BY MR. HOWARD:

 3    Q.   Mr. Shaw, please look to 940I in your binder, please.

 4    A.   Okay.

 5    Q.   Do you recognize what this is?

 6    A.   Yes, I do.

 7    Q.   And what is this?

 8    A.   This is a weight estimate for four different categories of

 9    drugs based on a high selling price.

10    Q.   Can you describe what you mean by high price?

11    A.   I can.  I selected 100 items from the database and manually

12    reviewed them and calculated a price per weight for each those

13    items.  I then selected the highest price per weight for those

14    items out of that list of 100 items and by using that, came up

15    with what I considered a conservative estimate for the highest

16    price per weight.

17              And by using that high price per weight using the

18    formula of taking the total sales value in U.S. dollars

19    dividing by this high price per weight, it results in a weight

20    estimate, a conservative weight estimate.

21    Q.   Can you explain why you believe that to be conservative?

22    A.   Because by dividing by a larger number, you're going to end

23    up with a smaller number in weight.

24    Q.   And earlier you testified that you also looked at the

25    average price of these same 100 transactions, correct?

F22gulb5                              Shaw - direct

1   A.   Correct.

2   Q.   How do the high prices compare to the average prices?

3   A.   They were significantly higher -- multiple, two or three

4   sometimes four times.

5   Q.   So this analysis assumes that each sale of drug occurred at

6   the most expensive price you found in your random sample,

7   correct?

8   A.   That is correct.

9   Q.   Did you participate in the creation of this exhibit?

10  A.   Yes, I did.

11  Q.   Does it fairly an accurately represent information that you

12  extracted from the Silk Road Marketplace databases?

13  A.   Yes, it does.

14           MR. HOWARD:  The government offers 940I.

15           MR. DRATEL:  I object based on 100 transactions.

16  There's no statistical value to it.

17           THE COURT:  Let me ask a few questions so that I

18  understand what you did.

19           You took 100 transactions randomly; is that right?

20           THE WITNESS:  100 items randomly that were used in

21  transactions; yes.

22           THE COURT:  100 items?

23           THE WITNESS:  100 transactions.

24           THE COURT:  Which included a heroin sale?

25           THE WITNESS:  Correct.

F22gulb5                      Shaw - direct

1              THE COURT:  Based upon those 100, you determined

2      manually what the highest transaction price was for any one of

3      those 100; is that right?

4              THE WITNESS:  I determined --

5              THE COURT:  You took the hundred.

6              THE WITNESS:  I took the hundred.

7              THE COURT:  And if the highest price was $739 and

8      change, that's the price you used for the heroin analysis, is

9      that right?

10              THE WITNESS: Correct.

11              THE COURT:  And then what you did was, you took the

12      total sales revenue and you did some math to come up with the

13      possibility of what the number of -- the volume of drugs, is

14      that right?

15              THE WITNESS: Correct.

16              THE COURT:  All right.  It's not received.  We're

17      going to -- we'll have to talk about it again.  It's not

18      received based upon this analysis.

19              Is there anything else that government wanted to do?

20              MR. HOWARD:  No, your Honor.

21              THE COURT:  Why don't we do this.  If you want, I

22      don't want to have the jury have to sit around for this, we can

23      talk about this further.  I don't want to talk about the

24      evidentiary issue in front of the jury, but I can explain my

25      basis a little more fully, but I think we need to excuse the

F22gulb5                         Shaw - direct

1    jury for that, all right.  Unless you folks are ready to move

2    on in light of the rulings but I assume based on the side bar

3    you'd like to take this up?

4            MR. HOWARD:  Yes.

5            THE COURT:  Ladies and gentlemen of the jury, I'm

6    sorry for the quick break, but we're right at the end of this

7    witness, so I need to resolve this before we go on.

8            Let's take this break a little early.  We'll see how

9    things go.  Hopefully it will be about ten to 15 minutes.  I

10   appreciate your patience with us.

11           Thank you.  Don't talk to each other about this case.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

F22gulb5                              Shaw - direct

1              (In open court; jury not present)

2              THE COURT:  I'm going to ask you, Mr. Shaw, to step

3     down, but stay close because we may have some additional

4     questions for you, all right?

5              THE WITNESS:  Yes.

6              (Witness temporarily excused)

7              THE COURT:  I've asked Mr. Shaw to take a break but to

8     stay close in case we have any additional questions for him on

9     what underlies his analysis.  Let's all be seated.

10             And let me describe a little bit more fully the

11    Court's view, all right, since I can do that better when we're

12    not at side bar.

13             We all I think understand the importance of this

14    document.  There are two ways in which such a document can be

15    used:  One is for the jury to answer each of the three

16    questions in connection or four questions in connection with

17    their determination if they reach past the first question on

18    Counts One, Two and Three.  The second is if there was a

19    conviction, it would be highly relevant to sentencing.

20             The issues for sentencing are different, the Court has

21    a different standard.  It's preponderance of the evidence.

22    We're not anywhere near there, so I'm going to put those to the

23    side for the moment and deal with the evidentiary value and

24    importance of these in terms of the elements of the causes of

25    action that are in Counts One, Two and Three.

1          The concern that I have is with, let's just take 940I,

2     which was the more-recently offered document, for that we don't

3     in fact know whether 739 was the highest possible weight.  His

4     analysis assumes that he took -- or the value -- that he took

5     the highest possible value.  Now, it would have been relatively

6     easy for him to have done a sort and to have come up with on a

7     database in fact what the highest possible value was.

8          Is that not true?

9          MR. TURNER:  No, your Honor.  That's not true.  The

10    system recorded the price.

11         THE COURT:  Right.

12         MR. TURNER:  But the weight would just be an attached

13    description --

14         THE COURT:  Not the weight.  I'm talking about, as I

15    understand it, the weight is derived by this witness from the

16    overall denominator and the numerator is the price obtained

17    from the random 100 transactions, which in Exhibit I happens to

18    be the highest dollar value attributed in those 100.

19         MR. HOWARD:  Let me address that.  You couldn't do

20    just a standard sort because the database does not capture for

21    each item what the price is per weight.  There's a price

22    value and then --

23         THE COURT:  Let's forget about that.  What I'm trying

24    to figure out is, if you wanted to come up with an analysis

25    like the one you've done, and I'm not saying it's not possible

1    to have them done, you need the figure out before you say that

2    out of 100 random, okay, first of all, to do 100 random, you

3    know somebody who knows about statistics, and who knows how to

4    derive what random is and whether random was within the

5    relevant time frame, what random means.  And there are a

6    variety of ways in which random is understood in the world of

7    statistics, so that's number one.  So picking 100 random is an

8    issue.

9            The second piece is, it is nonetheless possible to

10   come up with the highest transaction price for heroin, but

11   you've got to do that -- to extrapolate that to the entire

12   array of transactions, whatever thousands of heroin

13   transactions there are, if you were going to do it with a

14   statistician, you'd need to do it through some form of figuring

15   out if that number is right.  In other words, 739 could in fact

16   be the highest price or it might not be.  And if it's not, then

17   it would be, I suppose, understating would be the argument, it

18   would be understating the number of kilos, right?  Because

19   you'd have fewer kilos reflected in a higher price.  If you had

20   a thousand dollars per kilo, your number per kilo would go down

21   to, say, ten kilos.  If you had $1,200, it would go down again.

22   So the problem I have is the statistical piece, which I don't

23   think this witness is competent to do.

24           There is a manual version of this which could be done

25   but hasn't been done.  So that's the issue I have, because I

```
 1   have no idea if he's got the right number or not frankly and
 2   it's an extraordinarily important derivation that he's doing
 3   here.
 4            MR. HOWARD:  One point is, first of all, I think he
 5   did testify that he used the database functions to derive the
 6   random selections, the random selection of heroin transaction.
 7   So he wasn't --
 8            THE COURT:  But not in a statistical way.  What he did
 9   was sort of like randomize, right?  I have no idea if the
10   algorithm that he used to randomize spit out random.
11            For this kind of situation, what you would want in
12   order to get a good price point is you would need to control
13   for geography, time frame, because you might sell it at one
14   price in India and a different price in Timbuktu and a
15   different price on the streets of New York.  And you folks have
16   put in now maps showing that kind of global footprint.
17            So I don't have any idea whether or not in his random
18   sampling he got a truly random sampling for all geographies.
19   In other words, you could take 2013, pick each geography,
20   average those prices together, come up with one random sample
21   per geography, go to another time frame, take all the relevant
22   geographies on a date certain, average them, but that's not
23   what was done.
24            MR. HOWARD:  I think one of the issues here is with
25   the difficulty of what the data is and the data for each
```

F22gulb5                              Shaw - direct

 1   transaction as I mentioned doesn't calculate a price per weight

 2   in and of itself.  It required manual review of the hundred

 3   that were selected to make that calculation for each one

 4   individually.

 5           Also, in terms of the geography, as Mr. Shaw

 6   testified, that only appeared in the database where a user

 7   elects to provide that information, and there's no verification

 8   of that.  So, our ability to do that analysis based on

 9   geography is limited by -- it would be highly inaccurate

10   because it would involve a much smaller sample size and also

11   involve users that may or may not be telling the truth about

12   where they're from.

13           THE COURT:  The deficiency in the data does not allow

14   us then to assume that the data we do have is the right data;

15   it just means that perhaps the exercise can't be done.

16           Now, it may be that the government, and I don't know,

17   has in evidence the whole list of transactions because that's

18   part of what this fellow has authenticated, and you can go

19   through and for those where you've got actual weights, since

20   it's in evidence, you can manually add up enough to get you

21   where you want to go.  That's different.  But I don't think

22   this document can come in on this basis.

23           Let me ask Mr. Dratel if you have any other view or do

24   you want to add anything?

25           MR. DRATEL:  No.  I think the deficiencies in the

1   database don't allow us to manipulate data in a way that is not

2   statistically valid and there's no statistical accuracy in this

3   whatsoever.  It's really not a statistic at all.  The other

4   thing is, to the extent that the government now says self-ID is

5   not verified, that would be exactly my point to the objection

6   to the maps because you can't have it for one thing to be used

7   in evidence and then try to undermine it for purposes of

8   getting in this other chart.

9           THE COURT:  I think that the point, as I understood

10  it, was that there's not self-ID for everybody, but where there

11  was self-ID, that that's what's reflected on the map.

12          Am I wrong about that, or is the map somehow itself

13  deficient?

14          MR. HOWARD:  No.  And I believe the witness of the

15  witness is he testified about what it actually was.  These are

16  the users who have self-reported.  That's what that map

17  captured.

18          MR. DRATEL:  What I'm saying is the government also

19  said there's no verification, which is the point with respect

20  to those maps.  It's just someone's self-ID.  It really has no

21  value as true.

22          THE COURT:  On the basis that you folks have

23  proffered, this is not the witness to get this document in.

24          MR. TURNER:  Your Honor, we have the testimony in the

25  record and we would just ask for an opportunity to brief this

1    tonight and ask your Honor to reserve judgment.  Our opinion is

2    this goes to weight, not admissibility.  This is an extremely

3    conservative estimate.  You have a random sample of 100 heroin

4    transactions.  He's taken the absolute highest price.

5           THE COURT:  He's taken the highest price of the 100.

6           MR. TURNER:  Right.  What he did is, he went --

7           THE COURT:  What if he's wrong?  What if the highest

8    price is $1,200?

9           MR. TURNER:  So what he did is, he took these 100

10   heroin transactions and then he looked at -- each one has the

11   weight of the product being sold and he looked at the price per

12   weight.  So what he did was for those 100, he said here is the

13   highest possible price per weight that's being charged for

14   these heroin transactions.

15          THE COURT:  What he could have done is he could have

16   done a chart that had only those 100 on it.  And it could have

17   been those 100 had the total price per transactions of X and

18   here is the weight attributable to it.  Maybe it would have

19   been 700 grams.  I have no idea.  But that's one exercise.  But

20   that's a different exercise.

21          What happens, though, mathematically if it is $1,200

22   as opposed to 700?  Am I right that it would mean that the

23   number of kilos decreases?

24          MR. TURNER:  I'm just not sure what your Honor means,

25   if you're right.  If you're talking about a sample of a

1    hundred --

2              THE COURT:  Let's take a sample of 101.  The one that

3    gets added in, let's assume is from Timbuktu where they're able

4    to sell heroin at $1,200 --

5              MR. TURNER:  On that point, there's no geography in

6    terms of --

7              THE COURT:  I understand.

8              MR. TURNER:  In Silk Road, there's one price for

9    everybody.  It's not like you buy from Timbuktu -- and you get

10   one price.

11             THE COURT:  I have no idea.  There were some things

12   which said ships out of X, so it may ship out of, for all I

13   know, ship out of wherever.

14             Let's put it this way:  What if somebody who is

15   desperate for money sells it at $1,200 for their price point.

16   Am I correct that using this methodology, had that been used,

17   that would decrease the number of kilos?

18             MR. TURNER:  Yes, but this is why we were arguing it

19   goes to weight.  For example, if somebody offers it for

20   1200 --

21             THE COURT:  It can't go to weight if you're offering

22   it for the fact that there were 12 kilos.  That's not weight.

23   That is a mathematical factual calculation.

24             MR. TURNER:  It goes to weight in that the jury has

25   received an explanation as to what this is.  What it is is the

1    witness took a sample size of 100 and they saw that this is the

2    highest price in that sample and that this is an extrapolation

3    in that sample.

4          If the defense wants to say, well, there could be a

5    larger sample you could have taken that could have yielded a

6    different result, that goes to weight.  It still makes it more

7    relevant -- it still makes a fact more probable than it

8    otherwise would be.  It clears the 401 bar.

9          THE COURT:  It's not a relevance issue.  It's a

10   foundation issue.

