F23gulb1                          Trial

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4                 v.                        14 Cr. 68 (KBF)

 5    ROSS WILLIAM ULBRICHT,

 6                 Defendant.

 7    ------------------------------x

 8                                          New York, N.Y.
                                            February 3, 2015
 9                                          9:10 a.m.

10
      Before:
11
                       HON. KATHERINE B. FORREST,
12
                                            District Judge
13

14                          APPEARANCES

15
      PREET BHARARA,
16         United States Attorney for the
           Southern District of New York
17    BY:  SERRIN A. TURNER
           TIMOTHY HOWARD
18             Assistant United States Attorneys

19    JOSHUA LEWIS DRATEL
      LINDSAY LEWIS
20    JOSHUA HOROWITZ
           Attorneys for Defendant
21
               – also present –
22
      Special Agent Vincent D'Agostino
23    Molly Rosen, Government Paralegal
      Nicholas Evert, Government Paralegal
24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F23gulb1                          Trial

1                (In open court; jury not present)

2                THE DEPUTY CLERK:  The continued matter on trial, the

3     United States of America v. Ross William Ulbricht, 14 Cr. 68.

4                Counsel, state your names for the record.

5                MR. TURNER:  Good morning.  Serrin Turner for the

6     government.  With me at counsel table is AUSA Tim Howard and

7     paralegal Molly Rosen.

8                MR. DRATEL:  Good morning, your Honor.  Joshua Dratel

9     for Mr. Ulbricht who is standing besides me, also Lindsey Lewis

10    from my office and also Joshua Horowitz.

11               THE COURT:  Good morning to all of you.

12               We have several housekeeping matters to go over this

13    morning.  Let me make sure that the agenda I have corresponds

14    with the matters which you folks agree we should raise.

15               I would like to check in and find out what the status

16    is of the testimony of Bridget Prince.  We left that as an open

17    issue last night.  Defense was going to think about it some

18    more.  I didn't receive any submissions on that, so I just

19    wanted to find out where that stands.

20               MR. DRATEL:  Your Honor, we're not going to use the

21    timeline during her testimony.  We informed the government of

22    that last night.

23               THE COURT:  All right.  Then for inigo, we need to go

24    over that and then we need to go over the defense-requested

25    jury instructions, so those two final matters, since I think we

1   have then taken care of the one, are where we are.

2            Are there things which you folks would like to raise?

3            MR. TURNER:  No, your Honor.  I responded to the inigo

4   issue.

5            THE COURT:  Mr. Dratel, anything from your perspective

6   you would like to raise in addition to those items?

7            MR. DRATEL:  No.

8            THE COURT:  In terms of inigo, I have received the

9   letter from defense counsel.  Let me just preview that I think

10  it breaks into analytically into two very separate inquiries

11  though they're related:  One is the hearsay issue relating to

12  reading into the record the statement that inigo, a cooperating

13  witness, gave to the government and as recounted in the letter

14  of December 29.  So there's the hearsay issue and then there's

15  a separate request for a missing witness charge in the event

16  that the statement is otherwise disallowed.  So I think

17  analytically those are related but stand separately.

18           Mr. Turner, I didn't receive a written response from

19  the government.  I knows you folks are busy, but why don't you

20  tell me your views.

21           MR. TURNER:  Sure.  As the government sees it, this is

22  sort of another example of the defense assuming they can get in

23  their case through our witnesses.  So the defense has known for

24  approximately two weeks that we were not going to call

25  Mr. Jones.  They made no effort to contact or subpoena

F23gulb1                          Trial

1    Mr. Jones until the eve of the defense case.  They didn't ask

2    us to immunize him.  They made no effort to draft any

3    stipulation even though we told them that we were open to a

4    stipulation until the eve of their case.  And now the defense

5    is trying to use the lack of time, which is an issue of their

6    own making, to try to force the government to agree to whatever

7    stipulation language the defense wants, even though it does not

8    include language that is favorable to the government.

9             Defense counsel had no right to assume that he'd be

10   able to rely on a stipulation to get in facts they want from

11   Mr. Jones.  You have to have a witness lined up in case a

12   stipulation falls through.  That's why for Alex miller with

13   Stack Overflow, we wanted to get that in through stipulation.

14   We weren't able to work that out.  We had Alex Miller ready to

15   testify.  They were obliged to do the same thing with

16   Mr. Jones.

17            Defense counsel is trying to make it out as we engaged

18   in some sort of tactical maneuver by not calling Mr. Jones.  We

19   didn't call Mr. Jones because we felt like we no longer needed

20   it for the case.  That was our right.  That was our call.  And

21   the defense was not entitled to rely on our calling a witness

22   during our case and them getting in some fact from Mr. Jones

23   through his testimony on our case.

24            The confrontation issue that they have tried to raise

25   is ludicrous.  This is a stipulation we're talking about.  So a

F23gulb1                        Trial

1    stipulation can present any statements that the witness would

2    be able to testify to.  And it would be perfectly appropriate

3    if he were to testify about this conversation he had to explain

4    his understanding of the conversation, to explain his state of

5    mind during the conversation.  It happens all the time when you

6    have witnesses testifying about conversations they're having

7    with other people and what's going on, the context of those

8    conversations.  That's all we were trying to put in this

9    stipulation and the defense didn't want that in.  We think it's

10   necessary to be balanced.

11        So if they're not amenable to a stipulation, then it's

12   up to them to call the witness.  You can't just get in core

13   hearsay because the government won't stipulate to putting

14   information in a stipulation.  You can't just take a letter

15   that the government sends, which is not the declarant's

16   statement, that is the government's disclosure, that is the

17   government's characterization, that's not been adopted by the

18   declarant, so you can't just ignore the hearsay rules and just

19   submit a letter.

20        THE COURT:  Let's go to the hearsay rules.  As I said,

21   I think this breaks analytically into two pieces, each of which

22   have their own independent evidentiary standards.  One is 8043,

23   there's a typo in defense letter but we understood from

24   yesterday what he was referring to, so it's not 803.  It's 8043

25   which is a statement against penal interest, which is an easy

1    juxtaposition to make, that statement against penal interest,

2    as the Court understands it, requires two parts:  It requires

3    subpart A and subpart B.  Subpart A requires a statement

4    against penal interest, which typically is a statement made

5    under circumstances which indicate that no person would have

6    made it unless they were telling the truth because it was so

7    contrary to their interest under those circumstances to do so.

8    And it also requires B, which is big letter B, B also requires

9    some independent corroborating evidence as to the

10   trustworthiness and/or reliability.

11           Why don't you address whether or not, putting aside

12   the circumstances over not reaching the stipulation, whether or

13   not the hearsay statement otherwise meets the standard under

14   8043.

15           MR. TURNER:  First of all, it's not his statement.

16   It's not like an email that he sent.  It's not an affidavit he

17   signed.

18           THE COURT:  No.  It's your recitation of his

19   statement.

20           MR. TURNER:  That is hearsay.

21           THE COURT:  I understand we're dealing with hearsay.

22   I'm saying tell me why it doesn't fit within the hearsay

23   exception.

24           MR. TURNER:  The point is, it's not just the

25   declarant's statement; it's somebody else's statement about

F23gulb1                    Trial

 1  what the declarant said, so it's double hearsay.

 2          THE COURT:  Lovely.

 3          MR. TURNER:  And that's part of the problem.  That's a

 4  characterization of what this declarant said.  It's not the

 5  statement itself.

 6          THE COURT:  So we go to both pieces of it, okay.

 7          MR. TURNER:  Right.

 8          THE COURT:  Mr. Turner, I'm trying to cut through

 9  because let me be perfectly blunt:  I don't think this meets

10  the hearsay standard.  I don't think under 8043 this is a

11  statement against penal interest.  The reason for that is

12  because the witness at the time was already under a cooperation

13  agreement.

14          Under a cooperation agreement, under Second Circuit

15  law, there is clear law that says that you're no longer under

16  criminal penalty for making a particular statement; (B), based

17  upon the representations of the government, there's no

18  corroborating evidence for reliability because there's no chat

19  that ever indicates apparently that this ever happened.

20  There's no indication in the record so far that there is an

21  absence of chats and, therefore, the absence here, there's just

22  nothing to corroborate this as a reliable statement.  So I

23  don't think it meets 8043.

24          Do you disagree with my analysis?

25          MR. TURNER:  We absolutely disagree, and we just also

1    believe there are further reasons that it doesn't even come

2    under 8043 to start with because it's not this witness'

3    statement.  It's the government's statement about what he said.

4             THE COURT:  Why don't you go to the missing witness

5    charge, which I think is analytically separate.

6             MR. TURNER:  Again, this is an issue of the

7    defendant's own making.  If they wanted to call this witness,

8    that's something they should have realized right after they

9    learned we weren't going to call him.  If they thought he was

10   that important to their case, they should have asked can we

11   immunize him, can we call him.  That could have been worked out

12   two weeks ago.

13            THE COURT:  Would you have immunized him or is this

14   sort of an argument that you can make because they didn't ask

15   but you would not in fact have immunized him?

16            MR. TURNER:  No.  I'm not representing that at all.  I

17   think we would have immunized him.  He's under our control and

18   we would not have resisted allowing him to testify.  The point

19   is, even a stipulation was not proposed until the eve of the

20   defense case when government counsel was busy preparing for

21   closing, preparing for possible cross of the defendant,

22   preparing for the witnesses that were going to be part of the

23   defense case.

24            This was sprung on the government on the last minute.

25   It's an issue of the defense's own making and to say that, oh,

1  now there's an unavailable witness because they don't have time

2  now to scramble and subpoena this witness and work out the

3  immunity issues, it's their fault.

4          THE COURT:  Let me ask you, I thought that Mr. Dratel

5  had information that indicated this witness would take the

6  Fifth if called.

7          MR. TURNER:  Apparently he called his counsel, he

8  didn't call me, he called -- this is just based on what

9  Mr. Dratel said in court, I didn't even talk to counsel for

10  Mr. Jones since then.  But I understand that he called counsel

11  for Mr. Jones and counsel said, well, he'd take the Fifth.  But

12  defense counsel can still contact the government and see if we

13  would immunize the witness so that he couldn't claim the Fifth

14  Amendment.  We never had that discussion.  We were never

15  consulted about that.

16          MR. DRATEL:  It's not the government's position to

17  immunize a witness.  It's the Court's authority under the

18  statute.  The government has never immunized a defense witness,

19  never.

20          THE COURT:  They make an application, which is then so

21  ordered by the Court but typically it's within the

22  prosecutorial discretion as to whether to suggest immunization,

23  so they are related.

24          MR. DRATEL:  That's the most specious argument, the

25  most disingenuous argument I have heard.  This is completely

F23gulb1                          Trial

1    outrageous.  By the way, last weekend we were told that

2    Mr. Turner would not agree to anything and would not discuss

3    anything with us, and that's what we were told last week.  I'm

4    just -- I want to call Mr. Turner as a witness.  We'll

5    eliminate the double hearsay problem.  He wrote the letter and

6    signed it.  He's disavowing it.  This is so disingenuous, so

7    outrageous.  A prosecutor has obligations that transcend

8    wanting to win the case at all costs, and this is what we have

9    here.

10             THE COURT:  Let's take these two issues analytically

11   separately; one is the hearsay issue whether we think of it as

12   single hearsay or double hearsay, 8043, whether or not those

13   standards are met.

14             MR. DRATEL:  Yes.

15             THE COURT:  If they're not met, then we are into the

16   world of the missing witness charge.  If they are met, then

17   there is some other issues as to whether we can read it in.

18             MR. DRATEL:  Two things:  One is, it is a statement

19   against penal interest.  He is not sentenced.  All of these

20   things can be raised at sentencing.  That's why he has a Fifth

21   Amendment privilege is because the statement against

22   penal -- even if he's cooperating, and the truthfulness and the

23   trustworthiness aspect of it, there's a chat that substantiates

24   the first part of it, so that indicates the trustworthiness.

25   They went and found the chat.  They didn't have the chat

1    beforehand.  They went and found the chat which substantiated

2    the first part, and he is under an obligation to tell the truth

3    or else he loses his cooperation agreement.  Every jury is told

4    that and argued by the government why would -- they're going to

5    argue it here with respect to Mr. Duch.  They're going to argue

6    it here with respect to Mr. Bates.  They're going to say this

7    guy has an agreement.  He would never lie to you.  What more

8    trust -- they can't have it both ways.

9         They continually want it both ways.  This is a

10   preposterous argument.  I want a page and-a-half stipulation

11   that they don't have time to read.  They knew exactly what was

12   in the -- my stipulation is completely what's in the letter.

13   And what I objected to in their stipulation is what they're not

14   entitled to.  They could have called the witness if they wanted

15   balance.

16        THE COURT:  Hold on.  I want us to pull back and take

17   a deep breath and focus on --

18        MR. DRATEL:  It's just an outrage.  That's all.  It's

19   an outrage.

20        THE COURT:  I hear what you're saying.  I do want us

21   to focus on the evidentiary rules because --

22        MR. DRATEL:  Part of it is fairness.  Part of it is

23   *Chambers v. Mississippi*.  Part of it is due process.  Part of

24   it is they can't do a bait and switch.  I called the lawyer.

25   He's on trial, by the way.  I called him on the weekend and he

 1    told me he's taking the Fifth.

 2            They never offered -- this immunity is preposterous.

 3    You should ask them right now.  He's said no, we're not saying

 4    we're going to immunize him.  Of course not, because they're

 5    not going to.  This is a bogus argument, bogus, bogus, bogus,

 6    and it's coming in a way that is completely disingenuous.

 7            He should be a witness, and it's a problem 100 percent

 8    of his making because they had him on the witness list.  In the

 9    middle of trial, they say he's not testifying.  He's the best

10    witness; Mr. Turner wrote the letter.  He heard the statement.

11    He was there.

12            THE COURT:  You folks are sufficiently emotional about

13    it.  I have the government's statement.  I have your letter.  I

14    have read your letter.  I have also looked at case law.  Let me

15    be sure that I understand the chats which do exist versus the

16    chats which don't exist.

17            As I understand it, the chat which does exist is the

18    October 16, 2012 chat which indicates the "recommend a good

19    book Rothbard" answer, that that chat has been found.

20            MR. DRATEL:  Correct.

21            THE COURT:  I understand that paragraph C, which is

22    really the heart of what we're discussing here, the chat as to

23    whether the key identifying question was asked, that chat has

24    not been found.

25            MR. DRATEL:  Because it was a Pidgin chat, which are

 1    not saved.  It's different.  It's a different type of chat.

 2              THE COURT:  There are some.

 3              MR. DRATEL:  Well, not the Pidgin chats, no.

 4              THE COURT:  Here, let me just tell you my ruling on

 5    the 804(3) issue.  On the 804(3) issue, putting aside the

 6    double level of hearsay, just assuming that this is a faithful

 7    representation of what the witness said, it's an out-of-court

 8    statement; without a doubt it's being offered for the truth.

 9    It has to meet both provisions of 804(3).

10              I do not believe that it was against the declarant's

11    penal interest as the case law interprets it because he was

12    under a cooperation agreement at the time.  Moreover, the chat

13    itself independently and in itself doesn't carry any particular

14    penal impact; in other words, it's not the equivalent of a

15    statement saying I sold the drugs or the equivalent of saying I

16    did X, Y or Z.  It's simply whether or not a particular

17    communication occurred.  So it does not meet some of the

18    circumstances that are anticipated under (A).

19              Under subpart (B), it also needs to be -- and there's

20    an "and" between those subparts -- corroborated by

21    circumstantial evidence clearly indicating its trustworthiness.

22    Its trustworthiness is not whether or not it was said to

23    Mr. Turner.  Its trustworthiness is whether or not it ever

24    occurred.  There's nothing that I'm aware of that indicates the

25    trustworthiness as to whether or not it ever occurred.

F23gulb1                      Trial

1    Therefore, it is not a hearsay statement which can come in

2    under 8043.

3           Under a missing witness charge, I've received the

4    government's now oral response and I've also looked at the

5    defendant's papers.  Important in this regard are several

6    Second Circuit cases, which the Court pulled this morning.  One

7    is the *Myerson* case, 18 F.3d 153 at pin cite 159; the other is

8    the *Burgess v. U.S.* case, which is a DC circuit case -- the

9    *Myerson* case is a Second Circuit case -- the *Burgess* case is a

10   DC circuit case which is quoted at length in the *Myerson* case

11   favorably.  That's at 440 F.2d 226.  And then there are a

12   series of other cases.  There's the *U.S. v. Torres* case, Second

13   Circuit, 845 F.2d 1165, pin cite 1169 to 70.

14          In the *Myerson* case where there's a question about a

15   missing witness, the Court is to look at a series of things:

16   One the relation of the parties, not only physical

17   availability, and I think that there are some questions as to

18   whether or not there was in fact true physical availability

19   which would include the immunity issues and everything else,

20   but the Court does note the special relationship between the

21   parties by virtue of the cooperation agreement and that,

22   therefore, there is some further ability by the government to

23   control this witness.

24          Whether or not that the defense did all that it could

25   have I think is open to question but, frankly, I'm more

F23gulb1                        Trial

1   persuaded that the government does have control over this

2   witness.  That does not end the analysis.  That just clears us

3   to the point where we're able to ask the substantive question.

4   The substantive question is whether or not -- and by the way,

5   immunity is only given under extraordinary circumstances and I

6   don't think that immunity here would be extraordinary

7   circumstances.

8              But putting that aside, the question really is, and

9   I'm quoting from the Second Circuit, "When the court is asked

10  to give the instruction, then a judgment is to be reached as to

11  whether, from all the circumstances, an inference of

12  unfavorable testimony from an absent witness is a natural and

13  reasonable one."

14             From the *Burgess* case, I'm going to recite a longer

15  paragraph because it gives really the basis for what all of the

16  circuit courts do in this regard and it's the *Burgess* case is

17  widely cited for setting this standard.

18             "When the court is asked to give the instruction, then

19  a judgment is to be reached as to whether, from all the

20  circumstances, an inference of unfavorable testimony from an

21  absent witness is a natural and reasonable one.  In reaching a

22  decision, the court will have in mind that it is not ruling

23  upon an offer of evidence.  The missing witness instruction is

24  not evidence, but is concerned with the absence of evidence.

25  While the context in which the question arises may clothe the

1   missing witness with significance, there is the danger that the

2   instruction permitting an adverse inference may add a

3   fictitious weight to one side or another of the case.  When

4   thus an instruction is sought, which, in a sense, creates

5   evidence from the absence of evidence, the court is entitled to

6   reserve to itself the right to reach a judgment as wisely as

7   can be done in all the circumstances."

8           It is the Court's view having looked at the proffered

9   language, and assuming that the witness, if called, would

10  testify to that language, is that this is not reasonably

11  exculpatory when all things are considered.  This witness says

12  he asked a first question.  There's no indication that it was

13  not answered -- I guess the only implication is it was not

14  answered.  There's no implication that it was answered wrongly.

15  There's no implication as to whether or not multiple things

16  were going on at the same time.  Eleven months had passed.  A

17  second question was then asked to reveal identity, just as

18  Google does to reveal identity of people all the time where you

19  get three or four different questions to figure out what your

20  first dog's name was, that second question was answered

21  correctly; and therefore, the only reasonable inference to be

22  drawn from this is that the DPR identification was completed.

23  Any other inference would be, in this Court's view, an

24  unreasonable inference, so the inigo issue is resolved.  There

25  will be no missing witness instruction on that issue.

F23gulb1                         Trial

1              MR. DRATEL:  Then I'm signing the stipulation that the

2       government proposed.

3              THE COURT:  Go ahead.  Do you want to agree to the

4       stipulation?

5              MR. DRATEL:  He already did.  He proposed it to me.

6              MR. TURNER:  Let me just consult, your Honor, over the

7       break.

8              THE COURT:  That's fine with me.  If you stipulate to

9       facts, that takes it out of the Court's hands, then I have no

10      reason to make an independent evidentiary ruling.

11              Now, on the jury instructions, we will accept the

12      defense jury instruction on the character evidence with the

13      addition of two sentences from the Sands instruction.  Sands

14      for character evidence also includes -- I don't have the exact

15      language right here, but it's essentially, here it is, the

16      testimony is not to be taken by you as the witness' opinion as

17      to whether the defendant is guilty or not guilty, that question

18      is for you alone to determine.

19              So it will say an independent -- there will be an

20      independent instruction on character:  You have reputation

21      evidence about the defendant's character trait for peacefulness

22      and nonviolence.  This testimony is not to be taken by you as

23      the witness' opinion as to whether the defendant is guilty or

24      not guilty.  That question is for you alone to determine.  You

25      should consider character evidence together with and in the

F23gulb1                          Trial

1   same way as all other evidence in the case.  So that will be

2   included.

3          MR. DRATEL:  I object to that sentence being added.

4   Sand also has that a character testimony alone can provide a

5   reasonable doubt and I left that out because generally most of

6   the circuits don't have that and they don't have the other

7   sentence.  What I took is from the Seventh Circuit.  I believe

8   it's the same as the Ninth Circuit.  It's a very simple

9   instruction and I object to that additional sentence.

10         THE COURT:  Your objection is noted.

11         As to supplemental instructions number two, three and

12  four as well as five, those will not be included for the

13  following reasons:  Number two is an incorrect statement of the

14  law.  Conduct outside of a district when combined with

15  sufficient jurisdictional conduct within a district is fine.

16         As to three, it's confusing and misleading and, in

17  fact, the undercover purchases becomes argumentive because

18  they're not by themselves.  These are combined with a whole

19  variety of other evidence, so that's not an issue.  But in any

20  event, by themselves, they would nonetheless be potentially

21  evidence of a variety of things.

22         The Homeland Security seizures could be, for instance,

23  evidence of sales over the Internet.  They could be evidence of

24  sales of a narcotics conspiracy or substantive narcotics

25  violations.  The venue issue the Court has already discussed at

F23gulb1                        Trial

1    length.

2            In terms of fake identification documents, that's just

3    an incorrect statement of the law.

4            In terms of supplemental defense instruction number

5    five, this is not applicable under the circumstances here.

6    This is not about a law enforcement confession.  There are

7    independent indicia of reliability for these statements indeed

8    because they were stated in chats where this individual

9    believed that the communications were quite secure and

10   anonymous; but in any event, the cases cited are inapplicable

11   to this statement.  So that's the Court's ruling on those

12   instructions.

13           Are there any other applications we should take up

14   before we bring the jury out?

15           MR. TURNER:  Not from the government.

16           MR. DRATEL:  Well, I want to know about the

17   stipulation before we start the case.

18           MR. TURNER:  I'll need to confer, your Honor.

19           THE COURT:  You folks do that outside of the presence

20   of the Court.  We're waiting, I think, for everybody else to be

21   gathered for the jurors.  We had most of them but not all.

22           We have three witnesses.  Who is going to be the first

23   witness?

24           MR. DRATEL:  We only have two witnesses.

25           THE COURT:  Who is the one who is not going to be

F23gulb1                          Trial

 1    testifying?

 2              MR. DRATEL:  Schiller.

 3              THE COURT:  Schiller will not be here?

 4              MR. DRATEL:  Correct.

 5              THE COURT:  So we'll have Kincade and Prince.  And

 6    Prince is going to be talking about an investigation which she

 7    herself conducted and has firsthand knowledge.

 8              MR. DRATEL:  Put in some documents mostly.  She'll be

 9    putting in documents.

10              THE COURT:  Let's take it step by step.  I assume

11    she's got some independent foundation and basis.  She can't be

12    a generalized custodian of records but we'll take it --

13              MR. DRATEL:  She reviewed certain discovery that they

14    provided.  It's clearly authentic because it's provided by the

15    government.  And you wouldn't let me get it in through the guys

16    who authenticated the actual material, so I'm putting it

17    through my witness.  Like you said, put on a witness.

18              So I'm putting on witness who has reviewed the

19    material provided by the government.  I'm putting in two

20    documents through her that were government exhibits back in

21    December.  These are two documents that were government

22    exhibits, Government Exhibit 242 and Government Exhibit 252.

23    They were government exhibits back in December, and I'm putting

24    them in.

25              THE COURT:  What's her basis for firsthand knowledge

F23gulb1                          Trial

1    as to those documents?

2              MR. DRATEL:  She has reviewed the image of the laptop

3    that the government provided us.  The government is going to

4    back off that then, fine; if they're going to make that

5    argument, that's another argument that is really --

6              THE COURT:  Mr. Dratel, I simply asked you for just

7    what she had looked at.  You've answered that.  Exhibit 242, I

8    thought this came in.

9              MR. DRATEL:  Which?

10             THE COURT:  242.

11             MR. HOWARD:  To be clear, some of the exhibits were

12   renumbered, so I think he's referring to what was originally

13   numbered as 242.

14             THE COURT:  What is the current number?

15             MR. DRATEL:  There is no current number because the

16   government pulled it.  It's our exhibit I believe it's D.  I

17   have the original government exhibits here, your Honor.

18             THE COURT:  And what's the second document?

19             MR. DRATEL:  I'm sorry.  243, not 242.  243 and 252 is

20   the original exhibits.

21             THE COURT:  Basically what she's going to do is say I

22   reviewed the hard drive.  These are documents which I saw on

23   the hard drive.  They're true and correct copies of what I saw

24   on the hard drive?

25             MR. DRATEL:  Correct.

F23gulb1                          Trial

1             THE COURT:  And she's not going to interpret the

2      content?

3             MR. DRATEL:  I'm going to read.

4             THE COURT:  That's fine.  If they're received into

5      evidence, you would read it.

6             Is that going to create any problems?

7             MR. TURNER:  We don't have any authenticity

8      objections.  I think we're going to have a relevance objection

9      to Exhibit N.  I don't know how it's relevant to the defense

10     case.  And if I'm guessing why they want to put it in, then I

11     think we're going to object for the basis.

12            THE COURT:  Let's see how that goes.  If there's no

13     authenticity issue so far as this witness is concerned, she can

14     do what Mr. Dratel is suggesting, which is to say I reviewed

15     the hard drives, these were on the hard drives, I printed them

16     off, here they are.  They'll be received into evidence.

17     Mr. Dratel will then -- unless you object on relevance grounds,

18     I'll take a look at it -- but Mr. Dratel will read in whatever

19     he's going to read in.

20            MR. TURNER:  Right.  I think our objection is going to

21     be in the nature of relevance and hearsay.

22            THE COURT:  Why doesn't somebody hand me them so I can

23     look at these while we are waiting for the jury.  We're waiting

24     for four.  They have gotten used to us.

25            MR. DRATEL:  C and N.

F23gulb1                         Trial

1           THE COURT:  Is she going to do anything apart from

2   those two documents, Mr. Dratel?

3           MR. DRATEL:  Yes, your Honor.  She's going to talk

4   about her review of the Google production with respect to

5   emails during periods of time that we have already established.

6   There was a gap in the login.  And then she's also going to

7   recite from the complaint about four sections, probably about

8   four sentences.

9           MR. TURNER:  We object to that, your Honor.

10          THE COURT:  So I understand what their issues are, do

11  you have any issue with the witness saying I reviewed the

12  Google production and there's a gap between X period of time

13  and Y period of time?  This is what I have personally observed

14  from my review of these hard copies.  There's nothing for X to

15  Y.

16          MR. DRATEL:  No.  The opposite, that there are emails.

17          THE COURT:  Okay, whatever it is.  My personal

18  observation of the production is that there are emails covering

19  whatever the period is.

