

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

<u>TO BE FILED UNDER SEAL</u>

November 21, 2014

<u>By E-mail</u>
Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:    *United States v. Ross William Ulbricht*, 14 Cr. 68 (KBF)

Dear Judge Forrest:

The Government writes respectfully concerning an ongoing federal grand jury investigation being conducted by the U.S. Attorney's Office for the Northern District of California ("USAO-San Francisco"), in conjunction with the Public Integrity Section of the Criminal Division of the Department of Justice. The subject of the grand jury investigation is a former Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), named Carl Force. In 2012 and 2013, SA Force was involved as an undercover agent in an investigation of Silk Road conducted by the U.S. Attorney's Office for the District of Maryland ("USAO-Baltimore"). As the Court is aware, USAO-Baltimore has a pending indictment against Ross Ulbricht, charging Ulbricht with, among other things, soliciting the murder-for-hire of a Silk Road employee. (*See* Attachment A.) SA Force is the undercover agent whom Ulbricht allegedly hired to arrange the murder-for-hire, as described in that indictment. He is now being investigated by USAO-San Francisco for, among other things, leaking information about USAO-Baltimore's investigation to Ulbricht in exchange for payment, and otherwise corruptly obtaining proceeds from the Silk Road website and converting them to his personal use.

SA Force played no role in the investigation of Silk Road conducted by the U.S. Attorney's Office for the Southern District of New York ("USAO-SDNY," or "this Office"), which proceeded on a separate and independent track from the investigation conducted by USAO-Baltimore. Moreover, the Government does not believe that the ongoing investigation of SA Force is in any way exculpatory as to Ulbricht or otherwise material to his defense. However, in an abundance of caution, the Government seeks to disclose the investigation of SA Force to the defense, and therefore respectfully requests a protective order authorizing the

Government to do so pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E) and prohibiting the defense from disclosing the investigation to any third-party.

Facts

SA Force is being investigated by USAO-San Francisco for a variety of conduct, including suspected misconduct undertaken in his capacity as a DEA undercover agent in USAO-Baltimore's Silk Road investigation. USAO-San Francisco began investigating SA Force in the spring of this year after learning of suspicious transactions he had had with a certain Bitcoin exchange company with a presence in San Francisco. Further investigation by USAO-San Francisco revealed that SA Force held accounts at multiple Bitcoin exchange companies in his own name, through which he had exchanged hundreds of thousands of dollars' worth of Bitcoins for U.S. currency during 2013 and 2014 and transferred the funds into personal financial accounts. USAO-San Francisco also learned that SA Force had used his position as a DEA agent to protect these funds, including sending out an unauthorized administrative subpoena to one of the Bitcoin exchange companies, purporting to instruct the company to unfreeze an account held in SA Force's name that the company had frozen due to suspicious activity.

Since learning this information, USAO-San Francisco has been investigating, among other things, how SA Force could have come into possession of such a large quantity of Bitcoins and the extent to which he may have acquired these Bitcoins through his involvement in USAO-Baltimore's Silk Road investigation. This Office has been assisting USAO-San Francisco with its investigation, by sharing relevant evidence collected from this Office's investigation of Silk Road, including evidence from the server used to host the Silk Road website (the "Silk Road Server") and evidence from Ulbricht's laptop computer. To date, USAO-San Francisco's investigation has uncovered several possibilities as to how SA Force could have acquired a large amount of Bitcoins through his involvement in USAO-Baltimore's Silk Road investigation.

1.    *Leaks of Investigative Information in Exchange for Payment*

As discussed further below, SA Force operated an authorized undercover account on Silk Road under the username "nob," which was involved in the murder-for-hire alleged in the USAO-Baltimore indictment. However, USAO-San Francisco now suspects SA Force of also operating at least two other accounts on Silk Road, which were not authorized undercover accounts. These accounts appear to have been used to leak (or offer to leak) investigative information to Ulbricht (whom SA Force knew only by his Silk Road username, "Dread Pirate Roberts"), in exchange for payment in Bitcoin.

One of these accounts is the Silk Road username "french maid." Evidence from the Silk Road Server and Ulbricht's laptop indicates that, in or about mid-September 2013, a Silk Road user named "french maid" contacted "Dread Pirate Roberts" via Silk Road's private message system, claiming that "mark karpeles" had given the true name of "Dread Pirate Roberts" to "DHLS." Mark Karpeles is the former CEO of a now-defunct Bitcoin exchange company known as "Mt. Gox," whom USAO-Baltimore was seeking to interview in September 2013 to determine if he had any information concerning the identity of the Silk Road operator "Dread Pirate Roberts." "DHLS" is a possible reference to the Department of Homeland Security,

2

agents of which were working with USAO-Baltimore's investigation.  Evidence from Ulbricht's laptop indicates that Ulbricht paid "french maid" $100,000 in Bitcoins to pass on the name that Karpeles had supposedly given to authorities, but that "french maid" never replied.[1]  Given "french maid's" use of SA Force's first name and apparent knowledge of the USAO-Baltimore investigation with which he was involved, USAO-San Francisco is investigating whether the "french maid" account was controlled by Force and used to corruptly obtain this $100,000 payment from Ulbricht.

SA Force is also being investigated for leaking investigative information to Ulbricht through a different Silk Road username – "alpacino" (or "albertpacino" or "pacino").  A file recovered from Ulbricht's laptop titled "le_counter_intel" (*i.e.*, "law enforcement counter intelligence") contains extensive records of communications that appear under the heading "correspondence with alpacino."  The communications purport to be from someone claiming to be "in the perfect spot to play spy for Silk Road with the DEA."  Like the correspondence from "french maid," these communications reflect inside knowledge of USAO-Baltimore's investigation of Silk Road.  Further evidence indicates that Ulbricht paid "alpacino" a salary of $500 per week to supply such information.  Accordingly, USAO-San Francisco is investigating whether SA Force controlled this username as well and exploited it to exchange investigative information to Ulbricht for payment in Bitcoins.[2]

## 2.     Use of Cooperator's Silk Road Account to Steal Bitcoins from Silk Road

SA Force is also being investigated concerning a theft of $350,000 in Bitcoins that appear to have been taken from Silk Road through the account of a Silk Road employee – the same employee at issue in the murder-for-hire allegations charged by USAO-Baltimore.  The employee, Curtis Green, who went by the username "Flush" on Silk Road, was a cooperator in USAO-Baltimore's investigation at the time, and his handler was SA Force.  Green was arrested by SA Force and several other agents involved in the USAO-Baltimore investigation on January 17, 2013.  Green cooperated with the investigation following his arrest and turned over his login credentials to the "Flush" account to SA Force.  According to DEA investigative reports filed by SA Force, SA Force initially changed the password on the "Flush" account; however, the reports state that, on or about January 19, 2013, he gave Green the changed password, so that Green could log in to the account and resume communications with "Dread Pirate Roberts" for the purpose of acting as a confidential source.[3]

---

[1] Ulbricht's name was not in fact given by Mark Karpeles to any investigators associated with USAO-Baltimore's investigation.

[2] Silk Road employees are known to have been paid in Bitcoin.

[3] All of this information has already been disclosed to the defense, as SA Force's investigative reports were turned over in discovery pursuant to Rule 16(a)(1), given that they contain numerous recorded statements by the defendant.

Approximately one week later, on January 26, 2013, the "Flush" account appears to have been used to steal approximately $350,000 in Bitcoins from Silk Road.[4]  "Dread Pirate Roberts" messaged "Flush" on January 26, 2013, accusing him of stealing the money and warning that he was "taking appropriate action."  Subsequent private messages from the Silk Road Server and chats recovered from Ulbricht's computer reflect that Ulbricht subsequently recruited a Silk Road user he knew as "nob" to have Green killed in retaliation for the theft.  The "nob" account, as noted above, was an undercover account controlled by SA Force.  SA Force had been using the account to communicate with "Dread Pirate Roberts," posing as a large-scale drug dealer seeking to do business on Silk Road.  As reflected in USAO-Baltimore's indictment, after being solicited to arrange Green's murder, SA Force continued communicating with "Dread Pirate Roberts" about what he wanted done and eventually staged Green's murder to prove that the murder was carried out, for which "Dread Pirate Roberts" paid $80,000.

SA Force's use of the "nob" account for this purpose was part of an authorized law enforcement operation and his communications with "Dread Pirate Roberts" about the murder-for-hire – which have already been disclosed to the defense – are not suspected of being improper.  Moreover, the receipt of the $80,000 payment for the murder-for-hire is documented in SA Force's reports.  However, the apparent theft of $350,000 from Silk Road through the use of the Green's "Flush" account remains unaccounted for.  Given that SA Force had the login credentials to the "Flush" account at the time, he is under investigation for using the account to steal the funds.[5]  Although these funds were criminal proceeds and thus would have been subject to seizure by law enforcement, USAO-San Francisco is investigating whether SA Force took the funds without proper authorization and unlawfully converted them to his own personal use.

### 3.    Receipt of Additional Undocumented Payments from "Dread Pirate Roberts"

SA Force continued to use the "nob" account to communicate with "Dread Pirate Roberts" through September 2013, and USAO-San Francisco is investigating whether he used the "nob" account to receive any payments that are not documented in his investigative reports filed with the DEA.  In particular, the Silk Road Server contains private messages sent by "Dread Pirate Roberts" to "nob" in the summer of 2013, referencing two transfers of Bitcoins made by "Dread Pirate Roberts" to "nob" during this time period – totaling 400 Bitcoins and 525 Bitcoins, respectively (equivalent to approximately $85,000 altogether at then-prevailing exchange rates).  However, the receipt or seizure of these Bitcoins does not appear to be reflected in SA Force's

---

[4] As a Silk Road administrator, "Flush" had administrative privileges on the Silk Road website that gave him certain effective access to user funds, such as the ability to reset user passwords and thereby take over user accounts.

[5] According to an investigative report filed by SA Force, Green claimed not to know anything about the theft.  The report states: "GREEN has telephoned SA Force on numerous occasions and advised that he has been 'racking his brain' about the supposed theft of $350,000 from DREAD PIRATE ROBERTS.  Note, DREAD PIRATE ROBERTS is accusing GREEN of stealing the money.  GREEN believes that there is a glitch in the website and that somebody hacked into the SILK ROAD marketplace and stole the Bitcoin."

reports.  Accordingly, USAO-San Francisco is investigating whether he wrongfully used the "nob" account to acquire these Bitcoins as well and convert them to his personal use.

<u>Discussion</u>

Federal Rule of Criminal Procedure 6(e) generally prohibits an attorney for the Government from disclosing any "matter occurring before the grand jury."  Fed. R. Crim. P. 6(e)(2)(B).  The Supreme Court has explained that grand jury secrecy is justified, among other reasons, by the need to protect the integrity of an ongoing investigation and to prevent premature public disclosure of the fact that an individual is suspected of criminal wrongdoing.  *See Procter & Gamble Co.*, 356 U.S. at 681 n. 6.  However, the secrecy requirement of Rule 6(e) is not absolute.  In particular, the rule provides that a court "may authorize disclosure – at a time, in a manner, and subject to any other conditions that it directs – of a grand jury matter . . . preliminarily to or in connection with a judicial proceeding."  Fed. R. Crim. P. 6(e)(3)(E).  Disclosure is permissible under this exception if a court presiding over a judicial proceeding determines that "a particularized need for disclosure outweigh[s] the interest in continued grand jury secrecy."  *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 223 (1979).

Here, the Government seeks to disclose to the defense the facts set forth above concerning the pending grand jury investigation of SA Force, under a protective order that addresses the need to otherwise keep the investigation confidential.  The Government therefore requests that the Court enter a protective order authorizing the Government to make this disclosure under Rule 6(e)(3)(E) and precluding the defense from disclosing the existence of USAO-San Francisco's investigation to any third-party.

To be clear, the Government does not believe that this disclosure is required under Rule 16 of the Federal Rules of Criminal Procedure or under *Brady v. Maryland*, 373 U.S. 83 (1963).  The suspected criminal conduct for which SA Force is being investigated – even if he did in fact commit the conduct – does not exculpate Ulbricht in any way or otherwise materially aid his defense.  To the contrary, the suspected leaks of investigative information by SA Force indicate that Ulbricht repeatedly paid a government agent to provide "counter-intelligence" information in the interest of protecting Silk Road from law enforcement.  Likewise, regardless of whether SA Force or someone else stole $350,000 through the "Flush" account in January 2013, the facts remain that Ulbricht believed that his employee, Curtis Green, had stolen the funds, and that Ulbricht sought to murder Green for doing so.  Finally, any personal use of payments that SA Force received through his undercover "nob" account reflects only corruption on SA Force's part, rather than anything suggestive of Ulbricht's innocence.

Moreover, SA Force played no role in this Office's investigation of Silk Road and the Government does not intend to call SA Force as a witness at trial.  Thus, the facts underlying the USAO-San Francisco investigation do not constitute impeachment material for which disclosure would be required under *Giglio v. United States*, 405 U.S. 150 (1972).  Nor does the Government intend to use at trial any communications between Ulbricht and SA Force that were found on the Silk Road Server and Ulbricht's laptop – even though these communications include highly

incriminating exchanges reflecting Ulbricht's hiring of "nob" to arrange the murder of Curtis Green.[6]

Although not exculpatory or impeachment material, in an abundance of caution, the Government seeks to disclose USAO-San Francisco's investigation of SA Force to the defense in order to avoid any dispute concerning whether this information is subject to discovery. Even though the disclosure relates to an ongoing grand jury investigation, the Government believes that, with the entry of a protective order prohibiting further disclosure, the disclosure will be sufficiently limited so as to avoid impinging on any interests protected by Rule 6(e), and that the disclosure is therefore permissible under Rule 6(e)(3)(E). This Office has consulted with USAO-San Francisco, which consents to the proposed disclosure under the requested protective order.

<u>Conclusion</u>

For the reasons set forth above, the Government respectfully requests that the Court enter a protective order authorizing the Government to disclose to the defense the facts set forth in this letter and prohibiting the defense from disclosing the existence of USAO-San Francisco's investigation of SA Force to anyone outside the defense team. The Government further respectfully requests that the protective order, and this letter, be maintained under seal.

Respectfully,

PREET BHARARA
United States Attorney

By: _____
SERRIN TURNER
Assistant United States Attorneys
Southern District of New York

Encl.

---

[6] The Government does intend to introduce other evidence of this attempted murder-for-hire, through communications that Ulbricht had about it with co-conspirators.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------

UNITED STATES OF AMERICA

    - v. –

ROSS WILLIAM ULBRICHT,
  a/k/a "Dread Pirate Roberts,"
  a/k/a "DPR,"
  a/k/a "Silk Road,"

          Defendant.

---------------------------------------

**UNDER SEAL**

14 Cr. 68 (KBF)

## ORDER

Upon the attached letter from Serrin Turner, Assistant United States Attorney for the

Southern District of New York, dated November 21, 2014 (the "Letter"), IT IS HEREBY

ORDERED as follows:

1.    Pursuant to Rule 6(e)(3)(E) of the Federal Rules of Criminal Procedure, the

    Government may disclose to the defense the existence of the grand jury

    investigation referenced in the Letter.

2.    Pursuant to Rule 16(d)(1) of the Federal Rules of Criminal Procedure, the defense

    is prohibited from disclosing the grand jury investigation referenced in the Letter

    to anyone outside the defense team.

3.    The Letter and this Order shall be sealed until such time as the Court otherwise

    directs.

Dated: New York, New York
       November ___, 2014

                          _____
                          HON. KATHERINE B. FORREST
                          UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    - v. —

ROSS WILLIAM ULBRICHT,
  a/k/a "Dread Pirate Roberts,"
  a/k/a "DPR,"
  a/k/a "Silk Road,"

            Defendant.

**UNDER SEAL**

14 Cr. 68 (KBF)

ORDER

Upon the attached letter from Serrin Turner, Assistant United States Attorney for the

Southern District of New York, dated November 21, 2014 (the "Letter"), IT IS HEREBY

ORDERED as follows:

1.     Pursuant to Rule 6(e)(3)(E) of the Federal Rules of Criminal Procedure, the

        Government may disclose to the defense the existence of the grand jury

        investigation referenced in the Letter.

2.     Pursuant to Rule 16(d)(1) of the Federal Rules of Criminal Procedure, the defense

        is prohibited from disclosing the grand jury investigation referenced in the Letter

        to anyone outside the defense team.

3.     The Letter and this Order shall be sealed until such time as the Court otherwise

        directs.

Dated: New York, New York
     ~~November ___, 2014~~
     December 1, 2014

                                  HON. KATHERINE B. FORREST
                                    UNITED STATES DISTRICT JUDGE

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**
A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL                                    STEVEN WRIGHT
—                                                  *Office Manager*
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

December 3, 2014

**BY ELECTRONIC MAIL**

**FILED UNDER SEAL**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: DEC 0 4 2014

Re:   *United States v. Ross Ulbricht*
      14 Cr. 68 (KBF)

Dear Judge Forrest:

This letter is submitted under seal on behalf of defendant Ross Ulbricht, whom I represent in the above-entitled case, respectfully requesting an extension until Tuesday, December 9, 2014, for the filing of Mr. Ulbricht's motions *in limine*, which are currently due today, December 3, 2014. Assistant United States Attorney Serrin Turner has informed my associate, Lindsay A. Lewis, Esq., that the government consents to this request so long as the Court grants a corresponding extension for the government's motions *in limine*. The letter is filed under seal at the government's request because it references the government's sealed letter pursuant to Rule 6(e), Fed.R.Crim.P.

The requested extension is necessary in light of the government's recent sealed letter to counsel, which raises additional issues that are appropriately addressed in Mr. Ulbricht's motions *in limine*, and, in fact, materially affect the motions counsel intended to make. Also, because the deadline for notice of the government's exhibits was changed to today, time will be needed to review these exhibits prior to the filing of Mr. Ulbricht's motions in order to determine whether those exhibits provide a basis for further motions *in limine* not previously anticipated by counsel, or possibly obviate the need to make other such motions.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
December 3, 2014
Page 2 of 2

In addition, the proposed changes in the motion schedule, which would also push back the due date for motion responses by the parties to December 16, 2014, will compress the Court's time for consideration of the motions *in limine* prior to the final pre-trial conference, currently scheduled for Wednesday, December 17, 2014, at 2 p.m. The parties are of course available if the Court wishes to adjust the date of that conference.

Accordingly, it is respectfully requested that the Court grant an extension until Tuesday, December 9, 2014, for the filing of Mr. Ulbricht's motions *in limine*. As noted, the government consents to this application so long as the Court grants a corresponding extension in regard to the government's motions *in limine*.

Respectfully submitted,

Joshua L. Dratel

JLD/lal

cc:     Serrin Turner
        Timothy Howard
        Assistant United States Attorneys

Ordered

Motions due by 12/8; oppositions due
by 12/12 --( I have to have the
weekend to review the oppositions; you
can't just give me 24 hours.)

⟵ 17. Forrest
USDJ

12/4/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA            :            14 Cr. 68 (KBF)

       - against -                            :            (Electronically Filed)

ROSS ULBRICHT,                                :

              Defendant.      :
-------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT ROSS ULBRICHT'S MOTIONS *IN LIMINE*


JOSHUA L. DRATEL, P.C.
29 Broadway, Suite 1412
New York, New York 10006
(212) 732-0707

JOSHUA J. HOROWITZ, ESQ.
225 Broadway, Suite 1804
New York, New York 10007
(845) 667-4451

*Attorneys for Defendant Ross Ulbricht*


– Of Counsel –

Joshua L. Dratel
Lindsay A. Lewis
Whitney G. Schlimbach

TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT

POINT I

CERTAIN GOVERNMENT EXHIBITS SHOULD BE
PRECLUDED BECAUSE THEY CONSTITUTE
INADMISSIBLE HEARSAY, AND/OR DO NOT QUALIFY
AS CO-CONSPIRATOR STATEMENTS OR UNDER ANY
OTHER HEARSAY EXCEPTION, BECAUSE EVIDENCE
OF HUNDREDS OF THOUSANDS OF TRANSACTIONS
BETWEEN THOUSANDS OF ANONYMOUS USERS OF
THE SILK ROAD WEB SITE AT MOST ESTABLISHES
MULTIPLE DISCRETE CONSPIRACIES, RATHER THAN THE
SINGLE UNITARY CONSPIRACY CHARGED IN THE INDICTMENT . . . . . . . . . . . . . . . . 3

A.    *As a Threshold Matter, Venue Has Not Been Established In the Southern
      District of New York for the Multiple Conspiracies Alleged Against Mr. Ulbricht* . . . . . 4

B.    *The Conduct Alleged Does Not Fall Within the Scope of the Single Charged Conspiracy
      and Is Thus Inadmissible As Irrelevant Pursuant to Rules 401 and 402* . . . . . . . . . . . . . . 6

C.    *The Admission of the Evidence and Government Exhibits Would Be
      Unfairly Prejudicial to Mr. Ulbricht, Pursuant to Rule 403, Fed.R.Evid.* . . . . . . . . . . . . 7

POINT II

ANY AND ALL EVIDENCE AND/OR REFERENCES
TO THE "MURDER-FOR-HIRE" ALLEGATIONS
SHOULD BE PRECLUDED AT TRIAL, AND ANY
AND ALL SUCH LANGUAGE SHOULD BE STRICKEN
FROM THE SUPERSEDING INDICTMENT, BECAUSE
THEY ARE NOT RELEVANT TO THE CHARGED OFFENSES
AND/OR, UNDER RULE 403, FED.R.EVID., THEIR UNFAIR
PREJUDICIAL EFFECT SUBSTANTIALLY OUTWEIGHS

ANY PROBATIVE VALUE THEY MIGHT POSSESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

A.    *The Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B.    *Any and All References to the "Murder-For-Hire" Allegations Should Be*
*Precluded At Trial, And Stricken from the Superseding Indictment As Surplusage,*
*Because They Are Irrelevant to the Charged Offenses and Unduly Prejudicial* . . . . . . . 11

      1.    *The "Murder-For-Hire" Allegations Should Be*
          *Excluded Because They Are Irrelevant to the Charges* . . . . . . . . . . . . . . . . . . . . 12

      2.    *The "Murder-For-Hire" Allegations Should Be Excluded*
          *Because They Are Unduly Prejudicial Pursuant to*
          *Rule 403, Fed.R.Evid., As Any Probative Value Is Vastly*
          *Outweighed by Their Extraordinary Danger of Unfair Prejudice* . . . . . . . . . . 14

POINT III

CERTAIN GOVERNMENT EXHIBITS SHOULD
BE PRECLUDED BECAUSE THEY ARE NOT
SUFFICIENTLY AUTHENTICATED PURSUANT
TO RULE 901, FED.R.EVID., AND RECENT CASE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A.    *The Applicable Law Regarding Authentication Under Rule 901* . . . . . . . . . . . . . . . . . 16

B.    *The Facts and Opinion In* Vayner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C.    Vayner*'s Application to the Government's Proposed Exhibits In This Case* . . . . . . . . . 20

POINT IV

CERTAIN EVIDENCE AND GOVERNMENT EXHIBITS
ALLEGING PURCHASE OF FALSE IDENTIFICATION
DOCUMENTS SHOULD BE PRECLUDED BECAUSE THEY ARE
NOT REASONABLY DEMONSTRATIVE OF "CONSCIOUSNESS
OF GUILT," AND/OR THEIR PROBATIVE VALUE, IF ANY,
IS SUBSTANTIALLY OUTWEIGHED BY THE DANGER OF
UNFAIR PREJUDICE TO MR. ULBRICHT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A.    *The Law Applicable to Admissibility of "Consciousness of Guilt" Evidence* . . . . . . . . 21

B.    *Mr. Ulbricht's Alleged Purchase of False Identification*
*Documents from the Silk Road Web Site Is Insufficient to*
*Reasonably Infer His Consciousness of Guilt of the Crimes Charged* . . . . . . . . . . . . . . 23

C.      *Alternatively, Evidence of the Alleged Ordering of False Identification Documents Must*
        *Be Excluded Under Rule 403 As Substantially More Prejudicial Than Probative* . . . . . 24

POINT V

THE GOVERNMENT'S NOVEMBER 21, 2014, LETTER
SHOULD BE UNSEALED, AND THE INFORMATION
AND EVIDENCE THEREIN SHOULD BE ADMISSIBLE
AT TRIAL BECAUSE IT IS RELEVANT AND EXCULPATORY,
THEREBY ESTABLISHING A COMPELLING NEED FOR UNSEALING . . . . . . . . . . . . . 25

A.      *The Government's November 21, 2014, Letter* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B.      *The Principles Applicable to Exculpatory Material and Information* . . . . . . . . . . . . . . 27

C.      *Evidence Related to the Investigation of Misconduct by Former SA Force*
        *During the Silk Road Investigation Is Both Material and Favorable to Mr. Ulbricht* . . 28

D.      *The Evidence Related to the Investigation of Former SA Force*
        *Should Be Unsealed Because It Constitutes* Brady *Material, Thus*
        *Providing a Compelling and Particularized Need for Its Disclosure* . . . . . . . . . . . . . . 29

POINT VI

OTHER OBJECTIONS TO THE GOVERNMENT'S
PROPOSED EXHIBITS NOT COVERED ABOVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

### POINT V

### THE GOVERNMENT'S NOVEMBER 21, 2014, LETTER SHOULD BE UNSEALED, AND THE INFORMATION AND EVIDENCE THEREIN SHOULD BE ADMISSIBLE AT TRIAL BECAUSE IT IS RELEVANT AND EXCULPATORY, THEREBY ESTABLISHING A COMPELLING NEED FOR UNSEALING

In its November 21, 2014, letter to the Court, and subsequently provided to defense counsel December 3, 2014, the government disclosed an ongoing investigation of Carl Force, a former Special Agent with the Drug Enforcement Administration ("DEA"). The investigation has thus far revealed that former SA Force allegedly used his position as a DEA agent for self-gain by leaking investigative information to the operator of Silk Road in exchange for payment, and hijacking a cooperating witness's Silk Road account to obtain $350,000 in Bitcoins.

