<div align="center">
LAW OFFICES OF

# JOSHUA L. DRATEL, P.C.
A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com
</div>

JOSHUA L. DRATEL                                                                STEVEN WRIGHT
—                                                                                    *Office Manager*
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

May 15, 2015

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

        Re:    *United States v. Ross Ulbricht*,
                   14 Cr. 68 (KBF)

Dear Judge Forrest:

      This letter is submitted on behalf of, and in connection with, the sentencing of defendant Ross Ulbricht, and provides to the Court, as directed in its April 28, 2015, Order endorsement, the "matters as to which the hearing is requested . . . [and] any evidence in support of his position and a list of witnesses" related to the hearing sought by Mr. Ulbricht pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978).

      While this letter identifies witnesses who would testify at such a hearing, and provides the supporting evidence, upon preparing these materials the defense believes that this letter and supporting materials, including the Declaration of Lindsay A. Lewis, Esq., and the Exhibits thereto, are sufficient, and that an evidentiary hearing is not necessary, thus Mr. Ulbricht will rely on the papers and oral presentation by counsel at sentencing.

      The reasons for that conclusion are (1) the witnesses would simply be repeating in their testimony what they have included in their Declarations (that constitute Exhibits to Ms. Lewis's Declaration); (2) the logistics of producing the witnesses – who are located across the globe – for a hearing next Friday that in some instances conflicts with their pre-existing schedules are impracticable, unwieldy, and inordinately costly. Also, the government's position has been that while written submissions are appropriate, an evidentiary hearing is not necessary. This

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 2 of 13

approach obviates the need to resolve that issue.

As a result, this letter will address two issues made relevant by the government's reliance, in the context of sentencing, on six deaths it attributes to each deceased's alleged purchase of drugs from vendors on the Silk Road web site:

(1) in contrast to the government's portrayal of the Silk Road web site as a more dangerous version of a traditional drug marketplace, in fact the Silk Road web site was in many respects the most responsible such marketplace in history, and consciously and deliberately included recognized harm reduction measures, including access to physician counseling.  In addition, transactions on the Silk Road web site were significantly safer than traditional illegal drug purchases, and included quality control and accountability features that made purchasers substantially safer than they were when purchasing drugs in a conventional manner;  and

(2) to the extent the six deaths are relevant at all to Mr. Ulbricht's sentencing – there being no allegation that he or any vendor ever intended the death of a purchaser, or that any of the drugs sold were adulterated or of a purity that was dangerous – the information provided by the government, and reviewed by the defense expert, Mark L. Taff, M.D., a Board-certified forensic pathologist, is utterly insufficient to attribute any of the deaths to drugs purchased from vendors on the Silk Road site.  Due Process protects Mr. Ulbricht from being sentenced on the basis of speculation, and the information provided by the government – in tandem with the information that is missing with respect to the six deaths – does not rise above that level.

Accordingly, for the reasons set forth below and in the supporting materials and exhibits, it is respectfully submitted that the six deaths should not contribute in any manner to consideration of Mr. Ulbricht's sentence.

**I.** *The Silk Road Web Site Instituted Unprecedented Harm Reduction*
*and Quality Control Measures That Made the Purchase of Drugs from*
*Vendors On the Site Far Safer Than Traditional "Street" Drug Transactions*

The findings by the academics and researchers, who have studied the Silk Road web site (and other on-line drug marketplaces) and subjected it to rigorous and accepted social science research protocols, demonstrate that the Silk Road web site in many respects represented a far safer environment for drug purchasing and even use, and constituted a more evolved, better-informed drug-using (or even abusing) community than any previously observed in the "street"

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 3 of 13

or elsewhere.

The Silk Road web site provided features, including physician counseling, ratings of vendors, and improved accountability and transparency, as well, conversely, an anonymous forum in which drug users and abusers could be candid about their drug use and abuse, and seek advice not only about drug use, but also about drug safety, use reduction, and even ceasing such activity altogether.

