LAW OFFICES OF

## JOSHUA L. DRATEL, P.C.

A PROFESSIONAL CORPORATION

29 BROADWAY

Suite 1412

NEW YORK, NEW YORK 10006

---

TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL                                                                STEVEN WRIGHT
          —                                                                     *Office Manager*
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

May 22, 2015

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

> Re:    *United States v. Ross Ulbricht*,
>            14 Cr. 68 (KBF)

Dear Judge Forrest:

This letter is submitted on behalf of defendant Ross Ulbricht in connection with his sentencing, scheduled for May 29, 2015, at 1 p.m., and supplements my May 15, 2015, letter, which addressed certain evidentiary issues related to information the government provided regarding sentencing, and a prospective hearing pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978). Discussion of those issues will not be repeated herein (and are therefore respectfully incorporated herein by reference), except with respect to discrete matters not addressed in my May 15, 2015, letter, but which are relevant to sentencing generally; rather, this letter predominantly covers other issues relevant to sentencing.

For the reasons set forth below, it is respectfully submitted that analysis and application of the sentencing factors enumerated in 18 U.S.C. §3553(a) establish that a sentence substantially below the applicable advisory Sentencing Guidelines range represents a sentence "sufficient but not greater than necessary" to achieve the goals of sentencing listed in 18 U.S.C. §3553(a)(2).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 2 of 78

As detailed below, those reasons include:

(1)     Mr. Ulbricht's personal history and background, as reflected in the scores of letters submitted herewith on his behalf, which establish that Mr. Ulbricht is far more multifaceted than merely the conduct for which he has been convicted,[1] has expressed genuine remorse for his conduct related to the Silk Road web site, and can make – and is committed to making, as his own letter attests – a positive contribution to society after completion of a sufficient but not unnecessarily lengthy prison term;

(2)     the nature of Mr. Ulbricht's offense conduct, and the motivation and intent underlying that conduct;

(3)     the need, pursuant to 18 U.S.C. §3553(a)(6), to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[;]"

(4)     that, for practical, policy, and equitable reasons, including ongoing empirical and academic research, as well as the realities of drug trafficking and drug use notwithstanding the severity of federal sentences for three decades, general deterrence does not serve as a basis for enhancing Mr. Ulbricht's sentence;

(5)     the empirical and academic research has established that longer prison sentences do not reduce recidivism, and that individuals over the age of 40 – which Mr. Ulbricht will reach well before the mandatory minimum term of 20 years' imprisonment would expire – present a significantly reduced threat of recidivism;

(6)     the statistical information from the United Statets Sentencing Commission, which establishes that a sentence *below* the applicable Guidelines range is not only very much the *norm* in the Southern District of New York (hereinafter "SDNY"), but increasing in frequency, as 73.1% of sentences during all of Fiscal Year 2014 and 77.1% of sentences during the First Quarter of Fiscal Year 2015 in SDNY were below the applicable Guidelines range;  and

(7)     Mr. Ulbricht has spent his 20-month confinement at the Metropolitan Detention

---

[1]  Of course, in the context of sentencing, the jury's verdict is deemed dispositive with respect to the legal implications of Mr. Ulbricht's conduct.  However, that context does not waive any of his rights to appeal that verdict.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 3 of 78

Center ("MDC") in Brooklyn (13 months) and the Metropolitan Correctional
Center ("MCC"), facilities that have been recognized by courts as constituting
harsh pretrial confinement and therefore a basis for a sentence below the
applicable Guidelines range.[2]

In addition, this letter enumerates Mr. Ulbricht's corrections, additions, and/or objections
to the Pre-Sentence Report, and seeks a recommendation from the Court that the U.S. Bureau of
Prisons (hereinafter "BoP") waive any Public Safety Factors and/or Management Variables that
might preclude designation of Mr. Ulbricht to a BoP facility commensurate with the security
criteria that would otherwise apply to him.

Accordingly, for all these reasons, it is respectfully submitted that Mr. Ulbricht should be
sentenced to a prison sentence substantially below the applicable advisory Guidelines range.

**I.      *The Principles Governing Federal Sentencing Since* United States v. Booker,**
**  *543 U.S. 220 (2005), Require the Court to Look Beyond the Guidelines***
**  *In Order to Arrive at a Sentence Sufficient But Not Greater Than Necessary***
**  *to Achieve the Purposes of Sentencing Set Forth in 18 U.S.C. §3553(a)(2)***

The PSR calculates Mr. Ulbricht's Offense Level as Level 43, with a Criminal History
Category (hereinafter "CHC") of I, corresponding to an advisory Sentencing Guidelines range of
life imprisonment. Yet the Guidelines calculation merely begins the analysis. In that context,
the PSR also fails to provide any guidance in navigating and evaluating the relevant
considerations under §3553(a), and arriving at a sentence "sufficient but not greater than
necessary" to achieve the goals listed in §3553(a)(2).

Rather, it merely hews to a reflexive Guidelines-centric analysis without reference to any
other factors listed in §3553(a), and fails to recognize that a Guidelines-only approach was
constitutionally dismantled by *Booker*, and, in practical terms, has been overwhelmingly
abandoned by the courts in this District in the course of their continuing sentencing practice.

---

[2] Following his October 1, 2013, arrest in San Francisco, California, Mr. Ulbricht was
confined in a pretrial facility in California for nearly four weeks before being transferred to
MDC, a process that consisted of another three-to-four weeks of travel between various facilities
en route. That process, too, was grueling, as the transient nature of Mr. Ulbricht's stay at each
facility along the way meant that while he was in transit he was confined in Special Housing
Units and was unable to avail himself of any of the ordinary amenities otherwise accessible to
inmates at each facility.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 4 of 78

In *Pepper v. United States*, 562 U.S. 476, 131 S. Ct. 1229 (2011), the Court *twice* emphasized that a sentencing judge assumes "an overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Id.*, at 1242. *See also United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) ("[u]nder §3553(a)'s 'parsimony clause,' it is the sentencing court's duty to 'impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth' at 18 U.S.C. §3553(a)(2)"), *quoting United States v. Samas,* 561 F.3d 108, 110 (2d Cir. 2009).

As the Second Circuit explained in *Dorvee*,

> [e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a) sentencing factors. *See* [*United States v.*] *Cavera,* 550 F.3d [180,]189 [(2d Cir. 2008) (*en banc*)].

604 F.3d at 93. *See also Pepper*, 562 U.S. at ___, 131 S. Ct. at 1244-45 (statute – 18 U.S.C. §3742(g)(2) – precluding consideration, at re-sentencing, of post-sentence rehabilitation was invalid because it had the effect of making the Guidelines mandatory in "an entire set of cases").

Thus, as the Supreme Court declared in *Nelson v. United States*, 550 U.S. 350 (2009), "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Id.*, at 351 (emphasis in original).[3] *See also Dorvee*, 604 F.3d at 93 ("[i]n conducting this review [of the §3553(a) sentencing factors], a district court needs to be mindful of the fact that it is 'emphatically clear' that the 'Guidelines are guidelines – that is, they are truly advisory'"), *quoting Cavera,* 550 F.3d at 189.

Indeed, in *Pepper*, Justice Sotomayor again hearkened back to *Koon v. United States*, 518 U.S. 81 (1996) – as Justice Stevens had in *Rita v. United States*, 551 U.S. 338, 364 (2007) (Stevens, J., *concurring*) – repeating that

---

[3] While the Supreme Court's ruling in *Rita v. United States*, 551 U.S. 338 (2007), established that a within-Guidelines sentence can be presumptively reasonable, *id.* at 347, that presumption is restricted to appellate review and "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id.* at 351 (*citing United States v. Booker*, 543 U.S. 220, 259-60 (2005)). *See also Nelson*, 550 U.S. at 351.

LAW OFFICES OF                                          Hon. Katherine B. Forrest
**JOSHUA L. DRATEL, P.C.**                              United States District Judge
                                                        Southern District of New York
                                                        May 22, 2015
                                                        Page 5 of 78

> "[i]t has been uniform and constant in the federal judicial tradition
> for the sentencing judge to consider every convicted person as an
> individual and every case as a unique study in the human failings
> that sometimes mitigate, sometimes magnify, the crime and the
> punishment to ensue."

562 U.S. at ___, 131 S. Ct. at 1239-40, *quoting Koon*, 518 U.S. at 113.

Therefore, while sentencing judges must still consider the Guidelines, *see* 18 U.S.C. §3553(a)(4), nothing in the statute provides any reason to treat that calculation as more controlling of the final sentencing decision than any of the other factors a court must consider under §3553(a) as a whole. *See United States v. Menyweather*, 431 F.3d 692, 701 (9th Cir. 2005); *United States v. Lake*, 419 F.3d 111, 114 (2d Cir. 2005), *explaining United States v. Crosby*, 397 F.3d 103, 111-13 (2d Cir. 2005).

Also, as Justice Scalia noted in his dissent from the "remedial" opinion in *United States v. Booker,* 543 U.S. 220 (2005):

> [t]he statute provides no order of priority among all those factors,
> but since the three just mentioned [§§ 3553(a)(2)(A), (B) & (C)]
> are the fundamental criteria governing penology, the statute –
> absent the mandate of § 3553(b)(1) – authorizes the judge to apply
> his own perceptions of just punishment, deterrence, and protection
> of the public even when these differ from the perceptions of the
> Commission members who drew up the Guidelines.

543 U.S. at 304-305 (Scalia, J., *dissenting in part*).

Moreover, the Supreme Court has been vigilant in ensuring that the Guidelines are genuinely advisory, and not merely a default sentence ratified by appellate courts by rote. For example, in *Nelson*, 550 U.S. at 350, the Court reiterated that "district judges, in considering how the various statutory sentencing factors apply to an individual defendant 'may not presume that the Guidelines range is reasonable.'" 550 U.S. at 351, *quoting Gall v. United States*, 552 U.S. 38, 50 (2007); *see also id.* ("[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable").

The broad discretion afforded district courts to determine a sentence also conforms with 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate

sentence.” *See also United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990); *Jones*, 531 F.3d at 172, n. 6.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 6 of 78

sentence.” *See also United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990); *Jones*, 531 F.3d at 172, n. 6.

In fact, in *Pepper*, the Court cited §3661 as an important means of achieving just sentences: “[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant ‘ensures that the punishment will suit not merely the offense but the individual defendant.’” 562 U.S. at___, 131 S. Ct. at 1240, *quoting Wasman v. United States,* 468 U.S. 559, 564 (1984).[4]

As the Supreme Court directed in *Gall*, 552 U.S. at 49, “after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party.”

Thus, here, in light of the analysis and application of the §3553(a) factors, the Court possesses sufficient discretion to impose a sentence below the Guidelines. A sentence premised upon analysis of the Guidelines exclusively, and an implicit but unmistakable presumption that the Guidelines, and *only* the Guidelines, prescribe a reasonable sentence, is in irreconcilable conflict with the Supreme Court’s and Second Circuit’s direction manifested in the series of cases discussed **ante**. Accordingly, the sentencing factors in §3553(a) provide the proper guidepost for determining for Mr. Ulbricht a sentence “sufficient, but not greater than necessary” to achieve the objectives of sentencing.

**II.** *Application of the §3553(a) Factors Also Compels a Sentence for*
 *Mr. Ulbricht Substantially Below His Applicable Sentencing Guidelines Range*

As discussed below, in applying to Mr. Ulbricht both §3553(a)’s mandate that a sentence be “sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth

---

[4] Indeed, the Court’s opinion in *Pepper* opened with the following statement:

> [t]his Court has long recognized that sentencing judges “exercise a wide discretion” in the types of evidence they may consider when imposing sentence and that “[h]ighly relevant-if not essential-to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant’s life and characteristics.”

562 U.S. at___, 131 S. Ct. at 1235, *quoting Williams v. New York,* 337 U.S. 241, 246-247 (1949).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 7 of 78

in" §3553(a)(2), and the sentencing factors set forth in §3553(a)(1)-(7), it is respectfully
submitted that a sentence substantially below the applicable Guidelines range is appropriate.[5]

---

[5] The sentencing factors enumerated in §3553(a) are:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    need for the sentence imposed –

        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)    to afford adequate deterrence to criminal conduct;

        (C)    to protect the public from further crimes of the defendant; and

        (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3)    the kinds of sentences available;

    (4)    the kinds of sentence and the sentencing range established for –

        (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [. . .];

    (5)    any pertinent policy statement [. . .];

    (6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;  and

    (7)    the need to provide restitution to any victims of the offense.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 8 of 78

In considering those prescribed sentencing factors and identified purposes of sentencing,[6] several aspects of Mr. Ulbricht's circumstances are relevant. Either independently or in combination, they amply justify a sentence far below the Guidelines range.

### A.    *Mr. Ulbricht's Personal History, Background, and Characteristics*

Mr. Ulbricht, now 31 years old, was born and raised in Austin, Texas, by his parents Lyn and Kirk Ulbricht. *See* PSR, at ¶ 130. He grew up in a loving and supportive environment, along with his sister, Cally, 35, who currently resides in Sydney, Australia, and his half-brother Travis, who lives in Sacramento, California. *Id.*

Mr. Ulbricht excelled in school, but also enjoyed nature and the outdoors, even becoming an Eagle Scout during his teen years. *Id.*, at ¶ 134. Upon graduating high school, Mr. Ulbricht relocated to Dallas, where he attended the University of Texas on a full academic scholarship. *Id.*, at 138. He graduated in 2006, with a Bachelor's of Science degree in physics, and proceeded to complete a Master's Degree in material sciences at Penn State University, in 2009, specializing in the subject matters of photovoltaic cells and crystallography. *Id.*

Although Mr. Ulbricht showed considerable promise in the field of physics and his professor had asked Mr. Ulbricht to accompany him to Cornell University, where Mr. Ulbricht had been offered a full scholarship to pursue a PhD, Mr. Ulbricht declined that opportunity in order to return to his home town of Austin and pursue more entrepreneurial and charitable endeavors. Most notably, Mr. Ulbricht became the CEO and manager of Good Wagon Books, a company he operated from the end of 2009 until early 2011, and which solicited book donations, and upon resale donated 10% of all profits to charity. *Id.*, at ¶ 140. At approximately that same

---

[6] Section 3553(a)(2) lists the following purposes of sentencing:

(2)    the need for the sentence imposed –

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 9 of 78

time, Mr. Ulbricht created the Silk Road website, which led to his involvement in the instant case.

As set forth below, and demonstrated by the 97 letters submitted on Mr. Ulbricht's behalf and appended hereto as Exhibits, Mr. Ulbricht is an individual who possesses a multitude of exemplary traits that have had a positive impact on his family, friends, professional colleagues, even acquaintances, and the world at large. That, of course, is juxtaposed against the offenses for which he has been convicted – convictions of which those who have submitted letters acknowledge and are well aware.

Notwithstanding those offenses, those who have written on Mr. Ulbricht's behalf have not abandoned him, but instead have rallied to support him because, like all humans, Mr. Ulbricht is a composite of many characteristics – some perhaps even irreconcilable – and which, in his case, those who have written believe on balance are positive, can contribute to society in the future, and should not be forfeited to a lifetime in prison – not only for his sake, but for the sake of the promise they see in Mr. Ulbricht as a positive force in the world.

The measure of a person, even a convicted defendant, is the totality of his conduct and interaction with the world. As detailed below, the 97 letters are unanimous in their position that if Mr. Ulbricht is released after serving a sufficient term of imprisonment, he has a unique set of skills and traits that will enable him to become a valuable asset to his community.

1. ***Mr. Ulbricht Is Extraordinarily Devoted to His Family, to Which He Has Maintained Close Ties Despite His Incarceration and Conviction***

Pursuant to §3553(a), family ties are a relevant and important factor in determining an appropriate sentence. *See, e.g.*, *United States v. Nellum*, ___ F. Supp.2d ___, 2005 WL 300073, at *4 (N.D. Ind. 2005) ("under §3553(a), the history and characteristics of the defendant, including his family ties, are pertinent to crafting an appropriate sentence"). As the letters note by acclamation, Mr. Ulbricht is "deeply committed" to his family, which remains in close contact with him, even during the 20 months he has been incarcerated. *See, e.g.,* Letter of Maureen McNamara, attached hereto as Exhibit 2, at Letter 40.

In addition, since Mr. Ulbricht's arrest and imprisonment, his parents have relocated from Austin, Texas, to New York State to be closer to their son, and Mr. Ulbricht has received multiple visits from his sister (who has flown in twice from Australia to visit him and to attend his trial), his half-brother, Travis, and his aunts, uncles and cousins, who reside all over the country and unwaveringly support and care for Mr. Ulbricht.

Indeed, the overwhelming majority of the letters on Mr. Ulbricht's behalf, whether from

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 10 of 78

family, colleagues, friends, or neighbors, refer to the extremely strong bond the Ulbrichts share, including "the family's close ties to one another and the extended family as well."  *See* Letter of Gail Gibbons,  attached hereto as Exhibit 2, at Letter 54.[7]

As Kelly Payne, "who first met Ross in 1984 when [she] became friends with his sister, Cally" explains in her letter,

> [i]t was through this friendship that I came to know Ross and both
> Lyn and Kirk as well.  Anyone who knows the Ulbricht family
> knows that it is impossible to know one of them without knowing
> them all.  They are an extremely close-knit family who spent their
> time together more than apart and who are deeply connected to one
> another. . . It is my experience of Ross that he is a gentle and kind
> man who loves his family deeply.

*See* Letter of Kelly Payne, attached hereto as Exhibit 2, at Letter 72.

Likewise, Mary Alice Spina, who is based in Costa Rica, where Mr. Ulbricht's parents operate a business, writes that the Ulbrichts "are a close and loving family, sharing vacations as well as a homelife. . . Over the years I have observed Ross as an upstanding individual and a dedicated son. . . He always remains close with his family. . . . Their love and commitment to one another is admirable."  *See* Letter of Mary Alice Spina, attached hereto as Exhibit 2, at Letter 43.

Another letter, from Loanne Snavely, the mother of Mr. Ulbricht's friends Joe and Elody Gyekis, also refers to the strong connection Mr. Ulbricht has to his family.  Ms. Snavely remarks in her letter that "[a]s a mother, I . . . appreciated [Ross's] close family relationships.  He often spoke fondly about his family while he was far from them in Pennsylvania.  At every opportunity he participated in family activities, and made special efforts to see them."  *See* Letter of Loanne Snavely, attached hereto as Exhibit 2, at Letter 77.

Karen Lasher, who has known Mr. Ulbricht since 2005, is best friends with Mr. Ulbricht's sister Cally, and "joined [Ross] and his family in San Francisco two weeks before Ross was arrested in October, 2013," remarks in her letter that "I have spent time with Ross with his family and have witnessed first hand the love and devotion that he shows to his family and friends."  *See* Letter of Karen Lasher, attached hereto as Exhibit 2, at Letter 20.

---

[7]  Attached as Exhibit 4 is a group of photographs depicting Mr. Ulbricht and a number of the persons who have written letters on his behalf (and others).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 11 of 78

Accordingly, throughout Mr. Ulbricht's incarceration, and if released, he will have a devoted and firmly rooted support network including his parents, sister, and brother, as well as aunts, uncles, and cousins, to rely on in rejoining society in a productive manner.

### 2. *Mr. Ulbricht Is a Loyal and Dependable Friend*

Of the 97 letters written to the Court on Mr. Ulbricht's behalf, an impressive number are from Mr. Ulbricht's friends, many of whom have known him for decades. However, it is clear from the letters' sincerity and effusiveness regarding Mr. Ulbricht's character and capacity as a friend in letters from friends both recent and long-term, that Mr. Ulbricht has made lifelong friends and left a lasting and positive impression on people at every juncture of his life.

For example, Susie Jauregui, who considers Mr. Ulbricht to be "like another brother to [her]," discusses Mr. Ulbricht's friendship with Ms. Jauregui's brother, Mark. *See* Letter of Susie Jauregui, attached hereto as Exhibit 2, at Letter 31. Ms. Jauregui writes that she "went to grade school with Ross Ulbricht and have known him since my middle school days. He has been my brother Mark's best friend for as long as I can remember. . . I always envied my brother Mark for having such a close, trusting, and loyal friend growing up." *Id*.

Mr. Ulbricht's cousin, Sean Becket, who considers Mr. Ulbricht to be "a close friend and someone [he] greatly admires," notes of Mr. Ulbricht's character and nature as a friend,

> Ross deeply cares about his fellow human beings. He is the kind of guy who remembers your name when you meet him, and he doesn't have to be reminded. He'll ask you questions about yourself, not to be polite, but because he's genuinely interested. Ross has a positive influence on everyone he meets. He is always helpful, giving and ready to contribute to people, even in little ways. He's the friend you can count on for a ride when your car breaks down, and will feed your cat when you're out of town.

*See* Letter of Sean Becket, attached hereto as Exhibit 2, at Letter 33.

