UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     v.

ROSS ULBRICHT,
  a/k/a "Dread Pirate Roberts,"
  a/k/a "DPR,"
  a/k/a "Silk Road,"

       Defendant.

14 Cr. 68 (KBF)


GOVERNMENT SENTENCING SUBMISSION


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America


SERRIN TURNER
TIMOTHY T. HOWARD
Assistant United States Attorneys
- Of Counsel –



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

May 26, 2015

By ECF
Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re:  *United States v. Ross William Ulbricht*, 14 Cr. 68 (KBF)

Dear Judge Forrest:

The Government respectfully submits this letter in advance of the sentencing of defendant Ross Ulbricht, scheduled for May 29, 2015. Ulbricht stands before the Court convicted of all seven counts of the Indictment in connection with his creation and operation of the Silk Road website. The evidence at trial established that Ulbricht ran a massive narcotics-trafficking enterprise that dramatically lowered the barriers to obtaining illegal drugs. As the Presentence Report ("PSR") filed by the Probation Office makes clear, that enterprise resulted in serious real-world consequences, including at least six drug-related deaths. Such consequences were entirely foreseeable to Ulbricht, who understood that his business was fueling drug abuse and addiction. Ulbricht profited greatly from his operation of Silk Road, ultimately amassing millions of dollars in commissions. He was willing to use violence to protect his enterprise, as evidenced by his solicitation of multiple murders for hire in attempts to eliminate perceived threats. At no point has he acknowledged full responsibility or shown true remorse for his actions.

Given the enormous quantities of drugs sold on Silk Road, in combination with other aggravating factors, Ulbricht's recommended sentence under the United States Sentencing Guidelines is life imprisonment, with a 20-year mandatory minimum due to his conviction for engaging in a continuing criminal enterprise in violation of Title 21, United States Code, Section 848. The Probation Office, too, recommends life imprisonment, finding "no factors that could overcome the severity of the instant offense." (PSR at 38). As set forth below, in light of the seriousness of the offense and the need for general deterrence, the Government believes that a lengthy sentence, one substantially above the mandatory minimum, is appropriate in this case.

I.     **Ulbricht Was the Kingpin of a Worldwide Digital Drug-Trafficking Enterprise and Is Responsible for All of Its Foreseeable Consequences**

   A.     **By Design, Silk Road Provided Easy Access to Illegal Drugs and Other Illicit Goods and Services**

   Silk Road was an online black market of unprecedented scope.  By the time it was shuttered in October 2013, over 13,000 offerings were listed on its homepage for illegal drugs of every conceivable variety.  (PSR ¶ 25; GX- 910).  A wide variety of other illicit goods and services were sold on the site as well, including fake IDs and passports, computer-hacking tools and services, counterfeit goods and pirated media, criminal guidebooks and instruction manuals, and money laundering services.  (PSR ¶¶ 29, 32, 34; *see also* Ex. A (sample screenshots)).[1]  In total, over 1.5 million transactions were conducted over Silk Road, involving over 100,000 buyer accounts and nearly 4,000 seller accounts.  (PSR ¶ 59).  Those transactions had a total value of nearly $214 million in U.S. currency.  (*Id.*)  Nearly 95 percent of those sales were for illegal drugs – including at least $8.9 million in sales of heroin, $17.3 million in sales of cocaine, and $8.1 million in sales of methamphetamine.  (*Id.*)  The buyers and sellers involved in these transactions were spread across the world, from Argentina to Australia, from the United States to the Ukraine.  (*Id.*; GX-940F; GX-940-G).

   Ulbricht specifically designed Silk Road for the purpose of facilitating black-market transactions.  He hosted the site on the Tor network to enable users to conduct business anonymously.  (PSR ¶¶ 12-17, 45).  He implemented a Bitcoin-based payment system to enable them to make payments and cash out proceeds without leaving behind a traditional money trail.  (PSR ¶¶ 35-42).  He provided instruction on "stealth" shipping methods and other ways to evade detection by law enforcement.  (GX-119; GX-120).  And he created a slick user interface aimed at making the illicit commerce on the site as simple and frictionless as ordinary online shopping.  (PSR ¶ 14).

   The effect of Ulbricht's conduct was to dramatically lower the entry barriers into the underground economy – for both buyers and sellers alike.  As illustrated by the trial testimony of Michael Duch, a significant heroin dealer on Silk Road, the site's plug-and-play platform enabled someone like Mr. Duch – who had never dealt drugs before in his life – to develop a bustling heroin-trafficking business in just a few weeks, all from the comfort of his own living room.  (Tr. dated Jan. 28, 2015, at 1499:13-1532:16).  Mr. Duch merely had to procure a supply of drugs (which he bought from his existing personal supplier on the street), and Silk Road provided the rest: an anonymous online sales portal, a huge preexisting customer base, how-to

---

[1] Ulbricht attempts to favorably distinguish Silk Road from "Agora," a "dark market" currently in operation, on the basis that "Agora" permits the sale of firearms.  (Def.'s Ltr. dated May 22, 2015, at 36).  However, Ulbricht also permitted sales of firearms on Silk Road, including sales of assault rifles, until March 2012, when he moved firearms sales to a companion site he ran known as "The Armory."  Ulbricht closed "The Armory" after several months only because it was not drawing enough business.  (*See* Ex. B (forum posts and screenshots reflecting firearms sales on Silk Road and the Armory)).

advice from the "Seller's Guide" and Silk Road discussion forum, and an escrow system enabling him to collect payment from his customers remotely. (*Id.* at 1518:12-1519:1). As Mr. Duch testified, he never would have been able to become a drug dealer so easily and surreptitiously in real space; he was only able to do so online, through the facilitating technology of Silk Road.[2]

By the same token, Silk Road made it simple for anyone anywhere to buy any drug of their choosing. They needed only a computer and a shipping address. With the click of a mouse, a Silk Road user could circumvent all of the physical obstacles that might otherwise prevent or deter one from obtaining drugs locally. Someone who might not know where to find drugs in his or her area, or feel comfortable searching them out, could find and buy drugs effortlessly on Silk Road. Again, Mr. Duch's testimony is instructive. He was able to sell heroin on Silk Road at double the price he paid for it on the street in the New York metropolitan area, in part because he was re-shipping it to less populous locations across the country where heroin was harder to come by. (Tr. dated Jan. 28, 2015, at 1523:18-1524:23). In the same way, Silk Road made it easy for existing users of one drug to find and abuse more serious drugs. The site provided a one-stop online shopping mall where the supply of drugs was virtually limitless.

