

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 7, 2022

**BY ECF (except for Exhibit 3, which is being filed under seal)**

The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Ross Ulbricht*, S1 14 Cr. 68 (LGS)

Dear Judge Schofield:

    The Government respectfully submits this letter motion pursuant to Rule 32.2(e) of the Federal Rules of Criminal Procedure in support of its application to amend an existing preliminary order of forfeiture to include certain subsequently located property. Specifically, in the proposed Amended Preliminary Order of Forfeiture, attached hereto as Exhibit 1, the Government seeks to forfeit 51,351.89785803 Bitcoin ("BTC") (the "Subsequently Located Silk Road BTC"), which, as the Court found at sentencing, constitutes certain specific property that was involved in defendant Ross Ulbricht's money laundering offense, or is traceable to such property. For the reasons set forth below, the Court should enter the proposed Amended Preliminary Order of Forfeiture, imposing the forfeiture of certain directly forfeitable, subsequently located specific property, namely, the Subsequently Located Silk Road BTC.

**I.    Procedural History**

    **A.  The Superseding Indictment and Trial**

    Superseding Indictment S1 14 Cr. 68 (KBF) (the "Indictment") was filed on August 21, 2014, charging Ulbricht in seven counts, as follows:

- Count One charged Ulbricht with distributing and aiding and abetting the distribution of narcotics, in violation of Title 21, United States Code, Sections 841(a), 841(b)(1)(A) and Title 18, United States Code, Section 2;
- Count Two charged him with doing so by means of the Internet, in violation of Title 21, United States Code, Sections 812, 841(h) & 841(b)(1)(A);
- Count Three charged him with conspiring to distribute narcotics, in violation of Title 21, United States Code, Section 846;
- Count Four charged him with engaging in a continuing criminal enterprise, in violation of Title 21, United States Code, Section 848(a);

- Count Five charged him with conspiring to obtain unauthorized access to a computer, for purposes of commercial advantage and private financial gain and in furtherance of other criminal and tortious acts, in violation of Title 18, United States Code, Section 1030(a)(2) & 1030(b);
- Count Six charged him with conspiring to traffic in fraudulent identification documents, in violation of Title 18, United States Code, Section 1028(f); and
- Count Seven charged him with conspiring to launder money, in violation of Title 18, United States Code, Section 1956(h).

The Indictment included forfeiture allegations as to all seven counts of the Indictment. As relevant here, Count Seven of the Indictment included a forfeiture allegation, seeking forfeiture to the United States pursuant to Title 18, United States Code, Section 982(a)(1), of any property, real or personal, involved in the offense alleged in Count Seven of the Indictment, or any property traceable to such property.

Trial commenced on January 13, 2015 and ended on February 4, 2015, when the jury found Ulbricht guilty on all counts. Ulbricht did not seek a finding by the jury as to forfeiture.

### B. Sentencing, Forfeiture, and Certain Subsequent Proceedings

On May 29, 2015, the Court sentenced Ulbricht principally to the recommended Guidelines range of life imprisonment. *See generally* May 29, 2015 Sentencing Transcript ("Sentencing Tr.").

With respect to forfeiture, at Ulbricht's 2015 sentencing, the Court concluded that "*all funds* passing through Silk Road's Bitcoin-based payment system were involved in the money laundering offense in Count Seven. The Bitcoin-based system promoted and facilitated illegal transactions on Silk Road and concealed the proceeds of those transactions. It also concealed the identities of and locations of users." Sentencing Tr. at 92:15-21 (emphasis added).[1] Based on evidence that it described as "clear," the Court found, "by far more than a preponderance of the evidence," that Ulbricht was "liable for *all the funds* that passed through Silk Road *regardless of whether he personally retained them*." *Id.* at 92:22-93:2 (emphasis added). As a factual matter, at sentencing it was undisputed that all 9.9 million Bitcoin that passed through Silk Road's Bitcoin-based payment system between 2011 and 2013 were directly forfeitable proceeds of Ulbricht's money laundering. Indeed, all parties agreed that, between February 2, 2011 and October 2, 2013, approximately 1.5 million transactions occurred over Silk Road, involving approximately 9.9 million Bitcoin, and these transactions generated commissions of approximately 640,000 Bitcoin for Silk Road. *See* Presentence Investigation Report dated April 28, 2015 ("PSR") ¶ 59.[2] At the time, the exact whereabouts of many of these Bitcoin were unknown to the Government; they already had been withdrawn from Silk Road by Silk Road vendors and customers. Thus, as the Court found at sentencing, all of the approximately 9.9 million in Bitcoin that passed through Silk Road's Bitcoin-based payment system were directly forfeitable proceeds of Ulbricht's money laundering, including with respect to his conviction on Count Seven of the Indictment.