11         MR. TURNER:  In terms of foundation, the witness has

12   fully explained how he arrived at this figure.

13         THE COURT:  Let's do this:  I really feel like this is

14   one where there's not enough, but you can always put in

15   something else.  Right now, my ruling is going to be what my

16   ruling is.  And if people want to put in letters that sort of

17   go into it again, so be it.

18         MR. DRATEL:  I'm going to be preparing for summation

19   tonight.  The Court has ruled this is clear, this is not

20   statistics what they're putting in.  It's not statistics.  It

21   is cherry picking.  That's all it is.  It has no value to

22   $8 million worth of transactions.  The Court knows.  The Court

23   is agreeing, so let's just move on with it.  We can't keep

24   these things open all the time.

25         THE COURT:  I hear you.  The evidentiary record, if

F22gulb5                          Shaw - direct

```
 1   it's open, it will be open.  I take letters on a variety of
 2   topics, but I'm not going to preclude -- I'm not going to
 3   change my ruling right now, so if the government gets this in,
 4   they're going to have to call the witness back because
 5   Mr. Dratel would then be able to cross-examine him on the
 6   content of a document that I'm not allowing in right now, so
 7   there would be that.  So that's how we're going to proceed on
 8   this.
 9           MR. TURNER:  If I can make one more attempt.  The one
10   point is if you take the highest price in this sample, you get
11   a weight estimate that is way, way beyond what's required for
12   the (b)(1)(A) weights, which makes it even -- again --
13           THE COURT:  Presumably the government has in evidence
14   all this data underlying this.
15           MR. TURNER:  No, your Honor.  The actual underlying
16   data is the categories and then the amounts of money that came
17   in associated with this category.  So you're going to have
18   black tar heroin, brown heroin and then a money figure.  The
19   only way you get to the weight is by going line by line through
20   the data, which you're going to have millions and millions of
21   screens for that.  That's why you have to have a sample of some
22   sort.
23           THE COURT:  I agree, but it seems like the kind of
24   thing that you should have had a statistical expert do, not
25   this fellow who is like a computer guy.  I hear what you're
```

F22gulb5                          Shaw - direct

1     saying, which is, you were facing a difficulty in proof, but

2     you have to understand, this is such an important point that

3     unless all of the I's are dotted and T's are crossed, I am very

4     hesitant to let this in.

5               MR. TURNER:  I understand.  We would like an

6     opportunity to brief the issue.

7               THE COURT:  If the evidentiary record is still open,

8     I'll look at any issues, but as I said, the government would

9     have to be prepared to bring this fellow back because right

10    now, he's not going to be allowed to be cross-examined on this

11    document.

12              MR. TURNER:  Thank you.

13              MR. DRATEL:  I object to letting them bring him back.

14    I think it should be closed.  This is done.  We're putting on

15    our case.

16              THE COURT:  No.  I ruled right now.  It would have to

17    be a change of ruling, which has happened in the past.  All

18    right.

19              Is there anything else?

20              MR. DRATEL:  The 403 aspect of it is also very

21    important.

22              THE COURT:  The 403 aspect of it I think actually goes

23    the other way.  The 403 aspect of it I believe that it's not --

24    in terms of its probative value?

25              MR. DRATEL:  No.  It's confusing.  There's nothing

F22gulb5                         Shaw - direct

1   statistical about it.

2            THE COURT:  If you want to go to that, confusing,

3   that's a weight issue.  Then Mr. Turner is -- once we're into

4   403 --

5            MR. DRATEL:  It's confusing.  I mean, I'm just adding

6   to what has already been determined about its admissibility but

7   I'm just saying also it's not statistics.  It's made up.

8            THE COURT:  I think we're now preaching to the

9   converted.  The government will brief if it wants to.  Let's

10  take as short a break as we can reasonably make it and then

11  we'll come back.

12           THE DEPUTY CLERK:  All rise.

13           (Recess)

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F225ulb4                          Shaw - direct

1           (Witness not present)

2           THE COURT:  So, I was looking at a few cases, I have

3   only looked at a couple, and then I spoke to three

4   colleagues -- Judges here -- and I believe that the proper way

5   to proceed, looking at the cases, is as follows.  This is now

6   on 940D and I, which is the following:

7           In order for there to be a foundation laid the program

8   would have to be talked about that was used o create the random

9   sample, that all the heroin transactions and the other

10  transactions need to be in so the jury could replicate, if they

11  wanted to, manually, the exercise.  And so, since the

12  underlying data is in, the pages will have to be printed out

13  for that to occur or something else.  And then the documents

14  can come in subject to cross-examination and I need to look at

15  things much more closely overnight and it is possible that this

16  could be struck.  And so, we would go into it with our eyes

17  open.

18          I believe that striking it is a relatively discrete

19  piece and it would relate to these documents themselves, but

20  that that would be the way to proceed and that seems to be the

21  unanimous view of others and the Second Circuit in terms of

22  methodology and it going to reliability of analyses.

23          MR. TURNER:  Your Honor, I'm sorry.  What would need

24  to be struck?

25          THE COURT:  Because I have to look at this more

1   closely.

2            MR. TURNER:  If we were to offer the testimony now?

3            THE COURT:  You are going to offer it now.

4            MR. TURNER:  I see.

5            THE COURT:  Mr. Dratel is going to cross-examine it

6   now and then I may strike it after we do further examination on

7   this.

8            MR. HOWARD:  I have one question.  When you are

9   referring to underlying data do you mean all the data for the

10  transaction tables overall or transactions that occurred?

11           THE COURT:  Whichever ones you have in here for

12  heroin, cocaine, methamphetamine and LSD.

13           MR. HOWARD:  We do have spreadsheets that are quite

14  voluminous so we would offer it under 1006 as a summary

15  exhibit.  That has been produced, the underlying data to

16  defense in discovery.

17           THE COURT:  I think you have to produce the underlying

18  data so that the jury can redo the exercise itself, if it wants

19  to.

20           MR. HOWARD:  If you give us a minute we can burn the

21  spreadsheets to a disk that can be authenticated by the witness

22  but I would just need to do it with the witness.

23           THE COURT:  Look.  I know you folks have not had the

24  time that I have had to look at this.  This is the kind of

25  thing that I really wished I had been able to look at before

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1   being confronted with it just now but perhaps you folks thought

2   it was really straightforward.  I don't think it is really

3   straightforward given the testimony of this witness on this

4   issue.

5              Mr. Dratel?

6              MR. DRATEL:  A couple things.

7              One is that I don't think they should be given any

8   time to do anything.  I think we should move forward and

9   they've had plenty of time to get this stuff together.  This is

10  transparent in the sense that this is not a valid statistical

11  analysis.  It is not statistics, period.

12             But, the other thing is that I don't think it works --

13  it is something that the government claims is so important and

14  the Court agrees is very important that the jury should hear it

15  and then it be struck.  That's too late.  The damage is already

16  done at this stage of the trial on an issue of considerable

17  importance so I don't think that that is the proper way to go

18  about it.

19             The other thing is, and I understand the value of

20  consulting and all of that, but, I mean, the Court ruled.  It

21  is not the Court of Appeals that goes to other judges to go

22  overrule.  The Court heard the testimony.

23             THE COURT:  It is important that I get it.

24             MR. DRATEL:  The Court is here.

25             THE COURT:  Look.  I have consulted on all kinds of

1    issues where people have disagreed with me and I go with what I

2    believe is appropriate, but I do think sometimes when one is

3    pressed for time in dealing with these kinds of issues that it

4    is useful and, indeed, a lot of us call each other.  People

5    call me a lot including more senior judges.  We utilize the

6    experience and expertise of each other which is, I believe, a

7    useful thing to do.  Nevertheless, it is the Second Circuit

8    talking about reliability and talking about methodology as

9    within the ambit of cross-examination, not within the ambit,

10   necessarily, of a foundation.  I was characterizing it as a

11   foundational issue.  They characterize it as a reliability

12   issue which goes to cross-examination.

13              MR. DRATEL:  But the chart is wrong.  The chart is

14   wrong.  You can't have $8 million worth of heroin transactions

15   and say it is based on 100.  The chart is not accurate.  The

16   chart cannot come in as a statement of that.  It is not -- it

17   is just not -- it is not it.  I can put two numbers together

18   that have no bearing on each other and say you can

19   cross-examine on that.  The fact is the chart is not a valid

20   chart.

21              MR. TURNER:  Your Honor, I just want to make sure that

22   I am clear on what your Honor is imagining.  Are you proposing

23   that the government produce the random sample of 100

24   transactions?

25              THE COURT:  I think you have to do that for sure.  You

F225ulb4                         Shaw - direct

1    have got to produce the random sample of the 100 transactions.

2    You have to explain the program that created that random sample

3    of 100 transactions and you have got to produce the data so

4    that the jury could, itself, if they wanted to, replicate that.

5    I don't know if that is 4,000 pages, 10,000 pages or 2,000

6    pages but that's, I think, what needs to occur.

7              MR. TURNER:  When you say the data, you mean beyond

8    the 100?

9              THE COURT:  Yes.

10             MR. TURNER:  I think that we are just going to forego

11   that.  I don't think we need it.  And so, I think we are ready

12   to move on.

13             THE COURT:  All right.  So, we won't then return to

14   this topic so then I think I take it from Mr. Turner's

15   statement that they won't produce that 940D and I will not come

16   into evidence.

17             MR. HOWARD:  I think it is I and J -- sorry, H and I.

18             THE COURT:  H and I.

19             MR. HOWARD:  D was the last exhibit that we showed.

20             THE COURT:  So, H and I will remain excluded from

21   evidence based upon the government's lack of desire to put in

22   the underlying data.

23             Let's then get Mr. Shaw Back out here and we will

24   proceed.

25             Joe, you can go ahead and bring out the jury while

F225ulb4                        Shaw - direct

1    Mr. Shaw is coming out.  That's all right.

2            So, this issue is closed.  Done.  No briefing

3    tomorrow.  We are done with it.  Mr. Dratel, we are done with

4    this issue, it is not going to be reopened tomorrow.

5            MR. DRATEL:  Great.  Thank you, your Honor.

6            (Continued on next page)

1          (Jury present; witness resumes the stand)

2          THE COURT:  Ladies and gentlemen, let's be seated.

3          Tomorrow we are going to arrange to have afternoon

4    coffee service for you folks.  When I say coffee it will be

5    tea, coffee, water, something like that so you have something

6    to look forward to at this hour in the day.

7          I want to thank you all for your patience.  We have

8    Mr. Shaw back on the stand.

9          Mr. Howard, you may proceed.

10         MR. HOWARD:  The government has no further questions.

11         THE COURT:  Mr. Dratel?

12   CROSS EXAMINATION

13   BY MR. DRATEL:

14   Q.  Good afternoon, Mr. Shaw.

15   A.  Good afternoon.

16   Q.  I want to go back to Government Exhibit 901 which you

17   testified about on Thursday with respect to an SSH key.

18   A.  Yes.  Okay.

19   Q.  And that's in evidence and there were two SSH keys on the

20   Silk Road server, correct?

21   A.  Correct.

22   Q.  And there was one ending in frosty@frosty and one ending in

23   root@bcw, right?

24   A.  Correct.

25   Q.  And an SSH key essentially allows someone to have remote

1   administrative access to a computer server?

2   A.  Correct.

3   Q.  And by administrative access that means total control over

4   the site, right?  Through those keys?

5   A.  Correct.

6   Q.  Not just general administrative access but through these

7   SSH keys, correct?

8   A.  Correct.  In this case, correct.

9   Q.  So, an individual gaining access through those SSH keys

10  would be able to review and change any information in the

11  server, correct?

12  A.  The database had its own authentication which would be

13  separate, but otherwise, correct.

14  Q.  And anyone getting in through that SSH key would be able to

15  obtain information that's logged within the database or on the

16  server, correct?

17  A.  Again, the database had its own authentication, but yes,

18  correct.

19  Q.  And that would include they could get login and password

20  information for the Dread Pirate Roberts account, right?

21  A.  Depends on which -- what you mean by password information.

22  Passwords are typically stored encrypted.

23  Q.  Well, but typically, but do you know?

24  A.  I'm sorry?

25  Q.  Do you know though, with respect to that?  With respect to

F225ulb4                        Shaw - cross

1  the server?

2  A.  It is the default for the ubuntu which the server was.

3  Q.  Do you know?

4  A.  And then for the --

5  Q.  The question is do you know.

6  A.  Can you rephrase your question, please?

7  Q.  Sure.

8         You said that typically such information would be

9  encrypted.  Do you know for a fact whether that information,

10  DPR's password and login information on the server, was

11  encrypted?

12  A.  I have not verified that.

13  Q.  Now, so, by the way, with respect to, you had, on

14  Government Exhibit -- the mastermind page for the server,

15  right?

16  A.  Yes.

17  Q.  And if you log in as Dread Pirate Roberts that

18  automatically comes up, correct?

19  A.  No, it does not.  It depends which page you come from.

20  There are two login pages.

21  Q.  So which login page does it come up on automatically?

22  A.  There was a special support admin login page.

23  Q.  For the support admin page, right?

24  A.  Correct.

25  Q.  And you testified Thursday that you used both an MD5 hash

1   value and an SHA 1 -- you call it a SHA 1 or SHA?

2   A.   Shah 1.

3   Q.   So, MD5 hash and Shah 1 hash value to confirm the copies of

4   the server that you viewed, right?

5   A.   Correct.

6   Q.   And you did that to ensure that you were looking at the

7   same data that was on the original that you had imaged on a

8   copy?

9   A.   Correct.

10  Q.   There was a reason -- withdrawn.

11          You used both the MD5 hash and the Shaw 1 hash because

12  you wanted to be thorough and you wanted to be as -- you want

13  to be as reliable as possible, right?