20          MR. TURNER:  The issue is whether she has foundation

21  to opine about --

22          THE COURT:  She's presumably looked a the production.

23          MR. TURNER:  Right, but there are two issues.  We can

24  look at the emails in the email account and then there's the

25  logs, the IP logs which show the defendant log into a Gmail

F23gulb1                         Trial

1    account.  I know from having dealt with Google before that

2    those IP logs are not complete; they don't log in every log,

3    for example --

4              THE COURT:  But she won't be speculating as to why.

5    She'll just be saying this is what's here; this is what's not

6    here.  So be it.

7              MR. DRATEL:  Why did we present a stipulation that

8    those are accurate records if he knows they're not?  I don't

9    get it.

10             THE COURT:  I don't even follow that one.  I'm focused

11   on one very small thing, which is, it sounds like she's

12   reviewed this production.

13             MR. DRATEL:  It's simple.

14             THE COURT:  And she just wants to say I review it,

15   here's what is here.

16             MR. TURNER:  The problem is, your Honor, if she's

17   interpreting --

18             THE COURT:  She can't interpret, right, because she's

19   not a Google witness.

20             MR. TURNER:  If that's implicit in the testimony, then

21   she's interpreting what the Google records mean.

22             THE COURT:  We'll get to each question as it comes,

23   but in terms of her ability to say I reviewed the Google

24   production, this is what I have observed personally in terms of

25   the Google production in terms of the date ranges are as

F23gulb1                          Trial

1    follows X, Y or Z, that's fine.

2              MR. DRATEL:  They can put on a witness to say that the

3    records mean something else.  I'll argue that in summation.

4    I'm not going to ask her to argue it.

5              THE COURT:  I take it she's not going to draw

6    conclusions from the presence or absence of documents; is that

7    right?

8              MR. TURNER:  That's what I'm --

9              THE COURT:  I'm trying to figure out from Mr. Dratel.

10             MR. DRATEL:  Yes.

11             THE COURT:  She's not going to draw conclusions.

12   She's just going to state the facts.

13             MR. DRATEL:  No.

14             THE COURT:  That's fine.  We'll take it step by step.

15   These are the two documents I understand she'll be doing other

16   than that and reciting from the criminal complaint.

17             MR. TURNER:  I just want to be clear on what is being

18   offered because the government is getting conflicting messages.

19   One of the exhibits looks like this.

20             THE COURT:  That I have as Defense Exhibit C it looks

21   like.  It's the multipage document.

22             MR. DRATEL:  No, no.  It's D actually.  C.

23             THE COURT:  I have C.

24             MR. DRATEL:  C is the law enforcement file.

25             MS. LEWIS:  Here is a copy of C.

F23gulb1                          Trial

1              MR. TURNER:  This I think raises problems, your Honor,

2       and I think we need to address it at side bar.  This raises

3       significant problems.

4              THE COURT:  Let me read this.

5              MR. DRATEL:  This was a government exhibit.

6              THE COURT:  This was originally a government exhibit?

7              MR. DRATEL:  Yes; 243.

8              MR. TURNER:  It's different.

9              MR. DRATEL:  I printed it this morning from their

10      first disk.  I can give the Court the copy that I printed this

11      morning from their disk.

12             MS. LEWIS:  Actually, I even have a copy here that I

13      put a sticker on weeks ago.  You can see on the back.

14             MR. TURNER:  This means nothing.  We need a side bar.

15             THE COURT:  Hold on.

16             You know what, I'll tell you, I need to read this and

17      I can't do it with you folks because you interrupt my train of

18      thought.

19             Joe, how many are we waiting for?  We are still

20      waiting for four.

21             MR. TURNER:  I'd also note this was not emailed to us

22      before the Court's deadline for disclosure of exhibits.  It was

23      just sprung on us now.

24             THE COURT:  All right.  Well, we've had issues.  We're

25      not going to quibble with timing in light of the back and forth

1    and what short lengths of time people have had for documents.

2    I will look at this and I think we resolved then the Google.

3    production.

4              The reciting from the complaint, are we going to have

5    any issues with that?

6              MR. TURNER:  Yes, your Honor.

7              THE COURT:  Tell me what your issues are with that so

8    I can think about that, too.

9              MR. TURNER:  This goes back to the *GAF* issue.

10             THE COURT:  I understand.

11             MR. TURNER:  Great.  First of all, *GAF* has not been

12   held to apply to an affidavit in the complaint.  *Ramirez*

13   specifically reserved decision on that.  But in any event, even

14   if it did, the prerequisite for it to apply is a genuine

15   inconsistent statement with some position the government is

16   taking now.

17             THE COURT:  Let me find out what the four statements

18   are, Mr. Dratel, that you are considering getting in.

19             MR. TURNER:  It was also not provided as a defense

20   exhibit.

21             THE COURT:  We were talking about the *GAF* issues back

22   then.

23             MR. TURNER:  The complaint is an exhibit.

24             MR. DRATEL:  It's not an exhibit.  It's an admission.

25             THE COURT:  He wants to put it in as an admission.

1    And actually whether or not it would come through this witness

2    and whether or not Mr. Dratel would stand up and state it as an

3    admission I think is not -- the vehicle is not the issue; it's

4    the content.

5              MR. DRATEL:  One is the $79.8 million in commissions.

6    That's one.  That's in paragraph 22C.  And then paragraph 24A,

7    the Silk Road forum in its current form was created on or about

8    June 18, 2011.

9              At 24CII, the first sentence which is a quote from on

10   or about December 1, 2011, DPR announced that he had changed

11   the onion address for the Silk Road website, stated Silk Road

12   now resides at a new more easily remembered URL address.

13             And III:  On or about October 19, 2011, DPR posted a

14   message concerning an outage of the Silk Road website

15   explaining we are having to rebuild the site from a backup.

16   DPR assured the sites users, etc.

17             THE COURT:  Let me ask you, in terms of the DPR

18   October 19 posting, is it the case that that posting is

19   somewhere on the hard drives that have been received into

20   evidence?

21             MR. DRATEL:  Yes, from the servers.

22             THE COURT:  Is it also the case that the quote from on

23   or about December 1, 2011 where DPR announced that he had

24   changed the onion address for the website, stated Silk Road now

25   resides at a new more easily remembered URL address, I actually

1    thought we had gotten that into evidence at one point.

2              MR. DRATEL:  We may have, your Honor.  I'll withdraw

3    that one.

4              THE COURT:  I think that came in early.  But in any

5    event, I would assume that would actually be part of a post

6    also that is on the servers.

7              MR. DRATEL:  Yes.

8              THE COURT:  So I understand the lay of the land, would

9    you state the date of the complaint?

10             MR. DRATEL:  Okay.  I'll do it how ever the Court

11   wants me to do it.

12             THE COURT:  My copy of the complaint, which I used to

13   carry faithfully because this was a big issue, I left

14   downstairs.  Does somebody have a copy I can take a look at?

15             MR. DRATEL:  I have it, your Honor.

16             THE COURT:  It's 22C.

17             MR. DRATEL:  May I add one thing.  With respect to

18   Ms. Prince, I would have, had the Court not precluded

19   Defendant's E earlier, I would have also moved to introduce

20   that through her.

21             THE COURT:  So noted.  Are you planning on reading the

22   entire -- it looks like the October 19, 2011 post is just a

23   post.  Are you going to read that entire paragraph, or just the

24   top part?  You've highlighted just a piece of it.

25             MR. DRATEL:  Right.  I'll read the whole thing if

1    that's the way the Court wants me to do it.  I was trying to be

2    as surgical as possible.

3            THE COURT:  The one thing you shouldn't do is talk

4    about based on his training and experience what it means.

5            MR. DRATEL:  Right.

6            MR. TURNER:  Your Honor, we addressed this issue, you

7    may recall, in our January 22 letter.

8            THE COURT:  I remember.

9            MR. TURNER:  There's *United States v. Purdy*.  It

10   clearly holds you cannot just introduce a bill of particulars,

11   prior indictment, certainly not a complaint without some

12   showing that is inconsistent with the position the government

13   is taking now.

14           If they want to produce these forum posts, they can

15   introduce the forum posts.  There's no need to get them in

16   through the complaint.  They have the forum posts.

17           THE COURT:  Right, but I have the ability, if there is

18   an easy and efficient way to do something and that these are

19   accurate reflections of forum posts, just to have it done

20   through these, right?

21           This doesn't strike me as something which is

22   particularly earth shattering and you can address the timing

23   and what inference should be drawn from the timing.

24           MR. TURNER:  But getting it in through the complaint

25   suggests that the government is taking some different position

F23gulb1                         Trial

1      now.

2                  THE COURT:  Mr. Dratel, are you amenable to just

3      saying that you're going to read the following into the

4      record --

5                  MR. DRATEL:  Sure.

6                  THE COURT:  -- from posts from Silk Road?

7                  MR. DRATEL:  Yeah.

8                  THE COURT:  You can use the complaint's recitation as

9      a faithful representation of what those posts said?

10                 MR. DRATEL:  That's fine.

11                 THE COURT:  So you won't cloak it in the ermine cloth,

12     such as it is, of a complaint.

13                 MR. DRATEL:  No, not of Mr. Turner's complaint.

14                 THE COURT:  Fine.  You can do those.  That issue is

15     done.  Hand back the complaint.  Just don't call it a complaint

16     and please, as a result, you can just say that these come from

17     posts on Silk Road.  Now, if those paragraphs don't come from

18     posts on Silk Road, you're going to have to modify that

19     language in some manner.

20                 MR. DRATEL:  Okay.

21                 THE COURT:  All right.  Okay.

22                 MR. TURNER:  I'm sorry to belabor the issue, but I'm

23     not clear.  There were two posts and then there were two other

24     things from the complaint that the defense wanted to read that

25     were not in the nature of posts.

F23gulb1                    Trial

1            THE COURT:  He's going to do 79.8 million --

2            MR. TURNER:  That's not a post.

3            THE COURT:  -- in commissions.

4            MR. TURNER:  That has been directly addressed in the

5    government's letter.  It's not inconsistent in any way with

6    what --

7            THE COURT:  Then it's not going to be a problem for

8    you.  I'm allowing it.  I'm allowing it.  No.  Sit down.  I'm

9    allowing it.

10           MR. TURNER:  It's suggests --

11           THE COURT:  I'm allowing it.

12           The June 18, 2011, the October 19, 2011, the June 18

13   and the October 19 both come from posts, Mr. Dratel.

14           MR. DRATEL:  Correct.

15           THE COURT:  The 79.8 does not, so for that one, you

16   can say "information as of" and then give the date of the

17   complaint, all right?

18           MR. DRATEL:  Okay.  We have December 1.  I'm sorry.

19           THE COURT:  22C.

20           MR. DRATEL:  Okay.  Right.  22C is first.

21           THE COURT:  June 18, 2011.

22           MR. DRATEL:  Yes.

23           THE COURT:  October 19, 2011.

24           MR. DRATEL:  Right.  Then also on December 1 the page

25   before, 401C, it's another post.

1                   THE COURT:  It's a post.

2                   MR. DRATEL:  Yes, December 1, 2011.

3                   THE COURT:  If it's a post, you can read it as a post.

4                   MR. DRATEL:  What does the Court want me to say --

5                   THE COURT:  About the 79.8, which apparently that may

6       have changed.  One can argue an inference that it did or did

7       not change over time, but that is based upon information as of

8       this date.

9                   MR. TURNER:  We ask that the context of that sentence

10      in the complaint be read in in full, because the complaint is

11      very clear that this was based as of the date of the arrest.

12                  THE COURT:  Fine.  Why don't you pull out that

13      language and make sure you all agree on the highlight on that.

14                  MR. TURNER:  I'd also like an instruction to the jury

15      that they're not to infer that there is some sort of

16      inconsistency here.  This is why it's being put in, because the

17      defendant is trying to confuse the jury that the government

18      said that $80 million in bitcoins were seized or were part of

19      the commissions and now it's only saying that $13 million in

20      commissions.  It is apples and oranges, and they're trying to

21      treat it as the same thing.

22                  This is being introduced for no other purpose but to

23      confuse the jury and that's why *Purdy* is important.

24                  THE COURT:  All right.  I will give the instruction.

25      Mr. Dratel, you'll give the entirety of that context, all

F23gulb1                          Trial

1   right?

2            MR. DRATEL:  Okay.

3            THE COURT:  We're still waiting on three.  We'll come

4   back out as soon as they have or I have a resolution of this

5   situation.

6            THE DEPUTY CLERK:  All rise.

7            (Recess)

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F23gulb1                         Trial

1                    (Pages 2084 through 2097 sealed by order of the Court)

2                    (In open court; jury not present)

3                    THE CLERK:  All rise.

4                    THE COURT:  Let's bring the jury out.

5                    THE CLERK:  All rise as the jury enters.

6                    (Jury present)

7                    THE COURT:  All right.  Ladies and gentlemen, let's

8      all be seated.

9                    Your witness.  We've got a new witness.

10                   MS. LEWIS:  The defense calls Chris Kincaid.

11                   THE COURT:  Mr. Kincaid.

12                   THE CLERK:  Please raise your right hand.

13      CHRISTOPHER KINCAID,

14         called as a witness by the defendant,

15         having been duly sworn, testified as follows:

16                   THE CLERK:  Please state and spell your full name.

17                   THE WITNESS:  Christopher Kincaid,

18      C-h-r-i-s-t-o-p-h-e-r K-i-n-c-a-i-d.

19                   THE COURT:  All right, Mr. Kincaid.  You can be

20      seated, sir.  And it will be important for you to pull up your

21      chair and to adjust that microphone so that you can speak

22      clearly.  And there is water there on your left.

23                   THE WITNESS:  Thank you.

24                   THE COURT:  Ms. Lewis, you may proceed.

25                   MS. LEWIS:  Thank you.

F23gulb1                         Trial

1    DIRECT EXAMINATION

2    BY MS. LEWIS:

3    Q.   What is your name?

4    A.   Christopher Kincaid.

5    Q.   How old are you?

6    A.   31.

7    Q.   And where do you live?

8    A.   235 Monterey Boulevard in San Francisco.

9    Q.   That's in California?

10   A.   Yes.

11   Q.   And where do you currently work?

12   A.   I work at Room & Board, a furniture store in San Francisco.

13   Q.   How long have you worked there?

14   A.   It's been about three months at this point.

15   Q.   OK.  What did you do before that for work?

16   A.   I worked for a chi tea company for a short period of time,

17   and then before that I worked for a mattress company and

18   managed their flagship store for seven years.

19   Q.   OK.  What is your educational background?

20   A.   Currently I'm working on my associate's degree and hoping

21   to transfer to State or UC.  I am a psyche major.

22   Q.   Are you familiar with Ross Ulbricht?

23   A.   Yes.

24   Q.   OK.  And how are you familiar with Ross?

25   A.   I was living with Ross for a couple of months roughly 15 or

1    16 months ago.

2    Q.  OK.  And that was until his arrest?

3    A.  Yes.

4    Q.  OK.  So from about August to September -- I'm sorry, August

5    to October?

6    A.  That sounds right.

7    Q.  And that is 2013?

8    A.  Yes.

9    Q.  And do you see Ross in the courtroom today?

10   A.  Oh, yes.

11   Q.  And can you identify him by an article of clothing that he

12   is wearing?

13   A.  Yeah.  He's got a gray sweater on and a white collared

14   shirt.

15   Q.  And how did Ross come to live with you?

16   A.  A room in our house opened up and we posted a Craigslist

17   ad, and there were several people who came to look at the room.

18   We had a good feeling about Ross from the first conversation

19   that we had with him.  He was actually trying to decide between

20   two places to live, and ultimately he decided to move in with

21   us and we were happy to have him.

22   Q.  When you say "our house," who is that?

23   A.  That was myself, my wife and our other roommate Alex.

24   Q.  OK.  And so how many people were living at the house at

25   that time?

F23DULB2                    Kincaid - direct

1   A.   Including Ross, there was four of us.

2   Q.   How big is the house?

3   A.   It is a three-bedroom.

4   Q.   Did you ever know him by any other name besides Ross

5   Ulbricht?

6   A.   No.

7   Q.   Did you socialize with him while he was living with you?

8   A.   Oh, yeah, absolutely.

9   Q.   And in what ways did you socialize?

10  A.   It was common for us to hang out in the living room, and he

11  would play on his djembe, his drum, and I would play my bass

12  guitar and, you know, talk about random life events.  And there

13  was a time he had a gathering of people out at the beach and we

14  all just kind of hung out and celebrated.  I mean, he

15  accompanied me to a friend's birthday one time, as well.  And

16  we ended up leaving and going on this long walk to the city and

17  ended up food shopping and eating some crepes.  And it was good

18  times?

19  Q.   Did he ever bring people over to the house?

20  A.   Oh, yeah.  Absolutely.  His childhood friend Rene and his

21  girlfriend came by for dinner one night, and Ross and them and

22  my wife and I all sat down in our living room and had dinner

23  together.  And we shared childhood stories about Ross, and we

24  all kind of laughed at some of the peculiar things that he

25  shared.  Yeah.

F23DULB2                        Kincaid - direct

1   Q.  And did you ever meet anyone else -- anyone else come over

2   to the house?

3   A.  Oh, yeah.  Absolutely.  His family came and stayed with us

4   for a couple of nights.  I think they were on a road trip and

5   his parents --

6             MR. HOWARD:  Objection.  Relevance.

7             THE COURT:  Overruled.

8   Q.  You can continue.

9   A.  His parents stayed with us for a couple of nights, and I

10  was fortunate to meet his brother during that time as well.

11  Q.  OK.  So which of his family members did you meet then?

12  A.  It was his mother Lynn and his father Kirk and his brother

13  Travis.

14  Q.  Around what time was this that they came to visit you or

15  came to --

16  A.  I want to say it was like somewhere between two and three

17  weeks before Ross was arrested.

18  Q.  OK.  And where exactly did his family stay?

19  A.  They slept in his bed and he slept in the couch in the same

20  bedroom even though he was too tall for the couch and his legs

21  were hanging off the side.

22  Q.  OK.  And if you know, how much time did Ross spend with his

23  family during that visit?

24  A.  I don't know exactly because I was working at the time, but

25  every time I was home he was there with his family.  I think

F23DULB2                        Kincaid - direct

 1   they stayed for a few days beyond that as well, if I remember

 2   correctly.

 3            MS. LEWIS:  Thank you.  No further questions.

 4            THE COURT:  Thank you.

 5            Mr. Howard.

 6            MR. HOWARD:  Thank you.  I will be brief.

 7   CROSS-EXAMINATION

 8   BY MR. HOWARD:

 9   Q.  So, Mr. Kincaid, you said on direct examination you only

10   knew the defendant for a couple of months before he was

11   arrested, correct?

12   A.  Yes, that's right.

13   Q.  And you weren't with him on the day that he was arrested,

14   were you?

15   A.  No, sir.  I was at work.

16   Q.  You sublet a room to him through Craigslist, right?

17   A.  I'm sorry.  Could you repeat that?

18   Q.  You sublet -- you leased a room in your house to him

19   through Craigslist, correct?

20   A.  That's right.

21   Q.  And he paid for the first month with a money order, isn't

22   that right?

23   A.  That sounds right.

24   Q.  You had no idea what he was doing for a living at the time,

25   isn't that right?

F23DULB2                          Kincaid - cross

1   A.  I didn't.

2   Q.  And now on direct examination you described you had a

3   social relationship while you lived with him, is that right?

4   A.  That's right.

5   Q.  Do you remember meeting with an FBI agent in late October,

6   a couple of weeks after the defendant's arrest?

7   A.  That sounds right.

8   Q.  And do you remember telling -- isn't it true that you told

9   him that you barely spoke with the defendant during the two

10  months you lived with him?

11  A.  I don't recall.

12          MR. HOWARD:  Your Honor, may I approach the witness?

13          THE COURT:  You may.

14  Q.  Would you just take a look at that document and let me know

15  when you've finished reading it?

16  A.  OK.

17  Q.  Does that refresh your memory?

18  A.  Where would you like me to start, from the top --

19  Q.  I am not asking you to read it.

20          THE COURT:  Don't read it out loud.

21          THE WITNESS:  Oh, OK.

22  Q.  Does that refresh your memory about whether you told that

23  to the FBI agent?

24  A.  It doesn't.

25          MR. HOWARD:  No further questions.

F23DULB2                          Kincaid - cross

1             THE COURT:  All right.  Thank you.

2             Ms. Lewis, anything further from you?

3             MS. LEWIS:  Just a couple of questions, your Honor.

4    REDIRECT EXAMINATION

5    BY MS. LEWIS:

6    Q.  Just to be clear, the activities you described, did you do

7    all these things with the defendant while you were living

8    together?

9    A.  Which activities?  Sorry.

10   Q.  The ones you spoke about in your direct examination, the

11   parties you went to when you went to eat crepes, you know,

12   hanging out in the house playing the djembe drum, going on that

13   long walk together.

14   A.  Yes.  And there were times we went out to eat together as

15   well.

16   Q.  He lived with you for two months, right?

17   A.  That's right.

18   Q.  Were you working during that time?

19   A.  Yes.

20   Q.  OK.  About how many hours a week were you working?

21   A.  Probably 45 to 50 hours.

22   Q.  And was just on weekdays?

23   A.  No.  I worked weekends and then I'd have two days off

24   during the week.

25             MS. LEWIS:  Thank you.  No further questions.

F23DULB2                        Kincaid – redirect

1              THE COURT:  Thank you.  You may step down, sir.

2              (Witness excused)

3              THE COURT:  All right.  Would the defense like to call

4    its next witness, please?

5              MR. DRATEL:  Yes.  Thank you, your Honor.

6              I call Bridget Prince.

7              THE COURT:  All right.  Ms. Prince, please.

8              THE CLERK:  Please raise your right hand.  Stand.

9    Please raise your right hand.

10    BRIDGET PRINCE,

11         called as a witness by the defendant,

12         having been duly sworn, testified as follows:

13             THE CLERK:  Please state and spell your full name for

14    the record.

15             THE WITNESS:  Bridget Prince, B-R-I-D-G-E-T

16    P-r-i-n-c-e.

17             THE CLERK:  Thank you.

18             THE COURT:  All right.  Ms. Prince, please be seated.

19    And it will be important for you to adjust that microphone so

20    that you can speak into it clearly and directly, and there is

21    water there on your left.

22             THE WITNESS:  Great.

23             THE COURT:  Mr. Dratel, you may proceed, sir.

24             MR. DRATEL:  May I just have a moment, your Honor,

25    because I think there was a miscommunication?

F23DULB2

1           (Pause)

2           Thank you, your Honor.

3    DIRECT EXAMINATION

4    BY MR. DRATEL:

5    Q.  Good morning.

6    A.  Good morning.

7    Q.  Could you state your name again, please?

8    A.  It's Bridget Prince.

9    Q.  And how old are you?

10   A.  I'm 39.

11   Q.  And how are you employed?

12   A.  I'm an investigator and researcher.

13   Q.  And what kind of investigation and research do you do?

14   A.  I run a company called One World Research, and we carry out

15   a variety of investigations primarily for attorneys and NGOs.

16   Q.  What are "NGOs"?

17   A.  Nongovernmental organizations.

18   Q.  Can you give us an example of an NGO that you have worked

19   for?

20   A.  Human Rights Watch or the ACLU.

21   Q.  And how long have you been doing this job of One World

22   Research?

23   A.  I've worked for One World research since 2007.

24   Q.  And before that?

25   A.  Before that I worked the Habeas Corpus Research Center in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F23DULB2                         Prince - direct

1   San Francisco as an investigator, and before that I worked for

2   a private investigator company called Murphy & Associates in

3   San Francisco.

4   Q.  And what is your education?

5   A.  I have a master's in human rights from the London School of

6   Economics and a bachelor's in Philosophy from Kings College,

7   London.

8   Q.  And you were retained by the defense in this case to be an

9   investigator?

10  A.  That's correct.

11  Q.  I show you what's -- did you have access to the image of

12  the defendant's laptop, Mr. Ulbricht's laptop?

13  A.  Yes, I did.

14  Q.  I'm going to approach and show you what's marked as

15  Defendant's M, as in Mary, and ask you if you recognize that

16  document.

17  A.  Yes, I do.

18  Q.  And can you just explain what it is generally?

19  A.  This is a document that was found on the laptop.

20  Q.  And is it a file?

21  A.  Yes.  It is a text file.

22  Q.  And what is the name of the text file?

23  A.  It's named "market rewrite."

24          MR. DRATEL:  I move Defendant's M in evidence, your

25  Honor.

1              MR. TURNER:  No objection.

2              THE COURT:  Received.

3              (Defendant's Exhibit M received in evidence)

4              MR. DRATEL:  And could we publish Defendant's M,

5    please.

6              (Pause)

7              THE COURT:  Mr. Horowitz, will you be able to brighten

8    that a little bit also?

9              MR. HOROWITZ:  I believe that once the projector warms

10   up, it will probably be brighter.

11             THE COURT:  All right.

12   BY MR. DRATEL:

13   Q.  So this document says:  "For later.

14             "Use auto focus on pages with form inputs.

15             "reso center message format to make admin message

16   clear.

17             "Minimize cache parameters in silkroad," and then a

18   symbol "users.

19             "Group listings under category tree on vendor pages.

20             "Update placeholders.

21             "Style pagination links.

22             "Flag URLs in discussion posts and reviews.

23             "Cleanup order process.

24             "Cleanup old orders still processing.

25             "Add transaction hash to withdrawal and deposit

F23DULB2                          Prince - direct

1    records.

2              "Restrict item title characters.

3              "Change - one quantity to deleted flag.

4              "Move constants to global config."

5              And it is essentially a list, correct, the rest of it?

6    A.  That is right.

7    Q.  Now, did you have a chance to review production of

8    Mr. Ulbricht's Google account?

9    A.  Yes, I did.

10   Q.  And did you review emails associated with that account?

11   A.  Yes, I did.

12   Q.  And did you review whether there were emails between June

13   24, 2013 and June 28, 2013?

14   A.  Yes, I did.

15   Q.  Did you find emails from Mr. Ulbricht -- from Mr.

16   Ulbricht's account for that period of time?

17   A.  Yes, there were.

18   Q.  And approximately how many emails did you find during that

19   period that you looked?

20   A.  Approximately six.

21            MR. DRATEL:  May we approach, your Honor?

22            THE COURT:  Yes.  Do you mean to the sidebar?

23            MR. DRATEL:  Yes.  I'm sorry.

24            THE COURT:  Sorry.  I thought you meant the witness.

25            MR. DRATEL:  Yes.  I have one question.

F23DULB2                          Prince - direct

1                  (At the sidebar)

2                  MR. DRATEL:  I just wanted to make sure.  I am not

3       going to ask her about the complaint.  I am just going to read

4       that in separately.

5                  THE COURT:  Yes.

6                  MR. DRATEL:  OK.

7                  (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F23DULB2                              Prince - direct

1              (In open court)

2              MR. DRATEL:  I have nothing further, your Honor.

3              THE COURT:  Thank you.

4              Anything from you, Mr. Turner?

5              MR. TURNER:  No.  Thank you.

6              THE COURT:  Thank you.  You may step down.

7              (Witness excused)

8              THE COURT:  Mr. Dratel.

9              MR. DRATEL:  Yes.

10             I am just going to read what has been stipulated as

11     coming in.

12             THE COURT:  These are posts from the Silk Road forum,

13     is that correct?

14             MR. DRATEL:  Yes.

15             THE COURT:  All right.

16             MR. DRATEL:  DPR's first posting to the forum was

17     June 18, 2011.  At that time DPR's username on the forum was

18     simply "SilkRoad."

19             MR. TURNER:  Your Honor, may we have one moment?

20             THE COURT:  Yes.  Hold on one second, Mr. Dratel.

21             MR. TURNER:  This document is already in the record

22     your Honor as 125A.

23             THE COURT:  All right.  So do you want to point out

24     125A, Mr. -- let me just take a look at it, but it is already

25     in evidence.  We can do it either way.  You are certainly

F23DULB2

1   welcome to point it out now, if you would like.