The government submitted its letter, and provided a copy to defense counsel, pursuant to Rule 6(e), Fed.R.Crim.P., and sought and obtained in that context an Order, dated December 3, 2104, maintaining under seal the letter and the information provided therein.

However, for the reasons set forth below, and in the *ex parte* letter provided contemporaneously with theses motions, it is respectfully submitted that the information in the government's November 21, 2014, letter, is exculpatory, and should therefore be unsealed, available to the defense to perform a complete investigation, and admissible at trial.

### A.    *The Government's November 21, 2014, Letter*

In its November 21, 2014, letter, at 1, the government informed the Court that former SA Force "is the undercover agent whom Ulbricht allegedly hired to arrange the murder-for-hire, as described in that indictment[,]" and that former SA Force "is now being investigated by USAO-San Francisco for, among other things, leaking information about USAO-Baltimore's

investigation to Ulbricht in exchange for payment, and otherwise corruptly obtaining proceeds from the Silk Road website and converting them to his personal use."

The government's letter, at 2, adds that "USAO San Francisco first began investigation former SA Force in the Spring of 2014[,]" yet the information about the investigation was not disclosed to the defense in this case until December 3, 2014, essentially one month prior to trial. The government, in its letter, at 1, claims that it "does not believe that the ongoing investigation of SA Force is in any way exculpatory as to Ulbricht or otherwise material to his defense[,]" it has now disclosed the information "in an abundance of caution[.]"

However, that is simply a tacit admission that the government itself recognizes the potentially exculpatory value of the information, even if it not capable of articulating it either to the Court or even itself [and that continued withholding of the information would be contrary to the government's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963)].  Nevertheless, as detailed in the accompanying *ex parte* letter, the relevant and exculpatory character of the information is abundantly clear to defense counsel.

Also, while the government, in its letter, at 1, asserts that former SA Force "played no role" in SDNY's investigation of Silk Road, the connection is obvious and inescapable from the fact that the government, in its letter, at 2, admits that SDNY "has been assisting USAO-San Francisco with its investigation, by sharing relevant evidence collected from this Office's investigation of Silk Road, including evidence from the server used to host the Silk Road website (the "Silk Road Server") and evidence from Ulbricht's laptop computer."

**B.**    *The Principles Applicable to Exculpatory Material and Information*

Given the nature of former SA Force's alleged misconduct during the investigation of the Silk Road web site, evidence related to that investigation must be unsealed and disclosed to the defense in order to afford Mr. Ulbricht Due Process and satisfy *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

*Brady* and a series of subsequent cases impose an affirmative duty on the government to disclose all evidence which is material and favorable to the defendant, either because it is exculpatory or as impeachment material, in compliance with the due process clause of the Fifth Amendment. *Brady v. Maryland*, 373 U.S. 83 (1963) ("evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution");  *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) (if the reliability of a witness "'may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule" of disclosure).

Contrary to the government's claims, the evidence is both material and potentially exculpatory, and consequently must be disclosed under *Brady*.  Furthermore, the due process right to *Brady* material in a manner that allows effective use of exculpatory evidence, certainly establishes a compelling and particularized need to modify the protective order to permit a defense investigation, as well as use of admissible evidence at trial.  *See e.g., Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 296 (2d Cir. 1979);  *see also Dennis v. United States*, 384 U.S. 855, 868 (1966).

27

C.    ***Evidence Related to the Investigation of Misconduct by Former SA Force During the Silk Road Investigation Is Both Material and Favorable to Mr. Ulbricht***

In the retrospective context, evidence must be disclosed pursuant to *Brady* when there is a "reasonable probability . . . that the outcome would have been different if disclosure had been made." *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001). A reasonable probability of a different outcome "is not a sufficiency of evidence test," and thus, does not require that the "evidence would have rendered the evidence as a whole insufficient to support a conviction." *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995), *quoting Kyles*, 514 U.S. at 435.

Rather, evidence which must be disclosed is that which "could reasonably [have been] taken to put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001), *quoting Kyles v. Whitley*, 514 U.S. 419, 435 (1995). As the Second Circuit has held, even when evidence may be both inculpatory and exculpatory, its disclosure is not thus precluded under *Brady*. *See United States v. Mahaffy*, 693 F.3d 113, 130 (2d Cir. 2012) ("[t]he fact that the government is able to argue that portions of the transcripts were consistent with the prosecution's theory fails to lessen the exculpatory force" of the remaining parts); *see also United States v. Rivas*, 377 F.3d 195, 199-200 (2d Cir. 2004).

Here, though, in the pretrial context, as discussed **post**, disclosure has a broader context. Thus, when the "exculpatory character harmonize[s] with the theory of the defense case" failure to disclose that evidence constitutes a *Brady* violation. *Id.*, *quoting United State v. Triumph Capital Grp.*, 544 F.3d 149, 164 (2d Cir. 2008). That harmony with defense theories is detailed in the accompanying *ex parte* letter.

28

**D.**  ***The Evidence Related to the Investigation of Former SA Force
Should Be Unsealed Because It Constitutes* Brady *Material, Thus
Providing a Compelling and Particularized Need for Its Disclosure***

The timeliness requirement incorporated in the *Brady* disclosure obligation compels

disclosure of materially favorable evidence in sufficient time to permit the defense the

opportunity to use it effectively before trial.  *Coppa*, 267 F.3d at 142 (whether the disclosure is

made in a timely fashion depends on the "sufficiency, under the circumstances, of the defense's

opportunity to use the evidence when disclosure is made");  *see also United States v.

Solomonyan*, 451 F.Supp.2d 626, 644-645 (S.D.N.Y. 2006).

Thus, implicit in the government's *Brady* obligation is the requirement that the defense is

able to use the materially favorable evidence, even if only to uncover additional exculpatory

evidence.  *See e.g. United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002) (materially favorable

evidence, even if not admissible itself, must be disclosed pursuant to *Brady* if it "could lead to

admissible evidence").  Indeed, in *Gil*, the inclusion of critical exculpatory (and impeachment)

information in boxes of documents produced pursuant to 18 U.S.C. §3500 the weekend prior to

trial was deemed insufficient notice.  *Id.*, at 106-07.

Consequently, although the interests in maintaining grand jury secrecy are certainly

stronger while an investigation is ongoing, unsealing is necessary here because evidence of an

investigation of former SA Force is exculpatory, and thus *Brady* material, disclosure of which is

necessary to avoid "a possible injustice."  *See generally Douglas Oil Co. Of California v. Petrol

Stops Northwest*, 441 U.S. 211 (1979) (requiring a showing that "material [sought] is needed to

avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater

than the need for continued secrecy, and that their request is structured to cover only material so

29

needed"). Certainly, the right to pre-trial access to *Brady* material presents a particularized and/or compelling need for its unsealing and disclosure. *See e.g. United States v. Youngblood*, 379 F.2d 365, 367 (2d Cir. 1967); *see also Dennis*, 384 U.S. at 868-70 ("disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice").

In that regard, in a pretrial rather than appellate context – with the latter involving *post hoc* considerations of materiality and harmless error – it is respectfully submitted that *Dennis* compels pretrial disclosure in this case to promote a fair trial for Mr. Ulbricht, and afford him Due Process. *See also* Kathleen Ridolfi, Tiffany M. Joslyn, and Todd H. Fries, *Material Indifference: How Courts Are Impeding Fair Disclosure In Criminal Cases*, National Association of Criminal Defense Lawyers and The Veritas Initiative (Santa Clara University School of Law), November 17, 2014.[6]

Accordingly, Mr. Ulbricht's due process right to exculpatory evidence under *Brady* warrants unsealing, and admitting at trial, evidence related to the improper conduct alleged against former SA Force in the government's November 21, 2014, letter.

_____

[6] The Executive Summary of the NACDL/Veritas Report laments that

> [a]cross the nation prosecutors are guiding their disclosure obligations by a post-trial standard that some courts have decried as unworkable in the pre-trial context. Prosecutors are ill-equipped to apply a post-trial standard to a pre-trial obligation without the benefit of the defense perspective and with their natural biases as zealous advocates. Taking their cues from the courts, prosecutors are acting to the detriment of the defense and fair process.

NACDL/Veritas Report, at xv (Executive Summary).

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  DEC 1 2 2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                  :
UNITED STATES OF AMERICA                          :
                                                  :
                                                  :      14 Cr. 68 (KBF)
                      -v-                         :
                                                  :      SEALED ORDER
                                                  :
ROSS WILLIAM ULBRICHT,                            :
                                  Defendant.      :
------------------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

A conference in this matter is scheduled for Monday, December 15, 2014 at 10:00

a.m. In advance of that conference and not later than 9:00 a.m. that day, the

Government shall respond, by letter, to the following:

1. Is the fact of, or any aspect of the Government's investigation of Carl Force
   public or otherwise known to persons or entities outside of the grand jury, the
   investigators directly involved in that case or any cases involving Mr.
   Ulbricht?

2. Does Mr. Force know he is under investigation?

3. If the fact of the investigation is not publicly known, what (if any) harm
   would the Government suffer if it became known?

4. What's the status of the investigation?

5. Would the Government be able to reveal any of the facts regarding Mr.

   Force's conduct without endangering the grand jury investigation? If so,

   which ones? If no facts are known, why not?


   SO ORDERED:

Dated:      New York, New York
            December 12, 2014


                                      _____
                                           KATHERINE B. FORREST
                                           United States District Judge



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

<u>TO BE FILED *EX PARTE* AND UNDER SEAL</u>

December 12, 2014

<u>By Electronic Mail</u>

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:     *United States v. Ross William Ulbricht*, S1 14 Cr. 68 (KBF)

Dear Judge Forrest:

The Government writes *ex parte* to respond to the Court's Order, dated December 12, 2014, which requested additional information regarding the ongoing federal grand jury investigation being conducted by the U.S. Attorney's Office for the Northern District of California ("USAO-San Francisco"), in conjunction with the Public Integrity Section of the Criminal Division of the Department of Justice into Carl Force, a former Special Agent ("SA") with the Drug Enforcement Administration.

After consulting with the Assistant U.S. Attorney in charge of the USAO-San Francisco investigation, we can provide the following responses to your inquiries:

1.      The investigation is not public and is only known to a limited group of individuals outside the grand jury and the government employees involved in the investigation case. Specifically, the investigation is known to representatives of Bitstamp (the Bitcoin exchange company that reported the suspicious Bitcoin transactions involving Carl Force that prompted the investigation), outside counsel for Bitstamp, and also, to varying degrees, witnesses who have been interviewed or otherwise contacted as part of the investigation.

2.      Carl Force is aware that he is under investigation insofar as he has been interviewed in connection with the grand jury investigation. He is not, however, aware of the full range of misconduct for which he is being investigated.

3.     USAO-San Francisco believes that the ongoing grand jury investigation would be harmed by public disclosure of the investigation at this time, for the following reasons:

     a.     As noted above, although Carl Force is aware that he is under investigation, he is *not* aware of the full range of misconduct that is the subject of the investigation. Public disclosure of the full scope of the investigation could threaten the integrity of the investigation, as it might cause Mr. Force (or any potential subjects, co-conspirators or aiders and abettors) to flee, destroy evidence, conceal proceeds of misconduct and criminal activity, or intimidate witnesses.

     b.     Based on the significant level media attention that the allegations against Carl Force would likely generate, there is a serious risk that media reports could influence the information or testimony provided by witnesses, bias grand jury members, or otherwise impact the integrity of the investigative process.

     c.     The grand jury investigation is ongoing and the scope of any charges the Government may end up pursuing against Carl Force is not yet known. Disclosure of the investigation at this juncture would risk publicly airing suspicions or allegations of wrongdoing that may not ultimately be charged due to lack of evidence.

4.     According to USAO-San Francisco, the grand jury investigation is at an early stage. The grand jury is scheduled to receive live testimony next Tuesday, December 16, 2014, and is expected to continue into 2015. At this stage it is impossible to pinpoint precisely when charges will be brought, but USAO-San Francisco advises that they anticipate charging Force sometime in mid-2015.

5.     At present, for the reasons set forth above in answer #3, the Government does not believe that there any facts that could be released regarding Mr. Force's conduct that may be revealed without jeopardizing the grand jury investigation.

Based on the sensitive nature of the contents of this letter, the Government respectfully requests that the protective order, and this letter, be maintained under seal.

Respectfully,

PREET BHARARA
United States Attorney

By: _____

TIMOTHY T. HOWARD
SERRIN TURNER
Assistant United States Attorneys
Southern District of New York
(212) 637-2308

2

Thoward1UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

   -v.-                                        :           S1 14 Cr. 68 (KBF)

ROSS ULBRICHT,                              :
  a/k/a "Dread Pirate Roberts,"
  a/k/a "DPR,"                               :
  a/k/a "Silk Road,"
                                            :
                Defendant.

                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


# MEMORANDUM OF LAW IN OPPOSITION
## TO THE DEFENDANT'S MOTIONS IN LIMINE


PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States of America


TIMOTHY T. HOWARD
SERRIN TURNER
     Assistant United States Attorneys
     *Of Counsel*

flight, where there was no other evidence that defendant had become a fugitive). Nor is there any evidence of some other unrelated criminal conduct in which Ulbricht was engaged that could explain his conduct. *Cf. United States* v. *Diallo*, 461 Fed. Appx. 27, 30 (2d Cir. 2012) (considering, and rejecting, argument that admission of flight evidence was improper because defendant's flight could be explained by fact that he was trafficking in illegal cigarettes, rather than committing robberies).

Finally, as asserted previously, the Court should not exclude evidence of the false identification documents under Rule 403. (*Id*. at 18-19). The evidence regarding Ulbricht's attempts to obtain fraudulent identification documents is highly probative, and his attempts to obtain nine fake identification documents on a single occasion are not any more "sensational or disturbing" than the scope of the alleged offenses in this case, which include a large-scale narcotics trafficking conspiracy, among other things, such that there would be any legitimate risk that the evidence will "arouse irrational passions" among the jurors. (*Id*. at 19).

## V. THE DEFENDANT'S APPLICATION TO UNSEAL INFORMATION REGARDING THE INVESTIGATION OF DEA SPECIAL AGENT CARL FORCE AND TO ADMIT THAT EVIDENCE AT TRIAL SHOULD BE REJECTED

The defendant seeks to unseal evidence regarding an ongoing investigation into a former Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), named Carl Force, and to use that evidence affirmatively at trial. As set forth below, the defendant's request should be rejected, for many reasons, including because the evidence is irrelevant and inflammatory and because there is no sound, particularized need to disclose the evidence that outweighs the interest in protecting the secrecy and integrity of the ongoing grand jury investigation.

14

A.     Facts

By letter dated November 21, 2014, the Government sent an *ex parte* letter to the Court, which provided details regarding an ongoing grand jury investigation into SA Carl Force being conducted by the U.S. Attorney's Office for the Northern District of California ("USAO-San Francisco"), in conjunction with the Public Integrity Section of the Criminal Division of the Department of Justice (the "Force Letter").  The Force Letter requested leave to disclose the contents of the letter to defense counsel pursuant to Rule 6(e)(3)(E), accompanied by a protective order prohibiting the disclosure of the Force Letter and the existence of the USAO-San Francisco investigation of SA Force outside the defense team.  The Court granted that request on December 1, 2014, and the Force Letter was provided to counsel for the defendant later that same day.

As set forth in the Force Letter, SA Force participated in an unrelated investigation of Silk Road coordinated by the U.S. Attorney's Office for the District of Maryland ("USAO-Baltimore").  The Government has not relied on and is not offering any evidence obtained by that investigation in this case.  USAO-San Francisco is investigating allegations that SA Force has converted hundreds of thousands of dollars' worth of Bitcoins into U.S. currency and deposited them into his personal accounts.  With respect to SA Force's involvement in the USAO-Baltimore investigation of Silk Road, USAO-San Francisco is investigating whether SA Force may have: (1) leaked or offered to leak investigative information to Ulbricht regarding the USAO-Baltimore investigation in exchange for payments from Ulbricht; (2) used access to the Curtis Green ("Flush") account to steal approximately $350,000 worth of Bitcoins from Silk Road; and (3) received two payments totaling approximately $85,000 worth of Bitcoins, which were undocumented and converted for personal use.  (Force Letter at 2-5).

B.     Discussion

As set forth in the Force Letter, SA Force did not play any role in this investigation, the Government does not intend to call SA Force at trial, and the Government is not using any evidence obtained in the USAO-Baltimore investigation in this case.[2]  Accordingly, the facts underlying the ongoing grand jury investigation of SA Force does not constitute impeachment material for which disclosure would be required under *Giglio* v. *United States*, 405 U.S. 150 (1972).  (Force Letter at 5).  Nor do those facts exculpate Ulbricht in any manner, or otherwise aid the defense.  (*Id.*).

As a threshold matter, the grand jury investigation into whether SA Force was involved in leaking sensitive law enforcement investigation information to the defendant, and that he may have converted Bitcoins provided to him by the defendant, do not exculpate Ulbricht in any way, and is not helpful to the defense.  (Force Letter at 5).  Even if substantiated, such evidence is plainly inculpatory, as Ulbricht's attempts to gather counterintelligence on law enforcement efforts is probative of his knowledge and his attempts to protect his illegal enterprise.  (*Id.*).  Similarly, the fact that SA Force may have converted Bitcoins obtained from Ulbricht for his personal use would, if true, reflect only corruption on SA Force's part, and would not be relevant to the question of Ulbricht's guilt.  (*Id.*).

The Government's case against Ulbricht is completely independent of evidence gathered by SA Force, and the only reference to "Nob" that the Government intends to make in its case in chief are chats where the defendant and other co-conspirators mention him as the party solicited

---

[2] Nor does the Government intend to use at trial any communications between Ulbricht and SA Force that were found on the Silk Road Server and Ulbricht's laptop – even though these communications include highly incriminating exchanges reflecting Ulbricht's hiring of "nob" to arrange the murder of Curtis Green. (Force Letter at 6).  As discussed in the Government's motions in limine, the Government seeks to offer other evidence of the attempted murder for hire of Green, through communications that the defendant had with co-conspirators "Inigo" and "cimon" regarding the murder for hire. (Gov. Mot. at 6-7).

by the defendant to arrange for the murder of Curtis Green, a/k/a "Flush."  Regardless of whether SA Force, Green or anyone else stole the Bitcoins, the identity of the culprit is wholly irrelevant to the fact that the defendant *believed* that they were stolen by his employee, "Flush."  Upon learning that "Flush" had been recently arrested, and fearing that he was cooperating with law enforcement, Ulbricht made the conscious decision to seek to murder "Flush," in order to protect his interests in his underground black market website and the illegal proceeds it generated.  Even assuming that the grand jury's investigation concludes that SA Force was responsible for stealing the Bitcoins, that collateral fact is not exculpatory as to Ulbricht, as it does not detract from his criminal intent in ordering the murder for hire.

The Government understands that the defendant has filed an *ex parte* letter seeking authority to admit evidence pertaining to the Force investigation at trial.  Because it was submitted *ex parte*, the Government is not in a position to respond.  Counsel for the defendant has previously suggested in conversations with counsel for the Government that evidence of the Force investigation might be helpful to support an entrapment defense, but any such argument lacks merit.  The allegations against SA Force do not tend to prove either of the essential elements of an entrapment defense, including: (1) government inducement of the crime and (2) a lack of predisposition on the part of the defendant to engage in criminal conduct.  *See United States* v. *Kopstein*, 759 F.3d 168, 173 (2d Cir. 2014).  Even if SA Force is found to have stolen the Bitcoins, he at most caused a situation to which the defendant chose to respond to with violence, which is wholly insufficient to prove an entrapment defense.  *United States* v. *Cromitie*, 727 F.3d 194, 204 (2d Cir. 2013) ("The fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution.").  Chat logs obtained from the defendant's computer plainly indicate that

"Nob" (i.e., SA Force), did not induce Ulbricht's decision to order "Flush" killed; rather, the decision to solicit "Flush's" murder originated from the defendant himself, during conversations he had with co-conspirators "cimon" and "Inigo."[3]

In addition to not being aware of any evidence regarding SA Force's potential theft and conversion of Bitcoins that would be exculpatory to the defense, the Government has consulted with the lead Assistant U.S. Attorney in USAO-San Francisco handling the SA Force investigation, who has also confirmed their position that USAO-San Francisco is unaware of any such evidence. The compelling interests in preserving the integrity of the grand jury's ongoing investigation simply cannot be overcome by purely speculative and conclusory assertions that otherwise irrelevant and law enforcement sensitive information is exculpatory. Accordingly, the Court should deny the defendant's application to unseal the ongoing grand jury investigation and reject the defendant's application to disclose any evidence concerning that investigation at trial.

---

[3]     Relevant excerpts of the chat logs reflecting discussions between the defendant, SA Force as "Nob," "Inigo," and "cimon" regarding Flush are attached as Exhibit A. Those chat logs indicate that: (1) "Inigo" first discovered the theft of the Bitcoins via the "Flush" account and reported it to Ulbricht, and Ulbricht reported the theft to Nob (pp. 1-2); (2) Ulbricht identified "Flush" to "Nob" as Curtis Green and asked if he could arrange to "get someone to force him to return the stolen funds" (p. 5); (3) "Nob" replied by asking in an open-ended fashion whether Ulbricht wanted him "beat up, shot, just paid a visit," and the defendant responded at the time by instructing "Nob" to arrange to have Green "beat up" (p. 5); (4) "cimon" initiated a discussion with Ulbricht about whether they should consider executing Green, and Ulbricht eventually agreed (pp. 11-13); (5) the very next time that Ulbricht spoke with Nob, Ulbricht, unprompted, requested that Nob change the order from "torture to execute," even after Nob told Ulbricht that beating Green up would not cost Ulbricht anything, but that Ulbricht would have to pay for a murder for hire (pp. 18-20); and (6) Nob quoted a price of $80,000 in United States currency for the hit, to which Ulbricht agreed (p. 21). As noted in the Force Letter, the Government does not intend to use the portions of the chat logs involving Nob at trial, even though the logs are highly inculpatory.

**EXHIBIT A**

**Compilation of Torchat Logs Seized from Ulbricht Laptop Reflecting
Communications with SA Force ("Nob"), "Inigo" and "Cimon"
Between January 26, 2013 at 3:39 a.m. and January 29, 2013 at 12:49 p.m.[1]**

(2013-01-26 03:39) inigo (laptop): [delayed] i hope you get online soon.
we are under attack over 100k stolen, shits hitting the fan you need to
pull the plug on withdrawals
[delayed] over 300k stolen. i think i figured out how to contain it.
[delayed] as far as I can tell it was flush, and he managed to steal a
little over $350k
[delayed] either that or somebody with access to his account
[delayed] but my hunch is that it was him.
[delayed] fortunately i was able to stop it before it got any further
[delayed] looks like he took 900bitcoins from the petty cash fund, and the
rest by changing vendors passwords and resetting their pins, and then
logging into their accounts to wipe out their balances
[delayed] ive been up all night frantically trying to stop this massive
theft, i need to catch a few zzz's
[delayed] ill be back on in a few hours. hopefully in time to see you get
online
(2013-01-26 03:41) myself: you there?
(2013-01-26 04:47) myself: yea, this makes me sick to my stomache.  I
decrypted his ID and did some digging.  He was arrested for cocaine
posession last week.  I think this stuff about his daughter was a tale.
This will be the first time I have had to call on my muscle.  fucking
sucks.


(2013-01-26 10:42) Nob: [delayed] my friend you up
(2013-01-26 10:43) myself: i am
(2013-01-26 10:43) myself: how are you amigo?
(2013-01-26 10:43) Nob: I'm tired D, real tired
(2013-01-26 10:44) myself: not enough sleep?
(2013-01-26 10:44) Nob: no I'm working too hard.  overseeing three good
size loads coming from South America up here into U.S.
(2013-01-26 10:45) myself: lots of people to coordinate?
(2013-01-26 10:46) Nob: yes, heah i just saw your message on SR
(2013-01-26 10:46) myself: yea, not a ton of money, but it pisses me off
to no end.  I trusted the guy too much
(2013-01-26 10:47) Nob: ok, who is it and where is he
(2013-01-26 10:48) myself: ill send you his ID
(2013-01-26 10:48) Nob: how?
(2013-01-26 10:48) myself: I had him send it to me when I hired him
(2013-01-26 10:48) myself: for just this kind of situation
(2013-01-26 10:49) myself: he was recently arrested for cocaine possession
on Jan 17th

---

[1] Torchat communications between Ulbricht and SA Force ("Nob") are included in their entirety for this designated
time period.  Torchat ommunications between Ulbricht and "Inigo"/"Cimon" are excerpts of relvant portions
regarding the theft of Bitcoins by Curtis Green, a/k/a "Flush."