For example, as set forth in the accompanying declaration of Tim Bingham (attached as Exhibit 11 to the Declaration of Lindsay A. Lewis, Esq.), who has worked for over 20 years in the field of addiction and mental health, and between September 2012 and August 2013 conducted research both on and surrounding the Silk Road web site regarding the user experiences of vendors and consumers on the site, which research has formed the basis for three published research papers on that topic, the cyber community on the Silk Road website fostered a "'nested support system[]' which in turn fuelled information sourcing and exchange, user connectivity, identification of trusted and reliable sourcing routes, and mutual user supports." *See* Bingham Dec., at ¶6.c.

Indeed, in interviewing site participants – who Mr. Bingham noted were not first-time users, *see* Bingham Dec., at ¶6.f. ("I did not encounter a single customer whose first drug purchase was on the Silk Road website") but instead exhibited drug use trajectories ranging from 18 months to 25 years – Mr. Bingham found that

> comments centered around a perceived sense of "belonging" in the Silk Road community. This occurred irrespective of whether members were purchasing or only accessing the forums. Thus, risks and harms traditionally posed by illicit open and closed drug markets were replaced by insular online communities interacting within Silk Road's built in quality of information exchange, where protected by screen pseudonyms and anonymity, members could converse freely about their drug use. In this way Silk Road as novel technological drug subculture, potentially minimized drug-related stigma by reinforcing as sense of community[.]

*Id.*, at ¶ 6.1.

Mr. Bingham also found that "along these same lines, forum postings also included member support for those requiring assistance in quitting their drug habit." *Id.*, at ¶ 6.m. Thus, Mr. Bingham concluded, based on his study of multiple users, that "Silk Road forums . . . appeared to act as an information mechanism for the promotion of safer and more acceptable or

LAW OFFICES OF  
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest  
United States District Judge  
Southern District of New York  
May 15, 2015  
Page 4 of 13

responsible forms of recreational drug use" and "Silk Road's member subcultures offered a viable means of enmeshing safer drug use and encouraging harm reduction amongst a very hard to reach and informed drug-using population." *Id.*, at ¶ 6.n.

The harm reduction ethos on Silk Road also extended to the vendor population, which Mr. Bingham found "from a vending perspective . . . centered on informed consumerism and responsible vending by availability of high quality products with low risk for contamination, vendor-tested products, trip reporting and feedback on the vending infrastructure. *Id.*, at ¶ 6.p.

Dr. Fernando Caudevilla, a Spanish physician specializing in drugs and addiction, who provided expert advice on drug use and abuse to Silk Road users on the site under the username "Doctor X," and has submitted an declaration, attached to the Declaration of Lindsay A. Lewis, Esq., as Exhibit 12, was also a critical part of the harm reduction ethos of the site. As Dr. Caudevilla affirms in his accompanying declaration,

> [b]etween April 2013 and late October 2013, [he] sent more than 450 messages to Silk Road users in response to requests for advice and assistance. [He] also spent up to two to three hours a day on the forum during that time frame providing expert advice as to drugs and health. [His] advice ranged from information as to safe dosage and administration of particular drugs as well as the risks attendant to the use of certain drugs, information as to where to find reliable and credible information about various substances on the internet, proper methods of drug administration, adverse effects, pharmacological interactions, advice as to whether particular combinations of drugs (both legal and illegal) should be avoided, advice as to how to stop use of particular drugs or drugs generally, to general medical and psychiatric advice related to drugs.

*See* Caudevilla Dec., at ¶ 5.

Dr. Caudevilla further explains that his contact with and assistance to Silk Road users was in part possible because "[t]he administrator pf the Silk Road site, Dread Pirate Roberts, was aware of [his] presence on Silk Road and was supportive of [his] role in furthering the harm reduction ethos of the site. *Id.*, at ¶6. Indeed, Dr. Caudevilla notes that he

> provided weekly reports to DPR which documented the topics [he] had discussed in [his forum] thread [entitled "Ask a Drug Expert Physician About Drugs & Health"] during the previous week.. . . .