Casey Nelson, a friend of Mr. Ulbricht's for more than a decade, since high school, also summarizes Mr. Ulbricht's essence as a friend, in her letter, explaining, "Ross has always been a kind and generous friend – he was a person who you could call upon if you needed to talk or reflect on any of life's big questions, or if you just wanted playful company and to have some fun. He's a loyal person, greatly respected by his peers." *See* Letter of Casey Nelson, attached hereto as Exhibit 2, at Letter 49. Ms. Nelson concludes, "I have admired his compassion and

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 12 of 78

acceptance toward his friends for as long as I have known him." *Id.*

Mr. Ulbricht's childhood friend, Rene Pinnell "who has known Ross since childhood and spent a year living with him as an adult," sheds additional light on Mr. Ulbricht's compassion in his friendships in his letter:

> I consider [Ross] to be one of my oldest and closest friends.
> Growing up together I was always impressed by his kindness and
> gentle nature. . . . A few years ago Ross moved across the country
> [to San Francisco] to help me start a company that scanned family
> photos.  I was also going through a painful break up of an eight-
> year relationship.  Ross not only helped me get my company on
> track but more importantly he helped me get my life back on track.
> . . . He is a good person who has so much to give and contribute.
> The world would be a much poorer place without him.

*See* Letter of Rene Pinnell, attached hereto as Exhibit 2, at Letter 48.

Mr. Pinnell's mother, who "fe[lt] as though Ross were a part of [her] family" shared similar memories of her son's "cherished friend," noting that "[Ross] has a big heart and a tender loving nature and . . . is the kind of man who was there when anyone needed him.  He literally would drop what he was doing to come to your aid."  *See* Letter of Suzi Stern, attached hereto as Exhibit 2, at Letter 73.

Ultimately, as Michael Haney, the father of one of Mr. Ulbricht's closest friends remarked, "[Ross] cares deeply for his friends, and they for him."  *See* Letter of Michael J. Haney, attached hereto as Exhibit 2, at Letter 67.

### 3. *Mr. Ulbricht Has Continuously and Generously Contributed His Time and Energy to Charitable Endeavors*

In addition to Mr. Ulbricht's stewardship of Good Wagon Books, which many of the letter writers remember, and which had a significant charitable component (Mr. Ulbricht donated 10% of all profits from book sales to charity, and also books to prisons), a number of letters provide insight into other charitable endeavors which Mr. Ulbricht has vigorously pursued throughout his life.

For instance, as a youth, Mr. Ulbricht was a Boy Scout and later became an Eagle Scout. Brandon Schaffner, who met Mr. Ulbricht more than 17 years ago through Mr. Ulbricht's sister, recalled that "Ross was very involved with his Boy Scout troop and through that gave back to

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 13 of 78

the community over the years." *See* Letter of Brandon Schaffner, attached hereto as Exhibit 2, at Letter 50. Long-time family friend Karen Steib Arnold, who testified at Mr. Ulbricht's trial as a character witness, also recalls that Mr. Ulbricht "participated enthusiastically in the Boy Scouts, taking part in numerous community service projects on his way to becoming an Eagle Scout." *See* Letter of Karen Steib Arnold, attached hereto as Exhibit 2, at Letter 51.

Shiloh Travis relates an anecdote about Mr. Ulbricht's gracious contribution of his time to an event Mr. Shiloh had organized and was seeking volunteers to help run, explaining

> I first met Ross in the summer of 2010, when I was putting together a team of volunteers to put on an event designed to enrich and empower the lives of attendees. I called him up from a recommendation of another friend, not knowing who he was, and asked if he would consider volunteering his time for some of the event. . . . He blew me away by not only saying yes to my request, but offered to volunteer full time for the entire 5 day event. Of the 16 people that volunteered in the event, he was the only one that was there the whole time. . . . Ross taught me to look toward the service of others to find peace and happiness,. It will be a huge loss for our society if his positive and peaceful contribution is taken away.

*See* Letter of Shiloh Travis, attached hereto as Exhibit 2, at Letter 63.

Marcia Brady Yiapan, a former teacher and filmmaker who has known Mr. Ulbricht and his family for many years, worked alongside Mr. Ulbricht on another charitable venture, Well Aware. According to Ms. Yiapan's letter, "[a]n example of Ross's commitment to helping people is the time and effort he spent in Austin, Texas helping to establish the non-profit water charity Well Aware. This charitable effort, which I also worked on, raised money to dig wells for poor villagers in Kenya." *See* Letter of Marcia Brady Yiapan, attached hereto as Exhibit 2, at Letter 82.

In making these contributions, Mr. Ulbricht devoted his time for charity's sake alone, not for any personal gain or reward, or in anticipation of sentencing. As his friend Brandon Anderson attested,

> [w]hen [Ross] was in college he volunteered at charities. Not for resume building or to brag. He basically never mentioned it except for when it resulted in scheduling conflicts. His volunteer work was because he really wanted to help people. Ross also regularly

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 14 of 78

> donated to charities in college, despite making a very minimal
> salary working in a lab.

*See* Letter of Brandon Anderson, attached hereto as Exhibit 2, at Letter 64.

Indeed, as Mr. Anderson concludes, "[Ross's] humility and desire to do good are a core value of his that I do not feel has diminished." *Id.*

### 4.    *Mr. Ulbricht's Remarkable Thoughtfulness and Compassion for Others*

Of the many admirable traits Mr. Ulbricht possesses, "an abundance of compassion" was one that many of the letter writers recall. *See*, *e.g.*, Letter of Logan Becket, attached hereto as Exhibit 2, at Letter 10. *See also* Letter of Clay Cook, attached hereto as Exhibit 2, at Letter 56 ("I have seen [Ross's] caring and compassionate demeanor many times.[.] . . . He was especially protective of his grandparents, elderly friends and acquaintances"); Letter of Robert Gold, attached hereto as Exhibit 2, at Letter 75 ("[Ross] is someone who would go out of his way to support a new acquaintance, not just his close friends").

The recurring mention of this particular characteristic in letters from a widely disparate group of people reflects that, as attested to by Mr. Ulbricht's sister, Cally, "Ross's qualities of empathy and compassion have extended to people throughout his life." *See* Letter of Cally Ulbricht, attached hereto as Exhibit 2, at Letter 3. As Cally elaborates,

> [Ross] has always accepted everyone, no matter their race, station
> in life or status. . . . That is because Ross sees people for who they
> are, not what's on the outside. He cares about people and wants to
> help improve their lives, be it through music, philosophy
> discussions or acts of kindness. Even as a child Ross especially
> felt for the underdogs, the kids who did not have many friends.
> His sympathetic nature reached out to them, so they felt wanted
> and part of the group. This continued into adulthood.

*Id.*

Dr. Joel R. Meyerson, a close friend of Mr. Ulbricht's from elementary school through college, had similar memories of Mr. Ulbricht:

> [i]n thinking back on our childhood, one particularly salient
> memory of [Ross] was as someone who would repeatedly display
> friendship to many in our school who were perceived as nerdy,

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 15 of 78

weird or otherwise unpopular.  I always thought this was admirable given the often harsh social conditions among high schoolers.  This is a small and impressionistic recollection, but it has stayed in my mind for over 10 years and I think it's emblematic of the kindness that Ross displays so effortlessly.

*See* Letter of Dr. Joel R. Meyerson, attached hereto as Exhibit 2, at Letter 26.  *See also* Letter of Lindsay Gunter Weeks, attached hereto as Exhibit 2, at Letter 84 ("Ross is amazing in the way he embraces life:  loving nature for both the science and spirit, accepting all people despite the social implications, and keeping his word even if it costs him").

Mr. Ulbricht's father, Kirk, provides in his letter a particularly moving account of an incident during Mr. Ulbricht's time as an Eagle Scout which demonstrates Mr. Ulbricht's compassionate nature.  He recalls,

[t]here was an incident while he was a boy scout which illuminates Ross's character.  One of the kids in the troop was almost completely blind. . . . There were a few kids who were always helping out as his companion.  Ross was one of them, even though Ross was younger.  When our troop went to Philmont Scout Ranch for summer camp in the Pecos Wilderness, the blind boy, I'll call him Bill, went with us. . . . The boys would rotate in and out of being Bill's trail companion several times a day.  It meant leaving early, arriving late, and hiking at Bill's slow pace instead of hiking with the leaders of the main group, but there was a group of boys who did it.  Ross was one of them.  Bill never made it through a day without falling at least twice, but he never gave up. . . As we were walking into base camp on the sixth day, I walked a few hundred yards in front of Bill, so he couldn't hear me kicking the loose rocks off the trail in front of him.  Ross joined me, and we walked along kicking rocks aside with tears of pride and joy falling down our faces.  Bill was going to complete the hike with the rest of his buddies. . . . When the whole group stood and roared out their approval of Bill's accomplishment there wasn't a dry eye in the crowd.  Ross never got or sought any particular praise for his part in Bill's triumph, but that's the kind of guy he is, compassionate and selfless.

*See* Letter of Kirk Ulbricht, attached hereto as Exhibit 2, at Letter 2.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 16 of 78

Mr. Ulbricht's aunt, Leigh LaCava, mentions in her letter that another "example of Ross' compassion and caring occurred a few years ago when [their] family had a reunion in Cape Cod, [Massachusetts]." *See* Letter of Leigh LaCava, attached hereto as Exhibit 2, at Letter 9. As Ms. LaCava recounts,

> I flew in from California with my daughter Ava, who at the time was 9 years old, much younger than her adult cousins. The age difference caused her to feel left out, so Ava was spending most of her time alone in her room not participating with the others. Ross became aware of this and went out of his way to spend time with Ava and help her feel comfortable. He made it a point to get to know her. He took her sailing and swimming and Ava was thrilled to have the attention. It warmed my heart to see Ross take this time with his much younger cousin and make the extra effort while her other cousins were too busy. Ross is known for his big heart, and this is just one example. Not all young men are sensitive enough to take the time to make their younger cousin feel part of the group. It was wonderful to see and just one of many times Ross has demonstrated sensitivity and compassion toward others.

*Id.*

Mr. Ulbricht's step-cousin, Catherine Becket recalls yet another family occasion during which Mr. Ulbricht demonstrated his extreme thoughtfulness and compassion for others. As she explains,

> [t]he last time I saw Ross was at my brother's wedding in 2012. There was a dinner held for out-of-towners and most of the guests were in their 20s and 30s. My mother and step-father, both in their 70s, were a bit out of their element. . . . I had a look around for my parents, wanting to make sure they were well situated. I needn't have worried, however, because there was Ross, having a chat with them. I believe they were discussing World War II, one of my step-father's favorite topics. Ross, a handsome and affable young man who could have been chatting with any of the cute girls in attendance, chose to take the time to join my parents who had been sitting by themselves. Being thoughtful comes naturally to him.

*See* Letter of Catharine Becket, attached hereto as Exhibit 2, at Letter 19. *See also* Letter of Suzanne Howard, attached hereto as Exhibit 2, at Letter 74 ("[t]he last time I saw Ross in 2013, I

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 17 of 78

was struck by his demeanor and his eye contact as we spoke. . . . As a senior citizen I am invisible to many younger people, but the interest Ross demonstrated during our visit speaks volumes about his character").

Other letter writers recount a more recent story reflective of Mr. Ulbricht's compassionate nature, from his time living in San Francisco just prior to his arrest.  As told by his aunt, Ann Becket,

> [o]ne of Ross's friends told me how, once, while out walking they passed a woman selling flowers.  Ross stopped and bought a flower and then turned around and gave it to the flower seller.  Confused, his friend asked Ross why he did such a thing.  Ross replied, "People are always buying flowers *from* her, but I wonder how often someone buys a flower *for* her."  That sums up perfectly the essence of my nephew.

*See* Letter of Ann Becket, attached hereto as Exhibit 2, at Letter 6.  *See also* Letter of Lyn Ulbricht, attached hereto as Exhibit 2, at Letter 1.

Indeed, as JoJo Marion, a long time friend of Mr. Ulbricht's and also the younger brother of one of Mr. Ulbricht's close friends, Noah Marion, writes in his letter, "Ross' qualities of empathy, compassion and kindness, [are] qualities he is widely known for and that inspire loyalty among people who know him."  *See* Letter of JoJo Marion, attached hereto as Exhibit 2, at Letter 87.

**5.    *Mr. Ulbricht Is Well-Known to Be Kind, Peaceful and Gentle In Nature***

As Mr. Ulbricht's aunt, Gale LaCava, stated in her letter, "[o]ne would be hard-pressed to find a kinder, more gentle soul that Ross.  Although Ross has now been convicted of a crime, my faith in him remains as strong as when I pledged my life savings toward his bail."  *See* Letter of Gale LaCava, attached hereto as Exhibit 2, at Letter 7.

Likewise, his aunt Kim LaCava, attests, "I have shared countless personal moments with Ross as well as seen him interact with others through all stages of his life.  He has always been an exceptionally sweet, thoughtful and peaceful person.  I can't remember seeing him lose his temper."  *See* Letter of Kim LaCava, attached hereto as Exhibit 2, at Letter 5.  *See also* Letter of Michael Harrison, attached hereto as Exhibit 2, at Letter 36 ("Over the years I encountered Ross on many occasions. . . .  In that time I observed him to be very even tempered, with an upbeat and positive outlook.  I cannot recall a single occasion where I saw him angry or annoyed");
Letter of  Kim Norman, attached hereto as Exhibit 2, at Letter 38 ("[a]ll through his life I've

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 18 of 78

known Ross to be kind, courteous, peaceful and respectful"); Letter of Andy Pruter, attached hereto as Exhibit 2, at Letter 80 ("[a]lways polite and generally reserved, Ross . . . is a peaceful person and [it] would be hard to imagine him to be a threat to anybody").

Still others who know Mr. Ulbricht well, feel the same way. Rosy Hanby, a "long time friend of the Ulbricht family" who has "known Ross since he was just a little boy" commented in her letter, "[t]hroughout his life Ross has been caring, sweet and thoughtful. His relationship with his parents, peers and those around him is a testament to that. I have always known him to have a positive outlook and a peaceful disposition." *See* Letter of Rosy Hanby, attached hereto as Exhibit 2, at Letter 21.

Similarly, Sara Dunn, whose friendship with the Ulbricht family "goes way back to the days [they] shared a South Austin babysitting co-op,"states in her letter, "[o]ver the years it was a joy to watch Ross mature and grow. He was always a bright, conscientious person, polite and gentle." *See* Letter of Sara Dunn, attached hereto as Exhibit 2, at Letter 35.

Daniel Davis, who testified at Mr. Ulbricht's trial and "consider[s] [Ross] to be one of [his] oldest and closest friends," remarked in his letter, "[i]n that time I have known [Ross] to be a kind, forthright, generous and caring person. . . . As a consistently peaceful and non-violent person, I feel that Ross does not pose a threat to the public, and that the likelihood of his committing any criminal acts in the future is nonexistent." *See* Letter of Daniel Davis, attached hereto as Exhibit 2, at Letter 8.

Joe Gyekis, a good friend of Mr. Ulbricht's since they were graduate students at Penn State University, remarked in his letter that "among [his] friends, [Ross] was one of the ones that [his] wife liked best, mostly because of his general kind and respectful personality" as exemplified by a couple of anecdotes that Mr. Gyekis recalled in his letter, and which his wife "remembers to this day." *See* Letter of Joe Gyekis, attached hereto as Exhibit 2, at Letter 27.

In particular, Mr. Gyekis referenced an occasion on which "[his] wife rather shyly invited people from [their] group to come to her singing recital, Ross was the only one to show up." *Id.* On another occasion, when Mrs. Gyekis's parents were in town, "despite the language barrier, [Ross] very kindly invited them to his place and treated them in the polite and thoughtful way that he does to everyone else [they] saw [Ross] around." *Id.*

6.      *Mr. Ulbricht's Potential to Contribute to Society, Including His Support and Encouragement to Others to Make Positive Contributions to Society*

Mr. Ulbricht's impressive academic and scientific accomplishments in college and graduate school are well-known among his family and friends. In addition, nearly all who have

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 19 of 78

written letters on his behalf have also articulated a strong belief in Ross's ability to use his intelligence, in conjunction with his compassionate, generous nature, and inherent desire to improve on peoples lives, to contribute positively to society.

### a.    *Mr. Ulbricht's Potential for Positive Contributions to Society*

As Mr. Ulbricht's father remarks in his letter, "[d]uring his college years, Ross had developed a strong desire to use his talents to make a positive difference in the world [and] . . . rightly felt that he had the potential to do something good for mankind."   *See* Kirk Ulbricht Letter (Exhibit 2, at Letter 2).  Mr. Ulbricht's father, in turn, regards his son as "a young idealistic man who was driven to succeed and to do good work" and who, "in his early twenties, . . . was either in college doing theoretical work for the betterment of mankind or working a book-selling business with a significant charitable component."  *Id*.  Mr. Ulbricht's father also notes "the potential that Ross still has to contribute to society" and to "be a contributor to the benefit of us all" explaining "that the illegal aspects of Ross' Silk Road experiment represents a complete departure from the trajectory of his life," and adding that "[h]is desire to contribute still exists" but "[i]t is tempered with a respect for the law that this experience has added to his character."  *Id*.

Kirk Ulbricht's perception of his son as a gifted young man with tremendous potential to benefit society is shared by many of his lifelong friends, relatives, his former business partner, and those others that know him best.

For instance, Mr. Ulbricht's close friend since high school, Curtis Rodgers, notes "I think Ross' experience as a material science researcher, and entrepreneur with his Good Wagon books venture illustrate his capacity to have a positive impact on our society."  *See* Letter of Curtis Rodgers, attached hereto as Exhibit 2, at Letter 17.

Mr. Ulbricht's business partner at Good Wagon Books, Donny Palmertree, writes in his letter,

> [w]e were friends and business partners, but we never argued, and never had any disagreements that I can remember.   This is one of the best things about Ross – he is as friendly, good-natured and easy going as a person can be. . . . I ask that he will have as short a sentence as possible so that he can use his infectious personality to do more good in the world, like he did with me at Good Wagon Books.

*See* Letter of Donny Palmertree, attached hereto as Exhibit 2, at Letter 32.   *See also* Letter of

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 20 of 78

Robert Reisinger,  attached hereto as Exhibit 2, at Letter 55 ("I have known Ross through his family, as a friend for about seven years.  I also had a business association with him while he was in the book-selling trade. . . . [E]very person [I spoke to about their experience with Ross and his business] gave me nothing but confidence about Ross's professional dealings and ethics. This was also corroborated by my own experience").

J'aime Mitchell, a friend of Mr. Ulbricht's since high school, attributes "the positive impact that people like Ross can have on their communities" to "the community servitude of an Eagle Scout, and the peaceful demeanor of someone who loves the outdoors" which "are all characteristics that bring benefits to this world."  *See* Letter of J'aime Mitchell, attached hereto as Exhibit 2, at Letter 61.

Vicky Cheevers, who has known Mr. Ulbricht since January 2012, remarks in her letter that, "[h]e is highly intelligent, often using intelligence to help people and society in general, as demonstrated by his scientific ability."  *See* Letter of Vicky Cheevers, attached hereto as Exhibit 2, at Letter 12.

Dr. Meyerson, a research scientist and friend of Mr. Ulbricht's since elementary school, comments in his letter that

> in the scientific community I see firsthand on a daily basis the incredible feats that can be accomplished when passion, creativity and technical abilities combine in an individual.  This is an exceedingly rare combination of traits that I know Ross happens to possess. . . . It would be a loss for our country if someone like Ross were unable to have the chance to contribute positively to the many challenges we face now, and will in the years to come.

*See* Dr. Joel R. Meyerson Letter (Exhibit 2, at Letter 26).  *See also* Letter of Martha and Herb Ulbricht, attached hereto as Exhibit 2, at Letter 59 ("Ross could use some of his inherited traits to benefit the community with what time he has left");  Letter of Madeline Norman, attached hereto as Exhibit 2, at Letter 37 ("I have known Ross Ulbricht for almost 18 years. . .  His intellect is inspiring.  He is an amazing person with so much potential.  This . . . should not go to waste");  Letter of Melanie C. Norman, attached hereto as Exhibit 2, at Letter 39 ("[i]t would be a shame to waste such a brilliant mind and heartfelt being");  Letter of Douglas and Valencia Mills, attached hereto as Exhibit 2, at Letter 58 ("[w]e believe [Ross] still has the capacity to do something worthwhile for others.  Our great fear is that his life will be wasted");  Letter of Rick Hardy, attached hereto as Exhibit 2, at Letter 83 ("I feel strongly that [Mr. Ulbricht] should serve as an asset to our nation and not be simply warehoused. . .. The possibilities are unlimited and I feel Mr. Ulbricht can truly be a contributor when given the chance to work toward the good,

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 21 of 78

providing positive and pragmatic solutions to contemporary problems").

John Charles Miller, who has known Mr. Ulbricht and his family since the 1990s, states in his letter, "I believe that with a future out of prison, Ross could achieve many positive actions and deeds for society in general, and specifically his community." *See* Letter of John Charles Miller, attached hereto as Exhibit 2, at Letter 13. *See also* Letter of Lyn Pierce, attached hereto as Exhibit 2, at Letter 45 ("I believe in the depths of my heart that Ross is capable of achieving great good in the world"); Letter of Noah Marion, attached hereto as Exhibit 2, at Letter 46 ("[a]s a person who has been convicted of two crimes, I know personally what it means to be able to move past terrible realities and make a truly altruistic impact on the world. . . What it comes down to is this: Ross has the energy . . . to bring about positive change"); Letter of Linda D. Bailey, attached hereto as Exhibit 2, at Letter 52 ("[Ross is] a bright and personable young man who has a desire to do positive work for society"); Letter of Ariana Stern-Luna, attached hereto as Exhibit 2, at Letter 68 ("[n]ot only have I observed the positive impact that Ross has had among the individuals who he has personally encountered throughout the years, but I have always believed his positive impact would one day expand to benefit society as a whole"); Letter of Luis Jauregui, attached hereto as Exhibit 2, at Letter 79 ("Ross is an intellectual, a free spirit and guileless, with great potential to contribute in very positive ways to the people and world around him").