The problem of drug dealing on the Internet is specifically recognized in a Guidelines sentencing enhancement for the mass-marketing of illegal drugs online (which is included in Ulbricht's Guidelines calculation). As noted by the Sentencing Commission in approving the enhancement:

> The Commission identified use of an interactive computer service as a tool providing easier access to illegal products. Use of an interactive computer service enables drug traffickers to market their illegal products more efficiently and anonymously to a wider audience than through traditional drug trafficking means, while making it more difficult for law enforcement authorities to discover the offense and apprehend the offenders.

U.S.S.G. app. C (Vol. III), amend. 667, reason for amend. ¶ 2. That is precisely what Silk Road did – on a scale never before seen. The site enabled thousands of drug dealers to expand their markets from the sidewalk to cyberspace, and thereby reach countless customers whom they never could have found on the street. The consequence was to vastly expand access to illegal drugs, as Ulbricht well knew. As he stated in one of "DPR's" posts on the Silk Road discussion forum: "Silk Road has already made an impact on the war on drugs. The effect of the war is to limit people's access to controlled substances. Silk Road has expanded people's access." (Ex. C).

---

[2] (*Id.* at 1500:22-1501:7 ("Q. Had you ever considered selling drugs on the street? A. Never. Q. So why were you willing to deal drugs on Silk Road? A. Well, I think, you know, being successful in purchasing drugs on Silk Road, I saw the relative ease that came with it. . . . [I]t seemed like something that I could potentially . . . get away with.")).

### B.     The Drugs Sold on Silk Road Carried Serious Health Risks and Led to Multiple Drug-Related Deaths

Given the massive quantities of drugs distributed through Silk Road, Ulbricht's operation of the site generated clear and continuing risks to public health. And in fact, as set forth in the PSR, the Government has learned of at least six drug-related deaths linked to Silk Road drugs. These deaths are described below.[3]

Jordan M.

On the afternoon of August 29, 2013, Jordan M., a 27-year-old Microsoft employee residing in Bellevue, Washington, was found unresponsive in his bedroom by one of his roommates, who called 911. Members of the Bellevue Police Department ("BPD") arrived soon thereafter to discover Jordan slumped in a chair, unconscious and cold to the touch, his arms dangling by his sides and his head tilted backwards. A black belt with a looped end was lying near his feet on the floor, along with a hypodermic needle and an express mail package that had been torn open. Jordan was seated next to a desk, where officers found a plastic bag containing a grayish powder (which later tested positive for heroin), along with a spoon and lighter (for dissolving it into water for injection). These drugs and paraphernalia were strewn next to Jordan's computer. (PSR ¶¶ 62-64).[4]

Jordan's computer had two browser windows open. One was a Tor browser window displaying the Silk Road website – specifically, Jordan's private message inbox on the site, maintained under the username "d0xic." The most recent message was from a Silk Road vendor, "PTandRnR," bearing the subject line "Your day just got better." It was about a package of heroin and Xanax due to arrive that morning, for which "PTandRnR" had supplied the tracking number in an earlier message. The other window was a standard webpage, open to USPS.com, displaying tracking information for a package sent from Chicago – a package with the same tracking number provided by "PTandRnR," which matched the tracking number on the express mail package next to Jordan's chair on the floor. (PSR ¶¶ 64, 66; *see also* Ex. D (photo of screen showing Silk Road inbox)).[5]

---

[3] The facts set forth below are based on the PSR and supporting evidentiary materials provided to the Probation Office and the defense in advance of sentencing, certain of which are attached hereto as exhibits. All of the supporting materials were provided to the Court on a DVD-ROM delivered to chambers on May 18, 2015 (the "May 18, 2015 DVD"). The Government respectfully requests that the May 18, 2015 DVD be made part of the record and kept under seal given the sensitive contents contained therein (including investigative reports and medical records).

[4] Further documentation of what was found at the scene of the incident is found on the May 18, 2015 DVD, in the document titled "BPD Case Report," at pages 18 through 22.

[5] Further documentation of the contents observed on the computer screen and the tracking number for the package is found in the "BPD Case Report" at pages 27-33.

Jordan's messages on Silk Road reflect that he had ordered pharmaceutical drugs on the site in the past, including valium and Xanax ordered from "PTandRnR" in the previous weeks. On August 24, 2013, Jordan inquired with "PTandRnR" for the first time about ordering heroin. "I'm hesitant about this," Jordan stated, but went on to ask "PTandRnR" if he had any "QUALITY H." A few days later, "PTandRnR" replied that he could get "grams of china white for $150." Jordan responded, "Boom! Would you be able to attest to its quality?" On August 28, 2013, "PTandRnR," replied: "my buddy [*i.e.*, supplier] doesn't play – good shit all the time (I don't do it so I can't say from a personal point of view)." Jordan messaged back: "Slap…or sounds like a plan." Later on August 28, 2013, "PTandRnR" told Jordan that he was sending a package to arrive by noon the next day, "to include 2 grams dope [*i.e.*, heroin] & 50 bars [*i.e.*, Xanax pills] which puts us at $1,100." That night, Jordan replied he was "so F'ing excited I might not sleep tonight." The next morning, "PTandRnR" responded: "you got about an hour before it gets there . . . as far as the quality is concerned . . . all I got to say is you should be good. there have been no complaints and a lot of satisfied people." (PSR ¶ 65).[6]