---

[1] The May 29, 2015 Sentencing Transcript is attached hereto as Exhibit 2.

[2] The PSR is attached under seal hereto as Exhibit 3.

On June 3, 2015, the Court entered a preliminary order of forfeiture/money judgment, ordering, among other things, that: (a) a money judgment in the amount of $183,961,921 be entered against Ulbricht, based on the value of Bitcoin at the time of the offenses; (b) the Court retain jurisdiction to enforce the preliminary order of forfeiture/money judgment, and to amend it as necessary, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure; and (c) the United States Attorney's Office is authorized to conduct any discovery needed to identify, locate, or dispose of forfeitable property pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure. *See* Dkt. No. 273 (attached hereto as Exhibit 4). Ulbricht never objected to or substantively challenged any of the Court's well-supported judicial forfeiture determinations, including its conclusion that all of the approximately 9.9 million Bitcoin that passed through Silk Road's Bitcoin-based payment system constituted directly forfeitable proceeds of Ulbricht's crimes.

Ulbricht appealed his conviction and sentence, which were affirmed by the United States Court of Appeals for the Second Circuit; his petition for a writ of certiorari to the Supreme Court was denied. *See United States v. Ulbricht*, 858 F.3d 71 (2017), *cert. denied*, 138 S. Ct. 2708 (2018). On June 9, 2022, the Court denied Ulbricht's § 2255 petition. *See* Dkt. No. 392. Again, Ulbricht did not object to or substantively challenge any of the Court's forfeiture determinations in any of these appeals or collateral proceedings.

## II.   In 2021 and 2022, the Government Locates and Obtains the Subsequently Located Silk Road BTC

As set forth above, at the time of Ulbricht's 2015 sentencing, the Court determined that all of the approximately 9.9 million Bitcoin that passed through Silk Road were forfeitable. However, at the time of sentencing, the exact whereabouts of many of these Bitcoin were unknown to the Government. In 2021 and 2022, the Government located and obtained 51,351.89785803 BTC traceable to the forfeitable 9.9 million Silk Road Bitcoin. This 51,351.89785803 BTC is the Subsequently Located Silk Road BTC that the Government is moving to forfeit in the proposed Amended Preliminary Order of Forfeiture.

The circumstances of the Government's locating and obtaining the Subsequently Located Silk Road BTC are detailed in the attached affidavit of Internal Revenue Service – Criminal Investigation Division ("IRS-CI") Special Agent Trevor McAleenan (the "McAleenan Affidavit," attached hereto as Exhibit 5).

As noted in the McAleenan Affidavit, since 2019, law enforcement has been investigating the whereabouts of approximately 53,500 BTC that are directly forfeitable property involved in or traceable to Ulbricht's money laundering offense. Specifically, in September 2012, an individual ("Individual-1") executed a scheme to defraud Silk Road of its money and property by (a) creating a string of approximately nine Silk Road accounts (the "Fraud Accounts") in a manner designed to conceal Individual-1's identity; (b) triggering over 140 transactions in rapid succession in order to trick Silk Road's withdrawal-processing system into releasing approximately 50,000 Bitcoin from its Bitcoin-based payment system into Individual-1's accounts; and (c) transferring this Bitcoin into a variety of separate addresses also under Individual-1's control, all in a manner designed to prevent detection, conceal Individual-1's identity and ownership, and obfuscate the Bitcoin's source. At the time of the fraud, all of these approximately 50,000 Bitcoin had passed

through Silk Road's Bitcoin-based payment system; indeed, Individual-1 unlawfully obtained them from Silk Road's Bitcoin-based payment system. *See* McAleenan Affidavit ¶¶ 13, 18, 19, 31.

Nearly five years after Individual-1's fraud, in August 2017, solely by virtue of Individual-1's possession of the 50,000 BTC that Individual-1 unlawfully obtained from Silk Road, Individual-1 received a matching amount of a related cryptocurrency—50,000 Bitcoin Cash ("BCH Crime Proceeds")—on top of the 50,000 Silk Road BTC.[3] Individual-1 thereafter exchanged through an overseas cryptocurrency exchange all of the BCH Crime Proceeds for additional Bitcoin, amounting to approximately 3,500 BTC of additional crime proceeds that are traceable to Ulbricht's laundering of criminal proceeds. These 3,500 BTC are property traceable to the forfeitable 9.9 million Silk Road Bitcoin. *See* McAleenan Affidavit ¶¶ 14, 31. Collectively, by the last quarter of 2017, Individual-1 thus possessed approximately 53,500 BTC (collectively, the "Silk Road Crime Proceeds") of directly forfeitable crime proceeds. *See* McAleenan Affidavit ¶¶ 15, 17.