14  A.   It was the default setting for the tool that I used so it

15  automatically calculated both for verification.

16  Q.   But it calculates both but you matched both, right?

17  A.   That's correct.

18  Q.   That's not always -- you don't have to match both, you

19  decided to match both, right?

20  A.   Yes, I did match both.

21  Q.   Not because you wanted to be forensically sound in your

22  analysis, right?

23  A.   Sure.

24  Q.   That's because MD5 hashes have some vulnerability, correct?

25  A.   Depends on the use case.

F225ulb4                          Shaw - cross

1    Q.  But you use a SHA 1 because that has more reliability,

2    right?

3    A.  Again, depends on the use case.

4    Q.  But you did it in this case, correct?

5    A.  Because it was available to me, yes.

6    Q.  Now, going back to Government Exhibit 901 and looking at

7    the key that ends the SSH key which we were just talking

8    about -- let me know when you get there.

9    A.  Thanks.

10   Q.  Looking at the key that ends in frosty@frosty and you

11   testified Thursday, I think, that the user name frosty and the

12   computer name "frosty" that are found in the SSH key are taken

13   from the system that you are coming from?

14   A.  That's correct.

15   Q.  Well, the part of the key that contains frosty@frosty is

16   what is called a comment, right?

17   A.  I don't know that for sure.

18   Q.  Well, you can generate a key ending in frosty@frosty from

19   my computer, right?  You can do it at any computer, can't you?

20   A.  That is correct.

21   Q.  Are you familiar with the program called SSH- -- withdrawn.

22        And you also talked a little bit about on direct on

23   how SSH keys work, right?

24   A.  Correct.

25   Q.  And you are familiar with how they're generated?

F225ulb4                        Shaw - cross

1    A.  Yes.

2    Q.  And you have a lot of background and training in UNIX and

3    Linux programs, the two computer systems, right?

4    A.  I have experience at both, yes.

5    Q.  And you are familiar with the manual pages associated with

6    computer programs contained in UNIX-based operating systems

7    like Macrolex or Linux?

8    A.  Yes.

9    Q.  And these manuals contain documentation for how the

10   software works, right?

11   A.  Correct.

12   Q.  And they're widely accepted in the community as being

13   reliable authority on how computer programs contained in a

14   UNIX-based operating system work, right?

15   A.  As long as updated, yes.

16   Q.  And if you look at 901, that's a file called authorized

17   keys, right?

18   A.  Correct.

19   Q.  And that file is associated with a computer program called

20   SSHD or open SSH Daemon, right?

21   A.  I believe that is correct.

22   Q.  And are you familiar with the system manager's manual for

23   that computer program SSHD?

24   A.  I have not reviewed that manual, no.

25   Q.  Isn't the comment field not used for anything other than

F225ulb4                          Shaw - cross

1    the convenience of the user to identify the key?

2    A.   Again, I don't know if that is referred to as a comment

3    field or not.  I have not reviewed the page on that.

4    Q.   With respect to the Silk Road market server image that you

5    worked on, right?

6    A.   Yes.

7    Q.   There was an image of the server captured October 8, 2013;

8    correct?

9    A.   Correct.

10   Q.   And you received the Silk Road marketplace server by

11   recreating a local copy of the server on your computer, right?

12   A.   Correct.

13   Q.   And just for purposes of shorthand, that was the server

14   ending in the IP address, last two digits .49, right?

15   A.   I don't remember the IP address off the top of my head.

16   Q.   Let's look at 603A -- Government Exhibit 603A.

17           This is the image that you used to create a local copy

18   of the Silk Road marketplace on your computer, right?  In other

19   words this is the log entry?

20   A.   That looks familiar.  Correct.

21   Q.   And if you look at the created date on the top -- I'm

22   sorry, on the left as you go down it says:  Task, status and

23   created date is Tuesday, October 8, 2013, right?

24   A.   That's what it says.  Yes.

25   Q.   And the image that you get is essentially -- not

1   essentially, the image that you get is a snapshot of what

2   exists on the computer at that moment in time, right?

3   A.   Correct.

4   Q.   Now, I want to direct your attention back to Government

5   Exhibit 936, please.  If we look at the third entry in the

6   second paragraph, the one that begins on March 14, 2013 at

7   11:26, right?

8   A.   Okay.

9   Q.   If you look at the second paragraph of that and at first it

10  says -- it says it is from friendlychemist:

11          "u dont know me but i am lucydrops supplier. the only

12  reason i lent lucydrop so much product is bcuz he showed me the

13  chat logs of u and him talking and how u made him the #1 seller

14  on silkroad."

15          Now, do you know whether that is accurate or not, that

16  statement?

17          MR. HOWARD:  Objection.

18          THE COURT:  Overruled.

19          THE WITNESS:  I do not know.

20          THE COURT:  I take it by that you mean did he see it,

21  a reference to that elsewhere?

22          MR. DRATEL:  Right.

23          THE COURT:  Was that the question?

24          MR. DRATEL:  Yes, your Honor.

25          THE COURT:  Is that how you understood the question?

F225ulb4                           Shaw - cross

1          THE WITNESS:  Yes.

2          THE COURT:  Yes?

3          THE WITNESS:  Yes.

4          THE COURT:  All right.

5   BY MR. DRATEL:

6   Q.  Further down that entry do you see the paragraph that

7   begins:

8          "i put a keylogger on lucydrops computer when he left

9   the room one day"...

10         Right?  Do you see that?

11  A.  Yes.

12  Q.  So, when you were looking at hacking software, right, which

13  you showed us on Thursday as well, can you explain what a key

14  logger is?

15         MR. HOWARD:  Objection.  Beyond the scope.

16         THE COURT:  Sustained.

17         MR. DRATEL:  Your Honor, the government read this

18  document.

19         THE COURT:  No, they can read the document, but

20  whether or not he knows about how to interpret the content is

21  different.  So, you can ask him about the matters that he went

22  over in his direct.

23         MR. DRATEL:  Your Honor, he also testified about

24  hacking software such as that, key loggers, in his direct.

25         THE COURT:  If he talked about it then certainly you

F225ulb4                        Shaw - cross

1   can go into that.  Don't tie it to the document but go ahead

2   and question him about things he otherwise testified to.

3   BY MR. DRATEL:

4   Q.  In terms of hacking software, what does a key logger do?

5   A.  Key logger?  It is my understanding that it logs your key

6   strokes.

7   Q.  When you say logs your key strokes, you mean for someone --

8   it could be done by someone who is not at the computer,

9   correct?

10              MR. HOWARD:  Your Honor, objection.  Beyond the scope.

11              THE COURT:  You know, Joe, my LiveNote has gone out.

12              I will allow this to the extent -- I can't look and

13  see what he testified to on direct as to this topic because my

14  LiveNote is not currently working.

15              MR. HOWARD:  Your Honor, if we can have a side bar we

16  can make a proffer as to that or maybe he could move on to a

17  different issue and come back once you can verify that.

18              THE COURT:  We can do it even more easily.  Why don't

19  you say do you recall testifying on direct that?  And then that

20  will remind me and it will have the benefit of reminding

21  everybody and then we can take it from there.

22  BY MR. DRATEL:

23  Q.  Do you recall testifying on direct about hacking tools and

24  reading from the screen pages about what hacking tools were

25  available on Silk Road?

1           MR. HOWARD:  Objection.

2           THE COURT:  Well, that question he can answer.

3           THE WITNESS:  I didn't read out loud any of the

4    hacking tools.  I described that there were listings for items

5    referred to as hacking tools.

6    Q.  Known as key loggers, right?

7    A.  That is correct.

8    Q.  So, when you say a key logger logs strokes, it is not by

9    the person who is actually logging them, right?  It is someone

10   who wants to know what the person, as a hacking tool -- it is

11   for someone who wants to know what the person is doing on the

12   computer while the person who wants to know is not there,

13   right?

14          MR. HOWARD:  Objection to scope and foundation and

15   form.

16          THE COURT:  Now it is sustained.

17   BY MR. DRATEL:

18   Q.  Now, let's go to page 8, please, of 936.

19          That blue portion, that's not from the chats, right?

20   A.  On this page, that is correct, it is not from the chats.

21   Q.  And all blue portions for the entire document are not from

22   the chats, right?

23   A.  They are not from the marketplace chats, that's correct.

24   Q.  They are from the forum, correct?

25   A.  From a file -- backup file from the forum, correct.

F225ulb4                        Shaw - cross

1    Q.  And that forum is available to the entire Silk Road

2    community, correct?

3    A.  That is my understanding.  Correct.

4    Q.  And it is imported into this document, correct?

5    A.  Correct.

6    Q.  So, when we are looking at the -- so, when this was taken

7    off the server, that blue part wasn't there in that chat,

8    right?

9    A.  It was not blue.  That is correct.

10   Q.  No, but it wasn't there.

11   A.  Wasn't where?  I'm sorry.

12   Q.  In other words, the next entry on the chat is the next

13   white entry, not the next blue entry; correct?

14          In other words let's parse this out.  Let's go to the

15   entry right above it, 3/15/2013 at 20:42, right?

16   A.  Yes.

17   Q.  And that's 8:42 p.m., correct?

18   A.  Correct.

19   Q.  We are talking military time here, right?  24-hour clock.

20          Okay, so then we have a blue section and then we have

21   another blue section on page 9, right?  All blue, right?

22   A.  Correct.

23   Q.  And then we have 10 which is all blue again, right?

24   A.  Correct.

25   Q.  And then we have 11 which is all blue, right?

1   A.  Correct.

2   Q.  And then we have 12 which is all blue?

3   A.  Correct.

4   Q.  And we have a part of 13 that is all blue?

5   A.  Correct.

6   Q.  Then we have 3/21/2013 at 1:33, that's the next white

7   entry, correct?

8   A.  Correct.

9   Q.  And, in fact, that white entry is the next entry on the

10  private message chat, correct?

11  A.  On the -- yeah, the Silk Road marketplace, correct.

12  Q.  So, all that blue stuff was imported into this document,

13  correct?

14  A.  Correct.

15  Q.  So, if I were to print out just the part that is white I

16  would not see any blue.  This was created for purposes of the

17  trial, right?

18  A.  It was the weaving of two different.

19  Q.  It was created for the trial, right?

20  A.  Correct.

21  Q.  Did you do it?

22  A.  I participated in the creation of this, yes.

23  Q.  It is actually occurring on a public forum -- when I say

24  public I mean for any Silk Road user, anyone with a user

25  account, anyone with a user name, anyone with access to the

F225ulb4                        Shaw - cross

1    Silk Road site, right?

2    A.   There is the one individual forum post on page 8 and then

3    the rest were one-on-one messages.

4    Q.   But on the forum page?

5    A.   On the forum site, correct, the separate site.

6    Q.   If you go to page 16, 3/26/2013, that second, the third

7    entry, the second white entry at 20:08, right?  And it says:

8              "That is interesting."

9              This is from redandwhite, right?

10   A.   Correct.

11   Q.   And it says:

12             "That is interesting. How much is it possible to sell

13   on here if we listed every product far cheaper than everyone

14   else? We have a majority hold over most of the movement of

15   products in western Canada (one of the main drug ports to North

16   America)."

17             It says that, right?

18   A.   Yes, it does.

19   Q.   Now, if we go to page 17 at March 27, 2013 at 23:38.

20             Do you see that entry?

21   A.   Yes, I do.

22   Q.   By the way, that blue one in the middle there again, that

23   belongs on the Silk Road forum, right?

24   A.   Right.  That is a message on the Silk Road forum, correct.

25   Q.   Okay, that paragraph:

1      "In those categories, I think you could be doing over

2   $1M in sales a week within a few months. It is hard to estimate

3   because it depends on how much market share you get and also

4   the site as a whole is constantly growing. You will need to

5   become very proficient at stealth shipping and packaging if you

6   aren't already. Think vacuum sealers and leaving no forensic

7   evidence on your packages. You will also want to ship from

8   multiple drop points so you can't be traced back via your

9   (fake) return address.

10      If you go through with this, I would contact some of

11   the top vendors and hire them to consult you. Ask the weed

12   vendors because you won't be competing with them and their

13   product is smelly and looked for by USPS" --

14      That would be the United States Postal Service?

15      MR. HOWARD:  Objection.

16      THE COURT:  Sustained.

17   Q.  -- "so they have to be on top of their game."

18      MR. HOWARD:  Objection to form.

19   Q.  It says that, right?

20      THE COURT:  Yeah.  What is the objection?

21      MR. HOWARD:  I thought that was the question.  I

22   didn't realize.

23      THE COURT:  Do those words appear on the page?

24      THE WITNESS:  Yes, they do.

25      THE COURT:  All right.

 1    BY MR. DRATEL:

 2    Q.  That is talking about security, correct?

 3              MR. HOWARD:  Objection.

 4              THE COURT:  Sustained.

 5              He can't talk about what the content means.  He can

 6    talk about what the content is on the page but he can't

 7    interpret the content.  So, move on.

 8              MR. DRATEL:  Your Honor, this is a witness who put the

 9    document in evidence.

10              THE COURT:  He did.  He did put it in evidence.  He

11    can't interpret what the people meant.

12    BY MR. DRATEL:

13    Q.  Let's go to April 2nd, 2013 at 20:55, page 24.

14    A.  Okay.

15    Q.  And that entry which is in the middle of the page, if we

16    can blow that up a little bit it says:

17              "Regarding image metadata, you can strip all of that

18    out and it is a good practice.  The upload page is secure, but

19    I would still have access to that metadata."

20              By the way, this is from Dread Pirate Roberts to

21    redandwhite?