2            MR. DRATEL:  That is a June 18, 2011 post from DPR

3   with the username silkroad -- I'm sorry, it is from username

4   silkroad.  It is a June 18, 2011 post --

5            THE COURT:  Do you want to just --

6            MR. DRATEL:  -- by DPR.

7            THE COURT:  Do you want to see the version that is in

8   evidence?  It might be helpful.

9            MR. DRATEL:  OK.

10           THE COURT:  Here.  I can give you my hardcopy.

11           MR. DRATEL:  OK.  Thank you, your Honor.

12           THE COURT:  (Handing to Mr. Dratel).

13           MR. DRATEL:  June 18, 2011, at 1:44 a.m.

14           "Hey, gang,

15           "Really sorry for the dead time there.  Hopefully most

16   of you got the message on the bitcoin forum or at

17   silkroadmarket.org.  The only major change is this forum.  We

18   have it running on a separate server with its own url so if the

19   main site ever goes down again, first check here for updates.

20   Unfortunately this means we have separate logins for the main

21   site and the forum.

22           "As we mentioned before, everything was backed up and

23   totally restored, but if for some reason a deposit didn't make

24   it into your account or something like that, just let us know

25   and we'll track it down and credit you.  Also, we're giving

F23DULB2

1   everyone a 4 day grace period on taking orders to the

2   resolution center before they are auto-resolved, so sellers,

3   you may see some orders past due for a few days.

4          "Thanks everyone for hanging in there with us.  This

5   work is scary and exciting all at the same time, and I'm really

6   very happy to be on this journey with all of you.

7          "Cheers, Silk Road staff."

8          Another post, December 1, 2011, from the Silk Road

9   staff.  It says:  "Silk Road now resides at a new more easily

10  remembered URL" -- and I'll leave out the URL.  "Please update

11  your book marks and memorize it:  Silk Road vb5piz3r.onion."

12         October 19, 2011, Silk Road staff posted a message as

13  follows:  "We're having to rebuild the site from a backup.

14  There was no security breach or anything to worry about that

15  led to this situation.  Release server space in different

16  locations around the globe through unaware third parties.  We

17  do this to hide the identities of those that run Silk Road in

18  the event of a security breach in one of the servers.

19  Unfortunately this means we have to deal with some unreliable

20  people."

21         October 21, 2011, Silk Road staff posted:  "The light

22  at the end of the tunnel is getting bigger.  We have a full

23  capacity server online and are in the process of configuring

24  it."

25         October 22, 2011, Silk Road staff posts:  "The site

F23DULB2

```
 1    just went live.  The new server is more powerful and secure
 2    than the one we were on before the outage and at least through
 3    a more professional proxy.  So I have high hopes that it will
 4    last us a long time."
 5            MR. TURNER:  Your Honor, could I just note for the
 6    record that most of that post is contained in 125E.
 7            THE COURT:  125D --
 8            MR. TURNER:  Yes.
 9            THE COURT:  -- is also a record of the October 19th,
10    2011 post.  Yes.
11            MR. DRATEL:  Your Honor, I'm just going to return your
12    copy.  Thank you.
13            THE COURT:  All right.  Thanks.
14            MR. DRATEL:  And there are two additional issues that
15    I don't know that we have resolved yet with respect to defense
16    exhibits.
17            THE COURT:  The one that we spoke about?
18            MR. DRATEL:  Yes and the other one.
19            THE COURT:  We didn't resolve it?
20            MR. DRATEL:  Well, we resolved it.  I just -- should
21    we have a sidebar?
22            THE COURT:  OK.  That's OK.  Let me just sort of tell
23    the ladies and gentlemen of the jury -- actually, you know what
24    we'll do, we'll take a break.  This is what we do, right, when
25    we are within striking distance of a break and we are going to
```

F23DULB2

1    have a sidebar.

2              Let me tell you, ladies and gentlemen, of the jury

3    that we are very close to the end of the evidentiary record.

4    So I don't want you to talk to each other or anybody else about

5    this case.  If you use the breaks to look at any kind of news

6    reports or anything else, make sure you do not read anything

7    about this case.  Take a break and we'll be back in a few

8    minutes and we'll take it from there.

9              Thank you very much.

10             THE CLERK:  All rise as the jury leaves the courtroom.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F23DULB2

```
 1                (Jury not present)

 2                THE COURT:  All right.  Let's all be seated.

 3                As I understand it, there are the three components

 4     that we had talked about.  Were there other items which you had

 5     identified?

 6                MR. DRATEL:  Yes, your Honor.  Just that --

 7                THE COURT:  Do you want to hand me the document?

 8                MR. DRATEL:  Sure.

 9                THE COURT:  Or is there language that you are

10     suggesting we add?

11                MR. DRATEL:  Yes.  Well, let me try to -- I can hand

12     you the document but I also kind of need this.

13                THE COURT:  Actually, I realize I have a copy from

14     earlier.

15                MR. DRATEL:  OK.

16                THE COURT:  Tell me the component that you are

17     thinking of adding.

18                MR. DRATEL:  Yes.  One is that DPR was informed that

19     the concentration was on the forum and administrators and

20     moderators.

21                THE COURT:  The "concentration."  What do you mean by

22     concentration?

23                MR. DRATEL:  In other words, the investigation was

24     focusing -- I'm taking it from the document directly --

25     focusing on the forum and your admin and mods.  So rather than
```

F23DULB2

1   putting it in slang, administrators and moderators.

2           THE COURT:  Let me get the other one and then we will

3   talk about this.

4           MR. DRATEL:  OK.  There are references to

5   Mr. Wonderful as one of the people who is conducting -- who was

6   one of the undercovers.

7           That Mr. -- I'm sorry, that DPR is paying for the

8   information.

9           THE COURT:  All right.  What else?  Anything else?

10          MR. DRATEL:  There have been efforts to DDos,

11  distributed denial of service, the site and the forum.

12          THE COURT:  That came in through the law enforcement

13  investigation?  Didn't he know about those?  There is already

14  evidence in the record about DDos attempts.

15          MR. DRATEL:  Not -- he didn't have information that

16  the government may have been responsible for it.  I'm not

17  saying that is true or not.

18          THE COURT:  I know, but that is coming in for the

19  truth, though.

20          MR. DRATEL:  It is not come in for the truth.  It is

21  coming in for his state of mind as to what he is going to do

22  after he learned this.

23          THE COURT:  All right.  Let me get the complete list.

24          MR. DRATEL:  OK.  There have been attempts to run exit

25  nodes and track traffic across TOR, and that there also is a

F23DULB2

1    focus on bitcoin exchanges as part of the investigation.

2              THE COURT:  Anything else?

3              MR. DRATEL:  That's it, your Honor.  I mean,

4    obviously, we would like the whole document but this is --

5              THE COURT:  I understand.

6              Mr. Turner.

7              MR. TURNER:  We would have no objection to the first

8    change about administrators and moderators.  Everything else we

9    would object to for the reasons stated in camera.

10             MR. DRATEL:  That he was paying for it?

11             THE COURT:  Let me just tell you what I think is

12   within the scope of what I believe is appropriate and straddles

13   the lines between the hearsay issues and the 403 issues, which

14   are the three statements that we had previously talked about:

15   That DPR learned in the spring of 2013 that law enforcement was

16   investigating Silk Road and attempting to identify DPR.

17             Number two, that on Ross Ulbricht's laptop there was a

18   multipage document entitled "LE Counterintelligence," which the

19   parties agree means "law enforcement counterintelligence."

20             Three.  This document contains communications to DPR

21   about a variety of information relating to purported ongoing

22   law enforcement efforts with respect to Silk Road and DPR.

23             Four -- these are new -- DPR learned that the

24   investigation included the forum, administrators and

25   moderators, and bitcoin exchanges.

F23DULB2

1      And, five, DPR was providing payment for the

2   information.  Full stop.

3      MR. TURNER:  We'd object to the mention of bitcoin

4   exchanges, your Honor, for the reasons we've stated.

5      THE COURT:  All right.  I think that in terms of

6   bitcoin exchanges, let me be clear.  That is not to be confused

7   with a reference to Mr. Karpeles, but to the extent that there

8   was investigation as to whether or not the movement of funds

9   could be a focus of the investigation and might give some

10  indication as to anything having to do with Silk Road, I think

11  that that is just part and parcel of what was being

12  investigated.  Whether or not it caused a reaction by DPR is, I

13  think, entirely different.  So I'm not suggesting that the

14  Karpeles, Mount Gox piece is incorporated in that.

15     MR. TURNER:  I understand your Honor is not suggesting

16  that, but I think that is a suggestion that is going to be made

17  to the jury and it is based on hearsay and it is --

18     THE COURT:  Well, I think that the fact that it

19  included bitcoin exchanges is fact, right?

20     MR. DRATEL:  Yes.

21     THE COURT:  And you can't use from that, Mr. Dratel --

22  just so that we're clear, you can't extrapolate from that that

23  Mr. Karpeles did it.

24     MR. DRATEL:  I will not use it in connection with

25  Mr. Karpeles, your Honor.

F23DULB2

1          THE COURT:  All right.  That's what I am going to

2     allow.

3          All right.  Do you have those down?

4          (Pause)

5          MR. DRATEL:  No.  I can read what the Court has

6     written down, if that's OK, but -- your Honor, I took some of

7     the notes --

8          THE COURT:  You have my notes.

9          MR. DRATEL:  Yes.

10          THE COURT:  But I'm going to --

11          MR. DRATEL:  I'm one of those jurors who don't like to

12     take notes and listen at the same time.

13          THE COURT:  Tell me if you can't decide on

14     particularly the placement of the word "purported," and I think

15     it should be introduced with "The parties have agreed to the

16     following."

17          (Continued on next page)

18

19

20

21

22

23

24

25

F23gulb3                          Trial

1              MR. DRATEL:  The only part I can't make out is it says

2    "ongoing law enforcement efforts," I think it says "with

3    respect to ID'ing Silk Road or DPR."  Is that --

4              THE COURT:  Silk Road and DPR; yes.

5              MR. DRATEL:  Okay.

6              THE COURT:  Now, there was a second item.

7              MR. DRATEL:  Whether the government is going to

8    stipulate with respect to Mr. Jones the stipulation that they

9    proposed to me that I ultimately am unable to get the statement

10   in --

11             THE COURT:  What's your position?

12             MR. TURNER:  No.

13             MR. DRATEL:  I move for mistrial, your Honor, on that.

14             THE COURT:  That does actually have the benefit of

15   actually evening out the number of times you have moved for a

16   mistrial.  Between this trial and the last one we tried, the

17   count makes it five movements, five applications denied.  So

18   that application is denied.  My ruling is as it was previously

19   and there's no basis to change it.

20             Here's what I'd like to ask you folks to do:  We can

21   bring the jury right out now, go through the one final thing

22   and then take another short break before closings, or we can

23   take our own short break right now, do the one final matter and

24   go directly into closings.

25             Preferences?

1              MR. DRATEL:  With respect to the last thing:  I think

2    that when the party offers a stipulation and the other party

3    accepts it, it's not a question of asking the defendant to

4    accept it and the defendant has to do it because that's a

5    different issue.  But when one party offers a stipulation and

6    the other party accepts it, it's a stipulation, and they can't

7    then withdraw it in a fit of pique.

8              THE COURT:  These are contract principles in part.

9    And there are lots of things which go into whether or not you

10   have a binding agreement, and there is the old saying that it's

11   not over 'til it's over, etc.  You got to see the signature wet

12   on the page, etc.  There are some instances, but that's not the

13   case.  I'm not going to force the government into a

14   stipulation.  In the absence of a stipulation, it's hearsay.

15             MR. DRATEL:  The government's email to me last night

16   was take it or leave it, so I'm taking it and now they renege.

17             THE COURT:  So be it.

18             Do you folks want to take a break right now and come

19   back, and then we'll go from this last piece, which I think

20   will take a minute or two, into the closings, which I think

21   makes more sense because the jury is already breaking right

22   now.

23             Are you ready?

24             MR. TURNER:  Sure.  Can we have a 15-minute break just

25   to make sure we have all of the electronics lined up.

1              MR. DRATEL:  I object.

2              THE COURT:  Yes.  The answer is yes.  Over objection,

3     the Court grants the application to set up the equipment.

4              Why don't you tell the jury that we'll resume at

5     11:30.  We'll have the remaining matters at 11:30 and then

6     straight into closing statements.  Thank you.

7              (Recess)

8              (In open court; jury not present)

9              THE COURT:  Just so you're all aware, we're going to

10    start and go directly into the closings.  When we get to 12:45,

11    the closings after Mr. Dratel has completed what he's going to

12    do, I will need to get a signal from you as to whether or not

13    we should try to go 'til 1:00, if that's a more logical place

14    to stop or we can stop at 12:45, but we need to break for lunch

15    between 12:45.  I suspect we'll be in the middle of something

16    at that point or not quite done.  If you have a preference as

17    to when, just somehow make it clear if you can.

18             MR. TURNER:  Okay.

19             THE COURT:  If you keep going beyond 12:45, I'm going

20    to let you go to 1:00, but then I'll stop you at 1:00.

21             MR. TURNER:  If I have maybe five minutes left at

22    1:00 --

23             THE COURT:  Then why don't you just tell me that.  Say

24    your Honor, I have a few more minutes left.  And we have lunch

25    brought in for the jury, so they will be fine with that to have

F23gulb3                          Trial

1    you stop at that point.

2                MR. TURNER:  Okay.

3                THE COURT:  Let's bring out the jury.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F23gulb3                         Trial

1                 (In open court; jury present)

2                 THE COURT:  Thank you.  Let's be seated.  Mr. Dratel,

3       you may proceed.

4                 MR. DRATEL:  Thank you, your Honor.

5                 The parties have agreed to the following:  DPR learned

6       in the spring of 2013 that law enforcement was investigating

7       Silk Road and attempting to identify DPR.  There was a

8       document -- withdrawn.

9                 There was a multipage document on the Ross Ulbricht

10      laptop titled "LE Counterintel," which the parties agree means

11      law enforcement counterintelligence.  This document contains

12      communications to DPR about a variety of information relating

13      to ongoing law enforcement efforts with respect to Silk Road

14      and DPR.  DPR learned that the investigation included the forum

15      administrators and moderators and bitcoin exchanges.  DPR was

16      providing payment for the information.

17                Thank you, your Honor.

18                THE COURT:  Is there anything further from the

19      defense?

20                MR. DRATEL:  No, your Honor.  The defense rests.

21                THE COURT:  Ladies and gentlemen, the evidentiary

22      record in this matter is now closed.  You have now heard all of

23      the evidence in this matter.  Let me just describe to you how

24      we're going to proceed from here.  We're now going to go

25      directly into closing statements.  I told you at the outset

1      that there are two opportunities for the lawyers to address you

2      directly.  The first is during the opening statements when they

3      give you an overview as to what they expect the evidence will

4      show; and the second comes at the end of the case when they may

5      argue to you as to what they believe the evidence that's in the

6      record has shown.  They will argue to you as to what inferences

7      they think you should draw.

8              What the lawyers say is not evidence.  The evidence is

9      that which was received into evidence in this matter through

10     the witnesses, through the documents during the trial.

11             During closings, as at any other point in time, what

12     lawyers say is not evidence, with the sole exception as to when

13     they are reciting a stipulation.  But other than that, what

14     lawyers say is not evidence.  So your recollection of evidence

15     and ultimately the inferences that you determine should be

16     drawn from the evidence is what controls.

17             The closing statements will not be completed in their

18     entirety before lunch.  After all the closing statements are

19     completed, I'll then charge you on the law and I'll be giving

20     you a copy of the jury instructions to follow along with me and

21     then you'll start your deliberations.

22             I don't know that you'll get to your deliberations

23     today.  It may be tomorrow morning.  We'll have to see how

24     things go and be a little bit fluid.  All right.  Thank you.

25             Mr. Turner.

1            MR. TURNER:  Thank you, your Honor.

2            At the beginning of this case we told you that we

3    would prove beyond a reasonable doubt that the defendant Ross

4    Ulbricht was the creator, the owner and the operator of the

5    digital drug-trafficking enterprise that was Silk Road, and

6    that's exactly what we've shown.

7            The evidence presented by the government comes from

8    multiple independent sources.  It's interlocking, it's

9    overwhelming, and to a significant extent, it's undisputed.

10   There is no dispute in this case that the defendant started the

11   Silk Road website.  The defense counsel conceded that right off

12   the bat.  There's no dispute that it was used to sell drugs

13   from the start.  There's no dispute the defendant started it on

14   the Tor network so that the users of the site and the dealers

15   on the site and the site itself would be hidden.  And there's

16   no dispute that when the defendant was arrested, he was logged

17   into the Silk Road website as the Dread Pirate Roberts.

18           The dispute in this case isn't even about whether the

19   defendant operated the Silk Road website.  The defense has

20   already granted that he did.  It's about when and for how long.

21   I'll explain later under the law it doesn't even really

22   matter --

23           MR. DRATEL:  Objection.

24           MR. TURNER:  -- but the evidence is clear that he ran

25   it from beginning to end.  He started it.  It was his baby.

1    And he stayed with it enthusiastically for nearly three years.

2    It was his secret livelihood.  It was his passion.  He built it

3    he grew it, he operated it from top to bottom until the very

4    end when he was arrested logged into the site as its

5    mastermind.

6          How do you know that it was Ross Ulbricht the whole

7    time behind his computer?  Because of the mountain of evidence

8    you've seen that he ran it the whole time.  Let's start with

9    the files on his computer, ladies and gentlemen.  His computer

10   is filled with evidence related to Silk Road.  There are

11   hundreds of files spread across numerous folders.  There's an

12   entire copy of the Silk Road website itself.  There's an entire

13   copy of transaction records covering the whole duration of the

14   site.

15         There are chats with Silk Road employees.  There are

16   Silk Road bookkeeping records.  There are lists of Silk Road

17   servers, there's Silk Road to-do lists, Silk Road reports, Silk

18   Road maintenance logs and on and on.  These files date from

19   2013 all the way back to 2010 when the defendant was first

20   starting to work on the site.  This is not what you'd expect to

21   see if Silk Road had been just some passing fad and passing

22   interest of the defendant that he pursued for a few months back

23   in 2011.  It's what you'd expect to see on a person's computer

24   who had been running the site continuously for years, and the

25   details of so many of these files are damning, so let's start

1    with the personal journal that the defendant kept on his

2    laptop.

3            THE COURT:  Can you speak up a little bit.

4            MR. TURNER:  Sure.

5            These files go from 2010 to 2012.  And it's absolutely

6    clear that the defendant wrote these journal entries.  They're

7    filled with personal details about the defendant.  So in these

8    entries, the defendant talks very explicitly about starting and

9    running and continuing to run Silk Road.  The 2010 journal

10   entry begins "I started the year in the middle of my stint with

11   Good Wagon Books."  Remember this is something he did before

12   Silk Road.  The journal entry goes on and on about Good Wagon

13   Books for a few paragraphs and the defendant's personal life.

14           And then it says, "While all of this was happening, I

15   began working on a project that had been in my mind for over a

16   year.  I was calling it Underground Brokers, but eventually

17   settled on Silk Road.  The idea was to create a website where

18   people could buy anything anonymously, with no trail whatsoever

19   that could lead back to them.  I had been studying the

20   technology for a while, but needed a business model and

21   strategy.  I finally decided that I would produce mushrooms,"

22   magic mushrooms, illegal drugs, "so that I could list them on

23   the site for cheap to get people interested.  I worked my ass

24   off setting up a lab in a cabin out near Bastrop off the grid.

25   In hindsight, this was a terrible idea and I would never repeat

it, but I did it and produced several kilos of high quality
shrooms.  On the website side, I was struggling to figure out
on my own how to set it up."

       How do you know that's Ross Ulbricht?  Well, for one
thing in the defendant's Gmail there's an email around the same
time showing that he was looking for a place to rent in
Bastrop.  There's also a copy of the book on the defendant's
computer titled "The Construction and Operation of Clandestine
Drug Laboratories."  It's filled with instructions on how to
set up your own laboratory custom built for drug dealing.  So
from the very beginning the defendant conceives that Silk Road
as a website for drug trafficking and he was setting up to be
its very first drug dealer.

       In 2010 journal entry ends with an express of high
hope for Silk Road in the coming year.  "It says" in 2011, "I
am creating a year of prosperity and power beyond what I have
ever experienced before.  Silk Road is going to become a
phenomenon and at least one person will tell me about it,
unknowing that I was its creator."  The same journal entry, the
same guy.  It's clear from this entry that Silk Road is not
some little experiment he's pursuing for a few months.  It's an
obsession.  He wants power.  He wants prosperity.  He is
relishing the thought, the site becoming a phenomenon with him
the secret mastermind behind it.  Those are long-term
ambitions, ladies and gentlemen.

F23gulb3                          Summation - Mr. Turner

1              We see these ambitions continue in the journal entries

2       into 2011 and beyond.  So the 2011 journal starts out, "Still

3       working on Good Wagon Books and Silk Road at the same time.

4       Programming now.  Patchwork PHP MySQL.  Don't know how to host

5       my own site.  Didn't know how to run bitcoind.  Got the basics

6       of my site written.  Launched it on freedom hosting.  Announced

7       it on the bitcointalk forums.  Only a few days after launch, I

8       got my first signups, and then my first message.  I was so

9       excited I didn't know what to do with myself.  Little by

10      little, people signed up, and vendors signed up, and then it

11      happened.  My first order.  I'll never forget it.  The next

12      couple of months, I sold about ten pounds of shrooms through my

13      site."

14             How do you know that's Ross Ulbricht?  First of all,

15      he says he launched his site on Freedom Hosting and there's an

16      email in his Gmail account where he's contacting somebody about

17      setting up a Tor hidden service.  The person recommends Freedom

18      Hosting.

19             Second, the journal entry says he announced the site

20      on the bitcoin talk forums.  And you saw evidence recovered

21      from the bitcointalk.org website showing that that was one of

22      the places where Silk Road was first publicized on the

23      Internet.  Remember, that's how IRS Agent Gary Alford caught up

24      to the defendant's trail.  He found a message on

25      bitcointalk.org that quoted a message by another user named

1   Altoid from January 2011 publicizing Silk Road.  Altoid's

2   original message had been deleted from the forum, but the

3   quotation still remained.  The defendant didn't realize that.

4   There's a chat on his computer where the defendant is telling a

5   Silk Road employee about how he first publicized the site.  He

6   says he made one thread on the forums at bitcointalk.org but it

7   got taken down pretty quickly.  The defendant must have thought

8   that once his original Altoid post had been deleted from the

9   site, there was no longer any link between that Altoid username

10  and Silk Road, because months after that Altoid post, he would

11  use the same Altoid username to post a message on bitcointalk,

12  unrelated to Silk Road, where he mentioned his true email

13  address, rossulbricht@gmail.com.  That's how Special Agent

14  Alford was able to tie the Altoid username of the defendant,

15  and that's another way that you know that the defendant was the

16  author of that 2011 journal entry where he's talking about

17  announcing the site on the bitcointalk forums.

18          Now, he also talks about, in that journal entry, the

19  shrooms that he grew.  He said those were the first things he

20  sold on Silk Road.  And you know that another place the

21  defendant first advertised Silk Road was on a website called

22  the Shroomery and you see that in his Gmail account, too.  And

23  you see there was another forum that he advertised on,

24  drugsforum.com where he's actually sort of punished by the

25  forum for spamming.  So, these emails show, again, the

1   defendant knew what he was doing.  He wasn't starting up some

2   content-neutral economic experiment.  He was creating a

3   drug-trafficking website.  That's why he's spamming about it in

4   discussion forums relating to illegal drugs.

5           Going back to that 2011 journal entry, there is

6   nothing in there, nothing to indicate that Ross Ulbricht ever

7   walked away from Silk Road a few months after starting it.  To

8   the contrary, the journal entry goes on and on about how the

9   site grew bigger and bigger over the course of 2011.  He says

10  "For the first several months, I handled all of the

11  transactions by hand."  And he rewrites the site.  "Rewriting

12  the site was the most stressful couple of months I've ever

13  experienced."  Then he perseveres.  "When I finally got the

14  site ready, there were several new features including a tumbler

15  and an automated payment processing."

16          He keeps going:  "Two U.S. Senators came out against

17  the site..they made a big deal out of it and called for a

18  shutdown of the site.  I started getting into a bad state of

19  mind.  I was mentally taxed."  Then he ends with "Eventually we

20  got through it and entered a more calm and harmonious phase."

21  Later:  "Some major advances were price pegging, vendor

22  ranking, a more sophisticated feedback system, buyer stats,

23  transaction logging, building up the admin toolset.  More

24  importantly, the market began its path to maturity.  After

25  making about 100k and up to a good 20- to 25k monthly, I

1    decided it was time to bring in some hired guns to help me take

2    the site to the next level.  For the next three months, SYG,"

3    one of those hired guns, "had my full attention."

4            So the journal entry goes through the year.  He's

5    continuing to run Silk Road.  It's getting big enough to

6    attract the attention of government officials.  It doesn't

7    dissuade him.  He sticks with it.  He grows it bigger.  And

8    there's a separate file on the defendant's computer with a

9    journal entry for 2012 which makes it clear again he's still

10   running the site.  "Well, I'm choosing to write a journal for

11   2012," he says.  "I imagine that some day I may have a story

12   written about my life, and it would be good to have a detailed

13   account of it."So it's clear at this point the site has only

14   gotten bigger and the defendant's ego has gotten bigger with

15   it.

16           It goes on to talk about his life in Australia where

17   Ross Ulbricht was living at the time.  And he talks about

18   personal things like his friends inviting him to hang out but

19   he can't, he says, he's too busy, it's just too much time away

20   from Silk Road.

21           How else do you know that the defendant didn't just

22   run Silk Road for a few months?  Because the evidence from

23   these journal entries dovetails with what you heard from a

24   personal friend of the defendant, Richard Bates.  Mr. Bates was

25   only one of two people in real life who he confided his secret

1    to.

2             You saw Mr. Bates testify on the stand.  He was not

3    happy to tell you about that, ladies and gentlemen.  He did not

4    want to be here.  You could tell it was painful for him to

5    testify about his former friend.  But Mr. Bates' testimony

6    makes clear that the defendant talked with him about running

7    Silk Road for many months in 2011 until the defendant moved to

8    Australia and cut his ties to Mr. Bates.

9             Mr. Bates told you the defendant started acting

10   mysteriously in late 2010 when the defendant kept contacting

11   him with programming questions.  He wouldn't say what it was

12   for.  Instead the defendant would only say top secret.  And

13   again, we saw the journal entries where in 2010 he says "On the

14   website side I was struggling to figure out on my own how to

15   set it up."

16            Eventually at the end of February 2011, Mr. Bates told

17   the defendant he wasn't going to help him until you tell me

18   what your secret is, right?  I'm officially forbidding you from

19   mentioning your secret project to me again unless you're going

20   to reveal it.  So the defendant gave it and he let him in on

21   his carefully-guarded secret.  The defendant showed Mr. Bates

22   the Silk Road website.  He was full of pride about it.  And

23   Mr. Bates told you he continued to talk with the defendant

24   about Silk Road regularly in the months that followed.

25            Mr. Bates told you he remembered conversations where

1    the defendant mentioned he was making commissions from the

2    site.  He told you he remembered a conversation where the

3    defendant said the site was getting too big for himself and he

4    needed to hire admins, and he actually asked Mr. Bates if he

5    wanted to be an admin.