(2013-01-26 10:50) Nob: that wasn't the kilo that I sent was it.  because I'm going to be pissed
(2013-01-26 10:50) myself: did you send it to UTAH?
(2013-01-26 10:52) Nob: yes, it's an address that googleyed gave to me. and i'm having problems with him/her
(2013-01-26 10:52) myself: are you serious!
(2013-01-26 10:52) Nob: yes what the mierda
(2013-01-26 10:52) myself: mierda?
(2013-01-26 10:53) Nob: what you want done?  what the fuck is up with the googleyed.  i don't need this shit
(2013-01-26 10:54) Nob: and who is the frickin idiot?
(2013-01-26 10:54) myself: I'm incredibly sorry nob, but this guy on the ID
(2013-01-26 10:54) myself: he's the one I asked to set you up with vendors
(2013-01-26 10:55) myself: he must have somehow tricked you into sending the kilo to him instead of googleyed
(2013-01-26 10:55) Nob: ok what do you want done with him?
(2013-01-26 10:55) myself: he then took advantage of some of the tools I gave him to do vendor support to rip a bunch of vendors off, who I will have to compensate
(2013-01-26 10:56) Nob: i'm not worried.  i didn't send it out.  but googleyed worries me.  you sure he/she is ok?


(2013-01-26 10:56) inigo (laptop): im back online now


(2013-01-26 10:57) myself: I'm not sure about googleyed.  they were locked out of their account by this guy 24 hours ago
(2013-01-26 10:57) myself: more like 12 hours ago


(2013-01-26 10:57) inigo (laptop): if you want me to get on a plane and go find him, just say the word
(2013-01-26 10:57) myself: I have someone on it
(2013-01-26 10:57) myself: thank you though
(2013-01-26 10:57) inigo (laptop): i really wish i could have figured it out faster and stopped him before he took so much


(2013-01-26 10:58) myself: you didn't send the kilo?  or are you talking about a second order?


(2013-01-26 10:58) inigo (laptop): i noticed it as soon as he started, luckily, but it took me a few hours to figure out what was happeneing and realize how to stop it
(2013-01-26 10:58) myself: how did you stop it?
(2013-01-26 10:58) inigo (laptop): by resetting the password to his account
(2013-01-26 10:58) myself: oh, smart
(2013-01-26 10:58) inigo (laptop): as soon as i did that the stealing stopped

(2013-01-26 10:59) Nob: i sent the kilo and G-eyed did pay so.  G-eyed is talking about doing a second order for five kilos to the UK.
(2013-01-26 10:59) myself: you sent one kilo to the utah address?


(2013-01-26 10:59) inigo (laptop): i was watching the bitcoin address that he was sending all the coins to
(2013-01-26 10:59) inigo (laptop): 20000 btc by the time i cut off his admin access
(2013-01-26 10:59) myself: I even had the thought that I was putting too much trust in you guys and should give one pin reset power and the other pass reset power
(2013-01-26 10:59) inigo (laptop): that would have been a good idea
(2013-01-26 11:00) inigo (laptop): i wish i had a kill switch
(2013-01-26 11:00) inigo (laptop): for the site
(2013-01-26 11:00) inigo (laptop): or for withdrawals at least
(2013-01-26 11:00) myself: withdrawals at least
(2013-01-26 11:00) inigo (laptop): i could have stopped it at under $60k
(2013-01-26 11:00) myself: yea, a w/d kill switch is a good idea
(2013-01-26 11:00) inigo (laptop): im sorry it got so far. but i hate to think how much more he could have stolen
(2013-01-26 11:01) inigo (laptop): i just wish i could have been faster
(2013-01-26 11:02) inigo (laptop): 350k is a lot of money. it will take him a while to cash it all out. if we can find him first maybe something can be done


(2013-01-26 11:03) Nob: yes a utah address, but like i said; i didn't send it so i'll have to reach out and get the exact address
(2013-01-26 11:03) myself: let me see if I understand...
(2013-01-26 11:04) Nob: i had my people send it. i never touch the dope
(2013-01-26 11:04) myself: you sent a kilo to geyed, which he received. where did you send that one?  who asked for the kilo to utah?


(2013-01-26 11:04) inigo (laptop): it was sheer luck that i noticed it, i had sent my coins to sugar mama to cash out my paycheck, and i kept looking her up to see if she was back online because im flat broke and was really antsy for her to send me the MP codes (which she still hasnt done thanks to this mess) and then i noticed her balance drop to 0, and she made a forum post about it


(2013-01-26 11:05) Nob: googleyed gave me an address in utah to send the kilo.  googleyed requested that the kilo go to utah.


(2013-01-26 11:05) inigo (laptop): so i started to investigate, searched the bitcoin address that her coins were withdrawn to, and noticed that 4 top vendors had withdrawn to the same address
(2013-01-26 11:05) inigo (laptop): about 1000 bitcoins from each

(2013-01-26 11:06) Nob: g-eyed said she got it that is why she finalized, but he/she isn't leaving feedback on SR which is pissing me off

(2013-01-26 11:06) inigo (laptop): then i started talking with sugar mama and figured out that her pin and pass had been reset, and that led me to realize it was someone with admin access and not a virus or malicous code
(2013-01-26 11:06) inigo (laptop): so then i just thought the best shot i had to stop it was reset flush's password
(2013-01-26 11:06) inigo (laptop): cut off his admin access

(2013-01-26 11:07) myself: where was the first kilo sent?
(2013-01-26 11:07) myself: was it ireland?
(2013-01-26 11:07) Nob: to utah
(2013-01-26 11:07) myself: do you have the exact address?
(2013-01-26 11:07) Nob: next five kilos are supposed to go to ireland
(2013-01-26 11:07) myself: does it match the id?
(2013-01-26 11:08) myself: ok, don't send them until I get to the bottom of this
(2013-01-26 11:08) Nob: i have to call back to my guy who sent the kilo for me

(2013-01-26 11:08) inigo (laptop): by then his address had racked up 20k btc
(2013-01-26 11:09) inigo (laptop): also, what really led me to thinking it was him, was the fact that sealswithclubs got ddos'd yesterday
(2013-01-26 11:09) inigo (laptop): and was held at ransom
(2013-01-26 11:09) myself: oh damn
(2013-01-26 11:09) inigo (laptop): and theres only one person i know with ties to SR and sealswithclubs
(2013-01-26 11:09) myself: what sleaze
(2013-01-26 11:09) inigo (laptop): flush told me that he knew the owner really well
(2013-01-26 11:09) myself: he told me that too
(2013-01-26 11:09) inigo (laptop): yeah so he must have organized an attack on his site as well

(2013-01-26 11:10) Nob: yes, i need you to let me know what is going on

(2013-01-26 11:10) inigo (laptop): some desperate attempt to get as much as he could in one day
(2013-01-26 11:10) inigo (laptop): fucking scumbag
(2013-01-26 11:10) myself: so, I have a friend that smuggles heroin for cartels.  I'm chatting with him now.  he has muscle everywhere and will get to him quickly.

(2013-01-26 11:11) myself: I will.  what do you want to do about Curtis

(2013-01-26 11:11) inigo (laptop): ah you must be referring to the guy
that was offering free full auto AR's with his heroin
(2013-01-26 11:11) inigo (laptop): the guy with ties to FARC
(2013-01-26 11:11) inigo (laptop): nob or something like that

(2013-01-26 11:12) myself: If you can get someone to force him to return
the stolen funds, that would be amazing
(2013-01-26 11:12) Nob: personally, I don't want any contact.  i'm clear.
if you want something done, i can help you discreetly

(2013-01-26 11:12) inigo (laptop): if thats who your talking about, then
he would seem like the perfect person for the job

(2013-01-26 11:13) myself: what do you mean?

(2013-01-26 11:13) myself: this is someone else
(2013-01-26 11:13) inigo (laptop): oh ok
(2013-01-26 11:14) inigo (laptop): i can't believe he pulled this. some
people are hard to read

(2013-01-26 11:15) Nob: do you want him beat up. shot, just paid a visit?

(2013-01-26 11:16) inigo (laptop): so just out of curiousity i pulled up
the messages from "chronicpain" since he revealed thats who he used to be
(2013-01-26 11:16) inigo (laptop): he was logged in 17 hours ago

(2013-01-26 11:17) myself: I'd like him beat up, then forced to send the
bitcoins he stole back.  like sit him down at his computer and make him do
it
(2013-01-26 11:17) myself: beat up only if he doesn't comply I guess
(2013-01-26 11:17) myself: not sure how these things usually go
(2013-01-26 11:18) Nob: remember that guy in Africa?  you wanted me to put
a gun to that guy's head while he is logged on SR and take a picture.  you
want that?
(2013-01-26 11:18) myself: no thanks
(2013-01-26 11:18) myself: just don't want him to have that money
(2013-01-26 11:19) Nob: ok, you just want him beat up and send you money
back;  the guy I'm going to send knows nothing about computers so he won't
know whether or not the mark has the funds or even if he sent it
(2013-01-26 11:20) myself: we could give him a letter to give curtis
(2013-01-26 11:21) myself: so the message doesn't get mixed up
(2013-01-26 11:21) myself: and if I know when he is paying him a visit, I
can tell him to log on to torchat to talk to me while your man is there
(2013-01-26 11:22) myself: so I can be loged in when he goes to his house
(2013-01-26 11:22) Nob: ok, you write the letter and send it to me.  i'll
get the exact address where the kilo was sent.  please check into
googleyed, this doesn't make sense to me

5

(2013-01-26 11:23) myself: ok
(2013-01-26 11:23) Nob: just forget about googleyed, i'm cutting ties
(2013-01-26 11:24) Nob: be back in contact later today or tomorrow;  stay
out of trouble, i can't loose you now
(2013-01-26 11:24) Nob: should be can't lose you now, frickin spanish to
english bullshit ... so tired can't think straight
(2013-01-26 11:24) myself: how quickly do you think you can get someone
over there?  and what does that cost you?  is it worth the hassle?
 (2013-01-26 11:25) Nob: not sure.  it is going to cost money because it's
not my people
(2013-01-26 11:26) myself: ok, if it costs more than we can recover, then
obviously we should not go through with it
(2013-01-26 11:27) Nob: shit, shit, shit; we don't need this, one step
forward, two steps back
(2013-01-26 11:27) myself: i know, it's a pain
(2013-01-26 11:27) Nob: ok talk at you
(2013-01-26 11:27) myself: we don't have to do anything if you don't want
(2013-01-26 11:27) myself: talk to you soon
(2013-01-26 11:28) Nob: ok, i'll let you know
(2013-01-26 11:28) Nob: i'm confident that I'm clear; googleyed on the
other hand


 (2013-01-26 11:29) inigo (laptop): weird
(2013-01-26 11:32) inigo (laptop): flush has to be an idiot to steal from
you knowing that you know where he lives. he must be going on the run
(2013-01-26 11:32) myself: maybe so
(2013-01-26 11:33) myself: i assumed that would be enough to deter him
from doing anything like this
(2013-01-26 11:33) inigo (laptop): you may need to hire some private eyes
to find him. somebody thats a pro in finding fugatives and missing people
(2013-01-26 11:33) myself: yea
(2013-01-26 11:34) inigo (laptop): like i said if need be you always have
me at your disposal if you locate him and need somebody to go handle it
(2013-01-26 11:35) myself: thanks.  I want to go kick his ass myself, but
let's leave it to the pros
(2013-01-26 11:35) inigo (laptop): k


(2013-01-26 11:46) myself: here's the note
(2013-01-26 11:46) myself: Curtis,
Send the bitcoins you stole to the following address immediately:
1p6QfxXEdHTFPkVPxlnFJXqpfiyEKXBNG
Tell the person who just gave you this note after one confirmation on the
blockchain.
-DPR
(2013-01-26 11:47) myself: then we'd have to get the guy to give us
confirmation so we can check the blockchain.
(2013-01-26 11:48) myself: I'd actually like to go through with this even
if it costs more than we can recover.  I would like the experience in case
something like this happens again.


(2013-01-26 11:48) myself: you there?

```
(2013-01-26 11:48) inigo (laptop): yep
(2013-01-26 11:49) myself: ok, let's tackle the support page until we have
everything zeroed
(2013-01-26 11:49) myself: what are you working on right now?
(2013-01-26 11:49) inigo (laptop): customer messages
(2013-01-26 11:49) myself: ok, I'll do vendor messages
(2013-01-26 11:49) inigo (laptop): k
```

<span style="color:red">(2013-01-26 11:50) Nob: ok got it.  i'll get back to you with address and
see if I can get a "friend" over to visit your guy
(2013-01-26 11:50) myself: ok
(2013-01-26 11:50) myself: thanks nob
(2013-01-26 11:50) Nob: no problem my friend.  te amo</span>

```
 (2013-01-26 13:24) myself: while I'm fixing this...
(2013-01-26 13:24) myself: your with me right inigo?
(2013-01-26 13:24) inigo (laptop): yes sir
(2013-01-26 13:24) myself: i mean... long term
(2013-01-26 13:25) myself: I don't know what I'm doing wrong
(2013-01-26 13:25) myself: or if im doing anything wrong
(2013-01-26 13:25) inigo (laptop): oh yeah absolutely. i swore my loyalty
to you
(2013-01-26 13:25) inigo (laptop): and i will stick by that
(2013-01-26 13:25) inigo (laptop): i take pride in my loyalty above all my
other characteristics
(2013-01-26 13:26) inigo (laptop): where i lack in other fields, you'll at
least get your value out of me by having somebody loyal for life :)
(2013-01-26 13:26) myself: thank you
(2013-01-26 13:27) inigo (laptop): you've given me a chance at a
financially secure future that i didn't have before. while flush may have
been a greedy scumbag, im here for the long run, if anything just to show
my graditude
(2013-01-26 13:28) myself: maybe guys like us are just rarer than I'd
hoped
(2013-01-26 13:29) inigo (laptop): he clearly didn't want to wait, and
wanted to get rich quick. im willing to put in the long hours now and even
stuggle a little bit financially, because i know that in the long run it
will pay off and in a few years i figure ill be making enough that i wont
have to worry about money
(2013-01-26 13:30) inigo (laptop): [delayed] even if its 5-10 years from
now, i see the long run opportunity
(2013-01-26 13:31) myself: that's good, so do I, obviously.
(2013-01-26 13:33) inigo (laptop): ive only been with you for three
months, so i don't expect to have a new car and a nice place to live and
all that good stuff just yet. im willing to earn it.
(2013-01-26 13:33) inigo (laptop): what other details did you find out
about flush's arrest?
(2013-01-26 13:34) inigo (laptop): did it say how much he was caught with?
(2013-01-26 13:34) myself: I haven't dug into it yet
(2013-01-26 13:34) inigo (laptop): yeah i guess its pretty early
(2013-01-26 13:34) myself: we want to move quickly, but I gave the whole
mess over to my guy
```

7

```
(2013-01-26 13:35) inigo (laptop): just to confirm that he gave you his
real ID, i was able to aquire what i believe to be his identity from the
info he revealed to me
(2013-01-26 13:35) myself: oh really?
(2013-01-26 13:35) inigo (laptop): i made him as Curtis Green from ███████
████, Utag
(2013-01-26 13:35) inigo (laptop): utah
(2013-01-26 13:35) myself: yep
(2013-01-26 13:35) myself: how'd you manage that?
(2013-01-26 13:35) inigo (laptop): ok good so that wasn't a fake id
(2013-01-26 13:35) inigo (laptop): he told me about this website that he
owns
(2013-01-26 13:36) myself: what is it?
(2013-01-26 13:36) inigo (laptop): ██████████████.com
(2013-01-26 13:36) inigo (laptop): he was trying to recuit me to this
multi level marketing scam
(2013-01-26 13:36) inigo (laptop): so today i looked up who owns that site
(2013-01-26 13:37) myself: this guy is an idiot
(2013-01-26 13:37) inigo (laptop): he also owns a company called anytime
airport shuttle or something like that
(2013-01-26 13:37) inigo (laptop): yeah
(2013-01-26 13:37) inigo (laptop): i found his twitter account too
(2013-01-26 13:37) inigo (laptop): had a picture of the SR logo as his
profile pic
(2013-01-26 13:37) inigo (laptop): i couldn't believe it
(2013-01-26 13:38) inigo (laptop): hasn't made an update since jan 5th tho
(2013-01-26 13:39) myself: what's the name of the twitter account?
(2013-01-26 13:39) inigo (laptop): one sec
(2013-01-26 13:39) inigo (laptop): https://twitter.com/████████████
(2013-01-26 13:40) inigo (laptop): that twitter page also links to his
dads charity's website that he manages
(2013-01-26 13:40) inigo (laptop): ██████████████.com
(2013-01-26 13:40) myself: the more you can give me the better
(2013-01-26 13:40) inigo (laptop): he frequents poker tournys in vegas
(2013-01-26 13:42) inigo (laptop): he owns the email address
indolor12@yahoo.com
(2013-01-26 13:43) inigo (laptop): although i couldn't find a record of
that email anywhere online
(2013-01-26 13:43) inigo (laptop): seemed to be a dead end lead
(2013-01-26 13:43) inigo (laptop): idk what the address on his ID is, but
i have him at ███████████████████
(2013-01-26 13:44) myself: that's the same
(2013-01-26 13:45) inigo (laptop): i also have two previous addresses
associated with his name:
```

███████████████████████
███████████████████████
███████████████████████
███████████████████████

```
(2013-01-26 13:46) inigo (laptop): here's his amazon wishlist:
http://www.amazon.com/gp/registry/registry.html?ie=██████████████████████
███████████
(2013-01-26 13:46) inigo (laptop): lol
```

(2013-01-26 13:47) inigo (laptop): i think his daughter's name is ███████
and his wife's name is ███████
(2013-01-26 13:47) myself: how do you know that?
(2013-01-26 13:47) inigo (laptop): ███████
(2013-01-26 13:47) inigo (laptop): i have a subscription
(2013-01-26 13:47) myself: whats that?
(2013-01-26 13:47) inigo (laptop): for situaitons like this
(2013-01-26 13:48) inigo (laptop): its a website that pulls up info on
people
(2013-01-26 13:48) myself: oh ok
(2013-01-26 13:48) inigo (laptop): previous addresses, relatives
(2013-01-26 13:48) inigo (laptop): etc
(2013-01-26 13:51) inigo (laptop): my grandparents on my dads side live in
vegas, they're both in their 90's living on their own with lots of health
problems, if he turns up at some poker tourny out there i could kill two
birds with one stone by visiting them and doing some reconossaince mission
on our friend curtis here lol. just keep that in mind in case the
opportunity arrises
(2013-01-26 16:36) myself: be on the look out for vendors screwed by flush
trying to get back in
(2013-01-26 16:36) myself: those ones i mentioned before
(2013-01-26 16:36) inigo (laptop): will do
(2013-01-26 16:37) inigo (laptop): i found the account that he was sending
the password resets to last night. i dont know if that helps, but it gave
me a list of all the vendors he screwed
(2013-01-26 16:37) inigo (laptop): i guess you have that same list tho
(2013-01-26 16:37) myself: yea, I dug through all that as well
(2013-01-26 16:38) inigo (laptop): ok


(2013-01-26 20:00) cimon: Hey there, sexy man. Come in, welcome, buy me a
drink.
(2013-01-26 20:37) myself: [delayed] sup sup
(2013-01-26 20:38) myself: [delayed] oops missed ya.  had a little mishap
today I need to run by you.  had a csr go rogue and rip me off for $350k
(2013-01-26 20:38) myself: [delayed messages have been sent]
(2013-01-26 00:42) myself: hey, you around?
(2013-01-27 00:43) cimon: yes, give me 5 mins first
(2013-01-27 00:43) myself: no rush
(2013-01-27 00:47) cimon: OK. Howdy, doodie.
(2013-01-27 00:47) cimon: 350k, eh
(2013-01-27 00:47) cimon: fucker
(2013-01-27 00:48) myself: yea, I didn't expect him to do it because I
have his id
(2013-01-27 00:48) cimon: REALLY
(2013-01-27 00:48) myself: but I left myself open to it
(2013-01-27 00:48) cimon: well, tell me a tale Uncle Robert
(2013-01-27 00:48) myself: gave him pin and password reset capabilities.
it was dumb
(2013-01-27 00:48) cimon: ahh - I follow
(2013-01-27 00:49) cimon: enough about the theft, tell me about the organ
donor
(2013-01-27 00:49) myself: I even though I shouldn't, but then I thought,
since i have the id, he'd never do it

9

(2013-01-27 00:49) myself: and he did
(2013-01-27 00:49) myself: you wanna see his id?
(2013-01-27 00:49) cimon: How sure are you it's really his ID


(2013-01-27 00:50) cimon: oh yeah, I'm gonna have a chat with him
(2013-01-27 00:50) myself: pretty damn sure
(2013-01-27 00:50) cimon: <-- could use some exercise
(2013-01-27 00:51) myself: the story gets moreinteresting
(2013-01-27 00:51) cimon: Well, I'm sure we can tell the diff IRL in real
life betwen some schmoe who has his info lifted, and a guy who's on tor
and also just got 350 k
(2013-01-27 00:51) myself: its deffo him
(2013-01-27 00:51) myself: unless he's super clever
(2013-01-27 00:51) myself: and he isnt
(2013-01-27 00:52) cimon: yeah, that ID looks pretty good
(2013-01-27 00:52) myself: the other csr confirmed alot
(2013-01-27 00:52) cimon: have you run any online searches to see if you
can match the addy
(2013-01-27 00:52) myself: lemme tell you the rest of the story
(2013-01-27 00:53) myself: nob has been bugging me off and on
(2013-01-27 00:53) myself: since you last spoke to him
(2013-01-27 00:53) myself: checking in every few weeks
(2013-01-27 00:53) cimon: Gor for it, I'm gonna have me an afternoon
spliff before my nap -- Davids truck broke down, so I'm running the bar
until 4 am tonight
(2013-01-27 00:53) myself: i told him I'd find him a buyer from the
current vendors
(2013-01-27 00:53) myself: i put this guy on the task
(2013-01-27 00:54) myself: curtis
(2013-01-27 00:54) myself: i haven't gotten to the bottom of it yet, but
somehow he impersonated googleyed or something and got nob to ship him a
key of columbias finest
(2013-01-27 00:55) myself: now if you google his name, one of the first
things that comes up is an arrest on Jan 17
(2013-01-27 00:55) myself: for cocaine posession
(2013-01-27 00:55) myself: like 10 days ago
(2013-01-27 00:56) cimon: fuck
(2013-01-27 00:56) myself: I know, right?
(2013-01-27 00:56) cimon: <-- is pissin self
(2013-01-27 00:56) myself: so nob is pissed.  I gave him his info when he
asked for it
(2013-01-27 00:57) myself: he won't do anything without my go though, I
don't think
(2013-01-27 00:58) cimon: yeah, he's been busted for coke. Write off the
money, no way I'd send anyone in there, or go myself, with that kind of
heat, especially since he may still roll on SR for leniency.
(2013-01-27 00:58) myself: ok
(2013-01-27 00:58) myself: i just hate getting ripped off
(2013-01-27 00:58) cimon: HOWEVER,  it certainly fucking gives nob a wee
bit o' credibility.
(2013-01-27 00:59) myself: yea, nobs legit, but not quite as big time as
he was making himself out to be

(2013-01-27 00:59) cimon: Oh, I have a long memory, and the time to deal
with Curtis is after he's out of his current predicament.
(2013-01-27 00:59) cimon: I'll get on tracking him
(2013-01-27 00:59) myself: says he makes 25 mil a year
(2013-01-27 01:00) myself: yea, but that money won't last long

(2013-01-27 01:04) cimon: Sorry, back to Curtis for a sec. Since Smed is
behind, instead of having Irish come out here in a few days, I can have
him skip to Utah and see if this whole Curtis thing smells at all. Dumb
Irishmen that can't use a smart phone don't fit our profile, so I'm sure
he'd be cool.
(2013-01-27 01:05) myself: that's fine with me
(2013-01-27 01:05) myself: would be good to put eyeballs on this guy
(2013-01-27 01:05) myself: he may be in a jail cell for all we know though

(2013-01-27 01:07) cimon: Irish always knows a guy who knows a guy, we'd
get a better handle on what's going on.
(2013-01-27 01:07) cimon: I'd be most curious about his living
arrangements, did they go nuts seizing computer stuff, or just grab the
guy and the drugs. Gotta talk to the neighbors, man, ya *always* gotta
talk to the neighbors.
(2013-01-27 01:08) cimon: It's the shit that happened AFTER the bust that
tells us what they're looking at now
(2013-01-27 01:08) cimon: when did he liberate the 350
(2013-01-27 01:08) myself: lemme get an exact
(2013-01-27 01:09) myself: around
(2013-01-27 01:09) myself: January 26, 2013, 8:50 am UTC
(2013-01-27 01:09) cimon: So he ain't in jail
(2013-01-27 01:10) cimon: and his computer shit wasn't taken
(2013-01-27 01:10) cimon: so the feds have no linke there. Yet. He still
has lots of time to deal.
(2013-01-27 01:10) myself: so he must be out on bail?
(2013-01-27 01:10) myself: he might be fleeing
(2013-01-27 01:10) cimon: One would think.