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 5 of 13

> Dread Pirate Roberts never censored my views or advice in any way, even when I espoused views that Silk Road users should not use or buy certain drugs sold on the site . . . . , discouraged drug use, or helped customers to reduce or cease drug use entirely.

*Id.*, at ¶ 6.

In fact, when the demand for Dr. Caudevilla's advice became a burden because of the time it consumed in Dr. Caudevilla's day, DPR even offered to pay Dr. Caudevilla $500 a week to continue to provide advice to site users. *Id.*, at ¶ 7. Around the same time, "Dread Pirate Roberts also sought to partner with [Dr. Caudevilla] to send the drugs sold on the Silk Road out to laboratories for independent testing as an effort to ensure that only safe, non-toxic substances were being sold on Silk Road." *Id.*, at ¶ 8. That effort was halted only by the government's seizure and discontinuation of the site in October 2013 following Mr. Ulbricht's arrest. *Id.*

As Dr. Caudevilla attests, "as a result of his personal experiences working with customers on the site, and monitoring the site's drug safety forums," he has

> firsthand knowledge that Silk Road provided site users with the tools to take drugs in a safer and more informed manner, espoused a harm reduction ethos which was reflected in the individual buyer-seller transactions on the site and in the community created on the site's forums, and enabled some site participants to actually reduce, if not entirely eliminate, their drug use. For example, some heroin users were drawn to Silk Road because it provided them access to methadone, a drug utilized in many countries, and administered by physicians, to enable heroin users to end their addictions. For many Silk Road users methadone was illegal or unavailable in their home countries. Accordingly, they would likely not have had access to the resources necessary to reduce their heroin use without the Silk Road.

*Id.*, at ¶ 9.

Tellingly, Dr. Caudevilla also reports that "[i]n his seven months monitoring and actively participating in the Silk Road forums [he] never came across even a single report of a Silk Road-related drug overdose." *Id.*, at ¶ 10. To the contrary, "on several occasions, when users provided negative feedback about the drugs sold by a particular vendor, that vendor or the drug in question was removed from the site" – a decision he believed "was made by the site's administrators. " *Id.*

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 6 of 13

      In analyzing the various motivations, however, for use of the Silk Road site to purchase drugs, the member forums, professional medical advice and assistance and community of Silk Road were certainly factors, but so was the contrast between the user experience of buying drugs on Silk Road versus far more dangerous and unpredictable "street-level" transactions and drug purchases, according to Mr. Bingham's research and also research conducted by Dr. Monica Barratt, who authored a research report along with co-authors Jason A. Ferris and Adam R. Winstock, entitled "Use of Silk Road, the online drug marketplace, in the United Kingdom, Australia and the United States," (*Addiction* (2013) 109, at 774-783), and which represents the first large scale survey to characterize buyers on the Silk Road.  *See* Declaration of Dr. Monica Barratt, attached as Exhibit 13 to the Declaration of Lindsay A. Lewis.

      As Mr. Bingham explains in his declaration,

> participant reasons for accessing and using Silk Road appeared centered on the site's anonymity, its member forums, the wide variety of products advertised, its transaction system supported by the dispute resolution modes and vendor feedback ratings [but] [u]sers also expressed concern for poor drug quality in their locality and fears for personal safety when buying drugs in the street.  Observational site data further revealed member comments around the avoidance of adverse health and social consequences associated with street drug sourcing when purchasing drugs on Silk Road; . . . those participants with purchasing experience on the Silk Road commented on the perceived levels of insular trust within the Silk Road member communities, which assisted them in consumer decision-making and openly contrasted with the unknowns associated with street drug-dealing.  For instance, according to one Silk Road customer who had stopped purchasing drugs elsewhere, "[t]his type of market significantly lowers the chances of a scam or buying contaminated products.  Like Amazon or eBay, I have a market of sellers to choose from and product reviews to satisfy my own requirements before I purchase.  A street market in comparison is based on a 'take it or leave it' approach which gives no rights to a buyer.  This form of regulation ensures safety and harm reduction for the buyer[.]"