Jay Thomas, a friend of Mr. Ulbricht's since high school, believes that "Ross is the kind of person this world sorely needs more of. He is someone who can impact this world in a positive way." *See* Letter of Jay Thomas, attached hereto as Exhibit 2, at Letter 29. It is Mr. Thomas's "sincerest belief that when Ross is back in society again, he will use his compassion and talents to do good works and be a productive member of this community." *Id*. *See also* Letter of Timothy A. O'Leary, attached hereto as Exhibit 2, at Letter 60 ("I believe that these criminal activities do not represent . . . the positive things that [Ross] would be capable of achieving both for himself and for society if he were to be spared a long sentence"); Letter of Michele Desloge, attached hereto as Exhibit 2, at Letter 65 ("[a] person such as Ross provides a positive impact on society. We need more people like him contributing ideas and taking action to improve our communities")

Windy Smith, who has known Mr. Ulbricht since 1988 when she was eight years old, and her family moved onto Mr. Ulbricht's street, too, is "positive [that] if [Ross] is spared a long sentence, society would benefit from the impact of his good workings." *See* Letter of Windy Smith, attached hereto as Exhibit 2, at Letter 34.

Mr. Ulbricht's uncle, Jeff Crandall, concurs in his letter: "Ross has a tremendous intellect and strong belief in his fellow man. Given his . . . freedom, Ross will contribute to the betterment [of] our world as few others could – I have no doubt." *See* Letter of Jeff Crandall,

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 22 of 78

attached hereto as Exhibit 2, at Letter 15.

Rosalind Haney, the wife of one of Ross's closest friends, expresses a similar sentiment in her letter, asking the Court to grant Mr. Ulbricht "a second chance to use his intellect and kindness to make a positive impact on society[,]" and sharing her opinion that "of [her husband] Thomas' friends, Ross was always one of my favorites for his friendliness and desire to do something important and meaningful with his life."  *See* Letter of Rosalind Haney, attached hereto as Exhibit 2, at Letter 24.

In that regard, George Reinke, who has known Mr. Ulbricht since August 2011, posits that "the time for Ross to understand the wrongfulness [of his offense conduct] must be a length that the constructive value Ross can being to society is not lost."  *See* Letter of George Reinke, attached hereto as Exhibit 2, at Letter 88.   Mr. Reinke bases this conclusion on a personal connection, as his own "great grandfather was sentenced to death in 1828 for horse theft, then was not only re-sentenced to life . . . but pardoned . . . [and] [h]e became a significant contributor to the development of Sydney[, Australia]."  *Id.*

Indeed, Hannah Thornton, the wife of one of Mr. Ulbricht's close childhood friends, states in her letter, "I was friends with Ross when he began Good Wagon Books, the company he founded with the intention of donating 10% of all profits to charity.  Ross was energized by this undertaking, excited by the idea that through his business he could make the lives of others better."  *See* Letter of Hannah Thornton, attached hereto as Exhibit 2, at Letter 22.

An anecdote from Timothy A. Losie, who met Mr. Ulbricht several years ago when the two were selected to participate in an event at which "you pitch your idea to a small group, and then you . . . spend the next 72 hours making the best ideas a reality," also evokes Mr. Ulbricht's enthusiasm when taking on new ventures.  *See* Letter of Timothy A. Losie, attached hereto as Exhibit 2, at Letter 81.  As Mr. Losie explains, "Ross's idea was one of the only ones I remember. . . . I remember Ross's idea because he was so passionate about it."  *Id.*

Barbara Record Emmert-Schiller, who has "had the privilege of knowing Ross and his family since Ross and [her] son were in elementary school together," remarks in her letter that she knew Mr. Ulbricht "to be a young man busy collecting books for charitable purposes and improving solar efficiency. . . . Ross has always been adventurous and pioneering and has tried to contribute to the greater good."  *See* Letter of Barbara Record Emmert-Schiller, attached hereto as Exhibit 2, at Letter 23.

Put simply by Mr. Ulbricht's cousin, Alex Becket, "I consider Ross one of those truly exceptional individuals who thinks about the greater good for all people."  *See* Letter of Alex Becket, attached hereto as Exhibit 2, at Letter 18.   *See also* Letter of Susie Kim, attached hereto

LAW OFFICES OF
## JOSHUA L. DRATEL, P.C.

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 23 of 78

as Exhibit 2, at Letter 85 ("I have never met a person who cares about the world and humanity as truly and pragmatically as Ross does").

   **b.**  *Mr. Ulbricht's Inherent Ability and Desire to Have a Beneficial Impact On Society Have Been Manifested By His Positive and Voluntary Contributions to His Prison Community*

   Even while incarcerated, Mr. Ulbricht's engine for contributing in positive fashion has been active. As Mr. Ulbricht's older brother, Travis, writes

> [w]hile it's hard to sum up a person's life, there is something I heard about Ross that really "fits" who he truly is. Ross started up a yoga group in jail, to help ease the stress of his fellow inmates, and of himself as well. . . . I believe Ross started the yoga group because it was a bit of good that he could do in his surroundings and for the people around him. That gesture of compassion is who my brother is. It is how he has been in most situations in his life. He is always looking for how he might improve the world and the lives of those around him, even if it's in a small way.

*See* Letter of Travis Ulbricht, attached hereto as part of Exhibit 2, at Letter 4.

   Indeed, Mr. Ulbricht's mother, who has visited him many times during his incarceration at the MDC, and more recently the MCC, is well-aware of his day-to-day activities, and has interacted with prison staff on her visits, attests in her letter that

> [i]n prison Ross has been a great boon to his fellow inmates. Now at MCC, he's tutoring some of them in math and science. He tutored his cellmate for the GED in the evenings after trial. At MDC he led a physics class and a yoga class. His former cellmate (now released) wrote me to say what a positive influence Ross had been on him. An MDC guard took me aside and literally gushed about what a wonderful person Ross is and what an asset he was to the environment there.

*See* Letter of Lyn Ulbricht, attached hereto as Exhibit 2, at Letter 1.

   Fellow inmates, too, have written letters regarding Ross's remarkable contributions to improving the prison community and individual prisoners's lives, and his good temperament while doing so. For example, Michael Satterfield, an electrical contractor, and formerly Mr.

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 24 of 78

Ulbricht's cell mate at MDC, writes,

> [w]e shared a cell at MDC and spend 24 hours, 7 days a week
> [together] for several months.  During that time Ross consistently
> exhibited a peaceful and positive demeanor.  He spent his days
> sharing positive thoughts with the other inmates.  Ross also
> encouraged them to find peaceful ways to resolve their differences.
> With the permission of detention staff, he also began teaching yoga
> and meditation to the general population, inviting anyone to join
> in.  He was always respectful, compliant, and he had the foresight
> to understand and empathize with the difficult duties of the staff.

*See* Letter of Michael Satterfield, attached hereto as Exhibit 2, at Letter 97.

Davit Mirzoyan, "an inmate at MCC in the same unit as [Mr.] Ulbricht," and who has
known him now for five months, states in his letter,

> Ross is generally interested in the welfare of others.  He is well
> educated and gives freely of his time to those who wish to benefit
> from his knowledge.  He has tutored students seeking their GED,
> two others who are working on bachelor degrees by
> correspondence, and me.  When he was helping one prisoner with
> math in the common area, I mentioned that I wanted to learn
> physics some day.  He heard and told me he'd be happy to tutor
> me.  That same day, he lent me his physics text book and we had
> our first lesson.  It has been challenging to absorb the material, but
> Ross helps me fill in the gaps and patiently explains the concepts
> to me.  He is attentive and enthusiastic and makes it fun to learn.
> Every time we sit down for a lesson, I am eager to move forward
> and make productive use of my time in prison.

*See* Letter of David Mirzoyan, attached hereto as Exhibit 2, at Letter 90.

These sentiments echo the sentiments expressed by Mr. Ulbricht's friends who have
known him for many years, including, for instance, Mr. Ulbricht's high school friend, Allison
Cassel, who first met Mr. Ulbricht when they were both sixteen years old.  She recalls "[h]e is so
full of energy, life and love[.] . . . He is so intellectual, patient and articulate in explaining the
complexities of this world."  *See* Letter of Allison Cassel, attached hereto as Exhibit 2, at Letter
16.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 25 of 78

Another inmate, Scott A. Stammers, who invited Mr. Ulbricht to be his cell mate just weeks after Mr. Ulbricht's arrival at MCC, recounts that "when [Mr. Ulbricht] first came in, he struck me as a very calm and collected individual. I knew he was facing serious charges and going to trial, yet every night when he'd come back from court, I'd see him mingling with the other inmates, getting to know them, playing [table] tennis and just being at ease." *See* Letter of Scott A. Stammers, attached hereto as Exhibit 2, at Letter 91. Accordingly, Mr. Stammers explains, "[i]t's easy to get overwhelmed with grief and despair, but when I see Ross, [whose] situation is so much worse, and how he remains friendly and kind to me and the others in our unit, it gives me the strength to do the same. I know Ross would continue to set an example for how to be a strong and peaceful person if he were given his freedom back." *Id*.

As Mr. Ulbricht's sister, Cally, notes in her letter, "[e]ven in the lowest and worst situations, my brother focuses on the positive and aims to make the environment around him a better space." *See* Cally Ulbricht Letter (Exhibit 2, at Letter 3).

Likewise, Mr. Ulbricht's college friend for the past decade, Mae Rock-Shane, explains, "[Ross is] a smart person, a kind soul and one of those people you want to be around, because just having him in your life improves it. He has the same effect on his community, bringing energy and positive change wherever he goes." *See* Letter of Mae-Rock Shane, attached hereto as Exhibit 2, at Letter 25.

It is not surprising then that yet another letter writer, Debbie Tindle, an occupational therapist and friend of Mr. Ulbricht's for more than 13 years, reports in her letter that "[e]ven now, in these dire circumstances, Ross is teaching inmates how to treat their own back pain with 'tennis ball massage' . . . something he learned from [Ms. Tindle] many years ago." *See* Letter of Debbie Tindle, attached hereto as Exhibit 2, at Letter 41.

Put succinctly by his close friend Thomas Haney, "[t]he entire time I've known Ross he has been a positive and uplifting presence and influence on the people around him, and I'm sure he will continue to be so wherever he finds himself." *See* Letter of Thomas Haney, attached hereto as Exhibit 2, at Letter 11.

c.  *Mr. Ulbricht's Ability to Inspire and Encourage Others to Achieve Their Goals and Make Positive Contributions to Society*

Indeed, so many of Ross's close friends and relatives discuss his unique ability to inspire others to pursue and ultimately achieve their goals, even some who had doubted their own abilities to achieve personal success and happiness. As one friend from high school, Margeaux Paschall-Kolquist, attested "[Ross] has always been a very helpful individual who wants to share his knowledge to help others better than own lives." *See* Letter of Margeaux

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 26 of 78

Paschall-Kolquist, attached hereto as Exhibit 2, at Letter 44.

Thus, even in high school, Mr. Ulbricht was guiding and encouraging others. As James McFarland, another friend from high school recalls, "[o]n numerous occasions his friendship and advice helped myself (and others) navigate difficult situations of high school social life." *See* Letter of James McFarland, attached hereto as Exhibit 2, at Letter 57.

As. Mr . Ulbricht developed, his drive to help and direct others in their personal, and professional, pursuits continued. Mr. Ulbricht's close friend since the third grade, Alden Schiller III, states in his letter, "Ross has lived his life being very conscientious of those around him. He took a personal interest in my well being and showed me that he deeply cared about my happiness and that I was flourishing in my environment." *See* Letter of Alden Schiller III, attached hereto as Exhibit 2, at Letter 47.

Similarly, Jonathan Rosenberg, a close friend of Mr. Ulbricht's since middle school, recalls that "[Ross] has always been willing to share his time with anyone who wanted to chat or needed help" and that "Ross [had] deeply affected [his] path in life." *See* Letter of Jonathan Rosenberg, attached hereto as Exhibit 2, at Letter 78. *See also* Letter of Carla Bacelli, attached hereto as Exhibit 2, at Letter 86 ("I remember confiding my feelings in Ross at different times and him giving me advice and just listening"). When during college, Mr. Rosenberg "was considering dropping out of school, Ross was embracing full acceptance of life and inspired [Mr. Rosenberg] to stick to a goal." *Id.* With Ross's encouragement, Mr. Rosenberg "ended up turning [his] grades around, took a bike tour around the USA and got a BS in Computer Science at UT Austin." *Id.*

Michael Policelli, "an aerospace propulsion engineer working in the commercial space industry and a friend of Ross Ulbricht['s] for over [eight] years," remembers that

> [w]e met my sophomore year in college while we were both
> pursuing degrees in Material Science and Engineering. At the time
> I was pursuing my B.S. with plans to work immediately after
> graduation in the industry, but after discussions with Ross and
> attending his M.S. thesis defense about crystal grain growth, I was
> inspired by him to pursue an advanced degree and follow my
> passion in life – and I am extremely grateful for his advice to live
> up to my potential. . . . [Ross's] intelligence, talents and passion to
> help others have so much potential to bring positive change to the
> world.

*See* Letter of Michael Policelli, attached hereto as Exhibit 2, at Letter 42.

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 27 of 78

Notably, Mr. Policelli's college girlfriend, Ashley Callaghan, who first met Mr. Ulbricht in college through Mr. Policelli, also comments in her letter regarding "the positive ways in which Ross has uplifted [her] life." *See* Letter of Ashley Callaghan, attached hereto as Exhibit 2, at Letter 71.

Captain James Woodring, Mr. Ulbricht's friend from Penn State University, remarks in his letter that he "has repeatedly" been "impressed" by Mr. Ulbricht's "depth of character over the years" and describes a particular incident during which Mr. Ulbricht had helped him:

> I struggled in college and had a hard time living on my own and taking care of myself. At that time, I looked up to Ross and was able to learn from his self-discipline, work-ethic, and personal habits. He was always happy to include others in his own positive activities and I benefitted from the solid example he set of good study habits, yoga practice and regular outdoor exercise. . . . Many times he invited me to spend time meditating and attending workshops to study self-empowerment, peaceful communication, and spiritual mindfulness. I cannot thing of another person who embodies these ideals as well as Ross does.

*See* Letter of Captain James Woodring  attached hereto as Exhibit 2, at Letter 53.

Jessica Graves, an acquaintance from high school and subsequently a close friend, who also recalled Mr. Ulbricht's drive to help others succeed, states in her letter,

> I remember once, I mentioned that there was an advanced yoga pose I wanted to get good at, but that it would be impossible without months of stretching. Ross remembered to ask me how it was going months later, long after I had forgotten it was something I had ever said I wanted to do. He is the kind of person who wants you to succeed in your goals. I still haven't mastered that pose, but when I think of the kindness and generosity of spirit that Ross displayed in remembering somethingI said I wanted for myself, I get motivated to get out the mat and work on it.

*See* Letter of Jessica Graves, attached hereto as Exhibit 2, at Letter 70.

Jenni Stewart Pittman who met Mr. Ulbricht during their freshman year at the University of Texas at Dallas, paints in her letter a clear portrait of Mr. Ulbricht's ability to inspire and guide others, including herself, stating

> I am continually grateful that Ross came into my life at such a

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 28 of 78

> critical age.  He was a guiding force in our peer group and offered
> the best advice and unique worldview.  I often talked to Ross
> during that time about my fear of the future and life after
> university.  I wasn't sure if I should follow my passion to become
> an artist and work in public service.  Ross counseled me to follow
> my dreams, not to worry about money, and to do the right thing for
> myself and others.  I saw him be this positive force with out other
> friends as well.  We all needed someone who believed in us at that
> time.  After college, Ross and I stayed updated on each other's
> lives through email and in person when distance and time allowed.
> His letters always encouraged me to take that next step in my own
> life and gave me confidence to move forward.  Ross encouraged
> and held us all accountable to be the best version of ourselves.

*See* Letter of Jenni Stewart Pittman, attached hereto as Exhibit 2, at Letter 76.

Ms. Pittman concludes that, "I know I would not be the person I am today without Ross Ulbricht.  And I hope that he has the chance to impact other people's lives as much as he has mine."  *Id.*

Similarly, another letter writer who identifies herself as a former "dating partner" and more recently a friend of Mr. Ulbricht's, describes in her letter, based largely on e-mail correspondence between herself and Mr. Ulbricht, that she "value[s] Ross for his willingness to provide constructive feedback[:]"

> [f]or example, on one occasion I made a tangential reference to
> downplaying my true enthusiasm for a particular subject matter, to
> which [Ross] addressed, "I encourage you to express your
> enthusiasm.  More often than not, it 'gives people permission' to
> do the same and will attract supportive people to you."

*See* Redacted Letter, attached hereto as Exhibit 2, at Letter 14.  Likewise, "[o]n another occasion when [she] explicitly asked for candid feedback [Ross] responded, '[j]ust my perspective. . . try going for what you want without over analyzing how to get there."

Mr. Ulbricht's commitment to supporting and encouraging the people in his life has not ceased with his incarceration, as demonstrated by his efforts with fellow inmates, discussed **ante**, and also as relayed by letter writers who have reached out to him for guidance since his time at the MDC, and later the MCC.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 29 of 78

Christine Reitmeyer, a friend of Ross's since high school who currently works part-time as an academic counselor at a high school and part-time as a care coordinator at a rehabilitation center for people suffering from addictions to drugs and alcohol, writes in her letter, "I wrote to [Ross in February 2015] about my life and curious about how life had been for him, with so many changes. . . . I expressed feelings of doubt in my new career and he encouraged me to keep going. Even through this difficult time, Ross is working to remain himself: kind, optimistic and full of love." *See* Letter of Christine Reitmeyer, attached hereto as Exhibit 2, at Letter 28.

Jenny Keto, an old friend of Mr. Ulbricht's, also relays in her letter Mr. Ulbricht's ability to support and encourage her, even during his incarceration. As she explains,

> [a]nytime I share my own fears and struggles with my life, he is always there with a positive affirmation to boost my spirits in the midst of troubles far greater than mine. He is the kind of man who cares to reach out to people, focus on others, and in some way help those around him, even in the confines of prison.

*See* Letter of Jenny Keto, attached hereto as Exhibit 2, at Letter 62.

There is, however, only so much Mr. Ulbricht can achieve while incarcerated. As his aunt, Kim LaCava frankly conveys in her letter, "I am saddened by the turn Ross' life has taken, but in particular that there is so much good that will be lost to society in general, not only from him directly but the support he gives others. . . . I know there are still many positive contributions that Ross can make." *See* Kim LaCava Letter (Exhibit 2, at Letter 5).

Mr. Ulbricht is the quintessential example of a good person, with a lifetime of good deeds and admirable behavior, who has also now been convicted of committing a serious crime for which he must be sentenced. This Court, however, would not be the first in this district to face the challenge of sentencing such an individual. In fashioning an appropriate sentence under such circumstances, *i.e.*, in which a defendant's "past history was exemplary" but he committed an "egregious" offense with a Guidelines range of life imprisonment, Judge Jed. S. Rakoff remarked,

> surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 30 of 78

consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, ___ F.Supp.2d ___, 2006 WL 2008727, at *7-8 (S.D.N.Y. 2006) (providing rationale for imposing a below-Guidelines sentence of 42 months' imprisonment in case in which defendant's Guidelines range was life imprisonment, limited only by the statutory maximum sentence of 85 years available on the counts of conviction).[8]

**B.     *The Nature of Mr. Ulbricht's Offense Conduct, and the Motivation and Intent Underlying That Conduct***

**1.     *Mr. Ulbricht's Motivation and Intent In Creating the Silk Road Site***

Mr. Ulbricht has been convicted of seven counts, including narcotics trafficking, narcotics trafficking by means of the Internet, conspiring to commit narcotics trafficking, engaging in a continuing criminal enterprise, conspiring to commit or aid and abet computer hacking, conspiring to traffic in fraudulent identification documents, and conspiring to commit money laundering, all stemming from his alleged design, creation and operation of the Silk Road website.

Yet, as set forth in Mr. Ulbricht's own letter to the Court, and several others, including those of his parents, to whom he has confided throughout this process, Mr. Ulbricht's motivations and intent for the creation of Silk Road were drastically different from what the Silk Road website ultimately became, and which led to its eventual demise.

As Mr. Ulbricht explains in his letter to the Court,

[m]y incarceration for the past year and a half has given me a lot of time to reflect on the actions I took which led to my arrest and conviction, and my motivations for those actions.  When I created

---

[8]  In *Adelson*, Judge Rakoff lamented the

the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.