Jordan was found unconscious in his room the next afternoon. (PSR ¶ 62). He was promptly transported to the hospital after BPD arrived and died two days later. (*Id.*) An autopsy determined the cause of death to be acute intoxication from heroin, Xanax, and valium – all drugs he had ordered on Silk Road from "PTandRnR," as evidenced by his messages on Silk Road. (PSR ¶¶ 62, 68).[7]

*Preston B.*

On Saturday, February 16, 2013, the father and sister of Preston B., a 16-year old boy from Perth, Australia, were on their way to a restaurant for breakfast. Their route took them past a hotel where they knew Preston B. had stayed the night before, as part of a post-prom party. They noticed an ambulance and police officers in the driveway. Worried for Preston's safety, they drove back to the hotel, where they learned that Preston had suffered some sort of fall and was in critical condition. He was taken to the hospital, where he was unresponsive, and died two days later. (PSR ¶ 77).

---

[6] Further documentation of the relevant private messages between "d0xic" and "PTandRnR" is found in the document titled "d0xic" on the May 18, 2015 DVD, at pages 21, 37, 39, 42 through 49, and 57 through 64.

[7] Astoundingly, Ulbricht states in his May 15, 2015 letter to the Court that Jordan, whom Ulbricht describes as an "overweight 27-year old black man," "may have suffered an acute brain hemorrhage consistent with a stroke, which could have been a competent cause of death." (Def.'s Ltr. dated May 15, 2015 at 9.) Yet the autopsy report (included on the May 18, 2015 DVD) clearly attributes Jordan's death to a drug overdose – a conclusion that Ulbricht's own expert appears to agree with. (Lewis Decl. dated May 15, 2015, at ¶ 25). In any event, the circumstantial evidence that the death was due to an overdose – from Silk Road drugs – could not be more stark. *See United States v. Russow*, No. 14 Cr. 84 (JBA), 2015 WL 1057513, at *2-*3 (D. Conn. Mar. 10, 2015) (imposing upward departure based on overdose death where victim's text messages indicated he had recently obtained heroin from defendant).

Australian law enforcement officers interviewed a number of witnesses who were at the party and had seen Preston before his accident.  According to witness statements, Preston had told his friends he had been looking forward to trying "acid" during the party.  One of Preston's friends (himself 16 years old) admitted that, in advance of the party, he had used Silk Road to purchase eleven tabs of 25i-NBOMe, a powerful synthetic drug designed to mimic LSD, colloquially known as "N-Bomb."[8]  The friend had chosen the "cheap" option from among Silk Road's offerings – 10 "tabs" for $20, plus "1 for free." Records from the Silk Road database confirm the placement of the order.  (PSR ¶ 78).[9]

The friend – who stated that he himself had never used any drug other than marijuana before – further admitted to providing Preston two doses of the drug (each one-third of a "tab") during the course of the party.  Multiple witnesses reported that Preston acted increasingly erratically after taking the drug.  One friend described him as muttering incoherently and seemingly "at war with himself."  Others described aggressive outbursts and random, destructive behavior.  Eventually, when it was time to leave, Preston's friends tried to get him to exit the hotel room, but he would not respond, instead staring vacantly into space.  When the friends went for help, they heard Preston scream loudly, followed by a loud thud outside.  He had leapt from the hotel-room balcony, and was found lying on the deck below.  (PSR ¶¶ 77-80).

*Bryan B.*

On October 7, 2013, Bryan B., a 25-year-old male resident of Boston, Massachusetts, was found dead in his apartment, with a belt in his left hand and a small plastic bag of brown heroin and a syringe immediately next to him.  A toxicology report confirmed the presence of opiates in his system, which was pronounced as the cause of death in his death certificate.  A forensic analysis of Bryan's laptop computer revealed searches of the Internet for how to find heroin.  Notably, some of his search queries (*e.g.*, "how to find heroin in Boston") indicate that he lacked a local source, while others indicate that he sought to find heroin on Silk Road instead (*e.g.*, "download tor," "fastest way to get a bitcoin," "can you trust seller reviews on silk road").  (PSR ¶¶ 69-70).

The computer forensic examination also confirmed the presence of a Tor browser on the computer, with Silk Road bookmarked as a favorite website.  A PGP key for encrypting communications was also found, which was created on September 25, 2013; the file was titled "ilmsh."  Records from the Silk Road server revealed a Silk Road user named "ilmsh," who sent his first message to a Silk Road vendor "mrgood247," on the same date – September 25, 2013.  The message stated, "Hey Mrgood.  This will be my first order and I'm trying to figure out this PGP business."  (PSR ¶¶ 70-71).

---

[8] *See also* Drug Enforcement Administration, Office of Diversion Control, Information Sheet on 25I-NBOMe, *available at* http://www.deadiversion.usdoj.gov/drug_chem_info/nbome.pdf.

[9] Records of these purchases, and further details regarding the friend's interview statements, are included on the May 18, 2015 DVD.

The next day, September 26, 2013, only days before Silk Road was shut down by law enforcement, Bryan used the "ilmsh" account to place his first orders on the site – one for "1 GRAM OF PURE UNCUT #4 RAW HEROIN," and another for a pack of syringes. Bryan's Silk Road private messages reflect that he was given a tracking number for the heroin. According to postal records, the package arrived at Bryan's residence on October 1, 2013. That same day, Bryan messaged "mrgood247" on Silk Road, stating, "Ordering from you was flawless and i will be back. Thank you for everything Mrgood." (PSR ¶ 71).