On November 9, 2021, pursuant to a judicially authorized premises search warrant (the "Search"), IRS-CI agents recovered 50,491.06251844 BTC of the Silk Road Crime Proceeds from one of Individual-1's residences. *See* McAleenan Affidavit ¶¶ 16, 25-28. Specifically, law enforcement located 50,491.06251844 BTC of the approximately 53,500 Silk Road Crime Proceeds (a) on devices in an underground floor safe; and (b) on a single-board computer that was submerged under blankets in a popcorn tin stored in a bathroom closet. *See* McAleenan Affidavit ¶¶ 25-28. In addition, law enforcement also recovered property not traceable to Silk Road, including $661,900 in cash from the underground floor safe and a kitchen drawer, 25 Casascius coins (physical bitcoin) with an approximate value of 174 Bitcoin from the underground floor safe, and metal items from the underground floor safe. *See* McAleenan Affidavit ¶ 26. During the Search, law enforcement also recovered Individual-1's laptop containing detailed ledgers spelling out cryptocurrency transactions of assets configured in 40,000 and 10,000 blocks—the same configuration as the BTC that Individual-1 had unlawfully obtained from Silk Road in September 2012—involving the Silk Road Crime Proceeds. These detailed ledgers show Individual-1's control of the Silk Road Crime Proceeds. *See* McAleenan Affidavit ¶ 27.

Beginning in or around March 2022, counsel for Individual-1 began surrendering to the Government passphrases and instructions for the Silk Road Crime Proceeds then in the Government's possession, as well as for additional Silk Road Crime Proceeds that Individual-1 had access to and had not dissipated. The passphrases and instructions provided by Individual-1 verified Individual-1's prior control of the Silk Road Crime Proceeds. On or about March 25, 2022 and May 25, 2022, counsel for Individual-1 surrendered to the Government 825.38833159

---

[3] In August 2017, in a hard fork coin split, Bitcoin split into two cryptocurrencies, traditional Bitcoin and Bitcoin Cash ("BCH"). When this split occurred, any Bitcoin address that had a Bitcoin balance (as Individual-1's did) now had the exact same balance on *both* the Bitcoin blockchain *and* on the Bitcoin Cash blockchain. As of August 2017, Individual-1 thus possessed 50,000 BCH in addition to the 50,000 BTC that Individual-1 unlawfully obtained from Silk Road, solely by virtue of Individual-1's possession of the 50,000 Silk Road BTC at the time of the August 2017 hard fork. *See* McAleenan Affidavit ¶ 14 & n.1.

BTC and 35.4470080 BTC, respectively, of additional Silk Road Crime Proceeds (*i.e.*, in addition to what law enforcement recovered during the Search). *See* McAleenan Affidavit ¶¶ 17, 28, 30. As detailed below, based on a review and forensic analysis of the Subsequently Located Silk Road BTC, including a review of the Bitcoin blockchain, records provided by a blockchain tracing provider, Individual-1's laptop ledgers, attribution information contained in files from the Search, the transaction history of the Subsequently Located Silk Road BTC, and Individual-1's sworn plea allocution in 22 Cr. 606 (PGG) (S.D.N.Y.) that occurred on November 4, 2022, all of the Subsequently Located Silk Road BTC was involved in or is traceable to Ulbricht's laundering of criminal proceeds. *See* McAleenan Affidavit ¶¶ 14, 17, 18, 19, 26, 31, 33.

Using a conservative estimate of the lowest spot price of BTC on the dates that the BTC was seized, the total value of the Subsequently Located Silk Road BTC was approximately $3.39 billion. *See* McAleenan Affidavit ¶¶ 17, 30. The Subsequently Located Silk Road BTC was seized on the dates specified in the chart below:

| **Date** | **Quantity (BTC)** | **Lowest BTC Spot Price (USD)** | **Total USD Value at Time of Seizure** |
|---|---|---|---|
| November 9, 2021 | 50,491.06251844 | $66,382.06 | $3,351,700,741.56 |
| March 25, 2022 | 825.38833159 | $43,706.29 | $36,074,661.78 |
| May 25, 2022 | 35.4470080 | $29,384.95 | $1,041,608.56 |
| **Total:** | **51,351.89785803** | | **$3,388,817,011.90** |

*See* McAleenan Affidavit ¶¶ 17, 30.