22    A.  Correct.

23    Q.  So:

24              "Regarding image metadata, you can strip all of that

25    out and it is a good practice.  The upload page is secure, but

F225ulb4                         Shaw - cross

1    I would still have access to that metadata.  Of course you can

2    trust me, but what if I was compromised?  Do a search of

3    'remove image metadata.'  A decent one for windows can be found

4    here:"

5              And there is a URL, correct?

6    A.  Correct.

7    Q.  "Regarding bitcoin withdrawal, I would avoid mt gox if at

8    all possible, especially if you are withdrawing to a USA

9    account. There are many other exchanges that don't have so much

10   attention on them."

11             It says that, right?

12   A.  Yes, it does.

13   Q.  And if you look at the bottom, April 4, 2013, that one it

14   says:

15             "I can't find a surname anywhere of Lawsry."

16             L-A-W-S-R-Y?

17   A.  Yes, it says that.

18   Q.  In fact, you heard the stipulation, right, that there was

19   no person by that name?

20             MR. HOWARD:  Objection.

21             THE COURT:  Sustained.

22   BY MR. DRATEL:

23   Q.  Now, let's go to 4/6/2013 on page 26 at 57 minutes, so that

24   would be 12:57, right, after midnight?

25   A.  Correct.

F225ulb4                              Shaw - cross

1    Q.   12:57 a.m., right?

2    A.   Correct.

3    Q.   And just look at that, we will go to the third sentence:

4              "He is likely sitting on many thousands of stolen

5    bitcoins perhaps tens of thousands, so I would think we'd want

6    to "work him over" to get those funds back. They could be on an

7    encrypted drive only he can unlock."

8              Right?  It says that?

9    A.   Yes, it does.

10   Q.   Now, from your knowledge of the server, having reviewed the

11   server and the private messages, is there any way for you to

12   tell whether or not lucydrop, redandwhite, reallucydrop,

13   friendlychemist, whether they're different people or the same

14   people?

15   A.   There is -- no.  Not that I can think of.

16   Q.   Now, this set of messages occurs from March -- from page 1

17   is March 13, 2013, right?

18   A.   Correct.

19   Q.   And goes up to April 18th, 2013 -- actually, April 21st,

20   and then there is one also on June 1st, but the particular

21   string is pretty much through April 21st, right?

22   A.   Correct.

23   Q.   Going back to the SSH key for a second, that was changed

24   March 26, 2013?  Is that right?

25             THE COURT:  I'm sorry, could you have the court

F225ulb4                        Shaw - cross

1    reporter read back the question?  I missed it.

2              MR. DRATEL:  I can rephrase it.

3              THE COURT:  Either way.  My LiveNote is still not up,

4    we are trying to fix it.

5    BY MR. DRATEL:

6    Q.  Going back to the SSH keys, you testified, I believe on

7    Thursday, that it was modified -- the frosty@frosty was

8    modified March 26, 2013, right?

9    A.  Can you tell me which exhibit that was, please?

10   Q.  I think it is 603.

11   A.  900s, hopefully.

12   Q.  901?

13   A.  Thanks.  That is correct; recorded date modified was March

14   26, 2013.

15             THE COURT:  I am back in business here with LiveNote.

16             Mr. Dratel, I think you got an answer.

17             MR. DRATEL:  Thank you, your Honor.

18   BY MR. DRATEL:

19   Q.  If we can go to Government Exhibit 1201?

20             MR. HOWARD:  Objection, your Honor.  This has not been

21   admitted into evidence.

22             THE COURT:  Take it down and let's find out if it was.

23             MR. DRATEL:  It may not be, your Honor.  It was not

24   the one I was looking for.

25             THE COURT:  So you are looking for a different

F225ulb4                         Shaw - cross

1    exhibit?

2    BY MR. DRATEL:

3    Q.  Government Exhibit 1200, that is in evidence; just look at

4    the date on that, does it say March 16th?

5    A.  Yes, it does.

6    Q.  2013?

7    A.  Yes.

8           MR. HOWARD:  Objection, your Honor.  This is

9    argumentative.

10          THE COURT:  Well, I don't know where it is going yet,

11   so overruled.  Let me see where it is going.

12          MR. DRATEL:  It is precisely what the government does

13   in all of its examinations.

14          THE COURT:  Let's see where it goes.  I am overruling

15   the objection.  Go ahead.

16   BY MR. DRATEL:

17   Q.  I am saying that this is March 16, 2013, right; and there

18   is a post by frosty to stackoverflow, right, about code,

19   correct?

20   A.  I'm not familiar with this exhibit but it is what it looks

21   like, yes.

22   Q.  Then if we go to the next entry in this exhibit, if we go

23   up further, okay, if we go to -- that's March 16, 2013 and the

24   last modification of the authorized user key for the 16789SH

25   was March 26, 2013, correct?

F225ulb4                              Shaw - cross

1   A.  Correct.

2   Q.  And you don't know what it was before then because you just

3   have what it was changed -- what became of it as of March 26,

4   2013, right?

5   A.  That is correct.

6   Q.  With respect to 940A that is in evidence, you said that the

7   null category was not included in your analysis?

8   A.  It is included in Exhibit 940 -- or 940A.

9   Q.  940As it included, but when you did the pie chart you

10  didn't include it, correct?

11  A.  That is correct.

12  Q.  And so, the null transactions account for about 11 or 12

13  percent of the entirety, right, of the transactions?

14  A.  Doing a quick double-check here.  That's approximately

15  correct.

16  Q.  And the reason they're null, just again, is because you

17  could not categorize them, correct?

18  A.  That is correct.

19  Q.  Let's talk about 940D and the total number of commissions

20  over the life the Silk Road is 642,455 bitcoin, right?

21  A.  That's what it says.  Correct.

22  Q.  And the dollar value of $13 million is based on the value

23  of bitcoin at the time of the transaction, correct?

24  A.  As it was recorded in the database.

25  Q.  So, in other words, if the database recorded bitcoin value,

F225ulb4                          Shaw - cross

1    let's say, in 2012, bitcoin value might be different in 2013,

2    correct?

3    A.   Correct.

4    Q.   And that would influence not the value -- not the number of

5    bitcoin but in fact the value of the money, correct, in terms

6    of exchange into dollars, right?

7             Let me pose it a simpler way for everybody's benefit,

8    including mine.

9             If a transaction in October of 2012 is 1 bitcoin is

10   worth $4.50, right, that would look there at 1 bitcoin and at

11   the bottom, U.S. equivalent would be $4.50, right?

12   A.   Correct.

13   Q.   If that same transaction occurred with bitcoin at a value

14   of $12 a bitcoin, it would still be 1 bitcoin on the

15   commissions but the dollar value -- U.S. dollar equivalent

16   would be $12, right?

17   A.   That's what the database would -- should reflect, yes.

18   Q.   And so that the database only reflects the value of bitcoin

19   in the transaction, correct?  Right?

20   A.   Correct.

21   Q.   Did you look at the value of bitcoin over time?

22   A.   No.  I was pulling it from the database.  The value

23   recorded in the database.

24   Q.   Let me show you what is in evidence as Defendant's Exhibit

25   B.   It is in evidence.  This is a graph of the value of bitcoin

F225ulb4                           Shaw - cross

1    over time and so in the context of your chart which is 940D, it

2    doesn't tell you what the value is of those commission bitcoins

3    at any point in time other than what is in the database at the

4    time of the transaction, correct?

5    A.  It tells you what the value was recorded in the database.

6    Q.  Right; but it doesn't tell you what happens a month or a

7    year later if those bitcoins are still held and whether the

8    price has appreciated.  It is not reflected in that chart?

9    A.  Yes.  To my understanding that that field does not change,

10   correct, once entered in.

11   Q.  So that if you had 100 bitcoins at a dollar, right, and in

12   2012 and you held on to them until November 2013 as on that

13   graph when it peaks at, and we will say $1,000, just for round

14   numbers, that 100 bitcoins at a dollar each would be worth a

15   thousand times more, correct?

16           MR. HOWARD:  Objection.  Beyond the scope.

17           THE COURT:  Well, no.  It is, I think, related to what

18   he was saying before but I think it has been asked and

19   answered.  But, I will allow this last question.

20           MR. DRATEL:  Thank you, your Honor.

21           THE WITNESS:  Yeah, the value of the bitcoin varies

22   wildly.

23   BY MR. DRATEL:

24   Q.  And it would be a thousand times more but it wouldn't be

25   reflected on 940B?

F225ulb4                          Shaw – cross

1    A.   It is my understanding, yeah, that the value in the

2    database did not change.

3    Q.   I want to draw your attention to Government Exhibit 935.

4    If you look at that first entry, this is from shefoundme to

5    KingofClubs, June 10th, 2013.  Right?

6    A.   Correct.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.   And you testified about this Thursday?

2   A.   Correct.

3   Q.   And this is about shefoundme ordering fake IDs, right?

4        MR. HOWARD:   Objection.

5        THE COURT:   Hold on.  Well, I think the document says

6   what it says.  I don't want the witness to be interpreting it,

7   but if you want to read something into the record, you can do

8   that.

9        MR. DRATEL:   Okay.

10  Q.   Let's read from the top "Hi I need a few of your highest

11  quality IDs.  I notice several attributes you list:  Hologram,

12  UV, scannable, raised lettering.  Can you give me a rundown of

13  the importance of these attributes and what they are needed

14  for?  For example, which are needed to pass airport security

15  for a domestic flight?"

16       Right?

17  A.   Yes, it says that.

18  Q.   "Which are needed to get through being pulled over by a

19  cop."  Right?

20  A.   Yes.

21  Q.   And if you go to page two, again, from shefoundme

22  to -- June 10, 2013, shefoundme to KingOfClubs, right?

23  A.   Correct.

24  Q.   And then if you look at the third-to-the-last paragraph

25  down at the bottom, it's a one-line paragraph, "Can you comment

F22gulb7                          Shaw - cross

1    on the suitability of using any of these IDs to board a

2    domestic USA flight."  Right?

3    A.  Yes, it says that.

4    Q.  Then it says "Can you please comment on what the various

5    attributes mean.  For example, does UV mean if it is held under

6    a UV light then some pattern appears that makes it look legit.

7    If it doesn't have UV, does that mean if it is held under UV

8    light, it will be exposed as a fake?  In general, how much

9    scrutiny can these cards hold up against?"

10           Right?

11   A.  Yes.

12   Q.  Now, if we go to page 11, July 18, 2013, the one right in

13   the middle of page 132606, right?

14   A.  Okay.

15   Q.  From shefoundme to KingOfClubs:  "Looks like it got stuck

16   in customs.  The last step is 'inbound out of customs' on the

17   tenth.  Have you ever had something seized or any of your

18   customers get in trouble?"

19           Right it says that?

20   A.  Yes, it does.

21           MR. DRATEL:  May I have a moment, your Honor.

22           THE COURT:  Yes.

23   Q.  With respect to SSH keys and what we talked about before

24   with respect to a manual, right, the system manager's manual,

25   are you familiar with them?

1    A.  I'm familiar with man pages in general.

2    Q.  So are you familiar with the SSH-D system manager's manual?

3    A.  I have not reviewed that one; no.

4    Q.  But you testified here about SSH keys, right?

5    A.  That is correct.

6              MR. DRATEL:  Nothing further.  Thank you.

7              THE COURT:  All right.  Thank you.

8              Mr. Howard.

9              MR. HOWARD:  I'll be very brief.

10             THE COURT:  All right.

11             MR. HOWARD:  Mr. Evert, can you please publish

12   Government Exhibit 936 again, please.

13   REDIRECT EXAMINATION

14   BY MR. HOWARD:

15   Q.  Mr. Shaw, this is a compilation of messages involving the

16   Dread Pirate Roberts, correct, other than the forum posts?

17   A.  That's correct.

18   Q.  Can we go to page seven, please.  And the one that's shaded

19   here on blue on page eight, that's the forum post, right?

20   A.  That is correct.

21   Q.  A forum post can be seen by many users on Silk Road, right?

22   A.  That's correct.

23   Q.  Can we go to the next page.  Isn't it true that you

24   testified that all of the other messages shaded in blue were

25   private messages taken from the forum database, correct?

1    A.   That's correct.

2    Q.   Those are one-to-one private messages involving Dread

3    Pirate Roberts, correct?

4    A.   Correct.

5    Q.   So 936, apart from that forum post, contains private

6    messages taken from the private message database on the

7    Marketplace, correct?

8    A.   Correct.

9    Q.   And also private messages between Dread Pirate Roberts and

10   other individuals taken from the forum database?

11   A.   Correct.

12   Q.   And all of these were contained on the servers you

13   reviewed?

14   A.   Yes, they were.

15   Q.   You testified about MD5s and SHA1s on cross, right?

16   A.   Yes, I did.

17   Q.   And you testified that whether or not you used one or both

18   comes down to the use case, correct?

19   A.   Correct.

20   Q.   What do you mean by "use case"?

21   A.   For the purposes -- there are multiple use cases for

22   hashing a file.  Typically in the forensic world, users will

23   create what's called a white list, you know, known files.  And

24   so it's common to create hash values of those files so that

25   way, you know, every Windows computer ever has notepad.exe, so

F22gulb7                           Shaw - redirect

1    if you create a hash value of that file, whenever you import

2    your new image, you can quickly exclude that image.  So it's a

3    process for quickly excluding files.  So it's fairly common to

4    use hash values to eliminate files that need review and there

5    was, you know, a few years ago some academic papers and studies

6    on weaknesses in MD5 for that purpose.

7    Q.  So for the purpose of creating forensic images, however,

8    are you aware of weaknesses in MD5?

9    A.  For comparing whether a file has changed, you know, whether

10   it's been under control and whether it's changed from point A

11   and point B, MD5 is still used; yes.