6            All of this lines up with what you saw in the 2011

7    journal entry.  Do you remember how Mr. Bates told you he

8    remembered Senator Chuck Schumer issuing a statement about Silk

9    Road calling it to be shut down by law enforcement.  That's

10   also referenced in the 2011 journal entry.  And Mr. Bates told

11   you after that happened, he tried to dissuade the defendant

12   from continuing to work on Silk Road, work on something legal,

13   but the defendant didn't drop it; he continued working on Silk

14   Road and talking with Mr. Bates about it.

15           How do you know he's telling you the truth?  Because

16   you see references to Silk Road in the communications between

17   Mr. Bates and the defendant all the way through October 2011.

18   Mr. Bates told you that after the defendant told him about Silk

19   Road whenever they'd mention it in chat, they wouldn't say

20   "Silk Road," they talked about "the site," right.

21           "My site had a 40-minute spot on a national radio

22   program."

23           "I might tell people about the site if that's okay."

24   This is from March 2011.

25           April 2011:  "All my friends think your site is really

1    cool."

2              October 2011:  "You don't have a job besides the site

3    right now, do you?"

4              "Nope."

5              Now, in November 2011, things changed between the

6    defendant and Mr. Bates.  The defendant got nervous about how

7    much Mr. Bates knew.  You remember that Mr. Bates testified

8    that he invited the defendant to an 11-11-11 party,

9    November 11th party and the defendant shows up early to talk to

10   Mr. Bates in private.  He was panicking.  He asked Mr. Bates

11   have you told anybody, have you told anybody about my

12   involvement with Silk Road.  Mr. Bates says no.  The defendant

13   explained that the only other person who knew his secret, his

14   ex-girlfriend, had told someone else, and that person had

15   posted a message on the defendant's Facebook page saying I'm

16   sure the authorities would love to know about your

17   drug-trafficking site.

18             The defendant told Mr. Bates he had deleted that

19   message and unfriended the poster.  And Mr. Bates warned the

20   defendant, you've got to shut this thing down.  And the

21   defendant responds I can't shut it down, I've already sold it.

22   That was a lie.  It was a lie that the defendant told so he

23   could cut his ties to Mr. Bates and eliminate him as a

24   potential source of liability.  Chats recovered from the

25   defendant's computer make that crystal clear.  You remember

F23gulb3                    Summation - Mr. Turner

1    those chats.  They were read into evidence right after

2    Mr. Bates testified.

3           Those charts were with VJ, Variety Jones, who went

4    later by the name Cimon, and you can tell from the chats he's

5    kind of a mentor to the defendant.  The defendant talks about

6    him in that 2011 journal entry.  He says around the end of 2011

7    that Variety Jones shows up.  This was the biggest and

8    strongest willed character he had met through the site so far.

9    He quickly proved he had value in pointing out a major security

10   hole I was unaware of.  And he says he helped me interact with

11   the community about Silk Road, delivering proclamations,

12   handling troublesome characters, running a sale, changing my

13   name.  He's been a real mentor.

14          The idea of "changing my name," changing the

15   defendant's username on Silk Road came from a chat the

16   defendant had with VJ about Bates.  It's dated December 9,

17   2011, about a month after that party where the defendant told

18   Mr. Bates he had sold the site.

19          And VJ asked the defendant:  "IRL," in real life, "is

20   there anyone with a clue at all?"

21          "myself:  Unfortunately, yes.  There are two, but they

22   think I sold the site and got out."

23          "Good for that - when do they think you've sold."

24          "About a month ago," right when he told that lie to

25   Mr. Bates.

1                Then about a month later, VJ comes up with the idea of

2       changing the defendant's name on Silk Road to the Dread Pirate

3       Roberts.  And as you heard during the trial, Dread Pirate

4       Roberts is a movie character and part of the legend is that

5       there's not just one Dread Pirate Roberts.  When one person

6       gets tired of being Dread Pirate Roberts, he hands off the

7       title to someone else to be the successor.  So VJ suggests this

8       to the defendant to clear his trail.

9                "Have you ever seen The Princess Bride?  Do you know

10      the history of the Dread Pirate Roberts?  You need to change

11      your name from admin to Dread Pirate Roberts, clear your old

12      trail - to be honest, as tight as you play things, you are the

13      weak link from those two previous contacts," those two previous

14      contacts being Mr. Bates and his ex-girlfriend.  And that's

15      what happened.  So on the site about a month later -- well,

16      about a month later, the defendant changes his name on Silk

17      Road:  My new name is Dread Pirate Roberts.

18               That's whole point of the Dread Pirate Roberts

19      nickname, ladies and gentleman.  It's a con.  It's a bogus

20      cover story designed to fool people into believing there was

21      some sort of rotating command over the site.  The defendant and

22      VJ explicitly talked that way about it in other chats.  For

23      example, this one from October 2012:  The DPR thing is great,

24      and we need to make at least one publid set of statements that

25      indicates that the old admin is long gone, and dpr is now in

1    charge.

2         Myself: yea, I was thinking the same thing.  Have a

3    back story for him.

4         Cimon: I suggested DPR when I first realized I could

5    track you.  I don't give a shit who you are, and it's to my and

6    everyone's advantage no one else can.  DPR by it's very nature

7    indicates a rotating command.  We'll play that."

8         Which brings us to the TorChat logs on the defendant's

9    computer, the chat logs you saw so many of between DPR and the

10   Silk Road employees and advisors like VJ.  And like the journal

11   entries, they are incredibly damning.  There are reams of them.

12   Some of these chat logs are hundreds of pages long.  The one

13   with VJ is over 1,000 pages long.  And there is no real dispute

14   that the person reflected as "myself" in those chats is DPR,

15   the operator of the Silk Road website.

16        Here is an example.  This one is with Squid Shepard,

17   who was a member of the Silk Road support staff labeled here as

18   sSh, and he starts the chat by confirming that he's talking to

19   DPR.

20        "May I ask to whom I'm speaking?"

21        "Myself:  DPR, and you are?"

22        And that's consistent with all of the other chat logs

23   you've seen.  In each one "myself" is either specifically

24   referred to as DPR or Dread Pirate Roberts or Silk Road admin

25   or the context otherwise makes clear that "myself" is the

1    operator of the Silk Road website.

2         How do you know that the user reflected as "myself"

3    a/k/a DPR is the defendant, Ross Ulbricht?  Well, first of all,

4    Mr. Bates communicated with the defendant through TorChat later

5    in 2011.  And he told you he recognized who was who.  "r,"

6    Richard, Richard Bates; "myself" was the defendant.  This is

7    the same TorChat program that generated all the other TorChats

8    you see on the computer.  So it's true for all the other chats

9    that involve Silk Road employees and coconspirators.  The user

10   "myself" is the defendant.

11        But of course, you don't have to rely on Mr. Bates'

12   testimony to infer that because repeatedly and these chats

13   "myself" reveals little details about what's going on in his

14   life that match up perfectly with the details of Ulbricht's

15   life.  The details don't pop up regularly, but when they do,

16   it's often a perfect match between what they talked about in

17   the chat and what we see in the email account or Facebook

18   account or other evidence of what's going on in the defendant's

19   life.

20        For example, whenever "myself" talks about traveling

21   or being away in his chats, it matches up with the defendant's

22   travel plans.  An example is this chat with h7, who was one of

23   the programmers who worked for Silk Road, and in these chats,

24   "myself" is clearly the boss and h7 -- he gives programming

25   assignments to h7.  He tells h7 when he's going to be paid.  In

1    other words "myself" is DPR.

2            Now, at one point in these chats between "myself" and

3    h7, "myself" tells him I'm going to be unavailable from

4    4:00 a.m. UTC Friday to 4:00 a.m. UTC Sunday.  At that point,

5    the defendant is living in Australia, which is 12 hours ahead,

6    so that makes him unavailable from Friday to Sunday afternoon,

7    and that's what you see in the defendant's email account.  He's

8    going house-boating starting Friday 7:00 p.m. staying two

9    nights.  So it's the defendant who is speaking as "myself" in a

10   chat with h7.  He is the boss of h7.

11           Here is another example, a chat with VJ, January 26,

12   2012.  He tells VJ he's in a relaxing environment, friendly

13   folks everywhere.  VJ says "Sounds very Thai."

14           DPR says "Haha, I didn't expect you to start

15   guessing."

16           Well, where is the defendant at that time?  His

17   Facebook account shows that he is in Thailand.  A few days

18   later there's more chats with VJ where "myself" says "Took the

19   day off.  Ran around beaches and jungles with some girls, very

20   little on my mind."

21           "VJ:  Girls and jungles, life don't get any better for

22   'ol Dread Pirate Roberts."

23           Where is the defendant that day?  Beaches and jungles,

24   ladies and gentlemen.  This is his Facebook album "Thailand,

25   February 2012."  There are many more examples like this.

1           The chat with VJ -- now he's using the name Cimon --

2      "myself" says "I changed timezones today."  There's an

3      itinerary in his Gmail account where he's flying from San

4      Francisco to Austin.

5           November 2012, DPR says "I'm done traveling, at least

6      for a while anyway."  What does the defendant's email account

7      show?  He was traveling to Dominica that day.  He just got done

8      with three flights.

9           February 2013, DPR tells Cimon he's going to be away

10     over the weekend.  What does the defendant's Facebook account

11     show?  He went camping that weekend.

12          And it's not just travel.  It gets a lot more specific

13     than that.  Another example relates to a series of chats that

14     DPR has with VJ from March to May 2012 where DPR is talking

15     about how he is applying for foreign citizenship so he can

16     eventually renounce his U.S. citizenship.  And they

17     specifically talk about what it takes to buy citizenship in

18     foreign countries, and DPR mentions he is specifically looking

19     at applying for citizenship in the Caribbean island of

20     Dominica.

21          Elsewhere on the defendant's computer there's a

22     brochure about Dominica's Economic Citizenship Program where

23     you can buy citizenship with a cash investment in the form of a

24     donation to the government, to the Dominican government.  And

25     there's a filled-out application form signed by -- or with the

name "Ross Ulbricht," and the metadata is May 2012.  How do you

know that it's the defendant who is talking with VJ about these

things?  Well, in the defendant's Gmail account there are

several emails to friends where he says May 1, 2012, lines up

with the chat, "I'm applying for a second citizenship to an

island in the Caribbean called Dominica."  And then he says in

the second paragraph, "You may wonder why I'm doing this crazy

thing.  There are opportunities available, tax opportunities."

And he says at the end "It's a bit of a political hedge if

things ever get dicey here in the U.S."  What does that mean,

ladies and gentlemen?  Why would things ever get dicey for the

defendant here in the U.S.?  Because he was still running Silk

Road at the time, and that's why he's talking with VJ about

getting non-U.S. citizenship.

          This isn't the only time you see the defendant

thinking about things getting dicey for him.  You saw on

July 2013, he orders nine fake IDs from Silk Road, nine fake

IDs with different guises from different states, from different

countries.  Is this normal, ladies and gentlemen?  You saw the

messages on the Silk Road where those IDs were ordered.  He

doesn't use his own DPR account to write those messages because

you have to give an address for the order.  He uses a sham

buyer account, shefoundme account, Government Exhibit 935.

          And what does he ask the vendor of those IDs in

placing the order?  He says things like will these IDs get me

F23gulb3                    Summation - Mr. Turner

1    through airport security; will these IDs work if I get pulled

2    over by a cop?  He's not going bar-hopping with these IDs,

3    ladies and gentlemen.  He's worried about the possibility of a

4    life on the lam.

5            So back to the Tor chats:  There's another chat on the

6    defendant's computer with, again, VJ.  And you can see in this

7    chat the defendant actually crosses over chatting with VJ to

8    his Gmail account and then back to the chat with VJ.  Here

9    they're talking about improving the bitcoin tumbler on Silk

10   Road, part of the bitcoin payment system.  And VJ suggests find

11   me some statistician they can consult somehow about the math

12   involved.  And DPR says he knows a statistician, he knows her

13   and her husband well.  And VJ tells DPR to ask her who are the

14   top five statisticians in the world.

15           Five days later, we see the defendant emailing

16   someone, apparently the husband, with this very question.  "Who

17   are the top five statisticians in the world besides Heather?"

18   An exchange of emails ensues.  "Wow.  Good question.  In terms

19   of lifetime achievement or current hotness?"

20           And then we see after that DPR passes the exact same

21   email exchange to VJ.  It says "Here is my convo with my stats

22   friend.  Who are the top five statisticians in the world?  Wow.

23   Good question."

24           So it's undeniable that these chat logs from the

25   defendant's computer, hundreds of pages of chats, in which DPR

1    is assigning tasks to people, consulting about matters with

2    VJ/Cimon, the person behind those chats reflected as "myself"

3    is the defendant, Ross Ulbricht.

4          The evidence on the laptop does not stop by any means

5    with the journal entries in the chat logs.  There's still more.

6    There's a file labeled "sr accounting," Silk Road accounting.

7    It's a bookkeeping record of Silk Road.  How do you know that

8    it was created by the defendant?  Well, for one thing, it

9    starts all the way back in July 2010, July 17, 2010 start.

10         What sort of expenses does it list to start off?  This

11   is the same time when, according to the defendant's journal,

12   he's renting a cabin in Bastrop to grow magic mushrooms, and

13   that's what you see here:   Lab clothes, petri dishes, HEPA

14   filter.  And in the defendant's Gmail account, you find

15   matching receipts for the same items:  HEPA filter, carryover

16   from 2009.  2009, 88.94.  $89.  The same thing later:

17   Humidifier, August 15, 2010, $33.  There's an August 16 receipt

18   from Amazon, $33.

19         And the SR accounting document keeps going for months.

20   It doesn't stop after a few months.  It keeps going all the way

21   through July 2013 like the journal entries keep going well

22   after the site is launched.

23         And notably, it contains a number of entries for

24   commissions and that matches up with data found in the Silk

25   Road server.  The commissions start on the spreadsheet in

1   May of 2011.  As Brian shaw testified, the transaction data

2   from the server starts up in May 2011.  And this also matches

3   up with the 2011 journal entry in the defendant's computer.  He

4   says there after making about 100k and up to a good 25k

5   monthly, I decided it was time to bring in some hired guns and

6   that's what you see.  He starts making 25k or so monthly.

7   There's no break in the document or an indication that someone

8   different starts to maintain it.  In fact, there's an entry in

9   that sr accounting spreadsheet for the defendant's laptop,

10  Okay.  This is, like, a year later, April 28, 2012, $1,150 for

11  a laptop.  What do you see in the defendant's Gmail account?  A

12  matching receipt, April 27, 2012, just a day apart, $1,149.99,

13  one cent off, and it's a Samsung silver laptop, Model 700Z, the

14  same laptop that was seized from the defendant at the time of

15  his arrest.  He considered it a Silk Road business expense at

16  the time, and it's clear why:  Because he planned to use it to

17  run Silk Road, just as he was caught doing on the day he was

18  arrested.

19          There's another spreadsheet on the defendant's

20  computer.  This one is labeled "networth calculator," and the

21  entries on it go all the way from August 6 through June 2012

22  and it lists a bunch of different assets, including one that is

23  astronomically bigger than the rest labeled "SR Inc.,

24  $104 million."  Now, how do you know it's the defendant who

25  gave SR Inc. that valuation?  Look at the other items in the

1    spreadsheet.  There's the Samsung 700Z, there's the laptop.

2    There's also entry for USAA and PayPal accounts.  And if you

3    look at the USAA records for June 2012 where the last entry was

4    made in the spreadsheet, you see matching balances:  1347 in

5    the USAA account, $1,400; 46.89 in the PayPal account, $50.

6    So, this shows you in June 2012, the defendant counts SR Inc.

7    among his assets.  Why?  Because he is, of course, still

8    running it.

9            Another document in the defendant's computer worth

10   noticing, it's labeled log.txt, and on its face, it's clearly a

11   log of actions taken in connection with operating Silk Road.

12   So there are entries in there like tried moving forum to

13   multi.onion config, finished rewriting Silk Road.PHP

14   controller, rewrote orders page, paid attacker -- it was a

15   hacker -- 50,000 weekly ransom.  And these entries go from

16   March 20, 2013, all the way through September 30, 2013, the day

17   before the defendant's arrest.

18           How do you know that the defendant was the person who

19   maintained this log?  Because, again, every now and then there

20   are references to personal details that match up with

21   information known about the defendant.  So there's an entry for

22   May 3, 2013, "I'm sick."  What do you see in the defendant's

23   Gmail account?  Same date, "How are you feeling today?"

24           "A lot better.  I took NyQuil last night.  Got a good

25   night's sleep."

1          September 11, four months later to 18th says he got

2     covered in poison oak.  What does the defendant's email account

3     show?  "I have poison oak from head to toe."

4          It also says went on a first date with Amelia from

5     OKC.  What do you see in the Gmail account:  Okaycupid messages

6     dating services, involving Amalia, "Be there in a few.  Nice

7     meeting you."

8          But perhaps the most revealing of the defendant's

9     emails is a May 2, 2013 email.  If you look at the log file

10    around this time, you'll see a number of entries relating to

11    smed, smedley, one of the programmers that worked for Silk

12    Road.  And these log entries reflect that who ever is keeping

13    the log, DPR, was working closely with smed in early May to

14    deal with attacks on Silk Road:  Helping smed to fight off

15    attacker, working with smed to put up more defenses.

16         Well, smed shows up in the defendant's Gmail account

17    at this time.  And what appears to be a keyboard accident, this

18    email is sent to -- this is May 2, 2013 -- sent to somebody

19    named Curtis and has a screenshot attachment, no body in the

20    message, just a screenshot.  And the screenshot appears to have

21    been taken just a minute earlier before the email was sent if

22    you adjust for Pacific timezones.  And there is the photo that

23    was attached, the screenshot.

24         Now, presumably what the defendant was trying to do

25    was just send a screenshot of his desktop with this

F23gulb3                    Summation - Mr. Turner

bizarre-looking lizard on it.  But he probably didn't realize

that what happened was he had two monitors open and when he hit

"print screen," both screens are included in the screenshot

because on the other screen at the time was a chat with smed,

"smed:  Morning, hey, good morning," the same programmer that

according to the log DPR was busy working with at the time.

And if you look even further at the chat window, you'll see

there's another tab indicating the defendant had a chat going

with the username MG.  MG is also mentioned in the log file,

that Pidgin chat working with inigo working with MG.  And

what's more is that both MG and smed show up on the defendant's

computer the day of the arrest on his chat buddy list along

with cirrus, libertas and all the other Silk Road employees,

and the part of the defendant's chat buddy list where his own

username was listed as dread.

          So in short, there is overwhelming evidence that all

of the files on the defendant's computer relating to Silk

Road -- the journal entries, spreadsheets, TorChats, the log --

all of them were authored and created by the defendant in the

course of operating Silk Road.

          But there is even more, there's even more on the

computer that links the defendant to Silk Road.  There's

evidence that links him directly to the Silk Road server, the

server that hosted the website.  Remember that the name of the

defendant's computer, the name of his user account on that

F23gulb3                       Summation - Mr. Turner

1    computer was frosty.  And we see from his Gmail account that

2    this is a nickname of the defendant's.  The email is referring

3    to him as Rossty Frosty.  And you remember that when the

4    defendant was arrested, frosty was the name of his user account

5    on his computer.

6            And you're familiar with this:  When you have a

7    computer at home, you log in, you can set up an account where

8    you can name it anything you want.  And the name of the

9    defendant's computer itself was frosty.  So you know, you have

10   a Windows computer.  It might be called "My Computer," but you

11   can rename it anything you want.  The defendant's user account

12   was frosty.  His computer name is frosty.  And Special Agent

13   Chris Beeson told you that's how that's reflected in sort of

14   the computer terminal on the defendant's screen, frosty@frosty.

15           Well, then, let's look at the Silk Road server at the

16   authorized keys file that you heard about.  As Mr. Shaw

17   explained, this authorized keys folder defines the computer

18   users -- the computers that can log into the Silk Road server

19   automatically without having to enter a password.  So it's a

20   way for a website administrator to log on quickly.  The server

21   just recognizes the person's computer so he can automatically

22   log in.  And you can see from the top entry in the file that

23   one of the computers that had the special permission was

24   frosty@frosty, the defendant's computer.

25           How long had the defendant's computer had this access

F23gulb3                    Summation - Mr. Turner

1    to Silk Road, the Silk Road Marketplace server?  Since the very

2    time the server had been set up.  The last modified date of

3    this file is March 26, 2013.  That's the last time it would

4    have been changed.  And if you look back at the log file on the

5    defendant's computer, you see that that's exactly when this

6    server was being set up by the defendant.  On 3/27, there's an

7    entry, "set up servers."  So we have the Silk Road server was

8    set up right around this time, including the authorized keys

9    folder, and from the very beginning, the defendant's computer

10   had automatic access to it.

11           There's another revealing connection, though, between

12   the defendant's computer and the servers used to run Silk Road,

13   and that's the bitcoin wallet on the defendant's laptop.  The

14   defendant had simply an enormous trove of bitcoins on his

15   laptop, 144,000 at the time he was arrested, worth $18 million

16   at the time.  Those were Silk Road bitcoins.

17           How do you know that?  Besides the obvious, besides

18   the obvious fact that no one is going to store $18 million

19   worth of bitcoins on their laptop as opposed to, you know, a

20   bank if you're dealing with proceeds from legitimate activity

21   but you know these are Silk Road bitcoins from the mastermind

22   page for one thing that was on the defendant's laptop at the

23   time he was arrested.

24           There's an entry there for cold BTC, 144,000 bitcoins,

25   the same amount of bitcoins found on the defendant's laptop

F23gulb3                       Summation - Mr. Turner

 1    wallet.  Remember Agent Yum explained that cold storage refers

 2    to a bitcoin wallet that's offline, not constantly being

 3    accessed on the Internet.  There are wallets on the Silk Road

 4    servers that had a lot smaller amounts of bitcoins on it, and

 5    they're used to process the payments on a daily basis.  But if

 6    the site gets hacked, those bitcoins are vulnerable.  So as a

 7    result, you want to keep the excess funds offline.

 8         Just think of it like a business owner, okay?  You

 9    have a cash register at a store and you have a safe at home.

10    You don't want to keep too much cash in the store because if it

11    gets robbed, you're going to lose it.  So you take your excess

12    cash and you keep it in a safe at home protected.  You can

13    always move it back if you need it, but if you have access,

14    you're going to keep it at home, and that's exactly what the

15    defendant did.

16         Mr. Yum, former Special Agent Ilhwan Yum, showed you

17    how there was a long history of bitcoin transfers from the

18    wallets on the Silk Road server to the wallet found on the

19    defendant's laptop from September 2012 to August 2013 totaling

20    over 13 million based on the transfers -- the value of the

21    transfers at the time they were made, and that's because the

22    laptop was being used for cold storage.  It's the defendant

23    taking money out of the register for the night and putting it

24    in a safe at home.

25         And the evidence is also clear that the wallet on the

F23gulb3                     Summation - Mr. Turner

1    defendant's laptop had been on the laptop for months.  It

2    didn't suddenly appear on the day of his arrest.  Look at the

3    metadata for the wallet file.  Date created:  4/7/2013.

4    Computer scientist Tom Kiernan told you the "date created" date

5    means that's the date the file initially hits the computer,

6    either it's created on that computer at that point or it's

7    transferred in from somewhere else.  That April 7 date matches

8    up exactly again with an entry on the log file on the

9    defendant's laptop:  4/7/2013, moved storage wallet to local

10   machine.  In other words, the defendant must have kept the

11   storage wallet elsewhere before on a server he controlled.  On

12   April 7, he decides to move it to his local machine, his

13   laptop, which is exactly where it was found on the date of his

14   arrest.  Again, this is just more evidence that the defendant

15   controlled the Silk Road website, including the massive

16   proceeds from the website.

17          There's one more truly damning connection between the

18   defendant's laptop and the Silk Road server, and that's the

19   connection with the murder-for-hire messages found in the Dread

20   Pirate Roberts' account on the Silk Road server.  You remember

21   what those messages were about.  A Silk Road vendor,

22   FriendlyChemist, was trying to blackmail the defendant

23   threatening to leak the names of thousands of Silk Road

24   customers, as well as a handful of vendors.  So Dread Pirate

25   Roberts tries to identify this person.  He's told his name is

F23gulb3                    Summation - Mr. Turner

Blake Krokoff and then he gets in touch with the username
redandwhite who he is told is involved with Hell's Angels.

And Dread Pirate Roberts tells redandwhite
FriendlyChemist is causing me problems, that he wants to put a
bounty on his head.  And he elaborates:  "He's threatening to
expose the identities of thousands of my clients.  This kind of
behavior is unforgivable to me.  Especially here on Silk Road,
anonymity is sacrosanct."

And Dread Pirate Roberts contracts with redandwhite to
put a hit out on FriendlyChemist for the price of $150,000 for
1,670 bitcoins.  Redandwhite answers back a day later, "Your
problem has been taken care of."  Dread Pirate Roberts says
"Excellent work.  Send me a picture," which redandwhite
apparently does.

Well, you see that the log file on the defendant's
computer contains entries matching up with the private messages
that are recovered from the Silk Road server.  So the private
messages with redandwhite, they're from the Silk Road server.
Here you have the log entries that match up with that
precisely:

3/28/2013:  "Being blackmailed with user info.
Talking with large distributor (Hell's Angels.)"

3/29/2013:  "Commissioned hit on blackmailer with
angels."

4/01/13:  "Got word that blackmailer was excuted.

1    Created file upload script.  Started to fix problem with bond

2    refunds over 3 months old."  He is doing this as he's fixing

3    server bugs, ladies and gentlemen.

4            Then you saw that the messages between Dread Pirate

5    Roberts and redandwhite didn't stop there.  Redandwhite tells

6    DPR that before FriendlyChemist was killed, the hitmen

7    extracted information from him that he was working with another

8    person, Andrew Lawsry.  And Dread Pirate Roberts says "I would

9    like to go after Andrew, too."  Redandwhite says, "Well, he's

10   living with three other people.  You can put a hit out on just

11   Andrew.  But redandwhite says "I prefer to do all four because

12   it would be better than having to get Andrew somewhere else and

13   having no chance of recovering any potential product/money he

14   may have."  And astoundingly Dread Pirate Roberts says "Hmm,

15   okay, I'll defer to your better judgment and hope we can

16   recover some assets from you."  And he agrees to pay

17   redandwhite $500,000 this time for four more murders-for-hire,

18   3,000 bitcoin.  And a week later redandwhite reports back "The

19   problem was dealt with."  So again, you see that in the log

20   file, 4/6/2013:  "Gave angels go ahead to find tony76."

21           4/8/2013:  "Sent payment to angels for hit on tony76

22   and his three associates."

23           Again, how do you know that the Dread Pirate Roberts

24   behind these chilling chats was Ross Ulbricht?  Because it's

25   the same log file that has the entry "I'm sick" in May.  It

F23gulb3                    Summation - Mr. Turner

1   matches up with the defendant's emails that has the poison oak,

2   the date with Amalia.  It's the same person.

3         And there's also a separate file in the defendant's

4   computer labeled ops.txt like black ops, operations, and the

5   file contains information that appears verbatim in the Dread

6   Pirate Roberts messages about the murders-for-hire.  Blake

7   Krokoff lives in an apartment near White Rock Beach, tony76,

8   Andrew Lawsry.  This is the same information that's discussed

9   in the communications between redandwhite and DPR.

10        And there's a chat with Cimon where "myself" talks

11  about it, again, the same "myself" that we've already matched

12  up with DPR in numerous ways.  The same date range, April 3,

13  2013:

14        "Myself: I get blackmailed by a guy saying he's in

15  deep shit with hell's angels.  He says he was fronted $700k in

16  LSD from them.  I said, have the hells angels contact me so i

17  can work something out.