(2013-01-27 01:11) cimon: well, he does have 350k, but it takes time to clear that, so he may be holding fast until he can get it out.
(2013-01-27 01:11) myself: but with an arrest, seems like it would be hard to flee
(2013-01-27 01:12) myself: he sent the money to one address
(2013-01-27 01:12) myself: l27B3qwztPyA67uq63LG8G5izwhFcJ7j4A
(2013-01-27 01:12) myself: which still has 15k on it
(2013-01-27 01:13) cimon: As a side note, at what point in time do we decide we've had enough of someones shit, and terminate them? Like, does impersonating a vendor to rip off a mid-level drug lord, using our rep and system; follows up by stealing from our vendors and clients and breeding fear and mis-trust, does that come close in yer opinion?
(2013-01-27 01:14) myself: terminate?
(2013-01-27 01:14) myself: execute?
(2013-01-27 01:14) cimon: Not to mention that whole common law breach of fiduciary duties and duty of care
(2013-01-27 01:15) myself: if this was the wild west, and it kinda is, you'd get hung just for stealing a horse
(2013-01-27 01:15) cimon: Yeah, pretty much. At what point in time is that the response. We're playing with big money with serious people, and that's the world they live in.
(2013-01-27 01:15) cimon: I sure as fuck don't want nob to try it, fuck up, and then have our laundry aired.
(2013-01-27 01:16) myself: unfortunately, there isn't much inbetween
(2013-01-27 01:16) cimon: I know a guy, and he knows a guy who knows a guy, that gets things done.
(2013-01-27 01:16) myself: in a perfect world, we'd get the money back, plus our expenses and maybe beat him up or something
(2013-01-27 01:16) myself: but that's not realistic
(2013-01-27 01:16) cimon: Nope. And it ain't the money, fuck, it's your fault, no one elses. Someday I'll tell you a long story from a guy who explained to me why situations like this are always yer own fault.
(2013-01-27 01:17) myself: so yea, it's a good quesiton I've been thinking about the last 24 hours
(2013-01-27 01:17) myself: oh it's my fault.  I even thought of it before it happened
(2013-01-27 01:17) myself: I could've taken 5 minutes and separated powers
(2013-01-27 01:17) myself: i thought too much of him
(2013-01-27 01:18) cimon: But he came at us from inside, put many folks at risk, and facing a serious felony he's def the kind of guy that would seel what little he knows for a break with the Feebs
(2013-01-27 01:18) myself: that's true
(2013-01-27 01:18) myself: he doesn't know much


(2013-01-27 01:19) myself: you don't log chat do you?
(2013-01-27 01:19) inigo (laptop): of course not
(2013-01-27 01:19) inigo (laptop): that was the first thing you told me
(2013-01-27 01:19) myself: ok good.  I was just thinking about it flush did
(2013-01-27 01:19) inigo (laptop): on day 1
(2013-01-27 01:19) inigo (laptop): are you serious?

(2013-01-27 01:19) myself: but I've chatted with him quite a bit.  he could have logs


(2013-01-27 01:20) myself: he is facing charges right now
(2013-01-27 01:20) myself: yea, I dont know for sure
(2013-01-27 01:20) inigo (laptop): he really logged everything?
(2013-01-27 01:20) inigo (laptop): fuckkk him
(2013-01-27 01:20) myself: no, just speculating that he might have
(2013-01-27 01:20) inigo (laptop): oh
(2013-01-27 01:20) inigo (laptop): i think it tells you when your being logged by another user
(2013-01-27 01:20) inigo (laptop): at least i thought it did
(2013-01-27 01:20) myself: it doesn't
(2013-01-27 01:20) inigo (laptop): maybe not
(2013-01-27 01:20) inigo (laptop): oh
(2013-01-27 01:20) inigo (laptop): damn


(2013-01-27 01:20) cimon: Dude, he was a CSR that could read PMs, reset passwords, mebbe harvest addys while emptying accounts, etc., etc. He was smart enough to impersonate gooly-dick, take nob for some marching powder, and all with yer assistance.
(2013-01-27 01:20) cimon: yeah, and chat logs


(2013-01-27 01:21) inigo (laptop): he would probably be quick to tell them everything he knows
(2013-01-27 01:21) inigo (laptop): about SR
(2013-01-27 01:21) inigo (laptop): as leverage
(2013-01-27 01:21) inigo (laptop): they probably would love to get an inside scoop
(2013-01-27 01:21) inigo (laptop): to pick his brain
(2013-01-27 01:21) myself: exactly
(2013-01-27 01:21) myself: they may have already


(2013-01-27 01:21) cimon: So, you've had your time to think. You're sitting in the big chair, and you need to make a decision. Now, really, things could move fast in the future.
(2013-01-27 01:21) myself: I would have no problem wasting this guy
(2013-01-27 01:21) cimon: Well ok then, I'll take care of it.


(2013-01-27 01:22) inigo (laptop): i don't condone murder but thats almost worthy of assasinating him over lol
(2013-01-27 01:22) myself: well, this is the wild west inigo
(2013-01-27 01:22) myself: they used to hang cattle theives
(2013-01-27 01:22) inigo (laptop): there are certain rules to the underworld. and problems can sometimes only be handled one way
(2013-01-27 01:22) inigo (laptop): thats true


(2013-01-27 01:22) myself: do you mind keeping me abreast

13

(2013-01-27 01:22) cimon: So, other than that, how's your weekend going?


(2013-01-27 01:23) inigo (laptop): sometimes its the only solution
(2013-01-27 01:23) myself: hopefully it won't come to that
(2013-01-27 01:23) myself: i wish the best for people in general
(2013-01-27 01:23) myself: and love them
(2013-01-27 01:23) myself: even flush


(2013-01-27 01:23) myself: it's good
(2013-01-27 01:23) cimon: we'll have 2 opportunies to change gears.
  1- find the fucker and report.
  2- find out what the local skinny is on the guy, gather as much humint
  as possible and report.


(2013-01-27 01:24) inigo (laptop): mighty big of you
(2013-01-27 01:24) inigo (laptop): but for the security and future of this
enterprise, he may be too much of a liability
(2013-01-27 01:24) myself: yea, i'm getting advise now
(2013-01-27 01:24) inigo (laptop): i guess you'll have to weigh what he
knows


(2013-01-27 01:24) myself: been having fun interspersed with putting out
fires
(2013-01-27 01:24) cimon: 3- wait for a go or a no-go.
(2013-01-27 01:24) myself: ok
(2013-01-27 01:24) cimon: yeah, I had a great/fucking exhasuting and
exhasperating few days


(2013-01-27 01:25) inigo (laptop): i can only imagine the kind of person
you turn to for advice


(2013-01-27 01:27) inigo (laptop): at least for a situation like this
(2013-01-27 01:27) myself: heh
(2013-01-27 01:27) inigo (laptop): some mafia don mentor?
(2013-01-27 01:27) myself: I have excellent advisors


14

```
(2013-01-27 01:28) inigo (laptop): or a consiglere
```

```
(2013-01-27 01:28) myself: selfish bastard
(2013-01-27 01:28) cimon: OK - here's what I'm gonna do.
(2013-01-27 01:28) myself: get a new lappy
(2013-01-27 01:28) myself: ill pay for it :)
(2013-01-27 01:28) cimon: ha!
```

```
(2013-01-27 01:29) myself: of course
(2013-01-27 01:29) cimon: Yeah, I won't run one thta's not set up pretty
much like mine now ;)
(2013-01-27 01:30) cimon: brb - phon
(2013-01-27 01:30) cimon: e
(2013-01-27 01:30) myself: k
```

```
(2013-01-27 01:31) inigo (laptop): so i guess the priorites would be 1.)
compiling the list of knowledge he was privy to that he can compromise 2.)
get somebody on top of tracking him down 3.) figure out how to squeeze him
for as much of the money back as possible?
(2013-01-27 01:32) myself: 3 will depend on what we find out in 2
(2013-01-27 01:32) inigo (laptop): true
(2013-01-27 01:32) inigo (laptop): i would assume trying to recover money
is more important then just flat out revenge
(2013-01-27 01:33) inigo (laptop): maybe by taking control of his
computers we can get control of his bitcoin addresses
(2013-01-27 01:33) myself: revenge isn't in the equation
(2013-01-27 01:33) myself: there's money, security, and justice
(2013-01-27 01:33) myself: but not revenge
(2013-01-27 01:33) inigo (laptop): justice is the word i was looking for
(2013-01-27 01:33) inigo (laptop): revenge isn't the libertarian way :)
(2013-01-27 01:33) myself: i guess not
(2013-01-27 01:33) inigo (laptop): deff not your style either
(2013-01-27 01:34) myself: it kills the person seeking it as much as the
one receiving
(2013-01-27 01:34) myself: you wanna know one of my deepest fears in all
of this
(2013-01-27 01:35) inigo (laptop): what's that
(2013-01-27 01:35) myself: being wildly successful
(2013-01-27 01:35) myself: and becoming extremely powerful
(2013-01-27 01:35) myself: and being corrupted by that power
(2013-01-27 01:36) inigo (laptop): thats a very real possibility
(2013-01-27 01:36) myself: inigo
(2013-01-27 01:36) inigo (laptop): inigo
(2013-01-27 01:36) inigo (laptop): power has corrupted even some of the
best of men
(2013-01-27 01:36) myself: I need something from you
(2013-01-27 01:36) inigo (laptop): anything
```

(2013-01-27 01:37) myself: you need to call me out if ever I am over
confident in my ideas, or abusive of my power
(2013-01-27 01:37) inigo (laptop): i wouldn't hesitate to
(2013-01-27 01:37) inigo (laptop): don't worry
(2013-01-27 01:38) myself: thank you
(2013-01-27 01:38) inigo (laptop): especially knowing that's your deepest
fear, i won't let that happen, or at least i'll do anything in my power to
stop you if I notice a seed of power corruption getting to your head
(2013-01-27 01:39) myself: yea, even the thought of it makes me shutter
(2013-01-27 01:39) myself: and it will start with rationalizations
(2013-01-27 01:39) myself: so don't let me fool you.  call a spade a spade
(2013-01-27 01:39) inigo (laptop): understood
 (2013-01-27 01:40) inigo (laptop): fortunately, i have faith in your
character and your will power
(2013-01-27 01:40) inigo (laptop): i dont think it will come to that
(2013-01-27 01:40) inigo (laptop): but i will be forever on the ever
vigilant watch
(2013-01-27 01:40) inigo (laptop): just in case
(2013-01-27 01:40) myself: perfect!
 (2013-01-27 01:41) inigo (laptop): i give you my word on that
(2013-01-27 01:41) myself: ya know, in a way I'm glad flush is gone
(2013-01-27 01:42) inigo (laptop): me too
(2013-01-27 01:42) myself: he was kinda manipulating me against you
(2013-01-27 01:42) myself: i didn't like that
(2013-01-27 01:42) inigo (laptop): yeah i really started to not trust him
as time went on
(2013-01-27 01:42) myself: very subtle though, nothing i could really call
him on
(2013-01-27 01:43) inigo (laptop): i started to see the ugly side of his
character
(2013-01-27 01:43) inigo (laptop): i never thought he would go this far
though
(2013-01-27 01:44) inigo (laptop): but he rubbed me more and more as a
sleezy scheemer
 (2013-01-27 01:45) inigo (laptop): aparantly he's the kind of guy who has
lied his whole way through life. like when i told him i needed to buy a
car but have terrible credit, he had this whole scheeme that he said he's
been using his whole life where he fakes W-2's and paystubs and basically
commits fraud regularly to qualify for his house and his car and his
business
 (2013-01-27 01:46) inigo (laptop): he was trying to get me to do it, but
im not a good liar, and i dont feel comfortable committing fraud like that
(2013-01-27 01:47) inigo (laptop): then his whole multi-level marketing,
amway-type scam shit
(2013-01-27 01:47) myself: yea, i never saw those signs
(2013-01-27 01:47) inigo (laptop): he wanted me to put up some money up
front to get stuck with a cart of vitamins that i was supposed to go to
gyms and try to sell
(2013-01-27 01:47) inigo (laptop): like wtf
(2013-01-27 01:47) myself: that's odd
(2013-01-27 01:48) inigo (laptop): yeah he was promising all this income
from it, and how he was getting rich because of it and how everyone who
gets in early gets paid the most
(2013-01-27 01:48) inigo (laptop): some pyramid thing

```
(2013-01-27 01:48) inigo (laptop): i just kept saying no thanks
(2013-01-27 01:49) inigo (laptop): he was greedy
(2013-01-27 01:50) myself: its hard to judge people
(2013-01-27 01:50) inigo (laptop): yeah its deff easy to say all this
after the fact
(2013-01-27 01:50) myself: and i was a little desperate having lost both
my guys at the same time last time
(2013-01-27 01:51) inigo (laptop): yeah dont get me wrong, you werent at
fault at all, he played his cards perfectly at first, it wasnt until the
last month or so when i started to really get rubbed the wrong way by him
(2013-01-27 01:52) inigo (laptop): he's been conning people most of his
life i suppose
(2013-01-27 01:52) inigo (laptop): he must be good at it
(2013-01-27 01:52) myself: I may not be at fault, but it's my
responsibility.  we have to do better going forward bringing people in
(2013-01-27 01:53) myself: i have one person i really hope comes on board
(2013-01-27 01:53) inigo (laptop): yeah. more scrutiny. if only we had a
doctor of pscyology
(2013-01-27 01:53) myself: but i'll want your input if it comes to it
(2013-01-27 01:53) inigo (laptop): to analyze potential employees
(2013-01-27 01:53) inigo (laptop): sure thing
(2013-01-27 01:53) myself: yea, it's not my area of expertise at all
```

```
(2013-01-27 01:53) cimon: You would have surprised me if you had balked at
taking the step, of bluntly, killing Curtis for fucking up just a wee bit
too badly.
Also, if you had balked, I would have seriously re-considered our
relationship.
We're playing for keeps, this just drives it home.
I'm perfectly comfortable with the decision, and I'll sleep like a lamb
tonight, and every night hereafter.
```

```
(2013-01-27 01:54) inigo (laptop): lol yeah thats something you need to
spend a lifetime specializing in
(2013-01-27 01:54) inigo (laptop): but thats why big corporations hire
them so often
```

```
(2013-01-27 01:54) cimon: Let's just try and not make a habit of this,
mkay.
(2013-01-27 01:54) myself: well put
```

```
(2013-01-27 01:55) inigo (laptop): its hard enough figuring out if they
are undercover LE, its even harder to tell what their character is like
(2013-01-27 01:55) inigo (laptop): over the internet especially
```

```
(2013-01-27 02:07) cimon: OK, there is one alternate approach that kills
two birds with one stone, so to speak.
Tell nob, OK, why don't you deal with the problem, just not for at least
one week.
```

Get the guy who knows a guy to get some guys in place to bat clean-up if
the first string fucks it up.
Same result, and I'd be pretty sure nobs not a fed then.
(2013-01-27 02:08) cimon: IF he's a fed, nothing happens. If he's
incompetent, we take out his team and finish the task.
(2013-01-27 02:08) cimon: Either way, valuable things would be learned.
(2013-01-27 02:08) myself: take out?
(2013-01-27 02:09) cimon: Well, figure if his team tries to take the guy
and fails, the best place to be is close enough to deal with it as it
happens.
(2013-01-27 02:09) cimon: Otherwise, it'd be tough to ever get another
chance.
(2013-01-27 02:10) cimon: He'd likely send in 2 guys, one to cover the
lead.
(2013-01-27 02:11) cimon: We'd cover the cover guy
(2013-01-27 02:12) cimon: If they are getting a beat-down 'cause they
walked into a poker game, not a guy sleeping, they're gonna need some help
getting out of there.
(2013-01-27 02:13) myself: so you steak out curtis and wait for nob to
send in some guys?
(2013-01-27 02:13) cimon: Pretty much. Oh, and re-reading what I said
above, replace "take out his team" with "extract his team"
I was typing and missed your 'take out?' send, :p
(2013-01-27 02:14) myself: ok, good!
(2013-01-27 02:14) myself: i was like, damn we need to have a talk
(2013-01-27 02:14) cimon: Our team woujld be like his teams guradian angel
(2013-01-27 02:14) cimon: ha!
(2013-01-27 02:15) cimon: Hey, nobs guys or not, they'd be on our team,
and we never leave a man behind.
(2013-01-27 02:15) myself: lol, yea
(2013-01-27 02:15) myself: so many miscommunications on this thing i am
sure

(2013-01-27 15:08) Nob: good evening Cabeza
(2013-01-27 15:08) myself: hey nob, how're you?
(2013-01-27 15:09) Nob: good
(2013-01-27 15:09) myself: im still waiting to hear back from googleyed.
I couldn't confirm anything just by looking at his account.
(2013-01-27 15:10) Nob: esta bien, the address that googlyed gave me was
(2013-01-27 15:11) Nob: my men shipped the kilo there
(2013-01-27 15:11) myself: that is a business owned by curtis green

(2013-01-27 15:11) Nob: so green is the utah guy that stole your money?
(2013-01-27 15:11) myself: yes
(2013-01-27 15:12) myself: he set something up with googleyed, but they did it over torchat, so I don't know what it was
(2013-01-27 15:12) myself: hopefully googleyed will be forthcoming
(2013-01-27 15:12) Nob: how did he do it?  you said that he stole $350,000
(2013-01-27 15:12) myself: he had access to the password reset function
(2013-01-27 15:13) myself: he got into several vendor accounts that way and emptied them
(2013-01-27 15:13) Nob: what was he a programmer or something?
(2013-01-27 15:13) myself: no, he was doing support
(2013-01-27 15:14) myself: resolution center admin
(2013-01-27 15:14) Nob: what is support?
(2013-01-27 15:14) myself: investigating vendors
(2013-01-27 15:14) myself: assisting vendors
(2013-01-27 15:14) myself: that kinda stuff
(2013-01-27 15:14) myself: i had him helping you find customers for example
(2013-01-27 15:15) Nob: oh, well I'm going to need more help in that area; something es mal con googleyed
(2013-01-27 15:15) myself: yea, I'm really curious what happened
(2013-01-27 15:16) myself: but yea, curtis got busted for your key
(2013-01-27 15:16) myself: really wierd turn of events
(2013-01-27 15:16) Nob: as we discussed, I reached out and I have two very, professional individuals that are going to visit green
(2013-01-27 15:16) myself: will they execute him if I want?
(2013-01-27 15:17) Nob: they are very good; yes, but I directed them only to beat him up; that was your wishes yesterday, correct?
(2013-01-27 15:19) myself: yes it was
(2013-01-27 15:19) myself: will you be in contact with them when they get there?
(2013-01-27 15:19) Nob: no, no contact; too risky
(2013-01-27 15:19) myself: ok, so the plan is in motion then?
(2013-01-27 15:20) myself: for them to give him the note and beat him up?
(2013-01-27 15:20) Nob: yes, they have your note and are going to, how do I say it, torture him
(2013-01-27 15:20) myself: ok, hmmm
(2013-01-27 15:21) Nob: i am paying for this one, but if you want him killed it will be a lot more and you will have to pay the difference
(2013-01-27 15:21) myself: do they know he was arrested for coke 10 days ago?
(2013-01-27 15:22) Nob: no the details; they work for an associate of mine; i have never met them
(2013-01-27 15:22) myself: ok
(2013-01-27 15:23) Nob: do you know what happened? what are the details of his arrest
(2013-01-27 15:23) myself: I don't know, but I assume it was your key because it happend right around the same time
(2013-01-27 15:24) Nob: this is why I shouldn't mail;  everybody want's them in the mail
(2013-01-27 15:25) myself: yea, larger stuff is better to do drops
(2013-01-27 15:25) Nob: too risky, not damned methylone and other shit
(2013-01-27 15:25) myself: ok, so can you change the order to execute rather than torture?

(2013-01-27 15:26) myself: he was on the inside for a while, and now that he's been arrested, I'm afraid he'll give up info
(2013-01-27 15:26) Nob: yes, is that what you want?
(2013-01-27 15:26) myself: and he ripped me off
(2013-01-27 15:26) myself: it is, after i had a chance to think on it
(2013-01-27 15:26) myself: never killed a man or had one killed before, but it is the right move in this case.
(2013-01-27 15:27) myself: how much will it cost?
(2013-01-27 15:27) Nob: ok, I was going to pay $5,000 to have him beat up; I need to contact my associate and ask what the price will be for the deed
(2013-01-27 15:27) myself: ok
(2013-01-27 15:28) myself: ballpark?
(2013-01-27 15:28) Nob: i have no idea what it will cost
(2013-01-27 15:28) myself: ok
(2013-01-27 15:28) myself: less than $100k?
(2013-01-27 15:29) Nob: depends, they need to check out the neighborhood, police force, etc.
(2013-01-27 15:29) myself: ok, so you'll let me know
(2013-01-27 15:29) myself: ?
(2013-01-27 15:30) Nob: yes, give them a couple days to assess the situation and I will have a price for you
(2013-01-27 15:30) myself: thank you
(2013-01-27 15:30) Nob: for you anything, I am sorry that this has happened
(2013-01-27 15:30) myself: have you killed or had someone killed before?
(2013-01-27 15:31) Nob: i'm a good catholic man, but yes I have; sometimes there are no alternatives
(2013-01-27 15:31) Nob: do your fear googleyed is LE?
(2013-01-27 15:31) myself: no
(2013-01-27 15:32) Nob: ok, i trust you
(2013-01-27 15:32) myself: just my hunch
(2013-01-27 15:32) myself: I don't have all the facts
(2013-01-27 15:32) myself: but he's been selling on here for a while
(2013-01-27 15:32) Nob: damn
(2013-01-27 15:34) myself: he doesn't trust curtis completely which is a good sign
(2013-01-27 15:34) myself: i think curtis tricked him into having him send him the key somehow
(2013-01-27 15:35) Nob: i see
(2013-01-27 15:36) Nob: ok, i will get back to you; stay safe
(2013-01-27 15:36) myself: you too

(2013-01-27 16:30) myself: i talked to nob
(2013-01-27 16:30) myself: he's already mobilizing apparently
(2013-01-27 16:31) cimon: well ok then, I think we should take observer status here.
(2013-01-27 16:31) cimon: If you think about it, it REALLY doesn't look good on nob if a guy he sold to immediately gets buseted
(2013-01-27 16:32) myself: yea, his response was "this is why I ask them to do drops instead of through the mail"
(2013-01-27 16:32) cimon: gussetet, is like gusseted, from the hillbilly 'to get all gussied up'

(2013-01-27 16:32) myself: he said he is going to get in touch after his
ground crew surveys the situation
 (2013-01-27 02:15) cimon: (17:14:27) Dipper: i was like, damn we need to
have a talk
Too funny!

(2013-01-28 17:42) myself: I got confirmation of my story from googleyed
(2013-01-28 17:42) cimon: in case we have any probs, so he has
replacements
(2013-01-28 17:42) myself: and a 3rd address of his
(2013-01-28 17:43) myself: his = curtis


(2013-01-29 12:44) Nob: [delayed] ¿Donde tu estás?  Tenemos que hablar.
(2013-01-29 12:44) myself: hola nob
(2013-01-29 12:45) myself: you there?
(2013-01-29 12:46) Nob: sí
(2013-01-29 12:46) myself: what's up?
(2013-01-29 12:47) myself: que tal?
(2013-01-29 12:47) Nob: doing all right!  can't complain, have friends
like you
(2013-01-29 12:47) myself: :D
(2013-01-29 12:47) Nob: look at you hablando
(2013-01-29 12:48) Nob: my guy got back to me at quoted 80K for the hit;
guy lives in a tight neighborhood; going to be hard gettin in and the body
out
(2013-01-29 12:48) myself: ok
(2013-01-29 12:49) Nob: you want to go forward?  i assume you are going to
want to move fast
(2013-01-29 12:49) myself: yes, let's do it



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

December 17, 2014

TO BE FILED UNDER SEAL

<u>By Email</u>
Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:     *United States v. Ross William Ulbricht*, 14 Cr. 68 (KBF)

Dear Judge Forrest:

The Government writes regarding the timing of any additional sealed proceeding the Court intends to hold on the defendant's motion *in limine* concerning the grand jury investigation of former DEA Special Agent Carl Force. The Government respectfully requests that the Court schedule any such proceeding for tomorrow or Friday, rather than holding it today, for two reasons. First, in light of issues raised during the sealed portions of the pretrial conference held on December 15, 2014, the Government respectfully requests leave to file a supplemental letter regarding its position on the matter, and is prepared to file such a letter by 9 a.m. tomorrow, *i.e.*, December 18, 2014. Second, given the expected media presence at the pretrial conference already scheduled for today, the Government respectfully suggests that it would be impractical to hold a sealed portion of that proceeding to discuss the issues surrounding the Force investigation.

Accordingly, to the extent the Court intends to hold an additional sealed proceeding regarding the investigation of Special Agent Force, the Government respectfully requests that the conference be postponed until Thursday or Friday, at the convenience of the Court.  The Government also requests that this letter be maintained under seal.

Respectfully,

PREET BHARARA
United States Attorney

By: _____
SERRIN TURNER
TIMOTHY T. HOWARD
Assistant United States Attorneys
Southern District of New York

cc:    Joshua Dratel, Esq.

Ordered - under Seal

1. The Court will accept any final submissions on this issue by 9 a.m. tomorrow.

2. To the extent the defendant would request particularized discovery, he should submit a letter setting forth such requests by 9 am tomorrow. on this issue

3. The Court shall rule promptly thereafter but does not expect to need an additional hearing at this time.

2

K— B. Force
WDS
12/17/14



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

<u>TO BE FILED UNDER SEAL</u>

December 18, 2014

<u>By Hand</u>

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:    *United States v. Ross William Ulbricht*, S1 14 Cr. 68 (KBF)

Dear Judge Forrest:

Enclosed please find copies of reports written by former Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), named Carl Force, as requested by the Court on Monday, December 15, 2014.  Copies of these materials were already produced in discovery to the defendant, on or about March 21, 2014.

Respectfully,

PREET BHARARA
United States Attorney

By:_____
     TIMOTHY T. HOWARD
     SERRIN TURNER
     Assistant United States Attorneys
     Southern District of New York

Encl.