*See* Bingham Dec., at ¶ 6.h.-6.i.

      Likewise, as memorialized by Dr. Barratt in her research paper based on the findings of

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 7 of 13

the survey she conducted of Silk Road buyers in the United States, Australia and the United Kingdom, and as set forth in her accompanying declaration,

> [s]urvey respondents who had purchased drugs from Silk Road were asked to pinpoint their reasons for consuming drugs purchased on Silk Road from a list of eight possible reasons. Respondents across all three countries indicated that among their top four reasons for consuming drugs purchased on Silk Road were: (1) the drugs were of better quality than the drugs they could normally access, and (2) they were more comfortable buying from sellers with high ratings.

Dr. Barratt Dec., at ¶ 7.

The views of Meghan Ralston, whom, until today was the director of harm reduction for the Drug Policy Alliance, described in its web site as "the nation's leading organization promoting drug policies that are grounded in science, compassion, health and human rights," also align with the position that Silk Road was unique amongst drug markets because it "created a safe environment, free of weapons and violence during the transaction, where people could acquire drugs."  *See* Declaration of Meghan Ralston, attached to the Declaration of Lindsay A. Lewis, Esq., as Exhibit 14, at ¶ 5.c.  As Ms. Ralston explained,

> [m]any reformers, myself included, have long been highlighting the forward-thinking benefits of Silk Road and the ways it began to slowly revolutionize drug sales around the world. For instance, it provided a platform that could allow indigenous growers and cultivators around the world to sell directly to the consumer, potentially reducing cartel participation and violence[.] . . . [A]ccordingly, using Silk Road could be seen as a more responsible approach to drug sales, a peaceable alterative to the often deadly violence so commonly associated with the drug war, and street drug transactions, in particular.  None of the transactions on Silk Road, for instance, resulted in women drug buyers being sexually assaulted or forced to trade sex for drugs, as is common in street-level drug transactions. Nor did any Silk Road transactions result in anyone having a gun pulled on them at the moment of purchase, also a common danger present in street-level drug transactions[.] . . .[M]oreover, even with all the hurdles and the risks, people chose to use Silk Road rather than rely exclusively on whatever illegal and potentially dangerous drug market existed in

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 8 of 13

> their 'real world' community. The site's success reinforced that people who are dependent or addicted can make rational choices, even if we like to imagine them as being totally irrational. Given the choice of quickly and easily accessing drugs in potentially sketchy or dangerous neighborhoods, or buying them safely on-line but having to wait, many users preferred privacy, security and a wait to the alternative[.]

*Id*., at 5.c.-5.e.

Collectively, these accounts by researchers, academics and doctors deeply familiar with the Silk Road site and the state of drug use and abuse worldwide, provide a more accurate, multifaceted portrayal of Silk Road – based on research and study – that is quite different than the one-dimensional characterization the government advances. Silk Road, like any social or economic experiment, evolved, but it is undisputed that its operator(s) endeavored to incorporate harm reduction measures as well as the resources for drug users and abusers to become better informed, better protected, and, ultimately, *former* users if they so wished.

Indeed, the distinction between Silk Road and traditional drug selling is as dramatic as it is unique. Traditional drug sellers do not offer counseling, much less by a physician who is empowered, without interference, to guide a user to abstinence. Traditional drug sellers do not provide forums for their customers to rate vendors, share experiences, ensure quality control and reliability. Traditional drug-selling operations do not afford customers an environment in which they can anonymously and, as a result, candidly, absent stigma and fear, discuss their drug use and abuse, its impact on their lives, and acquire the skills and perspective to reduce their use or even quit altogether.

Confronted as a society with the reality of continuing drug use and abuse, and the continuing U.S. consumer demand that perpetuates the illegal drug industry (and in many respects the legal drug industry as well), Silk Road represented – in large part, as demonstrated above, by design and deliberate practice – the safest incarnation of a drug marketplace to date, made possible by its protected internet status on TOR and its use of Bitcoin for payment, and which was the most likely to encourage users to examine their own conduct, and seek assistance in reducing their use/abuse and stop abusing drugs before it irreparably damaged their lives.