2006 WL 2008727, at *6.

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 31 of 78

> and began to work on Silk Road I wasn't seeking financial gain. I
> was, in fact, in fairly good financial shape at the time. I was the
> head of a startup company, Good Wagon Books, that was growing
> and had potential. I held two degrees that could land me an
> excellent job I could fall back on should the company fail. I
> created Silk Road because I thought the idea for the website itself
> had value, and that bringing Silk Road into being was the right
> thing to do. I believed at the time that people should have the right
> to buy and sell whatever they wanted to as long as they weren't
> hurting anyone else. However, I've learned since then that taking
> immediate actions on one's beliefs, without taking the necessary
> time to really think them through, can have disastrous
> consequences. . . .
>
> Silk Road was supposed to be about giving people the freedom to
> make their own choices, to pursue their own happiness, however
> they saw individually fit. What it turned into was, in part, a
> convenient way for people to satisfy their drug addictions. I do not
> and never have advocated for the abuse of drugs. I learned from
> Silk Road that when you give people freedom, you don't know
> what they'll do with it. While I still don't think people should be
> denied the right to make this decision for themselves, I never
> sought to create a site that would provide an avenue for people to
> feed their addictions. Had I been more mature, or more patient, or
> even more worldly then, I would have done things differently.

*See* Letter of Ross Ulbricht, attached hereto as Exhibit 1.

Mr. Ulbricht's parents' letters echo those sentiments. As Mr. Ulbricht's mother, Lyn, states in her letter,

> when [Ross] created Silk Road, [he] was a young idealist who was
> passionate about the concept of personal and economic freedom.
> He wanted to convince others of he ideas he was caught up in. To
> that end he created an open, free market website with few
> restrictions. This was a rebellious act and I don't justify it. Nor
> would I ever defend Silk Road. I simply ask that you consider his
> young age and his motivations, which I believe were political and,
> from his immature view, humanitarian. . . . I believe he allowed his
> rash, youthful idealism and zeal to take him into areas and choices

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 32 of 78

> he shouldn't have made, and normally wouldn't have, and it got
> out of hand.

*See* Lyn Ulbricht Letter (Exhibit 2, at Letter 1).

> Mr. Ulbricht's father, Kirk, too refers to his son's passion for
> economic theory and misguided idealism as the catalyst for his
> son's creation of Silk Road, stating "[Ross's] study of economic
> theory was done with the intention of using his knowledge to
> better the common condition of us all.  His idealism led him to
> implement a free market website.  His naivete and the folly of
> youth blinded him to the consequences. . . . It was a terrible
> decision.  I would give anything I have to be able to go back in
> time and have the opportunity to counsel Ross on the inevitable
> outcome of his decision.

*See* Kirk Ulbricht Letter (Exhibit 2, at Letter 2).

As Mr. Ulbricht's uncle, Peter L. Becket, bluntly put it, "[Ross's] creation of the Silk
Road website . . . turned out to be a naive, most unfortunate attempt to put his libertarian and
economic beliefs into a real world setting.  So an idealistic a dream has turned into a nightmare
for someone who had an otherwise bright future."  *See* Letter of Peter L. Becket, attached hereto
as Exhibit 2, at Letter 30.

Accordingly, to the extent that Mr. Ulbricht's actions created a site that was not what he
had initially envisioned, the criminal nature of which has resulted in his imprisonment and
inability to use his considerable intellect and many talents to make a positive contribution to
society, at least for many years to come, Mr. Ulbricht has expressed deep remorse, in his own
letter, and to many others, who in turn have reiterated that sentiment to the Court.

In Mr. Ulbricht's own words, "Silk Road turned out to be a very naive and costly idea
that I deeply regret. . . In creating Silk Road, I ruined my life and destroyed my future.  I
squandered the enviable upbringing my family provided me, all of the opportunities I had been
given, and the ones I have earned, and my talents.  I could have done so much more with my life.
I see that now, but it's too late."  *See* Ross Ulbricht Letter (Exhibit 1).

Mr. Ulbricht goes on to explain that his feeling of regret extend beyond even the
implications of the site itself, to the ramifications his creation of the Silk Road, and eventual
arrest and incarceration, have had on his family: "If I had realized the impact my creation of Silk
Road would ultimately have on the people I care about most, I never would have created Silk

LAW OFFICES OF                                    Hon. Katherine B. Forrest
**JOSHUA L. DRATEL, P.C.**                        United States District Judge
                                                  Southern District of New York
                                                  May 22, 2015
                                                  Page 33 of 78

Road.  I created it for what I believed at the time to be selfless reasons, but in the end it turned out to be a very selfish thing to do."  *Id.*

> Mr. Ulbricht then explained to the Court,

> > I tell you these things because I want you to know that while I will miss the comforts and joys of freedom, the most painful loss is the loss of my ability to support the people I care about and to be a daily part of their lives, and to be a productive member of society. For these reasons, if you find that my conviction warrants a sentence that allows for my eventual release, I will not lose my love of humanity during my years of imprisonment, and upon my release I will do what I can to make up for not being there for the people I love, and to make the world a better place, but within the limits of the law.

*Id.*

> Indeed, Mr. Ulbricht's own family has seen a marked change in Mr. Ulbricht since his arrest.  His sister, Calla, with whom Mr. Ulbricht is extraordinarily close, remarked in her letter, "[Ross's] mindset and ideals have drastically shifted as he had time to think about his actions in the past 19 months."  *See* Calla Ulbricht Letter (Exhibit 2, at Letter 3).  His father, Kirk, similarly expressed that

> > Ross regrets the decision to launch and operate the [Silk Road] website.  He has told me that in our visits to him in prison.  I have seen a very pronounced change in his attitude toward life in general, and in particular to the law, and the consequences of breaking the law.  He is a very different person now than he was before his arrest.  The experience of a year and a half in prison has matured him more than 15 years of life on the outside would have.

*See* Kirk Ulrbricht Letter (Exhibit 2, at Letter 2).

> Mr. Ulbricht's mother, too, has found that Mr. Ulbricht "now 31 and chastened by his imprisonment . . . has matured and will continue to do so. . . . This is someone who is civilized, ready to cooperate and endure what he must in the hopes of returning to society as a law abiding citizen."  *See* Lyn Ulbricht Letter (Exhibit 2, at Letter 1).  Elaborating, she states, "I know he regrets his actions very deeply, not only for the severe consequences he is suffering and the terrible grief and hardship he has caused his family, but for any harm he may have caused

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 34 of 78

others." *Id*.

Yet, while the Silk Road website provided a vehicle for the purchase and sale of illicit drugs, as my May 15, 2015, letter and accompanying Declarations establish, those researchers and professionals who studied the site, and/or participated in its harm reduction measures in the site's forums, and interacted with its users– *i.e.*, Tim Bingham, Dr. Monica Barratt, Dr. Fernando Caudevilla, and Meghan Ralston – attest that the site did in fact ultimately have a positive and progressive element, manifested in its ability to make the inevitable drug trade safer for all participants, both in the terms of the transactions, and the composition of the drugs themselves. *See* May 15, 2015, Letter from Joshua L. Dratel, Esq., to The Honorable Katherine B. Forrest, at 2-8 (Dkt. # 241), and Exhibits 11 to 14 to the Declaration of Lindsay A. Lewis, Esq., (Dkt. # 242).

Moreover, as those Declarants explained, by maintaining the anonymity of its users, Silk Road permitted those users to be open and honest about their drug use and abuse, in turn transforming a universe of customarily wary and inaccessible drug users into a community that provided and availed itself of access to advice that ultimately enabled a number of users to reduce their drug use, or cease use of drugs entirely. *Id*., at Bingham Declaration (Exhibit 11 to the Lewis Dec. (Dkt. # 242).

In fact, since that letter and the accompanying Declarations were filed, I received an e-mail from a former Silk Road user who related the following:

> I can say without a doubt I [private message']d DPR and alerted him to the presence of DoctorX on the SR forum back in 2013. My first pm to him did not include a link to X's thread, DPR pm'd me and asked for that link which I sent to him right away. Several days later I noticed a huge increase in thread views caused by DPR putting X's thread up on the same page as the products were displayed. DoctorX went from working to keep his thread from dropping down to dead thread land, to a sticky on the main page. Huge change due to DPR seeing his importance as a harm reduction specialist.
>
> Far as X goes, I can say he inspired me to quit drugs and follow the golden rule. I helped him a little bit with some English translation issues.

*See* E-mail, May 21, 2015, attached hereto as Exhibit 3.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 35 of 78

Thus, while Silk Road was the largest such web site in history, it was also the most responsible drug market place in history as a result of its ingrained harm reduction ethos and the accountability and safety features integrated into the site. In addition, though there are countless other similar sites operating on the Deep Web and the Internet, by many accounts these other sites do not provide the positive aspects that Silk Road was able to. *See, e.g.*, Greenberg, Andy, "How the Dark Web's New Favorite Drug Market is Profiting From Silk Road 2.0's Demise," *Wired* (November 20, 2014) (in contrast to Silk Road's "libertarian views and bann[ing of] all but victimless contraband," the "rise [of Evolution, a successor site] . . . signals perhaps the final shift away from the political roots of the original Silk Road"); Greenberg, Andy, "Drug Market 'Agora' Replaces the Silk Road as King of the Dark Net," *Wired* (September 2, 2014) (although less permissive than its competitor "Evolution," "[Agora,] unlike Silk Road, . . . allows users to sell several categories of weapons, including powerful semi-automatic firearms").

Accordingly, Mr. Ulbricht is deeply remorseful for the negative aspects of the Silk Road site, in particular because it did not fulfill his idealist vision for it. Indeed, Mr. Ulbricht's exceedingly modest lifestyle demonstrates that his vision for Silk Road did not include personal enrichment, or that he motivated by avarice.

> ### 2.    *The Attempted "Murder for Hire"*
> ### *Allegations Should Not Be Considered*

As detailed below, the attempted "murder for hire" allegations should not be considered because (1) they were not charged conduct, and were not encompassed within the jury's verdict in any respect; (2) they do not constitute elements of Counts One, Three, or any of the other counts in the Indictment; and (3) as the Stipulation embodied in Government Exhibit 805 establishes beyond dispute, there is no evidence – despite the government's comprehensive investigation – that anyone was murdered or even harmed in relation to any of the alleged "murder for hire" plots – indeed, all of the evidence, and lack of evidence, establish that the persons purportedly targeted, as well as any related activity, were fictitious and the alleged plots were not manifested in any manner, but were limited to cyberspace discussions.[9]

---

[9]   The Stipulation states as follows:

1.    Canadian authorities have no record of any Canadian residents named "Blake Krokoff" or "Andrew Lawsry," or any name associated with "Friendly Chemist."

2.    Canadian law enforcement authorities do not have any record of any homicide occuring in the area of White Rock, British Columbia on or

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 36 of 78

In that context – cyberspace – there was abundant evidence at trial establishing that the Silk Road web site (and the internet as a whole) contains ample components of masquerade, code, disguise, deception, and role-playing. That lack of transparency with respect to meaning, intent, and even identity deprives those discussions, included within Government Exhibit 936, of any firm meaning, much less that sufficient to justify enhancement of a defendant's sentence.

For example, there is no evidence establishing the identity of "redandwhite," who could have been *anybody*, including even former Drug Enforcement Administration Special Agent Carl Force or former Secret Service Special Agent Shaun Bridges, both of whom have subsequently been charged with corruption with respect to their unauthorized access to the Silk Road site, including the use of (of a non-exhaustive list of) aliases.

Nor can anyone state with the requisite certainty just what the parties to GX 936 meant in their communications, particularly since certain communications occurred by other means and have not been preserved. It could just as easily been an elaborate means of moving money from the site for an ostensible but fabricated purpose, *i.e.*, extortion or theft. Again, the destination of the payments supposedly related to the "murder for hire" allegations, and any persons connected to such an account, were not identified.

Indeed, the lack of *any* connection to a genuine, identifiable person – either the supposed predators or their targets – reinforces dramatically the prospect that GX 936 describes a fictitious episode with some other import or meaning that, without further evidence, cannot be ascertained. Absent that necessary grounding in reality, the attempted "murder for hire" allegations are insufficiently substantiated to be considered with respect to Mr. Ulbricht's sentencing.

In addition, the "murder for hire" allegations should not be considered in sentencing Mr. Ulbricht because (a) the government has not offered sufficient proof of any of that conduct, and/or Mr. Ulbricht's participation therein, under any standard of proof; (b) due to the potential impact including such uncharged conduct would have on Mr. Ulbricht's sentence, it should be subject to a more exacting standard of proof and discounted entirely if the proof fails to satisfy that stricter standard; and (c) the impact of any such alleged conduct on Mr. Ulbricht's sentence

about March 31, 2013, or any record of any homicides occurring in the area of Surrey, British Columbia on or about April 15, 2013, or any other evidence that anyone was physically harmed as a result of the plans discussed by "Dread Pirate Roberts" and "redandwhite."

*See* Government Exhibit 805.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 37 of 78

should be ameliorated by consideration of the other sentencing factors enumerated in §3553(a).[10]

As detailed below, even before the Supreme Court commenced its series of decisions beginning with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and carrying through *United States v. Booker*, 543 U.S. 220 (2005) and beyond,[11] in which the Court has held that elements of an offense must be decided by a jury, beyond a reasonable doubt (and not by a judge as a "sentencing factor"), the Second Circuit acknowledged the problem inherent in evaluating Guidelines enhancements by the "preponderance of the evidence" standard rather than by a more exacting burden of proof, particularly when the enhancements can result in a substantial increase in the defendant's sentence.

Nor is there a difference for practical purposes when, as here, the government and the PSR have cited the allegations as relevant Mr. Ulbricht's sentence not as relevant conduct under §1B1.3, or as specific Guidelines enhancements, but rather under the broader rubric of §3553(a) factors. Even in that context, though, Due Process would still apply, and require that the information be accurate and sufficiently reliable to warrant consideration.

As a remedial measure, during the pre-*Booker* the Second Circuit established a process by which sentencing courts could ensure that dramatic increases in a defendant's offense level, imposed by either adjustments or inclusion of relevant conduct, could be alleviated by a secondary level of analysis that subjected the facts to a more demanding standard of proof and, if those facts did not meet that standard, an appropriate downward departure.

That process has survived *Booker*, and is indeed augmented by the advisory nature of the Guidelines, and a sentencing court's capacity to balance extreme Guidelines calculations against the sentencing factors listed in §3553(a) in order to arrive at a sentence "sufficient, but not greater than necessary" to achieve the purposes of sentencing identified in §§3553(a)(2)(A)-(D).

In addressing the burden of proof issue in the pre-*Booker* environment, the Second Circuit several times grappled with the inexorable tension between a defendant's Due Process and Sixth Amendment rights at sentencing, and the preponderance of the evidence standard. For

---

[10] The same analysis applies to the six deaths the government seeks to attribute to the Silk Road web site and, in turn, to Mr. Ulbricht. Those deaths are discussed in detail in my May 15, 2015, letter (Docket #241).

[11] The line of cases includes more recently *Alleyne v. United States*, ____ U.S. ____, ____, 133 S. Ct. 2151, 2155 (2013) (extending *Booker* to facts that increase a mandatory minimum sentence) and *Southern Union Co. v. United States*, ____ U.S. ____, 132 S. Ct. 2344 (2012) (extending *Booker* principles to criminal fines).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 38 of 78

example, in *United States v. Cordoba-Murgas*, 233 F.3d 704 (2d Cir. 2000), the Second Circuit clarified its various opinions on the issue, explaining that

> the enhancement of a sentence based upon a defendant's "relevant conduct," if done without regard to the weight of the evidence proving the relevant conduct, may result in a total term of incarceration which is excessive, inappropriate, and unintended under Sentencing Guidelines.

233 F.3d at 708.

The Court in *Cordoba-Murgas* cited and quoted from *United States v. Gigante*, 94 F.3d 53 (2d Cir. 1996), which included adjustments within that framework:

> the preponderance standard is no more than a threshold basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered with regard to both upward adjustments and upward departures. With regard to upward adjustments, a sentencing judge should require that the weight of the factual record justify a sentence within the adjusted Guidelines range.

94 F.3d at 56. *See also United States v. Concepcion*, 983 F.2d 369, 390 (2d Cir. 1992) and 983 F.2d at 393-95 (Newman, J., *concurring*).

Under such circumstances, the Court in *Gigante* instructed that in making its determination,

> the Court may examine whether the conduct underlying multiple upward adjustments was proven by a standard greater than that of preponderance, such as clear and convincing or even beyond a reasonable doubt where appropriate.

94 F.3d at 56.

The Court in *Gigante* added, "[w]here a higher standard, appropriate to a substantially enhanced sentence range, is not met, the court should depart downwardly." *Id.* In *Cordoba-Murgas*, the Court similarly declared that "the factual finding by a preponderance of the evidence is a preliminary step susceptible to adjustment." 233 F.3d at 709. The Court in *Cordoba-Murgas* also authorized downward departures when the appropriate standard of proof

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 39 of 78

was not satisfied, 233 F.3d at 708, and provided the following direction to sentencing courts after finding such enhancements or relevant conduct by a preponderance of the evidence:

> under the combination of circumstances that may be present here, including (i) an enormous upward adjustment (ii) for uncharged conduct (iii) not proved at trial and (iv) found by only a preponderance of the evidence, (v) where the court has substantial doubts as to the accuracy of the finding, the Court would be authorized to depart downward from the scheduled adjustment by reason of the extraordinary combination of circumstances.

233 F.3d at 708, *citing United States v. Concepcion*, 983 F.2d at 389. *See also United States v. Allen*, 644 F. Supp.2d 422, 435 (S.D.N.Y. 2009) (footnote omitted).

Since *Booker*, that doctrine has not been disturbed. For example, in *United States v. Vaughn*, 430 F.3d 518 (2d Cir. 2005), in addressing whether acquitted conduct can be used in calculating a Guidelines range (and deciding it can), then-Judge Sotomayor, writing for the panel, considered it important to remind courts that

> [w]e restate, however, that while district courts may take into account acquitted conduct in calculating a defendant's Guidelines range, they are not required to do so. Rather, district courts should consider the jury's acquittal when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence. *See Cordoba-Murgas,* 233 F.3d at 708 (acknowledging that enhancements based on relevant conduct may be excessive when imposed "without regard to the weight of the evidence proving the relevant conduct") (citation omitted); *United States v. Gigante,* 94 F.3d 53, 56 (2d Cir.1996) (holding that, for sentencing purposes, "the preponderance standard is no more than a *threshold* basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered") (emphasis in original).

430 F.3d at 527. *See also United States v. Juwa*, 508 F.3d 694 (2d Cir. 2007) (*citing Cordoba-Murgas* in the context of holding that the allegations in an indictment were by themselves insufficient to justify an enhanced sentence).

Indeed, the *Cordoba-Murgas* doctrine was applied in *United States v. Allen*, 644 F. Supp.2d 422 (S.D.N.Y. 2009), in which the Court found certain relevant conduct by the

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 40 of 78

preponderance standard, yet noted that "the Guidelines are not mandatory[,]" *id.*, at 434 (footnote omitted), and that "were defendants to be sentenced in accordance with the Guidelines, a downward departure might be appropriate." *Id.*, at 435.

In examining the conduct – which the Court concluded it had "no doubt that [it] in fact occurred," although adding that it was equally "skeptical that any rational jury could make this finding beyond a reasonable doubt" *id.* (footnote omitted) – the Court in *Allen* remarked that "[t]he situation in *Cordoba-Murgas* exactly parallels that of these defendants" because "[t]he related conduct increases their sentencing exposure *at least five-fold* for conduct proven only by a preponderance of the evidence." *Id.*, at 435 (emphasis in original) (footnote omitted).

In addition, the Court in *Allen* reasoned that "[w]ere the Guidelines mandatory, and no downward departure available, this situation would present serious constitutional problems. Due process of law has little meaning if it does not protect citizens from such arbitrary exercises of power." *Id.*, at 434.

The discretion *Cordoba-Murgas* and its successors in the post-*Booker* environment afford sentencing courts for the purpose of ameliorating disproportionate enhancements and/or relevant conduct has been amplified since *Booker* by the Guidelines' status as merely advisory, and the added consideration of §3553(a)'s sentencing factors that are balanced against the Guidelines' severity. *See, e.g., United States v. Jones*, 531 F.3d 163, 176 (2d Cir. 2008) (noting that question of standard of proof is less compelling because *Booker* makes *all* Guidelines findings "in the end, only advisory") (other citations omitted), *citing Vaughn*, 430 F.3d at 525; *United States v. Salazar*, 489 F.3d 555, 558 (2d Cir. 2007) ("the discretion afforded district judges by *Booker* applies only to their consideration of a Guidelines range as one of the §3553(a) factors *after* that range has been calculated").[12]

---

[12] The panel's statement in *Jones* that "[i]n light of this Court's continual application of the preponderance of the evidence standard, it is incorrect to construe the [] language [in *United States v. Shonubi*, 103 F.3d 1085, 1089 (2d Cir. 1997)] as authorizing the use of a higher standard of proof[,]" 531 F.3d at 176, *citing Cordoba-Murgas*, 233 F.3d at 708, and *United States v. Bennett*, 252 F.3d 559, 565 (2d Cir. 2001) (reiterating that *Shonubi* remark was *dictum*), which would appear to deprive the Court of discretion to follow *Cordoba-Murgas* and *Gigante*, and apply a higher standard of proof, are at best confusing and inconsistent. Neither *Cordoba-Murgas* nor *Gigante* have ever been overruled; indeed, the cases that reassert the preponderance standard – *i.e., Vaughn*, and even *Jones* itself – all cite *Cordoba-Murgas* as authority while inexplicably ignoring the remainder of *Cordoba-Murgas*'s instruction to the District Court: that, as set forth **ante**, at 38-42, it at least permissible, and even appropriate, to calibrate the burden of proof proportionately with the effect a particular adjustment or set of facts exerts on a

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 41 of 78

     Consequently, it is respectfully submitted that the process set forth in *Cordoba-Murgas* should be implemented to determine whether any conduct constitutes relevant conduct.[13]  Such a potential increase in Mr. Ulbricht's sentence requires attendant safeguards, with respect to both the quality of information relied upon, *i.e.*, whether the evidence is competent and/or admissible under the Federal Rules of Evidence.