The quantity of heroin Bryan purchased from "mrgood247" was sufficient for approximately 5 to 10 doses of heroin. (PSR ¶ 72). Bryan was last heard from Friday, October 4, 2013. (PSR ¶ 69). He was found dead three days later. (*Id.*). The heroin and syringe found next to his body closely resembled the product photos on the Silk Road listings from which he had ordered. (PSR ¶ 72; *compare* Ex. E at 1 (photo from apartment) *with* Ex. E at 3-4 (photos from Silk Road listings)).

*Alejandro N.*

On September 10, 2012, police officers in Camino, California, responded to a 911 call regarding a reported drug overdose. They found Alejandro N., a 16-year old boy, lying on the garage floor of his friend's house. (PSR ¶ 73).

One of Alejandro's friends, who had been present at the scene, informed law enforcement that he had witnessed Alejandro take four hits of 25i-NBOMe approximately two hours before the police arrived. According to the friend, Alejandro became increasingly incoherent and aggressive. His friends tried to calm him and were able to get him to sit down. However, Alejandro appeared to stiffen his entire body and then fell face-first out of the chair, completely rigid. He began having violent seizures, at which point his friends went to get help. After law enforcement arrived at the scene, Alejandro was transported to a hospital and pronounced dead. (PSR ¶¶ 73-74).

Local law enforcement later interviewed a friend of Alejandro's, who admitted that he had given Alejandro the 25i-NBOMe after obtaining the drug from a local dealer ("Dealer-1"). Dealer-1 was subsequently arrested and interviewed. He stated that he had acquired the drug in turn from a vendor on Silk Road, who appeared to be located in Spain, based on the packaging of the shipments. Dealer-1 supplied the username of the vendor. Records from the Silk Road server confirm the existence of a Silk Road vendor of 25i-NBOMe who operated under the username in question. (PSR ¶¶ 75-76).

_Scott W._

On May 19, 2013, Scott W., a 36-year old male from Australia, was found dead at his home. He was hunched at his computer desk, with his sleeve rolled up, with a used syringe and a plastic bag containing a cream-colored powder believed to be heroin nearby. An autopsy found toxic levels of morphine in Scott's system that were "almost certainly derived from heroin," as well as depressants with the potential to increase the drug's harmful effects. The cause of death was determined to be "multiple drug toxicity." (PSR ¶ 85).

Evidence recovered from the Silk Road server reflects that Scott had a Silk Road user account that had been used to place over 70 orders from January to May 2013, including 9 orders for heroin and 19 orders for a category of depressants, which were shipped to him under his true name at the address where he was found dead. (PSR ¶ 86).

_Jacob L._

On February 14, 2013, Jacob L., a 22-year old male from Australia, was found dead by his mother at his home. Unlike the preceding deaths, Jacob's death appears to have been caused not by an overdose, but by a health condition that was aggravated by the use of drugs. Specifically, an autopsy found that Jacob had recently used multiple drugs – including heroin, cocaine, and methamphetamine – while he had pneumonia. The autopsy noted that "[t]he presence of multiple drugs of abuse may have blunted the deceased's perception of the severity of his illness." (PSR ¶¶ 81-83).

Evidence recovered from the Silk Road server reflected that Jacob had a Silk Road user account – under the username "Needheroin" – which he had used to place over 30 orders for various narcotics between early 2012 and early 2013, including heroin, "speed," "meth," "crack," mephedrone, and others, and that they were shipped to Jacob under his true name at the address where he was found dead. (PSR ¶ 84).

Ulbricht generally does not dispute any of the foregoing facts, but instead claims they are insufficient to allow the Court to draw any inference, arguing that "it is simply impossible for the government to prove that drugs obtained _from Silk Road_ 'caused' death" in these instances. (Def.'s Ltr. dated May 15, 2015, at 9 (emphasis in original)). However, the evidence speaks for itself. Ulbricht appears to assume a standard of proof considerably higher than that applicable to fact-finding at sentencing. A preponderance of the evidence is all that is required. _See United States v. Vaughn_, 430 F.3d 518, 525-27 (2d Cir. 2015).[10] Conjecture about possible alternative causes of death or alternative sources for the drugs is insufficient to undermine the concrete

---

[10] Moreover, at sentencing, the Court is entitled to rely on hearsay evidence such as police reports and witness interviews. See _United States v. Broxmeyer_, 699 F.3d 265, 280 (2d Cir. 2012) ("A sentencing court's largely unlimited discretion to review information relevant to the defendant and his crime permits it to consider hearsay evidence." (internal quotation marks omitted)).

evidence tying these deaths to his criminal enterprise. *See United States v. Pacheco*, 489 F.3d 40, 45 (1st Cir. 2007) (district court appropriately found that victim's death was caused by drugs distributed by the defendant by a preponderance of the evidence where the record contained no proof supporting conjecture that victim had other sources for narcotics).

The deaths detailed above highlight the obvious fact that the distribution of controlled substances can lead to serious bodily harm, including death, particularly when distributed in the massive aggregate quantities sold on Silk Road. Moreover, for every death caused by Silk Road drugs, there are doubtlessly many more destructive addictions that were fueled by the site. The trial testimony of Mr. Duch provided a glimpse into these consequences of Silk Road. Mr. Duch explained that he became a Silk Road vendor after struggling to finance his own crushing addiction to heroin, which was costing him thousands of dollars a week. Mr. Duch acknowledged that many of his customers on Silk Road were suffering from similar addictions. Indeed, he testified that, nearly every day, he would receive messages from his buyers indicating they were anxiously awaiting their shipments in order to avoid the onset of withdrawal symptoms. (Tr. dated Jan. 28, 2015, at 1510:6-1512:17). "[I]s there anyway you could ship it overnight," asked one buyer, noting, "I am throwing up, the worst of the worst withdrawl [*sic*] symptoms and plus i have life destroying pain." (GX-704 at 2). "[I] see ur cutoff time is 3," wrote another, adding, "[I] just wanna double check because i am EXTREMELY dope sick and NEED something by tomorrow!!" (*Id.* at 1). These messages are, of course, only examples from Mr. Duch's set of customers. Given that the site as a whole had over 100,000 customers and was regularly selling all manner of highly addictive substances, the full scope of the drug dependency sustained by Silk Road is far broader.[11]