On or about October 26, 2022, Individual-1 signed a plea agreement with the Government wherein Individual-1 agreed to plead guilty in a standalone criminal case, 22 Cr. 606 (PGG) (S.D.N.Y.), to wire fraud, in violation of 18 U.S.C. § 1343, for Individual-1's 2012 scheme to defraud Silk Road of Bitcoin (the "Individual-1 Plea Agreement"). In the Individual-1 Plea Agreement, Individual-1 also agreed to forfeit, among other things, all Bitcoin traceable to the offense and various additional assets, including: Individual-1's 80% interest in RE&D Investments, LLC, a Memphis-based company with substantial real estate holdings; approximately 154.426879300004 Bitcoin not traceable to Silk Road; and items recovered from the Search, including the $661,900 in cash, 25 Casascius coins (physical bitcoin) with an approximate value of 174 Bitcoin, and metal items. *See* McAleenan Affidavit ¶ 32.[4] During Individual-1's plea allocution, Individual-1 admitted, in sum and substance, to executing a scheme to defraud Silk Road of approximately 50,000 Bitcoin in September 2012. In particular, Individual-1 admitted to defrauding Silk Road of money and property, specifically, approximately 50,000 Bitcoin, by (a)

---

[4] Apart from the instant proposed Amended Preliminary Order of Forfeiture as to subsequently located property, these other forfeiture matters will be addressed to the district court assigned to Individual-1's 2022 criminal case, the Honorable Paul G. Gardephe, United States District Judge.

creating a string of Silk Road accounts in a manner designed to conceal Individual-1's identity; (b) triggering multiple transactions in rapid succession in order to trick Silk Road into releasing Bitcoin from Silk Road's Bitcoin-based payment system into these accounts; and (c) transferring this Bitcoin into a variety of separate addresses also under Individual-1's control, all in a manner designed to prevent detection and conceal Individual-1's identity. *See* McAleenan Affidavit ¶ 33.

## III.     Legal Background

### A. Forfeiture of Subsequently Located, Directly Forfeitable Property

Criminal forfeiture is "an aspect of sentencing," *Libretti v. United States*, 516 U.S. 29, 49 (1995), that is "mandatory," *United States v. Viloski*, 814 F.3d 104, 112 n.11 (2d Cir. 2016). Under Rule 32.2 of the Federal Rules of Criminal Procedure, once a criminal defendant is convicted of the offenses giving rise to the forfeiture allegations in an indictment, the district court must determine what property is subject to forfeiture and, if appropriate, enter a preliminary order of forfeiture. Rule 32.2(b)(1)(A) provides both for criminal forfeiture of specific property, as well as for a personal money judgment. In addition, the Rule permits the Court to modify an order of forfeiture in the event, as here, specific property is subsequently discovered. Specifically, under Rule 32.2(e)(1)(A), "[o]n the government's motion, the court may at any time enter an order of forfeiture or amend an existing order of forfeiture to include property that . . . is subject to forfeiture under an existing order of forfeiture but was located and identified after that order was entered." Fed. R. Crim. P. 32.2(e)(1)(A). Once "the government shows that the property is subject to forfeiture," the district court "must" then "enter an order forfeiting that property, or amend an existing preliminary or final order to include it." Fed. R. Crim. P. 32.2(e)(2)(A). As an aspect of sentencing, criminal forfeiture is governed by the preponderance of the evidence standard. *United States v. Bellomo*, 176 F.3d 580, 595 (2d Cir. 1999). Accordingly, the Government must prove by a preponderance of the evidence the forfeitability of subsequently located property, such as the Subsequently Located Silk Road BTC.

In imposing sentence on a person convicted of an offense in violation of Title 18, United States Code, Section 1956, as Ulbricht was with respect to Count Seven, the Court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." *United States v. Bermudez*, 413 F.3d 304, 306 (2d Cir. 2005) (per curiam) (quoting 18 U.S.C. § 982(a)(1)). Once 18 U.S.C. § 982(a)(1) is satisfied, "a district court has no discretion not to order forfeiture in the amount sought." *Viloski*, 814 F.3d at 112 n.11. Because "[a] court may order a defendant to forfeit proceeds received by others who participated jointly in the crime, provided the actions generating those proceeds were reasonably foreseeable to the defendant[,]" *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012), defendants are subject to forfeiture of all foreseeable proceeds of their offenses, not just the portion that they personally retained, so long as the defendant had direct or indirect control over the proceeds at any point. *See* Dkt. No. 262. For this reason, the Court, citing *Contorinis*, determined at Ulbricht's sentencing that *all* Silk Road transactions were foreseeable to Ulbricht and thus ordered the forfeiture of "*all funds* passing through Silk Road's Bitcoin-based payment system," not just those that he "personally retained." Sentencing Tr. at 92:15-17 (emphasis added); 92:25-93:2.