12   Q.  So relying on MD5 alone would be sufficient?

13            MR. DRATEL:  Objection.

14            THE COURT:  Sustained.

15            You can ask a different way.

16   Q.  Is MD5 alone accepted in the community as a way of

17   verifying forensic copies?

18            MR. DRATEL:  Objection; form.

19            THE COURT:  I'll allow it.

20   A.  MD5 is a -- still considered a technique for verifying if a

21   file changed in transit.  With hash values, if they're -- that

22   weakness that I discussed, something else will also change in

23   the process.  So the size of the file will likely change almost

24   always will get larger.  Additionally, if it's, like, a jpeg

25   type image, that the image would get corrupted.  So when it

1    comes to verifying whether a file changed in transit, it's

2    still considered a valid process.

3              MR. HOWARD:  No further questions, your Honor.

4              THE COURT:  Mr. Dratel.

5    RECROSS EXAMINATION

6    BY MR. DRATEL:

7    Q.  It's not most valid process, though, is it, right?  SHA1 is

8    more reliable than MD5?

9    A.  SHA1 is the newer standard that --

10   Q.  I'm sorry --

11   A.  The newer process that doesn't have the same weakness as

12   MD5.

13   Q.  And with respect to the 936 of those posts, those

14   were -- the blue sections were imported from a

15   different -- that's a separate conversation going on from the

16   white ones, right --

17   A.  That is correct.

18   Q.  -- in terms of where it's occurring?

19   A.  Correct.

20             MR. DRATEL:  Thank you.  Nothing further.

21             THE COURT:  All right.  Thank you.  You may step down,

22   sir.

23             THE WITNESS:  Thanks.

24             (Witness excused)

25             THE COURT:  Mr. Howard.

1            MR. HOWARD:  The government would like to read one

2     last chat into evidence.

3            THE COURT:  All right.

4            MR. HOWARD:  229D as in dog, please.

5            THE COURT:  All right.

6            MR. HOWARD:  This is from page 49 of a 139-page chat

7     log, October 24, 2012:  "inigo: if you dont mind me asking.

8     what do you tell your family that you do?

9            Myself: opportunity of a lifetime, of many lifetimes

10           Myself: I live a modest life still

11           Myself: security requires it

12           Inigo: absolutely

13           Myself: so I have my little alibi

14           Myself: I'm clever, so I can bs when I need to

15           Myself: but I hate having to lie to people

16           Inigo: nothing raises a red flag more then a nobody

17    becoming a big somebody out of no where

18           Inigo: yeah i hear ya

19           Myself: and friends will tell me shit like, why don't

20    you do this or that

21           Myself: like I have all this free time

22           Myself: I just want to scream at them "because i

23           Myself: 'm running a goddam multi-million dollar

24    criminal enterprise!!!!"

25           The government rests, your Honor.

F22gulb7                          Shaw - recross

1           THE COURT:  Thank you, Mr. Howard.

2           Defense.

3           MR. DRATEL:  I have some applications.

4           THE COURT:  Save the applications for the end of

5    the -- we'll hold on until the end of the court day.  The

6    defense can proceed.

7           MS. LEWIS:  The defense calls Karen Steib Arnold.

8           (Witness sworn)

9           THE COURT:  Ms. Steib Arnold, please be seated.  And

10   it will be important for you to pull the chair up and to adjust

11   the microphone so that you can speak into it clearly.  And

12   there will be some water there as soon as we get a new pitcher

13   for you.

14          THE WITNESS:  Great.  Thank you.

15          THE COURT:  Ms. Lewis, you may proceed.

16    KAREN STEIB ARNOLD,

17        called as a witness by the Defendant,

18        having been duly sworn, testified as follows:

19   DIRECT EXAMINATION

20   BY MS. LEWIS:

21   Q.  State your name for us again.

22   A.  Karen Steib Arnold.

23   Q.  How old are you, Mrs. Arnold?

24   A.  I'm 72.

25   Q.  Where do you live?

F22gulb7                      Steib Arnold - direct

1   A.  I live in Austin, Texas.

2   Q.  Are you a Texas native?

3   A.  I lived in Texas since I was three years old.

4   Q.  What do you do for work?

5   A.  I'm a mental health counselor.

6   Q.  What does that job involve?

7   A.  I work with people who have problems that can be solved

8   with talk therapy.  I also work with some chronic pain

9   sufferers who have both physical therapy and talk therapy.  I

10  help people to explore their inner life and to come to see

11  things in ways where they can navigate life comfortably.

12  Q.  In what context do you perform these services?

13  A.  I've worked in the clinics.  I also have a private

14  practice.  Right now I'm associated with a chronic pain clinic

15  and I have a private practice.  I've also worked in a rape

16  crisis clinic with sufferers of -- survivors of childhood

17  sexual abuse and rape.  And I have also worked with grief and

18  dying-type -- people who are dying and those who are surviving

19  them and grieving.  And I've worked with other chronic pain

20  patients.

21  Q.  Before your private practice, did you have something else

22  that you did?

23  A.  I was a social worker for many years.

24  Q.  And how long have you done this work collectively, the

25  private practice and the social work?

1    A.  About 45 years.

2    Q.  What are the ages of the people that you assess?

3    A.  Pretty much all ages, not babies, but school-age children

4    to geriatrics.

5    Q.  And what is your education background?

6    A.  I have a Master's degree and every year I get continuing

7    education.

8    Q.  What is your Master's in?

9    A.  Counseling psychology.

10   Q.  Are you familiar with Ross Ulbricht?

11   A.  Yes.

12   Q.  And how are you familiar with Ross?

13   A.  Ross' family, our family are kind of intertwined.  We're

14   like twin families.  See, I'm good friends with his mother.  My

15   husband is good friends with his dad.  And we have two children

16   the same ages as Ross and Cally.  So all the time our kids were

17   growing up, we did things together as families and with other

18   families, we'd go to the beach, go sailing.  I keep their kids,

19   they keep my kids.  We were twins.

20   Q.  And how long have you known Ross?

21   A.  His whole life.

22   Q.  And do you see Ross in the courtroom today?

23   A.  Where is Ross?  Yes, I do.  He has a brown shirt and blue

24   collar.

25   Q.  Have you kept in touch with Ross over the years?

F22gulb7                          Steib Arnold - direct

1    A.  Oh, yes.

2    Q.  And is that including after he graduated from college and

3    graduate school?

4    A.  Yes.  Definitely.

5    Q.  And he was back in Austin at that point?

6    A.  Yes.

7    Q.  And do you have any knowledge of what other people think of

8    Ross?

9    A.  Well, sure yes, I do.

10           MR. TURNER:  Objection.

11           THE COURT:  Why don't you -- depending upon where

12   that's going to go, let's talk about her first, all right.

13           MS. LEWIS:  Yes.

14           THE COURT:  Thank you.

15   Q.  So in what context have you -- do you have knowledge of

16   what people think of Ross?

17           MR. TURNER:  Objection to form.

18   A.  We have a community of people --

19           MR. TURNER:  Objection to form.

20           THE COURT:  We'll just have you talk about --

21   Q.  Do you personally have knowledge of what people think of

22   Ross or what Ross -- what was your personal interaction with

23   Ross over time?

24   A.  Well, depending on the age, because as I said, I've known

25   him all his life when he was --

1   Q.  So we'll take it in portions then.  Let's say when he was

2   young during his school years.

3   A.  Well, he would stay with us at our house.  Our kids would

4   stay at his house.  We'd all visit together.  Because, you

5   know, to have a family that matches like that is pretty

6   special, so we spent a lot of time together.  And I was around

7   Ross a lot as he was a little kid and I was an adult when he

8   was little.

9   Q.  And through his teen years, high school years, what was the

10  context of those connections with Ross?

11  A.  The same thing that we did together, things together as

12  families, but it changes of course, when kids grow up.  He

13  began to see me as a friend as well as an adult because he was

14  becoming an adult, so I would say he was my friend and the

15  child of one of my friends.

16  Q.  And then later on after he graduated college and was back

17  in Austin, did you see him then, too, and what was the context

18  of that relationship?

19  A.  Yes.  Similar, except that Ross was older, so

20  sometimes -- I mean, I remember once he lent me his car because

21  mine was in the shop.  I would see him either when his parents

22  were there or when they weren't, but we always kept in touch.

23  We were almost like relatives the way our families related.

24  Q.  Okay.  Do you have knowledge of other people's

25  relationships with Ross?

1    A.  Well, sure.  Yes, I do.  We were -- there are many families

2    with kids that got together and did things and had activities

3    together, so I knew all of them.  We were friends.  We'd have

4    parties or go to the beach or go sailing, so I knew a lot of

5    people who were in that same group.

6    Q.  And was this at all those different stages in his life that

7    you spoke about as a younger and teen years and after college?

8    A.  Yes.  Yes.

9    Q.  Do you have knowledge of what those other people thought of

10   Ross?

11              MR. TURNER:  Objection.

12              THE COURT:  Sustained.  You can ask it in a different

13   way.  And I assume that you'll get there.

14   Q.  Are you familiar with Ross' reputation in the community?

15   A.  Yes.

16   Q.  And have you discussed his reputation with other people in

17   the community?

18   A.  Yes, I have.

19   Q.  And have you talked to them about their impressions of

20   Ross?

21   A.  Yes.

22   Q.  And have you talked to them about his reputation for

23   peacefulness and nonviolence?

24   A.  Yes.

25   Q.  And what is Ross' reputation for peacefulness and

F22gulb7                         Steib Arnold – direct

1    nonviolence?

2                 MR. TURNER:  Objection.

3                 THE COURT:  Sustained.

4                 MS. LEWIS:  May I lay a foundation, your Honor, the

5    number of people, who they are?

6                 THE COURT:  I don't think that's the issue.

7                 MS. LEWIS:  Can we have a side bar, your Honor?

8                 THE COURT:  Sure.

9                 (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F22gulb7                              Steib Arnold - direct

 1              (At the side bar)

 2              THE COURT:  All right.  So that I understand, why

 3     don't you tell me what rule that you are thinking you're

 4     operating under so we're on the same page?

 5              MS. LEWIS:  804 and 805 involving reputation in the

 6     community.

 7              THE COURT:  You mean 608?

 8              MS. LEWIS:  I'm sorry.  It's 404(a) and 405.

 9              THE COURT:  This is why I wanted to ask you because I

10     was looking at 608.

11              MS. LEWIS:  I misspoke.

12              THE COURT:  That's all right.  Let me take a quick

13     look.

14              MR. TURNER:  Where are we?

15              THE COURT:  405.

16              MS. LEWIS:  404(a).

17              THE COURT:  Yes.  I'll allow the question under 405.

18     Let me ask Mr. Turner.

19              MR. TURNER:  Partly it was a leading question.

20              THE COURT:  I understand.  I'll allow a little bit

21     with the character witness.

22              Thank you, Ms. Lewis.

23              (Continued on next page)

24

25

 1                (In open court; jury present)

 2                THE COURT:  Do you want the question reread or just

 3     ask it?

 4                MS. LEWIS:  I'll reask it.

 5     Q.  Do you have any knowledge of Ross' reputation in the

 6     community for peacefulness and nonviolence?

 7     A.  Yes, I do.

 8     Q.  What is that reputation?

 9     A.  Everyone I know who knows Ross sees him as a very peaceful

10     and nonviolent person.  He's compassionate, gentle; he always

11     has been.  From the time he was a little child, he's a very

12     gentle and compassionate person.

13                MS. LEWIS:  Thank you.

14                THE COURT:  Thank you.

15                Mr. Turner, anything from you, sir?

16                MR. TURNER:  No questions.

17                THE COURT:  Thank you.  You may step down, ma'am.

18     Thank you very much.

19                THE WITNESS:  Thank you.

20                (Witness excused)

21                THE COURT:  Would the defense like to call its next

22     witness, please.

23                MS. LEWIS:  The defense calls Daniel Davis.

24                THE COURT:  Mr. Davis, please to the stand.

25                (Witness sworn)

F22gulb7                         Steib Arnold - direct

1          THE COURT:  Mr. Davis, sir, please be seated and it

2     will be important for you to pull the chair up so you can speak

3     directly into that mic. and there's water there if you want it

4     at any point in time.

5          THE WITNESS:  Okay.

6          THE COURT:  Ms. Lewis, you may proceed.

7          MS. LEWIS:  Okay.

8      DANIEL JEFFERSON DAVIS,

9          called as a witness by the Defendant,

10         having been duly sworn, testified as follows:

11    DIRECT EXAMINATION

12    BY MS. LEWIS:

13    Q.  Can you state your name, sir.

14    A.  Daniel Davis.

15    Q.  How old are you?

16    A.  I'm 30 years old.

17    Q.  Where do you live?

18    A.  Austin, Texas.

19    Q.  And are you from Austin originally?

20    A.  Yes, I am.

21    Q.  Where do you currently work?

22    A.  I work for the City of Austin, Watershed Protection

23    Department.

24    Q.  What do you do?

25    A.  I'm a GIS analyst, which is a -- computer mapping

F22gulb7                          Davis - direct

1   essentially.

2   Q.  And how long have you worked in that position?

3   A.  I've been there for seven years.

4   Q.  And what is your educational background?

5   A.  I have a Bachelor of Science in Environmental Science.

6   Q.  Are you familiar with Ross Ulbricht?

7   A.  Yes, I am.

8   Q.  And how are you familiar with him?

9   A.  We went to school together, middle school and high school,

10  so I've known Ross for 17 years, 18 years.

11  Q.  Do you see Ross in the courtroom today?

12  A.  Yes, I do.

13  Q.  Can you identify him by an article of clothing that he's

14  wearing?