18        Cimon: ha!

19        Myself: very foolishly he did.  They said they caught

20  up with lucy, got the product back and killed him.

21        Cimon:  Well, I bet ya he won't use the HA," the

22  Hell's Angels, "as a reference again any time soon."

23        But beyond that, the most devastating link between the

24  defendant and DPR's murder-for-hire message is the payment

25  trail.  The payment trail shows that March 31, 2013 redandwhite

1    is talking with FriendlyChemist about sealing the deal and he's

2    given a bitcoin address to send the money to redandwhite.  So

3    he tells redandwhite I paid you, here is the transaction info

4    for 1,670 btc, the bitcoin address that redandwhite gives him,

5    and he even gives him the transaction number so you can look it

6    up on the block chain and make sure the payment is done.  And

7    if you look it up on the block chain, as there was testimony,

8    those payments were made.  Same thing for the April payment of

9    $500,000 in bitcoins.

10           Here is the text where he says after redandwhite said

11   I prefer to kill all four, DPR:  Hmm, okay, I'll defer to your

12   better judgment.  500,000 has been sent to bitcoin address,

13   transaction number.  You look it up on the block chain.  There

14   is the payment.  The payment was made.  How do we know that the

15   payments were made by the defendant?  Because they were sent

16   directly from the defendant's bitcoin wallet.  That's what

17   Special Agent Yum testified to.  Those payments came from

18   addresses that were found on the defendant's laptop, the same

19   wallet we were just discussing earlier, the wallet that was

20   moved to the defendant's local machine right around the same

21   time; in fact, it was moved to the defendant's laptop on

22   April 7 and then on April 8th, he's making the payments.  So it

23   was the defendant who made these payments.  It was the

24   defendant who was trying to murder five people.

25           Now, to be clear, the defendant has not been charged

F23gulb3                      Summation - Mr. Turner

1    for these attempted murders here.  You're not required to make

2    any findings about them.  And the government does not contend

3    that those murders actually occurred.  The defendant may have

4    fallen for a big con job, which would only go to show that the

5    Dread Pirate Roberts is not a criminal super-genius that the

6    defendant wants to make him out to be, but what the

7    murder-for-hire exchanges do show is how far the defendant was

8    willing to go to protect his criminal enterprise if users got

9    the idea that their anonymity wasn't safe on Silk Road, that

10   their identities could be leaked en masse, they weren't going

11   to use the site, and the defendant was going to lose business,

12   and he was willing to use violence to stop that from happening.

13        For him, it was trivial.  The click of a mouse, send

14   $500,000, half a million dollars' worth of bitcoins, wait for

15   the picture of a dead body.  Thank goodness it does not look

16   like any murders occurred.  Thank goodness that this man's

17   power trip was stopped before he managed to connect with a true

18   hitman through his criminal website.

19        Let's talk about how he was finally stopped.  Let's

20   talk about his arrest, which gives you even more evidence,

21   perhaps the clearest evidence of all that Ross Ulbricht and

22   Dread Pirate Roberts were one in the same because he was caught

23   red-handed, okay.

24        You heard from Agent Der-Yeghiayan, the first witness

25   that took the stand and the second witness, computer scientist

1    Tom Kiernan about how the arrest unfolded.  The afternoon began

2    with the defendant at home.  He was under surveillance by FBI

3    agents.  Meanwhile, Agent Der-Yeghiayan was sitting on a bench

4    elsewhere in the neighborhood with Mr. Kiernan keeping DPR

5    under surveillance online by monitoring him on the Silk Road

6    staff chat.

7            And while Mr. Ulbricht was at home, DPR was online and

8    at 2:47 p.m., DPR goes offline.  And a few minutes later, the

9    defendant is seen leaving his home heading towards the area

10   where Agent Der-Yeghiayan and Mr. Kiernan are stationed.  Just

11   to be clear, you remember it says 9:47 here but Agent

12   Der-Yeghiayan testified it was UTC.  It was seven hours ahead

13   of the local time.

14           So what happens?  Well, about 15 minutes later, Agent

15   Der-Yeghiayan and Mr. Kiernan see the defendant approach.  He

16   crosses the street, pops his head into an Internet cafe, sees

17   it's crowded and then he heads next door to the public library.

18   Mr. Kiernan follows him inside with a number of other FBI

19   agents.  And they assemble at the top landing of the stairwell

20   waiting to get a signal for the arrest.

21           Meanwhile, Agent Der-Yeghiayan remains outside waiting

22   for DPR to pop up online, and that's what happens.  A few

23   minutes later, after the defendant enters the library at

24   3:08 p.m. DPR shows up on staff chat.  At this point, the

25   defendant's had enough time to open his computer in the library

1    and log on.  And Agent Der-Yeghiayan starts chatting with him

2    at that point using his undercover account as a Silk Road staff

3    member, cirrus.  He says hi.  And DPR responds, and he knows

4    who cirrus is.  He's been chatting with him for months.  And

5    that's why when Agent Der-Yeghiayan tells DPR "Can you check

6    out one of the flagged messages for me," DPR knows exactly what

7    he's talking about.  DPR had trained cirrus, had trained Agent

8    Der-Yeghiayan, on the use of that flagged messages screen a

9    month and-a-half earlier in August, we went over that during

10   Agent Der-Yeghiayan's testimony.  DPR doesn't say hmm, you'll

11   have to remind me what the flagged message screen is all about

12   cirrus, I don't remember that.  No.  He says sure, let me log

13   in.  In fact, a couple lines later, DPR says you did bitcoin

14   exchange before you started working for me, right?  Agent

15   Der-Yeghiayan told you that was not something he had told DPR

16   before; the person he took over the cirrus account from back in

17   July had operated a bitcoin exchange.  She had told DPR that

18   months before the arrest, and the defendant remembered that

19   because he was DPR back then, just as he was on the day of his

20   arrest.

21        A minute later into the chat, when it's clear DPR had

22   logged in where he says "okay, I'm here, which post," Agent

23   Der-Yeghiayan gives the signal to arrest.  It's approximately

24   3:14 p.m.  Remember, it's seven hours ahead.  So agents quickly

25   move in for the arrest.  The defendant is behind his laptop.

1    Two agents distract him by faking a domestic dispute.  The

2    defendant turns his head, they grab him, they pull away the

3    laptop and handed it to Tom Kiernan.

4            And Mr. Kiernan immediately starts keeping the

5    computer alive and taking pictures on the screen.  This is just

6    a minute or so after Agent Der-Yeghiayan had given the signal

7    to arrest.  Remember, Mr. Kiernan had a Blackberry set to

8    Eastern Time because he's from the New York field office.  It

9    was from 3:15.  And there's the chat right there on the screen

10   where the discussion had left off.

11           Not only that, but they go back in the web browser.

12   They see the defendant had logged in as Dread Pirate Roberts

13   and gone to the Silk Road mastermind page, which Agent

14   Der-Yeghiayan had never seen before.  Not only that, but agents

15   follow up by searching the defendant's residence, and what do

16   they find there?  They find a couple of crumpled notes in the

17   trash.  And what are those notes about?  They're about a revamp

18   of the Silk Road buyer rating system -- seller rating system,

19   excuse me, that Dread Pirate Roberts had been posting about on

20   the Silk Road forums since way back in August, August 11.  And

21   there's a match of specific terms:  Solid, would recommend.  It

22   matches a post from September 12 where he's talking about the

23   changes he's thinking about making to the rating system.  And

24   agents also find a couple of thumb drives on the defendant's

25   night stand, one of which contains a backup of many of the same

1    Silk Road-related files that were found in his laptop.

2              So the evidence is overwhelming, ladies and gentlemen,

3    that this man Ross Ulbricht is the same person who started Silk

4    Road and kept it running up until the very end, up until the

5    moment he was arrested logged into the Silk Road server as the

6    mastermind of the site under the Dread Pirate username chatting

7    with someone he believed was a Silk Road employee.  There is no

8    way he can credibly explain away this evidence, and the

9    defense's attempts to do so throughout this case have been

10   absurd.

11             At the beginning of this case, Mr. Dratel admitted, he

12   had to, admitted that the defendant started Silk Road, but he

13   said the evidence would show that operating the site became too

14   stressful to him, so he handed it off to other people.  There's

15   been no evidence to show that.  It's just the same bogus cover

16   story that he told to Richard Bates to throw him off his trail.

17             The defendant is trying to dust off the old Dread

18   Pirate Roberts play and try it out one last time on you, ladies

19   and gentlemen.  It's not surprising the defendant is used to

20   living a lie at this point.

21             Remember, this chat, he was talking with inigo, one of

22   his customer support representatives.  Inigo asks: "If you

23   don't mind me asking, what do you tell your family that you

24   do?"

25             "I live a modest life still.  Security requires it.

F23gulb3                    Summation - Mr. Turner

1   So I have my little alibi.  I'm clever, so I can bs when I need

2   to but I hate having to lie to people.  And friends will tell

3   me shit like why don't you do this or that, like I have all

4   this free time.  I just want to scream at them 'because I'm

5   running a goddam multi-million dollar criminal enterprise!!!!"

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. TURNER:  He still thinks he's clever.  He thinks

2     he can pull one over on you.

3          MR. DRATEL:  Objection.

4          THE COURT:  Sustained.

5          MR. TURNER:  And then there is the defendant's attempt

6     to explain await mountains of evidence on his computer.  It's a

7     hacker.

8          MR. DRATEL:  Objection.

9          MR. TURNER:  It's a virus.

10          THE COURT:  Overruled.

11          MR. TURNER:  It's a Stephen Colbert show he was

12     watching or downloading into his computer.  It's ludicrous.

13     There were no little elves that put all of that evidence on the

14     defendant's computer.  It was the defendant who put all that

15     evidence on the defendant's computer and in his trashcan, in

16     his nightstand, in the Silk Road server, his Gmail account and

17     his Facebook account, from the bitcoin talk forum and the

18     shroomery, everywhere else you have seen the digital

19     fingerprints.  Use your common sense, ladies and gentlemen.

20          But even if there were any reason to believe the

21     defendant's story, which there is not, it wouldn't even make a

22     difference under the law.  The government doesn't have to prove

23     that the defendant's criminal activity continued from start to

24     finish, from the beginning of Silk Road to the end.  As I

25     expect the Judge will instruct you, it doesn't matter when a

1    person becomes part of a criminal conspiracy, even if it's just

2    at the beginning or just at the end, he is liable for

3    everything that happens as part of the conspiracy as long as it

4    is foreseeable to him, before or after he joins.  You don't

5    need to go there because the evidence is absolutely clear.

6    This man ran the site from start to finish.

7            So let me now talk with you about what the defendant

8    is charged with, what he's liable for as a result of

9    masterminding Silk Road.  The defendant is charged with seven

10   offenses.  The first four relate to drug trafficking.  The

11   fifth relates to the computer hacking tools and services sold

12   on the site.  The sixth, to the fake passports and IDs that

13   were sold on the site, and the seventh relates to money

14   laundering, the laundering of the proceeds from all the illegal

15   sales conducted on the site.

16           Let's take the drug charges first.  Count One charges

17   the defendant with distributing illegal drugs or helping others

18   to do so.  Count Two charges the defendant with much the same

19   thing, distributing drugs but over the Internet specifically,

20   or helping others do so.

21           MR. DRATEL:  I object to this, your Honor.  We were

22   not given this in advance.

23           THE COURT:  Overruled.

24           MR. TURNER:  And Count Three charges the defendant

25   with conspiring to distribute drugs, which just means agreeing

with others to distribute drugs.

          To be clear, the Judge will instruct you after the
addresses about what the law is and her instructions control,
but this is what I expect her to instruct you.

          Now, these charges -- these first three charges, they
are not complicated.  The basic question is were drugs
distributed through Silk Road and did the defendant help
distribute them, or agree with others to do so.  Now, if you
don't believe that drugs were distributed through Silk Road,
then you must have been watching the wrong trial because that
is what the site was all about.  There were thousands of
listings on Silk Road every day for drugs -- heroin, cocaine,
LSD, methamphetamine, ecstasy, speed, steroids, prescription
pain killers, pretty much every possible controlled substance
you can imagine; even cyanide the defendant was willing to sell
on the site.

          You heard Agent Der-Yeghiayan explain how Silk Road
first came to his attention.  Right?  Ecstasy and other drugs
started showing up in the international mail in O'Hare in ways
that had never been seen before.  The packaging was stealthy
and professional.  There was a business model behind it.  And
those packages started as a trickle and eventually turned into
a flood.  And he told you how he was able to tie many of those
packages back to drug dealers operating on Silk Road.

          He also told you about the undercover buys he himself

did on Silk Road, over 50 of them, from dealers in more than

ten different countries, and all of those purchases, except

one, tested positive for illegal drugs.

You also heard a stipulation that the DEA New York

Field Office here, in the Southern District of New York, did

undercover buys from Silk Road as well, more than a dozen of

them from September 2011 to May 2013 -- heroin, cocaine,

oxycodone, and all of them positively tested for drugs.

You also heard from Brian Shaw, who told you about the

staggering sales figures in the transaction database on the

Silk Road server.  The silk Road server showed that the site

executed over one-and-a-half million transactions during its

lifetime, involving over 100,000 unique buyer accounts.  Nearly

3700 unique seller accounts.  And it took in over $213 million

in revenue.  Some of those sales were done before Silk Road

kept track of the categories being sold.  But of the 190

million reflected in the database of categorized sales, sales

that had a category of goods associated with them, 96 percent,

$182 million of them were for illegal drugs.  So there is no

doubt that drugs were sold through Silk Road in massive

quantities.

You also heard from Michael Duch, who once ran his IT

business, his own IT business, but started dealing drugs on

Silk Road as a way of supporting his own heroin addiction, and

he told you how easy it was to become a Silk Road drug dealer.

F23dulb4                    Summation - Mr. Turner

1    All he had to do was buy heroin off the street in the same New

2    York City area where he bought it, and he was able to sell it

3    at 100 percent markup on Silk Road because the customers he was

4    selling to were located all over the country, where heroin is a

5    lot more scarce.  Within six weeks, he told you, he was

6    shipping out around 500 glassine bags of heroin a day, making

7    60 to $70,000 in revenue per month.

8            So did the defendant help distribute these drugs?  Of

9    course he did.  The defendant was the one who made this entire

10   enterprise possible.  He custom built Silk Road to be an online

11   storefront for drug dealing.  He attracted customers by making

12   it easy for them to buy drugs on the site anonymously.  He

13   attracted suppliers by making it easy for them to deal drugs on

14   the site.  And he manned the cash register to make sure that he

15   got his cut from every sale because it was his store.  The

16   site's customers were his customers.  The sales from the

17   purchases were his sales, just as much as they were customers

18   and sales of the individual drug dealers on the site.

19           The defendant made no bones about that.  Here is a

20   post of his, January 10, 2012, in which he responds to a series

21   of complaints he was getting at the time from drug dealers on

22   the site about the commission rates he was charging.  He says:

23   "Whether you like it or not, I am the captain of this ship.

24   You are here voluntarily, and if you don't like the rules of

25   the game, or you don't trust your captain, you can get off the

1    boat."

2              Here is another post, where he's responding to a user

3    who is complaining about getting taxed by the site.  The

4    defendant responds:  "What you are referring to is more

5    appropriately called a commission or broker's fee.  It would be

6    a tax if I tried to take money from you based on a transaction

7    I wasn't involved in.  You are free to sell whatever you want

8    to whomever without my interference, but if you are going to

9    use" Silk Road, "the Silk Road platform to meet your customers

10   and advertise your wares, you will need to pay a commission."

11             The defendant was involved in every single sale on

12   Silk Road, and that's why it was so important to him to enforce

13   the rule the site had against vendors selling outside of

14   escrow, or OOE.  Right?  You heard about this.  Collecting

15   payment outside of Silk Road to avoid paying commissions, doing

16   side deals.

17             That rule was prominently posted in the seller's

18   guide.  Right?  "Do not create listings that instruct customers

19   to pay outside of escrow.  If you do your privileges will be

20   revoked."  There are chats with VJ where he talks about

21   enforcing the rule by searching through vendors' listings and

22   users' private messages to check to make sure that they are not

23   doing side deals outside of Silk Road's payment system.

24             Here is a private message the defendant sent to one

25   Silk Road seller telling him why he had lost his privileges.

1    The defendant explains, "You do not have a right to the

2    business I generate for you through Silk Road.  Your status as

3    a vendor here is a privilege that is contingent on you

4    following the rules."

5            The defendant knew his site was critical to generating

6    business for the drug dealers operating on it.

7            Think back to what Michael Duch told you.  Michael

8    Duch had never dealt drugs in his life.  He was an IT guy.  He

9    had never considered dealing drugs on the street.  But with

10   Silk Road, what had once been unthinkable for him became a

11   no-brainer of a business decision.  Silk Road supplied

12   everything he needed to become an online drug dealer

13   overnight -- a fully anonymous online sales portal, a huge

14   preexisting customer base, instructions on how to package drugs

15   to evade detection, an escrow system and a support staff to

16   make sure that he would get paid by his customers if he shipped

17   out the drugs as ordered.

18           And as you saw, Duch was able to reach customers all

19   over the country through Silk Road.  He would never have been

20   able to do that on his own.  That's the legacy of Silk Road.

21   It lowered the barriers to drug dealing by enabling drug

22   dealers to reach customers online they could have never met on

23   the street.

24           That was how the defendant facilitated drug dealing

25   through Silk Road.  And because he knew the value of his

 1    services, he knew how prized his drug dealing territory was.

 2    He required drug dealers to agree to his terms of service.  You

 3    remember this, the Seller Agreement that you had to click on in

 4    order to create a vendor account on the site.  Every time a new

 5    dealer clicked on that agreement, they were agreeing with the

 6    defendant to deal drugs together.  The agreement was you get to

 7    use my site; I get a piece of your deals.  It is a criminal

 8    business partnership.

 9            Again, that's the defendant's own words.  Here is one

10    private message where he tells a user:  "Silk Road isn't some

11    bureaucracy.  I consider us business partners."

12            So the defendant helped others deal drugs on the site.

13    He distributed drugs.  He agreed with others to distribute

14    drugs.  And that covers Counts One through Three of the

15    Indictment.

16            And, you know, he himself acknowledges this.  Who knew

17    that a softie could lead an international narcotics

18    organization?  Thank you for being here.  Thank you for being

19    my comrades."

20            THE COURT:  Mr. Turner.

21            MR. TURNER:  Mm-hmm.

22            THE COURT:  Would now be an all right time to stop?

23            MR. TURNER:  I've probably got 10 to 15 more minutes,

24    your Honor.

25            THE COURT:  Let's stop here and then we'll pick up,

1   ladies and gentlemen, right after lunch, and so we'll pick up

2   at 2 o'clock.  Joe has had lunch arranged to be brought in for

3   you.

4          Now, it's very important that while you've heard the

5   government's -- most of the government's closing summation, you

6   haven't yet heard from the defendant.  You haven't heard the

7   government's rebuttal, and you haven't been charged on the law.

8   So do not be tempted to talk to each other at this point.  All

9   right?  Don't talk to each other about this case or anybody

10  else about this case.  The time for you to do that is coming

11  soon but it's not yet.

12          Thank you very much and have a nice lunch.

13          THE CLERK:  All rise as the jury leaves.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F23dulb4                    Summation - Mr. Turner

1              (Jury not present)

2              THE COURT:  All right, ladies and gentlemen, the

3      reason for taking the break there, Mr. Turner, was one of the

4      jurors I thought was indicating that they needed a break.  So

5      when you reached a point where it seemed like I could

6      interrupt, I did.  I don't like to interrupt.  I would have

7      otherwise let you go 'til 1:05.

8              MR. TURNER:  I understand, your Honor.

9              THE COURT:  So is there anything we need to raise

10     before we take our lunch bread?  No.

11             I will see you folks back promptly at 2 o'clock.

12     Thank you.

13             THE CLERK:  All rise.

14             (Luncheon recess)

15

16

17

18

19

20

21

22

23

24

25

1                  **A F T E R N O O N   S E S S I O N**

2                               2:06 p.m.

3          (Jury not present)

4          THE CLERK:  All rise.

5          THE COURT:  All right.  Let's bring out the jury.

6          THE CLERK:  All rise as the jury enters.

7          (Jury present)

8          THE COURT:  All right, ladies and gentlemen.  Let's

9    all be seated.

10         All right.  Mr. Turner, you may proceed, sir.

11         MR. TURNER:  Before I go into Count Four, let me touch

12   briefly on drug quantities.  Assuming you find the defendant

13   guilty on Count One, Two or Three, you will be asked to make a

14   further finding, whether certain quantities of drugs were

15   involved in the offenses, how much of these substances did the

16   defendant help others distribute, or agree with others to

17   distribute.  More than a kilogram of heroin.  More than five

18   kilograms of cocaine.  At least ten grams of LSD, or at least

19   500 grams of methamphetamine.

20         So for heroin it's easy.  Michael Duch told you he

21   alone distributed over three kilograms of heroin as a dealer on

22   the site, which by itself puts the amount over the threshold

23   and that's just one vendor.  So you know the total amount of

24   heroin the defendant helped others distribute or agreed with

25   others to distribute through Silk Road is well beyond that.

1          For other substances, take a look at Government

2     Exhibit 940E.  This is data from the Silk Road transaction

3     database.  For cocaine, for example, there were 82,582 orders

4     of cocaine on the site.  Even if each of those orders was only

5     a tenth of a gram of cocaine, there would still have been

6     8 kilograms of cocaine distributed through the site to be above

7     the 5-kilogram threshold.

8          If you look at Government Exhibit 911A, pictured under

9     here, all the cocaine -- 1 gram, 3.5 grams, 7 grams, 5 grams --

10    they are all well above -- well above .1 grams.  And you can go

11    through the same sort of calculation for the other drug

12    quantities.  The quantities of drugs distributed through Silk

13    Road were massive.

14          So let's go on to Count Four.

15          Count Four charges the defendant with operating a

16    continuing criminal enterprise.  Basically what this means, as

17    the Judge, I expect, will instruct you is that the defendant

18    engaged in drug trafficking on a continuing serious basis, and

19    that he oversaw others and made substantial profits in doing

20    so.

21          So to find the defendant guilty on this charge, you

22    have to find that the defendant committed a series of three or

23    more drug crimes, oversaw five or more persons in the process,

24    and received substantial profits from his crime.

25          Now, here the defendant clearly committed a series of

1      three or more drug crimes.  He was facilitating drug deals

2      every day.  You only have to agree on three such crimes.  Just

3      pick a few.  Pick three of the thousands of drug sales that

4      Michael Duch did himself over the site, or pick three of the

5      undercover purchases of drugs done by Agent Der-Yeghiayan or

6      DEA New York.  All of those were drug deals the defendant was

7      involved in as a middleman.

8              Did the defendant oversee five or more persons as part

9      of his operation?  Of course he did.  First, he had employees.

10     If you look back -- this is an exhibit with his to-do list.  He

11     has employees -- a list of employees that he pays every week.

12     There are chats with the employees on the computer.  There are

13     other references to the employees.

14             Look at the government exhibit numbered here, if you

15     want to go back and take a look and see what those individuals

16     did as part of the operation.  Basically some were the support

17     staff, the customer support, who would basically make sure

18     everything ran smoothly on the site.  If there were disputes

19     between buyers and dealers, they would resolve those disputes.

20     That was partly what Agent Der-Yeghiayan, in operating his

21     undercover account, was involved in, as support staff.

22             Then you have the back-end people, the computer

23     programmers, Smedly, Syg, H7.  In one of the chats with H7 they

24     talk about having a team of programmers.  So he has people

25     working under him, working for him.  He is a boss of the

 1    enterprise.

 2            Not only that, you don't even have to limit yourself

 3    to the employees that the defendant supervised.  He was the

 4    leader of the whole site.  He organized the hundreds of vendors

 5    of drug dealers that sold drugs on this site.  He harmonized

 6    their operations into one essentially orderly business

 7    enterprise.  And that is acting as an organizer.  And that,

 8    too, is a basis for finding that he oversaw five or more people

 9    as part of his operation.

10            Finally, did he make substantial profit from his

11    enterprise?  Of course he did.  He earned millions of dollars

12    in commissions.  So far at least, he earned the millions of

13    dollars that were recovered from his laptop in bitcoins.

14            Next there is Count Five, conspiring to commit or aid

15    and abet computer hacking.  Now, computer hacking tools and

16    services were offered on Silk Road.  Agent Der-Yeghiayan told

17    you that he would see those listings in the digital goods

18    section, in the computer equipment sections of the website.

19    And although we didn't look at them in detail during the

20    testimony of Brian Shaw, the government introduced a sampling

21    of the computer hacking listings found on the Silk Road website

22    when the FBI seized it.  There were keyloggers.  There were

23    email account crackers.  There were password stealers.  There

24    were DDos services for knocking websites offline.  You heard

25    from Agent Alford about how he made an undercover purchase of

 1    some of this hacking software and it worked as advertised.

 2            And you have seen evidence that the defendant

 3    controlled what was sold on the site.  Customer support chats

 4    about cyanide, for example.  The customer support staff part of

 5    the role is looking for stuff that is not supposed to be sold

 6    on the site.  Computer hacking was a feature on the site

 7    throughout.  So this was something that the defendant allowed

 8    to be sold on the site.  And then vendors were only allowed to

 9    sell on Silk Road at the pleasure of the defendant.  He let

10    them sell on the site; they agreed to give him a cut of the

11    proceeds, he's conspiring with them as well.

12            It is the same thing with the trafficking or aiding

13    and abetting trafficking of fraudulent identity documents.

14    You've seen the fake IDs and passports regularly offered on

15    Silk Road.  You even saw forum posts where the defendant

16    announced the creation of the forgery section on the site where

17    fake IDs and passports were specifically supposed to be listed.

18    And you saw that the site did over a million dollars in sales

19    in fake IDs and passports, including the ones the defendant

20    bought.  Just like the drug dealers on the site, the sellers of

21    these fake IDs and passports all had to enter into an agreement

22    with the defendant to sell their wares on the site.  He

23    conspired with them, too.

24            Finally, Count Seven charges the defendant with

25    conspiring to commit money laundering.  Now, the Judge will

1    instruct you on the elements of money laundering in more

2    detail.  But basically money laundering is taking proceeds of

3    certain crimes, like drug trafficking, and moving the money

4    from one account to another, for example, or exchanging it from

5    one form to another, with the purpose of either promoting

6    illegal activity, where the illegal activity came from, or

7    concealing the money from law enforcement.  Through his

8    operation on Silk Road, the defendant agreed to do that for the

9    sellers on the site in basically two ways.

10            First, in operating the Silk Road payment system, he

11   was agreeing to help drug dealers on the site get the funds

12   from their illegal sales and move them off the site

13   anonymously.  That was why he chose bitcoins as the coin of

14   Silk Road because it is an anonymous currency.  And not only

15   that but Silk Road's payment system included a tumbler built

16   into it.  What this means is money didn't go straight from a

17   buyer's bitcoin address to a seller's bitcoin address when a

18   payment was made.  Money would be tumbled through a bunch of

19   dummy bitcoin addresses before it hit the seller's account in

20   order to make the payments harder to trace on the block chain.

21   You read about this on the buyer's guide.  "Just when you

22   thought Silk Road couldn't be more secure, we went one step

23   further.  The tumbler sends all payments through a complex

24   semi-random series of dummy transactions, each one with a new,

25   one-use receiving address making it nearly impossible to link

1    your payment with any coins leaving the site."

2              That feature, all those features of the payment

3    system, were designed to help drug dealers move their dirty

4    money through the site without being tracked.  That's money

5    laundering.