Cc:    Joshua Dratel, Esq. (by electronic mail, without enclosure)



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

<u>TO BE FILED UNDER SEAL</u>

December 18, 2014

<u>By Electronic Mail</u>

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:    *United States v. Ross William Ulbricht*, S1 14 Cr. 68 (KBF)

Dear Judge Forrest:

The Government writes regarding the defendant's motion *in limine* to unseal information regarding the ongoing grand jury investigation into a former Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), named Carl Force, and to use that evidence affirmatively at trial. As the Government has previously asserted in prior filings, unsealing the requested information regarding the corruption allegations would result in significant prejudice to the integrity of the ongoing investigation, and the allegations are wholly irrelevant to the Government's case. The information is similarly irrelevant to any potential entrapment defense, previously suggested by defense counsel.[1]

Based on questions posed by the Court during sealed portion of the proceedings, the Government believes that the defendant may be seeking to use allegations from the investigation to support a defense theory that evidence against the defendant has been fabricated. However, as set forth below, the Court should deny the defendant's motion, and preclude the defendant from introducing evidence of alleged corruption by former SA Force at trial because it would have no probative value, and because it would turn the case into a mini-trial of SA Force that would waste time, confuse and mislead the jury, and otherwise unfairly prejudice the Government in violation of Rule 403 of the Federal Rules of Evidence.

---

[1] The Government addresses these arguments on pages 16 and 17 in its Memorandum of Law in Opposition to the Defendant's Motions in Limine, filed on December 12, 2014.

## A.     Background

As set forth in the Government's prior submissions, former SA Force was involved in a completely independent investigation into Silk Road based out of the U.S. Attorney's Office for the District of Maryland ("USAO-Baltimore").  The Government's case has not relied on, and is not offering any evidence obtained by, the USAO-Baltimore investigation in this case.  The only references to Force that the Government intends to make in its case in chief are to his online undercover identity as "Nob" in TorChat[2] logs recovered from Ulbricht's computer, where the defendant and other co-conspirators mention "Nob" as the party solicited by the defendant to arrange for the murder of Curtis Green, a/k/a "Flush."  According to those TorChat logs, the defendant solicited Green's murder because he believed that Green had stolen approximately $350,000 worth of Bitcoins from Silk Road and was concerned that Green may have been cooperating with law enforcement.

The Government long ago produced discovery regarding this incident, including information that the "Nob" account was controlled by an undercover DEA agent, that Curtis Green, a/k/a "Flush" was arrested in January 2013 on narcotics charges and was cooperating with law enforcement, and that the undercover officer had obtained access to the "Flush" account following Green's arrest.  The chronology of events regarding Green's arrest and access to the "Flush" account is as follows:

January 17, 2013

Curtis Green, a/k/a "Flush" was arrested on narcotics charges.  "Flush" was a member of the Silk Road support staff and as such could take certain administrative actions with respect to Silk Road user accounts, such as resetting a user's password (*e.g.*, in the event a user claimed to have forgotten his password and needed to create a new one).  According to reports filed by Force, Green began cooperating promptly after his arrest and provided Force with access to his "Flush" account; thereafter, Force logged into the "Flush" account and changed the login password in order to secure the account for undercover purposes.

January 19, 2013

According to reports filed by Force, two days later, Force provided Green with the changed password for the "Flush" account, in order to return access to the account to Green, so that Green could cooperate with the investigation by engaging in online conversations with the defendant as a confidential informant.

---

[2] "TorChat" is an instant-messaging service that enables users to chat over the Tor network.  *See* http://en.wikipedia.org/wiki/TorChat.  TorChat users can "log" their chats in order to keep a record of them for future reference.  The TorChat service was and is unaffiliated with the Silk Road website.

<u>January 26, 2013</u>

One week later, according to a TorChat log recovered from the defendant's computer, on January 26, 2013, at approximately 3:39 a.m., another Silk Road support staff member, with the username "Inigo,"[3] informed the defendant that he had detected a possible theft of approximately $350,000 worth of Bitcoins from Silk Road user accounts, which he believed had been stolen the "Flush" account. Specifically, it appeared to "Inigo" that "Flush" had reset the passwords of individual Silk Road users in order to remove funds from the accounts of those users.

According to reports filed by Force, and as corroborated by TorChat logs recovered from the defendant's computer, on that same day, starting at approximately 10:42 a.m., the defendant engaged in an online TorChat with "Nob" in which he told "Nob" that "Flush's" true identity was Curtis Green, and asked "Nob" if he could arrange to "get someone to force [Green] to return the s funds."

According to another TorChat log recovered from the defendant's computer, approximately six minutes later, at approximately 10:48 a.m., "Inigo" informed the defendant that he had successfully stopped the theft of Bitcoins by resetting "Flush's" password, thereby locking "Flush" out of his account.

Subsequent TorChat logs reveal that the defendant later ordered "Nob" to arrange for Green's execution in exchange for $80,000 in United States currency, and that the defendant later informed both "Inigo" and another associate, with the TorChat username "cimon," that Green had been successfully executed.

* * *

All of the above facts above were provided to the defendant in discovery, and have been at defense's proposal to investigate since that time.[4]  The only *new* information, made available to the defendant on December 1, 2013, pursuant to a Court order authorizing disclosure under seal pursuant to Rule 6(e)(3)(E), is that: (1) former SA Force is the subject of an ongoing grand jury investigation being conducted by the United States Attorney's Office for the Northern District of California ("USAO-San Francisco") for using his position as a DEA agent to convert Bitcoins for personal use; and (2) USAO-San Francisco is investigating specifically whether former SA Force could have been responsible for the theft of the $350,000 worth of Bitcoins through the "Flush" account during late January 2013.

---

[3] "Inigo" has been identified as Andrew Michael Jones, who was indicted for his role as a Silk Road administrator in a separate case pending before Judge Griesa.  Jones has pled guilty to the charges.

[4] The Government will provide copies of relevant reports authored by former SA Force to the Court by separate letter, which were previously produced to the defendant in discovery on or about March 21, 2014.

Last evening, undersigned counsel consulted with the lead AUSA in USAO-San Francisco handling the Force investigation, regarding the status of the investigation into whether, specifically, Force converted the $350,000 worth of Bitcoins in late January 2013 through the "Flush" account.  The AUSA clarified that the investigation is at a preliminary stage with respect to that incident, and that the investigation has not uncovered any evidence that Force was responsible for any such theft other than motive and opportunity.  That is, the investigation into that incident is based only upon evidence that Force improperly converted Bitcoins for personal gain in *other* contexts, and that he had the access to the "Flush" account (possibly along with Curtis Green) at the time that the $350,000 worth of Bitcoins went missing from Silk Road accounts.  USAO-San Francisco currently has no evidence to corroborate that Force in fact was responsible for those Bitcoins going missing.  In fact, some evidence indicates that Force may have had no involvement and that the Bitcoins may not have been stolen at all.  Again, the investigation into this incident is at a preliminary stage.

**B.    Discussion**

For the reasons below, any evidence concerning the potential misconduct by former SA Force being investigated by USAO-San Francisco should not be admitted at trial in this case.  Any such evidence would have no probative value under Rule 401, and in particular would lend no support to any defense that evidence has been fabricated against the defendant.  Moreover, any probative value such evidence did have would be vastly outweighed by the risk of unfair prejudice to the Government, as it would threaten to turn the trial into a time-consuming corruption inquest into SA Force – who had no involvement in this Office's investigation –with the effect of confusing and biasing the jury and turning their attention away from the charges against the defendant.

Evidence from the USAO-San Francisco investigation is not relevant to any fabrication defense, first and foremost, because USAO-San Francisco has not uncovered any evidence that Force fabricated any evidence against the defendant or the "Dread Pirate Roberts" online persona.  Again, the USAO-San Francisco investigation instead concerns only whether Force improperly converted Bitcoins to his personal use.  Any theory that Force was involved in fabricating evidence against the defendant would be based on a purely speculative leap from one type of misconduct (corrupt conversion of criminal proceeds for personal gain) to another (fabrication of evidence against the defendant).

In particular, any argument that Force could have used the "Flush" account to take control of the "Dread Pirate Roberts" account to plant incriminating statements by the defendant is not only completely speculative, but is also contrary to the evidence in this case.  To take several of many examples:

- Logs of TorChat communications seized from the defendant's laptop computer— which occurred over a completely separate communications system from Silk Road— reflect that the defendant discussed the business of owning and operating Silk Road with his co-conspirators on a daily basis throughout the period that Force had access to the login credentials for the "Flush" account, and long afterwards, without any

reference to losing him access to his Silk Road "Dread Pirate Roberts" administrator account.

- Those same TorChat logs reflect that "Inigo" locked down the "Flush" account on January 26, 2013, shortly after coming to believe that "Flush" was responsible for stealing Bitcoins from the site; hence, the account would have been inaccessible to Force after that time.

- While "Flush" had the capability to reset the passwords of Silk Road user accounts, there is no evidence that he had any ability to reset the password for the "Dread Pirate Roberts" account, nor is there any reason to believe a site administrator would give any such ability to his employees.

- Even assuming the defendant could have ever been locked out of the "Dread Pirate Roberts" account, he still would have controlled the server and computer code underlying the website, and could simply have regained control of the account through that root-level access. (By analogy, if a CEO's email account is hacked, that doesn't mean he thereby loses control of his company. In particular, given that he has ultimate, physical control over the email server on which the account his hosted, he can take whatever steps are necessary to regain control over the account.)

- "Dread Pirate Roberts" at times digitally signed or encrypted his communications using what is known as a "private key" – including after January 2013. In order to send those communications, Force would have had to have that private key; yet it was stored on the defendant's computer. There is no way Force could have obtained it simply by gaining access the "Dread Pirate Roberts" account on Silk Road.

Accordingly, there is no basis to admit evidence of corruption on the part of Force to support any theory that Force fabricated evidence against the defendant. Any conceivable wisp of probative value such evidence would have would be clearly outweighed by the danger of unfair prejudice to the Government. The Government does not intend to call former SA Force as a witness or offer any evidence collected by him. Were the defense nonetheless to introduce inflammatory allegations of corruption on the part of this non-witness former agent, and to launch a fishing expedition into whether he somehow fabricated the evidence being used at trial, the result will surely be to "confuse the issues, sidetrack the trial and impede the jury from deciding the guilt or lack of guilt of the defendant[] based on the evidence in the case," in violation of Rule 403. *United States v. Milan-Colon*, 836 F. Supp. 1007, 1012-14 (S.D.N.Y. 1993) (precluding evidence under Rule 403 of an investigation into officers for stealing money from defendant's car at the time of the arrest, where: (1) the Government did not intend to introduce at trial evidence seized by the officers implicated by the corruption investigation and did not intend to call them as witnesses; (2) many of the corruption allegations remained unsubstantiated; and (3) no evidence from the corruption investigation indicated that evidence was fabricated against the defendants).

**CONCLUSION**

For the reasons set forth above, as well as the Government's prior submissions, the Government respectfully requests that the Court deny the defendants motion *in limine* to unseal information regarding the ongoing USAO-San Francisco investigation into former SA Force, and preclude the defense from using any information regarding the investigation as evidence at trial, based on Rules 401 and 403 of the Federal Rules of Evidence.

Based on the sensitive nature of the contents of this letter, including references to an ongoing grand jury investigation, the Government respectfully requests that it remain under seal.

Respectfully,

PREET BHARARA
United States Attorney

By:_____
    TIMOTHY T. HOWARD
    SERRIN TURNER
    Assistant United States Attorneys
    Southern District of New York

cc:    Joshua Dratel, Esq.

**JOSHUA L. DRATEL, P.C.**
A PROFESSIONAL CORPORATION

**29 BROADWAY**
Suite 1412
NEW YORK, NEW YORK 10006
...
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL

LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

STEVEN WRIGHT
*Office Manager*

December 18, 2014

**BY ELECTRONIC MAIL**

**FILED UNDER SEAL**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl
New York, New York 10007

      Re:  *United States v. Ross Ulbricht,*
         14 Cr. 68 (KBF)

Dear Judge Forrest:

    This letter is submitted on behalf of defendant Ross Ulbricht and, in response to the Court's December 17, 2014, endorsement of the government's December 17, 2014, letter, sets forth particularized discovery requests regarding former Drug Enforcement Administration Special Agent Carl Force. This letter is submitted under seal, with a copy to the government, because it relates to a matter still under seal.

    Accordingly, Mr. Ulbricht makes the following particularized discovery demands with respect to former SA Force:

    (1)  bank account records from any and all bank accounts maintained by former SA Force or his spouse in the U.S. or overseas;

    (2)  records from any and all Bitcoin accounts and/or wallets maintained by former SA Force or any of his aliases;

    (3)  records of any and all Bitcoin transactions conducted by former SA Force through any Bitcoin accounts and/or wallets;

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
December 18, 2014
Page 2 of 4

(4)    records of any and all Bitcoin blockchain analyses conducted by the government with respect to former SA Force's Bitcoin accounts, wallets, and/or transactions;

(5)    any spending, net worth, or other financial analysis conducted with respect to former SA Force;

(6)    the names, addresses, and contact information for any person possessing exculpatory information or material regarding former SA Force in connection with this case;

(7)    any and all forensic computer or other electronic analysis or tests conducted with respect to former SA Force in connection with the grand jury investigation of him;

(8)    any and all phone records relating to former SA Force and/or the government's investigation of him;

(9)    any and all aliases used by former SA Force on the Internet, or otherwise;

(10)    the contents of any email accounts operated by former SA Force or any of his aliases;

(11)    any and all chats involving former SA Force or any of his aliases on Silk Road, or otherwise;

(12)    any forum posts authored by former SA Force or any of his aliases on Silk Road, or otherwise;

(13)    any and all blog posts authored by former SA Force or any of his aliases;

(14)    the contents of any and all social media accounts operated by former SA Force or any of his aliases (including but not limited Facebook, Linkedin, and/or Twitter);

(15)    former SA Force's tax returns from 2010 through 2014;

(16)    any and all stock or other financial holdings maintained by former SA Force or any of his aliases;

(17)    any and all reports prepared by the government regarding its investigation of former SA Force;

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
December 18, 2014
Page 3 of 4

(18)     any and all reports or other memorialization and/or recording of the interview of former SA Force by government investigators in connection with the current grand jury investigation of him;

(19)     any and all search and/or eavesdropping warrant applications and supporting materials, and search and/or eavesdropping warrants executed during the investigation of former SA Force, and the fruits of those searches;

(20)     any and all subpoena returns obtained during the government's investigation of former SA Force;

(21)     any and all other documents and information obtained by any other process, including but not limited to, pen registers, trap and trace orders, and/or orders pursuant to 18 U.S.C. §2703(d);

(22)     any negative or adverse disciplinary records or reports regarding former SA Force;

(23)     any FBI rap sheet or other criminal history information regarding former SA Force;

(24)     any surveillance footage taken during the government's investigation of former SA Force;

(25)     any and all audio recordings of former SA Force made in connection with the investigation of him or of this case;

(26)     any other exculpatory information or material regarding former SA Force in connection with this case;

(27)     any and all reports, memoranda, recordings, and/or other memorialization of interviews with Curtis Green (a/k/a "Flush") in connection with this case and/or the investigation of former SA Force;

(28)     records of any other investigations of former SA Force by the FBI, or any other agency.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
December 18, 2014
Page 4 of 4

Accordingly, it is respectfully requested that the Court compel the government to produce the above-demanded discovery.

Respectfully submitted,

Lindsay A. Lewis

LAL/

cc:    Serrin Turner
       Timothy T. Howard
       Assistant United States Attorneys

Ordered [ under Seal ]

1. The Government shall respond to this letter as soon as practicable. The Government shall consider what information as to which it ~~could not~~ believes subpoenas from the defendant might issue without harming any ongoing investigations.

2. The defendant shall provide the Court and Government forthwith with some prioritization/ranking of the requested items -- otherwise, it's not "particularized" in any helpful sense.

12/18/14

K B. Fr
USDJ



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

<u>TO BE FILED UNDER SEAL</u>

December 18, 2014

<u>By Electronic Mail</u>
Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:    *United States v. Ross William Ulbricht*, S1 14 Cr. 68 (KBF)

Dear Judge Forrest:

The Government writes to respond to the Court's order issued today requiring the Government to advise the Court concerning what subpoenas it believes the defendant could issue with respect to its recent discovery requests without harming any ongoing investigation. The Government will endeavor to respond to the Court's order substantively as soon as practicable. However, doing so will require consultation with the prosecutors handling the USAO-San Francisco investigation, as undersigned counsel are not fully familiar with what responsive records may exist from that investigation and cannot independently assess what impact disclosure of any such records may have on the investigation.

The prosecutors handling the USAO-San Francisco investigation have advised that, due to preexisting commitments they have today, they are unable to review the Court's order or discuss it with undersigned counsel until this evening. Accordingly, the Government will plan to respond to the Court's order as soon as possible tomorrow.

Respectfully,

PREET BHARARA
United States Attorney

By:_____
SERRIN TURNER
TIMOTHY T. HOWARD
Assistant United States Attorneys
Southern District of New York

Ordered
understood. I didn't impose
a specific deadline to
provide flexibility.

K. B. Forrest
US DJ
12/18/14

Cc:    Joshua Dratel, Esq. (by electronic mail)



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

_____

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

TO BE FILED UNDER SEAL

December 19, 2014

By Electronic Mail
Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:    *United States v. Ross William Ulbricht*, S1 14 Cr. 68 (KBF)

Dear Judge Forrest:

The Government writes respectfully to respond to the Court's order issued yesterday requiring the Government to advise the Court concerning what subpoenas it believes the defendant could issue with respect to its recent discovery requests (the "Defense Requests") without harming any ongoing investigation. As set forth below, for a number of reasons, the Government believes it would be inappropriate for the Court to approve any subpoenas with respect to the Defense Requests.

First, the attorneys handling the ongoing grand jury investigation of former Special Agent ("SA") Carl Force believe that disclosure of any of the requested records from the investigative file threatens to harm the investigative process, by revealing to Force or others the full scope of the Government's investigation, which is currently unknown to Force. Second, in any event, Rule 17 subpoenas are not a discovery tool and cannot be used to seek broad categories of information such as those contained in the Defense Requests; rather, Rule 17 subpoenas must be limited to information that is specific, relevant, and directly admissible. Third, while the defense relies on *Brady v. Maryland*, 373 U.S. 83 (1963) as the authority for the Defense Requests, *Brady* is not a discovery tool either; *Brady* simply obligates the Government to disclose any exculpatory information in its possession, and here the Government has represented that it knows of none. In the face of that representation, *Brady* does not authorize the defense to issue discovery demands for broad swaths of information from government files so that the defense can search for exculpatory information on its own. Fourth, allowing the defense to pursue the Defense Requests would entail a substantial delay of trial, as both the gathering of responsive documents and the opportunity for review by the defense would take several weeks at a minimum. For all of these reasons, as well as the reasons explained in the Government's prior letters concerning the Force investigation, the Government respectfully requests that the Court deny the Defense Requests in their entirety.

**A.      The Defense Requests Threaten to Harm the Ongoing Investigation of Former SA Force**

Undersigned counsel have consulted anew with the prosecutors from the U.S. Attorney's Office for the Northern District of California and the Public Integrity Section of the U.S. Department of Justice (the "USAO-SF/PIN Prosecutors") handling the investigation of former SA Force and have shared with them the Court's order with respect to the Defense Requests. The USAO-SF/PIN Prosecutors continue to believe that there are no records that could be provided from their investigative files without jeopardizing the ongoing grand jury investigation. As noted in the Government's December 12, 2014 letter to the Court, the USAO-SF/PIN Prosecutors are concerned that, although former SA Force is aware that he is under investigation, he is not aware of the full range of misconduct that is the subject of the investigation. The prosecutors believe that disclosure of materials taken from the case file would threaten to reveal the full scope of the investigation and might cause Mr. Force (as well as other potential subjects, co-conspirators, or aiders and abettors) to flee, destroy evidence, conceal proceeds of misconduct and criminal activity, or intimidate witnesses. The prosecutors further believe that disclosure of any materials obtained through grand jury process would have to be authorized under Rule 6(e) and that any such order would have to be issued in the Northern District of California, where the grand jury is convened. *See* Fed. R. Crim. P. 6(e)(3)(F).

To be clear, the USAO-SF/PIN Prosecutors do not take the view that the need for grand jury secrecy precludes the defendant in this case from pursuing his own independent investigation of former SA Force, for example, by subpoenaing records from third parties or attempting to talk to former SA Force, so long as the defendant does not disclose the fact of the USAO-SF/PIN investigation in doing so. (Such independent investigation would be separately improper for the reasons below, however.) The USAO-SF/PIN Prosecutors simply object to the premature disclosure of any records they have obtained – and certainly to the disclosure of any work product they have generated – in advance of any public charges being filed in the case, which the prosecutors do not expect to happen until the spring of 2015 at the earliest.

**B.      Rule 17 Does Not Provide Authority for the Defense Requests**

Putting aside any impact on the USAO-SF/PIN investigation, to allow the defense to issue subpoenas for the broad categories of information sought in the Defense Requests (whether to the Government or a third party) would be an abuse of Rule 17. A party seeking to issue a Rule 17 subpoena has the burden of showing that the documents sought are (1) relevant, (2) admissible, and (3) specific. *United States v. Nixon*, 418 U.S. 683, 700 (1974). This is because "Rule 17 subpoenas are properly used to obtain admissible evidence, not as a substitute for discovery." *United States v. Barnes,* 560 Fed. Appx. 36, 39 (2d Cir. 2014) (citing *United States v. Murray*, 297 F.2d 812, 821 (2d Cir.1962) (observing that subpoenaed materials must themselves be admissible)). Accordingly, pretrial subpoenas "not intended to produce evidentiary materials but . . . merely [constituting] a fishing expedition to see what may turn up" are not authorized by Rule 17, and should be quashed. *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951).

The categories of information enumerated in the Defense Requests are manifestly not limited to relevant, admissible, and specific evidence. Instead, they seek "any and all" materials

relating to numerous broad categories of information.  (*See* Def. Ltr. at 1-2 (seeking, *inter alia*, "any and all bank accounts maintained by former SA Force or his spouse in the U.S. or overseas," "any and all Bitcoin accounts and/or wallets maintained by former SA Force or any of his aliases," "any and all phone records relating to former SA Force and/or the government's investigation of him," "the contents of any email accounts operated by former SA Force," and "any and all subpoena returns obtained during the government's investigation of former SA Force")).  These requests sweep far beyond the bounds of a valid Rule 17 subpoena.  *United States v. Mendinueta-Ibarro*, __ F. Supp. 2d __, No. 12 Cr. 379 (VM), 2013 WL 3871392, at *2 (S.D.N.Y. July 18, 2013) ("Subpoenas seeking 'any and all' materials, without mention of 'specific admissible evidence,' justify the inference that the defense is engaging in the type of 'fishing expedition' prohibited by *Nixon*."); *see also United States v. Binday*, 908 F. Supp. 2d 485, 492 (S.D.N.Y. 2012) (rejecting Rule 17 subpoena seeking "vast array of documents" that defendant sought in pursuit of unspecified exculpatory evidence); *United States v. Weisberg*, No. 08 Cr. 347 (NGG), 2011 WL 1327689, at *6 (E.D.N.Y. Apr. 5, 2011) (rejecting Rule 17 subpoena seeking "all documents and material in any way" relating to certain escrow account); *United States v. Louis*, No. 04–CR–203 (LTS), 2005 WL 180885, at *5 (S.D.N.Y. Jan. 27, 2005) (rejecting Rule 17 subpoena requesting "any and all" documents relating to several categories of subject matter).

## C.    *Brady* Does Not Provide Authority for the Defense Requests

Nor does *Brady* supply a basis for the Defense Requests.  The defense appears to take the view that *Brady* entitles the defense to pursue broad discovery concerning the investigation of former SA Force, so that defense counsel may sift through the requested documents themselves for potentially exculpatory evidence.  As the defense stated in its second letter concerning the Defense Requests filed yesterday: "the defense does not know . . . which requests would bear the most fruit with respect to exculpatory information and/or material[,] [n]or should it be defendant's burden: it is the government's burden to provide such information and material, and not require defendant to guess at which type of information will yield the exculpatory information."  (Def. Ltr. dated Dec. 18, 2014, at 1).

This view rests on a mistaken conception of the *Brady* doctrine.  "*Brady* . . . is not a discovery tool."  *United States v. Bin Laden*, No. 98 Cr. 1023 (KTD), 2005 WL 287404, at *13 (S.D.N.Y. Feb. 7, 2005); *see generally Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case and *Brady* did not create one.").  Rather, *Brady* imposes specific disclosure obligations on the Government "to ensure that a miscarriage of justice does not occur."  *United States v. Bagley*, 473 U.S. 667, 675 (1985).  These obligations require the prosecution to disclose evidence, in its possession or reasonably available to it, that "is both favorable to the accused and material either to guilt or to punishment."  *Id.* at 674 (citation and internal quotations omitted).  But it is the prosecution – not the defense – who "decides which information must be disclosed."  *Pennsylvania v. Ritchie*, 480 U.S. 39, 59-60 (1987).  "Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final.  Defense counsel has no constitutional right to conduct his own search of the [prosecution's] files to argue relevance."  *Id.*

The defendant's requests fail to specify any particular exculpatory evidence withheld by the Government.  "Instead, [the defendant] makes a variety of boundless requests, which he apparently believes *might* yield *Brady* fruit. This is not, however, what *Brady* prescribes." *Bin Laden*, 2005 WL 287404, at *13; *see also United States v. Ruiz*, 702 F. Supp. 1066, 1069 (S.D.N.Y. 1989) ("Defendant's broad requests, although made under *Brady*, seem to be, in effect, a demand to conduct a thorough review of the government's investigative file. The law plainly does not support such discovery."); *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir.1982) (holding that Brady is not to be utilized as a discovery device to "supply a defendant with all evidence in the government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the government").