**II.**   ***For Legal, Factual, and Forensic Reasons, the Six Deaths Cited By the Government Cannot Be Attributed to Purchases Made from Vendors on the Silk Road Web Site***

As detailed in the accompanying Declaration of Lindsay A. Lewis, Esq., at ¶¶ 3-37, Dr. Taff's preliminary findings, which will be converted to a formal report, establish that the records

LAW OFFICES OF  
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest  
United States District Judge  
Southern District of New York  
May 15, 2015  
Page 9 of 13

provided by the government – in conjunction with the records and information that are absent from that production – are insufficient to attribute any of the six deaths to drugs purchased from vendors on the Silk Road site.

As explained by Dr. Taff is his preliminary impressions and findings, the evidence presented by the government in discovery reveals gaping holes in each death investigation which would prevent Dr. Taff, or any medical examiner or forensic pathologist, including those who conducted the actual death investigations in these cases – given Dr. Taff's assessment of a proper death investigation, as set forth in ¶ 10-11 of the Lewis Dec.– from forming opinions to a reasonable degree of medical certainty as to the cause, manner, and time of death. Indeed, for many of the deaths, the most basic of forensic documents including autopsy reports, toxicology reports and death certificates, were notably absent.

What is, however, clear from the limited discovery as to the six alleged overdose deaths is the following:

- each and every decedent had a history of chronic substance abuse as well as medical and psychiatric problems prior to death which could have caused or contributed to their death. For instance, Dr. Taff concluded that Jordan Mettee, a overweight 27-year old black man alleged to have died as a result of drugs purchased on Silk Road, may have suffered an acute brain hemorrhage consistent with a stroke, which could have been a competent cause of death and was consistent with a pre-existing condition.  *See* Lewis Dec., at ¶ 22. Jacob Lyon Green, another individual alleged to have overdosed on drugs purchased on Silk Road, had recently suffered from bronchitis and been admitted to the hospital for complications related to that condition just prior to death (and been discharged), and in fact his cause of death was found by the medical examiner in that case to be "aspiration pneumonia."  *See* Lewis Dec., at ¶ 15;

- many of the decedents sought out and ingested multiple legal and illegal drugs prior to death. The synergism of multiple drugs, taken in varying amounts, via different routes of administration (*i.e.,* inhalation, ingestion, injection), at different times, in individuals with varying levels of drug tolerance leaves too many variables and unknowns to conclude that a particular drug caused death;

- when interpreting drug test results, physicians cannot selectively ignore one or more drugs from the drugs contributing to death in order to single out the one the government would like to be able to conclude caused death; and

- it is simply impossible for the government to prove that drugs obtained *from Silk Road* "caused" death, and in certain cases, the government cannot even establish to any degree

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 10 of 13

of certainty that *any* of the drugs ingested came from Silk Road.  Indeed, among the many unsatisfied discovery demands made of the government after their initial discovery productions was a request for "the underlying information used to create the Silk Road user summaries contained in the discovery as to Jacob Scott Lyon-Green and Scott Christopher Wilsdon, as well as any information as to who prepared the summaries, and when they were prepared."   These summaries were the only alleged evidence that drugs taken by Lyon-Green or Wilsdon were obtained from Silk Road.

Accordingly, the information provided by the government is inadequate to establish that the six deaths are attributable to drugs purchased from Silk Road vendors.

     A.     *The Six Deaths Are Not Relevant to Mr. Ulbricht's Sentencing At All*

Another dispositive impediment to consideration of the six deaths in the context of Mr. Ulbricht's sentencing is that the information provided by the government does not sufficiently establish *as a matter of law* that the six deaths detailed below resulted from the offense conduct in this case.  Absent the appropriate evidence of causation, the deaths are not relevant to sentencing.