     While the Federal Rules of Evidence do not limit the type of information a Court can consider at sentencing, *see* 18 U.S.C. §3661 (*see also* **ante**, at 6), certainly the integrity and reliability of certain information is a factor in determining whether such information can legitimately form the basis for increasing the length of a sentence – and to what extent if permissible at all.  Indeed, Due Process places constraints on the impact information can have on sentence relative to that information's provenance.  *See United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978).  Due Process and the Sixth Amendment do not permit any less.

     Accordingly, under any standard of proof, the attempted "murder for hire" allegations are legally and factually insupportable in this case, and consequently do not qualify as competent for

---

defendant's Guidelines level, and depart downward accordingly.  In addition, the comment in *Jones* that the language in *Shonubi* was merely *dictum*, 531 F.3d at 176, is perplexing because the relevant passage in *Shonubi* declares "though the Sentencing Commission has favored the preponderance-of-the-evidence standard for resolving all disputed fact issues at sentencing, U.S.S.G. § 6A1.3., p.s., comment., *we have ruled that a more rigorous standard should be used* in determining disputed aspects of relevant conduct where such conduct, if proven, will significantly enhance a sentence."  103 F.3d at 1085 (emphasis supplied), *citing United States v. Gigante*, 94 F.3d 53, 56-57 (2d Cir.1996) (denying petition for rehearing).

   [13]  Nor does the opinion in *United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008), alter the analysis.  In *Yannotti*, the jury convicted the defendant of RICO conspiracy, but deadlocked on the substantive RICO count.  *Id.*, at 118.  The jury also deadlocked on an alleged kidnaping conspiracy, *id.*, at 119, and the Court made the unremarkable determination that it "could be factored into Yannotti's sentence as relevant conduct pursuant to §1B1.3."  *Id.*, at 128.  The Court did not address *Cordoba-Murgas*, or *Gigante*, or whether the effect of the relevant conduct could be moderated by imposition of a higher burden of proof and a downward departure, as those cases authorize.

     Interestingly, too, in *Yannotti*, while the jury had marked on the verdict sheet "not proven" with respect to murders and attempted murders, *id.*, at 118-19, apparently that conduct was *not* included in the Guidelines calculation or sentence as relevant conduct (but only the kidnaping conspiracy was in dispute).  *Id.*, at 127-28.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 42 of 78

the Court to consider.[14]  Moreover, even if they did, it is respectfully submitted that the Court should ameliorate their impact on Mr. Ulbricht's sentence by balancing them against consideration and application of §3553(a)'s sentencing factors.

> ### 3.    *Mr. Ulbricht's Offense Conduct Most Closely Resembles A Violation of 21 U.S.C. §856, Proscribing "Maintaining Drug-Involved Premises"*

Also, as set forth in Mr. Ulbricht's initial pretrial motions (Docket # 19-21), his offense conduct more closely resembles a violation of 21 U.S.C. §856, "Maintaining Drug-Involved Premises, than it does either 21 U.S.C. §§841, 846, or 848.  Section 856 makes it unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance;" §856(a)(1), and/or "manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance."  §856(a)(2).

Designed in particular to eliminate "crack houses," the text of and legislative history for §856 make it clear that it imposes criminal liability only on persons whose premises are operated for the purpose of manufacturing, storing, distributing or using a controlled substance.  *See* H 5484, 99th Cong, 2d Sess (Sept 8, 1986), in 132 Cong Rec S 26473, 26474 (Sept 26, 1986) (purpose of §856 was to "[o]utlaw operation of houses or buildings, so-called 'crack-houses,' where 'crack,' cocaine and other drugs are manufactured or used");  *see also* Historical and Statutory Notes to 21 U.S.C. §856.[15]

---

[14]  As noted **ante**, at n. 10, these principles and the same result should obtain with respect to the six deaths the government seeks to attribute to the Silk Road web site and Mr. Ulbricht, which are addressed in my May 15, 2015, letter to the Court (Docket # 241).

[15]  Consistent with Congress's express purpose in enacting §856, it has been primarily applied to punish those individuals involved in operating drug manufacturing or distributing operations out of crackhouses, warehouses, or large drug manufacturing and storage facilities. *See United States v. Wicker*, 848 F.2d 1059 (10th Cir.1988) (methamphetamine lab); *United States v. Martinez–Zyas*, 857 F.2d 122 (3rd Cir.1988) (cocaine warehouse and packaging facility);  *United States v. Bethancurt*, 692 F.Supp. 1427 (D.C. Dist.Ct.1988) (crack house); *United States v. Restrepo*, 698 F.Supp. 563 (E.D.Pa.1988) (cocaine warehouse).  *But see United States v. Tamez*, 941 F.2d 770, 773-74 (9th Cir. 1991) (owner of used car dealership who was aware of large-scale drug distribution activities emanating from his dealership, and allowed them to continue, was guilty of violating §856(a)(2));  *United States v. Chen*, 913 F.2d 183, 185, 191 (5th Cir. 1990) (same re: motel owner who was aware of and/or willfully blind to the fact that her

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 43 of 78

Plainly, §856 was intended to cover a gap in the criminal code and create a vehicle for holding criminally liable those whose premises were used, with their knowledge and intent, for the particular criminal activity described in §856. That is exactly what Mr. Ulbricht's conduct manifested, albeit in the more modern form of a web site.

Yet, §856, which describes Mr. Ulbricht's offense conduct with precision, carries a maximum penalty of 20 years' imprisonment. As a result, it is respectfully submitted that Mr. Ulbricht's sentence should reflect significant consideration of the appropriate sentence, and limitations thereon, for the specific type of offense conduct for which Mr. Ulbricht has been convicted.

C.      *Sentencing Mr. Ulbricht to a Prison Term Substantially Below the Applicable Guidelines Range Would, As Required by §3553(a)(6), Avoid Creating an Unwarranted Sentencing Disparity*

In sentencing a defendant the Court is required to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6). Here, a sentence of life imprisonment or the functional equivalent would create just such an "unwarranted sentence disparit[y]" in contravention of §3553(a)(6)'s mandate.

As noted **ante**, Mr. Ulbricht's offense conduct was more analogous to a violation of §856, which carries a maximum prison sentence of 20 years. Yet here he faces substantially more prison time due to the broader nature of the charges (and their corresponding lengthier statutory maximum penalties), and because the applicable Sentencing Guidelines level – a base offense level of 36 – is predominantly a function of the quantity of drugs involved.

In that context, as a threshold matter, the Second Circuit's decision in *Dorvee*, in which the Court addressed essentially automatic but severe Guidelines enhancements in child pornography cases that placed Guidelines ranges at or near the statutory maximum(s), is particularly pertinent here, too.

In *Dorvee*, addressing enhancements relating to possession of child pornography (§2G2.2), the Circuit noted that "the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to

---

motel was occupied by drug dealers who sold drugs in the rooms and on the premises, and who also stored drugs at her motel).

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 44 of 78

unreasonable sentences that are inconsistent with what §3553 requires." 616 F.3d at 184.[16]

The Circuit also explained in *Dorvee* that §2G2.2 is different from most Guidelines in that it is not based on empirical data. 616 F.3d at 186. Indeed, that was a defect in the crack-cocaine Guidelines at issue in *Kimbrough v. United States*, 552 U.S. 85 (2007). The same is true with respect to the drug quantity enhancements as well: they represent merely a point in space chosen arbitrarily, and are not the result of the Sentencing Commission's core function, *i.e.*, assigning Guidelines levels that conform with conclusions based on data compiled from a statistically significant number of cases.

The drug quantity Guidelines were developed by the Sentencing Commission pursuant to a directive from Congress, as part of the Sentencing Reform Act of 1984 that the Commission set Guideline ranges for drug offenders. In formulating this Guideline the Commission's task was to engage in a developmental process that included examination of  pre- Guideline sentences to ensure that the Guideline sentences would not be, on average, materially different from actual time spent in prison by then-current offenders. *See* 28 U.S.C. §994(m).

Also, the Commission was to review periodically the implementation of those Guidelines by considering feedback from the judiciary and other components of the criminal justice system. *See* 28 U.S.C. §§994(o), (p) & (x). In addition, Congress directed the Commission to conduct extensive empirical research  by collecting data and studying the relationship of the sentences imposed to the sentencing goals enumerated in 18 U.S..C. §3553(a)(2). *See* 28 U.S.C. §§995(a)(12)-(16).

Yet, since their promulgation, neither the original Guidelines nor the amendments expanding the class of the offenders has ever been the subject of, or supported by, empirical evidence or reason. As noted **ante**, the Supreme Court has advised in a number of cases including *Rita v. United States*, *Kimbrough v. United States*, and *Pepper v. United States*, district courts can consider whether a particular Guideline itself can be disregarded (or discounted) because it was based merely on Congressional or Commission fiat, and *not* on empirical evidence. *See also Dorvee*, 616 F.3d at 184-88.

---

[16] *See also United States v. Tutty*, 612 F.3d 128, 130-33 (2d Cir. 2010) (applying *Dorvee*); *United States v. Bonilla*, 618 F.3d 102, at 110 (2d Cir. 2010) (extending *Dorvee* doctrine to the 16-point enhancement related to illegal reentry conviction); *United States v. Hernandez*, 2010 WL 2522417, at *1 (E.D.N.Y. May 28, 2010) (acknowledging *Dorvee*, but noting that §3553(a) analysis would not alter sentence because defendant received the mandatory minimum term of five years).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 45 of 78

In *Dorvee*, the Court further examined the extent to which a sentencing court owes deference to the Guidelines when a particular enhancement is not the product of empirical evidence, explaining that the ordinary

> deference to the Guidelines is not absolute or even controlling; rather, like our review of many agency determinations, "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 [] (1944); *see Kimbrough,* 552 U.S. at 109 [] (citing the crack cocaine Guidelines as an example of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role").

616 F.3d at 188.

As a result, the Court in *Dorvee* recognized that under such circumstances

> adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories.

616 F.3d at 187.

Confronted with that situation in *Dorvee*, the Court concluded that "[t]his result is fundamentally incompatible with § 3553(a)[,]" because "[b]y concentrating all offenders at or near the statutory maximum, §2G2.2 eviscerates the fundamental statutory requirement in §3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant[.]'" *Id.*

The Court in *Dorvee* added that mechanical application of such Guidelines enhancements

> violates the principle, reinforced in *Gall,* that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct. *See Gall,* 552

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 46 of 78

> U.S. at 55 [] (affirming a sentence where "it is perfectly clear that
> the District Judge considered the need to avoid unwarranted
> disparities, but also considered the need to avoid unwarranted
> *similarities* among other co-conspirators who were not similarly
> situated" (emphasis in original)).

*Id.*[17]

Thus, as the Court in *Dorvee* lamented with respect to §2G2.2, "sentencing enhancements cobbled together through this process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." 616 F.3d at 186. Yet, as the Court cautioned, "[i]n all events, even a statutory maximum sentence must be analyzed using the §3553(a) factors." 616 F.3d at 184.[18]

Ultimately, the Court in *Dorvee* reminded that

> [d]istrict judges are encouraged to take seriously the broad
> discretion they possess in fashioning sentences under §2G2.2 –
> ones that can range from non-custodial sentences to the statutory
> maximum-bearing in mind that they are dealing with an eccentric
> Guideline of highly unusual provenance which, unless carefully
> applied, can easily generate unreasonable results.

616 F.3d at 188.

That "broad discretion" exists here as well, even in the context of Mr. Ulbricht's conduct, which essentially facilitated the sale of drugs. As the Court concluded in *Dorvee*, "[w]hile we

---

[17] In *Dorvee*, the Court offered an example of how Guidelines like §2G2.2 create – via automatic substantial enhancements applied across a broad spectrum of a specific offense conduct – unwarranted *similarities* among dissimilar defendants: "[e]ven with no criminal history, this [defendant's] total offense level of 23 would result in a Guidelines sentence of 46 to 57 months. This is the same Guidelines sentence as that for an individual with prior criminal convictions placing him in a criminal history category of II, who has been convicted of an aggravated assault with a firearm that resulted in bodily injury.[]" 616 F.3d at 187 (footnote omitted).

[18] *See also United States v. Adelson*, (certain customary offense-specific enhancements "represent[] . . the kind of 'piling-on' of points for which the guidelines have frequently been criticized"). 2006 WL 2008727, at *5.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 47 of 78

recognize that enforcing federal prohibitions on child pornography is of the utmost importance, it would be manifestly unjust to let Dorvee's sentence stand." *Id.*

Here, as in *Dorvee*, "adherence to the Guidelines results in virtually no distinction between sentences for the most dangerous offenders," 616 F.3d at 187, and someone like Mr. Ulbricht, who, as the scores of letters on his behalf attest, should not be categorized among them. As a result, sentencing Mr. Ulbricht at or close to the applicable advisory Guidelines range would result in a sentence that is "fundamentally incompatible with § 3553(a)." *Id.*

In amending the drug quantity table in 2014, the Sentencing Commission expressly acknowledged that the focus on drug quantity skewed sentences in the wrong direction. As the Commission noted in explaining its 2014 amendments,

> [t]hese numerous adjustments, both increasing and decreasing offense levels based on specific conduct, reduce the need to rely on drug quantity in setting the guideline penalties for drug trafficking offenders as a proxy for culpability, and the amendment permits these adjustments to differentiate among offenders more effectively.

Amendments to the Sentencing Guidelines (April 30, 2014), at 23 (hereinafter "2014 Amendments"), <available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20140430_RF_Amendments.pdf>.

Moreover, the Commission noted that "[t]he amendment was also motived by the significant overcapacity and costs of the Federal Bureau of Prisons." *Id.* As the Commission reported,

> [i]n response to these concerns, the Commission considered the amendment an appropriate step toward alleviating the overcapacity of the federal prisons. Based on an analysis of the 24,968 offenders sentenced under §2D1.1 in fiscal year 2012, the Commission estimates the amendment will affect the sentences of 17,457 – or 69.9 percent – of drug trafficking offenders sentenced under §2D1.1, and their average sentence will be reduced by 11 months – or 17.7 percent – from 62 months to 51 months. The Commission estimates these sentence reductions will correspond to a reduction in the federal prison population of approximately 6,500 inmates within five years after its effective date.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 48 of 78

*Id.*

In that context, the Commission

> the Commission received testimony from several stakeholders that
> the amendment would permit resources otherwise dedicated to
> housing prisoners to be used to reduce overcrowding, enhance
> programming designed to reduce the risk of recidivism, and to
> increase law enforcement and crime prevention efforts, thereby
> enhancing public safety.

*Id.*, at 24.  *See also* Sari Horwitz, "Holder Calls for Reduced Sentences for Low-Level Drug
Offenders," *The Washington Post*, March 13, 2014, available at
<http://www.washingtonpost.com/world/national-security/holder-will-call-for-reduced-sentences
-for-low-level-drug-offenders/2014/03/12/625ed9e6-aa12-11e3-8599-ce7295b6851c_story.html
> (quoting Attorney General Eric H. Holder, Jr. testifying before the Sentencing Commission
with respect to the Amendment to §2D1.1, as stating that "[c]ertain types of cases result in too
many Americans going to prison for far too long, and at times for no truly good public safety
reason . . .  Although the United States comprises just five percent of the world's population, we
incarcerate almost a quarter of the world's prisoners").

The Sentencing Commission, in explaining its pending amendment to §2D1.1, and its
conclusion that "the amendment should not jeopardize public safety[,]" also cited the absence of
any reduction in recidivism resulting from increased sentences:

> the Commission was informed by its studies that compared the
> recidivism rates for offenders who were released early as a result
> of retroactive application of the Commission's 2007 crack cocaine
> amendment with a control group of offenders who served their full
> terms of imprisonment.  *See* USSG App. C, Amendment 713
> (effective March 3, 2008).  The Commission detected no
> statistically significant difference in the rates of recidivism for the
> two groups of offenders after two years, and again after five years.
> This study suggests that modest reductions in drug penalties such
> as those provided by the amendment will not increase the risk of
> recidivism.

2014 Amendments, at 23-24.

Accordingly, the disproportionate impact drug quantity exerts on sentencing has been

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 49 of 78

recognized by the Sentencing Commission as a factor that needs to be recognized and rectified. Here, the distorting effect of drug quantity is magnified in the context of Mr. Ulbricht's offense conduct, which did not involve the sale of controlled substances, but rather the construction and operation of an internet vehicle that permitted others to do so, activity that in the brick-and-mortar world would be most akin to a violation of §856 and subject to a maximum punishment of 20 years' imprisonment.

> **D.**    ***The Prevailing Academic and Other Research Establishes That General Deterrence Is Not a Valid Basis for Enhancing Mr. Ulbricht's Sentence***
>
> **1.**    ***Specific Deterrence for Mr. Ulbricht Will Be More Than Amply Accomplished By the Mandatory Minimum 20-Year Prison Term***

Among sentencing's principal purposes is deterrence, both general and specific. *See* §§3553(a)(2)(B) & (C). The issue of *specific* deterrence – relating solely to deterring Mr. Ulbricht from future criminal conduct – is addressed in depth **ante** in section II(A) of this letter, and, it is respectfully submitted should not be a factor beyond the 20-year mandatory minimum Mr. Ulbricht faces as a result of his conviction on Count Four.

This case represents Mr. Ulbricht's first interaction with the criminal justice system, and his first conviction. In *United States v. Mishoe*, 241 F.3d 214 (2d Cir. 2001), in the context of the Career Offender Guidelines, the Court pointed out that "[t]he Commission has explained that the escalating sentence ranges prescribed by the CHCs are intended to achieve the purpose of deterrence[.]" *Id.*, at 220, *citing* U.S.S.G. Ch. 4, Pt. A, intro. comment.

Yet, as courts have concluded, for defendants who have not yet experienced extended incarceration, the deterrent purpose is satisfied by a sentence far shorter than a particular Guidelines range (including even those pursuant to the Career Offender Guidelines) would provide. For example, in *Mishoe*, explaining its reasoning in the Career Offender context, the Second Circuit remarked that

> [o]bviously, a major reason for imposing an especially long
> sentence upon those who have committed prior offenses is to
> achieve a deterrent effect that the prior punishments failed to
> achieve. That reason requires an appropriate relationship between
> the sentence for the current offense and the sentences, particularly
> the times served, for the prior offenses. If, for example, a
> defendant twice served five or six years and thereafter committed
> another serious offense, a current sentence might not have an
> adequate deterrent effect unless it was substantial, perhaps fifteen

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 50 of 78

> or twenty years. *Conversely, if a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect.*

241 F.3d at 220 (emphasis added).

Consequently, the Court in *Mishoe* concluded the District Court "would be entitled on remand to consider whether to make a departure based on an individualized consideration of factors relevant to the assessment whether CHC VI 'significantly over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes.'" *Id*. at 219, *citing* U.S.S.G. §4A1.3.

Here, of course, Mr. Ulbricht is in Criminal History Category I, yet faces the possibility of a life sentence. Yet the Second Circuit's rationale in *Mishoe* applies with equal if not greater force here: that a sentence of that length, or even approaching that length, is not necessary to achieve a deterrent effect.

## 2.    *General Deterrence Should Not Be a Factor In Mr. Ulbricht's Sentence*

Regarding general deterrence, while it is an express component of so many sentences, there is not any research or clinical evidence that justifies enhancing a particular defendant's sentence based on the prospect, entirely speculative and inchoate, of influencing some putative future wrongdoer, unidentified in any fashion, who has yet to commit, and perhaps even contemplate, a crime. Such a person's knowledge, motivation, and compelling factors that would lead to criminal conduct are simply unknown. Defendants should receive the sentence *they* deserve, and not have as a component of their sentence what some other, future, unknown defendant deserves.[19]

Indeed, strict and in many instances Draconian mandatory minimum sentences for federal drug offenses have been in place for three decades now, and there remains no shortage of

---

[19]    *See* Michael J. Lynch, *Beating a dead horse: Is there any basic empirical evidence for the deterrent effect of punishment?*, 31 Crime, Law & Social Change 347 (1999) (hereinafter "*Beating a dead horse*"), at 355 ("[m]ost assuredly, the assumption that a lesser increase in the rate of incarceration would have caused an inflated rate of offending *is just that* – an *assumption* or assertion *which cannot be demonstrated* except with data that make a great many assumptions about how individuals *might* behave given some set of *hypothetical* circumstances") (emphasis in original).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 51 of 78

persons willing to engage in the illegal activity that puts them in jeopardy of such punishment. Consumer demand for illicit drugs in the U.S., and not prudential behavior, is what drives this market, the profits, and the consequent willingness of individuals to risk their freedom for what for many is a lifestyle they fully expect will be short-lived before they are apprehended or become a casualty of drug violence.