## C.    Ulbricht Is Responsible for the Harm Caused by Silk Road Drugs

Ulbricht bears responsibility for the overdoses, addictions, and other foreseeable repercussions of the illegal drugs sold on Silk Road. It does not matter that he did not personally handle those drugs; neither would a traditional kingpin. Ulbricht was the architect and overseer of the entire Silk Road enterprise. From the beginning, he intended it to be a drug-trafficking venture – starting with the hallucinogenic mushrooms that he himself grew in order to have something to sell on the site when it first launched. After that he did not handle the drugs flowing through Silk Road because he did not have to. The thousands of drug dealers who subsequently flocked to the site served as Ulbricht's source of supply. They were, as Ulbricht himself described them, his "business partners," who had to give Ulbricht a cut of every deal in order to sell on his digital turf. (GX-933). Ulbricht thus had a hand in every sale Silk Road dealers made on the site, and he is responsible for the consequences of the dangerous products they sold together. *See* U.S.S.G. § 1B1.3(a)(1)(B) (defendant responsible for all harm caused by "reasonably foreseeable acts" of others involved in jointly undertaken activity); *see also United*

---

[11] Beyond drugs, Silk Road also offered other illegal goods and services for sale without any regard to the societal harm they might cause. Among other things, Silk Road sold counterfeit identity documents as well as computer hacking tools and services that could be used to facilitate a wide array of fraud, identity theft, and other criminal offenses capable of causing serious loss to victims.

*States v. Faulkner*, 636 F.3d 1009, 1022 (8th Cir. 2011) ("While [the defendant] may not have played a direct role in manufacturing or distributing the heroin that caused [the victim's] death, he was part of the conspiracy that distributed the heroin."); *United States v. Westry*, 524 F.3d 1198, 1219 (11th Cir. 2008) ("Where a conspirator is involved in distributing drugs to addicts, some of which are even administered intravenously, it is a reasonably foreseeable consequence that one or more of those addicts may overdose and die.").

Likewise, it does not matter that Ulbricht did not specifically intend any deaths to occur from his conduct. Few drug dealers do. But it is a foreseeable risk they inevitably take, and they are responsible when that risk turns into a reality. *See United States v. Russow*, No. 14 Cr. 84 (JBA), 2015 WL 1057513, at *2-*3 (D. Conn. Mar. 10, 2015) (imposing upward adjustment based on overdose death even though death was accidental and not specifically intended by defendant); *see also United States v. Nossan*, 647 F.3d 822, 824 (8th Cir. 2011) (imposing upward adjustment in similar circumstances, explaining that defendant "engaged in dangerous activities, disregarding the grave risks accompanying the use of the drugs," and that his argument regarding intent was "only [a] mitigating factor [ ] to be considered in deciding whether and to what extent to depart upward").

Nor does it matter whether other factors may have contributed in some way to the deaths at issue here, such as accidental overdoses, "lethal combinations of drugs," or "pre-existing medical and psychiatric conditions." (Def.'s Ltr. dated May 15, 2015, at 13). Overdoses, toxic drug cocktails, and interplay with existing health conditions are all common features of drug-related deaths, and do not relieve the dealer who supplied the drugs of culpability for his part in the causal chain. A drug dealer takes his customers as he finds them. *See Pacheco*, 489 F.3d at 48 n.5 (rejecting defendant's argument that he could not be held accountable for overdose death where victim mixed two drugs in combination and, according to defendant, could have been attempting suicide: "[T]he defendant here engaged in the commercial trade of potent substances that he must have known could have dire consequences in a myriad of circumstances. . . . [W]hile he could not have anticipated the exact sequence of events that unfolded here, he could (and should) have foreseen the possibility of the kind of serious harm that in fact occurred.").

### D. Any Harm-Reduction Measures on Silk Road Were Dwarfed by the Easy Access to Drugs That It Enabled and Promoted

Ulbricht seeks to downplay the harm caused by Silk Road by pointing to certain aspects of Silk Road that he characterizes as "harm reduction measures" – primarily a vendor-rating system and the presence of a physician on the Silk Road forums who volunteered advice to users during the last seven months of the site's operation. (Def.'s Ltr. dated May 15, 2015, at 2-8). According to Ulbricht, these measures made Silk Road "in many respects the most responsible [illegal drug] marketplace in history." (*Id.* at 2). These measures, however, did little to mitigate the fundamentally harmful feature of Silk Road – the sales portal it gave to drug dealers enabling them to sell every illegal drug imaginable to anyone in the world who wanted them.

Indeed, praising Silk Road for including "harm reduction measures" is akin to applauding a heroin dealer for handing out a clean needle with every dime bag: the point is that he has no business dealing drugs in the first place. Our laws, like the laws of many other nations, reflect a

societal judgment that there is no such thing as a "safe" or "responsible" marketplace for illegal drugs – that certain drugs should not be distributed *at all*, because they inherently pose unacceptable dangers. And in fact, as the evidence detailed above makes clear, many people developed or sustained addictions, and some individuals died, as a result of Silk Road drugs, notwithstanding any supposed "harm reduction measures" offered on the site.