A Rule 32.2(e) motion is the proper procedure to forfeit a defendant's illicitly obtained property that was "located and identified" after a prior order of forfeiture was entered. Fed. R. Crim. P. 32.2(e)(1)(A). In these circumstances, the district court may forfeit such subsequently located property "at any time," Fed. R. Crim. P. 32.2(e)(1), and the district court "must" forfeit that property once the government "shows that the property is subject to forfeiture," Fed. R. Crim. P. 32.2(e)(2)(A). This Rule recognizes that, in many cases, vast amounts of forfeitable property is not calculated, located, or identified until after a prior order of forfeiture already has been entered. *See, e.g.*, *United States v. Percoco*, No. 16-CR-776 (VEC), 2019 WL 1593882, at *1, *2 (S.D.N.Y. Apr. 15, 2019) (nearly seven months after a forfeiture order was entered at sentencing, forfeiting $320,000 in bribes under Rule 32.2(e)(1)), *aff'd*, 13 F.4th 180 (2d Cir. 2021), *cert. granted on other grounds*, 142 S. Ct. 2901 (June 30, 2022); *United States v. Hallinan*, 521 F. Supp. 3d 590, 595 (E.D. Pa. 2021) (years after sentencing and entry of forfeiture order, forfeiting as directly forfeitable property, under Rule 32.2(e)(1)(A), a $2 million promissory note assigned to defendant's daughter); *United States v. Saccoccia*, 62 F. Supp. 2d 539, 540 (D.R.I. 1999) (forfeiting, six years after the defendant was convicted, 83 bars of gold that were buried or otherwise secreted at defendant's mother's home); *see also United States v. Parker*, No. 3:02-0053, 2017 WL 1075098, at *1, *2 (M.D. Tenn. Mar. 22, 2017) (upholding the forfeiture as substitute property, under Fed. R. Crim. P. 32.2(e), of a $12,000 gold diamond ring that was not discovered until approximately 12 years after entry of forfeiture order, when IRS agents were clearing out a storage room and found the briefcase with the ring contained in an inside pocket).

As noted above, Title 18, United States Code, Section 982(a)(1) subjects to forfeiture "any property, real or personal, involved in [a violation of 18 U.S.C. § 1956], or any property traceable to such property." Property "involved in" a money laundering offense includes not only the illegal proceeds themselves, but also any property used to facilitate the laundering of such proceeds, such as business, business premises, untainted funds comingled with criminal proceeds, and bank accounts of corrupt businesses. *See United States* v. *All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 486 (2d Cir. 1995) (affirming forfeiture of all assets of corporation that "served as a conduit for the proceeds of the illegal transactions"); *United States* v. *Schlesinger*, 261 F. App'x 355, 361 (2d Cir. 2008) (summary order) (same); *In re 650 Fifth Ave.*, 777 F. Supp. 2d 529, 567 (S.D.N.Y. 2011) ("The ability to forfeit a business entity which is used to facilitate the offense of money laundering is well established." (internal quotation marks omitted)).

### B. Appreciation of Directly Forfeitable Property is Itself Forfeitable

It is well established that any appreciation of directly forfeitable property—here, the appreciation of the value of the Subsequently Located Silk Road BTC between the time of the offense and the present—is itself forfeitable. As the Second Circuit explained in the context of an insider trading case, "[w]e hold that, as a matter of law, forfeiture is not limited to the amount of funds acquired through illegal transactions in an insider-trading scheme; rather, forfeiture may extend to appreciation of those funds." *United States v. Afriyie*, 929 F.3d 63, 66 (2d Cir. 2019). Thus, in *Afriyie*, where the defendant's insider-trading gain was only $1.53 million, the Second Circuit affirmed the forfeiture of $2.78 million because this larger, $2.78 million figure included the substantial appreciation on the defendant's $1.53 million in insider-trading gains. *Id.* at 71, 72-74. In *Afriyie*, the Second Circuit upheld the following jury instruction delivered in the forfeiture phase of the trial:

> Assets purchased with crime proceeds are forfeitable even if they increase or appreciate in value, to grow greater than the original monies obtained from the crime. Where the present balance of a particular account is attributable to the appreciation made from the criminal proceeds in that account, the assets and funds in that account constitute or are derived from fraud proceeds and, therefore, are forfeitable.