15  A.  He has a gray sweater and a blue collar.

16  Q.  Have you kept in touch with Ross over the years?

17  A.  Yes, I have.

18  Q.  And did you keep in touch with him -- in what context do

19  you know him?  Since when?

20  A.  I'm sorry?

21  Q.  And you know him since when again?

22  A.  Since middle school, high school, so the past 17 years or

23  so.

24  Q.  And did you keep in touch with him after high school?

25  A.  Yes, I did.

1   Q.  And what about in college?

2   A.  Not so much when we were in college.  We went to different

3   schools.  I was in Oregon but after college, yes.

4   Q.  And when did you resume your friendship after college on a

5   regular basis?

6   A.  Probably 2010, 2011, back in Austin.

7   Q.  Do you have knowledge of what Ross' reputation is in the

8   community?

9   A.  Yes, I do.  I'd say Ross has a good reputation.

10  Q.  Let me ask in what community do you have that contact?

11  A.  I mean, we have a pretty close friend group.  So Ross knows

12  my wife and my mother and several of our other friends.

13  Q.  And does this also include the community of the people that

14  you knew growing up with him in high school and college?

15  A.  Yeah.  We have several friends from back then that are

16  still good friends together.

17  Q.  Do you have any knowledge about his reputation for

18  peacefulness and nonviolence?

19  A.  Yes, I do.

20  Q.  And what is his reputation?

21  A.  It's very good.  I mean, he's one of the most peaceful

22  people I know and his reputation among our friend group is the

23  same as being a very generous, kind, peaceful person.

24  Q.  Thank you.

25          MS. LEWIS:  No further questions.

1              THE COURT:  Thank you.

2              Anything from you, Mr. Turner?

3              MR. TURNER:  Briefly.

4    CROSS-EXAMINATION

5    BY MR. TURNER:

6    Q.  Good afternoon.

7    A.  Good afternoon.

8    Q.  So you are friends with Mr. Ulbricht for a long time?

9    A.  I'm sorry.

10   Q.  You were friends -- you have been friends with Mr. Ulbricht

11   for a long time?

12   A.  Yes.  Yes, that's true.

13   Q.  He never told you that he created the Silk Road website?

14   A.  No, he did not.

15   Q.  He never told you he grew illegal drugs?

16   A.  No.  We never discussed that.

17   Q.  Never told you he grew them and sold them on Silk Road?

18   A.  No.

19   Q.  Never told you he lived under a fake name for a while?

20   A.  No, he never told me that.

21   Q.  He never told you that he ordered nine fake IDs for himself

22   in different states?

23             MS. LEWIS:  Objection.  Improper and scope.

24             THE COURT:  Well, overruled.  But you can -- why don't

25   you rephrase the questions.

F22gulb7                          Davis – cross

1    Q.   Did he ever tell you that he ordered nine fake IDs for

2    himself?

3              MS. LEWIS:  Objection.

4              THE COURT:  Overruled.

5    A.   No.

6              MS. LEWIS:  Can I have a side bar.

7              THE COURT:  No.

8              MR. TURNER:  No further questions.

9              THE COURT:  Ms. Lewis --

10             MR. DRATEL:  Before the next --

11             THE COURT:  But you're all set with this witness?

12             MS. LEWIS:  Yes.  No further questions.

13             THE COURT:  Sir, you may step down.  Thank you.

14             THE WITNESS:  Thank you.

15             (Witness excused)

16             THE COURT:  We'll get the witness next.  Let's call

17   the next witness and get the witness on the stand, but we'll

18   have a side bar in the meantime so we can use our time

19   efficiently.

20             Who is the next witness?

21             MS. LEWIS:  Thomas Haney.

22             (Continued on next page)

23

24

25

1          (At the side bar)

2          MS. LEWIS:  Under Second Circuit case law, *United*

3  *States v. Orshats* (ph) this line of questioning is improper of

4  a character witness, a lay character witness, such as friends

5  or a neighbor.  That case says that guilt-assuming hypothetical

6  questions when testifying about a defendant's reputation for a

7  character trait or expressing an opinion about such a trait are

8  impermissible.

9          THE COURT:  Is that the case or your notes?

10         MS. LEWIS:  It's just a note.  You are welcome to see

11  it.

12         THE COURT:  I'm looking at, in the rules, once you've

13  opened the door to certain kinds of things, then it opens the

14  door to specific instances of conduct.

15         MS. LEWIS:  In that regard, the *United States v.*

16  *Danblue*, which is also a Second Circuit case, actually says

17  that direct examination does not open the door in that regard

18  to cross-examination that assumes the defendant's guilt with

19  respect to the charged crime, which is what this question does.

20         THE COURT:  Double-teamed?  That's okay.

21         MR. DRATEL:  You haven't disallowed it on the other

22  side.

23         THE COURT:  That's all right.

24         MR. DRATEL:  They can't ask questions about candor as

25  a trait when the direct exam is about peacefulness and

 1  violence.  They can ask about peacefulness and violence, but

 2  they can't open it up to other traits.

 3              THE COURT:  I think this is going to go fairly

 4  quickly, and it's probably not worth spending a lot of time on.

 5              MR. TURNER:  In terms of guilt-assuming questions,

 6  starting the Silk Road website is something they've opened.

 7              MR. DRATEL:  That's a different trait.  That trait is

 8  not at issue.

 9              THE COURT:  I hear you.  Mr. Dratel's point is if

10  they're going to ask about peacefulness, then we should limit

11  it to peacefulness.

12              MR. TURNER:  He's not charged with being nonpeaceful.

13  He's charged with --

14              THE COURT:  I know, but you brought in instances of

15  some violent conduct, so I would certainly allow that.  This

16  will be quick I assume.

17              MR. TURNER:  Yes.

18              THE COURT:  The next one is going to be similar?

19              MS. LEWIS:  Yes.

20              THE COURT:  Then the other two witnesses are going to

21  be here in the morning?

22              MS. LEWIS:  I just got a text message from one of them

23  that his flight was waylaid to Cincinnati and won't arrive I

24  believe until late tonight.  That's assuming he gets out.

25              THE COURT:  We're not expecting to call him right now.

2017
F22gulb7                    Davis - cross

1    We're close enough to 5:00.  That's all right.

2              Something else?

3              MR. HOWARD:  The only it goes to impeach the witness'

4    actual knowledge of the --

5              THE COURT:  What I'm saying is, let's just take this

6    relatively straightforward for the next witness and just I

7    think we can avoid it.  I don't think this is something we need

8    to do.

9              MR. DRATEL:  Very good.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F22gulb7                          Davis - cross

1              (In open court)

2       THOMAS HANEY,

3            called as a witness by the Defendant,

4            having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MS. LEWIS:

7    Q.  State your name, please.

8    A.  Thomas Haney.

9    Q.  How old are you?

10   A.  Thirty-one.

11   Q.  And where do you live?

12   A.  Cape Charles, Virginia.

13   Q.  And have you always lived in Virginia?

14   A.  No.  I lived out west for the last eight years in different

15   places and I grew up in Austin, Texas.

16   Q.  And how long did you live in Austin for?

17   A.  From when I was seven until 18.  I left in 2002.

18   Q.  Do you still have family and friends in Austin?

19   A.  Yes.

20   Q.  Do you go back to visit them?

21   A.  Yes.

22   Q.  About how often is that?

23   A.  Once or twice a year since 2002.

24   Q.  Where do you currently work?

25   A.  I work at the West Shelton Smoke Jumping Base in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Summers and I do clam aquaculture in the winters in Virginia.

2    Q.   What is your educational background?

3    A.   I went to college at Prescott College in Arizona for

4    environmental studies and didn't finish when I went first, but

5    I just reenrolled to finish.

6    Q.   Are you familiar with Ross Ulbricht?

7    A.   Yes.

8    Q.   How are you familiar with him?

9    A.   We went to high school together.  We played on the soccer

10   team together.  And we just not to know each other over the

11   years, more after high school really than when we were in high

12   school.

13   Q.   And how long have you known Ross for?

14   A.   I guess 15 years since we were about 15 or 16 is when I

15   first met him.

16   Q.   And do you see Ross in the courtroom today?

17   A.   Yes.

18   Q.   Can you identify him by an article of clothing he is

19   wearing?

20   A.   He's got a gray sweater and a blue collar sticking out of

21   it.

22   Q.   Have you kept in touch with him over the years?

23   A.   I've seen him often over the years.  We didn't really call

24   or email, but I don't really keep in touch with many people

25   that way and I don't know if Ross does either, but I've seen

1   him many times over the years and spent time with him.

2   Q.   In what context did you see him?

3   A.   There were a couple of times that I was with him and his

4   parents down in Costa Rica at their home for a fairly extended

5   period of time both times.  And in and around Austin, we'd see

6   each other at Christmas and whenever I was in town.  And yeah,

7   he'd come over to our parents' house or we'd go out swimming,

8   playing Frisbee, various things.

9   Q.   Do you have a group of people in common that you see

10  together when you visit him or when you visit each other?

11  A.   Yes.  Generally there are a mutual group of friends that we

12  know.

13  Q.   Where are those friends from?

14  A.   Mostly Austin, actually entirely Austin.

15  Q.   They're high school friends?

16  A.   Yeah, high school friends.  Yeah, I guess high school

17  friends, yeah.  None from college.

18  Q.   In addition to that or are there other people either way

19  over the years?

20  A.   No.  I'd say it's all high school friends that we have in

21  common basically.

22  Q.   And do you have any knowledge of Ross' reputation amongst

23  those friends in that community?

24  A.   Yes.

25  Q.   Do you have any knowledge about his reputation for

1   peacefulness and nonviolence?

2   A.  Yes.

3   Q.  And what is his reputation for peacefulness and

4   nonviolence?

5   A.  Just that he is an extremely calm, kind, and loving person

6   and that's something that always impresses everyone that really

7   knows him that I've talked to him about him.

8           MS. LEWIS:  Thank you.  No further questions.

9           THE COURT:  Mr. Turner, anything from you?

10          MR. TURNER:  No.

11          THE COURT:  Thank you.  You may step down.

12          (Witness excused)

13          THE COURT:  Ladies and gentlemen, I think it makes

14  sense to break for the afternoon.  And is there anybody else --

15  is tomorrow morning a better time to pick up?

16          MR. DRATEL:  I think so.

17          THE COURT:  We'll pick up tomorrow morning.  I want to

18  remind you not to talk to each other or anybody else about this

19  case.

20          I hope to have an update for you tomorrow that will be

21  pretty clear about where we are but you see that we are now

22  into the defense case.  I think that I'll have some further

23  information for you tomorrow.

24          Joe is going to order lunch for you now and through

25  the end of trial, so hopefully he'll vary the menus and we'll

F22gulb7                              Haney - direct

1    also get you folks some sort of afternoon snack if there's

2    something in particular in terms of soda or drink that you

3    would like -- no alcoholic beverages -- then let Joe know.  We

4    are limited in terms of what the courthouse has but we do want

5    to make you comfortable.

6           Thank you for putting up with the weather this morning

7    and getting in here.  I know it may have been a bit of a

8    challenge.  And we'll see you folks tomorrow.  Goodnight.

9           (Jury excused)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  Let's all be seated.  I think the first

3     order of business is to take up the applications, Mr. Dratel,

4     that I told you we would take up at the break and then we'll go

5     into scheduling after that.

6              MR. DRATEL:  Yes, your Honor.  Pursuant to Rule 29 of

7     the Federal Rules of Criminal Procedure, I move for -- if I can

8     find my notes for a second -- I move for a judgment of

9     acquittal on all seven counts.  And with respect to some of

10    the -- I want to lay out some of them in a little more detail.

11             With respect to the forgeries count, Count Six,

12    there's no venue and there's no evidence of Mr. Ulbricht's

13    involvement or intent or agreement in any respect with respect

14    to conspiracy.

15             With respect to the hacking, the conspiratorial aspect

16    of it, the only purchase that's in evidence is by an

17    undercover, so that would not qualify as a conspiratorial act

18    or at least to make a conspiracy, let's put it that way.  And

19    there's no evidence of any intent by Mr. Ulbricht with respect

20    to the usage of these programs, which is something obviously we

21    addressed in the pretrial motions as well.

22             With respect to the other counts, Count Four, there's

23    no evidence that he supervised, managed or organized five

24    different people.  There's no evidence as to identity of these

25    people.  So, that is insufficient.  The government is also, and

1   this obviously goes to a certain sense the legal argument, the

2   government has not identified a series of violations with

3   respect to the 848 count.

4           With respect to the other counts, the other

5   narcotics-related counts the government has not proved that

6   Mr. Ulbricht was a member of any conspiracy and certainly not

7   the conspiracy charged in the indictment.

8           And with respect to the money laundering count I think

9   it falls because the other counts fall and in addition, a lack

10  of sufficiency of evidence with respect to Mr. Ulbricht's

11  involvement in that as a conspirator.  Thank you.

12          THE COURT:  Thank you.

13          MR. TURNER:  In terms of venue, the Second Circuit is

14  clear that projecting a website that is perpetrating a criminal

15  activity, you have cases involving websites that have been

16  fraudulent in nature --

17          THE COURT:  Would you mind speaking up a little bit.

18          MR. TURNER:  Sure.

19          THE COURT:  Thank you.

20          MR. TURNER:  In terms of venue, I think there are

21  several bases here, but I think the fundamental basis for venue

22  all of the counts is a projection of a website and that is a

23  a this district in furtherance of the different crimes that that

24  website is facilitating and perpetrating.

25          So with respect to the forgeries issue, you have a

1    website that is advertising false identifications for sale and

2    part of the way it does that is by projecting the website

3    worldwide.  Anywhere that website is viewed or anywhere where

4    it's reasonably foreseeable that it would be viewed, that is a

5    district that is an area where Mr. Ulbricht is projecting

6    activity into, and there's very clear Second Circuit case law

7    on that.  The *Rowe* case, the *Romi* (ph) case.