6              How else did the defendant agree with others to

7    launder their money?  Well, we already had a whole section on

8    the site of money laundering services.  That was what the money

9    section of the site was about.  And that section allowed drug

10   dealers on the site to take their bitcoins and exchange them

11   for cash or anonymous credit cards or other forms of money that

12   couldn't be traced back to them.

13             Here you have -- you can trade your bitcoins in for

14   $10,000 in cash delivered to your door.  This vendor advertises

15   you will be mailed genuine U.S. currency that has not been

16   altered or linked to criminal activity.  Here is one for

17   anonymous credit cards and debit cards.  It's a normal debit

18   card but hasn't got your personal information.  It's totally

19   anonymous.

20             So the defendant agreed with these money laundering

21   service providers to allow them to operate on the site so that

22   they could help the drug dealers on the site anonymously cash

23   out their illegal proceeds.  That's another way he conspired,

24   agreed with others to commit money laundering.

25             Let me talk about one more legal requirement and

1    that's venue.  You have to find that the defendant, or people

2    he aided or abetted or conspired with, caused something to

3    happen here in the Southern District of New York in furtherance

4    of his crime.  For the drug crimes in the case, you can find

5    venue multiple ways.  You know, for example, that Michael Duch

6    based his heroin dealing operation here, in Orange County, in

7    the Southern District of New York, where he lived.  And as a

8    Silk Road vendor he is a co-conspirator of the defendant.  He

9    is someone who is aided and abetted by the defendant, and he

10   performed his drug dealing operation out of this district.

11         You've also got undercover drug buys by DEA New York

12   in which the drugs were ordered from here and delivered here.

13   Again, the drug dealers who were to ship those orders were

14   co-conspirators of the defendant, aided and abetted by him.

15   The defendant is involved in each of those deals as a

16   middleman.

17         But there's also another basis for venue that actually

18   provides venue for all the counts in the Indictment and that's

19   the Silk Road website itself.  The Silk Road website was

20   projected across the Web, accessed throughout the world,

21   including here in the Southern District of New York.  And as I

22   expect Judge Forrest to instruct you, venue could be based on

23   the transmission of a website into the Southern District of New

24   York where the operation of the website is in furtherance of

25   the criminal activity at issue and where it's reasonably

1    foreseeable to the defendant that the website could be accessed

2    by someone here.

3           Here, the operation of the website was critical for

4    the offense, and it was obviously reasonably foreseeable that

5    people in New York, in this district, could access it.  In

6    fact, you know it was accessed here because, for example, it

7    was accessed by DEA New York in conducting their undercover

8    buys.  It was accessed by Mr. Duch every time he had to log

9    onto the site in order to do his business.

10          So, for example, for the fake ID charge, it's enough

11   for venue that the defendant ran a website with offerings for

12   fake IDs and broadcast those offerings through the Web into

13   this district.  It is as if he put a billboard up here in this

14   district in furtherance of the effect.  The same thing with the

15   computer hacking and money laundering charges and the drug

16   charges.

17          And that's where the action was in this case, ladies

18   and gentlemen.  The hundreds of thousands of drug deals and

19   other illegal transactions that occurred on Silk Road didn't

20   take place on some street corner; they took place in a dark

21   corner of the Internet.  That was the defendant's criminal

22   turf.

23          But just because he operated in cyberspace doesn't

24   make his crimes any less real.  Those were real drugs he was

25   selling through his site, just as dangerous and addictive as

1    drugs sold on the street.  Think of Michael Duch.  All he was

2    doing -- all he was doing was taking drugs off the street and

3    using the defendant's site to redistribute them across the

4    country.  Think of the messages he got from his customers that

5    you saw.  On a daily basis, anxiously waiting for their

6    shipment to arrive before debilitating withdrawal symptoms set

7    in.  I am extremely dope sick and need something by tomorrow.

8    Those are real people, real families, with real addictions.

9    And it was the defendant's website that made it easier than

10   ever before to feed those addictions, for people to get hooked

11   in the first place, and it was the defendant's website that

12   made it easier for drug dealers to get users hooked, users from

13   all over the world.

14           Based on his operation of the website, which the

15   government has proven beyond a reasonable doubt, the defendant

16   is liable for all the crimes charged in the Indictment.  His

17   conduct was brazenly illegal.  He knew perfectly well what he

18   was doing the whole time, and you should find him guilty on all

19   counts.

20           Thank you.

21           THE COURT:  Thank you, Mr. Turner.

22           Mr. Dratel.

23           MR. DRATEL:  Could we just have one second just for

24   the technical changeover?

25           THE COURT:  Yes.

1          (Pause)

2          MR. DRATEL:  May it please the Court?

3          Thank you, ladies and gentlemen of the jury, thank you

4     for listening.  Thank you for paying attention thank you for

5     being here sometimes in weather that was inclement and

6     difficult.  So we really appreciate it, and it is a reflection

7     on your recognition of how important this case is for

8     Mr. Ulbricht.

9          This will be my last chance to speak to you about the

10    case.  The government is going to get another opportunity after

11    I'm done, and I'll talk about that towards the end of my

12    closing statement.

13         Obviously, in a trial that's lasted this long with as

14    much testimony and documents as have come in, I am not going to

15    be able to talk to you about everything.  I'm going to pick

16    items and concepts that illustrate why Ross Ulbricht is not

17    guilty of each and every count in the Indictment; why the

18    government has failed to prove beyond a reasonable doubt, as it

19    must do, each and every element unanimously to all of you, to

20    each of your satisfaction, and the other counts in the

21    Indictment.

22         Some of this stuff has been technical.  Some of it may

23    be a little technical during my summation.  But as I told you

24    in opening, the fundamentals, the foundation of all of this is

25    common sense.  It's your life experience.  It's what you know

1    and what teaches you, from the evidence in this case, that

2    Mr. Ulbricht is not guilty.

3           I talked about this in my opening.  It is apparent

4    from everything we've heard in the case.  It is that the

5    Internet is not what it seems.  The very first witness, a

6    government agent, assumed multiple identities on the Silk Road

7    site.  Multiple.  As many as a dozen.  So he had dozens of

8    accounts that he was controlling.  No one realized that the

9    usernames had changed when he assumed an account.  No one

10   realized when he created an account that he was law

11   enforcement.  He never took a lesson.  He didn't know anything

12   about computer technology, necessarily, more than the average

13   person.  He was able to do it, just like his colleagues.  He

14   said they all had accounts.  All of them were operating

15   accounts.

16          The Internet permits, and thrives on, to a certain

17   extent, deception and misdirection.  They were never caught as

18   law enforcement operating undercover.  In all of the posts that

19   they did and all of their interaction here on Silk Road -- the

20   buyers, sellers, administrators, moderators, all of that.  You

21   heard Michael Duch talk about his wariness of customers because

22   he agrees, you never know who precisely is on the other side of

23   that computer screen.

24          Even Agent Der-Yeghiayan, during cross-examination,

25   recalled that there was a period of time where he was so

 1   convoluted in his own mind that he didn't quite know who was

 2   supposed to be who.  He said who's on first.  And he was a

 3   person who knew the inside of it, that he was playacting, that

 4   his colleagues were running accounts.  He even knew that and he

 5   couldn't keep track.

 6        You don't even know if any of the screen names that

 7   the government has pointed to, that any of them, is a separate

 8   person.  They could all be the same person and you wouldn't

 9   know.  You can't conclude that here, I submit to you.  You have

10   no evidence that there are different people.  They could all be

11   Agent Der-Yeghiayan -- not that they're Agent Der-Yeghiayan,

12   but just like Agent Der-Yeghiayan, they could all be the same

13   person operating multiple usernames.  Where is the proof that

14   they are separate people?  Where is the proof from the witness

15   stand, from anyone who came in and said that was me, that was

16   me, that was me?  No.  We don't know.  You don't know.  And you

17   can't make a conclusion beyond a reasonable doubt based on

18   that.

19        Reasonable doubt, it is what protects us all.  It

20   protects Mr. Ulbricht.  It protects us all in this system.  It

21   is the bedrock of the system.  It requires the government to

22   prove its case, to satisfy you beyond a reasonable doubt.  The

23   Judge will instruct you, reasonable doubt is a doubt that

24   appeals to your reason, your judgment, your experience, your

25   common sense.  Proof beyond a reasonable doubt must, therefore,

1    be proof of such a convincing character that a reasonable

2    person would not hesitate to rely and act upon it in the most

3    important of his or her own affairs.  If you have such a doubt

4    as would reasonably cause a prudent person to hesitate in

5    acting in important matters in his or her own affairs, then you

6    have a reasonable doubt and it's your duty to find the

7    defendant not guilty.

8            One of the fundamental principles in this case is that

9    DPR and Mr. Ulbricht cannot be the same person.  That's what

10   the evidence, I submit, shows you.  And the government hasn't

11   proved beyond a reasonable doubt -- certainly, that's the

12   burden -- that they're the same person.  Let's just look at

13   some of the evidence.

14           DPR starts February 5, 2012, with a post that says I'm

15   announcing my name.  By that time the only witness with

16   firsthand knowledge, Richard Bates, has already testified that

17   Mr. Ulbricht is already out of Silk Road by February 2012.

18   They could talk all they want about documents -- and we'll talk

19   about them -- that could be created, edited, moved.  But their

20   witness, the only person who actually knew Mr. Ulbricht, told

21   you Mr. Ulbricht said it was sold as of November 2011.  I

22   submit to you it was even before that.  That's just when they

23   talked about it.

24           There is also just a difference in the way security is

25   handled here so you can tell that Mr. Ulbricht is not DPR, and

1    the evidence hasn't proved that to you beyond a reasonable

2    doubt that they are the same person.  First, if you look at

3    Mr. Ulbricht from what we know, you have those posts attributed

4    to him in early 2011.  That's even before Silk Road starts, and

5    then where he started he posts as Altoid, which is directly

6    linked back to him.

7           Does that sound like DPR?  The day of his arrest he's

8    facing out the window with his back to the people in the

9    library.  He's already said in a chat that they've –– DPR has

10   already said in a chat that they put in evidence to someone

11   working for him, he said:  The worst that could happen, your

12   only vulnerability is someone coming behind and looking over

13   your shoulder, which is exactly the position that Mr. Ulbricht

14   was in in that library the day he was arrested.

15          Saving those chats, does that sound like DPR?  You

16   have to actually enable the chats to be saved.  The government

17   witness, Mr. Kiernan, testified to that.  You actually have to

18   choose to save all of the incriminating evidence.  Does that

19   sound like DPR?

20          Keeping a journal like that and then saving it on your

21   laptop?  A little too convenient.  Does that sound like DPR?

22   That's Government Exhibit 241.  And we'll talk more about that,

23   too.

24          Keeping your PGP keys in a file named "Key," something

25   that's supposed to be secret, something that's supposed to

 1    keep -- that's something that is supposed to enable you to

 2    communicate in an encrypted fashion.  There are a lot of

 3    blinking neon signs in this case that have been created to

 4    incriminate Mr. Ulbricht, and I submit to you DPR wouldn't do

 5    any of that.

 6            BitTorrent, a program, a peer-to-peer file sharing

 7    program for people on the network, on the Internet.  At the

 8    time that he was arrested Mr. Ulbricht is on a program that

 9    connects him to other people on the Internet.  The photos that

10    we put in as Defendant's G and Defendant's H show that he is

11    connected to nine people.  That he uploaded the Colbert Report.

12    There were nine peers on his system, nine people connected to

13    an open port on his computer.  Think about that from the point

14    of view of Internet security, computer security, when you've

15    seen from government witnesses, one after the other, talk about

16    hacking tools and what can be done when someone gets access to

17    your computer.  I will talk more about that, too.

18            They had said he had a thumb drive of the entire site.

19    Why do you have it on your laptop if you have it on a thumb

20    drive if you want to be secure?  What's the purpose?  Would DPR

21    do that?

22            Let's look at DPR for a second on that issue.  You had

23    a long -- first of all, in the seller's contract, which is

24    Government Exhibit 121B, it says -- basically, it is all about

25    security.  It is how to keep your -- the vendors had to keep

1    them secure, how to keep their customers secure about

2    destroying addresses and identifying information and all of

3    that packaging and all of these things to make sure that

4    everyone is secure on the site and that this security is

5    paramount for DPR.  You had a law enforcement professional,

6    Agent Der-Yeghiayan.  You had many of his colleagues -- he

7    doesn't even know how many around the world -- in the United

8    States, and he said, around the world, who were on that site

9    trying to identify DPR.

10          He got on that site first -- the first time he went on

11   that site was October of 2011.  Two years.  Did DPR give away

12   anything to him?  No.  He was an administrator.  He was inside.

13   By August of 2013, he was inside.  He took over an

14   administrator account.  He had direct communication and private

15   chats with DPR.  Still, this law enforcement professional, who

16   is all over the Silk Road site, thousands of hours on the site,

17   could not get any personal information about DPR.

18          I submit to you -- and I'll talk more about this as I

19   continue, but I submit to you that that in and of itself and

20   the Cirrus chats, which is Agent Der-Yeghiayan, for a

21   three-month period, prove that those other chats, that pretend

22   to have personal information about Mr. Ulbricht, are phonies.

23   Maybe not in the entirety in the sense that they are not

24   Mr. Ulbricht, but they're DPR's, but that they're edited,

25   sprinkled with facts about Mr. Ulbricht's life that are out

1    there and available not only in the public but to anyone who

2    would have access to his computer and his accounts.

3            Look at Government's Exhibit 936, which is the

4    redandwhite friendly chemist, series of chats.  I read some of

5    that yesterday.  There is one section where DPR gives

6    redandwhite advice.  We will put it up there for you.  Where he

7    gives redandwhite various concrete detailed advice about how to

8    scrub metadata from a photo image so that it could be sent

9    without revealing incriminating information.

10           Look at Mr. Ulbricht's computer.  Look at all the

11   metadata the government showed you.  Metadata, of course, that

12   can be edited, as the government witnesses acknowledged.

13           It is not the same person.  It is not like a person

14   who has two contrasting character traits that don't seem to go

15   together.  It is not something like a virtuoso player who can't

16   boil an egg.  It's not a virtuoso piano player who can't play

17   Happy Birthday.  That is what this really is when they talk

18   about security, when they talk about DPR, what they are trying

19   to say about Mr. Ulbricht.  It doesn't fit.  It is a little too

20   convenient.

21           Now, one of these chats -- and the government talked

22   about it in summation earlier -- that said "told two people."

23   Well, in fact, whoever wrote that chat didn't know that there

24   were more than two people involved in this whole thing.

25   Whether all of them had to do with Mr. Ulbricht or not is

1    unclear.  But I submit to you, they put one of those people in

2    there because they didn't know about a couple of others that

3    Mr. Ulbricht had been in contact with at the early part.  So,

4    for example, they put in someone named Jessica, and that's

5    240C.  Let's show that.

6         Well, he talks in a chat.  There is a journal that

7    says "I went out with Jessica and I told her I have secrets and

8    I'm so stupid.  I trust people."

9         That's one.  Bates would be two.  Mr. Ulbricht's real

10   girlfriend, Julie Alan, would be three.  A woman with the

11   Facebook post, that's four.  That's not two.

12        Just to give you an another example of how easy it is

13   or how convenient it is to say something and then to try to

14   make something of it by putting together facts that don't fit,

15   which make an assumption that doesn't fit beyond a reasonable

16   doubt.  If I say to you "beaches," do you think Thailand?  So

17   you have to say Thailand in return?  That's the first guess?

18   He's in Australia at the time, Mr. Ulbricht.

19        They want to create the person or persons who created

20   those chats, they wanted to create this as if it were somehow

21   connected to Mr. Ulbricht's life.

22        Now, how do we know that DPR was not Mr. Ulbricht?

23   Well, first of all, like I said, Mr. Bates told you.  And then

24   Mr. Ulbricht leaves for Australia for six months in October of

25   2011.  Then in April of 2013 there is evidence that DPR has

1    changed again.  That's from Agent Der-Yeghiayan.

2              And, by the way, he had been on that site from

3    October 2011.  But he doesn't know anything, by the way, about

4    the beginning of the site.  No one knows anything about the

5    beginning of the site.  There are no witnesses, there are no

6    documents, there is no anything about Silk Road in terms of

7    transactions or anything like that from the beginning of the

8    site.  We haven't heard any evidence of that.

9              Now, with respect to a timeline for 2011, I think it's

10   important to look at the timeline for 2011.

11             If you look in March -- February, March and April,

12   there is a lot of conversation between Bates and Mr. Ulbricht

13   about programming.  And of course we know that the site was

14   launched around that time.  But then that part drops off after

15   June.  And there are things that happen in June.  You heard

16   this morning, the Silk Road site in its current form, June 18,

17   2011, with that first post from the Silk Road site that they

18   were down for a little bit, and then they're back up.  It

19   sounds like a transition.

20             Now, you know from Mr. Bates also that Mr. Ulbricht

21   had another project going on before Silk Road and in the

22   beginning of it, Good Wagon Books, through the early part of

23   2011.  Also, the government pointed out 240B this morning, but

24   240B also says no commissions at the beginning.  You don't have

25   a single piece of evidence that Mr. Ulbricht was responsible

F23dulb4                     Summation - Mr. Dratel

1    for any commissions.

2              Mr. Ulbricht was never a conspirator, as charged in

3    the Indictment.  He is not a conspirator at all.  There is no

4    agreement here.  There is no evidence when that seller's

5    account contract came into being on the site.  Again, we don't

6    have anything from the site until later on in 2011, after he's

7    already gone from it.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            MR. DRATEL:  No evidence of when an escrow system was

2      set up on the site, no evidence of Mr. Ulbricht set up an

3      escrow system.

4            Now also on that timeline as we get through 2011, we

5      see that it's only in October of 2011 that Agent Der-Yeghiayan

6      starts to monitor the site and that November 11, 2011,

7      Mr. Bates testified that Mr. Ulbricht tells him I've already

8      sold it to someone else.  Mr. Ulbricht leaves for Australia

9      four days later for six months.

10           Now, there's a chat in April of 2013 that the

11     government did not discuss in its submissions, Government

12     Exhibit 1004, it's between Mr. Bates and Mr. Ulbricht.  Okay.

13     If we can blow up the first part.  April 2013, baronsyntax,

14     this is Mr. Bates:  Did you see slashdot last week.

15           Mr. Ulbricht:  Negative.

16           Mr. Bates:  There was something posted on Friday that

17     you might have found interesting.

18           I'll take a look.  Thanks.

19           And then it says -- this is Mr. Ulbricht -- in April

20     of 2013:  "glad that's not my problem anymore," with a smiley

21     face.

22           It says afterwards:  "I have regrets, don't get me

23     wrong...but that shit was stressful."

24           That's the only chat the government doesn't want you

25     to believe, the only one that an actual witness came in and

1    told you that he participated with Mr. Ulbricht.  Not a single

2    other chat is verified in any other way that Mr. Ulbricht was a

3    participant.  That one we know happened, and that one is the

4    one the government doesn't want to talk about.  It's the only

5    government witness that ever met or spoke with Mr. Ulbricht

6    until July of 2013.  Won't talk about that interview with Agent

7    Critten who testified.

8            Now, the chat in October of 2011, the government

9    showed that today as well, but the one that says are you doing

10   anything besides the site for a job, well, in fact, we put in

11   the rest of the chat, which is R57, and it's all about the

12   bitcoin exchange site that Mr. Bates and Mr. Ulbricht are

13   working on at that time.  Throughout the summer, Mr. Bates'

14   testimony - again, a live witness telling you what happened,

15   not a document created on the Internet, on a computer that

16   anyone can do at any time - he testified that throughout the

17   summer of 2011, they were working together on a bitcoin

18   exchange website that people would go to and be able to

19   synthesize prices and availability in the market.

20           Mr. Bates said he was working on the code.  There was

21   a contract that Mr. Ulbricht had sent him that was never

22   signed, but they got as far as a contract to be partners in

23   this.  And in R57, it's all about the bitcoin site.  It's not

24   about Silk Road he says.  Nobody talks about the site.  That's

25   a presumption.  I submit to you that based on the rest of the

1  chat, it's not a valid presumption.  It's not a presumption

2  that permits you to conclude beyond a reasonable doubt that

3  they're talking about Silk Road, but it doesn't come up

4  anywhere in the chat.

5          There's also an Altoid post, posted by Altoid on the

6  bitcoin forum chat, Government Exhibit 306, in which, again,

7  this is a post where Mr. Ulbricht is asking for advice about a

8  bitcoin exchange.  That's what the post is about.  It's

9  October 2011.  It's at the very same time.  That's what he's

10  working on at that time.  He didn't even change his address

11  from the earlier Altoid post from early 2011.  You know why?

12  Because Silk Road -- he wasn't worried about security at that

13  point but Silk Road was in his rear-view mirror.  He was

14  already out of it.

15          Now, Mr. Ulbricht's background:  Physics degree,

16  Master's of Material Sciences from Penn State University.

17  There was a chat where something about the laws of gravity that

18  was said in a way as if you have to be a physics major to know

19  that gravity is a law of physics.  I don't know what the other

20  purpose was to try to make that kind of a leap for you.

21          Agent Shaw, the government's last witness -- not Agent

22  Shaw, Mr. Shaw, I'm sorry -- said the first commission charge

23  was May 16, 2011.  There's no proof that Mr. Ulbricht was still

24  involved at that time.  He also didn't know -- couldn't tell

25  you -- understand he had access to the entire server, all of

1    these transactions.  Look at what he went through to make those

2    charts.  He could not say when the first heroin sale was, could

3    not say when the first cocaine sale was.  We have no evidence

4    of when any drug sale was made on Silk Road before that date.

5    Talk about proof, not just taking a line and then extending it

6    because it seems like it could have happened that way or it

7    should have happened that way or it might have happened that

8    way; it has to have happened that way beyond a reasonable

9    doubt.

10          The changes in Silk Road over time, again,

11   transitions, changes.  We talked before, the site shut down in

12   2011, it was split from the Marketplace and the forum as two

13   separate sites at that time.  Big changes.  I submit to you

14   it's part of that transition from Mr. Ulbricht to the person he

15   sold it to.  The forgeries don't start until August of 2011.

16   And again, in October of 2011, there's more activity, there's

17   more shutdown, there's more transition.  The URL changes at the

18   end of 2011.  DPR becomes -- is announced in February of 2012,

19   a new commission schedule in January 2012.

20          Silkroad.org, remember that thing, that advertisement

21   that takes you from the open web to Tor, that's not renewed.

22   That is registered in March of 2011 and in April of 2012, it's

23   not renewed.  It's now owned by a guy in China who has nothing

24   to do with it.  It was not renewed.  It was only up for a year.

25

1           Didn't make any seizures before -- Agent Der-Yeghiayan

2    did not start making those particular seizures until October of

3    2011.  By the way, as he admitted on cross-examination, what

4    was coming in, he has no idea whether it was from the Silk Road

5    or not specifically.  That's like saying I order a book -- I go

6    on Amazon and I see a book, and then I go to another site and I

7    like the price better or the shipping costs or whatever it is

8    or I got points, I'm a member, who knows what it is, I buy it

9    from the other site, but it's advertised on Amazon and when it

10   comes from my house, it means it comes from Amazon?  No.  You

11   have to prove that.  There's no proof.  We know there are

12   multiple sites out there.

13           These people can be working directly -- he admitted

14   all of that.  Buyer and seller can be working directly.  They

15   can be working over email.  They can be working over a variety

16   of different ways.  There's no proof that that whole room --

17   there's no proof that anything in that room that is Silk Road.

18           They tell you about assumptions and being careful

19   about assumptions, and they're all after Mr. Ulbricht has left

20   Silk Road even if they could be attributed.

21           The same thing, by the way, with Michael Duch.  He was

22   not even on the site as a buyer until October 2012, not as a

23   seller until April 2013, well after Mr. Ulbricht is gone.  You

24   know, he has spreadsheets he said he actually worked on for

25   this trial.  And I'm sorry, do you believe a thing he said

without some real corroboration, without some verification?

Could you actually believe a thing he said for several reasons,

one of which is at the time this is all happening he is doing,

by his own account, a volume of heroin that probably defies

reality, he's probably selling most of that that he says he's

doing and he's probably selling it on the street.  Second is,

he's got a deal to get him out from under a life sentence, so I

submit you can't take his word for anything without proof and

not proof of a spreadsheet that he created.  Do you know that

what's on this spreadsheet is reliable?  Can you trust it

beyond a reasonable doubt in a matter of importance in your own

affairs?

          I want to look at the timeline again for the early

part of 2013.  A lot happens in the early part of 2013, the

spring of 2013 in particular.  First we have February 5 -- I'm

sorry.  I had the wrong date.  The February 5, 2013 post of the

chat where Ross says "Glad that's not my problem anymore, I

have regrets, don't get me wrong, that shit was stressful,"

that's what he says to Bates, that's a chat that's in evidence,

Government Exhibit 1004.

          Then in March on the 16th, there's a Stack Overflow,

that site the gentleman came in where you ask computer

questions, Stack Overflow, all of a sudden, Ross Ulbricht is on

there asking a question and then 30 seconds later he changes

his screen name to frosty.  I mean, really?  Really?  Do you

1    think DPR would do that?  Get on your own name and then change

2    it to the name that supposedly connects you, absolutely

3    connects you to Silk Road?  This is March of 2013.

4           March of 2013 is also when the denial of service

5    attack occurs on the Silk Road site.  March of 2013 is also

6    when the FriendlyChemist/redandwhite sets of chats all begin.

7    And by the way, with respect to those, I submit it doesn't

8    really matter because it's not Mr. Ulbricht, but I submit that

9    it's indicative again about the Internet.  There are no people

10   of the type they named there.  Can you explain what those chats

11   mean since those people never existed?  Can you explain it?

12   Can you explain it beyond a reasonable doubt?

13          Money was paid?  We don't know where the money went.

14   It could have gone anywhere.  Who knows who was on the other

15   side of that wallet.  Did we hear evidence of that?  No.  It

16   could have been a way for DPR to get his money out of Silk

17   Road.  Who knows?  You can create an entire fiction, an entire

18   fictional episode on the Internet, and you can sit here right

19   now and not know whether it was real or not, much less beyond a

20   reasonable doubt, and that's all the evidence in this case.

21          Let's keep going.  In 2013, that's also the date of

22   the first log entry of 241, Government's 241, that journal,

23   that log journal.  We have one for 2010, which is one entry of

24   maybe a page; we have one for 2011, which is one entry, maybe a

25   page; we have one at the beginning of 2012, January 1, 2012,

1   "I'm going to start a journal," nothing else for 2012 and then

2   all of a sudden in March of 2013, presto, we have this very

3   detailed piece trying to correspond to things.

4            Also you heard -- March 26, you heard from Mr. Shaw.

5   March 26, 2013, the SSH key, the security key to get into the

6   site was modified to frosty@frosty.  We don't know what it was

7   before then.  We do know there's another key that allowed

8   someone else access at root@bcw.  Any evidence about that, who

9   that could be?  No.

10           So Mr. Ulbricht, they want you to believe, on

11  March 16, 2013 outs himself as frosty by affirmatively changing

12  on the Stack Overflow site his name from Ross Ulbricht to

13  frosty, his account name, and then ten days later, puts that as

14  the SSH key for Silk Road.  Does that sound like DPR?

15           You know what else happens in the spring of 2013, it's

16  not on the timeline, but you just heard it today?  It was the

17  last thing that was read, and this is not a coincidence -

18  that's when DPR learns that the investigations are for real;

19  that's when he's paying for information; that's when he knows

20  they're look at bitcoin exchanges; they're look at moderators;

21  they're trying to turn all of his people against him.  He knows

22  the walls are closing in and it's time to implement an escape

23  plan.