"Absent a particularized showing that something exists which must be disclosed before trial, the [prosecution] need do no more than acknowledge and abide by its *Brady* . . . obligations." *United States v. Rahman*, No. 93 Cr. 181 (MBM), 1994 WL 533609, at *3 (S.D.N.Y. Sept. 30, 1994).  Accordingly, "[c]ourts in this Circuit have repeatedly denied pretrial requests for discovery orders pursuant to *Brady* where the government . . . has made a good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady*." *United States v. Perez*, 940 F. Supp. 540, 543 (S.D.N.Y.1996); *see also United States v. Boyle*, No. 08 Cr. 534 (CM), 2009 WL 2032105, at *10 (S.D.N.Y. Jul. 9, 2009) ("The Government states that it is aware of its obligations, and has made and will continue to make all required disclosures as appropriate. This representation is sufficient to satisfy the Government's current *Brady* obligations."); *United States v. Numisgroup Intern. Corp*., 128 F. Supp. 2d 136, 150 (E.D.N.Y. 2001) ("In the absence of a particularized showing by the defense that certain materials covered by *Brady* are being withheld, the Court accepts the Government's good faith assertion as sufficient.").

Here, the Government fully recognizes its *Brady* obligations and, were any exculpatory material known to the Government, the Government would readily produce it to the defense. However, the Government knows of *no* exculpatory information relating to the defendant.  In particular, as the Government has repeatedly represented, the Government knows of no such exculpatory information stemming from the USAO-SF/PIN investigation of former SA Carl Force – whether evincing entrapment, fabrication of evidence, or otherwise.  Further, undersigned counsel have consulted repeatedly with the prosecutors handling the USAO-SF/PIN investigation, who have likewise consistently represented that they know of no such exculpatory evidence.

While the defendant has apparently written multiple *ex parte* letters in an attempt to persuade the Court that the USAO-SF/PIN investigation does contain information that exculpates the defendant and requires disclosure under *Brady*, again, that determination is not for the defense to make.  The obligation to identify and produce exculpatory information instead lies with the Government.  *See United States v. Jones*, No. 85 Cr. 1075 (CSH), 1986 WL 275, at *8 (S.D.N.Y. May 28, 1986) (rejecting request by defense for *ex parte* hearing as to "[the defendant's] theory of defense so that the Court, rather than the Government, can rule on whether [the defendant] is entitled to certain materials under *Brady*," stating: "'It is the prosecutor who decides what evidence, if any, should be voluntarily submitted to defense counsel in accordance with *Brady*'") (quoting *United States v. Shakur*, 560 F. Supp. 309, 311

4

(S.D.N.Y. 1983) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976))); *see also United States v. Walker*, 05 Cr. 440, 2008 WL 5002937, at *3 (E.D. Pa. 2008) (rejecting request for supposed *Brady* information that defendants made *ex parte* due to "concern that their trial strategy will be divulged," holding:  "Defendants are seeking this material under *Brady* and its progeny, which have established disclosure procedures that neither permit a defendant to move *ex parte* to procure impeachment or exculpatory evidence nor allow the defendant to review Government files in the hopes of discovering such material.").

Accordingly, the Government objects to the *ex parte* submissions filed by the defense in this regard, and doubly objects to the Defense Requests insofar as they are premised upon those submissions.  If the defense has a "particularized showing" to make concerning supposedly exculpatory material in the Government's possession, then the defense must make that showing in an adversarial posture, so that the Government may respond appropriately – either by producing the material if it truly is exculpatory, or by justifying its refusal to do so if it is not. Otherwise, the Government's good faith representation that it is aware of and has complied with its *Brady* obligations requires that the Defense Requests be denied.

**D.      The Defense Requests Cannot Be Pursued Without Seriously Delaying the Trial**

Undersigned counsel have consulted with the prosecutors handling the USAO-SF/PIN investigation, who report that the records in their investigative files have not been compiled, organized, or reviewed for discovery purposes and that it would require weeks to do so, especially given the lengthy holiday period beginning next week during which the staff needed to process such discovery would not be available.  Indeed, even in simple criminal cases involving small amounts of documentary evidence, the Government typically receives several weeks to produce discovery.  Much more time would be needed to produce anywhere near the volume of documents sought in the Defense Requests.  Further, any substantial amounts of records produced to the defense could require additional weeks or even months for the defense to review.

Therefore, the Government does not believe it would be possible to allow the defense to pursue the Defense Requests without delaying trial well past January or beyond.

## CONCLUSION

For all the reasons above, the Government respectfully requests that the Court deny the Defense Requests in their entirety.  As the Government has previously argued, the pending investigation of SA Force is a collateral matter that does not relate to the defendant's guilt or innocence.  The Government is fully aware of its *Brady* obligations and can assure the Court that it knows of no *Brady* material stemming from the investigation.  Respectfully, the Government requests that the Court defer to that representation and not permit the defense to pursue a fishing expedition into the files of an ongoing grand jury investigation being conducted by another U.S. Attorney's Office, which would lack any basis under Rule 17, *Brady*, or any other source of law.

Respectfully,

PREET BHARARA
United States Attorney

By:_____
SERRIN TURNER
TIMOTHY T. HOWARD
Assistant United States Attorneys
Southern District of New York

Cc:    Joshua Dratel, Esq. (by electronic mail)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
UNITED STATES OF AMERICA                                    :
                                                            :
              -v-                                           :        14-cr-68 (KBF)
                                                            :
ROSS WILLIAM ULBRICHT,                                      :        SEALED
                                                            :        MEMORANDUM &
                        Defendant.                          :        DECISION[1]
                                                            :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

       On November 21, 2014, the Government submitted a letter (the "November

21, 2014 Letter" or the "Letter") disclosing an ongoing federal grand jury

investigation of a former special agent of the Drug Enforcement Agency ("DEA"),

Carl Force ("SA Force" or "Force"), by the U.S. Attorney's Office for the Northern

District of California ("USAO-San Francisco"), in conjunction with the Public

Integrity Section of the Criminal Division of the Department of Justice.  In sum and

substance, the grand jury investigation (the "Force Investigation") concerns an

inquiry into whether Force "went rogue" at some point during an independent

investigation of Silk Road by the U.S. Attorney's Office for the District of Maryland

("USAO-Baltimore")—stealing bitcoins, corruptly converting proceeds from Silk

Road transactions to his own use, and/or providing inside information regarding the

USAO-Baltimore investigation to an individual known as "Dread Pirate Roberts"

("DPR").  DPR is alleged to have controlled the Silk Road website.  The Force

Investigation is active and its scope is non-public.  Notably, the November 21 Letter

---

[1] References to defendant's ex parte submissions have been redacted from this version of the Sealed
Memorandum & Decision.

does not disclose known facts regarding Force's conduct, but rather discloses the fact and scope of an investigation into potential misconduct.

The Government requested leave to disclose the November 21, 2014 Letter to defense counsel pursuant to Rule 6(e)(3)(E) of the Federal Rules of Criminal Procedure under a protective order prohibiting outside disclosure of the Letter and its contents.  At that time, the Government asserted—and it continues to assert— that the disclosure is not pursuant to any <u>Brady</u> obligation as the information contained in the Letter is neither exculpatory nor material to any potential defense. On December 1, 2014, the Court granted the Government's request to provide the Letter to defendant pursuant to a protective order.

The parties filed motions <u>in limine</u> on December 9, 2014.  As one of his motions, defendant moved for an order unsealing the November 21, 2014 Letter.[2] The Government opposed.[3]  On December 15, 2014, the Court held a sealed hearing on the motion.  The parties subsequently submitted additional correspondence on this issue, including a second <u>ex parte</u> letter by the defense.

During the December 15, 2014 hearing, the Government argued that significant information regarding what is actually known about Force's role in the investigation of Silk Road by USAO-Baltimore had long ago been disclosed to the defense in discovery.  Documents subsequently produced by the Government

---

[2] Defendant's motion <u>in limine</u> was accompanied by an <u>ex parte</u> letter-motion to unseal.

[3] On December 12, 2014, the Government submitted an <u>ex parte</u> letter providing responses to the Court's inquiries regarding the ongoing grand jury investigation of SA Force.  A redacted version of this <u>ex parte</u> letter has been provided to the defendant.

confirmed this.[4]  The defense maintained that the issues under investigation by USAO-San Francisco might have a significant bearing on this case, and that while certain information was received as part of ordinary pre-trial disclosures, information regarding Force's potentially rogue conduct was not.  Based on the discussion at the hearing and all of the submissions on this issue to date, it is clear that precisely what Force did (or did not do) remains unknown.

On December 18, 2014, defendant submitted a lengthy list of extremely broad discovery requests—seeking 28 separate categories of information relating to SA Force from the Government.  Defendant has not sought to obtain truly targeted discovery from the Government or any third party.  The Government has opposed disclosure of any of the discovery requested on the basis that it would interfere with the ongoing grand jury investigation.

Currently before this Court are the two related motions by defendant: to unseal the November 21 Letter and to compel the Government to produce the 28 enumerated categories of discovery.  Notably, none of defendant's submissions explains why it is necessary to have the entirety of the November 21 Letter unsealed and made part of the public record—versus requesting public disclosure of particular isolated facts from that Letter.  Nor has the defendant attempted to demonstrate how and why his discovery requests are appropriate under the rules and in light of the Government's assertions regarding the potential impact on the

---

[4] The Government produced a binder of documents relating to Force's role in the investigation—all of which had been previously disclosed to defendant.  These documents reveal the type of technical access Force had to the Silk Road website as part of his work for the DEA on the USAO-Baltimore investigation.

ongoing investigation. Nevertheless, the Court has carefully reviewed defendant's arguments and sets forth its ruling below. Both of defendant's applications are DENIED.

I.    BACKGROUND[5]

A.    SA Force's Role in the USAO-Baltimore Investigation

In 2012 and 2013, SA Force participated in an independent investigation of Silk Road conducted by USAO-Baltimore. USAO-Baltimore has a pending indictment against Ulbricht charging him with, inter alia, soliciting the murder-for-hire of Curtis Green ("Green"), a former Silk Road employee known by the username "Flush." (See November 21, 2014 Letter at 1, 3.) As part of his duties in connection the USAO-Baltimore investigation, SA Force infiltrated the Silk Road website under the username "Nob." (Id. at 2, 4.) Force managed to strike up an online relationship with DPR, who, the Government contends, is the creator and lead administrator of the Silk Road website. At the heart of its case against Ulbricht is the Government's contention that he is DPR.

Acting in his capacity as a special agent for the DEA, SA Force—via his Silk Road identity, Nob—portrayed himself as someone who wished to distribute large quantities of narcotics through Silk Road. (Id. at 4.) In short, Nob was a fictional "big-time drug dealer." In January 2013, DPR solicited Nob to arrange for the murder-for-hire of Green, the owner of the Flush account. (Id.) The Government intends to introduce evidence that DPR believed that Green had stolen

---

[5] The Court assumes familiarity with the underlying facts of this case.

approximately $350,000 worth of bitcoins, the currency used to effect Silk Road transactions.

According to the Government, the events leading up to the solicitation of the murder-for-hire of Green are as follows.[6] Green was arrested on narcotics charges on January 17, 2013, and began cooperating with the authorities promptly after his arrest. (See id. at 3; Government's Six-Page Letter of December 18, 2014 ("Gov't December 18, 2014 Letter") at 2.) As part of his cooperation, Green provided Force with access to the Flush account. (Gov't December 18, 2014 Letter at 2.) Force changed the login password on the Flush account to secure it for undercover purposes. (Id.)

On January 19, 2013, Force provided Green with the changed password to the Flush account so that Green could engage in online conversations with DPR as a confidential informant. (Id.) On January 26, 2013, a Silk Road support staff member with the username "Inigo"[7] informed DPR that Flush might have reset the passwords of Silk Road users in order to steal approximately $350,000 worth of bitcoins.[8] (Id. at 3.) DPR messaged Flush, accusing him of stealing the money and warning that he was "taking appropriate action." (November 21, 2014 Letter at 4.) Later that day, DPR engaged in an online TorChat with Nob, in which he told Nob

---

[6] Information regarding these events was provided to the defense in discovery.

[7] Inigo has been identified as Andrew Michael Jones, who was indicted in a separate case pending before Judge Griesa. Jones has pled guilty to the charges.

[8] The November 21, 2014 Letter notes that "[a]s a Silk Road administrator, 'Flush' had administrative privileges on the Silk Road website that gave him certain effective access to user funds, such as the ability to reset user passwords and thereby take over user accounts." (November 21, 2014 Letter at 4 n.4.)

that Flush was Green and asked Nob if he could arrange to "get someone to force [Green] to return the s [sic] funds." (Gov't December 18, 2014 Letter at 3.)  A few minutes later, Inigo informed DPR that he had successfully stopped the theft of bitcoins by resetting the password on the Flush account. (Id.)  The Government alleges that defendant subsequently ordered Nob to arrange for Green's murder in exchange for $80,000, and that defendant later informed Inigo and another associate—with the TorChat username "cimon"—that Green had been successfully executed. (Id.)

B.    The Force Investigation

USAO-San Francisco began investigating Force in the spring of 2014 after learning of suspicious transactions that Force had with a certain Bitcoin exchange company. (November 21, 2014 Letter at 2.)  Further investigation revealed that Force held accounts at several Bitcoin exchange companies, exchanged hundreds of thousands of dollars' worth of bitcoins for U.S. currency during 2013 and 2014, and transferred the U.S. currency into personal accounts. (Id.)  USAO-San Francisco also learned that Force used his position as a DEA agent to protect these funds. (Id.)  After learning this information, USAO-San Francisco has been investigating, inter alia, how SA Force acquired such a large quantity of bitcoins and whether he did so through exploiting his role in the USAO-Baltimore investigation. (Id.)

In particular, USAO-San Francisco is investigating whether SA Force may have (1) leaked information about the USAO-Baltimore investigation to Ulbricht in exchange for payment, (2) himself used access to Green's Flush account to steal the

$350,000 in bitcoins, and/or (3) received and converted to personal use payments from DPR of approximately $85,000 in bitcoins. (See id. at 2-5; Memorandum of Law in Opposition to the Defendant's Motions In Limine ("Gov't Opp.") at 15.)

The Government has represented that (1) Force did not play any role in the investigation that culminated in Ulbricht's indictment in this District, (2) the Government will not call Force as a witness at trial, and (3) the Government will not use any evidence obtained in the USAO-Baltimore investigation in this case. (Gov't Opp. at 16.) The Government also has represented that it will not seek to introduce at trial any communications between Ulbricht and Force, including communications regarding Ulbricht's alleged hiring of Nob to arrange Green's murder-for-hire. (Id. at 16 n.2.) According to the Government, Nob will be referenced at trial only in connection with TorChat logs in which Ulbricht and his alleged co-conspirators mention Nob as the party that Ulbricht solicited to arrange the murder-for-hire of Green. (See id.; Gov't December 18, 2014 Letter at 2.)

C.   Defendant's Asserted Relevance of the Force Investigation

Defendant has submitted two ex parte letters to the Court describing the ways in which information relating to or derived from the Force Investigation might be relevant, material, and exculpatory. According to defendant, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████

██████████████████████

### D.     Defendant's Discovery Requests

On December 18, 2014, defendant submitted a letter under seal that set forth 28 discovery demands for the Government.  Together, the demands seek, inter alia, any documents in the Government's possession relating to its investigation of SA Force, including financial analyses, forensic computer analyses, interview notes, reports, warrant applications, evidence obtained via searches and wiretaps, and surveillance footage.  The demands also seek any records in the Government's possession regarding SA Force's finances (specifically, records pertaining to his bank, bitcoin, and investment accounts), Internet and telephone communications, and disciplinary records or reports.[9]

## II.     LEGAL STANDARDS

### A.     Grand Jury Secrecy

The Supreme Court consistently has "recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." Douglas Oil Co. of Cal. v. Petrol Stops Nw., 441 U.S. 211, 218 (1979) (citation omitted).  The fivefold rationale for this policy is

---

[9] The breadth of the requests is evident on their face.  For example, defendant seeks without any other qualification or limitation: "bank account records from any and all bank accounts maintained by former SA Force or his spouse in the U.S. or overseas"; "the contents of any email accounts operated by former SA Force or any of his aliases"; "the contents of any and all social media accounts operated by former SA Force or any of his aliases (including but not limited Facebook, Linkedin, and/or Twitter)"; and "any and all reports prepared by the government regarding its investigation of former SA Force."  (Defendant's December 18, 2014 Discovery Requests ("Disc. Requests") ¶¶ 1, 10, 14, 17.)

> (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before the grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect the innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

In re Grand Jury Subpoena, 103 F.3d 234, 237 (2d Cir. 1996) (quoting United States v. Moten, 582 F.2d 654, 662 (2d Cir. 1978)).

Rule 6(e) implements this policy of secrecy by providing that "[r]ecords, orders, and subpoenas relating to grand-jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. 6(e)(6). "The plain language of the Rule shows that Congress intended for its confidentiality provisions to cover matters beyond those actually occurring before the grand jury: Rule 6(e)(6) provides that all records, orders, and subpoenas relating to grand jury proceedings be sealed, not only actual grand jury materials." In re Grand Jury Subpoena, 103 F.3d at 237 (emphasis in original).

"[W]hen the district court finds that disclosure of the confidential information might disclose matters occurring before the grand jury, the information should be protected by Rule 6(e)," which means "it receives a presumption of secrecy and closure." Id. at 239 (citation omitted). While this presumption is rebuttable, "[t]he

burden is on the party seeking disclosure to show a 'particularized need' that outweighs the need for secrecy." Id. (quoting Moten, 582 F.2d at 662) (internal quotation marks omitted). "A party makes a showing of particularized need by proving 'that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed.'" Id. (quoting Douglas Oil, 441 U.S. at 222). "If a showing of particularized need has been made, disclosure should occur unless the grand jury investigation remains sufficiently active that disclosure of materials would prejudice a legitimate interest of the government." Moten, 582 F.2d at 663 (citation omitted).

### B.   Discovery in Criminal Cases

#### 1.   Rule 16

"[I]n all federal criminal cases, it is Rule 16 that principally governs pre-trial discovery." United States v. Smith, 985 F. Supp. 2d 506, 521 (S.D.N.Y. 2013). Under Rule 16(a)(1)(E), a defendant is entitled to obtain from the Government documents and objects that are "within the government's possession, custody, or control" if they are "material to preparing the defense."[10] Fed. R. Crim. P. 16(a)(1)(E).

---

[10] Rule 16(a)(1)(E) also permits the defendant to obtain government documents and objects "within the government's possession, custody, or control" if "the government intends to use [them] in its case-in-chief a trial," or if they were "obtained from or belong[] to the defendant." Fed. R. Crim. P. 16(a)(1)(E). Neither scenario applies here. Additionally, under Rule 16(a)(2), the pre-trial discovery authorized by Rule 16 does not encompass "the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2). However, Rule 16(a)(2) does not enable the Government to escape potential Rule 16 discovery obligations in this case because the discovery defendant seeks does not concern the investigation or prosecution of

Evidence is "material" under Rule 16 "as long as there is a strong indication
that it will play an important role in uncovering admissible evidence, aiding witness
preparation, corroborating testimony, or assisting impeachment or rebuttal."
United States v. Stein, 488 F. Supp. 2d 350, 356-57 (S.D.N.Y. 2007) (quoting United
States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993)). "Evidence that the government
does not intend to use in its case in chief is material if it could be used to counter
the government's case or to bolster a defense." Id. at 357 (quoting United States v.
Stevens, 985 F.2d 1175, 1180 (2d Cir. 1993)). "There must be some indication that
the pretrial disclosure of the disputed evidence would . . . enable[ ] the defendant
significantly to alter the quantum of proof in his favor." Id. (alterations in original)
(quoting United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1991)).

A speculative laundry-list discovery request is improper under Rule 16. See,
e.g., United States v. Persico, 447 F. Supp. 2d 213, 217 (E.D.N.Y. 2006) (rejecting a
discovery request for "long list of items" because the request was based on "mere
conjecture"); United States v. Larranga Lopez, 05 Cr. 655 (SLT), 2006 WL 1307963,
at *7-8 (E.D.N.Y. May 11, 2006) (Rule 16(a)(1)(E) "does not entitle a criminal
defendant to a 'broad and blind fishing expedition among [items] possessed by the
Government on the chance that something impeaching might turn up.'" (alteration
in original) (quoting Jencks v. United States, 353 U.S. 657, 667 (1957))).

---

the instant case, but rather a different investigation conducted by a different U.S. Attorney's Office
concerning a different defendant. See United States v. Armstrong, 517 U.S. 456, 463 (1996) (Rule
16(a)(2) prohibits a defendant from "examin[ing] Government work product in connection with his
case." (emphasis added)); United States v. Koskerides, 877 F.2d 1129, 1133-34 (2d Cir. 1989)
(purpose of Rule 16(a)(2) is to protect prosecutors' interest in protecting communications concerning
trial tactics).

Rule 16(d)(1) provides that the Court may "[a]t any time" deny pre-trial discovery "for good cause," which may be shown "by a written statement that the court will inspect ex parte." Fed. R. Crim. P. 16(d)(1). "[C]ourts have repeatedly recognized that materials . . . can be kept from the public if their dissemination might 'adversely affect law enforcement interests.'" <u>Smith</u>, 985 F. Supp. 2d at 531 (quoting <u>United States v. Amodeo</u>, 71 F.3d 1044, 1050 (2d Cir. 1995)) (collecting cases).

For example, in <u>Smith</u>, the Government sought a protective order for materials concerning an ongoing investigation of possible misconduct in connection with the case. <u>Id.</u> at 516. The Government submitted an <u>ex parte</u> letter that "provided specific details of ongoing investigations that [we]re related to the discovery materials" sought. <u>Id.</u> at 531. The Court ruled that the Government established "good cause" for the protective order under Rule 16(d)(1), noting that the possible public disclosure of an ongoing investigation "could alert the targets of the investigation and could lead to efforts by them to frustrate the ongoing investigations." <u>Id.</u> at 531-35.

2.   <u>Rule 17</u>

A party seeking to issue a Rule 17 subpoena must demonstrate that the materials sought are (1) relevant, (2) admissible, and (3) specific. <u>United States v. Nixon</u>, 418 U.S. 683, 700 (1974); <u>see also</u> <u>United States v. Cuti</u>, 528 Fed. App'x 84, 86 (2d Cir. 2013) ("Under <u>Nixon</u>, a party moving for a pretrial Rule 17(c) subpoena, must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." (internal quotation marks omitted)). "Rule 17 subpoenas are properly used to obtain

admissible evidence, not as a substitute for discovery." United States v. Barnes, 560 Fed. App'x 36, 39 (2d Cir. 2014) (summary order) (citing United States v. Murray, 297 F.2d 812, 821 (2d Cir. 1962)).

The party seeking the Rule 17(c) subpoena "must be able to 'reasonably specify the information contained or believed to be contained in the documents sought' rather than 'merely hop[e] that something useful will turn up.'" United States v. Louis, No. 04 Cr. 203, 2005 WL 180885, at *5 (S.D.N.Y. Jan. 27, 2005) (alteration in original) (quoting United States v. Sawinski, No. 00 CR 499(RPP), 2000 WL 1702032, at *2 (S.D.N.Y. Nov. 14, 2000)).  Courts in this District have repeatedly noted that Rule 17 does not countenance fishing expeditions; subpoenas cannot simply seek broad categories of documents without an articulation of how they will enable defendants to obtain specific admissible evidence that is probative of defendant's guilt.  E.g., United States v. Mendinueta-Ibarro, No. 12 Cr. 379 (VM), 2013 WL 3871392, at *2 (S.D.N.Y. July 18, 2013) ("Subpoenas seeking 'any and all' materials, without mention of 'specific admissible evidence,' justify the inference that the defense is engaging in the type of 'fishing expedition' prohibited by Nixon." (citing Louis, 2005 WL 180885, at *5)); United States v. Binday, 908 F. Supp. 2d 485, 492-93 (S.D.N.Y. 2012) (rejecting Rule 17 subpoena seeking "vast array of documents" because it was "a fishing expedition, not a targeted request for evidentiary matters"); Louis, 2005 WL 180885, at *5 (rejecting Rule 17 subpoena requesting "any and all" documents relating to "several categories of subject matter (some of them quite large), rather than specific evidentiary items").

Rule 17(c)(2) provides that "[o]n motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2).

### 3.    Brady

Under Brady v. Maryland, 373 U.S. 83 (1963), the Government has a constitutional duty to disclose favorable and material information to the defendant, id. at 87. However, "Brady is not a rule of discovery—it is a remedial rule." United State v. Meregildo, 920 F. Supp. 2d 434, 440 (S.D.N.Y. 2013) (citing United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001)). Brady imposes a disclosure obligation on the Government; it does not give defendant a constitutional entitlement to obtain discovery. See Weatherford v. Bursey, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and Brady did not create one . . . ."); see also United States v. Bonventre, No. 10CR228–LTS, 2014 WL 3673550, at *22 (S.D.N.Y. July 24, 2014) (court denied discovery request under Brady because Brady is "not a discovery doctrine that could be used to compel the Government to gather information for the defense"); Meregildo, 920 F. Supp. 2d at 439 ("An interpretation of Brady to create a broad, constitutionally required right of discovery would entirely alter the character and balance of our present systems of criminal justice." (quoting United States v. Bagley, 473 U.S. 667, 675 n.7 (1985))).

## III.    DISCUSSION

### A.    Motion to Unseal the November 21, 2014 Letter

It is undisputed that the November 21, 2014 Letter "relates to" an ongoing grand jury investigation, Fed. R. Crim. P. 6(e), such that unsealing the Letter

"might disclose matters occurring before the grand jury," In re Grand Jury Subpoena, 103 F.3d at 239. The Government has repeatedly represented that unsealing information regarding the Force Investigation would result in significant prejudice to the integrity of the investigation. Specifically, the attorneys handling the grand jury investigation believe that disclosure "threatens to harm the investigative process, by revealing to Force or others the full scope of the Government's investigation, which is currently unknown to Force." (See Government's December 19, 2014 Letter at 1.) Such a revelation may cause Force— as well as potential co-conspirators, aiders and abettors, and others—to flee, intimidate witnesses, destroy evidence, and conceal proceeds of criminal activity.[11] (Id. at 2.)