However, the extent or degree of causation required to conclude that death or injury was the "result" of the offense conduct has not been clearly or consistently addressed in the Second Circuit, as most cases which enhancements or upward departures are sought on the basis of uncharged injury or death, present fairly straightforward links between cause and effect.[1]

     1.     *Proximate Causation Is Required*

When causation is not immediate and direct, the general rule is that conduct must be a proximate cause of injury in order to give rise to liability.  *See United States v. Guillette*, 547 F.2d 743, 749 (2d Cir.1976) (if defendant's conduct is not the "immediate" cause of injury or death, criminal liability is imposed only when "intervening events are foreseeable and naturally

---

[1] For example, in *United States v. Russow*, 2015 WL 1057513, at *3 (D. Conn. Mar. 10, 2015), which addressed an upward departure pursuant to §5K2.1, the Court quickly dispensed with the causation issue because the evidence demonstrated that the heroin the victim bought from the defendant on the day the victim died was almost certainly the heroin injected hours before the victim was found dead from acute heroin toxicity.  *United States v. Russow*, 2015 WL 1057513, at *3 (D. Conn. Mar. 10, 2015);  *see also United States v. Reis*, 369 F.3d 143 (2d Cir. 2004) (Court affirmed upward departure under §5K2.1 when defendant accidentally strangled underage victim during sexual intercourse).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 11 of 13

result from . . . [the] criminal conduct").

In the criminal context, proximate cause has been defined as requiring "some direct relation between the injury asserted and the injurious conduct alleged," which cannot be "too remote," "purely contingent," or "indirec[t]." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9, 130 S. Ct. 983, 989, 175 L. Ed. 2d 943 (2010) (defining proximate cause in the RICO context), *quoting Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268-274 (1992).

Whether the conduct is too attenuated from the injury is determined by the foreseeability of events that occur between the conduct and the injury. For instance, in the context of a health care fraud prosecution, the Sixth Circuit described intervening acts which would not break the chain of causality in a proximate cause analysis as acts or events that "involve[] reaction to the conditions created by the defendant." *United States v. Martinez*, 588 F.3d 301, 321 (6th Cir. 2009); *see also United States v. Harris*, 701 F.2d 1095, 1102 (4th Cir. 1983) (although victim, who was already ill, died from heat stroke, proximate cause was established because defendants, whose convictions stemmed from charges of involuntary servitude, were aware of the victim's illness and forced him to work anyway).

As the Court explained in *Martinez*, "the perimeters of legal cause are more closely drawn when the intervening cause was a matter of coincidence rather than response," and consequently, "an unforeseeable coincidence will break the chain of legal cause" and "a response" will do so "if it is abnormal." 588 F.3d at 321.

2. **"But-For" Causality, As Established By the Supreme Court In Burrage v. United States**

The recent Supreme Court decision in *Burrage v. United States*, analyzed the section of 21 U.S.C. §841(b)(1)(C), which permits an enhanced sentence when death "results from" the offense conduct, and its holding significantly narrows the doctrine of causation. *Burrage v. United States*, 134 S.Ct. 881 (2014). Although the government does not seek the specific enhancement contained in the Controlled Substances Act section, the principles of causation set forth in the *Burrage* opinion apply because the government seeks to introduce evidence of death or serious injury alleged to be a result of the defendant's offense conduct, and drug-trafficking in particular. *Burrage*, 134 S.Ct. at 887-91.

Prior to the decision in *Burrage*, facts used to establish what had been, prior to *United States v. Booker*, 543 U.S. 220 (2005), the sentencing enhancement in §841(b)(1)(C) needed to be proven only by a preponderance of the evidence, as is the case generally with respect to demonstrating uncharged conduct at sentencing. *See e.g. United States v. Chevalier*, 776 F.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 12 of 13

Supp. 853, 860 (D. Vt. 1991), *citing United States v. Madkour*, 930 F.2d 234, 237 (2d Cir.1991). However, before the Supreme Court specified a causality standard in *Burrage*, courts rarely, if ever, specified with any clarity or consistency the extent to which a victim's death or injury must be caused by the defendant's offense conduct.