As detailed below, in the context of Silk Road, internet drug markets will not be affected by the sentence in this case. Whether due to the anonymity TOR provides, or the global nature of the marketplace, those who build and operate such markets will not be discouraged by the sentence in this case any more than the street drug trade wants for steerers, sellers, distributors, and suppliers notwithstanding thirty years of a well-advertised severe regime of pretrial detention, sentencing, and forfeiture in the federal system (and/or in the states that implemented such systems since the 1970's).

a.      *Harsh Penalties Are Not Effective In Deterring Drug Activity*

For decades, law makers and courts have implemented various methods addressed to reducing drug crime, with varied focus and limited success. Drug policy in the United States is currently dominated by a concentration on increasing the cost of drug crime to participants, primarily through heavy punitive measures, in an effort to reduce the supply of and demand for drugs. The underlying theory is that the threat of a heavy penalty is incorporated into the cost of participating in drug activity, ideally resulting in higher prices and lower quality drugs, and thus, decreased demand. *See* Echegaray, Margarita Mercado, *Drug Prohibition in America: Federal Drug Policy and Its Consequences*, 75 Rev. Jur. U.P.R. 1215, 1246-47 (2006) (hereinafter "*Echegaray*").[20]

---

[20] Also, according to a criminologist, there

> is a widespread belief that in order for society to "get revenge" against those who transgress the law, criminal penalties must be stiffened so that they are much graver than the crimes criminals commit (the punishment must outweight the rewards of crime). This interpretation of the connection between revenge and punishment, while popular, misses one of the central premises of retributive philosophy: namely, that the crime and punishment should be near equivalents [ ]. From the perspective of retributive theory, the excessive punishments which characterize the U.S. penal system do not fall within the parameters of retributive philosophy, and does not facilitate meetings the goals of

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 52 of 78

However, current and historical trends demonstrate that an enforcement policy grounded in deterrence does not account for the various, and possibly unique, motivations driving participation in drug crimes. Since harsher penalties, including mandatory minimums, were instituted, and despite focusing billions on disrupting the supply of drugs, the rate of drug use has remained fairly constant, new drugs continue to emerge, drug purity has in fact improved, and drug prices have fallen. *See The Price and Purity of Illicit Drugs: 1981 Through the Second Quarter of 2003*, Executive Office of the President, Office of National Drug Control Policy, November 2004 (hereinafter "*Price and Purity 1981-2003*"), at v-vii, available at <https://www.ncjrs.gov/ondcppubs/publications/pdf/price_purity.pdf>; *see also* Fries, Arthur et al., *The Price and Purity of Illicit Drugs: 1981-2007*, Institute for Defense Analyses, October 2008, at VII-1 - 3, available at <https://www.whitehouse.gov/sites/default/files/ondcp/policy-and-research/bullet_1.pdf>.

Comprehensive surveys examining the impact of increased sentences on drug activity have repeatedly concluded that attempting to deter drug dealers and users with heavy sentences is too blunt an approach to make any significant impact on actual participation in drug crime. Mascharka, Christopher, *Mandatory Minimum Sentences: Exemplifying the Law of Unintended Consequences*, 28 Fla. St. U. L. Rev. 935, 947-49 (Summer 2001) (hereinafter "*Mascharka*"), *citing* Jonathan P. Caulkins et al., Rand Drug Policy Research Center, *Mandatory Minimum Drug Sentences: Throwing Away the Key or the Taxpayers' Money?* (1997) (hereinafter "*Rand Analysis*"), and Barbara S. Vincent & Paul J. Hofer, Federal Judiciary Center, *The Consequences of Mandatory Minimum Prison Terms: A Summary of Recent Findings*, 1 (1994). *See also* Tonry, Michael, *The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings*, 38 Crime & Just. 65 (2009).

  **b.**  ***Drug Supply Is Not Reduced***
      ***Through Imposition of Harsh Penalties***

As the *Rand Analysis* explains, the efficacy of deterrence and incapacitation in the context of black market criminal activity is substantially diluted by the consensual nature of the crime. *See Rand Analysis*, at 13. Indeed, even adopting the hypothesis underlying general deterrence as a crime-reducing mechanism (challenged by the research discussed **post**, at 60-66),

---

    punishment.

*Beating a dead horse*, at 348 (citations omitted).

Yet, as Mr. Lynch added, "[i]In theory, however, there is no necessary connection between tough, retributive punishments and deterring criminals. *Id.* (citation omitted).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 53 of 78

the commerce in controlled substances defies the operative rationale.[21]

For example, while an increased penalty for burglary would (theoretically) weigh firmly against committing the burglary and would therefore deter that crime, a drug seller can compensate for the possibility of a severe sentence by charging more money for his product. *Id*. However, in a black market framework, a deterrent effect exists only when a drug seller has determined that he cannot charge enough money for his product to offset the risk of an extended prison sentence. Rasmussen, David W. & Benson, Bruce L., *Rationalizing Drug Policy Under Federalism*, 30 Fla. St. U. L. Rev. 679, 697 (Summer 2003) ("the effect of law enforcement focused in one direction can be completely mitigated by drug market entrepreneurs within a short period of time").

Consequently, rather than deterring drug activity, imposing lengthy sentences on drug dealers will select for individuals "who attach high value to money and low value to the risk of lengthy incarceration." *Rand Analysis*, at 13. *See also Price and Purity 1981-2003*, at 18 ("[p]erhaps the most striking observation about illicit drug prices is simply that they are still extraordinarily high per unit weight, even though prices have declined over the past 20 years").[22]

Similarly with respect to incapacitation, the incarceration of drug dealers for an extended period does not exert any impact the amount of drugs sold because, unlike other kinds of criminal activity, there is demand for drugs unaffected by removing suppliers from the market. *See Rand Analysis*, at 14-15. As the *Rand Analysis* notes, "[t]he common pessimism is not too far from the truth: 'If you arrest one dealer, someone else will take his or her place.'" *Id*.

---

[21] As Michael Lynch explains, "[t]he deterrence hypothesis states that rational people, calculating the costs and rewards of their behavior, will be deterred from selecting negative (criminal) behaviors when the costs (punishment, arrest, etc.) of such behavior are greater than the rewards. *Beating a dead horse*, at 352, *citing* Becker, Gary S., *Crime and Punishment: An Economic Approach*, 76 Journal of Political Economy 169-217 (1968).

[22] The individuals the 1997 *Rand Analysis* predicted would be least discouraged by severe penalties, and would thus flock to the high yield, high risk field of drug dealing, are in fact a large portion of today's drug vendors – "young, impoverished, inner-city . . . [people] who perceive few legitimate alternatives as compared to the large, immediate returns from dealing." *Mascharka*, 28 Fla. St. U. L. Rev. at 949, *citing* Vincent & Hofer; *see also* Little, Michelle & Steinberg, Laurence, *Psychosocial Correlates of Adolescent Drug Dealing in the Inner City: Potential Roles of Opportunity, Conventional Commitments and Maturity*, J. Res. Crime Delinq. at 3-4, 10, 12-13 (2006) (discussing the role of social and financial incentive in adolescent drug trafficking among inner city youth), available at <http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2792760/>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 54 of 78

On a broader scale, increased sentences also mean offenders remain incarcerated well beyond the ten or fifteen years of the average criminal career. *See Rand Analysis*, at 15. Lengthier sentences mean allocating resources to the continued incapacitation of individuals who are statistically much less likely to commit crimes, instead of to the prosecution and incarceration of the next generation of offenders, which only expands the pool of individuals available to take the place of arrested dealers. *Id.*

c.      *Drug Demand Is Not Reduced By Imposition of Harsh Penalties*

The primary, and most obvious, aspect of drug culture which inhibits the deterrent effect of harsh punishments is demand, and even addiction, among drug users. The power of deterrence is nullified when the process of balancing the costs and benefits of committing a drug crime is so heavily influenced by the perceived benefit of satisfying an addiction. *See Mascharka*, 28 Fla. St. U. L. Rev. at 948. In that respect, addicts as a group are willing to assume any number of irrational risks which are objectively more hazardous than a lengthy prison term, in order to sustain their addictions. *Id.*

Yet even dependence short of addiction, or simply desire, can override rational considerations and evaluation of risk. Thus, deterrence is equally ineffective with respect to first time or casual drug users. While addiction is an irrational motivator that upsets the process of balancing the cost and benefit of drug activity, most first time and casual drug users cannot be relied upon to consider seriously or sufficiently the possibility of a lengthy prison term when deciding whether to commit a drug crime. *See* Johnston, Lloyd et al., *2014 Overview: Key Findings on Adolescent Drug Use*, Monitoring the Future: National Survey Results on Drug Use, 1975-2014, February 2015, available at <http://www.monitoringthefuture.org/pubs/monographs/mtf-overview2014.pdf>. *See also* Johnston, Lloyd et al., *2013 Volume 2: College Students and Adults Ages 19-55*, Monitoring the Future: National Survey Results on Drug Use, 1975-2014, August 2014, available at <http://www.monitoringthefuture.org/pubs/monographs/mtf-vol2_2013.pdf>.

Also, the impact of publicized harsh sentences apparently overrated. As Michael J. Lynch of the Department of Criminology at the University of South Florida wrote in a 1999 article, "[e]xisting research suggests, however, that there is little media effect, and that people derive their information about probabilities of arrest from personal encounters with others." Michael J. Lynch, *Beating a dead horse: Is there any basic empirical evidence for the deterrent effect of punishment?*, 31 Crime, Law & Social Change 347 (1999) (hereinafter "*Beating a dead horse*"), at 361 n. 3, *citing* Tyler, T., & Cook, F., *The mass media and judgments of risk: Distinguishing impact on personal and societal level judgments*, 47 Journal of Personality and Social Psychology, 693-708 (1984) (other citations omitted).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 55 of 78

Drug interdiction policies grounded in deterrence fail to address at all the massive demand for drugs. As a result, law enforcement is faced with the monumental task of stemming the staggering flow of illegal narcotics without any corresponding reduction in the financial incentive to sell drugs. *See Echegaray,* at 1258-66.

### d.     *The Failure of Steep Sentences to Deter Drug Illegal Drug Selling and Use Is Apparent From the Number of Hidden Websites That Have Already Replaced, and Surpassed, Silk Road*

The most obvious proof that harsh sentences do not deter drug activity is the continued, and expanding, presence of hidden web sites selling illegal drugs on what has been denominated the "Dark Net." Despite Mr. Ulbricht's arrest and conviction, as well as the arrests of numerous other individuals alleged to be involved in Silk Road or similar enterprises, the Digital Citizens Alliance reported in its April 2014 report – six months after Mr. Ulbricht's arrest – *Busted, But Not Broken – The State of Silk Road and the Darknet Marketplaces*, Digital Citizens Alliance Investigative Report, April 2014 (hereinafter "*Busted, But Not Broken*"), available at <https://media.gractions.com/314A5A5A9ABBBBC5E3BD824CF47C46EF4B9D3A76/5f8d416 8-c36a-4f78-b048-f5d48b18dc0a.pdf>, that while shortly before Mr. Ulbricht's arrest there existed 13,000 listings for drugs on Silk Road, six months later that total had increased to 13,648 listings on Silk Road 2.0. *Id.*, at 1.

Moreover, while the total Dark Net drug listings at the time of the closure of the Silk Road site (October 2, 2013) was 18,174, *id.*, at 22, by April 2014, the listings had nearly *doubled* to 32,029. *Id.* As *Busted, Not Broken* recognized, Silk Road's closure simply prompted "significantly more competition[,]" as competitors arose to fill the void left by the absence of what had previously constituted the largest site. *Id.*, at 1.

Indeed, within the six months after the closure of Silk Road, *Busted, Not Broken* had identified six new sites offering controlled substances. *Id.*, at 22. Thus, while Silk Road's drug listings had increased by only 5% in the six months following Mr. Ulbricht's arrest, at that same point in time "the Darknet drug economy as a whole contain[ed] 75% more listings for drugs." *Id.*, at 1. As a result, as *Busted, Not Broken* concluded, Silk Road "and other Darknet marketplaces continue to do steady business despite the arrests of additional alleged operators who authorities say worked for Ulbricht." *Id.*

In the year following the October 2013 seizure and shuttering of Silk Road, "the Dark Net economy [grew] to more than double its original size." Ingraham, Christopher, "The FBI promises a perpetual, futile drug war as it shuts down Silk Road 2.0," *The Washington Post* (November 6, 2014), available at <http://www.washingtonpost.com/blogs/ wonkblog/wp/ 2014/11/06/ the-fbi-promises-a-perpetual-futile-drug-war-as-it-shuts-down-silk -road-2-0/>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 56 of 78

The Digital Citizens Alliance's 2015 updates have confirmed that trend.  For example, the most recent update, *Darknet Marketplace Watch – Monitoring Sales of Illegal Drugs on the Darknet (Q1)*, Digital Citizens Alliance, April 24, 2015, available at <http://www.digitalcitizensalliance.org/cac/alliance/content.aspx?page=Darknet>, documented that between March 17, 2015, and April 21, 2015, drugs listings on Dark Net sites had increased from 41,934 (already a 31% increase from the year before, and six weeks after Mr. Ulbricht's conviction at trial) to 43,622.  *Id.*, at 1.  *See also* Greenberg, Andy, "Global Web Crackdown Arrests 17, Seizes Hundreds of Dark Net Domains," *Wired* (Nov. 7, 2014), available at <http://www.wired.com/2014/11/ operation-onymous-dark -web-arrests/>.

That *Darknet Marketplace Watch* update noted the extraordinary resiliency of the market because the increase occurred despite the disappearance of the largest site, Evolution (which in March 2015 hosted 47% of those drug listings), in the intervening period in what was generally regarded as a scam on its customers (as the site appeared to abscond with its customers' Bitcoin). *Darknet Marketplace Watch*, at 1.

Also, the *Darknet Marketplace Watch* update reflected on the reaction of the marketplace to Evolution's absence:  "[i]nstead of a large amount of growth concentrated among two or three central players like we have seen in the past, our research shows that the wealth is being spread. We've seen 7-8 sites experience significant growth over the last month." *Id.*  In that context, the update reported that "8 out of the 12 sites we were tracking when Evolution went down have doubled in size in the past month."  *Id.*

The growth of Dark Net web sites has been exponential, and the speed with which they have multiplied demonstrates the futility and even disutility (in terms of resources devoted to punitive, rather than rehabilitative, solutions) of pitting the threat of heavy prison sentences against the financial benefit of supplying even a small piece of the overwhelming demand for drugs in this country and across the globe.  *See e.g.* Jones, Ben, "The Amazons of the dark net," The Economist (Nov. 1, 2014), available at < http://www.economist.com/news/international/21629417-business-thriving-anonymous-internet-despite-efforts-law-enforcers>.  *See also Darknet Marketplace Watch*, at 2 (noting that such sites are proliferating globally).

Just as surely, the notion that deterrence will somehow curb illegal drug sales on the internet, and over the TOR network in particular, is fanciful.  We might as well try to stop the world from spinning forward to the future, which has already arrived in the context of internet penetration generally, and as a vehicle for criminal conduct.  Mr. Ulbricht did not create that world, and his sentence should not be enhanced as part of Phyrric effort to stem its continued evolution.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 57 of 78

Accordingly, the notion of general deterrence in the context of drug crimes is illusory, and increasing the length of one defendant's sentence in an attempt to deter the general population from participating in similar drug activity – either selling or purchasing – is indisputably ineffectual and inconsequential and, therefore, would be inappropriate.

### e.  *The Literature Is In Agreement That Deterrence Through Longer Sentences Is Illusory*

Practical experience alone does not teach this lesson.  Rather, it is also the conclusion of the research.  Academic literature and clinical research concur that no greater degree of deterrence would be attained by a sentence within the advisory Guidelines range compared with a sentence well below that range.  Research has consistently established that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).[23]

---

[23]  In that context, the current research simply confirms the theses proposed by the influential 18th Century Italian philosopher and criminologist Cesare Beccaria, whose analysis was praised and quoted with favor by such varied readers as Voltaire, Jeremy Bentham, and John Adams, and who provided three incontestable reasons why proportionality in punishment represents an essential component of any justice system:

    (1)     punishment should be only that severe enough necessary to deter crime, and any penalty in excess of that objective constitutes an abuse of power by the state;

    (2)     the lack of any distinction between punishments for crimes of inequal kind or degree creates a dangerous and counterproductive equation:  an offender contemplating two offenses, a greater and a lesser, that are punished alike is presented no disincentive to forego the greater for the lesser.  If the punishments are identical, there is no greater risk in attempting the greater;  and

    (3)     the punishment should fit the crime, *i.e.*, those who defraud the public should build public works.

Cesare Beccaria, *On Crimes and Punishments* (1764), translated from the French edition by Edward D. Ingraham (Seven Treasures Publications:  Lexington, Kentucky 2009), at 70-71, 97.  *See also United States v. Canova*, 412 F. 3d 331, 351 (2d Cir. 2005) (citing *Booker*, 541 U.S. at 263, for the proposition "that post-*Booker* sentencing contemplates consideration of Guidelines to serve goals of 'avoiding unwarranted sentencing disparities' and 'proportionality'").

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 58 of 78

As Michael J. Lynch has noted, "[d]espite the paucity of evidence favoring a connection betweeen punishment and deterrence, there is, it seems, a desire or hope that deterrence works[.]"  *Beating a dead horse*, at 348-49.  Yet, as his article demonstrates, "[a]n examination of the incarceration and crime data from 1972-1993 reveals *no evidence of deterrence* at the aggregate level for the U.S. Additional analysis of cross-sectional crime and imprisonment trends for 1980 through 1991 also failed to provide any basic support for the deterrence hypothesis."  *Id*., at 359 (emphasis in original).  *See also id*. ("[c]onservatively, we can say that imprisonment does not appear to deter most criminals").

In fact, "[t]hree National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."  *Id*.  *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.  *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF (hereinafter "Cambridge Report").

The Cambridge Report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries.  *Id*. at 1.  It examined the effects of changes to both the certainty and severity of punishment. *Id*.  While there existed significant correlations between the *certainty* of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id*. at 2.

As a result, the Cambridge Report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects."  *Id*. at 1.  *See also Beating a dead horse*, at 354 ("[f]rom these data, it appears that over the long run, imprisonment has no suppression effect on the rate of criminal offending in the aggregate.  The implication of this finding is that criminal offending has much less to do with levels of imprisonment than with other independent variables or causal processes related to criminal offending").[24]  Consequently, here, a life or equivalent sentence for Mr. Ulbricht, in

---

[24] In evaluating the data discussed in *Beating a dead horse*, Mr. Lynch calculated a "series of additional correlation coefficients" to "address the question of a time lag effect between rising rates of incarceration and decreases in criminal offending – the idea that increased

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 59 of 78

contrast with one substantially lower, likely would not achieve any additional general deterrence.

Similarly, an extensive report issued earlier this year by the Brennan Center for Justice (at New York University School of Law) concluded that, controlling for other variables, incarceration rates have increased to such an extent in the United States that they have not played a role in crime reduction for many years. *See* Dr. Oliver Roeder, Lauren-Brooke Eisen & Julia Bowling, *What Caused the Crime Decline?*, Brennan Center for Justice, at 7 (February 12, 2015) (hereinafter "*Brennan Report*") ("the current exorbitant level of incarceration has reached a point where diminishing returns have rendered the crime reduction effect of incarceration so small, it has become nil"). Synthesizing data from the past few decades with recently collected data, the *Brennan Report* determined that "incarceration has been decreasing as a crime fighting tactic since at least 1980 . . . [and s]ince approximately 1990, the effectiveness of increased incarceration on bringing down crime has been essentially zero." *Id.*, at 23.[25]

This lack of correlation between crime reduction and heightened incarceration rates is apparent from the simultaneous declines in state prison populations and crime rates in those states. *See Brennan Report*, at 27 (imprisonment and crime decreased by more than 15% in New York, California, Maryland, New Jersey, and Texas, which account for "more than 30 percent of the US population"). The *Brennan Report* cites the overestimation of the deterrent effect of heavy penalties as one possible factor in the ineffectiveness of incarceration as a crime reduction tool. *See id.*, at 26 (relying in part on the National Academy of Sciences report, discussed below, that concluded that "insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects").

While the *Brennan Report* explored the various factors contributing to the conclusion that heavy incarceration (and accompanying lengthy sentences) has minimal impact on crime reduction, the 2014 report by the National Academy of Sciences (hereinafter "NAS") provided an even more in-depth treatment of the issue, focusing on the law enforcement policies that have resulted in the current state of mass, prolonged incarceration, and how those policies have diluted the effectiveness of incarceration as a crime-fighting tool. *See The Growth of Incarceration in the United States: Exploring Causes and Consequences*, National Research Council (hereinafter "*NAS Report*"), 2014, available at

---

rates of incarceration have a positive effect on knowledge of the increased tendency to send people to prison, which in turn decreases criminal offending . . ." *Id.*, at 357 (citation omitted). However, "none of the three cross-sectional correlation tests provided support for the deterrence argument." *Id.*, at 359.

[25] The *Brennan Report* is available at <www.brennancenter.org/sites/default/files/analysis/What_Caused_The_Crime_Decline.pdf>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 60 of 78

<http://www.nap.edu/download.php?record_id=18613>, at 130-156.  In particular, the *NAS Report* examined the diminution of deterrence as sentence length increased across various crimes, including those imposed on low level offenders.  *See id.*, at 155-56.