Silk Road's "vendor rating" system, for example, did not help Jordan M. when he fatally overdosed from heroin and other drugs purchased from "PTandRnR," whose rating on Silk Road was "4.96" out of 5. Nor did it help Bryan B., who bought the heroin that killed him from "mrgood247," whose rating was a perfect "5." Notably, Silk Road vendor ratings, even on their own terms, were hardly a model of reliability. Faked feedback was a common problem on the site. (*See* GX-227-A at 2 (chat in which Ulbricht notes "faking feedback" among the "major issues" dealt with by his customer support staff)). Some vendors were even known to threaten buyers with leaking their address information on the forums (and thereby outing their real identities) if they gave anything less than a perfect rating. (Ex. F).[12] Mr. Duch took a page from this playbook, instructing users on his vendor page: "YOU MAY NOT ORDER unless you agree to rate 5 out of 5 no matter what happens with the product, the packaging, delays or anything else!" (GX-700). But more fundamentally, Silk Road's vendor rating system was flawed because it provided a veneer of safety to an intrinsically unsafe business. Even if rated "5 out of 5," heroin is still *heroin*. That notorious drug and many others that were sold on Silk Road are highly potent substances, capable of causing harm in many unpredictable ways – which is precisely why they are classified as controlled substances to begin with. Again, the law deems them not to be fit for distribution at all – let alone under some crude, manipulable "rating" system operated by those dealing and abusing drugs themselves.

Likewise, the mere fact that a single doctor – "Doctor X" – volunteered medical advice on the Silk Road discussion forum, for seven months, hardly makes up for the uncontrolled distribution of massive quantities of drugs on Silk Road over several years. While "Doctor X" states that "[b]etween April 2013 and late October 2013, I sent more than 450 messages to Silk Road users in response to requests for advice and assistance," (Caudevilla Decl. ¶ 5), the fact remains that from January 2011 to October 2013, over 100,000 users made more than 1.5 million

---

[12] Ulbricht was aware of this practice, as reflected in Exhibit F, which is an excerpt of a chat with a co-conspirator found on Ulbricht's computer:

| | |
|---|---|
| (2011-12-19 17:12) vj: | so vendors that mention a buyer[']s handle to bitch about fucking feedback should be fed to the sharks |
| (2011-12-19 17:13) vj: | ones that do that AND keep records of the addresse[s] should be fed to ants, and then to sharks |
| (2011-12-19 17:13) vj: | lttm keeps addressess |
| (2011-12-19 17:13) vj: | Paperchasing keeps addressses and threatens to spread names of anyone who dares give him a 4/5 |
| (2011-12-19 17:13) myself: | how do you know all of this? |
| (2011-12-19 17:14) vj: | I read the forums |
| (2011-12-19 17:14) myself: | I should probably do that ;) |

purchases from Silk Road, mostly for illegal drugs. Thus, the number of individuals seeking out "Doctor X's" advice constituted a small fraction of the overall Silk Road user population. There is no evidence that "Doctor X" sent any private messages to Jordan M., Bryan B., Scott W., or Jordan L., for example. And he obviously had no opportunity to counsel teenagers Alejandro N. and Preston B., who did not even purchase drugs from Silk Road directly themselves, but rather obtained them downstream from others. Indeed, these latter two examples show that Silk Road drugs were not only distributed to users who purchased them from the site; they were also easily resold or redistributed on the street, where any "harm reduction measures" found on Silk Road were moot.

In any event, Ulbricht's overriding motive was never "harm reduction." He did not set up Silk Road simply to give drug users a way to rate drug dealers online or use drugs "safely," let alone to help them find drug counseling. He set up Silk Road as a drug-trafficking business, run for a profit. And in pursuit of those profits, he was willing to supply any kind of illegal drug in demand – no matter how dangerous or addictive. Every conceivable prohibited substance – even poisons such as cyanide[13] – could be found for sale on Silk Road, without restriction. The buyer's age didn't matter. The buyer's health condition didn't matter. The buyer's motives – including drug addiction – didn't matter. Ulbricht was content to let users buy whatever drugs they pleased and leave them to deal with the consequences.

Ulbricht was well aware of the dangers inherent in the products he was selling. One telling example is synthetic drugs – which even "Doctor X" specifically warned Silk Road users against trying, given the novelty of the drugs and the lack of research about their known effects, (Caudevilla Decl. ¶ 6). Notably, Ulbricht himself was warned about these drugs in his personal life, in an email from a relative dated February 10, 2013, recovered from his Gmail account. In the email, the relative advised Ulbricht and others:

> You may already know this…and I am not assuming that any of you use, but I just heard some stories about how much worse – how dangerous and damaging – synthetic pot ("spice") is. This, and of course "bath salts" are to be totally avoided. Well, I would say all drugs. . . . A girl is now blind and paralyzed and the stories go on. Fore-warned is fore-armed.

(Ex. G). Ulbricht reassured the relative that "I don't go near that stuff." (*Id.*). But even though Ulbricht knew enough to avoid using these drugs himself, he evidently had no compunction about distributing large quantities of them to others, through Silk Road. Silk Road transaction records show that Ulbricht sold over $200,000 worth of synthetic cannabis on Silk Road[14] and

---

[13] (*See* GX-223, GX-229C (chats reflecting that Ulbricht knowingly permitted the sale of cyanide on the site)).

[14] (*See* GX-940 at 1 (entry for "Synthetic – Cannabis"), 4 (entry for "Smoking Blend – Synthetic"); Ex. H (sample screenshots of Silk Road offerings for these products)).

more than $4.4 million worth of drugs known on the street as "bath salts."[15]  Obviously, the most effective "harm reduction" measure Ulbricht could have taken with respect to these drugs would have been to ban their sale on the site.  But he chose not to.  It would have been antithetical to his business model.