*Id.* at 72. The Second Circuit has thus held that criminal forfeiture extends to proceeds "derived from" proceeds that are "traceable" to the offense, to include appreciation on that property. *Id.* at 73; *see id.* ("The plain text compels our conclusion that a defendant convicted of insider trading must forfeit the appreciation of funds acquired through illegal transactions in an insider-trading scheme . . . ."). The Second Circuit's 2019 conclusion in *Afriyie* echoed the reasoning in a long line of preceding district court cases within this Circuit. *See, e.g.*, *United States v. Kalish*, No. 06 Cr. 656 (RPP), 2009 WL 130215, at *6 (S.D.N.Y. Jan. 13, 2009) (finding that, where at least $1.7 million of fraud proceeds in an investment account appreciated to about $2.4 million over a seven-year period, the full $2.4 million was forfeitable because "the entire $2.4 million in assets currently" in the account "constitutes or was derived from fraud proceeds and thus is forfeitable"), *aff'd*, 626 F.3d 165, 168 (2d Cir. 2010); *United States v. $465,789.31 Seized From Term Life Ins. Pol'y No. PJ 108 002 588 in Name of Lee at AXA Equitable Life Ins. Co., New York, New York*, No. 3:15-CV-1353 (JAM), 2018 WL 4568408, at *5 (D. Conn. Sept. 24, 2018) ("If a criminal uses tainted money to buy an asset that appreciates in value, forfeiture properly attaches to the appreciated value of the asset, not simply to the outlay spent to buy the asset. . . . A contrary rule would encourage criminals to invest or gamble ill-gotten gains, secure in the knowledge that their investment or gambling gains would be subject to forfeiture only for the amount that they paid in."); *United States v. Hatfield*, No. 06-CR-0550 JS, 2010 WL 4340632, at *1 (E.D.N.Y. Oct. 22, 2010) (explaining that, where tainted funds were used to purchase stock, "the United States enjoy[s] the benefit of appreciation but [defendant] bear[s] the risk of depreciation"); *United States v. Moses*, No. 1:05-CR-133, 2010 WL 3521725, at *7 (D. Vt. Sept. 7, 2010) (concluding that "any profits or appreciation in value from drug proceeds is forfeitable").[5]

---

[5] Likewise, other circuits have agreed that any appreciation of illicitly obtained property, or property traceable to such property, is itself forfeitable. For example, in a memorable fact pattern, the Fifth Circuit affirmed the forfeiture of $5.48 million in Texas lottery winnings by a drug defendant who used about $10 of his $76,000 in illicit drug proceeds to purchase the winning lottery ticket. *United States v. Betancourt*, 422 F.3d 240, 244, 250-52 (5th Cir. 2005). Similarly, in an unpublished opinion, the Sixth Circuit affirmed the forfeiture of, among other things, 9,240 shares of stock by a money laundering defendant where 616 shares of stock were involved in the defendant's money laundering offense and, following a stock split, the 616 shares had become 9,240 shares of stock that the Sixth Circuit explained were "directly 'traceable to' the original shares involved in the money laundering conviction." *United States v. Hill*, 46 F. App'x 838, 839 (6th Cir. 2002) (unpublished). Put another way, the Sixth Circuit determined that the district court properly forfeited the 9,240 shares because they represented the appreciated value of the properly forfeited 616 shares. *See id.* ("[B]ecause this case merely involves the appreciated value of the forfeited 616 shares, the district court properly ordered the forfeiture of the appreciated value of the stock."). Other courts have employed similar reasoning in explaining that any appreciation of