8         In terms of forgeries, we entered into evidence, for

9    example, a forum post by Dread Pirate Roberts where he says I'm

10   creating a new category for fake IDs and passports.  This was

11   on the website for a long time.  So, clearly Mr. Ulbricht was

12   involved in the decision to offer those items for sale and he

13   was conspiring with the vendors of those items to traffic in

14   those false identity documents.

15        Hacking:  Agent Der-Yeghiayan testified that hacking

16   tools were persistent offerings on the site and hacking

17   services were persistent offerings in the site.  We offered

18   evidence from the Silk Road server as it was seized from the

19   FBI with 26 different listings in there that were there just on

20   the day it was seized.  So these are a recurrent category of

21   items that were offered under digital goods.  They were offered

22   under services.  And we offered in evidence that Mr. Ulbricht

23   and his customer support staff, one of the things they did was

24   to police the site.  If there were items that did not belong,

25   forget about the cyanide question, that was something they

1   looked for to pull those items off.  So those computer hacking

2   services and tools were persistently offered items, something

3   that was tolerated by Mr. Ulbricht.

4           Every vendor on the site Mr. Ulbricht had an agreement

5   with.  They had to click I agree to your terms, I have to agree

6   to follow your rules, and in return, Mr. Ulbricht got a cut of

7   their proceeds.  It is fundamental; the essence of a

8   conspiracy.

9           Count Four in terms of supervising five different

10  people, there's lots of different people.  Agent Der-Yeghiayan

11  testified that besides him at the time that he was working you

12  had libertas, you had inigo, you had samesamebutdifferent, you

13  had the person he took over the account from, scout/cirrus,

14  before he took it over.  You have chats with programmers such

15  as h7 and smed.  You have other customer support staff that we

16  have chats on the computer.  You have DigitalAlchemy.  You have

17  people like Variety Jones and Cimon.

18          You don't have to show under the law the true

19  identities of these individuals.  There just has to be

20  sufficient evidence for the jury to conclude that they were

21  different individuals and, of course, there would be no reason

22  for the same individual to be contacting Mr. Ulbricht in all

23  these different roles.  There is evidence upon which the jury

24  could reasonably conclude that these are more than five

25  different individuals.

1          In addition as we argued to your Honor before, we're

2     not limited to arguing that it was just the employees that he

3     was supervising.  He was organizing all of the vendors on this

4     site, and there were hundreds and hundreds of different

5     vendors, different drug dealers.  So, the limitation of five

6     different people is not a problem.

7          In terms of the no series of violations, this is a

8     three-year massive drug-dealing enterprise.  You have a kingpin

9     of a traditional cartel, the cartel is involved in doing

10    hundreds and thousands and thousands of different drug deals.

11    That's what the statute goes after:  Recurrent series of

12    transactions, and that's what you see here.

13         The testimony of Mr. Shaw today was based on

14    transactional data that has thousands and thousands of

15    different drug deals that Mr. Ulbricht abetted, that

16    Mr. Ulbricht participated in as a broker through his site.  All

17    of those are part of the continuing series.  All of the things

18    he did in terms of the forum posts in furtherance of the site,

19    these are all communications in furtherance of drug trafficking

20    that are in violation of 21 USC 843.  So there are many

21    different specific violations the jury could look to in

22    determining whether the defendant committed the continuing

23    series.

24         In terms of Mr. Ulbricht being a member of the

25    conspiracy, again, he conspired with his employees.  He

F22gulb7                          Haney - direct

1     conspired with the vendors.  He agreed with other people to

2     distribute the drugs, to aid and abet the distribution of drugs

3     and to use communications facilities in furtherance of drug

4     trafficking.  So there's a reasonable basis for the jury to

5     find the defendant is guilty on all the counts and therefore

6     this motion should be denied.

7              MR. DRATEL:  Just two issues:  One is on the venue.

8     Rowe and Romi (ph) I think is more accurately characterized as

9     whether or not the activities of law enforcement agents can

10    create jurisdiction because there was no question there was

11    conduct -- connected conduct, not just projected -- but conduct

12    in the Southern District.  And the question was whether,

13    because of the activities of the undercovers, that constituted

14    a jurisdictional nexus.  In this case, we don't have that from

15    any of the charges, so I think there's a distinction.

16             If the principle is that anywhere a website is

17    available there is venue, then venue is meaningless in the

18    current age.  And I think in a civil case you couldn't even

19    have that level of universal jurisdictional application, so I

20    don't see how it could apply in a criminal case.

21             With respect to the five people, true identity is not

22    really the issue.  The issue here is there's no proof these are

23    different people.  We have seen that Agent Der-Yeghiayan was 12

24    people at the same time, so we don't know who was who.  There

25    is no proof sufficient beyond a reasonable doubt that these are

F22gulb7                              Haney - direct

1    different people.

2                THE COURT:  The standard for a motion under Rule 29 is

3    whether the judge thinks that there is sufficient evidence to

4    sustain a conviction and if the evidence meets that threshold,

5    then the case is to go to the jury.  I find that the case

6    should go to the jury.  I think that there is evidence to

7    sustain a conviction on each of the counts.  Whether the jury

8    will decide to do so or not is ultimately up to the jury as

9    fact finders in this matter.

10               In terms of the venue issues, I have looked

11   extensively at the venue issues in connection with the jury

12   instructions.  And the results of my determinations are set

13   forth in the jury instructions that were sent around yesterday

14   in the sense of including an instruction relating to websites.

15   Venue, of course, is a preponderance of the evidence standard.

16   And for certain counts, of course, there's even different and

17   much more direct evidence in terms of venue, but certainly

18   there's enough for a finding of venue here.  So the motion is

19   denied.  The case will go to the jury at the appropriate time.

20               Let's talk about what's going to happen next to get us

21   to the point where we're going to be having charging and

22   closings.  So there are two witnesses, Ms. Lewis, who you

23   expect to be able to land tonight with the weather conditions?

24               MS. LEWIS:  Yes.  There are two witnesses that I do

25   expect to be able to land tonight.  In fact, one of them I

1    actually know has already landed.  One is here and the other

2    one I will assume will be able to arrive tonight, but I'll

3    certainly let the Court know.

4            THE COURT:  There is an ice condition apparently, but

5    you'll figure it out and hopefully they'll be able to make it.

6            MS. LEWIS:  We'll take it as it comes.

7            THE COURT:  Get me an ETA if they're on some early

8    morning flight.

9            MR. DRATEL:  Then we have the investigator who is

10   probably maybe a half hour on direct.

11           THE COURT:  Are there three witnesses tomorrow?

12           MR. DRATEL:  Yes.

13           THE COURT:  You folks have exchanged whatever there is

14   in terms of 3500 materials and I've got Alden Schiller, Chris

15   Kincade and who is the other one?

16           MR. DRATEL:  Bridget Prince is the investigator, your

17   Honor.

18           THE COURT:  She'll be available tomorrow?

19           MR. DRATEL:  Yes.  Either way, even if the other

20   witnesses don't show up, she'll be available.

21           MR. TURNER:  As to that witness, we received an

22   exhibit or set of exhibits that it looks like it's nothing more

23   than sort of what you'd present to the jury at closing.  It's

24   just a summary of -- or a selection of different facts or

25   assertions that different witnesses have made.  And we don't

1    think it's proper under 1006.

2           We don't think it's proper for an investigator to be

3    called just to read in or summarize transcripts from the case

4    if that's what's going to occur.

5           MS. LEWIS:  Your Honor, the timeline that we have here

6    is merely just a demonstrative to aid in her testimony so it's

7    not confusing to the jury when she goes into various aspects of

8    the evidence which are all in discovery.  There's nothing new

9    or unusual or surprising.  It's merely admitted exhibits and

10   just the same way the government would put it on the screen, we

11   merely just have it in a chart to keep it organized for her and

12   the jury.

13          THE COURT:  By tomorrow morning, you should confer to

14   figure out if there's some nature of the testimony that is

15   going to be a problem.  But if she's done something that's

16   otherwise appropriate and she's going to use a timeline, that

17   is, you know --

18          MR. TURNER:  It sounds like the testimony is going to

19   be about other testimony.

20          THE COURT:  Let's put it this way:  I assume everybody

21   knows that the testimony can't be simply a factual narrative of

22   the case or somebody getting up and summarizing what has

23   occurred and then drawing an inference from that, right, that

24   would usurp the province of the jury.

25          But if it's not that and it happens to be a timeline

1     of different dates and she's done an investigation and is able

2     to testify firsthand as to certain things and those dates are

3     useful, then that would be a different use.

4               MR. TURNER:  It really doesn't appear that way, your

5     Honor, it's things like --

6               THE COURT:  Let's take it as it comes, then.  I don't

7     want to have a situation tomorrow though -- here is the

8     tension:  I don't want to have a situation tomorrow where we

9     run into 8 million side bars and objectionable things and all

10    of that.

11              The witnesses -- we'll be clear.  The witness can't

12    speculate.  She can however talk about things that she knows

13    from firsthand knowledge.  She's being offered as a percipient

14    witness.  And if there is something, a timeline-type document

15    which aids that percipient testimony, she can use it, but she

16    can't summarize in some sort of summation sense.

17              But if you folks think you should give me a heads-up

18    on something --

19              MR. DRATEL:  Here's what we'll do.  My suggestion,

20    hearing the Court's instruction on that and direction, we'll go

21    back and look at the timeline and make sure that whatever we

22    put in meets the standards that the Court has laid out.  We

23    will send that to the government as early as we can this

24    evening so that if there's an issue, then we can have it to the

25    Court in whatever form it is -- I don't mean whatever form it

F22gulb7                          Haney - direct

1    is.  It's in a form, but I mean whatever part that is in

2    contention by tonight.  That would be the hope to do that.

3            The other thing that I have that I know I have with me

4    but I can't find the page right now among my papers is, I have

5    about a three-line character testimony jury charge.  It's just

6    basic.

7            THE COURT:  Get it to me in the morning.

8            MR. DRATEL:  I'll get it to you tonight.

9            THE COURT:  Now, on this witness, it sounds like this

10   is the kind of thing where I ought to receive a copy of

11   whatever the exhibits are, Mr. Dratel, that you end up giving

12   to the government so that I can look at them in advance and be

13   prepared for any additional positions that the parties may take

14   in this regard.

15           I mean, right now, I don't want to necessarily, since

16   she's being offered as a fact witness, delve too deeply into

17   all of her testimony, but I do want to make sure that she's not

18   going to be sort of just a narrative.

19           MR. DRATEL:  No.  The timeline is only a portion of

20   the testimony.  There are other portions that are not related

21   to the timeline.

22           MR. TURNER:  May I have a preview.

23           THE COURT:  Why don't you show me the document.  Let

24   me see.  It may or may not be relevant if the document is going

25   to be changed.

 1            MR. TURNER:  Sure.  Just this one as an example.

 2            THE COURT:  What you folks can do for this, you can

 3       put a few words in and not all of the citations, which she

 4       might find helpful, I don't know, in terms of tying herself

 5       down to a particular time frame, but if she thinks it's

 6       important that at a particular time in February of 2013 he had

 7       a communication with Bates, a communication with Bates could be

 8       the relevant event.

 9            I don't know where this testimony is going,

10       Mr. Turner, but I'm hesitant to do anything until I find out

11       more about it.

12            MS. LEWIS:  To be clear, I'm assuming we're moving the

13       citation to the government exhibits into the testimony that

14       relates to the information.

15            THE COURT:  Let's just say what she cannot do, okay.

16       We'll be clear so that you folks understand and I am not trying

17       to be exclusive or exhaustive as to what she cannot do because

18       I don't know what she's going to do, so I can't focus this but

19       you can never in a jury trial have a witness who gets on the

20       stand and says I've reviewed all of the documents in the case,

21       I've spent hours on -- or whatever, 20 minutes, whatever the

22       length of time is -- on the evidence.  Here is my findings.  My

23       findings are the following:  I've done an analysis and my

24       findings demonstrate that as of these four days, you know, X

25       couldn't possibly be the case because that's precisely what the

1    jury would do, which is take the evidence and draw inferences

2    from the evidence.

3             So she can't be providing a factual narrative.  She

4    needs to have -- let's put it differently.  She needs to have

5    done something or have -- she needs to either come to the table

6    with unique evidence that's firsthand like, you know, I, in

7    2013, ran into Mr. Ulbricht outside of his house and he

8    introduced himself to me as Ross, all right, which wouldn't be

9    in for the truth, it would be in for the fact that it was said.

10   That kind of firsthand knowledge is true, percipient knowledge,

11   you know, what she saw or heard, touched as a percipient

12   witness, not what she read and synthesizes as a convenient

13   narrator of facts, right.  This comes up a lot when people want

14   to put on a witness who then sort of gives an overview of their

15   version of the story which you can't use one overview witness

16   for.

17            MR. TURNER:  I think the key word is "firsthand."

18            THE COURT:  She's being offered as a percipient

19   witness.  I assume she has some firsthand knowledge.

20            MR. TURNER:  If your Honor looks at the exhibit --

21            THE COURT:  This may not be everything she's going to

22   say.

23            Is she going to have firsthand knowledge?

24            MS. LEWIS:  She conducted an investigation.

25            MR. DRATEL:  Some stuff.

1              MR. TURNER:  Some stuff?  For example, the document

2      before your Honor says Special Agent Der-Yeghiayan says who is

3      on first.

4              THE COURT:  Let's forget the document and more

5      generally the issue is, does this witness have firsthand

6      knowledge about which she is competent under the rules to

7      testify?