24           And what you have is a series of events that no one

25  would do with respect to frosty@frosty -- and by the way, you

1    heard from frosty@frosty with the SSH keys and they made it

2    seem like it was something important when you heard it on

3    direct, but on cross, it turns out you could do that from any

4    computer.  I could get on a computer right now and create a

5    frosty@frosty SSH key.  It's that simple and that fast.  But in

6    terms of speed, when you start it in March and you have until

7    October, there's a lot you can do to frame somebody.

8            And then you have the May 2013 seizure of the accounts

9    from Mr. Karpeles, and you heard that.  You heard about

10   Mr. Karpeles.  By the way, Mr. Yum was able to do a very

11   detailed bitcoin analysis in a week.  Thousands of

12   transactions.  What if you had four, five, six months to work

13   on a project like that?  It's easy to create or edit chats and

14   computer files and spreadsheets and all of that.  You heard

15   that.

16           The prosecutor in summation said there's no break in

17   the documents.  How would you know?  How would you know?  You

18   know you can get on a document, edit it, save it in a way that

19   no one is going to know it was edited.  Sophisticated people

20   know how to eliminate, modify, manipulate metadata.  You heard

21   that, too:  Metadata can be edited just like content and you

22   saw evidence of it.  You have a FBI computer scientist standing

23   in San Francisco, California with a phone on Eastern Time.  You

24   have an FBI computer forensic examiner whose phone is 40

25   minutes off the real time.  You can do any of this stuff

1    manually.  You can manipulate it all.

2            And it was easy to reconstruct Mr. Ulbricht's

3    activities from Facebook pages, from YouTube, from access to

4    his email account.  Again, you heard about all the hacking

5    stuff that goes on.  It's a bit disturbing, all of them.  Think

6    if someone were trying to frame you.  Even Agent Alford's

7    searches that got him to the original Altoid posts on

8    bitcoinforum talk and shroomery.org, those are regular Google

9    searches he found those.  Anywhere you find those.  That was

10   out there.  It's easy to reconstruct this in a way that would

11   frame Mr. Ulbricht.  Not only can it be edited, it can be moved

12   from computer to computer over the Internet.  And Mr. Yum

13   acknowledged that these bitcoin wallets can be moved from

14   computer to computer.  The addresses in a bitcoin wallet can be

15   moved from wallet to wallet.  It's not as if you know it was

16   created there, it's not as if you know the money went in there

17   when it was there.

18           Also, these text files, all these chats, all these

19   spreadsheets, they are tiny files.  They take no time to upload

20   onto someone's computer without them knowing.

21           You know, trying to think of an analogy:  If you saw

22   footprints of a shoe in the snow and I said a-ha, here is

23   Mr. Ulbricht's shoe, it fits, I submit to you, not unless you

24   see him walking, you don't know who was wearing those shoes

25   when he was walking.  You don't know if they're a different

1    pair of shoes.  You don't know if it's someone on his shoes.

2    And on the Internet, it's much worse.  Remember, it has to be

3    beyond a reasonable doubt, not a set of circumstances that

4    sounds convenient.  There are some metadata anomalies the

5    government didn't even try to explain.

6         Let's look.  Now, remember, Mr. Ulbricht was arrested

7    October 1, 2013 at about 3:00 in the afternoon, Pacific Time.

8    Let's look at Government Exhibit 250.  There's a file on there

9    called todo.txt and what's the time?  9:45 p.m. on October 1,

10   2013.  How do you explain that?  Now, by the way, with respect

11   to Pacific Time, they wanted you to believe that the computer

12   was set to Pacific Time on the conversations with cirrus

13   before, not that day, but before they said what's -- this was

14   during Agent Der-Yeghiayan's testimony:  And what does it say?

15   It says Pacific Time.

16        Let's look at 251, it's the same directory, it's the

17   same document, todo.txt, the same time:  9:45 p.m., six hours

18   after Mr. Ulbricht is arrested.

19        Let's look at 212A, again, Government Exhibit, a

20   document called homepage.php, again, October 1, 2013 at

21   8:46 p.m. on October 1, 2013.  How is that explained?

22        Now, let's talk a bit about Mark Karpeles.  And as you

23   heard, he was under investigation.  You heard he had computer

24   experience.  He had computer expertise.  He had resources.  He

25   ran the primary bitcoin exchange in the world.  You heard he

1    had confederates.  You heard that his platform for some of his

2    sites was the same as the Silk Road site, and it was a

3    non-updated version that forum hosts don't use very much.  It's

4    MediaWiki 1.17.

5            You heard that he was the original -- that his

6    companies were the original hosts for the Silk Road site, his

7    hosting company.  We know that also that web host -- there was

8    testimony web hosts know their customers' activity very

9    carefully, just like a GPS in a rental car, the same thing as

10   bitcoin exchange -- bitcoin exchange owners and their

11   customers' accounts.  Just like in a bank, they know.

12           I submit to you he also had motivation because Silk

13   Road was a major player in the bitcoin market, and look what

14   happened after Mr. Ulbricht's arrest:  The price went from 100

15   to $1,000 for bitcoin.  Who profits by that?

16           And you heard also about someone named Anand Athavale

17   who Agent Der-Yeghiayan investigated, did a whole comparison,

18   pages and pages, a comparison of language between those posts

19   on mises.org that he linked to Mr. Athavale and DPR, the

20   commonality.  You can do that with anyone, same here with

21   Mr. Ulbricht - you take pieces of people's lives and you can

22   put them together in a way that makes it look like anything

23   could happen.

24           By the way, with respect to Karpeles and Athavale, the

25   government has never seen their electronic devices.  They have

F23gulb5                        Summation - Mr. Dratel

1    never seen their computers or laptops or phones.  These are

2    people who don't live in the United States.  Agent

3    Der-Yeghiayan also told you that the government was under

4    pressure to make an arrest in this case.  They had the servers,

5    the government had access to the Silk Road servers since

6    July 2013.  Think about it.  They're letting the largest drug

7    operation in the world operate from July 2013 through the end

8    of September.  You think there was pressure to make an arrest?

9    All this money flowing out of the country to drug dealers

10   overseas unrecoverable, drugs coming into the country, which

11   they didn't capture, which they didn't seize.  Think about

12   those families, Michael Duch's customers.  You think the

13   government wasn't concerned about that that they needed to make

14   an arrest?  They needed to make an arrest.  They wanted to shut

15   it down.  They needed to make an arrest.

16        Now, let's talk about computer insecurity, the hacking

17   tools you saw.  Slaves, botnets, things that allow you to get

18   inside somebody's computer, keylog, there are all these things.

19   You saw it in other aspects of the evidence, too.  It gives you

20   full access to computers.

21        It's interesting that Agent D'Agostino used

22   eharmony.com as a way of stealing passwords and things like

23   that.  Well, we saw an okaycupid exhibit from Mr. Ulbricht.

24   I'm not actually saying that things on Gmail are necessarily

25   invented, though they might be, we don't know, but the point

1   is, if you have access to that and you know when someone takes

2   a trip, then you create a chat that says, oh, I'm traveling

3   tomorrow, and you have no way of knowing when that chat was

4   created and whether what's in that chat is real or not.

5        You heard about PGP keys.  I don't think the

6   government went into it on summation, but again I won't be able

7   to speak to you again, so I'm trying to anticipate, but there's

8   nothing customized, nothing personal.  It's spit out by a

9   computer, you cut and paste.  And you see people sending their

10  public keys.  Private keys can be sent the same way; they can

11  be shared.  That key was created in April of 2011, so

12  Mr. Ulbricht could very easily have that key.

13       THE COURT:  Mr. Dratel, we're going to take a break in

14  just a couple of minutes.

15       MR. DRATEL:  Five minutes good?

16       THE COURT:  Five minutes.  Thank you.

17       MR. DRATEL:  With respect to computer manipulation,

18  remember this peaceloveharmony discussion I had with Agent

19  Der-Yeghiayan, there was someone named peaceloveharmony, a

20  username at Silk Road, sitting on DPR's profile for hours right

21  around the time that Mr. Ulbricht was arrested, like the day

22  before, someone monitoring that account, not law enforcement

23  because we know because it wasn't anybody on the arrest team

24  because Agent Der-Yeghiayan asked.  It wasn't anybody.  Someone

25  monitoring what was going on on DPR's account.  We don't know

1    who peaceloveharmony is.  Can't find that out.

2             By the way, BitTorrent was still open, connected to

3    the Internet, even after Mr. Ulbricht's arrest.  If you look at

4    G and H, you'll see that it goes from about nine megs up loaded

5    to 26 megs uploaded by the time Beeson takes the photo later

6    that night.  It's uploaded -- it's been uploaded from four to

7    five to six hours depending on how you count Mr. Beeson's

8    clock.

9             And you heard about Live Capture.  By the way, you

10   heard also about the belt program, about the hacking stuff,

11   that you can actually embed something that then disappears that

12   destroys itself so that you can't even tell, but we don't even

13   know that because the FBI crashed the laptop.  They lost the

14   RAM memory, and they acknowledge it.  We'll never know what

15   processes were running on that computer that day at that time.

16            Agent Beeson did not get even an MD5 Hash value, which

17   is not the gold standard, obviously, because we know there are

18   vulnerabilities with respect to that to try to make sure one

19   file is the same file that you're looking at in terms of

20   copying, but he didn't even do that until October 3rd.

21   Mr. Shaw didn't get a hash value on the Silk Road servers for a

22   week after Mr. Ulbricht was arrested, October 8.  There is so

23   much to question in this case, and when we come back from the

24   break, I'll continue.  Thank you.

25            THE COURT:  All right.  Ladies and gentlemen, take a

F23gulb5                    Summation - Mr. Dratel

1    short break.  Then we'll come back, we'll hear from Mr. Dratel,

2    and then we'll hear once more from the government for their

3    rebuttal.  Then after that, I think we'll have time where I'll

4    start instructing you on the law, all right?  So let's just

5    take -- again, do not talk to each other, we're not at that

6    point yet, or anybody else about this case but we're close.

7    Thanks very much.  Take a short break.

8                THE DEPUTY CLERK:  All rise as the jury leaves.

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  Is there anything we need to raise before

3    we take our own break?

4              MR. TURNER:  Not from me, your Honor.

5              THE COURT:  The reason I stopped you, Mr. Dratel, is

6    one of the jurors needed a break.

7              MR. DRATEL:  I understand.

8              THE COURT:  I appreciate your breaking now because I

9    don't know how much leeway we had, and I want them to be able

10   to concentrate.

11             Mr. Howard, are you going to do the rebuttal?

12             MR. HOWARD:  Yes, I am.

13             THE COURT:  Approximately how long?  I'm not trying to

14   constrain you.  I just want to get a sense of what kind of

15   timing we've got.

16             MR. HOWARD:  It's hard to say.  Maybe a half an hour

17   or so.

18             THE COURT:  One thing I want to make sure is -- we

19   won't finish, I don't think, charging the jury today, but I

20   want to make sure that you folks have ample time to discuss

21   exactly what exhibits are going to go back into the jury room

22   with the jurors.

23             As soon as they're fully instructed and released to go

24   speak to each other in the jury room, I'll want at that minute

25   the cart with things to go in.  And that requires you folks to

1    confer to make sure that you've got the right things and not

2    other things.  You folks will take care of that.

3              Here is the indictment, a copy of the indictment.  If

4    you folks want to inspect it to make sure that it's the correct

5    version, you are welcome to.  And that will go into the jury

6    room with the jurors at the appropriate time.  That may not be

7    until tomorrow.

8              Let's take our own short break and come back.  I'm

9    hoping for ten minutes, but I always hope for that.  Thanks.

10             THE DEPUTY CLERK:  All rise.

11             (Recess)

12             (In open court; jury not present)

13             THE COURT:  Let's bring out the defendant and then

14   let's bring out the jury.

15             (Pause)

16             Now let's bring out the jury.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Let's all be seated.  Thank you.

3              Mr. Dratel, you may proceed.

4              MR. DRATEL:  Thank you, your Honor.

5              I want to go to October 1, 2013, the date of

6    Mr. Ulbricht's arrest, and recapping again what happened that

7    day in the sense that Agent Der-Yeghiayan, acting as cirrus,

8    saw that Mr. Ulbricht was online, not on the Silk Road site,

9    but on Pidgin chat, separate and completely from Silk Road,

10   engaged him in a conversation and asked him to get on the site.

11   And as you saw during the prosecutor's summation, he said okay,

12   I'll log on.

13             Now, there was a lot made of the mastermind page, but

14   we found out from Mr. Shaw that if you log on as DPR, you

15   automatically go to the mastermind page for the tech support

16   panel, which is where cirrus asked Mr. Ulbricht to go.

17             By the way, we know that more than one person could

18   have access to the Silk Road servers or log on as DPR as long

19   you have the credentials.

20             Now, some other things we know, that during the period

21   of a couple of days before Mr. Ulbricht's arrest, Agent

22   Der-Yeghiayan noted, and Agent Alford, too, that DPR on the

23   Silk Road forums and on the site was unusually quiet during

24   those couple of days.  And then you have Mr. Ulbricht out, talk

25   about security, out in a public place using a public Wi-Fi when

1    he could have easily been in his room at 235 Monterey

2    conducting the business of Silk Road if that's what he was

3    doing and he was DPR.

4            Now, want to go back to Government Exhibit 225B

5    because, again, this is DPR in January of 2013 talking to

6    scout, just to demonstrate how complicated it can get about

7    identity, scout becomes cirrus, but it's still the original

8    scout and cirrus, it's not yet Agent Der-Yeghiayan.  That

9    doesn't happen until July of 2013.

10           This is January 2013, this is scout, and DPR gives

11   scout some advice and about -- if you go down further -- here,

12   "There is nothing on your laptop for them to use."  Nothing on

13   your laptop for them to use; that's what DPR is saying, nothing

14   on your laptop.  Think about what was on Mr. Ulbricht's laptop.

15   "And if you obscure your bitcoins properly," another security

16   measure DPR is instructing, then it says "realistically, the

17   only way for them to prove anything would be for them to watch

18   you log in and do your work."  And let's go further down, the

19   third one in "Sure, someone could stand behind you without you

20   realizing it."  There's Mr. Ulbricht -- that's DPR.  And there

21   is Mr. Ulbricht in the library looking out the window with his

22   back to everyone who walks in, including a squad of FBI agents.

23           Now, there was -- in the prosecution's summation this

24   morning, he talked about the exchange between cirrus, who you

25   recall at that time was Agent Der-Yeghiayan, on October 1, 2013

1    and Mr. Ulbricht about the bitcoin exchange:  Did you use to

2    work at a bitcoin exchange?  Well, I submit to you that if he

3    had been working with him all that time, he would have know

4    that.  He wouldn't have had to have asked that question.  If he

5    had been communicating with him for all those months, it

6    indicates someone who is not familiar with cirrus as opposed to

7    someone who is.

8          And then the day of the arrest when the arresting

9    officers go to Mr. Ulbricht's residence, and you heard, by the

10   way, from Mr. Kincade this morning so I'm not going to go into

11   it about Mr. Ulbricht's time there, under his own name living

12   there, and the Government's Exhibit 130, those handwritten

13   notes found in the waste basket.  And we heard from Agent

14   Der-Yeghiayan that as early as August of 2013 and then

15   throughout September of 2013, the subject that's on those

16   handwritten notes has already been discussed for six weeks by

17   DPR in great detail.  Does DPR sound like a guy who takes pages

18   of handwritten notes?  What we put in today may not have looked

19   like anything, but that Exhibit M that we put in this morning

20   through Ms. Prince, it's a to-do list.  DPR knows how to make a

21   to-do list on a computer.  I submit to you that those

22   handwritten notes are much more likely to have been notes that

23   someone takes during a telephone call.

24          It's also interesting how much in those last ten days

25   shows up in these documents.  The Amelia from OKC, who, by the

1     way, has not been identified, poison oak, except for that "I'm

2     sick," which, again, you could go find those emails and then

3     create one in three seconds of typing, "I'm sick," to put it in

4     there to match something that's part of Mr. Ulbricht's life.

5     DPR and his confederates would be able to do that in a matter

6     of seconds.  But then it's only at the end when you see that in

7     the last couple of entries, it's gilding the lily, it's a

8     set-up, it's way too convenient, and you cannot rely on it

9     beyond a reasonable doubt.

10          There's an instruction about withdrawal from a

11    conspiracy, we're not relying on that.  Mr. Ulbricht was never

12    a conspirator at the beginning or at the end.  Remember, that

13    first -- that 240A:  I want to establish a site where anyone

14    can sell anything.  Not a drug site, not an illegal site.

15    Where anyone can sell anything.  It sounds like Amazon.  It

16    sound like eBay.

17          And about the thumb drive, why wasn't that updated?

18    It's about ten days old, the date on that one.  I submit to you

19    that's not because it's a backup from the computer; it was

20    something that was uploaded into the computer, received by

21    Mr. Ulbricht.

22          Now, a couple of concepts, bitcoin, Tor, I think they

23    were demystified for you enough that you know that they're not

24    synonymous at all with anything illegal.  I think that was

25    established to everyone's satisfaction.

F23gulb5                    Summation - Mr. Dratel

1            Mr. Yum acknowledged that the bitcoin wallets and the

2     bitcoin addresses -- excuse me -- that Silk Road was used and

3     could be used as a wallet itself putting money in and out,

4     putting money in and out.  And if you look at those amounts of

5     bitcoins, those were small amounts of bitcoins going into those

6     addresses.

7            But the one thing he never did was where the money

8     went, the 700,000 bitcoins going into Mr. Ulbricht's wallet --

9     in the wallets, the addresses, the ones that are on his

10    computer; by the way, they're not, again, necessarily his.  We

11    don't know.  We don't know.  They're on the laptop the day he's

12    arrested.

13           And they may come back and talk about metadata.  We

14    know metadata can be edited.  Metadata can be manipulated, but

15    where is the money?  700,254 bitcoins in; 144,000 there.

16    There's no analysis of anything going out.  There's no evidence

17    of anything going out.

18           (Continued on next page)

19

20

21

22

23

24

25

1          MR. DRATEL:  Where is the money?

2          Now, that 556,000 bitcoins that are unaccounted for,

3     if you look at -- that would be worth at the time of

4     Mr. Ulbricht's arrest about $85 million.  By November 22, 2013,

5     six weeks later, they were worth a thousand dollars a bitcoin.

6     Do you know what that comes to?  $556 million.  Would you spend

7     13 million -- would you spend 144,000 bitcoins, 19 million, to

8     get 556 million?  Would that be a sacrifice worth making, to

9     put that on someone's wallet, if you could get away with the

10    rest of it?  And we know that November 22, 2013, from Mr. Yum,

11    that there was a transaction of 195,000 bitcoins that was

12    quickly broken up into three smaller numbers.  Whose bitcoins

13    are those?  DPR's.  Not Mr. Ulbricht's.

14         The government was absolutely correct this morning.

15    They said who stores $19 million of bitcoins on a laptop?

16    Exactly.

17         Also, there were 90,000 bitcoins -- 89,854, almost 90,

18    not attributed to the Silk Road wallet.  Some of them may say,

19    well, they were from wallet to wallet, but we didn't hear how

20    much.  If there had been a significant amount, I'm sure you

21    would have heard about it from the government.

22         No evidence of Mr. Ulbricht cashing out, ever.  He's

23    living with roommates for a thousand dollars a month, three

24    different places.  One place he is living with three people.

25    Another place three people -- four people, rather.

1          DPR knew as of April 2013 that the bitcoin exchanges

2    were being monitored.  They were under scrutiny.  Does

3    Mr. Ulbricht, do we know that Mr. Ulbricht did anything during

4    that time period with respect to his bitcoins?  No.  And wee

5    know that he was a trader.  We know from the Bates chats that

6    he was interested in bitcoins.  We know that he wanted to start

7    a bitcoin site.  We know that he was an investor and a

8    speculator.  And we know that bitcoin in 2010 was infinitesimal

9    pricing, perhaps a dollar, maybe even less.  So you could make

10   money and then reinvest and reinvest and continue to make

11   money.  Think about even a price that goes from 60 cents to

12   $60, think of what your return on investment is after a year,

13   year-and-a-half period.  At one point it went up to $250.

14          So we don't know who DPR is, but we do know who Ross

15   Ulbricht is.  You heard from four witnesses, three of them

16   character witnesses.

17          The government says that those redandwhite chats,

18   Government Exhibit 936, demonstrates that DPR would resort to

19   violence to protect this site.  Assuming that those are true at

20   all, agreed.  That's why, you know, that DPR is not Ross

21   Ulbricht.  Because one thing that the people who know him for

22   his whole life know is that his reputation is for peacefulness

23   and nonviolence.  Challenge yourself.  Look at the credibility

24   of those witnesses.  Assess the sincerity of those witnesses as

25   to the honesty of those witnesses and their experience with

1    Ross Ulbricht, which is real corporeal, like you and I speaking

2    here today, not behind a computer screen, where you cannot tell

3    who is who, when is when, or what is what.

4         You also know that Ross is a person who gets stressed

5    out.  It is the only evidence we have that's real.  You heard

6    that voicemail, Government Exhibit 1005, to Mr. Bates.  I'm

7    panicked.  You saw 1004.  Silk Road was too stressful.  You

8    heard Mr. Bates.  Again, these are real witnesses, really

9    experiencing things that actually happened.  That he thought

10   Ross was stressed out, that he thought Ross was overwhelmed.

11        And then 2012, by the way, what's the message from

12   Ross when Bates reaches out to him?  Chillin'.

13        Look at the journal entries in 2010, 2011, full of

14   crises and anxiety.  Look at 2013, starting in March, that one

15   that is 241.  There is nothing like that in there.  There is

16   nothing from Ross except at the very end.  They talk about

17   Amelia and poison oak, which is stuff that you could get from

18   his Gmail account in two seconds.

19        What about those IDs?  Life on the lam.  What did he

20   ask KingOfClubs.  Let's assume it is Mr. Ulbricht.  It was

21   delivered to his address.  Domestic U.S. flights, life on the

22   lam in the U.S. like that?  Really.  For a guy sitting on

23   700,000 bitcoins.  That's safe?

24        He is asking, if you look at those -- look at

25   Government Exhibit 935.  He asks about the details -- and I

1    read it yesterday so I want to go over it today, I spent time

2    on it.  But he asks about features of these fake IDs.  Does

3    that sound like DPR, or a novice?  He asks about being held at

4    customs.  Do you have any problems with your customers?  Does

5    that sound like DPR, or a novice?

6          He knew about all of that, and yet when Homeland

7    Security, Agent Critten came to him, he spoke to him

8    voluntarily, even though he did not have to.  Does that sound

9    like DPR, or a novice?  Critten, by the way, had no idea that

10   it was a Silk Road package.

11         Mr. Ulbricht volunteered the information about Silk

12   Road when they said speak hypothetically about -- help us out.

13   Speak hypothetically.  Would DPR do that?  Does that sound like

14   DPR to you?  To say, well, on Silk Road you could order

15   anything.  Imagine DPR doing that.

16         Now, Ross gave Agent Critten his valid Texas driver's

17   license.  He gave him an email address -- on Tor, no less.

18   Imagine DPR doing that.

19         He said he was a currency trader.  That's what Ross

20   told him.  And he admitted that he used a false name with his

21   roommates at that time.  Later on, when you heard that he moved

22   to Crazy Cape after knowing that homeland security had come to

23   him and he had spoken about Silk Road with them, he goes back

24   to using his real name when he moves.  Sound like DPR?

25         You heard about his travel.  There is no evidence of

1    anything going on, foreign-to-foreign travel, or anything like

2    that.  You saw the passports.

3         By the way, after the visit by Homeland Security, what

4    does Ross do?  Does he make travel plans?  Does he leave the

5    country?  Are there bitcoin movements?  Does he go underground?

6    Live under an assumed name?  No.  The exact opposite.  He does

7    nothing.

8         And what did they find when they arrested him?

9    Only -- the only passport was his.  That's more than two months

10   after his encounterer with Agent Critten.  He didn't run.  He

11   didn't go underground.  He didn't remove any bitcoins or any

12   money.  He doesn't do anything that one would expect someone

13   like DPR to do.  Nothing that would indicate the

14   security-savvy, security-conscious DPR.

15        Agent D'Agostino gave you an example of how people get

16   into other people's emails and get into their computer.  You

17   send an email that says "cute puppies" and you hope that people

18   click on the link.  Well, sometimes it comes from people you

19   know.  A pishing email.  Would you judge that person you know

20   based on that pishing email?  Would you judge a person you know

21   based on an email that says I'm stuck in a foreign country and

22   I just got robbed, please send me a thousand dollars so I can

23   get home?  Would you judge that person on that email?

24        I submit to you that you cannot find proof beyond a

25   reasonable doubt in this case -- there is so much at stake for

1    Mr. Ulbricht, his future -- based on evidence that so easily

2    can be fabricated, edited, distorted, moved and manipulated.

3            We experience with our senses.  We make decisions

4    based on our perceptions.  And we employ our common sense based

5    on facts you can rely on.  We reach conclusions based on all of

6    those elements.  Yet, the Internet and the impenetrability of

7    the computer screen deprives us of the ability to do that the

8    same way we do "IRL," in real life.  There is a reason that's a

9    phrase, that is an acronym on the Internet, because there is a

10   distinction between the Internet and IRL.  We are here in IRL,

11   and we have to make judgments based on IRL.

12           The Internet denies us the ability to say for sure

13   what is a masquerade, what is truth, what is fiction, what is

14   transparent, and what is hidden from us.  With all this digital

15   evidence of chats and journals and logs and private messages

16   and bitcoin wallets, not a single witness, other than

17   Mr. Bates -- you ought to have a look at that material -- other

18   than Mr. Bates, not a single witness came in and said created

19   by Mr. Ulbricht, that Mr. Ulbricht was the person on the other

20   side of the screen, except, again, that day of the arrest,

21   after he was lured back in, I submit to you, with a phone call

22   about the rating system, with a thumb drive.  Again, we don't

23   have to prove anything.  It's up to the government to prove

24   beyond a reasonable doubt.

25           Your common sense and your life experience will tell

1    you this kind of evidence we've seen here cannot be trusted

2    beyond a reasonable doubt.  Think about yourself.  Think about

3    those close to you.  Think about the definition of reasonable

4    doubt in important parts of your own affairs, important

5    decisions in your own affairs.  Judge that way.

6         This case is not about a specific document here or

7    there, because the entire process lacks integrity in terms of

8    your ability to judge its reliability.  That's what reasonable

9    doubt is all about.

10        Again, this is the last time I'll speak to you during

11   the case.  And because of that, I would ask you that when the

12   government gets up again and speaks to you, that in your head

13   you challenge the government on these issues.  Where is the

14   proof?  Where is the reliability?  Where is anyone who said

15   that Ross Ulbricht composed those?  Where is anyone that said

16   they were composed on that laptop?  Where is anyone that says

17   when they were composed that the metadata isn't manipulated

18   somehow.  All we know is as easy as a keystroke.

19        Challenge the government in your head.  Where is the

20   proof beyond a reasonable doubt that can be relied on in a

21   matter of such importance in your own affairs.  I'm confident

22   when you do that, and when you do that in deliberations, you

23   will reach only one conclusion:  Ross Ulbricht is not guilty on

24   every count in the Indictment.

25        Thank you very much.

1          THE COURT:  All right.  Thank you, Mr. Dratel.

2          Mr. Howard.

3          MR. HOWARD:  Thank you, your Honor.

4          So I get it.  The defense theory appears to be that he

5     was the victim of a complicated conspiracy, a huge setup with

6     many, many layers.  He admitted that he started the site, but

7     then he quickly left and was set up at the very end.  He was

8     the fall guy.  He was just in the wrong place at the wrong

9     time.