The November 21, 2014 Letter thus is entitled to "a presumption of secrecy and closure." Id. (citation omitted). To overcome this presumption, defendant must make a showing of "particularized need" by proving that disclosure of the November 21, 2014 Letter is "needed to avoid a possible injustice," "that the need for disclosure is greater than the need for continued secrecy," and that defendant's "request is structured to cover only material so needed." Id. (quoting Douglas Oil, 441 U.S. at 222). Defendant has not carried this burden here.

---

[11] The Government's letter of December 12, 2014 sets forth additional reasons why disclosure of the November 21, 2014 Letter threatens to jeopardize the ongoing investigation of SA Force. First, there is a serious risk that the significant level of media attention that the allegations against SA Force would likely generate would "influence the information or testimony provided by witnesses, bias grand jury members, or otherwise impact the integrity of the investigative process." In addition, disclosure of the investigation at this time would risk publicly airing suspicions of wrongdoing that may not materialize due to lack of evidence.

15

1.   "Possible Injustice"

    a.   Defendant's arguments

Defendant argues that "evidence of an investigation of former SA Force is exculpatory, and thus <u>Brady</u> material.'" (Memorandum of Law in Support of Defendant Ross Ulbricht's Motions In Limine at 29.)  Defendant describes the supposed exculpatory value of the November 21, 2014 Letter in two <u>ex parte</u> letters to the Court.







> b.    Analysis

Defendant has not made a showing that either the fact of the Force Investigation or the information learned during that investigation is "needed to avoid a possible injustice."  Contrary to defendant's arguments, the statements in the November 21, 2014 Letter are not exculpatory.[13]

In discovery, the Government produced information that (1) the Nob account was controlled by an undercover DEA agent, (2) Green a/k/a Flush was arrested in January 2013 on narcotics charges, and (3) the undercover agent had obtained access to the Flush account

---

[13] If anything, the November 21, 2014 Letter is inculpatory.  The Letter indicates that SA Force may have leaked information about USAO-Baltimore's investigation to DPR in exchange for payment.  If Ulbricht is DPR, this is evidence of Ulbricht's criminal state of mind and attempts to protect his criminal enterprise by purchasing investigative information.

after Green's arrest. (Gov't December 18, 2014 Letter at 2.) ███████████

███████████████████████████████████

███████████████████████████████████

To whatever extent this provides a basis for a defense, it has been known to the
defendant for some time. It is not news. The defense also learned in discovery that
the Flush account may have had administrative privileges. In fact, the Government
produced evidence that, on January 26, 2013, Inigo told DPR that Flush may have
stolen $350,000 in bitcoins by resetting the passwords of Silk Road users. (See id.
at 3.) ███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████

The only <u>new</u> information in the November 21, 2014 Letter is that USAO-San
Francisco is investigating whether Force may have stolen the $350,000 in bitcoins,
converted other bitcoins to personal use, and/or leaked investigative information to
DPR. ███████████████████████████████

Notably, "USAO-San Francisco has not uncovered any evidence that Force
fabricated any evidence against the defendant or the 'Dread Pirate Roberts' online
persona." (Gov't December 18, 2014 Letter at 4.) To the contrary, there is
persuasive evidence that no such fabrication occurred. (See id. at 4-5.)

Nor does the November 21, 2014 Letter help attack the Government's murder-for-hire allegations. The Government alleges that Ulbricht solicited Green's murder-for-hire in part because he believed that Green had stolen the $350,000 in bitcoins. The fact that SA Force may have been responsible for the theft is irrelevant unless defendant knew about it, and there is no evidence that he did. As the Government correctly points out, "[r]egardless of whether SA Force, Green or anyone else stole the Bitcoins, the identity of the culprit is wholly irrelevant to the fact that the defendant <u>believed</u> that they were stolen by his employee, 'Flush'" (Government's Opp. at 17) and that Flush was Green. ███████████████

███████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████

██████████████████████████████████

███████████████████████████████████

████████████████████████████████████



Importantly, nothing about the Force Investigation prevents defendant from doing that which he could always do: presenting a theory supported by the technical capabilities of Silk Road and the materials produced in discovery. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ To be clear, to the extent the Government now or at any point in the future develops any exculpatory information, such as information suggesting that Force did fabricate evidence against DPR, it would have a Brady obligation to disclose it to the defense. The Government has affirmed that it fully understands its obligations under Brady, that it currently knows of no exculpatory information, and that, if it acquires any exculpatory material, it will readily produce it to the defense. (See, e.g., Government's December 19, 2014 Letter at 4.) The Court has no reason to believe that the Government has not complied with all of its Brady disclosure obligations to date or that it will not comply with those obligations in the future.

The Court finds that defendant has not met his burden of showing that unsealing the November 21, 2014 Letter is "needed to avoid a possible injustice." The Government's ongoing Brady obligations, as well as its representation that it will not call SA Force as a witness at trial, will not use any evidence obtained in the USAO-Baltimore investigation, and will not seek to introduce any communications between Ulbricht and SA Force further mitigate the (virtually non-existent) risk of "possible injustice" from maintaining the November 21, 2014 Letter under seal.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2.    Need for Disclosure Versus Need for Continued Secrecy

Defendant also has not demonstrated that any "need for disclosure is greater than the need for continued secrecy." The grand jury investigation of SA Force is ongoing, and the Government has indicated that unsealing the November 21, 2014 Letter would result in significant prejudice to the integrity of the investigation. The Court credits this statement. In particular, after consultation with USAO-San Francisco, the Government has advised the Court that disclosure of the November 21, 2014 Letter threatens to compromise the investigative process by revealing to SA Force the full scope of the investigation against him. Learning about the full range of misconduct that is the subject of the USAO-San Francisco investigation might jeopardize that investigation by causing Force, and others, to flee, destroy evidence, conceal criminal proceeds, and/or intimidate witnesses. (Government's December 19, 2014 Letter at 2.) Under these circumstances, the Court finds that the minimal, if any, value of the November 21, 2014 Letter to Ulbricht's defense is significantly outweighed by the need for continued secrecy.

3.    Structure of the Request

Finally, the Court finds that defendant's request to unseal the November 21, 2014 Letter is not "structured to cover only material" needed to avoid a possible injustice. Rather than requesting to unseal specific facts from the Letter and explaining why disclosure of those facts is necessary for a fair trial, defendant seeks to unseal the entire Letter based on broad, vague allegations that it contains exculpatory information.

In sum, the Court finds that defendant has failed to make a showing of "particularized need" sufficient to overcome the presumption of secrecy. Moreover, even if defendant had made such a showing, the Court nonetheless would conclude that the November 21, 2014 Letter should remain under seal while the grand jury investigation of SA Force is ongoing. See Moten, 582 F.2d at 663 ("If a showing of particularized need has been made, disclosure should occur unless the grand jury investigation remains sufficiently active that disclosure of materials would prejudice a legitimate interest of the government." (emphasis added) (citation omitted)); In re Grand Jury Subpoena, 103 F.3d at 240 ("We have grave doubts as to whether Appellants made a showing of particularized need to the district court. Yet, even were we to decide that they had, we would not favor opening the hearing to the press while the grand jury investigation is on-going.").

Over the course of the trial, defense counsel may find that they have a basis to believe that specific information in the November 21, 2014 Letter is useful or necessary for effective cross-examination. If such a situation arises, defense counsel should so inform the Court and make a proffer as to the probative value of the particular information sought to be disclosed.

B.   Defendant's Discovery Requests

Defendant is not entitled to the discovery he seeks either under the Federal Rules of Criminal Procedure or under Brady.

1.   Rule 16 Discovery

The evidence defendant seeks does not meet the threshold of materiality required by Rule 16(a)(1)(E), as there is at present no strong indication that the

discovery defendant seeks will play an important role in uncovering admissible evidence or will significantly aid in the preparation of defendant's case.  As the Government long ago produced discovery regarding SA Force's access to administrative privileges on Silk Road, the only information that should be new to defendant is that SA Force is being investigated for leaking information, and the conversion and/or theft of bitcoins.  Defendant has not articulated a coherent and particular reason why the fact of SA Force's investigation, or the fruits of that investigation, could themselves "counter the government's case" or "bolster a defense."  Stein, 488 F. Supp. 2d at 357 (quoting Stevens, 985 F.2d at 1180).

Indeed, this much is made clear by defendant's open-ended laundry list of discovery demands, which represent precisely the kind of speculative fishing expedition not permitted by Rule 16.  For instance, defendant seeks discovery as to "bank account records from any and all bank accounts maintained by former SA Force or his spouse in the U.S. or overseas," (Disc. Requests ¶ 1), which could encompass SA Force's spouse's bank statements from the time before she married SA Force.  Defendant also seeks "the contents of any email accounts operated by former SA Force or any of his aliases," (Disc. Requests ¶ 10), which could encompass all of SA Force's non-work-related emails and emails relating to investigations other than that of Silk Road.  Indeed, eighteen of defendant's twenty-eight requests request "any and all" materials in a particular category, and none is time-delimited. Such broad and speculative requests are inappropriate under Rule 16.  To the extent that the defendant requests issuance of truly targeted requests, and can

support those requests under the rules, the Court will review those and make an individualized determination.

Finally, the Court notes that it is not unusual for the Government to investigate many aspects of a criminal case and numerous people involved at the same time, nor (sadly) is this the first occasion on which a court has confronted a situation in which the Government's own investigative team has been accused of misconduct in the course of an investigation. See, e.g., Brown v. United States, No. 1:10 CV 752, 2014 WL 4231063, at *1-2 (N.D. Ohio 2014) (DEA agent indicted by a grand jury on charges of creating incriminating evidence, withholding exculpatory evidence, and committing perjury). The fact that multiple investigations of criminal conduct occur simultaneously does not mean that—even if related as to certain facts—one must or even should await the outcome of the other. It is perfectly appropriate for the Government, in the reasonable exercise of its prosecutorial discretion, to pursue charges as and when it deems it appropriate and necessary. Except in unusual circumstances, courts should not attempt to alter the Government's chosen timing.

In any event, even assuming arguendo that the information defendant seeks is material, good cause exists under Rule 16(d)(1) for denying defendant's request. Here, as in Smith, disclosure of the materials sought by defendant could alert Force to the full scope of the ongoing grand jury investigation and lead to efforts by him to frustrate the investigation. Defendant's pre-trial discovery requests are accordingly DENIED under Rule 16.

2.    Rule 17 Subpoenas

In its December 19, 2014 letter, the Government opposed the issuance of any Rule 17 subpoenas based on defendant's discovery requests.  Rule 17 subpoenas must be limited to information that is specific, relevant, and admissible.  As explained above, defendant's requests collectively seek "any and all" materials with regard to several broad categories of information, and defendant has not articulated any specific items of admissible evidence he seeks.  Simply put, were defendant to request the materials he seeks via Rule 17 subpoenas, he would be engaged in "a fishing expedition, not a targeted request for evidentiary matters."  Binday, 908 F. Supp. 2d at 492.  Further, and again as explained above, the issuance of Rule 17 subpoenas in this case could endanger the ongoing grand jury investigation of SA Force.  Accordingly, the issuance of subpoenas based on defendant's discovery requests would be "unreasonable or oppressive" under Rule 17(c)(2), and therefore inappropriate.

3.    Brady

Brady does not provide a vehicle for defendant to obtain the discovery he seeks—it imposes an obligation on the Government to apprise defendant of any exculpatory information obtained via the Force Investigation, but it does not entitle defendant to obtain access to materials from that grand jury investigation, or for that matter any other materials.  The Government has an ongoing Brady obligation in this case; this means that to the extent there is any information revealed or developed during the Force Investigation that is material and potentially exculpatory, the Government must disclose such information to the defense.

27

The Court is aware that defendant argues that the Government cannot know what may be exculpatory as it may not anticipate certain defenses. This is as true here as in any case. To the extent that defendant wants to ensure that the Government provides exculpatory information of which it is aware and that is responsive to a particular theory, it must give the Government enough information to understand that theory. Opening statements are only two weeks away, and the mysteries of the defense theories will be largely revealed at that time; defendant's tactical interest in preserving the mystery of a particular defense theory may now be outweighed by his desire to determine whether particular information supportive of that theory has come to light.

IV.    CONCLUSION

For the reasons set forth above, defendant's motion to unseal the November 21, 2014 Letter and discovery requests are DENIED. As explained above, the Court will, over the course of the trial, entertain specific requests to use information from the November 21, 2014 Letter on cross-examination. In addition, if, during the course of the trial, the Government opens the door to specific information or facts develop which render particularized disclosure of facts or documents relevant, the Court will entertain a renewed application at that time.

Dated:    New York, New York
          December 22, 2014

KATHERINE B. FORREST
United States District Judge

**JOSHUA L. DRATEL, P.C.**

A PROFESSIONAL CORPORATION

29 BROADWAY

Suite 1412

NEW YORK, NEW YORK 10006

---

TELEPHONE (212) 732-0707

FACSIMILE (212) 571-3792

E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL                                      STEVEN WRIGHT
—                                                *Office Manager*
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

December 30, 2014

**BY ELECTRONIC MAIL**

**FILED UNDER SEAL**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:    *United States v. Ross Ulbricht*,
14 Cr. 68 (KBF)

Dear Judge Forrest:

This letter is submitted on behalf of defendant Ross Ulbricht, whom I represent in the above-entitled case, and, in light of the Court's December 22, 2014, Sealed Memorandum & Decision (hereinafter "December 22, 2014 Opinion"), seeks an adjournment of trial until the government completes its grand jury investigation of former Drug Enforcement Administration Special Agent Carl Force, and the full nature of his alleged misconduct is known, and available to Mr. Ulbricht's defense.

The Court's December 22, 2014 Opinion states that "it is clear that precisely what Force did (or did not do) remains unknown." *Id.*, at 3. Yet that is only because it is the government that is in sole possession of that information, and is in exclusive control of the investigation, and because the government's now ten-month long investigation of former SA Force is not complete.

Under such circumstances, Mr. Ulbricht is compelled to request an adjournment of the trial until the government's investigation is complete, and the defense can have access to and the use of the information gathered as a result of the investigation (through either the government or independent means, which at present are foreclosed to the defense).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
December 30, 2014
Page 2 of 3

While the Court's December 22, 2014 Opinion also states, at 22, that the government "has affirmed that . . . if it acquires any exculpatory material, it will readily produce it to the defense[,]"[1] such production during trial or even at this late date would not be sufficient to provide Mr. Ulbricht effective use thereof. Also, obviously, learning of such information *after* trial would be entirely ineffectual.

Similarly, admonishing the government that if it "opens the door" at trial, the issue can be revisited, *id.*, at 28, fails to provide Mr. Ulbricht sufficient ability to utilize the information, as investigation and pursuit of documents and other materials cannot be accomplished on such short notice and in the middle of trial. Indeed, the breadth of the defense's discovery requests – all of which are consistent with what the grand jury surely has assembled from various sources – is the result of the lack of the defense's ability to do *anything* at present on its own to pursue the investigation of former SA Force. Delaying that process until mid-trial only amplifies and aggravates the problem therein.

Indeed, in its December 19, 2014, letter to the Court, the government protests that "allowing the defense to pursue the Defense Requests [for discovery] would entail a substantial delay of trial, as both gathering of responsive documents and the opportunity for review by the defense would take several weeks at a minimum." Yet that problem is one of the government's own making given its eleventh-hour disclosure of matters under investigation for the past ten months, and is not a basis for precluding Mr. Ulbricht's use of the information. Rather, it is an indisputable justification for adjourning the trial.

Accommodating the government's desire to maintain the secrecy of its extended investigation of former SA Force and protection of Mr. Ulbricht's constitutional rights are not mutually exclusive interests, and the only solution that accomplishes both objectives is an adjournment of trial. Otherwise, Mr. Ulbricht's Fifth Amendment right to Due Process and a fair trial, and his Fifth and Sixth Amendment rights to prepare and present a defense, will be violated, and he will be denied his Sixth Amendment right to compulsory process, as he would otherwise subpoena former SA Force and/or any other witnesses who could provide testimony at trial.

As noted in my prior December 16, 2014, sealed letter (at n. 2), examining former SA Force without the use of the information disclosed in the government's November 21, 2014, letter – and thereby limited to what suits the government – would be meaningless to the defense.

---

[1] The government's ability even to acknowledge what is "exculpatory" is doubtful given its refusal to acknowledge that what it has already disclosed with respect to former SA Force is exculpatory – even though it is patent that its exculpatory character, rather than any other discovery obligation, is what motivated disclosure "in an abundance of caution."

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
December 30, 2014
Page 3 of 3

However, it would be the defense's intention to subpoena former SA Force if the full range of his conduct (and/or misconduct) were accessble for inquiry.  Consequently, the defense has prepared a subpoena for former SA Force, and will serve it conditionally, and only on the prosecutors in this case, and not on former SA Force (in order to abide by the Court's ruling denying the motion to unseal the government's November 21, 2014, letter).

In addition, Mr. Ulbricht would be denied his Sixth Amendment right to confrontation, as the government's attempt to introduce former SA Force's undercover identity as "Nob" – through references to him that will involve hearsay, and certainly implicate Nob's communications in significant fashion – in the case without providing Mr. Ulbricht opportunity to cross-examine him (or call him or others as witnesses in any meaningful manner) simply constitutes an attempted end-run around Mr. Ulbricht's Sixth Amendment right to confrontation. Moreover, Mr. Ulbricht's Sixth Amendment right to effective assistance of counsel is also compromised by the limitations placed on counsel's advocacy, investigation, and preparation with respect to former SA Force's alleged misconduct.

The government's effort to use its ongoing grand jury investigation as both a sword and shield cannot be reconciled with Mr. Ulbricht's right to a fair trial.  Accordingly, for all the reasons set forth above, as well as in Mr. Ulbricht's previously filed submissions on this subject (as well as the sealed portion of the court conference devoted to this issue), the only appropriate solution is an adjournment of the trial until the government's investigation of former SA Force is complete, and the defense can effectively pursue and ultimately use at trial the information disclosed.  Having the trial proceed first puts the cart plainly, and unconstitutionally, before the horse.

Respectfully submitted,

Joshua L. Dratel

JLD/
cc:    Serrin Turner
       Timothy T. Howard
       Assistant United States Attorneys

ORDERED:

The Government shall submit any response not later than 12/31/2014 at 6 P.M.

12/30/2014

KATHERINE B. FORREST
United States District Judge



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

TO BE FILED UNDER SEAL

December 30, 2014

By Electronic Mail
Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:    *United States v. Ross William Ulbricht*, S1 14 Cr. 68 (KBF)

Dear Judge Forrest:

The Government writes respectfully to respond to the defendant's letter submitted under seal earlier today, requesting an adjournment of trial until the conclusion of the pending grand jury investigation of former DEA Special Agent Carl Force. The request essentially seeks to relitigate the issues this Court has already adjudicated in its December 22, 2014 sealed opinion, and should be denied.

The defense's request is premised on the notion that the Force investigation is likely to uncover exculpatory evidence as to the defendant; yet, as the Court has already found, the defense "has not made a showing that either the fact of the Force Investigation or the information learned during that investigation is 'needed to avoid a possible injustice.'" Slip op. at 18. Indeed, the disclosures made by the Government about the investigation to date are "not exculpatory," but rather, "if anything," are "*in*culpatory." *Id.* at 18 & n.13. From the outset, the Government has made clear that the investigation of former SA Force concerns only possible corruption on former SA Force's part rather than anything suggestive of the defendant's innocence. In particular, the investigation does not concern, and has not yielded any indication of, suspected fabrication of evidence, entrapment, or any other conduct by former SA Force that would tend to exculpate the defendant. Accordingly, postponing trial until the Force investigation is over would do nothing except unnecessarily delay these proceedings by several months or longer, to the detriment of the public's right to a speedy trial. *See United States v. Didier* 542 F.2d 1182, 1188 (2d Cir. 1976) ("[T]he right to a speedy trial belongs not only to the defendant, but to society as well.") (internal quotation marks and citation omitted). Again, as stated in the Court's opinion: "The fact that multiple investigations of criminal conduct occur simultaneously does not mean that – even if related as to certain facts – one must or even should await the outcome of the other." Slip op. at 26.

Contrary to the defense's assertion, proceeding with trial will not deny the defendant his "Sixth Amendment right to confrontation." (Ltr. at 3). The Government is not planning to call former SA Force as a witness, and therefore there is no issue of the defendant being deprived of the right to cross-examine him. Nor is the Government is even planning to use any communications of former SA Force as evidence in the case; and even if it were, those communications would not constitute testimonial hearsay implicating the defendant's Sixth Amendment confrontation rights. (Introducing such communications would be no different from introducing a defendant's recorded conversations with an undercover agent on a wiretap or consensual recording, for example.)

As for the defendant's Sixth Amendment right to subpoena witnesses, the Government has never contended that the pending investigation of former SA Force would necessarily prevent the defendant from subpoenaing him to testify *if* the testimony the defendant sought to elicit was material to the defense. However, it appears that the defendant seeks to call former SA Force as a witness merely to elicit the facts surrounding the pending corruption investigation of him. As the Government has previously argued, eliciting such testimony would not merely jeopardize the pending investigation of former SA Force, but it would also plainly be more prejudicial than probative, as it would threaten to turn the trial into a sideshow about former SA Force rather than an adjudication of the guilt or innocence of the defendant. Accordingly, the Government would object to the defense calling former SA Force as a witness simply based on Rules 401 and 403 – regardless of whether the subpoena was issued before or after the conclusion of the grand jury investigation.

In this regard, the Government notes that the defense's letter indicates that the defense has prepared a subpoena for former SA Force to be served "conditionally" on "the prosecutors in this case," as opposed to former SA Force himself. (Ltr. at 3). To the extent the defense means to say that it plans to attempt service of a subpoena on former SA Force by serving the subpoena on the Government, such an attempt at service would be improper. Former SA Force is no longer a federal employee whom the Government has the power to produce at trial; and undersigned counsel are not authorized to accept service on his behalf. Any subpoena served by the defense on former SA Force would thus have to be served personally. However, in order to protect the pending grand jury investigation of former SA Force, the Government respectfully requests that the defense be required to move the Court for permission to serve any trial subpoena on former SA Force, and to give notice to the Government of any such motion, so that the Government has the opportunity to oppose. There is no need for the defense to serve a subpoena on former SA Force merely to trigger litigation over the relevance of his potential testimony. *See United States v. Boyle*, No. 08 Cr. 523 (CM), 2009 WL 484436, at *3 (S.D.N.Y. Feb. 24, 2009) (explaining that requiring a party to make a motion to issue a subpoena is a permissible and advisable procedure where the subpoena is likely to result in a motion to quash).

Accordingly, the Government respectfully requests that the Court deny the defense's request for an adjournment of trial. The Government further respectfully requests that the Court require the defense to move for permission before serving any subpoena on former SA Force, and to notify the Government of such motion, so that the Government may oppose.

Respectfully,

PREET BHARARA
United States Attorney

By: _____

SERRIN TURNER
TIMOTHY T. HOWARD
Assistant United States Attorneys
Southern District of New York

Cc:    Joshua Dratel, Esq. (by electronic mail)

Ordered (under seal):

Defendant's motion to adjourn the trial is DENIED. The Court shall provide reasons on the record on January 13, 2015. Any subpoena on former SA Force must be made on motion with notice to the Government. Such a motion would need to be accompanied by a showing that the proposed witness would provide testimony admissible at trial and meet all other applicable rules.

SO ORDERED.

_____  12/31/14

KATHERINE B. FORREST
United States District Judge

3



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

TO BE FILED UNDER SEAL

February 1, 2015

By Electronic Mail

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

        Re:    *United States v. Ross William Ulbricht*, S1 14 Cr. 68 **(KBF)**

Dear Judge Forrest:

        The Government writes to express its objections to proposed Defense Exhibit E (attached to this letter as Exhibit 1), which was provided to the Government on the evening of January 31, 2015. Defense Exhibit E consists of a redacted version of a chat over the Silk Road messaging system between "Dread Pirate Roberts" and "DeathFromAbove," in an apparent attempt to cast Anand Athavale as an alternative perpetrator. As discussed in greater detail below, Defense Exhibit E contains inadmissible hearsay, as it seeks to use statements made by "DeathFromAbove" for the truth in support of an alternative perpetrator theory. Further, it seeks to redact important context from the conversation, which indicates that "DeathFromAbove" was seeking to extort the "Dread Pirate Roberts" based on information regarding the "Dread Pirate Roberts'" attempts to solicit the murder for hire of Curtis Green, a/k/a "Flush." This is a back-door attempt to re-inject former DEA Special Agent Carl Force into the case. When the full version of the conversation is viewed, in the context of evidence recovered from the defendant's laptop and information recently obtained from USAO-San Francisco that Force controlled the "DeathFromAbove" account, it is apparent that there is no probative value to this evidence, and that any potential probative value is substantially outweighed by the potential of unfair prejudice, confusion of the issues, and misleading the jury. Accordingly, to the extent that the defendant makes a spurious claim that this is not being offered for the truth, it should be excluded under Rule 403.