After addressing the common meaning of "results from," the Supreme Court noted the various legal contexts in which language similar to that contained in §841(b)(1)(C), is read to require "but-for causality." *Id*., at 887-88. The Supreme Court defined "but-for causality" as requiring evidence that the use of the drug distributed by the defendant was "an *independently* sufficient cause of the victim's death or serious bodily injury." *Id*., at 892 (emphasis added).

In *Burrage*, the Court held that standard had not been met because although two expert witnesses agreed that the heroin sold by the defendant was a "contributing factor" in the victim's overdose death, neither was able to opine that the victim would not have died absent the heroin use. *Id*., at 885-86; *see e.g. United States v. Hoey*, 2014 WL 2998523, at *4 (S.D.N.Y. July 2, 2014) (adopting the causality standard set forth in *Burrage*).

In affirming the "but-for" standard, the Supreme Court rejected the government's argument that the "distinctive problems associated with drug overdoses," primarily that overdoses very often involve the use of more than one drug, support a broader definition of causality. *Burrage*, 134 S.Ct. at 889-90. Again pointing to the traditional interpretation of language similar to that contained in §841(b)(1)(C), the Court in *Burrage* concluded that Congress made a conscious decision to limit the possibility of an enhanced sentence to those situations in which the drug distributed by the defendant was the "but-for" cause of the victim's death or injury. *Id*., at 891.

While here the government did not include a charge under §841(b)(1)(C), any evidence of overdose deaths must still be satisfactorily connected to a defendant's conduct in order to serve the goals of punishment, particularly deterrence. The concerns and issues raised in *Burrage*, and which compelled the Supreme Court to conclude but-for causality was the appropriate standard, are equally applicable here.

As detailed **ante**, in the discussion of Dr. Taff's review of the information provided by the government, here the government has not met the requisite standard of causation with respect to *any* of the six deaths it attributes to drugs sold by vendors on the Silk Road site, and in turn to Mr. Ulbricht. In fact, in not a single instance is there proof that drugs distributed via Silk Road constituted "an *independently* sufficient cause of the victim's death or serious bodily injury." *Burrage*, 134 S.Ct. at 892.(emphasis added).

<div style="display:flex">

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 15, 2015
Page 13 of 13

</div>

**2.     *There Was No Intent to Sell "Bad" Drugs on the Silk Road Web Site***

Indeed, it is quite clear from the harm reduction analysis set forth above that the Silk Road web site, espoused an ethos of drug safety and education that was more sophisticated and evolved than anything else in existence at the time.  Likewise, on the whole, the vendors of drugs on the site were some of the most well- informed, careful, and accountable drug sellers in the drug trade.  In fact, as set forth **ante**, "when users provided negative feedback about the drugs sold by a particular vendor, that vendor or the drug in question was removed from the site" – a decision Dr. Caudevilla believed "was made by the site's administrators."  *See* Dr. Caudevilla Dec., at ¶ 10.  Thus, it is quite clear that there was never an intent by anyone associated with the Silk Road site to sell "bad" drugs.  In fact, to the contrary, the site was known for selling drugs of higher, safer quality than available in ordinary "street" encounters.

**3.     *It is Not Alleged that Any of the Drugs Sold On Silk Road
             Were Adulterated or Were Too Pure to Be Found Safe***

Nor is there any evidence that any of the drugs sold on Silk Road were adulterated in any manner or too pure to be considered safe.  In fact, as Dr. Taff explained in his preliminary findings, there were a multitude of *other* factors, such as lethal combinations of drugs, pre-existing medical and psychiatric conditions, and administration of and quantity of drugs that likely caused or contributed to cause of death in the six cases presented by the government.

### Conclusion

Accordingly, for all the reasons set forth above and in the supporting documents and materials, it is respectfully submitted that the six deaths cited by the government should not be considered in connection with Mr. Ulbricht's sentencing.

Respectfully submitted,

Joshua L. Dratel

JLD/lal

cc:     Serrin Turner
        Timothy T. Howard
        Assistant United States Attorneys