Summarizing the findings of several studies[26] focused on determining whether there is an appreciable improvement in deterrence as sentence length increases, the NAS report concluded that the "deterrent effect of sentence length may be subject to decreasing returns."  *NAS Report*, at 154.  As sentences grow longer and thus, more costly, the deterrent effect decreases to the point of irrelevance to crime rates, and becomes especially inefficient when sentences are so lengthy that individuals age past the point of any significant risk of recidivism, simultaneously mooting the achievement of crime reduction through incapacitation of those individuals, and draining resources better aimed at crime prevention.  *See id.*, at 155-56.

Nor has the inefficacy of longer terms of imprisonment been lost on national public officials.  Only last month, Supreme Court Justices Anthony Kennedy and Stephen Breyer appeared before Congress.  In response to a question from Rep. Steve Womack (R-AR) regarding whether the United States possessed the "capacity to deal with people with our current prison and jail overcrowding," Justice Kennedy testified, with respect to the corrections system, that "[i]n many respects, I think it's broken."  *See, e.g.,* Jess Bravin, "Two Supreme Court Justices Say Criminal-Justice System Isn't Working," *The Wall Street Journal*, March 24, 2015, available at <http://www.wsj.com/article_email/two-supreme-court-justices-say-criminal-justice-system-isnt-working-1427197613-lMyQjAxMTA1NTIzNDUyNTQyWj>.  *See also* <sentencing.typepad.com/sentencing_law_and_policy/2015/03/justices-kennedy-and-breyer-urge-congress-to-reform-broken-federal-criminal-justice-system.html>.  Video of the Justices' testimony is available from C-SPAN at <www.c-span.org/video/?324970-1/supreme-court-budget-fiscal-year-2016>.

Justice Kennedy added that "[a]nd this idea of total incarceration just isn't working, and

---

[26]  One such study, which reviewed California's "Three Strikes" laws, scrutinized whether there was a different recidivism rate between offenders with two "strikes" and those with one "strike" who had been tried for a "strike" offense but convicted of an ineligible offense.  *See NAS Report*, at 137.  The study found a lower arrest rate among the first group (one "strike" closer to the 25-year mandatory minimum under "Three Strikes" legislation), but the authors also concluded that "the crime-saving benefits are so small relative to the increased costs of incarceration that the lengthy prison sentences mandated by the third-strike provision cannot be justified on the basis of their effectiveness in preventing crime."  *Id.*, at 138.

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 61 of 78

it's not humane." *Id.*[27]  Similarly, then-U.S. Attorney General Eric Holder, Jr., has stated that "too many Americans go to too many prisons for far too long, and for no truly good law enforcement reason."  *See* Editorial, "Smarter Sentencing," *The New York Times*, August 14, 2013, available at <http://www.nytimes.com/2013/08/14/opinion/smarter-sentencing.html>. What *The Times* editorial described as a "harsher-is-better mind-set" characterized by "widespread incarceration" is, according to AG Holder, "both ineffective and unsustainable."[28]

The underlying empirical reality recognized by Justices Kennedy and Breyer and AG Holder is that, as the *NAS Report* states, at 2, "[i]n 2012, close to 25 percent of the world's prisoners were held in American prisons, although the United States accounts for about 5 percent of the world's population.  The U.S. rate of incarceration, with nearly 1 of every 100 adults in prison or jail, is 5 to 10 times higher than rates in Western Europe and other democracies."  *See also Brennan Report*, at 20;  *Beating a dead horse*, at 353 (U.S. has the "highest average sentence lengths in the world") (footnote omitted).

As a result, "[t]here are five times as many people incarcerated today than there were in 1970."  *Brennan Report*, at 3 (footnote omitted).  As *The New York Times* noted in a 2011 editorial, "[i]n the past generation, the imprisonment rate per capita in this country has multiplied by five[,]" and "[s]pending on prisons has reached $77 billion a year[.]"  Editorial, "Falling Crime, Teeming Prisons," *The New York Times*, October 29, 2011, available at

---

[27]  A different approach to corrections, practiced in Norway, was profiled in a recent *New York Times Magazine*.  *See* Jessica Benko, "The Radical Humaneness of Norway's Halden Prison," *New York Times Magazine*, March 29, 2015, available at <mobile.nytimes.com/2015/03/29/magazine/the-radical-humaneness-of-norways-halden-prison.html?from=promo>.

[28]  AG Holder, appearing in the Eastern District of New York to support and encourage that District's alternatives-to-incarceration programs that he described as "'emblematic' of the sort of specialized programs that the nation needs in order to address overincarceration within the federal criminal justice system[,]" told the audience that "[w]e will never as a nation be able to incarcerate ourselves to better outcomes, a stronger nation or brighter futures.  Instead we need to make smart choices and smart investments that will help individuals get on the right path and stay out of the criminal justice system."  *See* Andrew Keshner, "Holder Endorses Eastern District Alternatives to Prison," *New York Law Journal*, October 31, 2014, available at <www.newyorklawjournal.com/printerfriendly/id=1202675146471>.  *See also Beating a dead horse*, at 349 ("[o]ver the past two decades it is clear that this view has been at least partially responsible for what [Irwin, John and James Austin, *It's About Time:  America's Imprisonment Binge*, (Belmont, CA:  Wadsworth 1997) call[s] the 'imprisonment binge' – or America's rapidly expanding prison population").

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 62 of 78

<http://www.nytimes.com/2011/10/30/opinion/sunday/falling-crime-teeming-prisons.html>.

Observing these figures, the *NAS Report* concluded, at 2, that "[t]he growth in incarceration rates in the United States over the past 40 years is historically unprecedented and internationally unique." *See also Brennan Report*, at 3 ("[f]or the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy").

Yet, as discussed **ante**, the results of mass, prolonged incarceration have not exerted an impact on crime rates. Jeremy Travis, President of John Jay College of Criminal Justice in New York and co-editor of the *NAS Report*, told *The New York Times* earlier this year "[t]he policy decisions to make long sentences longer and to impose mandatory minimums have had minimal effect on crime. . . . The research on this is quite clear." Erik Eckholm, "In a Safer Age, U.S. Rethinks Its 'Tough on Crime' System," *The New York Times*, January 13, 2015, available at <http://www.nytimes.com/2015/01/14/us/with-crime-down-us-faces-legacy-of-a-violent-age-.html>. *See also Beating a dead horse*, at 356 (data "also provides evidence that a consistently increasing rate of incarceration appears to have little or no effect on the amount of crime in the U.S. from 1972-1993").

Consequently, one of the *Brennan Report*'s three central findings was that "Increased incarceration at today's levels has a negligible crime control benefit[.]" *Brennan Report*, at 4. Elaborating, the *Brennan Report* observed that

> [i]ncarceration has been declining in effectiveness as a crime control tactic since before 1980. Since 2000, the effect on the crime rate of increasing incarceration, in other words, adding individuals to the prison population, has been essentially zero. Increased incarceration accounted for approximately 6 percent of the reduction in property crime in the 1990s (this could vary statistically from 0 to 12 percent), and accounted for *less than 1 percent* of the decline in property crime this century. Increased incarceration has had little effect on the drop in violent crime in the past 24 years. In fact, large states such as California, Michigan, New Jersey, New York, and Texas have all reduced their prison populations while crime has continued to fall.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 63 of 78

*Id.*[29]

In that context, a sentence for Mr. Ulbricht substantially below the advisory Guidelines range, would also be fully consistent with 18 U.S.C. §3553(a)(2)'s sentencing purposes.[30]  The Second Circuit and Southern District of New York figures since *Booker*, discussed **post**, at 72-

---

[29]  The *Brennan Report* notes, at 13, that it did not include federal inmates in its analysis.  However, the *Report* also explained why adding federal inmates would likely only amplify the findings:

> [t]o study the incarceration variable the authors first sought to include the total incarceration rate, including federal prisons, state prisons, and local jails.  As explained further in Appendix B, federal prison data and local jail data were not available for all the years analyzed and for all states.  For that reason, the authors used state imprisonment data (the number of state prisoners incarcerated in public or private prisons, and the number of *state prisoners* held in local jails).  It does not include individuals in the overall jail population (those held pretrial or serving short sentences), juvenile facilities, or immigration detention centers.  The use of this subset of incarceration is in line with other research in the field.  The exclusion of federal prisoners, juvenile detainees, and the majority of the jail population does not affect the core findings of this report.  If that data were included, the rate of incarceration would be even higher than that in the authors' regression.  A higher incarceration rate would likely show more dramatic diminishing returns on crime reduction.  Accordingly, this report's empirical findings are likely conservative compared to what a more inclusive definition of "incarceration" would produce.

*See also Beating a dead horse*, at 351 (also not including federal inmate in the study's data set, but noting that "the exclusion of the federal data will not have a significant impact on the analysis since most crimes and most inmates are under state jurisdiction.  For example, in 1994 federal inmates made up 5.8 percent of all persons incarcerated at the state and federal level in the U.S. [ ] . . .  This figure is relatively stable over time") (citations omitted).

[30]  Also, 18 U.S.C. §3582(a) requires that a sentencing court "recognize [that] imprisonment is not an appropriate means of promoting correction or rehabilitation."  Regardless, as the letters on Mr. Ulbricht's behalf, as well as his background, attest, the mandatory minimum 20-year prison term will suffice for "correction or rehabilitation."

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 64 of 78

78, reflect that reality, as well as the reality that prison overcrowding as a result of reflexively long Guidelines sentences needs to be addressed.

### E.    *Longer Terms of Imprisonment Do Not Reduce Recidivism*

Nor, according to "the best available evidence" does imprisonment "reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). *See also* Gary Kleck, et al, *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005); Michael Tonry, *The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings*, 38 Crime and Justice: A Review of Research 102 (2009).

Again, Justice Kennedy concurred during his Congressional testimony last week, as *The Wall Street Journal* reported that "[i]n many instances, [Justice Kennedy] said, it would be wiser to assign offenders to probation and other supervised release programs." Jess Bravin, "Two Supreme Court Justices Say Criminal-Justice System Isn't Working," *The Wall Street Journal*, March 24, 2015, available at <http://www.wsj.com/article_email/two-supreme-court-justices-say-criminal-justice-system-isnt-working-1427197613-lMyQjAxMTA1NTIzNDUyNTQyWj>.

Quoting Justice Kennedy directly, the article added, "'This is cost-effective,' he said, even 'without reference to the human factor' involved in incarceration. 'We have a very low recidivism rate for those who are on release.'" *Id.* Of course, here Mr. Ulbricht faces a mandatory minimum of 20 years in prison, which only augments the policy revisions expressed by Justice Kennedy and others because the threshold question of whether incarceration at all is appropriate is moot. Rather, the question is at what *length* does Mr. Ulbricht's sentence become not only unnecessary for the purposes of sentencing, but also a future burden on the federal penal system, which is correctly concerned about the aging nature of its population.

Indeed, the impracticality of diverting resources to lengthy prison terms is further emphasized by the Department of Justice Office of Inspector General's report, issued earlier this month, documenting the exceedingly high cost of housing and caring for an aging inmate population. *See The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, Office of the Inspector General, Department of Justice (May 2015) (hereinafter "*Aging Inmate Population*"), available at <https://oig.justice.gov/reports/2015/e1505.pdf#page=1>. In addition to the fact that the inmate population over 50 years is more expensive, the risk of recidivism among individuals over 50 is greatly reduced, and the incidence of misconduct while incarcerated is extremely low, and generally limited to low-level and/or non-serious infractions. *See id.*, at 37-39 (Table 7).

Furthermore, the cost of the aging inmate population will only increase. As the *Aging*

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 65 of 78

*Inmate Population* report notes, the number of aging inmates is not only "increasing at a faster rate in older age groups," but the underlying factors ("elimination of parole, use of mandatory minimum sentences, increases in average sentence length . . ., and an increase in white collar . . . and sex offenders") which contributed to this growth have also resulted in a "9 percent increase in the number of younger inmates who will be age 50 and older when they are ultimately released." *Id.*, at 1-3.

Again in the context of the Career Offender Guidelines, which have been a proving ground for the efficacy – or, more accurately, the lack thereof – of long sentences as a means of reducing recidivism, the Sentencing Commissions's report entitled *Fifteen Years of Guideline Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 133-34 (2004) (hereinafter "*Fifteen Year Report*"),[31] also repudiated any argument that the long sentences imposed pursuant to the Career Offender Guidelines are justifiable based on recidivism issues:

> [m]ost importantly, preliminary analysis of the recidivism rates of drug trafficking offenders sentenced under the career offender guideline based on prior drug convictions shows that their rates are much lower than other offenders who are assigned to criminal history category VI.  The overall rate of recidivism for category VI offenders two years after release from prison is 55 percent (USSC, 2004).  The rate for offenders qualifying for the career criminal guideline based on one or more violent offenses is about 52 percent.  But the rate for offenders qualifying only on the basis of prior drug offenses is only 27 percent.

*Id.*

As a result, the *Fifteen Year Report* concluded,

> [t]he recidivism rate for career offenders more closely resembles the rates for offenders in the lower criminal history categories in which they *would be* placed under the normal criminal history scoring rules in Chapter Four of the *Guidelines Manual*.  The career offender guideline thus makes the criminal history category

---

[31] The *Fifteen Year Report* is available at <http://www.ussc.gov/Research/Research_Projects/Miscellaneous/15_Year_Study/15_year_study_full.pdf>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 66 of 78

> a *less* perfect measure of recidivism risk than it would be without
> the inclusion of offenders qualifying only because of prior drug
> offenses.

*Id*. (emphasis in original).  *Cf. United States v. Wilken*, 498 F.3d 1160 (10th Cir. 2007) (rejecting
further reduction than afforded by the District Court – to CHC V – while noting defendant's
reliance on the *Fifteen Year Report*'s findings that Career Offenders classified as such based
only on prior drug offenses have lower recidivism rates than career offenders whose prior crimes
were violent).

Moreover, in the context of recidivism, defendants over 40 years of age present a
dramatically reduced danger of recidivism.  Mr. Ulbricht is presently 31 years old, which puts
the peak years of potential recidivism behind him.  *See* United States Sentencing Commission,
*Measuring Recidivism: The Criminal History Computation of the Federal Sentencing
Guidelines*, at 12 ("[r]ecidivism rates decline relatively consistently as age increases," from
35.5% for those under age 21 to 9.5% for those over age 50) (available at
<http://www.ussc.gov/publicat/Recidivism_General.pdf>.  *See also United States v. Nellum,*
2005 WL 300073, at *3 (N.D. Ind. 2005);  Daniel Glaser, *Effectiveness of A Prison and Parole
System*, 36-37 (1964);  P.B. Hoffman & J.L. Beck, *Burnout – age at release from prison and
recidivism*," 12 J. Crim.Just. 617 (1984); *United States v. Clark*, 289 Fed.Appx. 44, 48 (5th Cir.
2008) (unpublished opinion).[32]  Moreover, the 20-year mandatory minimum prison term would
by itself put Mr. Ulbricht well past the 40-year old threshold by the time of his release.

As a *New York Times* editorial commented last month,

> the persistent fantasy that locking up more people leads to less
> crime continues to be debunked.  States from California to New
> York to Texas have reduced prison populations and crime rates at
> the same time.  A report released last week by the Brennan Center
> for Justice found that since 2000 putting more people behind bars
> has had essentially no effect on the national crime rate.

Editorial, "The Roadblock to Sentencing Reform," *The New York Times*, February 17, 2015,

---

[32]  According to a recent News Analysis in *The New York Times*'s *Sunday Review*
section,  "[n]euroscience suggests that the parts of the brain that govern risk and reward are fully
developed until age 25, after which lawbreaking drops off."  Dana Goldstein, "Too Old to
Commit Crime?" *The New York Times*, March 20, 2015, available at
<www.nytimes.com/2015/03/22/sunday-review/too-old-to-commit-crime.html>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 67 of 78

available at <http://www.nytimes.com/2015/02/17/opinion/the-roadblock-to-sentencing
-reform.html?gwh=58092C4DB7605498FC0E7490098282A6&gwt=pay&assetType=opinion>.

According to a June 2012 study by the Pew Center on the States, entitled *Time Served –
The High Cost, Low Return of Longer Prison Terms* (hereinafter "*Pew Report*"),[33] which
analyzed state data reported to the federal government between 1990 and 2009, "offenders
released in 2009 served an average of almost three years in custody, nine months or 36 percent
longer than offenders released in 1990. The cost of that extra nine months totals an average of
$23,300 per offender." *Id*., at 2.

Also, the *Pew Report* found that "for offenders released in 2009 after serving prison
sentences for drug crimes: 2.2 years in prison, up from 1.6 years in 1990 (a 36% increase)." *Id*.,
at 3. Nor, with respect to many offenders, was there a correlation between the longer
imprisonment and improved public safety. As the *Pew Report* concluded,

> [d]espite the strong pattern of increasing length of stay, the
> relationship between time served in prison and public safety has
> proven to be complicated. For a substantial number of offenders,
> there is little or no evidence that keeping them locked up longer
> prevents additional crime.

*Id*., at 4. *See also id*. ("[a] new Pew analysis conducted by external researchers using data from
three states – Florida, Maryland, and Michigan – found that a significant proportion of
nonviolent offenders who were released in 2004 could have served shorter prison terms without
impacting public safety").[34]

The above-discussed empirical and social science research demonstrates that a sentence
dramatically below the applicable advisory Guidelines range would be sufficient to achieve the
sentencing goal of specific deterrence with respect to Mr. Ulbricht, and more than adequately
address the issue of recidivism.

As discussed **ante,** as the Second Circuit has recognized in *Mishoe*, for someone like Mr.

---

[33] The *Pew Report* is available at
http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/Prison_Time_Served.pdf.

[34] And legislatures, too, are becoming aware. As the *Pew Report* states, "a 2006
legislative analysis in Washington State found that while incarcerating violent offenders
provides a net public benefit by saving the state more than it costs, imprisonment of property and
drug offenders leads to negative returns.[]" *Pew Report*, at 8 (footnote omitted).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 68 of 78

Ulbricht, who has not previously served any prison sentence, shorter sentences can protect against recidivism as effectively as longer terms:  "if a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect."  241 F.3d at 220.  *See also* Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) ("[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame");  Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism:  The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) (according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions").[35]

F.      *The Sentencing Commission's Most Recent Sentencing Statistics*

The United States Sentencing Commission (hereinafter "the Sentencing Commission") publishes each quarter an abstract of federal sentencing statistics entitled *U.S. Sentencing Commission Preliminary Quarterly Data Report* (hereinafter "*Quarterly Data Report*").[36] The figures in the most recent version, the *4th Quarter Release, Preliminary Fiscal Year 2014 Data, Through September 30, 2014*, which covers sentences imposed from October 1, 2013 through September 30, 2014, demonstrate that the Guidelines no longer constitute the predominant factor in a decisive majority of sentences in the Southern District of New York (or the Eastern District of New York, either).

For example, the *Quarterly Data Report* reveals that in Fiscal Year 2014 within the Second Circuit, a clear majority of sentences, 69.6%, were *not* within the calculated Guidelines range.  *See Quarterly Data Report 2014*, at 2.[37]  In SDNY, 73.1% of sentences were outside the Guidelines range (along with 74.5% in the Eastern District of New York).  *Id*.  Those numbers

---

[35]  *See also* Gary Kleck, et al, *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005); Michael Tonry, *The Mostly Unintended Effects of Mandatory Penalties:  Two Centuries of Consistent Findings*, 38 Crime and Justice: A Review of Research 102 (2009).

[36]  The *Quarterly Data Report* is available at <http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2014-4th-Quarterly-Report.pdf>.  Prior *Quarterly Data Reports* are also available on the Sentencing Commission's web site, www.ussc.gov.

[37]  Nationally, for Fiscal Year 2014, only 53.3% of sentences were *within* the Guidelines range (down from 54.8% in Fiscal Year 2013).  *Quarterly Data Report 2014*, at 1.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 69 of 78

represent a continuing trend since *Booker* was decided January 12, 2005: in the first quarter of 2005, 70.5% of sentences nationally were within the Guidelines range. *Sourcebook of Federal Sentencing Statistics*, U.S. Sentencing Commission, Section 2, Fig. G & Section 3, Fig. G (2005), available at <http://www.ussc.gov/research-and-publications/annual-reports-sourcebooks/2005/sourcebook-2005>. That number initially decreased to 61.8% by the first quarter of 2006, then remained essentially steady (60.7% for first quarter 2007, and 60.0% for first quarter 2008), before resuming its decline in 2009 and thereafter. *Id.*

In addition, only a minute fraction – 1.5% – of all SDNY sentences were *above* the Guidelines range, while 71.7% were *below* the range. In addition, the reasons for sentences below the Guidelines have evolved as well. Also, in SDNY, in Fiscal Year 2014 only 20.9% of sentences[38] were attributable to government-sponsored motions,[39] while §3553(a) factors, Guidelines downward departures, and/or a combination thereof were responsible for 50.8% of sentences (all of which were *below* the Guidelines range). *Quarterly Data Report 2014*, at 3.[40]

The proportion of sentences in SDNY in Fiscal Year 2014 below the Guidelines, and attributable exclusively to "below range w/ *Booker*" – 45.1% – represents by a wide margin the highest percentage in that category among *all* districts (with the Northern District of Illinois second at 40.6%). *See Quarterly Data Report 2014*, at 3, 5. Also, the proportion of §3553(a)-based below-Guidelines sentences relative to government-sponsored below-Guidelines has increased dramatically since *Booker*. *Compare*, *U.S. Sentencing Commission Preliminary Quarterly Data Report*, 3rd Quarter Release, Preliminary Fiscal Year 2006 Data, Through July 30, 2006, at 3.[41]

---

[38] The percentages are of *all* sentences within the District, as that is how the figures are presented in the *Quarterly Data Report*.