Not only did Ulbricht allow drugs of all kind to be sold on Silk Road without restriction, he specifically encouraged and promoted drug use in pursuit of ever greater profits.  As evidenced at trial, Ulbricht went so far at one point as to offer customer prizes on Silk Road – including a vacation giveaway – as a marketing gimmick designed to drive up the drug sales on the site.  In a chat about the promotion with a co-conspirator, "VJ," Ulbricht joked about the fact that he was, in essence, offering incentives to buy drugs ("we're selling drugs here, first one's free little jonny!  damn that sounds awful").  (GX-226C at 2).  Tellingly, the winner of the grand-prize vacation was a heroin addict.  In a later chat about the promotion, "VJ" told Ulbricht he was "worried about our winner," explaining: "He's trying to dry out.  Heroin."  Ulbricht responded, "oh geez.  fuck, what are we doing."  "VJ" continued: "Yeah, he told me some time ago he was trying to quit, but SR made it kinda tough."  Ulbricht mockingly retorted: "maybe our next prize will be 3 months in rehab."  (GX-226C at 2-3).

Ulbricht thus knew full well that he was in the business of profiting from drug abuse and addiction.  Against that context, Ulbricht's claim that Silk Road was designed to "encourage users to examine their own conduct, and . . . stop abusing drugs before it irreparably damaged their lives," (Def.'s Ltr. dated May 15, 2015, at 8), rings completely hollow.

## II.     The Proliferation of "Dark Markets" Like Silk Road Underscores the Need for a Lengthy Sentence

Ulbricht did not merely commit a serious crime in his own right.  He developed a blueprint for a new way to use the Internet to undermine the law and facilitate criminal transactions.  Using that blueprint, others have followed in Ulbricht's footsteps, establishing new "dark markets" in the mold of Silk Road, some selling an even broader range of illicit goods and services than Silk Road itself.  Although the Government has achieved some successes in combating these successor dark markets, they continue to pose investigative challenges for law enforcement.  The use of sophisticated anonymizing technologies, such as the Tor network, make it difficult to locate the infrastructure and identify the operators behind them.

Curiously, Ulbricht argues that the continuing growth of "dark markets" counsels *against* factoring general deterrence into his sentence, based on the notion that attempting to deter this type of criminal conduct is pointless.  (Def.'s Ltr. dated May 22, 2015, at 59).  The opposite inference is warranted.  Because "dark markets" represent an emerging front in the fight against

---

[15] (*See* GX-940 at 1 (entry for "Methylone") & 2 (entry for "MDPV"); Ex. I (sample screenshots of Silk Road offerings for these products); *see also* Drug Enforcement Administration, Office of Diversion Control, Information Sheets on Methylone and MDPV, *available at* http://www.deadiversion.usdoj.gov/drug_chem_info/methylone.pdf and http://www.deadiversion.usdoj.gov/drug_chem_info/mdpv.pdf.).

crime, general deterrence interests are a particularly salient sentencing factor in this case. Ulbricht's conviction is the first of its kind, and his sentencing is being closely watched. The Court thus has an opportunity to send a clear message to anyone tempted to follow his example that the operation of these illegal enterprises comes with severe consequences. While not all may be deterred as a result, that is virtually always the case with any deterrent measure. *Cf. Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.,* 651 F.3d 722, 728 (7th Cir. 2011) (noting that "deterrence is never perfect"). The point is to deter those at the margins. To the extent that would-be imitators may view the risk of being caught to be low, many are still likely to be deterred if the stakes are sufficiently high.

Accordingly, beyond the seriousness of Ulbricht's offense, the interest in general deterrence of similar criminal conduct also counsels in favor of a lengthy sentence of imprisonment.

### III.    Ulbricht's History and Personal Characteristics Do Not Present Significant Mitigating Factors

In his sentencing submission, Ulbricht portrays himself as having created Silk Road for idealistic, disinterested motives and attaches numerous letters from family and supporters attesting to their impressions of his good moral character. The evidence, however, tells a different story, of someone who consciously chose to operate a criminal enterprise for several years, motivated in substantial part by greed and vanity. On balance, Ulbricht's history and personal characteristics do not significantly cut in his favor.

Ulbricht claims in his letter to the Court that he created Silk Road to "giv[e] people the freedom to make their own choices" and that he "wasn't seeking financial gain." (Def.'s Ltr. dated May 22, 2015, Ex. 1, at 1). But, in fact, Ulbricht was motivated by a personal agenda at least as much as a political one. As he himself stated in his journal in 2010, anticipating the launch of the site the following year: "I am creating a year of prosperity and power beyond what I have ever experienced before. Silk Road is going to become a phenomenon and at least one person will tell me about it, unknowing that I was its creator." (GX-240).

The desire for "prosperity and power" continued to motivate Ulbricht as he operated the site over the next three years. Ulbricht paid close attention to the collection of profits from his enterprise. (GX-240B (journal entry discussing profits); GX-250 ("SR Accounting" spreadsheet); GX-251 ("net worth" spreadsheet listing Silk Road as $104 million asset). He collected commissions automatically on every Silk Road sale, and prominently banned users from transacting business "out-of-escrow" in order to avoid these commissions – a prohibition that he and his support staff continually sought to enforce. (Tr. dated Jan. 14, 2015, at 220:14-221:22; GX-120; GX-125G; GX-226B; GX-227A; GX-242; GX-930). He tracked sales and profit figures for the site, noting various milestones in his chats with "VJ," at one point boasting: "I made a declaration about 8 years ago that I'd be a billionaire by my birthday in 2014. If you coun[t] the discounted future values of the enterprise, it could happen." (GX 226A).