This settled proposition—any appreciation of directly forfeitable property is itself forfeitable—is consistent with the goals of criminal forfeiture, namely, disgorgement, punishment, and deterrence.  As the Second Circuit has explained, "[c]riminal forfeiture focuses on the disgorgement by a defendant of his ill-gotten gains," *Contorinis*, 692 F.3d at 146 (citations and internal quotation marks omitted), as well as "removing the incentive others may have to commit similar crimes tomorrow," *id.* (quoting, in a parenthetical explanation, this testimony before the House Judiciary Committee when recommending the Civil Asset Forfeiture Reform Act); *see also S.E.C. v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014) (noting that disgorgement's "underlying purpose is to make lawbreaking unprofitable for the law-breaker" and that disgorgement "has the effect of deterring subsequent fraud" (citation and internal quotation marks omitted)).  Against this backdrop, this rule—that any appreciation of directly forfeitable property is itself forfeitable—advances the disgorgement, punishment, and deterrence foundations of forfeiture.  As another district court has persuasively observed, "[a] contrary rule would encourage criminals to invest or gamble ill-gotten gains, secure in the knowledge that their investment or gambling gains would be subject to forfeiture only for the amount that they paid in."  *$465,789.31 Seized From Term Life Ins. Pol'y No. PJ 108 002 588 in Name of Lee at AXA Equitable Life Ins. Co., New York, New York*, 2018 WL 4568408, at *5.

## IV.   Discussion

### A. The Subsequently Located Silk Road BTC Is Subject to Forfeiture

The record makes plain that the Subsequently Located Silk Road BTC is subject to forfeiture under Rule 32.2(e).  As noted above, at Ulbricht's 2015 sentencing, the Court concluded that all funds passing through Silk Road's Bitcoin-based payment system were involved in Ulbricht's money laundering and thus forfeitable, and that, in turn, meant that all 9.9 million Bitcoin that passed through Silk Road's Bitcoin-based payment system between 2011 and 2013 constituted directly forfeitable proceeds of Ulbricht's crimes.  *See* Sentencing Tr. at 92:15-21; PSR ¶ 59.  Ulbricht never challenged these determinations.

Additionally, pursuant to the Court's June 3, 2015, preliminary order of forfeiture and money judgment, the Court has jurisdiction to enter the proposed Amended Preliminary Order of Forfeiture as to the Subsequently Located Silk Road BTC, which, as described below, is traceable

---

directly forfeitable property is itself forfeitable.  *See, e.g.*, *United States v. Hawkey*, 148 F.3d 920, 928 (8th Cir. 1998) (reasoning in a money laundering case that if a defendant had "misappropriated funds and used them to make a profit," both "the original funds *and any profits*" would be "subject to forfeiture" (emphasis added)); *id.* ("If, for example, [defendant] misappropriated $10,000 and purchased stock that appreciated in value to $30,000 at the time of forfeiture, [defendant] would be required to forfeit the stock. . . .   Furthermore, in the event that [defendant] misappropriated $10,000 and purchased stock which had depreciated in value to $5,000 at the time of forfeiture, he would be required to forfeit $10,000—certainly the victim of the misappropriation should not bear the burden of his choice of investment.").

to the 9.9 million Bitcoin that had passed through Silk Road and thus constitutes forfeitable property.

### B. The Subsequently Located Silk Road BTC Was Involved in Ulbricht's Money Laundering Offense and Is Traceable to Such Property

As Rule 32 lays out, the district court may forfeit subsequently located property "at any time," Fed. R. Crim. P. 32.2(e)(1), and the district court "must" forfeit that property once the government "shows that the property is subject to forfeiture," Fed. R. Crim. P. 32.2(e)(2)(A). The Government has made that showing. As set forth in the McAleenan Affidavit, the Subsequently Located Silk Road BTC is subject to forfeiture because it was "involved in" Ulbricht's money laundering offense and is "traceable to such property." 18 U.S.C. § 982(a)(1).

As described above, in September 2012, Individual-1 executed a scheme to defraud Silk Road through unlawfully obtaining approximately 50,000 BTC from Silk Road's Bitcoin-based payment system and transferring it into a variety of separate addresses that Individual-1 controlled. At the time of the fraud, all of these 50,000 Bitcoin had passed through Silk Road's Bitcoin-based payment system; indeed, Individual-1 unlawfully obtained them from Silk Road's Bitcoin-based payment system. *See* McAleenan Affidavit ¶¶ 13, 18, 19, 31. Nearly five years after Individual-1's fraud, in August 2017, solely by virtue of Individual-1's possession of the 50,000 BTC that Individual-1 unlawfully obtained from Silk Road, Individual-1 received a matching amount of a related cryptocurrency—the BCH Crime Proceeds—on top of the 50,000 BTC of Silk Road BTC. Individual-1 thereafter exchanged through an overseas cryptocurrency exchange all of the BCH Crime Proceeds for additional Bitcoin, amounting to approximately 3,500 BTC of additional crime proceeds that are traceable to Ulbricht's laundering of criminal proceeds. These 3,500 BTC are property traceable to the forfeitable 9.9 million Silk Road Bitcoin. *See* McAleenan Affidavit ¶¶ 14, 31. Collectively, by the last quarter of 2017, Individual-1 possessed the Silk Road Crime Proceeds, that is, 53,500 BTC of directly forfeitable crime proceeds. *See* McAleenan Affidavit ¶ 15.