8              If the answer is yes and it's probative of an issue, a

9      material issue in dispute, she can testify.  The exhibits she

10     uses may have evidentiary issues, but she can testify to her

11     percipient knowledge.

12             MR. TURNER:  My concern is we have no 3500, no

13     meaningful 3500 for this witness, no exhibits except for this

14     thing.

15             THE COURT:  Right.

16             MR. TURNER:  So there's absolutely no indication that

17     she has firsthand knowledge of the facts.

18             THE COURT:  I'll get a proffer from you folks tomorrow

19     morning.  I'm not going to make you do it tonight.  She's a

20     fact witness, not an expert witness.  So the disclosure

21     requirements are entirely different.  So the fact that she

22     doesn't have 3500 material is not particularly remarkable for

23     many fact witnesses who are talked to extensively by law

24     enforcement necessarily.

25             Mr. Dratel and Ms. Lewis, you folks as trial lawyers

F22gulb7                          Haney - direct

1    know what to do.  As you know, I will hold you to the rules of

2    evidence so don't put us all in an awkward position where

3    you're trying to put somebody on who is going to be a narrative

4    speaker, okay?

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F225ulb6

1          MR. DRATEL:  That's why I propose let us go back, look

2     at the document, try to make sure that we are not including

3     things in their testimony obviously that the Court has

4     indicated it would preclude.

5          But also I wanted, in terms of -- the firsthand

6     knowledge part is really a little bit of a red herring on the

7     part of the government's position because none of their

8     witnesses have firsthand knowledge.  They put in something and

9     then they read it.  So, it is not firsthand knowledge and the

10    government, historically -- not here, today, not in this

11    trial -- to a certain extent perhaps, but not really.

12         THE COURT:  Well, let's talk about this trial.

13         MR. DRATEL:  What I mean by that, and the Second

14    Circuit has permitted it, which is the concept of a summary

15    witness.  We would not go beyond what is permitted on that and

16    we will ---

17         THE COURT:  That sounds like, okay, so I am getting --

18    I think of that fellow sniff-sniff and I wonder was it sniffing

19    packets or sniffing packets and other things I know not, but it

20    has stuck with me.  So, I am sniffing here that there may be a

21    bit of a summary issue which might bleed into narrative.

22         MR. DRATEL:  No question.

23         THE COURT:  Then let's head this off at the pass and

24    find out, send me the case cite that you think gives me the

25    parameters you are staying within.

F225ulb6

1           MR. DRATEL:  Yes.

2           THE COURT:  And why don't you, Mr. Turner, give me

3    your case cites on before, number one, whether this kind of

4    summary testimony is allowed, to what extent and where you

5    think it runs afoul of things.  I will look at that all before

6    I walk in, we will start at 9:00, that will be our first order

7    of business, and if you folks have gone beyond what the rules

8    allow -- and I don't have in my mind apart from what I have

9    said whether or not there is a particular version that might be

10   allowed, I don't know of one but I hear your point, Mr. Dratel,

11   then I will, in terms of summary, then I will make whatever

12   rulings I need to make.

13           MR. DRATEL:  Okay.  That's fine.

14           THE COURT:  For those three folks they are going to go

15   one, two, three.

16           MR. DRATEL:  Yes.

17           THE COURT:  Except for the Cincinnati person.

18           MR. DRATEL:  Depending, obviously, when they arrive

19   but, yes, the intention would be that.

20           THE COURT:  So, I am going to assume that Ms. Prince

21   has done some sort of investigation after the fact, sort of a

22   relatively contemporaneous investigation where she has gone out

23   and she has either looked at things and/or put things together

24   and wants to come in and testify either as to what she has

25   looked at or as to what she has put together.

F225ulb6

1    Now, you folks will give me whatever I need in the

2  sense of evaluating that kind of witness, generally, in terms

3  of substance and type, okay?

4    Now, Mr. Ulbricht, is he going to -- has he made a

5  decision as to whether he is going to testify?

6    (Defendant and counsel conferring)

7    THE DEFENDANT:  I'm not going to testify, your Honor.

8    THE COURT:  All right.

9    Now, if you change your mind between now and the end

10  of the case, let Mr. Dratel know and he can make an appropriate

11  application at that time.  All right?  I do understand that I

12  am asking you now before these other witnesses have testified

13  and if Ms. Prince's testimony gets constrained in some way that

14  you are not expecting then you should let Mr. Dratel know and

15  renew the application, make an application to be able to

16  testify, and I am very unlikely to preclude you, right?  What I

17  want to know is I want to know for purposes of figuring out how

18  the trial is going to proceed.  But, if you end up with a

19  burning desire to testify or just any desire to testify, you

20  will be allowed to do so.  All right?

21    THE DEFENDANT:  Okay.

22    THE COURT:  I had one more thing on the jury

23  instructions.

24    On page 47, if you folks have it, if you don't -- this

25  is not extensive, I think you can probably just hear it.  The

1   word "adage, actions speak louder than words is applicable

2   here," I think "adage" is not as well known as it used to be

3   and I would use the word "phrase" in place of the word "adage."

4           Any opposition?

5           MR. DRATEL:  No, your Honor.

6           MR. TURNER:  No.  I think that is a good idea.

7           THE COURT:  Then, in the concluding remarks on page 91

8   where we are talking about what is being sent and not sent back

9   into the jury room, I think it is useful to strike, "and any

10  narcotics seized" because we haven't presented or handed

11  around, I don't think narcotics seized and put, "for instance,

12  the actual computer hard drives," which we are not intending on

13  sending back, as an example.

14          Any objection?

15          MR. TURNER:  No, your Honor.

16          MR. DRATEL:  No, your Honor.

17          THE COURT:  The other one, which based upon my more

18  recent review of all these CCE cases -- and I think I may have

19  read every CCE case in this circuit at any level, and others --

20  is to change the last sentence at page 62 relating to

21  continuing series of violations to the following:

22          However, you must unanimously agree on which, if any,

23  three or more violations committed by the defendant constitute

24  a continuing series of narcotics violations in order to find

25  the defendant guilty on Count Four.  They have to agree to

F225ulb6

1    unanimously not only that there were three but, as between

2    themselves, they must agree unanimously on which three.

3              MR. TURNER:  That's fine, your Honor.

4              MR. DRATEL:  Yes, Judge.

5              THE COURT:  Those changes will be made and you will be

6    given a copy that will say "as delivered" which is my intent to

7    deliver it in that form.

8              In terms of the use of time tomorrow, we are now at

9    the point where let me ask you, Mr. Dratel, how long do you

10   expect these witnesses to go?  Or Ms. Lewis?

11             MR. DRATEL:  I think that given the nature of the way,

12   character of the witnesses that went today, I think we are

13   talking about less than an hour of direct.

14             THE COURT:  For all three?

15             MR. DRATEL:  Yes.

16             THE COURT:  Combined?

17             MR. DRATEL:  Yes.

18             THE COURT:  So, why don't we, if that is the case, is

19   the government planning any rebuttal?

20             MR. TURNER:  No, your Honor.

21             THE COURT:  Then let's plan on closing tomorrow

22   afternoon.

23             MR. TURNER:  Yes.

24             THE COURT:  All right?

25             MR. DRATEL:  Yes, your Honor.

F225ulb6

1          THE COURT:  So, we will plan on closing tomorrow

2     afternoon.  I would ask that if you folks have any

3     demonstratives that you even have any view -- I couldn't figure

4     out how to put the word sniff in there -- if you have any view

5     at all that there is any kind of issue as between you folks on

6     any demonstratives, please try to talk about it in advance and

7     raise it with me so we don't have any objections during the

8     closings, if at all possible.  I would really like to avoid

9     that.

10          If you perceive, as you think about your closing and

11     what the other side is likely to do tonight, issues that might

12     come up where you know you are going to be upset because

13     they've been issues in the trial and believe would be

14     inappropriate, we should flag those before people start so we

15     know what the rules are so that people can try to avoid

16     objections, if possible.

17          Obviously you have to put an objection if you are

18     going to preserve something so they may well occur.  I am not

19     suggesting you shouldn't, you have to preserve your record.

20     You understand.

21          MR. TURNER:  Just for clarity, your Honor, regardless

22     of how long the direct goes we are going to plan to do the

23     summations at 2:00 tomorrow?

24          THE COURT:  I think that if the direct does finish by

25     let's just say -- direct and cross finish by lunchtime, we will

1  close starting at 2:00.

2          MR. TURNER:  And if it finishes earlier than that?

3          THE COURT:  If it finishes earlier why don't we decide

4  we will take until 2:00.  Frankly, we have been starting every

5  day at 10:00, so say we go to 11:00, 11:30, take the hour and

6  45 minutes rather than having somebody start and hang over

7  lunch.  We will just do them in a row.

8          Now, I say that but I'm not anticipating that the

9  total closings are going to be more than three hours with a

10  break.  Give me a sense.  Because if they are, then we would

11  start before lunch.

12          MR. DRATEL:  Right.  I would like to know what the

13  government projects as its opening summation.

14          THE COURT:  Frankly, I'm not going to cut you off.

15  I'm not suggesting any particular time is not okay.  I just

16  want to have a sense.

17          MR. TURNER:  We don't plan on going beyond 90 minutes.

18          THE COURT:  So an hour and a half.  We should start,

19  then, earlier.  We may want to start earlier, just in case.

20          MR. TURNER:  I am saying that that is certainly our

21  limit.

22          THE COURT:  So that would be 2:00 to 3:30, then if we

23  took a 15-minute break, and Mr. Dratel would go how long?  Any

24  idea?  It would depend on what they say.

25          MR. DRATEL:  I really don't like going beyond an hour

F225ulb6

15.  This is a complicated case, there may be some reading.  At the outside it would be an hour and a half but I don't like going more than an hour, but this case may require it because of the density.  I would like to come in at an hour and 15.  That's my aspirational point.

THE COURT:  An hour 15 would put us right at 5:00 and we have rebuttal, so let's start them when we need to start tomorrow because I would rather not have the rebuttal in the morning, if we can avoid it.

MR. DRATEL:  That, to me, would be --

THE COURT:  You don't want that?

MR. DRATEL:  That's the worst case scenario.

THE COURT:  If we are going to run into issues and it is going to be a 10-minute or 15-minute issue, we will see if the jury tomorrow, for that purpose, can say so that we are done as opposed to starting the next morning with the rebuttal just before the instructions.

MR. DRATEL:  Okay.

THE COURT:  So this is sort of, I think, the parameter.  The summary of all of this is given the length, I think we have to start as soon as we are done.  We will take a break and then we will start.

MR. TURNER:  I guess if -- I mean, again, if we end by let's say 11:30, perhaps we can start at 1:30 with summations, or 1:00.

F225ulb6

1           THE COURT:  We might be able to do that.

2           Why don't we do this:  Why don't we see where we are

3    tomorrow.  You folks will know much better this evening having

4    prepared yourselves how you are going to go, and we will pick

5    something that is going to work.  Okay?

6           MR. TURNER:  Thank you, your Honor.

7           MR. DRATEL:  Thank you, your Honor.

8           THE COURT:  One other thing.

9           You folks had the stipulation?

10          MR. DRATEL:  Yes.

11          THE COURT:  The amigo stipulation.

12          MR. DRATEL:  The government has provided me a proposed

13   revision.  What I was going to do is give them my emendations

14   right after court by sending it to them and then we will

15   negotiate.  If we have an issue for the Court, you will get it

16   tonight.  It won't be complicated.

17          THE COURT:  Thank you.

18          MR. DRATEL:  It will be a phrase here and a phrase

19   there.

20          THE COURT:  Thank you.

21          And then I just wanted to say, I am taking my last

22   post-it off of my phone that there have been several rulings

23   that were subject to connection where the connection has been

24   made.  We talked about one earlier that was related to the

25   server but there were a couple of others that, as they went

F225ulb6

1    through the connections were made so all the

2    subject-to-connection rulings are now complete.

3              We will pick up tomorrow morning at 9:00.  Thank you.

4              Send me, please, whatever we need on this Ms. Prince

5    issue.

6              (Adjourned to 9:00 a.m., February 3, 2015.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   BRIAN SHAW

 4   Direct By Mr. Howard . . . . . . . . . . . .1876

 5   Cross By Mr. Dratel  . . . . . . . . . . . .1970

 6   Redirect By Mr. Howard . . . . . . . . . . .1996

 7   Recross By Mr. Dratel  . . . . . . . . . . .1999

 8   KAREN STEIB ARNOLD

 9   Direct By Ms. Lewis  . . . . . . . . . . . .2001

10   DANIEL JEFFERSON DAVIS

11   Direct By Ms. Lewis  . . . . . . . . . . . .2010

12   Cross By Mr. Turner  . . . . . . . . . . . .2013

13   THOMAS HANEY

14   Direct By Ms. Lewis  . . . . . . . . . . . .2018

15                       GOVERNMENT EXHIBITS

16   Exhibit No.                              Received

17    805    . . . . . . . . . . . . . . . . . .1909

18    920B   . . . . . . . . . . . . . . . . . .1910

19    961    . . . . . . . . . . . . . . . . . .1912

20    950    . . . . . . . . . . . . . . . . . .1917

21    940    . . . . . . . . . . . . . . . . . .1922

22    940A   . . . . . . . . . . . . . . . . . .1932

23    940B   . . . . . . . . . . . . . . . . . .1934

24    940C   . . . . . . . . . . . . . . . . . .1935

25    940E   . . . . . . . . . . . . . . . . . .1937
```

1    940F  . . . . . . . . . . . . . . . . .1941

2    940G  . . . . . . . . . . . . . . . . .1942

3    940D  . . . . . . . . . . . . . . . . .1943

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25