10         The defendant's story is absolutely ridiculous and

11    defies all common sense.  This is a desperate attempt to create

12    a smokescreen, a distraction from the mountain of evidence that

13    shows that that man created and ran Silk Road.

14         Ladies and gentlemen, his digital fingerprints are on

15    everything, which shows that he ran Silk Road from beginning to

16    end.  All the files on his laptop computer, the thumb drive

17    found on his bedside table, the $18 million worth of bitcoins

18    that were found on his laptop computer, his personal email,

19    Facebook account and bank records, the posts on the various

20    Internet forums that he made advertising the site, and on top

21    of all of that evidence, the defendant simply cannot escape the

22    fact that he was caught with his fingers on the keyboard.  He

23    was caught redhanded in the middle of a conversation as the

24    Dread Pirate Roberts with an undercover agent who he thought at

25    the time was posing as a member of his support staff.

1           He was right there, logged into Silk Road as the Dread

2    Pirate Roberts.  But he claims that he had no control over what

3    he was doing.  He was not running Silk Road at the time.  He

4    had absolutely nothing to do with the thousands of pages of

5    chat logs on his computer, journal entries, expense reports,

6    all regarding the operation of Silk Road.  Those aren't his,

7    even though they were mixed with very intimate personal details

8    about his life, details that match precisely in dates and

9    content with his personal email account, on his Facebook

10   account, and his bank accounts.  These documents cover years

11   and years.  In the face of actual evidence, his story is

12   absolutely ridiculous.

13           This case is about -- this is about the evidence in

14   this case.  It's about the conduct of the defendant in this

15   case.  It's what each of the witnesses told you about the

16   evidence against the defendant in this trial.  It's about all

17   the evidence that shows through and through that that man was

18   the digital kingpin of the Silk Road underground criminal

19   empire.

20           The defense theory is a complete distraction that is

21   not supported by any actual evidence.  He tries to create

22   boogie men and talk about hypothetical computer

23   vulnerabilities.  He comes up with an incredible fantasy, that

24   he set up, that all the evidence was planted, all of the

25   evidence was fabricated.

1           He was caught redhanded, with a computer full of

2    incriminating evidence.  So what does he do?  He pedals the

3    same Dread Pirate Roberts story that he invented after he

4    realized a mistake by telling too many people that were close

5    to him about his secret.  The one that came up with VJ -- the

6    one that VJ and him came up with together after he had told VJ

7    that he had told a couple of people in real life and told them

8    that he had sold the site.  And VJ said, you remember that

9    chat.  VJ said, you know what, you should come up with a new

10   identity on the site.  Remember the Princess Bride?  You should

11   become the Dread Pirate Roberts.  That's exactly what he did in

12   real life, and that's exactly the story he's trying to sell to

13   you now, that he sold the site and someone else was the one

14   running in.

15          He knows he has to carefully craft the defense story

16   right now because there are some things he simply cannot deny.

17   He simply cannot deny that he started the site; the evidence is

18   way too powerful on that point.  And he can't deny that he was

19   caught redhanded at the end.  So he tells us now that he

20   started and created Silk Road.  He may have gotten too

21   stressful, left quickly, and then was set up at the end by some

22   mysterious hacker or little elves that put all of these files

23   on his computer.  This story does not add up.  It defies all

24   common sense.  The defendant is the Dread Pirate Roberts and

25   ran the Silk Road empire the entire time.

1           Now, let's just start with something simple, the
2      money, something that he does get.  During opening arguments he
3      didn't claim it was planted on his laptop, the 144,000 in
4      bitcoins, almost worth $18 million at that time.  And during
5      open arguments this was legitimate investment income, or
6      something about bitcoin mining.  He admitted that they were his
7      back then.  But that's not true.  You heard the testimony of
8      former Special Agent Ilhwan Yum, which is absolutely
9      devastating to that story that that was investment income.
10          He showed you that he analyzed the bitcoin addresses
11     that were recovered from the servers that were running Silk
12     Road, and he analyzed the bitcoin addresses that were found on
13     the defendant's laptop, the personal laptop that had 144,000
14     bitcoins, almost $18 million at the time of his arrest.
15     Mr. Yum's analysis was clean and simple.  It looked at direct
16     transfers from Silk Road to the defendant, to the defendant's
17     computer.
18          The defendant is trying to cause confusion by trying
19     to make bitcoins sound more complicated than they are.  But
20     don't be distracted.  As Mr. Yum explained, it's much like bank
21     accounts.  You had one set of bank accounts here from Silk Road
22     and another set that was associated with the defendant's
23     laptop.  And he found over 700,000 bitcoins and over 4,000
24     transactions in a year's period that flowed directly from Silk
25     Road to the defendant's computer.  He did that by looking at

1    public records, the block chain.  This was not legitimate

2    investment income.  This was Silk Road money.

3              But now, after hearing Mr. Yum's testimony, there is a

4    suggestion that that was planted, too.  Just like the chat logs

5    and the journal entries and the expense report, like all of

6    those things, that was planted, too.

7              But this is just the beginning.  Let me just talk

8    about a few of the things the defense also told you that defies

9    common sense, the smokescreens that are designed to take your

10   focus off the actual evidence in this case.

11             Mr. Dratel talked a lot about this theme that the

12   Internet is not what it seems.  Multiple people company use

13   different accounts.  It thrives under deception and

14   misdirection.  Yet, the only deception and misdirection is the

15   story they're trying to push right now.  This is not that

16   complicated.

17             Imagine a bank robber in a case where the bank robber

18   is robbed just as he's leaving the bank, holding the bag of

19   cash, the bag with the gun, the getaway plan, and the cell

20   phone with text messages going back for months where he's

21   planning every single detail of the robbery.  This is no

22   different just because it happened on the Internet.  He was

23   caught red-handed with his hands at the keyboard.  Computer

24   crimes can be solved just like any other crime.  The

25   investigation showed that that man was the man behind the

1    keyboard, the Dread Pirate Roberts.

2              Now, the defendant makes a whole series of arguments

3    that there's no way that he could have been the Dread Pirate

4    Roberts because there is no way that the Dread Pirate Roberts

5    could have been that sloppy.  DPR was so careful and security

6    conscious that he could not be the defendant.  He would never

7    have stored his encryption keys in a folder labeled "Keys" or

8    accessed Silk Road from a library.  He would have never kept a

9    journal detailing all of the stuff that he did on Silk Road.

10   The defense wants to paint the Dread Pirate Roberts as a

11   perfect cybercriminal.

12             Ladies and gentlemen, criminals make mistakes all the

13   time.  That's how they get caught.  No one is perfect.  And

14   there are plenty of opportunities to make mistakes when you're

15   running a massive online criminal enterprise for a period of

16   years, which is processing hundreds of millions of dollars in

17   illegal transactions.  But the fact is he thought he was

18   completely protected.  He thought he was completely safe for

19   two reasons.  First, he thought he was safe because of the

20   protections that he got from the Tor network.  Second, he

21   thought he was safe because he had a fully-encrypted computer.

22   That was what he relied on to preserve his anonymity and

23   protect himself from law enforcement.

24             This was not the first time he had used someone else's

25   wireless connection to access Silk Road.  You may remember the

1    testimony of Richard Bates, how when the defendant went over to

2    Bates' house to show him Silk Road after he was forced to do so

3    otherwise he wouldn't get any more help from Mr. Bates.  He

4    used the neighbor's Wi-Fi just to be sure in case -- in case he

5    was wrong and something would get traced back to him.  That's

6    why he didn't use his house, ladies and gentlemen.  That's why

7    he went to a library.  In case there was a mistake, it could

8    have been any of the patrons in the library.  It wouldn't be

9    traced back to the defendant's home.  He did that for his own

10   protection.

11          Tor was his shield.  Sure, he told Special Agent

12   Critten, after Critten tried to deliver the nine counterfeit

13   driver's licenses to him, that hypothetically someone could buy

14   these kind of things or drugs from Silk Road.  He thought he

15   had no chance of being caught.  He thought he was smarter than

16   everyone else.  It's his ego, ladies and gentlemen.  You see it

17   in the journal entries.  He thought he was safe because of Tor.

18   He thought he was completely anonymous.  And it didn't matter

19   what Special Agent Critten might have learned about Silk Road

20   based on his statements.

21          He thought he was completely safe from law enforcement

22   because his computer was encrypted.  The defense showed you

23   Government Exhibit 225B, the chat with Scout talking about

24   where the Dread Pirate Roberts tells Scout put yourself in the

25   defendant's -- the shoes of a prosecutor.  They'd have to get

1  right behind you and see you logon.  Ladies and gentlemen,

2  that's exactly what we did here.  The FBI did exactly that.

3  They were able to get behind him and catch him redhanded,

4  logged on to the site, before he had a chance to close his

5  computer and protect all the files that were in there through

6  encryption.

7        It doesn't matter what the names of the files were or

8  the folders on the computer, whether the keys were stored in a

9  folder named "Keys" or the aliases that he used, like Richard

10 Page, you might remember, were stored in a folder named -- it

11 didn't matter because no one would get anything so long as the

12 encryption worked.  But the FBI made sure that they got the

13 computer before he could engage the encryption.

14       If he had closed the laptop, it would have been, as

15 Mr. Kiernan told you, a brick.  He thought he was safe.  He

16 thought Tor and the encryption was going to save him.  He

17 thought we would never be able to show you all the documents

18 we've shown you in court over the past few weeks.

19       The defendant talks about Mark Karpeles.  I am not

20 going to talk about him very long.  There is really no real

21 evidence to support that.  It is an utter distraction and a red

22 herring.  Remember what we learned about the ask any

23 connection, any real connection that Mark Karpeles had to Silk

24 Road.  The Silk Road market.org website, not the Silk Road

25 market on Tor but a simple website that was used to advertise

1    the Silk Road, tell people how to get there.  But it's even --

2    Mark Karpeles is even farther away than that.  He owned a -- he

3    ran a company that hosted hundreds and hundreds of websites, or

4    servers where people could host their websites, and someone

5    registered -- someone else registered the Silk Road market.org

6    Web page, Web server at his company.  And who was that?  That

7    was Richard Page.  We showed you the registration information.

8    That was Richard Page.  There was a phone number.  There was an

9    address.  And where do we find all of the same information

10   about Richard Page?  On the defendant's computer, in the folder

11   labeled "Aliases."

12         Silkroadmarket.org was not -- was tied to the

13   defendant, not Mark Karpeles.  Without -- and that's all you

14   have.  It's completely, completely smoke.

15         Let's talk a little bit about Mr. Bates, Richard

16   Bates.  Mr. Turner told you you could tell he wasn't happy to

17   be here to talk about his friend.  They want to use his

18   testimony and he did.  He got up there and told you that on

19   November 11, 2011, he had a party, the 11/11/11 party.  They

20   were excited that the days were all the same.

21         And at that party the defendant got there early, had a

22   private conversation with Mr. Bates, because he was worried.

23   Mr. Bates told you that he saw that the defendant was nervous.

24   Who else have you told?  Who else have you told my secret to?

25   Because he was having a crisis.  He was having a crisis because

 1    he had also told his girlfriend, who was sloppy with the

 2    secret, and someone else posted on his Facebook.  He was

 3    freaking out.

 4              That's not a man who had sold the site six months ago.

 5    That's a man who was connected to the site.

 6              So Bates got up there and told all of you that he

 7    believed the defendant when he told him he sold the site.  The

 8    defense makes a big deal about Government Exhibit 1004, our

 9    exhibit which we showed, the 2013 conversation.  Do you

10    remember that conversation where Mr. Bates tells the defendant

11    do you see the article on I think it was slashed out -- some

12    article he was referencing on the Internet.  And the defense

13    says, Sheesh, I'm glad that that is not my problem anymore.

14              Those are lies.  Those are lies that are part of the

15    story that he invented back then, that he had sold the site.

16    You saw that almost exactly one month later, on December 9,

17    2011, he talked to VJ.  VJ asked him whether he had told anyone

18    else in real life.  He told him he had told two people.  He

19    claimed that he had sold this story on them.  He spun the story

20    on them that he had sold the site and they believed him.

21    Mr. Bates believed the defendant, that's true.  But there you

22    have it, a chat log on his computer where he admits that that's

23    a lie.  And then one month after that, that's when VJ comes up

24    with the bright idea, let's deal with those loose ends, those

25    people that you shared your secret with.  Let's invent this new

1    identity on the site, the Dread Pirate Roberts, as part of this
2    whole scheme from the very beginning to claim that it's someone
3    else.
4              It's the same story from the very beginning.  And he's
5    trying to pull it over on you right now.
6              None of this really matters.  As Mr. Turner told you,
7    he admitted to starting the site.  He was logged in at the end.
8    He had to have known the Dread Pirate Roberts' password.  He
9    was running Silk Road.  Listen to the Judge's instructions,
10   ladies and gentlemen.  Just listen to the instructions.
11             Once you put all the distractions off to the side,
12   there is overwhelming evidence the defendant is guilty -- the
13   laptop and everything on it.  The defendant wants you to
14   believe that it was all planted there at the last second,
15   through BitTorrent or something, but this is ridiculous.  He
16   wants you to believe that all of those writings weren't his.
17   Those weren't his words.  But they absolutely were.  He wants
18   you to believe that literally thousands of pages of highly
19   incriminating chats were invented from thin air and planted.
20   That's not all.  During the hundreds of files on that computer,
21   all of those files were neatly organized by some boogie man who
22   downloaded them to his personal computer at the last minute --
23   the Silk Road keys, the list of servers, the Silk Road
24   accounting spreadsheet, the copy of the Silk Road website and
25   the transaction database that was on his computer, the computer

1    filled with documents, and the same documents talk about Silk

2    Road and also talk about his personal life.  Remember the

3    spreadsheet in which he listed all of his assets, which had

4    showed that he thought that Silk Road was worth $104 million to

5    him, but then also had references to his job at Good Wagon

6    Books and entries to the exact amount of money that he had in

7    his USAA account and his PayPal account the last time that

8    spreadsheet was updated.  It is the same thing with the chats.

9          Those chats, as I've mentioned, and as Mr. Turner

10   mentioned, include details about his personal life that match

11   up exactly with things you saw from his Facebook account and

12   his email account.  The trip to Thailand, his travel and his

13   weekend getaways, the poison oak incident, getting sick.

14   Remember the email in 2012 to his friend about statistics?  The

15   same email that was found copied almost exactly into the chat

16   that was talking about Silk Road?

17         He wants you to -- he's claiming that the part about

18   his personal life are real but everything else is fabricated

19   and planted.  You have got to be kidding me.

20         And how about the evidence seized from his residence?

21   I just want to hold up.  This is Government Exhibit 502A.

22   These are the thumb drivers.  They are very small, but one of

23   these is very, very important; it is a powerful piece of

24   evidence.  It was a thumb drive that the FBI found on that

25   man's bedside table.

1              Now, Mr. Kiernan talked to you about this thumb drive.

2    It contained backup copies of the Silk Road website, the same

3    copies of files that were also found on the computer.  It

4    contained backup copies of other files from his computer, many

5    of the incriminating documents you've seen during this trial.

6    And Mr. Kiernan showed you the date that backup was made,

7    September 23, 2013, weeks before he was arrested.

8              So these files were planted on both the laptop and the

9    thumb drive weeks apart?  The same mysterious hacker or Mark

10   Karpeles, or whoever you want it to be, broke into his house

11   and planted that thumb drive on his bedside table?

12             This shows that he was running the Silk Road website,

13   ladies and gentlemen.  He backed up his files to a thumb drive

14   and he had left it on his table.  It was encrypted.  But

15   Mr. Kiernan was able to figure out the encryption, and the

16   evidence is very powerful.

17             Mr. Kiernan showed you one of the files, the log file,

18   the one that also contains the references to the murders for

19   hire, when he talks about, you know, getting confirmation that

20   the blackmailer was executed, the same file that had details

21   about his personal life, about getting sick, that's

22   corroborated by his Gmail account about the poison oak, about

23   the date with Amelia.  There were two different copies.  There

24   was a copy on the thumb drive that was up to date as of the

25   date that the backup was made, September 23rd, and he had a

copy on the laptop which had a more recent update about what he
had done on Silk Road since the backup was made.  It's
devastating evidence, ladies and gentlemen.  It's devastating.
The story does not make sense, his story that has no actual
evidence to support it.

          How about the piece of trash?  Was that planted, too?
The piece of paper with details about the vending system
formula that was on the Silk Road website for weeks.  Someone
placed a telephone call and he blindly listened and wrote it
down on a piece of paper, the exact same formulas that the
Dread Pirate Roberts was talking about on Silk Road for
changing the vending system?  It doesn't make sense.  This
simply cannot be explained away.

          And, third, the money trail.  The absolutely
devastating evidence the bitcoins on his laptop were from Silk
Road and not from legitimate investing as, you know, they
wanted you to believe in opening statement.  That money trail
also shows you that he made two payments of hundreds and
hundreds of thousands of dollars for those murders for hire.

          Again, we don't think -- there is no evidence those
occurred, and hopefully they did not.  But he felt threatened
and he made those payments to arrange for a hitman to take out
five different people.  Thank God that didn't work out.  As
Mr. Turner explained, it showed he was willing to stop at
nothing to protect his illegal empire, his multimillion-dollar

F23DULB6                    Rebuttal - Mr. Howard

1    empire.

2             Ladies and gentlemen, the evidence is overwhelming

3    that that man, Ross Ulbricht, built and operated Silk Road.

4             At the end of the day, Judge Forrest will tell you

5    that what I say is not evidence, what Mr. Dratel says is not

6    evidence.  Reasonable doubt is not about flights of fancy,

7    ridiculous stories of conspiracy theories that do not match up

8    with the actual evidence.  It's your job to apply the evidence

9    that you've heard, the actual evidence, to the law as the Judge

10   will instruct you.  Use your common sense and don't let the

11   defendant insult your intelligence.

12            You, the jury, are entrusted with finding the facts.

13   Look past all of these distractions and look at the actual

14   evidence.  Listen to the Judge's instructions.  Use your common

15   sense.  If you do these things, I expect that you will see the

16   defendant's wild conspiracy theories do not hold water.  There

17   is only one real conspiracy here.  That's the conspiracy that

18   was created and run by that man -- to create Silk Road, to

19   control every single aspect of that illegal empire, and for

20   that he took his cut, his piece, of all the drugs and illegal

21   goods that were sold on the site.

22            (Continued on next page)

23

24

25

1          MR. HOWARD:  The evidence overwhelmingly shows that

2     Ross Ulbricht was the digital kingpin of the underground online

3     illegal marketplace that was Silk Road.  We respectfully

4     request that you return the only verdict consistent with the

5     law, the defendant is guilty as charged.  Thank you.

6          THE COURT:  All right.  Thank you, Mr. Howard.

7          Ladies and gentlemen, I don't think we have quite

8     enough time to really get going with the jury instructions this

9     afternoon, so instead, we'll adjourn for the day and then pick

10    them up tomorrow morning.

11         It will take me about, so you have your mind set, it

12    will take me about an hour and 15, 20 minutes to get you the

13    instructions.  Now, let me just assure you that you're each

14    going to have a copy of them on with you.  We'll hand them out

15    to you tomorrow morning so you can follow along.  It will be

16    what I say that's actually the instruction, but the

17    instructions, it's pretty scripted, but every once in a while,

18    I make a change.  So it's important that you listen, even if

19    you're following along.  But we'll go through that and then and

20    then immediately after that, you'll be allowed to go and

21    deliberate.  My expectation is that if we all can get going

22    with our usual hope springs eternal, as soon as we can tomorrow

23    morning, that you'll be deliberating before lunch for sure and

24    then you can deliberate through lunch.

25         One thing that I want to tell you about now which is

1    you all have to be there together in order to deliberate.  In

2    other words, if somebody takes a cigarette break, you have to

3    wait, right?  Also, you can't in the morning start before

4    everybody is there.  So same thing with the instructions:  We

5    have to have everybody in our seats to get going.  All right.

6           And we'll talk about the role of the alternates also

7    tomorrow as part of that whole discussion.  So for tonight, I

8    know that you have now heard all of the evidence in the case.

9    You have now also heard the closing statements.  However, you

10   haven't been given the instructions on the law.

11          So it does remain extremely important that you not

12   talk to anybody, including each other or anybody else about

13   this case.  We're very close to the point that you'll be able

14   to deliberate, but it's important that you hear my instructions

15   on the law before you even speak with each other about the

16   case.  As you read news articles and things, anything that you

17   think might be related to this case, you must turn your eyes

18   and do not read that article.  I instruct you that you cannot

19   read any news articles until this case has been fully

20   completed.  I'll see you folks tomorrow morning and we'll

21   hopefully start as close to 9:30 as we can.  We're always

22   trying.  Have a good night.

23          (Jury excused)

24          (Continued on next page)

25

1              (In open court; jury not present)

2              THE COURT:  Is there anything that you think we should

3    go over before we break ourselves, before we break for the

4    evening?

5              MR. TURNER:  Not from the government.

6              MR. DRATEL:  No, your Honor.

7              THE COURT:  Unless there is anything to be raised

8    tomorrow morning, I don't think we need to gather before being

9    all in our places and ready to go at 9:30.

10             MR. DRATEL:  Just as long as our previously stated

11   objections are incorporated for purposes of the final charge

12   that the Court has prepared.  In other words, that we don't

13   have to go through all of our prior objections that we made

14   during the charge conferences.

15             THE COURT:  Yes.  So let me just describe how it works

16   because you have received now a final and then you've received

17   an "as delivered."  The difference between the two are some of

18   the changes that I had given yesterday.  I have given you

19   absolutely every iteration.  You're welcome and I encourage you

20   to run a blackline against it if you want to look for any

21   additional typographical errors, things that may have changed

22   in there.  Otherwise, I believe I released an opinion yesterday

23   that went through my resolution of most of the substantive

24   objections.

25             To the extent that I didn't have a particular

 1   objection expressly pointed out in that written decision, it's

 2   relatively obvious after our discussion, I just went with one

 3   position or the other based upon the Court's review of the law.

 4   So all objections that were lodged, either orally or in the

 5   written submissions, there were both letters which the Court,

 6   when this is all done, will post on the docket for the jury

 7   instructions, as well as the additional defense instructions.

 8           My practice is to have 100 percent of that go onto the

 9   docket so that if anybody ever chose to do so, they could

10   recreate, between the transcript and those written submissions

11   and the track changes, exactly what's occurred, so I think

12   there will be a complete record.

13           MR. DRATEL:  I'm saying it so we don't have to restate

14   again.  I prefer not to.  Believe me.

15           THE COURT:  Your objections as they have been set

16   forth so far are preserved.  If there's anything new that you

17   think you needed to raise, then you'd have to do it.  But the

18   ship has sort of sailed, but if you did have something, I

19   wouldn't want you not to say something, but the objections

20   you've already made have been made.

21           MR. DRATEL:  Thank you, your Honor.

22           THE COURT:  If there is anything that you folks want

23   to go over, get ahold of each other and I'll be here in any

24   event and we can deal with things at 9:00; otherwise, let's try

25   to be here as close to 9:30 as possible.

1          MS. LEWIS:  One logistical matter.

2          THE COURT:  Let's sit down.  I thought it would be

3     quick.

4          MS. LEWIS:  One logistical matter and we mentioned the

5     exhibits, there are a lot in this case, would you prefer we

6     check the exhibits tonight then?

7          THE COURT:  I don't mind, frankly, logistically

8     whether you do it tonight or tomorrow morning before 9:30, but

9     you need to have resolved everything that's going into the jury

10    room in agreement between the parties.  And if there's any

11    dispute, I will resolve it.

12          In other words, if there's a demonstrative and

13    somebody thinks they're sending it back into the jury room,

14    right, and there's a dispute, then you folks need to discuss it

15    and then you need to raise it with me if you can't resolve it.

16          The reason I say that is I've actually had cases where

17    after it's gone back into the jury room, a verdict is ready to

18    come out before they have the documents rolled in because it

19    can sometimes -- that, I don't expect to occur in this case,

20    but it has trained me that it needs to get rolled in at the

21    same time because I do want to recite that all the documents

22    were there and available to the jury.

23          Whenever you want to do it, do it, but the moment that

24    I'm done with the charge, I wanted to launch that there.

25          MR. TURNER:  So I'm perfectly clear, are you saying

 1   that all of the exhibits should go in or that the parties

 2   should confer about which selection go in?

 3         THE COURT:  Here is my view:  Anything that has been

 4   received into evidence as evidence in this case, in other

 5   words, let's put aside things that were just shown marked for

 6   identification and potentially depending upon your view of the

 7   demonstratives, and that can be how you folks decide, that

 8   should go back, right?  I'm not saying pick and choose ten

 9   exhibits here, ten exhibits there.

10         There's an entire list of exhibits and my view is they

11   should go in order, all of them, into the jury room.

12         MR. TURNER:  Okay.  Understand.  Thank you.

13         THE COURT:  Now, the other issue, and I assume that

14   you folks will have this automatically, is to have -- the U.S.

15   Attorney's Office always has this -- is an electronic version

16   of the transcript available in case there are questions which

17   require us to extract testimony so that we can do that

18   relatively quickly.  It's a lot easier than the cutting and

19   pasting, so I assume you folks have that capability on this

20   case.

21         MR. TURNER:  We have been working on that.

22         THE COURT:  Terrific.  I told you I'm going to send

23   the indictment back, and I left it up for inspection.  It's up

24   here as well.  I will send back into the jury room -- the four

25   alternates will be told to go home.  They are not going to be

1    dismissed.  I'm sure we've all had it, I've had it, where

2    there's been an alternate called upon and the jury

3    deliberations must commence anew, so the alternates remain part

4    of the jury panel until it's done, but they won't, in the

5    initial instance, deliberate with the panel of 12.

6            But I will send 13 copies of the verdict form into the

7    jury room; that's one for each juror and an extra because they

8    tend to mark them up and they need an extra.  So, that's why we

9    have the 13 here.  If you're wondering what they look like,

10   they're right here.  It's what you've seen before.  It's what

11   was already circulated.  I hadn't made the initial changes

12   apart from adding signature lines.  It is my practice to have

13   each of the 12 jurors sign, as well as whoever they choose as

14   the foreperson, the actual verdict form.

15           The one thing I did want to say was in terms of once

16   the jury is charged, I need one lead counsel from each side --

17   and, of course, the defendant will need to remain available

18   throughout the entire deliberation process all day -- until we

19   get a verdict in how ever many days it takes, so if we have

20   questions, people aren't running over from wherever they're

21   running over from.  So we can reach you, it doesn't mean you

22   have to be right here, but Joe needs to know exactly where in

23   the building you are.  So if you have gone to the cafeteria or

24   someplace else, Joe needs to know exactly where to find you.

25   And you guys I'm sure your experience is the same:  Typically,

F23gulb7                        Trial

1    if you're going to get a question, you often get it in the

2    first hour, hour and-a-half and then there might be a delay

3    when they're talking, but they might have an initial question

4    and then a delay before additional questions.

5              Anything else?

6              MR. DRATEL:  No, your Honor.

7              THE COURT:  We are adjourned for the evening then

8    until tomorrow morning.

9              THE DEPUTY CLERK:  All rise.

10             (Adjourned to February 4, 2015 at 9:30 a.m.)

11                              * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                              Page

CHRISTOPHER KINCAID

Direct By Ms. Lewis . . . . . . . . . . . .2099

Cross By Mr. Howard . . . . . . . . . . . .2103

Redirect By Ms. Lewis . . . . . . . . . . .2105

BRIDGET PRINCE

Direct By Mr. Dratel . . . . . . . . . . . .2107

                  DEFENDANT EXHIBITS

Exhibit No.                              Received

 M   . . . . . . . . . . . . . . . . . . .2109