        The redactions proposed by the defendant eliminate critical context to the conversation. Defense Exhibit E simply contains references to statements made by "DeathFromAbove" to the "Dread Pirate Roberts," in which "DeathFromAbove" asserts that he believes that "Dread Pirate

Roberts" is Mr. Athavale.  The complete version of the conversation as it occurred over the Silk Road messaging system (attached hereto as Exhibit 2) provides important context, indicating that it started on or about April 1, 2013, when "DeathFromAbove" started making accusations that the "Dread Pirate Roberts" was responsible for the disappearance and death of Curtis Green, a/k/a "Flush."  The "Dread Pirate Roberts" only responds once during the conversation, in an April 6, 2013 message in which he states:

> I don't know who you are or what your problem is, but let me tell you one thing:  I've been busting my ass every god damn day for over two years to make this place what it is.  I keep my head down, I don't get involved with the drama and I do the right thing at every turn.  Somehow that isn't enough.  Somehow psychotic people still turn up at my doorstep.  I've been scammed, I've been stolen from, I've been hacked, I've had threats made against the site, I've had threats made against the community, and now, thanks to you, I've had threats made against my life.  I know I am doing a good thing running this site.  Your threats and all of the other psychos aren't going to deter me.  That's all I say to you.  I won't answer your questions, or get sucked in to whatever trip you are on.  I have much more important things to do.  Stop messaging me and go find something else to do.

"DeathFromAbove" continues to make threats of violence against "Dread Pirate Roberts," until, on April 16, 2013 (the portion that the defendant wants admitted) "DeathFromAbove" ultimately provides Mr. Athavale's personal identifiers, and demands a payment of $250,000 in United States currency as "punitive damages" for Green's death, and otherwise threatens to provide information to law enforcement that Mr. Athavale is "Dread Pirate Roberts."

The statements made by "DeathFromAbove" are inadmissible hearsay.  They are plainly offered for the truth, in another, utterly frivolous attempt by the defendant to put forward Mr. Athavale as an alternative perpetrator.  Any claim by the defendant that this evidence is not offered for the truth is spurious and belied by the defendant's prior improper attempts to seek to have Special Agent Jared DerYeghiayan testify on cross-examination as to his undeveloped *suspicions* of Mr. Athavale at an early stage of his investigation.

Even if not precluded by the hearsay rules, these statements further present a significant danger of unfair prejudice under Rule 403 in supporting an inference of alternative perpetrator, as the record lacks any legitimate evidence that can link Mr. Athavale to the crimes charged. As the Second Circuit has noted, where a defendant seeks to offer evidence that an "alternative perpetrator" committed the crime charged, a court must be especially careful to guard against the danger of unfair prejudice under Rule 403, for "[t]he potential for speculation into theories of third-party culpability to open the door to tangential testimony raises serious concerns."  *Wade v. Mantello*, 333 F.3d 51, 61 (2d Cir. 2003).  As the Second Circuit explained in *Wade*:

> In the course of weighing probative value and adverse dangers, courts must be sensitive to the special problems presented by

2

> 'alternative perpetrator' evidence.  Although there is no doubt that
> a defendant has a right to attempt to establish his innocence by
> showing that someone else did the crime, a defendant still must
> show that his proffered evidence on the alleged alternative
> perpetrator is sufficient, on its own or in combination with other
> evidence in the record, to show a nexus between the crime charged
> and the asserted 'alternative perpetrator.'  It is not sufficient for a
> defendant merely to offer up unsupported speculation that another
> person may have done the crime.  Such speculative blaming
> intensifies the grave risk of jury confusion, and it invites the jury to
> render its findings based on emotion or prejudice.

*Id.* at 61-62 (quoting *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir.1998) (citation omitted); *see also DiBenedetto v. Hall*, 272 F.3d 1, 8 (1st Cir. 2001) ("Evidence that tends to prove a person other than the defendant committed a crime is relevant, but there must be evidence that there is a connection between the other perpetrators and the crime, not mere speculation on the part of the defendant."); *People of Territory of Guam v. Ignacio*, 10 F.3d 608, 615 (9th Cir. 1993) ("Evidence of third-party culpability is not admissible if it simply affords a possible ground of suspicion against such person; rather, it must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense."); *Andrews v. Stegall*, 11 Fed. Appx. 394, 396 (6th Cir. 2001) ("Generally, evidence of third party culpability is not admissible unless there is substantial evidence directly connecting that person with the offense.").[1]

Any evidence that Mr. Athavale was an alternative perpetrator must be carefully scrutinized.  In order to introduce evidence that Mr. Athavale was the "alternative perpetrator" in this case, the defense must offer evidence of a direct and substantial connection between Mr. Athavale and Silk Road based on *actual fact*.  The record simply does not support any such direct and substantial connection.  Rather, the only testimony received by the jury regarding Mr. Athavale was testimony from Special Agent DerYeghiayan on cross examination acknowledging that Mr. Athavale: (1) is a Canadian citizen who resided in Vancouver; (2) was at one time connected to "half a page" of different IP addresses; (3) is a libertarian with a profile on the mises.org website; and (4) frequently used terms and spelled words on the mises.org website in a similar manner to the way that "Dread Pirate Roberts" was known to use them on Silk Road, including "labour," "real-time," "lemme," "rout," "intellectual laziness," "agorism," and "agorist." *See Tr.* 672:23-678:25, 813:6-819:9.  The association between Mr. Athavale and the charged offenses is insubstantial on this record, such that that Defense Exhibit E "invite[s] testimony that [is] both distracting and inflammatory" and "pose[s] a danger of turning attention away from issues of [defendant's] culpability."  *Wade v. Mantello*, 333 F.3d at 61.

The substantial risk of unfair prejudice in the admission of statements by "DeathFromAbove," is further compounded when the full conversation is viewed in the context of other evidence.  First, the defendant's computer contained a file, received into evidence as

---

[1] Additional legal support for these propositions is detailed on page 12 of the Government's prior letter in this matter dated February 1, 2015.

Government Exhibit 241, which reflects the fact that the defendant did not in fact feel threatened by "DeathFromAbove."  Specifically, the unredacted version of Government Exhibit 241 (attached hereto as Exhibit 3), reflects the following entries, which correspond in timing and content to the conversation with "DeathFromAbove":[2]

> 04/02/2013
>
> got death threat from someone (DeathFromAbove) claiming to know I was involved with Curtis' disappearance and death. messaged googleyed about it. goog says he doesn't know. user is prolly friend of Curtis who he confided his plan to.
>
> * * *
>
> 4/10/2013
>
> being blackmailed again. someone says they have my ID, but hasn't proven it.
>
> * * *
>
> 4/13/2013
>
> guy blackmailing saying he has my id is bogus

The full context of the conversation makes plain that the defendant received the threat from "DeathFromAbove," and then rejected it as without substance after "DeathFromAbove" repeatedly incorrectly referred to him as "Anand."[3]

Further, it is important to note that it appears that "DeathFromAbove," was controlled by former Special Agent Force, based on information that was recently obtained from USAO-San Francisco regarding their ongoing grand jury investigation into Force.  Following the defendant's first attempt to seek to use Defense Exhibit E with Special Agent DerYeghiayan, the Government consulted with the lead Assistant U.S. Attorney handling the Force investigation, who provided evidence that Force controlled the "DeathFromAbove" account and sent the

---

[2] The version of Government Exhibit 241 that was received in evidence is redacted to exclude references to the Curtis Green "murder for hire."  The Court previously ruled that the Government was permitted to present evidence regarding the murder-for-hire of Green. Although the Government agreed with the ruling of the Court, it elected to forego presenting evidence regarding that incident at trial, and has redacted references to the incident at the request of defense counsel.

[3] By omitting the full context of the conversation, the defendant also conveniently eliminates the statement by "Dread Pirate Roberts" that he had "been busting my ass every god damn day for over two years to make this place what it is," which is obviously contrary to the defense theory of the case presented during opening argument.

4

messages to the defendant.[4] Accordingly, when taken in context with the information obtained from the defendant's computer and the fact that "DeathFromAbove" was used by Force, it is evident that the excerpt of the chat is being used to mislead and confuse the jury.  Accordingly, because the evidence has no probative value, and any possible probative value is vastly outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury, it should be precluded under Rule 403.

## CONCLUSION

For the reasons set forth above, the Government respectfully objects to proposed Defense Exhibit E as inadmissible hearsay.  To the extent that the defense makes a spurious application to have it admitted for any purpose other than the truth, Defense Exhibit E should be alternatively excluded under Rule 403 based on the significant danger of unfair prejudice, confusion of the issues, and misleading the jury that the evidence presents.


Based on the sensitive nature of the contents of this letter, including references to an ongoing grand jury investigation, the Government respectfully requests that it remain under seal.

Respectfully,

PREET BHARARA
United States Attorney


By:_____
TIMOTHY T. HOWARD
SERRIN TURNER
Assistant United States Attorneys
Southern District of New York


Cc:    Joshua Dratel, Esq.

---

[4] It should be noted that former Special Agent Force (who was aware of the Curtis Green murder-for-hire attempt) had access to law enforcement reports filed by Special Agent DerYeghiayan concerning his investigation into Mr. Athavale, which is likely the source of the information provided by Force through the "DeathFromAbove" account, in an attempt to extort the defendant.

| | | | |
|---|---|---|---|
| 4/6/13 18:00 | DeathFromAbove | Dread Pirate Roberts | Dread Pirate Roberts |



It's not that easy Anand

| | | | |
|---|---|---|---|
| 4/10/13 11:54 | DeathFromAbove | Dread Pirate Roberts | so |

. Do they have a casino there Anand?

| | | | |
|---|---|---|---|
| 4/16/13 5:56 | DeathFromAbove | Dread Pirate Roberts | personal history |

Name: Anand Athavale
DOB:
POB: India
Citizenship: India
Sex: M
Brown hair, 5'6" tall, Brown eyes, 300 lbs.
Residence:

is that enough to get your attention?

So, $250,000 in U.S. cash/bank transfer and I won't give you identity to law enforcement.  Consider it punitive damages.
DeathFromAbove

**Case
Defebdant's**

**Exhibit
E**

| Date | To/From | Subject | Message Body |
|---|---|---|---|
| 4/1/2013 8:40 | From: DeathFromAbove | message for Dread Pirate Roberts | Dread Pirate Roberts,<br>I know that you had something to do with Curtis' disappearance and death. Just wanted to let you know that I'm coming for you. Tuque. You are a dead man. Don't think you can elude me.<br>De Oppresso Liber |
| 4/1/2013 8:43 | From: DeathFromAbove | message for Dread Pirate Roberts | Dread Pirate Roberts,<br>I know that you had something to do with Curtis' disappearance and death. Just wanted to let you know that I'm coming for you. Tuque. You are a dead man. Don't think you can elude me.<br>De Oppresso Liber |
| 4/3/2013 7:50 | From: DeathFromAbove | I'm coming | indigo,<br>did you forward the below message to your boss? i'm coming for your ass, also :)<br>"Dread Pirate Roberts,<br>I know that you had something to do with Curtis' disappearance and death. Just wanted to let you know that I'm coming for you. Tuque. You are a dead man. Don't think you can elude me.<br>De Oppresso Liber" |
| 4/5/2013 7:32 | From: DeathFromAbove | Dread Pirate Roberts | indigo please pass this message to your boss. FBI, DEA, SOCA, AFP, can't find you but don't think for a second DOD (US Army and Navy) can't. i just want an explanation; if you didn't do it, then I need you to tell me who did. you don't strike me as the Type but I have seen stranger stuff; if I don't hear from you by this weekend then I fly to Vancouver within the next couple of days;<br>DeathFromAbove |
| 4/6/2013 12:37 | To: DeathFromAbove | re: Dread Pirate Roberts | I don't know who you are or what your problem is, but let me tell you one thing:<br>I've been busting my ass every god damn day for over two years to make this place what it is. I keep my head down, I don't get involved with the drama and I do the right thing at every turn. Somehow that isn't enough. Somehow psychotic people still turn up at my doorstep. I've been scammed, I've been stolen from, I've been hacked, I've had threats made against the site, I've had threats made against the community, and now, thanks to you, I've had threats made against my life. I know I am doing a good thing running this site. Your threats and all of the other psychos aren't going to deter me.<br>That's all I'll say to you. I won't answer your questions, or get sucked in to whatever trip you are on. I have much more important things to do. Stop messaging me and go find something else to do. |
| 4/6/2013 18:00 | From: DeathFromAbove | Dread Pirate Roberts | It's not that easy Anand. I'm legit. Green Beret. Friend of Curtis. I have access to TS/SCI files that FBI, DEA, AFP, SOCA would kill for. In fact, that is what I do ... kill. The only thing that I do.<br>Curtis had a lot of faults but he helped me through a really bad time.<br>I only have one question for you. What did you do with Curtis Green? Tell me the truth and I'll spare you. We, his love ones, need to know.<br>Don't worry DoD has no interest in you and your little website. North Korea and Iran are a lot more important. In fact, as far as the Army and Navy are concerned you are a nobody. Petty drug dealer. But, Curtis was somebody.<br>So tell me where he is and we will can be done with this. |
| 4/10/2013 11:54 | From: DeathFromAbove | so | I'm reviewing your file and you don't fit the profile of a killer. So where is Curtis? I need an answer. I got side-tracked from Vancouver, but I think that I'll go to the North Bay Indian Reservation. Do they have a casino there Anand? |
| 4/16/2013 5:56 | From: DeathFromAbove | personal history | Name: Anand Athavale<br>DOB: ▮▮▮▮▮▮▮<br>POB: India<br>Citizenship: India<br>Sex: M<br>Brown hair, 5'6" tall, Brown eyes, 300 lbs.<br>Residence: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br>is that enough to get your attention? After watching you, there is no way you could have killed Curtis.<br>But I think you had something to do with it.<br>So, $250,000 in U.S. cash/bank transfer and I won't give your identity to law enforcement. Consider it punitive damages.<br>DeathFromAbove |

03/20/2013
someone posing as me managed to con 38 vendors out of 2 btc each with a fake message about a new silk road
posted about cartel formation and not mitigating vendor roundtable leaks.
worked on database error handling in CI

03/21/2013
main server was ddosed and taken offline by host
met with person in tor irc who gave me info on having custom hs guards
buying up servers to turn into hidden service guards

03/22/2013
deployed 2 guards on forum
adjusted check_deposit cron to look further back to catch txns that died with an error

03/23/2013
bought a couple of more servers from new hosts
organized local files
stripped out srsec db naming functions
introduced at least two bugs doing this

03/24/2013
been slowly raising the cost of hedging
orgainzed local files and notes

03/25/2013
server was ddosed, meaning someone knew the real IP.  I assumed they obtained it by becoming a guard node.  So, I
migrated to a new server and set up private guard nodes.  There was significant downtime and someone has mentioned
that they discovered the IP via a leak from lighttpd.

03/26/2013
private guard nodes are working ok.  still buying more servers so I can set up a more modular and redundant server
cluster.  redid login page.

03/27/2013
set up servers

03/28/2013
being blackmailed with user info.  talking with large distributor (hell's angels).

03/29/2013
commissioned hit on blackmailer with angels

04/01/2013
got word that blackmailer was excuted
created file upload script
started to fix problem with bond refunds over 3 months old

04/02/2013
got death threat from someone (DeathFromAbove) claiming to know I was involved with Curtis' disappearance and
death.  messaged googleyed about it.  goog says he doesn't know.  user is prolly friend of Curtis who he confided his
plan to.
applied fix to bond refund problem
stopped rounding account balance display

04/03/2013
spam scams have been gaining tracktion.  limited namespace and locked current accounts.
lots of delayed withdrawals.  transactions taking a long time to be accepted into blockchain.  Wallet was funded with single large transaction, so each subsequent transaction is requiring change to be verified.  lesson: wallets must be funded in small chunks.
got pidgin chat working with inigo and mg

04/04/2013
withdrawals all caught up
made a sign error when fixing the bond refund bug, so several vendors had very negative accounts.
switched to direct connect for bitcoin instead of over ssh portforward
received visual confirmation of blackmailers execution

04/05/2013
a distributor of googleyed is publishing buyer info
mapped out the ordering process on the wiki.
gave angels access to chat server

04/06/2013
made sure backup crons are working
gave angels go ahead to find tony76
cleaned up unused libraries on server
added to forbidden username list to cover I <-> l scam

04/07/2013
moved storage wallet to local machine
refactored mm page

04/08/2013
sent payment to angels for hit on tony76 and his 3 associates
began setting up hecho as standby
very high load (300/16), took site offline and refactored main and category pages to be more efficient

04/09/2013
problem with load was that APC was set to only cache up to 32M of data.  Changed to 5G and load is down to around 5/16.
ssbd considering joining my staff
transferring standby data to hecho standby server

04/10/2013
some vendors using the hedge in a falling market to profit off of me by buying from themselves.  turned of access log pruning so I can investigate later.  market crashed today.
being blackmailed again.  someone says they have my ID, but hasn't proven it.

04/11/2013
set up tor relays
asked scout to go through all images on site looking for quickbuy scam remnants
cimon told me of a possible ddos attack through tor and how to mitigate against it.
guy blackmailing saying he has my id is bogus

04/12/2013
removed last remnance of quickbuy scam
implemented new error controller

rewrote userpage

04/13/2013
inigo is in the hospital, so I covered his shift today.  Zeroed everything and made changes to the site in about 5 hours

04/14/2013
did support. inigo returned.
started rewritting orders->buyer_cancel, been getting error reports about it.

04/15/2013
day off

04/16/2013
rewrote buyer_cancel

04/17/2013
rewrote settings view

04/18/2013
modified PIN reset system

04/19/2013
added blockchain.info as xrate source and modified update_xrate to use both and check for discrepancies and log.
modified PIN reset system

04/20/2013
migrated to different host because current host would not connect to guards.  Bandwidth limited and site very slow
after migration.

04/21 - 04/30/2013
market and forums under sever DoS attack.  Gave 10k btc ransom but attack continued.  Gave smed server access.
Switched to nginx on web/db server, added nginx reverse proxy running tor hs.  reconfiged everything and eventually
was able to absorb attack.

05/01/2013
Symm starts working support today.  Scout takes over forum support.

05/02/2013
Attack continues.  No word from attacker.  Site is open, but occasionally tor crashes and has to be restarted.

05/03/2013
helping smed fight off attacker.  site is mostly down.  I'm sick.
Leaked IP of webserver to public and had to redeploy/shred
promoted gramgreen to mod, now named libertas

05/04/2013
attacker agreed to stop if I give him the first $100k of revenue and $50k per week thereafter.  He stopped, but there
appears to be another DoS attack still persisting.

05/05/2013
Attack is fully stopped.  regrouping and prioritizing next actions.

05/06/2013
working with smed to put up more defenses against attack

05/07/2013
paid $100k to attacker

05/08/2013
reconfigured nginx to not time out.  almost all errors have disappeared.

05/10/2013
started buying servers for intro/guard nodes

05/11/2012
still buying servers

05/13/2013
helping catch up support
smed demo'ed multi address scheme for the forum

05/15/2013
more servers

05/22/2013
paid the attacker $50k

05/26/2013
tried moving forum to multi .onion config, but leaked ip twice.  Had to change servers, forum was down for a couple of days.

05/28/2013
finished rewritting silkroad.php controller

05/29/2013
rewrote orders page
paid attacker $50k weekly ransom
$2M was stolen from my mtgox account by DEA
added smed to payroll
rewrote cart page

05/30/2013
spoke to nob about getting a cutout in Dominican Republic.  said he knew a general that could help
created misc_cli with send_btc function for sending to many addresses over time.

05/31/2013
$50k xferred to cimon

06/01/2013
someone claiming to be LE trying to infiltrate forum mods

06/02/2013
loaning $500k to r&w to start vending on SR.

06/03/2013
put cimon in charge of LE counter intel

06/04/2013

rewrote reso center

06/05/2013 - 09/11/2013

Haven't been logging.  Tried counter intel on DEA's "mr wonderful" but led nowhere.  tormail was busted by dea and all messages confiscated.  "alpacino" from DEA has been leaking info to me.  Helped me help a vendor avoid being busted.  did an interview with andy greenberg from forbes where i said i wasn't the original DPR, went over well with community.  tried to get a fake passport from nob, but gave fake pic and fucked the whole thing up.  nob got spooked and is barely communicating.  said his informant isn't communicating with him either.  r&w flaked out and disappeared with my 1/2 mil.  smed has been working hard to develop a monitoring system for the SR infrastructure, but hasn't produced much in actual results.  similarly cimon has been working on the mining and gambling projects, but no results forthcoming.  created Anonymous Bitcoin Exchange (ABE) and have been trying to recruit tellers.  the vendor "gold" is my best lead at the moment.  nod is an H dealer on SR who says he has world class it skills and I am giving him a chance to show his stuff with ABE.  did a "ratings and review" overhaul.  It hasn't gone over too well with the community, but I am still working on it with them and I think it will get there eventually.  tor has been clogged up by a botnet causing accessibility issues.

09/12/2013

Got a tip from oldamsterdam that supertrips has been busted.  contacted alpacino to confirm.

09/13/2013

french maid claims that mark karpeles has given my name to DHLS.  I offered him $100k for the name.

09/11 - 09/18/2013

could not confirm ST bust.  I paid french maid $100k for the name given to DHLS by karpeles.  He hasn't replied for 4 days.  Got covered in poison oak trying to get a piece of trash out of a tree in a park nearby and have been moping.  went on a first date with amelia from okc.

09/19/2013

red pinged me and asked for meeting tomorrow.

09/19 - 09/25/2013

red got in a jam and needed $500k to get out.  ultimately he convinced me to give it to him, but I got his ID first and had cimon send harry, his new soldier of fortune, to vancouver to get $800k in cash to cover it.  red has been mainly out of communication, but i haven't lost hope.  Atlantis shut down.  I was messaged by one of their team who said they shut down because of an FBI doc leaked to them detailing vulnerabilities in Tor.

09/30/2013

nod deivered HS tracking service timeline.  spoke with inigo for a while about the book club and swapping roles with libertas.  Had revelation about the need to eat well, get good sleep, and meditate so I can stay positive and productive.

LAW OFFICES OF

## JOSHUA L. DRATEL, P.C.

A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL                                                                    STEVEN WRIGHT
— *Office Manager*

LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

March 6, 2015

**BY ELECTRONIC MAIL**

**FILED UNDER SEAL**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:    *United States v. Ross Ulbricht*,
14 Cr. 68 (KBF)

Dear Judge Forrest:

This letter is submitted on behalf of defendant Ross Ulbricht, whom I represent, as part of his motion, pursuant to Rule 33, Fed.R.Crim.P., for a new trial. This letter is submitted under seal because it relates to former Drug Enforcement Administration Special Agent Carl Force, and matters previously maintained under seal.

For the reasons set forth below, in addition to those documents and materials listed in Exhibit 1 to Mr. Ulbricht's Rule 33 motion, the government has committed, with respect to former SA Force, two separate nondisclosure violations under the standards of *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny:

(1)    former SA Force himself was obligated to disclose any misconduct he committed during the course of or related to his investigation of the Silk Road website, and SA Force's knowledge in that regard is imputed to the prosecution as a whole; and

(2)    it is clear from the government's February 1, 2015, letter to the Court (a copy of

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
March 6, 2015
Page 2 of 3

which is attached hereto as Exhibit A) that the grand jury investigation of former SA Force continued to generate exculpatory material and information that the government did not disclose until its letter, and likely has not disclosed at all (with respect to other such information and material).

Regarding former SA Force's knowledge of his misconduct, "a prosecutor's constructive knowledge extends to individuals who are 'an arm of the prosecutor' or part of the 'prosecution team.'" *United States v. Thomas*, 981 F. Supp.2d 229, 239 (S.D.N.Y. 2013), *citing United States v. Gil,* 297 F.3d 93, 106 (2d Cir.2002), and *United States v. Morell,* 524 F.2d 550, 555 (2d Cir.1975); *United States v. Bin Laden,* 397 F.Supp.2d 465, 481 (S.D.N.Y.2005).  *See United States v. Millan-Colon*, 829 F.Supp. 620, 634-36 (S.D.N.Y. 1993) (in addition to declaring a mistrial following numerous revelations concerning a corruption investigation into police officers involved in the investigation of the offenses charged, the District Court vacated two guilty pleas entered prior to trial, holding that evidence related to the corruption investigation was material and exculpatory and should have been disclosed as *Brady/Giglio* material).

Regarding the continuing generation of undisclosed *Brady* material, the government's February 1, 2105, letter (Exhibit A), at 4, revealed that

> it appears that "DeathFromAbove," was controlled by former Special Agent Force, based on information that was recently obtained from USAO-San Francisco regarding their ongoing grand jury investigation into Force. Following the defendant's first attempt to seek to use Defense Exhibit E with Special Agent DerYeghiayan, the Government consulted with the lead Assistant U.S. Attorney handling the Force investigation, who provided evidence that Force controlled the "DeathFromAbove" account and sent the messages to" Dread Pirate Roberts.

That passage demonstrates that the investigation of former SA Force continued to gather exculpatory information – essentially, that *Brady* material was being collected during the trial itself, and being generated by the investigation of former SA Force.  In fact, the government, in its earlier submissions, had never identified the DeathFromAbove username/account as being controlled by former SA Force.  Yet during trial it used the cross-examination of Homeland Security Investigations Special Agent Jared Der-Yeghiayan to continue its investigation of former SA Force, and to generate further *Brady* material, but *without disclosing it to the defense until the eve of the defense case itself.*

As established by the case law and principles discussed in the Memo of Law in support of Mr. Ulbricht's Rule 33 motion, that constitutes a *Brady* violation.  Accordingly, for the

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
March 6, 2015
Page 3 of 3

reasons set forth above and elsewhere in Mr. Ulbricht's motion, it is respectfully submitted that his motion for a new trial should be granted.

Respectfully submitted,

Joshua L. Dratel

JLD/
cc:    Serrin Turner
       Timothy T. Howard
       Assistant United States Attorneys