[39] Of those, 17.0% were the result of motions pursuant to §5K1.1, and the remaining 3.9% were composed of "§5K3.1 Early Disposition" (1.3%) and "Other Government Sponsored" (2.6%). *Quarterly Data Report 2014*, at 3.

[40] The components of below-Guidelines sentences in SDNY (other than government-sponsored) were classified as follows: (1) downward departures alone: 2.9%; (2) "downward departure w/ *Booker*": 1.9%; (3) "below range w/ *Booker*": 45.1%; and (4) "remaining below range": 0.9%. *Quarterly Data Report 2014*, at 3.

[41] In the Second Circuit as a whole, only 30.4% of sentences were within the Guidelines, with 1.4% above the Guidelines range and 61.8% below. 20.1% of sentences were attributable to motions pursuant to §5K1.1, and another 8.2% to other government-sponsored downward

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 70 of 78

Those figures are reinforced by those for the First Quarter of Fiscal Year 2015, published in the Sentencing Commission's *Preliminary Quarterly Data Report*, 1st Quarter Release, Preliminary Fiscal Year 2015 Data October 1, 2014, Through December 31, 2014 (hereinafter "*Quarterly Data Report 2015*"), available at <http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2015_1st_Quarterly_Report.pdf>.

In fact, the proportion of sentences within the applicable advisory Guidelines range continues to decline. Thus, for the First Quarter of FY 2015, within the Second Circuit 72.1% of sentences were outside the Guidelines range, with 71.6% *below* the range (and 0.5% above the range). *See Quarterly Data Report 2015*, at 2-3.[42]

In the Southern District, the numbers are even more dramatic, as 77.1% of sentences were outside the range, with 0.7% above the range and 76.4% – more than three-quarters of all sentences imposed during the period – *below* the applicable range. *Id.*[43] Of that 76.4% below the Guidelines range, 21.7% were attributable to government-sponsored downward departures,[44] while 54.6% were independent of any government support.[45]

_____

departures. 40.1% of sentences were below the Guidelines range without any government sponsorship (via 5K1.1 or otherwise), with "*below range w/ Booker*" alone responsible for 34.4% of sentences. *See Quarterly Data Report 2014*, at 2-3.

[42] Nationally, the proportion of sentences within the Guidelines range dropped for the first time below 50%, to 46.5%. *See Quarterly Data Report 2015*, at 1.

[43] The only districts with a lower percentage for First Quarter FY 2015 were Delaware, at 20% (but which had only a statistically small sample of 25 cases compared with 432 in SDNY), and the Southern District of California, for which its national low 14.6% total is attributable to a whopping 61.3% of its sentences including §5K3.1 Early Disposition downward departures (sponsored by the government), due to its voluminous immigration-related criminal docket, with only 6.8% attributable to *Booker* alone. *See Quarterly Report 2015*, at 2-3, 6-7.

[44] Of those, 18.5% were the result of motions pursuant to §5K1.1, and the remaining 3.2% were composed of "§5K3.1 Early Disposition" (1.6%) and "Other Government Sponsored" (1.6%). *Quarterly Data Report 2015*, at 3.

[45] The components of below-Guidelines sentences in SDNY (other than government-sponsored) for the First Quarter FY 2015 were classified as follows: (1) downward departures alone: 1.4%; (2) "downward departure w/ *Booker*": 1.4%; (3) "below range w/ *Booker*":

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 71 of 78

In addition, a *majority* of sentences in SDNY during First Quarter FY 2015 – 50.9% – were, for the first time, below the advisory Guidelines range based on *Booker alone*. *See Quarterly Data Report 2015*, at 3.[46] Thus, in SDNY, a sentence *below* the Guidelines range is the overriding *norm*, and *not* the exception. Even excluding cases involving §5K1.1 (or other government-sponsored) motions, the incidence in SDNY of a below-Guidelines sentence based on §3553(a) factors and/or Guidelines downward departures (50.8% of all sentences for FY 2014;  54.6% for 1ˢᵗ Quarter 2015) was nearly double the number of within-Guidelines sentences (26.9% of all sentences in 2014;  22.9% for First Quarter FY 2015).

For drug trafficking offenses (which are not distinguished any further with respect to type of drug or quantity), the data – which are provided in the *Quarterly Data Report* only on a national level – are also instructive.  Only 27.5% of drug-trafficking sentences nationally for FY 2014 were within the Guidelines range (down from 38.8% in Fiscal Year 2013). *Quarterly Data Report 2014*, at 8.  Only 0.8% of all drug-trafficking sentences were *above* the Guidelines, while 71.7% were below the Guidelines.  *Id*., at 8-9.

The *Quarterly Report* for the first quarter of FY 2015 establishes that for drug-trafficking generally, nationally only 31.0% of sentences were within the Guidelines.  The 68.2% that were below the Guidelines were composed of 24.9% due to §5K1.1 motions, 18.7% due to other government-sponsored downward departures, 1.5% on downward departure grounds, 1.0% as a result of downward departure and *Booker*, and 21.5% based on *Booker* alone (with 0.6% uncategorized "remaining below range").  *See Quarterly Data Report 2015*, at 8-9.[47]

---

50.9%;  and (4)  "remaining below range":  0.9%.  *Quarterly Data Report 2015*, at 3.

[46]  The District of Delaware, at 48% (with only 25 cases) is the only district close to that percentage. *See Quarterly Data Report 2015*, at 2.

[47]  Nationally for FY 2014, the distribution for drug-trafficking defendants sentenced below the applicable advisory Guidelines range was as follows:

Attributable to:

| | | |
|---|---|---|
| §5K1.1 motion: | 26.2% | |
| §5K3.1 departure: | 6.9% | |
| Other government sponsored: | 14.0% | |
| Downward departure: | | 1.5% |
| Downward departure with *Booker*: | 1.6% | |
| Below range with *Booker*: | 21.3% | |
| Remaining below range: | 0.3% | |

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 72 of 78

For SDNY in particular, for FY 2014, 82.3% of drug-trafficking sentences were *below* the Guidelines (with 0.2% above the range), with 20.5% attributable to §5K1.1 motions by the government, 5.5% the result of other government-sponsored downward departures, 2.2% due to downward departures alone, 1.8% because of a combination of downward departure(s) and *Booker*, and 52.0% a consequence of *Booker* exclusively (with 0.3% "remaining below range" but uncategorized). *See U.S. Sentencing Commission, Statistical Information Packet*, Fiscal Year 2014, Southern District of New York (hereinafter "*SDNY Packet 2014*", at 19, available at <http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2014/nys14.pdf>.

The mean sentence for the 19,974 defendants sentenced for drug-trafficking during FY 2014 was 73. *See Id.*, at 10 (Table 7, "Length of Imprisonment By Primary Offense Category"). The median sentence for that class of defendants in FY 2014 was 57 months. *Id.* In SDNY, the mean was 62 months and the median 46 months (for the 522 defendants sentenced for drug-trafficking during FY 2014). *Id.* For the 4,834 defendants sentenced for drug-trafficking during the first quarter of FY 2015, the mean sentence was 65 months, and the median 48 months. *See Quarterly Data Report 2015*, at 31 (Table 19, "Sentence Length In Each Primary Offense Category").

Moreover, of the 4,336 sentences meted out for drug trafficking nationally during Fiscal Year 2014, and in which the sentence was below the Guidelines based on §3553(a) factors alone, the *median* sentence was 46 months, representing a 29.8% "*median* percent decrease from Guideline minimum." *Quarterly Data Report 2014*, at 24 (emphasis added). That, of course, refers to a median percentage decrease from the Guidelines for the drug offense, and not the Career Offender Guidelines (which would likely show a greater percentage decrease from the Guidelines minimum).

Also, of the 298 drug trafficking sentences imposed during the data period, and in which the sentence was below the Guidelines based on a downward departure and §3553(a) factor(s), the median sentence was 37.6% below the Guidelines minimum. *Id.*, at 23. In addition, as Figure H, at p. 37 of the *Quarterly Data Report 2014* establishes, since Fiscal Year 2009 all federal drug sentences have remained on average approximately at least 20% below the applicable Guidelines (as the average sentence has decreased along with the Guidelines range),

---

*See U.S. Sentencing Commission, Statistical Information Packet*, Fiscal Year 2014, Southern District of New York, at 19 (Table 10), available at <http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2014/nys14.pdf>.

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 73 of 78

with that gap widening through Fiscal Years 2013 and 2014.[48]

For the first quarter of FY 2015, the *Quarterly Data Report 2015*, again at Table 11 (p. 23), the median sentence for the subset consisting of "downward departures with *Booker*/3553s" was 51 months' imprisonment, representing a 33-month median decrease from the applicable Guidelines range minimum (and a 40.5% median decrease from that Guidelines range minimum). For "*Booker*/3553" only, the median was 44 months, representing an 18-month median (corresponding to a 28.6%) decrease from the Guidelines range minimum. *Id*., at 24 (Table 12).[49]

Moreover, even if the attempted "murder for hire" allegations are considered, a sentence substantially below the advisory Guidelines range would still be consistent with the statistical record both in SDNY and nationally. For instance, for FY 2014, the mean sentence for murder was 273 months nationally, and 240 months in SDNY. *See SDNY Packet 2014*, at 10 (Table 7). In SDNY, the mean sentence was 172 months, and the median 162 months. *Id*. For the first quarter of FY 2015, the national mean was 297 months, and a 330-month median. *See Quarterly Data Report 2015*, at 31 (Table 19).

Thus, any support for a Guidelines sentence pursuant to the applicable advisory range for Mr. Ulbricht in this case not only ignores all §3553(a) factors other than the Guidelines (and particularly as they relate to him), but also defies empirical reality in this district and in this Circuit. As a result, the Guidelines simply no longer reflect a sentence "sufficient but not greater than necessary," and Mr. Ulbricht's circumstances present a compelling example why they do not.

The Second Circuit and SDNY figures since *Booker* reflect the reality of reflexively long Guidelines sentences. As The Honorable John Gleeson has noted in his academic writing, "the federal prison population has exploded under the Guidelines, and the average sentence lengths

---

[48] Even when a sentence for drug-trafficking is within the Guidelines, courts have moderated those sentences. For example, for the first quarter of FY 2015, of the 1,269 cases, 64% of the sentences were at the Guidelines range minimum, 14.2% within the lower half of that range, 7.0% at the midpoint, 6.3% within the upper half of the range, and 8.5% at the Guidelines range maximum. *See Quarterly Report 2015*, at 39 (Table 20).

[49] For the much smaller proportion of defendants sentenced during the first quarter of FY 2015 for drug-trafficking, and who received below Guidelines sentences for "all remaining below Guideline range cases," the median sentence was 60 months, constituting a 15-month and 28/6% decrease from the applicable advisory Guidelines range minimum. *Quarterly Data Report 2015*, at 25 (Table 13).

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 74 of 78

have increased dramatically."  Hon. John Gleeson, *The Sentencing Commission and Prosecutorial Discretion:  The Role of the Courts in Policing Sentencing Bargains*, 36 Hofstra L. Rev. 639, 657 (2008).

As a result, the Guidelines do not represent a sentence "sufficient, but not greater than necessary" to accomplish the objectives of sentencing with respect to Mr. Ulbricht.  Instead, a prison term substantially shorter than the advisory Guidelines range more than adequately serves that purpose.

> **G.    *Mr. Ulbricht Has Endured Pretrial Confinement for Nearly
> 20 Months Under Harsh Conditions at Both MDC and MCC***

Mr. Ulbricht spent approximately 13 months at MDC while on pretrial confinement, and another five months at MCC during trial and awaiting sentencing in this case.  The harsh conditions at these two pretrial facilities – including lack of ample programming, limited family visits, and lack of exposure to sunlight and the outside – are well known to the courts.  *See, e.g., Bell v. Wolfish*, 441 U.S. 520 (1979);  *United States v. Gallo*, 653 F.Supp. 320, 336 (E.D.N.Y. 1986).

Thus, even prior to *Booker*, courts held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departure."  *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001).  *See also United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.1997) (harsh conditions of confinement constitute valid ground for departure);  *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996) (remanding for reasons for downward departure due to "harsher incarceration" due to unavailability of programs);  *United States v. Brinton*, 139 F.3d 718, 725 (9th Cir. 1998);  *United States v. Mateo*, 299 F. Supp.2d 201 (S.D.N.Y. 2004); *United States v. Francis,* 129 F. Supp.2d 612, 616 (S.D.N.Y. 2001), *citing United States v. Sutton*, 973 F. Supp. 488, 491-495 (D.N.J. 1997).

The harsh conditions at MCC have been observed by several courts.  *See, e.g., United States v. Behr*, 2006 WL 1586563 (S.D.N.Y. 2006).  *See also Bell v. Wolfish*, 441 U.S. 520 (1979);  *United States v. Gallo*, 653 F.Supp. 320, 336 (E.D.N.Y. 1986).  In *Behr*, the court noted that a judge had "reduced an individual's sentence by one third based upon the harsh conditions in Unit 11-South at MCC[.]" 2006 WL 1586563, at *5.  In light of the harsh conditions at MCC, the defendant in *Behr* was sentenced to a non-Guidelines sentence. *Id.  See also* Ken Strutin, "Cognitive Sentencing and the Eighth Amendment," *New York Law Journal*, March 24, 2015, available at <http://www.newyorklawjournal.com/expert-analysis/id=1202721348619/Cognitive-Sentencing-and-the-Eighth-Amendment?mcode=1380566174563&curindex=11>.

LAW OFFICES OF

**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 75 of 78

Accordingly, it is respectfully submitted that an adjustment below the Guidelines is appropriate to account for Mr. Ulbricht's extended pretrial custody at MDC.

### III.    *Mr. Ulbricht's Objections, Corrections, and Additions to the Pre-Sentence Report*

Mr. Ulbricht's objections, corrections, and additions to the PSR are as follows:

(1)    at ¶ 2, "a/k/a Dead Pirate Roberts" should be corrected to "Dread Pirate Roberts;

(2)    at ¶ 10, with respect to the citation issued to Mr. Ulbricht on December 18, 2014, "for being insolent" which resulted in a suspended sanction of 30 days loss of phone privileges and visitation, the PSR should be amended to include the following:  the incident arose from the failure of MDC staff to abide by the Court's Order permitting Mr. Ulbricht to review discovery in the visiting area of the MDC on his designated laptop during the time frame appointed in the Court's Order.  Ultimately, Mr. Ulbricht was informed by his counselor that because Mr. Ulbricht had been correct, despite his having disobeyed an order he would not be punished if he did not commit another infraction for 30 days, a condition which Mr. Ulbricht satisfied;

(3)    at ¶ 49, with respect to Mr. Ulbricht's alleged "willingness to use violence to protect interests in Silk Road," and the description of Mr. Ulbricht's alleged participation in "an attempt to solicit the murders for hire of five people" as having been "established at trial[,]" Mr. Ulbricht objects to that language, which should be deleted from the PSR, because those allegations were not charged, and were not established by any cognizable standard of proof;

(4)    at ¶ 60(A)(e), with respect to the conclusion that Mr. Ulbricht "used violence" and "paid approximately $650,000 for five attempted murders for hire, which he commissioned to protect his interests in Silk Road," Mr. Ulbricht objects to that language and conclusion, which should be deleted from the PSR for the same reasons set forth **ante** in ¶ (3) above;

(5)    at ¶ 60(B)(1), with respect to the conclusion that Mr. Ulbricht "assumed a leadership role" in the Conspiracy to Commit and Aid and Abet Computer Hacking, Mr. Ulbricht objects to that language and conclusion, which should be deleted from the PSR because there was not any evidence of such leadership role;

(6)    at ¶¶ 61-86, with respect to the alleged overdose deaths, Mr. Ulbricht objects to their inclusion in the PSR (and they should be deleted therefrom) because the

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 76 of 78

information provided by the government, including the available forensic evidence, has not established that these deaths are attributable to drugs obtained from vendors on the Silk Road site, or in turn to Mr. Ulbricht;

(7)     at ¶ 87, with respect to victim impact, Mr. Ulbricht objects to that paragraph, which should be deleted from the PSR for the same reasons set forth **ante** in ¶ (6) above.;

(8)     at ¶ 94, with respect to the calculation of Mr. Ulbricht's base offense level, he objects to the the two-level enhancement based on "credible threats of directed violence," which should be deleted from the PSR because (a) the allegations constitute uncharged conduct and are therefore not appropriately part of the *base* offense level; and (b) for the reasons set forth **ante** in ¶ 3 above;

(9)     at ¶ 146, the PSR should be corrected to reflect that Mr. Ulbricht no longer owns the residence at 111 South Coral Street in State College, Pennsylvania, and has not owned it for several years;

(10)    at ¶ 147, the PSR should be corrected to reflect that Mr. Ulbricht no longer owns the referenced vehicles and has not since well before his arrest in this case;

(11)    at ¶ 150, with respect to the minimum terms of imprisonment for Counts One through Three, and Count Four, Mr. Ulbricht objects to the characterization that each mandatory minimum term should be imposed separately. Counts One, Two, and Three are lesser included offenses of Count Four, and therefore merge for purposes of sentencing. Therefore sentences on Counts One, Two, and Three cannot be imposed independent of Count Four, much less consecutively. The PSR should be amended to include the following language: "Counts One, Two, and Three merge with Count Four. As a result, the sentence on Count Four, carrying mandatory minimum term of imprisonment of 20 years, encompasses the potential sentences for Counts One, Two, and Three; and

(12)    at p. 38 of the "Justification" for the recommended sentence, Mr. Ulbricht objects to the statement (which should be deleted from the PSR) that "a site like Silk Road can entice people who are maybe uncomfortable with the face-to-face aspect of traditional drug deals to go into drugs[.]" As set forth in my May 15, 2015, letter, and the Declarations submitted therewith, the Silk Road site did not entice first-time users, and in fact helped individuals reduce and even eliminate their drug use. Mr. Ulbricht also objects, for the same reasons set forth **ante**, at ¶ (6) above, in his objection to ¶¶ 61-86 of the PSR, to the claim (which should be

**LAW OFFICES OF**
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 77 of 78

deleted from the PSR) that "Silk Road represents a grave threat to public health," and to the contention (which should be deleted from the PSR) that "we've seen six individuals die from drugs purchased on Silk Road."

## IV.    *Recommendation for BoP Waiver, and Motion Pursuant to Rule 38, Fed.R.Crim.P.*

Mr. Ulbricht's lack of any criminal history, or history of violence or escape, would, despite the severity of his offense level, result in him scoring favorably with respect to his security classification by BoP, which in turn would affect, if not control, the options for designation to a particular BoP facility.

However, BoP Public Safety Factors (hereinafter "PSF's") and/or Management Variables (hereinafter "MV's"), which take into account generic factors such as sentence length and greatest severity level of offense (which Mr. Ulbricht's offense will be categorized as), could override a low security score. Consequently, Mr. Ulbricht could be confined in a facility at a higher security level than his security score would otherwise require or dictate.

Accordingly, it is respectfully requested that the Court recommend, on the record and in the Judgment, that BoP waive its application of any sentence length/greater security PSF or MV with respect to Mr. Ulbricht. There are several reasons why, it is respectfully submitted, such a recommendation, which would enable designation to one of three facilities, the Federal Correctional Complex (hereinafter "FCC") at Coleman (Sumterville, Florida), FCC Allenwood (White Deer, Pennsylvania), or FCC Tucson (Tucson, Arizona), would be appropriate:

(1)    those three facilities are regarded as significantly safer than other BoP penitentiaries. Mr. Ulbricht's background would otherwise make him vulnerable in a more dangerous facility;

(2)    those facilities would enable Mr. Ulbricht's family to continue visiting him on a regular basis;

(3)    those facilities provide more appropriate programming opportunities for someone of Mr. Ulbricht's education level;  and

(4)    those facilities would be more consistent with Mr. Ulbricht's security classification scoring absent consideration of PSF's and MV's.

In addition, after sentencing Mr. Ulbricht will be filing a motion, pursuant to Rule 38, Fed.R.Crim.P., for a recommendation by the Court that he be confined locally (at MCC or MDC) during the pendency of his appeal. Mr. Ulbricht's lack of e-mail access, as well as the nature

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
May 22, 2015
Page 78 of 78

and volume of the digital discovery and evidence in this case make access to him during the appellate process a priority for counsel.[50]

### Conclusion

Accordingly, for all the reasons set forth above, either independently or combination, and in the supporting documents and materials, it is respectfully submitted that Mr. Ulbricht be sentenced to a term of imprisonment substantially below the applicable advisory Guidelines range.

Respectfully submitted,

Joshua L. Dratel

JLD/
Encls.

cc:    Serrin Turner
        Timothy T. Howard
        Assistant United States Attorneys

---

[50] Rule 38(b)(2) reads:

If the defendant is not released pending appeal, the court may recommend to the Attorney General that the defendant be confined near the place of the trial or appeal for a period reasonably necessary to permit the defendant to assist in preparing the appeal.