Ulbricht succeeded in making a considerable fortune from Silk Road, including the huge stash of Bitcoins seized from his personal laptop, worth nearly $18 million at the time of his

arrest. (PSR ¶¶ 41-42, 57). Ulbricht was careful not to flaunt his money, because he knew it was important to maintain a low profile to avoid detection. As he told a co-conspirator, "I live a modest life still . . . security requires it." (GX 229D). But Ulbricht did not plan to live a modest life forever. He researched offshore havens such as Monte Carlo and Andorra, where, as he put it, "you can live permanently w/o income tax." (GX-226E at 3). In mid-2012, he filed an application for foreign citizenship in the Caribbean island of Dominica, one of a handful of countries that sells citizenship in exchange for a substantial "economic investment," and followed up in November by traveling to the country for an interview. (GX-290; GX-291; GX-316; GX-321). In mid-2013, he took further steps toward preparing for a possible life on the run, ordering nine high-quality fake IDs from a Silk Road vendor, whom he repeatedly asked for assurance that the IDs were sufficient "to get through being pulled over by a cop" or "to board a domestic USA flight." (GX-400; GX-935). Thus, while it is unclear whether Ulbricht ever settled on a specific plan, clearly, he was exploring exit strategies. He had every intention of enjoying the fruits of his criminal enterprise.

As for the letters submitted in support of Ulbricht, which describe the letter writers' memories of acts of compassion and kindness by Ulbricht, the Government does not doubt the sincerity of these letters; but the fact remains that Ulbricht kept those close to him deeply in the dark about his criminal livelihood. He became well practiced in leading a double life. As he confided in a chat with a co-conspirator, who asked Ulbricht what he told his family he did for a living: "I have my little alibi. I'm clever, so I can bs when I need to. . . . and friends will tell me shit like, why don't you do this or that like I have all this free time. I just want to scream at them 'because i'm running a goddam multi-million dollar criminal enterprise!!!!'" (GX-229D).

Indeed, behind the mask of the "Dread Pirate Roberts," Ulbricht cultivated a darker side of his personality, one that his friends and family – and even "DPR's" admirers on Silk Road – would have found shocking. He proved quite ruthless in seeking to protect his illegal empire, attempting on multiple occasions to solicit murders for hire in order to deal with perceived threats to his operation. At trial, the Government introduced evidence of five of those attempted murders-for-hire. (GX-936). As the Government made clear, no one, thankfully, was actually killed as a result of Ulbricht's actions; the "hitman" involved in these five attempts appears to have been a conman. But – contrary to Ulbricht's absurd suggestion in his sentencing submission that these murder-for-hire attempts were mere "masquerade" or "role-playing," (Def.'s Ltr. dated May 22, 2015, at 37) – Ulbricht clearly believed that all of the murders were real and intended for them to occur. He paid for them with $650,000 in Bitcoins – transferred directly from a Bitcoin wallet on his laptop.[16] He coldly noted the arrangement and execution of the murders-for-hire in entries in his "log" file on his computer.[17] And he excitedly reported one

---

[16] (Tr. dated Jan. 2, 2015, at 1727:21-1732:13; GX-601; GX-630; GX-631; GX-936 at 22, 31).

[17] See GX-240 ("being blackmailed with user info," "commissioned hit on blackmailer with [hell's] angels," "got word that blackmailer was ex[e]cuted," "received visual confirmation of blackmailers execution").

of the murders-for-hire in a chat with "VJ."[18]  Ironically, in his public pronouncements on Silk Road in the voice of "DPR," Ulbricht portrayed himself as a champion of "freedom" on the Silk Road website, opposed to the use of any kind of "force" against others.  In truth, Ulbricht was just as willing as a traditional kingpin to use intimidation and violence in furtherance of his criminal enterprise.[19]

Thus, while the Court should of course give due consideration to the letters submitted in support of Ulbricht, they must be weighed against the facts surrounding his criminal conduct. The defendant created Silk Road for self-aggrandizing motives, despite ample opportunities available for him to pursue as a law-abiding member of society.  He sought to profit from the drug abuse and addiction of others and was even willing to solicit murder to eliminate threats to his business.  At no time has he accepted full responsibility for his actions.  The Court's sentence should hold Ulbricht accountable for his choices.

_____

[18] *See* GX-227D ("I get blackmailed by a guy saying he's in deep shit with hell's angels . . . i said, have the hells angels contact me so i can work something out . . . very foolishly he did . . . they said they caught up with lucy, got the product back and killed him").

[19] Accordingly, there is no basis for Ulbricht's objection to the PSR's inclusion of a Guidelines enhancement under U.S.S.G. § 2D1.1(b)(2), which applies "[i]f the defendant used violence, made a credible threat to use violence, or directed the use of violence."  (Def.'s Ltr. dated May 22, 2015, at 80).  As its plain terms make clear, the enhancement does not require that violence actually occur, but only that violence be credibly intended.  *See United States v. Harris*, 578 Fed. Appx. 451, 453-54 (5th Cir. 2014) (affirming application of enhancement even though "there was no actual drug stash" that defendant intended to rob, explaining: "the enhancement's view that higher sentences are warranted for those with a propensity for violence—even if just reflected in a threat and not an actual act of violence—is implicated even when the threat occurs in connection with a sting").  Moreover, contrary to Ulbricht's argument that the murder-for-hire solicitations constitute uncharged conduct that cannot be factored into his base offense level, the solicitations were specifically charged as an overt act of the alleged narcotics conspiracy.  *See* Indictment S1 14 Cr. 68 (KBF) ¶¶ 16.b & 16.c.  Moreover, all relevant conduct, whether charged or uncharged, must be considered in calculating Ulbricht's base offense level in any event.  *See* U.S.S.G. § 1B1.3(a).  Notably, Ulbricht does not challenge any other aspect of the Guidelines calculation in the PSR.  The Government agrees with the calculation in its entirety.

**IV.    Conclusion**

   For the reasons set forth above, the Government respectfully requests that the Court impose a lengthy sentence, one substantially above the 20-year mandatory minimum, in order to reflect the seriousness of the offense, to promote respect for the law, and to afford adequate deterrence to criminal conduct.  18 U.S.C. § 3553(a).

        Respectfully,

        PREET BHARARA
        United States Attorney

By:      _____
        SERRIN TURNER
        TIMOTHY T. HOWARD
        Assistant United States Attorneys
        Southern District of New York

cc:  Joshua Dratel, Esq.