During the Search, law enforcement located 50,491.06251844 BTC of the approximately 53,500 Silk Road Crime Proceeds (a) on devices in an underground floor safe; and (b) on a single-board computer that was submerged under blankets in a popcorn tin stored in a bathroom closet. *See* McAleenan Affidavit ¶¶ 16, 25-28. During the Search, they also recovered Individual-1's laptop containing detailed ledgers spelling out cryptocurrency transactions of assets configured in 40,000 and 10,000 blocks—the same configuration as the BTC that Individual-1 had unlawfully obtained from Silk Road in September 2012—involving the Silk Road Crime Proceeds. *See* McAleenan Affidavit ¶ 27. On or about March 25, 2022 and May 25, 2022, counsel for Individual-1 surrendered to the Government 825.38833159 BTC and 35.4470080 BTC, respectively, of the Silk Road Crime Proceeds, for a total of 51,351.89785803 BTC, constituting the Subsequently Located Silk Road BTC. *See* McAleenan Affidavit ¶¶ 17, 28, 30.

Accordingly, based on a review and forensic analysis of the Subsequently Located Silk Road BTC, including a review of the Bitcoin blockchain, records provided by a blockchain tracing provider, Individual-1's laptop ledgers, attribution information contained in files from the Search, the transaction history of the Subsequently Located Silk Road BTC, and Individual-1's sworn plea

allocution in 22 Cr. 606 (PGG) (S.D.N.Y.) that occurred on November 4, 2022, all of the Subsequently Located Silk Road BTC was involved in and is traceable to Ulbricht's laundering of criminal proceeds.  *See* McAleenan Affidavit ¶¶ 14, 17, 18, 19, 26, 31, 33.

Finally, under well-established precedent, any appreciation of the value of the Subsequently Located Silk Road BTC between the time of Ulbricht's offense[6] and the present is itself forfeitable.  Just as the appreciation of the defendants' insider-trading gains and fraud proceeds were respectively forfeitable in *Afriyie* and *Kalish*, likewise forfeitable here is the appreciation of value of Ulbricht's money laundering crime proceeds.  *Afriyie*, 929 F.3d at 63, 66, 71, 72-74; *Kalish*, 2009 WL 130215, at *6.  Again, as the Court determined at Ulbricht's sentencing, all Bitcoin that passed through Silk Road's Bitcoin-based payment system are forfeitable.  *See* Sentencing Tr. at 92:15-21; 92:22-93:2.  Accordingly, under *Afriyie*, *Kalish*, and the authorities cited above, any appreciation of value associated with these Bitcoin is also forfeitable.

The Subsequently Located Silk Road BTC is accordingly subject to forfeiture under 18 U.S.C. § 982(a)(1) as property that was "involved in" or is "traceable to such property" that was involved in Ulbricht's money laundering conviction.

\* \* \*

Accordingly, under Rule 32.2(e) of the Federal Rules of Criminal Procedure, the Court should enter the Amended Preliminary Order of Forfeiture as to subsequently located property, that is, the directly forfeitable, Subsequently Located Silk Road BTC.

---

[6] At the time of Individual-1's wire fraud offense in September 2012, the value of the approximately 50,000 Silk Road BTC that Individual-1 unlawfully obtained was approximately $620,000, based on the spot price of BTC at the time.  And, over the duration of Ulbricht's offense conduct between 2011 and 2013, when the Subsequently Located Silk Road BTC became Ulbricht's fraud proceeds, the PSR notes that the 9.9 million Bitcoin that passed through Silk Road's Bitcoin-based payment system had a total value of approximately $213.9 million.  PSR ¶ 59.  This amounts to an average price of about $21.60 per Bitcoin over the duration of Ulbricht's offense conduct.  The Subsequently Located Silk Road BTC (51,351.89785803 BTC) multiplied by $21.60 totals approximately $1,109,200.99.

## V. Conclusion

For the foregoing reasons, the Government respectfully requests that the Court enter the proposed Amended Preliminary Order of Forfeiture, imposing the forfeiture of certain directly forfeitable, subsequently located specific property, namely, the Subsequently Located Silk Road BTC.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

By: *(signature)*

David R. Felton
Assistant United States Attorney
(212) 637-2299

cc: Defense Counsel (via ECF, except for Exhibit 3, the PSR, which is being filed under seal)